E-FILED
Friday, 04 January, 2019 12:40:43 PM
Clerk, U.S. District Court, ILCD

# EXHIBIT B

**Page 1**

```
1              UNITED STATES DISTRICT COURT
               CENTRAL DISTRICT OF ILLINOIS
2
3  CURTIS LOVELACE, LOGAN LOVELACE,    )
   LINCOLN LOVELACE & CHRISTINE        )
4  LOVELACE ON BEHALF OF HER MINOR     )
   SON LARSON LOVELACE,                )
5                                      )
          Plaintiffs,                  )
6                                      )
      vs.                     )  No. 17 CV 01201
7                             )
   DET. ADAM GIBSON, POLICE CHIEF      )
8  ROBERT COPLEY, SGT. JOHN SUMMERS,   )
   LT. DINA DREYER, DET. ANJANETTE     )
9  BISWELL, UNKNOWN QUINCY POLICE      )
   OFFICERS, GARY FARHA, CORONER       )
10 JAMES KELLER, THE CITY OF QUINCY,   )
   AND COUNTY OF ADAMS,                )
11                                     )
          Defendants.                  )
12
13
14
15
16
17          DEPOSITION OF JEFF PAGE
                ELMORE & REID
18         808 SOUTH SECOND STREET
             SPRINGFIELD, ILLINOIS
19           NOVEMBER 20, 2018
                 1:30 P.M.
20
21
22
23
24       Reported and Transcribed by:
      Rhonda Rhodes Bentley, CSR #084-002706
25
```

**Page 2**

```
1                INDEX
2  APPEARANCES:
3  For the Plaintiffs:
      Tara Thompson
4     LOEVY & LOEVY
      Attorneys at Law
5     311 North Aberdeen Street, 3rd Floor
      Chicago, Illinois 60607
6     (312) 243-5900
      tara@loevy.com
7
   For the City of Quincy Defendants:
8     Ellen K. Emery
      ANCEL, GLINK, P.C.
9     Attorneys at Law
      140 South Dearborn Street, Sixth Floor
10    Chicago, Illinois 60603
      (312) 782-7606
11    eemery@ancelglink.com
12
   For the County of Adams Defendants:
13    James A. Hansen
      SCHMIEDESKAMP ROBERTSON
14    NEU & MITCHELL LLP
      Attorneys at Law
15    525 Jersey Street
      Quincy, Illinois 62301
16    (217) 223-3030
      jhansen@srnm.com
17
18
19 ALSO PRESENT:
      Curtis Lovelace
20    Christine Lovelace
21
22
23
24
25
```

**Page 3**

```
1              INDEX - CONTINUED
2  EXAMINATION BY:                    PAGE
   Ms. Emery.......................................5
3  Mr. Hansen....................................39
4
5  EXHIBITS:    DESCRIPTION          PAGE
   (None marked)
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

**Page 4**

```
1                STIPULATION
2
3          IT IS HEREBY EXPRESSLY STIPULATED AND
4  AGREED by and between the parties that the
5  DEPOSITION of JEFF PAGE may be taken on NOVEMBER
6  20, 2018, at the Law Offices of Elmore & Reid,
7  808 South Second Street, Springfield, Illinois,
8  pursuant to the applicable Supreme Court rules,
9  local rules, and the Code of Civil Procedure
10 governing said depositions.
11
12          IT IS FURTHER STIPULATED that the
13 necessity for calling the Court Reporter for
14 impeachment purposes is waived.
15
16
17
18
19
20
21
22
23
24
25
```



Page 5

1              1:23 p.m.
2              JEFF PAGE,
3  having first been duly sworn, testifies as
4  follows:
5              EXAMINATION
6  BY MS. EMERY:
7       Q.   Would you state your name and spell
8  your last name for the record.
9       A.   Jeff, last name Page, P-a-g-e.
10      Q.   Mr. Page, have you been deposed
11  before?
12      A.   I don't believe so.  I know the
13  process though.
14      Q.   So I don't have to go through all of
15  the --
16      A.   Nope, you're good.  Thank you though.
17      Q.   Okay.  Mr. Page, when were you
18  retained to represent Curtis Lovelace?
19      A.   August, I think, of 2014.  I know it
20  was late summer, I believe, fall of 2014, I
21  believe.
22      Q.   And who was first contacted?  You or
23  Mr. Elmore?
24      A.   I'm not sure how that went down.  I
25  know I had received a call, and also Jay had

Page 6

1  received a call somewhat in that time frame, but
2  who got the call first I'm not sure.  I think it
3  was a referral by Dave Penn which is a mutual
4  friend of ours in Quincy.
5       Q.   And then the two of you together
6  undertook the representation of Curtis Lovelace
7  in his first criminal matter, correct?
8       A.   Correct.
9       Q.   I'd like to show you what was marked
10  for me as Mr. Elmore Exhibit 1.  Take a look at
11  that and I'd ask you if you recognize it.
12      A.   I do.
13      Q.   Is that your signature on the second
14  page?
15      A.   Yes.
16      Q.   Okay.  And who composed this response
17  to a subpoena?  Was it you or Mr. Elmore?
18      A.   I did.
19      Q.   And this was in response to a
20  subpoena you received for documents comprising
21  your criminal defense file in the defense of Mr.
22  Lovelace, correct?
23      A.   Correct.
24      Q.   And you listed out a number of
25  documents that you contended were not going to be

Page 7

1  provided for reasons of work product and
2  attorney-client privilege, correct?
3       A.   That's right.
4       Q.   First one is your trial counsel notes
5  based on work product?
6       A.   Correct.
7       Q.   Obviously without revealing what was
8  contained therein, what comprised your trial
9  counsel notes?
10      A.   What would be in the notes?
11      Q.   Yes.  What they were?
12      A.   Well, they were notes taken during
13  the course of the trial.
14      Q.   Okay.  Were there also notes
15  regarding your preparation for trial?
16      A.   I would assume so.  Off the top of my
17  head, I can't recall.  I've got them listed in
18  the file, but I would assume that potentially
19  there could be some pre-trial prep as well, notes
20  relating to preparation.
21      Q.   And the second one is the client
22  notes under work product and attorney-client
23  privilege?
24      A.   Right.
25      Q.   Okay.  What comprises the client

Page 8

1  notes?
2       A.   Well, that would be our client Mr.
3  Lovelace.
4       Q.   Were there notes that he made and you
5  have possession of?
6       A.   Correct.
7       Q.   Okay.  And the interview notes of
8  Dr. Scott Denton by trial counsel --
9       A.   It's "trail" but should be "trial."
10      Q.   Right.  You contend are work product?
11      A.   Yes.
12      Q.   And who took notes of an interview or
13  interviews of Dr. Scott Denton?
14      A.   I did.  I did, and there was
15  technically one interview of Scott Denton --
16  Dr. Denton that occurred in November of, I
17  believe, 2014.  I was the only person present for
18  that interview, and I took notes during that
19  interview.
20      Q.   And where did that interview take
21  place?
22      A.   At Dr. Denton's office in
23  Bloomington.
24      Q.   Why did you go see Dr. Denton?
25      A.   Well, we had reference in the



Page 9

1 discovery -- when we got discovery from the
2 state, we had reference in there that the lead
3 investigator, Detective Gibson, had some type of
4 contact with Dr. Denton.  Unfortunately, we did
5 not have the report from Dr. Denton.  We didn't
6 have any information from the detective or very
7 little information from the detective as to what
8 was discussed in their meeting.  So Jay and I
9 felt it necessary to go interview him and find
10 out what was being -- what was discussed or, more
11 importantly, what this witness is going to say.
12     Q.    When you and Mr. Elmore were
13 preparing for trial, did somebody take the
14 laboring, more so to speak, and do the bulk of
15 the work, or what was the split of the work in
16 preparing for the trial?
17     A.    Well, I mean technically speaking Jay
18 would have been considered lead counsel.  I was
19 co-counsel.  We divided up the work we thought as
20 equally as we could.  I can't remember off the
21 top of my head who took what witness.  I know
22 that Jay did -- he cross-examined Dr. Denton.
23 I'm sorry.  He cross-examined Adam Gibson --
24 Detective Gibson.  He was responsible for the
25 cross-examination of the state's expert

Page 10

1 witnesses.  I was responsible for the direct
2 examination of our witnesses -- of our expert
3 witnesses, and then we divided up the other
4 witnesses just as equally as we thought we could.
5     Q.    Okay.  And there's -- for number 4
6 there's correspondence between trial counsel's
7 investigator and trial counsel that you claim is
8 work product, correct?
9     A.    Correct.
10     Q.    Who was your investigator or who were
11 your investigators?
12     A.    Well, we had one.  Bill Clutter was
13 our investigator.  So that would be
14 correspondence between Mr. Clutter and us, either
15 myself or Jay.
16     Q.    Okay.  And just so that you know we
17 put on Mr. Lovelace's deposition record and we'll
18 do so for you, that in the event we have to go in
19 front of now Judge Bruce and further litigate
20 whether there are indeed privileges which attach
21 to these documents that we reserve the right to
22 reopen your deposition if necessary on those
23 limited areas.
24     A.    Okay.
25     Q.    Number 5 is trial counsel's

Page 11

1 investigator's letters to expert witnesses that
2 you claim are work product, correct?
3     A.    Correct.
4     Q.    And that would have been
5 Mr. Clutter's letters to expert witnesses,
6 correct?
7     A.    That's right.
8     Q.    Why do you contend that those are
9 privileged under work product?
10     A.    Well, without getting into the
11 content of what those letters were, clearly if
12 we're -- if we're -- these expert witnesses are
13 disclosing certain strategies to our investigator
14 or investigators disclosing strategies to the
15 expert witnesses, that would be work product.
16     Q.    Are you of the opinion that the
17 retained expert witnesses files are not fully
18 open for discovery?
19     A.    You talking about our expert
20 witnesses?
21     Q.    Yes.
22     A.    At this stage in the proceeding I
23 would consider that work product.
24     Q.    Down at number 9, correspondence
25 between trial counsel and expert witnesses, do

Page 12

1 you contend that's work -- privileged under the
2 work-product doctrine also?
3     A.    Yes.
4     Q.    For the same reason?
5     A.    Yes.
6     Q.    Okay.  If there's anything in that
7 correspondence which does not discuss strategy,
8 are you withholding anything else based on work
9 product privilege?
10         MS. THOMPSON:  Object to form.
11     A.    Yeah, I don't -- well, first of all,
12 I'm not -- I don't -- I don't have the documents
13 in front of me right now.  So there may very well
14 be discussions between trial counsel and expert
15 witnesses that were not strategic or strategy in
16 nature.  So that could be.
17 BY MS. EMERY:
18     Q.    Okay.  If there are such documents do
19 you contend that they are privileged under
20 work-product doctrine?
21     A.    Yes.
22     Q.    And for number 10 you have
23 correspondence between the state's attorney, and
24 I'm going to guess that means the special
25 prosecutor's office?



Page 13

1    A.   Correct.  Ed Parkinson and either
2  myself or Mr. Elmore.
3    Q.   Okay.  And you contend that
4  correspondence between Mr. Parkinson and you or
5  Mr. Elmore constitute work-product privilege?
6    A.   Yes.
7    Q.   Why is that?
8    A.   Well, it's discussions -- there could
9  have been a number of -- again I don't have them
10  in front of me, but I know there was
11  correspondence going back and fourth throughout
12  the course of this litigation where I don't
13  know -- I wouldn't -- of course, it wouldn't be
14  strategy, but it would be potentially an offer
15  being made or procedural matters.  I think it's
16  work product.
17    Q.   Okay.  Do you believe that that goes
18  to -- that privilege goes to documents beyond
19  discussions involving any plea agreement offers
20  or other negotiations?
21    A.   Yes.
22    Q.   On page 2 for number 12 you have a
23  folder containing pre-trial discovery withheld
24  under Illinois Supreme Court Rule 415(c).  Do you
25  see that?

Page 14

1    A.   I see it.
2    Q.   Were you made aware that Judge
3  Hardwick had an order saying that you were to
4  disclose anything that would be otherwise
5  privileged under rule 415(c)?
6    A.   No, I'm not aware of that.  I'm aware
7  of an order from Magistrate Schanzle-Haskins
8  saying he agreed with our position.  We did not
9  have to release that pursuant to 415(c), but I'm
10  not aware -- maybe there is, but I'm not aware of
11  a Judge Hardwick order.
12    Q.   Okay.  Are you aware that Ms.
13  Thompson or somebody else at her firm went in to
14  get such an order?
15    A.   I'm not aware of that.  If she did, I
16  don't recall that.
17    Q.   Okay.  So you went by yourself, you
18  said, in November of 2014 to meet with
19  Dr. Denton?
20    A.   Yes, ma'am.
21    Q.   Okay.  What was discussed at that
22  meeting?
23    A.   Well, I wanted -- Jay and I had
24  discussed meeting with him and decided in
25  determining whether or not he would review with

Page 15

1  us certain aspects of discovery to determine
2  whether or not -- if he could determine cause of
3  death, manner of death of Cory Lovelace, and to
4  review certain findings by Jessica Bowman, and
5  other parts of the discovery.
6    Q.   Okay.  And what did he tell you or
7  what conclusions did you reach in the course of
8  your conversation?
9    A.   His whole discussion -- I mean the
10  premise of our -- of his discussion was that
11  suffocation was a rule-out cause of death.  That
12  was his -- that was the premise behind the
13  initial discussions, and that's where you start
14  is what he told me.  So rule out cause of death.
15  You have to rule out other causes of death to get
16  to the cause of death of suffocation; i.e., you
17  have to look to see whether there were other
18  causes of death -- natural causes that
19  potentially could have led to an individual's
20  death; in this case Ms. Lovelace's death.  So he
21  went back to the autopsy, and it was his opinion
22  that this autopsy was not very well done, and
23  that because it was not very well done, he could
24  not rule out certain natural causes of death.  So
25  therefore how can you get to suffocation if you

Page 16

1  can't rule out these other potential natural
2  causes of death?  That's it in a nutshell, and
3  it's not verbatim, of course, but --
4    Q.   Did he discuss with you anything
5  regarding whether Dr. Bowman should amend or come
6  off her determination of cause of death being
7  undetermined?
8    A.   Not that I can recall.  If he did, I
9  don't recall that.
10    Q.   Okay.  Did Dr. Denton ever tell you
11  that it was his belief that Dr. Bowman's report
12  and autopsy findings might put the issue of
13  reasonable doubt in a jury's mind?
14    A.   I don't know if he would have -- if
15  he said it in that fashion.  If he did -- if he
16  did, I don't recall.  He had a lot of problems
17  with the way the autopsy was conducted, I know
18  that, and his quote was, "I'm not excited about
19  this case.  I'm not gung-ho about this case," in
20  the context that there were so many problems with
21  the prosecution's theory of the case.
22    Q.   Okay.  Did he ever tell you what he
23  thought -- what he meant by he's not excited or
24  gung-ho about this case?
25    A.   That -- that -- that comment was made



Page 17

1  after we went -- after he went through a litany
2  of the problems with the -- with the autopsy and
3  the -- why you couldn't rule out certain natural
4  causes of death.
5     Q.  Okay.  And what was the impression
6  you got then when he made the statements that he
7  wasn't excited with it or wasn't gung-ho about
8  the case?
9     A.  That -- my impression was?
10    Q.  Your impression.
11    A.  My impression was he didn't want to
12  be any part of this case.  He didn't want to be a
13  part of the prosecution of Curtis Lovelace
14  because he thought there were significant
15  problems with the case, and it was to the point
16  where when I walked out of that meeting I asked
17  him if he would be willing to testify on our
18  behalf.  Now, he didn't want to do that.  He
19  didn't want to be part of our case.  He didn't
20  want to be part of the prosecution's case.  He
21  didn't want any part of that.
22    Q.  Did he tell you that?
23    A.  That's exactly what he said.
24    Q.  He said, "I want no part of this
25  case"?

Page 18

1     A.  I don't want any part of this case.
2     Q.  Okay.  Did you press him as to why he
3  wouldn't testify on Curtis's behalf?
4     A.  No.  I was disappointed.  I didn't
5  press him.  He made it very clear that he didn't
6  want to be part of the case one way or the other,
7  and I didn't press him.  I came back to the
8  office, talked to Jay Elmore.  He was very
9  surprised at the -- what I disclosed to him of
10  what Dr. Denton told us because he's notorious
11  for being a prosecution witness.  That's who
12  Dr. Denton is.  It's not -- I'm not going
13  critical of the guy on that aspect of it, you
14  know, but he's the guy that most county
15  prosecutors utilize in autopsies and expert
16  witness when it comes to the manner of death,
17  cause of death, those types of thing.  So we were
18  both shocked that he would point out that many
19  problems with the prosecution's case in this
20  case -- in the Lovelace case.
21    Q.  Okay.  Do you recall -- when you say
22  that he pointed out that many problems, do you
23  recall what he pointed out?
24    A.  Oh, I can recall several things.  I
25  can't -- I'd have to again refer to my interview,

Page 19

1  but I can point out several for you.  There was a
2  cut on Cory's lip somewhere -- as I recall it was
3  the top lip.  There was an issue as to the timing
4  of that laceration.  He was critical of
5  Dr. Bowman for not doing a biopsy of that lip,
6  which could have potentially told us how -- how
7  long that cut had been there.  It was his opinion
8  that that cut was an older injury.  That was
9  premised upon him stating that there was the
10  absence of blood around the area.  There was
11  absence of blood on the covers.  There was
12  absence of blood on the pillow; in her mouth, for
13  example, and he opined that that would lead him
14  to believe that that is an older injury as
15  opposed to a fresher injury, and that again he
16  was critical of Dr. Bowman for not doing a biopsy
17  of that to try and determine the age of that
18  laceration.
19        There was -- we went over -- Jeff
20  Baird was the -- Detective Baird's -- he had a
21  timeline in this case, and I was curious because
22  we -- in the timeline Dr. Baird had mentioned --
23  I'm sorry, not Dr. Baird -- Detective Baird had
24  mentioned that Cory was warm to the touch, and
25  that there was mild lividity, and Dr. Denton felt

Page 20

1  that that would be indicative of a more recent
2  death rather than a death that had occurred days
3  before as the prosecution was contending through
4  their experts.  Again he was critical of the --
5  he thought that there should have been biopsies
6  of the heart, of the brain, of the -- heart,
7  brain, lungs.  He felt that that would have again
8  potentially ruled out other natural causes of
9  death.
10        His concern was, for example, with
11  the -- with the lungs.  This woman had been sick
12  prior to her death.  He'd mentioned that if they
13  would have done a biopsy or if Bowman would have
14  done a biopsy of the lungs, it potentially could
15  have determined whether or not she suffered from
16  sepsis or whether she had some type of infection
17  which could have led to her death.  He indicated
18  that sepsis can cause seizures.  He was concerned
19  that the liver was extremely large, much more
20  larger than a normal woman's liver, and it was
21  fatty liver, and this can cause sudden death in
22  individuals, which can be caused by drinking,
23  which, of course, we know that Cory had a
24  drinking problem.  He said that that could have
25  affected potentially the brain and other organs,



Page 21

1  and again these biopsies would have helped
2  determine whether or not she was suffering from
3  these types of ailments.
4       He stated that the -- again I'm going
5  off of memory here.  He stated that these marks
6  on her chin and her upper cheek area appeared to
7  him to be adult acne.  He said that the -- the
8  laceration on the lip would not in his opinion be
9  caused by a pillow, that that would require more
10  force such as a hand.  So he discounted that
11  theory that the prosecution was utilizing.
12       I'm sure there's more, but that's
13  what -- that's what comes to mind.
14       Q.  Do you recall if he said anything
15  about the cut inside Cory's lip?
16       A.  That's the one I've been referring to
17  if I said outside.
18       Q.  There was one on the outside, and
19  there was one on the inside.
20       A.  The one I'm referring to was the
21  inside which he felt was rather significant that
22  would have produced quite a bit of blood, and
23  again I don't remember the one on the outside,
24  but it's been a while so.
25       Q.  Okay.  And do you recall what he told

Page 22

1  you about her arms in the air and the issue of
2  rigor mortis?
3       A.  Yeah, he thought that was unusual.
4  He couldn't explain the arms in the air.  He just
5  left it at that, thought that was unusual.  I
6  think we all thought that was unusual.
7       Q.  Okay.  And so when you left that
8  meeting, you left it quite sure that he wanted
9  nothing to do with the case, correct?
10       A.  Yes, I mean we -- I was in a sense --
11  I wouldn't say happy.  Surprised but disappointed
12  because I was hoping that he would agree to help
13  us out.  In fact, he was pointing out so many
14  problems.  I was hoping that he would be on board
15  and disappointed that he didn't -- that he wasn't
16  able -- wasn't going to do that.
17       So we came back -- and the discussion
18  Jay and I had, well, maybe we should take another
19  run at it down the road, see if he'll -- let him
20  think about it and maybe he'll change his mind.
21       Q.  Okay.  So tell me about the second
22  run at it.
23       A.  We really never -- never took a
24  second run.  Never got to that point.  I sent
25  him -- we sent -- I sent him a follow-up letter.

Page 23

1  I believe it was in May of -- the interview was
2  November of '14.  I think we sent him a follow-up
3  letter in May of '15 basically saying, listen,
4  it's been some time since we talked.  Here's a
5  copy of the summary interview that I had prepared
6  from my notes.  I'm not a medical expert.  I'm --
7  you know, I know very little about that, and so I
8  wanted to make sure that my recitation of our
9  discussion was accurate.  I told him in that
10  letter, please, if anything in that summary
11  interview is inaccurate or you think I've
12  misstated something, please let us know, and we
13  never got a response back.
14       Q.  And did you have occasion to speak
15  with him about the Lovelace case again?
16       A.  We did, and I -- we had a meeting --
17  actually there was a couple occasions.  I'm
18  trying to figure out the time.  We had -- Jay
19  called him on the phone while I was in Jay's
20  office, and he hadn't -- we tried several times
21  to call him.  He didn't call us back.  Jay, I
22  believe, had other cases with him, and he told us
23  -- as I recall, he told the secretary, whoever
24  answered the phone, if he could talk to
25  Dr. Denton, this is Jay Elmore, and I think he

Page 24

1  referenced the other case, not the Lovelace case,
2  and eventually Dr. Denton got on the phone, and
3  he -- he essentially was saying, listen, I've
4  been very busy.  Sorry I didn't get back to you,
5  but I've been contacted by Mr. Parkinson from the
6  state's attorney's office, and I will be
7  preparing a report and sending that out to all
8  the parties.
9       Q.  Okay.
10       A.  Words to -- I mean there's more to
11  it, but that's what I can recall.
12       Q.  Okay.  And then did you talk to him
13  again after that?
14       A.  I did -- we all had a meeting.  We --
15  when I say "we all," Ed Parkinson, myself, Jay
16  Elmore, and Dr. Denton met at the Logan County
17  Courthouse.  This was after we had received his
18  report, I believe, and we met there to discuss
19  not only the new report that was in contradiction
20  to the -- what he had told me.
21       So we met to discuss those issues
22  with him at the Logan County Courthouse, but I
23  don't recall the date.
24       Q.  Do you recall when that was?
25       A.  I don't.



Page 25

1    Q.   Okay.
2    A.   I'm thinking it would have been --
3 I'm guessing.  It really is simply a guess.  I'm
4 guessing the summer of 2015.  Again that's a
5 guess.
6    Q.   And so who said what at the meeting
7 with the four of you?
8    A.   Well, essentially I was trying to go
9 through the summary interview notes that I had
10 taken, that I had sent to him before, and he was
11 -- I mean I can't remember the details, but he
12 was backing off what he told me before with --
13 for lack of a better term, putting different
14 spins on it.  Saying, you know, that's not
15 exactly what I meant or that's not -- that's not
16 what I said, which I mean I was taken aback.  I
17 mean Jay wasn't there for the interview, but I
18 was completely shocked, and then the conversation
19 disintegrated when Jay basically told him,
20 "Listen, we've been trying to get a hold of you,
21 you've not returned our telephone calls," and
22 that's when he got furious and called an end to
23 the meeting.
24    Q.   Did he walk out?
25    A.   Yeah, I mean I would characterize it

Page 26

1 as walking out, yeah.
2    Q.   Okay.
3    A.   He was upset.  He was mad.
4    Q.   Okay.  Is your practice limited to
5 criminal defense?
6    A.   I do criminal defense and divorce
7 work.  That's the extent of my practice.
8    Q.   Okay.  How many murder cases have you
9 tried?
10    A.   Probably 15.
11    Q.   If a case is going to trial on a
12 charge of murder, would you ever expect that the
13 county forensic pathologist would testify for the
14 defense?
15    A.   Very rare.
16    Q.   Okay.  Because he does --
17    A.   Well, I mean the county prosecutor on
18 the case -- on the case itself, the one that
19 actually did the autopsy?
20    Q.   Not the prosecutor.  You mean the
21 forensic pathologist?
22    A.   Yes.  Your question would be the
23 forensic pathologist -- that was the pathologist
24 in the murder case, would that pathologist
25 testify for the defense?

Page 27

1    Q.   Correct.
2    A.   I've never seen that happen.
3    Q.   Wouldn't in your experience the
4 reason why the case got to be a murder trial and,
5 you know, through the whole charging process and
6 such is because the county forensic pathologist
7 found a cause of death that supported a murder
8 charge, correct?
9    A.   Are you talking about Bowman?
10    Q.   No, I'm talking about Denton.
11    A.   Repeat the question for me.
12    Q.   Okay.  You testified earlier that
13 Dr. Denton is known to be a witness for the
14 prosecution.
15    A.   Correct.
16    Q.   Okay.  He is numerous counties'
17 forensic pathologist, correct?
18    A.   That's right.
19    Q.   So wouldn't the reliance on his
20 autopsies in murder cases be a basis for the
21 murder charges to go forward so you would expect
22 him to testify for the prosecution, correct?
23    A.   Sure.  Yeah.  I agree with that.
24    Q.   Okay.  How much did -- strike that.
25 How much were you paid to defend Curtis Lovelace?

Page 28

1    A.   We got -- Jay and I got a hundred
2 thousand total.
3    Q.   And that was just for attorneys'
4 fees, correct?
5    A.   Correct.
6    Q.   Okay.  What about the expert fees for
7 Doctors Nichols and Teas?
8    A.   Yeah, I can't remember.  I can't
9 remember.  Nichols was, as I recall,
10 significantly higher than Shaku Teas, but I don't
11 recall without going back and looking at it what
12 each of them were paid.
13    Q.   Okay.  Did you front the costs for
14 those?
15    A.   I believe the family paid extra for
16 that.  It did not come out of our attorney fees.
17    Q.   Okay.  Are you familiar with
18 Dr. Bowman -- Dr. Jessica Bowman?
19    A.   I know who she is, yeah.  I know who
20 she is.
21    Q.   Have you dealt with her in the past
22 in cases that you've worked on?
23    A.   As I recall, we -- I'm trying to
24 think who was -- I can't remember if it was Jay
25 working on the case or maybe it was Bill Clutter



Page 29

1 assisting with a homicide case, I remember -- and
2 this has been a long time -- consulting with her
3 potentially regarding hiring her as an expert,
4 and we -- immediately after meeting with her, we
5 felt that that was not going to be a good idea.
6 That's like -- other than that I don't really
7 recall dealing with her much.
8     Q.   Okay.
9     A.   I heard -- heard things, hearsay, but
10 that's -- that's about it.
11     Q.   Okay.  Did either you or Mr. Elmore
12 or Bill Clutter approach Dr. Bowman in this case
13 about amending her finding of undetermined
14 because of all of the things that as you pointed
15 out were not a rule-out for suffocation?
16     A.   We discussed -- we met with her --
17 I'm trying to think where, but I think it was
18 Iowa.  We met with Dr. Bowman just to determine
19 whether or not we potentially wanted to call her
20 as a witness in this case.  I don't recall ever
21 asking her to amend her report.
22     Q.   Okay.  What did she tell you at the
23 meeting that you had with her?
24     A.   We were just going through her
25 findings.  I don't remember the specifics.  I

Page 30

1 wasn't taking notes.  We just went through her
2 autopsy findings.  We went -- as I recall,
3 discussed the injuries to Cory Lovelace, what she
4 felt about them, but really, like I said, I
5 didn't take notes.  I don't recall much of that
6 discussion.  When we got done I think it was our
7 position we're not going to -- I doubt we call
8 her as a witness.
9     Q.   Do you know a gentleman named Evan
10 Parke?
11     A.   Evan Parke?
12     Q.   Yeah.
13     A.   Not that I can recall.  If I do, I've
14 forgotten.
15     Q.   Okay.  When I say do you know, it's
16 like do you know of him or have you ever talked
17 to him even if you've never met him?
18     A.   I don't think I've ever talked to
19 him.  It doesn't ring a bell.
20     Q.   Okay.  Beyond all of the documents
21 that you got and the investigation that was done
22 by the Quincy P.D. and others, what investigation
23 was done by your office in the defense of Curtis
24 Lovelace?
25     A.   You mean in terms of preparation for

Page 31

1 trial?
2     Q.   Well, investigation as to the facts
3 of the case.
4     A.   Well, we obviously interviewed -- Jay
5 interviewed the Lovelace children.  I interviewed
6 Shaku Teas.  We interviewed Dr. Nichols, of
7 course, in Kentucky.  Bill Clutter did some
8 initial investigation early on, but then he kind
9 of disappeared on us later, but I mean that's the
10 extent of it.
11     Q.   Okay.  What did Bill Clutter do for
12 you?
13     A.   I'm trying to recall what he did.  I
14 mean I remember he went -- I'm not suggesting he
15 didn't do anything.  I just can't recall off the
16 top of my head what he -- what his role was.  I
17 know he definitely introduced us to Dr. Nichols.
18 He helped us find him as an expert, lined up the
19 interview with Dr. Nichols.  I believe he did
20 some research on cause of death, manner of death,
21 type of things in relation to suffocation cases
22 as I recall.  He corresponded with other experts
23 in trying to figure out if we could -- if there
24 were other experts available for us.  So he
25 definitely was helpful in that regard.

Page 32

1     Q.   Did anybody on your team -- when I
2 say your team, it would be you and Mr. Elmore and
3 anyone working with you, but did anybody on your
4 team issue any subpoenas?
5     A.   Oh, I'm sure we did.  I think, yes,
6 the witnesses -- I can't remember who we
7 subpoenaed, but I'm sure witnesses were
8 subpoenaed, yeah.  I just can't remember who they
9 were.
10     Q.   Did you issue any document subpoenas?
11     A.   I can't recall.
12     Q.   When did your involvement in the
13 defense of Curtis Lovelace end?
14     A.   When did we quit representing him?
15 You mean a date?
16     Q.   Well, no, I mean in the context of
17 things.  Not the date so much as where things
18 were in the progression of it.
19     A.   Well, once there was a -- once there
20 was a hung jury, unfortunately the family didn't
21 have the funds to retain us for a second trial.
22 So they went -- they decided to take a different
23 course of action.  I say "they," Mr. Lovelace and
24 Christine.
25     Q.   And then the Loevy firm came in to



Page 33

1  represent Mr. Lovelace, and your representation
2  of him ended at that point or some point around
3  that?
4      A.    Yeah, around that time frame,
5  correct.
6      Q.    And was your entire file turned over
7  to Tara's firm?
8      A.    I think Jay provided a copy of the
9  file to her firm.  I believe he did.
10     Q.    Okay.  Do you believe that there was
11 any police misconduct in the first trial?
12     A.    Police misconduct?  I would say that
13 -- I don't know if I'd use the term police
14 misconduct.  I don't -- Detective Gibson in my
15 opinion did not act appropriately.  When I say
16 that, I believe he had an agenda.  I'm going back
17 in time.  We know he met with Scott Denton.  We
18 know that Dr. Denton then refers him back to
19 Bowman.  I believe that Dr. Denton told Detective
20 Gibson some things that were negative about his
21 case or about Gibson's theory of the case.  I'm
22 concerned that there was no report from
23 Dr. Denton initially.  I'm concerned that Dr. --
24 or that Detective Gibson did not document his
25 conversations that he had with Dr. Denton.  It's

Page 34

1  concerning to me that Detective Gibson then upon
2  talking to Bowman goes and talks to Shaku Teas,
3  and then when he gets information from Shaku
4  Teas, Dr. Teas, that this is not a murder, that
5  this woman was not murdered, she died of natural
6  causes, it just didn't end.  And it -- it was our
7  position that Detective -- my position that
8  Detective Gibson wasn't getting what he wanted
9  because he had his own theory of the case, and
10 therefore he just kept looking to find an expert
11 that would support his theory of the case.
12        Now, is that police misconduct?  I
13 don't know.  That's up for -- that's for somebody
14 else to determine, but I don't think it's
15 appropriate, and I guess it could rise to the
16 level of misconduct if you have a police officer
17 that has his own agenda and is not listening to
18 the experts in the field, at least one of them
19 that he was referred to telling him this is not a
20 murder, and I believe potentially that Scott
21 Denton said the same thing to him, and the man
22 wouldn't give up and just kept looking for
23 somebody that would support his theory.  So I
24 don't know whether you call that police
25 misconduct or not, but it's not -- it's not fair,

Page 35

1  and especially when a man's life's on the line.
2  So I think it's a problem.
3      Q.    Now, what do you have other than your
4  opinion that -- do you have any evidence,
5  documents, conversations that would show that
6  Dr. Denton told Adam Gibson that this was not a
7  murder?
8      A.    Well, let's put it this way.
9  Dr. Denton made it clear to me that there was a
10 lot of problems with the case.  Now, maybe I
11 guess he could have, like he did before, he
12 backtracked before, so I guess he could have told
13 Detective Gibson something totally different than
14 he told me, and if he did, that's -- that's --
15 that's shameful, and that shows lack of
16 integrity.
17        But I -- I'm not -- we watched the
18 second trial, of course.  I did.  Like, I didn't
19 watch every day of it, but it was on, you know,
20 we could watch it online or read it online, and
21 I'm familiar with there are emails out there.  I
22 know that -- I haven't seen those emails, but I
23 know there were emails going back and forth
24 between Denton and Gibson.
25     Q.    You saw -- you saw Dr. Denton's --

Page 36

1  when he finally did a written report, you saw
2  that report, correct?
3      A.    I saw that report.  I did see that
4  report, but I'm talking about the correspondence
5  that we did not see -- that Jay and I did not
6  see, those emails that went back and forth, and I
7  was led to believe just by the trial and
8  discussions that were had by people -- and close
9  to the case that those emails were -- were -- led
10 me to believe that Denton again was expressing
11 concerns to Gibson that either this -- maybe he
12 didn't say this wasn't a murder, but there were
13 problems with the case.  That's what I was led to
14 believe, and it's concerning to me regardless of
15 what's in those emails -- I mean if there are
16 emails that are going back and forth between the
17 -- Dr. Denton and Gibson, we should have gotten
18 them in the first trial.  I mean that's -- that's
19 concerning.  In my opinion it's a discovery
20 violation, and that should have been -- we should
21 have received that.  That's problematic to me.
22     Q.    If Ed Parkinson had seen them, do you
23 believe he should have given them to you?
24     A.    Absolutely.  Absolutely.
25     Q.    Do you believe it's prosecutorial



Page 37

1 misconduct if he had seen them or he had them and
2 he didn't give them to you?
3     A.   I believe that is a clear discovery
4 violation, and if he had them and didn't give
5 them to us, I would say yes, that that would be
6 prosecutorial misconduct.
7     Q.   To this day you've never seen them,
8 correct?
9     A.   I've never seen them other than just
10 hearing about them during the course of the trial
11 and people talking about them.  I've not seen
12 them so I couldn't tell you what -- I couldn't
13 tell you the details of what are in these
14 details.
15     Q.   So your opinions are based on what
16 other people have told you about them?
17     A.   Correct.
18     Q.   Okay.  Do you believe that if
19 Dr. Denton told Adam Gibson that there were
20 problems with this case and all that such as what
21 he told you and somebody else was there that
22 agreed with Adam Gibson's rendition of what
23 Dr. Denton told them, that they would both be --
24 both have an agenda?
25         MS. THOMPSON:  Object to form.

Page 38

1     A.   I'm not even sure I understand the
2 question.
3 BY MS. EMERY:
4     Q.   Well, Jim Keller was with Adam Gibson
5 when he met with Dr. Denton.  You know that,
6 right?
7     A.   I'm not sure I knew that.  If I did,
8 I've forgotten that fact.
9     Q.   Okay.  If I tell you he was with Adam
10 Gibson and they both came away from the meeting
11 with Denton convinced that, unlike how you came
12 away, that this was a murder, do you think
13 they're both making it up?
14     A.   I wouldn't know why Dr. Denton would
15 tell me one thing and tell them another.  So
16 that's -- that's problematic to me.  Why would
17 Dr. Denton sit down with me and point out all the
18 problems with the prosecutor's case, tell me he
19 didn't want any part of that case, and then tell
20 Gibson and Keller something different?  Why would
21 he do that?  That's a concern to me if that
22 happened.
23     Q.   Okay.
24     A.   Because he's being -- he's being
25 deceitful to somebody.  They can't both be right.

Page 39

1 So that's a problem for me.
2     Q.   Do you think then that after the
3 meeting that the report that you saw was
4 deceitful?
5     A.   I do.  I do.
6     Q.   Okay.
7     A.   I absolutely do.
8         MS. EMERY:  I don't have any further
9 questions.
10        THE WITNESS:  Okay.
11        MS. EMERY:  I'm sure Mr. Hansen does.
12            EXAMINATION
13 BY MR. HANSEN:
14     Q.   Okay.  So let me -- first of all, I
15 represent the county and Gary Farha.  Okay.  Do
16 you know Gary?
17     A.   Yeah, I know Gary.  I know of him.
18     Q.   All right.  Did you have any
19 interaction at all in your defense of Curt
20 Lovelace with Gary Farha?
21     A.   Gosh, other than, you know, Jay
22 Elmore's from Quincy, you know, those guys would
23 -- I think we would maybe see them at lunch, but
24 I didn't have any interaction with him that would
25 even be related to this case, no.

Page 40

1     Q.   Okay.  All right.  Now, you just got
2 done telling us about how Scott Denton told you
3 one thing, that you came back to your office to
4 memorialize in your interview notes, and typed
5 that up and then later sent that to Scott Denton?
6     A.   Correct.
7     Q.   You then saw that Dr. Denton issued a
8 report in June of 2015.  I'll represent to you
9 that's when his report was written.  That -- I'll
10 use whatever term you want, but let's just say
11 contraindicated or was in opposition of what he
12 had told you in November; is that fair?
13     A.   Fair.
14     Q.   Okay.  And it was that report that
15 you believe was deceitful when he signed his name
16 to it because he told you something different?
17     A.   Correct.
18     Q.   Okay.  So if in fact he told those
19 things to Jim Keller and Adam Gibson, clearly
20 that was what got memorialized in his written
21 report which you believe was in opposition to
22 what he told you?
23        MS. THOMPSON:  Object to form.
24     A.   I don't know what he told Gibson or
25 Keller.



Page 41

1 BY MR. HANSEN:
2    Q.   Okay.
3    A.   I have no idea what he told them, but
4 what I do know is those -- whenever he did tell
5 Keller and Gibson, we should have received that
6 through the course of discovery.
7    Q.   Okay.
8    A.   Regardless of whether it was negative
9 or positive, it should have been disclosed to us.
10    Q.   Okay.  And you received your
11 discovery through the prosecutor who you're
12 dealing with?
13    A.   That's right.
14    Q.   Okay.  Back to your original meeting
15 with Scott Denton in November of 2014, I believe
16 you said you walked away from that meeting with
17 the understanding that Denton wasn't going to
18 testify for you?
19    A.   Correct.
20    Q.   But he wasn't going to testify for
21 the prosecution either?
22    A.   That was the impression I got.  He
23 didn't want to testify either way.  He didn't
24 want any part of the case, but again I didn't --
25 I didn't know whether the prosecution was going

Page 42

1 to follow up and try to solicit him or have him
2 testify for them, but yeah, I would -- that's a
3 fair comment.  I didn't think when I left, gosh,
4 he's not going to testify.
5    Q.   You would agree that the prosecution
6 has a right to contact Dr. Denton to speak to him
7 as well?
8    A.   Of course.
9    Q.   Okay.  And did you -- did you take
10 issue with the fact that Gibson contacted Denton?
11    A.   No.
12    Q.   Okay.  Did --
13    A.   Not at all.
14    Q.   Okay.  And you didn't take issue with
15 the fact that he contacted Shaku Teas?
16    A.   Not at all.
17    Q.   Okay.  How many experts did Bill
18 Clutter contact on your behalf?
19    A.   I couldn't answer that.  I know that
20 there were several names that he threw out.  In
21 terms of how many he actually talked to, I'm not
22 sure.
23    Q.   Do you know how many rejected getting
24 involved in the case?
25    A.   I don't.

Page 43

1    Q.   Do you know if any of those rejected
2 by saying, look, I believe this woman was
3 murdered?
4    A.   No, I don't recall -- I don't believe
5 that it even got to that point.  I think he gave
6 us some names.  We discussed the names -- or he
7 had some names.  We ended up with Nichols.  No, I
8 don't believe that we ever sent out materials
9 that I can recall where they said -- where an
10 expert said this lady was murdered, no.  It was
11 just tough finding an expert.  I -- I -- I'm
12 going back in time.  I would say we had to find
13 somebody that was in our price range, that was --
14 would be willing to work with us in this case, so
15 -- but no, I don't believe we ever sent out any
16 discovery to an expert where they came back and
17 said no, this is murder.  I'm not getting
18 involved.  That I recall.
19    Q.   Have you had that happen in your
20 career?
21    A.   Sure.  Sure.
22    Q.   Okay.  And you don't stop there; you
23 have to find somebody to best represent your
24 client?
25    A.   That's right.

Page 44

1    Q.   Okay.  And in this case you needed
2 expert testimony; you agree with me?
3    A.   I think we needed expert testimony,
4 yeah.
5    Q.   And no matter how many times anybody
6 would have told you no, we're not going to help,
7 you would have kept going on to find an expert to
8 testify on behalf of Curt?
9    A.   Well, I mean unless there's -- unless
10 it's just clear, which it wasn't in this case --
11 I mean if it's clear that any expert we would
12 contact is going to say it's murder, you go
13 without an expert.
14    Q.   Okay.  But in this case reasonable
15 minds differ and there was experts on both sides,
16 correct?
17    A.   Well, there were experts on both
18 sides, right.
19    Q.   So there were experts for the
20 prosecution including Mr. Baden and Ms. Turner
21 who believed Cory Lovelace died of suffocation or
22 some means that constituted murder, correct?
23    A.   That's right.
24    Q.   Okay.  And you had experts on your
25 side that felt otherwise, correct?



Page 45

1    A.    That's right.

2    Q.    And you called them to testify in the
3  defense?

4    A.    That's correct.

5    Q.    And ultimately that's what a jury is
6  put there to decide?

7    A.    That's what they decide, that's
8  right.

9    Q.    In this case the jury weighed the
10  opinions of all of the experts when they came to
11  their conclusion?

12    A.    That's right.

13    Q.    And in this case you got a hung jury?

14    A.    We did.

15    Q.    And do you know the split out on
16  that?

17    A.    I heard that it was 6/6.  That's what
18  I heard.

19    Q.    Okay.

20    A.    But I didn't interview any of the
21  jurors.  I know that they were -- there was some
22  show where they were interviewed as I recall --
23  maybe I shouldn't -- I -- I don't remember during
24  that interview with the jurors whether or not
25  they said what the split was, but I heard it was

Page 46

1  6/6, but it wasn't through that television
2  interview, I don't believe.

3    Q.    And that's what I was going to ask
4  you.  Did you interview any of them or follow up
5  with them?

6    A.    I didn't.

7    Q.    Okay.  And if it was 6/6 -- let's
8  assume that's what the breakout was, there were
9  six people that thought he was guilty of murder
10  and six people who thought he was not, correct?

11    A.    Correct.

12    Q.    Had you -- well, strike that.  When
13  you walked out of the meeting with Jessica
14  Bowman, were you and Jay both there?

15    A.    Yeah.

16    Q.    Okay.

17    A.    Yeah.

18    Q.    Did you both know you weren't going
19  to call her at trial?

20    A.    No, I don't think -- I don't think it
21  was immediate.  I think we -- you know, it was --
22  it was interesting because it was a question
23  of -- it was one of these going back and forth.
24  Was -- was Parkinson going to call her, or were
25  we going to call her, and I just -- I don't -- I

Page 47

1  don't -- I'm not suggesting that we made that
2  decision right then and there.  I think we
3  probably went back, discussed it and said, gosh,
4  you know, we're not -- we're not going to call
5  her.

6    Q.    Ultimately was there a stipulation
7  reached as to her not testifying?

8    A.    I think there was.  I think you're
9  right.  I think there was some stipulation at
10  some point with Bowman.  There would have had to
11  have been.  She did the autopsy, and then --
12  yeah, there was.

13    Q.    As there was with Denton?

14    A.    Correct.  I think there was with
15  Denton too, yeah.

16    Q.    Because wasn't that the discussion
17  that you may become a witness?

18    A.    A potential witness, that's right,
19  yep.

20    Q.    So the parties in this case,
21  prosecution and the defense, entered into
22  stipulations to not call both Scott Denton and
23  Jessica Bowman?

24    A.    I believe you're correct on that.

25    Q.    And in your meeting with Dr. Denton

Page 48

1  in November of 2014 --

2    A.    Now, wait.  Let me just go back and
3  make sure we're clear.  On the Denton, as I
4  recall, there was not any stipulation as to cause
5  of death, manner of death.  I think it was more
6  of a procedural thing, a chronological sequence
7  of events, as I recall, as opposed to if Denton
8  were called to testify, he would testify that
9  this was a murder, this was not a murder, this
10  was a cause of death, those types of things.

11    Q.    Okay.  He didn't render opinions in
12  the case as to those items?

13    A.    Right.  Right.

14    Q.    Okay.  When you left your meeting
15  with him in November of 2014 and he had told you
16  he didn't want any part of this case, was one of
17  the other reasons he communicated to you was the
18  fact that Jessica Bowman was involved?

19    A.    Absolutely.  That was also part of
20  the discussion.  He did not -- he was not fond of
21  Jessica Bowman.  He didn't use those terms, but I
22  mean yeah, there was issues that he had with
23  Bowman also.

24    Q.    Is that in part due to the fact that
25  he was called in a lot of the criminal cases



Page 49

1  around Sangamon County, Macon County, Morgan
2  County after Ms. Bowman was discredited and let
3  go and he had to testify in those cases or some
4  people would say clean up her mess with some of
5  her autopsy reports?
6      A.   I think that's an accurate statement,
7  yeah.
8          MR. HANSEN:  Yeah.  I don't have
9  anything else.  Thanks.
10         THE WITNESS:  Uh-huh.
11         MS. THOMPSON:  Nothing from us.
12         THE WITNESS:  Okay.
13         MS. EMERY:  Thanks very much.
14         THE WITNESS:  No problem, guys.
15  Thanks for accommodating my schedule.
16         MS. THOMPSON:  Are you reserving or
17  waiving?
18         THE WITNESS:  I'll waive.  Yeah, I'm
19  good.
20         MS. EMERY:  I've ordered.  Do you
21  want an E-tran?
22         MR. HANSEN:  Yeah, I'll take E-tran
23  by PDF.
24  (The deposition was concluded at 2:15 p.m., and
25  the signature of the deponent was waived.)

Page 50

1                    CERTIFICATION
2          I, Rhonda Rhodes Bentley, CSR, a
   Certified Shorthand Reporter (IL), do hereby
3  certify that JEFF PAGE, came before me on
   NOVEMBER 20, 2018, and swore before me to testify
4  to the truth, the whole truth and nothing but the
   truth regarding her knowledge touching upon the
5  matter in controversy.
6          I do further certify that I did take
   stenographic notes of the questions propounded to
7  said witness and her answers thereto and that
   said notes were reduced to typewritten form under
8  my direction and supervision.
9          I do further certify that the
   attached and foregoing is a true, correct and
10 complete copy of my notes and that said testimony
   is now herewith returned.  I do further certify
11 that said deposition was taken at the Law Offices
   of Elmore & Reid, 808 South Second Street, 1st
12 Floor, Springfield, Illinois.
13         I do further certify that I am not
   related in any way to any of the parties involved
14 in this action and have no interest in the
   outcome thereof.  Dated at Divernon, Illinois,
15 November 27, 2018.
16
17
18



19         Rhonda Rhodes Bentley, CSR
           CSR# 084-002706
20
21
22
23
24
25

JEFF PAGE
LOVELACE vs GIBSON

November 20, 2018
Index: 1..basis

------------

**1**

**1**
   6:10

**10**
   12:22

**12**
   13:22

**14**
   23:2

**15**
   23:3
   26:10

**1:23**
   5:1

------------

**2**

**2**
   13:22

**2014**
   5:19,20
   8:17
   14:18
   41:15
   48:1,15

**2015**
   25:4 40:8

------------

**4**

**4**
   10:5

**415(c)**
   13:24
   14:5,9

------------

**5**

**5**
   10:25

------------

**6**

**6/6**
   45:17
   46:1,7

------------

**9**

**9**
   11:24

------------

**A**

**aback**
   25:16

**absence**
   19:10,11,
   12

**absolutely**
   36:24
   39:7
   48:19

**accommodati
ng**
   49:15

**accurate**
   23:9 49:6

**acne**
   21:7

**act**
   33:15

**action**
   32:23

**Adam**
   9:23 35:6
   37:19,22
   38:4,9
   40:19

**adult**
   21:7

**affected**
   20:25

**age**
   19:17

**agenda**
   33:16
   34:17
   37:24

**agree**
   22:12
   27:23
   42:5 44:2

**agreed**
   14:8
   37:22

**agreement**
   13:19

**ailments**
   21:3

**air**
   22:1,4

**amend**
   16:5
   29:21

**amending**
   29:13

**appeared**
   21:6

**approach**
   29:12

**appropriate
ly**
   33:15

**area**

**19:10**
   21:6

**areas**
   10:23

**arms**
   22:1,4

**aspect**
   18:13

**aspects**
   15:1

**assisting**
   29:1

**assume**
   7:16,18
   46:8

**attach**
   10:20

**attorney**
   12:23
   28:16

**attorney's**
   24:6

**attorney-
client**
   7:2,22

**attorneys'**
   28:3

**August**
   5:19

**autopsies**
   18:15
   27:20

**autopsy**
   15:21,22
   16:12,17
   17:2
   26:19
   30:2
   47:11
   49:5

**aware**
   14:2,6,
   10,12,15

------------

**B**

**back**
   13:11
   15:21
   18:7
   22:17
   23:13,21
   24:4
   28:11
   33:16,18
   35:23
   36:6,16
   40:3
   41:14
   43:12,16
   46:23
   47:3 48:2

**backing**
   25:12

**backtracked**
   35:12

**Baden**
   44:20

**Baird**
   19:20,22,
   23

**Baird's**
   19:20

**based**
   7:5 12:8
   37:15

**basically**
   23:3
   25:19

**basis**
   27:20



JEFF PAGE
LOVELACE vs GIBSON

**behalf**
17:18
18:3
42:18
44:8

**belief**
16:11

**believed**
44:21

**bell**
30:19

**Bill**
10:12
28:25
29:12
31:7,11
42:17

**biopsies**
20:5 21:1

**biopsy**
19:5,16
20:13,14

**bit**
21:22

**blood**
19:10,11,
12 21:22

**Bloomington**
8:23

**board**
22:14

**Bowman**
15:4 16:5
19:5,16
20:13
27:9
28:18
29:12,18
33:19
34:2
46:14
47:10,23

48:18,21,
23 49:2

**Bowman's**
16:11

**brain**
20:6,7,25

**breakout**
46:8

**Bruce**
10:19

**bulk**
9:14

**busy**
24:4

———————

**C**

———————

**call**
5:25 6:1,
2 23:21
29:19
30:7
34:24
46:19,24,
25 47:4,
22

**called**
23:19
25:22
45:2
48:8,25

**calls**
25:21

**career**
43:20

**case**
15:20
16:19,21,
24 17:8,
12,15,19,
20,25

18:1,6,
19,20
19:21
22:9
23:15
24:1
26:11,18,
24 27:4
28:25
29:1,12,
20 31:3
33:21
34:9,11
35:10
36:9,13
37:20
38:18,19
39:25
41:24
42:24
43:14
44:1,10,
14 45:9,
13 47:20
48:12,16

**cases**
23:22
26:8
27:20
28:22
31:21
48:25
49:3

**caused**
20:22
21:9

**change**
22:20

**characterize**
25:25

**charge**
26:12
27:8

**charges**
27:21

**charging**
27:5

**cheek**
21:6

**children**
31:5

**chin**
21:6

**Christine**
32:24

**chronological**
48:6

**claim**
10:7 11:2

**clean**
49:4

**clear**
18:5 35:9
37:3
44:10,11
48:3

**client**
7:21,25
8:2 43:24

**close**
36:8

**Clutter**
10:12,14
28:25
29:12
31:7,11
42:18

**Clutter's**
11:5

**co-counsel**
9:19

**comment**

16:25
42:3

**communicated**
48:17

**completely**
25:18

**composed**
6:16

**comprised**
7:8

**comprises**
7:25

**comprising**
6:20

**concern**
20:10
38:21

**concerned**
20:18
33:22,23

**concerns**
36:11

**conclusion**
45:11

**conclusions**
15:7

**conducted**
16:17

**considered**
9:18

**constitute**
13:5

**constituted**
44:22

**consulting**
29:2

**contact**
9:4 42:6,



18 44:12

**contacted**
5:22 24:5
42:10,15

**contained**
7:8

**contend**
8:10 11:8
12:1,19
13:3

**contended**
6:25

**contending**
20:3

**content**
11:11

**context**
16:20
32:16

**contradicti
on**
24:19

**contraindic
ated**
40:11

**conversatio
n**
15:8
25:18

**conversatio
ns**
33:25
35:5

**convinced**
38:11

**copy**
23:5 33:8

**correct**
6:7,8,22,
23 7:2,6

8:6 10:8,
9 11:2,3,
6 13:1
22:9
27:1,8,
15,17,22
28:4,5
33:5 36:2
37:8,17
40:6,17
41:19
44:16,22,
25 45:4
46:10,11
47:14,24

**correspond
d**
31:22

**correspond
nce**
10:6,14
11:24
12:7,23
13:4,11
36:4

**Cory**
15:3
19:24
20:23
30:3
44:21

**Cory's**
19:2
21:15

**costs**
28:13

**counsel**
7:4,9 8:8
9:18 10:7
11:25
12:14

**counsel's**
10:6,25

**counties'**
27:16

**county**
18:14
24:16,22
26:13,17
27:6
39:15
49:1,2

**couple**
23:17

**Court**
13:24

**Courthouse**
24:17,22

**covers**
19:11

**criminal**
6:7,21
26:5,6
48:25

**critical**
18:13
19:4,16
20:4

**cross-
examination**
9:25

**cross-
examined**
9:22,23

**curious**
19:21

**Curt**
39:19
44:8

**Curtis**
5:18 6:6
17:13
27:25
30:23

32:13

**Curtis's**
18:3

**cut**
19:2,7,8
21:15

———————

**D**

———————

**date**
24:23
32:15,17

**Dave**
6:3

**day**
35:19
37:7

**days**
20:2

**dealing**
29:7
41:12

**dealt**
28:21

**death**
15:3,11,
14,15,16,
18,20,24
16:2,6
17:4
18:16,17
20:2,9,
12,17,21
27:7
31:20
48:5,10

**deceitful**
38:25
39:4
40:15

**decide**

45:6,7

**decided**
14:24
32:22

**decision**
47:2

**defend**
27:25

**defense**
6:21
26:5,6,
14,25
30:23
32:13
39:19
45:3
47:21

**Denton**
8:8,13,
15,16,24
9:4,5,22
14:19
16:10
18:10,12
19:25
23:25
24:2,16
27:10,13
33:17,18,
19,23,25
34:21
35:6,9,24
36:10,17
37:19,23
38:5,11,
14,17
40:2,5,7
41:15,17
42:6,10
47:13,15,
22,25
48:3,7

**Denton's**
8:22



```
    35:25            disclose          divided          Elmore           eventually
                      14:4              9:19  10:3        5:23             24:2
deposed                                                   6:10,17
    5:10             disclosed         divorce            9:12            evidence
                      18:9  41:9        26:6             13:2,5            35:4
deposition                                               18:8
    10:17,22         disclosing        Doctors           23:25           examination
                      11:13,14          28:7             24:16            5:5  10:2
details                                                  29:11            39:12
    25:11            discounted        doctrine          32:2
    37:13,14          21:10             12:2,20                           excited
                                                        Elmore's          16:18,23
detective           discovery         document           39:22            17:7
    9:3,6,7,          9:1  11:18        32:10
    24  19:20,        13:23             33:24           emails           Exhibit
    23  33:14,        15:1,5                              35:21,22,        6:10
    19,24             36:19            documents          23  36:6,
    34:1,7,8          37:3              6:20,25           9,15,16         expect
    35:13            41:6,11            10:21                              26:12
                     43:16             12:12,18         EMERY             27:21
determinati                            13:18             5:6  12:17
on                  discredited        30:20             38:3            experience
    16:6             49:2               35:5             39:8,11          27:3
                                                        49:13,20
determine           discuss           doubt                             expert
    15:1,2            12:7  16:4        16:13           end               9:25  10:2
    19:17            24:18,21          30:7              25:22            11:1,5,
    21:2                                                 32:13            12,15,17,
    29:18           discussed         drinking          34:6             19,25
    34:14            9:8,10            20:22,24                           12:14
                     14:21,24                           ended            18:15
determined          29:16             due               33:2  43:7       23:6  28:6
    20:15            30:3  43:6         48:24                             29:3
                     47:3                               entered          31:18
determining         discussion        duly              47:21            34:10
    14:25            15:9,10           5:3                                43:10,11,
                     22:17                              entire            16  44:2,
died                 23:9  30:6        ─────────         33:6             3,7,11,13
    34:5             47:16                              equally
    44:21            48:20                 E             9:20  10:4      experts
                                                                         20:4
differ              discussions       ─────────        essentially      31:22,24
    44:15            12:14                               24:3  25:8       34:18
                     13:8,19          E-TRAN                              42:17
direct               15:13             49:21,22        Evan              44:15,17,
    10:1             36:8                                30:9,11          19,24
                                      earlier                            45:10
disappeared         discussion         27:12           event
    31:9             15:9,10                             10:18           explain
                     22:17            early                               22:4
disappointe                            31:8            events
d                   disintegrat                         48:7            expressing
    18:4            ed                 Ed
    22:11,15         25:19             13:1
                                      24:15
                                      36:22
```

36:10

**extent**
26:7
31:10

**extra**
28:15

**extremely**
20:19

———————
**F**
———————

**fact**
22:13
38:8
40:18
42:10,15
48:18,24

**facts**
31:2

**fair**
34:25
40:12,13
42:3

**fall**
5:20

**familiar**
28:17
35:21

**family**
28:15
32:20

**Farha**
39:15,20

**fashion**
16:15

**fatty**
20:21

**fees**
28:4,6,16

**felt**

9:9 19:25
20:7
21:21
29:5 30:4
44:25

**field**
34:18

**figure**
23:18
31:23

**file**
6:21 7:18
33:6,9

**files**
11:17

**finally**
36:1

**find**
9:9 31:18
34:10
43:12,23
44:7

**finding**
29:13
43:11

**findings**
15:4
16:12
29:25
30:2

**firm**
14:13
32:25
33:7,9

**folder**
13:23

**follow**
42:1 46:4

**follow-up**
22:25
23:2

**fond**
48:20

**force**
21:10

**forensic**
26:13,21,
23 27:6,
17

**forgotten**
30:14
38:8

**form**
12:10
37:25
40:23

**forward**
27:21

**found**
27:7

**fourth**
13:11

**frame**
6:1 33:4

**fresher**
19:15

**friend**
6:4

**front**
10:19
12:13
13:10
28:13

**fully**
11:17

**funds**
32:21

**furious**
25:22

———————
**G**
———————

**Gary**
39:15,16,
17,20

**gave**
43:5

**gentleman**
30:9

**Gibson**
9:3,23,24
33:14,20,
24 34:1,8
35:6,13,
24 36:11,
17 37:19
38:4,10,
20 40:19,
24 41:5
42:10

**Gibson's**
33:21
37:22

**give**
34:22
37:2,4

**good**
5:16 29:5
49:19

**gosh**
39:21
42:3 47:3

**guess**
12:24
25:3,5
34:15
35:11,12

**guessing**
25:3,4

**guilty**
46:9

**gung-ho**
16:19,24
17:7

**guy**
18:13,14

**guys**
39:22
49:14

———————
**H**
———————

**hand**
21:10

**Hansen**
39:11,13
41:1
49:8,22

**happen**
27:2
43:19

**happened**
38:22

**happy**
22:11

**Hardwick**
14:3,11

**he'll**
22:19,20

**head**
7:17 9:21
31:16

**heard**
29:9
45:17,18,
25

**hearing**
37:10

**hearsay**
29:9

**heart**



20:6

helped
  21:1
  31:18

helpful
  31:25

higher
  28:10

hiring
  29:3

hold
  25:20

homicide
  29:1

hoping
  22:12,14

hundred
  28:1

hung
  32:20
  45:13

————————

I

i.e.
  15:16

idea
  29:5 41:3

Illinois
  13:24

immediately
  29:4

importantly
  9:11

impression
  17:5,9,
  10,11
  41:22

inaccurate

23:11

including
  44:20

indicative
  20:1

individual'
  s
  15:19

individuals
  20:22

infection
  20:16

information
  9:6,7
  34:3

initial
  15:13
  31:8

initially
  33:23

injuries
  30:3

injury
  19:8,14,
  15

inside
  21:15,19,
  21

integrity
  35:16

interaction
  39:19,24

interesting
  46:22

interview
  8:7,12,
  15,18,19,
  20 9:9
  18:25
  23:1,5,11

25:9,17
31:19
40:4
45:20,24
46:2,4

interviewed
  31:4,5,6
  45:22

interviews
  8:13

introduced
  31:17

investigati
on
  30:21,22
  31:2,8

investigato
r
  9:3 10:7,
  10,13
  11:13

investigato
r's
  11:1

investigato
rs
  10:11
  11:14

involved
  42:24
  43:18
  48:18

involvement
  32:12

involving
  13:19

Iowa
  29:18

issue
  16:12
  19:3 22:1

32:4,10
42:10,14

issued
  40:7

issues
  24:21
  48:22

items
  48:12

————————

J

Jay
  5:25 9:8,
  17,22
  10:15
  14:23
  18:8
  22:18
  23:18,21,
  25 24:15
  25:17,19
  28:1,24
  31:4 33:8
  36:5
  39:21
  46:14

Jay's
  23:19

Jeff
  5:2,9
  19:19

Jessica
  15:4
  28:18
  46:13
  47:23
  48:18,21

Jim
  38:4
  40:19

Judge

10:19
14:2,11

June
  40:8

jurors
  45:21,24

jury
  32:20
  45:5,9,13

jury's
  16:13

————————

K

Keller
  38:4,20
  40:19,25
  41:5

Kentucky
  31:7

kind
  31:8

knew
  38:7

————————

L

laboring
  9:14

laceration
  19:4,18
  21:8

lack
  25:13
  35:15

lady
  43:10

large
  20:19



**larger**
20:20

**late**
5:20

**lead**
9:2,18
19:13

**led**
15:19
20:17
36:7,9,13

**left**
22:5,7,8
42:3
48:14

**letter**
22:25
23:3,10

**letters**
11:1,5,11

**level**
34:16

**life's**
35:1

**limited**
10:23
26:4

**lined**
31:18

**lip**
19:2,3,5
21:8,15

**listed**
6:24 7:17

**listen**
23:3 24:3
25:20

**listening**
34:17

**litany**

17:1

**litigate**
10:19

**litigation**
13:12

**liver**
20:19,20,
21

**lividity**
19:25

**Loevy**
32:25

**Logan**
24:16,22

**long**
19:7 29:2

**lot**
16:16
35:10
48:25

**Lovelace**
5:18 6:6,
22 8:3
15:3
17:13
18:20
23:15
24:1
27:25
30:3,24
31:5
32:13,23
33:1
39:20
44:21

**Lovelace's**
10:17
15:20

**lunch**
39:23

**lungs**

20:7,11,
14

_____

        **M**
_____

**Macon**
49:1

**mad**
26:3

**made**
8:4 13:15
14:2
16:25
17:6 18:5
35:9 47:1

**Magistrate**
14:7

**make**
23:8 48:3

**making**
38:13

**man**
34:21

**man's**
35:1

**manner**
15:3
18:16
31:20
48:5

**marked**
6:9

**marks**
21:5

**materials**
43:8

**matter**
6:7 44:5

**matters**
13:15

**means**
12:24
44:22

**meant**
16:23
25:15

**medical**
23:6

**meet**
14:18

**meeting**
9:8
14:22,24
17:16
22:8
23:16
24:14
25:6,23
29:4,23
38:10
39:3
41:14,16
46:13
47:25
48:14

**memorialize**
40:4

**memorialize
d**
40:20

**memory**
21:5

**mentioned**
19:22,24
20:12

**mess**
49:4

**met**
24:16,18,
21 29:16,
18 30:17
33:17

38:5

**mild**
19:25

**mind**
16:13
21:13
22:20

**minds**
44:15

**misconduct**
33:11,12,
14 34:12,
16,25
37:1,6

**misstated**
23:12

**Morgan**
49:1

**mortis**
22:2

**mouth**
19:12

**murder**
26:8,12,
24 27:4,
7,20,21
34:4,20
35:7
36:12
38:12
43:17
44:12,22
46:9 48:9

**murdered**
34:5
43:3,10

**mutual**
6:3



**N**

named
  30:9

names
  42:20
  43:6,7

natural
  15:18,24
  16:1 17:3
  20:8 34:5

nature
  12:16

needed
  44:1,3

negative
  33:20
  41:8

negotiations
  13:20

Nichols
  28:7,9
  31:6,17,
  19 43:7

normal
  20:20

notes
  7:4,9,10,
  12,14,19,
  22 8:1,4,
  7,12,18
  23:6 25:9
  30:1,5
  40:4

notorious
  18:10

November
  8:16
  14:18

23:2
40:12
41:15
48:1,15

number
  6:24
  10:5,25
  11:24
  12:22
  13:9,22

numerous
  27:16

nutshell
  16:2

**O**

Object
  12:10
  37:25
  40:23

occasion
  23:14

occasions
  23:17

occurred
  8:16 20:2

offer
  13:14

offers
  13:19

office
  8:22
  12:25
  18:8
  23:20
  24:6
  30:23
  40:3

officer
  34:16

older
  19:8,14

online
  35:20

open
  11:18

opined
  19:13

opinion
  11:16
  15:21
  19:7 21:8
  33:15
  35:4
  36:19

opinions
  37:15
  45:10
  48:11

opposed
  19:15
  48:7

opposition
  40:11,21

order
  14:3,7,
  11,14

ordered
  49:20

organs
  20:25

original
  41:14

**P**

P-A-G-E
  5:9

P.D.
  30:22

p.m.
  5:1

paid
  27:25
  28:12,15

Parke
  30:10,11

Parkinson
  13:1,4
  24:5,15
  36:22
  46:24

part
  17:12,13,
  19,20,21,
  24 18:1,6
  38:19
  41:24
  48:16,19,
  24

parties
  24:8
  47:20

parts
  15:5

past
  28:21

pathologist
  26:13,21,
  23,24
  27:6,17

PDF
  49:23

Penn
  6:3

people
  36:8
  37:11,16
  46:9,10
  49:4

person

8:17

phone
  23:19,24
  24:2

pillow
  19:12
  21:9

place
  8:21

plea
  13:19

point
  17:15
  18:18
  19:1
  22:24
  33:2
  38:17
  43:5
  47:10

pointed
  18:22,23
  29:14

pointing
  22:13

police
  33:11,12,
  13 34:12,
  16,24

position
  14:8 30:7
  34:7

positive
  41:9

possession
  8:5

potential
  16:1
  47:18

potentially
  7:18



13:14
15:19
19:6
20:8,14,
25 29:3,
19 34:20

**practice**
26:4,7

**pre-trial**
7:19
13:23

**premise**
15:10,12

**premised**
19:9

**prep**
7:19

**preparation**
7:15,20
30:25

**prepared**
23:5

**preparing**
9:13,16
24:7

**present**
8:17

**press**
18:2,5,7

**price**
43:13

**prior**
20:12

**privilege**
7:2,23
12:9
13:5,18

**privileged**
11:9
12:1,19

14:5

**privileges**
10:20

**problem**
20:24
35:2 39:1
49:14

**problematic**
36:21
38:16

**problems**
16:16,20
17:2,15
18:19,22
22:14
35:10
36:13
37:20
38:18

**procedural**
13:15
48:6

**proceeding**
11:22

**process**
5:13 27:5

**produced**
21:22

**product**
7:1,5,22
8:10 10:8
11:2,9,
15,23
12:9
13:16

**progression**
32:18

**prosecution**
17:13
18:11
20:3
21:11

27:14,22
41:21,25
42:5
44:20
47:21

**prosecution
's**
16:21
17:20
18:19

**prosecutor**
26:17,20
41:11

**prosecutor'
s**
12:25
38:18

**prosecutori
al**
36:25
37:6

**prosecutors**
18:15

**provided**
7:1 33:8

**pursuant**
14:9

**put**
10:17
16:12
35:8 45:6

**putting**
25:13

_____

**Q**

**question**
26:22
27:11
38:2
46:22

**questions**
39:9

**Quincy**
6:4 30:22
39:22

**quit**
32:14

**quote**
16:18

_____

**R**

**range**
43:13

**rare**
26:15

**reach**
15:7

**reached**
47:7

**read**
35:20

**reason**
12:4 27:4

**reasonable**
16:13
44:14

**reasons**
7:1 48:17

**recall**
7:17
14:16
16:8,9,16
18:21,23,
24 19:2
21:14,25
23:23
24:11,23,
24 28:9,
11,23
29:7,20

30:2,5,13
31:13,15,
22 32:11
43:4,9,18
45:22
48:4,7

**received**
5:25 6:1,
20 24:17
36:21
41:5,10

**recent**
20:1

**recitation**
23:8

**recognize**
6:11

**record**
5:8 10:17

**refer**
18:25

**reference**
8:25 9:2

**referenced**
24:1

**referral**
6:3

**referred**
34:19

**referring**
21:16,20

**refers**
33:18

**regard**
31:25

**rejected**
42:23
43:1

**related**
39:25



JEFF PAGE
LOVELACE vs GIBSON

November 20, 2018
Index: relating..stipulation

relating
  7:20

relation
  31:21

release
  14:9

reliance
  27:19

remember
  9:20
  21:23
  25:11
  28:8,9,24
  29:1,25
  31:14
  32:6,8
  45:23

render
  48:11

rendition
  37:22

reopen
  10:22

Repeat
  27:11

report
  9:5 16:11
  24:7,18,
  19 29:21
  33:22
  36:1,2,3,
  4 39:3
  40:8,9,
  14,21

reports
  49:5

represent
  5:18 33:1
  39:15
  40:8
  43:23

representat
ion
  6:6 33:1

representing
  32:14

require
  21:9

research
  31:20

reserve
  10:21

reserving
  49:16

response
  6:16,19
  23:13

responsible
  9:24 10:1

retain
  32:21

retained
  5:18
  11:17

returned
  25:21

revealing
  7:7

review
  14:25
  15:4

rigor
  22:2

ring
  30:19

rise
  34:15

road
  22:19

role
  31:16

rule
  13:24
  14:5
  15:14,15,
  24 16:1
  17:3

rule-out
  15:11
  29:15

ruled
  20:8

run
  22:19,22,
  24

─────────
     S
─────────

Sangamon
  49:1

Schanzle-
haskins
  14:7

schedule
  49:15

Scott
  8:8,13,15
  33:17
  34:20
  40:2,5
  41:15
  47:22

secretary
  23:23

seizures
  20:18

sending
  24:7

sense
  22:10

sepsis
  20:16,18

sequence
  48:6

Shaku
  28:10
  31:6
  34:2,3
  42:15

shameful
  35:15

shocked
  18:18
  25:18

show
  6:9 35:5
  45:22

shows
  35:15

sick
  20:11

side
  44:25

sides
  44:15,18

signature
  6:13

signed
  40:15

significant
  17:14
  21:21

significant
ly
  28:10

simply
  25:3

sit
  38:17

solicit
  42:1

speak
  9:14
  23:14
  42:6

speaking
  9:17

special
  12:24

specifics
  29:25

spell
  5:7

spins
  25:14

split
  9:15
  45:15,25

stage
  11:22

start
  15:13

state
  5:7 9:2

state's
  9:25
  12:23
  24:6

stated
  21:4,5

statement
  49:6

statements
  17:6

stating
  19:9

stipulation
  47:6,9
  48:4



JEFF PAGE
LOVELACE vs GIBSON

November 20, 2018
Index: stipulations..trial

stipulation
s
    47:22
stop
    43:22
strategic
    12:15
strategies
    11:13,14
strategy
    12:7,15
    13:14
strike
    27:24
    46:12
subpoena
    6:17,20
subpoenaed
    32:7,8
subpoenas
    32:4,10
sudden
    20:21
suffered
    20:15
suffering
    21:2
suffocation
    15:11,16,
    25 29:15
    31:21
    44:21
suggesting
    31:14
    47:1
summary
    23:5,10
    25:9
summer
    5:20 25:4

support
    34:11,23
supported
    27:7
Supreme
    13:24
surprised
    18:9
    22:11
sworn
    5:3

          T

taking
    30:1
talk
    23:24
    24:12
talked
    18:8 23:4
    30:16,18
    42:21
talking
    11:19
    27:9,10
    34:2 36:4
    37:11
talks
    34:2
Tara's
    33:7
team
    32:1,2,4
Teas
    28:7,10
    31:6
    34:2,4
    42:15
technically

8:15 9:17
telephone
    25:21
television
    46:1
telling
    34:19
    40:2
term
    25:13
    33:13
    40:10
terms
    30:25
    42:21
    48:21
testified
    27:12
testifies
    5:3
testify
    17:17
    18:3
    26:13,25
    27:22
    41:18,20,
    23 42:2,4
    44:8 45:2
    48:8 49:3
testifying
    47:7
testimony
    44:2,3
theory
    16:21
    21:11
    33:21
    34:9,11,
    23
thing
    18:17

34:21
    38:15
    40:3 48:6
things
    18:24
    29:9,14
    31:21
    32:17
    33:20
    40:19
    48:10
thinking
    25:2
Thompson
    12:10
    14:13
    37:25
    40:23
    49:11,16
thought
    9:19 10:4
    16:23
    17:14
    20:5
    22:3,5,6
    46:9,10
thousand
    28:2
threw
    42:20
time
    6:1 23:4,
    18 29:2
    33:4,17
    43:12
timeline
    19:21,22
times
    23:20
    44:5
timing
    19:3

told
    15:14
    18:10
    19:6
    21:25
    23:9,22,
    23 24:20
    25:12,19
    33:19
    35:6,12,
    14 37:16,
    19,21,23
    40:2,12,
    16,18,22,
    24 41:3
    44:6
    48:15
top
    7:16 9:21
    19:3
    31:16
total
    28:2
totally
    35:13
touch
    19:24
tough
    43:11
trail
    8:9
trial
    7:4,8,13,
    15 8:8,9
    9:13,16
    10:6,7,25
    11:25
    12:14
    26:11
    27:4 31:1
    32:21
    33:11
    35:18
    36:7,18



37:10
46:19

**turned**
33:6

**Turner**
44:20

**type**
9:3 20:16
31:21

**typed**
40:4

**types**
18:17
21:3
48:10

---

**U**

---

**Uh-huh**
49:10

**ultimately**
45:5 47:6

**understand**
38:1

**understanding**
41:17

**undertook**
6:6

**undetermined**
16:7
29:13

**unlike**
38:11

**unusual**
22:3,5,6

**upper**
21:6

**upset**
26:3

**utilize**
18:15

**utilizing**
21:11

---

**V**

---

**verbatim**
16:3

**violation**
36:20
37:4

---

**W**

---

**wait**
48:2

**waive**
49:18

**waiving**
49:17

**walk**
25:24

**walked**
17:16
41:16
46:13

**walking**
26:1

**wanted**
14:23
22:8 23:8
29:19
34:8

**warm**
19:24

**watch**
35:19,20

**watched**
35:17

**weighed**
45:9

**withheld**
13:23

**withholding**
12:8

**witnesses**
10:1,2,3,
4 11:1,5,
12,15,17,
20,25
12:15
32:6,7

**woman**
20:11
34:5 43:2

**woman's**
20:20

**Words**
24:10

**work**
7:1,5,22
8:10
9:15,19
10:8
11:2,9,
15,23
12:1,8
13:16
26:7
43:14

**work-product**
12:2,20
13:5

**worked**
28:22

**working**
28:25
32:3

**written**
36:1
40:9,20

