E-FILED
Friday, 04 January, 2019 12:40:44 PM
Clerk, U.S. District Court, ILCD

# EXHIBIT C

**Page 1**

```
 1         UNITED STATES DISTRICT COURT
           CENTRAL DISTRICT OF ILLINOIS
 2
 3  CURTIS LOVELACE, LOGAN LOVELACE,    )
    LINCOLN LOVELACE & CHRISTINE        )
 4  LOVELACE ON BEHALF OF HER MINOR     )
    SON LARSON LOVELACE,                )
 5                                      )
            Plaintiffs,                 )
 6                                      )
         vs.                            ) No. 17 CV 01201
 7                                      )
    DET. ADAM GIBSON, POLICE CHIEF      )
 8  ROBERT COPLEY, SGT. JOHN SUMMERS,   )
    LT. DINA DREYER, DET. ANJANETTE     )
 9  BISWELL, UNKNOWN QUINCY POLICE      )
    OFFICERS, GARY FARHA, CORONER       )
10  JAMES KELLER, THE CITY OF QUINCY,   )
    AND COUNTY OF ADAMS,                )
11                                      )
            Defendants.                 )
12
13
14
15
16
17         DEPOSITION OF JAY ELMORE
              ELMORE & REID
18         808 SOUTH SECOND STREET
            SPRINGFIELD, ILLINOIS
19           NOVEMBER 20, 2018
               10:30 A.M.
20
21
22
23
24         Reported and Transcribed by:
      Rhonda Rhodes Bentley, CSR #084-002706
25
```

**Page 2**

```
 1                 INDEX
 2  APPEARANCES:
 3  For the Plaintiffs:
       Tara Thompson
 4     LOEVY & LOEVY
       Attorneys at Law
 5     311 North Aberdeen Street, 3rd Floor
       Chicago, Illinois 60607
 6     (312) 243-5900
       tara@loevy.com
 7
    For the City of Quincy Defendants:
 8     Ellen K. Emery
       ANCEL, GLINK, P.C.
 9     Attorneys at Law
       140 South Dearborn Street, Sixth Floor
10     Chicago, Illinois 60603
       (312) 782-7606
11     eemery@ancelglink.com
12
    For the County of Adams Defendants:
13     James A. Hansen
       SCHMIEDESKAMP ROBERTSON
14     NEU & MITCHELL LLP
       Attorneys at Law
15     525 Jersey Street
       Quincy, Illinois 62301
16     (217) 223-3030
       jhansen@srnm.com
17
18
19  ALSO PRESENT:
       Curtis Lovelace
20     Christine Lovelace
21
22
23
24
25
```

**Page 3**

```
 1            INDEX - CONTINUED
 2  EXAMINATION BY:                    PAGE
    Ms. Emery.........................5
 3  Mr. Hansen.......................37
 4
 5  EXHIBITS:    DESCRIPTION          PAGE
    Exhibit 1   9.11.18 Letter.......6
 6
 7         (Exhibit attached.)
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

**Page 4**

```
 1              STIPULATION
 2
 3        IT IS HEREBY EXPRESSLY STIPULATED AND
 4  AGREED by and between the parties that the
 5  DEPOSITION of JAY ELMORE may be taken on NOVEMBER
 6  20, 2018, at the Law Offices of Elmore & Reid,
 7  808 South Second Street, Springfield, Illinois,
 8  pursuant to the applicable Supreme Court rules,
 9  local rules, and the Code of Civil Procedure
10  governing said depositions.
11
12        IT IS FURTHER STIPULATED that the
13  necessity for calling the Court Reporter for
14  impeachment purposes is waived.
15
16
17
18
19
20
21
22
23
24
25
```



JAY ELMORE                                                      November 20, 2018
LOVELACE vs GIBSON                                                         5—8

Page 5

1          10:31 a.m.
2              JAY ELMORE,
3  having first been duly sworn, testifies as
4  follows:
5              EXAMINATION
6  BY MS. EMERY:
7      Q.   Would you state your name and spell
8  it for the court reporter, please.
9      A.   It's Jay, J-a-y, Elmore, E-l-m-o-r-e.
10     Q.   My name is Ellen Emery.  I represent
11  the Quincy defendants in this case.  It should be
12  pretty quick today.  That's the good news.
13     A.   Good.
14     Q.   Have you ever been deposed before?
15     A.   Yes, I have.
16     Q.   Okay.  Being a trial lawyer you know
17  all of the fundamentals of a deposition so I
18  won't go through all those.  Did you receive a
19  subpoena in this case --
20     A.   Yes.
21     Q.   -- for your trial records?
22     A.   Yes.
23     Q.   Okay.  Let me show you what's been
24  marked as Exhibit -- do you want to continue from
25  yesterday because you're going to be referring to

Page 6

1  numbers, you said?
2          MS. THOMPSON:  I got -- I brought new
3  copies to remark.  So I'm happy to do whatever is
4  easier.
5          (Whereupon, Elmore Exhibit 1 was
6  marked for identification.)
7  BY MS. EMERY:
8      Q.   I've handed you Exhibit 1, which is a
9  two-page document.  Do you recognize it?
10     A.   Yes, I do.
11     Q.   Is that your signature or a copy of
12  your signature on the second page?
13     A.   Yes, it is.
14     Q.   Above that object pages?
15     A.   Yes.
16     Q.   And is your given name James Elmore
17  but you go by Jay?
18     A.   Yes.
19     Q.   All right.  And was this letter sent
20  to my office in response to the subpoena you got
21  for your litigation file in the Curtis Lovelace
22  case?
23     A.   Yes.
24     Q.   All right.  This document lists a
25  number of documents that you refuse to provide on

Page 7

1  privileged reasons and such, does it not?
2      A.   I believe so, yes, it does, uh-huh.
3  Yes.
4      Q.   Okay.  I want to go through those
5  very briefly and let you know that in the event
6  that we have to go before Judge Bruce -- the case
7  has been switched from Judge Myerscough to Judge
8  Bruce in Urbana -- regarding any of the privilege
9  issues that we reserve the right to reopen your
10  deposition if necessary.
11          You've listed that privilege under
12  work product privilege trial counsel notes.
13     A.   Yes.
14     Q.   What type of documents comprise your
15  trial counsel notes?
16     A.   My trial preparation notes,
17  cross-examination of witnesses, direct
18  examination of witnesses, opening statements,
19  closing arguments, jury selection, anything you
20  would -- you would prepare for a for jury trial.
21     Q.   Okay.  And those were either
22  handwritten by you or typed on a computer by you?
23     A.   Handwritten by me.
24     Q.   Okay.  Your client notes, you've
25  listed as work product and attorney-client

Page 8

1  privilege.  What type of documents comprise
2  client notes?
3      A.   Interview notes of Curt, interview
4  notes of Christine, interview notes of witnesses
5  we may not have called, interview notes of
6  witnesses.
7      Q.   Okay.  And those likewise were
8  prepared directly by you?
9      A.   Yes and Mr. Page together, yeah,
10  uh-huh.
11     Q.   Okay.  You have that you're claiming
12  work product on your interview notes of Dr.
13  Scott Denton by trial counsel, correct?
14     A.   Yes.
15     Q.   Okay.  What comprised those interview
16  notes?
17     A.   Those are the interview notes that
18  Jeff Page prepared in relation to his interview
19  with Dr. Denton.
20     Q.   All right.  And were they notes that
21  he himself wrote at the time or closely
22  thereafter his interview with Dr. Denton?
23     A.   Well, I wasn't there for the
24  interview, but I assume that would be true, yes.
25     Q.   Correspondence between trial



Page 9

1 counsel's investigator and trial counsel as a
2 work product privilege.  Do you see that one
3 under number 4?
4     A.   Yes, ma'am.
5     Q.   Who was your trial -- who was your
6 investigator?
7     A.   Well, we had Bill Clutter for a
8 while.  We ended up trying the case without the
9 benefit of an investigator.
10    Q.   Okay.  What happened with
11 Mr. Clutter?
12    A.   I really don't know what happened
13 with Mr. Clutter.  I don't know.  You'd have to
14 ask Mr. Clutter, but we ended up trying the case
15 really without the benefit of an investigator.
16    Q.   Okay.  Did he conduct some
17 investigation on your behalf or on your client's
18 behalf?
19    A.   Other than locating an expert witness
20 for us in Louisville -- it's been a while -- not
21 that I recall.
22    Q.   Okay.  Did you hire Mr. Clutter to be
23 your investigator?
24    A.   Yes, we did.
25    Q.   Okay.  Between you and Mr. Page which

Page 10

1 of the two of you specifically, if there is one,
2 hired Mr. Clutter?
3     A.   Probably myself.
4     Q.   Okay.  And did you at some point
5 terminate him as your investigator?
6     A.   No, we did not terminate him.
7     Q.   Did he quit?
8     A.   No.  I think he sort of faded to
9 black.  Like I said, he was just not available.
10 I believe he moved to Louisville, and it just
11 became -- he just wasn't involved anymore.
12    Q.   Okay.  So other than locating one
13 witness for you, what else did Mr. Clutter do?
14    A.   Nothing that I can recall, but it's
15 been -- been four years now so I could be
16 forgetting something, but I remember him locating
17 Dr. Nichols down in Louisville, and we went and
18 interviewed Dr. Nichols a time or two, Mr. Page
19 and myself, and Mr. Clutter was living in
20 Louisville.  So he facilitated that, which is
21 very important.
22        When we interviewed Dr. Bowman, he
23 wasn't with us.  When we interviewed
24 Dr. Denton -- Jeff interviewed him twice, I
25 interviewed him once, he was not with us.  When

Page 11

1 we interviewed the children, he was not with us.
2 When we -- when I interviewed Lyndsay in Quincy,
3 he was not with us.
4        I'm just going from memory.  So I
5 just think he got Dr. Nichols for us, and that
6 was pretty much it.
7     Q.   Okay.  Under number 5 of Exhibit 1 it
8 says the trial counsel's investigator's letters
9 to expert witnesses you're claiming are work
10 product.
11    A.   Right.
12    Q.   Why do you claim that your
13 investigator's letters or any other
14 correspondence to independent expert witnesses is
15 a work product privilege?
16    A.   Well, because I think some of the
17 contents of the letter -- the letter or letters
18 that Bill Clutter would have written to us
19 concerning experts would be work product -- trial
20 strategy, whether we call a witness, whether
21 we're not.
22    Q.   Okay.  That's -- as I understand what
23 you've just said, that would be correspondence
24 between you and Bill Clutter.
25        Number 5 says that it's Mr. Clutter

Page 12

1 or any other trial counsel's investigator's
2 letters to expert witnesses.
3     A.   Right.  That would be letters that
4 Bill may have sent to Dr. Nichols and any other
5 experts that we had contact with, and maybe he
6 sent those letters as well.  Again I -- it's been
7 a long time.  I can't remember what letters he
8 sent.
9     Q.   Okay.  I will tell you that it's the
10 Quincy defendants' contention that letters to
11 expert witnesses -- in fact, the entire expert
12 witness file is not privileged.  So I will ask
13 you to reconsider that privilege of work product
14 on number 5, and we will visit that through
15 correspondence later on.
16    A.   Okay.
17    Q.   Number 6, correspondence between
18 trial counsel and client's family.  You've
19 claimed work product and attorney-client
20 privilege?
21    A.   Yes.
22    Q.   Was there correspondence between you
23 and Christine Lovelace?
24    A.   Yes.
25    Q.   Okay.  And other members of Mr.



Page 13

1 Lovelace's family --
2     A.   Yes.
3     Q.   -- that falls within that?
4     A.   Yes.
5     Q.   Who did you correspond with?
6     A.   His mother and father.  Primarily his
7 father, but both Jan and Terry.
8     Q.   Okay.  Anyone else?
9     A.   Not that I can recall.
10     Q.   Okay.  Did you look at anything in
11 preparation for today's deposition?
12     A.   Nope.
13     Q.   Okay.  And did you meet with anybody
14 in preparation?
15     A.   Nope.
16     Q.   Okay.  You've got as work product
17 expert witness information and research regarding
18 expert witnesses.  What does that material
19 comprise that you're claiming work product?
20     A.   Well, you had cause and manner of
21 death, time of death.  So the case was an
22 expert-driven case in many respects -- at least
23 that's what it turned out to be, and so we had
24 done extensive research on cause, manner, and
25 time of death.  You had rigor mortis.  You had

Page 14

1 marbling.  You had artifact drying.  You had a
2 number of issues, and we spent a lot of time -- a
3 lot of time researching that.
4     Q.   Okay.  Obviously your letters to
5 client, are those letters specifically to Mr.
6 Lovelace?
7     A.   Yes.  Yes, ma'am.
8     Q.   Okay.  For number 9, likewise, the
9 correspondence between trial counsel and expert
10 witnesses, you've put as work product.  Are you
11 claiming work product privilege for any
12 correspondence between you or Mr. Page and expert
13 witnesses?
14     A.   Yes.
15     Q.   Okay.  I will tell you that we
16 contend that is not privileged material, and we
17 will address it at a later time, and, like I
18 said, if a judge rules otherwise, we reserve our
19 right to redepose you if necessary on that
20 limited issue.
21         Correspondence between the state's
22 attorney and trial counsel you've claimed as work
23 product privilege.  Tell me how that qualifies as
24 work product.
25     A.   Well, any -- any correspondence

Page 15

1 between us, Mr. Page and myself, and
2 Mr. Parkinson, plea negotiations, issues along
3 those lines I think are work product.
4     Q.   Okay.  So are you contending only
5 that the correspondence regarding plea
6 negotiations are privileged under work product,
7 or are you contending that all correspondence
8 between you and the -- when you say the state's
9 attorneys, it would be the special prosecutor?
10     A.   I think all correspondence is
11 confidential work product.
12     Q.   Okay.  Likewise, we'll reserve on
13 that.
14     A.   Okay.
15     Q.   You have a number 11 on page 2, the
16 litigation file utilized for trial preparation
17 and trial as work product.  Is there some
18 specific significance to a litigation folder that
19 doesn't qualify under the other materials you've
20 listed under work product?
21     A.   No, I think 11 is a repeat of 1.
22     Q.   Okay.  And you have folder containing
23 pre-trial discovery, you're claiming privilege
24 under rule 415(c).  Do you see that?
25     A.   Uh-huh, yes.

Page 16

1     Q.   With your subpoena did you get a copy
2 of Judge Hardwick's order saying that rule 415(c)
3 would not be considered and material should be
4 turned over in discovery?
5     A.   Yes.
6     Q.   Okay.
7     A.   This is a federal case.  Until I get
8 something from Judge Schanzle-Haskins or Judge
9 Bruce, we're not turning it over.
10     Q.   Okay.  Likewise, we will reserve on
11 that.  Other than Bill Clutter finding
12 Dr. Nichols for you, what investigation did you
13 do as part of your work in defending Curtis
14 Lovelace?
15     A.   Well, that's a broad question.  What
16 investigations did we do in defending Curt?
17 Well, we met with Curt.  I met with him a few
18 times.  Jeff Page met with him multiple times.
19 I'm going to guess 10, 15, 20 times up in Hancock
20 County Jail where he was being housed.  We
21 interviewed Logan, Lincoln, and Larson and
22 Lyndsay multiple times.  We met with Christine
23 dozens of times.  We interviewed Dr. Nichols.  We
24 interviewed Jessica Bowman in Keokuk, Iowa.  We
25 interviewed Nichols in Louisville on, I believe,



JAY ELMORE
LOVELACE vs GIBSON

November 20, 2018
17–20

Page 17

1  two occasions.  Jeff interviewed Scott Denton.
2       We then also met with Denton,
3  Parkinson, and Page and I up in Logan County
4  because it was halfway between Bloomington, spent
5  a lot of time on the time, manner, and cause of
6  death, rigor, artifact drying of the eyes, just
7  all that stuff.  We -- I don't believe we ever
8  got inside the home on Kentucky.  We interviewed
9  Marty, Curt's former mother-in-law.  We attempted
10  to interview Gibson.  We attempted to interview
11  Baird.  That was declined by QPD.
12       I mean those are the highlights.  We
13  spent a lot of time on this case, and there was a
14  lot of work done.
15       Q.   Okay.  What was the total bill that
16  Curtis Lovelace incurred for your services?
17       A.   His father paid Jeff and I a hundred
18  thousand dollars as a flat earned-upon-receipt
19  fee.  It wouldn't be ceded for any reason.  Those
20  are our fees.  Now, there were expert fees, and
21  that got a little complicated because there was
22  some fundraising going on, but our fees were a
23  hundred thousand dollars.
24       Q.   And that did not include expert fees
25  though?

Page 18

1       A.   Did not.
2       Q.   Do you have any idea, even a
3  ballpark, of what the expert fees were?
4       A.   I've got an idea.  I think Nichols
5  was somewhere between 15 and 20,000.  Shaku Teas
6  was --
7       Q.   S-h-a-k-u T-e-a-s.
8       A.   -- and we went to Chicago to
9  interview Teas also on, I think, a couple
10  occasions.  Jeff made that trip.  Teas was
11  10,000.  And there's airplane tickets, and there
12  were hotels, and there was per diems, and there
13  was dinners and things of that nature.  So it was
14  probably less than 50,000.
15       Q.   Okay.  So your ballpark estimate for
16  expert fees and other expenses incurred in
17  working with experts max 50,000?
18       A.   I'd say -- that's an educated guess.
19  Some of it went through our trust account.  Some
20  of it I think was paid directly by Christine.
21  Some of it we paid -- Mr. Page and I paid
22  directly ourselves.  So that's a pretty good
23  guess.
24       Q.   How many times did you or Jeff talk
25  to Dr. Denton you said?

Page 19

1       A.   Well, Jeff talked to him once alone
2  in November without a prover, and he generated a
3  memo of that interview, and then because of the
4  content of -- and the reason we interviewed
5  Denton was because in the discovery Denton's
6  report didn't appear anywhere, and that was
7  unusual, unprecedented if I can go that far.  So
8  we wanted to drive up to Bloomington and
9  interview him.
10       We got the report from Denton, which
11  supported Mr. Lovelace's innocence, and then we
12  played, you know, dodge and jump and miss and all
13  that kind of stuff with Denton for about six
14  months -- three months, and then Denton
15  eventually prepared a report for Ed Parkinson,
16  which was in my mind in direct contradiction to
17  the interview that he gave to Jeff Page.
18       So then as a result of that, we met
19  -- Parkinson, Page, Denton and Elmore met in the
20  first floor courthouse in Lincoln to try to work
21  that out, and it was rather contentious, and
22  Denton ended up walking out.
23       Q.   What was your understanding as far as
24  how Dr. Denton supported Curtis's innocence?
25       A.   Well, Denton told -- and again I've

Page 20

1  not looked at Mr. Page's memo in years, but he
2  told -- the nutshell was that Bowman had made a
3  mess of this case, that there's no way you could
4  have determined the cause of death, that she did
5  not properly test the -- or draw slides or
6  properly preserve the brain, the lung, the heart,
7  the liver -- even though there was one slide on
8  the liver as I recall -- the kidney.  Rather, she
9  did a Vitullo kit, a rape kit, on Curt's first
10  wife, and that was pretty much it.  He said that
11  suffocation is a rule-out cause of death.  You
12  must rule out all other cases of death before you
13  get to suffocation, and because Dr. Bowman did
14  such a poor job on the autopsy that you could not
15  rule it out, that he wanted nothing to do with
16  this case, that -- that you need to go somewhere
17  else -- words to that effect.
18       Now, I'm paraphrasing.  It's been
19  four years, but that was the upshot of the
20  interview that Jeff had with Denton up in
21  Bloomington in November of '14.
22       Q.   Okay.  When was the next interview?
23       A.   That would have been the summer of
24  '15 in Logan County.  Reference to the first
25  floor courthouse.  The four of us were present.



Page 21

1 And what happened was -- the reason we didn't
2 have a prover there was because Scott Denton had
3 an issue with Bill Clutter in another homicide
4 case involving myself and another attorney where
5 Clutter went up and interviewed Denton, produced
6 a report, and Denton accused Clutter of
7 dissembling and not being honest in the report.
8      So I told Jeff that -- and I was --
9 planned to go up there.  I can't remember if I
10 was in another trial.  I can't remember, but I
11 think I was in another jury trial so I couldn't
12 make the trip, but the bottom line is you're up
13 there naked because you don't have a prover.
14          So Jeff went up there, and out of an
15 abundance of caution we took Jeff's notes and
16 reduced them to writing, and I directed Jeff to
17 then send them to Dr. Denton so he could make
18 sure that he was not going to have an issue like
19 he had with Clutter earlier.
20          And so there was a time period where
21 we were waiting because Parkinson kept telling us
22 Denton's report in the discovery, and we had a
23 number of issues on that.  At one point, you
24 know, the judge got involved, and, you know, we
25 had discovery, okay, show us where in the

Page 22

1 discovery is Denton's report.  He couldn't
2 produce it.
3          So then in the summer of '15, Jeff
4 was not having any luck getting Denton to return
5 his calls.  So I had his cell phone, and he's the
6 pathologist in a number of homicides down here.
7 So I called Denton under the guise of another
8 case, and so he took my call, and I said, "Hey,
9 while I've got you on the phone, we sent you
10 these notes of Page's interview on Mr. Lovelace's
11 case.  Can you look at those?"  And he said,
12 "Well, my office staff -- my helper, who is also
13 a pathologist, she just had a child, and we're
14 backed up, and I'm behind," and I said, "Scott, I
15 mean it's four pages.  Just look at it, you know.
16 This is a first degree murder case," and then he
17 said, "Well, Parkinson just contacted me, and he
18 wants me to write a report," and I said, "Oh,
19 that's interesting because Parkinson said you
20 wrote a report months and months and months ago."
21 "No, I haven't, and after I write the report, I
22 will then get back in touch with you."
23          So he writes the report which is in
24 stark contrast to the interview with Mr. Page
25 back in November of '14.  That prompted the

Page 23

1 meeting with Denton to try to -- try to somehow
2 reconcile these two different reports that the
3 venerable Scott Denton wrote.
4      Q.   Okay.  When you say there wasn't a
5 prover there, explain what you mean by what a
6 prover -- you're referring to -- what's your
7 understanding when you use the word prover?
8      A.   The third party who can -- who can
9 verify what was said in an interview as opposed
10 to an attorney who would be -- because that
11 creates a conflict which it did in this case.
12      Q.   So then the four of you --
13      A.   Let me back up.
14      Q.   Okay.
15      A.   Denton would refuse to allow Clutter
16 in his office, and I knew that because I've had a
17 number of cases with Denton.  And Clutter was our
18 investigator.  We had nobody else, and money was
19 tight so we knew that he was not going to
20 allow -- in fact, I think he said, "You guys can
21 come up and talk to me but don't bring Clutter."
22      Q.   Okay.  Did Jeff tell you why Denton
23 said back in November of '14 that he -- why he
24 wanted nothing to do with the case?
25      A.   Yes, he did, and it was well-known

Page 24

1 that there was a -- there was bad blood between
2 Jessica Bowman and Scott Denton, and Bowman was a
3 Springfield pathologist who was -- who was
4 removed from the coroner's office, and it was a
5 big to-do.  It was in the paper around here.  She
6 was involved in many, many homicides in central
7 Illinois.  She's a pathologist, Jessica Bowman,
8 and so what had happened was she'd been
9 discredited on some high profile cases.  So they
10 -- the local state's attorneys were having Denton
11 review a lot of Bowman's work and maybe changing
12 her opinion about the manner and cause of death
13 and so on and so forth.  So that created some bad
14 blood between Denton and Bowman, and so in that
15 regard, Denton said words to the effect to Jeff,
16 hey, you know, I don't want to get involved in
17 this because this is another Bowman case.  She's
18 going to hit the ceiling if I come in and
19 change -- change the -- Bowman had determined the
20 cause of death as undetermined and Denton's
21 leaning towards natural causes.  So that was a
22 problem.
23      Q.   Okay.  So you met with Denton and
24 Parkinson up in Logan County?
25      A.   Yes, ma'am.



Page 25

1    Q.    Okay.  Tell me what happened in that
2  meeting.
3    A.    Well, I told Jeff -- he can speak for
4  himself, but I said, listen, this is your
5  witness.  You need to take -- you need to handle
6  this.  You interviewed Denton.  I didn't.  And,
7  you know, Jeff doesn't do as many homicide --
8  murder cases as I have done or I do, and he
9  didn't have the relationship with Denton that I
10  had.  So I was going to let Jeff basically take
11  the lead, and, you know, Denton sort of, "I
12  didn't say that.  You took my words wrong."  So
13  on and so forth, and that went on for a few
14  minutes, and then I just said, "Look, Scott, come
15  on.  Seriously?"  I mean Jeff doesn't even know
16  these terms.  And -- you know, "We tried to call
17  you.  You didn't try to call back.  We tried to
18  call you.  We sent you a letter.  You didn't
19  respond."  "You're accusing me of not being
20  professional.  We're done, and I'm out of here,"
21  and he left.
22        So that -- that left Parkinson, Page,
23  and myself.  So then we're looking into it.
24  Okay.  Now Jeff's got a conflict.  I said, if you
25  call Scott Denton, Jeff's going to be a witness

Page 26

1  and I'm going to have to get a different
2  co-counsel."
3        So then Parkinson eventually, for
4  reasons that are still unclear to me, capitulated
5  and didn't call Denton in Lovelace 1 for that
6  reason.  Well, that's the purported reason.
7    Q.    After that episode in Logan County,
8  did you ever talk to Denton again concerning the
9  Lovelace case?
10    A.    Not concerning Lovelace, no.
11    Q.    But you have talked to him concerning
12  other matters?
13    A.    He's testified in murder cases since
14  then.  Yes, I've faced him two or three times as
15  an expert since then, but Curt's case has never
16  come up.
17    Q.    When the Loevy firm came in for
18  Curt's second trial, were you -- you or Jeff --
19  was it discussed as to whether either of you
20  could possibly be a witness if Denton were called
21  in that case?
22    A.    Not -- not to me.  I don't know if
23  Tara or Jon Loevy asked Jeff.  They didn't ask
24  me.  I think Jeff was maybe endorsed as a witness
25  in Lovelace 2, but I don't know.

Page 27

1    Q.    Other than the phone call where you
2  got Denton on the phone with another case and
3  then brought up the Lovelace case and the meeting
4  in Logan County that you described, did you have
5  any other conversations with Dr. Denton regarding
6  this case?
7    A.    No.
8    Q.    I should say regarding --
9    A.    Not that --
10    Q.    -- the Lovelace case.
11    A.    Not that I'm aware of.  I think that
12  was it.  Again I wasn't in Bloomington.  So I
13  really only talked to him once on the phone in my
14  office briefly, and I think Jeff was still in my
15  office because he called right back, and then up
16  in Lincoln for -- I don't know, a half hour, 45
17  minutes.  That was it.
18    Q.    Okay.  Were you surprised that --
19  that it appeared as though everything that he had
20  told Jeff was now 180 degrees from what he was
21  saying after that meeting?
22    A.    Well, yeah, I was surprised.  First
23  time it's ever happened.  Shocked.  Never look at
24  the guy the same.  Don't trust him at all.  I
25  think he's dangerous.  I think he's in it for the

Page 28

1  money.
2        See, the way these guys get paid -- I
3  don't know if you know this, but these
4  pathologists are just like private attorneys.
5  They've got to keep on the good side of the local
6  prosecutors, the state's attorneys from Adams
7  County over in Quincy all the way over to
8  Champaign County and the whole band in southern
9  Illinois.
10        So the last thing you want to do as a
11  pathologist is to anger and upset a prosecutor
12  because then they can say, well, we don't want
13  Denton to do this work.  We want so and so to do
14  this work.  And so the next thing you know is
15  Scott Denton is out of work.  And so I think
16  Denton is all about the money, and he will say
17  pretty much anything.  That's my opinion.
18        And here's another thing too.  I
19  faced him more than a dozen times, and he's got a
20  way about him the jurors love, and he is very
21  convincing, and he's very difficult to cross, and
22  he's very disarming, and that makes him all the
23  more dangerous for all of us, especially that guy
24  right over there.
25        MS. THOMPSON:  I'm sorry, but can the



Page 29

1  record just reflect that when he said, "the guy
2  over there," he was pointing at Curt?
3        MS. EMERY:  Yes.
4        A.   My former client, Mr. Curt Lovelace.
5  BY MS. EMERY:
6        Q.   What was your involvement in the
7  second trial?
8        A.   Nothing.  I turned the file over to
9  someone in Tara's firm who came down.  I turned
10 over the file absent my work-product notes,
11 trying to get it as organized as I could.  We had
12 made -- there were photographs, and there's just
13 a number of things.  It was a big deal -- a big
14 -- big file.
15       Q.   Okay.  But did you work in a
16 consulting capacity at all?
17       A.   No.
18       Q.   Okay.  So your involvement with the
19 Curtis Lovelace criminal trials ended when you
20 turned your file over to Tara's firm?
21       A.   Yes.
22       Q.   Okay.  Did you believe that there was
23 any police misconduct in the first trial?
24       A.   Now I do, yes.
25       Q.   Okay.  What do you believe?

Page 30

1        A.   Well, clearly Detective Gibson or Ed
2  Parkinson -- somebody had some emails between
3  Denton and Gibson.  I'm led to believe -- I've
4  not seen those.  This is what I've been told.  I
5  didn't attend the trial, but there were emails
6  purportedly between Gibson and Denton that
7  weren't turned over to us and maybe -- maybe more
8  emails from Gibson.
9        Q.   Who told you that?
10       A.   I think people that were in the
11 courtroom that -- had called me on the phone and
12 told me.  I think I read it in the newspaper.  I
13 think I saw it on TV.  I think I've had
14 conversations with Parkinson about it.  I know
15 there's a dispute about who knew what.  Just a
16 whole number of sources.  I've never talked to
17 Tara about it, but other people have told me
18 that.  I don't know if it's true or not, but
19 that's what was reported to me.
20       Q.   So everything you know about it is
21 based on what somebody not involved with the
22 Loevy firm have told you?
23       A.   Yes, I've not talked to them at all
24 about it.
25       Q.   You've said you had conversations

Page 31

1  with Ed Parkinson about it?
2        A.   I've -- well, I've had conversations
3  with Parkinson.  I see him all the time.  We've
4  got cases together.  His office is right across
5  the street.  So yeah.
6        Q.   So what are the conversations you've
7  had with Ed Parkinson about that issue?
8        A.   Well, some of them are private
9  conversations, but the upshot is I maintained
10 that, as I do now, that Curt was innocent and,
11 you know, Ed was wrong, and, you know, that I
12 strongly felt that way and feel that way.  I was
13 disappointed, shocked because I've had -- I don't
14 know -- ten, 15 murder cases with Parkinson,
15 death penalty cases with Parkinson, and a lot of
16 this criminal business is trusting people.  They
17 turn stuff over to you.  You as a defense
18 attorney, you trust people, and so I trusted Ed,
19 and -- that he was giving me all the information
20 and documents in the case that were -- that were
21 to be given to me and Mr. Page, and then when I
22 don't get those things, it was a problem, and I
23 told him that.  I thought that was not cool.  It
24 was not good.  And he said, "Gibson didn't give
25 them to me."

Page 32

1        Q.   Now, did you make any effort to see
2  what it was that supposedly wasn't turned over?
3        A.   No.  No, and I still haven't seen
4  anything.  I'd like to see them, but I've not
5  seen them.
6        Q.   Is your understanding that there's
7  something that would have affected the trial or
8  the outcome of the trial?
9        A.   Yeah.
10       Q.   What is your understanding?
11       A.   Well, if the -- do you have the
12 emails?  I'd like to see them.
13       Q.   No, I'm asking you for your
14 understanding because you've never seen them.
15       A.   Well, okay, if my understanding is
16 correct, that the emails supported in part or in
17 whole the interview that Denton had with Page; in
18 other words, Denton was expressing the same thing
19 to Gibson that he expressed to Page, I would have
20 probably called Denton in our case in chief, and
21 because then you don't have the problem of a
22 defense attorney or former defense attorney
23 impeaching a pathologist, now you have a -- the
24 lead prosecutor or the lead detective in the
25 case.  So you have -- you could have Page



JAY ELMORE
LOVELACE vs GIBSON

November 20, 2018
33–36

Page 33

1 impeaching him, and you could have Gibson
2 impeaching him, and I think Denton would have
3 been a -- if he would have testified along the
4 lines of the notes from Page, he would have been
5 a devastating witness for the prosecution because
6 he was the guy that the state's attorneys picked
7 primarily to clean up Bowman's mess.
8    Q.   When did you learn that these --
9 there was emails that weren't turned over to you?
10   A.   During Lovelace 2.  During the trial
11 when people were coming back to me and saying,
12 hey, there's these emails between Denton and
13 Gibson that Jon Loevy and Tara Thompson thank
14 goodness were aggressive enough to get and didn't
15 trust Parkinson like we did and Gibson like we
16 did, and they got the emails, and I'm not even
17 sure how they got them, and I found out during
18 the trial 2 -- Lovelace 2.
19   Q.   And it was your understanding that
20 the emails supported Jeff Page's notes of the
21 initial interview?
22   A.   It was my understanding that the
23 emails had two -- two important purposes.  Number
24 one, it further buttressed the fact that Gibson
25 was doctor shopping, which we tried to establish

Page 34

1 in Lovelace 1, but that those emails showed that
2 he was not satisfied -- you know, Denton was
3 saying this was not a homicide, you can't prove
4 it.  There are problems with the case, similar to
5 what he was telling Page, and that Gibson for the
6 second or third time then goes and finds yet
7 another pathologist, Jane Turner down in St.
8 Louis, and maybe -- we heard rumors there was
9 even a pathologist between, you know, Shaku Teas
10 or Denton or Bowman and Turner.  Not Baden but
11 someone else, and that would have -- that would
12 have strengthened our case, and it would have
13 changed trial strategy.  It would have made
14 Gibson look absolutely awful on the witness stand
15 that he didn't turn those over, so on and so
16 forth.
17   Q.   Well, you said the one thing -- you
18 said there were two things.  One was the issue
19 that you contended Gibson was doctor shopping.
20 What was the second thing?
21   A.   And the second was that it would have
22 supported Page's words in his interview with
23 Denton.  We -- we would -- we first got the notes
24 -- when Jeff came back and told me about Denton,
25 we had numerous pretrials, and Parkinson kept

Page 35

1 throwing Denton's name out, and I said, "You
2 ain't calling him?"  "Yeah, we are."  I said,
3 "Have you talked to Denton because we have," and
4 so we were on the cusp of calling Denton in our
5 case in chief until he wrote the memo in the
6 summer of '15 which was contrary to what he told
7 Page.
8        So if I'd have had Gibson and
9 Denton's emails, then I probably would have run
10 the chance of impeaching him with those and
11 calling him in our case in chief, and who knows
12 what impact that would have had on Parkinson in
13 terms of pursuing the case, whether it ever would
14 have seen the light of day.  It had some internal
15 problems, discovery violations.  Who knows what
16 the impact would have been, whether we would have
17 even picked over in Quincy.
18       MR. HANSEN:  I'm sorry.  What was
19 that?  You would have picked what?
20   A.   Picked a jury -- whether we would
21 have selected a jury over in Quincy.  I'm just
22 telling you that you ain't cheatin' fair.
23 BY MS. EMERY:
24   Q.   But you never even seen them,
25 correct?

Page 36

1   A.   No, I've not seen them, but nobody's
2 telling me that they don't -- they don't exist,
3 and nobody's telling me they don't contain the
4 contents that I think they contain.
5   Q.   What was Curtis's participation in
6 trial preparation?
7   A.   Well, is he waiving his
8 attorney-client privilege?
9   Q.   You can tell me generally what he did
10 without --
11   A.   Not unless he waives attorney-client
12 privilege I'm not going to tell you what we
13 talked about.
14       MS. EMERY:  Okay.  Tara, you want to
15 go outside and --
16       MS. THOMPSON:  He is not waiving his
17 privilege.  So we assert at least that
18 communications he had with his counsel remain
19 protected by privilege.
20       MS. EMERY:  Okay.  I'm not talking
21 about communications.  I'm talking about his
22 participation as far as did he do research, did
23 he assist you with strategy.  General areas which
24 if you had to log it, you wouldn't tell me what
25 the content was.



JAY ELMORE
LOVELACE vs GIBSON

November 20, 2018
37—40

Page 37

1    A.   I don't think I can even touch that
2 because attorney-client conversations, I think
3 those are privileged.
4 BY MS. EMERY:
5    Q.   Okay.  We'll reserve that issue too.
6    A.   Thank you.
7    Q.   Have you ever met a man named Evan
8 Parke?
9    A.   Evan Parke?
10    Q.   Evan Parke.
11    A.   No.
12    Q.   Have you ever talked to or spoken on
13 the phone with him?
14    A.   No, not that I know of.  I don't
15 think I've ever heard that name before.
16       MS. EMERY:  Okay.  I don't have
17 anything else.  I'm sure co-counsel does.
18       EXAMINATION
19 BY MR. HANSEN:
20    Q.   Yeah.  So let's back up.  When you
21 were first contacted to represent Curt, who made
22 the contact with you?  Was it him or his parents?
23    A.   Christine.
24    Q.   Christine.  And you indicated that
25 Jan and Terry are the ones who paid you the

Page 38

1 hundred thousand dollars.
2    A.   Yes.
3    Q.   And was that by a flat fee retainer
4 agreement or --
5    A.   We called it a classic fee
6 arrangement.  It's earned upon receipt.  So we
7 just use a letter to solidify that agreement.
8    Q.   And did Terry and Jan sign that
9 letter?
10    A.   No, I don't think they signed the
11 letter.  We just mailed it to them confirming our
12 oral agreement.
13    Q.   Okay.  But you would have mailed that
14 to Terry and Jan, Curt's parents?
15    A.   Yes.
16    Q.   All right.  And the expert witness
17 fees that you mentioned earlier, you did retain
18 experts in the defense of the case, correct?
19    A.   Yes, we -- we retained Shaku Teas,
20 and we retained Steve Nichols, I believe.
21    Q.   Okay.  And Nichols is the gentleman
22 you said Bill Clutter found for you in Kentucky?
23    A.   Yes, I think that's his name.  It's
24 been a long time.
25    Q.   All right.  Regardless, those expert

Page 39

1 fees, were those paid separately apart from the
2 hundred thousand dollars?
3    A.   Yes.
4    Q.   And I would like to find out a little
5 more about that.  I thought you said -- did you
6 front some of those costs and then get reimbursed
7 for them?
8    A.   Well, what had happened was we ran
9 out of money, and Clutter was gone.  So we didn't
10 have an investigator, and Christine was
11 struggling mightily to fundraise and try to rob
12 Peter to pay Paul.  Some of those monies made it
13 to our trust account.  Some of the monies I think
14 Christine paid directly.  I can't remember
15 exactly because it was kind of a hodgepodge.  So
16 I think I asked Jan and Terry for some -- some
17 additional money.  It might have been during the
18 trial.  I believe it was after the trial, and
19 they declined because we had some outstanding
20 bills.  So we got to the point where both the
21 experts agreed to come up and testify basically
22 on a promise to get paid because we couldn't pay
23 them up front.  I believe Jeff and I paid for
24 Shaku Teas's plane ticket because I know we
25 picked her up at the airport in Quincy.  We paid

Page 40

1 for her hotel, and we paid for all her meals.
2 Nichols drove, I believe, and we paid for his
3 hotel and his meals.  And we -- we were
4 reimbursed -- Jeff and I were reimbursed for some
5 of those because there was some money in our
6 trust account.  Now, that left outstanding, you
7 know, thousands of dollars of actual fees to
8 Nichols and to Teas, and I lost track of that,
9 but I believe they were eventually paid.
10    Q.   All right.  And that's the next
11 question I have.  Were you part of eventually
12 getting them paid, or were you out of the case by
13 that time?
14    A.   It was during the transition period I
15 think there was some hearings on some monies that
16 had been raised, but I wasn't really involved in
17 that.
18    Q.   Okay.  Did you issue any subpoenas in
19 the defense of the case?
20    A.   I don't believe so, but the court
21 file would reflect that.  I think all the
22 witnesses were the children -- the kids and our
23 two experts.  I don't think we issued any
24 subpoenas.
25    Q.   How about subpoenas for documents



Page 41

1  from any agencies?
2    A.   No.
3    Q.   Was there a stipulation in the case
4  about Bowman not being called?
5    A.   I think there was.  Again you're
6  asking me to go back on that point four years
7  earlier.  I think there was a stipulation as to
8  why she was called.  It was sort of generic
9  vanilla stipulation.  It didn't hurt either side.
10  It didn't get in the business I just talked about
11  earlier.
12    Q.   Did you go up -- I thought you went
13  up and met with her one time in Keokuk?
14    A.   We drove to Keokuk.  She was working
15  at the hospital up in Keokuk.  Jeff and I drove
16  up.  It was in December right around Christmas,
17  met her at the county courthouse up there, and in
18  a big old room, and talked with her.  I knew her.
19  I'd seen her many times, and so I mean we were --
20  we were friends -- I was friendly with her and
21  got a really good report from her too.  Really
22  good report, and then she did the old 360 on us
23  too.
24    Q.   Okay.  So let's talk about that a
25  little bit.  Did you -- I'm not asking for copies

Page 42

1  of them, but did you make notes of your
2  interviews with her?
3    A.   Well, I was doing the questioning.  I
4  remember that, and Jeff was sitting there writing
5  some notes, but taking notes of an interview with
6  Jessica Bowman is a very difficult endeavor, and
7  she would be all over the place, but the takeaway
8  was she was still of the opinion the cause of
9  death was undetermined, the manner of death was
10  undetermined, that she could -- she absolutely
11  could not say that she was suffocated, and we
12  tried as best we could -- I tried as best we
13  could to control her a little bit, but I remember
14  she hugged us and said she would help us, and
15  she's on our side, that she didn't think he
16  committed the crime, blah, blah, blah, and she
17  would testify.
18         And then -- Jeff's office is right
19  behind us here.  I remember calling her on the
20  phone, and Parkinson had talked to her and had
21  made statements about things that little Larson
22  had been saying that we didn't tell her, and now
23  she's -- she's not -- "I want nothing to do with
24  this.  I think he very well could have killed his
25  wife."

Page 43

1    Q.   And did she tell you that information
2  based on information she had received from
3  Mr. Parkinson as to what Detective Baird had
4  interviewed Larson and discussed?
5    A.   No, it was not Baird.  It was Gibson.
6  It was based on information from Adam Gibson and
7  Ed Parkinson.  She said I -- I -- Parkinson and
8  Gibson spoke with me, and you didn't tell me
9  about Larson coming in and finding his mother
10  there in bed and Larson tried to shake her.  I
11  said, "Whoa, whoa, whoa, whoa, Jessica.  That's
12  not true.  That didn't happen.  That was" --
13  "Well, you lied to me.  You lied to me.  I can't
14  trust you."  I said, "We didn't lie to you.  What
15  are you talking about?  There's nothing in
16  discovery to say this," and that was one of the
17  theories that Parkinson had, and so then she --
18  we -- we lost her too.
19    Q.   Okay.  And --
20    A.   Not that I would have called her,
21  but --
22    Q.   Well, that's my next question.
23  You're familiar with Jessica Bowman from working
24  here in Sangamon County?
25    A.   Yes.

Page 44

1    Q.   And she had been discredited on many
2  occasions around here, true?
3    A.   Yes.
4    Q.   And in fact Morgan County and Macon
5  County stopped using her services?
6    A.   Yes.
7    Q.   And Sangamon County stopped as well?
8    A.   Yes.  And there may be more, but yes.
9    Q.   And that was because of various
10  autopsy reports she had done?
11    A.   Yes.  But let me -- but I -- I -- we
12  still may have called her.  We ultimately didn't
13  because of opening that up, but had she been
14  solid saying this is not a homicide, not
15  suffocation, I disagree with that -- that manner
16  of death, we probably would have called her just
17  because I think that would have put Parkinson in
18  a very difficult position because she did the
19  autopsy and now he's discrediting her, and how is
20  that going to -- but once she rolled on us,
21  flipped on us in a -- on the eve of trial we
22  decided not to call her.
23    Q.   And those are trial strategy
24  decisions that you make in defending a case?
25    A.   Yes.





Page 45

1    Q.    But you were able to put on expert
2  witnesses regardless?
3    A.    Yes, we called Teas and Nichols up
4  there.
5    Q.    And you said earlier this was a case
6  that had some expert-driven issues which are
7  rigor mortis, the marbling?
8    A.    Lividity, yes.
9    Q.    The lividity, the dehydration, the
10 drying, all of which go into cause, manner, and
11 time of death, true?
12    A.    That's correct.  True.  I agree.
13    Q.    And at the end of the day, Mr.
14 Lovelace was not convicted, was he?
15    A.    No, he was not convicted.  It was a
16 hung jury in Quincy though, and he had to try it
17 again in Springfield.
18    Q.    Well, that was after the prosecuting
19 attorney had to make a decision whether or not to
20 prosecute the case again, true?
21    A.    Yes.
22    Q.    Okay.  And I wanted to ask you on
23 something else here.  Hold on.  Oh, yeah.  So
24 Gary Farha --
25    A.    Okay.

Page 46

1    Q.    Do you know Gary?
2    A.    I do.  I went to high school with
3  him.  Grew up with him.
4    Q.    And is it fair to say you had
5  absolutely no involvement whatsoever in the first
6  defense of this case with Gary Farha?
7    A.    That's a correct statement.
8    Q.    Okay.  In fact, the Adams County
9  State's Attorney's office -- at the time you were
10 aware the state's attorney was John Barnard?
11    A.    Yes.
12    Q.    John Barnard had nothing to do with
13 regard to the prosecution of the case, true?
14    A.    Well --
15    Q.    He was a witness.
16    A.    Yeah, he had -- he had a member of
17 his office assisting Parkinson in the trial, a
18 young assistant state's attorney.  She was a lady
19 -- or is a lady, and she helped him with the
20 electronic devices in the courtroom, and she sat
21 with him, I think, the entire trial.
22    Q.    Okay.  It was a female?
23    A.    Yes.
24    Q.    Okay.
25    A.    That's my memory.  She was a younger

Page 47

1  -- she's very nice, and she just was helping Ed,
2  and she was with John's office, and John did
3  testify.  That was his only involvement.
4    Q.    Okay.  And as to Jim Keller, he was
5  called as a witness --
6    A.    Yes.
7    Q.    -- in the case, correct?  And did you
8  interview him at all prior to trial?
9    A.    No.
10    Q.    Are you aware of -- as you sit here
11 today you had mentioned your thoughts and
12 opinions on the Quincy Police Department
13 misconduct.  Is there any information you've been
14 provided at any time after the first trial that
15 there was any misconduct or fabrication of
16 evidence or withholding of any documents by the
17 Adams County State's Attorney's office?
18    A.    No.
19    Q.    Okay.
20    A.    No.
21    Q.    How about the Adams County Coroner's
22 office?
23    A.    No.  Gary Hamilton was the coroner --
24    Q.    Correct.
25    A.    -- at the time?  Right.  No.  Now, I

Page 48

1  will say Keller's testimony was contradicted by
2  all the first responders, but --
3    Q.    And that's an issue that sometimes --
4    A.    Sure.
5    Q.    -- interviews come out one way, then
6  a witness testifies another way?  You've had that
7  happen before?
8    A.    Yeah.  Sure.
9    Q.    Okay.  And just in general your type
10 of practice, are you a hundred percent criminal
11 defense?
12    A.    Yes, sir.
13    Q.    Okay.  And how many murder trials
14 have you taken to jury?
15    A.    Between 40 and 50.
16    MR. HANSEN:  Okay.  That's all I
17 have.  Thanks.
18    THE WITNESS:  Thanks.
19    MS. THOMPSON:  I don't have any
20 questions.
21    MS. EMERY:  Reserve or waive?
22    THE WITNESS:  I'll waive unless you
23 want me to --
24    MS. THOMPSON:  I trust the court
25 reporter.



JAY ELMORE
LOVELACE vs GIBSON

November 20, 2018
49–50

Page 49

1      THE WITNESS:  Okay.  I'll waive.
2      MS. EMERY:  Okay.
3      (The deposition was concluded at
4  11:24 a.m., and the signature of the deponent was
5  waived.)
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 50

1              CERTIFICATION
2          I, Rhonda Rhodes Bentley, CSR, a
   Certified Shorthand Reporter (IL), do hereby
3  certify that JAY ELMORE, came before me on
   NOVEMBER 20, 2018, and swore before me to testify
4  to the truth, the whole truth and nothing but the
   truth regarding her knowledge touching upon the
5  matter in controversy.
6          I do further certify that I did take
   stenographic notes of the questions propounded to
7  said witness and her answers thereto and that
   said notes were reduced to typewritten form under
8  my direction and supervision.
9          I do further certify that the
   attached and foregoing is a true, correct and
10 complete copy of my notes and that said testimony
   is now herewith returned.  I do further certify
11 that said deposition was taken at the Law Offices
   of Elmore & Reid, 808 South Second Street, 1st
12 Floor, Springfield, Illinois.
13         I do further certify that I am not
   related in any way to any of the parties involved
14 in this action and have no interest in the
   outcome thereof.  Dated at Divernon, Illinois,
15 November 26, 2018.
16
17
18 
   _____
19         Rhonda Rhodes Bentley, CSR
           CSR# 084-002706
20
21
22
23
24
25

JAY ELMORE
LOVELACE vs GIBSON

November 20, 2018
Index: 1..awful

---

**Exhibits**

3127205 Jay
.Elmore.
EXHIBIT1
 3:5 6:5,8
 11:7

---

**1**

1
 6:5,8
 11:7
 15:21
 26:5 34:1

10
 16:19

10,000
 18:11

10:31
 5:1

11
 15:15,21

11:24
 49:4

14
 20:21
 22:25
 23:23

15
 16:19
 18:5
 20:24
 22:3
 31:14
 35:6

180
 27:20

---

**2**

2
 15:15
 26:25
 33:10,18

20
 16:19

20,000
 18:5

---

**3**

360
 41:22

---

**4**

4
 9:3

40
 48:15

415(c)
 15:24
 16:2

45
 27:16

---

**5**

5
 11:7,25
 12:14

50
 48:15

50,000
 18:14,17

---

**6**

6
 12:17

---

**9**

9
 14:8

---

**A**

a.m.
 5:1 49:4

absent
 29:10

absolutely
 34:14
 42:10
 46:5

abundance
 21:15

account
 18:19
 39:13
 40:6

accused
 21:6

accusing
 25:19

actual
 40:7

Adam
 43:6

Adams
 28:6 46:8
 47:17,21

additional
 39:17

address
 14:17

affected
 32:7

agencies
 41:1

aggressive
 33:14

agree
 45:12

agreed
 39:21

agreement
 38:4,7,12

airplane
 18:11

airport
 39:25

anger
 28:11

anymore
 10:11

appeared
 27:19

areas
 36:23

arguments
 7:19

arrangement
 38:6

artifact
 14:1 17:6

assert
 36:17

assist
 36:23

assistant
 46:18

assisting
 46:17

assume
 8:24

attempted
 17:9,10

attend
 30:5

attorney
 14:22
 21:4
 23:10
 31:18
 32:22
 45:19
 46:10,18

Attorney's
 46:9
 47:17

attorney-
client
 7:25
 12:19
 36:8,11
 37:2

attorneys
 15:9
 24:10
 28:4,6
 33:6

autopsy
 20:14
 44:10,19

aware
 27:11
 46:10
 47:10

awful
 34:14



**B**

**back**
22:22,25
23:13,23
25:17
27:15
33:11
34:24
37:20
41:6

**backed**
22:14

**bad**
24:1,13

**Baden**
34:10

**Baird**
17:11
43:3,5

**ballpark**
18:3,15

**band**
28:8

**Barnard**
46:10,12

**based**
30:21
43:2,6

**basically**
25:10
39:21

**bed**
43:10

**behalf**
9:17,18

**benefit**
9:9,15

**big**

24:5
29:13,14
41:18

**bill**
9:7
11:18,24
12:4
16:11
17:15
21:3
38:22

**bills**
39:20

**bit**
41:25
42:13

**black**
10:9

**blah**
42:16

**blood**
24:1,14

**Bloomington**
17:4 19:8
20:21
27:12

**bottom**
21:12

**Bowman**
10:22
16:24
20:2,13
24:2,7,
14,17,19
34:10
41:4 42:6
43:23

**Bowman's**
24:11
33:7

**brain**
20:6

**briefly**
7:5 27:14

**bring**
23:21

**broad**
16:15

**brought**
6:2 27:3

**Bruce**
7:6,8
16:9

**business**
31:16
41:10

**buttressed**
33:24

**C**

**call**
11:20
22:8
25:16,17,
18,25
26:5 27:1
44:22

**called**
8:5 22:7
26:20
27:15
30:11
32:20
38:5
41:4,8
43:20
44:12,16
45:3 47:5

**calling**
35:2,4,11
42:19

**calls**
22:5

**capacity**
29:16

**capitulated**
26:4

**case**
5:11,19
6:22 7:6
9:8,14
13:21,22
16:7
17:13
20:3,16
21:4
22:8,11,
16 23:11,
24 24:17
26:9,15,
21 27:2,
3,6,10
31:20
32:20,25
34:4,12
35:5,11,
13 38:18
40:12,19
41:3
44:24
45:5,20
46:6,13
47:7

**cases**
20:12
23:17
24:9 25:8
26:13
31:4,14,
15

**caution**
21:15

**ceded**
17:19

**ceiling**
24:18

**cell**
22:5

**central**
24:6

**Champaign**
28:8

**chance**
35:10

**change**
24:19

**changed**
34:13

**changing**
24:11

**cheatin'**
35:22

**Chicago**
18:8

**chief**
32:20
35:5,11

**child**
22:13

**children**
11:1
40:22

**Christine**
8:4 12:23
16:22
18:20
37:23,24
39:10,14

**Christmas**
41:16

**claim**
11:12

**claimed**
12:19
14:22



claiming
8:11 11:9
13:19
14:11
15:23

classic
38:5

clean
33:7

client
7:24 8:2
14:5 29:4

client's
9:17
12:18

closely
8:21

closing
7:19

Clutter
9:7,11,
13,14,22
10:2,13,
19 11:18,
24,25
16:11
21:3,5,6,
19 23:15,
17,21
38:22
39:9

co-counsel
26:2
37:17

committed
42:16

communications
36:18,21

complicated
17:21

comprise
7:14 8:1
13:19

comprised
8:15

computer
7:22

concluded
49:3

conduct
9:16

confidential
15:11

confirming
38:11

conflict
23:11
25:24

considered
16:3

consulting
29:16

contact
12:5
37:22

contacted
22:17
37:21

contend
14:16

contended
34:19

contending
15:4,7

content
19:4
36:25

contention
12:10

contentious
19:21

contents
11:17
36:4

continue
5:24

contradicted
48:1

contradiction
19:16

contrary
35:6

contrast
22:24

control
42:13

conversations
27:5
30:14,25
31:2,6,9
37:2

convicted
45:14,15

convincing
28:21

cool
31:23

copies
6:3 41:25

copy
6:11 16:1

coroner
47:23

coroner's
24:4
47:21

correct
8:13
32:16
35:25
38:18
45:12
46:7
47:7,24

correspond
13:5

correspondence
8:25
11:14,23
12:15,17,
22 14:9,
12,21,25
15:5,7,10

costs
39:6

counsel
7:12,15
8:13 9:1
12:18
14:9,22
36:18

counsel's
9:1 11:8
12:1

county
16:20
17:3
20:24
24:24
26:7 27:4
28:7,8
41:17
43:24
44:4,5,7
46:8
47:17,21

couple
18:9

court
5:8 40:20
48:24

courthouse
19:20
20:25
41:17

courtroom
30:11
46:20

created
24:13

creates
23:11

crime
42:16

criminal
29:19
31:16
48:10

cross
28:21

cross-examination
7:17

Curt
8:3
16:16,17
29:2,4
31:10
37:21

Curt's
17:9 20:9
26:15,18
38:14

Curtis
6:21
16:13
17:16
29:19

Curtis's



19:24
36:5

cusp
35:4

——————

**D**

——————

dangerous
27:25
28:23

day
35:14
45:13

deal
29:13

death
13:21,25
17:6
20:4,11,
12 24:12,
20 31:15
42:9
44:16
45:11

December
41:16

decided
44:22

decision
45:19

decisions
44:24

declined
17:11
39:19

defendants
5:11

defendants'
12:10

defending

16:13,16
44:24

defense
31:17
32:22
38:18
40:19
46:6
48:11

degree
22:16

degrees
27:20

dehydration
45:9

Denton
8:13,19,
22 10:24
17:1,2
18:25
19:5,10,
13,14,19,
22,24,25
20:20
21:2,5,6,
17 22:4,7
23:1,3,
15,17,22
24:2,10,
14,15,23
25:6,9,
11,25
26:5,8,20
27:2,5
28:13,15,
16 30:3,6
32:17,18,
20 33:2,
12 34:2,
10,23,24
35:3,4

Denton's
19:5
21:22

22:1
24:20
35:1,9

Department
47:12

deponent
49:4

deposed
5:14

deposition
5:17 7:10
13:11
49:3

detective
30:1
32:24
43:3

determined
20:4
24:19

devastating
33:5

devices
46:20

diems
18:12

difficult
28:21
42:6
44:18

dinners
18:13

direct
7:17
19:16

directed
21:16

directly
8:8
18:20,22

39:14

disagree
44:15

disappointe
d
31:13

disarming
28:22

discovery
15:23
16:4 19:5
21:22,25
22:1
35:15
43:16

discredited
24:9 44:1

discrediting
44:19

discussed
26:19
43:4

dispute
30:15

dissembling
21:7

doctor
33:25
34:19

document
6:9,24

documents
6:25 7:14
8:1 31:20
40:25
47:16

dodge
19:12

dollars

17:18,23
38:1 39:2
40:7

dozen
28:19

dozens
16:23

draw
20:5

drive
19:8

drove
40:2
41:14,15

drying
14:1 17:6
45:10

duly
5:3

——————

**E**

——————

E-L-M-O-R-E
5:9

earlier
21:19
38:17
41:7,11
45:5

earned
38:6

earned-
upon-
receipt
17:18

easier
6:4

Ed
19:15
30:1



31:1,7,
11,18
43:7 47:1

**educated**
18:18

**effect**
20:17
24:15

**effort**
32:1

**electronic**
46:20

**Ellen**
5:10

**Elmore**
5:2,9
6:5,16
19:19

**emails**
30:2,5,8
32:12,16
33:9,12,
16,20,23
34:1 35:9

**Emery**
5:6,10
6:7 29:3,
5 35:23
36:14,20
37:4,16
48:21
49:2

**end**
45:13

**endeavor**
42:6

**ended**
9:8,14
19:22
29:19

**endorsed**

26:24

**entire**
12:11
46:21

**episode**
26:7

**establish**
33:25

**estimate**
18:15

**Evan**
37:7,9,10

**eve**
44:21

**event**
7:5

**eventually**
19:15
26:3
40:9,11

**evidence**
47:16

**examination**
5:5 7:18
37:18

**Exhibit**
5:24 6:5,
8 11:7

**exist**
36:2

**expenses**
18:16

**expert**
9:19
11:9,14
12:2,11
13:17,18
14:9,12
17:20,24
18:3,16

26:15
38:16,25
45:1

**expert-
driven**
13:22
45:6

**experts**
11:19
12:5
18:17
38:18
39:21
40:23

**explain**
23:5

**expressed**
32:19

**expressing**
32:18

**extensive**
13:24

**eyes**
17:6

──────────

**F**

──────────

**fabrication**
47:15

**faced**
26:14
28:19

**facilitated**
10:20

**fact**
12:11
23:20
33:24
44:4 46:8

**faded**
10:8

**fair**
35:22
46:4

**falls**
13:3

**familiar**
43:23

**family**
12:18
13:1

**Farha**
45:24
46:6

**father**
13:6,7
17:17

**federal**
16:7

**fee**
17:19
38:3,5

**feel**
31:12

**fees**
17:20,22,
24 18:3,
16 38:17
39:1 40:7

**felt**
31:12

**female**
46:22

**file**
6:21
12:12
15:16
29:8,10,
14,20
40:21

**find**
39:4

**finding**
16:11
43:9

**finds**
34:6

**firm**
26:17
29:9,20
30:22

**flat**
17:18
38:3

**flipped**
44:21

**floor**
19:20
20:25

**folder**
15:18,22

**forgetting**
10:16

**found**
33:17
38:22

**friendly**
41:20

**friends**
41:20

**front**
39:6,23

**fundamental
s**
5:17

**fundraise**
39:11

**fundraising**
17:22



_____

        **G**
_____

**Gary**
    45:24
    46:1,6
    47:23

**gave**
    19:17

**general**
    36:23
    48:9

**generally**
    36:9

**generated**
    19:2

**generic**
    41:8

**gentleman**
    38:21

**Gibson**
    17:10
    30:1,3,6,
    8 31:24
    32:19
    33:1,13,
    15,24
    34:5,14,
    19 35:8
    43:5,6,8

**give**
    31:24

**giving**
    31:19

**good**
    5:12,13
    18:22
    28:5
    31:24
    41:21,22

**goodness**

    33:14

**Grew**
    46:3

**guess**
    16:19
    18:18,23

**guise**
    22:7

**guy**
    27:24
    28:23
    29:1 33:6

**guys**
    23:20
    28:2

_____

        **H**
_____

**half**
    27:16

**halfway**
    17:4

**Hamilton**
    47:23

**Hancock**
    16:19

**handed**
    6:8

**handle**
    25:5

**handwritten**
    7:22,23

**HANSEN**
    35:18
    37:19
    48:16

**happen**
    43:12
    48:7

**happened**
    9:10,12
    21:1 24:8
    25:1
    27:23
    39:8

**happy**
    6:3

**Hardwick's**
    16:2

**heard**
    34:8
    37:15

**hearings**
    40:15

**heart**
    20:6

**helped**
    46:19

**helper**
    22:12

**helping**
    47:1

**hey**
    22:8
    24:16
    33:12

**high**
    24:9 46:2

**highlights**
    17:12

**hire**
    9:22

**hired**
    10:2

**hit**
    24:18

**hodgepodge**
    39:15

**Hold**
    45:23

**home**
    17:8

**homicide**
    21:3 25:7
    34:3
    44:14

**homicides**
    22:6 24:6

**honest**
    21:7

**hospital**
    41:15

**hotel**
    40:1,3

**hotels**
    18:12

**hour**
    27:16

**housed**
    16:20

**hugged**
    42:14

**hundred**
    17:17,23
    38:1 39:2
    48:10

**hung**
    45:16

**hurt**
    41:9

_____

        **I**
_____

**idea**
    18:2,4

**identificat
ion**
    6:6

**Illinois**
    24:7 28:9

**impact**
    35:12,16

**impeaching**
    32:23
    33:1,2
    35:10

**important**
    10:21
    33:23

**include**
    17:24

**incurred**
    17:16
    18:16

**independent**
    11:14

**information**
    13:17
    31:19
    43:1,2,6
    47:13

**initial**
    33:21

**innocence**
    19:11,24

**innocent**
    31:10

**inside**
    17:8

**interesting**
    22:19

**internal**
    35:14

**interview**
    8:3,4,5,
    12,15,17,
    18,22,24
    17:10



18:9
19:3,9,17
20:20,22
22:10,24
23:9
32:17
33:21
34:22
42:5 47:8

**interviewed**
10:18,22,
23,24,25
11:1,2
16:21,23,
24,25
17:1,8
19:4 21:5
25:6 43:4

**interviews**
42:2 48:5

**investigation**
9:17
16:12

**investigations**
16:16

**investigator**
9:1,6,9,
15,23
10:5
23:18
39:10

**investigator's**
11:8,13
12:1

**involved**
10:11
21:24
24:6,16
30:21
40:16

**involvement**
29:6,18
46:5 47:3

**involving**
21:4

**Iowa**
16:24

**issue**
14:20
21:3,18
31:7
34:18
37:5
40:18
48:3

**issued**
40:23

**issues**
7:9 14:2
15:2
21:23
45:6

_____

**J**

**J-A-Y**
5:9

**Jail**
16:20

**James**
6:16

**Jan**
13:7
37:25
38:8,14
39:16

**Jane**
34:7

**Jay**
5:2,9
6:17

**Jeff**
8:18
10:24
16:18
17:1,17
18:10,24
19:1,17
20:20
21:8,14,
16 22:3
23:22
24:15
25:3,7,
10,15
26:18,23,
24 27:14,
20 33:20
34:24
39:23
40:4
41:15
42:4

**Jeff's**
21:15
25:24,25
42:18

**Jessica**
16:24
24:2,7
42:6
43:11,23

**Jim**
47:4

**job**
20:14

**John**
46:10,12
47:2

**John's**
47:2

**Jon**
26:23
33:13

**judge**
7:6,7
14:18
16:2,8
21:24

**jump**
19:12

**jurors**
28:20

**jury**
7:19,20
21:11
35:20,21
45:16
48:14

_____

**K**

**Keller**
47:4

**Keller's**
48:1

**Kentucky**
17:8
38:22

**Keokuk**
16:24
41:13,14,
15

**kidney**
20:8

**kids**
40:22

**killed**
42:24

**kind**
19:13
39:15

**kit**
20:9

**knew**
23:16,19
30:15
41:18

_____

**L**

**lady**
46:18,19

**Larson**
16:21
42:21
43:4,9,10

**lawyer**
5:16

**lead**
25:11
32:24

**leaning**
24:21

**learn**
33:8

**led**
30:3

**left**
25:21,22
40:6

**letter**
6:19
11:17
25:18
38:7,9,11

**letters**
11:8,13,
17 12:2,
3,6,7,10
14:4,5

**lie**
43:14

**lied**
43:13



light
    35:14

likewise
    8:7 14:8
    15:12
    16:10

limited
    14:20

Lincoln
    16:21
    19:20
    27:16

lines
    15:3 33:4

listed
    7:11,25
    15:20

listen
    25:4

lists
    6:24

litigation
    6:21
    15:16,18

liver
    20:7,8

lividity
    45:8,9

living
    10:19

local
    24:10
    28:5

locating
    9:19
    10:12,16

Loevy
    26:17,23
    30:22
    33:13

log
    36:24

Logan
    16:21
    17:3
    20:24
    24:24
    26:7 27:4

long
    12:7
    38:24

looked
    20:1

lost
    40:8
    43:18

lot
    14:2,3
    17:5,13,
    14 24:11
    31:15

Louis
    34:8

Louisville
    9:20
    10:10,17,
    20 16:25

love
    28:20

Lovelace
    6:21
    12:23
    14:6
    16:14
    17:16
    26:5,9,
    10,25
    27:3,10
    29:4,19
    33:10,18
    34:1
    45:14

Lovelace's
    13:1
    19:11
    22:10

luck
    22:4

lung
    20:6

Lyndsay
    11:2
    16:22

——————————

M

——————————

Macon
    44:4

made
    18:10
    20:2
    29:12
    34:13
    37:21
    39:12
    42:21

mailed
    38:11,13

maintained
    31:9

make
    21:12,17
    32:1 42:1
    44:24
    45:19

makes
    28:22

man
    37:7

manner
    13:20,24
    17:5
    24:12

42:9
44:15
45:10

marbling
    14:1 45:7

marked
    5:24 6:6

Marty
    17:9

material
    13:18
    14:16
    16:3

materials
    15:19

matters
    26:12

max
    18:17

meals
    40:1,3

meet
    13:13

meeting
    23:1 25:2
    27:3,21

member
    46:16

members
    12:25

memo
    19:3 20:1
    35:5

memory
    11:4
    46:25

mentioned
    38:17
    47:11

mess
    20:3 33:7

met
    16:17,18,
    22 17:2
    19:18,19
    24:23
    37:7
    41:13,17

mightily
    39:11

mind
    19:16

minutes
    25:14
    27:17

misconduct
    29:23
    47:13,15

money
    23:18
    28:1,16
    39:9,17
    40:5

monies
    39:12,13
    40:15

months
    19:14
    22:20

Morgan
    44:4

mortis
    13:25
    45:7

mother
    13:6 43:9

mother-in-
law
    17:9

moved



10:10

multiple
  16:18,22

murder
  22:16
  25:8
  26:13
  31:14
  48:13

Myerscough
  7:7

_____

        N

_____

naked
  21:13

named
  37:7

natural
  24:21

nature
  18:13

negotiations
  15:2,6

news
  5:12

newspaper
  30:12

nice
  47:1

Nichols
  10:17,18
  11:5 12:4
  16:12,23,
  25 18:4
  38:20,21
  40:2,8
  45:3

nobody's

36:1,3

notes
  7:12,15,
  16,24
  8:2,3,4,
  5,12,16,
  17,20
  21:15
  22:10
  29:10
  33:4,20
  34:23
  42:1,5

November
  19:2
  20:21
  22:25
  23:23

number
  6:25 9:3
  11:7,25
  12:14,17
  14:2,8
  15:15
  21:23
  22:6
  23:17
  29:13
  30:16
  33:23

numbers
  6:1

numerous
  34:25

nutshell
  20:2

_____

        O

_____

object
  6:14

occasions
  17:1

18:10
44:2

office
  6:20
  22:12
  23:16
  24:4
  27:14,15
  31:4
  42:18
  46:9,17
  47:2,17,
  22

opening
  7:18
  44:13

opinion
  24:12
  28:17
  42:8

opinions
  47:12

opposed
  23:9

oral
  38:12

order
  16:2

organized
  29:11

outcome
  32:8

outstanding
  39:19
  40:6

_____

        P

_____

Page's
  20:1
  22:10

33:20
34:22

pages
  6:14
  22:15

paid
  17:17
  18:20,21
  28:2
  37:25
  39:1,14,
  22,23,25
  40:1,2,9,
  12

paper
  24:5

paraphrasing
  20:18

parents
  37:22
  38:14

Parke
  37:8,9,10

Parkinson
  15:2 17:3
  19:15,19
  21:21
  22:17,19
  24:24
  25:22
  26:3
  30:2,14
  31:1,3,7,
  14,15
  33:15
  34:25
  35:12
  42:20
  43:3,7,17
  44:17
  46:17

part

16:13
32:16
40:11

participation
  36:5,22

party
  23:8

pathologist
  22:6,13
  24:3,7
  28:11
  32:23
  34:7,9

pathologists
  28:4

Paul
  39:12

pay
  39:12,22

penalty
  31:15

people
  30:10,17
  31:16,18
  33:11

percent
  48:10

period
  21:20
  40:14

Peter
  39:12

phone
  22:5,9
  27:1,2,13
  30:11
  37:13
  42:20

photographs



29:12

picked
33:6
35:17,19,
20 39:25

place
42:7

plane
39:24

planned
21:9

played
19:12

plea
15:2,5

point
10:4
21:23
39:20
41:6

pointing
29:2

police
29:23
47:12

poor
20:14

position
44:18

possibly
26:20

practice
48:10

pre-trial
15:23

preparation
7:16
13:11,14
15:16
36:6

prepare
7:20

prepared
8:8,18
19:15

present
20:25

preserve
20:6

pretrials
34:25

pretty
5:12 11:6
18:22
20:10
28:17

primarily
13:6 33:7

prior
47:8

private
28:4 31:8

privilege
7:8,11,12
8:1 9:2
11:15
12:13,20
14:11,23
15:23
36:8,12,
17,19

privileged
7:1 12:12
14:16
15:6 37:3

problem
24:22
31:22
32:21

problems
34:4

35:15

produce
22:2

produced
21:5

product
7:12,25
8:12 9:2
11:10,15,
19 12:13,
19 13:16,
19 14:10,
11,23,24
15:3,6,
11,17,20

professiona
l
25:20

profile
24:9

promise
39:22

prompted
22:25

properly
20:5,6

prosecute
45:20

prosecuting
45:18

prosecution
33:5
46:13

prosecutor
15:9
28:11
32:24

prosecutors
28:6

protected

36:19

prove
34:3

prover
19:2
21:2,13
23:5,6,7

provide
6:25

provided
47:14

purported
26:6

purportedly
30:6

purposes
33:23

pursuing
35:13

put
14:10
44:17
45:1

_____

Q

QPD
17:11

qualifies
14:23

qualify
15:19

question
16:15
40:11
43:22

questioning
42:3

questions
48:20

quick
5:12

Quincy
5:11 11:2
12:10
28:7
35:17,21
39:25
45:16
47:12

quit
10:7

_____

R

raised
40:16

ran
39:8

rape
20:9

read
30:12

reason
17:19
19:4 21:1
26:6

reasons
7:1 26:4

recall
9:21
10:14
13:9 20:8

receipt
38:6

receive
5:18

received
43:2

recognize



6:9

**reconcile**
23:2

**reconsider**
12:13

**record**
29:1

**records**
5:21

**redepose**
14:19

**reduced**
21:16

**Reference**
20:24

**referring**
5:25 23:6

**reflect**
29:1
40:21

**refuse**
6:25
23:15

**regard**
24:15
46:13

**reimbursed**
39:6 40:4

**relation**
8:18

**relationshi
p**
25:9

**remain**
36:18

**remark**
6:3

**remember**
10:16

12:7
21:9,10
39:14
42:4,13,
19

**removed**
24:4

**reopen**
7:9

**repeat**
15:21

**report**
19:6,10,
15 21:6,
7,22
22:1,18,
20,21,23
41:21,22

**reported**
30:19

**reporter**
5:8 48:25

**reports**
23:2
44:10

**represent**
5:10
37:21

**research**
13:17,24
36:22

**researching**
14:3

**reserve**
7:9 14:18
15:12
16:10
37:5
48:21

**respects**
13:22

**respond**
25:19

**responders**
48:2

**response**
6:20

**result**
19:18

**retain**
38:17

**retained**
38:19,20

**retainer**
38:3

**return**
22:4

**review**
24:11

**rigor**
13:25
17:6 45:7

**rob**
39:11

**rolled**
44:20

**room**
41:18

**rule**
15:24
16:2
20:12,15

**rule-out**
20:11

**rules**
14:18

**rumors**
34:8

**run**
35:9

─────────

**S**

─────────

**S-H-A-K-U**
18:7

**Sangamon**
43:24
44:7

**sat**
46:20

**satisfied**
34:2

**Schanzle-
haskins**
16:8

**school**
46:2

**Scott**
8:13 17:1
21:2
22:14
23:3 24:2
25:14,25
28:15

**selected**
35:21

**selection**
7:19

**send**
21:17

**separately**
39:1

**services**
17:16
44:5

**shake**
43:10

**Shaku**
18:5 34:9
38:19

39:24

**she'd**
24:8

**shocked**
27:23
31:13

**shopping**
33:25
34:19

**show**
5:23
21:25

**showed**
34:1

**side**
28:5 41:9
42:15

**sign**
38:8

**signature**
6:11,12
49:4

**signed**
38:10

**significanc
e**
15:18

**similar**
34:4

**sir**
48:12

**sit**
47:10

**sitting**
42:4

**slide**
20:7

**slides**
20:5



solid
    44:14

solidify
    38:7

sort
    10:8
    25:11
    41:8

sources
    30:16

southern
    28:8

speak
    25:3

special
    15:9

specific
    15:18

specifically
    10:1 14:5

spell
    5:7

spent
    14:2
    17:4,13

spoke
    43:8

spoken
    37:12

Springfield
    24:3
    45:17

St
    34:7

staff
    22:12

stand
    34:14

stark
    22:24

state
    5:7

state's
    14:21
    15:8
    24:10
    28:6 33:6
    46:9,10,
    18 47:17

statement
    46:7

statements
    7:18
    42:21

Steve
    38:20

stipulation
    41:3,7,9

stopped
    44:5,7

strategy
    11:20
    34:13
    36:23
    44:23

street
    31:5

strengthened
    34:12

strongly
    31:12

struggling
    39:11

stuff
    17:7
    19:13
    31:17

subpoena
    5:19 6:20
    16:1

subpoenas
    40:18,24,
    25

suffocated
    42:11

suffocation
    20:11,13
    44:15

summer
    20:23
    22:3 35:6

supported
    19:11,24
    32:16
    33:20
    34:22

supposedly
    32:2

surprised
    27:18,22

switched
    7:7

sworn
    5:3

——————————

T

——————————

T-E-A-S
    18:7

takeaway
    42:7

taking
    42:5

talk
    18:24
    23:21
    26:8

    41:24

talked
    19:1
    26:11
    27:13
    30:16,23
    35:3
    36:13
    37:12
    41:10,18
    42:20

talking
    36:20,21
    43:15

Tara
    26:23
    30:17
    33:13
    36:14

Tara's
    29:9,20

Teas
    18:5,9,10
    34:9
    38:19
    40:8 45:3

Teas's
    39:24

telling
    21:21
    34:5
    35:22
    36:2,3

ten
    31:14

terminate
    10:5,6

terms
    25:16
    35:13

Terry
    13:7

    37:25
    38:8,14
    39:16

test
    20:5

testified
    26:13
    33:3

testifies
    5:3 48:6

testify
    39:21
    42:17
    47:3

testimony
    48:1

theories
    43:17

thing
    28:10,14,
    18 32:18
    34:17,20

things
    18:13
    29:13
    31:22
    34:18
    42:21

Thompson
    6:2 28:25
    33:13
    36:16
    48:19,24

thought
    31:23
    39:5
    41:12

thoughts
    47:11

thousand
    17:18,23



JAY ELMORE
LOVELACE vs GIBSON

38:1 39:2

**thousands**
40:7

**throwing**
35:1

**ticket**
39:24

**tickets**
18:11

**tight**
23:19

**time**
8:21
10:18
12:7
13:21,25
14:2,3,17
17:5,13
21:20
27:23
31:3 34:6
38:24
40:13
41:13
45:11
46:9
47:14,25

**times**
16:18,19,
22,23
18:24
26:14
28:19
41:19

**to-do**
24:5

**today**
5:12
47:11

**today's**
13:11

**told**
19:25
20:2 21:8
25:3
27:20
30:4,9,
12,17,22
31:23
34:24
35:6

**total**
17:15

**touch**
22:22
37:1

**track**
40:8

**transition**
40:14

**trial**
5:16,21
7:12,15,
16,20
8:13,25
9:1,5
11:8,19
12:1,18
14:9,22
15:16,17
21:10,11
26:18
29:7,23
30:5
32:7,8
33:10,18
34:13
36:6
39:18
44:21,23
46:17,21
47:8,14

**trials**
29:19
48:13

**trip**
18:10
21:12

**true**
8:24
30:18
43:12
44:2
45:11,12,
20 46:13

**trust**
18:19
27:24
31:18
33:15
39:13
40:6
43:14
48:24

**trusted**
31:18

**trusting**
31:16

**turn**
31:17
34:15

**turned**
13:23
16:4
29:8,9,20
30:7 32:2
33:9

**Turner**
34:7,10

**turning**
16:9

**TV**
30:13

**two-page**
6:9

**type**
7:14 8:1

48:9

**typed**
7:22

_____

**U**

_____

**uh-huh**
7:2 8:10
15:25

**ultimately**
44:12

**unclear**
26:4

**understand**
11:22

**understandi
ng**
19:23
23:7
32:6,10,
14,15
33:19,22

**undetermine
d**
24:20
42:9,10

**unprecedent
ed**
19:7

**unusual**
19:7

**upset**
28:11

**upshot**
20:19
31:9

**Urbana**
7:8

**utilized**
15:16

_____

**V**

_____

**vanilla**
41:9

**venerable**
23:3

**verify**
23:9

**violations**
35:15

**visit**
12:14

**Vitullo**
20:9

_____

**W**

_____

**waiting**
21:21

**waive**
48:21,22
49:1

**waived**
49:5

**waives**
36:11

**waiving**
36:7,16

**walking**
19:22

**wanted**
19:8
20:15
23:24
45:22

**well-known**
23:25

**whatsoever**
46:5



**whoa**
43:11

**wife**
20:10
42:25

**withholding**
47:16

**witnesses**
7:17,18
8:4,6
11:9,14
12:2,11
13:18
14:10,13
40:22
45:2

**word**
23:7

**words**
20:17
24:15
25:12
32:18
34:22

**work**
7:12,25
8:12 9:2
11:9,15,
19 12:13,
19 13:16,
19 14:10,
11,22,24
15:3,6,
11,17,20
16:13
17:14
19:20
24:11
28:13,14,
15 29:15

**work-
product**
29:10

**working**
18:17
41:14
43:23

**write**
22:18,21

**writes**
22:23

**writing**
21:16
42:4

**written**
11:18

**wrong**
25:12
31:11

**wrote**
8:21
22:20
23:3 35:5

---

**Y**

---

**years**
10:15
20:1,19
41:6

**yesterday**
5:25

**young**
46:18

**younger**
46:25



THE LAW OFFICES OF
# TIMONEY & PAGE

ATTORNEYS AT LAW

---

808 SOUTH SECOND STREET
SPRINGFIELD, ILLINOIS 62704
(217) 522-1944

**PATRICK "TIM" TIMONEY**
**JEFF PAGE**

FAX: (217) 523-2549

<u>LINCOLN PHONE</u>:
(217) 732-1944

September 11, 2018

Lucy B. Bednarek
Ancel, Glink, Diamond, Bush,
DiCianni & Krafthefer, P.C.
140 S. Dearborn Street, Suite 600
Chicago, IL 60603

    *Re:*    *Attorney Page's & Attorney Elmore's response to subpoena in the civil case of*
        *Curtis Lovelace, et. al. v. Detective Adam Gibson, et. al; 2017-cv-1201*

Dear Ms. Bednarek:

Enclosed please find a copy of various documents from our file in reference to our representation of
Curtis Lovelace in Adams County case Number 2014-CF-488.

In addition to the enclosed documents, we also possess a number of other documents that we are
refusing to provide for the following reasons:

1.     Trial counsel notes (work product).
2.     Client notes (work product and attorney client privilege).
3.     Interview notes of Dr. Scott Denton by trail counsel (work product).
4.     Correspondence between trial counsel's investigator and trial counsel (work product).
5.     Trial counsel's investigator's letters to expert witnesses (work product).
6.     Correspondence between trial counsel and client's family (work product and attorney client
        privilege).
7.     Expert witness information and research regarding expert witnesses (work product).
8.     Trial Counsel's letter to client (attorney client privilege).
9.     Correspondence between trial counsel and expert witnesses (work product).
10.    Correspondence between State's Attorney and trial counsel (work product).



EXHIBIT
Elmore 1
11/20/18 RB

Page 2
09/11/2018
Lovelace

11.    Litigation folder utilized for trial preparation and trial (work product).
12.    Folder containing pre-trial discovery (Illinois Supreme Court Rule 415(c)).

If you have any questions concerning the enclosed documents, please do not hesitate to contact our office.

Sincerely,

James Elmore

Jeff Page

JP/db
Enclosures