IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| CURTIS LOVELACE, LOGAN LOVELACE, | ) | |
| LINCOLN LOVELACE and CHRISTINE | ) | |
| LOVELACE on behalf of her minor son, | ) | |
| LARSON LOVELACE, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| vs. | ) | Case No. 17-cv-01201 |
| | ) | |
| DET. ADAM GIBSON, POLICE CHIEF | ) | |
| ROBERT COPLEY, SGT. JOHN SUMMERS, | ) | |
| LT. DINA DREYER, DET. ANJANETTE | ) | |
| BISWELL, UNKNOWN QUINCY POLICE | ) | |
| OFFICERS, GARY FARHA, CORONER | ) | |
| JAMES KELLER, THE CITY OF QUINCY | ) | |
| and COUNTY OF ADAMS, | ) | |
| | ) | |
| Defendants. | ) | |

## DEFENDANTS GARY FARHA, JAMES KELLER AND ADAMS COUNTY'S MEMORANDUM IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT

Comes now Defendants Gary Farha, James Keller and Adams County, by and through their attorneys Schmiedeskamp Robertson Neu & Mitchell, LLP, and for their Memorandum in Support of their Motion for Summary Judgment pursuant to Fed.R.Civ.P. 56 and Local Rule 7.1(D)(1), hereby state as follows:

## INTRODUCTION

On February 14, 2006, Cory Lovelace was found dead in her home by her husband, Plaintiff Curtis Lovelace. After finding his wife dead, Curtis Lovelace first called his boss at the Adams County State's Attorney's office, Jon Barnard. Curtis Lovelace informed his boss he had not called 911 or the police. That call was then made by Jon Barnard on Plaintiff's behalf at which point the Quincy EMS reported to the home and subsequently the Quincy Police Department. The coroner

- 1 -

of Adams County, Gary Hamilton, also appeared at the scene with his assistant at the time, James Keller.

The Quincy Police Department investigation was led by Detective Jeff Baird. The body of the decedent was sent for autopsy, which was performed by forensic pathologist Jessica Bowman, based at the time in Springfield, Illinois. Dr. Bowman's autopsy report came back inconclusive as to the cause of death. Ms. Lovelace's body was cremated.

In January 2014, Detective Adam Gibson from the Quincy Police Department re-opened the investigation into the cause and circumstances surrounding the death of Cory Lovelace. In January 2014, the case was referred out of Adams County due to a conflict. Jon Barnard was still the Adams County State's attorney at the time. He was also a witness in the case. The case was assigned to the State Appellate Prosecutor's office and attorney Ed Parkinson. In August 2014, Ed Parkinson took this case based on the investigation from Detective Gibson to the grand jury in Adams County. The grand jury returned a true bill of indictment against Curtis Lovelace for the murder of Cory Lovelace. Curtis Lovelace was then arrested on August 27, 2014.

Mr. Lovelace, based on his prior employment with the Adams County State's Attorney's office, was transported to the Hancock County Jail in Carthage, Illinois. Mr. Lovelace was housed there until his first trial which took place in February 2016. Mr. Lovelace was represented by attorneys Jay Elmore and Jeff Paige in his first murder trial in Adams County. The first trial resulted in a hung jury in March 2017.

Ed Parkinson, as the State's Attorney handling the case, decided to try Mr. Lovelace again for the murder of his wife. A second trial ensued in Sangamon County, Springfield, Illinois after a change of venue motion was brought by Lovelace and granted. Curtis Lovelace was represented in his second trial by the law firm of Loevy & Loevy, his current counsel in this case. The jury in

Sangamon County came back with a not guilty verdict on March 10, 2017. After the not guilty verdict in his second trial, Plaintiff Curtis Lovelace proceeded to file this action in Federal Court alleging the Defendants violated his constitutional rights and fabricated, concealed and withheld exculpatory evidence, violated his due process rights, maliciously prosecuted the Plaintiff, unlawfully detained the Plaintiff's three children, Logan, Lincoln and Larson Lovelace, and otherwise conspired to deprive all Plaintiffs of their constitutional rights.

The Plaintiffs filed Counts I (due process 42 U.S.C §1983), II (malicious prosecution 42 U.S.C 1983), IV (conspiracy 42 U.S.C 1983), VI (failure to intervene 42 U.S.C 1983), VII (intentional infliction of emotional distress-state), VIII (malicious prosecution-state), IX (civil conspiracy-state), XI (indemnification-state) against the Adams County Defendants.

Defendant, Gary Farha (Counts I, II, IV, VI, VII, VIII, IX, XI) was not involved with the investigation or prosecution of Defendant Curtis Lovelace. There are no material facts Defendant Farha concealed material exculpatory evidence, commenced the proceeding against Curtis Lovelace, or in any way deprived Curtis Lovelace of his constitutional rights. The material facts produced in discovery reveal (i) Farha was not the State's Attorney at the time of the investigation and prosecution (ii) any investigation of the Plaintiff was conducted by other officials and (iii) the prosecution was carried out by special counsel. Judgment should be entered on his behalf in this lawsuit.

Defendant, James Keller (Counts I, II, IV, VI, VII, VIII, IX, XI) did not participate in any investigation of Curtis Lovelace or conceal exculpatory evidence. Defendant Keller, as a coroner, cannot be liable for malicious prosecution because he did not commence the action against the Plaintiff and there are no material facts Defendant Keller conspired to deprive Curtis Lovelace of his constitutional rights. Judgment should be entered on his behalf in this lawsuit.

Defendant, Adams County (Counts I, II, IV, VI, VII, VIII, IX, XI) did not deprive Curtis Lovelace of his constitutional rights. Neither County employees Gary Farha or James Keller deprived Plaintiff Curtis Lovelace of his constitutional rights and therefore Judgment should be entered in favor of the County.

For the reasons set forth below in the Undisputed Material Facts and Memorandum of Law, Defendants Farha, Keller and Adams County bring their Motion for Summary Judgment seeking judgment against all Plaintiffs on all Counts, and an awarding of all costs and expenses incurred in the defense of this matter as Plaintiff has solely brought this matter against Defendant Farha in a malicious and vindictive manner not supported by any evidence to sustain any of the Plaintiffs' claims.

## UNDISPUTED MATERIAL FACTS

1.      Cory Lovelace died on February 14, 2006. (See Plaintiffs' Complaint, para. 5).

2.      At the time of her death, she was married to Curtis Lovelace and they had four children together: Lyndsay Lovelace, Logan Lovelace, Lincoln Lovelace, and Larson Lovelace. (See pgs. 43-44 of the deposition of Curtis Lovelace attached hereto and incorporated herein as Exhibit A).

3.      An autopsy was performed on the body Cory Lovelace by forensic pathologist Dr. Jessica Bowman on February 15, 2006. (See p. 26 of the deposition of Dr. Jessica Bowman attached hereto and incorporated herein as Exhibit B). Her cause of death was undetermined as she noted unexplained trauma of the mouth and signs of death inconsistent with the time frame given by history. (See p. 64 and 135 of Exhibit B).

4.      Cory Lovelace's body was cremated. (See p. 23 of Ex. A).

5.　　　After his wife's death, Curt Lovelace was never interviewed by anyone from Adams County. (See p. 14 of Ex. A).

6.　　　Curt Lovelace worked for the Adams County State's Attorney's office and was hired there by Jon Barnard. (See p.gs. 63-65 of Ex. A).

7.　　　He worked there from January 2005 to July 2012. (See p. 71 of Ex. A).

8.　　　After finding his wife dead in bed, the first call he made was to Jon Barnard. (See p. 149, 150 and 227 of Ex. A). He did not call 911. (See p. 148 of Ex. A). Jon Barnard took the call and Curtis Lovelace told him "Cory's dead". Jon Barnard asked Curtis Lovelace if he had called the ambulance or 911 and Lovelace told him no. Barnard then informed Lovelace he was going to call 911. (See pgs. 48 - 49 of the deposition of Jon Barnard attached hereto and incorporated herein as Exhibit C).

9.　　　Jon Barnard was elected the State's Attorney for Adams County in November 2004. (See p. 9 of Ex. C).

10.　　　Jon Barnard stepped down as State's Attorney for Adams County at the end of his term in 2014. (See p. 9 of Ex. C).

11.　　　Curtis Lovelace worked under Jon Barnard at the Adams County State's Attorney's office. (See pgs. 11 - 12 of Ex. C).

12.　　　Ultimately, Jon Barnard fired Curtis Lovelace from the position he held at the Adams County State's office on July 19, 2012. (See p. 14 and 40 of Ex. C).

13.　　　It was widely known that Curtis Lovelace and Cory Lovelace were heavy drinkers and had a volatile marriage. (See p. 20 of Ex. C).

14.　　　Jon Barnard witnessed volatile behavior by Curtis Lovelace and was made aware of another situation which he didn't directly observe in his office when Curtis Lovelace did not get

the Chief Public Defender job. (See pgs. 23 - 25 of Ex. C).

15.     Jon Barnard had separate conversations with Gary Farha and Jennifer Cifaldi about that situation. (See p. 9 of Ex. C).

16.     Gary Farha was concerned enough that he considered calling the police. (See p. 28 of Ex. C).

17.     Jennifer Cifaldi also told Jon Barnard that Curtis Lovelace was explosive and looked like he was "ready to just go off", yelling and screaming. (See p. 28 of Ex. C).

18.     Jon Barnard learned there was a reinvestigation of Cory Lovelace's death through detective Adam Gibson. (See pgs. 63 - 64 of Ex. C).

19.     Adam Gibson came into Barnard's office and advised him that he was reinvestigating or looking into the circumstances of Cory Lovelace's death. (See p. 65 of Ex. C).

20.     Adam Gibson told Jon Barnard the Quincy Police Department had received additional information since the first investigation that Dr. Jessica Bowman, who performed the autopsy of Cory Lovelace, had been terminated from her position at Memorial Medical Center in Springfield, Illinois for either misstating, altering or manipulating results and certain autopsies providing conclusions of either accidental death or a cause of death undetermined when it was later and reliably shown to have been the result of foul play. (See pgs. 65 - 66 of Ex. C).

21.     Detective Gibson was looking into the possibility the autopsy protocol prepared by Dr. Bowman on Cory Lovelace fit that description and pattern. (See p. 66 of Ex. C).

22.     Jon Barnard made it clear to Detective Gibson from the outset that if Curtis Lovelace was to be prosecuted, the Adams County State's Attorney's office would not be the prosecuting agency. (See p. 69 of Ex. C).

23.     Adam Gibson prepared the Cory Lovelace Death Investigation Summary ("Summary") document to give to Ed Parkinson. He did this prior to and for the purpose of assisting Ed Parkinson in taking the case to the grand jury. (See pgs. 73-74  and Exhibit 1 (bates stamped document Plaintiff 007932-007945) of the deposition of Adam Gibson attached hereto and incorporated herein as Exhibit D).

24.     Gibson shared the Summary with Jon Barnard, Gary Farha and Jennifer Cifaldi as they were all spoken to by Gibson regarding the incident that occurred with Lovelace at the State's Attorney's Office. (See pgs. 94-99 of Ex. D)

25.     Gibson showed the document to the three of them to clarify their recollection of events and make sure what he had typed in his Summary was correct. (See pgs. 94-99 of Ex. D).

26.     Adam Gibson had no conversations with Gary Farha about the investigation after Ed Parkinson became the prosecutor. (See p. 380 of Ex. D).

27.     Gary Farha was not involved in the presentment of the case to the grand jury, the prosecution of the case or the investigation of the case. (See pgs. 373, 376, and 377 of Ex. D).

28.     The Adams County State's Attorney Jon Barnard petitioned the court to transfer the case due to a conflict, the judge signed the order, and the decisions regarding the prosecution of Plaintiff Curtis Lovelace were not handled by the Adams County State's Attorney's office. (See p. 137 of the deposition of Ed Parkinson attached hereto and incorporated herein as Exhibit E).

29.     After the special prosecutor Ed Parkinson was appointed, Jon Barnard did not give any member of the special prosecutor's office any advice or direction about the case at all. (See pgs. 91 - 92 of Ex. C).

30.     Any file the Adams County State's Attorney's office had would have been passed off to the special prosecutor's office after the special prosecutor was appointed. This would have

included whatever police reports had originally been generated following the death of Cory Lovelace, the autopsy protocol and the motion for the appointment of the special prosecutor. (See p. 93 of Ex. C).

31. Gary Farha became a full-time employee of the Adams County State's Attorney's office in 2001. His boss was Jon Barnard. (See p. 9 and 12 of the deposition of Gary Farha attached hereto and incorporated herein as Exhibit F).

32. On June 20, 2014, Gary Farha was hospitalized and remained in the hospital until August 3, 2014. He was on medical leave and returned to work on Monday, August 6, 2014. (See pgs. 11 - 12 of Ex. F).

33. Gary Farha was elected the State's Attorney of Adams County on November 8, 2016. (See pgs. 15- 16 of Ex. F).

34. Gary Farha does not remember any specific occasion when Jon Barnard delegated to any other member of the State's Attorney's office any responsibility for assisting the Quincy Police Department with a homicide investigation. (See p. 18 of Ex. F).

35. In the 2013 – 2014 time period, the person responsible in the State's Attorney's office for dealing with matters that concerned the grand jury was Jon Barnard. (See p. 22 of Ex. F).

36. Gary Farha worked with Curtis Lovelace at the Adams County State's Attorney's office. (See p. 26 of Ex. F).

37. Gary Farha knew Adam Gibson before the Cory Lovelace investigation as he had worked with him on drug cases with the West Central Illinois Task Force. (See pgs. 58 - 59 of Ex. F).

38.     Gary Farha became aware there was an investigation into Cory Lovelace's death when Adam Gibson came by his office and specifically asked him about Curtis Lovelace's behavior. (See pgs. 58 - 61 of Ex. F).

39.     Gary Farha told Adam Gibson there was one occasion that he felt threatened by Curtis Lovelace. It involved Lovelace not getting an interview for the Chief Public Defender position. (See p. 61 of Ex. F).

40.     Gary Farha told Adam Gibson he witnessed Curtis Lovelace in a rage and it seemed to be directed at Farha when Farha had nothing to do with any of it. (See p. 61 of Ex. F).

41.     It was at that time when Adam Gibson informed Gary Farha he had reopened the case into the investigation of Cory Lovelace's death. (See p. 63 of Ex. F).

42.     Gary Farha was surprised because he knew nothing about this and no one had told him a word, not a police officer, not Jon Barnard, nobody on the office staff. (See p. 64 of Ex. F).

43.     After the initial conversation with Adam Gibson, the next discussion having anything to do with the Lovelace case was when Adam Gibson e-mailed Gary Farha his Summary report. (See p. 71 of Ex. F).

44.     Adam Gibson told Gary Farha he had opened up a cold case. He provided no specifics and told Gary Farha nothing about any pathology experts that Gibson was consulting about the case. (See pgs. 72 - 73 of Ex. F).

45.     Between the time Farha had his initial conversation with Gibson and when Gibson sent him the summary document, Farha did not learn anything else that was going on with the reinvestigation. (See p. 74 of Ex. F).

46.     Gary Farha was sent the Summary document by Gibson on August 19, 2014 to review the account of what he had previously told him regarding the behavior of Curtis Lovelace. (See p. 78, 79 and 97 of Ex. F).

47.     It was Farha's understanding Gibson was sending him the document to review his account of the statement attributed to Farha. (See pgs. 78 - 79 of Ex. F).

48.     Farha then responded to Gibson confirming the portion of the document that had to do with Farha was correct. (See p. 80 of Ex. F).

49.     Gary Farha knew from the outset there was no way his office could be involved in the prosecution of somebody that had worked for them. (See p. 83 of Ex. F).

50.     Farha never talked with anyone in the office about grand jury proceedings having to do with this case. (See p. 83 of Ex. F).

51.     Gary Farha has never had any conversations with Jim Keller about the Cory Lovelace investigation. Adam Gibson never told Gary Farha whether Jim Keller was in involved in the investigation. (See p. 102 of Ex. F).

52.     Ed Parkinson took this case to the Grand Jury in Adams County. (See p. 91 and 94 of Ex. C).

53.     The Grand Jury in Adams County came back with a True Bill of Indictment against Curtis Lovelace for the death of his wife. Mr. Lovelace was arrested August 27, 2014. (See pgs. 133 – 134 of Ex. E; p. 252 of Ex. A).

54.     Adams County played no role in the contact, transfer or interviews conducted of the Lovelace boys after Curt's arrest. (See p. 260 of Ex. A). Nobody from Adams County ever interviewed him or his boys. (See p. 261 of Ex. A).

55.     The decision of whether to prosecute Curtis Lovelace was solely made by Ed Parkinson and the State Appellate Prosecutor's office. Gary Farha was not the Adams County State's Attorney at the time of the Plaintiff's first trial and had no input or discussions with Ed Parkinson about the prosecution of Curt Lovelace. (See p. 138 of Exhibit E).

56.     This is true for the second trial of Plaintiff Curtis Lovelace. (See p. 138 of Ex. E).

57.     In both cases, it was Ed Parkinson who determined what witnesses to call, experts to call and what trial strategies to try and obtain a guilty verdict for the death of Cory Lovelace. (See p. 138 of Ex. E).

58.     Presentment of the case to the grand jury in Adams County and the prosecution of the two murder trials against Curtis Lovelace were all handled by Ed Parkinson. (See p. 262 of Ex. A).

59.     If Jim Keller, the Adams County Coroner, had any information the prosecution needed, Parkinson could have asked him for his file. A subpoena could have been sent to the Adams County Coroner. (See p. 137 of Ex. E).

60.     There was nothing in any e-mails between Adam Gibson and Jim Keller that would have made Ed Parkinson prosecute either of these trials differently in any way. (See p. 137 of Ex. E).

61.     Jay Elmore was one of the defense attorneys that defended Curtis Lovelace in his first murder trial. (See pgs. 37 – 38 of the deposition of Jay Elmore attached hereto and incorporated herein as Exhibit G).

62.     The first trial ended in a hung jury. The prosecuting attorney had to decide whether to prosecute the case again. (See p. 45 of Ex. G; p. 193 of Ex. A).

63.     Gary Farha and the Adams County State's Attorney's office had absolutely no involvement in the first trial Curt Lovelace. (See p. 46 of Ex. G).

64.     Jay Elmore is not aware of any information that he has been provided at any time after the first trial that shows there was any misconduct, fabrication of evidence or withholding of documents by the Adams County State's Attorney's office or the Adams County Coroner. (See pgs. 47 – 48 of Ex. G).

65.     Jeff Page was co-counsel for Curtis Lovelace in his first murder trial in Adams County, Illinois. (See pgs. 5 – 6 of the deposition of Jeff Page attached hereto and incorporated herein as Exhibit H).

66.     In his defense of Curtis Lovelace in the first murder trial, Jeff Page had no interaction at all with Gary Farha. (See p. 39 of Ex. H).

67.     If there was any contradictory evidence to what Dr. Scott Denton told Jeff Page in a meeting which took place between the two of them, and was related to Jim Keller or Adam Gibson, Page believes he should have received that through the course of discovery in the first trial from the prosecutor handling the case. (See pgs. 40 - 41 of Ex. H).

68.     Larson Lovelace had absolutely no conversations about his dad's arrest or anything that followed related to his father with the County Coroner. (See p. 109 of the deposition of Larson Lovelace attached hereto and incorporated herein as Exhibit I).

69.     At no point in time has Larson Lovelace had any conversations, discussions, interviews with Gary Farha. (See p. 109 of Ex. I).

70.     Anything he knows about his dad's situation is through conversations with Curtis Lovelace or Christine Lovelace. (See p. 110 of Ex. I).

71.     Larson Lovelace has no personal knowledge about any of the allegations about anyone fabricating evidence, withholding exculpatory evidence as to his dad, or the charges that were brought against Curtis Lovelace. (See p. 110 of Ex. I).

72.     Logan Lovelace never gave a statement, talked to or was interviewed by Gary Farha. (See p. 105 of the deposition of Logan Lovelace attached hereto and incorporated herein as Exhibit J).

73.     Logan Lovelace was never questioned, gave a statement or talked to the Defendant Jim Keller since his father's arrest. (See p. 105 of Ex. J).

74.     Logan has no independent information or knowledge of Gary Farha or Jim Keller fabricating any evidence against his father. (See p. 105 of Ex. J).

75.     Logan has no information or knowledge of Gary Farha or Jim Keller withholding any evidence from his father or his trial. Logan has no personal information or knowledge of Gary Farha or Jim Keller withholding exculpatory evidence from his family. (See p. 106 of Ex. J).

76.     Lincoln Lovelace has not had any conversations with Gary Farha or Jim Keller. (See p. 58 of the deposition of Lincoln Lovelace attached hereto and incorporated herein as Exhibit K).

77.     Lincoln Lovelace has not done any independent investigation of the allegations as to Gary Farha or Jim Keller. Lincoln has no independent personal knowledge that Gary Farha withheld evidence in this case. (See p. 58 of Ex. K).

78.     Curtis Lovelace has no facts or evidence that Gary Farha communicated with Adams Gibson about the initiation of the reinvestigation into the death of his wife. (See p. 275 of Ex. A).

79. The evidence of communication between Gary Farha and Adam Gibson that the Plaintiff can testify to is the e-mail on August 19, 2014 from Adam Gibson to Gary Farha sending the Cory Lovelace Death Investigation Summary, which was sent to Farha the day after Gibson sent it to the prosecutor Ed Parkinson. (See pgs. 273-276 of Ex. A).

80. The basis for Curtis Lovelace that Gary Farha fabricated evidence is from the e-mail from Gibson to Farha which was simply a summary. (See p. 277 of Ex. A). Curtis Lovelace is not aware of any information or evidence other than the e-mail communication that would support his allegations that Gary Farha fabricated any scientific information in his case. (See pgs. 278-279 of Ex. A).

81. Curtis Lovelace agrees that Gary Farha never took a witness statement, never interviewed anyone and never presented any information to the grand jury. (See pgs. 279-280 of Ex. A).

82. Plaintiff agrees the evidence put on and the witnesses that were called in the two murder trials was all done by Ed Parkinson and his office. (See p. 280 of Ex. A). Ed Parkinson convened and presented evidence to the grand jury that charged Curtis Lovelace with the murder of his wife. (See pgs. 290-291 of Ex. A).

83. When asked at his deposition on July 6, 2018 what evidence Plaintiff had that Gary Farha concealed from him and his attorneys in either trial, Plaintiff Curtis Lovelace responded he didn't know the extent of Gary Farha's involvement other than he received an e-mail regarding the Summary of the investigation from Gibson. Lovelace claimed Farha had also not yet been deposed in this case. (See pgs. 278, 291, 292 of Ex. A).

84. It was Lovelace's assumption that because Farha received the e-mail from Gibson, that Farha was involved in the investigation. (See p. 293 of Ex. A).

- 14 -

85.     Lovelace was aware that Jim Keller was involved in the investigation, was in meetings with Dr. Bowman, communicated with Dr. Denton, and believed Dr. Turner as well. (See p.gs. 293-294 of Ex. A).

86.     On January 31, 2019 Plaintiff Curtis Lovelace's deposition from July 6, 2018 that was continued was completed. By that time Gary Farha had already been deposed. When asked to provide the evidence for which he was relying on to prove his allegations against Gary Farha, that Farha fabricated evidence against him, Lovelace again referenced the e-mail communication regarding the Summary and that there was nothing else he learned that he could recall. (See p. 15 of the deposition of Curtis Lovelace of January 31, 2019 attached hereto and incorporated herein as Exhibit L).

87.     As of that date, there was nothing else Curtis Lovelace could point to that showed Gary Farha fabricated evidence in his underlying two murder trials. (See p. 16-17 of Ex. L).

88.     As of that date, Jim Keller had been deposed as well. Plaintiff stated the evidence he believed Keller fabricated were his statements of his observations of his wife's dead body when Keller arrived on the scene that day. (See pgs. 17-19 of Ex. L).

89.     He also believes Jim Keller fabricated evidence in an e-mail he sent to Dr. Scott Denton. (See p. 18-19 of Ex. L).

90.     When asked what *Brady* violations Farha committed, Lovelace said he wasn't even sure of Farha's involvement. (See p. 66 of Ex. L). He believes Jim Keller failed to disclose information or mislead Dr. Denton on the e-mails he exchanged with him. But he was unclear on that. (See pgs. 67-72 of Ex. L). He did feel that Keller gave the retained expert forensic pathologists for the prosecution information in a way that would produce an opinion that was not accurate. (See pgs. 71-73 of Ex. L).

- 15 -

91. On June 7, 2019 Plaintiff Curtis Lovelace filed his updated answers to the City of Quincy Interrogatories. (See Plaintiff Curtis Lovelace's Answers to City of Quincy First Set of Interrogatories attached hereto and incorporated herein as Exhibit M).

92. James Keller became the Adams County Coroner in 2012 and was a deputy coroner beginning in 1988 or 1989. (See p. 14 of the deposition of James Keller attached hereto and incorporated herein as Exhibit N).

93. James Keller responded to the scene where Cory Lovelace's body was found to assist then Adams County Coroner Gary Hamilton. (See p. 60 of Ex. N).

94. He observed the decedent on the bed with her hands in the air and a fairly strong odor which indicated to him she had been there for a little bit. (See p. 66, 67 and 80 of Ex. N).

95. Keller was called by Detective Gibson asking if the autopsy report and records were available as he was inquiring about opening back up the case. (See p. 105, 106, 111-112 of Ex. N).

96. Jim Keller went with Adam Gibson to meet with Dr. Bowman and he delivered the tissue slides to Dr. Denton. (See p. 113 and 140 of Ex. N). After his meeting with Dr. Bowman, he had no further involvement in the investigation. (See p. 139 of Ex. N).

97. Jim Keller spoke to Dr. Denton and asked him if he would look at the autopsy report and review the case. (See p. 144 of Ex. N).

98. Dr. Denton then communicated his opinions to Adam Gibson. (See p. 150 of Ex. N). Jim Keller asked Denton to write a report at the request of Gibson. (See p. 153 of Ex. N).

## **MOTION FOR SUMMARY JUDGMENT STANDARD**

Summary judgment is appropriate if there is no genuine dispute of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Martinsville Corral, Inc. v. Soc'y Ins.*, 910 F.3d 996, 998 (7th Cir. 2018). To survive summary judgment, Plaintiffs must

"present specific facts establishing a material issue for trial, and any inferences must rely on more than mere speculation or conjecture." *Giles v. Godinez*, 914 F.3d 1040, 1048 (7th Cir. 2019). "Inferences that are supported by only speculation or conjecture will not defeat a summary judgment motion." *Coleman v. City of Peoria, Illinois*, 18-1742, 2019 WL 2240575, at *6 (7th Cir. May 24, 2019) citing *Carmody v. Bd. of Tr. of Univ. of Ill.*, 893 F.3d 397, 401 (7th Cir. 2018).

## ARGUMENT

I.  **Summary Judgment should be granted for Defendant Gary Farha because there are no material facts Defendant Farha concealed material exculpatory evidence (Count I), commenced the proceeding against Curtis Lovelace (Count II and VIII), or in any way deprived Curtis Lovelace of his constitutional rights (Counts IV, VI, VII and IX).**

A defendant can be liable under § 1983 only when he is personally responsible for the violation of the plaintiff's constitutional rights, including when the violation occurs at a defendant's direction or with his knowledge or consent. *Mitchell v. Kallas*, 895 F.3d 492, 498 (7th Cir. 2018). Here, Defendant, Gary Farha (Counts I, II, IV, VI, VII, VIII, IX, XI) was not involved with the investigation or prosecution of Defendant Curtis Lovelace. There are no material facts Defendant Farha concealed material exculpatory evidence, commenced the proceeding against Curtis Lovelace, or in any way deprived Curtis Lovelace of his constitutional rights. The material facts produced in discovery reveal (i) Farha was not involved in the investigation of Curtis Lovelace (ii) any investigation of the Plaintiff was conducted by other officials and (iii) the prosecution was carried out by special counsel. There are no material questions of fact that would implicate Gary Farha as having violated the Plaintiff's constitutional rights, and therefore, judgment should be entered on his behalf dismissing him from this suit.

A.  **There are no material facts Defendant Farha concealed material exculpatory evidence (Count I).**

(i.)  **Farha played no role in the investigation of Curtis Lovelace.**

Lovelace claims that Farha violated his right to a fair trial by [failing to disclose exculpatory and/or impeachment evidence that was material to Plaintiff's defense in the criminal case] [and/or] [by fabricating evidence that was used against Plaintiff in the criminal case]. To succeed on this claim, Plaintiff must prove each of the following things by a preponderance of the evidence: 1. Defendant [knowingly concealed [from the prosecutor] exculpatory and/or impeachment evidence, and the evidence was not otherwise available to Plaintiff, through the exercise of reasonable diligence, to make use of at his criminal trial] [and/or] [knowingly fabricated evidence that was introduced against Plaintiff [at his criminal trial] [in his criminal case]. 2. The evidence was material. 3. Plaintiff was damaged as a result. Here, there are no material facts Defendant Farha withheld, suppressed or failed to disclose any exculpatory and/or impeachment evidence that was material to Lovelace's defense.

Gary Farha became a full-time employee of the Adams County State's Attorney's office in 2001. (See p. 9 of Ex. G). His boss, as the First Assistant, was Jon Barnard. Gary Farha was elected the State's Attorney of Adams County on November 8, 2016. (See pgs. 15- 16 of Ex. G). Gary Farha does not remember any specific occasion when Jon Barnard delegated to any other member of the State's Attorney's office any responsibility for assisting the Quincy Police Department with a homicide investigation. (See p. 18 of Ex. G). In the 2013 – 2014 time period, the person responsible in the State's Attorney's office for dealing with matters that concerned the grand jury was Jon Barnard. (See p. 22 of Ex. G).

Gary Farha first became aware there was an investigation into Cory Lovelace's death when Adam Gibson came by his office and asked him specifically about Curtis Lovelace's behavior. (See pgs. 58 - 61 of Ex. G). That is the time when Adam Gibson informed Gary Farha he had reopened the case into the investigation of Cory Lovelace's death. (See p. 63 of Ex. G). Gary Farha

was surprised because he knew nothing about this and no one had told him a word, not a police officer, not Jon Barnard, nobody on the office staff. (See p. 64 of Ex. G).

In the same meeting, Gary Farha told Adam Gibson there was one occasion that he felt threatened by Curtis Lovelace relating to Lovelace not getting an interview for the Chief Public Defender. (See p. 61 of Ex. G).

After the initial conversation with Adam Gibson, the next discussion having anything to do with the Lovelace case was when Adam Gibson e-mailed Gary Farha his summary report on August 19, 2014. (See pgs. 71 and 97 of Ex. G). After the initial conversation with Adam Gibson, Gary Farha was sent the summary document by Gibson to review the account of what he had previously told him regarding the behavior of Curtis Lovelace. (See pgs. 78 - 79 of Ex. G). Adam Gibson told Gary Farha he had opened up a cold case and found out some information and that was it. He provided no specifics and told Gary Farha nothing about any pathology experts that Gibson was consulting about the case. (See pgs. 72 - 73 of Ex. G). Between the time Farha had his initial conversation with Gibson and when Gibson sent him the summary document, Farha did not learn anything else that was going on with the reinvestigation. (See p. 74 of Ex. G).

Farha remembers one time where Gibson indicated he was listening to phone calls from the Hancock County Jail between Lovelace and his present wife which occurred after Curtis Lovelace had already been charged in the case. (See p. 82 of Ex. G). At that point, the case was being prosecuted by the State Appellate Prosecutor. (See p. 82 of Ex. G).

As described above, Gary Farha was not involved of the investigation of Curtis Lovelace. In fact, the material facts demonstrate Farha was a marginal witness in the investigation, nothing more. He was never in possession or knew anything other than what he said in his two conversations with Defendant Gibson. Aside from the two formal discussions with Officer Gibson,

it was nothing more than conversations in passing with Officer Gibson. These are not material facts demonstrating Farha participated or carried out any criminal investigation of Curtis Lovelace. As such, Plaintiff's Count I must be dismissed as a matter of law for failure to state material facts.

**B.** **There are no material facts Defendant Farha commenced the proceeding against Curtis Lovelace (Count II and VIII).**

**(i)** **Any investigation of the Plaintiff was conducted by other officials.**

The investigation of Curtis Lovelace was principally conducted by Adam Gibson and the State Appellate Prosecutor, who was appointed as special counsel after the Adams County State's Attorney's office filed a motion to appoint a special prosecutor.

Again, Farha did not participate in the Lovelace investigation aside from providing a statement to Defendant Gibson and confirming said statement was accurate. (See pgs. 94-99 of Ex. E). Adam Gibson had no conversation with Gary Farha about the investigation after Ed Parkinson became the prosecutor (See p. 380 of Ex. E). Farha did not participate in any witness interviews. (See p. 373 of Ex. E).

Gary Farha does not remember any specific occasion when Jon Barnard delegated to any other member of the State's Attorney's office any responsibility for assisting the Quincy Police Department with a homicide investigation. (See p. 18 of Ex. G). Jon Barnard made it clear to Detective Gibson from the outset that if Curtis Lovelace was to be prosecuted for this case that the Adams County State's Attorney's office would not be the prosecuting agency. (p 69 of Ex. D). Jon Barnard only had a meeting with Detective Gibson regarding two issues. One included a copy of a proposed Complaint for a search warrant for Comcast relating to a complaint made to Gibson by Erica Gomez that personal information of hers had been used without her permission by Curtis Lovelace. The second would have been the appointment of a special prosecutor. Outside of that anything where Gibson and Barnard met would have been unannounced. (See pgs. 71 - 72 of Ex.

- 20 -

D). Any file the Adams County State's Attorney's office had would have been passed off to the special prosecutor's office after the special prosecutor was appointed. This would have included whatever police reports had originally been generated following the death of Cory Lovelace, the autopsy protocol and the motion for an appoint of the special prosecutor. (See p. 93 of Ex. D).

Based on these facts, it is clear Gary Farha did not play any role in the investigation of Curtis Lovelace. The material facts demonstrate Defendant Gibson led and participated the investigation. Within the Adams County States Attorney's office, acting State's Attorney Jon Barnard, was the primary contact for Detective Adam Gibson during the investigation. Remember, Defendant Farha was on medical leave from June 20, 2014, until August 6, 2014. It is evident Gary Farha played absolutely no role in the investigation, and there were others at the Adams County State's Attorney's Office who played more of a role (albeit it was still not much) in the investigation of Curtis Lovelace. Therefore, Defendant Farha cannot be liable for any constitutional or state law violation.

**C.** **There are no material facts Defendant Farha in any way deprived Curtis Lovelace of his constitutional rights (Counts IV, VI, VII and IX).**

**(i.)** **Any prosecutorial functions were carried out by the special counsel.**

To succeed on a claim of malicious prosecution under § 1983, Lovelace must show: (1) he has satisfied the requirements of a state law cause of action for malicious prosecution; (2) a state actor committed the malicious prosecution; and (3) he was deprived of liberty. *Sneed v. Rybicki*, 146 F.3d 478, 480 (7th Cir.1998). To establish § 1983 liability through a conspiracy theory, a plaintiff must demonstrate (1) a state official and private individuals reached an understanding to deprive the plaintiff of his constitutional rights, and (2) those individuals were willful participants in joint activity with the state or its agents. 42 U.S.C.A. § 1983. *Fries v. Helsper*, 146 F.3d 452 (7th Cir. 1998).

Failure to intervene liability does not extend to prosecutors. See *Gordon v. Devine*, No. 08–CV–377, 2008 WL 4594354, at *17 (N.D.Ill. October 14, 2008) (declining to recognize failure to intervene claim against prosecutors who failed to intervene in the unlawful conduct of other State's Attorneys); *Andrews v. Burge*, 660 F.Supp.2d 868, 876 n. 6 (N.D.Ill.2009) (declining to recognize prosecutor's duty to intervene, because prosecutors do not have police powers or command of police operations); *Hobbs v. Cappelluti*, 899 F.Supp.2d 738, 773 (N.D.Ill.2012) (finding the reasoning in Gordon and Andrews persuasive).

After the Adams County State's Attorney's office petitioned the court and the judge signed the order, the decisions regarding the prosecution of Plaintiff Curtis Lovelace were not handled by the Adams County State's Attorney's office. (See p. 137 of Ex. F). The decision of whether or not to prosecute Plaintiff Curtis Lovelace was solely done by Ed Parkinson and the State Appellate Prosecutor's office. Gary Farha was not even the Adams County State's Attorney at the time of the first trial and had no input or discussions with Ed Parkinson about the prosecution of Curt Lovelace. (See p. 138 of Ex. F). In fact, Gary Farha was on medical leave from June 20, 2014 through August 6, 2014. This is true for the second trial of Plaintiff Curtis Lovelace as well. (See p. 138 of Ex. F). When it came down to the prosecution of the case, the trial strategies, trial determination, witnesses to call and evidence to put on rested with the prosecuting attorney Ed Parkinson. (See pgs. 138 – 139 of Ex. F). In both cases, it was Ed Parkinson who determined what witnesses to call, experts to call and what trial strategies to try and obtain a guilty verdict for the death of Cory Lovelace. (See p. 138 of Ex. F). Ed Parkinson took this case to the Grand Jury in Adams County. Ed Parkinson did not talk with Gary Farha at all about the prosecution of the case. (See p. 104 of Ex. F). The Grand Jury in Adams County came back with a True Bill of Indictment

against Curtis Lovelace for the death of his wife after presentment of evidence by Ed Parkinson and Mr. Lovelace was arrested later that date. (See pgs. 133 – 134 of Ex. F).

Gary Farha and the Adams County State's Attorney's office had absolutely no involvement in the first trial of this case. (See p. 46 of Ex. H). In conjunction with Jay Elmore, Jeff Page was counsel for Curtis Lovelace in his first murder trial in Adams County, Illinois. (See pgs. 5 – 6 of Ex. I). In his defense of Curtis Lovelace in the first murder trial, Jeff Page had no interaction at all Gary Farha. (See p. 39 of Exhibit I).

Here, based on the testimony from the prosecutors and defense counsel, it is evident Gary Farha played no role in the prosecution of either of Curtis Lovelace's murder trials. It cannot be said Gary Farha violated any of Curtis Lovelace's constitutional rights, including, through conspiracy or a failure to intervene. Plaintiff has not produced any material facts Defendant could be liable for any of Counts IV, VI, VII and IX. As such, judgment is proper and should be granted for Defendant Farha and against Curtis Lovelace.

In sum, there are no material facts Defendant Farha concealed material exculpatory evidence (Count I), commenced the proceeding against Curtis Lovelace (Count II and VIII), or in any way deprived Curtis Lovelace of his constitutional rights (Counts IV, VI, VII and IX). There are no material facts demonstrating evidence to support any of the federal and state counts alleged against Defendant Gary Farha.

As such, Defendant Gary Farha seeks judgment against all Plaintiffs on all Counts, judgment in his favor, and an awarding of all costs and expenses incurred in the defense of this matter as Plaintiff has solely brought this matter against Defendant Farha in a malicious and vindictive manner not supported by any evidence to sustain any of the claims brought herein.

**II.     Summary Judgment should be granted for Defendant James Keller because (1) probable cause existed for the arrest and prosecution of Curtis Lovelace (2) there are**

**no material facts James Keller deprived any of the Plaintiffs of their constitutional rights and (3) any actions he took as a public official are protected by qualified immunity.**

A.     **Defendant Keller, as the county coroner, cannot be liable for malicious prosecution because probable cause existed.**

To succeed on a claim of malicious prosecution under § 1983, Lovelace must show: (1) he has satisfied the requirements of a state law cause of action for malicious prosecution; (2) a state actor committed the malicious prosecution; and (3) he was deprived of liberty. *Sneed v. Rybicki*, 146 F.3d 478, 480 (7th Cir.1998); *Reed v. City of Chicago*, 77 F.3d 1049, 1051 (7th Cir.1996). The Seventh Circuit has consistently held that "the existence of probable cause for an arrest totally precludes any Section 1983 claim for unlawful arrest, false imprisonment or malicious prosecution, regardless of whether the defendant had malicious motives for arresting the plaintiff." *Mark v. Furay*, 769 F.2d 1266 (7th Cir.1985); *Meerbrey v. Marshall Field & Co.*, 139 Ill.2d 455, 474, 151 Ill.Dec. 560, 564 N.E.2d 1222 (1990) (same for Illinois causes of action). To survive summary judgment, the Plaintiff must therefore demonstrate he was arrested without probable cause. Generally, an indictment by a grand jury is prima facie evidence of probable cause. *Bontkowski v. United States*, 28 F.3d 36, 37 (7th Cir.1994) (Bontkowski was indicted by a grand jury). In Illinois this is prima facie evidence of probable cause. *Freides v. Sani–Mode Mfg. Co.*, 33 Ill.2d 291, 296, 211 N.E.2d 286 (1964).

Probable cause exists if "the facts and circumstances within the officer['s] knowledge and of which [he] had reasonably trustworthy information were sufficient to warrant a prudent person in believing that an offense has been committed." *Hughes v. Meyer*, 880 F.2d 967, 969 (7th Cir.1989); *Cervantes*, 188 F.3d at 811 (same with respect to prosecutor). "Probable cause requires only a probability or substantial chance of criminal activity, not an actual showing of such

activity." *United States v. Gilbert*, 45 F.3d 1163, 1166 (7th Cir.1995) (quoting *Illinois v. Gates*, 462 U.S. 213, 244 n. 13, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983)).

It is undisputed that there was probable cause in the underlying criminal actions. On February 14, 2006, Cory Lovelace was found dead in her home by her husband, Plaintiff Curtis Lovelace. Curtis Lovelace on that morning then called his boss as the Adams County State's Attorney's office, Jon Barnard, to inform him that he found his wife dead in bed. When questioned, Curtis Lovelace informed his boss he had not called 911 or the police. The body of the decedent was sent for autopsy which was performed by Jessica Bowman. Ms. Bowman's autopsy report came back inconclusive as to the cause of death. Ms. Lovelace's body was cremated. Forensic pathology evidence demonstrating probable cause, like a cut on her lip and the location of hands.

Ed Parkinson took this case to the Grand Jury in Adams County. Ed Parkinson did not talk with Gary Farha at all about the prosecution of the case. (See p. 104 of Ex. F). The Grand Jury in Adams County came back with a True Bill of Indictment against Curtis Lovelace for the death of his wife after presentment of evidence by Ed Parkinson and Mr. Lovelace was arrested later that date. (See pgs. 133 – 134 of Ex. F).

Here, like in *Bontkowski*, Curtis Lovelace's indictment by a grand jury is prima facie evidence of probable cause citing. As such, the malicious prosecution claim must be dismissed. Further, aside from the grand jury indictment, there is overwhelming circumstantial evidence to demonstrate "only a probability or substantial chance of criminal activity, not an actual showing of such activity."  See *Gates*, 462 U.S. 213, 244 n. 13. The unusual circumstances immediately following the Plaintiff finding his wife dead, the physical evidence, like the cut on her lip and the location of her hands, demonstrate probable cause. Further, the body appeared to be deceased much longer than an hour or so, which was testified to by Defendant Keller. In sum, there is undisputed

material facts to support a finding that there was probable cause to bring the prosecution. As such, Plaintiff's malicious prosecution claim should be dismissed against Defendant Keller.

**B.  There are no material facts James Keller deprived any of the Plaintiffs of their constitutional rights.**

A county coroner is not deemed to have violated a Plaintiff's constitutional rights by searching for a pathologist who would support the prosecution's theory of the case. In *Nugent v. Hayes*, a woman was found dead in her bedroom from a gunshot wound to the head. *Nugent v. Hayes*, 88 F. Supp. 2d 862, 864 (N.D. Ill. 2000). The manner of Ms. Nugent's death was undetermined. *Nugent*, 88 F. Supp. 2d at 865. During the course of the investigation four forensic pathologists were consulted regarding the cause of death. *Nugent* at 865. The husband, Raymond Nugent, was eventually indicted for the murder of his wife but acquitted at trial. *Id.* Mr. Nugent then brought claims under 42 U.S.C. §1983 for malicious prosecution and conspiracy against an officer and county coroner. *Id.*

The allegations against the coroner were that he misled and withheld information from the experts. *Id.* at 867. In *Nugent*, the court found that inconclusive, duplicative opinions of two of the expert witnesses, who could not rule out homicide or suicide, was not deemed exculpatory evidence. In any event, the court found the defendants did not conceal any of these opinions, which were reviewed by both of the prosecutors involved in the case. *Id.* at 867. Finally, the court reiterated that once probable cause was found against the criminal defendant husband, the coroner did not have a constitutional obligation to conduct any further investigation in hopes of uncovering exculpatory evidence. *Id.* at 868 citing *Davis v. Owens*, 973 F.2d 574, 577 (7th Cir.1992).

Here, Coroner Keller acted as Adams County Coroner to assist the Curtis Lovelace investigation and provide information to Officer Gibson in soliciting expert witness testimony. The undisputed facts reveal the following: Coroner Keller was called by Detective Gibson asking

if the autopsy report and records were available as he was inquiring about opening back up the case (See p. 105, 106, 111-112 of Ex. N); Jim Keller went with Adam Gibson to meet with Dr. Bowman and he delivered the tissue slides to Dr. Denton (See p. 113 and 140 of Ex. N); Jim Keller spoke to Dr. Denton and asked him if he would look at the autopsy report and review the case. (See p. 144 of Ex. N); Dr. Denton then communicated his opinions to Adam Gibson. (See p. 150 of Ex. N); and  Jim Keller asked Denton to write a report at the request of Gibson. (See p. 153 of Ex. N).

There are no material facts Defendant Keller manipulated forensic evidence, misled the experts or in any way failed to reveal exculpatory evidence. Jim Keller was copied on an email between Dr. Denton and Adam Gibson, but as stated in Adam Gibson's deposition that email was turned over to Prosecutor Ed Parkinson and eventually turned over to Curtis Lovelace. Like in *Nugent*, Coroner Keller did not in violate the criminal defendant's constitutional rights by speaking with multiple experts about the cause of death or turning over information to the officer leading the investigation. There is no evidence Keller did anything other than assist in the investigation when asked by Officer Gibson, speak with experts and ask for said expert opinions to be documented. There are no material facts Defendant Keller violated the Plaintiff's constitutional rights, and therefore, judgment should be entered for James Keller.

### C.    Any acts James Keller took as a county coroner are protected by qualified immunity.

"[Q]ualified immunity shields government officials from civil damages liability unless the official violated a statutory or constitutional right that was clearly established at the time of the challenged conduct." *Kingsley v. Hendrickson*, 801 F.3d 828, 831 (7th Cir. 2015); *Lund v. City of Rockford*, 17 C 50035, 2019 WL 1773354, at *6 (N.D. Ill. Apr. 23, 2019). Coroners enjoy the same qualified immunity as police officers or other investigators for the state prosecutor. *Kompare*

*v. Stein*, 801 F.2d 883, 887 (7th Cir. 1986) citing *Lawyer v. Kernodle*, 721 F.2d 632, 636 (8th Cir.1983).

A county coroner was entitled to qualified immunity from claim that she failed to disclose exculpatory evidence. *Kompare v. Stein*, 801 F.2d 883 (7th Cir.1986). In *Kompare*, the coroner did not violate any duty to reveal information for which she can be sued under § 1983. The government has a duty to reveal exculpatory information to a criminal defendant, *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), but **the disclosure need not be made until trial as long as the defendant is not prevented from having a fair trial**. *United States v. Allain,* 671 F.2d 248, 255 (7th Cir.1982). The coroner's finding of fibromatosis was disclosed two weeks before trial, and plaintiffs did not allege that Mrs. Kompare's trial was unfair in any manner. Indeed, the court found it was very hard to do so given the acquittal. Therefore, the corner did not violate any duty to reveal exculpatory information to the criminal defendant. *Kompare* at 890.

Under Illinois law, an officer's statements to a forensic pathologist at the time the pathologist joined homicide investigation that "there is some question as to whether [gunshot was self-inflicted, as asserted by defendant]," and that defendant had been indicted when in fact he had not, did not constitute malicious continuation of proceedings via manipulation of expert witness, so as to support defendant's post-acquittal §1983 action for malicious prosecution. 42 U.S.C.A. § 1983. *Nugent v. Hayes*, 88 F. Supp. 2d 862 (N.D. Ill. 2000). County officials' searching out four pathologists to render opinion on whether death was suicide or homicide, by itself, was not actionable as malicious prosecution under Illinois law, as required to support murder acquittee's §1983 action against officials. 42 U.S.C.A. § 1983. *Nugent v. Hayes*, 88 F. Supp. 2d 862 (N.D. Ill. 2000).

Here, the Plaintiffs allege Keller provided knowingly false and deliberately incomplete information to the experts they consulted and did not disclose certain emails from Dr. Denton. Adam Gibson never told Keller they were investigating Curtis Lovelace. (See p. 124 of Exhibit J). In fact, Keller only learned Curtis Lovelace was arrested after seeing it in the news. (See pgs. 124-125 of Exhibit J). In the course of the investigation in 2014 and the second trial, Keller and Det. Adam Gibson spoke about 10 times. (See p. 122 of Exhibit J). Keller met with the original pathologist Dr. Bowman. (See p. 139 of Exhibit J). Keller did communicate with Dr. Denton. (See p. 139 of Exhibit J). During the investigation, Keller was responsible for getting tissue slides so they could be disclosed to expert pathologists. (See p. 140 of Exhibit J). Keller made the decision to contact Dr. Denton. (See pgs. 147-148 of Exhibit J). Keller asked Dr. Denton to prepare a written report. (See p. 153 of Exhibit J).

Keller provided the autopsy report and the inquest report to the Quincy Police Department during the investigation. (See p. 155 of Exhibit J). In one email, Keller asked Dr. Denton to prepare a report. (See p. 157 of Exhibit J). Keller was told by Dr. Denton the case was likely suffocation but that they need to talk to Dr. Bowman and find additional experts. (See pgs. 164-165 of Exhibit J).

Like in *Kompare*, assuming *arguendo*, James Keller had a duty to disclose the email received from Dr. Scott Denton to the criminal defendant (Curtis Lovelace), the grand jury, or the prosecutor, then he did not violate his duty to turn over the email because the emails were disclosed. Also, any failure did not prevent Lovelace from a fair trial. Plaintiffs have not alleged the first or second trial was unfair in any manner, especially, considering Curtis Lovelace was acquitted. Like in *Kompare*, Defendant Keller did not violate any duty to reveal exculpatory information to the criminal defendant.

Similarly, as the court found in *Nugent*, Defendant's Keller assistance with finding expert pathology opinions to support the prosecution's theory is not a violation of the Plaintiff's constitutional rights. See also *Davis v. Owens*, 973 F.2d 574, 577 (7th Cir.1992). The Plaintiff has not produced any evidence Keller fabricated pathology slides, failed to turn over forensic evidence or in any way tampered with an expert's review. Like in *Nugent*, Coroner Keller helped find an expert who would testify as to the fact Cory Lovelace was suffocated. Keller cannot be held liable for violating Curtis Lovelace' constitutional rights when he is searching out an expert pathologist to support the prosecution's theory. Therefore, Defendant Keller should be awarded summary judgment.

**III.** **Plaintiff's intentional infliction of emotional distress claim should be dismissed because there are no material facts Defendant Farha or Keller acted extreme or outrageous.**

Under Illinois law, to state a claim for intentional infliction of mental suffering, plaintiff must show: (1) conduct involved was truly extreme and outrageous; (2) defendant intended that his conduct inflict severe emotional distress, or knew that there was a high probability that his conduct would cause severe emotional distress; and (3) conduct in fact caused severe emotional distress. *Nugent v. Hayes*, 88 F. Supp. 2d 862 (N.D. Ill. 2000).

County officials' actions during investigation into death of wife as possible homicide by husband, namely searching out expert pathologist to support theory and exaggerating relatively immaterial items to grand jury, were not sufficiently extreme or outrageous under Illinois law to support husband's post-acquittal action for intentional infliction of emotional distress. *Nugent v. Hayes*, 88 F. Supp. 2d 862 (N.D. Ill. 2000).

Keller's involvement in the investigation of soliciting expert opinions cannot be said to be extreme conduct. Nor can it be said Farha's participation in Officer Gibson's questioning or

occasional conversations with Adam Gibson is extreme conduct demonstrating material facts to support Plaintiff's Count VII. Like in *Nugent*, the behavior of Keller and Farha's actions were not sufficiently extreme or outrageous under Illinois law to support Curtis Lovelace's post-acquittal action for intentional infliction of emotional distress. Therefore, Defendant Farha and Keller should be awarded judgment in their favor as to Plaintiff's Count VII.

## IV. Summary Judgment should be granted to Defendant Adams County because neither Gary Farha or James Keller violated any of the Plaintiffs' constitutional rights.

A local public entity is empowered and directed to pay any tort judgment or settlement for compensatory damages (and may pay any associated attorney's fees and costs) for which it or an employee while acting within the scope of his employment is liable in the manner provided in this Article. 745 Ill. Comp. Stat. Ann. 10/9-102.

Here, because Defendant Farha and Keller cannot be liable for any cause of action against the Plaintiffs, Counts X and XI should be dismissed because Adams County is only named in its capacity as respondeat superior or employer for the two Defendants. As such, summary judgment is proper and judgment should be entered for Adams County.

## CONCLUSION

Summary Judgment should be granted for Defendant Gary Farha because there are no material facts Defendant Farha concealed material exculpatory evidence (Count I), commenced the proceeding against Curtis Lovelace (Count II and VIII), or in any way deprived Curtis Lovelace of his constitutional rights (Counts IV, VI, VII and IX). II. Summary Judgment should be granted for Defendant James Keller because (1) as the county coroner he did not prosecute the Plaintiff Curtis Lovelace (2) there are no material facts James Keller deprived any of the Plaintiffs of their constitutional rights and (3) any actions he took as a public official are protected by qualified immunity. Plaintiff's intentional infliction of emotional distress claim should be

dismissed because there are no material facts Defendant Farha or Keller acted extreme or outrageous. Summary Judgment should be granted to Defendant Adams County because neither Gary Farha or James Keller violated any of the Plaintiffs' constitutional rights.

By: /s/ *James A. Hansen*
James A. Hansen, #6244534
Daniel M. McCleery, #6321087
Attorney for Defendants Gary Farha, Coroner James Keller and Adams County
Schmiedeskamp, Robertson, Neu & Mitchell LLP
525 Jersey Street
Quincy, IL 62301
Telephone: (217) 223-3030
Facsimile: (217) 223-1005
E-mail: jhansen@srnm.com; dmccleery@srnm.com

## CERTIFICATE OF SERVICE

I hereby certify that on the 8th day of July, 2019, I e-mailed the foregoing to the following:

jon@loevy.com                          tara@loevy.com
jpalmer@slpsd.com
tdicianni@ancelglink.com               eemery@ancelglink.com

By: /s/ *James A. Hansen*
James A. Hansen, #6244534