E-FILED
Monday, 08 July, 2019 03:46:15 PM
Clerk, U.S. District Court, ILCD

LOVELACE v.
DET. ADAM GIBSON

CURTIS LOVELACE
July 6, 2018

---

## Page 1

```
 1       IN THE UNITED STATES DISTRICT COURT
        FOR THE CENTRAL DISTRICT OF ILLINOIS
 2              STATE OF ILLINOIS

 3

 4  CURTIS LOVELACE, LOGAN LOVELACE,
    LINCOLN LOVELACE, AND CHRISTINE
 5  LOVELACE on behalf of her
    minor son, LARSON LOVELACE,
 6
                   Plaintiffs,
 7
        -vs-                    No. 17 CV 01201
 8
    DET. ADAM GIBSON, POLICE
 9  CHIEF ROBERT COPLEY, SGT.
    JOHN SUMMERS, LT. DINA
10  DREYER, DET. ANJANETTE BISWELL,
    UNKNOWN QUINCY POLICE OFFICERS,
11  GARY FARHA, CORONER JAMES
    KELLER, THE CITY OF QUINCY AND
12  COUNTY OF ADAMS,

13              Defendants.

14

15

16      VIDEO DEPOSITION OF CURTIS LOVELACE
                July 6, 2018
17                 9:00 AM
               301 West White
18             Champaign, IL

19

20               Reported By:

21

22      Deann K. Parkinson:  CSR 84-002089
23  Area Wide Reporting & Video Conferencing
               301 West White
24         Champaign, Illinois  61820
               (800) 747-6789
25
```

## Page 2

```
 1  APPEARANCES:

 2

 3          FOR THE PLAINTIFFS:

 4      MS. TARA THOMPSON
        LOEVY & LOEVY
 5      311 North Aberdeen St. 3rd Floor
        Chicago, IL  60607
 6      312-243-5900
        tara@loevy.com
 7

 8      APPEARING FOR THE CITY OF QUINCY,
        ADAM GIBSON, ROBERT COPLEY, JOHN
 9      SUMMERS, DINA DREYER, ANJANETTE
        BISWELL:

10      MR. WILLIAM MECKES
        SCHOLZ LOOS PALMER SIEBERS &
11      DUESTERHAUS
        625 Vermont Street
12      Quincy, IL  62301
        wmeckes@slpsd.com
13

14      APPEARING FOR THE COUNTY OF ADAMS,
        GARY FARHA and JAMES KELLER:
15
        MR. JAMES HANSEN
16      SCHMIEDESKAMP ROBERTSON NEU &
        MITCHELL
17      525 Jersey Street
        Quincy, IL  62301
18      217-223-3030
        jhansen@SRNM.com
19

20

21

22

23

24

25
```

## Page 3

```
 1  APPEARANCES CONTINUED:

 2

 3              APPEARING FOR THE CITY OF QUINCY,
                ADAM GIBSON, ROBERT COPLEY, JOHN
 4              SUMMERS, DINA DREYER, ANJANETTE
                BISWELL:

 5      MR. THOMAS DiCIANNI:
        ANCEL, GLINK, DIAMOND, BUSH,
 6      DICIANNI & KRAFTHEFER PC
        140 South Dearborn Street
 7      Sixth Floor
        Chicago, IL  60603
 8      312-782-7606
        tdicianni@ancelglink.com

 9

10              *  *  *  *

11

12  TIMES ON THE RECORD:

13  9:24-10:59
    11:14-12:38
14  1:08-2:53
    3:01-4:43
15  4:50-5:33

16

17

18

19

20

21

22

23

24

25
```

## Page 4

```
 1                   INDEX

 2  WITNESS:  CURTIS LOVELACE

 3  Examination by Mr. DiCianni.......page 7
    Examination by Mr. Hansen.........page 206
 4

 5

 6              EXHIBITS

 7  Exhibit No. 1....................page 116
    (door sign)
 8  Exhibit No. 2....................page 134
    (photograph)
 9
    Exhibit No. 3....................page 135
10  (photograph)
    Exhibit No. 4....................page 138
11  (photograph)
    Exhibit No. 5....................page 140
12  (photograph)
    Exhibit No. 6....................page 142
13  (photograph)
    Exhibit No. 7....................page 143
14  (photograph)
    Exhibit No. 8....................page 147
15  (photograph)
    Exhibit No. 9....................page 216
16  (letter)
    Exhibit No. 10...................page 278
17  (email)
    Exhibit No. 11...................page 278
18  (email)
    Exhibit No. 12...................page 298
19  (photograph)

20

21

22

23

24

25              EXHIBIT A
```

LOVELACE v.
DET. ADAM GIBSON

CURTIS LOVELACE
July 6, 2018

---

**Page 5**

1      VIDEOTAPE DEPOSITION
2
3        The Videotape Deposition of CURTIS
4  LOVELACE, a citizen of the State of Illinois, a
5  witness of lawful age; produced, sworn, and
6  examined upon his corporeal oath, at 301 West
7  White, Champaign, Illinois, on July 6, 2018,
8  before Deann K. Parkinson, CSR, Notary Public in
9  and for the County of Champaign and State of
10  Illinois, as a witness in a certain suit and
11  matter now pending and undetermined in the United
12  States District Court for the Central District of
13  Illinois.
14        CSR License No. 84-002089.
15
16
17
18
19
20
21
22
23
24
25

---

**Page 6**

1      **VIDEO OPERATOR:** We're now going on the
2  record. Today is July 6th, 2018. The time is
3  approximately 9:24 AM. The location is 301 West
4  White Street, Champaign, Illinois, 61820. My name
5  is Garrett Sommer, video specialist of Area Wide
6  Reporting and Video Conferencing. This is case
7  number 17 CV 01201, entitled Lovelace versus
8  Detective Adam Gibson, et al. The deponent is
9  Curtis Lovelace. Counselors, will you please
10  identify yourselves for the record.
11      **MS. THOMPSON:** I'm Tara Thompson,
12  T-A-R-A, T-H-O-M-P-S-O-N for Curtis Lovelace.
13      **MR. DiCIANNI:** Tom DiCianni for the
14  Quincy defendants.
15      **MR. HANSEN:** Jim Hansen for the Adams
16  County defendants.
17      **MR. MECKES:** William Meckes for the City
18  of Quincy defendants.
19      **VIDEO OPERATOR:** The deponent may now be
20  administered the oath by Ann Parkinson of Area
21  Wide Reporting and Video Conferencing.
22
23
24
25

---

**Page 7**

1          CURTIS LOVELACE,
2  the deponent herein, called as a witness, after
3  having been first duly sworn, testified as
4  follows:
5      EXAMINATION BY
6      **MR. DiCIANNI:**
7      Q.  Sir, would you state your name and spell
8  your name for the court reporter.
9      A.  My full name is Curtis Tyson Lovelace.
10  That's C-U-R-T-I-S. Middle name Tyson, T-Y-S-O-N.
11  Lovelace, L-O-V-E-L-A-C-E. I often go by the name
12  of Curt.
13      Q.  And Mr. Lovelace, that's how you
14  pronounce your last name, as I understand it?
15      A.  Yes, it is.
16      Q.  Lovelace?
17      A.  Yes.
18      Q.  At some point in time, or what we've
19  seen in some of the media, we've seen your name
20  pronounced as Loveless. That's incorrect?
21      A.  That's incorrect as far as how I
22  pronounce my name. I have heard other people
23  pronounce it throughout my life, Loveless. I
24  really don't choose to correct them in that
25  regard. I'm not sure why the people who

---

**Page 8**

1  prosecuted me thought that the pronunciation was
2  such an issue. But, it became an issue, I think
3  at both trials, and then it became an issue in the
4  media. But I pronounce it Lovelace, and so does
5  my wife and my children.
6      Q.  And you've always pronounced it
7  Lovelace?
8      A.  I believe so. I mean, if I say it fast,
9  it will sometimes come off as Loveless, or
10  Lovelace. So, again, it's not something that I
11  spend a lot of time dwelling on. But, I introduce
12  myself as Curtis Lovelace.
13      Q.  Did the Loveless pronunciation begin
14  with the trial?
15      A.  No. As I indicated, I think, I'm not
16  sure if people ever mispronounce your name.
17      Q.  They always do.
18      A.  Okay. And so, it's not, I guess, an
19  unreasonable pronunciation. And I think others
20  may pronounce that spelling that way. I just
21  don't.
22      Q.  You're not contending that my clients or
23  anybody else affiliated with the prosecution or
24  the police investigation purposely mispronounced
25  your name in order to attribute anything negative

---

**Page 9**

1  to it?
2    A.   I'm not sure why they purposely
3  mispronounced my name. I know that they did. And
4  I know on at least one document from the Quincy
5  Police Department that it was spelled
6  L-O-V-E-L-E-S-S. And I'm not sure why they did
7  that.
8    Q.   Well, to answer my question, though, are
9  you asserting or accusing any of my clients of
10  purposely doing so in order to negatively frame
11  your last name, or negatively attribute some
12  negativity to your last name?
13    A.   They continually mispronounced the name,
14  even when we indicated that I pronounce it
15  Lovelace. So, again, I can't speculate as to why
16  they were doing that. I don't know if it was some
17  sort of play on words that I love less. I guess
18  that's a possibility. But, I'm not going to
19  speculate as to their motivations as to why they
20  did it. I just know they did it.
21    Q.   Okay. But, people throughout your
22  lives, even before the prosecution, would
23  sometimes call --
24    A.   Sure.
25    Q.   Pronounce it that way?

**Page 10**

1    A.   Yes.
2    Q.   Have you ever given a deposition before?
3    A.   No. I have never been deposed. As an
4  attorney, I have deposed other people.
5    Q.   You have taken depositions?
6    A.   I've taken depositions, correct.
7    Q.   And how many depositions in the course
8  of your career have you taken?
9    A.   That was early in my career when I was
10  doing civil work. And I can specifically recall
11  taking two depositions.
12    Q.   Okay. Most of your legal career has
13  been involved in criminal cases, correct?
14    A.   Seven and a half years of my legal
15  career was involved with, as a criminal
16  prosecutor, as an assistant state's attorney. I
17  had spent three and a half years prior to that in
18  a private practice in a law firm that did not
19  handle criminal cases. It was purely civil. And
20  then since I've been practicing law again,
21  beginning last year, I've devoted my work to
22  criminal cases.
23    Q.   Let me go through the rules of the
24  deposition, of the general reminders that I do in
25  every case, even though in your case you already

**Page 11**

1  know this.
2      But I'm going to ask you questions, as
3  you know, that pertain to your lawsuit, correct?
4  When you respond to my questions, you have to do
5  it verbally because the court reporter is taking
6  down everything we talk about. If you have any
7  problem with a question that I ask, please let me
8  know that. And if, at the end of the day, when
9  our court reporter types up the transcript, we're
10  going to want to assume that all the answers you
11  gave are the answers you intended to give, okay?
12    A.   I understand.
13    Q.   Is there anything that prohibits you
14  from giving a true, clear, and accurate deposition
15  today?
16    A.   No.
17    Q.   Do you take any medications that might
18  affect your ability to recall or describe things
19  in detail?
20    A.   No.
21    Q.   Do you take any medication that you
22  attribute is necessary because of any of the
23  incidents involved in this case?
24    A.   No.
25    Q.   Have you done anything to prepare for

**Page 12**

1  this deposition?
2    A.   I reviewed several topics that were
3  prepared in advance by my attorney. And I set
4  down with my attorney yesterday, Tara Thompson,
5  reviewed those topics, as well as any other
6  material that we had available to us in
7  preparation for this deposition.
8    Q.   Okay. Without getting into any
9  discussions you had with your attorney, tell me
10  what it is that you would have reviewed that was a
11  physical material; a document, a photograph, a
12  record, video? Anything?
13    A.   Well, I mean, the records in this case
14  are quite voluminous. I did not review all the
15  documents. I reviewed, I think, some police
16  reports. I at some point here within the last
17  couple of weeks have watched a video of my trial
18  testimony at the second trial. And I also
19  reviewed some of my answers to interrogatories, as
20  well as I reviewed some of the documents that I
21  produced pursuant to your request for production.
22    Q.   In going over the, what you call police
23  reports and other documents, did you review prior
24  statements that you gave?
25    A.   I have reviewed prior statements that I

Page 13

1  gave. Specifically, my statements to Adam Gibson
2  the day of my arrest. But, I don't believe I
3  reviewed -- I may have reviewed part of that
4  statement. I did review part of that statement
5  yesterday, just a section. Other than that, I did
6  not review the entire statement.
7    Q.  So, you reviewed a part of the statement
8  that Adam Gibson took after your arrest?
9    A.  Yes. I had a question in my mind as to
10  what was asked and how I answered. And I just
11  wanted to refresh my recollection as to the
12  question that was asked.
13    Q.  It's my understanding that after your
14  wife, Cory Lovelace, was found dead, you gave
15  several statements to police officers. Correct?
16    A.  I did.
17    Q.  And you gave a statement, a very short
18  statement, to one of the responding police
19  officers on the day that she died, correct?
20    A.  Yes.
21    Q.  And you gave another statement to
22  another Detective Baird a few days after she died,
23  correct?
24    A.  Well, my first statement to Detective
25  Baird was the morning of Cory's passing. Later

Page 14

1  that morning. And then I think I had another
2  statement, he interviewed me, I believe the next
3  day, Wednesday. And then there was another
4  statement, I believe in March, where he
5  interviewed me again.
6    Q.  Okay. You did not review those reports?
7    A.  I did not specifically review those
8  reports. But, I have reviewed them.
9    Q.  In the past?
10    A.  Yes.
11    Q.  Did you give a statement to any of the
12  Adams County personnel? The coroner or anybody
13  from the coroner's office at the time of Cory's
14  death?
15    A.  I was not interviewed by anyone from
16  Adams County. I did have a conversation with
17  coroner Hamilton after Cory's death, and after he
18  received the autopsy report, and he explained to
19  me what was contained in the autopsy report. But,
20  I was not interviewed by him.
21    Q.  So, that was a conversation you had with
22  Hamilton?
23    A.  Yes.
24    Q.  Was it for the purpose of talking to
25  him, or did you just run into him, or how did that

Page 15

1  happen?
2    A.  I believe he contacted me and said he
3  would like to discuss the findings in the autopsy.
4  And I met him then at Marty Didriksen and John
5  Didriksen's home. And I believe we met in the
6  kitchen. She was present and he explained what he
7  had been communicated in the autopsy. And I
8  believe at that point he may have also told us
9  that the body had been released, or would be
10  released. And that it would be available for the
11  funeral.
12    Q.  Okay. Did you ever see any kind of a
13  report of that conversation with Hamilton?
14    A.  No, I've never seen a report of the
15  conversation.
16    Q.  And are you able to say when that
17  conversation took place? Only it was before the
18  funeral?
19    A.  It was before the funeral.
20    Q.  And the funeral was when?
21    A.  The funeral, we had a visitation, I
22  believe, on Friday. And a funeral on Saturday
23  morning. I'm pretty certain. I don't think it
24  was Thursday/Friday. I think it was
25  Friday/Saturday. But, it could be either way, but

Page 16

1  I think it was Friday/Saturday.
2    Q.  And just to clarify, she was found dead
3  on Valentine's Day?
4    A.  Yes.
5    Q.  And that was Tuesday?
6    A.  Correct.
7    Q.  All right. So, Friday would have been a
8  wake, a visitation?
9    A.  Correct.
10    Q.  And Saturday the actual funeral?
11    A.  Yes. As I recall we had a visitation, a
12  private visitation with just family, with an open
13  casket viewing. I think late morning, early
14  afternoon. And then a just full visitation
15  without a casket or anything that evening. And
16  then funeral the next morning.
17    Q.  I see. Where was the -- where was the
18  visitation?
19    A.  The visitation was at Hansen-Spear
20  Funeral Home. That's located on State Street, I'm
21  not sure of the exact address, in Quincy,
22  Illinois.
23    Q.  And where was the funeral?
24    A.  The funeral service was held at First
25  Presbyterian Church. It later became Faith

LOVELACE v.
DET. ADAM GIBSON

CURTIS LOVELACE
July 6, 2018

Page 17

1  Presbyterian church. And I think it's Faith
2  Presbyterian church now. There was a service
3  there. And then there was a graveside funeral at
4  the cemetery.
5      Q.   And she was not -- she was created
6  though, correct?
7      A.   She was cremated.
8      Q.   So the graveside service would have been
9  while she was still in the casket prior to
10 cremation?
11     A.   No. I believe she had been cremated by
12 then.
13     Q.   Already?
14     A.   Yes.
15     Q.   So, obviously your conversation with
16 Hamilton took place sometime between Tuesday and
17 Friday?
18     A.   Yes. It was obviously either Wednesday
19 or Thursday. I believe it was Thursday.
20     Q.   And who was present during that
21 conversation?
22     A.   Marty Didriksen was present during that
23 conversation.
24     Q.   And Marty was Cory's mother, correct?
25     A.   That is correct.

Page 18

1      Q.   And Cory's father was John?
2      A.   Yes.
3      Q.   And John was not present?
4      A.   I don't think he was present during the
5  conversation. It is possible. I do remember
6  Marty being there. I don't specifically recall
7  John being there.
8      Q.   And so how good is your memory of what
9  was said between you and Mr. Hamilton on that day?
10     A.   I remember the basic things about the
11 conversation as to what the autopsy revealed to
12 him. And he explained that he did not give us a
13 copy of the autopsy. In fact, I never saw a copy
14 of the autopsy until -- until after my arrest.
15     Q.   So, tell me what Mr. Hamilton said to
16 you, and what you may -- you or Marty may have
17 said in response, and anything else you can
18 remember about the conversation?
19     A.   Sure. I remember him indicating that
20 the autopsy revealed problems with her liver that
21 could have been related to alcoholism. And that
22 could have been the cause of her death. And that
23 there were no other significant findings.
24     Q.   Did he tell you what the coroner's
25 conclusion was as to cause of death?

Page 19

1      A.   I don't --
2      Q.   Or I should say the pathologist's
3  conclusion?
4      A.   Right. And I think you're referring to
5  undetermined.
6      Q.   Yes.
7      A.   No. I do not recall him indicating that
8  the pathologist had revealed or indicated that it
9  was an undetermined cause of death. He may have
10 said something. At that point that wouldn't have
11 really meant anything to me. The first time I
12 heard that the cause of death was undetermined was
13 later that year when, maybe Marty, maybe someone
14 else, I can't recall how it was brought to my
15 attention, that the inquest results were published
16 in the newspaper. And I believe at that point it
17 indicated undetermined.
18     Q.   What was your reaction, or what did you
19 say to Hamilton, or to anybody in the room, at the
20 time that he told you about the autopsy results?
21         MS. THOMPSON: Object to form. You can
22 answer.
23     A.   Again, I remember Marty Didriksen being
24 there. He mentioned the liver and alcoholism. We
25 both acknowledged that Cory drank, maybe even said

Page 20

1  a heavy drinker, but drank a lot. I think we also
2  talked about the concerns we had with her bulimia.
3  And that was the extent of that conversation.
4      Q.   Did he mention bulimia?
5      A.   I don't think he mentioned bulimia.
6      Q.   Did you have any belief or understanding
7  that you may have been a suspect in her death at
8  that point in time?
9      A.   I didn't believe I was a suspect in her
10 death. I know that Detective Baird and the other
11 police officer who initially interviewed me had
12 interviewed me about what happened. But, I never
13 personally felt that I was a suspect.
14     Q.   How long did the conversation with
15 Hamilton last?
16     A.   I believe it was a short conversation.
17 Again, I recall it being in Marty's kitchen. He
18 stopped by, delivered that information and left.
19 I think the -- yeah.
20     Q.   Did you stay there then with Marty after
21 he left?
22     A.   I'm not sure what I did with Marty after
23 he left. I know Marty and I began the process of
24 making funeral arrangements, I believe starting
25 Wednesday afternoon. And we were engaged in doing

Page 21

1 that. I think probably about that same time frame
2 she and I were working together on the obituary,
3 as well as the service, and meeting with the
4 pastor.
5     So, there was a lot of activity with
6 Marty and John. But, mostly Marty during that
7 time period and Marty's family.
8   Q.   Did you ever express to Marty some
9 relief that the -- that the coroner's autopsy
10 found some natural causes that could have resulted
11 in her death?
12   A.   No. I didn't express any relief.
13   Q.   Are you aware of Marty having said at
14 some point in time that you expressed some form of
15 relief that the autopsy identified some natural
16 cause that could have been the cause of death?
17   A.   I know that she made statements to the
18 police, and as well as testified. I don't
19 remember her stating that I expressed any form of
20 relief in those findings.
21   Q.   In any event, you deny expressing any
22 form of relief at that point?
23   A.   No, I didn't express any form of relief.
24   Q.   Were you or your family a member of the
25 First Presbyterian church, which I think you say

Page 22

1 has become the Faith Presbyterian church?
2   A.   No. We were not. We were members of
3 the Congregational Church in Quincy. And Marty
4 and John were also as well as other members of
5 Cory's family. However, we didn't attend
6 regularly. We would attend basically on Easter.
7 And -- but we made the funeral arrangements at
8 First Presbyterian church.
9   Q.   And why was that?
10   A.   I think one, Marty had attended, I think
11 some services there with personal friends of hers
12 that were members of the church; Barb and Dennis
13 Gorman. But, the primary reason is that a high
14 school classmate of mine, of ours, Cory and I went
15 to high school with a gentleman by the name of
16 Kevin McGinnis. And Kevin was the associate
17 pastor at that church. I think Marty had
18 mentioned that to me. And we talked about if it
19 would be more appropriate to have him conduct the
20 service, given the fact that he knew both of us.
21 We really didn't know the pastor that well at
22 Congregational church. The Congregational church
23 was where Cory and I got married. And again, we
24 were members. But, we didn't attend regularly.
25 So the decision was made to hold the service

Page 23

1 there.
2   Q.   What is the -- that's a Christian church
3 obviously, the Congregational church?
4   A.   Congregational, yes.
5   Q.   And what is the denomination affiliated
6 with that church? Is it called the Congregation?
7   A.   Yeah, it's the Congregational church.
8 I'm not sure, I think that is an affiliation.
9   Q.   And that's not a Presbyterian sect?
10   A.   It's not a Presbyterian church, correct.
11   Q.   Does the Congregational church have any
12 dogma or teachings or positions on cremation?
13   A.   I don't know.
14   Q.   Whose decision was it to cremate Cory?
15   A.   It was our decision. And by our
16 decision, it was Marty and I came to that
17 decision. It was not something that Cory and I
18 had discussed in advance, either how to dispose of
19 my remains or how she wished to depose of her
20 remains. However, I was aware that other members
21 of Cory's family had passed away. Her grandfather
22 had somewhat recently passed away, I think that
23 was the last closest family member who passed
24 away. And he was cremated.
25   Q.   Was that a tradition in Cory's family,

Page 24

1 to cremate deceased?
2   A.   That was my understanding. My personal
3 experience with family was that, you know, I
4 was -- attended her grandfather's funeral. And he
5 was cremated. But, yes, that was my
6 understanding, that that was the tradition in that
7 family.
8   Q.   Did -- John died not long after Cory,
9 correct?
10   A.   Correct.
11   Q.   And John was not cremated, was he?
12   A.   No, I believe John was cremated.
13   Q.   He was cremated? Did you attend that
14 funeral?
15   A.   Yes.
16   Q.   So, you would say it was a joint
17 decision between yourself and Marty, or Marty and
18 John, to cremate Cory?
19   A.   Yeah. Yes. I do. Again, John did not
20 come with us to the funeral home. Marty and I --
21   Q.   John was very sick at the time?
22   A.   John was sick at the time. And so --
23 yeah.
24   Q.   And you felt that given what Coroner
25 Hamilton had said to you, that there wouldn't have

LOVELACE v.
DET. ADAM GIBSON

CURTIS LOVELACE
July 6, 2018

Page 25

1  been any prohibition by either the police
2  department or any other law enforcement agency to
3  cremation, correct?
4      A.   I really didn't think about it, on
5  whether or not there would be any prohibition.  It
6  was my understanding based upon the conversation
7  with Gary Hamilton that the body had been released
8  to the funeral home, and that we were free to move
9  forward with the funeral.
10     Q.   And you had no understanding at all that
11 you were suspect at all in her death at that point
12 in time, correct?
13     A.   That's correct.
14     Q.   And did Cory have a will?
15     A.   Yes.  I believe both of us had wills
16 that we put together.  I believe Dennis Gorman
17 wrote those wills.  They were simple wills,
18 reciprocal wills.  And I believe Dennis Gorman
19 also, I know Dennis Gorman, also handled that
20 estate.  It was a small estate.  I don't recall
21 doing much, if anything, regarding probating the
22 will or anything.  He handled all that.
23     Q.   The will was filed with the court?
24     A.   I assume so.  I think so.  But, I don't
25 know.  He handled all of that.

Page 26

1      Q.   But your understanding was, it was
2  handled by -- you're an attorney, you understand
3  small estates affidavit, that kind of thing?
4      A.   Yeah.  I've handled one small estate.
5  So, I'm not going to pretend to understand the
6  details of that.  And I believe I handled that for
7  Dennis Gorman when I was working with him.  And I
8  used all of his forms and followed his lead.  So
9  that is my understanding.  But, I don't have an
10 extensive understanding of that process.
11     Q.   Would you have a copy of Cory's will?
12     A.   I don't believe I have a copy of Cory's
13 will.
14     Q.   And if there was any probate proceeding
15 or even a filing of the will, it would have taken
16 place in Adams County?
17     A.   Yeah, anything that would have been in
18 Adams County, correct.
19     Q.   Were you represented by any attorneys
20 while -- during the immediate post-death period?
21     A.   No.
22     Q.   Did you consult with any attorneys at
23 that time?
24     A.   No.
25     Q.   We saw from your answers to

Page 27

1  interrogatories that while you mentioned it
2  yourself, that you and Cory went to high school
3  together?
4      A.   That is correct.
5      Q.   And where did you go to high school?
6      A.   Quincy High School.
7      Q.   And you were born and raised in Quincy?
8      A.   I was.
9      Q.   Your parents lived in Quincy their whole
10 life?
11     A.   Yes.  My father was in the Marines for a
12 stint.  An enlistment.  So he wasn't in Quincy
13 during that time.  I believe the rest of their
14 lives were in Quincy, and all of my upbringing was
15 in Quincy, Illinois.
16     Q.   And what is your father's name?
17     A.   Terry Monroe Lovelace.
18     Q.   And is Terry still alive?
19     A.   Terry is still alive.
20     Q.   Where does Terry live right now?
21     A.   I recall the address as being Deer Ridge
22 address.  I think it's since changed to some sort
23 of street designation.
24     Q.   When is the last time -- your mother
25 still alive?

Page 28

1      A.   She is.
2      Q.   And what is her name?
3      A.   Janice Lovelace.
4      Q.   And your parents are together?
5      A.   Yes.
6      Q.   When is the last time you've had any
7  communication with them?
8      A.   I haven't had any communication with
9  them in quite sometime.  The last time that I saw
10 them would have been during the course of the
11 first trial.  I believe I did not speak to them.
12 Of course I wasn't permitted to really speak to
13 anyone because I was still in custody.  There was
14 communication passed in the form of a note during
15 the first trial that my aunt, my mom's sister, had
16 passed away.  And I believe that may be the last
17 communication that I received from them.
18     Q.   Are you estranged from them at this
19 point?
20     A.   I don't communicate with them.
21     Q.   Purposely or --
22     A.   The circumstances of the arrest and
23 prosecution and the toll that it took on my
24 family, and I believe that the toll that it took
25 on them strained those -- that relationship while

LOVELACE v.
DET. ADAM GIBSON

CURTIS LOVELACE
July 6, 2018

**Page 29**

1 I was in jail. And we've never — we've not
2 repaired those relationships.
3     Q.   In what way did it strain it such that
4 it caused a break in the relationship?
5     A.   My relationship with my parents was good
6 just prior to my arrest, as well as the
7 relationship with my wife, Christene. We
8 interacted with them on a regular basis, and would
9 speak to them on a regular basis.
10         At the time of my arrest, my parents
11 spent time with Christene, and they were part of
12 the process of hiring my first attorneys. And at
13 that time they were the ones who put up the one
14 hundred thousand dollar fee that those attorneys
15 required.
16         After that, those, that relationship,
17 slowly started to break down. They began visiting
18 less. And I don't think visited after November or
19 December of 2014.
20         I was making phone calls to them, and at
21 one point they blocked me so that I was unable to
22 make a phone call to them. They — I also
23 received a letter to them while I was still in
24 jail, and I think probably the spring of 2015,
25 indicating that they not only expected to be

**Page 30**

1 repaid, but they demanded immediate repayment.
2     Q.   You were incarcerated immediately after
3 your arrest?
4     A.   I was.
5     Q.   And that would have been in August, at
6 the end of August, 2014?
7     A.   It was August 27th of 2014. Yes.
8     Q.   So, did they visit you between August
9 2014 and December when you lost touch with them?
10     A.   Yes. Yes. Yes — initially they
11 visited. They would visit when Christene would
12 visit. Those initial visits, I think it was — my
13 first visit was maybe a week and a half after my
14 arrest that I was eligible for a visit. And those
15 visits included my parents and the three — my
16 three sons and Christene.
17         And then at one point we agreed that
18 there were just too many people to visit in a 30
19 minute period. And it was taking its toll on me
20 just having to just handle everyone at once. And
21 so we decided that Christene and the boys would
22 visit one week, and that my parents would visit
23 one week. That would give me time with my
24 immediate family, as well as my parents.
25     Q.   But, then in December they stopped

**Page 31**

1 visiting and then they even blocked your calls?
2     A.   Yes. They stopped visiting. And in
3 fairness to them, after I think in January they
4 left for Florida. And so they were geographically
5 not able to visit. And then at one point then in
6 the spring I attempted to call them, and I can't
7 recall if I got through and it was — they hung
8 up. I can't remember exactly the circumstances.
9 But, there was a point then where I called them
10 and the system said that I was blocked.
11     Q.   Was there some event or incident that
12 precipitated this break in the relationship?
13     A.   I think that was about the same time
14 when the money became an issue. I didn't — I was
15 very limited in my communication with them. So,
16 we didn't have an opportunity to have a discussion
17 regarding the breakdown. I just know the
18 breakdown did occur.
19     Q.   So, who were they communicating with —
20 you seem to be suggesting that the money was
21 some — had played some part in this breakdown?
22     A.   That's the only reason I am aware of
23 that played a part.
24     Q.   Were they talking to Christine about the
25 repayment?

**Page 32**

1     A.   They and — Christine and my parents had
2 talked about the money.
3     Q.   And is that where the conflict occurred?
4     A.   I know that they had discussions
5 regarding, you know, they were going to put up the
6 $100,000. And then there was going to be some
7 fund raising attempt, and that they would be
8 repaid that amount. That was part of their
9 retirement. They had cashed out whatever they had
10 in investments in order to pay that.
11         And it's my understanding that they were
12 frustrated that that had not occurred. That more
13 money wasn't coming in to reimburse them. And
14 during that same time period the attorneys were
15 wanting more money. That was just their fee.
16 There were costs and expenses associated with that
17 also.
18     Q.   So, it would seem, just logically, it
19 would seem not realistic to expect such an
20 immediate repayment; but you're saying that they
21 thought there would be more efforts on your part,
22 your being your family, to raise some money to pay
23 them back, am I understanding that correctly?
24     A.   That was my understanding based upon my
25 very, again, I was limited in the amount of

**Page 33**

1 communication I could have with them.
2    Q.  Would you expect Christine to have more
3 information about that breakdown?
4    A.  Yes. I believe she was communicating
5 with them during that time period. And would have
6 had direct communication with them.
7    Q.  So, were you and Cory in the same class
8 in high school?
9    A.  Cory and I, yes. We were --
10    Q.  Same age?
11    A.  Yes. We both graduated in 1986.
12    Q.  And you went off to college together?
13    A.  No, we did not.
14    Q.  You, I understand, went to the
15 University of Illinois where you played football?
16    A.  That is correct.
17    Q.  And you played football in high school
18 obviously?
19    A.  I did, yes.
20    Q.  Were you -- did you receive awards as a
21 high school football player?
22    A.  Yes. I believe, I think I received some
23 individual team awards. And I was, I think all
24 conference.
25    Q.  All conference? What position did you

**Page 34**

1 play?
2    A.  In high school I played center. And
3 defensive line or defensive tackle.
4    Q.  And did you receive a scholarship to go
5 to Illinois to play football?
6    A.  I did.
7    Q.  Full scholarship?
8    A.  I did.
9    Q.  So, it's fair to say that you were quite
10 a good football player?
11    A.  I was good enough to get a scholarship
12 to attend the University of Illinois, and I guess
13 they don't just hand those out, if you will.
14    Q.  Okay. Understood. So, would you have
15 started immediately after graduation in 1986 at
16 the University of Illinois?
17    A.  Yes. My first semester would have
18 started in the fall of 1986. I would have arrived
19 at campus earlier to begin football practice.
20    Q.  And did Cory go to college right after
21 high school?
22    A.  She did.
23    Q.  She went to University of Iowa?
24    A.  That is correct.
25    Q.  So, did you continue to date through --

**Page 35**

1 after you both went off to separate colleges?
2    A.  We didn't date in high school.
3    Q.  Oh, you didn't date in high school?
4    A.  No. We did go to high school together,
5 but we did not date in high school.
6    Q.  I'm sorry. Misunderstood that. So,
7 when did you start dating Cory?
8    A.  My first interaction with Cory, as far
9 as any sort of dating or interests, I believe
10 would have been during Thanksgiving break of that
11 first year, 1986. As I recall that was my first
12 trip home that semester. And I recall going to a
13 house party somewhere, and she was there and we
14 began talking. And I can't remember if we went
15 then on a date during that break or not. But, I
16 know that we went on dates then and started dating
17 during the Christmas holiday when I was home and
18 she was home from college.
19    Q.  And you continually dated until you got
20 married?
21    A.  Yes.
22    Q.  Did you graduate from the University of
23 Illinois?
24    A.  I did.
25    Q.  And what year did you graduate?

**Page 36**

1    A.  I graduated in December of 1990. I went
2 four and a half years. I red shirted my freshman
3 year. And so in order to play out my eligibility,
4 but I had enough credits to finish and not have to
5 return in the spring of '91.
6    Q.  And so you played football all four
7 years at U of I?
8    A.  Yeah. I played football five. I
9 actually participated in football for five years.
10 But, played four.
11    Q.  'Cuz you were red shirted one year?
12    A.  Correct. My freshman year.
13    Q.  Okay. Were you a starter?
14    A.  I first started in 1988 as we'd refer to
15 as a red shirt sophomore. So it was my third year
16 academically. Second year athletically. And I
17 started then in '88, '89 and 1990.
18    Q.  And were you -- any awards in football,
19 in college?
20    A.  Yes.
21    Q.  What would that be?
22    A.  My junior and senior years I was all Big
23 Ten first team as a center. I had been academic
24 all Big Ten, I think I was academic all Big Ten my
25 sophomore year. I received several academic, just

**Page 37**

1 internal awards. I think it was called the George
2 Huff award for athletic and academic achievement,
3 I think for four years. And my junior and senior
4 years I received academic achievement. I think
5 Toyota Leadership Award. Honda Academic
6 Achievement award. Those were awards that were
7 sponsored by those car companies that were
8 announced during television broadcasts. And I
9 think a scholarship then was donated to the
10 general scholarship fund in my name, I think. And
11 I got plaques associated with that.
12 Q. Did you take any action to get into or
13 be considered for an NFL draft?
14 A. My senior year, about three-quarters of
15 the way through the season, I suffered a knee
16 injury that tore my meniscus and my ACL; anterior
17 cruciate ligament. I had the meniscus cleaned out
18 or the cartilage cleaned out and rehabbed. And
19 then played in my final game, I believe it was
20 January 2nd in a bowl game that our team got
21 invited to. Played a half, and the knee went back
22 out because there was no ligament in it. And then
23 had surgery thereafter. Actually, after Cory and
24 I got married, I think in February.
25 So, during that time period I was

**Page 38**

1 contemplating an NFL career. And I did hire or
2 retain an agent. But, I wasn't in the draft. And
3 I didn't try out for anything. I was rehabbing in
4 1991. And then I started law school in the fall
5 of 1991. And I never went back to football.
6 Q. So you didn't get invited to any
7 tryouts or combine or anything like that?
8 A. No.
9 Q. All right. And you and Cory got married
10 in February of '91?
11 A. We got married in January of 1991.
12 Q. And what was your major?
13 A. My major was business administration,
14 with a concentration in organizational behavior.
15 Q. So, you got a BA in that, I think it's
16 -- or a BS?
17 A. It's a BS. It's bachelor of science,
18 yes.
19 Q. Okay. And then you took, you went to
20 law school, in the fall of 1991?
21 A. Correct.
22 Q. So, when did you take the LSAT? That
23 spring?
24 A. No. I think I took the LSAT either in
25 the summer of 1990 or in the fall of 1990. I

**Page 39**

1 believe it was in the summer of 1990.
2 Q. Okay. You were admitted to the
3 University of Illinois law school?
4 A. Correct.
5 Q. And did you graduate from the University
6 of Illinois law school?
7 A. I did.
8 Q. When did you take the bar exam?
9 A. I took the bar exam the summer, I
10 believe it was in August of 1994.
11 Q. And in law school, what were your
12 grades? What was your class rank or however you
13 measured that at the U of I?
14 A. I don't remember what my class rank was.
15 I was not on Law Review. A's, B's, I recall a
16 couple of C's while I was in law school.
17 Q. Did you graduate with an intention to
18 practice law?
19 A. I did.
20 Q. So, what would have been -- you passed
21 the bar exam on the first try?
22 A. I did.
23 Q. What would have been your first job
24 after law school?
25 A. After graduating from law school I had

**Page 40**

1 already been hired by a firm in Quincy. I spent
2 the summer doing some work for them, research,
3 from Champaign whenever they needed it. Just like
4 a law clerk would. I had clerked for them the
5 summer prior. And at that point, I think it was
6 the end of summer, they had asked me to join their
7 firm as an associate and I agreed to do that.
8 So, after the bar exam Cory and I moved
9 to Quincy and I began working for them, still
10 clerking, because I still had not received the
11 results or been sworn in until November of 1994.
12 Q. Yeah. Well, what did Cory do while you
13 were in law school?
14 A. Cory began working, when I was in law
15 school, I believe it was for a temp agency. And
16 --
17 Q. In Champaign?
18 A. Yes. And I believe that temp agency
19 placed her at a company that still exists in
20 Champaign called Wolfram Research.
21 At some point, and I can't remember if
22 it was in that first year or second year, or when
23 it was, she then worked for a company that did
24 mobile telephone billing. That was back in the
25 days when you had roaming charges and things were

LOVELACE v.
DET. ADAM GIBSON

CURTIS LOVELACE
July 6, 2018

---

Page 41

1  extremely complicated and costly when it came to
2  mobile phones.
3      And so there was a company that operated
4  out of, at that time was the Bank of Illinois
5  building. I think the company was owned by the
6  Bank of Illinois, that providers contracted those
7  services. And so she was a customer service
8  person. And she worked there for them until we
9  moved back to Quincy.
10  Q.   So, when you were offered the position
11  with the firm, that's what prompted your move back
12  to Quincy?
13  A.   Correct.
14  Q.   And what was the firm?
15  A.   Schmiedeskamp, Robertson, Neu and
16  Mitchell.
17  Q.   And is that the same firm representing
18  Adams County in this case?
19  A.   It is.
20  Q.   Now, Mr. Hansen is probably too young to
21  have been there at that time?
22  A.   Jim and I did, I don't believe cross
23  paths. Jim joined the firm after I left.
24  Q.   How long did you stay with that firm?
25  A.   Started with them in 1994, I was there

---

Page 42

1  for --
2  Q.   (Phone ringing). I'm sorry. Let me
3  shut this off. I'm sorry. Go ahead.
4  A.   I started with them in 1994. I think I
5  was there three-and-a-half years. The time frame
6  when I left, I think was the spring of 1998.
7  Q.   And what type of work did you do there?
8  A.   I was one of two associates in the firm.
9  There were several partners. So, I did associate
10  type work. It was a civil practice. They did
11  insurance defense. Although, I didn't do a lot of
12  that. They had a primary bank client that I
13  handled a lot of their collections issues when
14  that bank was a creditor in bankruptcies. They
15  also had a large company, very large company, that
16  had different offices across the United States.
17  And if there were issues, a lot of them were
18  collection-related, I was also the contact person
19  and handled those cases.
20      Beyond that, I was an associate so
21  wherever they needed me, whatever research needed
22  to be done.
23  Q.   What was the bank?
24  A.   That was Mercantile Trust and Savings
25  Bank.

---

Page 43

1  Q.   Did you develop a specialty, or not
2  supposed to say specialty, but a concentration or
3  an expertise in collection work?
4  A.   I'd say if you stacked up all of the
5  cases I was handling, the majority of those would
6  have been collection-related.
7  Q.   So, you became proficient in collection
8  matters?
9  A.   Yes.
10  Q.   And did you develop any expertise or
11  special knowledge in bankruptcy matters?
12  A.   I developed some knowledge. Most of
13  those were simple Chapter 7, no asset type
14  bankruptcy. So, they weren't overly complicated.
15  And they typically weren't Chapter 13 and they
16  typically weren't Chapter 11.
17  Q.   You were just putting the claim in for
18  the bank or creditor?
19  A.   Attended I guess it was called 314
20  hearings and things of that nature. Just making
21  sure, oftentimes it was a reaffirmation agreement.
22  Q.   Right. So, you left there in 1998,
23  correct?
24  A.   I believe it was 1998, yes.
25  Q.   And at this time you and Cory were

---

Page 44

1  married, living in Quincy, correct?
2  A.   That's correct.
3  Q.   And had any of your four children --
4  four children you had, correct?
5  A.   Yes.
6  Q.   Any of your four children born by this
7  time?
8  A.   Yes.
9  Q.   Who was born by this time?
10  A.   Lyndsay was born on December 23rd of
11  1993, in Champaign, Illinois, while I was in my
12  third year of law school. Logan was born May 7th
13  of 1997 while I was still an associate at
14  Schmiedeskamp. And then Lincoln was born on
15  November 11th of 1998 after I had left
16  Schmiedeskamp. And then Larson was born August
17  31st of 2001.
18  Q.   Okay. So, you were a full-time employee
19  obviously at Schmiedeskamp, correct?
20  A.   Correct.
21  Q.   And where did you go from there?
22  A.   While I was at Schmiedeskamp I had
23  interviewed, and was hired in a nonlegal or pseudo
24  legal position with a company in Mt. Sterling,
25  Illinois, called Dot Foods. At that point in my

---

Page 45

1  career I had decided I wanted to pursue something
2  in the business management realm. Something more
3  associated with my undergraduate degree. And so I
4  interviewed there, and was hired into a management
5  training program. And then I worked there for
6  several years.
7     Q.  And you were not doing legal work there?
8     A.  I did some legal work initially because
9  I was a lawyer. And so I was working directly
10 with the chief financial officer who involved me
11 with some of the legal-related issues. Legal
12 issues. But they had general counsel, not inside
13 Dot Foods, but outside. And so I did not act as
14 general counsel. But, I did some legal work, but
15 it was very little.
16    Q.  How long did you work for Dot Foods?
17    A.  I worked for Dot Foods, I believe I left
18 there in January, early January, of 2005.
19    Q.  Okay. Were you fired from Dot Foods?
20    A.  No.
21    Q.  Marty Didriksen testified, I believe, at
22 some point, or said at some point that you were
23 fired from Dot Foods; that's not true?
24    A.  That's not true.
25    Q.  We tried to get your employment records

Page 46

1  from Dot Foods without success. Do you know why?
2     A.  No. I don't know why.
3     Q.  Have you ever tried to get your
4  employment records from Dot Foods?
5     A.  No.
6     Q.  Who would have been your direct
7  supervisor that you reported to at Dot Foods?
8     A.  Well, over my career I reported to a
9  number of people.
10    Q.  How about at the time you left?
11    A.  At the time I left -- at the time I left
12 the general manager of the Illinois distribution
13 center in Mt. Sterling was a gentleman by the name
14 of Randy Templan. He was new in that position.
15 Just prior to that I had worked for a gentleman by
16 the name of John Rusich.
17    Q.  Is Dot Foods still in existence in the
18 same form it was back then?
19    A.  It's still in existence, and I'd say
20 it's bigger.
21    Q.  It hasn't been swallowed up by another
22 bigger company?
23    A.  No, I think it's probably swallowed up
24 some smaller companies.
25    Q.  Okay. And is that their headquarters?

Page 47

1     A.  It is.
2     Q.  We've seen in documents that you have --
3  you are an admitted alcoholic?
4     A.  Correct.
5     Q.  And when would you say that your --
6  well, let me back up a second. Have you ever been
7  diagnosed by any professionals as an alcoholic?
8     A.  No.
9     Q.  So, this is your own self diagnosis?
10 Self proclaiming?
11    A.  Correct.
12    Q.  All right. And you have not drank for
13 some time?
14    A.  Correct.
15    Q.  And when would you say that you stopped
16 drinking?
17    A.  December of 2012.
18    Q.  When would you say that -- we all drink
19 and party and partake in college and what not.
20 When would you say that the normal activity of
21 drinking by a young person evolved into what you
22 considered to be alcoholism?
23        MS. THOMPSON: Object to form. You can
24 answer.
25    A.  As far as me considering alcoholism, I

Page 48

1  don't -- I don't believe I considered myself an
2  alcoholic until I actually admitted to being an
3  alcoholic in December of 2012, and decided at that
4  time that I wasn't going to drink any more.
5     Q.  Yeah, I understand. But, it was--it was
6  your drinking patterns and habits and how it was
7  affecting your life that led you to the conclusion
8  that you were an alcoholic?
9     A.  Um-huh.
10    Q.  Yes?
11    A.  Right.
12    Q.  And when would that type of pattern of
13 drinking and habit and impact on your life have
14 begun, looking back on it?
15    A.  Looking back on it, I think as you
16 indicated people drink, oftentimes drink in their
17 younger years in college. And I did not drink
18 daily as an undergrad. It would have been
19 something that a weekend sort of event with other
20 students or football players. I'd say my pattern
21 of drinking daily would have started while I was
22 in law school, of actually having a drink of
23 alcohol each day. Even then, it wasn't to
24 inebriation each day, but I started to regularly
25 drink alcohol each day when I was in law school.

LOVELACE v.
DET. ADAM GIBSON

CURTIS LOVELACE
July 6, 2018

Page 49

1    Q.   Did at some point in time in your life
2  you drink to inebriation each day?
3    A.   Yes.  At various points in my -- in my
4  life as an adult.
5    Q.   When would that first have begun?
6    A.   I think that it progressed from, you
7  know, just drinking to inebriation on weekends, to
8  then drinking to inebriation on week nights on a
9  regular basis.  And depending on my activities and
10  job schedule and things of that nature, that
11  varied, depending on essentially my ability to
12  drink.
13    Q.   When did it start to interfere with
14  normal functioning?
15    A.   The first counseling that I sought was
16  at the direction of Jon Barnard, who was a State's
17  Attorney I was working for.  And I think it was
18  December of 2008.  And he asked me and required me
19  to contact the lawyers' assistance program.  And
20  he thought that I had a problem that needed to be
21  addressed.  And I agreed to do that.
22         I went to a couple of AA meetings.  And
23  did contact and had some sessions with the lawyer
24  assistance program in December of 2008.  And maybe
25  January of 2009.  And actually abstained from

Page 50

1  drinking alcohol, as I recall, for a period of
2  maybe 90 days.  Ultimately making the decision
3  that I could drink smaller amounts and I returned
4  to drinking alcohol at my most -- at the point
5  where it was impacting my abilities as a parent,
6  if you will, or just my inability to the point
7  where I said something needs to be done about this
8  seriously, was that time frame in the fall of 2012
9  leading to my decision to stop drinking in
10  December of 2012.
11    Q.   So, during the time when Cory was alive
12  and the two of you were living together, would you
13  consider yourself as having been an alcoholic at
14  that time?
15    A.   Looking back?
16    Q.   Yes?
17    A.   Yes.
18    Q.   Okay.  Did you drink to inebriation
19  often at that time?
20    A.   Yes.
21         MS. THOMPSON: Object to form.  You can
22  answer.
23    Q.   Would you say -- how often would you
24  say, I mean if you're able to quantify?  A couple
25  times a week?  Every day?  A couple times a month?

Page 51

1    A.   Again, it would depend on, you know,
2  there was obviously a point in my career I could
3  not do that.  And I was -- I was a member of the
4  school board.  I had evening meetings.  I would
5  not drink before going to a school board meeting.
6  So it was activity drinking.  Activity driven.  So
7  if I had the ability to drink, and the time, given
8  my schedule, I would often do that.  Primarily on
9  the weekends because I didn't have job
10  responsibilities.
11    Q.   So, when job responsibilities or other
12  responsibilities did not interfere with your
13  ability to drink, you would drink to inebriation?
14         MS. THOMPSON: Object to form.  You can
15  answer.
16    A.   Yes.
17    Q.   And you had -- well, you had quite a few
18  different career endeavors going on at one time at
19  various points in your life, correct?  I think you
20  were a teaching at Quincy University at one time?
21    A.   That is correct.
22    Q.   And you were also working as a lawyer at
23  that time?
24    A.   Well --
25    Q.   Maybe we can do this a better way.  When

Page 52

1  you left the -- when you were working for Dot,
2  were you teaching?
3    A.   Yes.  I started teaching a business law
4  course at Quincy University in the evenings at
5  some point in my career at Dot Foods.
6    Q.   Do you remember when?
7    A.   No.  Not specifically.  It would have
8  been, you know, later in that term of employment
9  at Dot Foods.  So, it would have been while I was,
10  I believe, managing the frozen warehouse, was the
11  operations manager there.  I think that's when I
12  began to start that.  So, it would have been in my
13  final two or three years at Dot Foods.
14    Q.   When did you get elected to the school
15  board?
16    A.   I was elected to the school board in
17  the -- I believe it was in November -- no, I think
18  it was in the April election.  I believe 1999.
19    Q.   And how many terms did you -- those are
20  four year terms, correct?
21    A.   They are four year terms.  My first term
22  was a three-and-a-half year term.  It was just
23  because they had --
24    Q.   They moved it?
25    A.   They had lined it up with the

Page 53

1 aldermanic.
2 Q. Yeah, yeah; they moved it from November?
3 A. Exactly. So that first term I was
4 elected in April and began in November. So it was
5 a three and a half year term. And then I was two,
6 four year terms after that.
7 Q. Okay. And while you were working for
8 Dot Foods, were you practicing law at all outside
9 of Dot Foods?
10 A. No.
11 Q. You didn't maintain any clients or
12 anything like that?
13 A. No.
14 Q. Was there anything else that you were
15 doing of a professional or civic manner while you
16 were working for Dot Foods?
17 A. While I was at Schmiedeskamp I was on
18 the Family Service Agency Board. It was a
19 not-for-profit agency. Did child and family
20 services. And I think there was some overlap
21 between my switch from Schmiedeskamp Robertson to
22 Dot Foods where I remained on that board. I left
23 that board after I was elected to the school
24 board.
25 Beyond school board activities, while I

Page 54

1 was at Schmiedeskamp I started a local chapter of
2 the National Football Foundation that recognized
3 high school football seniors in the area for their
4 athletic and academic achievement. I received an
5 award from them nationally, and decided once I was
6 in Quincy that I wanted to start a local chapter.
7 There were local chapters doing exactly what I
8 ended up doing throughout the United States. So,
9 there was a little bit of template for doing that.
10 And the national organization obviously encouraged
11 it.
12 And so I, and a handful of other people,
13 it was primarily my responsibility, but I had some
14 other officers and we had an annual dinner and
15 recognized scholar athletes. And I had done that
16 for three years until I was unable to do that
17 because of just overall job responsibilities.
18 School board, as well as working for Dot Foods.
19 Other than that, any other activities,
20 all the other activities centered around my
21 children, and although even before my oldest son
22 started playing organized football, at some point,
23 I can't remember -- I think it was while I was
24 still at Schmiedeskamp, I started coaching youth
25 football.

Page 55

1 Q. Were your school board elections
2 contested?
3 A. Yes. They were. I think there were
4 more people running than school board seats
5 available at each election.
6 Q. So, there would be several candidates on
7 the ballot, and a limited number of seats, and the
8 top number of candidates would get elected?
9 A. Correct.
10 Q. And you always, for each election, you
11 were, in which you ran, there were more candidates
12 than open seats?
13 A. Correct.
14 Q. Were you a top vote getter in any of
15 those elections?
16 A. I don't believe I was ever the top vote
17 getter. Just in looking back, I believe I might
18 have been second, maybe as low as third. I was on
19 a four seat swing because there was three seats
20 up, one every two years, there was four seats,
21 then three seats. And I was on the four seat
22 cycle, if you were. If you will.
23 Q. Did you ever consider, or did any other
24 organization ever consider you, or approach you
25 for other public office?

Page 56

1 A. I had contemplated other public offices.
2 But, I never petitioned.
3 Q. What did you contemplate?
4 A. I think at that point in my life I was
5 very interested in politics. And obviously held
6 an elected position. I think it would come up
7 maybe in conversations, you know, casual
8 conversations, why don't you run for. But, I
9 never took serious action during that time. When
10 I started as an assistant State's Attorney, I
11 started considering at one point running for --
12 Q. State's Attorney?
13 A. State's Attorney. And actually had
14 considered that possibility, or was considering
15 that possibility, up until my arrest in August of
16 2014.
17 Q. Did you have any backing for that? In
18 other words, was any organization, party, local
19 party or other group, encouraging you to make that
20 run?
21 A. No. I mean, Jon Barnard had -- Jon
22 Barnard was elected in 2004. Took office in
23 December of 2004. And I think made it known that
24 he would -- he would seek reelection. And I'm not
25 even sure, I'm not even sure, I can't remember

LOVELACE v.
DET. ADAM GIBSON

CURTIS LOVELACE
July 6, 2018

Page 57

1  which elections of his were even uncontested. And
2  he served three terms. It was my understanding
3  that given his age, that his third term would be
4  his last term.
5  Q.  So, that would have ended in 2016, his
6  last term?
7  A.  Yes.  That is correct.
8  Q.  So, that's when, if you were, had
9  followed through with that thought of running, you
10  would have run that year?
11  A.  Yes.
12  Q.  Did you take any action to begin to
13  prepare a campaign or do anything?  Raise money or
14  anything that would have been a next step toward
15  that possibility?
16  A.  The next steps that I took, I started to
17  attend political events.  I attended an Adams
18  County Republican monthly meeting in 2013, I
19  believe.  I was -- as an Assistant State's
20  Attorney I was at primarily Republican events
21  because Jon Barnard was a Republican.  And so I
22  did participate in different aspects of campaigns,
23  signs in my yard.  Things of that nature.  Because
24  I was working for a Republican elected State's
25  Attorney.

Page 58

1       But at that point in 2013 I was no
2  longer with the State's Attorney's office.  I was
3  -- and so then I know Christene and I had attended
4  some fund raisers.  There's an annual, I think
5  it's the Lincoln dinner, Lincoln luncheon, in
6  Adams County that is probably the biggest
7  Republican county event.  A lot of people running
8  for office attend that event.
9       And so we were making appearances at
10  those events, as well as if there was a
11  campaigning event, I know we attended a fund
12  raiser for the Republican candidate for county
13  clerk in 2014.
14  Q.  So, you would -- started to make the
15  rounds just to show yourself and get involved as a
16  potential for a run for State's Attorney?
17  A.  Yeah.  It was -- it was to make
18  appearances, to just be seen, and potentially
19  heard.
20  Q.  I understand.  When did your last school
21  board term end?
22  A.  That's going to require a little bit of
23  thinking.  Yeah, you do the math.
24  Q.  You had three terms?
25  A.  Yes.  Three terms.

Page 59

1  Q.  And two of them were four, full four
2  years, and one was three-and-a-half years, so that
3  would be 11 and a half years?  You ran in '99, so,
4  what, 2010?
5  A.  Yeah, 2010, 2011 time frame.
6  Q.  Did you run again?
7  A.  No.
8  Q.  So, you did not run again?
9  A.  I did not run again.
10  Q.  You weren't defeated?
11  A.  No.
12  Q.  Why didn't you run again?
13  A.  I had -- I had made the decision that
14  for me, three years, three terms, 11 and a half
15  years on the school board was enough for me.  And
16  that, you know, my priorities had changed.  And
17  just didn't want to run and spend another four
18  years on the school board.
19  Q.  Were you ever elected president?
20  A.  I was.
21  Q.  What years were you president?
22  A.  I was president for two years.  So,
23  again, I'm going to have to do a little bit of
24  calculation.
25  Q.  That's fine.  Two of the 11 and a half

Page 60

1  were also president?
2  A.  Yeah, I was vice president for two
3  years.  Herb Jackson was president, who I was
4  elected with Herb.  And then I became president
5  after that for two years.
6  Q.  And that's an internal election by the
7  board itself, correct?  Not by the voters?
8  A.  That is correct.
9  Q.  All right.  Why did you leave Dot Foods?
10  A.  Dot Foods was a great company.  And I
11  was compensated, I felt I was compensated well.
12  The benefits were good.  However, it required an
13  enormous amount of time.  I was in operations.
14  It's a distribution, transportation distribution
15  company, with 24/7 operations.  And I was the
16  frozen warehouse manager, which was their highest
17  growth area in some ways because of the nature of
18  frozen and refrigerated foods.  And maybe the most
19  complicated, as far as storing product, moving
20  product, getting it loaded on trucks, etc.
21       And so when I had decided to go into
22  operations, I knew it would be long hours.
23  Actually I had trained for that position first in
24  the dry warehouse or ambient temperature.  And at
25  that point I was an assistant manager and I worked

LOVELACE v.
DET. ADAM GIBSON

CURTIS LOVELACE
July 6, 2018

Page 61

1 a split shift. So, I would leave in the late
2 morning, early afternoon, and work until midnight
3 into the morning hours so I could spend time with
4 both a morning and night shift.
5       And so that was hard on my family. It
6 was hard on Cory. It was odd hours. And -- but
7 it was a stepping stone to get to a better
8 position and better compensation.
9       But, that was a difficult time in my
10 family and a difficult time in our marriage
11 because I wasn't home a lot. And there was a lot
12 of stress. And she was at home with three, which
13 would become four children.
14       I became the frozen food, frozen
15 warehouse manager after that. My hours stabilized
16 a little bit, meaning I wasn't running a split
17 shift on a regular basis. However, I still had
18 evening responsibilities. So, work never really
19 stopped. Whether it be night, day, weekend. Some
20 of it was on the phone. Some of it was on the
21 computer and some of it was there present at the
22 warehouse in Mt. Sterling, Illinois, which was a
23 45 minute drive.
24       So, even on a normal schedule of eight
25 to five, that was really, which it never was, but

Page 62

1 even assuming that, it was seven to six because
2 there was at least 45 minutes to an hour drive.
3       So, that was taking a toll on my family.
4 And in 2004 I decided that I needed to be closer
5 to home. That Cory needed me closer to the home.
6 I needed to be closer for my children. And to
7 help her.
8       And so I began contemplating first
9 changing positions within Dot Foods. Something
10 that was not operational. And had spoken to the
11 management about that. And they were supportive
12 of that. I wanted to be honest with them on my
13 time commitment that I could spend. And they
14 wanted to put me in a position where I would
15 succeed.
16       And those conversations went well.
17 During that time period I learned Jon Barnard was
18 running for election. Jon Barnard was elected in
19 the November election as the State's Attorney.
20 And I knew that Jon had been the part-time
21 Assistant State's Attorney, and so there would be
22 an open part-time Assistant State's Attorney
23 position for him to fill. I had known Jon for
24 several years --
25       Q.   Let me stop you there so I can ask you

Page 63

1 the next question.
2       A.   Okay.
3       Q.   What was your relationship with Jon
4 Barnard?
5       A.   I had a good relationship with Jon
6 Barnard. I first met Jon when I started dating
7 Cory. Cory had an uncle who was an attorney, who
8 was good friends with Jon, and they would run on
9 weekends. And I would often times join them on
10 those runs.
11       Q.   Jon runs?
12       A.   Yeah, Jon. Jon and --
13       Q.   Jogging?
14       A.   Jogging, yeah. And then -- so that was
15 my first introduction to Jon. And then I worked
16 with him. He was a partner at Schmiedeskamp
17 Robertson when I worked there as a law clerk. As
18 well as my first two years, year and a half before
19 he left the firm. And I continued to just know
20 him as a family friend through Cory's side of the
21 family thereafter.
22       Q.   And he left the firm to set up his own
23 office?
24       A.   He left the firm and set up his own
25 office, and at some point, and I don't know where

Page 64

1 during that time period, he became a part-time
2 Assistant State's Attorney.
3       Q.   So, how did it come about that you ended
4 up, you did end up getting his part-time slot in
5 the Adams County State's Attorney's office?
6       A.   Yes, I did.
7       Q.   And how did that come about?
8       A.   I reached out to Jon. I indicated to
9 him that I was contemplating a career change; that
10 I was looking at stuff inside of Dot Foods that
11 would have a more regular, less demanding
12 schedule. But, also was very interested in
13 returning to the practice of law. And was
14 particularly interested in what I wanted to do,
15 even while I was at Schmiedeskamp, which was
16 litigation. I wanted to spend time in the
17 courtroom.
18       And so we had a conversation on the
19 phone. We scheduled an appointment. I met with
20 him in his office. He described to me what he
21 felt was necessary as far as the talent he had in
22 the office. What he wanted to do as the State's
23 Attorney. And he communicated that to me, and I
24 thought that sounded good. And so I agreed and he
25 appointed me as a part-time Assistant State's

Page 65

1   Attorney. I believe that was announced in
2   December of 2004.
3       Q.   So, what did that position entail? Did
4   you work a set number of hours per week? Or was
5   there some other arrangement?
6       A.   Well, first it was driven by the needs
7   of the office. Jon wanted me to handle the civil
8   side of the State's Attorney's office dealing with
9   office holders, dealing with employment issues,
10  anything that was not prosecution-related. He
11  wanted me to be responsible for. And reporting to
12  him on those issues. Attending county board
13  meetings. Attending committee meetings when
14  necessary. And handling FOIA type requests.
15  Things of that nature.
16          So, some of what I did was go with him
17  to the county board meeting. Or if he wasn't
18  going to be there, I would be at the county board
19  meeting.
20      Q.   So, would you have been the entire civil
21  division in the office?
22      A.   Yes. I was --
23      Q.   None of the other assistants were doing
24  civil work? Just you and of course the State's
25  Attorney?

Page 66

1       A.   Right. Yeah, I was the entire civil
2   division. At the same time, I expressed to Jon
3   that one of the reasons I was interested in the
4   position is I wanted to be in the courtroom. And
5   I wanted to be involved with criminal
6   prosecutions. And so we agreed that he would give
7   me a handful of cases to manage, felony
8   prosecutions. And as well as I would be in the
9   rotation for being on call for search warrants,
10  etc.
11          And so I had that dual role, but my
12  primary responsibility and my first priority was
13  the civil side.
14      Q.   How large of an office is the Adams
15  County State's Attorney's office? How many
16  assistants? Full-time assistants and part-time at
17  that time?
18      A.   Just a quick number, I might be off one
19  or two, but I think maybe six.
20      Q.   Six full-time? Or six total? Full-time
21  and part-time?
22      A.   I think the State's Attorney obviously
23  was a full-time position. I think there were five
24  full-time assistants. And then a part-time
25  assistant.

Page 67

1       Q.   And did the State's Attorney's himself
2   make all -- well, strike that. Was there a felony
3   review process in effect at that time? And do you
4   know what I mean by felony review?
5       A.   Yeah, I think I know what you mean by
6   felony review. The --
7       Q.   Let me put it on the record. In many
8   counties, police departments do not have the
9   authority to charge somebody with a felony. The
10  State's Attorney has to approve it, so the police
11  will bring a charge, bring an investigation to the
12  State's Attorney for the State's Attorney
13  approval. If the State's Attorney doesn't approve
14  it, the felony charges are not brought.
15          Was that the process in Adams County
16  when you were working there?
17      A.   I was not involved with that process.
18  And -- but, I believe some sort of hybrid of that
19  process did occur. And I think how that occurred
20  is that Jon Barnard would review that, along with
21  Gary Farha, who was his first Assistant State's
22  Attorney at the felony level. Gary focused a lot
23  of that, of his expertise was drug-related crimes.
24  So, he would handle a lot of that, those charging.
25  Grand juries, he did a lot of grand jury work with

Page 68

1   drug-related offenses.
2           And then when it came to misdemeanors, I
3   believe Josh Jones, who was another Assistant
4   State's Attorney there, handled the misdemeanor
5   side of things, as far as charging.
6           And then, again, depending on who was in
7   the office, who was on vacation, I think it was
8   primarily those three individuals. There were
9   other people in the office. There was someone who
10  specialized in juvenile prosecutions. Juvenile
11  cases. And then there was another person who
12  specialized in sex crimes.
13      Q.   But, the police did not have the
14  authority to charge somebody with a felony unless
15  the State's Attorney approved it, correct?
16      A.   Correct. Everything was either charged
17  through information, which Jon or someone from his
18  office would sign. Or grand juries, which Jon and
19  I think primarily Gary Farha ran the grand jury
20  process.
21      Q.   So, were all felonies brought by grand
22  jury or some of them brought by preliminary
23  hearing and then information?
24      A.   Well, information would occur and then
25  preliminary hearing.

LOVELACE v.
DET. ADAM GIBSON

CURTIS LOVELACE
July 6, 2018

Page 69

1  Q.  I don't think so.  Isn't that a
2  complaint?  Well, maybe Adams County is different.
3  In many counties, a complaint for preliminary
4  hearing is brought.  And if that probable cause is
5  found, then the information is filed.  Was Adams
6  County not like that?
7  A.  In Adams County there would be — a, you
8  know, a person would be -- let's say arrested.
9  You know, that report would go to the State's
10  Attorney.  The State's Attorney, or whoever he
11  assigned to that, would be responsible then for
12  determining how to charge it.  There would be an
13  information filed.  Now, the timing of that could
14  occur, I mean someone might be arrested and the
15  information could come later.
16  But typically they would be close in
17  time.  A person would be, you know, arraigned, and
18  if they didn't waive preliminary hearing, then
19  they would have a right to a preliminary hearing.
20  When Jon joined — when Jon became
21  elected, was elected, and Gary became the first
22  Assistant State's Attorney, they did start
23  charging more crimes by grand jury.  And a lot of
24  that, those were drug-related crimes, because to
25  protect confidential sources, as I understand it.

Page 70

1  As well as a drug-related crime might be -- you
2  know, involve the same parties.  So it was easier
3  just to present.  And then there is no preliminary
4  hearing to spend time with.  So I don't know what
5  the percentage was, information versus grand jury.
6  It was a mix.
7  Q.  Okay.  Did -- but you did not get
8  involved in the decision to charge somebody with a
9  felony when you were an Assistant State's
10  Attorney?
11  A.  I did not.
12  Q.  All right.  So, you would work on mainly
13  civil matters, and occasionally Jon Barnard would
14  give you some criminal matters to handle?
15  A.  I would handle all the civil matters,
16  and then once a month there would be a list that
17  would be distributed saying here's who is assigned
18  to these felony prosecutions.  They were typically
19  on a pretrial docket that month.  I would have a
20  dozen, half dozen to a dozen cases that would
21  assign -- were assigned to me.  And then I would
22  be responsible for making sure that all the
23  discovery had been disclosed.  Typically it had
24  already been disclosed.  And I would contact
25  witnesses, prepare for trial.

Page 71

1  Q.  You would work it up and try it?
2  A.  I would work it up and most of them
3  obviously would not go to trial.  And then once I
4  was assigned, if it was continued for another, any
5  other reason, I would retain those.  So, when that
6  list would come around my name would be beside
7  those that next month.
8  Q.  How long did you serve as an Assistant
9  State's Attorney?
10  A.  I served for six and a half years.  I
11  started in January of 2005 through July of 2012.
12  I guess that's seven, seven and a half.
13  MS. THOMPSON: Tom, when you're at a
14  good stopping point, maybe we can take a break.
15  MR. DiCIANNI: Okay.  Sure.  We can take
16  a break right now.
17  VIDEO OPERATOR: We're now going off the
18  record. The time is approximately 10:59 AM.
19  (A break was taken at 10:58 a.m.)
20  (Deposition resumed at 11:12 a.m.)
21  VIDEO OPERATOR: This is the beginning
22  of recording number two of the videotaped
23  deposition of Curtis Lovelace.  We're now going on
24  the record.  The time is approximately 11:14 AM.
25

Page 72

1  CONTINUED EXAMINATION BY
2  MR. DiCIANNI:
3  Q.  Mr. Lovelace, when we broke we were
4  talking about your years as an Assistant State's
5  Attorney in Adams County.  How much did you earn
6  on an annual basis roughly from working as a
7  State's Attorney?
8  A.  Roughly, my time there, anywhere from 30
9  to 40 thousand dollars.  More in the mid range.  I
10  think I received just annual percentage increases
11  with everyone else while I was there.
12  Q.  Were you paid a set salary or were you
13  paid based on the amount of times you were
14  working?
15  A.  I was paid a set salary, and I also
16  received benefits.
17  Q.  Did you have any other sources of income
18  during those years?
19  A.  Yes. I did.
20  Q.  What were they?
21  A.  When I first started with the State's
22  Attorney's office in 2005, I increased my class
23  load, or the University asked me to handle more
24  case — more classes, specifically a morning
25  class, as well as my evening classes.  So, I did

**Page 73**

1  that until my last semester of teaching at Quincy
2  University was the spring of 2008.
3    Q.   So you were teaching two classes a
4  semester from '05 to '08?
5    A.   It varied, depending on the semester and
6  the University's needs.  I think one semester I
7  even taught three.  It was always the same course.
8  It was just different sections of that course.
9  But once I returned, I started working for the
10  State's Attorney's office, then I was available in
11  the morning to teach.  So I started teaching, what
12  I guess some might consider regular student
13  classes as well as the evening student classes,
14  and adult accelerated classes.  And that just
15  depended on what the requirements were for the
16  University.  But, if they had a class for me to
17  teach, I taught it.
18    Q.   And you were paid by the University?
19  This was a paid position?
20    A.   Yes.
21    Q.   And was it -- was it a tenured
22  position?
23    A.   No.
24    Q.   Did you get paid like per class that you
25  taught or was there some other way?

**Page 74**

1    A.   It was per class.
2    Q.   And what would you get paid per class?
3    A.   I think it was three thousand dollars.
4    Q.   For the semester?
5    A.   Yeah.  For a class.  For the semester.
6    Q.   And it was always business law?
7    A.   It was always business law.
8    Q.   And why did you stop doing that in 2008?
9    A.   In 2008 I intended to do it in the fall
10  of 2008.  But, I would learn right before the
11  semester that they had decided to hire or contract
12  with a professor, a full-time professor, someone
13  who was a professor, not an adjunct instructor.
14  And then I didn't do that any more.
15    Q.   And why did they replace you with this
16  full-time professor, do you know?
17    A.   No.  I was surprised that they -- I
18  wasn't expecting not to do it.  But, I was a
19  contract, year to year, at will, if you will.  So,
20  I was just notified that I would not be teaching
21  that semester.
22    Q.   Would you get an annual contract?
23    A.   I think I just -- it wasn't an annual
24  contract.  At the beginning of each semester I
25  agreed to teach the class.

**Page 75**

1    Q.   Was there something that precipitated
2  your being replaced in this job to your knowledge?
3    A.   Not anything specific.  I did meet with
4  the Dean, and we discussed just her decision to go
5  with a different instructor.
6    Q.   So, it wasn't absenteeism or any other
7  performance-related reason for replacing you?
8    A.   I think the only thing we discussed were
9  just overall student reviews and evaluations.  I
10  think there were some changes in those numbers
11  from the prior year.  She really didn't elaborate
12  on that.  So, we discussed it briefly.
13    Q.   So, what was your relationship with Cory
14  like leading up to the years that -- the year that
15  she died?
16    A.   Clarify the time frame here?  So, 2000
17  --
18    Q.   Yeah, a few years.  Let me back up.
19       It seemed that there was a point to be
20  made, both by your lawyer and by the other lawyer
21  in the trial, that you did not have a perfect
22  marriage.  This was sort of a theme, at least from
23  reading it.  It seemed.
24       And by that, it seemed to me that they
25  were discussing problems that you had in your

**Page 76**

1  marriage.  So, for the several years, two, three,
2  four, however is easiest for you to describe it,
3  what was your relationship like with Cory in those
4  years preceding her death?
5    A.   First, I would agree it was not a
6  perfect marriage.  It was difficult at times,
7  especially when I was at Dot Foods.  Because as I
8  indicated, the long hours.  And the fact that she
9  was solely responsible for handling everything at
10  home while I was gone.
11       Cory had a personality or way of doing
12  things, that, you know, if she didn't like
13  something, she would verbalize that.  She would --
14    Q.   She was confrontational?
15    A.   At times she was confrontational.  She
16  would yell at me, yell at the kids, at times.  And
17  at other times, you know, we wouldn't see any of
18  that behavior.  That personality, that way of
19  doing things, that was Cory, that's who I married.
20  That's the way she was when I was dating her, as
21  well as when we got married.  And hadn't really
22  changed.
23    Q.   Had not changed?
24    A.   Had not changed.  Cory was who she was.
25  And so all of us who loved her and chose to spend

LOVELACE v.
DET. ADAM GIBSON

CURTIS LOVELACE
July 6, 2018

Page 77

1  time around her realized that, you know, those --
2  there would be those confrontational times.
3    Q.  Well, did it get worse over time?
4    A.  As far as any sort of degree of
5  confrontation, the most difficult time as I
6  indicated in our marriage was while I was working
7  at Dot Foods.
8    Q.  So after you left Dot Foods, did your
9  relationship with her improve?
10   A.  Yes.  There was still confrontations,
11 but they were less frequent and less severe.  And
12 --
13   Q.  So, you would --
14     MS. THOMPSON: Tom, you're interrupting
15 him when he's answering, and I don't think that's
16 appropriate.
17     MR. DiCIANNI: Well, I'm not trying to.
18     MS. THOMPSON: He was just in the middle
19 of an answer and you just cut him off.  And I want
20 the record to reflect that.  Because if it seems
21 like he gave a full answer, he didn't.
22     MR. HANSEN: Yeah, I'm going to object,
23 and I'll move to start striking things as
24 nonresponsive to the question.  He's been asked
25 yes and no questions and he goes on for five

Page 78

1  minutes on a thesis.  So I think it's been going
2  both ways here.
3      MR. DiCIANNI: Yeah, and I don't mean to
4  cut you off.  But there's some times I feel like
5  you've answered the question already, and anything
6  else would be beyond what I'm asking.  So, we do
7  have a limited amount of time to do this
8  deposition under the federal rules.
9      MS. THOMPSON: So Curt, if you're able
10 to give a yes or no answer, please do that.
11   A.  I will do that.
12   Q.  Yeah.  And if I interrupt you, and you
13 think that there's something important that you --
14 that I'm interrupting, please let me know that,
15 okay?
16   A.  Okay.
17   Q.  So, you left Dot Foods in 2005; no, when
18 was it again?
19   A.  It was January of 2005.
20   Q.  2005.  January.  And Cory died in
21 February of 2006, correct?
22   A.  Correct.
23   Q.  So, are you saying that that year
24 between Dot Foods and her death was a less
25 confrontational year than the previous ones had

Page 79

1  been?
2    A.  Yes.  As far as -- yes.
3    Q.  And is there -- how would you describe
4  the change, in terms of, you only fought once a
5  week?  Or however you can best describe that?
6    A.  I would just say that confrontations or
7  arguments were less frequent.  I was around more.
8  I was able to assist with getting the kids to and
9  from various activities.  I was more involved
10 because I could be with the kids' activities.  And
11 again, just generally, 2004 compared to -- or
12 2005, I should say, compared to prior years, that
13 was a better year as far as our marriage and any
14 sort of confrontation.
15   Q.  Well, if we had to quantify it, what
16 would you say?  Would you fight -- before 2005
17 when you were working at Dot Foods, would you have
18 fought X number of days?  What would you say?  How
19 often would the two of you fight while you were
20 working for Dot Foods, if you're able to quantify?
21   A.  It's difficult to quantify.  I think it
22 was a couple times a week there would be
23 arguments.
24   Q.  And describe the arguments to me?
25   A.  A lot of those arguments during that

Page 80

1  period of time centered around my work schedule.
2  My inability to be at children's events.  My --
3  the stress that was placed on her being solely
4  responsible while I was gone.
5    Q.  Those are what the arguments were about?
6    A.  Yes.
7    Q.  But what did the arguments themselves
8  look like?
9    A.  The arguments themselves would, you
10 know, would be her yelling.  There would be times
11 that I would yell back.  But, more it would be her
12 yelling.
13   Q.  And was there any physicality involved,
14 in terms of you laying hands on each other during
15 these fights?
16   A.  I think there were a couple of times
17 where she would lay hands on me.
18   Q.  In what way?
19   A.  In what way, in either a push or a pull,
20 or a shove.
21   Q.  Did she ever hit you with like an
22 object?
23   A.  You know, I can recall a time maybe
24 where she threw a cup of water or something at me.
25 But --

Page 81

1  Q.  Did you ever strike her?
2  A.  No.
3  Q.  Did you ever throw anything at her?
4  A.  No.
5  Q.  Did you ever put your hands on her in
6  the course of an argument?
7  A.  Not in anything but a loving way.  I
8  mean --
9  Q.  Would the arguments occur while one or
10  both of you were -- had been drinking?
11  A.  Yes, there were times that one or both
12  of us would have been drinking when those
13  arguments occurred.
14  Q.  Would drinking precipitate the
15  arguments?  In other words, did you fight when one
16  of you was drinking over things you might not have
17  fought about if you hadn't been drinking?
18  A.  I'm confident that the drinking did not
19  help in the process of resolving the arguments,
20  but there weren't arguments about drinking or
21  related to the drinking.
22  Q.  So, am I understanding that in that year
23  before she died you would argue at least once a
24  week?
25  A.  That's possible.

Page 82

1  Q.  Was there ever any contemplation by you
2  or, if you know, her, for separation or divorce?
3  A.  No.
4  Q.  And was that related to the kids?  Or
5  was it also -- was there a connection there, that
6  you would not have wanted to break?
7  A.  There was a connection, I mean, I think
8  it would be everything.  But, no, I did not want
9  to break that relationship.  And I don't believe
10  that she wanted to either.
11  Q.  So, it would be untrue to say that the
12  only reason you were together was for your
13  children?
14  A.  I mean, the children were a part of that
15  decision.
16  Q.  Of course.
17  A.  Because they were part of, you know, the
18  family.
19  Q.  Of course.
20  A.  Obviously we wanted to provide a stable
21  home for them.  But we never discussed hey, the
22  only reason we're together are the kids.  We never
23  had that discussion.
24  Q.  Were police ever called as a result of a
25  fight?

Page 83

1  A.  I believe there were -- there was one
2  incident.  And I'm not sure of the time frame,
3  where we were having a verbal confrontation, and
4  Lyndsay, I believe, called 911 for whatever
5  reason.  And the police did show up at the door.
6  And I talked to them.  Cory talked to them.
7  Explained that we were having an argument.  That
8  our daughter had called.  I think they asked
9  several questions to make sure everything there
10  was okay and they left.
11  Q.  When was that?
12  A.  I'm not entirely sure if that happened
13  in 2004.  I think it might have been.  And I think
14  it was after, maybe I even agreed or I was going
15  to the State's Attorney's office.  I seem to
16  recall that I had a conversation with Jon Barnard.
17  I felt an obligation to let him know whenever that
18  happened, that it did happen so that he wouldn't
19  hear about it through any other source.  And I
20  explained to him the situation.
21  Q.  There were no arrests?
22  A.  No.
23  Q.  And no orders of protection?
24  A.  No.
25  Q.  Or anything like that?

Page 84

1  A.  No.
2  Q.  When would have been the last time you
3  fought before she died or she was found dead, I
4  should say?
5  A.  I don't remember a specific argument.  I
6  mean --
7  Q.  Was there an incident in which you had a
8  fight with her, an argument with her, over the
9  purchase of a cell phone?
10  A.  That is the one argument I do recall.
11  And I believe that was the last argument that I
12  remembered having with Cory.
13  Q.  And when would that have occurred in
14  relation to her death?
15  A.  I'm not sure when that occurred.
16  Q.  Would it have been in the week before?
17  Or to the best of your memory?
18  A.  I'm not sure.
19  Q.  And as I understand it, you threw the
20  cell phone in the house, is that correct?
21  A.  Yes.  And I think I've given a statement
22  about that.  I threw the cell phone not at anyone.
23  I think I threw it down the hall.  And the reason
24  I recall that is there was contemplation of
25  bringing that phone back.  But, it landed in a dog

Page 85

1  dish and -- took on water.
2  Q.  It was destroyed?
3  A.  It was not destroyed, but it clearly got
4  wet. And that's what makes me remember that
5  situation.
6  Q.  And what about your purchase of a cell
7  phone triggered a fight?
8  A.  You know, I don't know what triggered
9  that, or why that was an argument. She had a cell
10  phone. And I had made the decision to get a cell
11  phone. It was exactly the same one that she had.
12  Just a different color. And so I don't recall if
13  it was an argument over the expense or the fact
14  that I got one very similar to hers. I don't
15  recall the nature of the conversation.
16  Q.  That got her angry?
17  A.  That got her angry. But, it didn't
18  last. It was short-lived. And I ended up keeping
19  the cell phone.
20  Q.  Was she intoxicated at the time?
21  A.  I don't recall.
22  Q.  Were you intoxicated at the time?
23  A.  I don't recall.
24  Q.  Did you two ever have counseling prior
25  to her death?

Page 86

1  A.  No.
2  Q.  You said earlier that during your
3  conversation with Hamilton that you advised him
4  that Cory was bulimic?
5  A.  Correct.
6  Q.  And that's what you believed at the
7  time, she was bulimic?
8  A.  Yes.
9  Q.  And what led you to that belief?
10  A.  Two things. One, and the primary reason
11  is that after large meals she would typically not
12  eat throughout the day. And would start drinking.
13  And we would have a large meal late mid-evening,
14  you know, eight, nine, ten o'clock. And then
15  there were times where then there's one bathroom
16  in the house, and I would go to use the restroom
17  after that meal, and I would smell the odor of
18  vomit. And that was consistent enough that I
19  believed that she was having those large meals and
20  then purging.
21  Q.  And did you ever discuss that with her?
22  A.  I did.
23  Q.  When?
24  A.  I know I had a conversation with her in
25  2005 about that and my concern about that. I was,

Page 87

1  again, I was home more regular hours. And so
2  whether she was doing it more or I was just seeing
3  it more, it was enough for me to say, hey, I
4  notice this.
5  Q.  Did she admit that she was inducing the
6  vomit?
7  A.  She became defensive, upset.
8  Confrontational. And sent me a clear message that
9  that was not something that she wanted to discuss.
10  Q.  So, you never brought it up again?
11  A.  I may have had two conversations with
12  her about that. I know I had at least one.
13  Q.  When did her bulimia start? As far as
14  you perceived it?
15  A.  I don't know. And -- I don't know when
16  it started. You know, Cory maintained a thin
17  figure during and after our children's birth. And
18  so looking back and knowing that she didn't
19  exercise, I can only assume that maybe that played
20  a part in that.
21  Q.  She was always thin?
22  A.  She was, I mean during various parts of
23  her life, she weighed more or less. But, she was
24  at probably her thinnest and lightest right after
25  Larson's birth. And thereafter.

Page 88

1  Q.  And thereafter. And did you have a
2  sense that the bulimic events were increasing
3  leading up to her death?
4  A.  Looking back, I think they were pretty
5  constant. That she would, again, not eat. Eat a
6  lot. And then purge that meal.
7  Q.  Do you think that your kids also knew
8  that? Any of them?
9  A.  I have -- I've never talked to -- I
10  mean, I've obviously talked to the boys about
11  that. Maybe since. But, I think Lyndsay may have
12  been aware of it. And I think that just through
13  statements that she gave during the investigation.
14  Q.  Did she throw up for, to your knowledge,
15  for reasons other than self-induced vomiting? For
16  example, drinking or other things?
17  A.  I don't know.
18  Q.  You don't know. Did she ever pass out
19  from drinking to your knowledge?
20  A.  She would typically drink into the late
21  hours. If you want to call her a night owl, as
22  far as staying up late and drink, and oftentimes
23  that would be until one or two o'clock in the
24  morning.
25  Q.  Where?

LOVELACE v.
DET. ADAM GIBSON

CURTIS LOVELACE
July 6, 2018

Page 89

1    A.   Typically downstairs.  She had a chair
2    downstairs, and then I would sit on the couch and
3    typically I'd end up falling asleep on the couch,
4    and then when she was ready to go to bed I would
5    either wake up on my own.  She would wake me up.
6    And we'd then go to bed together.
7    Q.   Did you typically go to bed together?
8    A.   Yes.
9    Q.   What did she like to drink?
10   A.   When I first met Cory she drank beer.
11   After we were married she drank beer and wine.
12   And then at some point during our marriage she
13   started drinking gin and tonics.  And that then
14   changed to vodka tonic.  So her primary drink up
15   until her death were vodka tonics.  But she would
16   have wine also, not so much beer.
17   Q.   And how often would she go through let's
18   say a 5th of vodka, if you know?
19   A.   I don't know.  She would do, normally
20   do, the grocery shopping.  And there was always,
21   it wasn't -- I get confused on the bottle sizes,
22   but the big bottles would be the bottles that she
23   would buy.  And when it came to wine, she would
24   buy boxes of wine.
25   Q.   So the big bottles of vodka, like a

Page 90

1    quart or whatever?  I don't know what it is
2    either.
3         MR. HANSEN: It's a 5th.
4    Q.   Not the big box.  5th is the small -- is
5    the regular bottle.
6    A.   You got the tiny ones, you got the
7    medium sized, and then you got the big ones.
8    Q.   Real big jug, yeah.  And how often would
9    she go through one of those?
10   A.   I don't know.
11   Q.   You don't know.  Okay.
12   A.   I mean, there would always be one in the
13   house.
14   Q.   Did your parents have a -- did they
15   visit your house during the years leading up to
16   her death?
17   A.   They started visiting our house in, I
18   believe it was either 2004 or 2005.  Prior to
19   that, they did not have a relationship with me or
20   Cory.
21   Q.   Why not?
22   A.   They, I think it's fair to say they did
23   not like Cory.  They did not think I should marry
24   her.  They said as much.
25   Q.   Why not?

Page 91

1    A.   Just her behavior.
2    Q.   Her confrontational --
3    A.   Confrontational.
4    Q.   Personality?
5    A.   Arguments.  There was a major argument
6    after I tore my ACL, after the Iowa game, that
7    there was an argument on who I was going to leave
8    a restaurant with or something.  That was pretty
9    serious between her and my mom.  And so that
10   chilled the relationship and it never improved.
11        And then for most of our marriage,
12   we did not have a relationship with my parents.
13   And they did not have a relationship with me.
14   But, that did change.
15   Q.   What about with their grand kids?
16   A.   Same; they didn't have a relationship
17   with them.
18   Q.   But that changed around '04, '05?
19   A.   Yes.  And I know specifically it changed
20   when my sister got married.  And we went to the
21   wedding and the reception.  And to this day I'm
22   not sure what necessarily happened.  It was just
23   that we were there.  And were invited to go to
24   various events at my sister's home.  And we
25   attended.  And then my parents started coming over

Page 92

1    to our house.  My father spent a lot of time, I
2    guess in 2005 over at the house because he helped
3    me redo the kitchen during that time period.  Just
4    kind of a do-it-yourself thing.  So he was there a
5    lot.  And so the relationship was good.
6    Q.   Did they ever bring up that they thought
7    she was living a dangerous life-style?
8    A.   No.
9    Q.   What about her parents?  Did her parents
10   ever come over?
11   A.   We had a lot of interaction with Cory's
12   parents.
13   Q.   They lived nearby?
14   A.   They lived nearby.
15   Q.   They would come over?
16   A.   We would go over there more than they
17   would come over to our house.  Cory's father would
18   come over to our house and spend time.  Cory's mom
19   would typically not come over.  And so a typical
20   day, weekday, if you will, would be that John was
21   at our house usually when I got home from work.
22   And they would be in the kitchen talking.  He
23   would have a beer.  She would have a drink.  And
24   that was their interaction.  Then we'd
25   oftentimes, he'd go back home and we would

Page 93

1 oftentimes follow him home and spend time over
2 there.
3    Q.   And why would Marty not come over?
4    A.   Cory had a very good relationship with
5 her father. And -- but she had a contentious
6 relationship with her mother. Marty was critical
7 of, you know, how Cory handled the kids sometimes.
8 She was critical of how she kept the house and
9 didn't feel like she did a very good job of
10 keeping the house. And she was also critical of
11 her drinking of alcohol or the quantity,
12 specifically Marty voiced her concern with
13 drinking hard alcohol or the vodka tonics.
14    Q.   Did they know that she -- that you
15 considered her bulimic?
16    A.   Mary and I had a conversation regarding
17 concerns I had about both Cory's bulimia and her
18 drinking. I believe in the fall, early winter, of
19 2005.
20    Q.   And what was discussed?
21    A.   It was an evening where Cory had had a
22 lot to drink and was confrontational. And I left
23 the house and came over to Marty's house that
24 evening. And said, hey, Marty, I'm concerned
25 about Cory. She's always been confrontational.

Page 94

1 You know that. But, I'm concerned about the
2 drinking and the bulimia, and the impact that it's
3 having. I'm at home more. I'm seeing it more. I
4 have concerns.
5    Q.   And nothing was done?
6    A.   Nothing was done.
7    Q.   Why no intervention of some type if she
8 was as bad as this?
9    A.   With Cory, I mean I can speak for me
10 personally, it was how to approach her with those
11 issues. Because with the bulimia, because I had
12 attempted to. And any discussion was rejected.
13 The alcohol use, looking back, was more difficult
14 for me because I was drinking too. And so I don't
15 know that I was prepared to stop. So, it was not
16 an issue. And Marty, you know, Marty had her
17 hands pretty full with the situation with John.
18 John was dying. And I don't believe she was in a
19 position to take on those issues either.
20    Q.   Was -- did Cory have a doctor?
21    A.   She had an OBGYN that was her doctor
22 when Larson was born.
23    Q.   Did she have a general practitioner --
24 practice doctor?
25    A.   No. Not --

Page 95

1    Q.   Did she go to the doctor?
2    A.   No. I think the last time she had been
3 to the doctor would have been around the birth of
4 Larson.
5    Q.   So, when -- at the time that she died,
6 she had been sick the days before then, right?
7    A.   Correct.
8    Q.   And it's been described in a number of
9 ways; flu-like symptoms and whatnot, correct?
10    A.   Correct.
11    Q.   She never saw a doctor at that point in
12 time?
13    A.   No.
14    Q.   When did you first realize that she was
15 sick?
16    A.   She was sick that weekend. I'm not sure
17 when that started. If it was Friday night. I
18 know that I took Larson to his basketball game at
19 the YMCA Saturday morning. And that is normally
20 something that Cory would attend. And she decided
21 not to attend that.
22    Q.   Did you and her go out to dinner on
23 Friday night at a place like -- what's the name of
24 it? Did you go out to dinner on Friday night?
25    A.   I don't have any specific recollection

Page 96

1 of that. I think a lot of my recollection comes
2 from reviewing the police reports. From -- that I
3 gave, from the interviews I gave with Detective
4 Baird. And there may have been something
5 mentioned in there that we went to a bar
6 restaurant on Friday night, maybe Mr. Bills.
7 Which was --
8    Q.   That sounds right.
9    A.   Which was a place that we would
10 frequent.
11    Q.   And was Lyndsay your in-house babysitter
12 at that time, or did you have to get babysitters?
13    A.   I'm not sure about that transition. I
14 think when we would go out together, just the two
15 of us, it would typically be to the Quincy Country
16 Club. And I think we were still having a neighbor
17 come over.
18    Q.   Okay. Were you a -- is that a private
19 club? The Quincy Country Club?
20    A.   Yes.
21    Q.   Were you members?
22    A.   Yes.
23    Q.   Full members?
24    A.   Yes.
25    Q.   Golf and whatever else?

LOVELACE v.
DET. ADAM GIBSON

CURTIS LOVELACE
July 6, 2018

Page 97

1    A.  Yes.
2    Q.  So, would you frequent the country club
3  a fair amount?
4    A.  Yes.  Cory did not golf.  I did not.  I
5  golfed very little.  It was a place that we spent
6  a considerable amount of time during summers with
7  the kids at the pool.  The kids were involved in a
8  lot of activities at the Quincy Country Club.  And
9  there were minimums on -- so during the winter
10  months, you know, we would go there for dinner to
11  satisfy those minimums.
12    Q.  Right.  So the best of your memory is
13  the earliest you remember her being sick would
14  have been Saturday morning?  And that equates with
15  Larson having a basketball game that morning?
16    A.  Logan having a basketball game.
17    Q.  All right.  You had said Larson, and I
18  was wondering; he was four, I don't know how he --
19    A.  Yeah, my mistake.
20    Q.  Logan had a basketball game?
21    A.  Logan had a basketball game.
22    Q.  And it was you took him, but normally
23  she would take him?
24    A.  Well, normally we would go together.
25    Q.  Okay.  So, that's your best memory

Page 98

1  regarding the earliest you remember her being
2  sick?
3    A.  Yes.
4    Q.  And did she get progressively sick over
5  the next few days, or was it about the same?
6    A.  I don't know that I remember any
7  progressiveness.  She was spending time in bed.
8  She didn't feel well.  She didn't eat with us.  I
9  just, you know, I kind of just took charge of the
10  kids.  And --
11    Q.  And she didn't see a doctor?
12    A.  She did not see a doctor.
13    Q.  Did you take her temperature or know of
14  her taking her own temperature?
15    A.  No.  I did not take her temperature and
16  I do not know whether or not she took her
17  temperature.  I do remember her indicating that
18  maybe she had a fever at some point.
19    Q.  Was she vomiting at all to your
20  knowledge during those days leading up to the
21  death?
22    A.  Yes.  And I specifically recall the
23  night, that Monday night, or maybe after midnight,
24  she asked me to get her another Ibuprofen or some
25  nonprescription drug that because she had taken it

Page 99

1  and she had thrown up.  So, I know she was
2  throwing up at that point.
3    Q.  Did you see her throw up?
4    A.  No.
5    Q.  Was she jaundiced at all?
6    A.  I think she appeared sick or sickly.
7  But, I don't know if I would classify it as
8  jaundiced.
9    Q.  You didn't notice any discolor of her
10  skin?
11    A.  No.  I mean, she was very light
12  complected.  And so, if anything, she was light
13  complected.
14    Q.  Were you aware of her falling at all
15  during those days leading up to the death?
16    A.  Again, a lot of my memories of what
17  happened back then come from my review of the
18  police reports having been so many years.  I do
19  recall reading a statement that I made, as well as
20  I think a statement that Lyndsay made about her
21  falling out of bed.  And that does jog my memory
22  that, yes, there was an incident where she fell
23  out of bed, and told me about it.
24    Q.  You told the police that?
25    A.  Yes.

Page 100

1    Q.  And do you -- but, you don't -- you were
2  not present when she fell?
3    A.  No.
4    Q.  You only know that because she told you
5  that?
6    A.  Yes.  She reported that to me.
7    Q.  Did she tell you when that happened?
8    A.  No.  And I don't remember even when she
9  told me.  But, it was something that in the course
10  of Jeff Baird's questions about anything I might
11  know regarding her health, I remembered that, and
12  told him that.
13    Q.  And you did not notice any bruising or
14  cuts on or about her face?
15    A.  No.
16    Q.  Did she -- are you aware of any habits
17  that she had regarding biting her lips?
18    A.  No.
19    Q.  What about the inside of her mouth?
20    A.  No.
21    Q.  Were her lips chapped during those days
22  leading up to the death?
23    A.  I don't recall her lips being chapped
24  leading up to those days.  I do remember seeing
25  her lips chapped or dry when I found her in bed

LOVELACE v.
DET. ADAM GIBSON

CURTIS LOVELACE
July 6, 2018

Page 101

1 that morning.
2   Q.  So, you would have been home on
3 Saturday -- well, Friday night, if the police
4 report is accurate, you would have gone out to
5 dinner with her?
6   A.  Yes.
7   Q.  And Saturday you were home, and took the
8 -- took Logan to his game?
9   A.  Correct.
10   Q.  And were you home the remainder of the
11 day?
12   A.  I think so.
13   Q.  Do you remember her condition?
14   A.  What I remember is that she stayed in
15 bed that weekend. And she didn't leave the house.
16 At one point I think I went to the store to get
17 food. I was doing all the cooking. Simple
18 cooking just for the kids. But, I don't remember
19 her leaving the house. She would --
20   Q.  Do you remember --
21   A.  She would get up occasionally. But, not
22 for any extended period of time.
23   Q.  Had you planned anything for her for
24 Valentine's Day?
25   A.  Yes. I believe I had -- I think I had

Page 102

1 purchased a card. Other than that, I was maybe
2 going to get flowers or something that day.
3   Q.  Did you? Had you ordered them?
4   A.  No. I had not.
5   Q.  Where was the card at the time that she
6 had died? Where was it?
7   A.  I don't remember. I think I would have
8 had the forethought to buy it in advance of
9 February 14th. And I had been to the store. And
10 I don't --
11   Q.  And did you -- you don't know if you
12 ordered flowers in advance?
13   A.  No, I did not order flowers.
14   Q.  Difficult to order them the day of
15 Valentine's Day, as I understand?
16   A.  For me, my habit, whether it's
17 insensitive or not, was more to just buy flowers
18 that day, versus order. I mean, in response to
19 that question, I guess it's a little bit
20 unresponsive, but there were, after her death, I
21 remember discovering the card that she bought me,
22 as well as the candy, that she had my favorite
23 cherry sour candy in a closet after her death.
24   Q.  Do you still have it?
25   A.  No.

Page 103

1   Q.  Do you still have the card that you
2 bought for her?
3   A.  No.
4   Q.  Why not?
5   A.  Various moves. Some things that were
6 kept. Some things weren't. Some things that
7 were in garages that were exposed to weather, etc.
8 Just not -- not something I kept.
9   Q.  Okay. So, at this time you were
10 teaching at Quincy, correct, Quincy University?
11   A.  Yes.
12   Q.  Okay. How many classes were you
13 teaching at that time?
14   A.  I was teaching two classes. I was
15 teaching an evening class that met for, I think I
16 believe it was four hours. It was a once a week
17 class. It was nontraditional students.
18   Q.  What does that mean?
19   A.  Meaning it was -- the students were in
20 the adult degree program. And so their classes
21 were in the evenings. They had -- they worked
22 during the day. And they were accelerated so they
23 were like a ten week class.
24   Q.  Night school?
25   A.  Yeah.

Page 104

1   Q.  Okay. So you had that class, then you
2 had another class?
3   A.  Yes.
4   Q.  And when was the other class --
5   A.  I also thought --
6   Q.  -- meeting?
7   A.  Yeah, I also taught a traditional class
8 that met on Tuesday and Thursday mornings from --
9 I believe it was 8:30 to -- I can't remember if it
10 was 8:30 to 10:00, or it was 8:00 to 9:30. I'm
11 just not -- but it met twice a week. It was a
12 three hour class. It met for an hour and a half
13 on each day, Tuesdays and Thursdays.
14   Q.  And we've seen that you made a decision
15 at some point in time that you were going to
16 cancel that morning class on Tuesday, right?
17   A.  Yes.
18   Q.  And when did you make that decision?
19   A.  I made the decision regarding that
20 morning class, that morning.
21   Q.  What time did you make that decision?
22   A.  It was after we got up. It even could
23 have been made earlier in that morning hours when
24 I got her that Tylenol or whatever she was asking
25 that I made the decision, okay, I'm going to need

LOVELACE v.
DET. ADAM GIBSON

CURTIS LOVELACE
July 6, 2018

Page 105

1 to take the kids to school. I'm going to have to
2 cancel that class. I had already canceled the
3 class the night before. And so it was just a
4 matter of canceling.
5 Q. So, there was -- the class that met at
6 night met the night before on the Monday night?
7 A. Yes.
8 Q. And it met every Monday?
9 A. I believe so. I mean, again, it was an
10 accelerated program, so it would have, you know,
11 which was kind of a big deal because it was a
12 matter of making up four hours. I couldn't cancel
13 that class more than once.
14 Q. Weren't you coaching Lincoln's
15 basketball team practices on Monday nights?
16 A. He did have practice on Monday night.
17 And that was one of the reasons I canceled that
18 class, that he -- that I needed to take him to
19 that. And she couldn't get him to that.
20 Q. I thought you were the coach?
21 A. With all the kids, through the years,
22 which teams I coached and which teams that I was
23 an assistant coach are a little bit fuzzy at this
24 point. But, I do -- I was a coach, and I -- I
25 can't remember if that time was later than normal.

Page 106

1 We had a blocked time. So, I can't -- I don't
2 remember why, if I was the head coach, I may have
3 been, it necessarily conflicted with my class.
4 But, it did that night.
5 Q. So, you canceled. When did you cancel
6 the Monday night class?
7 A. I don't specifically recall when that
8 class started. I want to say it probably started
9 at six o'clock. So, I would have went over some
10 time that afternoon before six, and put a sign on
11 the door saying that that class was canceled. It
12 may have included some sort of reading assignment.
13 And when we met again.
14 Q. You were living on Kentucky Avenue at
15 the time?
16 A. Yes.
17 Q. And how far was that from Quincy
18 University?
19 A. Not very far.
20 Q. How long would it take you to get back
21 and forth?
22 A. Without traffic, ten minutes.
23 Q. Okay. Was there any other process for
24 canceling a class besides putting the notice on
25 the door?

Page 107

1 A. The only process that I used was putting
2 the note on the door. I hadn't canceled -- I
3 don't think I had canceled that many classes prior
4 to. I may have canceled it, and I would have used
5 a note, versus e-mail. I didn't have all my
6 students' e-mails. It's not quite as extensive
7 e-mail use as it is today.
8 Q. So, that wasn't part of the practice?
9 A. I mean, it may have been part of the
10 practice of other teachers. But, as an adjunct
11 instructor, that's not how I had done things. And
12 given the decision to make those cancellations, I
13 guess maybe somewhat last minute, it wasn't
14 something that I call the office and say, hey, do
15 this.
16 Q. Did you, were you required, or was it
17 the practice to notify the department head that
18 you were canceling a class?
19 A. No. I mean, it wasn't my practice. And
20 I'm not aware that there was any requirement.
21 Q. So, you made the decision to cancel
22 Monday night's class sometime Monday afternoon or
23 leading up to it. And then you made the decision
24 to cancel Tuesday's class the morning of Tuesday.
25 A. Uh-huh.

Page 108

1 Q. And did you and Cory go to bed together
2 Monday night?
3 A. What I recall is she at some point I
4 think after the kids went to bed, she was
5 downstairs for a period of time. And I also
6 recall that there was some work that had to be
7 done regarding cupcakes, you know, something in
8 preparation. She had already done the Valentine's
9 with them separately upstairs. But, there was
10 something to do with cupcakes and icing them
11 something.
12 And so she came down with, for that, and
13 as I recall I had to finish some of that up
14 because she did not feel well. And she went
15 upstairs. I finished that.
16 And --
17 Q. The cupcakes you finished?
18 A. Yeah, I think. Something that sticks in
19 my mind about cupcakes. And then I believe I fell
20 asleep on the couch while she was upstairs. And
21 then at some point I woke up and went upstairs and
22 joined her in bed.
23 Q. And if you're laying on your back --
24 well, did you have regular spots in bed between
25 the two of you?

LOVELACE v.
DET. ADAM GIBSON

CURTIS LOVELACE
July 6, 2018

---

Page 109

1  A.  Yes.
2  Q.  And if you were laying on your back, who
3  would be right and who would be left?
4  A.  On our backs, I was on the right-hand
5  side of the bed.  She was on the left-hand side.
6  Q.  All right.  And the doorway to the
7  bedroom would have been on which side of either of
8  you or the bed?
9  A.  There were two doorways to the bedroom.
10 The doorway to the hallway would have been on the
11 right side of the room same side as I would be on
12 the bed.  The bed was centered.  And then on the
13 left side, her side, was a doorway that led to the
14 boys' room.
15 Q.  So, it's your memory that Cory was in
16 bed before you.  You had to finish up the
17 cupcakes.  And then you fell asleep on the couch,
18 and then at some point in time woke up and went to
19 bed?
20 A.  Woke up and went upstairs and I recall
21 that she was maybe still awake.  Again, I think
22 that was the time frame that she had indicated
23 that she had thrown up whatever she had taken, and
24 wanted another one of those.  And -- but I believe
25 she was awake and feeling sick, and could not

Page 110

1  sleep at that point.
2  Q.  So you got her a pill?
3  A.  Yeah.  Again, Ibuprofen, Tylenol,
4  something for headaches or reducing fever.
5  Something to that effect.
6  Q.  Where did you go to get it?
7  A.  I don't know if that was in the kitchen
8  or in the bathroom.
9  Q.  Did you smell vomit in the bathroom?
10 A.  I don't recall smelling vomit in the
11 bathroom.
12 Q.  But, you did get her, whatever pill it
13 was, that she wanted?
14 A.  Yes.  I got her that.  I may have also
15 got her a Sprite or something to settle her
16 stomach.  Something in my mind stands out about --
17 Q.  Did you get her a Sierra Mist?
18 A.  That's possible.
19 Q.  Was it -- did you mix it with vodka?
20 A.  No.
21 Q.  Did she mix it with vodka?
22 A.  Not that I'm aware of.
23 Q.  You understand, you recall that there
24 was a glass next to the bed that I believe had
25 vodka in it?  Do you recall that in the record?

Page 111

1  A.  I recall that from my review of the
2  record after my arrest, yes.
3  Q.  And did she take that up to bed with her
4  that night?
5  A.  I don't know.
6  Q.  You don't know when that got there or
7  when it was there?
8  A.  No.
9  Q.  Well, did she have a habit of taking
10 alcohol to bed with her at night?
11 A.  Yes.  That would be common.
12 Q.  So, she would sit in bed before falling
13 asleep and drink alcohol?
14 A.  She did most of her drinking downstairs.
15 And then going to bed.  But, it would not be
16 uncommon to have alcohol on the bedside stand
17 also.
18 Q.  Did you notice the glass with alcohol in
19 it before it was taken by the police or whoever
20 took it?
21 A.  No.  That's not something that I noted.
22 Q.  So, the Sierra Mist was not -- that you
23 got her, was unrelated to whatever that was next
24 to her on the bed?
25 A.  That's my understanding.

Page 112

1  Q.  Did she keep a bottle of alcohol
2  anywhere in the bedroom near the bed?  Or anywhere
3  in the bedroom?
4  A.  I would recall after, you know, her
5  death, probably around the same time I found the
6  Valentine's Day card, and to me, and my gift, the
7  cherry sours, that I was doing some cleaning up
8  and I found an empty bottle of vodka in the room
9  somewhere.  I don't remember where I found it.
10 Q.  Did you keep the card and candy that she
11 bought for you?
12 A.  I did for a period of time.  It was --
13 that was an emotional moment when I found that.
14 It was unexpected.  It was, again, a time that I
15 think I was just cleaning up the room.  But, I am
16 not sure what --
17 Q.  You don't still have it?
18 A.  No.
19 Q.  Why didn't you keep it?
20    MS. THOMPSON: Asked and answered.
21 Q.  I don't think I asked.
22    MS. THOMPSON: He did.  You can answer
23 again, Curt.
24 A.  There were a lot of things that I kept
25 immediately after the funeral that stayed in the

---

LOVELACE v.
DET. ADAM GIBSON

CURTIS LOVELACE
July 6, 2018

Page 113

1 house for a while. And when we moved, various
2 things got boxed and other stuff was kept out.
3 Lyndsay kept some stuff. So, I'm not sure where
4 that card would have gone.
5 Q. So when you went up to go to bed that
6 night, you know at some point in time you got up
7 to, or you brought her a pill, or may have brought
8 her Sierra Mist or Sprite or something; she was in
9 bed when you did this?
10 A. Yes.
11 Q. And you're not sure whether you had gone
12 up and got in bed first, and then at some point in
13 time she woke you up to get it? Or whether that
14 was immediately when you got up there?
15 A. I'm not sure. I just remember her
16 making that request, and me fulfilling that.
17 Q. Sometime in the middle of the night?
18 A. Sometime, yes.
19 Q. And when you got into bed you were on
20 your side, she was on her side?
21 A. Yes.
22 Q. And was she wearing pajamas?
23 A. Yes.
24 Q. Did she normally wear pajamas to bed?
25 A. Yes.

Page 114

1 Q. Did she normally wear pajamas during the
2 day?
3 A. I mean, she was -- she would stay up
4 late and if she didn't have, you know, some place
5 to be in the morning, she would wait until later
6 in the day to get dressed. But, it wouldn't be
7 normal for her to be in pajamas all throughout.
8 Q. Okay. Was she in pajamas while she was
9 working on the cupcakes before you took over?
10 A. Yes.
11 Q. Had she been in pajamas all day on
12 Monday?
13 A. I think so, but I'm not sure.
14 Q. She didn't change then when she got into
15 bed on Monday night after coming up from the
16 kitchen?
17 A. I don't know.
18 Q. So, when you -- well, what time did you
19 wake up in the morning?
20 A. I think it was 6:00, 6:30 time frame.
21 Q. Did you set an alarm?
22 A. I did. Because I knew I needed to be
23 up. And that I would be taking the kids to
24 school.
25 Q. And you expected to take the kids to

Page 115

1 school?
2 A. Yes.
3 Q. So when you woke up was Cory still in
4 bed?
5 A. Yes.
6 Q. What did you do when you woke up?
7 A. I probably got up. Went downstairs.
8 I'm a coffee drinker now. I was a coffee drinker
9 then. I would have made coffee. I had to prepare
10 a note and take it to Quincy University. I think
11 I got the kids up and moving before I left to go
12 to Quincy University. At that point I was still
13 in my, I guess you could call it pajamas; they
14 were just sweat pants, sweatshirt-type outfit. Not
15 really pajamas.
16 Q. Is that what you slept in?
17 A. Yes. And so, it was, again, it was a
18 compressed time frame. So, I rolled out of bed.
19 Did what I needed to do to get the kids moving.
20 And got that note. Took it to Quincy University.
21 Came back. And continued with getting the kids
22 ready for school and those activities.
23 Q. So, what time did you go to the
24 University?
25 A. It would have been -- it would have been

Page 116

1 sort of the next thing I would have done as soon
2 as I got the kids up. So, between 7:00 and 8:00,
3 probably between more 7:00 and 7:30. I don't
4 recall. I know there's details in Detective
5 Baird's report on that.
6 Q. And you went up to the University, and
7 you put the class canceled sign on the door to the
8 classroom?
9 A. I remember going to Quincy University
10 and putting a sign up. I don't remember whether
11 it was two signs, one sign, or which door.
12 Q. How would you have affixed it to the
13 door?
14 A. Tape.
15 Q. You brought a roll of tape with you?
16 A. I'm sure I would have, other than maybe
17 propping it in the door. That's just a detail I
18 don't remember.
19 Q. Let's mark this as exhibit number --
20 make it Curtis Exhibit 1. I know some people want
21 to do consecutive throughout the case, but I don't
22 think that ever works.
23 (Whereupon, Deposition Exhibit No. 1 was
24 marked for identification.)
25

LOVELACE v.
DET. ADAM GIBSON

CURTIS LOVELACE
July 6, 2018

Page 117

BY MR. DiCIANNI:

1  Q.  Have you take a look at what's been
2  marked as Exhibit No. 1.  So, first page, can you
3  identify that document?
4  A.  I believe that is a -- it's a business
5  law 215, which is the course that I taught, class
6  canceled.  Next class on 2/16.
7  Q.  Yeah.  Is this the cancellation sign
8  that we've just been talking about?
9  A.  I don't know if this is the cancellation
10  sign.  If you would have asked me that question
11  before the investigation, I would have said yes.
12  Based upon the investigation, and information that
13  somehow this did not get, was not printed at the
14  time frame, and if it was not printed, then it was
15  not the sign that I used to post on the door.
16  Q.  Explain to me what you mean by that?
17  What did the investigation, how does the
18  investigation affect your ability to identify this
19  document?
20  A.  It was my understanding that it was
21  communicated to me that in discovery there was a
22  forensic evaluation, what have you, of the
23  computer that I would have used to prepare this
24  sign.  And that I believe, and it's been a long

Page 118

1  time since I looked at this, that it indicated
2  that the sign that was on that computer, had not
3  been printed prior to me going to Quincy
4  University and putting a sign on a door or two
5  doors.  Whatever it might be.
6  Q.  Well, does this look like the sign that
7  you printed from that day?
8  A.  It looks like what was contained in the
9  discovery.
10  Q.  Right.  But, from your memory, does it
11  look like what you printed that day?
12  A.  I don't specifically remember printing
13  this sign that day.
14  Q.  You printed --
15  A.  I know that I made a sign and took it
16  over to Quincy University.
17  Q.  You made a sign on your computer?
18  A.  I clearly made a sign on the computer.
19  And I may have made a sign not on the computer
20  that was the sign that then was placed on that
21  door.
22  Q.  And if you didn't -- you're just
23  guessing or estimating, speculating, that you may
24  have made a sign not on the computer?
25  A.  I'm responding to the issue that was

Page 119

1  presented to me.  And that was, if this is the
2  sign, why hadn't it been printed?  And my only
3  explanation for that is that it was a new
4  computer, it was a new printer.  It was wireless.
5  I recall having problems with that printer.  And
6  an explanation is that I made the sign.  It
7  wouldn't print.  And therefore, I wrote a sign
8  and took it to Quincy University.  What I know for
9  sure that I'm not speculating is that I took a
10  sign to Quincy University.  And put it on -- at
11  least a door.
12  Q.  You don't have any memory of that, but
13  that's your only explanation for this discrepancy
14  in the printing record?
15  A.  Right.  I don't have a specific memory
16  of a printer working, not working.
17  Q.  The computer that you would have made a
18  sign on, that was your computer?
19  A.  Yes.
20  Q.  And at some point in time that came into
21  possession of Erika Gomez?
22  A.  Yes.
23  Q.  And how did that happen?
24  A.  There were computers in the house,
25  specifically three laptops.  Two of which had not

Page 120

1  been used.  Had just been put in storage.  And
2  when we got the divorce, or when we separated, I
3  took the computer that I was using at the time,
4  and those other two computers remained in the
5  house.
6  Q.  One of which was the one that was in
7  your kitchen?
8  A.  One of which was the laptop that I
9  purchased either in December of 2005 or January of
10  2006, that I was using at that time.
11  Q.  And that was the one that would have
12  been in your kitchen on Kentucky?
13  A.  It was a laptop.  So, it moved around
14  the house.  The printer itself was on the kitchen
15  on a shelf.  But the computer was in various
16  locations.
17  Q.  What about the second page?  Does
18  that -- can you identify that?
19  A.  Yes.  That was a sign that I believe
20  this is a sign that I would have prepared for that
21  class the night before.
22  Q.  This is the sign that we talked about a
23  little while ago that you went to the University
24  sometime in the late afternoon, early evening, of
25  that Monday before to put on the door?

LOVELACE v.
DET. ADAM GIBSON

CURTIS LOVELACE
July 6, 2018

**Page 121**

1   A.   Right.
2   Q.   Now, this says no class on Monday due to
3   jury trial.  What does that mean?  Did you write
4   that?
5   A.   Did I what?
6   Q.   Did you write that?
7   A.   Well, I would have typed it.
8   Q.   I mean, that's what I'm saying.  You
9   typed?
10   A.   I don't have any specific recollection
11   of typing it.  But, I understand that to be the
12   document that they pulled off the computer.
13   Q.   Okay.  And do you, as you sit here now,
14   can you recall what you meant by due to jury
15   trial?
16   A.   Two possibilities.  I don't -- I may
17   have had the potential of going to a jury trial
18   sometime that week.  I don't know if that was a
19   jury calendar week.  Whether or not I truly had a
20   jury trial.  I think the more likely possibility
21   is that rather than say, no class because my wife
22   is sick, I used the excuse that I had a jury
23   trial.
24   Q.   When you had jury trials, did you cancel
25   class?  Your night class?

**Page 122**

1   A.   Maybe.  I mean, I had jury trials
2   throughout, you know, seven plus years I worked at
3   the State's Attorney's office.  They were time
4   consuming.  I would have to focus on that.
5   Q.   How many jury trials did you do, have
6   you done?
7   A.   Over a dozen, I think.
8   Q.   So, you went to the University that
9   morning, at some point in time you put a sign on
10   the door, and you're not sure if, well, we know
11   you put a sign on the door.
12   A.   Right.  I know I went to Quincy
13   University to put a sign on the door, yes.
14   Q.   And you're certain that you did put a
15   sign on the door?
16   A.   I went there to put a sign on the door.
17   I'm certain that I put a sign on the door.
18   Q.   Are you certain that you brought
19   something that allowed to affix it to the door?
20   A.   I believe so.
21   Q.   And you're aware that there were some
22   students in your class who gave statements that
23   there was no sign on the door?
24   A.   I am aware of those statements.
25   Q.   And what is your explanation for that?

**Page 123**

1   A.   Well, first -- first time I was ever
2   made aware that students were claiming there was
3   no sign was through the police, reviewing the
4   discovery after my arrest.  And until then no one
5   had ever mentioned anything to me.  And so, I
6   don't know why some students do not remember
7   seeing a sign on the door.  I mean, there are
8   possibilities.  I would be speculating.  But, one
9   possibility is that, I mean, obviously it could
10   have fallen off.  It could have been removed by a
11   student for whatever reason.  Or, the students
12   entered -- I only put one sign up and the students
13   entered the other door.  There were two doors.
14   So, in looking back, and understanding there were
15   students who said they didn't see a sign.  I'd be
16   speculating.  But those are the possibilities.
17   Q.   Did you ever hear of any students saying
18   they did see the sign?
19   A.   I think there were students that were
20   interviewed, again, based on my review of the
21   discovery, that did not know whether or not there
22   was a sign.  And then there were one or two
23   students said, I don't remember or maybe again
24   there wasn't a sign.  Those interviews were
25   conducted years after that event.  Maybe their

**Page 124**

1   recollection is wrong.  I don't know.
2   Q.   Did you have the Thursday class that
3   week?
4   A.   I don't believe -- I'm certain I did not
5   have the Thursday class.  That I would have
6   canceled that class.  And I think in that
7   circumstance I did contact the University, and let
8   them know that the circumstances and the fact that
9   I would not be teaching that Thursday class.  And
10   I'm -- I know I returned to that class.  Whether I
11   returned that next Tuesday, or that next Thursday,
12   I don't recall.
13   Q.   So, you didn't put a class canceled sign
14   up for Thursday?
15   A.   I did not.  What the University or the
16   business school office who I worked with, whether
17   it be the secretary or the Dean, I don't remember
18   who I talked to, what they did in order to cancel
19   that, I don't know.
20   Q.   So, after you put up the sign, you
21   returned home?
22   A.   Yes.
23   Q.   And when you got home, what was going
24   on?
25   A.   I recall the kids were up.  There was

LOVELACE v.
DET. ADAM GIBSON

CURTIS LOVELACE
July 6, 2018

---

Page 125

1 activity. Cory was up. There was -- which I
2 guess was normal in our house with three children,
3 someone just finding the clothes that someone
4 wanted to wear, and I do recall someone needing a
5 specific pair of pants. And Cory going downstairs
6 to get those and coming up with those. And either
7 giving them to me or giving them to -- I'm sure it
8 was one of the boys.
9   Q.   And she went down to the basement?
10   A.   Yes, the wash.
11   Q.   That's where your washer and dryer was?
12   A.   Yes.
13   Q.   And that would have been approximately
14 what time, if you can tell us?
15   A.   It was after I returned from putting the
16 note at QU, but before I left with the kids to
17 take them to school. I think the approximate time
18 that we would typically leave in order to make it
19 to school, the two schools on time, was sometime
20 between 8:00 and 8:15.
21   Q.   And before you left to take the kids to
22 school, where was Cory? At the time you were
23 leaving to take the kids to school, where was
24 Cory?
25   A.   I remember Cory sitting on the stairway,

---

Page 126

1 going upstairs. And making sure that the kids had
2 all that they needed to have, specifically
3 valentines. And then I recall that I told her or
4 suggested that why don't you just go to bed. And
5 I think I helped her up. Either hand or -- and
6 then just kind of walked her up the steps. Led
7 her into our bedroom. And made sure she got to
8 bed.
9   Q.   So you helped her into the bed?
10   A.   I remember helping her into the bed.
11 Yes.
12   Q.   And as I understand it, you put her on
13 your side of the bed?
14   A.   I did.
15   Q.   Why did you do that?
16   A.   What I recall is that, again, she was
17 feeling bad. And as we walked in, rather than
18 have her go all the way around to the right, there
19 was a sewing machine, there were various things on
20 her side of the bed, there was a makeup table.
21 Rather than negotiate that, and the fact I wasn't
22 going to bed, I just took her straight into the
23 room and had her lie down on my side of the bed.
24   Q.   Did she normally negotiate around these
25 obstacles?

---

Page 127

1   A.   I would assume that she did. That's her
2 side of the bed.
3   Q.   Did you cover her up with covers?
4   A.   I don't remember whether I covered her
5 up or not. It would seem to me that I would, you
6 know, tuck her in to make sure she was
7 comfortable. But, I don't remember that
8 specifically, whether or not I put covers on her.
9   Q.   Did you have any conversation with her
10 at the time?
11   A.   Other than just walking up, her up the
12 stairs, and just -- no, I don't remember having a
13 conversation with her.
14   Q.   Was she able to walk on her own?
15   A.   Yes. I mean, I didn't carry her. I
16 guided her. I could tell she wasn't feeling well.
17 And that the effort of coming downstairs, going
18 into the basement, coming up, had taken something
19 out of her. And that she just needed to rest.
20   Q.   And you did not see Larson awake at this
21 point?
22   A.   No.
23   Q.   So, you took the kids to school and
24 returned. And what time would you have gotten
25 back to the house?

---

Page 128

1   A.   Sometime around 8:30. Either before or
2 after that time frame.
3   Q.   And according to your statement you came
4 in, and you didn't see Larson, right?
5   A.   No.
6   Q.   You went to the kitchen to work on your
7 computer?
8   A.   Yes.
9   Q.   And what -- you had a meeting at 9:30 at
10 the University?
11   A.   I remember there was -- that there was
12 something that caused me to realize that I needed
13 to shower and be somewhere. I don't specifically
14 remember what that was. But, there was -- you
15 know, I worked on the computer, and I decided, you
16 know, I need to get in the shower. And do
17 whatever I need to do. I don't remember what that
18 was.
19   Q.   What did you do on the computer?
20   A.   I don't recall. You know, that computer
21 had my e-mail. It had my calendar. So, I imagine
22 that I -- I looked at my calendar to see what else
23 I had that day. Whether or not I needed to
24 reschedule anything. Again, I don't know of -- if
25 we were in a jury schedule. I don't know if I had

---

Page 129

1 a jury trial later that week. I clearly did not
2 have a jury trial that morning.
3     And I may have done some e-mails.
4   Q.   You don't -- you told Detective Baird
5 that you had a meeting at Quincy University at
6 9:30, and it would seem that that would be a
7 pretty good memory?
8   A.   Yeah.
9   Q.   And reliable memory?
10   A.   Sure, sure. And what I -- what I don't
11 recall is, you know, who that meeting was with, or
12 whether or not that was my established office
13 hours. If that class, I guess that -- I'd have to
14 look at the syllabus. Maybe that class was from
15 eight, that class was probably from 8:00 to 9:30,
16 and either I would have had office hours that I
17 would have had an obligation to be at. Or it's
18 possible that I had an appointment scheduled with
19 a student. But, I don't recall.
20   Q.   Those are the two possibilities? You
21 had office hours or you had an appointment with
22 the student?
23   A.   If -- yes. I mean, if I had a reason to
24 be at Quincy University, at my office, those would
25 have been two reasons that I would have been at

Page 130

1 Quincy University. I really didn't meet with
2 other faculty. So, I don't think it was that.
3   Q.   So, did you ever do anything to explore
4 what it was that you had at 9:30?
5   A.   No.
6   Q.   Did you have access to the computer that
7 the Erika Gomez turned over to the police?
8   A.   No.
9   Q.   You never asked -- I mean, you could
10 have had access to it, but you never asked to have
11 it to examine?
12   A.   Yeah, I guess my attorneys could have
13 asked for it to examine it. I don't think they
14 did. I know I have not physically seen that
15 computer in a long time.
16   Q.   So, when you returned home, why didn't
17 you go to check on Cory first to see how she was
18 doing, given that you had just put her to bed, she
19 was sick?
20   A.   I assumed that she was resting. And
21 again, I had to figure out the rest of my day.
22 What I had to do. And if I needed to cancel
23 anything else, Larson was still at home. He was
24 in preschool at the time. And he would go to
25 preschool in the afternoon. I can't remember

Page 131

1 which days. So, I don't know if he had to go to
2 preschool that day. But, if he did, then one of
3 us would have to have taken him. And/or found
4 someone to take him.
5   Q.   So when you came in, you went straight
6 to the kitchen?
7   A.   Yes.
8   Q.   And the only time -- well, you went
9 upstairs only to take a shower? Not to check on
10 Cory? You went up to take a shower?
11   A.   Right, that's the reason I stopped what
12 I was doing in the kitchen and proceeded up the
13 stairs.
14   Q.   And then Cory, you saw Cory and that
15 caught your attention?
16   A.   Yes.
17   Q.   And your bathroom is located next to the
18 bedroom?
19   A.   If you are walking up the stairs,
20 starting at the front hallway, it moves around.
21 And so you're facing the opposite direction when
22 you reach the top of the stairs. Immediately in
23 front of the stairs are the boys' room. The
24 bedroom is to the left. And the bathroom is to
25 the right, and to the right. And then Lyndsay's

Page 132

1 room is at the other end of the hallway to the
2 right.
3   Q.   All right. So, it's 12:30 something.
4 Are we ready for lunch? We could break now.
5     VIDEO OPERATOR: Now going off the
6 record. The time is approximately 12:38 PM.
7     (The time is 12:37 p.m.)
8     (Deposition resumed at 1:06 p.m.)
9     VIDEO OPERATOR: This is the beginning
10 of recording number three of the videotaped
11 deposition of Curtis Lovelace. We're now going on
12 the record. The time is approximately 1:08 PM.
13     CONTINUED EXAMINATION BY
14     MR. DiCIANNI:
15   Q.   Mr. Lovelace, when we broke you were
16 saying that you went up to the second floor to
17 take a shower. And you described how the
18 stairwell turns you around. And when you got up
19 to upstairs, were you able to look into the
20 bedroom in the hallway outside of it?
21   A.   Yes. I remember seeing to the left the
22 bedroom door was open, and I could see Cory lying
23 in bed, and something just to me seemed off. And
24 I did notice her hands up by her chest area. And
25 as I approached her, I could see that she was

Page 133

1   pale, and that her eyes were open.
2   Q. So, when you were still out in the
3  hallway looking into the bedroom, what was it that
4  looked unusual to you?
5   A. I'm not sure what caught my attention
6  first. But, something did, or it's possible that
7  as I walked up and saw her there, I just made a
8  decision to check on her. And the closer I got,
9  the more I could see and more concerned.
10   So, looking back after this amount of
11  time, I'm not sure of the order of events. But
12  that is what I did. When I saw her, instead of
13  going right I went left, and I went into the
14  bedroom.
15   Q. You said one of the things that caught
16  your attention from outside of the bedroom was the
17  position of her hands.
18   A. Yes.
19   Q. And are you able to show us the position
20  of her hands as it looked to you from outside the
21  bedroom?
22   A. I've seen so many pictures.
23   Q. I know.
24   A. And so — and my memory is my memory.
25  And so I'm not sure where they were related to

Page 134

1  where they were in the pictures. I just know that
2  her hands were not down by her side and not in her
3  lap. But, they were on her -- in her chest area.
4   Q. Well, were -- so but then you walked in
5  closer and took a look?
6   A. Yes.
7   Q. And then you got a closer view of her
8  obviously?
9   A. Yes.
10   Q. Yeah. And were her hands -- were the
11  palms of her hands touching her chest?
12   A. I don't remember.
13   Q. Okay. I'm going to show you some
14  photographs. I assume you've seen these so many
15  times already. But --
16   A. I have.
17   Q. I think we have to do. Can you mark
18  this as the next exhibit.
19   (Whereupon, Deposition Exhibit No. 2 was
20  marked for identification.)
21  BY MR. DiCIANNI:
22   Q. Let me ask you to take a look at what
23  we've marked as Curtis Exhibit No. 2. Is that
24  what she looked like when you walked into the
25  bedroom?

Page 135

1   A. That is her in the location that I
2  recall her in on the left-hand side as you're
3  facing the bed. The right-hand side if you would
4  be lying in the bed. That's where she was. The
5  hands, as far as the elevation, I don't have a
6  specific recollection of where they were
7  elevation. I think it's accurate to say that they
8  were around her chest area. I did not pay
9  attention as to whether or not, and it wasn't a
10  concern of mine, whether or not they were touching
11  her sweatshirt or not touching her sweatshirt.
12   Q. So, you can't say the photograph in
13  Exhibit 2 was -- truly and accurately depicts what
14  you saw that day, or doesn't truly and accurately
15  depict what you saw that day?
16   A. Again, certain aspects of it, the
17  location of the body, everything else. As far as
18  the positioning of the hands, I think location
19  they were not down by her side. They were up
20  towards her chest. But, I don't have any specific
21  recollection as to whether they were where they
22  are now in that picture.
23   Q. Okay. All right. Thank you. Let's
24  mark this as the next one.
25   (Whereupon, Deposition Exhibit No. 3 was

Page 136

1  marked for identification.)
2  BY MR. DiCIANNI:
3   Q. I will ask you to take a look at what
4  we've marked as Exhibit No. 3. This appears to be
5  the same photograph, just from a different
6  perspective, correct?
7   A. It does.
8   Q. And would you say the same thing
9  regarding this photograph as to the position of
10  the hands? You can't necessarily say that's what
11  you saw or didn't see that day?
12   A. Correct.
13   Q. Okay. Can you describe what's up on the
14  top of the headboard?
15   A. It looks like there are a couple of
16  things on the headboard. What specifically are
17  you referring to?
18   Q. Well, it looks like there's something
19  all the way to the left as we look at it.
20  Something in the middle, almost directly over
21  Cory, and some things over on the right. Are you
22  able to tell us what those were?
23   A. I'm not sure I really see what is on the
24  left, whether or not that's a reflection or
25  actually something sitting to the far left. It

Page 137

1 would appear that something is in the middle of
2 the bed. That I'm not sure, that may be a remote
3 control. I don't know. But, there is something
4 sitting there. Clearly, all the way to the right
5 is a box of tissues that is sitting on the
6 headboard. And just to the left of it appears to
7 be maybe a book or a paper item, something.
8    Q. Was that headboard butted up against the
9 window frame? Or was there some space between
10 there?
11    A. I'm not sure if there -- I imagine that
12 it wasn't touching. But, there wouldn't be much
13 space.
14    Q. When you would get in and out of bed,
15 would that headboard shake or was it pretty
16 secure?
17    A. I recall it being a -- fairly secure.
18 It was a wooden headboard that was attached to the
19 frame of the bed. So I think it was secure.
20    Q. And I don't mean to ask you something
21 embarrassing, but did you and Cory have a sex life
22 at the time?
23    A. We did.
24    Q. Did you have sex in the bed?
25    A. Yes.

Page 138

1    Q. Did the headboard shake when you would
2 have sex? Not something you were aware of?
3    A. I'm guessing it would have, but I don't
4 know.
5    Q. The covers that are shown in both
6 Exhibit 2 and 3, is that what -- you said you
7 tucked her in.
8    A. I said that I may have. It would make
9 sense that I would have at least pulled some of
10 the covers up and helped her get into bed. And I
11 don't have specific recollection. But, it's
12 probable that I did.
13    Q. Okay. It appears in Exhibit 2 that the
14 covers are about halfway up; do you know if you
15 covered her more than that, or if that was about
16 where you left the covers?
17    A. I don't remember.
18    Q. Okay. Let's mark the next one as 4.
19       (Whereupon, Deposition Exhibit No. 4 was
20 marked for identification.)
21 BY MR. DiCIANNI:
22    Q. I'll ask you to take a look at Exhibit
23 No. 4. The door that we see on the right side of
24 this photograph, is that -- where does that lead
25 to?

Page 139

1    A. That's a closet.
2    Q. That's a closet. Okay. And you
3 mentioned before that you didn't want to put her
4 on her side of the bed because you would have to
5 negotiate around things. Are those things shown
6 in this photograph?
7    A. Yes. I mean, that I believe is an
8 accurate portrayal of what it looked like on her
9 side of the bed.
10    Q. And what are the objects that you didn't
11 want to negotiate around?
12    A. Not in that picture, I believe, is a
13 makeup table. And there were some other things,
14 you know, between the bed. And then in the lower
15 right-hand corner, you see the couch that extended
16 into the room. That there was then an opening for
17 foot travel or foot traffic around the bed. And
18 so as I recall, rather than have her take a right
19 and come that direction, I just had her walk
20 straight into the bedroom and had her lie down on
21 my side of the bed.
22    Q. So, on the foot of the bed, next to the
23 foot board there's a couch?
24    A. Yes. Not seen clearly in that picture.
25 I think Exhibit 3 shows that couch.

Page 140

1    Q. Let's mark this one.
2       (Whereupon, Deposition Exhibit No. 5 was
3 marked for identification.)
4 BY MR. DiCIANNI:
5    Q. Let me ask you to take a look at Exhibit
6 No. 5. Obviously the covers have been pulled
7 back, correct?
8    A. Correct.
9    Q. And I assume you didn't pull the covers
10 back?
11    A. No.
12    Q. And you didn't -- did you touch her at
13 all when you walked into the room?
14    A. Yes. I recall touching her, shaking
15 her. I think shaking the bed. I don't recall
16 exactly what parts of her body I touched.
17    Q. You did put your hand on her to shake
18 her?
19    A. I did touch her, her body, yes.
20    Q. But you don't remember --
21    A. I don't remember specifically where, or
22 how many times, or where I touched her.
23    Q. Was it on skin or was it on her clothing
24 or even on the blanket or covers?
25    A. I don't know. I don't recall.

LOVELACE v.
DET. ADAM GIBSON

CURTIS LOVELACE
July 6, 2018

---

Page 141

1    Q.   Were you able to say whether her body
2  was cold or normal feeling?
3    A.   I don't have a specific recollection of
4  that. I know that from my review of the reports,
5  that I reported both her body being cold and warm
6  based upon the report, I think it was the first
7  officer that interviewed me.
8    Q.   Yeah, I saw that. I was going to ask
9  you, how do you explain that? That her body is
10  both cold and warm? And how did you come to that,
11  whatever conclusion that is?
12    A.   Again, so many years have passed, I
13  don't have a specific recollection of where I
14  touched her, and what I felt. If you're asking me
15  to explain or speculate that, you know, some areas
16  of her body may have been cold. I'd say her
17  hands. And some areas that I touched may have
18  been warm. And so I was describing both
19  observations to that officer.
20    Q.   As you sit here now though, you don't
21  remember touching any part of her body, her skin?
22    A.   No. I don't remember touching her. I
23  remember -- what I do remember is shaking her and
24  attempting to wake her up.
25    Q.   You don't remember if you touched her

---

Page 142

1  hands?
2    A.   I don't have a specific recollection of
3  that.
4    Q.   Let's mark this one.
5         (Whereupon, Deposition Exhibit No. 6 was
6  marked for identification.)
7  BY MR. DiCIANNI:
8    Q.   Ask you to take a look at Exhibit No.
9  6. This appears to be a photograph that is
10  focused on some marks on her neck.
11    A.   Uh-huh.
12    Q.   Have you seen this photograph before?
13    A.   I have seen that photograph before.
14    Q.   Have you seen, and you've noticed the
15  marks on her neck?
16    A.   Yes.
17    Q.   Did you ever see the marks on her neck
18  while she was alive?
19    A.   Yes. Cory had a birth mark, a
20  collection of freckles or discoloration on her
21  neck there. She had that ever since I had known
22  her. I think at one point she had even commented
23  that because of the moles and everything, concerns
24  about exposure to sun, she was fair complected, I
25  remember something about that. Or maybe someone

---

Page 143

1  told her that. I'm not entirely sure. But those
2  marks have been as long as I've known Cory.
3    Q.   And what we see here in the photograph
4  of some reddish or brownish looking marks, you're
5  saying these are birth marks?
6    A.   And I am talking specifically about the
7  collection of what I would call moles or freckles
8  right in the middle of her neck.
9    Q.   I'll ask you to circle it just so the
10  record shows. There's no confusion in the record
11  what we're talking about?
12    A.   (Witness circling.)
13    Q.   Those are natural marks that she always
14  had?
15    A.   Yes.
16    Q.   Let's mark this as the next one.
17         (Whereupon, Deposition Exhibit No. 7 was
18  marked for identification.)
19  BY MR. DiCIANNI:
20    Q.   Let me ask you to take a look at this
21  photograph. Exhibit No. 7 shows a close up of
22  Cory's face. And it appears to be still on the
23  bed. Do you see her lips with kind of looks like
24  little cuts and discoloration? It that what it
25  looked like the last time you had seen her alive?

---

Page 144

1    A.   I don't recall seeing discoloration when
2  she was alive when I left that morning. But, I
3  definitely remember seeing, and that's a memory
4  that I have that her lips did appear that way when
5  I discovered her in bed later on that morning.
6    Q.   So, earlier, and you had seen her alive
7  half an hour earlier, or maybe 45 minutes earlier;
8  you didn't notice the discoloration we see on her
9  lips?
10    A.   I did not notice that, no.
11    Q.   What about, it looks like there's a mark
12  underneath her nose, directly underneath her nose.
13  What about that one? Did you see that prior to
14  the last time you had seen her when she was alive?
15    A.   No, I don't recall noticing that. Or I
16  don't have a memory of that. Nor do I recall that
17  as something that stood out to me when I
18  discovered her in bed.
19    Q.   Now, does she have eye makeup on there?
20    A.   I don't know.
21    Q.   There was some -- also a report and
22  photographs, which I don't know that I'm showing,
23  of a cut inside her mouth.
24    A.   I am aware of that photo, yes.
25    Q.   And that was an area of dispute during

---

LOVELACE v.
DET. ADAM GIBSON

CURTIS LOVELACE
July 6, 2018

---

Page 145

1  your trial as to the cause of that, correct?
2  **A.   That is correct.**
3  Q.   Were you aware that she had a cut on the
4  inside of her lip?
5  **A.   No.**
6  Q.   At the time?  And there was some
7  speculation that it may have been caused by her
8  falling, correct?
9  **A.   Yes.**
10  Q.   And you're aware that -- you were aware
11  at that time that there was -- she told you and
12  Lyndsay told you that she had fallen out of the
13  bed?
14  **A.   I remember, again, I remember reading**
15  **that in the report, and that does sound -- I do**
16  **recall that.  I didn't recall that, or it wasn't**
17  **an immediate memory when I was interviewed by**
18  **Detective Gibson, but in the report I do recall**
19  **that.**
20  Q.   You had no knowledge of her having
21  suffered any injuries falling out of the bed,
22  correct?
23  **A.   No.  I didn't have any knowledge of**
24  **that.**
25  Q.   And you had talked to her in the days

---

Page 146

1  before, and even that day?
2  **A.   Sure.**
3  Q.   Was there anything about her speech that
4  was unusual?
5  **A.   There was mention, and I didn't recall**
6  **this until I read it in the report, but now I**
7  **remember that she had complained about her tongue.**
8  **And I think she had complained to, I think Lyndsay**
9  **referenced it, and I do recall Cory saying**
10  **something about, you know, her tongue feels funny,**
11  **and maybe that that had to do with Sprite or**
12  **Sierra Mist, which I'm not sure what it had to do**
13  **with any of that.  But, I do remember that.**
14  Q.   But there was no mention of speech
15  difficulties or any issue with speech resulting
16  from a cut on her lip?
17  **A.   Not from a cut on the lip, no.**
18  Q.   One of the police reports, if I remember
19  correctly, discussed a broken shelf in the
20  bathroom.  Do you remember that?
21  **A.   I remember a police report discussing a**
22  **broken shelf in the bathroom.**
23  Q.   Do you remember there being a broken
24  shelf in the bathroom?
25  **A.   No, not particularly. If there's a photo**

---

Page 147

1  of something I can look at it and see if that --
2  Q.   I don't think.  I never saw a photo of
3  it.  I just saw a report of it.  Did you ever see
4  a photo of it?
5  **A.   I think there are photos from the**
6  **bathroom.**
7  Q.   Well, there are, but not of the broken
8  -- that I saw, of the broken shelf.  Here, let's
9  take a look at this one.
10         (Whereupon, Deposition Exhibit No. 8 was
11  marked for identification.)
12  **BY MR. DiCIANNI:**
13  Q.   Exhibit No. 8, does that show your
14  bathroom, a portion of it?
15  **A.   It shows, yes, the sink in the bathroom.**
16  Q.   Would the broken shelf -- where was the
17  broken shelf have been in relation to the sink?
18  **A.   I'm not sure where there was a shelf.**
19  **It was a small bathroom. I think the only area**
20  **where there could have been a shelf would have**
21  **been possibly above the toilet area. But, I don't**
22  **remember whether there was or wasn't a shelf.**
23  Q.   Okay.  So, you shook her, you got no
24  response?
25  **A.   Correct.**

---

Page 148

1  Q.   Do you know if she was dead?
2  **A.   I reached that conclusion.**
3  Q.   I saw somewhere in a report that you
4  know CPR?
5  **A.   Yes.  I did tell Detective Baird that I**
6  **had received training for CPR, and that training**
7  **was with when I was at Dot Foods.**
8  Q.   And you didn't feel that you should do
9  CPR at that point?
10  **A.   I don't know that I really felt whether**
11  **to do that or not do that.  When I discovered**
12  **Cory, I didn't know what to do.  She was**
13  **unresponsive. I did remember shaking her. I do**
14  **believe I yelled at her. I think I even walked in**
15  **and out of the room, thinking somehow that would**
16  **make a difference. But, not knowing what to do, I**
17  **may have checked her pulse. I don't recall.**
18  **And then my attention or concern**
19  **immediately went to Larson.**
20  Q.   You did not call 911?
21  **A.   I did not call 911.**
22  Q.   And you would agree with me that most
23  people would think that a natural first response
24  would be to call 911, correct?
25  **A.   I understand that people would think**

---

Page 149

1 that that's a natural response. And that has been
2 posed or brought out in two trials. And my
3 response is, my response is what my response. I
4 didn't know what to do.
5    Q.  So, you picked up Larson?
6    A.  I remember picking up Larson. I believe
7 he was in his bedroom. In bed. And took him out
8 of the house.
9    Q.  Okay. And you went over to the
10 Didriksens?
11    A.  Yes.
12    Q.  And you at some point in time also
13 called Jon Barnard?
14    A.  Yes.
15    Q.  And on your cell phone?
16    A.  Correct.
17    Q.  What -- when -- where were you when you
18 called Jon Barnard?
19    A.  I recall making the phone call to Jon
20 Barnard after, or as I was leaving Marty's house
21 after dropping off Lyndsay.
22    Q.  Larson?
23    A.  Or Larson. Sorry. Larson. And I was
24 in the process of returning to the house, and I
25 was talking to Jon on my cell phone. I'm not sure

Page 150

1 when I dialed that number. That number was on
2 speed dial, or favorites, or whatever it was at
3 the time. And that is the number I called.
4    Q.  What kind of phone did you have?
5    A.  I think it was -- it was through AT&T.
6 I think it was a Razor flip phone.
7    Q.  Do you remember your phone number?
8    A.  No.
9    Q.  You don't have that number any more?
10    A.  No. I don't have that number any more.
11    Q.  So you called Jon Barnard, your boss?
12    A.  Uh-huh.
13    Q.  And you would agree with me that most
14 people would think that that is an unusual first
15 phone call to make after discovering your wife in
16 a -- may be dead, but also may be in a distress
17 that she can be saved?
18    A.  Again, I didn't really know what to do.
19 And I can't tell you why I necessarily called Jon
20 Barnard. Other than the State's Attorney's office
21 was a number that I had in my phone. As well as
22 Jon was a close family friend. And someone I
23 respected and trusted. And would know what to do
24 when you find your wife dead in your bed, or make
25 that discovery.

Page 151

1    Q.  Were you at this point in time, were you
2 convinced that she was dead?
3    A.  I was.
4    Q.  And Jon Barnard called 911?
5    A.  I believe he asked me if I had called
6 911. I told him I had not. He said, do you want
7 me to call 911. And I told him to go ahead and do
8 that.
9    Q.  Okay. So, where did you go from there?
10    A.  I went back to the house. Again, I
11 recall making that phone call on the way. It was
12 a short conversation. I returned to the house.
13 I'm sure I would have gone into the kitchen
14 through the back door. I don't remember whether
15 or not I went back up stairs. I do remember
16 hearing sirens, emergency personnel arriving. I
17 think in one of the reports there was some
18 discussion of maybe they went to the wrong address
19 initially. There's something about that, that
20 rings a bell. But, again, I returned to the
21 house, and then I met with emergency personnel and
22 police officers.
23    Q.  And a Quincy police officer met you on
24 the porch of the house, correct?
25    A.  I remember that from a report.

Page 152

1    Q.  You don't have a memory of that?
2    A.  I don't. I don't have a specific memory
3 of that.
4    Q.  Do you remember, did you know that
5 police officer?
6    A.  I knew at least by face most of the
7 police officers. I'd only been in the State's
8 Attorney's office a year. So I had some
9 interaction. But no, I don't think I knew that
10 officer specifically.
11    Q.  Did you see in the report that the
12 officer said you were on the phone?
13    A.  I did see that.
14    Q.  And who were you on the phone with?
15    A.  I don't remember being on the phone.
16 And if I were on the phone--he says I was--I don't
17 know who I was talking to.
18    Q.  You were off with Barnard already?
19    A.  I believe so. I believe I ended that
20 phone conversation as I was going into, or maybe
21 just prior to going back into the house.
22    Q.  All right. So, when you -- just to back
23 up a second. When you dropped off Larson at
24 Marty's home, you remember -- do you remember what
25 Marty, how Marty described that incident?

LOVELACE v.
DET. ADAM GIBSON

CURTIS LOVELACE
July 6, 2018

---

Page 153

1    MS. THOMPSON: Object to form. You can
2 answer.
3    A.   I remember what she testified to, as far
4 as that interaction.
5    Q.   What do you remember about that?
6    A.   I remember she testified that it was a
7 very abrupt conversation.  She may have even said
8 he just, you know, handed me Larson and said
9 Cory's dead.  And then turned around.  And then I
10 think maybe at the second trial she added
11 something else that I said afterwards.  And I
12 don't recall what that was.  It's taken care of,
13 or something like that.  I remember that part of
14 her testimony.  Again, between the two trials I
15 think it was a little different.
16    Q.   Well, as I remember in a nutshell, she
17 said you dropped off Larson, and then you said, by
18 the way, Cory is dead and it's taken care of.  Do
19 you deny making that statement or any part of it?
20    A.   That doesn't sound like anything that I
21 would said.  Nor do I recall saying that.  That is
22 not the frame of mind that I was in at the time.
23 And at that point nothing had been taken care of.
24 In fact, as I went to Marty's house and handed
25 Larson to her, at that point I don't think I still

---

Page 154

1 knew what to do or how to handle the situation.
2       So, yes.  I don't think I said those
3 things.
4    Q.   All right.  So you went back to the
5 house, correct?
6    A.   Correct.
7    Q.   And that's when the responder started
8 appearing?
9    A.   Uh-huh.
10    Q.   Later that day you talked to Detective
11 Baird?
12    A.   Yes.  I think I talked to -- I remained
13 in the kitchen.  There was an officer with me
14 while I was in the kitchen.  And then I saw them
15 remove Cory's body.  Carrying it down the steps
16 from the kitchen and exit the house.  And it was
17 shortly thereafter that Detective Baird met me in
18 the kitchen and talked with me.
19    Q.   And as we discussed earlier, Detective
20 Baird interviewed you that day, the next day, and
21 then about a month later, correct?
22    A.   Yes.  I think that was the extent of the
23 interviews.
24    Q.   And over time, you have reviewed those
25 statements, I assume?

---

Page 155

1    A.   Yes.
2    Q.   Did you review them for purposes of this
3 deposition?
4    A.   I did not review those for purposes of
5 this deposition.
6    Q.   But, you had reviewed them in the past?
7    A.   Yes.
8    Q.   And at any point in time did anything
9 that you read in any of those statements, do you
10 dispute?
11    A.   No, I don't -- I can't recall anything
12 that seemed incorrect in what he asked, and what I
13 answered.
14    Q.   And you don't have a clear memory of
15 those conversations, correct?
16    A.   I remember having a conversation with
17 Jeff Baird.  I don't remember specifically what
18 questions he asked, and how I answered.  Now I do
19 after having -- I do remember the number of times
20 that he interviewed me.  And when he interviewed
21 me.
22    Q.   But then again, you're not -- you're not
23 contesting that any of the things he said you
24 said, you actually did say?
25    A.   No, I'm not contesting.

---

Page 156

1    Q.   Did you know Jeff Baird before then?
2    A.   I knew of Jeff Baird.  I knew Jeff Baird
3 was a year behind Cory and I in high school, I
4 believe.  But I didn't hang around him.  I don't
5 think Jeff played sports.  I think he was in
6 theater.  So, I don't have a lot of recollection
7 from him, from high school.  I did know him as a
8 Quincy police officer.  Probably more because he
9 was known as -- he had a canine.  He had a dog at
10 one point and that made him a very popular, appear
11 in the newspaper or whatever.
12       And then I did have -- I don't recall
13 between the time I started at the State's
14 Attorney's office and when I, and Cory's death,
15 whether or not he had ever been a witness in a
16 case that I was assigned.  I don't remember that.
17 Ultimately, he has been witnesses.  I think those
18 were all after the fact.  But, I don't know him
19 personally.
20    Q.   You were not social friends?
21    A.   No.
22    Q.   Still not, even either before or after?
23 You were not social friends?
24    A.   The only interaction that I had with
25 Jeff Baird was that I worked out at the Y.  And

---

LOVELACE v.
DET. ADAM GIBSON

CURTIS LOVELACE
July 6, 2018

Page 157

1  Jeff worked out at the Y. And this would have
2  been well after Cory's death. And Jeff also had
3  sons, and I can't remember their exact ages, about
4  the age of I think at least Lincoln. So, there
5  was some interaction. And I think one of them
6  played football.
7       And then the only other interaction that
8  I had with Jeff is that shortly before my arrest,
9  it was either July or August, I did, Christine and
10 I were at a friend's house who was having kind of
11 a pool party. And Jeff and his wife, and I
12 believe her name is Deanna, arrived and sat down.
13 And Christine had a conversation with Deanna. I
14 don't remember. I talked with Jeff. It wasn't
15 anything about anything specific.
16      And at that time Christine had her pie
17 shop. And there was a discussion that I overheard
18 between Christine and Deanna, and Deanna ordered a
19 couple of pies that evening.
20      And then I believe it was the next day,
21 because Christine baked and was open on Saturday,
22 she baked those pies and I went with her to
23 deliver those. So that's the only other
24 interaction. But, that was again was in 2014.
25 Q.   While we're on that topic, Larson you

Page 158

1  heard at his deposition say something about
2  somebody had done something to her pie shop in
3  terms of putting like a rat or an animal of some
4  type in there. What do you know about that?
5  A.   That had occurred in, I can't remember
6  if it was July or August of 2014. That it was
7  that summer. I was actually in the pie shop at
8  the time. It was towards the end of the day.
9  Christine had a kitchen area, and then kind of a
10 counter area. A couple of young teenagers walked
11 in. One was carrying a -- I guess a coffee cup,
12 and they just -- they weren't the typical
13 customers that we, typically older people would
14 come in. And just you wouldn't see teenagers come
15 in and want to buy a pie.
16      So something was unusual about it. And
17 they left, and then I commented to Christine that,
18 that's weird. And I'm not even sure Christine
19 came out. And then shortly thereafter there's a
20 small rat scurrying in the corner, which seemed
21 very unusual.
22      . And so we -- I guess decided that
23 they must have left the rat. And we reported that
24 to the police. It was very bothersome. It was
25 time that -- it was after the divorce. We — most

Page 159

1  of the stuff with Erika Gomez was gone. But, we
2  were still -- I think there was still some court
3  proceedings on some stuff, not the divorce,
4  because that was done in September. And I think
5  we had suspicions that somehow maybe someone was
6  involved.
7  Q.   She was behind it?
8  A.   Or --
9  Q.   You wondered?
10 A.   Or possibly her daughter. And so we
11 reported that to the police. The police came.
12 And we actually -- it looked like something that
13 was bought in a pet store. Limited number of pet
14 stores. And I think we called while they were
15 investigating. And learned from the manager that
16 there had been three young teenagers who had just
17 bought a rat.
18 Q.   It wasn't a street rat?
19 A.   No. No. And so -- and so then we left.
20 Let the police handle it. And later on I think
21 around 7 o'clock the officer that had been at the
22 pie shop called and said hey, would you come here
23 and look at this video.
24      So we went to the pet store, looked at
25 the video, and there were three teenagers, one of

Page 160

1  them was Darlene Steinkamp, Erika Gomez's
2  daughter, who was in there buying. She did not
3  come into the store. It was her two friends. And
4  then I think they were questioned. And I think
5  they were all issued, do not trespass. Do not go
6  back.
7  Q.   So, Erika Gomez was a student of yours
8  at Quincy, right?
9  A.   She was.
10 Q.   And do you have denied, and I don't know
11 that there's anything to dispute that, that you
12 ever had any relationship with her other than
13 teacher/student while Cory was still alive, right?
14 A.   Correct. I did not have any
15 relationship with her.
16 Q.   And when did the two of you begin to
17 have a romantic relationship?
18 A.   The first time that we engaged in any
19 talk outside the classroom was at a bar/nightclub
20 in Quincy. I believe it was in August of 2006.
21 Q.   And is that when you started dating?
22 A.   I think we went on some dates shortly
23 thereafter. I don't remember how quickly.
24 Q.   You remembered her from your class?
25 A.   I didn't immediately remember her from

Page 161

1  my class. Actually, I thought she was someone
2  else. But, then she explained that she was from
3  my class. And then it was obvious that she was
4  from my class.
5  Q.  And when did you get married?
6  A.  We got married June of 2008, I believe.
7  Q.  And you divorced, correct?
8  A.  Correct.
9  Q.  And when was that?
10  A.  We separated in December of 2012. And
11  the divorce, judgment, was in September of 2013.
12  Q.  And she -- and that marriage was not
13  perfect? Correct?
14  A.  Correct.
15  Q.  And the two of you had many
16  disagreements and fights?
17  A.  I don't know if we had many
18  disagreements and fights. I mean, we did disagree
19  on some key issues. Most of them centered around
20  her role in my sons and my daughter's life. And
21  how she treated them.
22  Q.  At some point in time she accused you of
23  some kind of a physical assault, correct?
24  A.  Yes, she did.
25  Q.  And you became a member of the military

Page 162

1  at some point, right?
2  A.  Correct.
3  Q.  When was that?
4  A.  I was commissioned a first lieutenant in
5  November of 2009.
6  Q.  You enlisted?
7  A.  No. I was a direct commission as an
8  officer in the Illinois Army National Guard in
9  November of 2009.
10  Q.  I don't know, how does that happen, that
11  you get commissioned to be an officer in the
12  National Guard?
13  A.  To become an officer in our military,
14  specifically the Army, you either have to go to
15  West Point, go to -- graduate and become an
16  officer through ROTC. Become an officer through
17  officer candidate school. Or receive a direct
18  commission. I received a direct commission.
19  Q.  How did that come about?
20  A.  Erika had returned from a recruiting
21  event where they were trying to convince enlisted
22  soldiers to become officers. When she returned,
23  and this was in 2008, she said that she had
24  engaged in that conversation with someone who had
25  mentioned that they were in need of judge

Page 163

1  advocates, military lawyers. And she said that
2  her husband was a lawyer.
3  And we talked about it, and we agreed, I
4  decided, well, I'll apply. I don't know that I
5  really thought that at my age, which was 39 I
6  think, that they would want me. But, I
7  interviewed. I did all the physicals. And they
8  said absolutely. We want you to become an
9  officer. So, I joined the Illinois Army National
10  Guard as a commissioned officer.
11  Q.  Did you have to do basic training?
12  A.  I did. I was commissioned in 2009. I
13  did the standard one weekend a month. But, I
14  wasn't certified as a judge advocate until I
15  completed basic training. My basic training
16  consisted of two weeks at Fort Lee, Virginia.
17  Immediately after that, ten weeks in
18  Charlottesville, Virginia, at judge advocate
19  basic. And then five weeks immediately after that
20  at Fort Benning for they called it direct
21  commission course. It's very similar to an
22  officer basic leadership course. And I completed
23  all of that in -- I started in July, and completed
24  that in November of 2010.
25  Q.  So, did you take a leave of absence from

Page 164

1  the State's Attorney's office?
2  A.  I did.
3  Q.  And who was taking care of your kids?
4  A.  Erika remained in Quincy and took care
5  of the children.
6  Q.  So, Erika was a member of the National
7  Guard?
8  A.  Yes.
9  Q.  What were the responsibilities, once you
10  became a commissioned officer?
11  A.  I was assigned to TDS, or trial defense
12  service, which was a component, newly formed
13  component in the Guard. But it had been in the
14  regular Army, which is the best way to describe
15  it, was essentially the public defender for
16  soldiers who are in trouble. It wasn't
17  income-based. It was, if you got in trouble with
18  your command, you should have representation. It
19  should be independent representation, independent
20  of the command.
21  And so it was something that was
22  separated. We reported to TDS. We didn't report
23  to anyone else in the National Guard. That way,
24  we could maintain our commitment or loyalty to the
25  soldier. And avoid even the perception that