LOVELACE v.
DET. ADAM GIBSON

CURTIS LOVELACE
July 6, 2018

**Page 165**

1  somehow someone could tell us what advice to give
2  or not to give to a client.
3       So, I spent the first part, in fact a
4  good portion of my part as trial defense service
5  attorney.
6   Q.   And what, did you get -- have to do a
7  stint at a time doing this?  Or did you get called
8  up for certain cases?
9   A.   I had to drill monthly.  At that time
10  our TDS met up in Chicago at an armory north of
11  Kedzie Avenue in Chicago.  And so that's where we
12  would all gather for the weekend.  We had just a
13  couple paralegals.  At one point I think there
14  were three of us, senior defense counsel, I was
15  defense counsel and one other guy.  And we were
16  assigned cases.  As well as we were available if
17  people just wanted to walk in and just ask legal
18  questions.  So, we provided general legal advice.
19  And we did everything; PT, physical activity, etc.
20  A lot of TDS happened outside the weekend because
21  -- and we represent soldiers throughout the state.
22       So, I might get a phone call saying,
23  hey, I'm special such and such, I was told to give
24  you a call, I've been flagged because I tested
25  positive for marijuana.  What do I do?

**Page 166**

1   Q.   So, did you have to actually handle
2  legal proceedings or you just offered advice?
3   A.   I was trained to handle a court martial.
4  However, the National Guard at the time, which was
5  not uncommon amongst all the states, did not have
6  a process for that.  So, everything was
7  administrative.
8       So, the proceedings that I handled, I
9  would represent a soldier on an administrative
10  separation action.  So, it wasn't whether or not
11  he was going to jail.  It was whether or not he
12  was going to get kicked out of the Army National
13  Guard.  And if he was going to get kicked out,
14  then what his characterization would be.
15   Q.   And you would have to go places to try
16  these cases?
17   A.   The administrative boards were all
18  conducted in Springfield.  And they would be
19  either coordinated with a scheduled drill weekend,
20  or I would just adjust my schedule.
21   Q.   So, you were paid to be JAG Corps?
22   A.   Yes, I received payment for, and I don't
23  remember what the rate is.  But, it's a daily rate
24  based upon my rank and number of years of service.
25  Since I was low in years of service, and I reached

**Page 167**

1  the rank of captain, there's a matrix that
2  determines that.  So I was paid for that weekend
3  work, and I was paid for the entire time as a
4  first lieutenant while I was in the basic
5  training.
6   Q.   So, when Erika Gomez made this
7  allegation against you, that was handled through
8  the military tribunals?
9   A.   Well, she had made the allegation to me
10  in text messages, I think during our separation;
11  right after our separation.
12   Q.   What did she say?
13   A.   I can't remember.  She mentioned, I'll
14  get you out of the house.  I don't remember the
15  exact text.  I think they're all in discovery.
16  I'm get you out of the house.  I'll get an order
17  of protection.  You're abusive, etc.  None of
18  which was true.  And I ignored it and I left the
19  house.  It was my decision to move both myself and
20  the boys out of that house in December of 2012.
21       Later, I would learn that she made some
22  sort of report to the Illinois Army National
23  Guard.  I was flagged, which is kind of just
24  puttin' you on pause.  You can't do anything.  I
25  mean, it's not punishment.  But you can't get

**Page 168**

1  promoted.  There's certain limitations.  And on
2  what you can do while you're flagged.  I was
3  flagged.  There was an officer appointed to
4  conduct an investigation.  He conducted an
5  investigation.  He interviewed me.  I gave a
6  written statement.  He interviewed Erika.  I
7  believe he even may have interviewed Erika's first
8  husband, who is also in the National Guard.  And I
9  never reviewed any of that.  I saw that later in
10  discovery.  And ultimately I was cleared of those
11  allegations.
12   Q.   So, you never did physically assault or
13  have any physical contact with her of an
14  aggressive nature?
15   A.   No, I did not.
16   Q.   Never struck her?
17   A.   No.
18   Q.   Did she get a protective order against
19  you at sometime?
20   A.   No, she did not.
21   Q.   She never got an injunction or anything
22  like that?
23   A.   No.
24   Q.   Or order of protection?
25   A.   Nope.  She did get one against her

LOVELACE v.
DET. ADAM GIBSON

CURTIS LOVELACE
July 6, 2018

Page 169

1 ex-husband years earlier.  But, no, that's not
2 something that was --
3    Q.   Did she ever report this to any police
4 department?  You know, other than the military
5 police?
6    A.   No.  The first that I -- I mean, the
7 first time that she reported it was my
8 understanding is when she reported it to Detective
9 Baird when he was conducting his investigation in
10 2014.
11    Q.   Detective Baird?
12    A.   I'm sorry.
13    Q.   Gibson?
14    A.   Detective Gibson, I'm sorry.
15    Q.   Okay.  So what was your financial
16 situation here now?  You were working for the
17 Army, you're still working as an Assistant State's
18 Attorney, you've stopped working for the
19 University.  Were -- was the Army and the State's
20 Attorney's office your sole sources of income
21 during this period of time?
22    A.   Yes.  During that period of time, yes,
23 for the most part.  I think I may have had one or
24 two civil cases that I was still handling.  I did
25 not have an office other than my office at the

Page 170

1 State's Attorney's office.  And I had created an
2 office in my home or in the basement of my home
3 where I would conduct those activities.  But,
4 there wasn't anything extensive.
5        So, for the most part it was the State's
6 Attorney's office, and the income I received
7 through the Illinois Army National Guard.
8    Q.   And while you were working for the
9 State's Attorney's office you were not working on
10 building a private practice?
11    A.   No.  I had started to build the private
12 practice.  And had a private practice office in
13 2005.  I shared some office space at that point.
14 And I left that office or moved out after Cory's
15 death.  It was already planned that I would move
16 out.  It just wasn't working out financially.  It
17 didn't make sense for me or them based on the
18 amount of time I was there and my level of
19 activity income in the private practice area.
20        So, I still had some cases.  I worked
21 out of my home at 1869 Kentucky.  I just
22 transferred that to 2025 Main Street where I was
23 able to dedicate a portion of the house in the
24 basement to those activities.
25    Q.   And how much would you say you earned

Page 171

1 during those periods of years from your private
2 practice?
3    A.   I think the most I would have earned in
4 the private practice would have been in 2005, and
5 I'm not sure what portion came from private
6 practice.
7    Q.   When you moved into Main Street, did you
8 sell Kentucky?
9    A.   Yes.  Not immediately.  It was on the
10 market for a while, but it did sell.
11    Q.   And did you and Erika buy the Main
12 Street home?
13    A.   Yes.
14    Q.   So when you moved out of Main Street,
15 after you and Erika broke up, you and the kids
16 moved out together?
17    A.   Yes.
18    Q.   And where did you go?
19    A.   The first night we spent at my parents
20 home.  And after that we had a discussion as to
21 how to handle that situation as far as I didn't
22 want my boys back there.  I did not want to go
23 back.  And it was pretty clear that Erika was
24 not -- and her daughter, were not going to leave
25 the house.

Page 172

1        And so in the course of that discussion,
2 I think we talked about maybe one of the boys
3 going to live with Marty, and one going to live
4 with my sister.  And one would be in the house
5 with me at my parents just because of space.  And
6 in talking with Marty, Marty said, you know, I've
7 got the space to do -- to have all three.  I want
8 all three here.  And I agreed to that.
9        And that's where they lived then from
10 that point, December of 2012 until October 30th,
11 or shortly thereafter, after we got the rooms
12 ready, when I took possession of 2025 Main Street.
13 So they lived with Marty.
14    Q.   So, that's what ultimately happened?
15 You got possession of Main Street?
16    A.   Yes.  After court proceedings, I got
17 possession.
18    Q.   You got possession.  And you filed for
19 divorce?
20    A.   I did.
21    Q.   So, when did you leave the State's
22 Attorney's office again?  I know we went through
23 this shortly.
24    A.   It was in, I believe July of 2012.
25    Q.   And were you fired?

Page 173

1   A.   I received an e-mail from Jon Barnard, I
2   believe it was on Wednesday or Thursday morning.
3   I had returned on that Sunday from two weeks of
4   National Guard training. My annual training. And
5   he sent me an e-mail that said my legal services
6   were no longer needed at the State's Attorney's
7   office.
8   Q.   So, you were terminated?
9   A.   I was terminated.
10  Q.   And did you ever find out why?
11  A.   I was shocked by that e-mail. Almost
12  immediately after I received the e-mail, I had a
13  couple sheriff deputies come and collect my keys.
14  Which I was shocked even further by. And then I
15  reviewed his e-mail. He had asked me to basically
16  give him a summary. Make sure there was a proper
17  hand off of everything that I was working on.
18       And I began working on that, as well as
19  I sent Jon an e-mail, asking him, you know, what's
20  going on. And explaining why I guess I was
21  valuable to the office.
22  Q.   And what did he say? What was the
23  response?
24  A.   His response, I didn't get the response
25  until like a week later. Apparently he went on

Page 174

1   vacation. And he didn't get my e-mail until a
2   week later. And his response was Curt, I'm not
3   going to change my mind. This is the decision I
4   made. And I personally didn't like that decision.
5   However, I accepted it, and --
6   Q.   He never gave you an explanation as to
7   why he didn't want your services any more?
8   A.   Well, he said that I was not at the
9   office enough on a daily basis to justify the
10  salary he was paying. We had had conversations
11  regarding that. I told him what I was able and
12  not able to do. And based upon what I had with
13  the Illinois Army National Guard, and my activity
14  there, and he felt that I hadn't lived up to the
15  obligations. And what his expectations were as to
16  number of hours specifically in the office.
17  Q.   What was interfering with it?
18       MS. THOMPSON: Object to form, but you
19  can answer.
20  A.   National Guard weekends, throughout the
21  week. Handling stuff like that.
22  Q.   So, it's July of 2012, you left the
23  State's Attorney's office?
24  A.   Yes.
25  Q.   And what did you do from that point on

Page 175

1   for an income source?
2   A.   Well, one, I filed for unemployment.
3   Which I received. And then I started, I continued
4   to serve in the Illinois Army National Guard. And
5   probably did more because I had more time, some of
6   which would have been paid. Some of it wouldn't
7   have been paid. And I started making decisions on
8   where to go with my life professionally.
9   Q.   And what did you decide?
10  A.   At one point I considered selling
11  insurance. And explored that option. I --
12  Q.   What did you do to explore that?
13  A.   I met with an insurance agent in Quincy.
14  A guy I had known for a while, who was interested
15  in building up his local organization. It was
16  with Prudential.
17       And so I went to some events, as well as
18  I took the state licensing test for -- I think it
19  was medical and property insurance. Or life
20  insurance. Life insurance and medical insurance.
21  Q.   Did you get licensed?
22  A.   I did receive a license in that.
23  Q.   So, did you engage in that?
24  A.   No. No.
25  Q.   What happened?

Page 176

1   A.   I started the process. The next step
2   would have been to actually start working in
3   selling insurance. I never went forward with
4   that. And then the other thing I would have had
5   to do was I think study and pass the series six.
6   And I did not do that.
7   Q.   Was the company you're talking about,
8   Prudential Financial?
9   A.   It is, yes.
10  Q.   And we, I have seen a report, I'm
11  looking at a report, in which a Sergeant
12  Vandermaiden responded to Prudential Financial on
13  November 23, 2012, in which somebody had called
14  the police about your conduct. Do you recall
15  that?
16  A.   I do recall that.
17  Q.   What were the circumstances there?
18  A.   I had access to that office. Mr.
19  Hageman, Chuck, had let me know where the key was
20  so that if I needed a place to study for that
21  exam, that I could go there and do that. That was
22  a difficult time in my life, both professionally
23  on where to go from here. I wasn't entirely
24  convinced that I wanted to leave the practice of
25  law. I was a little bit lost professionally. At

LOVELACE v.
DET. ADAM GIBSON

CURTIS LOVELACE
July 6, 2018

---

Page 177

1　the same time my relationship with Erika was
2　extremely strained.  There was a lot of
3　contentiousness between her and my children.  And
4　her and my parents.
5　　　　　And during that time period I was
6　drinking on a daily basis.  That was the Friday
7　after Thanksgiving.  I'm not sure when I --
8　probably Thanksgiving would have been the last
9　time I ate.  I left the house telling her that I
10　was going to go study for this test.  And brought
11　a -- I believe it was a bottle of wine with me.
12　And I was there, I was consuming that wine on an
13　empty stomach.
14　　　　　And that at one point I think someone
15　came to the door and knocked on the door to see if
16　it was open.  And saw me in a very disheveled
17　manner.  And had some sort of concern and called
18　the police.
19　Q.　Were you arrested?
20　A.　I was not.
21　Q.　Were you taken to the hospital?
22　A.　I was.
23　Q.　And what happened there?
24　A.　They, I can't remember if they gave me
25　an IV.  But, they just monitored my condition.

---

Page 179

1　another lawyer who I knew had an upstairs office
2　that no one was in, and he let me move in.
3　Q.　Did he charge you?
4　A.　No.
5　Q.　Who's the attorney?
6　A.　Drew Erwin.
7　Q.　And was this in Quincy?
8　A.　It was.
9　Q.　So, what did you do to try to start a
10　law practice?
11　A.　You know, I first talked to different
12　lawyers in the area, and I think I even started
13　engaging in those conversations to see if anyone
14　was interested in taking on another attorney.  The
15　challenge that I faced was my age, as well as I
16　didn't have a book of business to bring into a
17　firm.
18　　　　　So, I talked with lawyers, trying to see
19　if anyone had work that they couldn't handle.  And
20　didn't find any.  So, I continued just to work
21　through my divorce.  During that time I was going
22　to AA.  And I spent time with my kids.  As well as
23　explored other options applying, Web type
24　applications that I never really heard anything
25　from.

---

Page 178

1　Erika came to the hospital and picked me up.  And
2　I wasn't there long, and I returned home.
3　Q.　So, you didn't pursue the insurance
4　business.  You were no longer State's Attorney.
5　You were doing this National Guard work.  The kids
6　were being supported by Marty?
7　A.　They were living with Marty.  I would --
8　I would contribute both financially, but more just
9　in buying groceries and making sure that whatever
10　needs they had, whether it be school, clothes,
11　activities.
12　Q.　And your income sources at that point
13　were unemployment and --
14　A.　National Guard.
15　Q.　National Guard.  And where were you
16　living?
17　A.　I was living at my parents home.
18　Q.　Okay.  So, at some point in time did you
19　begin to open your own law practice?
20　A.　Later, I guess it was in 2013, and I
21　can't remember the time frame, I decided that I
22　did want to practice law.  Still wanted to
23　practice law.  Really didn't know what area.  But,
24　and I didn't want to be spending the entire day at
25　my parents house.  And so a gentleman who is

---

Page 180

1　Q.　Did you get any private practice
2　business?
3　A.　No.
4　Q.　So, by the time you were -- when you
5　were arrested in August of 2014, you hadn't built
6　a law practice?
7　A.　I started -- I officially opened my law
8　practice and started serving clients in January of
9　2014 after Christine and I got married in December
10　of 2013.
11　Q.　Got divorced?
12　A.　I got divorced from Erika in --
13　Q.　Oh.
14　A.　If I misspoke, I apologize.  Got
15　divorced in September of 2013.  And I married
16　Christine in December of 2013.
17　Q.　Okay.  When did you meet Christine?
18　You guys knew each other back in high school,
19　right?
20　A.　She and I did go to high school
21　together.  She graduated in '86 also.
22　Q.　When did you start dating?
23　A.　We went on one date in high school.  She
24　was my homecoming date.
25　Q.　And that was the extent of your high

---

Page 181

1  school relationship?
2  A.  Uh-huh.
3  Q.  When did you start dating again in 20 --
4  after you and Erika broke up?
5  A.  It was I believe end of May of 2013.
6  She reached out to me to let her know I was in
7  town, or she was in town to visit her grandmother
8  and friends, and invited me to join her and
9  another classmate that she was with on -- I
10  believe it was a Friday evening.  And I said,
11  sure.
12      At that point I was either at my parents
13  house, or at Marty's house with the kids.  After
14  -- I think the kids and I had some pizza at
15  Marty's house, and we watched a couple of movies.
16  And then I left later on that evening, you know,
17  at nine o'clock and went to that friend's house
18  and met her.  It wasn't a date.  But, it was
19  shortly thereafter that we started dating.
20  Q.  And so just shortly after that, you got
21  married?  December?
22  A.  Yes.
23  Q.  Okay.  And then in 2014 you started a
24  law practice, something different from what you
25  were doing with Drew Erwin?

Page 182

1  A.  Again, Drew, I really wasn't -- when I
2  started working with Drew, Drew said hey, you
3  know, Curt, I'll give you some stuff that I can't
4  do, or just timewise.  And then I'll credit
5  towards your rent.  And I did some of that work.
6  And I don't know how much we really tracked it.
7  But, I did some of that work in 2013.  And in 2014
8  Christine and I were married.  We had moved into
9  the house on 2025 Main Street.  And we were
10  deciding where to go professionally.  She had left
11  a very successful position with a Fortune 500
12  company to join me and the boys and Lyndsay in
13  Quincy.  And so she needed to decide what she
14  wanted to do.  And I needed to decide what I
15  wanted to do.
16      I decided that I was going to practice
17  law in Quincy.  I still had my license.  And so --
18  and I determined that that would be in the family
19  law area, because I saw that as the best
20  opportunity to make a living in the City of
21  Quincy.
22      So, I started advertising on the radio.
23  And started making investments in some furniture.
24  Nothing too big.  And started to market myself as
25  a divorce lawyer in the City of Quincy.

Page 183

1  Q.  You still were working out of Drew
2  Erwin's office?
3  A.  Yes.  It was still in the upstairs part
4  at that point.  Again, I had kind of developed it
5  with a little bit of furniture and made it an
6  actual working law office.
7  Q.  So, you were arrested in August of that
8  year?
9  A.  Correct.
10  Q.  So, between January and August, did you
11  get private clients?
12  A.  Yes.  I did represent private -- yeah,
13  clients.
14  Q.  And you and Christine were married at
15  this time?
16  A.  We were.
17  Q.  And where did Christine move from?
18  A.  Christine, when we started dating, lived
19  in Minneapolis, Minnesota.  And she moved to
20  Quincy October 30th of 2013.
21  Q.  So, you're -- during these from January
22  to August, how much money would you say you earned
23  practicing law?
24  A.  I don't know.  Because the practice was
25  really just starting.  I was starting to get some

Page 184

1  clients.  Some referrals.  I had collected some
2  fees.  And I was arrested.  I still have not filed
3  a tax return for 2014, is the reason why you don't
4  have that.  Because I'm not even sure where to
5  start with any of those records.  Because
6  everything -- our world was turned upside down on
7  August 27th of 2014.
8  Q.  You were only doing divorce work during
9  that 2014?
10  A.  Yes.  I think there may have been, maybe
11  a will thrown in there.  Or some other maybe civil
12  dispute.  But, my marketing, as well as my focus,
13  was on divorce work.
14  Q.  Why not criminal defense?  It would seem
15  like that would be a natural area for you to go
16  into?
17  A.  My experience with criminal defense in
18  Adams County, Illinois, and as it turns out in
19  Champaign County too for the most part, is that
20  that's an area where for the most part the public
21  defender serves most people who are accused of
22  crimes, and even serious crimes.  And that is a
23  difficult market to enter into without any sort
24  of reputation.  Meaning, you know, that typically
25  what you're going to get are the DUIs.  And

Page 185

1 there's typically, at least in Adams County there
2 were one or two lawyers, or two or three lawyers
3 who would handle the majority of that work. I
4 just didn't think it would be a profitable area.
5    Q.   Where did you advertise the law practice
6 that you discussed?
7    A.   I advertised with a radio station, doing
8 segments as far as commercials. And then there
9 was a radio talk show in the morning that I would
10 appear on, I think every other week, that was
11 designed and paid for as a commercial. But, it
12 was Curtis Lovelace, your family law lawyer in
13 Adams County, or something to that effect.
14    Q.   Sponsored content?
15    A.   Yeah, okay.
16    Q.   What was this radio station where you
17 advertised?
18    A.   It was Star radio. I think my ads
19 appeared on a couple of their stations. And it
20 was the — I can't remember if it was the AM talk
21 that — and it was specifically I remember it was
22 the Mary Griffith show.
23    Q.   This is a Quincy station?
24    A.   Yes.
25    Q.   So, when you were arrested in August of

Page 186

1 2014, did you have any idea that an investigation
2 had been opened into the death of Cory?
3    A.   I did not.
4    Q.   None at all?
5    A.   None at all.
6    Q.   Tell me about your arrest? Did Gibson
7 arrest you himself?
8    A.   He did.
9    Q.   Was he with anybody?
10    A.   Yes. He was.
11    Q.   Who was he with?
12    A.   I don't recall the names or who they
13 were. I was leaving my office approximately noon
14 hour, probably a little thereafter. I had just
15 received payment from a client and I was going to
16 deposit that in my account.
17       And so my plans were to — my car was
18 parked across the street from the office on the
19 street. Get my car, go to the bank, and then pick
20 up something for Christine for lunch. She was
21 working in the pie shop. And that is where I had
22 left her. We had one vehicle at that time. And
23 so I had actually dropped her off.
24       And so I was walking out, and I
25 immediately saw Detective Gibson standing in front

Page 187

1 of my vehicle. I reached out to shake his hand.
2 I recognized him as a police officer who I had
3 seen before. He was not dressed in uniform. And
4 I believe he told me something to the effect that,
5 I'm under arrest, place my hands on the hood of
6 the car. And he put handcuffs on me. There were
7 other officers around me. I think one in the
8 street to the right and maybe another one. And I
9 can't remember if they were in plain clothes or in
10 uniform. But, in the process of being arrested, I
11 noticed there were other officers.
12    Q.   Did you know what you were being
13 arrested for?
14    A.   He told me that I had been -- I was
15 being arrested for the murder of my wife. My
16 immediate concern was Christine because that's
17 what I heard. And I had, again, she was at the
18 pie shop, not too far away from that office and
19 where I was being arrested, you know. What's
20 going on. She's alive. I just dropped her off
21 this morning. I may have said something to the
22 effect, I don't know, and then I recall him saying
23 something about your wife, Cory Lovelace. And I
24 think I made a comment, I don't remember saying
25 this, but I think he reported that I said, she

Page 188

1 died eight years ago, or several years ago, or
2 whatever. And that was my comment.
3       And then I was placed in a back of a
4 police car, and transported to the Quincy police
5 department.
6    Q.   Were you aware of any speculation among
7 people in Quincy before this arrest that you may
8 have been guilty of murdering Cory?
9    A.   No.
10    Q.   You've never heard anything about that?
11    A.   Never.
12    Q.   So, you were handcuffed and taken into
13 custody?
14    A.   Correct.
15    Q.   And you were then interviewed, correct?
16    A.   Correct.
17    Q.   And you've read the interview recently?
18    A.   I have read the interview. I think I
19 read a portion of that interview yesterday. And
20 there was a videotape of it. And I did not review
21 the videotape in preparation. But, I'm quite
22 familiar with the videotape also.
23    Q.   Were you -- did everything that you say
24 in that statement, was it accurate?
25    A.   What I said or what he reported?

LOVELACE v.
DET. ADAM GIBSON

CURTIS LOVELACE
July 6, 2018

Page 189

1    Q.   What you said?
2    A.   Yes.  Everything that I stated, that I
3  could remember during that interview, that was
4  recorded, I believe that that was my memory at the
5  time.  Yes.
6    Q.   And it was accurately transcribed and
7  all that?
8    A.   That's one area that I disagree.  That
9  it wasn't accurately transcribed.  There were
10  portions, and one specific portion of that report
11  that the minute I reviewed it in discovery while I
12  was in the Hancock County jail, didn't seem
13  accurate.
14        And after that I viewed the videotape,
15  and it was absolutely not accurate.
16    Q.   And the report you're talking about, was
17  that Gibson's summary of the investigation?
18    A.   Yes.  As part of his police reporting,
19  he picked out portions of that interview to write
20  in his report.
21    Q.   And what was it that you recall that was
22  incorrect?
23    A.   The one thing that stood out
24  immediately, and this is what I did check on, I
25  didn't review the videotape again, but I'm --

Page 190

1  there was a question on whether or not I coached
2  the children.  And he said that I did not answer
3  that question.  And I did not coach the children.
4  And I thought I had answered that question.  And I
5  believe if you go into the video, he asked me that
6  question, and I say no, I did not.
7    Q.   So, he said you did coach the children?
8    A.   He said that -- he said I never
9  responded to his question of whether or not I
10  coached the children.
11    Q.   And you in fact did respond by saying
12  you did not coach the children?
13    A.   He asked me that question, and I said
14  no, I did not.
15    Q.   Was there anything else you found to be
16  incorrect?
17    A.   I mean, my impression of that was that
18  he picked and he chose what to include in that
19  report and what not to include in that report.
20  But the important thing was, there was a videotape
21  of that, that does accurately reflect what he
22  asked and what I answered.
23    Q.   Yes.  So, after the interview you were
24  arraigned?
25    A.   I'm sorry, repeat the question?

Page 191

1    Q.   Well, you were interviewed.  What
2  happened next?
3    A.   Okay.  Sure.  I was interviewed.  I
4  don't know if it was approximately two hours, an
5  hour and a half.  I answered all of his questions.
6  He asked me if I would take a polygraph.  I agreed
7  to do that.  I signed some sort of form that said
8  I would.  And he started, stopped, and brought
9  someone else in.  And the other person started
10  asking me questions.
11        And so at one point then it was
12  concluded.  He left me there.  And that's when I
13  figured out that no matter what I said to him, he
14  did not care what I had to say, or whether or not
15  it -- or he didn't really care about the truth.
16  It was then that I realized that I had been
17  indicted.  And my life would be forever changed.
18  And I had no idea what would happen next.  Or how
19  I would get through whatever would happen.  And
20  who would be my attorney, or where I was going.
21        So, that was I guess my thought process
22  as I sat in that room after he interviewed me.
23  Then the next step was he came back in, I believe
24  he put the handcuffs back on, and I was
25  transferred to the Adams County jail.

Page 192

1    Q.   Did you ever take a polygraph?
2    A.   No.
3    Q.   So, you were in the Adams County jail
4  for how long before you were taken somewhere else?
5    A.   Probably not more than an hour.
6    Q.   Where did you go after that?
7    A.   The Hancock County jail.
8    Q.   And why were you transferred from Adams
9  County to Hancock County jail?
10    A.   I was told by Sheriff Brent Fisher, who
11  I did know, that the jail had made a determination
12  that since I was a former prosecutor, that it
13  might cause disruptions.  And be a potential
14  safety risk for me if they put me in the Adams
15  County jail.  And that they had contacted the
16  Hancock County jail, and the Hancock County jail
17  agreed to take me and house me there instead.
18    Q.   So there was a concern that people you
19  had prosecuted at some point might have been in
20  the Adams County jail?
21    A.   Yes.  That those people or somehow I
22  would cross paths with people that I would have
23  prosecuted or who would have been prosecuted while
24  I was in that office.
25    Q.   All right.  So, when you would appear in

Page 193

1 court in Adams County, you would have to be
2 transported from Hancock County?
3 A. Correct.
4 Q. And bond was set at how much?
5 A. Five million dollars.
6 Q. And it was a cash bond?
7 A. It was five million. Had to post ten
8 percent. So it was five hundred thousand.
9 Q. Which you couldn't make?
10 A. No.
11 Q. Who was the judge who set the bond?
12 A. The judge who set the bond amount was
13 Judge Scott Walden, who signed my arrest warrant.
14 Q. You then were in Hancock County
15 throughout your first trial?
16 A. Correct.
17 Q. Hancock County jail?
18 A. Well, until the beginning of my first
19 trial I was in Hancock County.
20 Q. And your trial was in Adams County?
21 A. My trial was in Adams County, and while
22 I was being tried I was housed in Adams County.
23 Q. In Adams County. Okay. And the first
24 trial of course ended in a hung jury.
25 A. Correct.

Page 194

1 Q. And you were incarcerated up until the
2 end of the first trial, correct?
3 A. And thereafter.
4 Q. And thereafter? And tell -- what was
5 the experience like being incarcerated?
6 A. Like no other experience that I had ever
7 had. I arrived. They for the most part I guess
8 were very professional there. Brent was very
9 professional too.
10    I was -- I stripped down and all my
11 clothes were placed in a locker. I put on a black
12 and white two-piece outfit. I think I kept my
13 socks and my underwear and maybe even a T-shirt
14 on. And I was issued a pair of orange Crocs.
15 That became my attire except for the time in Adams
16 County, they had a completely different uniform,
17 was my daily outfit until I was released.
18    I was placed in the -- they placed me in
19 what they called work release section. Idea being
20 that the -- it was my understanding they didn't
21 see me as any sort of threat or concern, and they
22 thought the work release would be the -- maybe the
23 easiest place to put me. It was --
24 Q. So your fellow inmates there are on work
25 release?

Page 195

1 A. None of them were on work release at the
2 time. Hancock County sort of mixed and matched.
3 They were selective who they put in that area.
4 Two of the guys who were in there when I arrived
5 were trustees and would leave during the day just
6 to work inside and outside the jail on various
7 tasks.
8 Q. What do you mean by trustee?
9 A. They called them trustees. Essentially
10 they, for no pay, they -- it was just I guess an
11 opportunity to get out, mow grass, pick up litter,
12 help make the food. Smoke. Chew tobacco.
13 Whatever. It was just the freedom and the
14 opportunity to get outside.
15    So, there were a couple of those, as
16 well as there were ten -- there were I think eight
17 beds. There were eight bunks. There were bunk
18 beds. And might have been like five people, five
19 or six people in at the time. I was on a top
20 bunk. There was a guy below me.
21 Q. So you weren't in a separate cell?
22 A. I was not. It was all one area of bunks
23 against the wall with a table with half a dozen
24 seats around. A TV on the wall. A shower. One
25 toilet mixed in with a sink sort of configuration.

Page 196

1 Q. Kind of barracks style?
2 A. Yeah, it was barracks, I would call open
3 bay from a military standpoint. And so I spent
4 from August 27th until I think January or February
5 in there with people going in and out.
6    At one point I -- a new person came in
7 who didn't like lawyers. Didn't like prosecutors.
8 And was threatening. I reported that. And it was
9 agreed, which I was fine with, that I would be
10 moved. I was concerned that something might
11 happen. And I just voiced that concern. So they
12 moved me into then a more traditional cell, where
13 I had a common area and there were two separate
14 rooms that were locked down at night with a bunk
15 bed.
16 Q. And cell mate?
17 A. Cell mate was someone who had been
18 charged with a series of burglaries. And he had a
19 drug addiction. And so I shared a cell with him
20 until he took a plea deal and went to prison. I
21 was in there like one or two days. I remember I
22 was with him during the NCAA basketball
23 tournament. So, through March. He took a plea
24 deal, left. I was in there like one or two days
25 by myself. And at that point they needed that to

Page 197

1 isolate someone else. And so then I was moved
2 from there into a general population area. Where
3 again, I had my individual cell, but I would be
4 with anywhere from six to a dozen inmates.
5 Q. In the same cell?
6 A. The common area we shared. Each of us
7 had an individual cell that would be locked down
8 at night and lock us in.
9 Q. So, did you -- were you ever physically
10 assaulted in any way while you were in jail?
11 A. No, there was that one incident that I
12 felt that there was a possibility that that would
13 happen. And so I called that to the attention of
14 the jail administrator, and she moved me.
15 Q. Did you receive any medical treatment
16 while you were in the jail?
17 A. Yes. I, while I was in jail, and I
18 can't remember, it was probably in 2015, I
19 discovered that I had a pelvic hernia. Discovered
20 a bulge. And I reported that. Put in a request
21 to see the doctor. The doctor would come every
22 Wednesday sometimes. Sometimes it would be the
23 next week. I visited with him. They -- he said
24 yeah, that's what it looks like, but you need to
25 be looked at with a specialist.

Page 198

1     So I didn't hear anything back for two
2 or three weeks. And then one morning I got up and
3 they said you're going to Quincy. And so I was
4 shackled. I remember it was wintertime.
5 Shackled, which I typically traveled in, and
6 appeared in court wearing the same uniform with
7 the shackles and leg irons.
8     And they took me to Quincy Medical
9 Group. Walked me into the lobby and into the
10 public elevator. I'm not so sure they could have
11 parked any further away from the entrance. And
12 walked in there. Sat in a waiting room in Quincy
13 Medical Group for a period of time until the
14 doctor would see me. I filled out a form. I went
15 in. The two sheriff deputies went in with me.
16 And then an exam where I dropped my pants and he
17 examined me with those two officers in there. And
18 I even think there was an internist. It was
19 pretty crowded. And he said yes, you have a
20 pelvic hernia, and you need to have surgery.
21 Q. Did you have surgery?
22 A. I did not.
23 Q. You did not?
24 A. I did not.
25 Q. Have you had it since?

Page 199

1 A. No.
2 Q. You still have that condition?
3 A. I still have it.
4 Q. Why didn't you have surgery?
5 A. I had concerns about the finances of it.
6 I didn't have any health insurance. And --
7 Q. The county wouldn't pay for it?
8 A. Well, the county would pay for it. I
9 was told they may seek reimbursement for it. I
10 didn't want to put any more strain on my family,
11 specifically Christine. And I'd say more of the
12 -- more of the concern was that I was told that I
13 would not know when or where, nor would Christine
14 know when or where that would occur. I talked
15 with her about that. And she was concerned about
16 that, as well as my recovery in the jail.
17     And we both agreed that it's something I
18 could live with, and I did. At one point I did
19 come down with some sort of flu, fever, shaking.
20 Someone had came into the work release cell sick
21 and left it with us. He left, but the sickness
22 stayed.
23     And I put in a request the next morning
24 to see the doctor, and then a week and a half
25 later I saw the doctor and he asked me how I was

Page 200

1 doing. And I said well, I'm okay now. He said
2 well, you need better nutrition. I explained to
3 him what our nutrition was. And then that's when
4 I learned that they allowed vitamins. And so
5 Christine started giving me vitamins.
6     I didn't see a doctor based upon the
7 circumstances, but while I was in jail, I
8 developed what I can only self diagnose as a drop
9 foot where I couldn't lift up my foot, or put any
10 pressure. It just kind of would drag. I don't
11 know the cause. I'm going to speculate that it
12 had something to do with the fact that the only
13 shoes that I had were Crocs. And I did run for
14 exercise in Crocs. And I suspected that I had
15 something to do with the movement or the -- that
16 type of a shoe with repetitive running.
17     And so I scaled back on that physical
18 activity and it seemed to improve. And it doesn't
19 impact me now.
20     The other physical thing that I suffered
21 while I was there was weight loss. I won't go
22 into the details of the diet unless you want to
23 know. But, there was a limited amount of
24 calories, pretty much empty calories. Same thing
25 every day. I ate all of it. And --

LOVELACE v.
DET. ADAM GIBSON

CURTIS LOVELACE
July 6, 2018

Page 201

1  Q.   What was it?
2  A.   Frozen food. We had a Pop Tart and a
3  cup of milk for breakfast every morning. For
4  lunch we either had a potpie and a peanut butter
5  and jelly sandwich or Totino's pizza. And then we
6  would have a Banquet TV dinner for dinner. Mix
7  and match however you will. They kind of changed
8  things up with different flavors. I was
9  exercising. I felt it was important to do that
10 for not only my physical but mental well being,
11 and also I was able to spend time by myself in a
12 multi-purpose room. Essentially it was a
13 racquetball court, the best way to describe it.
14 And I would exercise, do calisthenics, do football
15 exercises. I would do running three times a week.
16      And I think it was in June of 2015 I
17 appeared in court in Cass County. So, people had
18 a full view of me because they walked me into
19 court because that is where the judge was from.
20 And he had to schedule the hearing there. And at
21 that point Christine said, have you looked at
22 yourself in a mirror? And I said no. And I felt
23 like I was in pretty good shape. And I was. I
24 could do lots of pushups. Lots of sit ups. My
25 running, my conditioning was good. And she said

Page 202

1  no, have you really looked at yourself? I said
2  there's no mirrors here. And she goes, do you
3  know --
4  Q.   Do you want to take a break?
5  A.   No, I'll finish. She said, do you know
6  how much you weigh? And I said well, no, they
7  really don't allow us to weigh ourselves. She
8  goes, you've lost a ton of weight. She goes, you
9  look bad. And the media had commented on it
10 apparently. And so --
11 Q.   How much did you lose?
12 A.   Well, I sort of talked one of the
13 guards, because by that time I got to know them
14 pretty well because I had been in there longer
15 than anyone else. So I said hey, would you mind
16 bringing me a scale? And I did. And I weighed
17 175 pounds.
18 Q.   And that was down from what was your
19 normal weight?
20 A.   I think I went in probably about 245.
21 So, my boys and Christine said, okay, things got
22 to change. You can't run any more. And so I
23 adopted a regimen of yoga. They sent me a yoga
24 book. Or actually yoga poses and taught me a
25 little bit just in letters. And then later I got

Page 203

1  a yoga book. I don't think they sent it to you.
2  I think someone gave it to me. And then even
3  towards the end I was doing some, and not very
4  good, I'm sure, but tai chi. And I very much
5  limited my activity. And then after the first
6  trial, Christine had -- she had gotten to know the
7  staff pretty well too, asked the jail
8  administrator if it would be okay if she brought
9  food. And the administrator said yes. And so she
10 started to bring food. Not just for me, because
11 she couldn't do that.
12      So, she just started bringing groceries
13 to the jail. So the food improved a little bit.
14 So --
15 Q.   You were eventually released, at some
16 point in time you were released on a home
17 confinement, correct?
18 A.   I was, yes.
19 Q.   And was that after the first trial?
20 A.   Yes. Yes. That was --
21 Q.   The first trial ended when? February of
22 2016, if I'm correct?
23 A.   Yes, I believe that is correct, yes.
24 Q.   And you were incarcerated at Hancock
25 County the entire time except for during the trial

Page 204

1  when you were housed in Adams County?
2  A.   Correct.
3  Q.   And you're saying they brought in a
4  judge from Cass County to oversee the trial?
5  A.   Yes; I mean, Judge Walden set the bond,
6  I never appeared before Judge Walden. All the
7  other judges in the county, because I had -- some
8  I had practiced law with, some I had worked with,
9  recused themselves. The chief judge assigned it
10 to Judge Butler. We talked, I talked to my
11 attorneys after my attorneys became my attorneys,
12 about --
13      MS. THOMPSON: I'm going to instruct you
14 not to talk about things you discussed with
15 counsel.
16 A.   Okay. All right. So, ultimately Judge
17 Hardwick was assigned to the case from Cass
18 County. And he oversaw all the proceedings in
19 both trials.
20 Q.   Both trials?
21 A.   Both trials.
22 Q.   The second one though was held in
23 Champaign County?
24 A.   Sangamon County.
25 Q.   Sangamon County in Champaign.

LOVELACE v.
DET. ADAM GIBSON

CURTIS LOVELACE
July 6, 2018

Page 205

1    A.   Sangamon County in Springfield.
2    Q.   I'm sorry, Springfield. So the judge
3  would travel to court then?
4    A.   Yes. Most of the proceedings were in
5  Adams County. And we had a couple of court
6  appearances in Cass County because he needed to be
7  there. And so I was transported there. Both
8  during while I was confined, as well as after I
9  was out on home confinement. And then the trial
10  was in Sangamon County.
11    Q.   Let's take a break. And after we come
12  back from a break, Mr. Hansen is going to ask
13  questions. I'm not finished. But, I promised
14  that he needs to have some time to question as
15  well.
16        MS. THOMPSON: You guys can apportion
17  your time however you want.
18        MR. HANSEN: Well --
19        MR. DiCIANNI: There may be a
20  possibility that we're going to need a second
21  session. I mean, this has been a lot to cover in
22  a seven hour session. And Mr. Hansen has a right,
23  we have already gone for five. So we have got two
24  hours left. And he has some and I have more. So,
25  if it's not something you would agree to, I think

Page 206

1  we might have to ask for the court's intervention.
2        MS. THOMPSON: We'll confer at the end.
3  I'm not sure we agree, but we'll talk about that.
4        VIDEO OPERATOR: Now going off the
5  record. The time is approximately 2:53 PM.
6        (The time is 2:52 p.m.)
7        (Deposition resumed at 3:00 p.m.)
8        VIDEO OPERATOR: This is the beginning
9  of recording number four of the videotaped
10  deposition of Curtis Lovelace. We're now going on
11  the record. The time is approximately 3:01 PM.
12        EXAMINATION BY
13        MR. HANSEN:
14    Q.   Curt, you mentioned earlier in
15  questioning by Tom, who represents the city, I
16  represent the county. You and I have known each
17  other for a long time, correct?
18    A.   Correct.
19    Q.   Okay. Dating back to high school, if
20  not shortly thereafter, true?
21    A.   True.
22    Q.   Okay. Our kids have played sports
23  together; you coached my kid, I coached your kid,
24  true?
25    A.   That is correct.

Page 207

1    Q.   Okay. However, since 2014 and your
2  arrest we have not spoken, is that true?
3    A.   Correct. We have not spoken.
4    Q.   And we never practiced law together,
5  right?
6    A.   No.
7    Q.   I'm going to jump around a little bit
8  because you've been asked a lot here today, but
9  I'm going to go over some things. And as you were
10  instructed earlier, if I ask a question you don't
11  understand, please tell me, okay?
12    A.   Okay.
13    Q.   I want to go back to when you were
14  married to Cory. You had four children of that
15  marriage; the oldest is Lyndsay, what is Lyndsay's
16  middle name?
17    A.   Lyndsay's middle name is Luvaas.
18    Q.   How do you spell that?
19    A.   It's L-U-V-A-A-S. And I believe there
20  is some sort of oompfla or something that sets off
21  one of those that you probably don't have on your
22  keyboard.
23    Q.   That is not a common name. What was
24  that derived from? Is that a family name on your
25  side or Cory's side?

Page 208

1    A.   That would be -- it was a family name on
2  Cory's side. And I believe it has some Norwegian
3  origin that came from John's side of the family.
4    Q.   To your knowledge, her legal name is
5  still that, correct?
6    A.   To my knowledge, yes.
7    Q.   And your oldest son is Logan, correct?
8    A.   Uh-huh.
9    Q.   Is that a yes?
10    A.   Yes.
11    Q.   And he was born Logan Didrik Lovelace,
12  true?
13    A.   Yes. We named him Logan Didrik,
14  D-I-D-R-I-K, yes.
15    Q.   Taken from Cory's last name, which if
16  you would put an S-E-N on that would have been her
17  last name?
18    A.   That is correct. That is the origin.
19    Q.   And that has since been changed, true?
20    A.   Correct.
21    Q.   And that was changed to your middle name
22  after your marriage to Christine, true?
23    A.   Correct.
24    Q.   Your next son is Lincoln, and his
25  original middle name was what?

LOVELACE v.
DET. ADAM GIBSON

CURTIS LOVELACE
July 6, 2018

Page 209

1    A.   Tolak.
2    Q.   T-O-L-A-K?  I took that out of his
3  school records.
4    A.   Okay.  All right.  I want to say it was
5  even misspelled in the school records.  I want to
6  say it's T-O-L-L-A-C-K.  But, I can not remember.
7    Q.   And whose name was that taken from?
8    A.   That also had some Norweigian origin on
9  Cory's father's side.
10   Q.   And that has since been changed to
11  Monroe, true?
12   A.   Correct.
13   Q.   And that was again, after you had
14  married Christine?
15   A.   Correct.
16   Q.   And Larson's original maiden name, or
17  excuse me, original middle name, was?
18   A.   Paul.
19   Q.   And is it still Paul?
20   A.   It is, correct.
21   Q.   So, your two oldest sons, and any
22  reference that they had to the Didriksen side of
23  the family has been removed from their name, true?
24   A.   Their middle name was changed to
25  something.  I don't know.  I won't agree that it

Page 210

1  was any sort of removal from the family.
2    Q.   Well, it removed -- this is a "yes" or
3  "no" answer.  It removed them, their names, from
4  the association they had with their natural
5  mother's side of the family, true?
6    A.   It did remove their Norwegian connection
7  to that family.  Yes.
8    Q.   And that's because Christine wants no
9  connection to Cory with any of your children,
10  true?
11   A.   No, that's not true.
12   Q.   All right.  Well, let's -- we'll get
13  into that.  Let's go back to your marriage to
14  Cory.  You moved back in 1994 to start private
15  practice, right?
16   A.   Correct.
17   Q.   And would you agree with me that Cory
18  did not like the long hours you worked in the
19  private law firm?
20   A.   I think there were times that, yes.  She
21  did not like — there were many evenings I would
22  go back to the office, as well as an expectation
23  that I would work on Saturdays.
24   Q.   And in fact, it was with some of her
25  urging for you to look for another job that you

Page 211

1  started looking and ended up at Dot Foods, true?
2    A.   No.  That's not true.
3    Q.   You don't agree with that at all?
4    A.   No.
5    Q.   So you start with Dot Foods in 1999,
6  right?
7    A.   1998, I think.
8    Q.   Okay.  And again, you've talked about
9  earlier that Cory did not like the hours
10  associated with Dot Foods, and the drive back and
11  forth to Mt. Sterling which took you away from the
12  home?
13   A.   Yes, that's correct.
14   Q.   Okay.  Now, you had said part of the
15  reason you and Cory never discussed divorce is
16  because you wanted to provide a stable home for
17  your kids.  You said that on direct testimony.  Do
18  you remember that?
19   A.   I said I'm sure that was one of the
20  reasons.
21   Q.   Okay.  You would agree with me that you
22  and Cory fought in your home in front of your
23  children?
24   A.   We did.
25   Q.   You agree that it got violent in front

Page 212

1  of your children?  You described things earlier
2  today in your testimony?
3    A.   I described incidents or an incident
4  where she had thrown something at me or had pushed
5  or shoved me.
6    Q.   There was screaming in front of the
7  children?
8    A.   Yes.
9    Q.   You were both alcoholics?
10   A.   In hindsight, yes.
11   Q.   There was laundry all over the house;
12  would you agree with that?
13   A.   The house was not kept in good order.
14   Q.   And in fact, Marty, Cory's mom would
15  come over to help, and Cory would yell at her for
16  doing that, correct?
17   A.   I don't recall Marty coming over to
18  help.  I recall Marty coming over and would
19  complain, and then there would be yelling back and
20  forth.
21   Q.   Okay.  You had pets at the time?
22   A.   We had -- yes.
23   Q.   And was there pet feces located in the
24  house?
25   A.   Not that I'm aware of.  I mean, what

LOVELACE v.
DET. ADAM GIBSON

CURTIS LOVELACE
July 6, 2018

---

Page 213

1  time frame are we talking about?
2  Q.  2004 and 2005?
3  A.  I mean, we had pets. I'm sure that a
4  pet may have had an accident. But, there wasn't
5  pet feces found in the house.
6  Q.  At this point in time all the way
7  through -- well, strike that. When did your
8  sister, Kim, get married?
9  A.  I can't recall if it was in 2004 or
10  2005. And I believe it was a June or summer
11  wedding. So, it may have been 2004. But I'm not
12  positive.
13  Q.  Up until that time, your children had no
14  relationship with your parents?
15  A.  Correct.
16  Q.  Okay. And after spring of 2015, they
17  have had no interaction with your parents since
18  then, correct?
19  A.  I am not certain when they stopped
20  interacting with my parents. But that is probably
21  a proper time frame. I believe they interacted
22  with my parents in December of 2014. Did you say
23  2015?
24  Q.  I did.
25  A.  Okay. And I am aware that my parents

---

Page 214

1  did go to Florida in 2015. And I don't think they
2  had any interaction after they returned from
3  Florida.
4  Q.  When is the last time you had any, you
5  personally, had any interaction with your sister,
6  Kim?
7  A.  I believe I talked to her on the phone
8  shortly after my arrest.
9  Q.  That would have been in August of 2014?
10  A.  Yes. I believe she may have attended a
11  day in the first trial, or I think I might have
12  seen her. But, I didn't interact with her.
13  Q.  And your children have not interacted
14  with her or their cousins since then, have they?
15  A.  No.
16  Q.  And as we sit here currently, your
17  children have not interacted with Cory's mother,
18  Marty, since the day of your arrest, is that
19  correct?
20  A.  Correct.
21  Q.  And I believe, did that relationship end
22  for your boys with Marty prior to the date of your
23  arrest after you had married Christine?
24  A.  No. It did not. They had a
25  relationship prior to my arrest.

---

Page 215

1  Q.  Okay. And your parents fronted you the
2  hundred thousand dollars for the attorney's fees
3  in your first trial, correct?
4  A.  Yes. They paid the $100,000.
5  Q.  And you have not paid them back any of
6  that, have you?
7  A.  I have not.
8  Q.  Okay. And in fact, didn't your parents
9  voice to you in a letter while you were in jail
10  the fact that they didn't like the fact that you
11  wouldn't stand up to any of the women in your
12  life?
13  A.  I remember a letter that I received from
14  them that -- if you have a copy, I can review that
15  and see that. I remember a letter from them that
16  was critical of me and it demanded payment.
17  Q.  Well, what was it that they were
18  critical of when Christine took the grand kids
19  away from them when your mother wrote you in July
20  of 2015, when your mom said, Curtis, you
21  absolutely stabbed us in the heart when you again
22  took our grandsons away from us. We don't
23  understand what we did. Do you know what that was
24  in reference to? It's plaintiff's Bates stamp
25  page 012053?

---

Page 216

1  A.  And you say that is a letter from July
2  of 2015?
3  Q.  July 1, 2015, from your mother to you.
4  A.  Yes. I did not discuss that with my
5  mother as far as what she meant by that.
6  Q.  Okay. But, at this point in time the
7  grand kids had been taken away from them?
8  A.  No, I don't believe the grand kids had
9  been taken away from them. They had not contacted
10  them, and Christine had not contacted them. Or
11  there was no communication between them.
12  Q.  Let's do this. Mark that, would you.
13  (Whereupon, Deposition Exhibit No. 9 was
14  marked for identification.)
15  BY MR. HANSEN:
16  Q.  Have you had a chance to read that?
17  A.  Uh-huh.
18  Q.  This is a letter dated May 5 of 2015 to
19  you from your mom and dad, isn't it?
20  A.  It is.
21  Q.  And it says, Curtis, you have just
22  finished our relationship with you. That is the
23  first sentence, did I read that correctly?
24  A.  Correct.
25  Q.  Do you know what your father is

---

**Page 217**

1  referring to as he states that in the first
2  sentence of this letter?
3     A.   I read it as, you have just finished our
4  relationship with you.  I have --
5     Q.   Was it in specific response to something
6  you did, do you know?
7     A.   I don't recall.  I don't recall any
8  conversation or letter that precipitated this.
9     Q.   Okay.  Then the second paragraph says,
10  we are tired of trying to help you all your life
11  and how you have never been appreciative for
12  anything we do for you.  You have never stood up
13  for yourself or you family or your beliefs.  You
14  just say what a woman tells you to say.  Did I
15  read that correctly?
16     A.   Yes, I believe that's what it says.
17     Q.   Did you have any follow-up with your dad
18  or mom about this, and what they meant?
19     A.   I did write them.  I don't know if I
20  specifically responded to this letter.  I don't
21  think I did.  And I think this probably would have
22  been the same time frame that I attempted to call
23  them and I was blocked.  But, again, a lot of that
24  runs together as far as 2015.
25     Q.   And as of this time, was your parents

**Page 218**

1  still visiting you in the Hancock County jail?
2     A.   No.
3     Q.   I want to hand you another letter, but
4  before I do, did you have certain pen names you
5  referred to Christine and she referred to you as
6  when you were writing her from the Hancock County
7  jail?
8     A.   Yes, there were times that I would refer
9  to her as Myrtle, and she would refer to me as
10  Alfred.
11     Q.   And why was that?  Were you afraid the
12  mail wasn't getting out right or what?
13     A.   No.  Those were pet names that we
14  created, I think either while we were dating or
15  possibly after we were married.  We took some sort
16  of Facebook quiz that would determine your old
17  person name.  And when she took it, her old person
18  name was Myrtle.  And my old person name was
19  Alfred.
20            And we would occasionally refer to each
21  other by those names, with the meaning that we
22  would be together for a long time, and grow old
23  together.  And then I can't remember who initiated
24  that, whether it was me.  It was probably
25  Christene.  Just as a way to give me comfort, is

**Page 219**

1  the way I interpreted it.
2            And so there were many letters that we
3  referred to each other as that.
4     Q.   So, when I see a letter to Myrtle from
5  Alfred, that's to Christine from you?
6     A.   Yes.  I'm Alfred and she's Myrtle in the
7  correspondence.
8     Q.   Now, after the relationship started with
9  Erika, you and her bought a house in 2008, was it?
10     A.   Correct.
11     Q.   And that's when you moved from Kentucky
12  to Main Street, correct?
13     A.   Correct.
14     Q.   All right.  Let's go back, you were
15  asked some questions about Kentucky and QU.  Your
16  house on Kentucky was seven blocks from Quincy
17  University, correct?  You come out your house, you
18  turn right to go to 18th street, you cross Main,
19  no excuse me, you cross Jersey, you cross Main,
20  Hampshire, Vermont, Broadway, and then Oak Street
21  is where QU is, correct?
22     A.   Correct.  My -- the classroom that I
23  thought and was in the building, which I guess
24  would have been another half a block up, in the
25  main building.

**Page 220**

1     Q.   Okay.  And you would agree with me that
2  Erika bullied your kids?
3     A.   In evaluating things in 2012, as well as
4  learning a lot of things after the divorce, or
5  during the divorce, and after the divorce, I do
6  believe that Erika abused my children.
7     Q.   She intimidated them?
8     A.   Yes.
9     Q.   And she favored her daughter over your
10  children?
11     A.   Yes.
12     Q.   And you would agree with me that that
13  was not a good home environment for your children?
14     A.   No.
15     Q.   And you would agree with me that Lyndsay
16  wasn't even living with you and Erika and the boys
17  on Main Street, correct?
18     A.   She did live with us for a period of
19  time in 2008, and moved out in December of 2008.
20     Q.   And when she moved out in December of
21  2009, she would have been 12 years old at that
22  time, correct?
23     A.   I believe it was December of 2008 that
24  she moved out.  We moved in, in August of 2008,
25  and --

LOVELACE v.
DET. ADAM GIBSON

CURTIS LOVELACE
July 6, 2018

Page 221

1  Q.  So she would have been 15?  2008?  She
2  was born there '93?
3  A.  Yes.
4  Q.  And she moved in with Marty?
5  A.  Correct.
6  Q.  And you had -- at the time you lived on
7  Main Street -- well, strike that.
8      Prior to moving into Main Street, when
9  you lived on Kentucky and had the boys by yourself
10  from '06 after Cory's death, to '08, would you
11  have started the routine of taking the boys to the
12  Crickard's house in the morning to drop them off
13  for school, and then pick them up later that
14  afternoon or evening after you had got done from
15  work?
16  A.  I don't know if that was the routine
17  that would occasionally, or would happen.  I'm not
18  sure of the regularity.  And that activity of
19  going to school with the Crickards, whether it be
20  walking, which it was a lot of times; continued
21  off and on throughout.  So, I don't know what you
22  mean by routine.
23  Q.  Would you agree with me that the boys
24  spent a considerable amount of time at the
25  Crickard's house, to the point where Maureen

Page 222

1  Crickard became a motherly figure to them?
2  A.  Logan was best friends with George, and
3  spent time with George there and elsewhere in the
4  neighborhood.  They were very good friends.
5  Lincoln, however, was not really the same age as
6  anyone else in the Crickard family.  And Larson
7  interacted with Jack, who was a special needs kid
8  who he had good interaction with.
9      So, as far as Logan and Larson, they
10  would spend time at the Crickards.  Lincoln not as
11  much.
12  Q.  Would you agree with me that your
13  children did not want to spend time in the house
14  with Erika when you were married to her?
15  A.  I would agree that there may have been
16  times that they didn't want to spend time with
17  her.  The fact is they did spend time with her and
18  me and her throughout the marriage.
19  Q.  Well, was your divorce from Erika
20  bitter?
21  A.  It was contentious.
22  Q.  That's what I mean.
23  A.  Yeah.
24  Q.  And you filed in December of 2012, and
25  it wasn't finalized until the following year?

Page 223

1  A.  Yes.  It was -- the judgment was entered
2  in September of 2013.  Yes.
3  Q.  And I'm not sure, I understood you had
4  not connected with Christine, am I correct, at any
5  point in time up through the end of the year in
6  2012, is that a fair statement?
7  A.  My first contact with Christine after
8  high school, which I don't recall, but we have
9  researched, is when we became Facebook friends.
10  Which would have been, I believe in May of 2010.
11  She looked that up on her Facebook account.
12  Q.  You have a Facebook account?
13  A.  Yes, I had a personal Facebook account
14  back then.
15  Q.  Did you end that account?
16  A.  I did.  That account was closed by
17  Christine shortly after my arrest.
18  Q.  Christine still have a Facebook account?
19  A.  She has a Facebook account that is
20  Christine Curt Lovelace.  It's her account, but we
21  share that.
22  Q.  After Cory died, you received between 35
23  and $40,000 in memorials after her death, is that
24  correct?
25  A.  No.  I don't believe that amount is

Page 224

1  correct.
2  Q.  So, you dispute the -- well, strike
3  that.  What was the amount then?
4  A.  I recall it being around 20, maybe
5  $25,000.  But I remember it being around $20,000.
6  Q.  And you did not set aside any of that
7  money for a college fund for the children, and
8  instead you spent that money, correct?
9  A.  I did set aside a good portion of that
10  money.  I did spend a portion of that money
11  initially on household expenses.  And then over
12  the years that followed, or year that followed, I
13  believe in 2007 that money was spent primarily on
14  club dues, which I was struggling to afford.
15  Q.  And see, that's -- this is going to take
16  a long time because my question simply was, did
17  you set aside the money in a college fund or spend
18  it?  And the answer was, you ended up spending it
19  all.  So none of it was set aside in a college
20  fund for the children, correct?  It's a yes or no
21  question.  He wants to spin yarn on it.  It's yes
22  or no, did you set up a college fund for your kids
23  with any of the memorial money from Cory?
24  MS. THOMPSON:  That's a different
25  question that you asked.  You are free to answer

Page 225

1  any question you want, but he answered your
2  question fairly.
3    A.   I think I can clear this up.  I did set
4  aside a portion of that.  And then I went to what
5  I set aside, and spent it.  And I did spend it on
6  something other than college.  It was our personal
7  expenses during that period of time.
8    Q.   Because you continued your membership at
9  the Quincy Country Club until 2008 when you had a
10  bill that was approximately $3,000 or more that
11  remained unpaid, correct?
12    A.   Yes.
13    Q.   And in fact, you tried to resign and
14  they rejected your resignation until you paid the
15  bill in full, true?
16    A.   That is true.
17    Q.   And in fact, you never paid the bill and
18  they had to send you to collection when you
19  settled it for a discounted amount, correct?
20    A.   Correct.
21    Q.   And part of the memorial money that
22  you're talking about, was that used to pay the
23  settlement on this country club bill that you had
24  unpaid?
25    A.   No.  I think those funds had been used

Page 226

1  by the time I settled that account in collection
2  with the country club.
3    Q.   Did Cory have any life insurance?
4    A.   No, she did not.
5    Q.   You didn't have any power of attorneys
6  at the time, did you?  You had a will you said,
7  didn't you?
8    A.   I had a will.  There probably was a
9  health care power of attorney.  And there may have
10  been just standard power of attorney documents
11  that would — as I indicated, Dennis Gorman
12  prepared those.
13    Q.   You didn't have a trust set up?
14    A.   No.
15    Q.   Did you at any point in time pay for any
16  of your daughter, Lyndsay's, college expenses,
17  tuition, otherwise, at the University of Iowa?
18    A.   I made two payments to her.  I think one
19  was shortly before she started as a freshman.  She
20  had been requesting money.  I did not — I was
21  embarrassed and did not tell her that that money
22  was no longer there.  I took a personal loan out.
23  And used part of that personal loan to write her a
24  check for $1,000, I think.  And then in 2013 or
25  early 2014 I wrote another check, I believe for

Page 227

1  $1,000 to assist her with tuition.
2    Q.   So, the total amount you assisted
3  Lyndsay for her college education is $2,000?
4    A.   Yes.  As I recall.
5    Q.   And were those checks directed to her or
6  to the University of Iowa?
7    A.   I don't remember who I wrote those
8  checks to.  I think the second one might have been
9  to the University of Iowa.  I'm not entirely sure
10  of the first one.  The first one would have
11  been -- well, I don't remember when the first one
12  was.
13    Q.   On the date of Cory's death, you
14  indicated that your first call was to Jon Barnard,
15  who at the time was your boss at the Adams County
16  State's Attorney's office, correct?
17    A.   Correct.
18    Q.   And when the police arrived, the report
19  indicates you were on -- excuse me.  I think you
20  said when the, was it the police or the first
21  responders arrived when you were on the porch?  Do
22  you recall?
23    A.   I don't recall any of that by memory.  I
24  know there were reports that indicated where I was
25  and what I was doing.

Page 228

1    Q.   Did you at any point in time walk
2  upstairs and show anybody where the body was?
3    A.   I don't know.  I'm not -- I'm not sure
4  whether I did or I didn't.
5    Q.   Do you recall that while they were
6  upstairs with Cory, you were inside on the kitchen
7  and were on your laptop?
8    A.   I was inside, or I was inside and I was
9  in the kitchen.  The laptop, I believe was on the
10  counter, still in front of me.  I don't remember
11  being on the laptop or doing anything.
12    Q.   Do you recall creating or sending any
13  e-mails while you waited there for the people who
14  were upstairs with Cory to finish what they were
15  doing?
16    A.   No.
17    Q.   Did you at any point in time ask any
18  questions of anyone who was upstairs with Cory
19  about her body or anything else?
20    A.   No.  I was downstairs in the kitchen
21  with a police officer who was standing there with
22  me.  I did not ask him questions, nor did I go
23  upstairs to ask them questions.
24    Q.   Okay.  Let me back up.  The testimony
25  you gave was that when you went upstairs to

LOVELACE v.
DET. ADAM GIBSON

CURTIS LOVELACE
July 6, 2018

Page 229

1  shower, you saw the body, and then after your
2  attempts at shaking or waking Cory, your thought
3  was and you went and got Larson out of his room,
4  is that correct?
5  A.  Correct.
6  Q.  Okay.  And did Larson share a room at
7  that time with the other two boys?
8  A.  He did.
9  Q.  And you said he was in the room and he
10  was in his bed?
11  A.  That is what I remember.  Yes.
12  Q.  And did you pick him up?
13  A.  Yes.
14  Q.  Did you tell him where you were going?
15  A.  I don't recall what I told him.
16  Q.  At the time he would have been four?
17  A.  Correct.
18  Q.  And was he in sleep clothes?  Dressed?
19  Do you recall anything about that?
20  A.  I believe he was still in pajamas, yes.
21  Q.  Okay.  And so I'm clear, you don't
22  recall seeing him before that, that morning?
23  A.  No.
24  Q.  And you had taken your other three
25  children to school prior to coming back, working

Page 230

1  on your laptop, and then going upstairs?
2  A.  Correct.
3  Q.  And the three children, Lyndsay would
4  have been where?  Where would she have been
5  attending school?
6  A.  She was at Baldwin.
7  Q.  And Logan was where?
8  A.  Logan was at Madison.
9  Q.  And was Lincoln at Madison?
10  A.  Lincoln was at Madison also.
11  Q.  So you would have taken them in your car
12  to school that morning?
13  A.  Yes.
14  Q.  And who would you have taken to school
15  first?  Lyndsay or the boys?
16  A.  The boys.
17  Q.  Okay.  And was the Madison drop off in
18  front or behind the school?
19  A.  It was behind the school.
20  Q.  And you would have pulled through the
21  drop line there, and dropped them off at the same
22  time?
23  A.  Yes.
24  Q.  And then you would have, what, made a
25  right hand turn and gone back to Main Street?

Page 231

1  A.  I'm not sure if the right hand turn was
2  allowed, or whether or not I would have taken a
3  right hand turn.  I drove that route quite a bit
4  through the years.  And sometimes may go left.
5  Might go down the alley.  May go to the next
6  street down the alley and go all the way to, what
7  I guess that's 33rd Street.  And then go that
8  route.
9  Q.  And then you would have taken Lyndsay to
10  Baldwin, dropped her off on the back side by the
11  high school gym?  Correct?
12  A.  Correct.
13  Q.  And then what was your route back home?
14  Would you have gone State Street or Main Street?
15  A.  I don't know.  I mean, either route
16  would get me back to our house.
17  Q.  And I believe you said you had left to
18  take the boys after putting Cory into bed; do you
19  recall, was that around 8:15 or so?
20  A.  Again, I would rely upon what I told
21  Detective Baird at the time.  My independent
22  recollection would be that, you know, in order to
23  make the start times, that you had to leave
24  anywhere between eight and 8:15 or so.
25  Q.  Okay.  And then you, if your report says

Page 232

1  you told them you were back by 8:35, would you
2  have any reason to dispute that?
3  A.  No.  If that's what I said.
4  Q.  Okay.  Now, going back to the
5  interaction with Larson, you go upstairs and you
6  grab him, and you carry him down the stairs and
7  out the front door, correct?
8  A.  I don't think I carried him out the
9  front door.  I believe I carried him out the back
10  door.
11  Q.  Okay.  And the back of your house would
12  have faced the back of the houses on Grove, is
13  that correct?
14  A.  Correct.
15  Q.  And knowing where your mother-in-law at
16  the time lived, she was, if you're standing on
17  your back porch or stairs at the Kentucky address,
18  she would have been to your northwest, correct?
19  A.  She would have been to the left, which
20  would have been north and west.  Correct.
21  Q.  And she would have been -- the back of
22  her house, could you see it from your house?
23  A.  I think you can see the roof line of
24  her, or their house.
25  Q.  Okay.  So, you would have taken Larson

LOVELACE v.
DET. ADAM GIBSON

CURTIS LOVELACE
July 6, 2018

Page 233

1  there by what route? Going through the back yards
2  of the houses?
3     A.  Yes. Once exiting the back door out of
4  the kitchen, taking a left, there are two garages
5  that were there, single car garages. We shared a
6  driveway with our neighbor. And there was a
7  walkway between those two garages.
8        So I would have walked through, and then
9  there was an opening directly to the left to walk
10 through essentially what we would refer to as Dr.
11 Dave's yard. Not Dave Schlembach, who lived right
12 behind us, but Dr. Dave. So I would have walked
13 through his yard, into the back yard of Marty's,
14 Marty and John's back yard, on to the back porch
15 and to their back door.
16    Q.  And then at the time you would have
17 knocked or rang the door bell and Marty would have
18 answered, correct?
19    A.  I don't believe there was a doorbell. I
20 would have knocked.
21    Q.  John was suffering from cancer, so he
22 certainly didn't come and answer the door, did he?
23    A.  No, Marty came to answer the door.
24    Q.  Okay. And you have testified earlier
25 about your disagreement with what she testified

Page 234

1  you said. But, you do agree you left Larson there
2  that morning with her?
3     A.  Correct.
4     Q.  And it was then after that point in time
5  on your way back to the house, which at this point
6  in time Cory would have been in the house alone,
7  correct?
8     A.  Correct.
9     Q.  And at this point in time there had not
10 been any calls made to Jon Barnard, 911, or
11 anybody else?
12    A.  At the point — at what point?
13    Q.  Hand Larson to Marty?
14    A.  Correct. There were no calls.
15    Q.  And in fact, it's on your way back to
16 your house when you on your cell phone called Jon
17 Barnard at the Adams County State's Attorney's
18 office?
19    A.  That's what I recall.
20    Q.  And at 9:02 AM on the morning of Cory's
21 death, you create an e-mail to Steve Belco called
22 late night thoughts. What were you -- why were
23 you creating an e-mail at 9:02 AM to Steve Belco
24 regarding late nights thoughts at the time in
25 which the police were there investigating the

Page 235

1  death of your wife?
2     A.  I have reviewed that document, as well
3  as the information that was in discovery. I did
4  not create late night thoughts that morning. That
5  would have been an e-mail that I wrote to him late
6  that evening. Maybe even into the morning of the
7  15th. I can't remember, do you have a copy of the
8  e-mail?
9     Q.  Luckily, I don't have to turn that over.
10 I mean --
11    A.  That's fine.
12    Q.  If you remember it, you remember it.
13    A.  No, that's fine. I believe that was —
14 I was trying to think if that e-mail was sent. I
15 think it was sent after midnight. And that was
16 the late night thoughts.
17    Q.  So -- sorry, go ahead?
18    A.  How it was created at 9:02 AM, I was
19 working on e-mail before I went upstairs. And I
20 communicated with Steve via e-mail. And so I
21 could have, and most probably did, open an e-mail
22 to send him. And obviously went upstairs and
23 never finished that.
24    Q.  So, let me ask it this way in a "yes" or
25 "no" fashion. Do you contest that you created the

Page 236

1  e-mail to Steve Belco titled "late night thoughts"
2  at 9:02 AM on February 14th of 2006?
3     A.  Yes. I did not create the contents of
4  that e-mail until late that evening, early
5  morning.
6     Q.  You were approached by the Quincy police
7  department I believe in 2008, regarding bad checks
8  you wrote to the Liquor Depot for purchasing
9  alcohol, do you recall that?
10    A.  No.
11    Q.  Do you recall writing bad checks to the
12 Liquor Depot where you were investigated for it?
13    A.  I recall that Jon Barnard called me into
14 the office to indicate to me that someone had
15 turned over checks to him that had bounced, and
16 that I was responsible for paying. And he
17 indicated to me that essentially that that can't
18 happen. That that's not the type of reputation
19 that his Assistant State's Attorney should live up
20 to. And that I needed to fix that situation. Fix
21 it right away. Make sure those checks were paid.
22 And make sure it never happened again.
23    Q.  So --
24    A.  I think that was the content of the
25 conversation. But that's how I learned of it.

Page 237

```
 1   And that's how it resolved.
 2   Q.   Well, you don't contest that you were
 3   the one who wrote the checks, do you?
 4   A.   No.  I do not deny writing the checks.
 5   And it's obvious that in 2008, I mean, they did
 6   bounce.  And I think I did settle those or pay
 7   those after I learned of them.
 8   Q.   And your testimony regarding your work
 9   at the Adams County State's Attorney's office.
10   You indicated that you were shocked when Jon
11   terminated you in July of 2012.  I want to
12   follow-up on that.
13        You had received an e-mail in June of
14   2012 from Jon warning you about your erratic
15   attendance and behavior, correct?
16   A.   There was an e-mail and a discussion
17   regarding expected hours.  I don't remember the
18   exact content, nor do I recall exactly when that
19   e-mail was sent.  But, we did have a discussion
20   regarding that.
21   Q.   If that e-mail was sent to you on
22   Friday, June 1 of 2012, would you have reason to
23   dispute that?
24   A.   No.
25   Q.   And did you also have discussions with
```

Page 238

```
 1   Jon about the fact that people believed you were
 2   coming to the office intoxicated?
 3   A.   No.  The only conversation I had with
 4   Jon about my drinking occurred in 2008.  It may
 5   have been around the same time or at the same time
 6   that I had the conversation regarding the checks.
 7   And that at that time he reported to me that
 8   someone in court security thought they had smelled
 9   alcohol on my breath.  And he indicated that he
10   was requiring me to seek counseling.  And I
11   complied with that request.
12   Q.   On July 19th, he sent you an e-mail that
13   said Curtis, this is to advise you that your
14   services are no longer required in this office
15   effective immediately.  I regret to inform you of
16   this, but your unexplained absence since your
17   return from military training, especially on the
18   heels of having been counseled about your frequent
19   absences, and further your lack of adherence to
20   your own self-declared new schedule following this
21   last incident in May is unacceptable.  And then he
22   went on to tell you about your check, etc.  Do you
23   recall receiving that e-mail?
24   A.   Yes.
25   Q.   And that's the e-mail you indicated
```

Page 239

```
 1   earlier you prepared a response to?
 2   A.   Yes.
 3   Q.   And do you recall in that response
 4   telling Jon that you felt his decision had
 5   compromised you financially, professionally, and
 6   compromised your overall reputation in the
 7   community?
 8   A.   I was disappointed with his decision,
 9   yes.
10   Q.   And those are your words in an e-mail
11   you sent back to him?
12   A.   I'm assuming you're reading from my
13   e-mail.  So I did write an e-mail, and I do
14   believe those are my words.
15   Q.   I'm reading from an e-mail you sent to
16   him on Saturday July 21, 2012?
17   A.   Correct.
18   Q.   Previously produced in this case?
19   A.   Yes.
20   Q.   Do you recall an incident in May of
21   2012, did you put in to get the public defender's
22   job in Adams County?
23   A.   Yes, I did apply for that position.
24   Q.   And you did not get it, correct?
25   A.   That is correct.
```

Page 240

```
 1   Q.   And you came into the office angry and
 2   upset about the fact that you had not received
 3   that appointment, true?
 4   A.   No.  That's not true.
 5   Q.   Okay.  So, if various people in the
 6   State's Attorney's office have a recollection of
 7   that, you would -- do you dispute that or you just
 8   don't recall?  I want to be clear on that.
 9   A.   I remember that I was disappointed that
10   I was not interviewed for the position.  And I
11   think I shared that with others in the office.  I
12   don't believe I did it in an angry manner.  And I
13   think what you're referring to is a police report
14   based on an interview with Adam Gibson, two
15   individuals in the office, and I don't -- the
16   characterization of that, I believe is incorrect.
17   Q.   I'm not asking you what you think I'm
18   referring to.  I'm asking you simply what you
19   recall as you sit here today about the reaction of
20   people in the office.  And if you expressed anger
21   to them about the fact you didn't get the PD
22   interview.  That's all I'm asking you about.  Do
23   you recall that or not?
24   A.   No.  I don't recall that.
25   Q.   Okay.  And you didn't get an interview
```

**Page 241**

1  for that job. How many people put in for the PD
2  job in May of 2012?
3  **A.  I'm not certain.**
4  Q.  Okay. Who ended up getting it?
5  **A.  I believe it was Holly Henss got that**
6  **position.**
7  Q.  Now, you indicated that you, after being
8  terminated from your employment at the Adams
9  County State's Attorney's office, had started
10  attending some political events in 2013, and I
11  wrote down you and Christene attended one for a
12  person who was running for the county clerk,
13  correct?
14  **A.  Yes. I think, that, yes.**
15  Q.  Was that Chuck Venvertloh?
16  **A.  I believe that was Chuck Venvertloh.**
17  Q.  And at this point in time you would
18  agree with me you had not put in for any elected
19  position? You hadn't put your name in the
20  running?
21  **A.  No, no.**
22  Q.  You were simply attending events to have
23  your face seen possibly, correct?
24  **A.  Yes.**
25  Q.  Meet people in the Republican party?

**Page 242**

1  **A.  Correct.**
2  Q.  You did not put your name in for the
3  open -- well, strike that. At this point in time
4  Jon Barnard was still the Adams County State's
5  Attorney?
6  **A.  Correct.**
7  Q.  And under his terms, that was not set to
8  end until 2016?
9  **A.  Correct.**
10  Q.  Okay. So, at this point in time do you
11  even know, had he announced he wasn't even going
12  to run for another term?
13  **A.  No. I don't believe he had announced**
14  **that he was not going to run for another term.**
15  Q.  So, at this point in time, assuming that
16  is factual, you would not have even been a
17  candidate for that spot because it wasn't even
18  open, true?
19  **A.  Correct. I couldn't, I guess go out and**
20  **get petitions signed or anything, because you're**
21  **right, it was not an open position.**
22  Q.  In late 2012, you, after leaving the
23  Adams County State's Attorney's office in July,
24  started this Prudential bit that we had talked
25  about earlier, and I -- was it Chuck Hageman's

**Page 243**

1  office?
2  **A.  Yes, it was Chuck Hageman's office.**
3  Q.  And he was the Prudential agent?
4  **A.  Yes.**
5  Q.  And you had indicated you took some test
6  to become licensed in the State of Illinois; what
7  is that? A licensed real estate agent?
8  **A.  No, no. It was a license to sell life**
9  **insurance and health insurance. It was a one day,**
10  **maybe a four hour test, I can't recall, that I had**
11  **to take in Springfield, as well as I had a one or**
12  **two-day course that I had to attend in order to**
13  **obtain that license.**
14  Q.  Okay. And then the Friday after
15  Thanksgiving a client of the agency shows up to
16  sign some papers, and you answer the door,
17  correct?
18  **A.  I don't believe I answered the door. I**
19  **came to the door. I don't believe I opened it.**
20  Q.  Okay. Well, was she on the other side
21  of the door?
22  **A.  Yeah, it was a glass door. The office**
23  **was closed.**
24  Q.  Okay. But, you had a key since -- were
25  you technically an employee of Prudential?

**Page 244**

1  **A.  No.**
2  Q.  Did Chuck Hageman ever pay you?
3  **A.  No.**
4  Q.  So, you didn't have any earnings that
5  year from Prudential?
6  **A.  Correct.**
7  Q.  And okay. So, but, he gave you a key so
8  you could be there and to study, as you said?
9  **A.  He didn't give me a key. He told me**
10  **where the key was --**
11  Q.  Okay.
12  **A.  -- hidden, and that I was welcome to**
13  **access his office when needed.**
14  Q.  Okay. And the police showed up, and do
15  you recall, you agree you were intoxicated at the
16  time?
17  **A.  Yes, I was.**
18  Q.  And you had urinated all over yourself?
19  **A.  Yes, I had.**
20  Q.  And your zipper was undone when they
21  showed up?
22  **A.  Quite possibly.**
23  Q.  You were stumbling around? Do you agree
24  with that?
25  **A.  Yes.**

Page 245

1  Q.  You didn't know where you were at the
2  time?
3  A.  I think I read that in a report.
4  Q.  Okay.  Well, would you have any reason
5  to disagree with that?
6  A.  No.  I was intoxicated.
7  Q.  And you had a cut on your hand and a
8  scrape on your head.  Do you know how you got
9  those?
10  A.  No.
11  Q.  After this, did Mr. Hageman tell you to
12  no longer come over to his agency's office?
13  A.  Actually, I met with Chuck later that --
14  on two or three days later regarding what had
15  happened.
16  Q.  Okay.  And did he tell you look, don't
17  be coming into my office any more?
18  A.  Correct.  We talked about whether or not
19  I wished to continue doing anything with
20  Prudential.  Or whether or not Prudential wanted
21  to do anything with me based upon that incident.
22  Q.  And I assume the answer was no, they did
23  not and you would go your separate ways?
24  A.  Yes.  There was a mutual agreement that
25  I did not want to, and they did not want me.

Page 246

1  Q.  Okay.  So, at this point in time you
2  indicated that you were deciding what you wanted
3  to do, and whether or not you were going to go
4  into private practice.  And before I get into
5  that, I want to ask you some questions about some
6  of the tax returns you've provided in this case.
7  In 2010 you filed jointly -- excuse me.
8  In 2011, 2011, you filed a joint return with Erika
9  Gomez.  You were married to her at the time?
10  A.  Correct.
11  Q.  Okay.  You had a W2 from DFAS, I suppose
12  that's the Department of Defense?
13  A.  Uh-huh.
14  Q.  For your National Guard work?
15  A.  Yes.  That is.
16  Q.  And you listed your job as a lawyer, and
17  she was a teacher/cafeteria worker, because she
18  worked for the Quincy public school system, true?
19  A.  Yes.  That is true.
20  Q.  And in 2011 your gross income that the
21  two of you reported was $68,105, of which you
22  yourself were responsible on the W2 for
23  $17,065.78 from your Army work, and your sole
24  proprietorship income, which would be you listed
25  your job you were a lawyer at that time?

Page 247

1  A.  Yes.
2  Q.  Was $4,391 in gross receipts.  Do you
3  have any reason to dispute those numbers which
4  appear on your tax returns?
5  A.  Is this the -- for the 2011 year?
6  Q.  Correct.
7  A.  And then in addition to that, I received
8  wages and earnings from the State's Attorney's
9  office.
10  Q.  Okay.  That would have been part of the
11  gross income calculation?
12  A.  Yes.
13  Q.  And you apparently don't have or are not
14  able to find that W2 from the State's Attorney's
15  office?
16  A.  If I did not, I provided you everything
17  that I had.
18  Q.  Okay.  2012, you -- let me back up.  In
19  2011 you used TurboTax?
20  A.  Correct.
21  Q.  Did you prepare that or did Erika
22  prepare that?
23  A.  I prepared it.
24  Q.  In 2012 you used TurboTax again, but
25  this time you filed married but filed separately,

Page 248

1  I assume due to your divorce.
2  A.  Correct.
3  Q.  Okay.  You, individually, filed a 1040
4  individual income tax return because you were
5  filing separately even though you were married,
6  true?
7  A.  Yes.
8  Q.  And again, you used TurboTax?
9  A.  Yes.
10  Q.  And you reported wages at that time of
11  $34,789.  And I believe you, this time, I see on
12  the W2 from Adams County it was $25,139.29 because
13  that would have not been, or that would have been
14  for the full 2011 calendar year?  You're filing in
15  2012, correct?  Your 2012 taxes are for the year
16  2011?
17  A.  So, this is my tax year for 2012?
18  Q.  Correct.
19  A.  Right.  So, it would have been on my
20  income from the State's Attorney's office from
21  January 1st of 2012 until the date of my
22  termination or the last check.  Yes.
23  Q.  Sorry.  Okay.  And then you still were
24  in the military and you had that income?
25  A.  Correct.

LOVELACE v.
DET. ADAM GIBSON

CURTIS LOVELACE
July 6, 2018

Page 249

1    Q.   And then you told us you had got some
2  unemployment from the state and that was in there
3  as well?
4    A.   Correct.
5    Q.   Now, I have a question for you.  There's
6  a notation on that tax return from 2012 under
7  business, you listed paper delivery.  And claimed
8  $1,709 in income.  What is paper delivery?
9    A.   At that time, and I can't remember what,
10 at what point the kids asked, the boys, asked if
11 they could deliver papers.  There was a paper
12 route open.  And so it was around the
13 neighborhood.  And I believe I was listed, but
14 they did most of the work.  But, as any father
15 knows, you get to do some of that too.  So, that
16 was for delivering papers around the neighborhood.
17   Q.   Okay.  And you claimed private practice
18 attorney, gross receipts of $3,275.  So, you would
19 have had some private practice work in 2012?
20   A.   Yes.  I think there was some just, you
21 know, carryover from what I was doing.  I was not
22 -- I didn't have an office outside of the home.
23 And that's what I reported.
24   Q.   Would you agree with me that through
25 2012 when you left the job at the State's

Page 250

1  Attorney's office you had never been a family law
2  lawyer?
3    A.   Correct.  I had done some family law
4  cases, but no.  I had never been a family law
5  lawyer.
6    Q.   Had you ever handled a divorce from
7  start to finish?
8    A.   Yes.
9    Q.   Now, in 2013 you filed as a head of
10 household solo on a 1040; you had $27,036 in
11 unemployment.  And the wages you claimed as a
12 private practice attorney were $12,443.  You self
13 prepared that and signed and filed it on February
14 15th of 2014.  That would have been for the year
15 you were single in 2013, correct?
16   A.   Correct.
17   Q.   Prior to marrying Christine?
18   A.   Correct.
19   Q.   And you signed off on that amount as
20 well as the 2011-2012.  And as I see it, the most
21 amount of money you made in 2011, 2012, or 2013 as
22 a private practice attorney was what you reported
23 in 2013 of $12,443.  Would you agree with that
24 statement?
25   A.   What was the amount?  For the year 2013?

Page 251

1    Q.   Correct.  $12,443 in wages as a private
2  practice attorney is what you listed on your tax
3  return?
4    A.   Okay.  Yes.  If that's what I listed.
5    Q.   You filed and signed it?
6    A.   Sure, sure, yeah.
7    Q.   You would represent that's truthful?
8    A.   Correct.  Correct.
9    Q.   Now, you indicated that 2014 is when you
10 started advertising and were office sharing with
11 Drew Erwin.  Where was Drew's address?
12   A.   It was a Vermont Street address.  I'm
13 not certain as to the number on the address.
14   Q.   Okay.  He never paid you any wages or a
15 1099 or anything like that, true?
16   A.   He did not, no.
17   Q.   You stated here earlier you have not
18 filed a 2014 tax return, have you?
19   A.   Correct.
20   Q.   You have not filed a 2015 tax return,
21 have you?
22   A.   No.  I have not.  I didn't have any
23 income in 2015.
24   Q.   And you did not file a 2016 tax return,
25 did you?

Page 252

1    A.   No.  I did not.  And I did not have any
2  income in 2016.
3    Q.   And at any point in time did you ever
4  file or request an extension from the IRS for any
5  of those three tax returns?
6    A.   No.
7    Q.   Now you worked in 2014 from January up
8  until August 27th, the date of your arrest,
9  correct?
10   A.   Correct.
11   Q.   You indicated on the date of your arrest
12 you were traveling to the bank to make a deposit
13 for your business.  Correct?
14   A.   Correct.
15   Q.   Did you have a trust account set up?
16   A.   I did have a trust account set up.
17   Q.   At what bank?
18   A.   I believe those accounts were at
19 Mercantile Trust and Savings Bank.
20   Q.   Did you have malpractice
21 insurance as a lawyer for that year in 2014?
22   A.   I did not.
23   Q.   Did you have any ledgers where you kept
24 income and expenses or who did your books?
25   A.   I kept some sort of ledger and expenses

Page 253

1 on-line with some sort of financial software.
2 Q. Do you still have those records?
3 A. I don't know where those records were.
4 And I don't know how to access those records.
5 Q. Okay. Well, if you don't know where
6 they are, how would you know how to access them?
7 A. Well, again, they were -- it was some
8 sort of on-line. And after August 27th of 2014,
9 none of that became a priority. And I have not
10 gone back to search for those records.
11 Q. Now, at the time of your arrest
12 Christine was operating a business herself?
13 A. Correct.
14 Q. And she had a pie shop which was located
15 on 12th Street in Quincy?
16 A. Correct.
17 Q. How long had she been operating the pie
18 shop?
19 A. She opened that pie shop in May of 2014.
20 Q. So that had been open for, if I say May
21 1, that would be a grand total of four months that
22 she had the pie shop? May 1 through -- well,
23 strike that. Let me not assume that.
24     If she opened it on May 1, did it
25 continue on after your date of arrest in August of

Page 254

1 2014?
2 A. It did not.
3 Q. Okay. So, if we use that as the end
4 line, that would have been four months worth of
5 operations, correct?
6 A. Correct.
7 Q. And who paid the rent for her building
8 and her pie shop?
9 A. She did.
10 Q. Okay. And what was the company she left
11 in Minneapolis to marry you and come to Quincy?
12 A. She was with Aflac.
13 Q. And she had been married how many times
14 prior to marrying you?
15 A. She had been married twice before me.
16 Q. And she has one daughter?
17 A. Correct.
18 Q. Who has never lived with you and her
19 permanently, correct?
20 A. Correct.
21 Q. She's of age and an adult?
22 A. Correct.
23 Q. And Christine had the money, whether
24 saved or otherwise from her prior job, divorce,
25 whatever, to start and open her own business,

Page 255

1 correct?
2 A. Yes.
3 Q. And as a business owner, did she keep
4 record of her income and what she made and what
5 she brought in?
6 A. I don't know what records she kept.
7 Q. Regardless, do you know if obviously you
8 were married in 2014, if you didn't file a tax
9 return, I assume she didn't either?
10 A. I assume she did not, but I don't know
11 whether she did or not.
12 Q. Okay. Well, is there any reason she
13 would have filed a tax return having been married
14 to you and filed separately that you can think of
15 as you sit here?
16 A. It's possible. I don't think she filed.
17 Q. We'll ask her, but I just wanted to know
18 what you know. All right. And the pie shop that
19 was opened for four months, then did she close
20 that down? Or voluntarily? Or what happened with
21 that? Did she fall behind on rent and they kicked
22 her out? What happened?
23 A. After my arrest, there was intense media
24 associated with that arrest. Christine was being
25 pursued by media sources. And she made a

Page 256

1 determination that running a business where she
2 had to interact with the public with open doors
3 was not going to work.
4     In addition, she became on August 27th,
5 2014, for all practical purposes a single parent
6 to our three boys.
7 Q. Well, as a single parent to your three
8 boys, had she adopted them at that time or did she
9 adopt them after your arrest?
10 A. No, we adopted -- she adopted them in
11 May of 2014. Yeah, May 2014.
12 Q. As a single parent of those kids, she
13 would have to continue to provide daily needs and
14 expenses, correct?
15 A. Correct.
16 Q. But, she decided to close down her
17 business, and did she ever work again until you
18 were living over here in Champaign?
19 A. I think she worked while I was in jail
20 briefly for the church as an administrator.
21 Q. Hold on. Let me interrupt you. When
22 you say the church, because we need to --
23 A. Yeah, sure, sure. It's St. John's
24 Lutheran church. The church we attended.
25 Q. So let me back up, and I will let you

LOVELACE v.
DET. ADAM GIBSON

CURTIS LOVELACE
July 6, 2018

**Page 257**

1  complete the answer. But I want to focus on a
2  little bit some of that. Because you had said
3  earlier you were members at First Pres?
4  A.  Sure, sure.
5  Q.  Excuse me, strike that. You weren't
6  members at First Pres, you were members at the
7  first Union Congregational Church. You had the
8  funeral for Cory at First Pres. At what point in
9  time did you start attending St. John's Lutheran
10  church?
11  A.  At what point in time -- St. John's
12  Lutheran church -- I was going to give you a
13  history, but I'll just answer your question.
14      We started attending church there in the
15  spring of 2014. Or maybe even late spring, early
16  summer of 2014.
17  Q.  And you say "we", that is you and
18  Christine and your boys?
19  A.  Correct.
20  Q.  Now, did you and Christine get married
21  in that church?
22  A.  No, we did not.
23  Q.  Where did you get married?
24  A.  At First Christian Church. Across from
25  the junior high.

**Page 258**

1  Q.  Okay. I got you. All right. But you
2  didn't attend there, or did you switch attending
3  there?
4  A.  We -- I think we had attended there
5  together a couple times with the boys before our
6  wedding, and we did attend thereafter for a little
7  bit before we started going to St. John's.
8  Q.  Okay. Now, to be fair and let you
9  finish your answer, so Christine worked a little
10  bit for the church while you were in jail during
11  the trial process and all that. Was she paid by
12  St. John's Lutheran?
13  A.  I believe she was. She was a part-time
14  employee. I'm not sure how much she was paid.
15  That would be a good question for her.
16  Q.  Okay. After your second trial, you and
17  her moved her to Champaign with, well, Larson,
18  correct? Lincoln and Logan have been in the
19  military?
20  A.  Sure. And, yes. Larson was actually at
21  high school in Concordia, Missouri, when we made
22  the move.
23  Q.  Did you and Christine decide to send him
24  to Concordia to get him out of the media
25  spotlight in Quincy?

**Page 259**

1  A.  That wasn't the sole reason. That was a
2  reason. Or one of the reasons that we had
3  concerns about him going to the high school. His
4  safety. His security. And when we had mentioned
5  it to him, he was very much in favor and wanted to
6  explore it. And so he did. They made a visit.
7  And we decided to send him there.
8  Q.  I mean, let's back up a little bit. I
9  mean, the public school system was certainly good
10  enough for you and you served on the school board
11  for 11 years, correct?
12  A.  Correct.
13  Q.  It was good enough for Logan and
14  Lincoln, correct?
15  A.  Logan did attend and graduate. Lincoln,
16  because of the circumstances, because of the
17  arrest, because of the public scrutiny, as well as
18  concerns we had about his safety and security, and
19  his desire, actually went to the alternative
20  school his junior year, and not only finished his
21  junior year offsite, but also finished all of his
22  credits for his senior year. And graduated early
23  and went into the military early.
24  Q.  You say you feared for his safety.
25  What? That he was going to get beat up in school?

**Page 260**

1  I mean, there's anti-bullying, there's all sorts
2  of things that happen now.
3  A.  Sure. Our concerns regarding all of the
4  children after my arrest was, you know, what would
5  kids say to them. What would teachers say to
6  them. And our overall concern about their
7  security, and when I mean security, they had been
8  taken from their classroom to the Quincy police
9  department without any sort of notification or
10  contact with either me or Christine or anyone else
11  as far as we know. And it would appear that the
12  Quincy police department had no problem doing that
13  on August 27th, 2014. And there wasn't any
14  assurance that they wouldn't do the same thing at
15  any point thereafter.
16  Q.  You agree with me that no one from the
17  county had any involvement with Logan, Lincoln or
18  Larson's initial contact, and then transfer or
19  interview relative to August 27th, 2014?
20  A.  Based upon Adam Gibson's testimony at
21  trial, it was people within the Quincy police
22  department who made that decision. So, I think
23  the answer is "yes". I'm not aware that the
24  county played any role in that decision making
25  process.

Page 261

1   Q.   And as you sit here today, you don't
2 have any evidence that anyone from the county ever
3 interviewed or interrogated your boys, correct?
4   **A.   Correct.**
5   Q.   And no one from the county ever
6 interviewed or interrogated you, did they?
7   **A.   No.**
8   Q.   And in fact, you would agree with me
9 that Jon Barnard, who is the State's Attorney at
10 the time of your arrest, immediately sent this out
11 for a handling by a special prosecutor?
12   **A.   It depends on what you mean by**
13 **immediately.**
14   Q.   Let me rephrase the question. You would
15 agree with me that Jon Barnard referred this out
16 to be handled by a special prosecutor with
17 relation to you and any prosecution of you?
18   **A.   Yes.**
19   Q.   And you agree with me that this was
20 assigned to Ed Parkinson of the state appellate
21 prosecutor's office to handle?
22   **A.   Correct.**
23   Q.   That was an assignment by the chief
24 judge of the 8th judicial circuit?
25   **A.   I believe the process — I won't agree**

Page 262

1   **with that. Let me just explain. It's just that I**
2 **believe the process is that Barnard would put in**
3 **an application for the special prosecutor to get**
4 **involved with the case. And then the state**
5 **appellate prosecutor's office would either grant**
6 **that or not grant it. And the state appellate**
7 **prosecutor's office would assign, or assigned Ed**
8 **Parkinson to handle the case. I don't believe**
9 **that was a chief judge's decision.**
10   Q.   Okay. And of that though, you would
11 agree with me that no one from Adams County, by
12 the way of the State's Attorney, Jon Barnard, Gary
13 Farha, Josh Jones, anyone else who was employed in
14 that office handled the grand jury presentment,
15 correct? That was handled by Ed Parkinson?
16   **A.   Ed Parkinson did appear before the grand**
17 **jury, yes.**
18   Q.   And you would agree with me that no one
19 from Adams County State's Attorney's office
20 handled either of your trials? That was Ed
21 Parkinson?
22   **A.   Correct.**
23   Q.   Or the state appellate prosecutor's
24 office?
25   **A.   Correct.**

Page 263

1   Q.   And one trial I believe was Julia Wikoff
2 and the other was David Robinson? Do I have those
3 names right?
4   **A.   Yes.**
5   Q.   And those are -- nobody or neither of
6 those people I just mentioned are Adams County
7 State's Attorney people?
8   **A.   That is correct.**
9   Q.   Now, after you moved here in 2017 you
10 filed jointly tax returns with Christine, and you
11 self prepared that and filed it yourself?
12   **A.   Correct.**
13   Q.   And you reported $21,914 in business
14 income as a private attorney, correct?
15   **A.   If that's what it says, yes.**
16   Q.   I took that right off your tax return.
17   **A.   Okay.**
18   Q.   And you have started your own law firm
19 here in Champaign?
20   **A.   Correct.**
21   Q.   And it's called what?
22   **A.   I call it The Justice Initiative.**
23   Q.   I've also seen your website. It's
24 called the -- is it the Loveless Center? What is
25 it called?

Page 264

1   **A.   We actually, and they are trade names.**
2 **Neither of them are officially organized.**
3   Q.   So you're not an LLC?
4   **A.   No.**
5   Q.   So this is a self proprietorship?
6   **A.   Right.**
7   Q.   Are you Curtis Loveless DBA?
8   **A.   Yes.**
9   Q.   And I keep saying Loveless; I got to be
10 honest with you, I've always said that since high
11 school. So, Lovelace. Okay. Is it Curtis
12 Lovelace DBA these things? Kind of a self
13 proprietorship?
14   **A.   Yes. It's — yes.**
15   Q.   Okay. And you were telling me it's the
16 Lovelace Center for Criminal Defense/The Justice
17 Initiative?
18   **A.   When we initially opened the office in**
19 **August of — on August 1st is when we opened the**
20 **office. We set out to do pro bono work under The**
21 **Justice Initiative, and fee work under the**
22 **Lovelace Center for Criminal Defense.**
23   **And as we have progressed through last**
24 **year, and into this year, it was difficult to**
25 **separate the books. And it just didn't make sense**

LOVELACE v.
DET. ADAM GIBSON

CURTIS LOVELACE
July 6, 2018

Page 265

1  from a -- it just complicated things. So we have
2  since decided to just operate under the Justice
3  Initiative. We do pro bono work, as well as fee
4  based work under the Justice Initiative. It's a
5  trade name. It's me, "doing business as".
6     Q.  You said you opened August 1. August 1
7  of what, 2017?
8     A.  Correct.
9     Q.  And you reported gross receipts of
10  $24,238, which you would agree with me all the
11  numbers I just read to you are larger than any
12  gross receipts you ever reported as a private
13  practice attorney in 2011, 2012, or 2013 in Adams
14  County, Quincy, Illinois?
15    A.  Yes.
16    Q.  Okay. And is this 1099 you got from
17  Park PLLC, part of that gross receipt for your
18  business?
19    A.  I think it is, yes.
20    Q.  What did you do for Park PLLC? Is that
21  Evan Park?
22    A.  It is.
23    Q.  And he's the attorney who worked with
24  you on FOIA requests in your underlying criminal
25  trial, true?

Page 266

1     A.  Yes.
2     Q.  Did you pay him in the underlying
3  criminal trial?
4     A.  I did not.
5     Q.  And he obviously has paid you by issuing
6  the 1099. What did you do for his entity?
7     A.  After my acquittal, and after maybe even
8  before, but for the most part after my move, our
9  move to Champaign, Evan indicated that based upon
10  his experience with me, that he would like me to
11  work with him where he needed help in his private
12  practice. He asked that I join him as of counsel.
13  We agreed to that. And I did work last year, and
14  I continue to do work whenever he needs me to
15  support his efforts in his practice.
16    Q.  All right. Well, we need -- I need more
17  specifics on that. Are you handling clients here
18  for him in Champaign?
19    A.  No.
20    Q.  Is it you do research for him? You file
21  a FOIA? Give me the nitty gritty of what it is
22  you're doing for him.
23    A.  Without disclosing any confidentiality
24  with regard to Evan's practice, they are Evan's
25  clients, and if it's research that needs to be

Page 267

1  done, a lot of that is legal research. Writing
2  memorandums.
3     Q.  Any court appearances?
4     A.  No.
5     Q.  No depositions?
6     A.  No.
7     Q.  No trials?
8     A.  No.
9     Q.  And his clients, are those clients he
10  has across the country? Out in DC where he's
11  located? Here in Illinois?
12    A.  Maybe all of the above.
13    Q.  So, he may have a certain project he
14  needs a memo or some research on, and he may ask
15  you to assist him?
16    A.  Correct.
17    Q.  Has he asked you to do FOIA requests on
18  behalf of clients of his?
19    A.  I think one of the initial clients that
20  he had some FOIA work that needed to be done.
21  And I assisted him in that. But, it was in a
22  drafting only, and those FOIAs came out under his
23  letterhead under his name. I was acting as a law
24  clerk for him at that point.
25    Q.  Okay. Did you take out a personal loan

Page 268

1  to open up your business?
2     A.  No.
3     Q.  How are you funding your business? Do
4  you have investors?
5     A.  No.
6     Q.  What are you using to pay rent?
7     A.  What we bring in, what I bring in, in
8  fees.
9     Q.  Okay. Do you have an office or do you
10  work out of your home?
11    A.  It's an office.
12    Q.  And what is your office address?
13    A.  It's 116 West Main, M-A-I-N, Street,
14  Urbana, Illinois, 61801.
15    Q.  Do you office share or is that you by
16  yourself?
17    A.  It's a second floor office. Christine
18  has an office in there too. I mean, we have
19  offices side by side together within the second
20  floor of this building. There's a karate studio
21  or something on the first floor.
22    Q.  So, you pay all of the rent, the
23  utilities, the expenses that go with the business?
24    A.  I do.
25    Q.  And I assume you don't own that

LOVELACE v.
DET. ADAM GIBSON

CURTIS LOVELACE
July 6, 2018

Page 269

1  building?
2  A.  No.
3  Q.  And you rent from the landlord?
4  A.  Correct.
5  Q.  Are you on a year-to-year lease or what?
6  A.  I am on a two year lease.
7  Q.  Okay.  Which started when you opened in
8  August of 2017?
9  A.  Correct.
10  Q.  What is your monthly rent?
11  A.  $950.
12  Q.  Does Christine work for your business?
13  A.  She works in the business.  She doesn't
14  get paid.
15  Q.  Does she have any job outside of your
16  legal?
17  A.  No.
18  Q.  Who does the books?
19  A.  I do.
20  Q.  You don't have an accountant or anything
21  like that?
22  A.  No.
23  Q.  Have you signed any book deals?
24  A.  I have not.
25  Q.  Has any -- how about movie rights?

Page 270

1  A.  No.
2  Q.  Now, you indicated that part of the
3  reason you moved Logan to boarding school was?
4  A.  Larson.
5  Q.  I'm sorry.
6  A.  It's okay.
7  Q.  Part of the reason you moved Larson to
8  boarding school, one of the factors was the
9  scrutiny, the security has saved you, those type
10  of things.  Did somebody give you Concordia, or
11  how did you come up with that?
12  A.  That decision occurred in 2016 after I
13  was on home confinement.  We started discussing
14  where he would go.  Whether it would be the high
15  school.  Quincy Notre Dame.  Anywhere else.  And
16  because we are members, and were attending
17  Lutheran church, Larson had been confirmed through
18  that Lutheran church, and he had attended St.
19  James, which was a -- his 8th grade year, which is
20  a Lutheran school.  I think Christine found that
21  in searching on the Internet for options.  And we
22  talked about it.  And I couldn't go because I
23  couldn't leave the house.  But Christine and
24  Larson went sometime I think early summer,
25  mid-summer of 2016, to make a visit.  Larson liked

Page 271

1  it.  And we made a decision to send him there.
2  Q.  And he now has been back though and last
3  year he attended Champaign Centennial high school,
4  true?
5  A.  Correct.  As a sophomore he attended
6  Champaign Centennial.
7  Q.  And he will attend there again this
8  year?
9  A.  Correct.
10  Q.  And he was attending Champaign
11  Centennial high school when your media story ran
12  on Dateline NBC, correct?
13  A.  Correct.
14  Q.  You didn't feel that was going to cause
15  him security issues or safety issues when they
16  played the story that you sat down for a
17  volunteered interview for and allowed NBC to play?
18  You didn't feel that was going to bring on undue
19  scrutiny and safety on to Larson at public school
20  Champaign Centennial high school?
21  A.  We were absolutely concerned of how that
22  would impact Larson.
23  Q.  Not enough to not give the interview
24  though, right?  You sat down with NBC and
25  voluntarily gave the interview, didn't you?

Page 272

1  A.  NBC, yes.  And CBS, yes.  We voluntarily
2  gave those interviews.
3  Q.  And you could have voluntarily said, no,
4  thanks, I just want to move on into the quiet and
5  leave me alone, correct?
6  A.  We could have declined those interviews.
7  Q.  Now, on the -- on the complaint that you
8  filed, did you review the allegations that you
9  have filed in this case before it was filed?  Did
10  you review the complaint?
11  A.  I did.  It's been a while since I
12  reviewed it, but I did review it prior to filing.
13  Q.  You understand as an attorney you're
14  reviewing that to make sure it's truthful and has
15  merit, correct?
16  A.  Correct.
17  Q.  And the attorney that signs that is
18  representing to the court that there's a good
19  faith basis for filing that document, correct?
20  A.  Correct.
21  Q.  You understand that as a licensed
22  attorney?
23  A.  Correct.
24  Q.  And in fact, you've never lost your law
25  license as a result of this, have you?

Page 273

1    A.   No.  I have not lost my law license.  I
2  wasn't active from 2015 through 2016 because I was
3  unable to complete my CLEs because I was in jail.
4  As well as I didn't think the limited resources we
5  have should go towards those dues.  And so I was
6  able to reactivate my license, I think it was May
7  of last year.  Something to that effect.
8    Q.   Let me ask it this way:  The ARDC has
9  never moved to revoke your law license?
10    A.   Correct.  They have not.
11    Q.   And you went inactive, which is people
12  can go inactive on their choosing, correct?  It
13  doesn't mean you're punished from practicing law?
14  Correct?
15    A.   No.  You just have to pay the fees and
16  complete the mandatory CLE credit.
17    Q.   Right.  And then it becomes active
18  again?
19    A.   Correct.
20    Q.   And that's what happened to your
21  license, and it is now active?
22    A.   Correct.
23    Q.   And what evidence or facts do you have
24  that Gary Farha had any communication with Adam
25  Gibson about the initiation of the reinvestigation

Page 274

1  of you that Mr. Gibson undertook?
2    A.   The information regarding communication
3  with Gary Farha about the investigation came in
4  the form of an e-mail that Adam Gibson sent to
5  Gary Farha, I believe in July of 2014.  I think
6  either shortly before or shortly after he sent the
7  same -- it was a different e-mail, but it contain
8  the same attachment.  Which was a summary of his
9  investigation.
10    Q.   Okay.  That's not my question.  So I'll
11  move to strike.  My question was, what information
12  do you have that Gary Farha communicated with Adam
13  Gibson about initiating his reinvestigation into
14  the death of Cory?
15    A.   I don't know of any communication,
16  verbal or otherwise, prior to the initiation.  So,
17  if you're talking --
18    Q.   Yes.
19    A.   Let's just go by dates.  So it was
20  initiated sometime in December, according to Adam
21  Gibson, of 2013, or January of 2014.  And --
22    Q.   And the e-mail you're referring to is
23  well after that?
24    A.   Correct.
25    Q.   So you don't have any information,

Page 275

1  factual, documentary or otherwise, that Gary Farha
2  had any communication with Adam Gibson about
3  opening up the reinvestigation as to the death of
4  your wife?
5    A.   No.
6    Q.   Correct?
7    A.   I do -- I am aware of communication
8  between him and what would then turn out to be one
9  of the witnesses, key witnesses in the case.  But,
10  and that was in December of 2012.
11    Q.   Okay.  Let me back up.  1 move to strike
12  that again as nonresponsive.  My question is
13  pretty simple.
14        Do you have any facts or evidence that
15  Gary Farha communicated with Adam Gibson about the
16  initiation of the reinvestigation into the death
17  of your wife, Cory Lovelace?
18    A.   I have not seen any e-mails or
19  communication between him prior to the Adam Gibson
20  taking it up, whenever he did, in either December
21  or January -- December of 2013, January of 2014.
22    Q.   I'm going to hand you a document, I'm
23  not going to mark it just yet, it's Bates stamped
24  AC 59 that's been produced in this case.  And I
25  think this is what you're referring to.  You

Page 276

1  mentioned an e-mail that Adam Gibson sent to Gary
2  Farha, which was dated Tuesday, August 19th of
3  2014.  Subject is case summary.  And it's the Cory
4  Lovelace death investigation summary.  Is that
5  what you're referring to?
6    A.   Yes, and it's August.  I misspoke.
7    Q.   Okay.  Which is an e-mail that was sent
8  the day after he sent that same e-mail to Ed
9  Parkinson, which is Plaintiff 003770 on Monday,
10  August 18th of '14.  Is that correct?  Where he
11  sent the Lovelace death investigation summary to
12  Ed Parkinson who had been appointed to be the
13  prosecutor in your case, correct?
14    A.   That is correct.
15    Q.   On break we can mark those, I didn't
16  have extra copies.  Tell me what specific facts
17  and evidence you have that Gary Farha fabricated
18  any of the scientific information from the medical
19  experts in either of your murder trials?
20        MS. THOMPSON: I'm going to instruct you
21  to answer that question without referencing
22  communications with your counsel.  But you can
23  answer the question.
24    Q.   Let me back up.  I'll move -- I'll
25  strike my question.  I'm going to rephrase it.

LOVELACE v.
DET. ADAM GIBSON

CURTIS LOVELACE
July 6, 2018

---

Page 277

1 Your complaint specifically alleges that Gary
2 Farha fabricated scientific information from the
3 medical experts in your two murder trials. And
4 your interrogatory answers state that as well.
5     Tell me specifically what it is Gary
6 Farha did to fabricate any of the scientific
7 information?
8 **A.   My basis for his belief -- my belief in**
9 **his involvement comes from the e-mail**
10 **communication.**
11 Q.   So, the e-mail communication which --
12 you know what? I'm going to refer to AC 59, is
13 that what you're talking about?
14 **A.   Yes.**
15 Q.   Now, you're referring to that; and that
16 is simply a summary that Mr. Gibson sent to Mr.
17 Farha, correct?
18 **A.   Correct.**
19 Q.   Now he also sent it to the state
20 prosecutor the day before, so what is it about the
21 fact that Adam Gibson sent this to Mr. Farha that
22 Mr. Farha fabricated any of the scientific
23 information?  Do you have any evidence he did
24 anything with that?
25 **A.   I don't know what he did with it, nor do**

---

Page 278

1 **I know the purpose of the e-mail, given the fact**
2 **that Jon Barnard had removed himself and everyone**
3 **else in the State's Attorney's office from any**
4 **involvement in that investigation.**
5 Q.   Okay. But, as you sit here today, other
6 than referencing e-mail AC 59, which we will mark
7 as Exhibit 10, you don't have any information or
8 evidence that Gary Farha fabricated any scientific
9 information in this case, correct?
10 **A.   No. I'm not aware of any other**
11 **information. I have not reviewed what you guys**
12 **have turned over, nor has Mr. Farha been deposed.**
13 Q.   Well, strike that. Not strike that.
14 Let me follow-up on that. You filed the
15 complaint?
16 **A.   Correct.**
17 Q.   Your lawyer signed off on that complaint
18 that what they were representing in that complaint
19 were your allegations as of the time they filed
20 it, true?
21 **A.   Correct.**
22 Q.   Okay. The fact that Mr. Farha hasn't
23 been deposed yet has no bearing on what you filed
24 in the complaint as the Plaintiff; you understand
25 that? You're an attorney?

---

Page 279

1 **A.   I'm an attorney. I'm not going to give**
2 **you a legal opinion as to the basis for the**
3 **complaint. I can tell you the facts that I'm**
4 **aware of that I believe would support the**
5 **allegations of that complaint.**
6 Q.   And you've already done that to the
7 first part, we've talked about. Do you have any
8 evidence that Gary Farha spoke to any of the
9 medical experts that were called in your murder
10 trials?
11 **A.   I don't know whether he did or did not.**
12 Q.   As you sit here today, can you point me
13 to anything that says he did?
14 **A.   No.**
15 Q.   And you agree with me Gary Farha never
16 showed up at the scene of your house on February
17 14th of 2006, correct?
18 **A.   Correct.**
19 Q.   And in fact -- okay. You agree Gary
20 Farha never took a witness statement in this case,
21 did he?
22 **A.   Not that I'm aware of.**
23 Q.   And he didn't interview anyone, did he?
24 **A.   Not that I'm aware of.**
25 Q.   And we already went over, you agree Mr.

---

Page 280

1 Farha presented no information to the grand jury,
2 correct?
3 **A.   Yes. The record, the transcript would**
4 **reflect that it was Ed Parkinson and Adam Gibson**
5 **who appeared before the grand jury.**
6 Q.   And those are the only two people that
7 appeared before the grand jury?
8 **A.   Yes, I think the State's Attorney's**
9 **office was involved with the scheduling of the**
10 **grand jury.**
11 Q.   Well, obviously somebody -- you know
12 Sheryl Elise, she would help schedule, bring in
13 the grand jury?
14 **A.   Sure, sure.**
15 Q.   Do you have any evidence that Gary Farha
16 communicated with Ed Parkinson at all about the
17 grand jury proceedings?
18 **A.   I don't know whether he did or he did**
19 **not.**
20 Q.   Now, would you agree with me that the
21 decisions of what witnesses were called and what
22 evidence was put on by the prosecution in either
23 of your two murder trials was done by Ed Parkinson
24 and his office?
25 **A.   That is my understanding. Yes.**

---

LOVELACE v.
DET. ADAM GIBSON

CURTIS LOVELACE
July 6, 2018

Page 281

1   Q.   And you would agree with me that after
2   your first trial, six people had voted to find you
3   guilty of murder?
4   A.   That was reported in the media.  And --
5   but what happens behind those closed doors, I'm
6   not entirely sure.  I think there were numbers.
7   But, I believe that it was reported in the media
8   that it was a six/six vote at one point.
9   Q.   Okay.
10  A.   I believe one of the jurors even spoke
11  to the media about that.
12  Q.   Correct.  And did you see that they --
13  did they speak in your 48 Hours episode that ran
14  on CBS about that?
15  A.   They did interview the jurors or some of
16  the jurors during the 48 Hours after the first
17  trial.
18  Q.   And after that hung jury the decision
19  whether or not to retry you was with Ed Parkinson
20  and the state appellate prosecutor's office?
21  A.   Correct.
22  Q.   And you agree with me that as you sit
23  here today, the only documentary evidence that you
24  can think of relating to Gary Farha's involvement
25  in your case is what is Deposition Exhibit 10,

Page 282

1   which is the e-mail from Mr. Gibson to him with
2   the case summary?
3   A.   There were other e-mails earlier that
4   year between Adam Gibson and Gary Farha regarding
5   another aspect of the investigation that Detective
6   Gibson was conducting into me, specifically into
7   allegations made by Erika Gomez and the
8   preparation of a search warrant.  I am aware of
9   that e-mail also.
10  Q.   Well, let me back up.  Because I think I
11  may know -- are you talking about the subpoena to
12  Comcast?
13  A.   Yes.
14  Q.   And I don't have that in front of me,
15  but I believe I'm familiar enough that Mr. Gibson
16  asked for the State's Attorney's office to contact
17  Comcast about a subpoena, is that correct?  Is
18  that your understanding?
19  A.   It was my understanding that first, that
20  Adam Gibson went to the State's Attorney's office
21  and asked for a subpoena.  Which they issued,
22  which I'm assuming it was a grand jury subpoena.
23  Q.   Are you sure about that?
24  A.   The only power for the State's Attorney
25  to issue a subpoena in something that's not a

Page 283

1   case, I believe is grand-jury related.  So, I
2   believe it was a -- just a subpoena that the
3   State's Attorney's office wrote and handed to Adam
4   Gibson, again based upon e-mail traffic, that then
5   he served on Comcast according to records.
6   Comcast rejected.  And then he went back to the
7   State's Attorney's office and asked for a search
8   warrant.  And I believe he was in communication
9   with Gary Farha regarding that.
10      MR. DiCIANNI: Can I just follow-up?
11  Are you saying that the State's Attorney's office
12  issued a subpoena -- wrote out a subpoena that was
13  not issued by the grand jury?
14  A.   Yes.  I believe they did.
15      MR. HANSEN: And that same e-mail, I
16  may pull that up on my laptop here in a second.
17      MR. DiCIANNI: Let me say something.  I
18  need to take a break to use the washroom.  I've
19  got at least two hours more.  And it sounds like
20  you've got more.
21      MR. HANSEN: I'm nearing the end.  But
22  yes, I have more.
23      MR. DiCIANNI: I'm going to suggest
24  this.  I'm going to suggest we break now.  And we
25  come back and finish Mr. Lovelace on the same day

Page 284

1   we do Christine, which is also videotaped and
2   that's not going to be nearly as long.
3   Christine's deposition I anticipate will be a few
4   hours.  I'm going to suggest that.  I think that's
5   the better way to do this.  We've been going for
6   eight hours now.
7       MS. THOMPSON: We've haven't been going
8   for eight hours.
9       MR. DiCIANNI: Seven hours.
10      MS. THOMPSON: We will hit seven in about
11  a half hour.  We started 30 minutes late, and you
12  guys have about 30 minutes left.
13      MR. DiCIANNI: So we're going to go over
14  the seven hours by a lot.  I don't think there's
15  any question that a judge would allow us more
16  time, given the span of what we have covered here
17  and have to still cover if we had to seek
18  intervention.  So, my suggestion is we break now.
19  And I'll fully admit that that has something to do
20  with an event I have to do tonight and a long
21  drive home.  But, that's my suggestion.
22      MS. THOMPSON: Well, let me just say
23  that it's your time and you have chosen to use it
24  how you used it.  And Curt has cooperated today
25  and you have more time to go today.  And we're not

Page 285

1  agreeing that two more hours of Curt being deposed
2  is appropriate. I will confer with my client. If
3  you're choosing to break today, that is your
4  choice and I will confer with Curt. But we're not
5  agreeing right now to reconvene this deposition.
6      MR. DiCIANNI: Well, I think you should
7  confer with Mr. Lovelace. Mr. Lovelace has been
8  very -- has given very long answers. And I'm not
9  critical of that. That is the way he answers
10  questions. I think that's fine. And we said that
11  earlier. And in fact, I encouraged Mr. Lovelace
12  not to -- to say everything he wanted to say.
13  But, his answers have been very long. And in many
14  instances longer than what the question called
15  for. And I'm not suggesting anything improper.
16  I'm just saying that is the way it happened.
17      So, I'm suggesting that, I made the
18  proposal that I made. I'm requesting an
19  agreement. I don't think we -- I want to break
20  without an agreement. All I'm saying is that I
21  think if we had to go, if we had to go to court to
22  seek additional time, I don't think the judge
23  would think twice about granting it.
24      MS. THOMPSON: What I'm saying is that
25  there's no evidence that Curt's answer have been

Page 286

1  obstructionist. He has answered your questions.
2      MR. DiCIANNI: Not saying that.
3      MS. THOMPSON: Right. He's answered
4  your questions as best he could. We may just have
5  a difference of opinion about this. Like I said,
6  I need to confer with my client. But, at this
7  point I'm not agreeing to reproduce him for two
8  hours in the future.
9      MR. HANSEN: Well, then I'm going to ask
10  for a record on this, and move to have a court
11  intervene. And I will go up to the seven hour
12  mark. And then at that point in time we'll seek
13  court intervention because there's no way we're
14  going to finish in another 20 or 25 minutes after
15  we take a break here for you to convene with your
16  client. This is a case that's been through two
17  murder trials. Been a death back in 2006. There
18  is a boat load of information here to go over.
19  And under Federal Rule 26 is the one that allows
20  for the court to grant a waiver of the time limit
21  under just and reasonable circumstances. And I
22  certainly feel this falls within just and
23  reasonable circumstances.
24      So, that being said, you have also sued
25  how many defendants in this case. So, why don't

Page 287

1  we do this. I would propose we take a two minute,
2  three minute break, whatever, you can talk to
3  Curt. If you won't agree to that, we'll come back
4  out and go to the seven minute mark and have to
5  seek court intervention. I hope not to do that,
6  but I will let you talk to your client.
7      MR. DiCIANNI: And I'll say, Tara, I
8  think it's unreasonable for you not to agree.
9      MS. THOMPSON: Well, the only other
10  thing I'll say you mentioned to me for the first
11  time at our break between 2:52 and 3 o'clock that
12  you wanted to extend this. So you basically told
13  me that today. If you knew that we were going to
14  go beyond seven hours, it's something you could
15  have raised before the deposition.
16      MR. DiCIANNI: We didn't know.
17      MS. THOMPSON: Well, now you're telling
18  me there's so many issues and so many parties;
19  that's not something you learned today. So I
20  don't understand why this is now an emergency when
21  you've known that this deposition was scheduled
22  for some time. But I'm ready to take a break and
23  confer with my client.
24      MR. DiCIANNI: You never really know how
25  long a deposition is going to go. The answers

Page 288

1  dictate the follow-up questions.
2      MS. THOMPSON: You chose to ask today
3  about a lot of topics that in my view aren't
4  particularly relevant, but that's your decision,
5  that's your choice, here we are. But I'll confer
6  with my client.
7      MR. DiCIANNI: I totally disagree.
8      MS. THOMPSON: I'll confer with my
9  client.
10      VIDEO OPERATOR: Now going off the
11  record. The time is approximately 4:43 PM.
12      (Break taken at 4:43 PM.)
13      (Deposition resumed at 4:50 PM.)
14      MS. THOMPSON: We're ready to proceed
15  whenever.
16      MR. HANSEN: Okay. Back on.
17      VIDEO OPERATOR: This is the beginning
18  of recording number five of the videotaped
19  deposition of Curtis Lovelace. We are now going
20  on the record. The time is approximately 4:50
21  PM.
22      MS. THOMPSON: I have had a chance to
23  confer with my client. And we were here for this
24  deposition to start at 9:00. It started at 9:24.
25  And I, after conferring, our position remains the

LOVELACE v.
DET. ADAM GIBSON

CURTIS LOVELACE
July 6, 2018

Page 289

1  same, which is we're willing to stay here beyond
2  the seven hours to finish up. This was the day
3  that was set for his deposition and our view is
4  this deposition should conclude today.
5      MR. HANSEN: Well, we're going to go to
6  the seven hour mark and then we will decide what
7  we want to do.
8      MS. THOMPSON: To be clear, we're
9  willing to go past seven hours today as long as we
10  believe the questions are appropriate. So we're
11  not saying there's a seven hour cut off today. We
12  are saying this deposition should conclude today.
13      MR. HANSEN: Here's my position on that
14  so the record is clear.
15      MS. THOMPSON: Sure.
16      MR. HANSEN: We either continue past the
17  seven hours until it's finished, which is, if that
18  means we go as long as we go, we go. Okay. Or I
19  don't want to say you're going to go past the
20  seven, and then at the 8th hour you're going to
21  say that's enough. Because that's not my position
22  either. My position is this deposition goes until
23  both of us are done. And if that's ten hours, 15
24  hours, etc., and we need to petition the court,
25  that's fine. I don't think any of us would stay

Page 290

1  until midnight tonight to get this done. And
2  certainly the videographer and court reporter
3  probably don't have that lined up. So we will go
4  here until the seven hour mark and then we will
5  take another quick break and Tom and I will
6  decide, but I will go to the seven hour mark right
7  now and pick up from there.
8          CONTINUED EXAMINATION
9          BY MR. HANSEN:
10  Q.  So Mr. Loveless, you agree with me that
11  when Jon Barnard got this, he sent it out to the
12  appellate prosecutor who made the decision to
13  present whatever they did to the grand jury,
14  correct?
15  A.  What do you mean, got this? When Jon
16  Barnard got this?
17  Q.  When Jon Barnard got notified -- Jon
18  Barnard didn't charge you in this case, correct?
19  A.  No.
20  Q.  The Adams County State's Attorney's
21  office and Gary Farha didn't charge you?
22  A.  Correct. A grand jury charged me.
23  Q.  Right. And that was a grand jury that
24  convened and had evidence presented by Ed
25  Parkinson?

Page 291

1  A.  Correct.
2  Q.  And what exculpatory evidence do you
3  believe Gary Farha concealed from you and your
4  attorneys in either trial?
5  A.  I'm not sure, again, the scope of Gary
6  Farha's involvement in the investigation or any
7  decisions regarding the investigation or what to
8  turn over.
9  Q.  Your complaint contains specific
10  allegations in it that Gary Farha fabricated
11  evidence that was exculpatory to you in both your
12  trials. So as you sit here today, can you
13  identify for me, please, what is that exculpatory
14  evidence you believe Gary Farha kept from you and
15  your attorneys?
16  A.  I don't know the extent of Gary Farha's
17  involvement. I know that he received an e-mail
18  that involved him somehow in the investigation.
19  Beyond that, I don't know at this point what
20  further involvement or the extent of the
21  involvement.
22  Q.  Okay. I'll move to strike that as
23  nonresponsive. My question is, besides Exhibit
24  10, which is the e-mail Adam Gibson forwarded to
25  Gary Farha, as you sit here today can you point to

Page 292

1  me any specific exculpatory evidence you claim
2  Gary Farha kept from you and your attorneys to
3  present at trial?
4  A.  And I'll answer again, I don't know of
5  any -- the extent of Gary Farha's involvement in
6  the investigation. As far as the facts that I
7  know today, or knew when we filed the complaint,
8  were that he was somehow involved in the
9  investigation. And received the -- a summary of
10  the investigation.
11  Q.  How was he involved in the
12  investigation? What information do you have he
13  was involved in any of the investigation into what
14  ultimately led to you being charged for murder?
15  A.  That he received a summary of the
16  investigation. I'm going to make an assumption.
17  Q.  Exhibit 10?
18  A.  Yes. I'm going to make an assumption
19  that he received that for a reason. The e-mail
20  does not say the reason, and so the e-mail and the
21  fact that he received it speaks for itself.
22  Q.  So, you're assuming that because he
23  received this e-mail he had some sort of part in
24  the investigation that was conducted prior to you
25  being charged with murder?

Page 293

1   A.   That is the only — that is the only
2   thing that I can reasonably conclude based upon
3   the fact that everyone in that office was
4   conflicted out and it's my understanding was not
5   to be involved in the investigation.
6   Q.   Move to strike that as nonresponsive.
7   Mr. Lovelace, my question is pretty simple.  We
8   can be here all night if you want.  Yes or no, is
9   it your assumption that Gary Farha had some
10  involvement in the investigation because he
11  received this e-mail from Adam Gibson?
12  A.   Yes.
13  Q.   Okay.  See, that's pretty simple to
14  answer yes or no, isn't it?  Pretty simple?
15  A.   I think you restated the question.  So,
16  I agree with that statement.
17  Q.   What exculpatory evidence do you believe
18  Jim Keller concealed from you and your attorneys
19  in this case?
20  A.   Jim Keller, this is going to be a long
21  answer so I apologize up front.  I am aware that
22  Jim Keller was involved in the investigation.  Was
23  involved with meetings with Dr. Bowman as well as
24  communicated with Dr. Denton, and I believe even
25  Dr. Turner.  And in those cases there, in those

Page 295

1   Q.   And he did not have any involvement in
2   any of the presentment of the evidence, or
3   exhibits or anything at the trial, correct?  He
4   wasn't the prosecutor, "he" being Mr. Keller?
5   A.   He was not the prosecutor.  He was a
6   witness for the prosecution.
7   Q.   He was called just like you were called
8   in your second trial as a witness, correct?
9   A.   He was a witness, correct.
10  Q.   You have received some psychiatric
11  counseling or treatment, however you want to refer
12  to it, with two providers, correct?
13  A.   Correct.
14  Q.   One is a Martin, how do you say his last
15  name?
16  A.   You know, I'm not sure exactly how to
17  say Martin's last name.  I refer to him as Martin,
18  but I know who you're speaking about.
19  Q.   It's spelled S-R-A-J-E-K.  Is he here in
20  Champaign?
21  A.   He is.
22  Q.   We produced those records that we
23  obtained by a subpoena.  I saw you had nine visits
24  with him with the last being on May 22.  Have you
25  seen him since then?

Page 294

1   situations, there was evidence that was not turned
2   over.
3   Q.   Do you believe Jim Keller had the duty
4   to turn any of that over after you had been
5   charged?
6          MS. THOMPSON: I'm going to instruct you
7   not to answer by referencing communications with
8   your counsel.
9   Q.   I don't want any communications you had
10  with your counsel.  Do you believe Jim Keller had
11  a duty to turn over anything that you just
12  referenced from the investigation regarding Drs.
13  Bowman, Denton or Turner, after you had been
14  charged?
15  A.   I am not — I think you're asking me a
16  question as to, did he have a legal duty.  And I'm
17  not in a position to give you a legal opinion as
18  to what his duties are regarding exculpatory
19  evidence.
20  Q.   As the coroner?
21  A.   As the coroner.
22  Q.   At the time of Cory's death, he was not
23  the coroner, correct?
24  A.   That is correct.  He was not the coroner
25  at the time of Cory's death.

Page 296

1   A.   Sorry, I have to think.  We may have had
2   — I'd have to look at my calendar.  We may have
3   had a visit in June also.
4   Q.   Do you pay for that out of pocket?
5   A.   That goes through my health insurance.
6   Q.   So you do have health insurance?
7   A.   We do have health insurance now.  And I
8   think I pay $30 portion of what is charged.
9   Q.   Okay.  So —
10  A.   And I do that out of pocket.
11  Q.   So if I do my math right, on the — if
12  you had one more visit that would be ten, if you
13  pay 30 bucks a visit, that means you've been out
14  of pocket $300?  Ten visits?
15  A.   Yeah, $300, yes.
16  Q.   Okay.  And what about Benjamin Fogel,
17  F-O-G-E-L?  I reviewed his records and you had
18  eight visits.  Is he in Chicago or here?
19  A.   He is in Chicago.
20  Q.   How would you get there?
21  A.   I would go with my wife, Christine.
22  Q.   And would you drive there?
23  A.   Yes.
24  Q.   And you saw him, I show on eight visits,
25  the last being May 2 of 2018?  Have you seen him

Page 297

1  since?
2  A.  No.
3  Q.  And how much did that cost?
4  A.  I paid out of pocket for those visits,
5  $75.
6  Q.  A piece?
7  A.  Uh-huh.
8  Q.  So 75 times eight, that's six hundred
9  dollars.  You did not have insurance at the time,
10 or did you, and it just wasn't covered?
11 A.  We didn't have insurance last year.  So,
12 those visits we were not able to turn in
13 insurance.  And so any visits in 2018, I don't
14 think I ran them through insurance because it was
15 new insurance.
16 Q.  Okay.  And who recommended Benjamin
17 Fogel to you?
18 A.  Another therapist in Chicago.
19 Q.  Did you see someone else in Chicago that
20 we haven't been provided?
21 A.  No.  No.
22 Q.  Is this just someone you knew?
23 A.  Yes, someone who Christine knew.
24 Someone else who worked in the same organization,
25 which I can't remember --

Page 298

1  Q.  Urban Balance?
2  A.  Urban Balance, because Ben started in
3  Urban Balance, and then at some point went out on
4  his own.
5  Q.  So, Mr. Fogel wasn't recommended to you
6  by your attorneys?
7  A.  No.
8  Q.  And why did you stop seeing him and
9  start seeing Mr. Martin, I'll just call him that?
10 A.  Sure.  The main reason was that because
11 of the distance to travel, to get to Ben.  I was
12 much more sporadic.  And I couldn't commit to
13 seeing him on a consistent basis.  And I thought
14 consistency would be better.  And so decided to go
15 local.  And I had a friend who recommended Martin.
16 Q.  Do you have any medical appointments
17 scheduled as you sit here today for anything you
18 attribute to your lawsuit that you filed?
19 A.  No.
20 Q.  Okay.  Can I have an exhibit sticker.
21      (Whereupon, Deposition Exhibit No. 12
22 was marked for identification.)
23 BY MR. HANSEN:
24 Q.  Going to hand you what I have marked as
25 Curtis Exhibit 12.  Is that a picture of you and

Page 299

1  your wife?
2  A.  It is, among other people.
3  Q.  And since I don't know them, that's what
4  I'm going to ask you next.  Who is the couple to
5  the right?
6  A.  Well, they're not exactly a couple.  The
7  tall gentleman is Cam Pepper.  And the woman,
8  Libby Herr.
9  Q.  Is that Rich Herr's wife?
10 A.  It is.
11 Q.  And is she part of the group that put up
12 your bond to get you out to home confinement?
13 A.  Yes, the Herrs did put up a portion of
14 that bond.
15 Q.  And have they been repaid?
16 A.  No, they have not.
17 Q.  And this was taken at the University of
18 Illinois spring football game in 2017; do you
19 recognize that?
20 A.  Yes.  There wasn't a spring game.  But,
21 it was an event associated with that.
22 Q.  I'm sorry.  And this was a picture your
23 wife put out on social media, correct?
24 A.  Correct.
25 Q.  And this is taken at a bar?

Page 300

1  A.  Yes.  It is.
2  Q.  And what bar?
3  A.  I believe it might be a bar called
4  Brothers.  But, I'm not entirely sure.  It is a
5  bar in Champaign.
6  Q.  And your wife has a beer in her hand,
7  correct?
8  A.  That is correct.
9  Q.  And this was taken, I believe on April
10 27th or somewhere about there of 2017?
11 A.  Correct.
12 Q.  And how long would that have been after
13 your second murder trial in Sangamon County?
14 A.  I was acquitted on March 10th of 2017.
15 Q.  So, about 45, 50 days later?
16 A.  Yeah.
17 Q.  And at that time were you living over
18 here in Champaign already?
19 A.  Yes.
20 Q.  How much did the Herrs put up for you
21 monetarily wise?
22 A.  Of the $300,000 bond, the Herrs
23 mortgaged their house and put up $100,000.
24 Q.  I have entered --
25 A.  I'm sorry, $350,000 bond.  Yes,

**Page 301**

1 $350,000. It had to be posted. The Herrs put up
2 $100,000 of that bond.
3    Q.  Have you entered into any payment plan
4 with them to pay them back for what they put up?
5    A.  No, they have not demanded repayment
6 from us yet.
7    Q.  Did your wife, after you were arrested,
8 set up a Go Fund Me page?
9    A.  I'm not sure whether it was Christine or
10 Bill Clutter. I think both of them were involved.
11 It may have been Bill Clutter who set that up.
12    Q.  Bill Clutter was the investigator hired
13 by your attorneys to work with you on your trial?
14    A.  In the first trial, yes.
15    Q.  How much money did either, both of
16 those, raise through any on-line fund raising,
17 etc.?
18    A.  I think the Go Fund Me account raised
19 somewhere between, I think it was a little over
20 $10,000. Somewhere between 10 and $15,000.
21    Q.  That money used for daily expenses of
22 Christine in taking care of the boys while you
23 were incarcerated?
24    A.  No.
25    Q.  What was it used for?

**Page 302**

1    A.  Well, the court ordered that it go first
2 towards paying experts who had not been paid for
3 their work in the first trial.
4    Q.  Okay. Any other fund raising that has
5 been undertaken?
6    A.  No.
7    Q.  Okay. Of the dozen felony trials you
8 said that you -- were they felony trials?
9    A.  Yes, I didn't try any misdemeanor cases.
10 I was only assigned felony cases.
11    Q.  And that's when you worked for Jon
12 Barnard, right?
13    A.  Uh-huh.
14    Q.  Yes?
15    A.  Yes.
16    Q.  And you didn't sue Jon Barnard as a
17 defendant in this case, did you?
18    A.  No.
19    Q.  And of the dozen felony trials you had,
20 how many resulted in a conviction?
21    A.  I'm not sure. And it was -- that's an
22 estimate. I'm not sure of my win/loss record when
23 it comes to trials. I think a majority of them,
24 again, win loss being convictions, versus
25 acquittals, I think a majority of them were

**Page 303**

1 convictions.
2    Q.  Let me ask it this way. You didn't win
3 every one of them, did you?
4    A.  No, I did not.
5    Q.  So these are cases where somebody had
6 been charged with a felony, correct?
7    A.  Correct.
8    Q.  And I assume they had been housed at the
9 Adams County jail awaiting trial?
10    A.  Maybe, maybe not. I mean, I'm sure some
11 of them were out on bond.
12    Q.  Okay. And then a decision was made to
13 prosecute them, and you handled that prosecution?
14    A.  Correct.
15    Q.  And you did not win all of those
16 prosecutions, which means some of those defendants
17 were found not guilty, correct?
18    A.  Correct.
19    Q.  And that means they got to walk out of
20 that courtroom a free person, correct?
21    A.  Correct.
22    Q.  And after they did that, did any of them
23 turn around and sue you?
24    A.  No.
25    Q.  As to the relationship your

**Page 304**

1 grandparents, or your parents have had with the
2 kids, I just want to make sure I understand this
3 right. So, up until 2004 or five when Kim got
4 married, they had no interaction with their grand
5 children. And then a relationship was started up
6 again, and continued; did it continue
7 uninterrupted until spring of 2015? Meaning they
8 had access to see the kids and had interaction
9 with the kids?
10    A.  Yes, they had interaction.
11    Q.  Okay. So, that would be an approximate
12 ten-year period, correct? '04, '05, through '15?
13    A.  Yeah.
14    Q.  And then they haven't had any
15 interaction with them since then, correct?
16    A.  Correct.
17    Q.  Okay. Do you have anything that you
18 have kept that has any relationship to Cory? You
19 were asked about this Valentine's card. Do you
20 have anything in your possession related to her?
21    A.  I think I have some, I think I have some
22 digital photos. I know I have some digital
23 photos. There's also a -- I think there's still a
24 box in our garage that there are photos of her.
25 And Lincoln has an album that has photos of her

LOVELACE v.
DET. ADAM GIBSON

CURTIS LOVELACE
July 6, 2018

Page 305

1  and our family that I currently have in my
2  possession because I have a lot of his personal
3  possessions in our garage right now.
4    Q.  While he's deployed?
5    A.  Yeah.
6    Q.  On the day that you found her body and
7  you went to deliver Larson to Marty, did you ever
8  ask Marty to call 911?
9    A.  I don't recall the conversation. I know
10  we had a conversation regarding what to do. And I
11  can only assume that out of that conversation came
12  an idea from her, from me, to call Jon Barnard.
13    Q.  Wait a minute. You're now telling me
14  that she had the idea to?
15    A.  No, I don't know. I don't know what
16  that conversation -- I don't recall exactly what
17  that conversation, the contents of that
18  conversation. And I don't know what caused me to
19  call Jon Barnard versus anyone else.
20    Q.  When you went into basic training before
21  you went into the JAG Corps or when you were doing
22  all that, you had to run and get in shape to go do
23  that, correct?
24    A.  Correct.
25    Q.  What was your weight when you entered

Page 306

1  into the Army? Were you under 200 pounds?
2    A.  No. I think when -- so, in November of
3  on 2009, so we can put a date on it, is that what
4  you're --
5    Q.  I don't know; you tell me. When did you
6  go and do basic training and everything you had to
7  do for the Army?
8    A.  My basic training was in the latter part
9  of 2010. And I think I weighed around 230 pounds
10  during that time period.
11    Q.  When is the last time you had any
12  contact -- or I'll just leave it at contact with
13  Lyndsay?
14    A.  The last contact I had with Lyndsay was
15  in September of last year.
16    Q.  Did you contact her or did she contact
17  you?
18    A.  We met.
19    Q.  What?
20    A.  We met.
21    Q.  Well, did you just randomly show up at
22  the same place? I said, did you call her first or
23  did she call you?
24    A.  It was a meeting that was arranged
25  between us.

Page 307

1    Q.  By who?
2    A.  By my attorneys.
3    Q.  And why did your attorneys arrange that
4  meeting for you instead of you calling her?
5      MS. THOMPSON: I'm going to instruct you
6  to answer not referencing any attorney client
7  privilege communication.
8    A.  I didn't have a current address or phone
9  number. And I had agreed to meet with Lyndsay.
10  It was my understanding she wanted to meet with
11  me. And the meeting was scheduled and we both
12  appeared.
13    Q.  Where was it?
14    A.  It was at the law office of Loevy and
15  Loevy.
16    Q.  In Chicago?
17    A.  Yes.
18    Q.  Who was there with you?
19    A.  Lyndsay, Jon Loevy and Tara.
20    Q.  Did your attorneys sit in on the meeting
21  between you and your daughter?
22    A.  Yes. I do believe they were there the
23  entire time.
24    Q.  Okay. Why didn't you ask them to leave
25  so you could be alone with your daughter?

Page 308

1    A.  The purpose of the meeting was not
2  necessarily to be alone with Lyndsay.
3    Q.  Well, what was the purpose?
4    A.  The purpose was to discuss whatever she
5  wanted to discuss.
6    Q.  Well, tell us about it? How long did
7  the meeting last?
8    A.  The meeting, I'm not sure. I think it
9  was at least an hour.
10    Q.  Did Christine go with you?
11    A.  Christine was in Chicago with me. We
12  drove together, but she did not attend the
13  meeting.
14    Q.  Did Logan, Larson or Lincoln attend and
15  spend any time with their sister?
16    A.  No, they were not at that meeting.
17    Q.  So, was Lyndsay, did she come by herself
18  to the best of your recollection?
19    A.  Yes.
20    Q.  So you're in there, and did you feel it
21  awkward that Lyndsay was asked to communicate with
22  you in front of your lawyers?
23      MS. THOMPSON: That misstates his
24  testimony. You can answer the question.
25      MR. HANSEN: What are you objecting to?

LOVELACE v.
DET. ADAM GIBSON

CURTIS LOVELACE
July 6, 2018

Page 309

1    MS. THOMPSON: I mean, you asked a
2  question, that misstates his testimony.
3    Q.   I didn't state anything. I said, did
4  Lyndsay state to you she found it odd that she had
5  to communicate in front of your lawyers?
6    MS. THOMPSON: That wasn't your
7  question. You can answer the question.
8    A.   I thought you asked me if I felt it was
9  awkward.
10   Q.   Okay. Fine, let's start with you. Did
11  you feel it was awkward communicating with your
12  daughter in front of your lawyers?
13   A.   I think at this point any communication
14  with Lyndsay is awkward, given what we've both
15  been through. So, I don't know if it was any more
16  or less awkward because Jon and Tara were there.
17   Q.   Tell me what you and Lyndsay talked
18  about.
19   A.   We just -- we talked about what she was
20  doing. And we talked about what I was doing.
21   Q.   And that was it? That's it? Did you
22  say, I'm sorry? Did you say, I want to talk to
23  you? I want to reconnect? I want to be a family?
24  I want you to see your brothers? Anything like
25  that?

Page 310

1    A.   We spoke at the end about possibly
2  meeting for some additional family-related
3  therapy. But neither of us followed up on that.
4    Q.   And in fact, you haven't followed up and
5  reached out to speak to your daughter since then,
6  have you?
7    A.   I have not.
8    Q.   And in fact, other than your children
9  seeing your current wife's grandmother and aunt,
10  do they have any communication at all with their
11  sister, Marty Didriksen, or your parents to the
12  best of your knowledge?
13   A.   No, they do not, to the best of my
14  knowledge.
15   Q.   And have you precluded them from
16  reaching out and talking to their sister? Strike
17  that.
18       Have you instructed them not to reach
19  out and talk to their sister?
20   A.   We have instructed Logan and Lincoln
21  that is up to them. And Larson is still in our
22  household, and we have really not given Larson any
23  instructions. But, he has not indicated a desire
24  to reach out or have those communications. And
25  neither has Logan and Lincoln said, hey, we want

Page 311

1  to have that type of communication. But that is
2  up to them. They're adults and they are out of
3  the house.
4    Q.   So, Lincoln and Logan are adults,
5  they're in the military, and they're free to
6  communicate with anyone they deem they want to?
7    A.   Yes.
8    Q.   Okay. Now, Larson, have you asked him,
9  hey, would you like to go back to Quincy and see
10  any of your grandparents?
11   A.   We have had those discussions throughout
12  the last year. I think we've had discussions
13  collectively with them when they were together.
14  How they felt and whether or not they wanted to
15  initiate some sort of communication.
16   Q.   And haven't you told them that you and
17  Christine don't want them to do that?
18   A.   We have told them, if they do want to do
19  that, we want them to be careful and be cautious,
20  and be smart about those communications. But, we
21  have not, again, we have not told them not to do
22  that.
23   Q.   Have you told Larson that he needs to
24  run any communication he has or desires he has to
25  communicate with Lyndsay, Marty or your parents,

Page 312

1  he has to get your permission first?
2    A.   Larson, being 16, now, and in the house,
3  in our house he has to talk with us about who he
4  associates with. And who he communicates with.
5  As parents we expect that.
6    Q.   Move to strike. My question was,
7  specifically, did you tell Larson he has to ask
8  your permission before he communicates with Marty,
9  your parents, or Lyndsay?
10   A.   I don't believe we have told him that.
11  I'm sure he's under the understanding that if he
12  wants to initiate those communications, he would
13  have to discuss it with us.
14       MR. HANSEN: Well, I'm sure we're at the
15  seven hour mark now.
16       MS. THOMPSON: We're not, actually.
17  BY MR. HANSEN:
18   Q.   The house you testified to being
19  foreclosed upon, was that the one that you and
20  Erika purchased in 2012 that you eventually took
21  possession of in that divorce and then lived there
22  with Christine?
23   A.   Correct.
24   Q.   You and Christine gave a deed in lieu of
25  foreclosure to the bank for that, is that correct?

LOVELACE v.
DET. ADAM GIBSON

CURTIS LOVELACE
July 6, 2018

Page 313

1  A.  Correct.
2  Q.  As you sit here today, is there anything
3  you are claiming in this case that you owe
4  financially to anyone as a result of the events
5  after August 27th, 2014?
6  A.  Yes.
7  Q.  What?
8  A.  I believe it is outlined in the
9  interrogatories, but the money that was paid by my
10  parents to the -- my first attorneys.  Money that
11  was received from individuals during our time of
12  need for experts.  As well as money that was
13  received from Christine's grandmother in the form
14  of just assistance as well as purchasing a vehicle
15  for her.  And money that was received from Jim
16  Liautaud.  A substantial amount of money that was
17  received for our living expenses in 2016.  As well
18  as money that he contributed for experts and other
19  costs related to the case.
20  Q.  Let me go through that answer, and I'm
21  going to break it down specifically.  You allege
22  in answer to interrogatory 22 that your parents,
23  Terry and Jan Lovelace, loaned you $100,000.  Is
24  that correct?
25  A.  Correct.

Page 314

1  Q.  And that would be the $100,000 that was
2  paid to Elmore & Page for your defense in the
3  first trial, correct?
4  A.  Correct.
5  Q.  And your parents, other than a letter,
6  which was marked Curtis Exhibit No. 9, where they
7  said you will pay us back, have they at any point
8  in time since then, since you haven't
9  communicated, demanded payment?
10  A.  No, they have not demanded payment or
11  initiated collection action against us at this
12  point.
13  Q.  So, at this point in time no one has
14  demanded you to make payment to them?  They
15  haven't claimed that you still owe them the money
16  and they haven't moved in on you with a
17  collection, correct?
18  A.  Correct.
19  Q.  Okay.  Jim and Leslie Liautaud,
20  L-I-A-U-T-A-U-D.
21  A.  Liautaud.
22  Q.  And Rich Herr, is he a guy you played
23  football with?
24  A.  Correct.
25  Q.  Loaned Mr. Lovelace through posting his

Page 315

1  bond $40,433.75, combined between the three of
2  them, correct?
3  A.  Correct.
4  Q.  Has any one of them or a combination of
5  them made written demand on you for repayment of
6  that amount?
7  A.  No.
8  Q.  Has anyone approached you about a demand
9  for a payment plan for you to pay that money back?
10  A.  No.
11  Q.  Has anyone, Jim, Leslie or Rich, on the
12  bond money they posted, initiated collection
13  proceedings against you?
14  A.  No, they have not.
15  Q.  Cleora Pessman loaned him goods worth
16  approximately $35,000.  Is that Christene's aunt?
17  A.  That would be her grandmother.
18  Q.  Grandmother, sorry.  What goods did she
19  loan you?
20  A.  She purchased a vehicle for Christine.
21  Q.  So, it wasn't a loan?  It was a purchase
22  of a car?
23  A.  I think that was the goods, that was
24  originally titled in I, believe, Cleora's name.
25  And then subsequently transferred to Christine's

Page 316

1  name.
2  Q.  Okay.  Has Ms. Pessman demanded
3  repayment for the purchase of that vehicle?
4  A.  No.
5  Q.  Has she demanded -- or excuse me.  Or
6  sought or filed collection action again you or
7  your wife?
8  A.  No.
9  Q.  Has she requested in writing or
10  otherwise that you enter into a payment plan with
11  her?
12  A.  No.
13  Q.  Has she titled that vehicle over to you
14  and/or your wife?
15  A.  To my wife.  Yes.
16  Q.  So, that vehicle is now titled in your
17  wife's name and Ms. Pessman has not sought
18  reimbursement of any of the amounts you claim she
19  loaned you in this answer to interrogatory,
20  correct?
21  A.  She has not demanded payment, correct.
22  Q.  Who is Rich and Gail Gastler,
23  G-A-S-T-L-E-R?
24  A.  Gastler.  Those are friends through
25  church, St. John Lutheran church.

Page 317

1  Q.  They loaned you approximately $7,500?
2  A.  Yes.
3  Q.  Are they still in Quincy, to the best of
4  your knowledge?
5  A.  Yeah, I think they live in Adams County.
6  Maybe even close to Hancock County, but they are
7  in the Quincy area.
8  Q.  Was that cash?
9  A.  I was in jail at the time. So, I'm not
10  sure of the details of the transaction. They gave
11  Christine money to use for purposes of paying
12  experts when we didn't have any more money to pay.
13  Q.  Has Rich or Gail Gastler demanded
14  repayment of the $7,500 they loaned you?
15  A.  No, they have not.
16  Q.  Have they initiated proceedings against
17  you in collection?
18  A.  No.
19  Q.  Have they contacted you at any time
20  since your incarceration to work out a payment
21  plan for you to repay the $7,500?
22  A.  No.
23  Q.  And they haven't made -- has any of
24  these people, the same questions I'm going to ask
25  your wife, but to the best of your knowledge have

Page 318

1  they made demand upon her?
2  A.  No. As you've asked the question, if we
3  do go back to Jim and Leslie Liautaud, who I think
4  was part of the same questions, there was
5  communication between, I believe Jim Liautaud's --
6  well, I know between Jim Liautaud's attorney and
7  me regarding -- and maybe even Steve Beckett. And
8  I don't think I'm disclosing anything here. That
9  about, you know, the amount that wasn't going to
10  be returned to Jim Liautaud after the rest of the
11  bond funds were released. And I've had
12  communication with both Jim Liautaud and Rich Herr
13  regarding the bond appeal, appealing that
14  decision, the denial. And actually I've shared
15  everything with them as the exoneration project
16  has moved towards that appeal.
17      So I just wanted to clear up, that
18  communication has been exchanged.
19  Q.  Right, but they haven't made demand you
20  repay it?
21  A.  No.
22  Q.  And you still speak to Jim, Leslie and
23  Rich?
24  A.  I've e-mailed with Jim. I have spoken
25  to him once, but never met him directly. And Rich

Page 319

1  Herr and Libby are good friends of ours and we do
2  see them on a regular basis.
3  Q.  And obviously you see Cleora Pessman?
4  That's Christine's grandmother? You just went,
5  your boys testified?
6  A.  Right. Not as regularly as we would
7  like, but, yeah.
8  Q.  Have you seen the Gastlers since you
9  have been out after your second trial?
10  A.  I believe we have.
11  Q.  Okay. And the last thing here is you
12  indicate that in addition to all of that, in 2016
13  Christine received a gift of $28,000 from Jim and
14  Leslie Liautaud. Is that in addition to the other
15  money for the bond?
16  A.  Yes.
17  Q.  And that was for what? Living expenses?
18  A.  Correct.
19  Q.  And have they at any point in time ever
20  asked for repayment of that $28,000?
21  A.  No, they have not demanded repayment.
22  Q.  Okay. So as you sit here today, not one
23  person identified that has provided you financial
24  support is currently demanding or has demanded
25  repayment of that money?

Page 320

1  A.  They have not demanded. We were -- are
2  under the understanding that if we ever have the
3  money to repay them, that they expect to be
4  repaid. And we have an understanding that we will
5  repay them.
6  Q.  Well, have you been setting aside any of
7  your earnings to that end?
8  A.  We have discussed at what point we can
9  start setting aside money to repay them.
10  Christine and I. But we have not set aside at
11  this point.
12  Q.  Okay. I don't want to know what you
13  talked about. I want to know, my question was,
14  have you at this point in time set any aside?
15  A.  No.
16      MR. HANSEN: I think I'm going to stop
17  there at this point in time and we can go on and
18  make a record or whatever you want to do.
19      MR. DiCIANNI: Do you want to confer?
20      VIDEO OPERATOR: Now going off the
21  record. The time is approximately 5:31 PM.
22      (Off the record discussion.)
23      VIDEO OPERATOR: Now going back on the
24  record. The time is approximately 5:33 PM.
25      MR. DiCIANNI: It is now 5:33. We

LOVELACE v.
DET. ADAM GIBSON

CURTIS LOVELACE
July 6, 2018

**Page 321**

1  started deposing the Plaintiff this morning at
2  about 9:30. Maybe a little earlier than that. We
3  have gone past seven hours. The parties have all
4  agreed to go past seven hours today. We suggested
5  to plaintiff's counsel a more reasonable approach
6  would be to adjourn at this point and to resume
7  Mr. Lovelace's deposition on the same day that we
8  take Christene's deposition, which would not be
9  very -- a real long deposition. We still held
10 that proposal out. The plaintiff's counsel has
11 refused to agree.
12      So, we at this point are prepared to go
13 forward. However, we have been advised by the
14 court reporter that she is not prepared to go
15 forward. She has an important meeting tonight
16 with -- get-together tonight with her grand
17 daughter. And she's also highly fatigued. And
18 based on that, we've asked the counsel whether
19 she would agree to resume without having to go to
20 the court for intervention. She has refused to do
21 so. It's our position that her position in this
22 case is highly unreasonable.
23      But, in deference to the court reporter,
24 and our concerns for her, we're going to stop the
25 deposition at this point. If counsel sticks with

**Page 322**

1  their agreement, with their refusal to agree to
2  resume at a different date, then we will seek
3  court intervention.
4      **MS. THOMPSON:** What I'll add is that
5  what counsel asked me is if we would be willing to
6  reproduce Mr. Lovelace at the same time as
7  Christine's deposition. And counsel can correct
8  me, but potentially for two hours, or there was no
9  particular time given. And we are not willing to
10 reproduce Mr. Lovelace for some unspecified amount
11 of time in the future. We did offer to stay late
12 today. And maybe we have already gone past seven
13 hours. But we were willing to continue.
14      And my understanding from the court
15 reporter is that no prior arrangements were made
16 with her to have someone else here, including at
17 2:52 when the issue was raised of going later
18 tonight. And so arrangements could have been made
19 to have another reporter here, and they weren't.
20 And so with respect to the court reporter, we
21 don't view that as a reason to change our
22 position. But we're happy to confer with this
23 about this issue after this deposition with
24 counsel further. But at this point we're not
25 agreeing to produce Mr. Lovelace at a later time.

**Page 323**

1      **MR. HANSEN:** I would just say I join in
2  the position Tom indicated earlier on behalf of my
3  client -- you can hear me, I assume? I would just
4  say I join in the position on behalf of the county
5  defendants as well, as far as reconvening Mr.
6  Lovelace and finishing at that time.
7      **MR. DiCIANNI:** Okay. With that, with
8  all that said, we will be adjourning the
9  deposition at this point.
10      **VIDEO OPERATOR:** Now going off the
11 record. The time is approximately 5:36 PM.
12      (The time is 5:35 p.m.)

**Page 324**

```
                IN THE UNITED STATES DISTRICT COURT
              FOR THE CENTRAL DISTRICT OF ILLINOIS
                        STATE OF ILLINOIS

CURTIS LOVELACE, LOGAN LOVELACE,
LINCOLN LOVELACE, AND CHRISTINE
LOVELACE on behalf of her
minor son, LARSON LOVELACE,

              Plaintiffs,

    -vs-                        No. 17 CV 01201

DET. ADAM GIBSON, POLICE
CHIEF ROBERT COPLEY, SGT.
JOHN SUMMERS, LT. DINA
DREYER, DET. ANJANETTE BISWELL,
UNKNOWN QUINCY POLICE OFFICERS,
GARY FARHA, CORONER JAMES
KELLER, THE CITY OF QUINCY AND
COUNTY OF ADAMS,

              Defendants.

        This is to certify that I have read the
transcript of my deposition taken in the
above-entitled cause, and that the foregoing
transcript taken on July 6, 2018, accurately
states the questions asked and the answers given
by me, with the exception of the corrections, if
any, on the attached errata sheet(s).


                        CURTIS LOVELACE
                        _____

Subscribed and Sworn before
me this _____ day of
_____, 2018.

Notary Public
```

LOVELACE v.
DET. ADAM GIBSON

CURTIS LOVELACE
July 6, 2018

Page 325

1    STATE OF ILLINOIS    )
                          )  SS
2    COUNTY OF CHAMPAIGN  )

3         I, DEANN K. PARKINSON, a Notary Public
     in and for the County of Champaign State of
4    Illinois, do hereby certify that CURTIS LOVELACE,
     the deponent herein, was by me first duly sworn to
5    tell the truth, the whole truth and nothing but
     the truth in the aforementioned cause of action.
6         That the foregoing deposition was taken
     on behalf of the Defendant on July 6, 2018.
7         That said deposition was taken down in
     stenographic notes and afterwards reduced to
8    typewriting under my instruction and said
     transcription is a true record of the testimony
9    given; and that it was agreed by and between the
     witness and attorneys that said signature on said
10   deposition would be not waived.
          I do hereby certify that I am a
11   disinterested person in this cause of action; that
     I am not a relative of any party or any attorney
12   of record in this cause, or an attorney for any
     party herein, or otherwise interested in the event
13   of this action, and am not in the employ of the
     attorneys for either party.
14        In witness whereof, I have hereunto set
     my hand and affixed my notarial seal July 12,
15   2018.

16

17                    DEANN K. PARKINSON, CSR
                      NOTARY PUBLIC
18

19

20

21

22

23

24

25