CURTIS LOVELACE, et al. vs DET. ADAM GIBSON, et al.
BOWMAN, JESSICA 11/07/2018

## Page 1

IN THE UNITED STATES DISTRICT COURT FOR THE
CENTRAL DISTRICT OF ILLINOIS

- - - - - - - - - - - - - - -X

CURTIS LOVELACE, LOGAN LOVELACE, :  Contains
LINCOLN LOVELACE, & CHRISTINE  :  Confidential
LOVELACE on behalf of her minor :  Information
son LARSON LOVELACE,          :

          Plaintiffs,      :
                            :  Case No.
v.                          :  1:17-cv-01201
                            :  JES-JEH
DET. ADAM GIBSON, POLICE CHIEF :
ROBERT COPLEY, SGT. JOHN SUMMERS,:
LT. DINA DREYER, DET. ANJANETTE :
BISWELL, UNKNOWN QUINCY POLICE :
OFFICERS, GARY FARHA, CORONER  :
JAMES KELLER, THE CITY OF QUINCY,:
and COUNTY OF ADAMS,          :

          Defendants.       :
- - - - - - - - - - - - - - -X

VIDEO-DEPOSITION OF DR. JESSICA H. BOWMAN,

taken by the Plaintiffs, before Julie M. McCurnin,

Certified Shorthand Reporter of the State of Iowa,

at Hampton Inn Keokuk, 3201 Main Street, Keokuk,

Iowa, commencing at 2:30 p.m., Wednesday,

November 7, 2018.

JULIE M. McCURNIN - CERTIFIED SHORTHAND REPORTER

## Page 2

APPEARANCES:
For the Plaintiffs: TARA THOMPSON, ESQ.
          Loevy & Loevy
          311 North Aberdeen, 3rd Floor
          Chicago, IL  60607
          (312)243-5900
          tara@loevy.com

For the Quincy    ELLEN K. EMERY, ESQ.
Defendants:    Ancel, Glink, Diamond, Bush,
          DiCianni & Krafthefer
          140 South Dearborn Street
          Chicago, IL  60603
          (312)782-7606
          eemery@ancelglink.com

For the County    JAMES A. HANSEN, ESQ.
Defendants:    Schmiedeskamp, Robertson,
          Neu & Mitchell, LLP
          525 Jersey
          Quincy, IL  62301
          (217)223-3030
          jhansen@srmm.com

Also Present:    Janis Fortin, Videographer
          Video Production Services of
          Iowa, LC
          1004 North Broadway Street
          Mt. Pleasant, IA  52641
          (319)385-2041
          vpsia@aol.com

          Curtis Lovelace, Plaintiff
          Christine Lovelace, Plaintiff

## Page 3

INDEX

NAME: DR. JESSICA H. BOWMAN          PAGE
  Examination By: Ms. Thompson         5, 164
  Examination By: Mr. Hansen          118, 166
  Examination By: Ms. Emery           138

EXHIBITS:                    MARKED
Exhibit 1 -  Autopsy report           4
Exhibit 2 -  Bowman file re: C. Lovelace    44
Exhibit 3 -  Keller/Bowman e-mails        83
Exhibit 4 -  Gibson/Bowman e-mails        112
Exhibit 5 -  Photo of C. Lovelace in bed    139
Exhibit 6 -  Photo re: C. Lovelace hands    140
Exhibit 7 -  Photo re: C. Lovelace neck     146
Exhibit 8 -  Photo re: C. Lovelace mottling  150
Exhibit 9 -  Photo re: C. Lovelace lips     151
Exhibit 10 - Photo re: C. Lovelace eyes     152

## Page 4

PROCEEDINGS

          (Deposition Exhibit 1 was
          marked for identification.)
          THE VIDEOGRAPHER: Here begins Tape No. 1
in the videotaped deposition of Dr. Jessica Bowman,
in the matter of Curtis Lovelace, Logan Lovelace,
Lincoln Lovelace, and Christine Lovelace on behalf
of her minor son, Larson Lovelace, Plaintiffs,
versus Detective Adam Gibson, Police Chief Robert
Copley, Sergeant John Summers, Lieutenant Dina
Dreyer, Detective Anjanette Biswell, Unknown Quincy
Police Officers, Gary Farha, Coroner James Keller,
the City of Quincy, and County of Adams,
Defendants, in the United States District Court for
the Central District of Illinois, Case No.
1:17-cv-01201-JES-JEH.
          Today's date is November 7, 2018.  The
time on the video monitor is 2:30 p.m.
          The videographer today is Janice Fortin
representing Planet Depos.
          This video deposition is taking place at
Hampton Inn Keokuk, 3201 Main Street, Keokuk, Iowa.
          Would Counsel please voice-identify
themselves and state whom they represent.
          MS THOMPSON: Dr. Bowman, I'm Tara

1 (Pages 1 to 4)

CURTIS LOVELACE, et al. vs DET. ADAM GIBSON, et al.
BOWMAN, JESSICA 11/07/2018

Page 5

1   Thompson, and I represent the plaintiffs in this
2   matter.
3       MS. EMERY:  I'm Ellen Emery, and I
4   represent the Quincy defendants.
5       MR. HANSEN:  Jim Hansen, and I represent
6   the county defendants.
7       THE WITNESS:  Okay.
8       THE VIDEOGRAPHER:  The court reporter
9   today is Julie McCurnin, representing Planet Depos.
10      Would the reporter please swear in the
11  witness.
12      DR. JESSICA H. BOWMAN,
13  called as a witness by the Plaintiffs, being first
14  duly sworn by the Certified Shorthand Reporter,
15  was examined and testified as follows:
16      THE VIDEOGRAPHER:  Please proceed.
17      MS. THOMPSON:  Thank you.
18          EXAMINATION
19  BY MS. THOMPSON:
20      Q.  Thanks for being here this afternoon,
21  Dr. Bowman.
22      A.  You're welcome.
23      Q.  Have you ever given a deposition before?
24      A.  Yes.
25      Q.  All right.  So a couple of quick ground

Page 6

1   rules before we start.
2       I will do my very best not to talk over
3   any answers that you give.  I'll wait until you're
4   finished talking before I pose another question.
5       I would also ask that you wait until I
6   finish asking a question before you respond, just
7   so the court reporter can get everything down.
8   Okay?
9       A.  Fair enough.
10      Q.  The court reporter is typing down what
11  you say, so if you have an answer that's "huh-uh"
12  or "uh-huh," she may not know how to write that
13  down.  So try to give a verbal answer if you can.
14  All right?
15      A.  Correct.  "Yes" and "no."
16      Q.  Yes.
17      A.  Okay.
18      Q.  And if you need to take a break at any
19  time, you're welcome to do that.  I would just ask
20  that, you know, if there's a question that's
21  pending, that you answer it, and then you're
22  welcome to take a break at any point that you need
23  one.  All right, Doctor?
24      A.  Yes.
25      Q.  Is there any reason, Dr. Bowman, why you

Page 7

1   would not be able to give true and accurate
2   testimony to the best of your ability and memory
3   today?
4       A.  No.
5       Q.  Can you please tell us your full name,
6   Doctor.
7       A.  Jessica Hellane Bowman, M.D.
8       Q.  Doctor, are you currently employed?
9       A.  Yes, I am.
10      Q.  Where do you work?
11      A.  I work for Unity Point Health, Keokuk,
12  mainly.  I also cover Carthage, which is part of
13  Unity Point Health.  And we contract with Pike
14  County Community Hospital.  So I'm there a little
15  bit also.
16      Q.  Is Pike County in Iowa or Illinois?
17      A.  Oh, pardon me.  Pike County is in
18  Missouri.
19      Carthage, of course, is Illinois.  And
20  then Keokuk is here in Iowa.
21      So I'm a tri-state physician, I guess you
22  could say.
23      Q.  Thank you.
24      Could you please briefly tell us your
25  educational background?

Page 8

1       A.  Okay.  Well, the way it was, at least 30
2   years ago when I started this process, you need a
3   bachelor's of science or arts, with two years of
4   pre-med training and then a medical degree and then
5   a residency at least in anatomic pathology, but I
6   went ahead and did anatomic and clinical pathology,
7   which was five years at that time.
8       And then I did a fellowship in forensic
9   pathology with the idea that it would be an adjunct
10  at the time to general pathology.  And I was
11  thinking of being in a small community setting
12  where I currently am, as a matter of fact.  So --
13      That's the basic summation of my
14  educational process.
15      Q.  You have a medical degree, Doctor?
16      A.  Oh, yes, a medical degree, M.D., from
17  Indiana University School of Medicine.
18      I've got certificates for my
19  residencies -- Well, actually the residency was
20  combined from Methodist into the Methodist Indiana
21  University program while I was still a resident,
22  and -- which afforded me learning opportunities,
23  actually.  So I have two bits of paper for that.
24      And then I have a bit of paper for
25  completing my fellowship.  And I have my anatomic/

2 (Pages 5 to 8)

CURTIS LOVELACE, et al. vs DET. ADAM GIBSON, et al.
BOWMAN, JESSICA 11/07/2018

Page 9

1    clinical pathology specialty boards.
2        Q.  That's two separate boards?
3        A.  Yeah, they call them separately now.
4        Q.  One is anatomical pathology and one is in
5    clinical pathology?
6        A.  Yeah.  Basically.  Yeah.
7        Q.  In your current job as a tri-state
8    physician, as you said, Doctor, are you working as
9    a pathologist?
10       A.  Yes, I am.
11       Q.  And can you tell us briefly what your
12   current job entails?
13       A.  Quite a lot, actually.
14           Anatomic pathology, looking at slides.
15   If something is cut off your skin or a biopsy taken
16   from an organ, it's sent to us and -- "us" being my
17   lab -- and we process it, and I look at it and
18   arrive at a diagnosis.  Sometimes I need to do
19   additional studies.
20           We also -- Body fluids can be analyzed
21   under the microscope.  It can also be analyzed
22   chemically.  We have various complicated and
23   expensive pieces of equipment that will come up,
24   you know, with everything from a hemoglobin level
25   to, you know, potassium levels to drug levels, if

Page 10

1    necessary.  It's not in this particular instance
2    certified for forensics, but I'm not doing that
3    anymore.  I'm doing general clinical pathology and
4    anatomical pathology.
5        Q.  And that was going to be my next
6    question.
7            Does your current position involve both
8    clinical and anatomical pathology?
9        A.  Yes, it does.
10       Q.  Are you the only pathologist that works
11   in your current lab?
12       A.  Regularly, yes.  I do have a colleague
13   who will cover for me when I'm on vacation, which
14   isn't very often, but -- Yeah, so there's
15   basically myself and then my associate who covers
16   for me when I'm gone.
17       Q.  How long have you been practicing
18   medicine, Dr. Bowman?
19       A.  Good question.  Decades.
20           I graduated in 2000, in the end of 1999,
21   2000, and began the young pathologist's kind of
22   roaming around, getting some experience here and
23   there, doing locums and so forth and so on.
24           I eventually -- For family reasons, I
25   needed to be near -- near Indiana for a while, and

Page 11

1    I accepted a job in full-time forensics.
2            Perhaps the best way of explaining it is
3    I viewed forensics more -- very much more from a
4    medical point of view and didn't quite appreciate
5    the degree of legal influence that goes along with
6    a job exclusively in forensic pathology, especially
7    in a larger city as opposed to a rural area, and it
8    turned out to not be a good fit.  So I went back to
9    clinical pathology, and there I have been the past
10   six years.
11       Q.  All right.
12           And you've mentioned some of these
13   different specialties in pathology.  Could you tell
14   us in your experience the difference between
15   clinical pathology and forensic pathology?
16       A.  Okay.
17           The luxury we have in clinical pathology,
18   and also the forms of anatomical pathology that
19   apply to living people, is that the person is still
20   living; we make a diagnosis, the person is treated,
21   they get better, that supports the diagnosis.
22           Forensic pathology, we are dealing with a
23   deceased individual, and we have to draw
24   conclusions from what we see, knowing that there
25   will be, you know, no further changes in the status

Page 12

1    of the body as we received it.  We can't say --
2            You know, the thing about clinical
3    pathology/clinical anatomic pathology, where you're
4    looking at tissues, is, living patient, if you miss
5    a cancer diagnosis, they're going to know it.  Vice
6    versa.  If you call it cancer and it isn't, it's
7    going to become quite clear over time that that
8    wasn't the case.  And then with forensics, of
9    course, that is not available.
10       Q.  But clinical/anatomical pathology, as
11   you've described it for us, and forensic pathology
12   are using the same methods of analysis within the
13   field of pathology; is that correct?
14       A.  The way I approach it, yes.
15       Q.  All right.
16           And those two different areas of
17   pathology require the same understanding of
18   medicine and pathology; is that right?
19       A.  Ideally, yes.
20       Q.  All right.
21           You alluded to a point previously in your
22   career where what you were doing was a little
23   different.
24           Was there a time in your career when you
25   were working as a coroner's physician?

3 (Pages 9 to 12)

CURTIS LOVELACE, et al. vs DET. ADAM GIBSON, et al.
BOWMAN, JESSICA 11/07/2018

Page 13

1   A.  Yes, there was.
2   Q.  And can you tell us what a coroner's
3   physician does?
4   A.  A coroner's physician, unlike a medical
5   examiner popularized by TV shows -- a coroner's
6   physician is a physician who basically performs
7   autopsies for coroners, arrives at a cause of
8   death, and then the coroner, either by their own
9   decision or by convening a jury, arrives at a
10   manner of death.  And these are very distinctively
11   different things.
12       For instance, a cause of death might be
13   gunshot wound to the head; doesn't imply anything
14   about motive or intent or anything.  Or heart
15   attack, myocardial infarction, that's a cause of
16   death.
17       Manner of death would be things like
18   natural, accidental, suicide, homicide, or
19   undetermined, and have other implications, as you
20   can tell.
21   Q.  Have you ever worked as a medical
22   examiner?
23   A.  Actually, I did for a little while.  One
24   of the jobs I was doing to acquire experience, I
25   was a deputy medical examiner in Arizona for about

Page 14

1   a year and a half.  It was a six-month locum that
2   turned into a year and a half.  It's mañana, you
3   know.  It was lovely down there, though; just far
4   away from home.
5   Q.  You've used this term "locum."  Can you
6   spell that for us?
7   A.  Yeah.  Locum, l-o-c-u-m, usually followed
8   by tenes, t-e-n-e-n-s, describes a period of
9   employment usually -- well, it does range, you
10   know, from maybe a couple of weeks or months to a
11   couple years.  But it's intended to fill a gap, if
12   you will, in the, you know, practice which you have
13   joined.  And, you know, sometimes they convert into
14   long-term employment, sometimes not.  But it's not
15   uncommon, especially in this day and age, for young
16   pathologists -- Nobody wants a pathologist right
17   out of training to be a medical director, for
18   instance.  So they want you to get some experience.
19   And that's very standard across the medical
20   profession.
21   Q.  Was there a time in your career when you
22   worked as a coroner's physician conducting
23   autopsies in Illinois?
24   A.  Yes, there was.
25   Q.  And in that capacity, did you conduct

Page 15

1   autopsies for deaths that occurred in Adams County,
2   Illinois?
3   A.  Yes.
4   Q.  How many autopsies of deceased persons
5   have you conducted in your career?
6   A.  I have estimated it to be around 3,000.
7   Q.  As of 2006, do you know how many
8   autopsies you had conducted?
9   A.  Maybe 2,000, 2,200, something like that,
10   would be a guess.
11       You know, I'd have to work the numbers.
12   Q.  In 2006, where were you employed?
13   A.  I was employed in -- I was living in
14   Springfield, Illinois, and I was employed as a
15   coroner's physician for an assortment of coroners
16   in a central -- roughly central Illinois region,
17   the main county being Sangamon County.
18   Q.  And did your responsibilities at that
19   time include working as a coroner's physician with
20   Adams County, Illinois?
21   A.  It did.
22   Q.  You were not a county employee at that
23   time?
24   A.  Contracted, probably, is the best way to
25   put it for these services.

Page 16

1   Q.  Are you familiar with someone named Gary
2   Hamilton?
3   A.  Yes.
4   Q.  And who is Gary Hamilton?
5   A.  Gary Hamilton was the coroner at the time
6   I was doing Hamilton County autopsies.
7   Q.  You said "Hamilton County."  Did you mean
8   Adams County?
9   A.  I mean Adams County.
10       Pardon me.  Adams County.
11   Q.  Was he the Adams County coroner in 2006?
12   A.  Yes.
13   Q.  Did you in your time as a coroner's
14   physician for Adams County have a good working
15   relationship with Coroner Hamilton?
16   A.  I thought so.
17   Q.  Had you -- Before 2006, had you
18   consulted on autopsies with Coroner Hamilton?
19   A.  Yes.
20   Q.  And you talked a little bit just a second
21   ago about the differences between cause of death
22   and manner of death.
23       As a coroner's physician, was one of your
24   responsibilities in conducting an autopsy to
25   complete an autopsy report?

4 (Pages 13 to 16)

CURTIS LOVELACE, et al. vs DET. ADAM GIBSON, et al.
BOWMAN, JESSICA 11/07/2018

Page 17

1    A.  Yes.
2        Q.  Did that document, what I called an
3    autopsy report -- did you know that by another
4    name, or did you refer to it as an autopsy report?
5        A.  I called it an autopsy report.
6        Q.  All right.
7        In completing autopsy reports, would it
8    ever be your role to reach a determination about
9    the manner of death of the person who you had
10   examined through the autopsy process?
11       A.  I didn't determine manner of death.  Like
12   I said, that was actually the purview of the
13   coroner and, if he so chose, coroner's jury.
14       Q.  Did you in the course of completing
15   autopsy reports make a determination, where
16   possible, about the cause of death?
17       A.  Yes.
18       Q.  All right.
19       And you gave us some examples earlier of
20   types of causes of death, and I think you included
21   in that list what we would commonly know to be a
22   heart attack or gunshot wound or things of that
23   nature.  Is that right?
24       A.  That is correct.
25       Q.  Is one possible determination that you

Page 18

1    could reach on an autopsy report at the time that
2    you were a coroner's physician a cause of death
3    determination of "undetermined"?
4        A.  Yes.
5        Q.  And what would an "undetermined" cause of
6    death conclusion in an autopsy report mean at that
7    time?
8        A.  "Undetermined" means that there aren't
9    sufficient pieces of the puzzle to put together to
10   be definitive, in my opinion, in saying, you
11   know -- Like a heart attack, for instance, where
12   you would see a clotted coronary artery, I mean,
13   that -- that is visual physical evidence that you
14   see.
15       Various other anatomic causes of death
16   are clear-cut in that fashion.  Findings that may
17   be seen -- And I'm going to use an example from
18   this case, if that's okay --
19       Q.  Sure.
20       A.  -- the case in question.
21       Like fatty change of the liver.  We know
22   in medicine that is associated with increased
23   mortality and certain other disease processes.  But
24   in and of itself, without supporting -- other
25   supporting evidence, it can be difficult to use

Page 19

1    that as a cause of death, because there are plenty
2    of people surviving with fatty livers.  So --
3        For instance, here's a common scenario
4    that I would run into:  Fatty change of the liver,
5    a blood alcohol -- elevated blood alcohol, and
6    maybe an individual was found outside in the cold
7    weather, and so it might be hyperthermia due to
8    alcohol toxicity.  And fatty change in the liver
9    supports the alcoholism, because that's one of the
10   things that can cause fatty change of a liver.
11       Am I explaining it in a lay-enough term,
12   do you think?
13       Q.  Thank you for that answer.
14       A.  Okay.
15       Q.  I appreciate that answer.
16       I want to talk to you a little bit about
17   the process by which you conducted autopsies for
18   Adams County when as you said you were contracted
19   to do that.
20       A.  Right.
21       Q.  So I want to ask you some process
22   questions.
23       And do you understand that when I ask you
24   about the process, I'm asking you about the process
25   you would use to do autopsies for Adams County?

Page 20

1        Does that make sense?
2        A.  Yes.
3        Q.  So I take it that at some point, if there
4    was a death in Adams County that required an
5    autopsy, that someone would contact you about doing
6    that.
7        A.  That is correct.
8        Q.  All right.
9        And did you have a location that you did
10   those autopsies for Adams County?
11       A.  Yes, I did.
12       Q.  And where was that?
13       A.  At that time, in 2006, it was Memorial
14   Medical Center in Springfield, Illinois.
15       Q.  So what would the process be for you to
16   conduct such an autopsy?
17       A.  Well, I would be contacted by the coroner
18   or the deputy coroner.  The body would be brought
19   over to Memorial Medical Center.  We had guards
20   that would admit the body into the morgue.  And
21   then the next day, I would proceed with the
22   autopsy.
23       Q.  All right.
24       In the course of conducting an autopsy,
25   is one of the things that you would do, to have

5 (Pages 17 to 20)

CURTIS LOVELACE, et al. vs DET. ADAM GIBSON, et al.
BOWMAN, JESSICA 11/07/2018

Page 21

1  photographs taken?
2      A.  Yes.
3      Q.  Would you take those or would someone
4  else take them during the autopsy?
5      A.  I have photography assistance,
6  photographers who would -- I would say, you know,
7  "I'd like a shot of this," "I would like --"
8          There were standard shots that they would
9  get routinely, and then there were special ones
10  that I would request --
11      Q.  All right.
12      A.  -- if I had a finding.
13      Q.  As part of the autopsy, would you also in
14  certain circumstances collect tissue samples?
15      A.  Yes.
16      Q.  And as part of that process, essentially,
17  am I right that if there's a piece of tissue needed
18  to collect, that you would, you know, cut that
19  tissue out and then put it in solution in a
20  container?
21      A.  Correct.
22      Q.  All right.  And what would you do with
23  those tissue samples after the conclusion of the
24  autopsy?
25      A.  Depending on the findings and what I was

Page 22

1  focused on at the time, I would put various pieces
2  through for histological evaluation.
3          And histological evaluation involves
4  processing the tissue, cutting a 3- to 5-micron-
5  thick section, staining it with hematoxylin and
6  eosin --
7          THE WITNESS:  Do you want me to spell
8  that?
9          You can type "H and E" for hematoxylin
10  and eosin.
11      A.  (Continue) And then I would look at it
12  under the microscope.
13          And although there would be always a
14  certain amount of change due to decomposition,
15  there are still features that can be informative
16  and helpful to a diagnosis.
17  BY MS. THOMPSON:
18      Q.  So when you're talking about histological
19  examination, you're talking about what laypeople
20  would understand to be pathology slides,
21  essentially.  Is that right?
22      A.  Yes.  I think so.
23      Q.  You've got a piece of glass with a little
24  piece of tissue on it that you can look at under
25  the microscope; is that right?

Page 23

1      A.  Exactly.
2          And it does take a lot of training to
3  recognize what you're looking at.
4      Q.  So would there be potentially leftover
5  tissue samples that would remain even after you'd
6  processed some of that tissue for slide purposes?
7      A.  Yes, for a period of time.  It varies
8  from -- You know, it would vary slightly from
9  hospital to hospital.  These are generally
10  regulated.
11          After so many weeks, the tissue preserved
12  in fluid is discarded.  And then the cassettes
13  that -- Cassettes are like little squares that
14  have paraffin and have the tissue embedded in them.
15      Q.  That's what you cut the slides off of,
16  essentially; correct?
17      A.  Right.
18          Those are kept, you know, for a little
19  bit longer, but they're also discarded.
20          The glass slides, however, are retained
21  indefinitely.
22      Q.  All right.
23          And when you were conducting autopsies
24  for Adams County, where would the tissue blocks
25  that you described be kept after an autopsy?

Page 24

1      A.  The blocks would be kept at Memorial
2  Medical Center.
3      Q.  All right.
4          And the tissue, if any, that was kept in
5  fluid before it was discarded, would that also be
6  kept at the hospital?
7      A.  Yes.
8      Q.  After an autopsy, were those kinds of
9  materials, either the tissue blocks or the tissue
10  in fluid -- would any of that ever be returned to
11  the county?
12      A.  No.
13      Q.  Did the county --
14      A.  Not routinely.
15      Q.  Did the county ever ask you to return
16  those things to them?
17      A.  No.
18      Q.  In the course of conducting an autopsy,
19  how would you decide what photographs needed to be
20  taken during the autopsy?
21      A.  Well, I mean, we had our standard
22  external examination.  We take photos of the body
23  as you received it.  And then I perform the classic
24  Y incision and open up the body.  And as I went
25  through and examined the organs, anything I found

6 (Pages 21 to 24)

CURTIS LOVELACE, et al. vs DET. ADAM GIBSON, et al.
BOWMAN, JESSICA 11/07/2018

Page 25

1  that struck me as being, you know, abnormal, I
2  would either get a picture of it, or, in some
3  instances, if I knew I was going to be putting a
4  piece of tissue under the microscope from that
5  organ, I might not get a picture of the organ
6  itself.
7      Like a fatty liver, for instance, there
8  may not be a picture of the fatty liver, but I
9  would have a slide of it, some record of it.
10      Q. I assume that the microscopic examination
11  of that kind of organ would be much more important
12  than the gross examination.
13      A. They're both important, yes. Because
14  there are sometimes focal lesions on the liver,
15  and, therefore, the gross examination --
16      Well, here's a for instance. If there's
17  a metastasis of a tumor to the liver, the gross
18  examination will be important to know where those
19  metastases are so you could get a piece of that as
20  well as the normal liver to put under the
21  microscope. But both are very important, yes.
22      Q. All right.
23      And did you ever have any direction from
24  Coroner Hamilton or another coroner employee from
25  Adams County as to the types of photos that you

Page 26

1  should take during an autopsy?
2      A. Direction? Not -- There wasn't anything
3  specifically brought up.
4      I mean, I -- I'm trying to think if I
5  ever --
6      Q. I mean, did anyone ever say to you
7  something to the effect of, "If you're doing an
8  autopsy for Adams County, we expect that you will
9  always take a photograph of --"
10      A. Oh, no. Oh, no.
11      Q. "-- the head" or something?
12      A. No.
13      None of the other coroners either.
14      Q. Okay.
15      Did you ever get any direction from Adams
16  County as to which tissue samples you should
17  collect when doing an autopsy for Adams County?
18      A. No.
19      Q. You mentioned and, I think, alluded to
20  earlier that you conducted an autopsy of Cory
21  Lovelace. Is that correct?
22      A. Yes.
23      Q. Yes.
24      And you understand that's the
25  deposition -- the deposition today concerns that

Page 27

1  autopsy?
2      A. Yes, I do.
3      Q. Have you had a chance to review your
4  autopsy report related to Cory Lovelace's autopsy
5  before your deposition today?
6      A. Yes, I have.
7      Q. And do you have a memory of conducting
8  that autopsy?
9      A. Yes, I do.
10      Q. Did you have sufficient time to --
11      Well, let me ask you a different
12  question, actually. Let me strike that and ask you
13  a different question.
14      Did your autopsy of Mrs. Lovelace follow
15  the general procedure that you described here today
16  as being your standard procedure for doing
17  autopsies for Adams County?
18      A. It began that way, but I had some
19  questions later on.
20      Q. All right. And we'll talk about that in
21  a minute.
22      A. Okay.
23      Q. In terms of the actual autopsy itself,
24  when you were examining Mrs. Lovelace's body, did
25  you have a sufficient amount of time to do that?

Page 28

1      A. Yes, I did.
2      Q. Were you able to collect any tissue
3  samples that you thought you needed to collect in
4  order to assess her death?
5      A. I did.
6      Q. All right.
7      And you mentioned that you had some
8  questions. Let's talk about that.
9      But let me step back one second.
10      For Mrs. Lovelace's autopsy, how did you
11  determine which tissue samples to collect related
12  to her autopsy?
13      A. Well, in the case of her autopsy, the
14  striking finding was a very fatty liver, and, as
15  was reported to me at that time, a history only of
16  social drinking. And she was not obese. So there
17  didn't seem to be a lot of explanation for why her
18  liver was so fatty.
19      Q. I'm going to show you what's been marked
20  as -- previously as Exhibit 1.
21      Just for the record, Dr. Bowman, this is
22  a multi-page document which is Bates-stamped AC 1
23  through AC 18.
24      And if you look at the first -- the first
25  six pages of this document, do you recognize the

CURTIS LOVELACE, et al. vs DET. ADAM GIBSON, et al.
BOWMAN, JESSICA 11/07/2018

Page 29

1    first six pages of Exhibit 1 to be your autopsy
2    report as to Mrs. Lovelace's death?
3        A.   Well, the first five actually are the
4    autopsy report. Page 6 actually has -- is a form
5    that the coroners had me fill out. So it's sort of
6    a separate form.
7        Q.   I appreciate that clarification. Thank
8    you.
9        A.   Okay.
10       Q.   The latter part of this document, which I
11   think is AC 7 through AC 18, do you recognize that
12   to be a copy of the coroner's inquest for
13   Mrs. Lovelace?
14       A.   Yes.
15       Q.   Did you have any role in the inquest
16   process for Cory Lovelace?
17       A.   Well, of course, they had my report, but
18   that would have been, to the best of my
19   recollection, the extent of my participation. I
20   was not in the courtroom.
21       Q.   Other than providing your report, did you
22   have any role in that inquest?
23       A.   To the best of my knowledge, no.
24       Q.   Okay.
25            And you've alluded to the fact --

Page 30

1            Let's turn to AC 6.
2            You said that AC 6 is a report that the
3    coroner had you -- or excuse me, a document that
4    the coroner had you fill out. Is that right?
5        A.   Yes. Yes. It's standard for all -- It
6    was standard for all of the coroners I worked for.
7        Q.   Okay. And at the time that you completed
8    the form that's in AC 6, did you believe that your
9    conclusions as stated in AC 6 were true to the best
10   of your knowledge and scientific understanding at
11   that time?
12       A.   Yes.
13       Q.   I want to talk to you about, then, your
14   autopsy report, which I think, as you said, is AC 1
15   through AC 5. Right?
16       A.   Uh-huh. Yes.
17       Q.   Am I right that when you --
18            Let me start that question again.
19            Am I right, then, to reach your findings
20   about Cory Lovelace's death, that you --
21            Well, let me actually ask you a different
22   question.
23            Before you conducted the autopsy of Cory
24   Lovelace, did you have any information related to
25   her death or the circumstances of finding her body

Page 31

1    or anything else other than just starting to exam
2    her body in the course of the autopsy?
3        A.   Yes. A narrative was provided to me
4    via -- I don't offhand recollect whether it was the
5    coroner or a deputy coroner -- about this case, and
6    I recollect jotting down some notes at the time
7    about the circumstances of her demise.
8        Q.   All right. And the narrative you're
9    describing, you knew that or had that information
10   before you did the autopsy; is that right?
11       A.   Yes, I did.
12       Q.   Okay. And then --
13            Did you have any other information
14   besides that narrative before you did the actual
15   autopsy?
16       A.   That's what I was working with, and
17   obviously the findings that I saw.
18       Q.   Okay. So in addition to that narrative,
19   you had your observation from conducting the
20   autopsy itself; is that right?
21       A.   That is correct.
22       Q.   And you also did examine some tissue of
23   Mrs. Lovelace; is that right?
24       A.   Yes, I did.
25       Q.   Did you examine any tissue

Page 32

1    microscopically?
2        A.   Yes, I did.
3        Q.   All right.
4            Did you conduct any testing on any of
5    Mrs. Lovelace's bodily fluids that you collected
6    during the autopsy?
7        A.   Yes, I did.
8            And this may be a little premature, but
9    that is part of the reason for some of the
10   uncertainty here, is that her toxicology screen,
11   which we routinely do, this is standard, was
12   negative for alcohol.
13       Q.   All right. Let me have you start looking
14   at page 1 of your report, which is in front of you.
15            You have -- On page 1 here, you have a
16   sort of summary of your findings --
17       A.   Uh-huh.
18       Q.   -- is that correct?
19       A.   Yes, it is.
20       Q.   All right.
21            And then, I think as you just indicated,
22   included in that summary is a line for toxicology,
23   which indicates that it was negative for lethal
24   drug levels. Do you see that?
25       A.   Yes, I do.

8 (Pages 29 to 32)

CURTIS LOVELACE, et al. vs DET. ADAM GIBSON, et al.
BOWMAN, JESSICA 11/07/2018

Page 33

1    Q.  All right.
2         And there's also a toxicology portion of
3    the autopsy that starts on page 1 at the bottom
4    where it says "Toxicology."  Do you see that?
5         I'm still looking at page 1.
6    A.  Oh.  Right.  Right.
7         Okay.  I misrecollected.  It appears she
8    had trace alcohol.
9    Q.  Okay.
10   A.  But anything of this level can be seen
11   with decomposition.
12        There are bacteria that get into the
13   bloodstream as our bodies break down, and this can
14   be seen without consumption of alcohol.  It's
15   considered equivalent to a zero.
16   Q.  And when you say "this," because I want
17   to be clear what you're talking about, your
18   conclusion in the autopsy from the toxicology
19   testing you did was that Mrs. Lovelace had a blood
20   ethanol level of .049 percent?
21   A.  That's what the toxicology lab provided
22   for me.  They run the assays.
23        And, again, like I said, this level is
24   not useful in determining if the individual had
25   been drinking or not.

Page 34

1    Q.  This .049 percent is not the same thing
2    as someone blowing a .049 at a traffic stop, for
3    instance?
4    A.  Oh, no.
5         Because of the death process, again, as I
6    explained, bacteria enter the bloodstream, and they
7    begin to produce -- Alcohol is a by-product.  I
8    mean, actually that's -- Bacteria make the alcohol
9    in our wines, and then the way we get anything more
10   concentrated is by distillation, because the
11   concentrations of alcohol will then kill off the
12   bugs.
13        But, you know, certainly a .049
14   post-mortem is nothing remarkable whatsoever, and
15   does not necessarily indicate the person drank.
16   Q.  That number, at the time you did this
17   autopsy and at the time that you were considering
18   your findings in this case, did not indicate to you
19   that alcohol could have played some role in her
20   death?
21   A.  It did not.
22   Q.  All right.
23        In reviewing your autopsy report prior to
24   your deposition, is there anything in here that you
25   have seen, you know, since the time you completed

Page 35

1    the report that, to you, seems incorrect; meaning,
2    have you ever seen anything in the report that you
3    think is a typo or you think that you wrote down
4    incorrectly?
5    A.  Well, you know, I know what I meant to
6    say, and there may be a typo in there somewhere,
7    but not that I recollect.
8         I mean, I check these pretty thoroughly.
9    But, you know, if somebody else has read it, it's
10   better than if I have read it.
11        It's just a simple editing process.
12   Q.  All of us like having a proofreader.
13   A.  Well, yeah, a proofreader doesn't know --
14   I mean, they read it fresh, and they don't read
15   into it things that were meant to be typed.
16        So there may be a, you know, flipped -- a
17   couple of words or letters flipped in a certain
18   place or spacing is wrong.  But this is
19   essentially -- I was satisfied with it enough to
20   send it off to the coroner, and I'm pretty picky.
21   Q.  All right.  Let me just have you turn to
22   page 2.
23   A.  Okay.
24   Q.  Do you see the section there that says
25   "Circumstantial Summary"?

Page 36

1    A.  Yes.
2    Q.  And does the information that's included
3    in there -- is that the narrative information that
4    you had before you completed your report?
5    A.  Yes.
6    Q.  After you had done the actual autopsy,
7    did you talk with anybody connected with Adams
8    County about what you had seen in the course of
9    doing the autopsy and doing the toxicology screen
10   and looking at the tissue samples?
11   A.  Yes, I did.
12   Q.  And what -- who is the first person you
13   remember talking to about this autopsy after you
14   completed it?
15   A.  I'm afraid I don't recollect whom I spoke
16   to twelve years ago first about it.  I would
17   suspect, though, it would be Coroner Hamilton, if I
18   could get ahold of him.  If he was busy at a scene,
19   it would have been one of his deputies.  And I
20   would have expressed the concerns that I found and
21   listed on my final autopsy data summary.
22        And at some point in time, either he --
23   he would have called or had me call, I'm not sure
24   exactly how we worked it out, law enforcement,
25   because there were a few findings that didn't seem

9 (Pages 33 to 36)

CURTIS LOVELACE, et al. vs DET. ADAM GIBSON, et al.
BOWMAN, JESSICA 11/07/2018

Page 37

1  to fit with the story I had.
2      Q.  Did you ever talk with a detective named
3  Jeff Baird from the Quincy Police Department about
4  this investigation?
5      A.  I believe I did.  It was a long time ago,
6  but I remember talking to police from that county,
7  because they were going to look into circumstances
8  of demise for me.
9      Q.  All right.  When you say they were going
10  to look into those circumstances for you, what do
11  you mean?
12      A.  Well, there were some findings -- you
13  know, they're listed here -- there's a little bit
14  of abrasion right about here (indicating) and a
15  little bit on the inside of the lip.
16      Tongue, fine.  Neck, fine.  Some kind of
17  sort of -- Her hands were in sort of a strange
18  kind of position; they were kind of up like this
19  (indicating).  There was some slightly -- I thought
20  a little more prominent drying on the fingers than
21  I usually saw.  And then, of course, the marked
22  steatosis of the liver.
23      And when I mentioned alcohol consumption,
24  I had been told that that was rec -- you know
25  social drinking.

Page 38

1      So it didn't really jibe, really, and I
2  wanted -- I guess wanted somebody to check and make
3  sure everything was okay.
4      Q.  So let me follow-up on a couple of those
5  things.
6      What you've just described, those were --
7  when you talk about having some concerns or some
8  difficulties about what you saw, that's the list
9  you just described were your concerns.
10      A.  Predominantly, yes.
11      Q.  Okay.  Were there other concerns you had
12  other than what you've just listed out?
13      A.  Well, again, like I said, her position
14  was a little odd with the hands up like they were
15  to me at the time.  I didn't have additional
16  information available then.
17      And like I said, the abrasions on the
18  lips.  The fatty change in the liver and reported
19  social drinking.
20      Yes, the flu can kill people, but this
21  woman was 38, and that's not a usual, in and of
22  itself, explanation for demise.
23      And so --
24      And then at the time I didn't know that
25  this individual suffered from bulimia, which is a

Page 39

1  metabolic stressor as well.
2      So those things I did not know about.
3  But even so, you know, it's -- never hurts to be
4  for sure.  And I asked -- you know, seen the marks
5  on the lip -- although those can be obtained in a
6  variety of ways, including, if you're very sick and
7  you're vomiting over the toilet, you can scrape
8  your face on it -- having the police look into the
9  situation a little bit, I thought, was a wise move,
10  given -- you know, given what I knew and didn't
11  know at the time.
12      Q.  So -- And I want to ask you about that,
13  to make sure that it's clear what you're
14  describing.
15      You've touched your face a couple of
16  times, and just so it's clear for the court
17  reporter, the mark related to Cory Lovelace's lip
18  that you observed, that mark was basically between
19  her upper lip and her nose?
20      A.  Right.  The philtrum is this area right
21  here on the face (indicating), yeah.
22      Q.  So basically the center of your mouth,
23  between your mouth and your nose?
24      A.  Right.  Exactly.
25      Q.  Okay.

Page 40

1      And you also noted that she had some kind
2  of cut on the inside of her mouth?
3      A.  Yes, she did.
4      Q.  Was that cut big?
5      A.  Not particularly, no.
6      Q.  But those were things you noted that you
7  were concerned about?
8      A.  Yes.
9      Q.  Okay.  And I think you said earlier that
10  it never hurts to look into things.  Is that right?
11      A.  I like to be careful.
12      Q.  Okay.  So did you ask either the coroner
13  or law enforcement to look into these issues
14  further?
15      A.  I did.
16      Q.  What did you ask them to do?
17      A.  Basically I asked -- I expressed my
18  concerns, and I just asked if they would, you know,
19  kind of investigate the scene and see if there was,
20  you know, any particular cause for suspicion or
21  concern.
22      Q.  Did someone, either law enforcement or
23  somebody with the coroner's office, report back to
24  you about those issues?
25      A.  Yes, they did.

CURTIS LOVELACE, et al. vs DET. ADAM GIBSON, et al.
BOWMAN, JESSICA 11/07/2018

Page 41

1    Q.  And what did they report back?
2    A.  They reported that the story --
3        There was a fair amount of children
4    involved in this particular case.  They
5    interviewed -- At the time of interview back then,
6    I recollect that they told me the children's
7    stories correlated.  One of them was, like, four or
8    something like that.  But that there was nothing
9    out of sync, if you will, nothing suspicious in
10   their investigation.
11   Q.  When you --
12   A.  But it --
13       I'm sorry.  Go ahead.
14   Q.  No.  I'm sorry.  Please finish your
15   answer.
16   A.  I was going to say, but still -- Which
17   is good, but still that didn't give me an answer as
18   to why this lady died; again, coming back to the
19   cause of death.
20       So even though they checked it out and --
21   I felt that I needed to mention that there were
22   these unusual findings.
23   Q.  So going back to page 2 of your report to
24   where it says "Circumstantial Summary," does this
25   summary include information that was given to you

Page 42

1    by either the coroner's office or law enforcement
2    after you asked them to follow up on some of your
3    concerns?
4    A.  Yes, it does.
5    Q.  And I'm referencing specifically, for
6    instance, looking at four lines from the bottom of
7    that first paragraph, the reported social history
8    included -- includes --
9        Excuse me.  Let me start that again.
10       "The reported social history includes
11   four kids present in the household ranging from
12   four to 12 years of age.  Additional history later
13   provided by the husband who contacted the coroner
14   includes that the decedent reportedly fell down on
15   Sunday, which would have been two days prior to her
16   demise."
17       What I just read, does that -- some of
18   that include information that you got later from
19   either the coroner or law enforcement?
20   A.  Yes.
21   Q.  All right.
22       In that same paragraph, about midway in,
23   there's a line that says, "Initial investigation of
24   the scene revealed the decedent was in bed on her
25   back.  Photos of the scene show the decedent in bed

Page 43

1    with wrists flexed in the air and over her body."
2        In reaching your conclusions in this
3    case, did you also look at photos of the scene
4    where Mrs. Lovelace was found?
5    A.  Yes.
6    Q.  Did you ask for those photos from either
7    the coroner or from law enforcement?
8    A.  I believe they were provided.
9    Q.  Did you review those photos?
10   A.  Yeah.  I would have reviewed them, but --
11   I believe they were brought --
12   Q.  Did you have --
13   A.  -- to me.
14   Q.  I apologize, because I did --
15   A.  Yes.
16   Q.  -- what I wasn't supposed to do, which
17   was interrupt you.  I'm sorry.
18   A.  It's okay.
19   Q.  So please finish your answer.
20   A.  I was just -- again, trying to remember
21   the specifics of how I got to see them and also
22   trying to separate that recollection from looking
23   at these pictures all over again a couple years
24   ago, and --
25       You know, I know that I saw them at some

Page 44

1    point in time, but, quite frankly, my clearest
2    recollection is the ones from a few years ago.  So
3    I'm -- You know, it's a little difficult to sort
4    out.
5        I believe there was a photo, though, with
6    the blankets on her belly and her hands up like
7    this (indicating), that I did see before the
8    autopsy twelve years ago.
9        MS. THOMPSON:  Mark this as 2.
10       (Discussion off the record.)
11       (Deposition Exhibit 2 was
12       marked for identification.)
13       MS. EMERY:  Are there Bates-stamps at the
14   bottom?
15       MS. THOMPSON:  There are, although I'm
16   realizing as I'm looking at this, the Bates stamps
17   are cut off.
18       It should be 81 through 133.
19       Is that what you both have?
20       MS. EMERY:  Yes.  Yeah.
21       MS. THOMPSON:  Let me make sure that's
22   what --
23       THE WITNESS:  It says here, "Photos of
24   the scene show the decedent in bed with wrists
25   flexed in the air and over her body."

11 (Pages 41 to 44)

CURTIS LOVELACE, et al. vs DET. ADAM GIBSON, et al.
BOWMAN, JESSICA 11/07/2018

Page 45

1    So I did get that photo the very first
2 time as well saw it again later.
3    MS. THOMPSON: I'm showing the witness
4 what has been marked as Bowman Exhibit 2. And just
5 for the record, these Bates stamps are a little cut
6 off, but I'll represent, and I'm hoping there's an
7 agreement between the parties, this is Bates-
8 stamped QPD 81 through 133.
9    MS. EMERY: Yes.
10 BY MS. THOMPSON:
11    Q. Dr. Bowman, I'm going to give you this
12 whole exhibit, but I'm going to start by
13 referencing QPD 88 for you.
14    A. Okay.
15    Q. I'm going to ask you just to flip through
16 QPD 88 through 133, which is the --
17    A. QPD --
18    Q. -- which is the packet that you've just
19 been handed, right --
20    A. Okay.
21    Q. -- what you're holding right now. And
22 I'm going to ask you if you recognize this set of
23 documents.
24    A. Yes. Yes.
25    Q. What do you recognize it to be?

Page 46

1    A. An e-mail. The top part would be me,
2 "Thank you. This photo is similar to one Gary sent
3 with the body." And I go on to say, "By the by,
4 the way the decedent's hands are up in the air is
5 also unusual for just an hour-and-a-half duration."
6    Cadavaric spasm can cause it, usually
7 occurs with, quote unquote, marked stress
8 immediately prior to demise. But stress does not
9 necessarily imply, like the TV shows, emotional
10 stress, but also physiological stress. If somebody
11 is experiencing severe pain or discomfort due to
12 medical processes, that can be stress as well.
13    And then going on to read, "Seaweed has
14 been found clutched in the hands of persons who
15 have drowned, for instance. Good luck," et cetera.
16    Q. Let me ask you this: In general, the
17 first page you're looking at looks like it's an
18 e-mail from you, the portion you just read.
19    A. Yes.
20    Q. Is that right?
21    A. Yes.
22    Q. In general, just looking at this entire
23 packet of documents, so not just page 1 but the
24 entire set of what you're holding in your hands --
25    A. Yes.

Page 47

1    Q. -- do you recognize this to be a copy of
2 your file, at least as it existed at some point
3 related to the Cory Lovelace investigation?
4    A. Yes. Yes, at the top are comments from
5 me, and at the bottom are -- information from
6 Detective Jeff Baird.
7    Q. Okay.
8    And if you -- if you sort of flip through
9 this packet, this packet includes some photographs;
10 is that right?
11    For instance, if you look --
12    A. Should I be putting these on top of --
13    Q. That's fine.
14    A. Okay.
15    Q. You can put them there. That's fine.
16    A. Okay.
17    Ah, yes. These would be autopsy photos.
18 I recognize the numbering system underneath.
19    Q. If you look back near the end of this
20 packet, starting with QPD 127 --
21    A. QPD 127 --
22    Q. This is maybe five or six pages from the
23 end of the set.
24    A. Oh, five or six pages from the end, okay.
25    QPD 0129?

Page 48

1    Q. Yes.
2    A. Okay.
3    Q. Or starting with 0127, actually.
4    A. 0127.
5    28. 27.
6    Yes.
7    Q. So there are some additional photographs
8 in your file starting at 127 that are not autopsy
9 photographs; is that correct?
10    A. Right. They would have been scene
11 photos.
12    Q. All right.
13    And would that indicate to you that you
14 had some scene photographs that you reviewed?
15    A. Yes.
16    Q. Going back to the front of this packet,
17 to -- so going back to that -- that initial e-mail
18 you were just looking at, which I think is QPD
19 88 --
20    A. Yeah.
21    Q. On QPD 88, your response is at the top,
22 and below that there's an e-mail that someone wrote
23 to you sending you some photos. Do you see that?
24    A. Yes.
25    Q. And do you see that that e-mail is signed

12 (Pages 45 to 48)

CURTIS LOVELACE, et al. vs DET. ADAM GIBSON, et al.
BOWMAN, JESSICA 11/07/2018

Page 49

1    "Detective Jeff Baird"?
2       A.  Yes.
3       Q.  Does that refresh your memory as to
4    whether or not you communicated with Jeff Baird
5    about this?
6       A.  Yes.  I clearly did.  I don't remember if
7    I actually spoke to him person-to-person, but
8    obviously we communicated by e-mail.
9       Q.  All right.
10          And the next page, which should be QPD
11   89 --
12      A.  Uh-huh.
13      Q.  -- does that also contain different
14   e-mails between you and Jeff Baird related to this
15   investigation?
16      A.  Yes, it does.
17      Q.  Okay.
18          And the second page, does that appear to
19   you that Jeff Baird sent you a rough timeline of
20   events related to the finding of Cory Lovelace's
21   body and the treatment of her body after her body
22   was found?
23      A.  Yes.
24      Q.  All right.  Is that information you took
25   into account in reaching your conclusions in the

Page 50

1    autopsy report?
2       A.  Yes.
3       Q.  Was there anything that you asked either
4    Coroner Hamilton or anyone in the coroner's office
5    or anyone in law enforcement to do related to
6    looking into questions that you had that either the
7    coroner or law enforcement didn't look into for
8    you?
9       A.  I'm not exactly sure --
10      Q.  Let me ask you that question in a better
11   way, because that wasn't as clear as it could have
12   been.
13          You said that you had some concerns and
14   that you asked either the coroner's office or law
15   enforcement to conduct some investigation into
16   those concerns.  Is that right?
17      A.  Yes.
18      Q.  Was there anything you asked them to look
19   into that they did not look into for you?
20      A.  The impression I got is they looked into
21   what they could find at the time and talked to the
22   people that were involved, but some of the
23   questions I had, like about the positioning of the
24   hands, wasn't really addressed at this point in
25   time.

Page 51

1       Q.  Okay.
2          Do you know what it is about your
3    questions related to the position of the hands that
4    wasn't addressed at that time?
5       A.  Well, allegedly, this photo --
6       Q.  Can you just tell us the number you're
7    looking at there?
8       A.  Yeah.  The number -- I'm looking at
9    0127.
10          QPD 0127 --
11      Q.  Yes.
12      A.  -- shows the decedent with her hands in
13   kind of -- one hand is up and the other is sort of
14   hovering a bit above her body.
15          And my understanding was this was a scene
16   photo of the decedent undisturbed, that this is the
17   way the body was found.
18          I don't see how I can mention this
19   without jumping ahead ten years later to find out
20   that the four-year-old apparently got in bed, on
21   top of the bed, and ate his cereal, not realizing
22   his mother had passed away.  So this was not an
23   undisturbed scene that I found out later on.
24      Q.  At the time that you issued the autopsy
25   report that's Exhibit 1, did you believe that this

Page 52

1    was an undisturbed scene?
2       A.  That's what I was told.
3       Q.  Did you believe that the photographs that
4    you reviewed of Mrs. Lovelace at the scene were
5    photographs that reflected how her body -- the
6    position her body had been in when she passed?
7       A.  Yes.
8          And I think they believed that, too, at
9    the time.
10      Q.  When you say "they," who do you mean?
11      A.  The investigators.
12      Q.  As a coroner's physician, did you have
13   any ability to talk to witnesses on your own?
14      A.  Not really, no.
15      Q.  Did you have any ability to go do your
16   own investigation?
17      A.  No.
18      Q.  Did you rely on the coroner's office and
19   on law enforcement to do any investigation that was
20   necessary in connection with this investigation?
21      A.  That is correct.
22      Q.  I just want to refer you, looking still
23   at the exhibit in front of you, to the very last
24   two pages.
25          So starting with QPD 132.

13 (Pages 49 to 52)

Page 53

1   A.  QPD 132.
2       Kind of looks like a 92 and a 93.
3   Q.  I think it's 132.
4       And if you give me your packet, I want to
5   make sure that you can find what I'm talking about.
6   A.  Sure.
7       These are out of order now, I'm afraid.
8   Q.  Here.  It may be in front of you here,
9   actually.
10      I'm showing you what I'll represent is
11  Bates-stamped 132 and 133.
12  A.  Ah.  Yes.
13  Q.  So starting with 132 --
14  A.  132 and 133.  Okay.
15  Q.  -- do you recognize --
16      132 has handwriting on it; is that
17  correct?
18  A.  Yeah.
19  Q.  Do you recognize whose handwriting that
20  is?
21  A.  Mine.
22  Q.  The first line of the handwriting on 132
23  says something, "DET Jeff Baird."  Do you see that?
24  A.  Yes.
25  Q.  Does this note reflect information that

Page 54

1   was given to you by Detective Baird?
2   A.  Yes.  It says "Per," actually, "Detective
3   Baird."
4   Q.  Thanks, Dr. Bowman.
5       And in the next line is something that
6   says --
7   A.  "Time of death, one and a half to two
8   hours."
9   Q.  Okay.
10      And there's a phone number; right?
11  A.  Uh-huh.
12  Q.  Then there's some information that's
13  crossed out.  Do you see that?
14  A.  Yeah.  It looks like, "Daughter
15  volunteers that her mother fell Sunday and --"
16      This must have been a conversation -- I
17  must have talked to him twelve years ago.
18  Q.  Do you know why that's crossed out?
19  A.  He would have rephrased it or something.
20  I guess he said, "No."
21      I started writing down "Daughter
22  volunteers" -- and I usually talk as I do this --
23  and then he said, "No.  We asked her."  So --
24  Q.  So --
25  A.  -- there was either some miscommunication

Page 55

1   that I started to write "Daughter volunteers," and
2   then he said, "No.  Actually, we asked her," or
3   something like that.
4   Q.  Did Detective Baird tell you that someone
5   had asked Cory Lovelace's daughter about her --
6   something related to her mother and her mother had
7   told her daughter that she had fallen?
8   A.  Yes.  That's what it says later, "When
9   asked, daughter said mother told her Monday she had
10  fallen."
11  Q.  Okay.
12      And if you turn to the next page -- so
13  we're looking at QPD 133 -- is this also your
14  handwriting?
15  A.  Yes.
16  Q.  And do you know what these notes refer
17  to?
18  A.  Yes, I do.
19  Q.  What do they refer to?
20  A.  They would have been the same
21  conversation that I obviously did have with
22  Detective Jeff Baird.  The temperature, reportedly
23  warm.  That would refer to the body's temperature
24  when they found her.
25      Lividity, reportedly blanching.

Page 56

1       All of this is useful in kind of --
2   looking for the word I want here -- in a contextual
3   sense.  The degree -- Loss of temperature varies
4   from individual to individual to environment to
5   environment.
6       Fixing -- Lividity is pooling of blood.
7   That happens starting immediately when our heart
8   stops beating, but it doesn't usually become
9   visible for a little while.  And then eventually it
10  becomes fixed, and you can't push the blood out of
11  the tissue anymore.  So it gives you kind of an
12  idea of time frame, but it's a rough idea.
13      "Saw hemolytic marbling," which is
14  discoloration of the blood vessels due to break-
15  down of hemoglobin and staining of the vessel
16  walls.  Over time it turns greenish due to
17  decomposition, production of sulfur molecules and
18  so forth and so on.  So there was some hemolytic
19  marbling.
20      The clothing was tidy.
21      And then it says, "Got out of bed, helped
22  children get ready for school.  Children were
23  interviewed" -- or "Children interviewed
24  separately."
25      "Not checked life insurance's policy;" so

14 (Pages 53 to 56)

CURTIS LOVELACE, et al. vs DET. ADAM GIBSON, et al.
BOWMAN, JESSICA 11/07/2018

## Page 57

1  that's probably in response to a question I asked.
2      Q.  So these two pages, QPD 132 and 133, are
3  these notes of things that Jeff Baird told you in
4  conversations you had with him?
5      A.  Yes.
6      Q.  In any of your conversations or e-mails
7  with Detective Baird or with anyone from the
8  coroner's office at this time -- so talking about
9  in 2006 -- did you ever get the impression that any
10  of those people were trying to push you one way or
11  another in terms of your findings or your
12  conclusions about this case?
13      A.  No.
14      Q.  Did those people at that time seem
15  interested in figuring out what had occurred?
16      A.  Yes.
17      Q.  Did any of them ever encourage you, you
18  know, to wrap up your opinions prematurely to just
19  sort of get this done?
20      A.  Not that they -- Not that I recall.
21      Q.  To go back to Exhibit 1 --
22          And I recognize Exhibit 2 is out of
23  order, so don't worry about it.
24      A.  This is the exhibit --
25      Q.  But let's look back to Exhibit 1.

## Page 58

1          You started talking about this earlier,
2  but I want to make sure that I understand your
3  conclusions.
4          In your final autopsy summary on page 1,
5  you have a section that's marked "Evidence of
6  Medical Disease."  Do you see that?
7      A.  Yes.
8      Q.  So what does it mean for something to be
9  evidence of medical disease?
10      A.  Well, it means obviously gross
11  examination, do I see anything there under the
12  microscope, what do I see.
13          In this particular individual, she --
14  The liver is supposed to look tan.  It was clearly
15  yellow on gross examination; and "gross" being with
16  the unaided eye.  And then I took a section, and I
17  put it under the microscope, and there was -- the
18  liver cells are full of fat.  So there was
19  something physiologically going on here.
20          And in forensics -- Again, I mentioned
21  this lady was not obese, not even overweight,
22  really.  So the thing that always crosses my mind
23  is alcohol, but I could not account for it by tox.
24  So it seemed kind of a strange puzzle to me.
25      Q.  In your conversations either with law

## Page 59

1  enforcement or with the coroner's personnel at that
2  time, did anyone give you any information about
3  Cory Lovelace's drinking other than I think you
4  said social, there was social drinking?
5      A.  Right.  That was --
6          My understanding is it was social
7  drinking, and that should -- Social drinking
8  allows your liver to process the alcohol, and it
9  does not build up as fat in the liver cells.  You
10  know, your body can handle it.
11      Q.  At the time that you reached --
12          Let me start the question again.
13      A.  Okay.
14      Q.  At the time that you completed this
15  autopsy report, had anyone given you any
16  information about a potential eating disorder that
17  Mrs. Lovelace might have had?
18      A.  Not that I recollect.  And I don't --
19  couldn't find it in my notes anywhere.  Although
20  they -- they're a little bit scribbly, I do write
21  down what I'm told, so -- and I keep that in my
22  file.  So no.
23      Q.  This section here on page 1, in the "Data
24  Summary," you've got the section that's marked
25  "Trauma Findings."

## Page 60

1      A.  Yes.
2      Q.  Are trauma findings things that would
3  potentially be evidence that someone's death was
4  not natural?
5      A.  They could be, or they could be evidence
6  of something that --
7          Depending on the circumstances.  I mean,
8  somebody could have had, you know -- you know, a
9  car accident and have healing bruises and injuries,
10  but, you know, for whatever reason, the coronary
11  artery that was nearly completely plugged up
12  didn't -- you know, didn't give out until later on.
13  And so they might have injuries or -- You know,
14  and people bump into things, bump into tables or
15  drop things or something.
16          I mean, injuries can be present and
17  totally incidental.  They can be causal or
18  associated with a cause.  Like, you might have some
19  minor abrasions that wasn't the cause of death, it
20  was, you know -- You know, say maybe the person's
21  suspended upside down in the car and respiratory
22  insufficiency was the actual cause of death due to
23  motor vehicle incident, and then whatever abrasions
24  they have were not causal but just incidental.
25          So, yeah, that -- injuries may or may not

15 (Pages 57 to 60)

CURTIS LOVELACE, et al. vs DET. ADAM GIBSON, et al.
BOWMAN, JESSICA 11/07/2018

Page 61

1    be causally related to death, it just depends on
2    the circumstances.
3        Q.  So if you're noting trauma findings in an
4    autopsy report, what you're noting may or may not
5    be connected with the cause of death?
6        A.  Correct.
7        Q.  Did you examine Mrs. Lovelace's body and
8    consider the findings that you were making when you
9    wrote this autopsy report, taking into account some
10   possibility that Mrs. Lovelace may have been
11   suffocated?
12       A.  Well, suffocated in the sense that -- I
13   mean, if you can kind of divide it up medically
14   from strangled to smothered, that's a tough one to
15   prove, you know what I mean?
16       There are cases in the literature of
17   people being smothered and not leaving any marks at
18   all, and depending on how much struggle is put up,
19   if it were a smothering case, there may be some
20   marks.
21       But when I put "Undetermined" down, I put
22   "Undetermined" down not to mean undetermined
23   because I can't prove that it's homicide -- which I
24   wouldn't call it homicide, anyway -- a smothering
25   as the cause of death, I would have used.

Page 62

1        I put "Undetermined" down because, you
2    know, the investigation, four kids around, getting
3    them up, getting them ready, it just didn't seem to
4    fit that kind of a scenario.  But the pictures --
5    Everything was a little bit off, just a little bit
6    off.
7        And then she has this fatty liver, and
8    she's not supposed to be a heavy drinker, and
9    things just seemed not well explained.
10       So when in doubt, I go with
11   "undetermined."
12       And I mentioned some of my concerns that
13   the trauma on the mouth was -- seemed inconsistent
14   with the time frame.  But, you know, again, time
15   frames, they can vary.
16       And then I also put in there, because I
17   think this -- at the time, this was the thing that
18   really bothered me, is that she had such marked
19   steatosis of the liver, and there didn't seem to be
20   an explanation for it.  I mean, I couldn't account
21   for that, and, yet, it was clearly there, and
22   severe.
23       So that -- that left me, you know, in a
24   situation where I really didn't have an answer as
25   to what was going on here.  But it's not --

Page 63

1        "Undetermined" means undetermined.  It
2    doesn't mean "not likely" or "likely" to have been
3    smothered.  It doesn't mean anything like that.  It
4    just means undetermined.
5        "Undetermined" means undetermined.  So --
6        Q.  When you examined Mrs. Lovelace's body,
7    did you examine her larynx?
8        A.  Yes, I did.
9        Q.  That's her throat?
10       A.  Yes.
11       Q.  Did you see anything unusual in that area
12   of her body?
13       A.  No, I did not.
14       Q.  And you noted this cut between -- or this
15   laceration between her lip and her nose?
16       A.  Yes.
17       Q.  Did you notice anything abnormal about
18   her nose itself?
19       A.  No.
20       Q.  Did you examine her eyes as part of the
21   autopsy?
22       A.  Yes, I did.
23       Q.  Did you note any petechial hemorrhage?
24       A.  No.
25       Q.  Did you notice any other signs of

Page 64

1    smothering or strangulation with respect to her
2    eyes?
3        A.  No, I didn't.
4        Q.  Did you see any evidence that she had
5    been the victim of a smothering or a strangulation,
6    understanding what you just testified to --
7        A.  Right.
8        Q.  -- that there may or may not be
9    indicators of that?
10       A.  Right.
11       I didn't.  I didn't see those things.
12       Q.  At the time that you completed your
13   autopsy report, were you confident that your
14   conclusion that the cause of death was undetermined
15   was the right determination to make with respect to
16   this autopsy?
17       A.  Given the -- Given the situation I had
18   and the number of unknowns that were present, I
19   felt "undetermined" was the best way to go.
20       Q.  And after you completed your autopsy
21   report, did you convey those findings to either the
22   coroner's office or to law enforcement in Adams
23   County?
24       A.  Yes.
25       I don't recollect whether I would have

16 (Pages 61 to 64)

CURTIS LOVELACE, et al. vs DET. ADAM GIBSON, et al.
BOWMAN, JESSICA 11/07/2018

Page 65

1 called Detective Baird back or --
2      I mean, I would have sent a copy, because
3 this is my standard procedure. I send a copy of
4 the autopsy report form and the form -- the
5 death -- that death statement that's --
6      Q.  That's AC 6?
7      A.  Yeah, AC 6, that's part of what they get
8 as well.
9      And I bill for the autopsy. It would
10 have been mailed to the coroner.
11      And I honestly don't recollect if I
12 communicated this information to Detective Jeff
13 Baird. But I will say this, if I did, he didn't
14 give me additional information, which would be
15 uncommon. So there's no additional notes. So my
16 guess is I just sent this off to the coroner.
17      Q.  And that was going to be my next
18 question, which is, when you sent the reports that
19 you just described off to the coroner, did -- at
20 that time, did anyone follow up with you and
21 indicate any concern about your findings?
22      A.  Not that I recollect. I mean, you know,
23 this is twelve years ago.
24      I mean, there was -- There's never
25 enthusiasm for "Undetermined"; there just isn't.

Page 66

1 We don't like to use "undetermined." We like to
2 know what's going on.
3      But I don't remember any specific, you
4 know, objections about this particular
5 "undetermined." I mean, we, after all, had looked
6 into it with the law enforcement and everything, so
7 we'd done what we could.
8      You know, I didn't -- I still didn't
9 have any explanation for that fatty liver. So, you
10 know, like I said, I don't recollect any --
11 anything more than what might have been the -- you
12 know, "Well, can't you just call it fatty liver?"
13 It's, like, "Well, yeah, but she's so young, and I
14 don't know she's an --" I mean, "She's a social
15 drinker." "Well, why is her liver so fatty?" You
16 know, I mean, it's just --
17      You know, apparently --
18      And, again, the positioning of the body,
19 I mean, those were apparently scene photos
20 uninterrupted. I should have figured the kid. A
21 four-year-old's running around. You know, you
22 can't tell where they're going to be; that he could
23 have gotten on the bed and pulled those covers
24 down. That would totally account for that. I
25 mean, that --

Page 67

1      But then, like I said, given what I was
2 told by the investigators and what I had, this is
3 what I came up with.
4      Q.  I want to ask you some questions now
5 about 2014.
6      MS. THOMPSON:  I think this actually
7 might be a good time for a quick break, if we just
8 want to take a quick break --
9      MS. EMERY:  Yeah, we can do that.
10      MS. THOMPSON:  -- use the restroom.
11      So we'll go off the record for a little
12 bit.
13      THE WITNESS:  Okay.
14      THE VIDEOGRAPHER:  We will go off the
15 record at 3:39 p.m.
16      (Short recess.)
17      THE VIDEOGRAPHER:  We are back on the
18 record. The time is 3:46 p.m.
19      EXAMINATION (Resumed)
20 BY MS. THOMPSON:
21      Q.  Dr. Bowman, at some point after you
22 conducted this autopsy of Mrs. Lovelace, you
23 stopped performing autopsies in Illinois; is that
24 right?
25      A.  Yes.

Page 68

1      Q.  All right. And when did you start your
2 current job?
3      A.  I think it's been about six years, so
4 about -- Well, there's kind of a transition.
5      So I went to work on a per-diem basis for
6 Dr. Miller for a period of time, probably around
7 2011, but I think it was 2012, in the spring, that
8 I actually started Keokuk. And then I worked
9 Keokuk, and I also worked at the main office in
10 St. Louis.
11      I would actually, believe it or not,
12 spend three days at Keokuk, and then I would drive
13 down Wednesday night, work down at St. Louis for a
14 couple of days and cover the main office there, and
15 then drive back Friday night, and then repeat the
16 cycle. Did that for, like, a year or two.
17      Then my employer, Dr. Miller, got another
18 person on staff, and so I was only needed for
19 covering vacations, usually was in a week block.
20 And then -- then he decided -- I mean, I can't
21 blame him, he was 85, you know. He wanted to
22 retire; fancy that. So he ended up selling the
23 business. And the person who bought the business,
24 like I said, was actually across the river from
25 St. Louis, in Illinois. And us way up here -- "us"

17 (Pages 65 to 68)

CURTIS LOVELACE, et al. vs DET. ADAM GIBSON, et al.
BOWMAN, JESSICA 11/07/2018

Page 69

1  being myself and my colleague -- way up here in
2  Iowa, it wasn't working out very well
3  strategically.
4       So, basically, he gave us the heads-up
5  that come the turn of the year, that we would have
6  to basically find employment through the hospital
7  systems that we were working by contract with him.
8  And that's exactly what happened.
9       So my colleague and I are not officially
10  colleagues anymore, but we were for several years.
11  He works at Fort Madison. I work at Keokuk.
12  Keokuk then merged with Unity Point Health. And
13  then Carthage did, too, so they needed a
14  pathologist over there. So, yeah, sure, I've got
15  the time, I'll go over there.
16       And, yeah, it's been great.
17       Q. So am I right that the current clinical/
18  anatomical pathology work that you're doing
19  currently, that's work that you've been doing since
20  about 2011?
21       A. Yeah.
22       Q. Okay.
23       At some point in 2014, did someone
24  contact you about the work that you did on Cory
25  Lovelace's autopsy?

Page 70

1       A. That sounds about right.
2       Q. All right.
3       And in between, whenever that contact
4  was -- and we'll talk about that more --
5       In between when you were contacted about
6  Cory Lovelace's case around 2014 and when you
7  concluded the work that you were doing on this in
8  2006, has anyone contacted you in the interim about
9  this?
10       A. Not to my recollection.
11       Q. Is this a case that you gave much thought
12  to after you'd concluded your work in 2006?
13       A. No, not really.
14       Q. Who first contacted you again about this
15  case in 2014?
16       A. Well, to the best of my recollection, it
17  would have been this chap Adam Gibson.
18       Q. And just for the record, you're looking
19  at some papers to answer that question; is that
20  right?
21       A. Yeah. Yeah.
22       Q. You've got a manila folder in front of
23  you.
24       A. Uh-huh.
25       Q. Can you just explain to us what the

Page 71

1  manila folder is you have with you?
2       A. The manila folder has accumulated bits of
3  information from -- initially from the original
4  autopsy. And then when it was re-investigated back
5  in 2014, whatever the heck that was, and people who
6  have contacted me, I have information taped on the
7  front and papers in the folder.
8       They are not in order, but -- And at
9  several points in time, both parties, defense and
10  prosecution, copied the contents of this.
11       So there's nothing in here, to the best
12  of my knowledge, that you folks don't already have.
13  I just brought it because it has, you know -- I
14  had your contact number if I got -- I wasn't going
15  to get lost in my own town, but, you know, had
16  other contact numbers here if it was needed for any
17  reason.
18       Q. You and I talked about this case earlier,
19  back when there was still a criminal case pending
20  against Curtis Lovelace; is that right?
21       A. Yes, we did.
22       Q. All right. I see you've got my card
23  taped on there.
24       Do you have Detective Gibson's card also?
25       A. Yes, I do.

Page 72

1       And Parkinson's.
2       Q. That's Ed Parkinson?
3       A. Uh-huh. Yeah. Parkinson.
4       Q. How did Detective Gibson contact you when
5  he first reached out to you?
6       A. Good question.
7       Trying to remember if it was a phone call
8  or an e-mail or what, but somehow a message was
9  gotten through to me.
10       And, again, that would have been the time
11  period where I was still working for Dr. Miller.
12  So, you know, at times I'd be down in St. Louis
13  where my cell phone worked in the office. My cell
14  phone -- It's a dead zone in my office up here.
15  So he would have had to leave a message with
16  somebody.
17       But I'm not sure where I was located when
18  that happened, but I think it was by phone --
19       Q. Do you know --
20       A. -- wanting to make an appointment with
21  me.
22       Q. Do you know someone named Jim Keller?
23       A. I believe that's the current coroner. I
24  believe that's the chap that came to --
25       The first meeting I had about this was

18 (Pages 69 to 72)

CURTIS LOVELACE, et al. vs DET. ADAM GIBSON, et al.
BOWMAN, JESSICA 11/07/2018

Page 73

1   actually at my office in Keokuk, and Adam Gibson
2   and Jim Keller were the two individuals that were
3   there.
4        Q.   All right.  So before having that in-
5   person meeting with Jim Keller and Adam Gibson, did
6   you talk with Adam Gibson on the phone about this
7   case?
8        A.   I don't remember how much or what would
9   have been said, but the gist I got out of it was
10  that he wanted to talk to me about this case, he
11  wanted to meet with me about this case.
12       And since I am responsible for my cases,
13  as I see it, you know, ever after, then, you know,
14  if he's -- he's in a -- legal official in this
15  county, and he wanted to speak with me about it, I
16  was willing to do what I could to try to explain
17  what I'd done.
18       Q.   We'll talk about that meeting in a
19  minute.
20       A.   Okay.
21       Q.   But there was some period of time in
22  which Detective Gibson and others were
23  re-investigating this case; is that your
24  understanding?
25       A.   Yeah, they could -- I mean, I don't --

Page 74

1   Yeah, I don't know how much they had done of that
2   before they contacted me, but I suspect, given the
3   information they had, that they had done some.
4        Q.   During that period of time, Detective
5   Gibson reached out to you numerous times; is that
6   right?
7        A.   Yep.
8        Q.   He called you multiple times?
9        A.   Yes.
10       Q.   And he e-mailed with you multiple times?
11       A.   Probably.  I'm not sure how many e-mails
12  I got from him, but I remember the phone calls.
13       Q.   Were you cooperative with him in talking
14  to him about this case?
15       A.   I tried to be.
16       I mean, I tried to be patient.
17       Q.   When you say you tried to be patient,
18  what do you mean?
19       A.   Well, you know, I explained that I draw
20  my conclusions from evidence, and if he had some
21  hard evidence to set on the table in front of me,
22  that could result in, you know, modifying the
23  diagnosis.
24       But I needed hard evidence.  It wasn't
25  going to be a he said/she said thing, you know what

Page 75

1   I mean?  I had to have hard evidence.  And I told
2   him that.
3        And they hadn't any, you know.  So I
4   said, "Well, you know, it's going to have to stay
5   as is.  I don't like the diagnosis of
6   "undetermined," I never have, but that's what it
7   is.  And you haven't given me anything better to
8   change it."
9        I don't think they liked that, so they --
10  he -- they -- he called several times, I think, to
11  see if I would change my mind.
12       And I guess that's what he was doing.  I
13  mean, I'm speculating here.  But he called several
14  times, and I basically reiterated, "No, unless and
15  until there's hard evidence, then it stays this
16  way."
17       Q.   When you said just a minute ago that you
18  didn't like the diagnosis of "undetermined," what
19  do you mean?
20       A.   It's a pathologist thing.  We like to
21  know what we're looking at, and we like to be able
22  to say --
23       People come to us for answers.  You know,
24  people say, "Is this cancer?"  "No, it's not
25  cancer," you know, be giving -- or "Cause of death

Page 76

1   is X."
2        But sometimes in the real world, you
3   don't know.  All the pieces aren't there, for
4   whatever reason.  You have to admit --
5        I always tell people, "If you've got a
6   doctor who can't say 'I don't know,' maybe you
7   should find a new doctor."  Because this world and
8   medicine is too big for all of us to have all the
9   answers all the time.  Sometimes you have to admit
10  you don't know.
11       Now, in living medicine, sometimes an
12  unknown diagnosis will become clear over time.  But
13  with the deceased, you don't have that.  So
14  "undetermined" may be what you're left with.
15       And when I say I don't like the diagnosis
16  of "undetermined," every case I've had to call
17  "undetermined," I don't like doing it, but you have
18  to do it if that's what you're left with.  I mean,
19  I can't make up something just so that I can have a
20  cause of death.  It's got to be there for real.
21       Q.   Have you had other cases in the time that
22  you were doing autopsies where the cause of death,
23  you've made the finding, was undetermined?
24       A.   Yes, I have.  And I don't like those
25  either, but that's just the way it is.

SUSAN FRYE COURT REPORTING | 515-284-1972
300 Walnut Street, #36, Des Moines, IA 50309-2224

CURTIS LOVELACE, et al. vs DET. ADAM GIBSON, et al.
BOWMAN, JESSICA 11/07/2018

Page 77

1    Q. In the thousands of autopsies that you've
2  conducted in your career, did you have cases where
3  you were able to make a finding about cause of
4  death?
5    A. Most of the time I can, which is
6  probably part of the reason I don't -- I didn't
7  give enough --
8    Incidents with most of us who do
9  autopsies is somewhere in the about 2 to 3 percent
10  range of autopsies that we do come up undetermined.
11    So, you know, when you add up how many
12  cases I've done, you know, there's a fair number of
13  them that are undetermined, but they're not so
14  many.
15    You're used to getting an answer. You do
16  all this work and you get an answer. So when you
17  don't get an answer, it's -- That's what I mean by
18  I don't like it. We're supposed to have the
19  answers, and sometimes we don't.
20    Q. All right. When you said that -- that it
21  was your impression that Detective Gibson didn't
22  like the answer you were giving him, why was that
23  your impression?
24    A. Well, basically because he kept calling.
25  I mean, I thought I made it pretty clear, you know,

Page 78

1  "Come back when and if you've got evidence." And
2  then he'd call me up and give me, you know, a spiel
3  or something that did not contain hard evidence.
4    And I have to admit, I didn't write all
5  this stuff down, because I'd already determined
6  that what he had was not hard evidence, and I -- I
7  really didn't -- I was busy, I had other things to
8  do.
9    So I just tried to make it clear to him
10  that, "Look, no hard evidence, it stays the same."
11    So, like I said, my impression was he
12  didn't like that, because he kept calling me,
13  trying to get me to get -- trying to ask -- trying
14  to present me with subjective findings in lieu of
15  hard evidence to get a change.
16    Q. What subjective findings was he giving
17  you in lieu of hard evidence?
18    A. Oh, you know, kind of he said/she said
19  stuff, like "So-and-So says they -- the decedent
20  and her husband fought all the time," or, I mean,
21  stuff like that. It's just like, "Yeah. So," you
22  know. I mean, that doesn't -- that doesn't mean
23  anything about cause of death.
24    So that kind of information to me is, you
25  know, stuff for the TV shows, you know. It doesn't

Page 79

1  give me anything useful. So that's the kind of
2  things that -- you know, no.
3    And saying things like, "You need to get
4  justice for this woman." And it's like, "Well, you
5  know, justice is all very well and good if you have
6  a perpetrator," you know what I mean. Not
7  everything that's undetermined --
8    I tried to explain this to him at great
9  length, "undetermined" does not mean likely
10  murdered. "Undetermined" means I don't know. And
11  I empha -- tried to emphasize to him that one of
12  the things that bugged me about this case even more
13  than the minor abrasions, which is -- there's ways
14  of getting that. And if the daughter said she
15  tripped and fell, I mean, that supports, I guess,
16  what the husband was saying.
17    That discrepancy bugged me tremendously.
18  And, you know --
19    I mean, so there's things going on here.
20  I wasn't getting the whole story.
21    People don't always tell doctors
22  everything. You guys knows that. They keep things
23  to themselves, thinking maybe they'll get a, quote
24  unquote, bad reputation.
25    So maybe that's why, you know, things

Page 80

1  weren't adding up for me, because they were trying
2  to, quote unquote, preserve her, you know,
3  respectability or whatever, I don't know.
4    But whatever it was, the more they talked
5  to me, the more I began to think to myself, "Now,
6  hey, wait a minute," you know. "I'm still sticking
7  with 'undetermined,' but, you know, this -- this
8  stuff that you're telling me, this is not pushing
9  any way towards a cause -- you know, homicide, not
10  even -- or smothering. It just doesn't."
11    So, like I said, I'm trying to find words
12  to explain things that I dismissed once I spotted
13  the tag on it that said, "This is he said/she
14  said."
15    You get to learn to recognize those sorts
16  of things in medicine in general and in forensics
17  in particular, you know what I mean? He said/she
18  saids are of no help.
19    Q. In any of the conversations that you had
20  with Detective Gibson, either in person or on the
21  phone, did he ever tell you that he was looking
22  into the possibility that Cory Lovelace's death
23  might have been caused by something natural?
24    A. Natural? Oh, no. I don't recollect any
25  discussion of -- that they were thinking it was a

20 (Pages 77 to 80)

CURTIS LOVELACE, et al. vs DET. ADAM GIBSON, et al.
BOWMAN, JESSICA 11/07/2018

Page 81

1    natural cause of death.  No.
2         Q.  In any of the conversations that you had
3    with Jim Keller at the meeting you described or any
4    other time you may have talked to him, did he ever
5    tell you that he was looking into whether or not
6    Cory Lovelace's death might have been natural?
7         A.  I didn't talk to him as much, but I --
8    No, I don't recollect any focus on a natural cause
9    of death.
10        Q.  Back in 2014, did you have the same
11   office number that you have today?
12        A.  Yes, I did.
13        Q.  And could you tell us what your office
14   number is?
15        A.  Area code (319)526-8716.
16        Q.  Did you ever talk with Detective Gibson
17   or Jim Keller or anybody else that was
18   investigating this case on a telephone number other
19   than your office number?
20        A.  Probably my cell phone.
21        Q.  And can you give us your cell phone
22   number?
23             And if you like, just to protect your
24   privacy, I think we'll agree that we'll mark this
25   part of your deposition confidential and we

Page 82

1    wouldn't include this number to the public.
2         A.  Okay.
3         Q.  But could you tell us what your cell
4    phone number was in 2014?
5         A.  It was, and is, (217)553-1250.
6         Q.  Thank you.
7             Did you have an e-mail address that you
8    were using back in 2014?
9         A.  Oh, yeah.  I've had it since 2000.
10        Q.  I'm going to ask you for that e-mail
11   address, too.  And, similarly, I'll represent to
12   you that we would mark this part of your deposition
13   confidential, and this isn't something we would put
14   in any public filing.
15        A.  Thank you.
16        Q.  But could you give us that e-mail
17   address, please?
18        A.  Okay.  It's J-H-B as in boy, M as in
19   Mary, D as in David, 66, A with a circle -- "at"
20   sign -- Yahoo.com.
21        Q.  I want to show you --
22        MS. THOMPSON:  We're on Exhibit 3, I
23   think.
24             We'll mark this as Exhibit 3.
25             (Deposition Exhibit 3 was

Page 83

1             marked for identification.)
2    BY MS. THOMPSON:
3         Q.  I'm showing you what's been marked as
4    Exhibit 3.  This is a document that's Bates-stamped
5    AC 236 and AC 237.
6             And if you want to just take a look at
7    this, I'm just going to ask you if you recognize
8    any -- if you recognize Exhibit 3.
9         A.  Okay.
10             Yeah.  This was -- would have been early
11   on.  Yeah, February, 2014.
12             I believe at this point I thought they
13   had some general reason -- some reason for concern.
14        Q.  So Exhibit 3 is a chain of e-mails
15   between you and Jim Keller; is that right?
16        A.  This one says James Keller, Dr. Bowman.
17             Yeah.  Yes, it is.
18        Q.  Did Jim Keller e-mail you on February 7th
19   of 2014 about this case?
20        A.  Yeah, there is one from February 7th.
21        Q.  Okay.
22        A.  And then it carries on to February 10th.
23        Q.  All right.
24             So there is a response e-mail to you --
25   Sorry.  There's a response e-mail from you to Jim

Page 84

1    Keller on February 10th, as you just indicated.  Is
2    that right?
3         A.  Yeah.  Yeah.
4             Yeah, I responded.  I guess February --
5    They're connected, so it looks like maybe I
6    responded on the 10th to the 7th e-mail.
7         Q.  Okay.
8         A.  And then -- Yeah.
9         Q.  So the e-mail that you sent Mr. Keller on
10   February 10th, that's this e-mail that's in the
11   middle of the first page of this document; is that
12   correct?
13        A.  Okay.
14             Yeah, the e-mail from me is in the
15   middle?
16        Q.  Yes.
17        A.  Yes.
18        Q.  So the first sentence there says, "Hey
19   there.  I guess you may be having a bit of a
20   Monday, so I figured I'd just drop an e-mail."
21             Do you know what you were referencing in
22   that sentence?
23        A.  I suspect I tried to call him and
24   couldn't get through.
25        Q.  And the next sentence says, "It's a

SUSAN FRYE COURT REPORTING | 515-284-1972
300 Walnut Street, #36, Des Moines, IA 50309-2224

CURTIS LOVELACE, et al. vs DET. ADAM GIBSON, et al.
BOWMAN, JESSICA 11/07/2018

Page 85

1 courtesy contact in case there's something you want
2 to address prior to the Wednesday meeting."
3     A. Yes.
4     Q. Were you giving Mr. Keller an opportunity
5 to reach out to you in advance of that meeting?
6     A. If he wanted to, that -- I mean, I make
7 myself available. They came to me. They were, you
8 know, all very -- acted all very concerned about
9 this. So, yeah, I mean, they could have called me
10 had they wanted to.
11     Q. And then the last sentence of that
12 paragraph that I just read that says, "I've seen
13 cases with little to no evidence get pushed along
14 as first degree murder, then others with worrisome
15 findings, parenthesis, to say the least, close
16 parenthesis, drop off the map...but not this time
17 it seems."
18     What did you mean by that sentence?
19     A. That sentence there is based on their
20 concern and agitation. It seemed that they had --
21 It seemed like they might have something here at
22 the time.
23     Q. Were you basing that on what they told
24 you?
25     A. Based on what they had told me and the

Page 86

1 amount of apparent agitation over this situation
2 that they were exhibiting.
3     But, again, notice I said, "but not this
4 time it seems." I still had reservations. I
5 wasn't going to commit to anything based on what
6 they had said so far. But they did seem -- They
7 presented -- They presented a story to me, and it
8 sounded a little bit worrisome.
9     The case, admittedly, had been
10 undetermined, and they were, you know, apparently
11 looking into it. And that was, you know, the
12 initial impression that I got dealing with them.
13     I give people the benefit of the doubt
14 until they prove otherwise. So that's the way I
15 was approaching it.
16     Q. What about what they told you led you to,
17 you know, conclude that what they were telling you
18 was worrisome?
19     A. Well, this concern that they had, that --
20     And, again, I don't know the demographics
21 of how things are in Adams County. I just, you
22 know, contact people, you know what I mean? It was
23 far away from my base of operations.
24     And they were saying they had concerns
25 that maybe the investigation hadn't been done

Page 87

1 properly at the time the autopsy had been
2 conducted. And I do rely on that.
3     So all these things when they first
4 presented it to me made me think, "Hey, well, maybe
5 there's, you know, some more work that needs to be
6 done here."
7     The more I spoke with them, the less
8 substantive the material, you know, seemed to be.
9 It's like as I went through -- as we went through
10 what their concerns were and what they had, it was,
11 again, he said/she said kind of thing.
12     Now, sometimes he said/she said leads to
13 actual, you know, findings, hard findings, but
14 apparently not in this case. And that became clear
15 later on. But, at first, it sounded like there was
16 maybe something that needed investigated. And I
17 would do what I could to explain my findings to
18 them, best of my ability, and they would have to
19 take it from there. Because I'm not an
20 investigator, I'm not a detective. I'm just a
21 pathologist who happened to be doing forensics at
22 the time. So --
23     Q. I don't have any other questions about
24 Exhibit 3, so if you want to set that aside, you
25 can.

Page 88

1     A. Okay.
2     Q. The questions I have, to go on, won't
3 concern that.
4     What do you remember about the meeting
5 that you had then with Mr. Keller and Detective
6 Gibson when they came to meet with you?
7     A. Well, like I said, they had, you know,
8 kind of a litany -- it was several -- I think a
9 couple hours' worth of meeting time, you know,
10 maybe as much as two, two and a half hours. I
11 scheduled it for after work, because I figured it
12 might take a while.
13     And they raised their concerns. And as
14 we went over them, when I pushed for hard evidence,
15 actual findings, you know, like -- I don't know --
16 you know, a rag or something that's been put over
17 somebody's face or whatever. In the case of
18 smothering, you know -- You know, I mean, again, a
19 pillow maybe, a specific pillow that had fluids on
20 it or something. I don't know what I would be --
21 Something of that nature, some hard evidence that
22 they think -- that they thought would -- you know,
23 would show that this is not just a medical demise,
24 that would tip it one way or the other.
25     But they didn't. They had, you know,

22 (Pages 85 to 88)

CURTIS LOVELACE, et al. vs DET. ADAM GIBSON, et al.
BOWMAN, JESSICA 11/07/2018

Page 89

1  "So-and-So said that they were fighting," like I
2  mentioned before, and fought a lot, and that there
3  was, you know, marital problems and stuff like
4  that. And, again, for me, that doesn't cut it. I
5  have to have hard findings, you know.
6          Because, you know, quite frankly, if
7  everybody who had marital problems ended up -- one
8  of the partners would end up dead, then there
9  wouldn't be enough pathologists in the world to
10 handle it. Everybody squabbles at some point in
11 time. Now, whether they squabble loud enough for
12 the neighbors to hear depends on the people in
13 question.
14         What I was getting from -- Detective
15 Gibson, as I recollect, did most of the talking,
16 but what I was getting from them was not stuff that
17 was ringing my alarm bells. It sounded to me like
18 they were going on he said/she said kind of stuff
19 and not really actual evidence.
20         And I began to also wonder -- because
21 this is just the way it is -- what's -- you know,
22 what sort of political situation is going on there,
23 is somebody trying to climb the ladder? Is
24 sometime --
25         This is a reality of life, you know what

Page 90

1  I mean? Is this something that somebody could use
2  to get a promotion or something? Is there another
3  motive other than just establishing that this woman
4  was, quote unquote, smothered?
5          You start to wonder, when there's no hard
6  evidence, what's going on here? And, eventually, I
7  did begin to wonder.
8          Like I said, I gave him a chance. I
9  said, "Go find me some hard evidence," essentially,
10 maybe not in those words. But basically I
11 communicated to them that that's what -- When they
12 called me back, I communicated to them, "You know,
13 it's not quite enough yet. Give me some hard
14 evidence." They did not.
15         And then subsequent calls were like, "No.
16 I said I needed hard evidence. No, that's not it."
17 You know, "Well, the mother don't like him."
18 Well -- Or whatever. You know, it's like, "No.
19 That's not hard evidence."
20         I explained what hard evidence was in
21 terms of pathology standards, and some finding I
22 could -- that I -- some finding that would alter
23 what I had said. There was none.
24         Q. At any point in this re-investigation,
25 either at this meeting at your office or any point

Page 91

1  after that, did you ever tell Jim Keller or Adam
2  Gibson that -- words to the effect that "No matter
3  what you bring to me, I'm not going to change my
4  undetermined finding"?
5          A. No. What I told them was if they found
6  hard evidence, then I would consider it. I didn't
7  promise to do anything. I would have to consider
8  the evidence and see how it weighed in. But I
9  didn't tell them, "No, I'm not ever going to change
10 it." It would just depend. I told them, "But it
11 has to be hard evidence, not this kind of
12 'Neighbors heard fighting' and stuff like that." I
13 mean, that doesn't do it.
14         Q. Did you ever tell either of them, meaning
15 either Detective Gibson or Jim Keller, words to the
16 effect that because you weren't doing forensic
17 pathology work anymore, you didn't want to change
18 your finding because you didn't want to put
19 yourself in a position of having to come to court?
20         A. I wouldn't say that.
21         I don't like to go to court, but I would
22 have done it if I had to.
23         I would not have said that to them.
24 That's just -- I wouldn't.
25         Q. At this meeting that you had at your

Page 92

1  office with Adam Gibson and Jim Keller, did you
2  tell them at this meeting words to the effect that
3  this laceration that was -- or this mark that was
4  on -- on Cory Lovelace's face between her lip and
5  her nose, that that mark was consistent with a
6  smothering?
7          A. I said -- I would have said something to
8  the effect of it could be consistent, but it's --
9  or consistent, but it's also consistent with a
10 bunch of other things.
11         And that's the nature of it; it's not
12 diagnostic, you know. You can't --
13         One of the things I tried to explain is
14 the difference between "diagnostic" and "consistent
15 with." You know, like fatty liver is consistent
16 with drinking. And it turns out later on we did
17 find out that she didn't just social drink, you
18 know. Now I kind of think I know why that liver
19 was fatty.
20         But "consistent with" is not diagnostic.
21 And you have to go another step to prove -- to
22 reach diagnostic; that is to say, you know, the
23 pillow -- And even then, it would be an issue of
24 beyond reasonable medical doubt, like 90 percent
25 probability.

23 (Pages 89 to 92)

CURTIS LOVELACE, et al. vs DET. ADAM GIBSON, et al.
BOWMAN, JESSICA 11/07/2018

Page 93

1   But, for instance, if they had, you
2   know -- you know, a pillow that, you know, had
3   been -- or rag or something had been pressed to her
4   face and nose with her saliva and so forth and so
5   on on it, even that would have to be taken in
6   context, because she could have put that up to her
7   face herself, you know.
8       So I might have said "consistent," or I
9   might have said "could be consistent." But, again,
10  "consistent" is not "diagnostic." It means that,
11  yeah, it could be, but it could also be something
12  else.
13      Q.  And did you convey to Adam Gibson and Jim
14  Keller at that meeting in your office other
15  possible explanations for why Cory Lovelace had
16  the --
17      A.  Mark.
18      Q.  -- the potential indicators of trauma
19  that she had that you found at autopsy?
20      A.  Oh, yes.  And I went through some --
21      You know, the fall, might be what she
22  told a kid, she may have -- Like I said, if she
23  was bulimic, which apparently she was -- I don't
24  have proof of that -- vomiting, forced vomiting,
25  you can definitely smack your face against a toilet

Page 94

1   seat.  That's a very easy way to get a mark there
2   and a little dig in the lip, hit your face against
3   that.  It would also account for the lack of
4   petechia and you, know, the nose not being injured.
5       I mean, there's a lot of ways you can get
6   that.  She could have gotten it falling, like if
7   you fall climbing up the stairs and you hit it just
8   right, it's possible.
9       So, I mean, that was possible.  But I
10  started to -- Like I said, when I found out about
11  the bulimia, I started to think to myself, I
12  wonder.  Because it's a place you frequent a lot.
13  And forced vomiting -- even when it's not forced,
14  it's a very convulsive-type thing, and you can
15  smack your face against things and injure it.
16      Q.  When did you first learn that there might
17  be some issue with Cory Lovelace having some type
18  of eating disorder?
19      A.  That's a good question.
20      It would have been when this thing was
21  re-opened; this case, I mean.
22      Q.  You're referring to after 2014?
23      A.  Yes.  Yes.
24      Q.  As you sit here today, do you know one
25  way or another whether that's true?

Page 95

1       A.  I can't prove it.  I mean, you know, like
2   records of her being treated of it for the
3   hospital -- in the hospital, I mean, would be gone
4   by now.
5       Hospitals keep records ten years, you
6   know.  So any records -- If her alcoholism -- If
7   she was ever treated for alcoholism, those records
8   would be gone too.  Because she would have been a
9   living patient then, see?  So I don't have any
10  records to indicate that.
11      But bulimia and the marks on her mouth,
12  those are consistent too.  And drinking to excess
13  and a fatty liver are very consistent, especially
14  in a case where nobody -- where the patient is not
15  obese and, you know, there's not another
16  physiological explanation for the fatty change in
17  the liver, like one of the rare storage disorders
18  or whatever.
19      MR. HANSEN:  I'm going to move to strike
20  that answer.
21      And, Doctor, I appreciate you wanting to
22  give us your explanations.  We're on a time limit
23  here, and that question was, "Do you have any proof
24  of whether or not she was bulimic," and that's a
25  yes or no answer.

Page 96

1       And I'd appreciate it if we could limit
2   the answers to the questions that are asked,
3   because we've been here for going on almost, you
4   know, two hours now, and we do have to move it
5   along.
6       So I appreciate that, but I need to get
7   my objection on the record.  Thank you.
8   BY MS. THOMPSON:
9       Q.  Let me pose another question to you,
10  Doctor.
11      At this meeting that you had at your
12  office, did -- did Adam Gibson show you a
13  photograph of Mrs. Lovelace?
14      A.  Yes.
15      Q.  Did he tell you "to do what's right for
16  this lady" at that meeting?
17      A.  That sounds like something he would have
18  said.
19      Q.  At any point in this re-investigation,
20  did Detective Gibson or Jim Keller talk to you
21  about some allegations that had been made about
22  Curtis Lovelace by his second wife?
23      A.  Yes.
24      Q.  Did they tell you that she had claimed
25  that -- she had said that she thought that maybe

24 (Pages 93 to 96)

CURTIS LOVELACE, et al. vs DET. ADAM GIBSON, et al.
BOWMAN, JESSICA 11/07/2018

Page 97

1    Curt had poisoned her?
2         A.   Yes.
3         Q.   What do you remember talking about that
4    issue, a potential poisoning issue, with either Jim
5    Keller or Adam Gibson?
6         A.   I asked if they had any evidence of it.
7         Q.   What did they tell you about that?
8         A.   They didn't.
9         I mean, I don't know that they told me,
10   but they didn't have anything to produce.  She
11   hadn't gone to the hospital and had any toxicology
12   screens done or anything, so if she'd been
13   poisoned, there's no proof of it.  She's still
14   alive, so --
15        I'm not sure how to answer that, I'm
16   sorry, but that's the best I can do.
17        Q.   At any point did Adam Gibson or Jim
18   Keller tell you that they had talked with a doctor
19   named Scott Denton about this case?
20        A.   Yes.
21        Q.   Do you -- Did you know Scott Denton
22   before you were contacted about this case being
23   re-opened?
24        A.   I knew of him, never met him.
25        Q.   Have you ever talked with Dr. Denton

Page 98

1    about this particular case?
2         A.   No.
3         Q.   Did they ever tell you whether or not --
4         Let me start the question again.
5         Did Adam Gibson or Jim Keller ever tell
6    you what, if any, opinions Dr. Denton had about
7    this case?
8         A.   I was informed that he agreed with me.
9         Q.   Who told you that?
10        A.   Either Jim Keller or Gibson.
11        Q.   Did you ever ask either Detective Gibson
12   or Jim Keller whether or not there was any report
13   from Dr. Denton about his opinions in this case?
14        A.   I believe I did ask to see his report.
15        Q.   When did you ask that?
16        A.   I believe it would have been that first
17   meeting.
18        Q.   All right.
19        And did you ever see any report from
20   Dr. Denton about this case?
21        A.   They didn't provide it to me, no.
22        Q.   At some point did you tell Detective
23   Gibson -- or suggest to Detective Gibson that he
24   talk to another pathologist named Shaku, S-h-a-k-u,
25   Teas, T-e-a-s?

Page 99

1         A.   Yes, I did.
2         Q.   All right.  And when did you tell Adam
3    Gibson that?
4         A.   I'm pretty sure it was at that meeting.
5         Q.   What did you tell him with respect to
6    Dr. Teas?
7         A.   To the effect that she had extensive
8    experience and was now a consultant forensic
9    pathologist and could be of help to them.
10        Q.   At the time that you suggested that he
11   talk to Dr. Teas, did you know her personally?
12        A.   I don't know her personally, but I know
13   of her work.  And she's a pretty straight-shooter.
14   She does her homework, she gets her consults, she
15   comes up with the conclusions that fit the
16   findings.
17        MR. HANSEN:  Again, I'll move to strike
18   that.
19        The question was, "Do you know Shaku
20   Teas."
21        I'll move to strike as non-responsive to
22   the question.
23        Go ahead.
24   BY MS. THOMPSON:
25        Q.   Are you friends with Dr. Teas?

Page 100

1         A.   No.
2         Q.   Were you friends with her back in 2014?
3         A.   No.
4         Q.   Is she someone that you consider to be a
5    professional colleague?
6         A.   Yes.
7         Q.   All right.
8         Did Detective Gibson have any response
9    when you suggested to him that he talk to Dr. Teas?
10        A.   I don't specifically recollect what he
11   said in regard to that.
12        Q.   Was it your understanding he did contact
13   Dr. Teas?
14        A.   Yes, that was my understanding, that he
15   was -- or that he was going to.  That was my
16   impression.
17        Q.   Did he ever -- Did Adam Gibson ever
18   contact you and tell you what, if anything,
19   Dr. Teas had told him?
20        MR. HANSEN:  I'm sorry.  Did you
21   reference who you're talking about?
22   BY MS. THOMPSON:
23        Q.   Let me rephrase that.
24        Did Adam Gibson ever tell you what, if
25   anything, he learned from Dr. Teas about this case?

25 (Pages 97 to 100)

CURTIS LOVELACE, et al. vs DET. ADAM GIBSON, et al.
BOWMAN, JESSICA 11/07/2018

## Page 101

1    A.  I don't recollect.

2    Q.  Am I right, then, that after that initial

3    conversation, the in-person meeting that you had

4    with Detective Gibson and Jim Keller, that

5    Detective Gibson kept calling you after that about

6    this case?

7    A.  Yes, he did.

8    Q.  All right.  And in those calls, what was

9    he telling you?

10    A.  The impression I got, again, he wanted

11    the report changed.

12    Q.  Did he ask you to change your report?

13    A.  The impression I got is that's what he

14    wanted, because when I tried to explain that it was

15    in his camp now to find some evidence, and if he

16    had it, then bring it to me, that he would continue

17    to talk at me, telling me, you know, "We need

18    justice for this woman," or whatever, stuff like

19    that, that I needed to change -- He didn't say I

20    needed to change my report, but basically implied

21    that that's what needed to happen.

22    And I tried to explain to him that I

23    couldn't do that without evidence, that he said/she

24    said -- the girlfriend said -- the wife or

25    whatever saying that she thought she was being

## Page 102

1    poisoned, that's not hard evidence.

2    I kept trying to explain it.

3    Q.  Other than recommending that he talk to

4    Dr. Teas, had you -- did you ever suggest to Adam

5    Gibson that he talk with another medical examiner?

6    A.  Well, when that did not seem to work, no,

7    I did not suggest anybody else.

8    Q.  Why didn't you?

9    A.  Didn't seem to be doing any good.

10    Q.  Why was it your impression that didn't

11    seem to be doing any good?

12    A.  Well, whatever it was, whatever -- pardon

13    my French -- bee in his bonnet that he had about

14    this case, that did not include hard evidence.

15    I was not able to -- to make it clear to

16    him that whatever was going to come of this case

17    rested with him and did not depend -- was not going

18    to depend on whether or not I changed my report,

19    especially without hard evidence.

20    I mean, I told him that if they had hard

21    evidence, I would consider it, but they never came

22    up with such.  And I kept saying, "But that's not

23    hard evidence, that's not --" you know.  What we've

24    been talking about here for the past several hours

25    is things that -- you know, the he said/she said,

## Page 103

1    you know, the second wife, and, you know, and

2    then --

3    And then they -- "We invest --" They

4    talked to the kids, and the youngest one couldn't

5    remember.  And it was, like, well, yeah, he was

6    four at the time -- or she was four at the time.

7    I'm sorry.  This is drama.  This is not -- This is

8    not evidence.  This is drama.

9    Q.  At some point did Adam Gibson tell you

10    that he had talked to a Dr. Jane Turner?

11    A.  Dr. Jane -- Would that be the lady down

12    in St. Louis?

13    Q.  Well, let me ask you, did he ever tell

14    you that he talked to a medical examiner from

15    St. Louis?

16    A.  I found out somehow about that.  He may

17    have told me.

18    Q.  All right.

19    Did he tell you that -- Did he ever tell

20    you that there were other pathologists who had

21    ruled that Cory Lovelace's death was, you know,

22    caused by someone killing her?

23    A.  That's what I was told, yes.

24    Q.  Did he tell you that?

25    A.  I think that he did.  I don't

## Page 104

1    specifically recollect.

2    Q.  Did you have any response to him when you

3    learned that?

4    A.  Well, again, I wanted to know based on

5    what these opinions were drawn, and if he wanted

6    to --

7    Again, I'm not a consulting forensic

8    pathologist.  So reviewing other path -- forensic

9    pathologists' reports is really not my job

10    description.  My duty was to respond to what I had

11    done and make any changes if additional evidence

12    was presented.

13    So whatever these other forensic

14    pathologists were doing, I did not deem it my duty

15    to review their work and comment on it.

16    Q.  Did Adam Gibson ever ask you to look at

17    other people's reports about their conclusions to

18    see if that would change your mind?

19    A.  I don't recollect, no.

20    I don't recollect if he asked me to or

21    not.

22    Q.  Is that something you would have done --

23    Is that something you would have done if you'd been

24    asked to do it?

25    A.  Again, reviewing other pathologists' --

26 (Pages 101 to 104)

CURTIS LOVELACE, et al. vs DET. ADAM GIBSON, et al.
BOWMAN, JESSICA 11/07/2018

## Page 105

1 forensic pathologists' casework is a job of a
2 consulting pathologist -- forensic pathologist,
3 which I'm not. So I would have been not happy with
4 that.
5     Q. Did you ever tell Adam Gibson words to
6 the effect that you were glad that he had taken
7 your advice that you gave at the onset of this new
8 investigation and got opinions from medical
9 examiners to be able to determine the cause and
10 manner of Cory Lovelace's death?
11     A. That doesn't sound like something I would
12 say, because it refers to forensic pathologists
13 just en masse.
14     I referred him to Dr. Shaku Teas, who I
15 had professional respect for. And these others I
16 don't know, so I wouldn't have recommended them.
17 So it doesn't really sound like something I would
18 say.
19     I think it's something maybe he wanted to
20 hear. That happens, unfortunately, in medicine all
21 the time, not just forensic pathology.
22     Sorry.
23     Q. I'm sorry. I didn't mean to interrupt
24 you.
25     A. No, no. I'm sorry I can't be more

## Page 106

1 specific. But that's it.
2     Q. Did you ever tell Adam Gibson words to
3 the effect that you relayed your suspicions about
4 Cory Lovelace's death at the time and that it was
5 then up to the coroner and the detectives to
6 determine what happened?
7     A. That's consistent with something I might
8 have said, yes, because it would have been up to
9 them. I am not an investigator, and I'm not a
10 coroner -- or wasn't a coroner at the time. So --
11     You know, I relayed my concerns. They
12 did get back to me. They did investigate.
13     Q. Did you ever tell Adam Gibson that the
14 opinions of medical examiners would be of great
15 help to him?
16     A. The opinion of medical examiners?
17     I wouldn't have phrased it that way, not
18 just generally. It depends on who you're asking.
19     Q. Did you ever tell Adam Gibson words to
20 the effect that he would be much better served by
21 Dr. Jane Turner's opinions since she's a medical
22 examiner and you were only a coroner's physician?
23     A. I don't know Dr. Jane Turner. I
24 wouldn't -- wouldn't have made a statement like
25 that. I don't know if she's more capable or

## Page 107

1 experienced than I am or not. So I wouldn't have
2 said that.
3     I don't know where he got that from.
4     Q. Did you tell Adam Gibson, quote: If you
5 don't get enough evidence this time, these people
6 don't quit. I know that's of no comfort to this
7 victim's family or the next victim's family, but
8 they don't quit, close quote?
9     A. "They" being the perpetrator?
10     Q. I'm just asking if you ever made a
11 statement --
12     A. That doesn't sound like something I would
13 say.
14     Q. So the portion -- this quote that I just
15 read to you --
16     A. Yeah, that sounds like a cop remark,
17 "They don't quit," "Perpetrators don't quit." I
18 mean -- You know, I don't --
19     That doesn't sound right to me at all.
20     Q. Did you ever convey words to that effect
21 to Adam Gibson, that someone doesn't quit?
22     A. This -- This does not sound like the way
23 I approach medicine. No.
24     I'm not an investigator. That sounds
25 like -- That sounds like something he thought of.

## Page 108

1     Q. Did you ever tell Adam Gibson words to
2 the effect that because Curtis Lovelace was a
3 lawyer, that you believed that people that were
4 working on defending him would, you know, be very
5 aggressive in defending Curt?
6     A. I can tell you the way I look at it. And
7 I know this may sound hokey and old-fashioned, but
8 I believe everybody, from street people to the
9 president, deserve proper procedure and trial and
10 no favoritism.
11     So that's not what I believe. It's
12 inconsistent with my belief system.
13     Q. Is that something you ever conveyed to
14 Adam Gibson?
15     A. No. Don't know where he got it from,
16 except maybe his head.
17     Q. Was there any point in the times that you
18 were communicating with Adam Gibson about this case
19 where you effectively told him, you know, "Don't
20 contact me anymore. I'm done talking to you," or
21 words to that effect?
22     A. I may have at some point. I don't
23 specifically recollect.
24     I try to be patient, but I might have got
25 a bit short towards the end there.

27 (Pages 105 to 108)

CURTIS LOVELACE, et al. vs DET. ADAM GIBSON, et al.
BOWMAN, JESSICA 11/07/2018

Page 109

1    Q.  Why -- If you got short toward the end
2  there, why was that?
3    A.  Again, this pattern of -- looking for the
4  right word here -- I would say excessively
5  persistent, fixation, on getting my autopsy report
6  changed.
7    MR. HANSEN:  Let the record --
8    Doctor, is there something that you want
9  to say to me?
10   You keep looking at me and smiling and
11 making gestures.
12   THE WITNESS:  Yeah.
13   MR. HANSEN:  Is there something you want
14 to get on the record?
15   Do you have a problem with the fact that
16 I objected to your testimony?
17   THE WITNESS:  No.  No.
18   MR. HANSEN:  Is there something we need
19 to talk about?
20   THE WITNESS:  No.
21   MR. HANSEN:  Okay.  I just want to make
22 clear, because you --
23   THE WITNESS:  I want to make sure you
24 understand, too, because --
25   MR. HANSEN:  -- you keep directing your

Page 110

1  answers to me and smiling and doing --
2    MS. THOMPSON:  I think there's a video of
3  this.  I don't think that --
4    MR. HANSEN:  Okay.
5    THE WITNESS:  There's a video that will
6  account for what's going on here.
7    MR. HANSEN:  Okay.
8    THE WITNESS:  I want to make sure you
9  understand too.
10   MR. HANSEN:  Okay.
11   THE WITNESS:  That's why I'm smiling.
12   MR. HANSEN:  I can hear perfectly fine.
13 If I can't hear you, I'll let you know.
14   THE WITNESS:  Yeah, but that doesn't mean
15 everybody understands.
16 BY MS. THOMPSON:
17   Q.  Do you want me to re-read the last
18 question to you, Dr. Bowman?
19   A.  Please do.
20   Q.  I'll confess, I don't recall it.  And I
21 think --
22   Let me just ask you this question,
23 Dr. Bowman, which is, if you got short with Adam
24 Gibson near the conclusion of the time you were
25 talking to him, why was that?

Page 111

1    A.  I would have been getting a little tired
2  of telling him the same thing over and over and
3  over again, that being -- to refresh everybody's
4  memory, and not take extra time -- I need evidence,
5  not he said/she said, to change anything.
6    Q.  Do you still have Exhibit --
7    I think this is actually maybe a new
8  exhibit.
9    And I'm almost done with my questions,
10 Dr. Bowman.  I just have a couple additional
11 questions for you.
12   I'm going to mark this as Group 4.
13   MS. EMERY:  Do you have any idea what the
14 Bates are?
15   MS. THOMPSON:  I'm really sorry.  I
16 realized --
17   You know what?  Let me just actually do
18 this: I'll give you guys those sets, but let me
19 actually -- let me just pull for the witness what I
20 want to show her.  I'm not going to give her this
21 whole set; it will be too complicated.
22   Let me ask the witness this question
23 before I show you an exhibit.
24 BY MS. THOMPSON:
25   Q.  Do you remember Adam Gibson ever

Page 112

1  e-mailing you photographs related to the
2  investigation?
3    A.  E-mail -- He might have, or he might
4  have given them -- I don't specifically recollect.
5    Q.  Do you remember reviewing photographs
6  with him?
7    A.  Yes.  He did go over photos.
8    MS. THOMPSON:  Let's mark this as
9  Exhibit 4.
10   If you look about -- near the end of this
11 packet, there's an e-mail --
12   Let's go off the record.
13   (Discussion off the record.)
14   THE VIDEOGRAPHER:  We will go off the
15 record at 4:39 p.m.
16   (Deposition Exhibit 4 was
17   marked for identification.)
18   (Discussion off the record.)
19   THE VIDEOGRAPHER:  We are back on the
20 record.  The time is 4:43 p.m.
21   MS. THOMPSON:  All right.  So we took a
22 brief break here to get on the same page
23 paper-wise.
24   (Please go to the next page.)
25

28 (Pages 109 to 112)

CURTIS LOVELACE, et al. vs DET. ADAM GIBSON, et al.
BOWMAN, JESSICA 11/07/2018

Page 113

1     EXAMINATION (Resumed)
2 BY MS. THOMPSON:
3     Q.  I'm going to show you what's been marked
4 as Bowman Exhibit 4.  And this document,
5 unfortunately, has Bates stamps that you cannot
6 read, but I'm going to represent to you that it is
7 a four-page document that starts with an e-mail
8 that has a date of March 5th of 2014.
9         So let me show you Exhibit 4.
10    A.  Okay.
11    Q.  And I'm going to ask you just to look
12 briefly at that, and I'm going to ask you if you
13 recognize Exhibit 4.
14    A.  Yes.  Yes, I do.
15    Q.  Is Exhibit 4 e-mails that you exchanged
16 back and forth with Adam Gibson?
17    A.  Yes.
18    Q.  I want to refer you specifically to that
19 page 1.  And there's an e-mail from Detective
20 Gibson to you that references — that references
21 you writing an addendum to your report.
22        Do you see where I'm referring you?
23    A.  Okay.  Is it where it starts, "In talking
24 to the State's attorney" —
25    Q.  Let me just actually —

Page 114

1     A.  -- or is it further?
2     Q.  Let me point out to you where I'm talking
3 about.
4         Yes.  So it starts with that, "In talking
5 to the State's attorney."
6     A.  Okay.
7         Okay.  Do I need to read it out loud for
8 the record?
9     Q.  Why don't — Well, let me just ask you
10 this:  In looking at that paragraph, do you recall
11 getting an e-mail from Adam Gibson where he asked
12 if you would be willing to write a short additional
13 addendum to your original autopsy report
14 identifying a cause of death for Cory Lovelace?
15    A.  Yes.  And it looks like it's followed by
16 an e-mail of mine.
17    Q.  Right.  And I'll ask you about your
18 e-mail in a second.
19        But do you remember getting that e-mail
20 from Adam Gibson?
21    A.  Not specifically, but, I mean, now that I
22 see it, it's like -- I recollect, yes.
23    Q.  Did you have conversations — either a
24 conversation or conversations with Adam Gibson
25 where he orally asked you the same thing, to make

Page 115

1 some addendum to your report?
2     A.  That's what I recollect, yes.
3     Q.  All right.
4         And as to this particular e-mail request
5 in Exhibit 4, you did respond to him via e-mail
6 about that.
7     A.  Yes, I did.
8     Q.  All right.  And your response is to
9 explain to him the difference between a cause of
10 death and a manner of death determination; is that
11 right?
12    A.  That was the effort.
13    Q.  All right.
14        And why is that the type of response you
15 gave to that request?
16    A.  Because unlike Shaku Teas, who is a
17 medical examiner, I was not.  And so I did not
18 participate in determining the manner of death.
19 And I was trying to — again, trying to make that
20 clear.
21    Q.  If you had been provided with evidence by
22 Adam Gibson or Jim Keller or someone else in this
23 re-investigation that would have given you a basis
24 to change your cause of death determination, is
25 that something you would have done?

Page 116

1     A.  If such had been provided, yes.
2         I mean -- Well, let me put it this way:
3 If such had been provided, I would have assessed
4 it, and if it was sufficient for a change, then I
5 would have made a change.  But I would have to
6 assess it first.
7     Q.  In addition to all of these conversations
8 that you had, either in person or on the phone with
9 Adam Gibson, did you talk with a prosecutor before
10 Curt's first trial in this case?
11    A.  Yes.
12    Q.  And do you remember the name of the
13 prosecutor you talked to?
14    A.  Yes.  It was Mr. Edwin Parkinson.
15    Q.  All right.
16        And I think to answer that question, you
17 referred back to your folder where you've got some
18 of these business cards; is that right?
19    A.  That is correct.
20    Q.  Okay.  You have Mr. Parkinson's business
21 card on your folder?
22    A.  I do.
23    Q.  All right.
24        You had talked earlier about learning
25 something at some point about maybe one of Cory

29 (Pages 113 to 116)

CURTIS LOVELACE, et al. vs DET. ADAM GIBSON, et al.
BOWMAN, JESSICA 11/07/2018

Page 117

1    Lovelace's children being on the bed that morning.
2        A.  That is correct.
3        Q.  Where did you get that information?
4        A.  I actually remember this, because,
5    ironically, I got it from Mr. Parkinson.  He was
6    the one that told me that the youngest had been on
7    the bed with the mother before realizing she was
8    deceased, eating his cereal and watching cartoons.
9        Q.  Did Mr. Parkinson tell you where he got
10   that information?
11       A.  I don't recollect if he did, or, if so,
12   where he got that information.
13       Q.  Did you ultimately testify at any of the
14   trial proceedings related to Mr. Lovelace's trial?
15       A.  Did I?
16       Q.  Yes.
17       A.  No.
18       Q.  Did you ever tell anyone that you would
19   not come to court if you were called to testify?
20       A.  No.
21       Q.  At any point in either your initial
22   investigation or any re-investigation of this case,
23   did you ever convey to any person an opinion that
24   you thought that, you know, Cory Lovelace had been
25   the victim of someone killing her, but that just

Page 118

1    wasn't an opinion that you wanted to, you know,
2    make official related to this case?
3        A.  Absolutely not.  No.
4        Q.  Has it ever been your opinion in this
5    case that Cory Lovelace was killed by somebody but
6    you just don't have the evidence to prove that?
7        A.  I don't know.  I don't have any evidence
8    either way.
9        MS. THOMPSON:  I don't have any other
10   questions right now, Dr. Bowman.  Thank you.
11       MR. HANSEN:  I'll go.
12          EXAMINATION
13   BY MR. HANSEN:
14       Q.  Doctor, my name is Jim Hansen.  I
15   represent the County of Adams, Jim Keller and Gary
16   Farha.
17       Let me start out by asking this question:
18   You've not had any conversations or e-mails or
19   communications with a gentleman named Gary Farha;
20   is that true?
21       A.  Gary Farha?  Not to the best of my
22   knowledge.
23       Q.  Okay.
24       And I'd like to inquire as to Jim Keller.
25   If you take a look at Exhibit 3 that's in

Page 119

1    front of you, the e-mail, it appears at the bottom
2    that the e-mail on Exhibit 3, the first page, from
3    February 7, 2014, Mr. Keller is e-mailing you in
4    reference to the examination you performed on
5    2-15-06 on a Cory Lovelace.  He then goes on to say
6    in the second sentence he was the deputy coroner at
7    the time and became coroner after Coroner Gary
8    Hamilton had retired.
9        You would agree with me that in 2006 when
10   you did your investigation, your communication with
11   the Adams County coroner at that time was with Gary
12   Hamilton?
13       A.  To the best of my recollection.  Again, I
14   mean, from time to time -- Pardon -- pardon the
15   extra wordage here.  But from time to time I will
16   speak with a deputy coroner if the coroner is not
17   available.  But usually I was able to get ahold of
18   Gary Hamilton, so it would probably have been him.
19       Q.  Okay.
20       And I read this e-mail as he's -- "he"
21   being Mr. Keller's introducing himself to you in
22   the first two sentences.
23       And do you recall, A, ever having a phone
24   call about this case with Jim Keller prior to
25   February 7th of 2014?

Page 120

1        A.  To the best of my recollection, no, from
2    no one.
3        Q.  Okay.
4        Now, you responded on February 10th, and
5    then on the top e-mail, he indicates he left you a
6    voice message; correct -- the second sentence?
7        A.  That's what he says.
8        Q.  Okay.
9        And he goes on to say, "I will just speak
10   with you on Wednesday"; correct?
11       A.  That's what he says.
12       Q.  And that's when you had the meeting with
13   Mr. Keller and Mr. Gibson at your office in Keokuk.
14       A.  Yes.  That's correct.
15       Q.  All right.  Okay.
16       Now, you were asked questions by
17   Ms. Thompson, and she kept using the word "they,"
18   so I need to clear this up a little bit.
19       We've seen other e-mails from Mr. Gibson
20   to you, and you referenced phone calls Mr. Gibson
21   had with you.
22       As you sit here today, after the initial
23   meeting with Mr. Gibson and Mr. Keller at your
24   office, did you ever again have an in-person,
25   face-to-face meeting with Jim Keller?

30 (Pages 117 to 120)

CURTIS LOVELACE, et al. vs DET. ADAM GIBSON, et al.
BOWMAN, JESSICA 11/07/2018

Page 121

1    A.  Not to the best of my recollection.
2    Q.  Okay.
3        And did you have any further phone
4    conversations with Jim Keller after that initial
5    meeting?
6    A.  Not to my recollection.
7    Q.  Okay.
8        So I want to be clear, the phone
9    conversations and the communications you were
10   talking about with Ms. Thompson, would those have
11   been with Detective Gibson?
12   A.  To the best of my recollection.
13   Q.  Okay.
14       Now, in going to Exhibit 3 --
15   A.  Wait a minute.
16   Q.  That's what you have in your hand.
17   A.  I have the exhibit?
18   Q.  Right. Yeah.
19       You made a statement in there that -- it
20   says, "I've seen cases with little to no evidence
21   get pushed along as first degree murder, then
22   others with worrisome findings, to say the least,
23   drop off the map." And we went over that sentence.
24       Would you agree with me you've done exams
25   and autopsies in cases where there isn't hard

Page 122

1    evidence to prove somebody's death?
2    A.  Yeah. I mean, that's part of the job.
3    Q.  Right. There's people who die of a
4    gunshot wound and you don't have the gun; correct?
5    A.  And -- I don't know if I'm allowed to
6    explain this, but the reality of medicine, as I
7    stated earlier, is that, you know, even categories
8    like suicide versus homicide aren't as clear-cut as
9    some people would like them always to be. Just the
10   way it is.
11   Q.  And cases are made on circumstantial
12   evidence as well as hard evidence; correct?
13   A.  Legally, yeah.
14   Q.  Yeah.
15       And you've been involved in cases where
16   you've been called to testify where there isn't the
17   pillow with, you know, blood on it from somebody
18   suffocating or the gun that was used in the
19   killing. You've been called in your forensic
20   pathology career to testify in cases such as that;
21   correct?
22   A.  I'm sure I have.
23   Q.  And I understand your statement that you
24   wanted to see that there was hard evidence from
25   Detective Gibson.

Page 123

1    A.  Before changing my report.
2    Q.  I understand.
3    A.  That's an important caveat.
4    Q.  I understand.
5        You've got to just let me finish my
6    question.
7        So you wanted to see hard evidence before
8    you, A, assessed that, and then, B --
9    A.  Yes.
10   Q.  -- determined whether you would or would
11   not change your report.
12   A.  Yes.
13   Q.  Okay.
14       And going to your report, which is
15   Exhibit 1, if you would --
16       Under page 1 -- I'm on your final autopsy
17   data summary -- you have under "Trauma Findings,"
18   under A and B -- We talked about A, there was a
19   laceration and hemorrhage of the upper lip, left
20   side, mucosal surface, that you found upon exam;
21   correct?
22   A.  Correct.
23   Q.  And a superficial abrasion of the upper
24   lip philtrum, .5 centimeters in maximal dimension;
25   correct?

Page 124

1    A.  Yes.
2    Q.  All right.
3        And you would agree with me that you
4    can't state one way or the other, because, A, those
5    could be consistent with a smothering type of
6    death, and they can also not be consistent with a
7    smothering type of death; correct?
8    A.  Correct.
9    Q.  And based on your findings, you were not
10   able to rule in or rule out a smothering type of
11   death of Ms. Lovelace based on your findings and
12   exam; correct?
13   A.  Correct.
14   Q.  All right.
15       Which, then, under "Signs of Death," A,
16   "Prominent hemolytic marbling of the anterior chest
17   and abdominal wall."
18       And hemolytic marbling, as you
19   referenced, is a breakdown of vessels that
20   ultimately over time turns greenish; correct?
21   A.  Close enough.
22   Q.  Okay.
23       And you indicated earlier you would agree
24   with me that that takes a period of time to happen.
25   A.  A period of time. You're not specifying

31 (Pages 121 to 124)

CURTIS LOVELACE, et al. vs DET. ADAM GIBSON, et al.
BOWMAN, JESSICA 11/07/2018

Page 125

1  what time period.
2  Q. Well, I'm going to ask you that next.
3  Okay. It takes a period of time.
4  A. It takes time, yes.
5  Q. Okay.
6  And can you be any more specific as to
7  how long a time, or does it vary per body?
8  A. It does vary per body and per
9  circumstance.
10  Q. Okay. So as you sit here today — and
11  it's not listed in there — is there any sort of
12  determination you made how long it would have taken
13  for the hemolytic marbling in Ms. Lovelace's
14  anterior chest and abdominal wall to develop?
15  A. Based on the photo that I had of her body
16  that I was told was from the scene uninterrupted,
17  with the covering about her waist and her hands and
18  chest up here (indicating), it seemed a little bit
19  quick.
20  Q. Okay.
21  And "a little bit quick" meaning
22  reference to the time of death that you were given
23  and when the body was found?
24  A. Correct.
25  Q. Meaning you would expect that hemolytic

Page 126

1  marbling to have been consistent with a body that
2  had been dead for a longer period of time?
3  A. That, or insulated with something
4  covering up.
5  Q. Okay.
6  And you would agree with me that one of
7  the other troubling findings you had in this case,
8  which you mentioned, is the body photos from the
9  scene and the position of the arms?
10  A. Yes.
11  Q. And to be fair, although you were told
12  that the four-year-old at the time got on the bed
13  and ate a bowl of cereal, you were never provided
14  any information that the four-your-old actually
15  touched or moved the body; correct?
16  A. That's a leading question.
17  You can't get on a bed without moving
18  things, pillows, covers, so forth and so on. So a
19  child climbing onto the bed is going to disrupt the
20  environment, whether or not they touched the
21  decedent.
22  Q. So are you — In your opinion, then,
23  when you used the term "a disturbed scene," you
24  meant simply by the fact that somebody sat on the
25  bed, that —

Page 127

1  A. Not just somebody; a four-year-old child
2  sat on the bed.
3  Q. Fine. A four-year-old child sat on the
4  bed. And the act of sitting on the bed disrupted
5  the scene —
6  A. Yes.
7  Q. — where the body was. Okay.
8  But you were not provided any information
9  or — at any point in time that the decedent's arms
10  had been moved prior to the arrival of the EMS
11  coroner or the detectives; true?
12  A. Correct.
13  Q. All right.
14  And you would agree with me that part of
15  your concern of the finding on the position of the
16  arms is because when you saw that, that — those
17  arms were in a fixed state; correct?
18  A. Yes.
19  Q. Which is a sign of rigor mortis?
20  A. Yes.
21  Q. Okay.
22  And you had mentioned some discussion
23  earlier about cadavaric spasm.
24  A. Cadavaric spasm, yes.
25  Q. Cadavaric spasm. Thank you.

Page 128

1  And cadavaric spasm, to give an example,
2  is, for instance, if someone is in war and shot,
3  they're found in the position where they were
4  because of the intense action and excitement;
5  correct?
6  A. Stress.
7  Q. Stress.
8  A. Yes.
9  Q. And I think a reference also I've seen in
10  the literature is someone who's drowning grabs a
11  thing of seaweed; correct?
12  A. Yes. I used that myself to try to
13  explain it to -- I don't know, I guess it was
14  Gibson.
15  Q. Okay.
16  And there was — Well, let me back up.
17  You would agree that type of spasm is
18  rare?
19  A. It's not common, but -- I can't give you
20  a percentage on it.
21  Q. Okay.
22  And in this case, you were not given
23  any — Well, were you given any information to
24  either rule in or rule out that type of spasm to
25  explain the position of the arms?

32 (Pages 125 to 128)

CURTIS LOVELACE, et al. vs DET. ADAM GIBSON, et al.
BOWMAN, JESSICA 11/07/2018

Page 129

1    A.  At the time of autopsy, no.
2    Q.  Okay.
3        And at the time of autopsy, I want to go
4  through the information that was reviewed that was
5  contained in the -- your report under
6  "Circumstantial Summary" on page 2 of Exhibit 1.
7    A.  Okay.
8    Q.  You were provided information by the
9  coroner, Gary Hamilton, that's listed there on page
10  2; is that correct?
11    A.  Yes.
12    Q.  And that information that he gave to
13  you -- and I'll get to it in another report -- is
14  the decedent was last seen alive by her husband at
15  8:15 in the morning and mumbled when he spoke to
16  her.  That's what Hamilton told you; right?
17    A.  Yes.
18    Q.  So we have a fixed point of this woman
19  being alive, correct --
20    A.  Yes.
21    Q.  -- at 8:15 in the morning on
22  February 14th of 2006?
23    A.  Yes.
24    MS. EMERY:  Go off the record.
25    THE VIDEOGRAPHER:  We will go off the

Page 130

1  record at 5:03 p.m.
2        (Discussion off the record.)
3    THE VIDEOGRAPHER:  We are back on the
4  record.  The time is 5:04 p.m.
5        EXAMINATION (Resumed)
6  BY MR. HANSEN:
7    Q.  Okay.
8        And now I'm going to ask you to -- Do
9  you see Exhibit 2 there, right next to you?
10    A.  Yes.
11    Q.  And page 89, if you can see it.  So
12  about --
13    A.  Eighty-one, 82 --
14        Does this begin with -- I might have
15  to --
16    MS. THOMPSON:  Can I help you find it,
17  Doctor?
18    THE WITNESS:  Well, I found the page, but
19  I can't read the very top part of it.
20    MS. THOMPSON:  It's about seven or eight
21  pages in.
22    MS. EMERY:  Yeah, there's --
23    THE WITNESS:  Yeah.  I mean, it's 0089.
24  And it starts up -- I've written in here, "Subject
25  RE: QPD Lovelace Investigation," got the case

Page 131

1  number up there.
2    MR. HANSEN:  Yes.
3    THE WITNESS:  And then I have some
4  typing, and then there's a "Dear Dr. Bowman" from
5  Doctor -- from Mr. -- Officer Jeff Baird.
6    MR. HANSEN:  Correct.
7  BY MR. HANSEN:
8    Q.  So up at the top, this is an e-mail you
9  sent -- or -- yeah, an e-mail.  And you indicate in
10  the second sentence, "And she was obviously in
11  rigor mortis in the first photo you sent, or her
12  arms would not have maintained their position in
13  the air as was shown.  So, there are still findings
14  of death that do not fit the time frame given, plus
15  the other finding we discussed."
16        Do you see that?
17    A.  Yes.
18    Q.  So as of this point in time, in your
19  communications with Officer Baird, you were
20  questioning the death and the time frame that you
21  had been given; correct?
22    A.  Yes.
23        And it also looks like I mentioned that I
24  may have to note these findings in my report
25  without the explanatory scene findings.

Page 132

1    Q.  Right.
2        And if you look down below, Officer Baird
3  had sent you a timeline, and it indicates that --
4  there we have it again -- at 8:15, the decedent was
5  seen by her husband and children as they left just
6  prior to school.  Correct?
7    A.  Uh-huh.
8        Yes.  Correct.
9    Q.  And then it's -- it states that 45
10  minutes later, or 9:05 - 9:10 in the morning, she
11  is found deceased in her bed by her husband;
12  correct?
13    A.  Yes.
14    Q.  So if that's true, that would mean that
15  within a 45- to 50-minute time period that Officer
16  Baird conveyed to you, that the body then had gone
17  into the state of rigor mortis that you saw in
18  those photographs; correct?
19    A.  Correct.
20    Q.  And that is one of the troubling things
21  that you noted in your e-mail, and that was
22  troubling to you in this case, is --
23    A.  Yes.
24    Q.  -- if, that, in fact, is the death time
25  frame, that does not explain the rigor mortis that

33 (Pages 129 to 132)

CURTIS LOVELACE, et al. vs DET. ADAM GIBSON, et al.
BOWMAN, JESSICA 11/07/2018

Page 133

1  you saw in those photographs; true?
2      A. Yes.
3      Q. And that would lead you, in looking at
4  this case, to believe that the pictures were
5  depicting a death time frame that was a lot longer
6  than a 45-minute time period?
7      A. That would be one possibility.
8      Q. Right.
9          That's one of the concerns you had in
10  looking at this; correct?
11      A. That that is a possibility, it's not the
12  only explanation.
13      Q. Right. But it's one of the things you're
14  considering when you're looking at this; correct?
15      A. Yes.
16      Q. All right.
17          And the fact that there were no petechial
18  hemorrhages does not rule out smothering or
19  suffocation; correct?
20      A. Doesn't rule it out.
21      Q. You noted that there was a pronounced air
22  drying of the lips and early mummification of the
23  distal fingers.
24          You would agree with me that when you
25  noted that in your report, the mummification of the

Page 134

1  distal fingers also did not correlate with the
2  death time frame you had been given of when she was
3  last seen alive and then found deceased in her bed;
4  correct?
5      A. Correct.
6          Also, the photo that I thought was
7  undisturbed didn't correlate with that either.
8      Q. All right.
9          You indicated that as the pathologist,
10  you have to rely on the officer and/or the coroner
11  to provide you supplemental information for your
12  findings, correct, if you need it?
13      A. Yes.
14      Q. And were you ever provided -- Because,
15  honestly, I've not taken a look or seen your manila
16  folder there. But in your review, other than these
17  e-mails from Jeff Baird, were you provided any of
18  the witness interview statements or the police
19  reports he prepared or anything like that?
20      A. I don't believe so, unless --
21          They're on record somewhere.
22          I mean, I don't recollect it.
23      Q. All right.
24      A. This is twelve years ago.
25      Q. I understand.

Page 135

1          And I want to be clear on one of the
2  things you said, why you put down "Undetermined,"
3  and that was because, in your mind, in addition to
4  the things we've already gone over, everything
5  seemed a bit off and not well explained and,
6  therefore, you couldn't make a determination one
7  way or the other as to the cause of death in this
8  case. True?
9      A. Yes.
10      Q. As far as your background, you indicated
11  that -- I think you indicated that you're board
12  certified in anatomical and general pathology. Is
13  that correct?
14      A. Anatomical and clinical pathology. And
15  the board now considers them separate, even though
16  they're -- When you list it, you list them both
17  together, because that's the standard way it's
18  done, you take them at the same time, sequentially,
19  obviously, over a period of a few days. But
20  they're considered separate --
21      Q. Okay.
22      A. -- for whatever reason.
23      Q. And there's another board certification
24  that you can obtain in forensic pathology; correct?
25      A. Yes, there is.

Page 136

1      Q. Okay.
2          And you have not attained that; correct?
3      A. Nor will I.
4      Q. Okay.
5          I take it you're licensed in Iowa,
6  Missouri and Illinois?
7      A. Yes.
8      Q. I thought you said you do work in -- You
9  do work in Carthage; correct?
10      A. Yes, I do.
11      Q. All right.
12          And the last time you were doing forensic
13  pathology was 2011?
14      A. Yes.
15      Q. And that would have been over in Sangamon
16  County?
17      A. I think by that time I had relocated out
18  to -- we'd already moved to Petersburg, and I was
19  doing my autopsies at a different hospital, but
20  they were being done in Springfield.
21      Q. And you said you haven't met him, but you
22  know Scott Denton. Or have you met him or --
23      A. I haven't met him. I know of him.
24      Q. Okay. And is that due to the fact --
25  Was he called in to some of the cases in Sangamon

34 (Pages 133 to 136)

CURTIS LOVELACE, et al. vs DET. ADAM GIBSON, et al.
BOWMAN, JESSICA 11/07/2018

Page 137

1  County that you had that were called into question?
2  Or excuse me, one of the --
3      A.  You're asking me about details that would
4  have happened after --
5      Q.  Okay.
6      A.  -- I was gone.
7      Q.  Okay.
8          When you were in Sangamon County doing
9  that work, were you employed by Memorial Medical
10 Center or were you a county employee?
11     A.  I contracted, as I said before, with
12 counties to do their autopsies.
13         So I don't think you could say I was a
14 county employee; but I did work for them.
15     Q.  But you were based at Memorial Medical
16 Center?
17     A.  I did my autopsies at Memorial Medical
18 Center morgue.
19     Q.  In your anatomical and clinical work for
20 these hospitals, do you do any autopsies at the
21 hospital?
22     A.  No.
23     Q.  Okay.
24         You'd indicated that you have your folder
25 from this matter.  What would have happened to any

Page 138

1  of the slides or cuts that you had in this case?
2      A.  They are in a filing cabinet in my
3  residence.
4          The reason for that being, without
5  appropriate training, including medical school and
6  a five -- four- to five-year pathology residency,
7  they are meaningless to anybody else.
8          So the coroners have no interest in
9  storing them.  Yet, they are evidence, so I keep
10 them, for the rest of my life, after which
11 presumably they won't be wanted.
12     MR. HANSEN: Thank you. That's, I think,
13 all I have.
14     THE WITNESS: Okay.
15     MS. EMERY: Thanks, Dr. Bowman.  I've got
16 some follow-ups.
17     THE WITNESS: Okay.
18          EXAMINATION
19 BY MS. EMERY:
20     Q.  We've been talking about photographs, so
21 I'm just going to show you a few just to clarify.
22     A.  Okay.
23     MS. EMERY: Would you mark this as Bowman
24 Exhibit 5.
25          And we'll just keep going with the

Page 139

1  exhibits?
2      MS. THOMPSON: Sure.
3      THE WITNESS: And these are all not mine,
4  so they go back to you?
5      MS. EMERY: To the court reporter, yes.
6          (Deposition Exhibit 5 was
7          marked for identification.)
8      THE WITNESS: The light at the end of the
9  tunnel.
10     MS. EMERY: Exactly.  And it's not a
11 train.
12     THE WITNESS: It's daylight.
13         Or street lights.
14 BY MS. EMERY:
15     Q.  Dr. Bowman, earlier you had made the
16 statement that the discrepancies in the case bugged
17 you.
18     A.  Uh-huh.
19         Yes.  I'm sorry.
20     Q.  If you look at what's been marked as
21 Bowman Exhibit 5 --
22     A.  Yes.
23     Q.  -- it's a photograph.
24         Had you seen this photograph of Cory
25 Lovelace still in bed at home?

Page 140

1      A.  Yes.  I think this is a close-up, though.
2          I think the one I saw had a little more
3  of her hands.
4      Q.  Okay.
5      A.  But, yes.
6      Q.  Okay.  But my question is, did it bug you
7  or concern you about the desiccation of her lips?
8      A.  That was one of the things I noted, yes.
9      Q.  Okay.
10         And that's what you're talking about, is
11 the desiccation, if presumably she'd been only dead
12 for an hour and a half, that -- the extent to the
13 desiccation of her lips?
14     A.  Yes, given the photos I was given of her.
15     Q.  Okay.
16     MS. EMERY: And mark this as 6, please.
17         You can just flip that over on the pile.
18     THE WITNESS: Okay.
19     MS. EMERY: The court reporter will take
20 care of the exhibits.
21     THE WITNESS: Lucky you.
22         (Deposition Exhibit 6 was
23          marked for identification.)
24     MS. EMERY: Okay.  Good?
25     Okay.

35 (Pages 137 to 140)

CURTIS LOVELACE, et al. vs DET. ADAM GIBSON, et al.
BOWMAN, JESSICA 11/07/2018

Page 141

1  BY MS. EMERY:
2      Q.  And now we're looking at a photograph,
3  Bowman Exhibit 6.
4          Have you seen this photograph before?
5      A.  Yes.  Yes, I have.
6      Q.  Okay.
7          And does this show Cory's hands up above
8  her chest that you have talked about today as being
9  something that you could not account for?
10     A.  Yes.
11     Q.  You've mentioned several times about what
12  you were told about the four-year-old climbing on
13  the bed.
14     A.  Yes.
15     Q.  Okay.
16         And I'm going to find what I wrote here
17  to ask you.  Just bear with me a second.
18     A.  Sure.
19     Q.  You said if he pulled those covers down,
20  it would totally account for the hands.
21     A.  If he pulled those --
22     Q.  What you said is if she had the covers
23  up, and he climbed in to bed, and then you said,
24  "If he pulled those covers down, it would totally
25  account for the hands."

Page 142

1      A.  Oh, yeah, meaning basically the kid
2  moving around on the bed --
3      Q.  Yes.
4      A.  -- and that, you know, if he pulled the
5  covers down around himself, it could -- you know,
6  her hands could be up there, because these covers
7  could have easily been up there, yes.
8      Q.  So you're saying the covers could have --
9  her hands could have been resting on the covers,
10  and when he pulled them down, would you have
11  expected them to stay up there unless there was
12  rigor?
13     A.  With rigor, yes.  And rigor can be
14  accelerated by the body staying warm, which the
15  covers would have done.
16     Q.  Okay.
17     A.  So --
18     Q.  So if I understand you correctly --
19         And this is all just to surmise.
20     A.  Right.
21     Q.  If.
22     A.  If.
23     Q.  If the covers had been up towards her
24  neck with her hands resting on them, that when
25  rigor set in, it could have set in that fast to

Page 143

1  keep them raised if he pulled the covers down?
2      A.  It could have.
3      Q.  Okay.
4          Have you seen a lot of instances where
5  rigor sets in that fast, to hold the arms and hands
6  in position?
7      A.  I have seen it as fast as seaweed.  I've
8  actually had a case where seaweed was clenched in
9  the hand, which is a cadaveric spasm, and then it
10  ranges out from there.
11         If she was in physiological distress,
12  like cramping from the alleged flu or from her
13  fatty liver or whatever, and was in pain, that
14  could accelerate it as well.
15     Q.  Okay.
16     A.  So --
17     Q.  Now, if we use your --
18         This is a hypothetical --
19     A.  Right.
20     Q.  -- of the four-year-old climbing on the
21  bed --
22     A.  Right.
23     Q.  -- and eating his cereal, then it would
24  have been even less time than the hour and a half
25  until her husband found her in bed; correct?

Page 144

1          MS. THOMPSON:  Object to form.
2          You can answer.
3      A.  Okay.
4  BY MS. EMERY:
5      Q.  This is just --
6      A.  Right.
7      Q.  -- we're going on this hypothetical.
8      A.  Yeah.  And, of course, it would depend on
9  when he got on there, you know what I mean,
10  versus -- She passes -- hypothetically, passes
11  away, kid climbs onto the bed a minute or two
12  later, be a little bit quick for that, right,
13  unless it was cadaveric spasm.
14         But let's say 10 or 15, 30 minutes, you
15  know, some more time evolves, you know, she's all
16  snuggled under these blankets, she's passed away,
17  and maybe she had pain, too.  It's possible.
18         It's a little less worrisome, to say the
19  least, if those covers were up around her neck,
20  because that's what you'd expect from a sick
21  person, have their covers up around their neck.
22  And if she's clutching them, she might have been in
23  pain.
24     Q.  Now, how do you tell the difference when
25  the body comes to you between cadaveric spasm and

36 (Pages 141 to 144)

CURTIS LOVELACE, et al. vs DET. ADAM GIBSON, et al.
BOWMAN, JESSICA 11/07/2018

Page 145

1 rigor mortis?
2 A. Well, I have to look for evidence, like,
3 for instance, seaweed, or there have been cases of
4 homicide where the victim grabs ahold of something
5 of the assailant, like a piece of clothing or piece
6 of their hair, and has that clenched in their
7 fingers. That's evidence of cadavaric spasm.
8 Q. Okay.
9 A. That wouldn't have happened after death.
10 You can't pry away rigor mortis, put the
11 hair in, and then fold it back up. It doesn't work
12 that way.
13 Does that answer your question?
14 Q. Partly.
15 But if there was cadavaric spasm in her
16 elbows and her wrists, wouldn't you have expected
17 her fingers to curl?
18 A. If she was gripping something, possibly.
19 But if she's holding up the blanket --
20 And, again, I'm not saying she had
21 cadavaric spasm, but having these blankets up, and
22 the way her arms are positioned, makes a lot more
23 sense than this picture I see here, which looks
24 weird to me.
25 Q. Okay.

Page 146

1 MS. EMERY: Exhibit 7.
2 (Deposition Exhibit 7 was
3 marked for identification.)
4 BY MS. EMERY:
5 Q. Okay. We're looking at what's been
6 marked as Bowman Exhibit 7.
7 Explain in your terms, Doctor, the back
8 of Cory's neck.
9 A. That is liver mortis, pooling of the
10 blood. And I already went into about fixed and
11 blanching, I think.
12 Q. Yes.
13 A. So --
14 Q. Yes.
15 For somebody who's been deceased around
16 an hour and a half, would you expect to see that
17 much liver mortis in the back of the neck?
18 A. You can see that much. It's a crease in
19 the body, so that's a place where blood would pool
20 through the head. Her head is propped up, so it
21 would drain down.
22 It could. It could.
23 Q. Okay.
24 Liver mortis usually takes a little while
25 for it to accumulate, doesn't it?

Page 147

1 A. It begins immediately, but it takes --
2 Probably you usually don't see it before maybe 20,
3 30 minutes --
4 Q. Okay.
5 A. -- at the earliest, usually.
6 Q. And looking again at Exhibit No. 7, I
7 didn't note anything in your autopsy that she was
8 wearing eye makeup, but is the brown discoloration
9 around her eyes -- what does that tell you?
10 A. You know, it could be residual. There
11 could be some residual material there from makeup.
12 It also -- That's another crevice area of the
13 body.
14 So you can see a little bit of pinkness
15 on her cheek here, at the crease of her -- where
16 her nose and cheek join.
17 So, again, a dependent portion of the
18 face, you would expect it to be more rosy colored,
19 if you will.
20 Q. Okay. If you'll look at Exhibit 5 --
21 it's in front of you -- it's the close-up of Cory's
22 face.
23 It's true, isn't it, that when people
24 die, their -- one of the -- we talked about her lip
25 desiccation, but one of the areas that starts to

Page 148

1 desiccate is also around the eyes; correct?
2 A. Yes.
3 Q. Okay.
4 And does it often show like this, in a
5 discoloration of the skin?
6 A. Are you talking about the skin of the
7 eyes or --
8 Q. The skin -- The skin of the eyelid and
9 surrounding the eye.
10 A. The conjunctiva of the eye is distinctly
11 different than the skin. So it's different in
12 appearance.
13 You see that band-like area there in the
14 center of her eyes?
15 Q. Yes, in the center of her eyes.
16 A. That happens more quickly than changes
17 that would be around the orbit of the eye.
18 But it looks like she has traces of
19 makeup --
20 Q. Okay.
21 A. -- that she didn't completely clean it
22 off.
23 Q. Okay.
24 But my question is, this brown area in
25 the skin around her eye, would you say that that

CURTIS LOVELACE, et al. vs DET. ADAM GIBSON, et al.
BOWMAN, JESSICA 11/07/2018

Page 149

1    was also an example of the desiccation based upon
2    the fact that she had died?
3        A.  It's --
4        I'm not sure what you're talking about
5    there.
6        Q.  Okay.  This part here (indicating), see
7    where it's brown around her eye?
8        A.  Uh-huh.
9        MS. THOMPSON:  Can I just see where you
10   indicated to the witness?
11       THE WITNESS:  Apparently she's asking
12   about this (indicating).
13       MS. EMERY:  The brown skin around her
14   eye.
15       MS. THOMPSON:  Thank you.
16       MS. EMERY:  Yeah.
17       A.  Okay.  Well, again, I do think there's
18   residual makeup there.  I do know that it's not
19   uncommon when a person dies on their back, that's a
20   pooling area, so it's going to be a bit darker
21   there.
22       It doesn't look particularly dried out
23   except on the conjunctiva.
24   BY MS. EMERY:
25       Q.  Okay.

Page 150

1        A.  The eyelids don't dry out as quickly as
2    mucosal surfaces, like the lips.  They just don't.
3        Q.  Okay.
4        A.  It's thinner.
5        Does that make sense?
6        Q.  Yep.  It does.
7        A.  Okay.  Good.
8        Q.  That's why I ask, because I don't do your
9    job.
10       A.  Sure.
11       Sorry.
12       Q.  That's okay.
13       A.  I try to make it relevant.
14       MS. EMERY:  Eight.
15       (Deposition Exhibit 8 was
16       marked for identification.)
17   BY MS. EMERY:
18       Q.  Showing you what's been marked as Bowman
19   Exhibit 8, it's a photograph.  And I'm going to
20   represent, I believe it was taken at the funeral
21   home before she came to the morgue.
22       A.  Okay.
23       Q.  Because --
24       A.  Correct.
25       Q.  Because of the white sheet, not the blue

Page 151

1    sheet.
2        But earlier Mr. Hansen was asking you
3    about the mottling.
4        A.  Right.
5        Q.  Does this picture show that mottling on
6    her chest?
7        A.  Yes, these kind of reddish patches
8    (indicating).
9        Q.  Yeah.
10       A.  Some of them are kind of linear looking.
11       Q.  Yes.  So this photograph does show that?
12       A.  Yes, it does.
13       Sorry.
14       (Deposition Exhibit 9 was
15       marked for identification.)
16   BY MS. EMERY:
17       Q.  Showing you what's been marked Bowman
18   Exhibit 9.
19       You were talking earlier about the injury
20   on the inside of her lip.
21       A.  Yes.
22       Q.  And this is either yours or your
23   assistant's hands holding her lip up so it could be
24   photographed; correct?
25       A.  Correct.

Page 152

1        Q.  Do you see the laceration in the skin?
2        A.  Yes.
3        It's just above the -- Well, it's mostly
4    above the left upper incisor.
5        Q.  Yes.
6        Did you lacerate that hemorrhage, or was
7    that skin already lacerated when you flipped it up?
8        A.  It was like that when I pulled it up.
9        Q.  Okay.  That's what I wanted to know.
10       A.  Okay.
11       MS. EMERY:  And then Exhibit 10.
12       (Deposition Exhibit 10 was
13       marked for identification.)
14   BY MS. EMERY:
15       Q.  Showing you what's been marked as -- it's
16   a photograph marked Bowman Exhibit 10.
17       Again, the blue gloves of your -- or an
18   assistant in the photograph taken.
19       Explain what you're showing in Cory's
20   eyes, why this was taken.
21       A.  Okay.  That is desiccation, drying out.
22   The conjunctiva of the eye dries out quickly.  And
23   that band-like pattern, when the eyes are partly
24   closed, is usually what you see.
25       Q.  Okay.  So we see it, it's almost --

38 (Pages 149 to 152)

CURTIS LOVELACE, et al. vs DET. ADAM GIBSON, et al.
BOWMAN, JESSICA 11/07/2018

---

Page 153

1    There's red blood vessels, but there's
2  also like a dark, almost looks bruising, but —
3    A.  Yeah, grayish color.
4    Q.  Grayish color —
5    A.  Yes.
6    Q.  — that goes horizontally across her
7  eyes.
8    A.  Correct.
9    Q.  Okay.  And does that begin immediately at
10  the time of death?
11    A.  Well, the process begins, but it takes a
12  while to become visible.
13    Q.  Okay.
14    A.  And "a while" is a very variable term.
15    Q.  Okay.
16    Let's see here.
17    If you would, Doctor, would you describe,
18  when a person dies and they're laying in the place
19  where they died, such as Cory Lovelace laid, and
20  you've talked about the various tissue changes, is
21  there a change to the smell of the body?
22    A.  Well, for humans to detect it, at this
23  point in time, there wouldn't be a whole lot of
24  change.  I'm sure dogs would find it clearer
25  otherwise.  But the odor of, quote unquote, death,

---

Page 154

1  you know, wouldn't be pronounced at this point.
2    Q.  Okay.  At like an hour and a half to two
3  hours after death, is that what we're saying?
4    A.  And, again, we have to caveat this with
5  the reality that —
6    Pardon me.  Stick a body in a trunk and
7  it's 110 degrees outside, within ten minutes that
8  body is going to stink.  I mean, it just depends on
9  the environment, the ambient temperature, you know.
10  If the body is feverish, it will start to —
11    These odors are from bacteria getting
12  into the bloodstream breaking things down and —
13  Well, it's putrefaction, is what it is.  There's
14  even a chemical called putrescine that produces
15  that specific odor.
16    So, yeah, it depends on the environment,
17  the individual, all those factors.
18    But I would not expect this body — And
19  I don't recollect that it had a particularly unique
20  odor at autopsy.
21    Q.  Okay.  And that — you did the autopsy
22  about 24 hours later?
23    A.  But, remember, it was in a cooler.  Yeah.
24    Q.  Right.  Right.
25    And your report talks about the lab

---

Page 155

1  finding that the blood samples were hemolyzed.  Do
2  you remember that?
3    A.  Can I refresh my memory?
4    Q.  Yes.  Exhibit 1, your report.
5    A.  I think I found it.
6    MS. THOMPSON:  There's some on page 2.
7    THE WITNESS:  Got it.
8    MS. EMERY:  Got it?  Okay.
9    A.  Hemolytic marbling?
10  BY MS. EMERY:
11    Q.  The hemolytic marbling.
12    We talked about the marbling.  Why do
13  they call it hemolytic marbling?
14    A.  Okay.  What's starting to happen after
15  death is cells are breaking down.  That includes
16  every cell in your body, from your brain cells to
17  your blood cells.  When they break down, the
18  hemoglobin stains the blood vessel walls, and
19  that's why we call it hemolytic marbling.
20    Q.  Okay.
21    A.  Yeah.
22    Q.  And so when you did Cory Lovelace's
23  autopsy, you saw staining of, like, the aorta and
24  other things from that that —
25    A.  I would expect so, but I didn't mention

---

Page 156

1  it because it's such a standard finding.
2    Q.  Okay.  So it's not something that you're
3  not used to seeing?
4    A.  It's something you see in virtually every
5  autopsy you do.
6    Q.  And when you did the autopsy, you never
7  came up with a hard-evidence finding as to where
8  that sore inside her mouth came from as you talked
9  about before; correct?
10    A.  That is correct.
11    Q.  You've talked about, under — if you look
12  at — it's Bates-stamped QPD 0099, where you did
13  the internal examination —
14    A.  Oh, "Internal Examination."  Got it.
15    Q.  Yes.
16    At the very first paragraph after
17  "Internal Examination," you said it was "limited by
18  decompositional change, including softening and
19  darkening of the internal organs."
20    And is it "autolysis"?
21    A.  Autolysis.
22    Q.  "Autolysis of glandular and mucosal-lined
23  tissue."
24    A.  Yes.
25    Q.  Do you see that?

---

39 (Pages 153 to 156)

CURTIS LOVELACE, et al. vs DET. ADAM GIBSON, et al.
BOWMAN, JESSICA 11/07/2018

Page 157

1    A. Yes.
2    Q. Okay. Twenty-four hours after she was
3  reported to have died, plus being in the cooler, do
4  you think that there was more decompositional
5  change in her than what you would have expected?
6    A. No. No.
7    Q. There was also evidence that she took or
8  was given either Tylenol, acetaminophen or
9  ibuprofen shortly before she died.
10    A. Let's see.
11    You've got clonidine and quinine, tonic
12  water ingredient.
13    I'm not seeing any mention of Tylenol.
14    Q. If you had found either a capsule or a
15  tablet of something in her stomach, you would
16  certainly have noted it, wouldn't you?
17    A. I would have mentioned it, yeah. I
18  believe we would have found it in my gross
19  examination.
20    I mean, like, if she'd just swallowed it
21  and it hadn't been absorbed yet -- under "Stomach,"
22  "No tablets or capsules identified."
23    Q. Right.
24    A. So there's none in her stomach, like
25  she'd just swallowed it, or -- and there's none

Page 158

1  detected.
2    And this is done by a toxicology lab
3  that's certified --
4    Q. Right.
5    A. -- to do forensic toxicology.
6    Q. And they analyzed the contents of her
7  stomach; correct? That's when they came up with
8  the tonic?
9    A. No. No. They got that from the blood.
10    Q. Oh, they did?
11    A. From the blood sample and urine sample
12  and vitreous.
13    But gastric contents, you know, like I
14  said, they generally aren't analyzed.
15    There's a lot of stuff in the stomach,
16  and it's hard to extract from -- the substance
17  you're after, so we try to avoid it. And since, if
18  it's only in the stomach and hasn't been absorbed
19  in the bloodstream yet, it's not going to be an
20  acceptable cause of death. So we don't tend to do
21  stomach stuff, you mean.
22    They show that on the TV all the time,
23  but that's just not the way it really is.
24    Q. I appreciate the explanation.
25    A. I know.

Page 159

1    But this -- this tonic water was in her
2  blood.
3    Q. Oh, okay.
4    A. Yeah.
5    Or urine, actually. Sorry. This one was
6  in her urine.
7    So she had consumed it long enough ago
8  for it to get into her urine.
9    Q. How long does it typically take for a
10  capsule or a tablet to break down in the stomach?
11    A. It varies. Bioavailability, digestive
12  acids, whatever else in there, like food, these can
13  all change the rate of absorption. And also the
14  physical well being of the individual.
15    Q. Okay.
16    A. So it's variable.
17    Q. Have you done autopsies before on people
18  who have bulimia?
19    A. Yeah, unfortunately. It's not as
20  uncommon as we'd like.
21    It's not something, unless they recently
22  vomited enough to send their electrolytes into
23  disbalance, it's not something you necessarily pick
24  up by looking at the chemicals in the vitreous,
25  but -- And chemicals in the blood like that are

Page 160

1  rapidly changed by the process of death, so you
2  have to look at the vitreous.
3    So bulimia, you know, it's unfortunate
4  that somebody --  It reminds me of what my clinical
5  colleagues deal with, that somebody that's 38 still
6  has it. Usually they outgrow it.
7    Q. Would you expect to see in a bulimic some
8  damage to the inside of the esophagus from all the
9  bile coming back up?
10    A. Well, bile is produced in the small
11  intestine, and you have to be -- And bulimia
12  varies in severity. So if you're throwing up bile,
13  you have to get past the stomach and into the small
14  bile (sic) to do that. Just to evacuate your
15  gastric contents doesn't require as much emesis.
16  So --
17    Q. And there's still stomach acid, though;
18  right?
19    A. There's stomach acid.
20    And, of course, there are ways of
21  concealing it, you know what I mean?
22    If they rinse, you know, their mouth
23  immediately afterwards and so forth, there are ways
24  of reducing the oral effect.
25    Q. What about of their -- inside of their

40 (Pages 157 to 160)

CURTIS LOVELACE, et al. vs DET. ADAM GIBSON, et al.
BOWMAN, JESSICA 11/07/2018

Page 161

1 esophagus, though, you would see that, wouldn't
2 you?
3     A. Well, see, the thing is, is the esophagus
4 starts to break down pretty early.
5         And also reflux esophagitis can cause
6 changes of the squamous, the glandular component,
7 and that's not bulimia at all.
8         So you can have alterations in the
9 epithelium that are not related to bulimia. So --
10        But, you know, it's a physiologically
11 stressful thing, you know. And, yeah, you read
12 about the graphic things where their teeth are
13 eroded and so forth and so on, but not --
14    Q. That was going to be my next question.
15    A. But not always.
16    Q. Because if you had seen any changes to
17 her --
18    A. Her dentia.
19    Q. -- tooth enamel --
20    A. Yeah.
21    Q. -- you would have noted it; right?
22    A. Well, I would have noted it, yeah.
23        But, again, dentition -- maintaining
24 one's dentition also isn't --
25        You can have bad dentition secondary to a

Page 162

1 lot of other causes than bulimia. So --
2 Problematic.
3    Q. On several of the e-mails, as well as I
4 noticed on your folder, there appears to be a file
5 number, CC-66-06?
6    A. Yes.
7    Q. Is that coded for something?
8    A. Yes. Coroner's Case - No. 66 - 2006.
9        There is a method.
10    Q. The coroner -- Is that particular to
11 Adams County, or just any of the ones you get?
12    A. Any coroner's case.
13    Q. Okay.
14        We talked about where the slides are kept
15 in your residence.
16        How come you also have the original
17 autopsy file?
18    A. Well, somebody has to take charge of all
19 this stuff, and obviously I make it available to
20 whoever needs it. But, you know, I mean the
21 coroners -- you know, even the cases they don't
22 autopsy, you know, they've got folders and folders
23 and folders too.
24        So, I mean, it's not my standard policy
25 to send everything to them, but if they ask for it,

Page 163

1 they are certainly welcome to it.
2    Q. Okay.
3        We were talking earlier about whether or
4 not you were going to or asked to or anything about
5 changing your report and your finding of "Cause of
6 Death: Undetermined."
7        Do you recall all that testimony?
8    A. Yeah. You bet.
9    Q. All right. Let me ask you this: Do you
10 ever change an autopsy report or do you amend it?
11    A. Well, I would probably amend it.
12    Q. And the reason -- What I mean by that
13 is, to change it means to change "undetermined" to
14 whatever it's going to be, and then there's no
15 record of you having --
16    A. Right.
17        No. I would maintain a record always.
18 That's what you do.
19    Q. Okay.
20    A. I mean, whether it's a surgical pathology
21 specimen or an autopsy case, you maintain a record
22 of whatever you issued as a final report initially,
23 and then you would --
24        So it would be an amended report,
25 technically.

Page 164

1    Q. Yes. So there would be a second report
2 that came out that said "Amended" so it was clear
3 what you had done now changed.
4    A. Oh, well, yeah, definitely.
5    Q. That's what I needed.
6    A. Yeah.
7    MS. EMERY: I don't have anything else,
8 Dr. Bowman, but --
9    MS. THOMPSON: Dr. Bowman, I have four
10 follow-up questions.
11    THE WITNESS: Okay.
12    MR. HANSEN: No, you don't.
13    MS. EMERY: No, you don't. Four for you
14 means --
15    MR. HANSEN: Four means more than four.
16    MS. THOMPSON: I have a few questions.
17        FURTHER EXAMINATION
18 BY MS. THOMPSON:
19    Q. You were shown some photographs of Cory
20 Lovelace's body at her home where she passed.
21    A. Yes.
22    Q. And I'm specifically talking about
23 Exhibit 6 and 5 and 7, the photos of her in bed.
24    A. Okay.
25        Seven, 6 and 5. Got them.

SUSAN FRYE COURT REPORTING | 515-284-1972
300 Walnut Street, #36, Des Moines, IA 50309-2224

CURTIS LOVELACE, et al. vs DET. ADAM GIBSON, et al.
BOWMAN, JESSICA 11/07/2018

Page 165

1    Q.  Is it your understanding that those three
2  photos depict how she looked when emergency
3  responders came to her home?
4    A.  That's my understanding.
5    Q.  In the conversation that you had with Jim
6  Keller or any e-mails with him, did he ever tell
7  you that he himself had been at the scene and had
8  observed her body by touching it -- "her body"
9  meaning Cory Lovelace's?
10    A.  I don't recollect.
11    Q.  Have you ever worked on any cases where
12  the person who passed had septicemia that
13  accelerated the decomposition of their body after
14  death?
15    A.  Yes.
16    Q.  Does that occur?
17    A.  Yes, it does.
18    Q.  You said that you've still got slides at
19  your home.  What do you have?
20    MS. EMERY:  That's five.
21    A.  Okay.  I'm pretty sure it's just the
22  liver, but let me double-check, because, you know,
23  we're -- you know, this is -- this is a wee while
24  ago.
25    A section of the liver.  Looked like I

Page 166

1  took a section of thyroid and cervix, which were
2  probably medically driven, not to do with any of
3  the uncertainty that we've been discussing, but if
4  I find any evidence of -- if there's any
5  abnormality of the cervix, then that has public
6  health information, for the spouse.
7    And her thyroid was discolored I thought
8  from probably minocycline, which is a drug that can
9  cause discoloration, and not due to pathology.  But
10  the thyroid is a cause of illnesses, so I wanted to
11  check it under the microscope and make sure.  And
12  they were not contributory.
13    It was the liver of interest only.  So --
14    MS. THOMPSON:  That's all I have.
15    THE WITNESS:  Okay.
16    MS. EMERY:  We're done.
17    MR. HANSEN:  I have --
18    THE WITNESS:  You have more?
19    See, medicine really is fascinating,
20  guys.
21    FURTHER EXAMINATION
22  BY MR. HANSEN:
23    Q.  You did not take any kidney slides.
24    A.  No, I did not.
25    Q.  Why not?

Page 167

1    A.  They were grossly unremarkable.  And the
2  irony is, is you can, you know -- the things that
3  cause fatty change in the liver can spare the
4  kidneys.  So I didn't take sections of those.
5    Q.  Do you agree with the general proposition
6  that rigor mortis normally sets in with the
7  eyelids, the neck and the jaw?
8    A.  I would say smaller muscles first, yes.
9    MR. HANSEN:  Okay.  That's all I have.
10    THE WITNESS:  Hey.
11    MS. THOMPSON:  So you have the right,
12  Dr. Bowman, to see a copy of the transcript that
13  the court reporter has typed out to review it to
14  confirm that she's typed out your answers
15  correctly, or you can waive your signature on this.
16    THE WITNESS:  I am going to waive it,
17  because I have confidence.
18    MR. HANSEN:  I don't have any questions,
19  but I would like to just take a look at the
20  coroner's here --
21    THE WITNESS:  Sure.
22    MS. THOMPSON:  I think we can go off the
23  record, then I --
24    THE WITNESS:  Can we go off the record?
25    MR. HANSEN:  Yeah.  I'm sorry.  Sure.

Page 168

1    THE VIDEOGRAPHER:  This marks the end of
2  the deposition of Dr. Jessica Bowman.  We are going
3  off the record at 5:47 p.m.
4    (Proceedings concluded.)

42 (Pages 165 to 168)