Transcript of Jon Barnard
Conducted on October 16, 2018

1 (1 to 4)

---

**Page 1**

```
     THE UNITED STATES DISTRICT COURT FOR THE
            CENTRAL DISTRICT OF ILLINOIS

CURTIS LOVELACE,
LOGAN LOVELACE, LINCOLN
LOVELACE & CHRISTINE LOVELACE
On behalf of her minor son
LARSON LOVELACE,

          Plaintiffs,              1:17-cv-01201-JES-
                                    JEH
     v

DET. ADAM GIBSON, POLICE CHIEF
ROBERT COPLEY, SGT. JOHN
SUMMERS, LT. DINA DERYER, DET.
ANJANETTE BISWELL, UNKNOWN
QUINCY POLICE OFFICERS, GARY
FARHA, CORONNER JAMES KELLER, KE
CITY OF QUINCY, AND COUNTY OF
ADAMS,

          Defendants.


     The deposition of JON BARNARD, called by the

Plaintiffs for examination taken pursuant o the

provisions of the Code of Civil Procedure and the Rules

of the Supreme Court of the State of Illinois, pertaining

to the taking of depositions for the purposes of

discovery, taken before LaDonna Gay CSR No. 084-001558, a

Certified Shorthand Reporter of said State at 140 South

Dearborn Street, Suite 600, Chicago, Illinois on October

16, 2018, at 9:30 a.m.

Reported by:  LaDonna Gray

License No. 084-001558
```

---

**Page 3**

```
              I N D E X

Date of Hearing: 10/16/18


Witness:

Jon Barnard

Direct Examination by Ms. Thompson - 4

Cross Examination by Ms. Emery - 106

Redirect Examination by Ms. Thompson - 128
```

---

**Page 2**

```
          A P P E A R A N C E S

PRESENT:

     TARA THOMPSON, of the firm of
          Loevy & Loevy
          311 NORTH ABERDEEN,
          3RD FLOOR
          CHICAGO, ILLINOIS  60607
          Phone:  (312) 243-5900
          Email:  tara@loevy.com
               Appeared on behalf of the Plaintiffs
               Lovelace;

     JAMES A. HANSEN, of the firm of

          Schmiedeskamp, Robertson
          525 JERSEY
          QUINCY, ILLINOIS  62301
          Phone:  (217) 223-3030
          Email:  JHANSEN@SRHM.COM
               Appeared on behalf of the Defendants
               J. Keller, G. Farha, Adams County.


     ELLEN K EMERY of the firm of
          Ancel, Glink, Diamond, Bush, DiCianni & Krafthefer
          140 SOUTH DEARBORN STREET
          Suite 600
          CHICAGO, ILLINOIS  60603
          Phone:  312.782.7606
          Email:  eemery@ancelglink.com
               appeared on behalf of the Quincy
               Defendants.
```

---

**Page 4**

JON BARNARD,
called as a witness on his own behalf, after having been
first duly sworn, was examined and testified as follows:
DIRECT EXAMINATION
BY MS. THOMPSON:
Q. Good morning Mr. Barnard.
A. Good morning.
Q. Have you ever been deposed before, sir?
A. I have.
Q. We are going to try keep this deposition short.
In the event that you need to take any breaks during this
deposition, obviously that's fine, I would just ask that
if there is a question pending that you answer it.  All
right?
A. Sure.
Q. I will do my best not to talk over you and I
ask that you do the same so the court reporter can write
down what we say.
A. I know the protocol.
Q. Is there any reason that you would be unable to
give true and accurate answers today, sir?
A. No.
Q. Did you review any documents in preparation for
your deposition today?

EXHIBIT C

Transcript of Jon Barnard

2 (5 to 8)

Conducted on October 16, 2018

---

**5**

1    A.  I did.

2    Q.  What documents did you review?

3    A.  I received a number of documents that I am told

4  were produced in discovery, that they consisted of e-mail

5  exchanges, couple of trial transcripts and some other

6  miscellaneous documents all having to do with things that

7  I was involved with either that I had produced or that I

8  had received.

9    Q.  Okay.  Did your counsel -- did you talk with

10 anyone in preparing for this deposition?

11    A.  Well, talked to my bride about it and that was

12 of course casual conversation.

13    Q.  Sir, my understanding is that Jim Keller is

14 currently facing some charges in Adams County.  I don't

15 have any questions for you about the specifics of that --

16 of the investigation that was done there, the specifics

17 of those charges, but have you had any involvement in

18 this investigation or those charges?

19    A.  My only knowledge and involvement would have

20 been the receipt of a phone call from the State police

21 investigator, several months ago.

22    COURT REPORTER:  Excuse me, my machine is not on.

23 BY MS. LEVY:

24    Q.  When we broke, sir, you were answering a

---

**6**

1  question about any involvement you had in the current

2  prosecution that Mr. Keller is facing?

3    A.  I have no involvement in the prosecution of it,

4  but I was contacted several months ago by phone, by a

5  State Police investigator by the name of Seth Knox.

6        He asked me some questions, about

7  information that he had received from persons involved or

8  who may have been the subject of the investigation and he

9  was looking to answer unanswered questions.  I helped him

10 as best I could.

11        I can tell you in substance that it dealt

12 with a conversation that Mr. Keller claimed to have had

13 with me.

14    Q.  Are you currently practicing law?

15    A.  I am licensed to practice law in the State of

16 Illinois.  I am not actively practicing although, it is

17 likely that I will be very shortly, in Illinois.

18    Q.  And do you know what your future plans in that

19 regard are?

20    A.  I received an offer from the office of the

21 State Appellate Prosecutor to basically do conflict work

22 for them.

23    Q.  Is this the Springfield office?

24    A.  Yes.

---

**7**

1    Q.  And is that on a contract basis or is that --

2    A.  No, it's a contract.

3    Q.  When did you receive that offer?

4    A.  Approximately a month ago I was in Springfield

5  and I made a courtesy call to their office to say hello,

6  turned into a job interview.

7    Q.  Who did you speak with when you were at their

8  office on that occasion.

9    A.  Pat Delfino.  I also saw other members of the

10 office, but that was the discussion with regard to the

11 position.

12    Q.  Did you talk with Ed Parkinson or David

13 Robinson when you were at that office?

14    A.  I talked with Ed Parkinson.

15    Q.  Did you talk with him at all about the Lovelace

16 case on that occasion?

17    A.  If I did it was only peripherally to ask what

18 his involvement was.  I think that he told me his

19 deposition had been taken, or was scheduled and that was

20 about it.

21    Q.  Do you have any other future plans for the

22 practice of law other than that conflict position?

23    A.  I am not sure it's exactly the practice of law,

24 but I do -- I do train lawyers as well as law enforcement

---

**8**

1  officers.  With regard to the training of lawyers, I am

2  on the faculty of the National Institute for Trial

3  Advocacy and have been since 1985.  Essentially, I teach

4  trial skills to young lawyers.

5        On the law enforcement side I provide

6  training through the Illinois Law Enforcement Training

7  Standards Board to field officers on legal subjects,

8  which I believe requires me to be licensed to practice

9  law although, I am not sure.

10    Q.  You were admitted to the Illinois Bar 1975?

11    A.  I was.

12    Q.  You were a part time member of the State's

13 Attorney's office from roughly between 1975 and 1976?

14    A.  I was full-time.

15    Q.  During that time period you were full time?

16    A.  Yes.

17    Q.  You had the office in 1976, is that right?

18    A.  I did.

19    Q.  You came back in 1975?

20    A.  I did.

21    Q.  What did you do with your career between those

22 two stints at the State's Attorney's office?

23    A.  I was hired away from the States's Attorney's

24 Office by the law firm of Schmiedeskamp Robertson Neu &

---

Transcript of Jon Barnard

3 (9 to 12)

Conducted on October 16, 2018

---

**9**

1  Mitchell. I was an associate with that office, during
2  several litigations and trial work for six years.
3          And in 1980 I was made a partner of that
4  firm and I had remained a partner of that firm until I
5  left the firm in 1995.
6      Q. And you left to go back to the State's
7  Attorney's office?
8      A. I left to go into solo civil practice. The
9  State's Attorney's position. Which was part time in
10 1995, became available and was offered to me about six
11 months after I left Smith Camp.
12     Q. So about six months after you left, did you
13 take a part time position with the State's Attorney's
14 office?
15     A. Yes. In addition to my solo civil practice.
16     Q. When did that become a fulltime position?
17     A. When I was elected as the State's Attorney in
18 November of 2004.
19     Q. When did you make the decision to step down as
20 State's Attorney?
21     A. Roughly two years, I would say, prior to the
22 expiration of my term which would place it in 2014 some
23 time. An exact date, I can't tell you because it was
24 more of a process than an event.

**10**

1      Q. Other than your spouse, when is the first time
2  that you told someone that you were not going to rerun?
3      A. I made an announcement to the media, that would
4  have been the first formal announcement. I likely would
5  have advised members of my staff or certain of them,
6  prior to releasing that to the media.
7          So if I wanted to isolate that date and
8  then go back in time a couple weeks, perhaps maybe a
9  month prior to that I would have advised members of the
10 staff.
11     Q. Other than telling members of your staff the
12 media announcement, is there anyone else that you told
13 before but told the president?
14     A. Other than close friends and casual and
15 confidential conversation, no.
16     Q. When did you first meet Curtis Lovelace?
17     A. Likely when he was in college, likely
18 through a very close friend of mine who would have been
19 his uncle by marriage.
20          In other words, the close friend of mine
21 whose name is Matthew Hufmacher (phonetic) was married to
22 the twin sister of Curtis Lovelace's mother.
23          I believe vaguely, that's how I would have
24 first formally met Curtis. I also saw him at the YMCA

**11**

1  where I regularly worked out when he was in college, when
2  he was home I recall seeing him there.
3      Q. Ultimately, did your work with Curtis at
4  (unintelligible) camp?
5      A. No.
6      Q. When you were elected to the State's Attorney's
7  Office, did Curt ask you if he could fill the part time
8  position vacancy that was being left by your election?
9      A. Curtis asked -- came to my office, my civil
10 practice office at 316 North 6th Street, one day
11 unannounced and said that he was interested in as he
12 described it, return to the practice of law and asked if
13 there would be a position available.
14          And I -- because I don't recall it exactly
15 when that chance meeting took place, I don't know if I
16 was still running or if I had won the election, but had
17 not yet taken the oath as State's Attorney.
18          So, at best I can tell you, if I -- if the
19 election had not yet occurred, I likely told him, yes,
20 Curtis, I would consider hiring you if I am elected. If
21 I had already been elected but not yet sworn in, the
22 conversation would have gone -- I will strongly consider
23 you for the position.
24     Q. Had you kept in touch with Curt between when

**12**

1  you met him through Matt and when he came to your office
2  to ask about that position whenever that was?
3      A. No. The only contact I would have had with
4  Curtis, would have been when he was present at Matt
5  Huronger's (phonetic) house for a social event, at this
6  YMCA, but I maintained no contact with him other than
7  that.
8      Q. While Curt was working in the State's
9  Attorney's Office part time, did you have conversations
10 with him about his career?
11     A. I may have and I may not have, I can't give you
12 a clear recollection on that.
13     Q. Did you advise him during that timeperiod about
14 things that he was working on?
15     MR. SCHREIBER: What timeperiod are you talking
16 about.
17 BY MS.
18     Q. /EURG /EURPBGS /EURBG during the time that Curt
19 worked as a part time State's Attorney, did you advise
20 Curt on your cases that he was working on as a member of
21 that office?
22     A. Yes.
23     /EURBGS /EURBGS /EURBGS /EURBGS that was total.
24     Q. How often during that timeperiod, again talking

Transcript of Jon Barnard                    4 (13 to 16)
Conducted on October 16, 2018

13

1  when Curt was a part time State's Attorney, did you see
2  him in the office?
3       A.  Well, that's a very good question, because
4  there were expectations of Curtis that he did not meet
5  about his time in the office.  And if we kept that out of
6  the discussion his routine at the office would have been
7  to cover particular courtrooms, either as primary
8  coverage or substitute coverage.  His work would have
9  included handling assignments for trial, and also for a
10 period of time County Board matters.
11           He was -- he was part time, technically,
12 but I would best describe it, I suppose, as a hybrid
13 between part time and full-time.
14           He had a private practice, and a law
15 office address while he was at the State's Attorney's
16 office.
17      Q.  During the time that he was a part time State's
18 Attorneys, was it expected by your office that he would
19 also be doing work for other clients in his private
20 practice?
21      A.  Yes.
22      Q.  Was there an expectation of how much time
23 specifically he would be spending on State's Attorney's
24 matters?

14

1       A.  Again, it's difficult to quantify it precisely.
2  I would put it this way because Curt had a law office
3  that I was aware of he had other work outside of the
4  office.  There was a certain, what I would call ebb and
5  flow to that, which is natural.
6           Some time the demands of his private work
7  might take up most of his time.  That wasn't the case for
8  the majority of the time he was at the State's Attorney's
9  office.
10      Q.  Was there a time, did he -- let me ask you
11 this:  Ultimately did you fire Curt from that position?
12      A.  I did.
13      Q.  Prior to firing him, was there a time where he
14 told you that he was looking for other jobs?
15      A.  I can't tell you with 100% certainty.  What I
16 can tell you with 100% certainty is that I was aware that
17 he was looking for other jobs.
18           And I do believe that there was a time
19 when he came and asked if I would write a letter of
20 recommendation for him.
21           Again, I don't know what that was, what I
22 who call to request on the come in a scenario if
23 hypothetically, he would interview for a position if he
24 could bring that with him or it might well have been a

15

1  scenario where he had actually made contact with another
2  potential employer then came to me.
3           Couldn't tell you which scenario fit, but
4  I was also aware that he applied for certain government
5  positions as many members of my staff did from time to
6  time.  And he may well have shared that with me.
7       Q.  What government positions did he apply for
8  prior to being separated from your office?
9       A.  The one that I am aware of would have been the
10 Adams County Public Defender.  He may also have applied
11 for a position in Hancock County, although I may be
12 confusing him with another member of our staff at the
13 time.
14           Again keep in mind, that it wasn't the
15 norm that Assistant State's Attorneys were always looking
16 to improve their situations and always looking for other
17 positions, so none of that would have surprised me or
18 offended me.
19      Q.  How did you become aware that he had applied
20 for the Public Defender position?
21      A.  Again, I can't give you a specific answer to
22 that, he may have told me that he applied for it and I
23 may have learned it from others.
24           It's the kind of information that within a

16

1  courthouse gets around fast so, either source is
2  possible.
3       Q.  Did you have any role in the selection of the
4  Public Defender?
5       A.  I was -- well, I did write a letter of
6  recommendation or let me just put it this way:  A letter
7  of commendation for an Assistant Public Defender, at the
8  time, who happened to have been my legal assistant when I
9  was in private practice at Schmiedeskamp, she was a very
10 bright, energetic organized individual.
11           She completed her college work when she
12 worked for me.  Two years within the span of a year she
13 went to law school commuting about 90 miles each way to
14 go to University of Missouri Law School.
15           She became an Assistant Public Defender, I
16 thought highly of her work.  I wrote a letter to the
17 Presiding Judge of Adams County, on her behalf.  I don't
18 recall whether or not she asked me to do so, but I did
19 write that letter for her and she got the position.
20      Q.  So who made the hiring decision for that
21 position, was it the Presiding Judge?
22      A.  Yes.
23      Q.  Other than writing the letter for her, did the
24 Presiding Judge or anybody else involved in that process

Transcript of Jon Barnard
Conducted on October 16, 2018

**17**

1  seek out your opinions about any of the candidates?
2      A.  Not that I recall.  I believe there was also
3  one other applicant from my office for that position.
4      Q.  Did you write that person any kind of
5  recommendation?
6      A.  No.
7      Q.  Did you talk about there being expectations
8  occurred that he didn't meet in the office?
9      A.  Yes.
10      Q.  Can you explain what did you mean by that?
11      A.  Well, again this involves a long period of time
12  and multiple events, but I can categorize them for you.
13  And those main categories would be my suspicion of
14  alcohol abuse, and erratic and decreasing presence in the
15  office.  Likely at least in my opinion they were related,
16  but those would be the two main subjects.
17      When did you have first suspect that Curt had a
18  problem with alcohol?
19      A.  I would say somewhere probably between — again
20  and I apologize, I can't give you a more specific time.
21  Somewhere between 2005 and 2007, that's when or during
22  that period of time I began to get information about his
23  presentation.
24      Q.  What information did you get?

**18**

1      A.  Information from members of my staff,
2  information from members of the Circuit Court Clerk's
3  Office related to my staff, with regard to the fact that
4  Curtis had a strong odor of alcohol about his person when
5  he appeared in court.  And that was a continuing concern
6  to me, because he was covering a morning court for at
7  least part of that time.
8      Q.  Who told you that he had an odor of alcohol on
9  him during court?
10      A.  Multiple persons.  The ones that I can recall
11  would have been my office administrator, Cheryl Ely.
12  Jennifer, Cifeline, because she covered a courtroom that
13  Curtis would commonly substitute in, and likely other
14  members of my staff but I recall those conversations.
15      Q.  Did Ms. Ely and Ms. Cifaldi tell you about that
16  in that 2005 and 2007 period?
17      A.  Yes, as best I can recall.
18      Q.  And did you talk with anyone in the Circuit
19  Court clerk's office about issues relating to Curt and
20  alcohol?
21      A.  No.
22      Q.  Were there other complaints about Curt that
23  members of that office had that reached you in some way?
24      A.  No, the concerns related to me from the clerk's

**19**

1  office then passed through members of my staff had to do
2  with the odor of alcohol.
3      Q.  All right.  You have stated that those issues
4  started or -- let me start that question again.
5      You have said that you started suspecting
6  that there was a problem with Curt and alcohol between
7  2005 and 2007, is that right?
8      A.  Roughly, yes.
9      Q.  And understand that is a statement, did your
10  suspicions come only from the reports that you got from
11  members of your staff about this?
12      A.  No.
13      Q.  What else led you to believe that?
14      A.  I was sitting at my desk one morning minding my
15  own business, when an officer from the Quincy Police
16  Department came to my office, I don't recall the name of
17  the officer, but that officer detail on that day was
18  following up on bad check investigations.
19      The criminal offense would be deceptive
20  practice, but essentially, he was on the bad check detail
21  and he walked into my office and handed me a photo copy
22  of a check that Curtis Lovelace had written to the Liquor
23  Depot at a local liquor store that bounced.
24      Q.  Did you ever get any information about Curt

**20**

1  writing bad checks other than that check to the Liquor
2  Depot?
3      A.  I can't answer that question with certainty.  I
4  do believe I may have asked the officer whether or not
5  there were any other checks.
6      I was not provided with any.  Although,
7  when he came to my office it may have been one or perhaps
8  more than one check, but I can tell you that one was too
9  many.
10      Q.  Is there anything else that you learned that
11  led you to believe that Curt had a problem with alcohol
12  other than his erratic and decreasing presence in the
13  office which I want to talk to you about separately.
14  Anything else?
15      A.  Yes.  And this would have been information from
16  a broader spectrum of individuals, social acquaintances,
17  and again I apologize I cannot give you a specific name
18  as the source of information.
19      But let me just say that it was widely
20  known that Curtis, during his marriage to Cory Lovelace,
21  before her death as well as Cory were heavy drinkers.
22      It was let's just say, common knowledge
23  that their marriage was volatile, which would not
24  surprise me, if in fact they were heavy drinkers, which I

Transcript of Jon Barnard
Conducted on October 16, 2018

---

**21**

1  personally witnessed.
2          And after Cory's death, in this continuing
3  evidence that I explained to you earlier from within the
4  office and from the Quincy Police Department, was
5  evidence of a continuing life-style.
6      Q.  Did you know that -- well, let me ask you this:
7  It was your understanding that Cory was a heavy drinker
8  as well in her life?
9      A.  Yes.
10     Q.  Did you know that Curt and Cory were heavy
11 drinkers when you hired Curt to that part time post?
12     A.  No.
13     Q.  Did you know that his marriage to Cory was
14 volatile when you hired him?
15     A.  That might be a tougher question for me to
16 answer it, to try to peg when I got that kind of
17 information I can't say with any certainty.
18          I may have known.  I may not have known.
19 That would not have been a deal killer for me, but
20 certainly had I been aware of his alcohol use and or
21 abuse, that would have been problematic.
22     Q.  You said that you personally observed Curt's
23 heavy drinking or I don't want to misstate your
24 testimony, so --

**22**

1      A.  Right.  I have seen him intoxicated, you know
2  in social situations, what I would have judged to be just
3  say over .08 blood alcohol content.
4      Q.  Have you ever seen him at work in a state that
5  you believed was an intoxicated one?
6      A.  I observed him over a period of time from time
7  to time, smelling of alcohol.  I cannot tell you that I
8  would have seen him, what I considered to be obviously
9  impaired by alcohol, but that's a very difficult
10 judgement to make.
11     Q.  You smelled alcohol on him at work?
12     A.  I have.
13     Q.  When was the first time that you smelled
14 alcohol on him at work?
15     A.  Again we're talking about a tenure of
16 seven years.  I would you say, the best I can say is on
17 occasion, keeping in mind that I did not have a lot of
18 direct face to face contact with Curtis in close quarters
19 where I would have been able to perceive that.  But there
20 were times when on occasion I did smell alcohol on or
21 about him.
22     Q.  Well, did you smell alcohol on him during that
23 same time period, roughly 2005 to 2007 when you were
24 getting those reports about him having alcohol odor on

**23**

1  him in court?
2      A.  Likely.  But when I say likely, again, it's
3  difficult to pinpoint in time or frequency, but the first
4  intervention whenever you want to get to that I can share
5  with you.
6      Q.  Let me ask you first --
7      A.  Sure.
8      Q.  In the time that you knew Curt, did you know
9  him to have an even keel personality?
10     A.  He had a controlled personality, but if we are
11 going to make fine judgements or split hairs, my
12 perception of Curtis was that it was simmering not too
13 far below the surface was a very competitive and perhaps
14 volatile streak.
15     Q.  Do you have any specific experiences or
16 examples that you can point to where you observed on his
17 -- where you observed that below the surface -- strike
18 that.
19          You have just described --
20     A.  I can't tell you the case or cases, but I can
21 tell you that after a trial Curtis would have prosecuted
22 and where the prosecution fell short, he was borderline
23 volatile.
24     Q.  What did he do in that situation that --

**24**

1      A.  Shook, his face turned red, he spoke through
2  gritted teeth, expressed anger.
3      Q.  Expressed anger to you?
4      A.  No.  Whatever the outcome was or whatever he
5  perceived to be the unfairness of the result.
6      Q.  Was this -- these things that you observed
7  about him in that case, was that after the verdict you
8  talked to him somewhere?
9      A.  Likely -- well, as I recall, would have been in
10 the hallway at the office.
11     Q.  Was anyone else present for that conversation?
12     A.  Couldn't tell you.  Just kind of -- he was
13 pacing, obviously upset.
14     Q.  Other than that example, can you think of other
15 times where you observed him to have this competitive or
16 volatile streak?
17     A.  Not directly.  I was advised of a particular
18 outburst that evidently frightened some other folks, but
19 I should go back, if I may, to tell you that that kind of
20 -- what I would call behavior following a disappointing
21 result was not one single time.
22          We -- all of us in the prosecution
23 business are going to fall short now and then.  And so
24 Curtis lost, you know, more than one trial, so, that kind

Transcript of Jon Barnard
Conducted on October 16, 2018

**25**

1  of behavior was something I had seen more than once.
2      Q.  Is this behavior that he exhibited every time
3  he lost a trial?
4      A.  No.
5      Q.  When you are saying -- I am just trying to
6  understand how many times you observed this, so do you
7  have an estimate?
8      A.  A handful.
9      Q.  Okay.  And when you said that you were aware of
10 another incident that you didn't directly observe, did
11 that relate to Curt not getting the Public Defender
12 position?
13     A.  Yes.
14     Q.  Other -- and I want to ask you about that, too.
15 Other than what you heard about him not getting the
16 Public Defender position, are there any other situations
17 that anyone else told you about where you would say that
18 that's an example of him having this competitive or
19 volatile streak?
20     A.  Well, other than the obvious information and
21 evidence that was developed during the course of this
22 criminal case, that would be the only other specific
23 incident that I could relate to you.  I think that that
24 would cover the waterfront.

**26**

1      Q.  Did you -- did you ever directly talk with Curt
2  about anything having to do with the Public Defender
3  position?
4      A.  I may have.  I wished him luck, if I did.  And
5  again, I can't recall if I did or not, I certainly was
6  aware that he had applied.  Again, and as I said, that
7  neither surprised nor offended me.
8          The conversation I would have had with
9  him, if in fact, I did, would have been of that -- I am
10 being informal, good luck to you, that sort of thing.
11     Q.  At the time that he applied for that position
12 were you hoping that he would on his own, leave the
13 State's Attorney's office?
14     A.  I had -- I was neutral about it.  I neither
15 hoped that he would leave nor hoped that he would stay.
16     Q.  Is it fair to say that as you have been
17 describing with the employees of the State's Attorney's
18 Office that you did not begrudge people looking for other
19 positions?
20     A.  That's correct.
21     Q.  All right.
22     A.  Again, the norm of an office like that is to
23 analogize crudely would be much like professional
24 athletics.  If you are managing a team you got players

**27**

1  that are going to come and go.  They are going to be free
2  agents.  They are going to look for other opportunities.
3  That's -- that's -- that's normal.  You need to expect
4  that and embrace that.
5      Q.  So did you ever talk directly with Curt about
6  him not getting that PD job?
7      A.  I may have.  And again I cannot give you an
8  answer with any more certainty than that.  I may not
9  have, I don't recall specifically.  It wouldn't surprise
10 me if I did.  It wouldn't surprise me if I didn't.
11     Q.  As you sit here today, though you don't have
12 any particular memory of Curt expressing anger to you
13 about not getting that job?
14     A.  No.
15     Q.  All right.  Have other people told you that
16 Curt expressed anger about not getting that job?
17     A.  Yes.
18     Q.  Who told you that?
19     A.  As best I recall, if again, and if my memory is
20 somewhat refreshed, if you will, by reading the documents
21 at some time ago, Gary Farha and Jennifer Cifaldi.
22     Q.  Did you have a joint conversation with them
23 about this or separate conversations?
24     A.  Likely separate.

**28**

1      Q.  What did Jennifer Cifaldi, C-i-f-a-l-d-i, tell
2  you?
3      A.  I cannot give you precise words, but I can give
4  you the gist of the conversation.  She related that he
5  was explosive, that may not have been her word, that may
6  have been inference from her words.  Looked like he was
7  ready to just go off.  I have some recollection of it
8  being related to me by either her or Gary that he was
9  yelling and screaming.
10         I wasn't there, I can't verify that, but
11 that was the gist that I received from one of the two of
12 them or perhaps both of them.
13     Q.  Is there anything different or additional you
14 recall about your conversation with Gary about this?
15     A.  No.  Except that I think that he was more
16 descriptive and this may have come from my review of the
17 documents produced in discovery, that he was concerned
18 enough that he considered calling the police and you need
19 to ask him about that.
20     Q.  How did this come to your attention, meaning
21 did you ask them about this?  Did they separately bring
22 it to you?  How did you come to learn about this?
23     A.  I would describe it as water cooler discussion
24 or hallway discussions, kind of along the line of, you

Transcript of Jon Barnard
Conducted on October 16, 2018

---

**29**

1 wouldn't believe how Curt is dealt with the news, that
2 sort of thing.
3     Q. Is it your memory that you were talking with
4 them about this close in time to the decision for him not
5 to get that job?
6     A. Likely. It would have been. I mean it doesn't
7 make sense for them to mention it five months later.
8     Q. You talked then or you mentioned that there was
9 a first time that you tried to intervene or counsel Curt
10 about alcohol issues?
11    A. Yes.
12    Q. When was that?
13    A. Very, very shortly after I had my meeting in my
14 office with the Quincy police Department, officer who
15 brought me the bad checks.
16    Q. And what do you remember about -- whatever
17 meeting you had, following the meeting about the bad
18 checks?
19    A. What do I recall about my meeting with Curtis?
20    Q. My question was bad, so yes, what do you recall
21 about your meeting with Curt?
22    A. I contacted him -- I don't know if he was in
23 the office but if he wasn't I told him to get to the
24 office.

**30**

1         And I brought him into my office and I
2 showed him this check and told him that this was
3 unacceptable. I explained to him what I considered to be
4 the obvious hypocrisy of a person entrusted to prosecute
5 crimes committing at least in a technical sense, a crime
6 that we prosecuted others for. I told him that it would
7 need to stop.
8         That there better not be other situations
9 like this looming. And I believe I would have also told
10 him that you may have a problem that needs attention. I
11 am not certain about that. It's likely that I would have
12 woven that into the conversation.
13    Q. Do you remember what, if anything, he said
14 during this conversation?
15    A. In substance, yes. His response was, I got it.
16 I get it, understood.
17    Q. Was he angry during this meeting?
18    A. No.
19    Q. Did -- prior to that -- prior to the police
20 officer coming to your office with the checks, had you
21 had -- had anyone complained to you about Curt's
22 performance as an Assistant State's Attorney other than
23 what you were told about him having -- maybe smelling of
24 alcohol?

**31**

1     A. Not specifically, no. I cannot sit here and
2 tell your there were other issues. The issues that I
3 related to you were the primary ones.
4     Q. All right. And you mentioned that ultimately
5 there were issues with his attention to the job or actual
6 attendance at the job, right?
7     A. Yes.
8     Q. Had those issues come out as of the time that
9 you had that first meeting with him about the checks?
10    A. No. The attendance issues, as they often do,
11 began gradually. And after that point in time, because
12 there was a -- there was what I would call an interval
13 after that bad check incident where Curtis enlisted in
14 the military.
15        And I noticed a certain improvement in his
16 attempts to detail, his overall performance, consistent
17 with the kind of affect of being in the military having
18 military training will have upon you.
19    Q. Have you served in the military yourself?
20    A. I have not.
21    Q. You said that you noticed an improvement in his
22 overall performance. Did you have concerns about his
23 performance prior to that meeting about the checks other
24 than I take it a very serious concern about him having an

**32**

1 alcohol problem?
2     A. No. The alcohol issue was -- was the issue
3 that I was concerned with because any one of us who is
4 been around the track more than a couple of times, knows
5 that if you got problems with alcohol, it is sooner or
6 later going to begin to affect your performance. If it
7 doesn't change.
8     Q. How long did the interval last after that
9 meeting where things with Curt seemed to improve?
10    A. Well, certainly when he went into the military,
11 began his military training, he seemed to, for lack of a
12 better term, just shape up, improve. He just was more
13 with it. It's a hard thing to describe globally, but
14 that's the best I can do.
15        And that continued for a period of time,
16 maybe a year or two, and then it began to deteriorate.
17    Q. During that time what you called the interval
18 where he improved, anyone come to you during that
19 timeperiod with a complaint about him smelling like
20 alcohol?
21    A. It's hard to say, and I cannot give you a
22 precise answer. It's possible and it's possible that I
23 did not receive any complaints during that, what I will
24 call period of improvement.

Transcript of Jon Barnard

Conducted on October 16, 2018

**33**

1       But those expressions of concern and
2 complaints about the alcohol odor about him, began to
3 recur.
4     Q. Can you pinpoint when those complaints
5 recurred?
6     A. Within a year of the time that I ultimately
7 fired him. And, roughly. Roughly. Might have been
8 longer than that but that's the best estimate I can give
9 you.
10     Q. Can you pinpoint that any further with
11 reference to a particular case that he was working on or
12 some other event that would time those complaints out
13 more specifically?
14     A. No, it was again the same kind of complaint
15 that was being presented to me earlier and that is again
16 to paraphrase them, well, Curt smells like a tavern
17 again.
18     Q. When those complaints recurred, who was making
19 them?
20     A. Again, the -- they were coming to me from the
21 same sources. There might have been different players,
22 different court personnel, but it's basically going to be
23 members of my staff or court personnel.
24     Q. When is the next time that you talked to Curt

**34**

1 about anything having to do with his performance in the
2 office after that meeting you had with him about the
3 check?
4     A. The next major performance discussion, it
5 occurred sometime in May, I believe of 2012 and I had
6 been receiving these kinds of expressions of concern or
7 complaints. I had also begun to notice and it was
8 related to me that Curtis' time in the office was
9 becoming more and more sporadic.
10     Q. Did that issue with his time becoming sporadic,
11 did that arise after he came back from a period of
12 military service?
13     A. He had been in the military I think for at
14 least a year, if not more, likely more when this event in
15 May of 2012 occurred.
16     I recall specifically from reviewing the
17 written memo that I sent to him, that one of the most
18 serious problems regarding his presence in the office was
19 when I was on vacation and out of the office. During May
20 of 2012, I was out of the office for I think ten work
21 days.
22     I was advised by my office administrator
23 that he was rarely there that entire time.
24     Q. This is Ms. Eli that told you that?

**35**

1     A. Yes, I believe so.
2     Q. You said after the check conversation you had a
3 conversation with him in May of 2012?
4     A. Yes.
5     Q. Tell me about that conversation.
6     A. Well, I say conversation, it may have simply
7 been the memo. I may have decided at that point within
8 the concept of progressive discipline, that it was time
9 for a written warning and a written warning was
10 appropriate. And my conversation -- my initial
11 conversation with him may well have been the written
12 memo.
13     Mostly it was because I -- if I had
14 written a memo following a conversation with him I would
15 have referred to the conversation and I didn't.
16     Q. And do you remember what, if anything, he said
17 to you when you raised these issues in May of 2012?
18     A. He sent me a written response, I do recall
19 that.
20     Q. Other than the written response, did he talk to
21 you at all?
22     A. It's possible, but if it did occur it was more
23 along the lines of an informal acknowledgement of what he
24 needed to do to improve.

**36**

1     Q. Did you believe at that time in May of 2012,
2 that the issue with his performance that you have
3 described were related to alcohol abuse?
4     A. Subjectively?
5     Q. Yes.
6     A. I did.
7     Q. Did you talk with him at that time about
8 seeking help?
9     A. I may have referred to it in my memo to him. I
10 do not recall making any such recommendation to him in
11 person.
12     Q. Was there --
13     A. Could we take ten seconds?
14     (Short recess.)
15 BY MS. THOMPSON:
16     Q. Mr. Barnard, I think the last question I asked
17 you was whether you had talked with Curt about the idea
18 of getting assistance. And I want to make sure you had a
19 chance to fully answer that question before we go on to
20 the next topic.
21     A. I may have referred to it in my memo to him. I
22 do not believe that I would have made such a
23 recommendation to him in person.
24     Q. And is there a reason you think he would not

Transcript of Jon Barnard
Conducted on October 16, 2018

---

37

1  have done that?
2      A.  Only because it's such a sensitive nature that
3  I would have recalled that.
4      Q.  In your -- in your statement in the State's
5  Attorneys office, was there a culture of drinking among
6  people who worked at the State's Attorney's Office?
7      A.  What culture?
8      MS. EMERY: Object to the form.
9      THE WITNESS: I don't know how you define culture.  I
10 don't know how you define culture.  Let me see if I can
11 clarify.
12         Certainly members of the staff did meet
13 socially and did consume adult beverages included, and it
14 was something that was not uncommon and I guess is as
15 good as I can get.
16 BY MS. THOMPSON:
17     Q.  Did members of the office ever have a drink
18 while waiting for a jury verdict?
19     A.  Yes.
20     Q.  Was there a fridge in the office that had beer
21 in it for people to occasionally drink at the office
22 after work?
23     A.  No.  There was a refrigerator.  I, from to
24 time, would have beer that I brought there and that would

38

1  only have been for when I was there working at night by
2  myself.  We do not have an alcohol stocked refrigerator.
3      Q.  After you sent Curt this memo in May, did you
4  again receive information that his performance was not
5  acceptable?
6      A.  It was ongoing and the sources of the
7  information were again likely multiple, including, but
8  not limited to my office administrator, particularly with
9  regard to his presence in the office.
10         I can't tell you specifically whether or
11 not there were expressions of concern or complaints about
12 the odor of alcohol on his person, during that period of
13 time between middle, end of May through July.
14         I think it was 18 when I terminated him.
15 There may have been, but certainly there were -- there
16 were problems with his attendance.
17     Q.  Did you talk with Curt again about his
18 performance between that May memo and when you ultimately
19 terminated him?
20     A.  I have no specific recollection of counseling
21 him in person beyond a very informal kind of discussion
22 where, are we good with my admonitions to you and an
23 acknowledgement of that.  There were no discussions in
24 person with him regarding the specific issue of alcohol.

---

39

1      Q.  Want to show you what is been marked as
2  Exhibit 1.
3      A.  Sure.
4      Q.  This is a document that is date stamped AC315
5  through AC320?
6      A.  Uh-huh.
7      Q.  There are multiple e-mails in this document.  I
8  want to refer to a specific e-mail that's on page one
9  that is dated June 1st, 2012, at 7:58 a.m. from you to
10 Curt, do you see that?
11     A.  I do.
12     Q.  Is this an e-mail you sent him?
13     A.  Yes.
14     Q.  Was there an additional memo to Curt around May
15 or June of 2012, that you sent him aside from this
16 e-mail, relating to his presence at the office?
17     A.  Forgive me, I am reading the --
18     Q.  Sure.  Take your time.  Read it before you
19 respond.
20     A.  There may have been and certainly if you have
21 any such that would refresh my recollection, but I
22 believe the next written communication to Curtis
23 regarding his performance would have been a notice of
24 termination.

40

1          I may be mistaken.  There may have been
2  one in between, but that's the best I can recall.
3      Q.  Let's me ask you this:  Is that e-mail the
4  June 1st, 2012, at 7:58 a.m, is this the May memo you
5  were referring to or is there an earlier memo?
6      A.  No, I believe was the memo to which I made
7  reference again.  I am willing to be corrected but this
8  appears to be the substance of the admonition I gave him.
9      Q.  Okay.  If you turn to the last -- if you turn
10 to the second to last page, so I am looking in the second
11 to last piece of paper so I am looking AC318.
12     A.  AC318?
13     Q.  Yes.
14     A.  Got you.
15     Q.  There is an e-mail there dated July 19th of
16 2012, is this e-mail, the manner in which you informed
17 Curt that he had been fired?
18     A.  Yes.
19     Q.  There is an e-mail response from Curt on the
20 couple of pages before this and I am specifically
21 referencing AC316, and AC317, an e-mail from Curt to you
22 dated, July 21, 2012, do you see that?
23     A.  Yes.
24     Q.  Did you receive any e-mail from Curt in

---

PLANET DEPOS
888.433.3767 | WWW.PLANETDEPOS.COM

Transcript of Jon Barnard
Conducted on October 16, 2018

**41**

1  response to your firing e-mail other than this one?
2      **A.  Not that I recall.**
3      Q.  Did anyone participate in the decision to fire
4  Curt besides you?
5      **A.  No.**
6      Q.  Did you talk with anybody about that decision
7  before you fired him?
8      **A.  I may have spoken with my office administrator**
9  **about it, particularly to confirm the most recent**
10  **absences, and my decision but that would have been it,**
11  **given the nature of the decision that I made.**
12      Q.  Did you ever talk with Gary Farha about your
13  decision to fire Curt?
14      **A.  I may have spoken with him in general terms**
15  **about my concerns perhaps, even about my inclination**
16  **because Gary was at the time managing pretrials for me**
17  **and that was the next to the last straw, but I did not**
18  **seek his advice nor his approval.**
19      Q.  Did anyone ever make a written complaint to you
20  about any concerns having to do with Curt's performance
21  as a member of the State's Attorney's Office?
22      **A.  A written one?**
23      Q.  Yes.
24      **A.  Not that I can recall.**

**42**

1      Q.  Have you seen any other written documentation
2  of anyone's concerns about Curt's performance as a member
3  of the State's Attorney's Office other than your e-mail
4  that we just looked at in Exhibit 1?
5      **A.  No.  Those are the ones that I am aware of.  I**
6  **cannot recall ever receiving a written complaint from**
7  **anyone within the courthouse, within the law enforcement**
8  **agency or that sort of thing.**
9      Q.  And the water cooler conversation or
10  conversations that you had with Jennifer Cifaldi and Gary
11  Farha about Curt being mad about the Public Defender
12  position.
13          Did either of them tell you that they were
14  fearful of Curt as a result of what they had observed in
15  terms of his anger about the outcome that decision?
16      **A.  That was the inference that I drew from what**
17  **they said to me.  May or may not have been specific words**
18  **that they shared with me that communicated that fear but,**
19  **that was my take on it.**
20      Q.  Did either of them say to you at any point,
21  something to the affect that because of how Curt had
22  reacted to that, that they didn't believe he ought to be
23  working at the State's Attorney's Office?
24      **A.  No, not that I recall.**

**43**

1      Q.  I am showing the witness what is been marked as
2  Exhibit 2, and this is a -- there is two pages of this
3  document, SAAP62 and SAAP 63.
4          I am really just asking you about SAAP63
5  e-mail on that page.
6      **A.  Okay.**
7      Q.  Including one from Jonathan Bernard to David
8  Robinson dated May 4th of 2017, do you see that e-mail?
9      **A.  Yes.**
10      Q.  Is that an e-mail that you sent to Mr.
11  Robinson?
12      **A.  Yes.**
13      Q.  I have some questions for you about this
14  e-mail, so if you want to read it first let me know when
15  your done.
16      **A.  Since I sent it to him.  Got it.**
17      Q.  So this e-mail references possibly discussing
18  with Mr. Robinson you doing some contract work for the
19  State Appellate Prosecutor, is that right?
20      **A.  Uh-huh.**
21      Q.  Do you know when you first discussed with
22  anyone in that office the possibility of doing contract
23  work for them?
24      **A.  Yes.  As best I recall it would have been at**

**44**

1  the 2015 mid year meeting of the State's Attorney's
2  Association here in Chicago.
3          When I had a casual conversation with Pat
4  Defino, who was the executive director of the State's
5  Attorney's Appellate Prosecutor service, and let him know
6  that I was going to be stepping down on my own terms at
7  the end of my tenure in November of 2016, at which point
8  he made a comment to me, informally, that he'd loved to
9  have me come to work for them.
10          That was the sum and substance of it.  I
11  may have touched base with him between -- between
12  December of 2015 and May of 2017, but I don't recall
13  whether or not for sure I did.
14      Q.  This termination references you seeing Mr.
15  Robinson in Quincy?
16      **A.  Uh-huh.**
17      Q.  Do you know what he was -- was he there for
18  this Law Day lunch?
19      **A.  Yes.**
20      Q.  Did he speak at it?
21      **A.  Yes.**
22      Q.  What did he speak about?
23      **A.  He spoke — let me see if I can recall the**
24  **subject.  As best I can recall it was on one or more**

Transcript of Jon Barnard
Conducted on October 16, 2018

45

1 specific provisions of the Bill of Rights to the
2 Constitution and their application to the justice system.
3 I also spoke — remember making a comment perhaps about
4 that or in anticipation of that so —
5    Q.  Did he reference the Lovelace case at all
6 during his comments?
7    A.  No.
8    Q.  Did you during your comments?
9    A.  No.
10    Q.  There is a reference in this e-mail to another
11 attendee at the law day luncheon, tell you about some
12 jury confusion in the Lovelace case?
13    A.  Yes.
14    Q.  What did this person tell you about jury
15 confusion?
16    A.  As best I recall, and my recollection
17 triggered, if you will, or activated by reading this
18 memo, so I am trying to recall something that occurred in
19 that would be May, 2017.
20       As best I recall, the information given to
21 me and other attendees at that Law Day Conference was
22 that the jury upon taking a vote believed that if there
23 wasn't a unanimous vote for guilty then that required
24 them to reach a unanimous verdict of not guilty.

46

1       As best I recall, that was the related
2 source of the confusion. Keep that in mind of course,
3 that by the time that got to me, it was at least third
4 hand, and I am giving you my best recollection.
5       And that was the alleged explanation for
6 the verdict, don't know if that's accurate, or
7 inaccurate. All I know is as best I recall that it was
8 what was related me.
9    Q.  Who told you that?
10    A.  That I can't even tell you. Probably,
11 although, I just can't tell you. I'd say probably — I
12 was going to say probably a lawyer because that would
13 appreciate that kind of thing, but I can't tell you for
14 sure.
15    Q.  Is there anything that would refresh your
16 memory about what that was?
17    A.  Yeah, if they said it to me again.
18    Q.  In this e-mail you called the verdict a
19 disappointing verdict?
20    A.  Yes.
21    Q.  Were you disappointed in the verdict?
22    A.  Yes.
23    Q.  Do you believe as you sit here that Curt killed
24 Cory?

47

1    A.  Well, doesn't matter what I believe because the
2 jury is spoken and that's the only thing that matters. I
3 believe that from my kind of peanut gallery assessment of
4 the evidence in the case, I felt there was a — I thought
5 — let's put it this way: I thought along with six other
6 members of the original jury there was evidence beyond a
7 reasonable doubt to convict him of that offense.
8    Q.  You testified at both of the trials that Curt
9 had, is that right?
10    A.  I did.
11    Q.  Have you reviewed that before today?
12    A.  I have.
13    Q.  Was your testimony in those two trials true and
14 accurate?
15    A.  Sure. You know — other than matters of very
16 specific and small refinement I think they are exactly
17 what I would say today.
18    Q.  I mean as you were reading that.
19    A.  Prior to this deposition, is there anything you
20 read that made you say — no.
21    Q.  I should have restated that or something about
22 that was wrong.
23    A.  No.
24    Q.  You testified about getting a call from Curt on

48

1 February 14, of 2006, is that right?
2    A.  Yes.
3    Q.  Is that how you learned about Cory Lovelace's
4 death?
5    A.  Yes.
6    Q.  Do you remember as you sit here today -- let me
7 state that question again. Do you have an independent
8 memory of that conversation with Curt as you sit here
9 today?
10    A.  Yes.
11    Q.  To the best of your memory what exactly did
12 Curt say to you on that phone call?
13    A.  I received a — way the system works, an
14 intercom alerts from one of our staff that Curtis was on
15 the line, and I mixed up the phone, and I either said
16 hello or I said, Curtis, might have been either one. And
17 he said, John, yeah, Cory's dead. That started the
18 conversation.
19    Q.  As you sit here today, can you tell me to the
20 best of your memory how the conversation proceeded after
21 that?
22    A.  Sure. When he said Cory's dead, I said where
23 is she. And he said that she was in bed. I said where
24 are you. If I recall correctly and he said you know, I

Transcript of Jon Barnard
Conducted on October 16, 2018

13 (49 to 52)

---

**49**

1    am at home.
2        I asked him if he had called the
3    ambulance.  He said, no.  I asked him if he called 911.
4    He said no.  Then I said to him, "Stay put, I am calling
5    911."  That was the end of our conversation.
6        Q.  Who hung up the phone first?
7        A.  Likely me.  Only because I had something that
8    needed to be done.  Do I have 100% recollection of that?
9    No, but, given the nature of the conversation that's
10   likely what occurred.
11       Q.  How long total did that conversation take?
12       A.  No more than a minute, and, almost certainly,
13   less than that.
14       Q.  That call was had was while you were at the
15   office?
16       A.  Yes.
17       Q.  Did you see Curt at the office later that day?
18       A.  No.
19       Q.  Were you at the office that entire day?
20       A.  In and out.  And I say that because of — I had
21   learned from my staff that, he, in fact, came to the
22   office that afternoon.
23       I know that I didn't see him because had I
24   seen him, I would have expressed my condolences to him,

---

**50**

1    and that never occurred.  But I was advised by members of
2    the staff that he did come into the office that
3    afternoon.
4        Q.  Who told you he had come in?
5        A.  Who, is one of three people.  Again, I would
6    say either my office administrator, Gary Farha,
7    Rhonda Bower, who would be the first person you would
8    encounter when you walked into the State's Attorney's
9    Office.  That's, B-o-w-e-r.
10       Q.  Was Ms. Bower an administrator?
11       A.  No.  She was a legal assistant slash
12   receptionist.
13       Q.  Did any of those people Ms. Ealy, Mr. Farha,
14   Ms. Bower or anybody else tell you that Curt was acting
15   weird at the office that day?
16       A.  They were surprised by his demeanor.
17       Q.  What did they tell you about his demeanor?
18       A.  Well, there was another source of input and
19   that was a Quincy Harold, Quincy, H-e-r-a-l-d, Whig,
20   W-h-i-g, Reporter, which of course is the local
21   newspaper, who was in the courthouse that afternoon and
22   encountered Curtis.
23       And like, that's the only conversation
24   that I can relate to you specifically in terms of the

---

**51**

1    words, the global perception by the others who mentioned
2    it would have been that he seemed matter of fact and
3    surprisingly not demonstrating any symptoms of grief.
4        Q.  When did you talk with the reporter about
5    Curt's demeanor?
6        A.  Within probably a day or two.
7        Q.  Do you remember who that was?
8        A.  Rodney Hart, H-a-r-t.
9        Q.  I take it that you don't remember necessarily
10   which of Ms. Ealie, Mr. Farha, Ms. Bower, you talked
11   about Curt's demeanor?
12       A.  That's correct.
13       Q.  When you had whatever conversations you had
14   with some or all of those people about Curt's demeanor,
15   when were they?
16       A.  Again, that would have been within a day or so
17   after that.
18       Q.  Did you attend the funeral?
19       A.  I did.
20       Q.  And was Curt's demeanor at the funeral
21   appropriate?
22       A.  Seemed to be.  Stoic, but I would consider that
23   to be appropriate.
24       Q.  Did you see Curt at all in between when he

---

**52**

1    called you on the 14th and the funeral?
2        A.  I have no specific recollection of an encounter
3    with him between those times.  It certainly -- we would
4    have given him a lot of slack in terms of needing to be
5    at the office and my best recollection is that I did not
6    see him between the morning of February 14th, and the
7    funeral.  I may be mistaken but that's my best
8    recollection.
9        Q.  The information that you started to receive
10   about Curt smelling like alcohol, did you first start
11   hearing those issues before Corey died?
12       A.  Yes.  Let me take that back.  Trying to recall
13   the year of her death, if you could help me with that.
14       Q.  She died in 2006.
15       A.  In 2006.  I can't tell you specifically, so I
16   am going to back off of that answer.  I may have, I may
17   not have.  Certainly within a year or so thereafter, yes.
18       Q.  Are you aware that after Cory died that Curt
19   married someone named Erica Gomez?
20       A.  Yes.
21       Q.  Did you know Ms. Gomez before?
22       A.  No.  I had met her at a social gathering, but I
23   had no acquaintance with her whatsoever, prior to that.
24       Q.  Did you meet her at a social gathering before

---

Transcript of Jon Barnard
Conducted on October 16, 2018

53

1 she and Curt were together?
2    A.  No, they were together.
3    Q.  Were you ever -- other than information you
4 have might have learned in connection with the
5 investigation into Cory's death, were you aware of before
6 about any problems in Curt's marriage to Erica?
7    A.  I am sorry.  Let me ask you to repeat that only
8 to give the timeframe.
9    Q.  Let me restate the question in a better way.
10 Other than information you might have learned in the
11 course of the investigation into Cory's death prior to
12 that, so prior to that investigation were you ever made
13 aware of any problems in Curt's marriage to Erica?
14    A.  No, not that I am aware of or can recall.
15    Q.  And did, in the context of the issues that you
16 have described about Curt's performance as a State's
17 Attorney, was anything having to do with Erica ever
18 connected to those complaints?
19    A.  Only in the sense that, again, water cooler
20 conversation stuff or casual conversations outside of the
21 office with non State's Attorney personnel, was to the
22 affect that the marriage of Curtis to Erica was one of a
23 partying life-style.  Which to me would be consistent
24 with the kinds of problems that I discussed, but that is

54

1 all that I could tell you.
2    Q.  Have you ever talked to Erica Gomez?
3    A.  About this case or any of the investigation?
4    Q.  About anything at all.
5    A.  Sure, but I — I couldn't tell you what that
6 was about if you held a gun to my head.
7    Q.  Did you — have you ever talked with her at any
8 -- well, let me withdraw that question.
9        Is it your general understanding that
10 there was some initial investigation into Cory Lovelace's
11 death and then that investigation either stopped or was
12 dormant for some period of time and then the case was
13 reinvestigated?
14    A.  Yes.
15    Q.  So I want to talk to you first about that
16 initial investigation which I am going to call the first
17 investigation.
18        Do you understand what I mean by that?
19    A.  I do — and I want to talk to you about going
20 to the US coffee department.
21    MS. THOMPSON:  Let's take a break.
22 BY MS. THOMPSON:
23    Q.  Before we broke we were talking about the first
24 investigation into Cory's death?

55

1    A.  Yes.
2    Q.  Were you involved at all in that investigation?
3    A.  I would say only indirectly, in that my primary
4 involvement would have been to screen, receive and review
5 the autopsy protocol prepared by Dr. Bowman.  I was
6 verbally briefed with regard to the circumstances of
7 Cory's death and because there was no obvious sign of or
8 cause of death everything awaited the outcome of the
9 autopsy in terms of triage for an investigation.
10    Q.  Who verbally briefed you about the
11 circumstances of her death?
12    A.  The on-the-scene officers.
13    Q.  Was it Jeff Baird who briefed you?
14    A.  May or may not have been.  There were several
15 officers there.  I know Jeff Baird was among them,
16 B-a-i-r-d, but it would have been the on-scene officers.
17    Q.  Did you believe at the time of the first
18 investigation that your office had a conflict of interest
19 in -- in any investigation having to do with Cory's
20 death?
21    A.  I believe that there could depending upon the
22 outcome of the autopsy, be the potential for a conflict
23 of interest.
24        I did not believe that there was any

56

1 reason to be concerned about a conflict of interest prior
2 to that time because we had no information about the
3 cause of death.
4        And I presumed and certainly I guess in a
5 personal way, hoped that it was death by natural causes.
6    Q.  Did you talk with Dr. Bowman either before or
7 after the autopsy about her work on the case?
8    A.  I did.
9    Q.  When did you talk with her?
10    A.  Probably within hours of receiving the autopsy
11 protocol.
12    Q.  Meaning after the autopsy was done?
13    A.  I refer to the autopsy protocol, it's the
14 autopsy report.
15    Q.  Did you talk with her at all before she did the
16 autopsy?
17    A.  No.
18    Q.  Okay.  And what do you remember about your
19 conversation after you got the protocol?
20    A.  I — well, I asked her questions about some
21 things in the autopsy report or protocol that were of
22 significant concern to me.
23    Q.  What did you ask her about?
24    A.  By way of back drop, the ultimate opinion or

Transcript of Jon Barnard
Conducted on October 16, 2018

15 (57 to 60)

57

1 conclusion of Dr. Bowman was that the cause of death was
2 undetermined.
3    Q.   Yet there were two specific references in Dr.
4 Bowman's protocol or report, that implied suspicion on
5 her part at least to me that there was the potential for
6 if not, the probability of another explanation or a
7 specific explanation, that again implied foul play.
8        I asked her about those two findings,
9 attempting to get some reconciliation between those two
10 findings in her ultimate opinion because they did not
11 seem to match.  And, what do you remember her telling you
12 about those things you had concerns about?
13   A.   Well, again, to go back a step, I expressed
14 concern to her about what she noted to be what appeared
15 to be compression wounds on the inside of the mouth and
16 if I recall correctly, she even used the term of concern
17 to me was compression wounds.
18       And she also noted perhaps, expressed
19 concern about the condition of the body being
20 inconsistent with the timeline reported by the deceased's
21 husband.
22   Q.   What did you discuss with her about the
23 compression wound?
24   A.   I discussed essentially, both of them jointly,

58

1 in the sense of the question of — something like this,
2 Doctor, what are you trying to say to me, because on the
3 one hand you are saying cause of death undetermined, but
4 you make specific note and seem to express some concern
5 or suspicion about the existence of these compression
6 wounds and the condition of the body, be inconsistent
7 with the timeline given by Curtis.
8        That was my question and her response was
9 in substance, well, I have concerns about these things,
10 but without more input from the investigators, my opinion
11 is that the cause of death is undetermined.
12       I don't know that I inquired of her any
13 further, or pushed her any further about what is it that
14 — what more information could they provide you, but I
15 sensed a feeling on her part or a position on her part or
16 an attitude on her part, that this case is closed.
17 That's my opinion, period.
18   Q.   Was the sense you had about that, was that
19 based on how she was talking to you about these issues?
20   A.   Yes.
21   Q.   Did you talk with anyone in the Quincy Police
22 Department about what Bilman (phonetic) had relayed to
23 you?
24   A.   I am certain that I would have because they

59

1 would have received a copy of the autopsy report, for
2 protocol as well.
3    Q.   Did you review the autopsy protocol before your
4 dep today?
5    A.   No.
6    Q.   Do you have any memory of what if anything you
7 discussed with QPD about Dr. Bowman's report?
8    A.   In a general sense, yes.
9    Q.   What is your general memory of that?
10   A.   I cannot give you a specific time or place or
11 conversation partner, if you will, but I can tell you
12 that I expressed to them my opinion based upon, let's
13 see — approximately 31 plus years of litigation and
14 trial work primarily dealing with medical experts.
15       That if the medical expert who is actually
16 treated the patient or in the case of an autopsy actually
17 performed the autopsy has one opinion, and the opinion of
18 some reviewing expert has another opinion.
19       That in my experience the opinion of the
20 person who laid hands on the patient prevails.  And that,
21 as concerning and suspicious as I found it to be, that
22 the opinion of Dr. Bowman foreclosed any realistic chance
23 for a meaningful or successful prosecution because in
24 substance, if the opinion of the person who did the

60

1 autopsy was cause of death undetermined, that is, all
2 other things being equal, an immovable object —
3 obstacle, to a prosecution.
4    Q.   The general substance that you just described,
5 was that information you conveyed to the people doing the
6 first investigation?
7    A.   I believe so, yes.  Again in a very general
8 way, this is the answer, yes.
9    Q.   Okay.  Did you ever tell the people involved in
10 the first investigation that they ought to do -- you
11 know, more investigation to try to give more information
12 to Dr. Bowman?
13   A.   My information, by the time I had talked with
14 Dr. Bowman, satisfied me, that the investigation to that
15 point was appropriate.  They had spoken with Curtis.
16       They had spoken with, I believe, the
17 children, spoken with anyone who knew about them
18 including, I think Cory's mom and dad.
19       And that it was one of the reasons I was a
20 bit baffled by Dr. Bowman's statement to me on the phone
21 because number one, it seemed to me that investigation
22 did touch all the appropriate basis based on information
23 known at that time.
24       And that, number two, if there was

Transcript of Jon Barnard
Conducted on October 16, 2018

16 (61 to 64)

61

1 something more that needed to be done Dr. Bowman should
2 certainly have reached out and said you may want to
3 consider this or that, something else.
4      Q.   As the State's Attorney, if at that point,
5 meaning at the time you are having this conversation with
6 Dr. Bowman, after the autopsy report, if at that point
7 you had determined that something else should be done
8 investigative in the case, is that something that you
9 could have made happen if you wanted to?
10     A.   Yes.  I think I could have ordered that, I
11 think that would have triggered serious consideration at
12 that point, whether or not to file a motion for the
13 appointment of a special prosecutor, certainly.
14          For instance if Dr. Bowman had expressed
15 an opinion that this -- her death was by means of
16 suffocation, or some other untoward means, I would have
17 at that point, immediately filed a motion for the
18 appointment of a special prosecutor.
19          I think that by the time it got to me and
20 by the time I had the conversation with Dr. Bowman, those
21 alternate avenues had been foreclosed.
22     Q.   Why had they been foreclosed?
23     A.   Well, number one, as mentioned, based on the
24 information I had, the investigation into the

62

1 circumstances of her death was appropriate and thorough.
2          And, number 2 if it wasn't thorough in her
3 mind, it seemed logical, reasonable and appropriate.  And
4 in fact, desirable for her to say what she would -- what
5 other information she would like to have.
6      Q.   I understand that you are expressing that at
7 this point you had concerns about what Dr. Bowman had
8 determined or what her autopsy had uncovered.
9          Even with those concerns, at the point
10 that you talked to Dr. Bowman, did you see anything else
11 that could be done to investigate the case at that point?
12     A.   No.  Meaningfully, no.  I suppose if I sat here
13 and thought long enough about it, I could think up some
14 things, but in terms of my day to day experience with
15 regard to criminal investigation, I was satisfied that
16 all appropriate investigation had been done.  And
17 literally what everyone was waiting for was what the
18 autopsy report is going to say.
19     Q.   Did you have any conversations with anybody
20 with the Quincy Police Department about terminating or
21 stopping their investigation at that point?
22     A.   No. That's -- that's really primarily their
23 call.  The prosecutor can only suggest things, and we do
24 on occasion, but they are the ones closer to the

63

1 situation and so that was something I did not feel the
2 need to recommend in this case.
3      Q.   And if at that point, after you talked to Dr.
4 Bowman, you believe there was things that should be done
5 in the investigation.  I understand you're saying it's a
6 QPD investigation, not your's, but if you had made those
7 recommendations whatever they might have been to QPD, is
8 your expectation that they would have, you know, done the
9 additional investigative things you had asked them to do?
10     A.   I think in let's say 90% of the cases, they
11 would.  I have had occasion where they -- I have made
12 requests or recommendations for additional investigation
13 or may have politely, but firmly declined to do that, and
14 have given me their reasons, but most of the time they
15 would.
16     Q.   And would you expect that if QPD disagreed with
17 you about whatever your recommendations might be in such
18 a situation that they would at least talk to you about
19 why there was a disagreement?
20     A.   Sure.
21     Q.   They wouldn't just ignore you?
22     A.   They would and they have.
23     Q.   At some point then, there was a reinvestigation
24 of Cory Lovelace's accident, is that right?

64

1      A.   Yes.
2      Q.   I want to ask you then about the
3 reinvestigation.  At what point, did you first learn that
4 there was going to be some reinvestigation into how Cory
5 died?
6      A.   When Detective Adam Gibson came into my office
7 unannounced, which is not uncommon, my door's open and
8 people just kind of come in and out.
9      Q.   Did you know Detective Gibson before he came
10 into your office unannounced?
11     A.   Yes.
12     Q.   You worked with him on other cases?
13     A.   Yes.
14     Q.   And did you have any opinions about his
15 abilities as a detective?
16     A.   Yes.
17     Q.   At the point that he came in?
18     A.   Yes.
19     Q.   What were your opinions?
20     A.   He was a thorough, savvy, tenacious police
21 officer and I say that in a very complimentary way
22 because law enforcement officers like all of us are a
23 population.
24          Probably all of us have bell curve of some

Transcript of Jon Barnard

Conducted on October 16, 2018

---

**65**

1 sort. There are some that are not so good, there are
2 some that are really good.
3    Q. Gibson was really good?
4    A. He was at that end of the spectrum.
5    Q. Do you know when it is he came into your office
6 unannounced?
7    A. Sometime in 2014.
8    Q. All right --
9    A. As I -- kind of backtrack from the -- I will
10 call it the time of the filing of the motion for the
11 appointment of a special prosecutor that I go backwards
12 in time from there so I said some time in 2014.
13    Q. What do you remember about your first
14 conversation with Detective Gibson about this case?
15    A. He came into my office, and advised me that he
16 was reinvestigating or looking into the circumstances of
17 Cory Lovelace's death and I said, something to the affect
18 why.
19         And I don't recall if he told me that he
20 had been assigned to look at it or had volunteered to
21 look at it, I don't recall, but I do recall what
22 precipitated his interest.
23    Q. What precipitated his interest?
24    A. Quincy Police Department had received

---

**66**

1 information that a number -- well, that Dr. Jessica
2 Bowman, had been terminated from her position at Memorial
3 Medical Center in Springfield, Illinois, which was the
4 regional autopsy service, if you will, for law
5 enforcement agencies in Central Illinois.
6         And he further relayed to me that she had
7 been terminated because it had been found that she had
8 either misstated or altered or manipulated again, picked
9 a term, results in certain autopsies, providing
10 conclusions of either accidental death or cause of death
11 undetermined when it was later and reliably shown to have
12 been the result of foul play.
13         That a number of these cases had been
14 investigated after complaints were made about this
15 pattern by Dr. Bowman, and that as a result of that,
16 there were prosecutions that went forward with resulting
17 convictions and ultimately that -- because of those
18 altered or changed or incomplete autopsy reports by her,
19 she was terminated.
20         Detective Gibson was concerned over at
21 least looking into the possibility that the autopsy
22 protocol prepared by Dr. Bowman on Cory Lovelace fit that
23 description or pattern.
24    Q. Was that something, the issues with Dr. Bowman,

---

**67**

1 something that you talked about with Gibson in the first
2 meeting that you had with him?
3    A. I believe to some extent we had a discussion
4 about that because that would have been a major
5 development that would change the investigative picture,
6 if you will.
7    Q. So is it your belief that you talked about Dr.
8 Bowman in the first meeting?
9    A. I believe so, but that's a general recollection
10 and it's possible that might not have come up until
11 shortly thereafter in other words he might have come in
12 and said I am looking into it.
13         I just want you to know I am going into
14 the file room, I am reading the reports and that might
15 have been the end of it.
16         Except for me to say, that if it -- if the
17 review of the initial investigation takes a turn toward a
18 criminal investigation then I am going to have to
19 withdraw.
20    Q. Is that -- to make sure I understand, is that
21 something you talked about with Detective Gibson in that
22 first meeting?
23    A. Likely I did, because I would have alerted him
24 that, for instance, in the scenario where he came in and

---

**68**

1 said, just want you to know I am looking into the Cory
2 Lovelace death.
3         I would have said to him, that's fine, but
4 just as a heads up, depending on where you go with this
5 and how this goes, I cannot be involved in the
6 investigation because I will be a witness in the case
7 because of my having taken the phone call from Curtis and
8 the circumstance of it.
9         So, my best recollection is I would have
10 alerted him right from the get go.
11    Q. Did you ever give Detective Gibson, or anyone
12 else in the Quincy Police Department, any advice or
13 direction about how to undertake any reinvestigation?
14    A. What I -- in my conversations discussed was
15 only from a perspective of experience. And that would --
16 that discussion would have gone something like this:
17 Number 1: Have at it, you do whatever investigation you
18 think is appropriate.
19         Number two, if it develops into a sharp
20 focus on Curtis Lovelace, then, I cannot be involved.
21         Number three, I can tell you why I didn't
22 go forward and that was the opinion of Dr. Bowman and
23 that was in the autopsy report of protocol several years
24 earlier.

---

Transcript of Jon Barnard

Conducted on October 16, 2018

69

1        And that no matter what you do, you're
2   going to ultimately have to confront the problem of Dr.
3   Bowman being the doctor who laid hands on the patient and
4   the dynamics that I discussed with you earlier. That I
5   thought that would be a very difficult hill to climb, if
6   you will, with any -- with any trial.
7        Q.   Did you make clear to Detective Gibson from the
8   outset, that if this case -- if Curt Lovelace were to be
9   prosecuted for this case that your agency, the Adams
10  County State's Attorneys' Office would not be the
11  prosecuting agency?
12       A.   Absolutely. That's a no brainer.
13       Q.   Do you believe that he knew that from the
14  outset?
15       A.   You have to ask him that.
16       Q.   When you told Gibson that you were a witness,
17  was it your sense that that was something he knew before
18  you disclosed it or was that something you were revealing
19  to him?
20       A.   I couldn't tell you because the answer to that
21  would be whether or not he had reviewed information that
22  related to my taking that phone call. I don't know
23  whether he knew that or didn't know that.
24       If he didn't know that, I certainly told

70

1   him right from the get go, that if this becomes a
2   criminal investigation of Curtis Lovelace, this office
3   cannot be involved because I guarantee you I am going to
4   be a witness.
5        Q.   Did you ever talk with anyone else in the
6   Quincy Police Department about the investigation at any
7   point between when Detective Gibson came to your office
8   when Curt was arrested?
9        A.   Other than an informal conversation with his
10  supervisor, which would be the head of the investigative
11  division or the Chief of Police, no.
12       Q.   What informal conversation or conversations, do
13  you remember having with the Chief of Police, I assume
14  you are talking about Chief Kokley (phonetic) here?
15       A.   Yes. I couldn't tell you that there was or
16  wasn't one but if we did discuss it, it would have only
17  been in very general acknowledging terms such as, looks
18  like Detective Gibson's looking into Cory Lovelace's
19  death yet, see where that goes, that kind of
20  conversation.
21       Q.   When you are talking about -- with his
22  supervisor, are you talking about Lieutenant Dryer?
23       A.   Would have been either Ron Dryer or John
24  Summers. There are -- was a transition at some point and

71

1   I don't recall when that was or when those
2   responsibilities were changed. Ron Dryer retired at some
3   point in time.
4        Q.   Do you remember any different kind of
5   conversation with either, Dryer or Summers other than the
6   kind of conversation you have described might have
7   occurred with the chief?
8        A.   No.
9        Q.   How many times did you meet with -- and I am
10  talking about meeting in person with Detective Gibson
11  about this reinvestigation?
12       A.   When you say meetings, I don't want you to
13  confuse meeting with a planned conference with him. From
14  time to time, he would come into my office, unannounced
15  and let me know what was going on with the investigation.
16       There were several of those, perhaps a
17  half dozen or more, before the special prosecutor was
18  appointed and even after that, certainly I was curious
19  about the status of the case.
20       Q.   Did you ever have any planned meeting with
21  Detective Gibson, meaning a meeting where you knew he was
22  going to be stopping by or where you knew you were going
23  to be stopping by to meet?
24       A.   Other than the following two categories, no. He

72

1   did come to our office and present me with a copy of a
2   proposed complaint for search warrant, for Comcast
3   relating to a complaint made to him by Erica Gomez
4   Lovelace.
5        That her personal information had been
6   used without permission by Curtis Lovelace. And I
7   believe that he wanted me to review that and I made time
8   to do that and even I think commented on some minor
9   changes.
10       Q.   The other category would have been regarding
11  the timing of the appointment special prosecutor?
12       A.   Outside of those more formal kinds of meetings,
13  anything where he and I met would have been happenstance
14  unannounced.
15       Q.   Did you talk on the phone with Detective Gibson
16  at all about this case?
17       A.   I'm sure that I did.
18       Q.   Do you know how many times?
19       A.   Infrequently. And again it would have dealt
20  with those subjects that -- that I just mentioned, the
21  Gomez identity theft search warrant and the timing of the
22  appointment of the special prosecutor.
23       They would have been infrequent and not
24  involving direction or recommendation regarding the

Transcript of Jon Barnard
Conducted on October 16, 2018

---

**73**

1  investigation.
2      Q.   As to the special prosecutor, do I have this
3  right, then, that it was your assessment that if there
4  was a point in the investigation where Curtis Lovelace
5  was the focus, that that would be the point at which your
6  office had a conflict?
7      A.   I think in a general way, that's fair.  You
8  might put a more fine point on that by saying the time at
9  which evidence was developed that he became a suspect or
10 a person of interest, we would have to bow out.
11     Q.   And I want to put a fine point on it.  Was it
12 your belief that at whatever point Curt became a suspect
13 in this case, that that is the point where your office
14 would have a conflict?
15     A.   I think that's fair, yes.
16     Q.   At what point in this investigation, did Curt
17 become a suspect?
18 MS. EMERY: Object to speculation.
19 MS. THOMPSON:  Let me withdraw.
20 BY MS. THOMPSON:
21     Q.   At what point in time did you determine that
22 your office had a conflict of interest with respect to
23 this investigation?
24     A.   Well, when officer — Detective Gibson walked

**74**

1  into my office and said he was revisiting the
2  circumstances of the death of Cory Lovelace, I alerted
3  him to the fact that that's fine, and do what you need to
4  do.
5          I certainly find it interesting what you
6  shared with me about Dr. Bowman, although that might not
7  have occurred in our first meeting, but Detective Gibson,
8  this office cannot be involved.
9          And if you believe you have sufficient
10 information to warrant formal prosecution, then this
11 office cannot be involved and I will file for — excuse
12 me, the appointment of the special prosecutor.
13     Q.   Was there a point where Detective Gibson came
14 to you and said that he believed he had sufficient
15 information to charge Mr. Lovelace, and why don't you
16 wait to answer that question until you have taken care of
17 what you need to do.
18          The question I think I asked you before
19 you sat down, was whether there was a particular point
20 where Detective Gibson came to you and said that he
21 believed he had sufficient information to prosecute
22 Curtis Lovelace?
23     A.   Yes.
24     Q.   When was that?

**75**

1      A.   I can't give you a date.  I can give you an
2  approximate timeframe.  If I were to look at the
3  documents, particularly the e-mails or the motion for the
4  appointment of a special prosecutor, however, whenever
5  that was, it would have coincided with his report to me,
6  that he had submitted the records of the autopsy to one
7  or perhaps more forensic pathologists who were of the
8  opinion that Cory Lovelace was suffocated.
9      Q.   Did you seek a special prosecutor in this case,
10 around the time that Mr. Gibson (sic) told you that he
11 had submitted -- let me start that question again.
12          Let me ask you something different.  Did
13 you ever tell any employee of the State's Attorney's
14 office that they could not talk to the defense in this
15 case without your permission?
16     A.   When you say "the defense in that case", I am
17 going to have to ask you to give me a timeframe so that I
18 can hopefully give you a better answer.
19     Q.   I appreciate that.  Did you ever at any point,
20 tell any employee of the State's Attorney's Office that
21 they should not talk to anybody representing Curtis
22 Lovelace's defense in either trial?
23     A.   I have no recollection of ever giving that kind
24 of blanket statement.  It wouldn't surprise me if I did,

**76**

1  but it just doesn't sound like me.
2      Q.   When you said -- did you say it wouldn't have
3  surprised you if you did?
4      A.   No, because that's kind of a garden variety
5  admonition you would give — you would give to someone in
6  a pending case, but I have no recollection of ever
7  admonishing my staff, do not speak with any lawyer or
8  investigator representing Curtis Lovelace.  I have no
9  recollection of that.  I could be wrong, but —
10     Q.   Jennifer Cifaldi, for instance, was a potential
11 witness in this case, because of information that she
12 potentially had about Curt's reaction to not getting that
13 public defender job, correct?
14     A.   Uh-huh, yes.  I believe she was one of the
15 persons who actually witnessed that behavior.
16     Q.   Would it have been appropriate for you to tell
17 Ms. Cifaldi not to talk to members of the defense?
18 MS. EMERY:  Object to the form.  Go ahead you can
19 answer.
20 THE WITNESS:  It would have been appropriate for me
21 to tell her that.  I don't recall whether or not I did
22 tell her that.  Again, that's within my discretion and
23 it's not inappropriate advice.
24     Q.   Did you ever talk with Dr. Bowman about this

Transcript of Jon Barnard

20 (77 to 80)

Conducted on October 16, 2018

---

**77**

1 case after their reinvestigation had begun?

2     A. No.

3     Q. Did you ever talk with any other pathologist,

4 yourself about this case after the reinvestigation had

5 begun?

6     A. Yes.

7     Q. Who did you talk to?

8     A. Dr. Michael, B-a-d-e-n.

9     Q. When did you talk with Dr. Baden?

10     A. When he appeared in our office for his

11 testimony at the first trial. I also spoke, briefly with

12 — and I apologize, I don't recall her name but the

13 forensic pathologist from the St. Louis Medical Examiners

14 Office.

15     Q. Was that Jane Turner?

16     A. I believe so.

17     Q. Did you talk with her also when she came to

18 testify?

19     A. Yes.

20     Q. Did you talk with her any other times?

21     A. No.

22     Q. When you talked Dr. Boden when he came to your

23 office, did you talk with him actually about the

24 substance of his opinions in this case?

**78**

1     A. No.

2     Q. Did you ever talk with Dr. Turner about the

3 substance of her opinions in this case?

4     A. No.

5     Q. Did you ever talk with Dr. Scott Denton about

6 anything having to do with Corey Lovelace?

7     A. I don't believe so. I say I don't believe so

8 because Dr. Denton has worked with the Adams County

9 State's Attorney's office in a number of cases. He has

10 testified on behalf of the prosecution in a number of

11 trials that I have handled, first degree murder trials.

12     Is it possible that a discussion of Cory

13 Lovelace could have come up casually or obliquely in the

14 context of his preparation for other cases, yep. Do I

15 recall anything specific, none.

16     Q. Do you have any memory of having any

17 substantive conversation with Dr. Denton about anything

18 having to do with Cory Lovelace?

19     A. No.

20     Q. I am going to show you what's been marked as

21 exhibits three and four. Exhibit 3, is a one page

22 document that is date stamped AC44 and Exhibit 4 is a one

23 page document that's date stamped AC54. I will ask you

24 just to look at these two documents and to let me know

**79**

1 when you're done.

2     A. Okay. Hold on one second, I want to make sure.

3 Okay.

4     Q. Looking at either exhibit 3 or 4, refresh your

5 memory at all about any timeframe about when you told

6 Detective Gibson that there needed to be a special

7 prosecutor in this case?

8     A. Sure. It puts a sharper focus on it.

9     Q. All right. And what additional focus does

10 looking at these documents give you in that respect?

11     A. It appears that on February 24th of 2014, I

12 advised Detective Gibson that depending upon the opinion

13 expressed by Dr. Denton as to the cause of death based on

14 his review of medical records, I would need to apply for

15 the appointment of the special prosecutor.

16     Q. Did Detective Gibson ever tell you that he got

17 an incriminating opinion from Dr. Denton?

18     A. I believe not only told me that, but I believe

19 Dr. Denton issued a report to that affect.

20     Q. When did Detective Gibson tell you that he had

21 gotten an incriminating opinion from Dr. Denton?

22     A. Detective Gibson's e-mails to me of

23 February 24th at 12:20 p.m. he indicated that he was

24 waiting on the formal response of Dr. Denton.

**80**

1     That could mean one of two things, either

2 that he did not know what Dr. Denton's opinion was or

3 that Dr. Denton had possibly told him verbally that his

4 opinion was suffocation.

5     I can't tell you which of those two is the

6 case, but I obviously knew that he had referred the

7 records to Dr. Denton.

8     Q. Do you have any additional memory besides what

9 you have just described about any conversations that you

10 had with Detective Gibson about Dr. Denton and his

11 opinions in this case?

12     A. I have a general recollection that he mentioned

13 to me that he was going to send the records to Dr. Denton

14 which would not have again surprised me because Dr.

15 Denton was, by that time, 2014, the go to forensic

16 pathologist for all unknown or suspicious causes of

17 death.

18     So I am sure that we discussed it, or he

19 mentioned his intent to do that.

20     Q. Is there anything else you can remember as you

21 sit here about conversations that you had with Detective

22 Gibson about Dr. Denton and this case?

23     A. No, other than that he was going to send the

24 records to Dr. Denton, and ultimately he obviously got an

Transcript of Jon Barnard
Conducted on October 16, 2018

21 (81 to 84)

---

**81**

1  opinion from Dr. Denton.
2      Q.  Did you ever believe that there was something
3  improper that Detective Gibson was doing in getting the
4  subpoena for the Comcast records related to the issues
5  that you mentioned there were about Erica Gomez?
6      A.  Did I believe there was anything inappropriate
7  that he had done?
8      Q.  Or anything inappropriate that he did period in
9  the way that he got a subpoena for Erica Gomez search
10 warrant?
11     A.  Well, first of all, a search warrant does not
12 involve a subpoena, a search warrant is a search warrant.
13 It's a Court order.
14         And, he came to me with a complaint and
15 proposed search warrant.  I reviewed it, made some
16 modifications to it and told him that I or a member of
17 our staff would present that to the Court.
18     Q.  Was it your understanding ever that he was
19 using a Grand Jury subpoena process to get information
20 about that issue with involving Erica Gomez and Comcast?
21     A.  I don't recall whether or not he did, but I do
22 know that he obtained a search warrant.
23     Q.  And in the course of talking with him about
24 that issue, did he give you any information about what

**82**

1  information Erica Gomez might have related to Curt
2  Lovelace, anything that Curt did that was illegal or
3  improper in her view?
4      A.  I am going to ask the court reporter to read
5  that back.  I apologize to you, but I just kind of
6  drifted off the middle of --
7      MS. THOMPSON: Let me reask the question.
8  BY MS. THOMPSON:
9      Q.  During the course of this entire
10 reinvestigation, did Detective Gibson ever tell you about
11 any information he had gotten from Erica Gomez about
12 things that Erica Gomez thought Curt had done that were
13 bad or illegal?
14     A.  Well, I knew that Erica Gomez had reported to
15 Detective Gibson that she felt that her personal
16 information was being used without authority and based on
17 the information that he related to me, he felt a warrant
18 was appropriate.
19         And I assisted him in that process, and
20 so, yes, she reported to me that Erica Gomez had
21 complained about certain behaviors of Curtis Lovelace.
22     Q.  Anything else besides what you just described
23 that he told you about, you know, things Erica Gomez had
24 to say?

**83**

1      A.  Somewhere along the line, I recall from the
2  source I cannot tell you, but that Erica Gomez had
3  concerns about perhaps being poisoned by Curtis Lovelace.
4      Q.  Anything else you remember in terms of things
5  Erica Gomez told Gibson that anybody -- that Gibson in
6  turn relayed to you?
7      A.  I recall vaguely, a reference by Detective
8  Gibson having asked her whether or not he ever admitted
9  to killing Cory Lovelace and the answer being
10 essentially, no, no direct admission.
11     Q.  When did you hear about that issue?
12     A.  I couldn't tell you.  It could have been before
13 the first trial and it could have between the first trial
14 and the second trial.
15     Q.  If there was information in Detective Gibson's
16 materials that indicates that he interviewed you
17 on January 6th of 2014, about what you remembered about the
18 call from Curt on February 14th of 2006.  Would that date
19 sound right to you in terms of when you might have had a
20 conversation about that --
21     A.  It's generally consistent with the timeframe.
22     Q.  Do you remember ever talking with Detective
23 Gibson about this issue with Curt not getting the PD job
24 and being upset about it?

**84**

1      A.  I don't recall ever telling Detective Gibson
2  about the outburst or alleged outburst because I didn't
3  witness it.
4          He may have inferred from my conversation
5  with him or conversation with someone else that I did
6  witness it, but I can tell you with comfort, I did not.
7      Q.  Can you say with comfort that you never
8  conveyed to Detective Gibson that you were a witness to
9  that?
10     A.  I can tell you with comfort that I did not
11 relate to him that I was a witness to that.  I may have
12 related to him what had been shared with me by other
13 members of my staff.
14         But, because I did not witness it I would
15 not have told him that I did.  If he perceived that I
16 did, he misread me.
17     Q.  The county ultimately paid some of the costs
18 associated with the trials against Curt, is that right?
19     A.  Yes.
20     Q.  And I take it that you had some involvement in
21 arranging for the payment to certain witnesses, right?
22     A.  Yes.
23     Q.  Have you seen some materials that indicate you
24 basically got a bill from the State Appellate Prosecutor

Transcript of Jon Barnard                          22 (85 to 88)
Conducted on October 16, 2018

85

1  about some of those costs?
2      A.  Yes.
3      Q.  Did you have any involvement in procuring
4  witnesses for either of the trials against Curt other
5  than footing the portion of the bill that was the
6  county's?
7      A.  No.
8      Q.  I am close to done here.  I've got a few
9  additional things.  You have got documents in front of
10  you.  That's document Exhibit 5.  That should be the
11  document that has AC41 as the date stamp.
12          This is an e-mail from Detective Gibson,
13  you and some other people updating you about an e-mail he
14  got from Dr. Denton, is that right?
15      A.  Yes, it appears to be.
16      Q.  Do you know why you were cc'd on this e-mail?
17      A.  No.  It could have been as a courtesy, it could
18  have been as a result of his sense that it was
19  appropriate to keep me posted, but again, I think you
20  would have to ask Adam Gibson for the definitive answer
21  to that question.
22      Q.  Did you ever direct Detective Gibson to keep
23  you updated about any specific developments in his
24  investigation?

86

1      A.  Only to the extent that again, if it appeared
2  that there was evidence that pointed to Curtis Lovelace
3  as a suspect, and that Quincy Police Department wanted to
4  submit that information for prosecution.  I would at that
5  point need to bow out.
6      Q.  Did you ever have any conversations with Jim
7  Keller, about anything having to do with Cory Lovelace's
8  death?
9      A.  I have a vague recollection of having a
10  conversation with Jim Keller within a couple of days
11  after the death of Cory Lovelace.  Because it's vague, I
12  can't tell you that it was within a couple of days or a
13  couple of years but, I just – have a vague recollection
14  of talking with him about his being on the scene.
15      Q.  Did you ever talk with Keller again after that?
16      A.  No.
17      Q.  And obviously about that case?
18      A.  Right.  I think I had a grand total of one
19  conversation with him about the – his activities on the
20  scene, his observations on the scene.
21      Q.  Do you remember what he told you about his
22  observations on the scene?
23      A.  He told me that she appeared to be in full
24  rigor mortis as best I recall.

87

1      Q.  Did you make any notes or records about what it
2  is that Keller told you?
3      A.  No.
4      Q.  Did Detective Gibson ever tell you what, if
5  any, role Keller was playing in the reinvestigation?
6      A.  I assumed that because he was the
7  representative of the coroner's office on the scene that
8  he was a potential witness, but that was an assumption,
9  and I have no specific recollection of Detective Gibson
10  ever defining whether or not he did or what that role
11  would be.
12      Q.  At the time you had your first conversation
13  with Detective Gibson or he came into your office
14  unannounced, had you been aware before that conversation
15  that Dr. Bowman had been let go from her job?
16      A.  No.  That was news to me.
17      Q.  And are you aware -- well, let me ask you this:
18  You were involved in some way or at least notified some
19  way about some reinvestigation that Detective Gibson did
20  in the Linda Booth case?
21      A.  Yes.
22      Q.  Are you aware of any other cases of Dr. Bowman
23  that either your office reinvestigated or that anyone QPD
24  investigated?

88

1      A.  Those are the only two of which I am aware that
2  involved Dr. Bowman's having performed an autopsy that
3  were the subject of revisit.
4      Q.  Are you aware of any effort by either anyone in
5  QPD or anyone in your office to evaluate whether there
6  were other cases of Dr. Bowman's office that should be
7  relooked at?
8      A.  No, sir.  Let's put it this way, those were the
9  two that popped up to the surface.  Dr. Bowman did other
10  autopsies, but according to the information that I
11  received from Quincy Police Department, the Adams County
12  Sheriffs Department and perhaps the State Police that –
13  that raised concern about the accuracy of Dr. Bowman's
14  autopsy.
15      Q.  Do you know who it is that made a decision to
16  relook into the Booth case?
17      A.  I recall talking with either John Summers or
18  Ron Dryer who would have been the Chief of Investigations
19  in the Quincy Police Department about the Linda Booth
20  case.
21          And my general recollection is that
22  because of the concerns developed in the Lovelace case,
23  the Quincy Police Department was looking into other
24  deaths where an autopsy had been performed by Dr. Bowman.

Transcript of Jon Barnard                    23 (89 to 92)
Conducted on October 16, 2018

89

1        I am certain that I also would have talked
2  with Detective Gibson about that, again because of his
3  already ongoing involvement in the Lovelace
4  investigation.
5      Q.  Was it your understanding that somebody in QPD
6  made the decision to look into the Booth case?
7      A.  Yes.
8      Q.  Did anyone either in QPD or your office look
9  into anybody who had been convicted in a case where Dr.
10 Bowman did the autopsy where that case ought to be
11 potentially reevaluated?
12     A.  I was advised and have heard from several
13 sources, I can't presently recall, that there were
14 several autopsies performed by Dr. Bowman that were the
15 subject of opinions that surprised and concerned
16 investigators, that were the subject of later review and
17 ultimately at least one case, the subject of a successful
18 prosecution for a homicide.
19        In fact, I recall that one specifically
20 because -- or at least in more detail because Dr. Bowman,
21 had opined that the cause of death was an infectious
22 process when there was other evidence of foul play.
23     Q.  What case was that?
24     A.  I couldn't give you a name.  I believe they

90

1  have it -- it was Sangamon County.  I think it was a
2  Sangamon County prosecution.
3      Q.  So as to Adams County, are you aware of any
4  evidence by either QPD or your office to look at any
5  other cases that Dr. Bowman did the autopsy on besides
6  the Lovelace case and the Booth case?
7      A.  I am not aware of any others.
8      Q.  All right.  I want to have you look at
9  Exhibit 6 which should be in front of you and that is
10 date stamped EC90.  If you just want to take a quick look
11 at this, I have a question for you about it.
12     A.  Okay.
13     Q.  Do you ever remember talking to Carol Nichols
14 about anything having to do with Cory or Curt?
15     A.  I may have, but only because Carol Nichols is a
16 social friend of my wife and myself.  And, in fact, my
17 wife was in a yoga class that Carol Nichols instructed.
18        That would have caused us to cross paths
19 in social encounters where we may have talked about it
20 briefly.
21     Q.  Do you know what, if any information she gave
22 you about some interactions with Curt close in time to
23 when his wife died?
24     A.  I don't, but I -- what I -- confidence that I

91

1  would have consistent with what LuAnne Clampitt,
2  C-l-a-m-p-i-t-t, Tolbert -- that she should contact the
3  special prosecutor's office or the Quincy Police
4  Department.
5      Q.  Let me take Exhibit 6 from you.  Did you learn
6  before Curt was arrested that the Grand Jury had returned
7  an indictment against him?
8      A.  Yes.
9      Q.  How did you learn that?
10     A.  Probably the day the Grand Jury returned the
11 indictment.  Ed Parkinson, I am virtually certain,
12 stopped up to my office following the Grand Jury vote on
13 whether or not to indict Curtis Lovelace to tell me the
14 outcome of that.
15        And also to tell me that he was finished
16 with his work because we had a number of cases lined up
17 immediately behind that to present to the Grand Jury.
18     Q.  So basically tell you, you could start your
19 stuff and he was done?
20     A.  Exactly.  He was done.
21     Q.  After the special prosecutor was appointed, did
22 you give any member of the special prosecutors office any
23 advice or direction about the case at all?
24     A.  No.  I felt the case was in good hands and even

92

1  if I didn't, it wasn't my place to tell him how to try
2  the case.
3      Q.  Did you ever talk with them about any of the
4  witnesses or the evidence in the case at any point before
5  Curt's acquittal?
6      A.  I am sure that because I was a witness, I would
7  have had a conversation with Ed Parkinson to prepare me
8  for my testimony, what questions likely would be asked of
9  me at the trial.
10        I also recall, telling him in the course
11 of the case or the preparation of the case once he had
12 been assigned, about my conversation with Dr. Bowman.
13        I have a general recollection of telling
14 him about the revelation or Dr. Bowman's issues that
15 would or those would be the things that come to mind in
16 response to your questions.
17     Q.  When did you tell him about your conversation
18 with Dr. Bowman?
19     A.  Very early on I believe after he was appointed
20 to the case, contacted our office probably when he first
21 came to our office on an initial appearance, or first
22 came to the Adams County courthouse on an initial
23 appearance.
24        You have to understand that the custom is

Transcript of Jon Barnard

24 (93 to 96)

Conducted on October 16, 2018

---

**93**

1 when a special prosecutor takes over a case at least with
2 Adams County, they use the State's Attorney's Office kind
3 of their base of operations. So they are going to be in
4 our office.
5        We extend every courtesy to them. So he'd
6 be in our office and it was, of course, natural that he
7 would look me up and talk to me about the status of the
8 case.
9    Q. Did you pass on any files or records to the
10 Special Prosecutors Office when they were appointed?
11    A. Yes.
12    Q. What did you pass off to them?
13    A. The entire file that we had, whatever that
14 would have been and it would not have been much because
15 it would have included whatever police reports had
16 originally been generated immediately following the death
17 of Curtis Lovelace.
18        It would have included the autopsy
19 protocol and the motion for an appointment of the special
20 prosecutor.
21    Q. Anything else that you remember being in that
22 file?
23    A. Not that I can recall. Although, a review of
24 that might refresh my recollection.

**94**

1    Q. Did you learn before Curt's arrest, that he was
2 going to be arrested?
3    A. Well, as soon as Ed Parkinson told me that the
4 jury voted to indictment him, I knew he was going to be
5 reverse. He ought to be arrested if he is been
6 indicted.
7    Q. Did you talk with any members of the media
8 about either the fact that Curt had been indicted or the
9 fact that he was going to be arrested before Curt's
10 arrest?
11    A. It's possible, but had I had any such
12 conversation, it would have been what we call cone.
13    Q. Which means you can't report on it until it's
14 happened?
15    A. As in a cone of silence, you are too young to
16 remember Get Smart.
17        Of course, the business of criminal
18 prosecution, you have a responsibility to deal with the
19 press and I always felt that it was — as I say, never
20 get into a fight with someone who buys printers ink in a
21 fifty gallon drum.
22        So I spoke to the press informally, I had
23 good relationships with them. And they would constantly,
24 want scoops, tips, hot information, even street noise.

**95**

1    And so — and so I would, at times, share with them some
2 information as a heads up, be ready kind of a thing.
3        And so it's entirely possible that I would
4 have, if asked, and under condition of this was off the
5 record and you shall not print anything or make any
6 reference to it that an indictment had been returned or
7 an arrest warrant forthcoming.
8    Q. Did you talk with the press any other times
9 either informally or on the record about the Lovelace
10 prosecution while it was going on?
11    A. On the record my comments would have been
12 limited to the fact that we filed a motion to withdraw
13 and appellate — a special prosecutor had been appointed.
14        Off the record, I am not only confident,
15 but certain that from time to time I would have
16 conversations with members of the press, about where it
17 looked like it was going based on conditions of
18 confidentiality.
19    Q. Did you ever talk with Bob Gough, G-o-u-g-h
20 during the course of either trial?
21    A. Yes.
22    Q. Showing you what's been marked as Exhibit 7,
23 the document is date stamped AC82 through AC85.
24    A. Yes.

**96**

1    Q. Is this document among the e-mails you reviewed
2 in preparation for your deposition today?
3    A. Yes, I recall, looking at this.
4    Q. Okay. What this actually is sort of appears in
5 reverse chronological order, so let me refer you to the
6 second to last page which is AC84.
7        You sent an e-mail on February 19th of
8 2015 to various news media announcing your retirement?
9    A. Yes.
10    Q. All right. And if you look on that same page
11 AC84, you wrote an e-mail to Bob Gough on February 19th
12 of 2015 telling him that you weren't going to be
13 endorsing anyone as your successor, is that right?
14    A. February 19th, at 10:28 a.m. I sent him an
15 e-mail, in essence telling him that I could not endorse
16 anyone who might be throwing their hat because at that
17 time I had good reason to know that two people within the
18 office were going to do that.
19    Q. And at that time, did you not want to make an
20 endorsement of one of those people over the other?
21    A. I didn't think it was appropriate, for me to be
22 stirring that kind of pot because I had almost two years
23 left to work with these people and office morale is an
24 important thing.

Transcript of Jon Barnard
Conducted on October 16, 2018

---

**97**

1  Q. If you turn ahead to AC83, the middle of that
2  page, do you see any mail from you to Bob Gough on
3  February 19th of 2015 at 10:44?
4  A. Yes.
5  Q. Do you see the line on that e-mail that says
6  (I, of course) have a lot of inside knowledge on the
7  whole Lovelace fiasco. (Much of which I can't talk about
8  publicly until after a trial, given that I am a witness).
9  Do you see that?
10  A. Yes.
11  Q. Do you have additional knowledge about how you
12  would define the Lovelace fiasco beyond what you have
13  testified about in your deposition so far?
14  A. Well, again, my global answer would have to be
15  yes, only because you haven't asked me about several
16  other aspects of the renewed investigation of which I had
17  become aware.
18  Q. What aspects about the renewed investigation,
19  do you have information about that we haven't discussed
20  so far in this deposition?
21  A. Specifically the opinions of Dr. Turner, Dr.
22  Boden (phonetic), only because those were related to me,
23  along -- as the prosecution developed by the special
24  prosecutor's office and likely more. I was -- I was kept

---

**98**

1  abreast of what was going on as a matter of courtesy.
2  Q. And you also said that you were curious about
3  the case, correct?
4  A. Sure.
5  Q. You wanted to find out what was going on?
6  A. Absolutely. I am a curious guy.
7  Q. You didn't talk with Dr. Turner or Dr. Boden as
8  they were developing their written opinions in this case,
9  correct?
10  A. No, I did not.
11  Q. Did you talk with Detective Gibson about or
12  anybody else about how it is that Dr. Turner, Dr. Boden
13  reached the opinions that they reached?
14  A. No, only that they had been provided with the
15  records from the autopsy as had Dr. Denton.
16  Q. Did you ever have a bigger conversation with
17  Bob Gough what you knew about the Lovelace case after you
18  sent this e-mail on February 19th, of 2015?
19  A. Define bigger.
20  Q. I mean the e-mail references reserving a table
21  to sit down and talk about it. Did you ever sit down and
22  talk about it?
23  A. No, we never had a conversation since then,
24  that related to the Lovelace investigation for the main

---

**99**

1  reason that he attended both trials and became aware of
2  everything that I was aware of that I evidently said at
3  some point we would share.
4  Q. Well, after the second --
5  A. After, after the trial.
6  Q. I'm sorry to interrupt you. After the
7  acquittal, did you talk with Bob Gough about the
8  acquittal?
9  A. I saw Bob at the Sangamon County courthouse.
10  If I remember I saw you there too.
11  Q. I was there?
12  A. And, saw him in the hall, talked with him just
13  briefly, hi, how you doing, to the conversation. And
14  since then, I have -- I ran into him once, and the total
15  mention of the case was by him, and was to the affect
16  that he was still working on his book.
17  Q. If you look back at the same page AC83, there
18  is an e-mail that Bob sent to you in response to the
19  e-mail we were just talking about where he said something
20  to the affect that he guesses Curtis likes getting three
21  hots and a cot? Do you see that?
22  A. I do.
23  Q. Do you interpret that to mean that there was a
24  lot of delay with this matter going to trial and it seems

---

**100**

1  like maybe Curt wasn't anxious to have it tried?
2  A. You would have to ask Bob Gough what he meant
3  by that. I wasn't really sure what the basis for his
4  comment was.
5  Q. You sent him an e-mail in response to that one,
6  correct?
7  A. Uh-huh.
8  Q. And that e-mail was dated February 19th of 2015
9  at 10:47 a.m?
10  A. Yes.
11  Q. And you said, "yep, I don't think it bothers
12  him too much". I am only reading part of the e-mail, but
13  do you see that?
14  A. Yes.
15  Q. What do you mean by that?
16  A. If I recall correctly, the information that I
17  had received, you know, again is kind of an ongoing what
18  is going on with the case in the category of an off
19  handed comment by Detective Gibson. He appeared to be
20  adjusting well to his incarceration in the Hancock County
21  Jail.
22  Q. Do you see the second part of that sentence
23  again in that February 19th, 2015 e-mail dated, 10:47
24  where you wrote his phone calls are interesting?

---

Transcript of Jon Barnard                    26 (101 to 104)
Conducted on October 16, 2018

101

1     A.  Yes.
2     Q.  What did you mean by that?
3     A.  What I meant by that is that that detective
4  Detective Gibson had related to me, reached me, whatever
5  term you would like.
6          That he was monitoring phone conversations
7  between Curtis and any other person other than his
8  lawyers as is required by law, to be confidential.  And
9  that his phone calls with his third wife, were
10 interesting.
11    Q.  Did he describe for you how those calls were
12 interesting?
13    A.  Yes.
14    Q.  What did he tell you about that?
15    A.  They were very argumentative, especially at —
16 I don't recall her name, his third wife — his third
17 wife, was angry and argumentative would be the way in
18 which Detective Gibson relayed those conversations to me.
19    Q.  Did he tell you anything else about Curt's
20 calls other than what you just testified to?
21    A.  No, I think that would be a fair description of
22 what I described in my e-mail to Bob Gough as being
23 interesting.
24    Q.  Did you believe it was appropriate for

102

1  Detective Gibson to be sharing those calls with you?
2     A.  Absolutely.
3     Q.  Why did you believe that was appropriate?
4     A.  Because if he is not monitoring jail calls, he
5  is not doing his job.  And it's perfectly appropriate for
6  him to, as a matter of courtesy, again because I am the
7  prosecuting agency of the county, to share that
8  information with me as would Ed Parkinson, who took the
9  case over from me to share information about the case
10 with me.
11    Q.  Did Ed Parkinson ever give you any information
12 about calls that Curt had made from the jail?
13    A.  I don't recall that he did, but he provided me
14 with a lot of information.  Certainly wouldn't surprise
15 me if he did.
16    Q.  Did Ed ever tell you about a dispute between
17 him and Mr. Gibson having to do with Scott Denton?
18    A.  That rings no bells for me.
19    Q.  If you go to the front of this e-mail, I am
20 looking at AC82.  I am looking at the third e-mail from
21 the bottom.  This is an e-mail from Bob Gough to you,
22 that's the 19th at 9:57 a.m. you see what I am looking
23 at?
24    A.  Uh-huh.

103

1     Q.  Do you see where Bob Gough said to you as the
2  kids say today "dude is whack, yo'".  Do you see that?
3     A.  I see that.
4     Q.  Okay.  And then the e-mail that was in response
5  to that you wrote back to Bob Gough, in part, Amen,
6  brother.  Do you see that?
7     A.  Yes.
8     Q.  What do you mean by, "Amen, brother"?
9     A.  Well, it was certainly an acknowledgement of
10 what he was saying, got it.
11    Q.  Did you believe it was appropriate for you to
12 be talking about Bob Gough about Curt's conversations
13 with his wife from the jail?
14    A.  On a confidential basis, sure.  Again,
15 understanding what I mean by confidential.  I have a lot
16 of conversations with members of the media about cases
17 and details of cases that I am not at liberty to discuss
18 with the public, nor are they — so long as they
19 understand the confidential nature of those conversations
20 at least at that time, I got no problem.
21    Q.  Did you ever discuss with Bob Gough the
22 possibility of you guys working on a book?
23    A.  No.
24    Q.  Have you ever considered yourself writing a

104

1  book about the Lovelace case?
2     A.  You'd want to talk to my grammar teacher before
3  you ask me that.  The answer is no, I got other things to
4  do.
5     Q.  I talked at the beginning of the deposition
6  about giving some training to law enforcement about legal
7  subjects.
8     A.  Yes.
9     Q.  Have you ever given any training to law
10 enforcement about any issues having to do with Brady
11 versus Maryland?
12    A.  No.  That's normally left to other aspects of
13 their training.
14    Q.  Other than e-mail, do you have any other
15 written documents anywhere that reflect any of your notes
16 about any conversations you have had with anyone related
17 to this case or any notes of your own about your
18 conversations with Curt on the 14th?
19    A.  14th of?
20    Q.  February 14th of 2006, about his wife's death,
21 or any other written documents that would reflect any of
22 the information that you had about this case?
23    A.  Let me start with my conversations with Curtis.
24 The only documents that are in writing I believe you have

Transcript of Jon Barnard
Conducted on October 16, 2018

---

**105**

1 in your possession.

2     Those are the only documents that I recall

3 sharing with him other than perhaps memos about a

4 specific case and what to do or how to approach it.

5     With regard to his performance, you have

6 those documents with regard to written communications or

7 conversations with others relating directly or indirectly

8 to this Lovelace investigation.

9     I believe that you have those all. Having

10 said that, I want you to understand that my process in

11 responding to things like a foyar, f-o-y-a-r, request.

12     I delegate those to a staff member to do

13 searches of data bases for that. And I was, I guess

14 surprised but not shocked that a more detailed search of

15 those data bases developed some of the documents that you

16 have that weren't discovered in response to the initial

17 response. So I guess given that experience, it's

18 possible there is some other stuff out there, but if

19 there is I am not aware of it.

20     Q. You believe in either the foyar request that

21 you previously responded to or the document production

22 that the county has made which includes some documents

23 relayed to you.

24     Those documents reflect the sum total of

---

**106**

1 written documents that might relate to you and any

2 involvement you had in Curt's case?

3     A. So far as I am aware, yes.

4     MS. THOMPSON: I don't have any other questions.

5     CROSS EXAMINATION

6     BY MS. EMERY:

7     Q. We are going to go back and ask you some

8 questions and it's going to be a little disjointed, but

9 just to clean up several things. You talked earlier

10 about Curtis' came to your civil practice office, and he

11 was interested in returning to the practice of law?

12     A. Yes.

13     Q. And, you said that if you hadn't been elected

14 that you would strongly consider him for a position and

15 if you had been elected you would have said yes, I will

16 hire you. Recall that?

17     A. Essentially, yes. I don't know that I gave him

18 a -- in the scenario where -- if the conversation

19 happened after I had been elected, before sworn in, I

20 think I likely would have told him I will.

21     We are going to need someone, I will give

22 you strong consideration. I don't know that I made a

23 commitment on the spot because it was an unannounced

24 visit.

---

**107**

1     Q. Right. But did you -- before you ultimately

2 did hire him, what did you look into as far as his

3 experience up to that point and his background?

4     A. Well, I relied on several things. Number one,

5 he had an -- obviously, he was licensed to practice law,

6 had a degree from a very good law school, University of

7 Illinois.

8     I knew that he had been hired my

9 Schmiedeskamp, the firm that I had been hired by years

10 earlier. I knew of their standards and so that made or

11 gave me a level of comfort. I also knew that he was a --

12 he had experience as an athlete.

13     And it has been my experience that -- or

14 maybe I should just say that I have some partiality to

15 hiring people with athletic experience, having to do with

16 their resilience, their tenacity, their persistence,

17 because the work of the Adams County State's Attorneys

18 Office, involves as you know, legal combat. You know

19 trials, you need to be resilient, persistent and

20 tenacious. That's a background consistent with that.

21     Those are the things that I took into

22 consideration. I didn't -- I can tell you what I didn't

23 look into, if that's of concern. I don't know if it is

24 or not.

---

**108**

1     Q. Yeah, it is.

2     A. I did not consult with the folks at

3 Schmiedeskamp. I knew that he parted ways with them

4 while he was an associate.

5     I did not consult with Dot Foods, where he

6 told me he was working when he came to my office. I do

7 not -- I did not consult with him.

8     Q. D-o-t Foods, D-r-e-y-e-r. You were talking

9 about the circumstances leading up to Curtis' ultimate

10 termination from the State's Attorneys Office.

11     And you said that there were expectations

12 of Curtis that he did not meet and you talked about his

13 time in the office that he wasn't showing up. Were there

14 other expectations that he didn't meet?

15     A. They would be derivative of not showing up in

16 the office. If he's not in the office, he is not working

17 on files, and he is not preparing cases to work them up

18 for trial.

19     So there are -- there are a number of

20 things, but they would all flow from not being in the

21 office. The list could go on, if I had time to think of

22 them, but that would give you the best sense.

23     Q. Why did you hire him as a part time assistant

24 State's Attorney rather than full-time?

---

Transcript of Jon Barnard
Conducted on October 16, 2018

109

1    A.  Budgetary reasons.  Because the — I was a part
2  time assistant, when I ran for the office.  So what we
3  needed to fill wasn't what I felt the will of the county
4  board would be, that they would continue to budget for a
5  part time assistant but not a full-time assistant.
6    Q.  And, so, how is a part timer paid?
7    A.  Part timer is paid — essentially it's kind of
8  a combination of — are you talking about the amount or
9  the method of pay?
10    Q.  The method of pay because you said he was kind
11  of a hybrid.
12    A.  Yeah, as was I.  Part time in the sense that
13  there was recognition of the fact that he had other
14  duties as a lawyer.  In his case, his own practice, to
15  the extent that existed and a salary that was less than
16  full-timers, depending on experience.
17        But, the hybrid sense of it was again, as
18  in my case, we provided him with health insurance, which
19  commonly would have been for full-time employees, but
20  because we expected most of his time, I'd ask that it be
21  covered with insurance.
22    Q.  And you said his private practice to the extent
23  that existed, were you aware of a thriving part time
24  private practice or did it appear to be nonexistent?

110

1    A.  In between.  He did have — I had given him a
2  case that I had — perhaps more than one case that I had
3  in my civil practice, when I took the oath of State's
4  Attorney, had him take over, but my — my sense of his
5  civil practice was that it was not overwhelming his time
6  whatsoever.
7    Q.  When he first started after you hired him, was
8  he preliminary or primarily in misdemeanors or felonies?
9    A.  We worked him right into the felony rotation.
10  I had a method of office organization where I wanted all
11  of the Assistant States's Attorneys to handle felony
12  trials.  That evolved a bit over time, but I immediately
13  threw him into the fray, if you will, of felony trials
14  along with assignment to particular courtrooms.
15    Q.  Was there an issue at some point in time about
16  Curtis missing pretrials?
17    A.  Yes.
18    Q.  What was the issue there?
19    A.  The flash point, if you will, occurred at the
20  May, 2012 pretrial conference.  And I think perhaps, it
21  would have been the, maybe the June pretrial conference.
22        At any event it occurred either at the end
23  of April or the beginning of May.  I was out of the
24  office, because it was reported to me by Gary Farha, my

111

1  first assistant at the time.
2        That Curtis did not appear for the
3  pretrial conferences and had not given any prior notice,
4  warning or heads up that he would not be there.
5        Because Curtis would have had a number of
6  cases on that docket as would have all the other
7  assistants, it left our office in general and Gary in
8  particular, without any knowledge about what is going to
9  happen with this case, and that's not a good thing.
10        So Gary reported to me the fact that he
11  was not there, and had not given anyone a heads up and
12  that was a problem.
13    Q.  Were any of the cases dismissed for want of
14  prosecution?
15    A.  I don't believe so.  Certainly that would have
16  made a bad situation worse, but even if they weren't, it
17  — it was my practice to be present at pretrial
18  conferences coming and going because I had other
19  responsibilities to monitor to make sure that we were
20  making sure that cases progressed appropriately.
21        And, I didn't like — never did like when
22  a case would come up and the Judge would call the case
23  and say who for the State is handling this case, and an
24  answer would come out, let's say, Curtis Lovelace, as an

112

1  example.
2        Where is Mr. Lovelace?  He is not here.
3  What is going on with his case?  And then the atmosphere
4  in the courtroom becomes unpleasant, so that was
5  something that I strove to avoid and as such the incident
6  in May, 2012, was getting really bad.
7    Q.  Is there a particular incident you spoke about
8  -- lets see managing the pretrials or lack of managing
9  the pretrials was next to the last straw.  What was the
10  last straw?
11    A.  The last straw occurred just prior to and
12  following the — Curtis' deployment for a weekend summer
13  military training.
14        It occurred on a weekend in July, keep in
15  mind that I had — that I had received assurances from
16  Curtis that he would abide by a new schedule of his own
17  making to improve the attendance situation based on the
18  problem in May.
19        He had a weekend deployment in July, and
20  was not present in our office for two days prior to that
21  deployment or perhaps three.  It was at least two, which
22  was unexplained.  Before he left, he assured my office
23  administrator, Sheryl Elee, that he would be in our
24  office on duty, Monday morning I am going to call it the

Transcript of Jon Barnard
Conducted on October 16, 2018

113

1   16th, I could be wrong, but it was Monday morning.
2        Monday came and went and we heard nothing
3   from Curt. Tuesday came and went, we heard nothing from
4   Curtis. Because of the previous issues, by Wednesday if
5   he didn't appear, especially appear with an explanation,
6   that would be in my mind, the last straw.
7        He did not appear, we did not hear from
8   him. At that point in time, I made my decision and
9   dispatched Sheriffs Department along with a memo to him.
10  That was the history of it.
11       Q.   And the Sheriff's Department was to retrieve
12  his key fobs that gave him access to the courthouse and
13  the office?
14       A.   Yes.
15       Q.   You were talking about that he joined the
16  military and you were just talking about his deployment.
17  When you said military, he joined the reserves, correct?
18       A.   Yes. I consider that to be military.
19       Q.   Okay.
20       A.   All be it on more of a part time basis.
21       Q.   And just so the record's clear, you referred to
22  the May 12th incident, or the May incident?
23       A.   Yes.
24       Q.   What incident was that?

114

1        A.   That was when he failed to appear for pretrial
2   conferences for the next month and did not give any
3   warning or alert or provide information about how his
4   cases were to be handled in his absence from pretrials.
5        Let me add to that hopefully to give you
6   an understanding. Let us assume as they always did, that
7   the jury trials in Adams County began on the second
8   Monday of each month.
9        Approximately, five weeks prior to that,
10  for instance, we assume that the jury trial docket would
11  start on June 7th, first Monday, let's call it. The
12  pretrial conferences for that docket would be at the end
13  of April or the very beginning of May about five weeks in
14  advance. And so, it was the — I believe it was a June
15  jury pretrials that he failed to appear for this occurred
16  within —
17       Q.   Okay.
18       A.   All of this occurred in May.
19       Q.   What was the -- I know you can't give me that
20  exact number, but how often did cases from your office go
21  to jury trial versus taking a plea?
22       A.   I think that if you use a broad statistical
23  term probably, I'm going to say 95% would result in a
24  disposition other than a trial on a month to month basis.

115

1        That might mean they are continued. That
2   might mean there is been a negotiated plea and in rare
3   instances there might be a dismissal. That would always
4   require an explanation to me by my assistant, but, I'd
5   say about 95%.
6        We normally had anywhere from one to four
7   or five jury trials per month that went to trial.
8        Q.   And they could be any size, correct? They
9   could be a one day trial?
10       A.   Yeah, sure, they could be one day, they could
11  be two days. They could be — my cases tended to be
12  longer because of the nature of the case, but, yeah,
13  couple days.
14       Q.   Did Curtis also try bench trials?
15       A.   Yes.
16       Q.   We were talking about you wrote a letter of
17  commendation for your prior assistant to the Presiding
18  Judge regarding the Public Defender's Office?
19       A.   I did.
20       Q.   But you recall that? Did you write such a
21  letter for Curtis?
22       A.   I did not.
23       Q.   Did he ask you to?
24       A.   I believe he did.

116

1        Q.   Did you tell him that you weren't going to?
2        A.   I believe that I said that I would consider
3   that. Again this is a general recollection. I don't
4   think it probably takes much to figure out who I thought
5   the better candidate would be.
6        Q.   You also talked about sometimes prosecutions,
7   as you put it, fell short.
8        A.   Yes.
9        Q.   Which means it was a defense verdict?
10       A.   Yes.
11       Q.   Did any of Curtis' problems with alcohol do you
12  believe that was a cause for any of the trials falling
13  short?
14       A.   That's difficult for me to say. It may have
15  been, it may not have been. I have lost cases and I
16  think anyone who's ever tried a case has lost a case. If
17  you tell me you never lost a case, you probably never
18  tried one.
19       It happens to us all. I heard both good
20  and not so good reviews from law enforcement with regard
21  to his handling of cases.
22       Q.   Well, that kind of begs the question as to
23  whether you believe that there was -- there were problems
24  related to alcohol in his performance?

Transcript of Jon Barnard
Conducted on October 16, 2018

117

1    A.  I cannot honestly say that that was the cause
2 of falling short in a given case or any case because lot
3 of things can go wrong on the way to proving a case, a
4 person guilty beyond a reasonable doubt.
5        I can say this, that I heard concerns from
6 law enforcement about his prosecutorial approach or
7 performance, and not being particularly up to the desires
8 of the law enforcement investigator.
9        I have also heard that about other members
10 of my staff and so, I can't tell you that I believe that
11 alcohol was involved in any subpar performance.  Is it
12 possible?  Sure.  Is it possible it's not?  Sure.
13    Q.  Okay.  And in response to one of Ms. Thompson's
14 questions you said there were no written complaints about
15 Curtis' performance.  So you did receive some complaints?
16    A.  I did.
17    Q.  And, earlier you were talking about the day
18 that Curtis called you to tell you that Cory was dead and
19 you remembered that through your intercom system somebody
20 told you Curtis was on the line?
21    A.  Yes.
22    Q.  That was February of 2006 actually Valentine's
23 Day, February 14th, 2006.  Back then, did you have a
24 direct dial line?

118

1    A.  I think I did.  I think you could reach me, by
2 — I think you could reach me by direct dial or by cell
3 phone.
4    Q.  And, you said that you learned from staff that
5 Curt had come to the office later that day?
6    A.  I did.
7    Q.  Do you have an understanding or did you have an
8 understanding of why you went into the office that day?
9    A.  No, I don't.  I know that by comments made to
10 me by my staff they were surprised that he came in.
11 That's all I can tell you.
12    Q.  And, the Quincy Harold reporter said — told
13 you that he had encountered Curtis in the courthouse that
14 day, is that correct?
15    A.  He did.
16    Q.  Do you have any understanding of what he was
17 doing over at the courthouse that day too?
18    A.  Well, our office is in the courthouse.
19    Q.  Okay.
20    A.  I don't know where he would have seen Curtis,
21 or where he encountered him, whether or not it was in our
22 office or somewhere else in the courthouse.  It could
23 have been either place, because again the media prowls
24 the courthouse including our office.

119

1    Q.  Do you recall whether in the days following
2 Curtis' call to you that Cory was dead, whether he took
3 time off or he was still working?
4    A.  Well, as I alluded to before, anyone who — in
5 that situation, has — going to be given wide berth about
6 their attendance.
7        And I would not have felt it necessary for
8 him to tell us he wasn't going to be there.  We would
9 have all essentially circled the wagons to cover any
10 matters he had up until following the funeral.
11    Q.  How many — and this was in 2006, how many
12 Assistant State's Attorneys were there, full or part
13 time?
14    A.  I think I had six staff attorneys and myself,
15 total of seven.  If I stop it's easier for me to count
16 the offices.
17    Q.  'Cause the faces changed?
18    A.  Yeah, right.  One, two, three, six, six
19 assistants, one elected State's Attorney.
20    Q.  How many criminal courtrooms in the courthouse
21 that you guys covered?
22    A.  Seven.  Those are the rooms — those are the
23 courtrooms that are used for — used for court.  I can
24 tell you that we had a number of assignments, assigned

120

1 courtroom.  If that was what you are looking for.
2    Q.  Yes.  I am not going to show it to you, but
3 back in Exhibit 3, there was an e-mail to Adam Gibson.
4 Tara have you got that?  Show it to the witness.  The
5 bottom e-mail from Adams Gibson to you on February 24th,
6 2014.
7    A.  Yes.
8    Q.  The first sentence says, can I take Lovelace to
9 Grand Jury to get it started or do I need to do that in a
10 different way since you are listed as a witness.  You see
11 that?
12    A.  Yes.
13    Q.  The police officer can't take cases to the
14 Grand Jury, can they?
15    A.  I suppose it's theoretically possible, but if
16 you take a peek at the — go to criminal procedure,
17 describes the State's Attorney's responsibility to do
18 that.
19    Q.  So, it would either be you or in the case of
20 the appointment of a special prosecutor.  The special
21 prosecutor's the one who takes it to the Grand Jury,
22 correct?
23    A.  Exactly.
24    Q.  And the decision even if you have a gung ho

---

**121**

1  officer, the decision to take a case to the Grand Jury
2  when you have a special prosecutor, is that the special
3  prosecutor?
4      MS. EMERY: Object to form, but you can answer.
5      THE WITNESS: Or the State's Attorney who has
6  responsibility for the case.
7  BY MS. THOMPSON:
8      Q.  Did you have any contact with Curtis Lovelace
9  after he left the State's Attorney's office?
10     A.  Yes.
11     Q.  What type of contact?
12     A.  Well, I encountered him on the street. But I
13  can -- there was one material contact on the street, that
14  I felt to be particularly relevant to this case.
15     Q.  What was that?
16     A.  That was a phone conversation and -- could I
17  take a quick break?
18     MS. THOMPSON: Sure.
19         (Short recess.)
20  BY MS. EMERY:
21     Q.  Before the break, we were talking about
22  contacts after Curtis left the State's Attorneys and you
23  were talking about one phone call in particular.
24     A.  Uh-huh, yes.

---

**122**

1      Q.  What about that phone call?
2      A.  That would have occurred, I am going to say
3  approximately a year, perhaps.
4          Well, it would have been approximately a
5  year or so after Curtis was terminated.
6      Q.  And, tell me about it. Who called who?
7      A.  Curtis called me and the backdrop for the
8  conversation, was as I am sure you seen, there was an
9  exchange of e-mails between Curtis and myself when he was
10  terminated.
11         I sent him an e-mail notifying him of my
12  decision and briefly the reasons for that. He then sent
13  me a response to that, and approximately ten days after
14  receiving that response I replied to his response.
15     Q.  All right, hang on. And that would have been
16  exhibit number one?
17     A.  If I am understanding you correctly, yes.
18     Q.  This is a series of e-mails that you are
19  talking about, Exhibit Number 1?
20     A.  Yes.
21     Q.  Just so we are clear.
22     A.  In any event you can see from a review from the
23  e-mails there that Curtis took some issue with my
24  understanding of his performance level, and again that's

---

**123**

1  natural, and yet, I felt it needed further clarification
2  on my end.
3          He took issue with the reasons I expressed
4  to him briefly in my letter of -- my e-mail of
5  termination. He outlined those to me in an e-mail of
6  July 21st.
7      Q.  That's date stamped AC316 and 317?
8      A.  Yes. And I replied to those in an e-mail of
9  August 1st, 2012, date stamped AC3019, I'm sorry that
10  August 1st e-mail is AC0319 and continues as AC0320, but
11  the exchange was an expression of something of a
12  difference of opinion about his performance.
13         Obviously I told him that ultimately my
14  decision was irrevocable. Approximately a year later I
15  received a phone call on my cell phone from Curtis.
16         I was in the Charlotte, North Carolina
17  airport awaiting a connection to, I think Philadelphia.
18  I didn't -- well, I think I did recognize it because I
19  had a name recognition for his cell phone.
20         I was somewhat surprised, took the call,
21  but I took it. I said, hello, Curtis, he greeted me. He
22  indicated to me that he just wanted to call me because he
23  just wanted to talk about his tenure in the State's
24  Attorney's Office.

---

**124**

1          And he said to me and I am quoting or near
2  quoting, he said John, we both know why you fired me. I
3  said well, Curtis, I think I know why I fired you and
4  sounds to me like you understand the issues you had.
5          He said yes, I do and I just want you to
6  know that I am working on -- on addressing those issues.
7  He said I have a sponsor and I am attending, may have
8  said meetings or counseling. I took that to mean efforts
9  to deal with his alcohol abuse that was unmistakable from
10  what he shared with me.
11         But in essence, what was relevant to me
12  was an acknowledgement by him of the problems he had,
13  particularly with alcohol and how they affected other
14  aspects of his performance.
15         I said, Curtis, I appreciate you sharing
16  that with me, I am glad you shared it with me. I hope
17  for the best for you and, you know, good luck to you
18  because any one of us walk up and down the street know
19  that alcohol abuse is a real problem, for a lot of people
20  and you always applaud an acknowledgement of the problem
21  and steps taken to address the problem. That's what that
22  conversation was about.
23     Q.  Any further contact with him after that?
24     A.  My contact with Curtis up until the time he was

---

Transcript of Jon Barnard

Conducted on October 16, 2018

---

125

1  indicted would have been infrequent and limited to hi,
2  how you doing. The only place I would see him would be
3  at the courthouse.
4      Q.  Okay.  During your tenure at the State's
5  Attorney's Office, were jury trials assigned just by
6  whoever had the courtroom, or were they assigned?
7          And I am saying to the assistant or
8  keeping them to try it yourself or were they assigned
9  based on the complexity and severity of the crime
10  alleged?
11      A.  All of the above.  And, what that means is that
12  I would -- number one, I assigned the jury trials.
13  Anything on the felony docket I assigned, and my method
14  of assignment was kind of a multi factorial process.
15          But number one, I would obviously try to
16  assign equal numbers of cases to members of the staff, so
17  that one person didn't have twenty cases and the other
18  person had two.
19          If I had 20 cases and I had five
20  assistants, four per or roughly that.  Obviously, there
21  were special factors that could affect an assignment, the
22  complexity, or whether or not this person had more
23  experience in the area, for instance of domestic abuse or
24  DUI, felony DUIs or sexual assault.

126

1          Those -- I knew who knew who had
2  experience in those areas, so that would factor into the
3  process, but, everyone was assigned an equal number of or
4  roughly equal number of cases.
5      Q.  Did you ever assign second chair?
6      A.  Yes.
7      Q.  How often?
8      A.  Only in my cases because of the nature of cases
9  that I was trying.
10      Q.  Okay.  So none of the assistants ever had
11  second chairs?
12      A.  Only perhaps the first trial or two just to get
13  their feet wet.
14      Q.  Okay.  So it was just to make sure they knew
15  what they were doing, things didn't go south badly?
16      A.  Right.
17      Q.  Okay.  As an Assistant State's Attorney, did
18  you help each other out with jury trials?
19      A.  Sure.  There was a -- we all -- because we are
20  a small office, would talk and collaborate and ask each
21  other for assistance on legal issues, on practical, you
22  know, issues.
23          Certainly there was an informal and well
24  oiled network for that kind of communications, but once a

127

1  person was assigned to a jury trial keeping in mind that
2  a case might be set for trial for the first time in May.
3          It's not going to go to trial in May, it's
4  continued to July.  It's not going to go to trial in
5  July, continued to September.  Then maybe something else,
6  but once that case is assigned to a particular assistant,
7  it stays with that assistant unless there is some unusual
8  circumstances.
9      Q.  Okay.  And how early is the case assigned?
10      A.  First time it shows up on the jury trial
11  docket, I would get the list of cases that are set for
12  trial that month.
13          Some of them had already been assigned
14  because, you know, they had been continued to that month.
15  Some we're assigned -- to be assigned for the first time.
16  I would make those assignments.
17      Q.  What kind of trial did you assign Curtis when
18  he was relatively new to your office, say around the time
19  of Cory's death, 2006?
20      A.  What you normally would do, certainly what I
21  did was assign them perhaps to the lower level felonies,
22  the less complicated, the less serious, just to see how
23  they do.
24          And if they -- if they got good results

128

1  and progressed, then they would throw them into the deep
2  end.
3      Q.  If you saw a document written by Curtis, around
4  the time of Cory's death, that he was taking two weeks
5  off to assist with jury trials and there were no jury
6  trials assigned in those two weeks, would you find that
7  odd?
8      MS. THOMPSON:  Object to form, but you can answer.
9      THE WITNESS:  At first blush based only on what you
10  are sharing, yes, I would find that -- for instance, just
11  to give you some context.
12          I know the jury trials always are going to
13  be on the first or rather the second sometimes into the
14  third week of the month.
15          If I saw a memo for him that said I am
16  going to be busy with jury trials, during the fourth week
17  of this month and the first week of next month.  I would
18  know that something ain't right because we don't have
19  trials during that part of the month.  Just an example.
20      MS. EMERY: I think that's all I have.
21          REDIRECT EXAMNATION
22  BY MS. THOMPSON:
23      Q.  Who in law enforcement gave you not good
24  reviews of Curt's work?

129

1   A.  I recall that Bryan Dusch, B-r-y-a-n,
2   D-u-s-c-h.  Brian, worked with Curtis on a case and we
3   fell short of that case and Bryan expressed his
4   displeasure with Curtis' handling the case, but that was
5   when it would occur, not a comment that would have been
6   solely limited to Curtis.
7       And I have heard that complaint from other
8   law enforcement agents with regard to other members of
9   our office from time to time?
10  Q.  Anyone else beside Mr. Dusch who was a law
11  enforcement that gave a not good review of Curt?
12  A.  I believe there was one other one but I
13  couldn't tell you who that was.  That is the one I can
14  recall specifically, but I know it wasn't isolated.
15      So that's why I say I believe it was one
16  other concern expressed to me by another officer.  Again,
17  I want you to understand that those things can be the
18  result of any number of things.  So I don't want — I
19  don't want to be unfair to Curtis in that regard.
20  Q.  Other than those two, can you remember any
21  other oral complaints made by anyone, law enforcement or
22  otherwise, about Curt's work in the State's Attorney's
23  Office other than what you have already discussed?
24  A.  I have a vague recollection of a member of the

130

1   County Board expressing displeasure with maybe some legal
2   question that he posed to Curtis that was not answered
3   either timely or to his satisfaction.
4       Again, I take those kinds of things with a
5   grain of salt, given the usual composition of the County
6   Board.
7   Q.  Any other oral complaints about Curt you can
8   remember?
9   A.  Those would be the ones that came to mind.
10  MS. THOMPSON: I don't have anything else.
11  MR. HANSEN:  He waives.
12
13
14      (End of Proceedings.)

131

1   STATE OF ILLINOIS )
2   COUNTY OF C O O K )
3
4       I, LaDonna Gray, being first duly sworn on
5   oath, says that she is the court reporter who reported
6   shorthand the proceedings had at the hearing of said
7   cause, and that the foregoing is a true and correct
8   transcript of her shorthand notes so taken as aforesaid.
9   So signed and dated this 31st day of October, A.D., 2018.
10
11      LaDonna Gray
12      LaDonna Gray, CSR
13      License #084-001558