Transcript of Adam Gibson
Conducted on July 17, 2018

---

**Page 1**

IN THE UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF ILLINOIS

SPRINGFIELD DIVISION

CURTIS LOVELACE, LOGAN )
LOVELACE, LINCOLN )
LOVELACE & CHRISTINE )
LOVELACE on behalf of )
her minor son LARSON )
LOVELACE, )
　　　　　 )
　　 Plaintiffs, )
　　　　　 )
　 - vs - )   No. 1:17-CV-01201-
　　　　　 )        JES-JEH
DET. ADAM GIBSON, POLICE )
CHIEF ROBERT COPLEY, )
SGT. JOHN SUMMERS, LT. )
DINA DREYER, DET. )
ANJANETTE BISWELL, )
UNKNOWN QUINCY POLICE )
OFFICERS, GARY FARHA, )
CORONER JAMES KELLER, )
THE CITY OF QUINCY and )
COUNTY OF ADAMS, )
　　　　　 )
　　 Defendants. )

　　　 VIDEO DEPOSITION of DET. ADAM GIBSON, taken
in the above-entitled case before Gina L.
Nottingham, Certified Shorthand Reporter of Adams
County, Illinois, at 8:59 A.M., on July 17, 2018,
at 625 Vermont Street, Quincy, Adams County,
Illinois.

---

**Page 2**

APPEARANCES:

　　 MS. TARA THOMPSON
　　 Attorney at Law
　　 Loevy & Loevy
　　 311 North Aberdeen Street
　　 3rd Floor
　　 Chicago, Illinois 60607
　　 (312) 243-5900
　　 tara@loevy.com

　　　　 appeared for the Plaintiffs.

　　 MS. ELLEN EMERY
　　 Attorney at Law
　　 Ancel Glink Diamond Bush DiCianni &
　　 Krafthefer
　　 140 South Dearborn Street
　　 Chicago, Illinois 60603
　　 (312) 782-7606
　　 eemery@ancelglink.com

　　 MR. WILLIAM MECKES
　　 Attorney at Law
　　 Scholz Loos Palmer Siebers & Duesterhaus
　　 625 Vermont Street
　　 Quincy, Illinois  62301
　　 (217) 223-3444
　　 wmeckes@slpsd.com

　　　　 appeared for the City of
　　　　 Quincy Defendants.

　　 MR. JAMES HANSEN
　　 Attorney at Law
　　 Schmiedeskamp Robertson Neu & Mitchell
　　 525 Jersey Street
　　 Quincy, Illinois  62301
　　 (217) 233-3030
　　 jhansen@srnm.com

　　　　 appeared for the County of
　　　　 Adams Defendants.

Gina L. Nottingham, CSR
License No. 084-002584

---

**Page 3**

I N D E X

DEPONENT                                    PAGE NUMBER

Adam Gibson

　 Examination by Ms. Thompson          7

　 Examination by Mr. Hansen            373

　 Examination by Ms. Thompson          377

　 Examination by Ms. Emery             381


E X H I B I T S

| NUMBER | DESCRIPTION | MARKED |
|---|---|---|
| Gibson 1 | Cory Lovelace Death Investigation Summary Bates stamped PLF 7932 through PLF 7945 | 71 |
| Gibson 2 | RMS Report Bates stamped PLF 9753 through PLF 9756 | 151 |
| Gibson 3 | RMS Report Bates stamped PLF 9756 through PLF 9769 | 152 |
| Gibson 4 | RMS Report Bates stamped PLF 9700 through PLF 9771 | 152 |
| Gibson 5 | RMS Report Bates stamped PLF 9772 through PLF 9782 | 152 |
| Gibson 6 | RMS Report Bates stamped PLF 9783 through PLF 9793 | 152 |
| Gibson 7 | RMS Report Bates stamped PLF 9794 through PLF 9795 | 152 |

---

**Page 4**

E X H I B I T S (CONT'D)

| NUMBER | DESCRIPTION | MARKED |
|---|---|---|
| Gibson 8 | Detectives's Daily Logs Bates stamped PLF 5568 through PLF 5616 | 227 |
| Gibson 9 | Detective's Daily Logs Bates stamped PLF 5509 through PLF 5567 | 233 |
| Gibson 10 | E-mail from Adam Gibson to Cheryl Ely Bates stamped PLF 2377 | 266 |
| Gibson 11 | E-mail from Adam Gibson to John Summers and Dina Dreyer dated 1/12/15 Bates stamped PL 3955 | 268 |
| Gibson 12 | E-mail from Adam Gibson to John Summers and Dina Dreyer dated 12/9/14 Bates stamped PLF 3592 | 271 |
| Gibson 13 | E-mails between Adam Gibson and Dr. Denton Bates stamped PLF 3602 | 276 |
| Gibson 14 | E-mails between Adam Gibson and Jon Barnard dated 2/24/14 Bates stamped PLF 3606 | 280 |
| Gibson 15 | Dr. Denton Opinion Letter Bates stamped PLF 6132 through PLF 6135 | 284 |
| Gibson 16 | Subpoena Response for Phone Records Bates stamped PLF 11047 through PLF 11147 | 292 |
| Gibson 17 | E-mail form Adam Gibson to John Summers dated 3/18/14 Bates stamped PLF 3638 | 304 |

---

Transcript of Adam Gibson
Conducted on July 17, 2018

2 (5 to 8)

**Page 5**

```
                 E X H I B I T S  (CONT'D)

NUMBER    DESCRIPTION                      MARKED

Gibson 18  Multipage document Bates    326
           stamped PLF 5809, PLF 5819,
           PLF 5832 and PLF 5833, PLF
           5841, PLF 5860 through PLF
           5864, PLF 5886 and PLF 5887,
           PLF 5890, PLF 5964 and PLF
           5965, PLF 5974 through PLF
           5977, and PLF 5989 and PLF
           5990
```

**Page 6**

1       THE VIDEOGRAPHER: The time is 8:59.
2 Here begins media number 1 in the videotaped
3 deposition of Detective Adam Gibson in the matter
4 of Lovelace, et al., versus Gibson, et al., in the
5 United States District Court, for the Central
6 District of Illinois, case number
7 1:17-cv-01201-JES-JEH.
8       Today's date is July 17, 2018.  The
9 videographer today is Erin Schuppert representing
10 Planet Depos.  This video deposition is taking
11 place at 625 Vermont Street, Quincy, Illinois.
12      Would counsel please voice identify
13 themselves and state whom they represent.
14      MS. THOMPSON: Tara Thompson for the
15 plaintiffs.
16      MS. EMERY: Ellen Emery for the Quincy
17 defendants.
18      MR. HANSEN: Jim Hansen for the county
19 defendants.
20      MR. MECKES: William Meckes for the
21 Quincy defendants.
22      THE VIDEOGRAPHER: The court reporter
23 today is Gina Nottingham representing Planet Depos.
24      Would the reporter please swear in the

**Page 7**

1 witness and proceed.
2       (Witness sworn.)
3          ADAM GIBSON,
4 having been first duly sworn by the Court Reporter,
5 was examined and testified as follows:
6 EXAMINATION BY MS. THOMPSON:
7    Q.  Good morning, Mr. Gibson.
8    A.  Good morning.
9    Q.  Are you currently employed, sir?
10   A.  I am.
11   Q.  And where are you employed?
12   A.  The Quincy Police Department.
13   Q.  And do you currently hold a rank with the
14 Quincy Police Department?
15   A.  Yes.  I'm a detective.
16   Q.  All right.  And for this deposition,
17 would you prefer that I refer to you as Detective
18 Gibson or Mr. Gibson or how should I address you,
19 sir?
20   A.  You can call me Adam.
21   Q.  I will call you Detective Gibson, if
22 that's all right.
23   A.  Okay.
24   Q.  Detective Gibson, have you ever been

**Page 8**

1 deposed before?
2    A.  I have not.
3    Q.  Other than your testimony that you've
4 given in the related criminal matter that we're
5 here today about, have you ever testified in court?
6    A.  Yes, several times.
7    Q.  On how many occasions?
8    A.  Over a hundred.
9    Q.  How many times have you testified in
10 court in a felony matter?
11   A.  I honestly don't know.  Probably more
12 than 25.
13   Q.  And have you ever testified before a
14 Grand Jury other than in this case?
15   A.  I have.
16   Q.  On how many occasions?
17   A.  Probably more than 25.
18   Q.  In this case, you gave some special
19 in-camera testimony; is that right?
20   A.  I'm not sure what that is.
21   Q.  Well, do you recall giving some testimony
22 that was in the judge's chambers with just the
23 parties present?
24   A.  Oh, yeah.  Yes.

Transcript of Adam Gibson
Conducted on July 17, 2018

9

1    Q.   Have you ever done that in any other case
2  in your life besides this one?
3    **A.   I have not.**
4    Q.   All right.  I'm sure you've gotten some
5  idea of how a deposition works, but let me give you
6  a couple of ground rules for today.  If I ask a
7  question that you don't understand, just like you
8  just did, please let me know; otherwise, I'm going
9  to assume that you understood my question.  All
10 right?
11   **A.   Okay.**
12   Q.   We got a court reporter that's writing
13 down everything that both of us are saying, and
14 because we need to make sure we have a clear
15 record, I will do my very best not to interrupt you
16 when you're giving an answer and I would ask
17 similarly that you wait until I've finished asking
18 a question before you answer it.  All right?
19   **A.   Yes, ma'am.**
20   Q.   This court reporter can't take down, you
21 know, nonverbal gestures that either of us are
22 making or things like huh-uh or uh-huh, so if you
23 are answering a question yes or no, please answer
24 using those words so that the court reporter can

10

1  take down what you are saying.  Okay?
2    **A.   Okay.**
3    Q.   If you need to take a break at any time,
4  we are going to be here for a while, it's a little
5  hot, that's no problem, obviously you can take a
6  break whenever.  I would just ask that if there is
7  a question pending that you answer it before we
8  take a break.  All right?
9    **A.   Okay.**
10   Q.   Is there any reason that you would be
11 unable to give truthful and accurate testimony
12 today?
13   **A.   No.**
14   Q.   And are you under the influence of any
15 medications that would impact your ability to
16 recall the events that you're being asked about in
17 this case?
18   **A.   No.**
19   Q.   As you sit here today, do you believe
20 that Curtis Lovelace murdered Cory Lovelace?
21   **A.   I do.**
22   MS. EMERY:  Objection.
23   Go ahead.
24   THE WITNESS:  I do.

11

1  BY MS. THOMPSON:
2    Q.   And on what do you base your belief that
3  Curtis Lovelace murdered Cory Lovelace?
4    **A.   A myriad of the facts involved in the**
5  **case.**
6    Q.   Are you able to be any more specific in
7  the reasons for your belief other than the myriad
8  of facts in the case?
9    **A.   All of the facts that have been outlined.**
10   Q.   Did you hear or observe any testimony --
11 let me start that question again.
12   Did you -- were you present for portions
13 of Mr. Lovelace's second trial other than the time
14 that you yourself testified, sir?
15   **A.   Some, but not very much.**
16   Q.   All right.  And have you had an
17 opportunity since the second trial to watch any
18 portions of the trial?
19   **A.   Very little.**
20   Q.   Have you read any transcripts of
21 testimony related to the second trial?
22   **A.   Not of anyone else, no.**
23   Q.   All right.  Have you heard about any
24 developments in the second trial that caused you to

12

1  question your belief that Curtis Lovelace killed
2  Cory Lovelace?
3    **A.   No.**
4    Q.   When did you first come to your belief
5  that Curtis Lovelace killed Cory Lovelace?
6    **A.   During the course of the investigation**
7  **and after speaking with several of the doctors.**
8    Q.   And when you are talking about speaking
9  with doctors, are you talking about some of the
10 pathology experts that you consulted as part of
11 your investigation?
12   **A.   Yes.**
13   Q.   Does that include Dr. Scott Denton?
14   **A.   It does.**
15   Q.   Does it include Dr. Ann Turner -- or
16 excuse me, Dr. Jane Turner?
17   **A.   Jane Turner.**
18   Q.   I'm sorry, Dr. Jane Turner?
19   **A.   Yes.**
20   Q.   Does that include Dr. Michael Baden?
21   **A.   It does.**
22   Q.   Does the include Dr. Werner Spitz,
23 W-E-R-N-E-R?
24   **A.   Yes.**

Transcript of Adam Gibson

Conducted on July 17, 2018

13

1   Q.   Any other doctors that you consulted that
2  contributed to your belief that Cory Lovelace was
3  killed by Curtis Lovelace?
4        MR. HANSEN:  Objection.
5        MS. EMERY:  Objection; relevance.
6        Go ahead.
7        THE WITNESS:  Dr. Jessica Bowman.
8  BY MS. THOMPSON:
9   Q.   And any other doctors besides Dr. Bowman
10 that contributed to your belief that Curt Lovelace
11 killed Cory Lovelace?
12   **A.   Not that I recall.**
13   Q.   And did you develop your belief that Curt
14 Lovelace killed Cory Lovelace only after you
15 conferred with all of the doctors you just
16 identified?
17       MS. EMERY:  Objection; relevance.
18       THE WITNESS:  Could you say that again?
19 BY MS. THOMPSON:
20   Q.   Sure.  Did you develop your belief that
21 Curtis Lovelace killed Cory Lovelace only after you
22 conferred with each of the doctors that you just
23 identified?
24   **A.   Dr. Baden and Dr. Spitz were consulted**

14

1  **afterwards.**
2   Q.   So you developed your belief that Curt
3  killed Cory before you talked to Dr. Baden,
4  Dr. Spitz, but after you talked to the rest of the
5  doctors you just listed?
6   **A.   Yes.**
7   Q.   And can you pinpoint for me a specific
8  time in your investigation when you developed the
9  belief that Curtis Lovelace killed Cory Lovelace?
10       MS. EMERY:  Can I have a standing
11 objection as to the relevance of his belief about
12 whether Curtis killed Cory?
13       MR. HANSEN:  It's relevant to the
14 malicious prosecution claim.  It's relevant to
15 punitive damages.  Relevance is not really an
16 appropriate objection at deposition, but if you
17 want to maintain a standing objection, I don't have
18 a problem with that.
19       MS. EMERY:  I do.
20       THE WITNESS:  I cannot pinpoint an exact
21 time.
22 BY MS. THOMPSON:
23   Q.   I take it that at the time that you
24 arrested Curtis Lovelace for supposedly murdering

15

1  Cory Lovelace that at that point you had a belief
2  that he had killed her; is that right?
3        MR. HANSEN:  I'll object to the form.
4        Go ahead, you can answer.
5  BY MS. THOMPSON:
6   Q.   You can answer the question.
7   **A.   When he was arrested, we had taken the**
8  **case to the Grand Jury.**
9   Q.   So my question is:  At the time you
10 arrested him, did you believe that he'd killed Cory
11 Lovelace?
12   **A.   Yes.**
13   Q.   All right.  And at the time you testified
14 before the Grand Jury, did you believe that he'd
15 killed Cory Lovelace?
16   **A.   Yes.**
17   Q.   At the time that you first began
18 contemplating taking this case to the Grand Jury,
19 did you believe that Curt Lovelace had killed Cory
20 Lovelace?
21       MS. EMERY:  Objection to form.
22 BY MS. THOMPSON:
23   Q.   You can answer the question.
24   **A.   Yes.  And I had met with the special**

16

1  **prosecutor by that point.**
2   Q.   When did you first consider taking this
3  matter to the Grand Jury?
4        MS. EMERY:  Objection; foundation.
5        THE WITNESS:  In totality, the Grand Jury
6  was when Mr. Parkinson came into play.  I had
7  considered going to the Grand Jury earlier for the
8  purpose of any types of subpoenas or to get
9  witnesses on record.
10 BY MS. THOMPSON:
11   Q.   Okay.  So when you were initially
12 considering taking this matter to the Grand Jury,
13 that was only to lock in witness statements and to
14 get some subpoena power; is that your testimony
15 today?
16   **A.   Yes.**
17   Q.   And when did you first consider taking
18 this matter to the Grand Jury for the purpose of
19 obtaining an indictment against Curt Lovelace?
20   **A.   That would have been when Mr. Parkinson**
21 **had been appointed.**
22   Q.   At any point after you arrested Curtis
23 Lovelace, have you learned any information that has
24 caused you to question whether or not he killed his

Transcript of Adam Gibson

Conducted on July 17, 2018

17

1 wife?
2    A.   No.
3    Q.   What did you do to prepare for this
4 deposition today?
5    A.   Reviewed trial transcripts of my own,
6 reviewed police reports.
7    Q.   What police reports did you review?
8    A.   Basically the whole case file.
9    Q.   All right.  And did you review your own
10 copy of the whole case file?
11    A.   I read it on RMS, our computer.
12    Q.   Does RMS stand for something?
13    A.   Records Management System.
14    Q.   And from the Records Management System
15 you can pull up any Quincy Police Department
16 documents related to this investigation; is that
17 right?
18    A.   I can pull up the reports.
19    Q.   Okay.  Are there police -- are there
20 documents created by someone in the police
21 department related to this investigation that are
22 not included in RMS?
23    A.   RMS is just the dictated reports that we
24 do.  The total report, including all the notes and

18

1 all that, is scanned into -- that's not part of the
2 RMS system.
3    Q.   You said that's scanned in somewhere?
4    A.   Yeah, but I don't know where it's kept
5 at.  The records people, they used to keep all the
6 files, and obviously now they scan them in and keep
7 them that way.
8    Q.   All right.  Have you ever had the ability
9 to go back and look again at a file that's been
10 scanned in by the records people at the Quincy
11 Police Department?
12    A.   I have.
13    Q.   How do you do that?
14    A.   Ask the records supervisor.
15    Q.   And in what form do you review it if you
16 are looking at something that's already been
17 scanned in?
18    A.   On the computer.
19    Q.   And do you have to have the records
20 supervisor give you access to those files somehow?
21    A.   Generally she e-mails them to you.
22    Q.   Who is the current records supervisor at
23 the police department?
24    A.   Susan Vahlkamp.

19

1    Q.   All right.  And other than -- did you
2 look at any documents that had been scanned into
3 the system with respect to this investigation in
4 preparing for this deposition?
5    A.   No.
6    Q.   Have you ever reviewed any documents
7 related to this investigation that were scanned
8 into the system at the Quincy Police Department?
9    A.   I'm sure at some point I have, but I
10 couldn't give you a specific time or what I looked
11 at.
12    Q.   Why are you sure that at some point you
13 have?
14    A.   I would just assume in preparation for
15 one, if not both trials that I would have looked at
16 things.
17    Q.   Other than reviewing -- well, let me ask
18 you this question.
19        As to the trial transcripts you reviewed,
20 that was just your testimony or other people's
21 testimony as well?
22    A.   Mine.
23    Q.   Okay.  Did you review your testimony from
24 both the first and the second trials?

20

1    A.   I believe so, yes.
2    Q.   All right.  And did you review your
3 testimony that you gave in that proceeding that was
4 just the court and the parties?
5    A.   Yes.
6    Q.   Okay.  Other than that testimony, did you
7 review any other testimony in this case in
8 preparing for your deposition?
9    A.   No.
10    Q.   And have you reviewed any documents in
11 preparing for your deposition other than the
12 testimony you just described and documents that you
13 were able to access through the RMS system?
14    A.   No.
15    Q.   Did you -- and I'm not asking you about
16 the content of any conversations, but did you meet
17 with your counsel in preparation for your
18 deposition?
19    A.   I have.
20    Q.   How many times?
21    A.   Three, maybe four.
22    Q.   When was the first of those meetings?
23    A.   I honestly couldn't give you a date.
24    Q.   Was it more than a month ago?

Transcript of Adam Gibson

Conducted on July 17, 2018

**21**

1    A.   I believe so, yes.
2    Q.   And for how long did you meet on that
3 occasion?
4    **A.   A couple hours maybe.**
5    Q.   All right.  And what about the second
6 time that you met with your counsel, when was that?
7    **A.   I don't remember any of the dates other**
8 **than we met yesterday also.**
9    Q.   All right.  For how long did you meet
10 yesterday?
11    **A.   Two hours maybe.**
12    Q.   All right.  And in total how much time
13 have you spent preparing with your counsel for this
14 deposition?
15    **A.   Six to eight hours, I would guess.**
16    Q.   For any of the meetings that you had with
17 your counsel in preparing for this deposition, was
18 anyone else present besides you and your counsel?
19    **A.   No.**
20    Q.   Have you discussed the fact that you were
21 being deposed today with anyone but your counsel?
22    **A.   Yeah.  I mean, I talked to my sergeant**
23 **about it.  Obviously Lieutenant Dreyer knows that**
24 **I'm being deposed because she is being deposed**

**22**

1 **also, but we haven't discussed content of the**
2 **deposition, no.**
3    Q.   Besides -- well, let me ask you this
4 question.
5        You said that obviously Lieutenant Dreyer
6 knows you're being deposed.  Why is that?
7    **A.   Because there is e-mails from counsel**
8 **with dates and times.**
9    Q.   All right.  And are those e-mails that
10 Lieutenant Dreyer and you have both been included
11 on?
12    **A.   Yes.**
13    Q.   Have you had e-mails -- well, let me ask
14 you this.
15        I want to go through your employment
16 history, and I want to ask you first about
17 positions that you've had outside the Quincy Police
18 Department.  Have you ever held a law enforcement
19 position anywhere beside the Quincy Police
20 Department?
21    **A.   I worked for the Department of**
22 **Corrections for a year and a half.**
23    Q.   That's for the Illinois Department of
24 Corrections?

**23**

1    A.   Yes.
2    Q.   And where in the Illinois Department of
3 Corrections did you work?
4    **A.   Illinois River Correctional Center.**
5    Q.   And just as a correctional officer there?
6    **A.   Yes.**
7    Q.   Did you go to the academy for the
8 Illinois Department of Corrections?
9    **A.   I did.**
10    Q.   When did you attend the academy?
11    **A.   I believe it was June or July of 1995.**
12    Q.   And then during what dates were you
13 employed by IDOC?
14    **A.   From that date until December 31st of**
15 **1997.**
16    Q.   When did you first apply for the Quincy
17 Police Department?
18    **A.   It would have been '96.**
19    Q.   Do you know when in 1996?
20    **A.   I don't.  At the time I think they tested**
21 **in like June or July.**
22    Q.   And when you say they tested in June or
23 July, what do you mean?
24    **A.   You have to take a written test and then**

**24**

1 a physical agility test.
2    Q.   Were you on a waiting list between when
3 you took that -- those tests and when you
4 ultimately started with the Quincy Police
5 Department?
6    **A.   I actually had to take it again in '97**
7 **because I didn't get hired off the list in '96.**
8    Q.   Do you know why you were not hired off
9 the list in '96?
10    **A.   Because I was far enough down the list**
11 **that they didn't hire enough people.**
12    Q.   All right.  And then when you took it in
13 1997, that time you were hired off the list?
14    A.   Yes.
15    Q.   Okay.  Have you ever applied for any
16 other law enforcement positions besides with the
17 Quincy Police Department and with IDOC?
18    **A.   Kansas City, Missouri.**
19    Q.   When did you apply in Kansas City?
20    **A.   That probably would have been '96 also.**
21    Q.   Did you take any exams with that
22 department?
23    **A.   I did.**
24    Q.   And is there a reason that you ultimately

Transcript of Adam Gibson
Conducted on July 17, 2018

---

**25**

1 didn't pursue employment with the Kansas City
2 department?
3    **A.   Actually, I think it was in '97.  And**
4 **then I got hired by Quincy.**
5    Q.   Did you have the opportunity -- well, let
6 me ask you this question.
7         Did you have the option of selecting
8 employment with the Kansas City department?
9    **A.   No.**
10    Q.   Were you turned down by Kansas City?
11    **A.   I just never heard anything back from**
12 **them.**
13    Q.   And then you took the position with
14 Quincy?
15    **A.   Yes.**
16    Q.   Other than what you've just testified
17 about, are there any other law enforcement
18 positions that you have applied for in your life?
19    **A.   I don't believe so, no.**
20    Q.   When did you graduate from high school?
21    **A.   1993.**
22    Q.   All right.  And have you ever been a
23 member of the military?
24    **A.   No.**

---

**26**

1    Q.   What did you do for employment between
2 graduating in 1993 and starting with IDOC in 1995?
3    **A.   I went to -- actually I enlisted in the**
4 **Marine Corps, and then they turned me down because**
5 **they said I has asthma.  And then I worked for**
6 **Ron's Tire for almost two years and then got hired**
7 **on at IDOC.**
8    Q.   How long did you work for Ron's Tire for?
9    **A.   Two years probably.**
10    Q.   With your experiences with the Marine
11 Corps, did you attend some portion of basic
12 training?
13    **A.   Yeah, but about the first week.**
14    Q.   And that's when you learned -- that's
15 when they informed you that you had a medical
16 condition that would prevent you from serving?
17    **A.   Yes.**
18    Q.   Is there a reason that you left the
19 Illinois Department of Corrections to apply for
20 police positions?
21    **A.   Because I wanted to be a police officer.**
22    Q.   Have you had any educational -- well, let
23 me ask you this.
24         Have you had any post high school

---

**27**

1 education?
2    **A.   No.**
3    Q.   Have you ever taken any higher level
4 college courses of any kind?
5    **A.   No.**
6    Q.   So did you begin with the Quincy Police
7 Department in 1998?
8    **A.   December 30th of 1997.**
9    Q.   And did you attend the police academy?
10    **A.   I did.**
11    Q.   Where did you attend the academy at?
12    **A.   University of Illinois Police Training**
13 **Institute.**
14    Q.   Did you attend that starting in December
15 of '97?
16    **A.   It was January of '98 when I started.**
17    Q.   Okay.  For how long were you at the
18 academy?
19    **A.   I think it was 12 weeks.**
20    Q.   Did you have a period of probation with
21 the Quincy Police Department --
22    **A.   Yeah.**
23    Q.   (Continuing) -- before you became a
24 full-time officer?

---

**28**

1    **A.   I'm sorry.  Yes.**
2    Q.   All right.  And for how long was your
3 probation period?
4    **A.   18 months.**
5    Q.   During any of your probation period or
6 when you first started with the Quincy Police
7 Department, did anyone serve as a field training
8 officer for you?
9    **A.   They did.**
10    Q.   Who?
11    **A.   It was several people, but my primary**
12 **field training officer was Doug Schlueter.**
13    Q.   All right.  Is there anyone else you
14 remember serving as a field training officer for
15 you besides Mr. Schlueter?
16    **A.   Jeff Royer.  I know Doug VanderMaiden,**
17 **but it was only for a short period.  I don't**
18 **remember anybody else.**
19    Q.   When you came back from the academy, were
20 you at that point a patrol officer?
21    **A.   Yes.**
22    Q.   And did you have -- was there -- well,
23 let me ask you this.
24         At some point were you promoted beyond

---

Transcript of Adam Gibson
Conducted on July 17, 2018

29

1  serving as a patrol officer?
2      A.  Yes.
3      Q.  When were you promoted?
4      A.  Well, it's not a promotion for our
5  department, but I've served in several different
6  positions.
7      Q.  When did you have your first change in
8  position after starting as a patrol officer?
9      A.  I worked with the drug task force 2000 to
10 2001.
11     Q.  After the drug task force, where in the
12 department did you go?
13     A.  I went back to patrol.
14     Q.  For how long?
15     A.  I think up until the point that I got the
16 canine, which would have been either late 2006 or
17 early 2007.
18     Q.  All right.  And then you had a canine
19 until when?
20     A.  2013.  October of 2013 is when he was
21 retired.
22     Q.  All right.  And at that point -- well, at
23 that point what position did you take in the
24 department?

30

1      A.  Back to patrol.
2      Q.  For how long were you in patrol at that
3  point?
4      A.  Two months.
5      Q.  And then where did you go?
6      A.  Detective assigned to elder crimes.
7      Q.  And is that -- have you had any other
8  positions in the department since you've became a
9  detective assigned to elder crimes?
10     A.  I don't believe so, no.
11     Q.  So as you sit here today, is that your --
12 is your assignment still a detective assigned to
13 elder crimes?
14     A.  Yes.
15     Q.  Am I right then that you had three stints
16 in the patrol -- am I right -- let me start the
17 question again.
18         Am I right that you had three stints as a
19 patrol officer in the department then?
20     A.  I believe that would be correct, yes.
21     Q.  Okay.  And during your first stint before
22 you went to the drug task force, did you have
23 anyone that was your partner, that was your
24 assigned partner?

31

1      A.  No, we don't have partners.
2      Q.  Okay.  Are you -- as a patrol officer,
3  are you assigned -- let me start the question
4  again.
5          As a patrol officer, do you have any
6  assignments other than to be in a police car for
7  your shift?
8      A.  I guess I don't know what you mean by
9  other assignments.
10     Q.  Let me ask you this.  Do patrol officers
11 in the Quincy Police Department during the time
12 that you've worked in Quincy have walking beats or
13 bike beats or any beats that don't involve being in
14 a patrol car?
15     A.  Yeah.  Well, I've also served as a bike
16 patrol officer.
17     Q.  For what years did you work as a bike
18 patrol officer, or during what years?
19     A.  We don't technically have just an
20 assignment to bikes.  Basically you just ride as
21 manpower allows, and I couldn't even begin to tell
22 you what year I went to bike school.
23     Q.  When you came back to patrol for that two
24 months between October of 2013 and when you were

32

1  assigned to elder crimes, did you have any stints
2  in that period where you worked as a bike officer?
3      A.  I don't believe so, no.
4      Q.  And does the way it work in the Quincy
5  Police Department that for a particular shift you
6  might be a bike officer, or is that an assignment
7  you get for a longer period of time?
8      A.  No, just basically in a shift as manpower
9  allows.
10     Q.  Can you tell me what you mean by "as
11 manpower allows"?
12     A.  Because we have -- you have minimum
13 manpower levels, and at the time I think it was
14 six.  So if you had more than six officers, the
15 extra officers would either be assigned as like a
16 warrant car, a traffic car, or a west end car, free
17 car, or as bikes; but typically you couldn't ride
18 bikes by yourself, you had to have somebody that
19 was also bike certified to ride with you.
20     Q.  And for the six patrol officers in the
21 minimum manpower, were those officers assigned
22 various portions of the city to patrol?
23     A.  Yes.
24     Q.  All right.  Have the boundaries of those

Transcript of Adam Gibson
Conducted on July 17, 2018

33

1  six patrol areas changed over the time that you've
2  been assigned to the Quincy -- or during the time
3  that you worked with the Quincy Police Department?
4      **A.   I don't believe the district boundaries**
5  **have changed.  They changed just prior to me being**
6  **hired on.**
7      Q.   Okay.  And as a patrol officer, were you
8  assigned to patrol the same district over a period
9  of time or did it change every shift?
10     **A.   You basically bid your district for a**
11 **year at a time.**
12     Q.   Are there any areas of the city that you
13 have -- let me start the question again.
14         Are there any districts that you haven't
15 bid in Quincy during the time that you worked as a
16 patrol officer?
17     **A.   There is none that I haven't worked, but**
18 **the districts that I bid was typically District 1**
19 **and then I think I bid District 5.  District 1 is**
20 **the northwest side of Quincy from 18th Street to**
21 **the river, Oak Street north; and District 5 is from**
22 **Oak to York and then 18th to the river.**
23     Q.   And why did you bid District 1 for the
24 times that you bid it?

34

1      **A.   That's just always where I worked.**
2      Q.   Did you have any reason for bidding that
3  district other than a familiarity with it?
4      **A.   No, other than that's where I like to**
5  **work at.**
6      Q.   Why did you like to work District 1?
7      **A.   It's the most -- one of the most active**
8  **districts that we have.**
9      Q.   And when you say it's the most active, do
10 you mean the most active in terms of calls for
11 service?
12     **A.   Calls for service, gang activity, drug**
13 **activity.**
14     Q.   The times that you bid District 5, why
15 did you bid District 5?
16     **A.   I think it was my last year on midnights**
17 **and I just bid it as a change.**
18     Q.   Why did you seek a change your last year
19 on midnights?
20     **A.   I don't really have a specific reason.**
21     Q.   Does the -- do the crime patterns in
22 District 5 differ from the crime patterns in
23 District 1?
24     **A.   District 5 is typically your bar**

35

1  **district.**
2      Q.   Have there been particular years over the
3  time that you worked as a patrol officer where you
4  worked midnights?
5      **A.   Yes.**
6      Q.   What years?
7      **A.   I don't know the exact years.  I worked**
8  **midnights for -- between Street Crimes and actually**
9  **being assigned to midnights, I worked midnights for**
10 **probably 12 to 13 years.**
11     Q.   During the time that you worked in patrol
12 between when you served on the drug task force and
13 when you became a canine officer, did you work
14 midnights during that time period?
15     **A.   Yes.**
16     Q.   During which of those years?
17     **A.   All of those years.**
18     Q.   And did you have times during that time
19 period, between the drug task force and being a
20 canine officer, that you weren't assigned to
21 midnights?
22     **A.   No.**
23     Q.   For the two months that you were back to
24 patrol between October of 2013 and when you became

36

1  a detective, did you work midnights during that
2  time period?
3      **A.   No.  That was -- that was on day shift.**
4      Q.   All right.  And you mentioned -- you
5  mentioned something about Street Crimes.  Was
6  that -- did you have an assignment related to
7  Street Crimes at some point while you worked with
8  the Quincy Police Department?
9      **A.   The canine is assigned to the Street**
10 **Crimes Unit.  The Street Crimes Unit in Quincy is**
11 **basically two three-man units, and the reason there**
12 **is two is we work 12-hour shifts.  So basically**
13 **when one shift is working the other shift is off,**
14 **so -- and it works vice versa.**
15     Q.   So what are the two -- what are the
16 12-hour shifts for the Street Crimes?
17     **A.   When I started Street Crimes, it was**
18 **5 p.m. to 5 a.m., and then at some point after a**
19 **couple of years they changed it from 3 p.m. to**
20 **3 a.m.**
21     Q.   Do you know when they made that change?
22     **A.   No.**
23     Q.   And were you choosing to work midnights
24 or was it the situation where you didn't have

Transcript of Adam Gibson

Conducted on July 17, 2018

37

1 enough seniority to not be working midnights or why
2 did that end up being your shift?
3    **A.   No, I chose to work midnights.**
4    Q.   Why did you choose to work midnights?
5    **A.   That's just the shift that I like to**
6 **work.**
7    Q.   Was there more activity as a canine
8 officer working midnights than working the day
9 shift?
10    **A.   Depends on the day.**
11    Q.   Well, did you choose to work midnights
12 because you wanted a shift that had more activity?
13    **A.   Yeah, that's why I bid midnights most of**
14 **the time, but with Street Crimes you don't have a**
15 **choice.  I mean, that's -- the hours are set.  If**
16 **you take an assignment to Street Crimes, then those**
17 **are the hours that you work.**
18    Q.   Well, in the Street -- in the Street
19 Crimes Unit as a canine officer, are there some
20 people in Street Crimes that are working the day
21 shift and some that are working the midnight shift?
22    **A.   No, ma'am.**
23    Q.   So everyone is working --
24    **A.   Yeah, all three officers.  You have one**

38

1 **two-man car and then the canine officer.**
2    Q.   Is there a particular reason that you
3 became -- well, let me ask you a better question.
4        Did you choose to become the canine
5 officer?
6    **A.   I applied for it, yes.**
7    Q.   Why did you apply for it?
8    **A.   It was a position that I'd always wanted.**
9    Q.   Why did you always want that position?
10    **A.   Just because I thought that working with**
11 **dogs was interesting and it would be something that**
12 **would be fun to do.**
13    Q.   In October 2013 when your dog was
14 retired, did you have an option at that point to
15 remain a canine officer?
16    **A.   Yes.**
17    Q.   And is there a reason you elected not to
18 remain a canine officer?
19    **A.   Because it's very labor intensive and**
20 **there were a lot of younger guys on the department**
21 **that wanted dogs and we only have two dogs on our**
22 **department, so if I would have taken the dog again,**
23 **the younger guys that wanted it wouldn't have had**
24 **an opportunity for another up to ten years.**

39

1    Q.   If you had chosen to be selfish and
2 remain the canine officer at that point, is that
3 something you could have done?
4    **A.   Yes.**
5    Q.   Had you ever applied or sought to be a
6 detective in the department before you were
7 assigned to -- before you became a detective
8 assigned to elder crimes?
9    **A.   No.**
10    Q.   And is there a reason when you were
11 ending your stint as a canine officer that you
12 became a detective assigned to elder crimes?
13    **A.   Yes.**
14    Q.   What's the reason?
15    **A.   It was a case that I worked with Larry**
16 **and Bernice Lamb, an elderly couple, where a**
17 **gentleman took advantage of them on a home repair**
18 **scam that I got involved in as a canine officer,**
19 **and I just decided then that that would be a good**
20 **field to move into.**
21    Q.   Was there someone vacating the position
22 of a detective assigned to elder crimes when you
23 took that position?
24    **A.   Yes.**

40

1    Q.   Who vacated that position?
2    **A.   Tom Liesen.**
3    Q.   And is there more than one person --
4 well, let me ask this question.
5        At the time you became the detective
6 assigned to elder crimes, was there more than one
7 person in the department that had that position?
8    **A.   No.**
9    Q.   And what position did Tom Liesen move to
10 when you became the detective assigned to elder
11 crimes?
12    **A.   He went to patrol.**
13    Q.   At the time that you stopped being the
14 canine officer, did you have an option of becoming
15 a detective with some other kind of assignment in
16 the department?
17    **A.   No.  There was no other positions open at**
18 **that time.**
19    Q.   If there had been a position open to be a
20 detective investigating some other kinds of case,
21 is that something you would have chosen at that
22 point?
23        MS. EMERY:  Objection; calls for
24 speculation.

Transcript of Adam Gibson
Conducted on July 17, 2018

41

1       Go ahead, Adam.
2   BY MS. THOMPSON:
3       Q.  You can answer the question.
4       A.  With our -- the way our investigations
5   work, all of the detectives work all cases.  It's
6   not that -- even though I may be assigned to elder
7   crimes, I still work all areas of investigations.
8   So I felt like moving into the area of elder crimes
9   as a specialty was something that would -- that I
10  was interested in.
11      Q.  I want to ask you some questions about
12  the structure of the Quincy Police Department, and
13  for all of the questions I'm going to ask you right
14  now about structure, I'm asking you about the
15  structure at the time that you became a detective
16  assigned to elder crimes.
17      A.  Okay.
18      Q.  And I'll try to make that clear, but do
19  you understand that when I'm asking you these
20  questions that follow that's the time period I'm
21  asking about?
22      A.  Yes, ma'am.
23      Q.  So at the point you became a detective
24  assigned to elder crimes, was there a particular

42

1   part of the Quincy Police Department that included
2   the detective division?
3       A.  Like a specific area?
4       Q.  Yeah.
5       A.  Yeah.  There is a room where the
6   detectives have a desk.
7       Q.  Okay.  And at the time that you became a
8   detective assigned to elder crimes, how many
9   detectives total were there in the department?
10      A.  I believe it was five.
11      Q.  And can you name those detectives?
12      A.  Eric Johnson, Gabe VanderBol, Doug
13  McQuern, Cathy Martin, Anjanette Biswell.  I think
14  that was it.
15      Q.  At the time you became a detective, did
16  any of those other detectives have areas of
17  specialty, like you being the elder crimes
18  detective?
19      A.  Yeah.  You have two juvenile detectives,
20  that would have been Doug McQuern and Cathy Martin,
21  Anjanette was the computer person, and then you
22  have two adult general criminal.
23      Q.  And when you say Anjanette was the
24  computer person, can you explain what her

43

1   assignment was?
2       A.  She does -- did the computer forensic
3   examinations, cell phone examinations, child porn
4   investigations.
5       Q.  You said earlier that all detectives work
6   all cases.  Can you explain how -- when you first
7   started working as a detective, how assignments for
8   detectives to work various cases were made?
9       A.  Basically the sergeant just walks back
10  and hands somebody a case.
11      Q.  And who was the sergeant at the time you
12  started as a detective?
13      A.  John Summers.
14      Q.  All right.  And I take it that -- well,
15  let me ask you this.
16          What rank did John Summers have when you
17  started as a detective?
18      A.  He was a sergeant.
19      Q.  All right.  So did -- as an elder
20  services officer -- as an elder services detective,
21  did you have the ability to ask Sergeant Summers
22  for assistance on a case you were working on?
23      A.  Yes.
24      Q.  And, for instance, if there was work to

44

1   be done on a case that you felt you couldn't do by
2   yourself, would you ask Sergeant Summers for
3   additional manpower on that case?
4       A.  Yes.
5       Q.  Did you have the authority when you
6   started as an elder services officer to ask other
7   detectives for assistance without going through
8   Sergeant Summers?
9       A.  Yes.
10      Q.  And how would you decide whether you
11  needed to get Sergeant Summers's input on getting
12  additional help or whether you could just ask
13  someone for assistance?
14      A.  I don't think there is a decision
15  process.  I mean, it's just if somebody else was
16  there and you needed help, you would ask them for
17  it.
18      Q.  If you had an investigation you were
19  working on that had some computer angle such as the
20  things you described, needing to look at someone's
21  cell phone, needing to do a forensic examination,
22  is that something you would always ask Detective
23  Biswell's assistance on?
24      A.  Yeah, she was -- is the only officer --

Transcript of Adam Gibson
Conducted on July 17, 2018

45

1  at the time she was the only officer that did
2  those.
3      Q.  Were there any -- was there ever a time
4  that you had a case with some forensic computer
5  angle where you did a forensic computing
6  examination yourself?
7      A.  No.
8      Q.  Did you ever have Sergeant Summers --
9  well, let me ask you this question.
10         In the first six months that you were
11 assigned to the detective division, did you have
12 Sergeant Summers assign you to any investigations
13 that did not concern an elder crime investigation?
14     A.  I don't -- I don't know that I asked him
15 to be assigned.  I mean, there is other cases that
16 they just give us.
17     Q.  When you say there is other cases they
18 give us, who is the "they" that does the giving?
19     A.  Summers, Sergeant Summers.
20     Q.  Okay.  So during the six -- the first six
21 months that you worked as a detective, did Sergeant
22 Summers assign you to cases that didn't have some
23 component of the investigation that related to
24 elder crimes?

46

1      A.  Yes.
2      Q.  How many such cases were you assigned in
3  the first six months that you worked as a
4  detective?
5      A.  I have no idea.  I couldn't give you a
6  number.
7      Q.  Is it less than ten?
8      A.  I can't give you a number.
9      Q.  Could it be more than a hundred?
10     A.  Well, no, it would not be more than a
11 hundred.
12     Q.  Okay.  Is it more than 50?
13     A.  No.
14     Q.  All right.  Is it more than 25?
15     A.  That, I don't know.
16     Q.  And in general terms, the cases that you
17 were assigned by Sergeant Summers in the first six
18 months that did not involve elder crimes, do you
19 remember the types -- do you remember the types of
20 investigations that those cases were?
21     A.  No, other than one of them was a murder.
22     Q.  Were any -- were more than one of them a
23 murder?
24     A.  In the first six months?  I don't believe

47

1  so, no.
2      Q.  All right.  And is the murder that you
3  were assigned to investigate the Cory Lovelace
4  death investigation?
5      A.  Actually it would be two then.  No.
6      Q.  So aside from this investigation, there
7  was another murder investigation you were assigned
8  to in your first six months of working as a
9  detective?
10     A.  Yes.
11     Q.  Was that the Booth investigation?
12     A.  That was not.
13     Q.  All right.  What investigation was it?
14     A.  It would have been Alex Koehler was the
15 suspect.
16     Q.  And do you know why you in particular
17 were assigned to that investigation?
18     A.  Because I had responded on the initial
19 ambulance call.
20     Q.  Were you the only detective that was
21 assigned to work that particular investigation?
22     A.  There -- there was another detective that
23 was assigned that came out and processed the scene.
24     Q.  Other than that detective working on

48

1  processing the scene, at any point when you were
2  involved in that homicide investigation, were there
3  any other detectives assigned to it?
4      A.  I don't believe so, no.
5      Q.  Was someone ultimately arrested in that
6  case?
7      A.  They were.
8      Q.  And when were they arrested?
9      A.  It would have been the same day that the
10 victim was discovered.
11     Q.  So how much time total did you work on
12 that homicide investigation?
13     A.  Probably a week by the end of it.
14     Q.  When is it that you were assigned to that
15 investigation?
16     A.  It was June, June or July.
17     Q.  Of 2014?
18     A.  Yes.
19     Q.  In total during all the time that you
20 worked as an elder crimes detective, how many cases
21 have you investigated that concern a death?
22     A.  2014 I had two that were homicides, 2015
23 I had five that were homicides, and I have
24 investigated numerous deaths, whether it be

Transcript of Adam Gibson
Conducted on July 17, 2018

49

1  suicide, because we investigate all deaths whether
2  it's suicide, anything of suspicious nature, even
3  if it ends up being natural.  If they just have
4  someone that someone finds dead at home with no
5  real reason, they send the investigators.
6      Q.   As an elder crimes detective, did you
7  investigate some death cases where you were
8  investigating neglect essentially?
9      A.   Yes.
10     Q.   And do you consider that to be a homicide
11 investigation or a different kind of investigation?
12     A.   Well, ultimately it's a homicide, but
13 it's a death investigation.
14     Q.   In 2016, did you investigate any homicide
15 cases?  And let me ask you a better question.
16        In 2016, did you investigate any cases
17 that involved a death?
18     A.   I would assume that I did.  To recall any
19 specifically, I don't recall anything specific.
20     Q.   In 2017, did you investigate any cases
21 that involved a death?
22     A.   Generally, there weren't any homicides,
23 but I'm sure at some point that I did investigate a
24 death in 2017.

50

1      Q.   And so far this year in 2018, have you
2  investigated any deaths?
3      A.   Yes.
4      Q.   How many?
5      A.   Probably less than five, I would say.
6      Q.   And of the deaths that you've
7  investigated in 2018, how many of those involve a
8  person who died who was elderly?
9      A.   I would say one.
10     Q.   Of the other cases you've investigated in
11 2018, what were the ages of the other people who
12 died whose deaths you've investigated, just talking
13 about 2018?
14     A.   The ones I can remember are both
15 overdoses and they were in their 30s and 40s.
16     Q.   In 2017, were there any homicides within
17 the -- within Quincy?
18     A.   Not that I remember.
19     Q.   Were there any death investigations that
20 anyone in the Quincy Police Department undertook in
21 2017?
22     A.   Yeah.  We do death investigations
23 sometimes daily.
24     Q.   And did your participate in death

51

1  investigations in 2017?
2      A.   Yes.
3      Q.   But no investigations that turned into an
4  investigation where there was a suspicion of
5  homicide?
6      A.   None that I remember, no.
7      Q.   All right.  In 2016, were there any
8  homicides in Quincy?
9      A.   I don't believe there were.
10     Q.   Were there any cases that were
11 investigated as a homicide in 2016 in Quincy?
12     A.   None that I can remember, no.
13     Q.   And I take it that in 2016 you also
14 participated in death investigations?
15     A.   I did.
16     Q.   But none that became a homicide
17 investigation; is that correct?
18     A.   I believe that's correct, yes.
19     Q.   Going back to 2018, the one homicide
20 investigation you've been involved in where
21 there -- where the person who died was elderly,
22 have there been any arrests in that case?
23     A.   No.  I didn't say it was a homicide
24 investigation.  That was a death investigation.

52

1      Q.   Okay.  Well, as to the one elderly
2  person, that was never investigated as a homicide?
3      A.   No.
4      Q.   Is it an ongoing investigation?
5      A.   No.
6      Q.   And then the two overdoses that you
7  referenced where the people were in their 30s or
8  40s, were either of those homicide investigations?
9      A.   Well, technically I guess you would say
10 yes.  It was drug induced homicide.
11     Q.   Are those open investigations?
12     A.   They are.
13     Q.   And I realize there may be some things
14 you can't tell me about those investigations, but
15 are those being actively investigated to determine
16 if there is a person responsible for those
17 overdoses?
18     A.   One of those hinges basically on the
19 ability to get into their cell phone when that
20 technology becomes available.
21     Q.   Are those both open investigations at
22 this time?
23     A.   Yes.
24     Q.   The elderly person death investigation

Transcript of Adam Gibson

Conducted on July 17, 2018

---

**53**

1  that you did in 2018, was that a drug-related
2  death?
3      A.  No.  It was natural.
4      Q.  Was there a determination by the coroner
5  in that case that the death was natural?
6      A.  Yes.
7      Q.  Was that a determination by Coroner
8  Keller?
9      A.  No.  That was actually out of -- I
10  believe it was out of St. Louis.  It was a person
11  that had been transferred to St. Louis.
12      Q.  Was that a person from Quincy who
13  ultimately passed away in St. Louis?
14      A.  Yes, ma'am.
15      Q.  In either of the overdose cases that
16  you're involved in in investigating currently, has
17  Coroner Keller been involved in those
18  investigations?
19      A.  The one he was out of town and Ben
20  Hamilton was the coroner that responded, and the
21  other one was Mr. Keller.
22      Q.  Is Ben Hamilton related to Gary Hamilton?
23      A.  I think it's his nephew, but I can't be a
24  hundred percent sure.

**54**

1      Q.  Going back to 2015, were you involved in
2  investigating five -- well, let me ask you that
3  question in a better way.
4          In 2015, the five investigations that you
5  mentioned, were those all homicide investigations?
6      A.  Yes.
7      Q.  And in any of those five was there a
8  determination that someone had been the victim of a
9  homicide?
10      A.  Yes.
11      Q.  And how many of them?
12      A.  All of them.
13      Q.  Did any of those cases involve a person
14  who was elderly who died?
15      A.  No.
16      Q.  And were there arrests made in any of
17  those five cases?
18      A.  All of them.
19      Q.  In those five cases were there -- was
20  anyone else who is a detective in Quincy involved
21  in the investigation?
22      A.  Yes.
23      Q.  Who else was involved in those
24  investigations, in speaking about detectives?

**55**

1      A.  I don't recall who specifically was
2  involved.
3      Q.  In the Quincy Police Department is there
4  such a thing as a lead detective on a case?
5      A.  Yes.
6      Q.  All right.  And for any of those five
7  cases were you the lead detective?
8      A.  All of them.
9      Q.  What does it mean to be the lead
10  detective on a case in the Quincy Police
11  Department?
12      A.  Basically it's your case that you are
13  assigned through its completion.
14      Q.  And what does it mean that it's your case
15  that you're assigned?
16      A.  It's your responsibility to do whatever
17  needs to be done on the case.
18      Q.  The other detectives that worked on the
19  five cases that you worked on in 2015, were
20  those -- were those detectives people that you
21  asked for assistance or any of them assigned by
22  sergeant -- by the sergeant of the detective
23  division to assist?
24      A.  Both.

**56**

1      Q.  And do you count -- well, let me ask you
2  this.
3          Was Coroner Keller involved in
4  investigating any of the five cases you worked on
5  in 2015?
6      A.  All of them.
7      Q.  Did he do an autopsy in all five?
8      A.  Well, he didn't do the autopsy, but he
9  had them -- took the body to Bloomington.
10      Q.  Did he oversee the autopsy in all five?
11      A.  Yes.
12      Q.  And you said he took the body to
13  Bloomington.  Did he -- did all five -- were all
14  five of those autopsies done by Dr. Scott Denton?
15      A.  I don't believe so.  I believe
16  Dr. Yeomans might have done one of them.
17      Q.  Did Dr. Denton do the other four?
18      A.  To the best of my recollection, yes.
19      Q.  Were you present for any of those
20  autopsies?
21      A.  Yes.
22      Q.  How many of them?
23      A.  I'm not sure, possibly all five of them,
24  but I think there might have been one that I didn't

Transcript of Adam Gibson
Conducted on July 17, 2018

57

1 go to, that somebody else went to.
2    Q.   How many homicides were there in Quincy
3 total in 2015?
4    A.   Five.
5    Q.   So of the five homicides that occurred in
6 Quincy in 2015 you were the lead detective in all
7 of them?
8    A.   Yes, ma'am.  I was the on-call detective
9 when all of them happened.
10    Q.   What does it mean to be the "on-call
11 detective"?
12    A.   All of the detectives take -- I think
13 it's eight weeks throughout the year that you're
14 assigned as the on-call detective, which means that
15 you have to be available 24/7 for a week at a time.
16    Q.   And so is it essentially -- well, let me
17 ask you this.
18        Does that on-call period include even
19 Detective Biswell and her computer specialties?
20    A.   I don't -- I think they took her out of
21 the on-call rotation.
22    Q.   Are there any other detectives that are
23 excluded from the on-call rotation besides her?
24    A.   No.

58

1    Q.   Okay.  And so was it essentially a matter
2 of chance that in 2015 you were the on-call
3 detective for all five homicides?
4    A.   Yes, ma'am.
5    Q.   In 2015 -- well, let me ask you this.
6        You said in 2014 you were involved in two
7 homicide investigations; is that right?
8    A.   Yes.
9    Q.   And in 2014, how many homicides were
10 there in Quincy?
11    A.   I believe that was -- those were the only
12 two.  There was possibly one more, but I can't
13 remember if that was -- I believe that was 2014.
14    Q.   And in 2014 -- in the two homicides cases
15 in 2014, were you the lead in both?
16    A.   The one in December I was not the lead.
17 I was actually working a hire back that night.
18 Eric Johnson was the detective that got called in,
19 but Sergeant Summers had me do some of the work on
20 it.
21    Q.   Okay.  So in one you were the lead and in
22 one Detective Johnson was the lead?
23    A.   Correct.
24    Q.   And you said there was maybe one other

59

1 homicide as well?
2    A.   I believe so.  I can't remember if it was
3 in 2014.  There is a guy that shot another guy on
4 11th Street between York and Jersey.
5    Q.   Who was the lead detective in this case?
6    A.   I honestly don't even know.  It was
7 either -- I think it was either Detective Biswell
8 or Detective VanderBol.
9    Q.   When you were first assigned as an elder
10 crimes detective, what was your understanding as to
11 what your job as a detective would entail?
12    A.   Like just exactly what I described, that
13 if there is crimes against elderly that come in
14 they come to me.  Other than that, you're a general
15 criminal detective.
16    Q.   And did you -- when you began working as
17 an elder crimes detective, did you have some
18 understanding of what percentage of your time you
19 would be spending working on elder crimes cases?
20    A.   No.
21    Q.   Was your -- when you started, was your
22 position paid for by any kind of funding source
23 outside of the City of Quincy?
24    A.   Yes.  Part of the salary is paid by the

60

1 West Central Illinois Area Agency On Aging.
2    Q.   As -- because your salary was in part
3 paid for by that organization, did you have
4 particular reporting requirements that you had to
5 make to that agency about what you were doing?
6    A.   Yes.
7    Q.   And what kind of reporting did you have
8 to do to that agency?
9    A.   It's basically just a monthly report of
10 totals of contacts, hours, different things that
11 are on there, types of investigations, whether they
12 are abuse, neglect, or exploitation investigations.
13    Q.   Was there anyone in that organization who
14 supervised you in some -- has supervised you at any
15 point in some capacity as an elder crimes
16 detective?
17    A.   No.
18    Q.   And you had -- did you have meetings that
19 you attended with that organization as an elder
20 crimes officer?
21    A.   I do.
22    Q.   And how often are those meetings?
23    A.   We have what they call an M team meeting,
24 and that's monthly, and then I have a triad

Transcript of Adam Gibson

Conducted on July 17, 2018

61

1 meeting, which is monthly, and then I have what
2 they call a fatality review meeting, which is
3 quarterly.
4    Q.   For all of those meetings that you've
5 described, does anyone else from the Quincy Police
6 Department attend besides you?
7    A.   No.
8    Q.   And who else attends those meetings other
9 than you?
10    A.   The M team is someone from adult
11 protective services, a doctor, a geriatric
12 specialist, a lawyer specializing in elder law, an
13 alcoholic and substance abuse specialist, mental
14 health specialist.  There is six or seven people,
15 different organizations.  The M team stands for
16 multidisciplinary.  It's basically just a
17 brainstorming meeting with particular cases that
18 APS presents that they may have trouble trying to
19 figure out what direction to try to handle the
20 case.
21    Q.   During the entire time that you've worked
22 for the Quincy Police Department, have you had any
23 sources of income other than your salary with the
24 police department?

62

1    A.   No.
2    Q.   So is it true that you haven't had any
3 other side jobs or moonlighting jobs while you've
4 been employed by Quincy?
5    A.   No.
6    Q.   Is that allowed by the Quincy Police
7 Department rules and regulations?
8    A.   It is.
9    Q.   Have you in your life had any -- well,
10 let me ask you this question in a better way.
11         Have you ever volunteered for a local
12 political campaign?
13    A.   Yes.
14    Q.   How many times have you done that?
15    A.   Probably two, maybe three.
16    Q.   All right.  And what candidates did you
17 volunteer for in those two to three times?
18    A.   I helped Jon Barnard, I helped Gary
19 Farha, and Jeff Vancamp.
20    Q.   What position was Jeff Vancamp seeking
21 when you volunteered with his campaign?
22    A.   Mayor.
23    Q.   And I'm not from Quincy.  Was he elected?
24    A.   No.

63

1    Q.   All right.  How many times did you
2 volunteer for his campaign, just once?
3    A.   Yeah.  It wasn't anything other than
4 passing out fliers.
5    Q.   On one occasion?
6    A.   Yeah.
7    Q.   Jon Barnard had more than one campaign
8 for State's Attorney; is that correct?
9    A.   Uh-huh.
10    Q.   And did you volunteer for more than one
11 of his campaigns?
12    A.   No, just the second one, I believe, or
13 the last one, whenever it was.
14    Q.   And what did you do for his last
15 campaign?
16    A.   Just helped put out some signs, nothing
17 extravagant.
18    Q.   Did you do that on more than one
19 occasion?
20    A.   No.
21    Q.   All right.  And the one time that you
22 volunteered to put out signs for him, why did you
23 volunteer to do that?
24    A.   Just to help him out.

64

1    Q.   Did you want to see him successfully
2 elected?
3    A.   I did.
4    Q.   Is there a reason why you didn't provide
5 assistance on more than one occasion for
6 Mr. Barnard if you wanted to see him elected?
7    A.   Timing.
8    Q.   All right.  And do you remember when it
9 is that you helped put out signs for his campaign?
10    A.   No.
11    Q.   How many times have you volunteered for a
12 political campaign for Gary Farha?
13    A.   Once, and that was putting out signs
14 also.
15    Q.   All right.  And when did you do that?
16    A.   Sometime during his campaign.  I don't
17 know when.
18    Q.   And when you say putting out signs, I
19 mean, is this literally driving around putting
20 signs up in town?
21    A.   Yard signs.  Taking signs to people's
22 houses.
23    Q.   Okay.  And is there a reason why you --
24 well, let me ask you this.

Transcript of Adam Gibson
Conducted on July 17, 2018

---

65

1    Did you want to see Gary Farha elected?
2    **A.  Yes.**
3    Q.  And is there a reason why if you wanted
4  it see him elected that you didn't volunteer more
5  than once for his campaign?
6    **A.  Again, just timing.**
7    Q.  Have you ever attended a fundraiser for a
8  local political candidate?
9    **A.  I have.**
10    Q.  How many times have you attended a
11  fundraiser?
12    **A.  Once or twice.**
13    Q.  And who were those fundraiser or
14  fundraisers for?
15    **A.  That would have been for Gary Farha as**
16  **well.**
17    Q.  All right.  And when did you attend the
18  one or two fundraisers for Gary Farha?
19    **A.  The one was a golf outing, and I think**
20  **one was at the Holiday Inn.**
21    Q.  All right.  When did you attend the golf
22  outing?
23    **A.  I don't recall when it was.**
24    Q.  Did you have to -- was this where people

66

1  were playing golf to raise money for his campaign?
2    **A.  Yes.**
3    Q.  All right.  Did you have to pay to play
4  golf at that fundraiser?
5    **A.  Yes.**
6    Q.  Did you -- were you golfing in foursomes?
7    **A.  Yes.**
8    Q.  Who was in your foursome?
9    **A.  Kathy Schisler, Justin Ebbing, and I**
10  **don't remember who the fourth one was.**
11    Q.  When was the event at the Holiday Inn
12  that you attended for Gary Farha?
13    **A.  I don't remember the day of that either.**
14    Q.  Was that this year?
15    **A.  No.  All of it was during the campaign.**
16    Q.  And when was the campaign, his campaign?
17    **A.  I believe he was elected November of '16,**
18  **I believe.  I don't remember whether it was '16 or**
19  **'17.**
20    Q.  Is it a fair determination that the
21  events you attended for him were earlier in the
22  year that he was elected, whatever year that was?
23    **A.  Yes.**
24    Q.  Okay.  And the event of the Holiday Inn,

67

1  was that like a mixer?
2    **A.  I believe so, yes.**
3    Q.  Other than those two fundraisers for Gary
4  Farha, have you ever attended any local political
5  meetings?
6    **A.  Like city council meeting or --**
7    Q.  That's a good question.  Have you ever
8  attended any local political rallies or a political
9  election event?
10    **A.  I honestly don't know.  I'm not saying**
11  **no, but -- it's possible, but I don't remember any**
12  **other ones, no.**
13    Q.  Have you ever -- well, have you ever put
14  a sign in your own yard for a local political
15  candidate?
16    **A.  Yes.**
17    Q.  Did you put signs in your yard for Jon
18  Barnard?
19    **A.  I did not have Jon's sign, no.**
20    Q.  What about Gary Farha?
21    **A.  I did.**
22    Q.  And what about Jeff Vancamp?
23    **A.  Yes.**
24    Q.  For anyone else?

68

1    **A.  Brian Vonderhaar.**
2    Q.  What was he running for?
3    **A.  Sheriff.**
4    Q.  Anyone else whose signs you put in your
5  yard?
6    **A.  None that I remember.**
7    Q.  All right.  And you have -- you did make
8  one political donation to Gary Farha's campaign,
9  correct?
10    **A.  Yes.**
11    Q.  That was for $400 in October of 2015?
12    **A.  Yes.**
13    Q.  Is that the only political contribution
14  for a local candidate that you've made in your
15  life?
16    **A.  I honestly don't know.**
17    Q.  As you sit here today, do you recall
18  making any other contributions to local candidates?
19    **A.  I don't recall, no, but it's possible**
20  **that I did.**
21    Q.  Why did you make that donation in October
22  of 2015?
23    **A.  To support Gary Farha.**
24    Q.  Did Gary Farha ask you to donate money to

Transcript of Adam Gibson
Conducted on July 17, 2018

69

1 his campaign?
2    **A. No.**
3    Q. I take it that in your life you've had
4 communications with Gary Farha over investigations
5 that you're both working on; is that correct?
6    **A. Yes.**
7    Q. And aside from investigations that you've
8 worked on with Gary Farha and aside from political
9 events, have you talked to Gary Farha on other
10 occasions?
11    **A. I don't understand what you're asking.**
12    Q. Sure. Is Gary Farha someone that you
13 consider a friend?
14    **A. Yeah.**
15    Q. Is he someone that you've spent time with
16 outside of your professional obligations?
17    **A. Like out socializing, is that what you**
18 **are asking?**
19    Q. Let's take socializing for one. Have you
20 socialized with Gary Farha in your life?
21    **A. Probably a couple times, yeah.**
22    Q. Okay. Have you attended any parties,
23 other than political events, where Gary Farha has
24 been there, too?

70

1    **A. I'm certain that I have.**
2    Q. Do you have mutual friends?
3    **A. Yeah.**
4    Q. Of the five homicide cases that you
5 worked on in 2015, were all of those cases
6 prosecuted by the Adams County State's Attorney?
7    **A. Yes.**
8    Q. And did you work in any of those cases
9 with Gary Farha?
10    **A. Most of them were with Jon Barnard or**
11 **Laura Keck, but I'm certain at some point during**
12 **the case I worked with Gary on something.**
13    Q. And the two homicide investigations in
14 2014, is one of those the investigation in this
15 case, or are those two separate cases?
16    **A. Those were two separate cases.**
17    Q. Okay. Did you work on either of those
18 cases with Gary Farha?
19    **A. I don't recall.**
20    Q. Were those two cases in 2014 cases of
21 people who had passed away in 2014?
22    **A. Yes.**
23    Q. Okay.
24       THE WITNESS: Can we take a break at this

71

1 point?
2       MS. THOMPSON: Sure.
3       (Whereupon a short recess was taken.)
4       (Gibson Exhibit 1 marked.)
5       THE VIDEOGRAPHER: Here begins media
6 number 2. We are back on the record. The time is
7 10:17
8 BY MS. THOMPSON:
9    Q. Detective Gibson, I showed you Exhibit 1
10 right before we took the break, but I actually have
11 a couple questions for you before we turn to that,
12 so you can ignore that for one second.
13       I asked you a question about the Booth
14 investigation. Is that investigation accounted for
15 in any of the -- well, let me ask you this
16 question.
17       For what years were you investigating the
18 Booth case?
19    **A. I don't remember if that was 2014 or**
20 **2015.**
21    Q. Did you -- when you told me there were
22 two cases you looked at in 2014 and five in 2015,
23 are you counting it in either of those tallies?
24    **A. No.**

72

1    Q. So it's separate from those numbers?
2    **A. Yeah.**
3    Q. Did you have any obligation under the
4 terms of the grant for your position to work a
5 certain number of hours as an elder services
6 officer?
7    **A. No.**
8    Q. Were there other personnel in other
9 agencies who -- well, let me ask that question a
10 better way.
11       Are there any other police agencies in
12 Adams County that have an elder crimes position
13 that you're aware of?
14    **A. The Adams County Sheriff's Department has**
15 **an elder service officer also.**
16    Q. Is that position a full-time position?
17    **A. Yeah. The elder service -- the actual**
18 **elder service officer is just a schooling. It's a**
19 **week long training put on by the Attorney General's**
20 **Office that anyone can go to, any officer.**
21    Q. Does your colleague in the Adams County
22 Sheriff's Office that is an elder services officer,
23 does that person handle other cases besides elder
24 services cases?

Transcript of Adam Gibson
Conducted on July 17, 2018

73

1    A.  Yeah, he's just a patrol deputy.
2    Q.  Let's go back to Exhibit 1 then.  I've
3  showed you what's been marked as Gibson Exhibit 1,
4  and just for the record, this is a document that is
5  Bates stamped Plaintiff 7932 through Plaintiff
6  7945.  So I'm going to ask you generally if you've
7  seen this document before, Detective Gibson, and if
8  you need to look it for a moment to answer that
9  question, please do so.
10    A.  I have seen it.
11    Q.  And what is Gibson Exhibit 1?
12    A.  The Cory Lovelace Death Investigation
13  Summary.
14    Q.  All right.  Is this a document that you
15  prepared?
16    A.  Yes.
17    Q.  And what was your purpose in preparing
18  Exhibit 1?
19    A.  It was given to Mr. Parkinson.
20    Q.  Did you give this to him -- well, let me
21  ask you this.
22       Did he request that you prepare a
23  document like Gibson Exhibit 1?
24    A.  Yes.

74

1    Q.  And when did you prepare Exhibit 1?
2    A.  I don't know.
3    Q.  Do you know when you gave this to Ed
4  Parkinson?
5    A.  Sometime before the Grand Jury.
6    Q.  All right.  And did you finish it just
7  before you provided it to him, or was it something
8  that had been done for some time before you gave it
9  to him.
10    A.  I don't remember.
11    Q.  When did you start preparing Gibson
12  Exhibit 1?
13    A.  I don't remember that either.
14    Q.  All right.  And is this a document that
15  you prepared on a Word processing program?
16    A.  Yes.
17    Q.  All right.  Was it your understanding
18  that Ed Parkinson would use Gibson Exhibit 1 to
19  assist him in the prosecution of Curtis Lovelace?
20    A.  Yes.  It was for the purposes of Grand
21  Jury.
22    Q.  And was it your understanding that he
23  would rely on the content of Exhibit 1 in
24  conducting the Grand Jury?

75

1    A.  Yes.
2    Q.  Looking on page 1 of Gibson Exhibit 1,
3  you see there in sort of the middle of the page
4  where it says "Interview of Firefighter Cole Miller
5  who was first in the room"?
6    A.  Yes.
7    Q.  And then there is sort of some summary
8  information that follows that in a paragraph.  Do
9  you see where I'm looking?
10    A.  Yes.
11    Q.  What is -- what interview of Firefighter
12  Cole Miller is Exhibit 1 referencing?
13    A.  When I interviewed him at the start of
14  the investigation.
15    Q.  Okay.  And similarly, does this interview
16  of Paramedic Ballard paragraph, does that reflect
17  an interview that you conducted of Paramedic
18  Ballard?
19    A.  Yes.
20    Q.  Then the third section, "Curtis's first
21  statement to Officer, now Deputy Chief, Doug
22  VanderMaiden," does that reference a summary of a
23  statement that you weren't present for?
24    A.  Correct.

76

1    Q.  Did you summarize that paragraph based on
2  your review of someone else's police report?
3    A.  Yes.
4    Q.  Did you ever talk with Doug VanderMaiden
5  about the statement that Curtis Lovelace made to
6  him on the scene?
7    A.  I believe I did, yes.
8    Q.  When did you talk with him about that
9  statement?
10    A.  I don't recall.
11    Q.  Did you do that before this case went to
12  the Grand Jury?
13    A.  I believe so, yes.
14    Q.  Did you do it at the beginning of your
15  investigation?
16    A.  No.
17    Q.  Why did you talk with him about his
18  interview of Curtis at the scene the day that his
19  wife was found?
20    A.  Why did I?
21    Q.  Yes.
22    A.  To basically see what his recollection
23  was.
24    Q.  Were you talking with Deputy Chief

Transcript of Adam Gibson

Conducted on July 17, 2018

77

1  VanderMaiden about that conversation so that you
2  could gain an understanding about what Curtis
3  Lovelace had said and done at the scene of his
4  wife's body being found?
5      **A.   That was basically confirming the details**
6  **that were in his report.**
7      Q.   Okay.  And was it relevant to you to talk
8  with people who were present at the scene of Cory
9  Lovelace's body being found so that you could get
10 an understanding of what had happened at that
11 scene?
12     **A.   Yeah.**
13     Q.   Did you make it a goal to try to talk
14 with anyone who was available to you who had been
15 present at the scene?
16     **A.   I think the only person that I did not**
17 **talk to was Jeff Baird.**
18     Q.   So my question was:  Did you make it a
19 goal to talk to people who were available who had
20 been present at the scene?
21     **A.   I did.**
22     Q.   When did you interview Paramedic Ballard?
23     **A.   I don't recall the exact date, but it**
24 **would have been probably early January of 2014.**

78

1      Q.   All right.  And is that the same time
2  period that you interviewed Cole Miller?
3      **A.   Yes.**
4      Q.   And is there -- did you talk with Deputy
5  Chief VanderMaiden at a later point than when you
6  interviewed Cole Miller and William Ballard?
7      **A.   Yes.**
8      Q.   And is there a reason that you didn't
9  talk to him in that early January 2014 period like
10 you did Mr. Miller and Mr. Ballard?
11     **A.   No.**
12     Q.   All right.  And then if you turn to page
13 2 of Exhibit 1, and page 3 and 4 as well, there are
14 three sections then that follow in the summary that
15 reference Detective Baird's involvement in this
16 investigation; is that correct?
17     **A.   Yes.**
18     Q.   And I think you just said a minute ago
19 that you did not talk to Jeff Baird during your
20 investigation; is that right?
21     **A.   That's correct.**
22     Q.   At any point in your investigation did
23 you have any communications with Jeff Baird about
24 any topic relating to Curtis or Cory Lovelace?

79

1      **A.   Yes.**
2      Q.   And what communications did you have with
3  him about Curtis or Cory Lovelace?
4      **A.   We spoke prior to going to Grand Jury.**
5      Q.   When was that?
6      **A.   We went to the Grand Jury in August, so**
7  **it would have been at some point probably in the**
8  **weeks leading up to that.**
9      Q.   All right.  And was that a communication
10 that you initiated?
11     **A.   Yes.**
12     Q.   And why did you speak with Detective
13 Baird at that point?
14     **A.   About the investigation and his reports.**
15     Q.   And why did you speak with him at that
16 point?
17     **A.   That's what I just answered.**
18     Q.   Okay.  Well, you were -- at that point
19 you talked to him about his investigation and about
20 his reports; is that your testimony?
21     **A.   Yes.**
22     Q.   And why at that point in the
23 investigation did you choose to confer with him
24 about those topics?

80

1      **A.   That was just the point in time that I**
2  **decided to talk to him.**
3      Q.   Is there a reason why you waited until
4  the weeks before the Grand Jury to talk with him?
5      **A.   Because the investigation had still been**
6  **ongoing.**
7      Q.   Well, were you trying to wait for more
8  investigation to be done before you talked with
9  him?
10     **A.   Yeah.**
11     Q.   And is there a reason you thought it was
12 prudent to wait to talk to him until more
13 investigation had been done?
14     **A.   No.**
15     Q.   Was he unavailable to you earlier on in
16 your investigation?
17     **A.   No.**
18     Q.   You could have spoken to him at any
19 point; is that right?
20     **A.   I could have.**
21     Q.   Were you deliberately waiting for some
22 portion of the investigation to be done before you
23 spoke to him?
24     **A.   Yes.  I chose to wait until later in the**

Transcript of Adam Gibson
Conducted on July 17, 2018

81

1 investigation.
2     Q.   And why did you believe that would be a
3 better course of action?
4     **A.   I can't really give you a description of**
5 **why.  That was just what I chose to do.**
6     Q.   As you sit here today, can you -- do you
7 have any additional information to provide about
8 why you waited to talk to Detective Baird other
9 than what you have testified to?
10    **A.   No.**
11    Q.   Are there any documents that you could
12 review that would refresh your memory about why you
13 waited to talk to Detective Baird?
14    **A.   No.**
15    Q.   Did you wait to talk to Detective Baird
16 because you thought that your investigation might
17 reveal information that was different than the
18 information he learned during the earlier
19 investigation?
20    **A.   That's part of it.**
21    Q.   All right.  And did you actually learn
22 information that you thought was different than
23 what he had learned during his initial
24 investigation?

82

1     **A.   I don't know that I would say that it was**
2 **different because some of the information that was**
3 **given to me was given to him.**
4     Q.   Okay.  So did you learn any information
5 in the course of your investigation that was
6 different than what Detective Baird had learned?
7         MR. HANSEN:  I would object to the form.
8 It's vague and calls for him to speculate as to
9 what Detective Baird learned in his investigation.
10        Subject to that, if you know, you can
11 answer.
12        THE WITNESS:  I can't tell you
13 specifically whether there was anything that was
14 different or not.
15 BY MS. THOMPSON:
16    Q.   Can you think of anything that was
17 different, as you sit here today?
18    **A.   Nothing that pops into my head, no.**
19    Q.   And so for these three sections of the
20 report of Exhibit 1, and I'm talking about the
21 three sections that appear on what's Bates stamped
22 7933, 7934, and it goes into 7935 and a little bit
23 on 7936, are those three sections based on your
24 summaries of reviewing Detective Baird's reports?

83

1     **A.   Yes.**
2     Q.   As you were reviewing his reports, did
3 you have any questions about what anything that he
4 had written down in those reports meant?
5     **A.   No.**
6     Q.   Did his reports make sense to you?
7     **A.   His reports did, yes.**
8     Q.   I'm looking at page 2 of this document,
9 so that's Plaintiff 9733, that first section
10 "Detective Jeff's Baird initial examination," do
11 you see where I am?
12    **A.   Yes.**
13    Q.   And do you see on the second line of that
14 section that this references Baird reported Coroner
15 Hamilton reported that Cory was warm to touch?  I'm
16 reading in part obviously.  Do you see where I'm
17 looking?
18    **A.   Yes.**
19    Q.   Did you interview Coroner Hamilton about
20 his observations from the scene of where Cory
21 Lovelace's body was found?
22    **A.   I did not.**
23    Q.   And is there a reason you didn't do that?
24    **A.   Because I had spoken with Coroner Keller**

84

1 who was also there.
2     Q.   Did you at some point conclude that what
3 Coroner Keller was telling you was different than
4 what Coroner Keller had reported -- or what Coroner
5 Hamilton reported to Detective Baird?
6     **A.   Yeah.**
7     Q.   And did you take any steps to try to
8 understand why what Coroner Keller was telling you
9 was different than what Coroner Hamilton was
10 telling you?
11    **A.   No.**
12    Q.   Why not?
13    **A.   I don't have a reason.**
14    Q.   Did it concern you that there were two
15 medical professionals on the scene who had
16 apparently observed different things?
17    **A.   That is concerning.  There was other**
18 **medical professionals that were there that saw the**
19 **same things as Coroner Keller.**
20    Q.   So did you think that Coroner Hamilton
21 was wrong in what he observed?
22    **A.   I can't say that he was wrong because I**
23 **wasn't there.**
24    Q.   But you took no steps to talk to him to

Transcript of Adam Gibson
Conducted on July 17, 2018

85

1 figure out why he was reporting something different
2 than Coroner Keller?
3         MS. EMERY:  Objection; argumentative.  Is
4 that a question?
5         MS. THOMPSON:  Yeah, that's a question.
6         MS. EMERY:  Okay.  Go ahead.
7         THE WITNESS:  I did take steps.  I talked
8 to the other medical professionals that were there
9 as well.
10 BY MS. THOMPSON:
11    Q.   Coroner Hamilton was not unavailable to
12 you in your investigation; is that correct?
13    A.   No.
14    Q.   All right.  Now, Coroner Hamilton -- let
15 me start that question again.
16         You were able to learn about what Coroner
17 Hamilton had observed by reviewing Jeff Baird's
18 reports; is that correct?
19    A.   Yes.
20    Q.   Were there any reports from the scene
21 that documented what Coroner Keller said he had
22 observed?
23    A.   I don't believe so, no.
24    Q.   All right.  And so is it fair to say that

86

1 you learned what Coroner Keller was reporting to
2 you by talking with him?
3    A.   That's part of it, yes, but there is
4 reports from the firefighters that were there.
5    Q.   Okay.  But my question is --
6    A.   And also the paramedics.
7    Q.   My question is specifically as to Coroner
8 Keller.  Did you have any other sources for
9 learning what Coroner Keller was saying he'd
10 observed at the scene besides talking with him?
11    A.   No.
12    Q.   And did you ask Coroner Keller how it is
13 he was able to recall the scene from 2006 without
14 having any documented reports of what he had
15 observed?
16    A.   I did not.
17    Q.   Were you concerned about a potential lack
18 of memory from him in recalling for you events that
19 had occurred years earlier without having any
20 report from the scene of what he had observed?
21    A.   He did not indicate that he had a lapse
22 of memory of the incident.
23    Q.   Did you discuss with him whether he might
24 have a lapse of memory?

87

1    A.   No, because he told me what he
2 remembered.
3    Q.   When did you first talk with Coroner
4 Keller about anything having to do with what
5 happened at the scene of where Cory Lovelace's body
6 was found?
7    A.   Late December of 2013.
8    Q.   All right.  And how did -- how was the
9 conversation with him initiated, who called who or
10 who contacted who?
11    A.   I believe I called him.
12    Q.   All right.  And did you set up -- did you
13 talk with him on the phone or did you set up a
14 meeting?
15    A.   We actually met briefly.
16    Q.   Where did you meet?
17    A.   I don't recall if it was at my office or
18 if I actually just met him in a parking lot and
19 talked to him.
20    Q.   How long did you talk for that first
21 time?
22    A.   Probably 30 minutes.
23    Q.   And was anyone else present besides you
24 and him?

88

1    A.   No.
2    Q.   Did you create a report of your
3 conversation with Detective Keller at that time?
4    A.   No.
5         MS. EMERY:  You mean Coroner Keller?
6         MS. THOMPSON:  Excuse me.  Thanks for
7 correcting that.
8 BY MS. THOMPSON:
9    Q.   At any point have you created a report of
10 that first conversation you had with Coroner Keller
11 in late December?
12    A.   No.
13    Q.   Is there a reason you didn't create a
14 report of that conversation?
15    A.   It was a general discussion of the case
16 and also to basically see what still remained from
17 the autopsy.  That was the basic discussion.
18         And then I also spoke with him about
19 whether or not he knew who Dr. Denton was, because
20 at the time I didn't know that Dr. Denton was the
21 person that conducted our autopsies for the City.
22 That was basically the conversation.
23    Q.   Can you narrow down any more specifically
24 when in late December that conversation with

Transcript of Adam Gibson
Conducted on July 17, 2018

89

1  Coroner Keller was?
2     A.  I cannot.
3     Q.  Are there any documents you could review
4  that would refresh your memory about specifically
5  when that conversation was?
6     A.  No.
7     Q.  In that conversation, did Coroner Keller
8  give you any information about what he personally
9  observed at the scene where Cory Lovelace's body
10  was found?
11     A.  He did.
12     Q.  And so did you understand that by him
13  giving you that information that this was a
14  potential witness providing you with information
15  about something they knew about?
16     A.  He relayed information that was already
17  documented.
18     Q.  What did he relay to you in that meeting
19  that was already documented?
20     A.  Just the position of the hands, the level
21  of rigor mortis, the temperature.
22     Q.  All right.  Did you believe at that point
23  that what he had observed as reported by him was
24  documented somewhere?

90

1     A.  Basically what he saw as indicated in the
2  reports.
3     Q.  Would you agree with me that in the
4  reports it's indicated as being observed by other
5  people, not him?
6     A.  Yes.
7     Q.  All right.  And did you believe that
8  there was any reason to document what Coroner
9  Keller was saying he personally had observed?
10     A.  At that time, no.
11     Q.  Did you later determine that you might
12  need to document Coroner Keller's memories about
13  what he observed at the scene?
14     A.  He was spoke to by the attorneys.
15     Q.  So is the answer to my question no?
16     A.  Well, I guess ask me the question again
17  then, please.
18     Q.  Sure.  At some point after that first
19  conversation with Coroner Keller, did you determine
20  that there might be a reason to document what
21  Coroner Keller had told you about his observations
22  from the scene?
23     A.  No.
24     Q.  At what point did you first believe that

91

1  Coroner Keller might be a witness in this case?
2     A.  Well, he is listed in the reports as
3  being there also.
4     Q.  So is it fair to say that from the first
5  time you spoke with him you knew he was a witness?
6     A.  Yeah, I knew he was there, yes.
7     Q.  And would you agree with me that it is
8  important in an investigation to document the
9  various accounts of events from the various
10  witnesses who might have information in the case?
11     A.  Yes.
12     Q.  And you agree that that's not something
13  you did here with respect to Coroner Keller?
14     A.  I did not document my conversation, no.
15     Q.  Let's look at -- going back to Gibson
16  Exhibit 1, I'm going to -- I have a question about
17  this second section on page 2, "Detective Baird's
18  First Interview of Curtis."  It might make sense
19  for you just to review this section first, let me
20  know when you are done, and I then have a couple
21  questions for you about the content of that
22  section.
23     A.  Okay.
24     Q.  In this section that we are looking at,

92

1  "Detective Baird's First Interview of Curtis," if
2  you go down six lines, do you see there is a line
3  that ends "helped her into bed," and then is there
4  an asterisk next to it?
5     A.  Yes.
6     Q.  What does that asterisk mean?
7     A.  I honestly don't know.  I don't know if
8  that was something that I did on accident.
9     Q.  Do you have a practice in report writing
10  of asterisk symbolizing something for you?
11     A.  Not necessarily, no.
12     Q.  Okay.
13     A.  I assume it must have just been an
14  accident on my part.
15     Q.  Let me refer you then to the bottom of
16  that page, Plaintiff 7933, about three lines up.
17     A.  Uh-huh.
18     Q.  Three or four lines up.  There is a
19  sentence that reads, "He went on to say he has
20  trained in CPR, but knows it does not work without
21  a defibrillator," and then there are three dots and
22  a question mark.  Do you see where I'm looking?
23     A.  I do.
24     Q.  Do you know what those three dots and

Transcript of Adam Gibson
Conducted on July 17, 2018

93

1 question mark reference in this section?

2    A.  That's basically me questioning about the
3 fact that he knew CPR and it didn't work without a
4 defibrillator.

5    Q.  What was your question about that
6 concept?

7    A.  Because it does not make sense to me.

8    Q.  Why doesn't that make sense to you?

9    A.  It just doesn't make sense how someone
10 who is trained in CPR -- CPR is the whole purpose
11 of what you do when you don't have a defibrillator,
12 not that it does not work without a defibrillator.

13    Q.  Did you ever confer with Detective Baird
14 about what Curtis Lovelace had told him about this
15 concept of CPR and how a defibrillator fits into
16 it?

17    A.  No.

18    Q.  This is a statement where you thought
19 that there was some lack of truthfulness indicated
20 by Curtis Lovelace's explanation; is that right?

21    A.  I thought it was odd.

22    Q.  I mean, you found that somewhat
23 incriminating, correct?

24    A.  That's not what I said at all.  I said I

94

1 thought the statement was odd.

2    Q.  All right.  Well, did you think that it
3 was indicative of an excuse about why he didn't do
4 CPR that might be a dishonest explanation?

5    A.  Yes.

6    Q.  And did you take any steps to confer with
7 Detective Baird to understand specifically what
8 Curt had said about that that might play into your
9 determination about whether or not it was truthful?

10    A.  I answered that several times.  No.

11    Q.  Okay.  And when you had your conversation
12 with Detective Baird prior to going to the Grand
13 Jury, did you talk with him about this CPR issue?

14    A.  I did not.

15    Q.  Did you share Exhibit 1, Gibson Exhibit
16 1, with anyone besides Ed Parkinson?

17    A.  Yes.

18    Q.  Who else did you share Exhibit 1 with?

19    A.  I had sent it to Gary Farha, and it's
20 possible that I might have given it to Jon Barnard
21 or showed it to Jon Barnard, but I don't recall
22 that exactly.

23    Q.  Okay.  When did you give Exhibit 1 to
24 Gary Farha?

95

1    A.  I don't remember the exact date of it,
2 but there is a portion in here in which both
3 Barnard and Farha were spoken to about incidents
4 that occurred at the State's Attorney's Office.

5    Q.  Okay.  So did you give this to Gary Farha
6 before or after you gave it to Ed Parkinson?

7    A.  I don't know.  I would assume it would
8 have been before.

9    Q.  Why do you assume it would have been
10 before?

11    A.  Basically just to clarify his
12 recollection of those incidents.

13    Q.  It's your testimony that that's why you
14 showed it to Gary Farha?

15    A.  Yes.

16    Q.  Is that why you showed it to Jon Barnard
17 as well?

18    A.  Yes.

19    Q.  Did you give Exhibit 1 to Jeff Baird?

20    A.  I don't know if I did or not.  I gave the
21 binder that I had all the reports in for Baird to
22 look at.  I don't remember if this specifically was
23 in there or not.

24    Q.  Well, you have a specific memory of

96

1 giving this to Gary Farha so that he could review
2 it to see if what he was a witness to with respect
3 to this investigation was correct, right?

4    A.  Right.

5    Q.  Did you see a need to give it to Jeff
6 Baird for the same purpose?

7    A.  I said I don't know if I gave this to
8 Jeff or not.  I let him look through the whole
9 binder that I had of all the reports, and I don't
10 know if this specifically was in that binder or
11 not.  I don't recall.

12    Q.  How did you provide Exhibit 1 to Gary
13 Farha?

14    A.  I believe it was either e-mailed or I
15 took it over.

16    Q.  How did you provide it to Jon Barnard?

17    A.  I don't know if I took it to Jon or if I
18 e-mailed, one or the other.  I don't know which.

19    Q.  Does this document, Exhibit 1, exist in
20 the Quincy Police Department RMS system?

21    A.  No.  The RMS system is just the reports
22 that we dictate.

23    Q.  Did -- if you didn't give a copy of this
24 to Jeff Baird either through e-mail or through a

Transcript of Adam Gibson
Conducted on July 17, 2018

25 (97 to 100)

97

1  hard copy, is there any other way that he could
2  have accessed Exhibit 1 to review it?
3      A.   No.
4      Q.   Did you give a copy of this, of Exhibit
5  1, to Cole Miller for him to verify what was in
6  here about what he'd observed?
7      A.   I did not.
8      Q.   Did you give it to William Ballard?
9      A.   I did not.
10     Q.   Did you show it to Lindsay Lovelace?
11     A.   No.
12     Q.   Did you show it to any other witnesses in
13  the case besides Gary Farha and Jon Barnard?
14     A.   I don't know if I might have shown it to
15  Jennifer Cifaldi as well.
16     Q.   Do you know how you would have provided
17  it to Jennifer Cifaldi?
18     A.   Again, I either would have taken it over
19  there or had it with me when I was over there or
20  e-mailed it.  I'm assuming that I probably had it.
21     Q.   Were you concerned that by showing Jon
22  Barnard a copy of a document that had other
23  witnesses' recollections in it as well that that
24  could potentially taint Jon Barnard's memory about

98

1  the things that he observed with respect to this
2  case?
3      A.   No.
4      Q.   And why weren't you concerned about that?
5      A.   Because he had already told me what he
6  had remembered and I had already documented it.
7      Q.   Did Jon Barnard look at this and tell you
8  that, in fact, what the information contained in
9  here with respect to him was correct?
10     A.   I believe so, yes.
11     Q.   How did he tell you that what was in here
12  was correct?
13     A.   He just told me.
14     Q.   Did he tell you that in person?
15     A.   Yeah.  I would have showed it to him at
16  some point over there at the office.
17     Q.   Okay.  And did Gary Farha also similarly
18  review this and tell you that what was in here was
19  correct?
20     A.   Yes.
21     Q.   And did he also do that in person at the
22  office?
23     A.   I believe so, yes.
24     Q.   At the time that you showed this to Jon

99

1  Barnard, had this case already fallen under the
2  jurisdiction of the special prosecutor?
3      A.   Yes.
4      Q.   And is that true for when you showed it
5  to Gary Farha as well?
6      A.   Yes.
7      Q.   I'm going to reference you now to page --
8  it's got a Bates stamp of Plaintiff 7939.  And I'm
9  asking about the section at the top that says,
10  "Interview of 7-year-old Lincoln Lovelace 2/16/16."
11  Do you see where I'm looking?
12     A.   Yes.
13     Q.   I have some questions about this section,
14  too, so if you want to read it and let me know when
15  you're ready, I'll ask you a couple of questions.
16         MR. HANSEN:  While we are off the record,
17  while he is reading it, is this your highlighting
18  or something on there or --
19         MS. THOMPSON:  That's a question I'm
20  going to ask him.
21         MR. HANSEN:  Oh, I'm sorry.  Okay.
22  Great.  Thank you.
23         THE WITNESS:  Go ahead.
24  BY MS. THOMPSON:

100

1      Q.   All right.  So you may have heard me
2  conferring with counsel as you were reading that.
3  Do you see some highlighting in this section?
4      A.   I do.
5      Q.   Do you know what that highlighting is?
6      A.   I don't.
7      Q.   Are you the person that highlighted this?
8      A.   I'm not saying I'm not, but I don't
9  remember highlighting it, no.
10     Q.   Okay.  And do you see here that the part
11  that's highlighted is referencing, and I'm
12  paraphrasing, that Baird didn't describe how it was
13  shown referencing something related to a possible
14  broken arm.  Do you see where I'm looking?
15     A.   Yes, ma'am.
16     Q.   Is that a question that you had about
17  Baird's documentation of his interview with
18  Lincoln?
19     A.   Yes.
20     Q.   Okay.  And did you ever discuss your
21  question about that documentation with Jeff Baird?
22     A.   I believe I did when we talked.
23     Q.   All right.  And what did Jeff Baird tell
24  you about that?

Transcript of Adam Gibson
Conducted on July 17, 2018

101

1    A.   He said that he couldn't remember how
2  the -- how Lincoln showed the arm.
3    Q.   At the time that you conferred with Jeff
4  Baird about this -- well, let me ask you this
5  question.
6          There is -- the last sentence here is
7  something in parentheses in this section that
8  starts with "part of me wonders."  Do you see that?
9    A.   I do.
10   Q.   And is that -- that references a question
11 that you had or a supposition that you had
12 potentially about what Lincoln's memory concerned;
13 is that right?
14   A.   It's not about his memory, no.
15   Q.   Okay.  It's a question you had about sort
16 of how to explain what Lincoln was describing about
17 her arms; is that right?
18   A.   Yes.
19   Q.   Okay.  Did you discuss your questions or
20 what you were wondering about that with Jeff Baird?
21   A.   I don't believe so, no.
22   Q.   Did you see any reason to discuss that
23 with Jeff Baird?
24   A.   He told me that he couldn't remember how

102

1  she described -- or how he described her arm.
2    Q.   Okay.  When you communicated with Jeff
3  Baird about the investigation before this went to
4  the Grand Jury, did you make any notes of your
5  conversations with Jeff Baird?
6    A.   No.
7    Q.   Did you do a report about that
8  conversation?
9    A.   No.
10   Q.   And is there a reason why you didn't do a
11 report?
12   A.   Because I was talking to another police
13 officer about his reports.
14   Q.   Well, Jeff Baird would be a potential
15 witness in this case, at least for impeachment,
16 correct?
17   A.   And he did reports on his involvement.
18   Q.   Okay.  Did you see what he was explaining
19 to you about Lincoln as being him clarifying
20 something that was in his report?
21       MS. EMERY:  Objection.  I think the
22 question is confusing.
23       But if you understand it.
24       THE WITNESS:  I don't understand.

103

1  BY MS. THOMPSON:
2    Q.   Okay.  Did you think that you had any
3  obligation to document what Jeff Baird was telling
4  you about his memory of communicating with
5  witnesses in this case?
6    A.   No.
7    Q.   I'm going to ask you to turn to the next
8  page and I'm looking at Plaintiff 7940.  Do you see
9  some additional highlighting on this page?
10   A.   I do.
11   Q.   And again, do you know what this
12 additional highlighting is about?
13   A.   I don't.  But just in looking at it, I
14 would assume that that was something that I
15 highlighted as I was typing it just because the
16 highlighting is so perfect.
17   Q.   Does it look to you like highlighting
18 that's in the Word processing program?
19   A.   Yes.
20   Q.   Okay.  And do you know why you
21 highlighted that sentence that's at the top there
22 of Plaintiff 7940 that starts "this is important
23 because"?
24   A.   I don't, other than to draw notice to

104

1  that statement.
2    Q.   Were you trying to draw notice to that
3  statement for either Jon Barnard or Gary Farha's
4  review of this document?
5    A.   I'm assuming that would have been for
6  Mr. Parkinson.
7    Q.   Why do you assume that?
8    A.   Because he was the prosecutor on it.  The
9  other two were not the prosecutors involved in the
10 case.
11   Q.   At the time that you provided Exhibit 1
12 to Jon Barnard, did you have any -- was there any
13 reason that he needed to be informed about what was
14 going on in the investigation other than, as you
15 said, to affirm whatever information he personally
16 had given you about the investigation?
17   A.   No.
18   Q.   And is the same true for Gary Farha?
19   A.   Yes.
20   Q.   I'm going to turn you to the last page of
21 this document.  And do you see that there is a
22 highlighted section on this last page, which is
23 Plaintiff 9745 where it says "Report From Jane
24 Turner"?

Transcript of Adam Gibson
Conducted on July 17, 2018

105

1    A.   Yes, I do.
2    Q.   And do you know why that is highlighted?
3    A.   Again, I'm assuming that I did that for
4 Mr. Parkinson.
5    Q.   Was Mr. Parkinson present for any of your
6 conversations about this case with Dr. Turner?
7    A.   We never spoke to her together.  He spoke
8 with her himself.
9    Q.   Okay.  And at the time that you prepared
10 this summary, did you already have Dr. Turner's
11 written report?
12    A.   I believe so, yes.
13    Q.   And had that written report already been
14 provided to Ed Parkinson?
15    A.   Yes.
16    Q.   Okay.  Was there a reason to highlight
17 Dr. Turner's conclusions about this case to Ed
18 Parkinson when Ed Parkinson had already talked with
19 Dr. Turner and had her written report?
20    A.   None that I can think of, no.
21    Q.   Okay.  Was it possible that you were
22 highlighting that section to update people who
23 didn't have information about what Dr. Turner had
24 said so that they would see it?

106

1    A.   No.
2    Q.   I think those are all the questions I
3 have about Exhibit 1.  You can set that aside.
4        Other than your -- other than the
5 conversation that you had with Detective Baird that
6 I think you said was at some point in the weeks
7 leading up to the Grand Jury investigation -- do I
8 have the timeframe of that conversation correct?
9    A.   Yes.
10    Q.   Other than that conversation with Jeff
11 Baird, did you talk with him at any other point
12 either before or after that about any aspect of the
13 Cory Lovelace investigation?
14    A.   No.
15    Q.   Did you -- did you do any work to help
16 prepare any witnesses to testify at either the
17 first or second trial?
18    A.   What do you mean did I do any work to
19 help them prepare?
20    Q.   Did you talk through -- did you help
21 prepare any witnesses to testify by reviewing
22 reports with them or talking about these events
23 with them?
24    A.   No.

107

1    Q.   After your one conversation with
2 Detective Baird about this case, did you have any
3 questions that remained after your conversation
4 about any aspect of what Detective Baird had
5 observed in this case or about anything that he
6 documented?
7    A.   Can you clarify that?
8    Q.   Sure.  One way that you learned what
9 Detective Baird had done in this investigation was
10 by reviewing his reports, correct?
11    A.   Yes.
12    Q.   And the second way that you had learned
13 what he had done was by the one conversation that
14 you had with him before the Grand Jury; is that
15 correct?
16    A.   Yes.
17    Q.   After talking with him before the Grand
18 Jury, did you have any conversations in your mind
19 that remained about any aspect of the work that he
20 had done to investigate this case?
21    A.   Yeah, I have questions about the work
22 that he did.
23    Q.   What questions did you have?
24    A.   Why he didn't interview the children the

108

1 same day, why he never brought Mr. Lovelace to
2 headquarters to interview him rather than
3 interviewing him at his office when confronted with
4 the information from the doctor about the
5 suspicious injuries found during autopsy.  Those
6 are some of the questions.
7    Q.   Any other questions that you had after
8 talking with him with respect to his investigation?
9    A.   Not that I can recall right now.
10    Q.   Is there anything that would refresh your
11 memory about additional questions you had about
12 what Jeff Baird had done after your conversation
13 with him?
14    A.   I don't think so.
15    Q.   In your conversation with Detective
16 Baird, did you ask him why the children were not
17 interviewed the same day?
18    A.   I don't know if I specifically asked him
19 that question or not.
20    Q.   Well, if this was a question you had
21 about his investigation, is there a reason you
22 wouldn't have asked him about it?
23    A.   It was documented that he interviewed
24 them two days later.

Transcript of Adam Gibson
Conducted on July 17, 2018

---

109

1    Q.   Your question was why he waited, correct?
2    **A.   Uh-huh.**
3    Q.   Is there any reason why you wouldn't have
4  asked him, Jeff, why did you wait?
5    **A.   Because at the time I was not trying to**
6  **question him on his investigation, just only on his**
7  **memory.**
8    Q.   Well, did you believe that he might have
9  information related to why he waited that could be
10 relevant to your investigation?
11   **A.   I did not believe that.**
12   Q.   Why didn't you believe that?
13   **A.   Because I had no reason to believe it.  I**
14 **had no information to make me believe that.**
15   Q.   And did you ask him -- let me start that
16 question again.
17       Did you ask Detective Baird in your
18 meeting with him why he hadn't brought Curtis
19 Lovelace back to be interviewed after the autopsy
20 report came back?
21   **A.   I did not.**
22   Q.   And is there a reason you didn't ask him
23 about that?
24   **A.   Again, I wasn't trying to question him**

110

1  **about his investigation.**
2    Q.   Did you believe he might have information
3  that would be relevant for you about why he had not
4  brought Curtis Lovelace in for another interview?
5    **A.   I had no reason to believe that, no.**
6    Q.   Did you believe that it would be
7  professionally unpleasant to have a conversation
8  with Detective Baird about either of those topics?
9    **A.   Yes.**
10   Q.   I mean, is that why you didn't do it?
11   **A.   That's part of it, yeah.  I had no**
12 **information that led me to believe that he had**
13 **further information.**
14   Q.   Did you convey to anyone else -- let me
15 start that question again.
16       After your meeting with Detective Baird,
17 did you tell -- did you talk with anyone else about
18 your -- you know, the questions that you had that
19 remained about why the children weren't interviewed
20 the same day or why Curt wasn't brought in to be
21 interviewed again?
22   **A.   Yes.**
23   Q.   Who did you discuss those concerns with?
24   **A.   I discussed them with the chief.  I**

111

1  **discussed them with Lieutenant Dreyer.  I discussed**
2  **them with Sergeant Summers.**
3    Q.   Anyone else?
4    **A.   Not that I can recall.  Probably Ed**
5  **Parkinson.**
6    Q.   And when you say "the chief," are you
7  talking about Chief Copley?
8    **A.   Chief Copley, yes.**
9    Q.   Copley.  I said it wrong.  Thank you.
10 Chief Copley.
11       When you had the conversation with Chief
12 Copley about those concerns, did he say anything to
13 you in response to you conveying those concerns?
14   **A.   I don't remember specifically what he**
15 **would have said, no.**
16   Q.   Do you remember anything about any
17 response he had to you conveying those concerns?
18   **A.   I think that he talked to**
19 **Deputy Chief VanderMaiden about them, and I think**
20 **that Deputy Chief VanderMaiden actually spoke with**
21 **Detective Baird.**
22   Q.   And why do you think that Chief Copley
23 spoke with Deputy Chief VanderMaiden about those
24 concerns?

112

1    **A.   I believe that's what he told me.  I'm**
2  **not positive, but...**
3    Q.   Did he tell you he had done it or he was
4  going to do it?
5    **A.   I don't recall exactly if he had told me**
6  **that after they had talked to Baird or if it was --**
7  **if he told me that that's what they were going to**
8  **do, I don't recall which, but it was one of those**
9  **two things obviously.**
10   Q.   Did you ever hear back from Deputy Chief
11 VanderMaiden or Chief Copley about anything that
12 occurred in that conversation between Detective
13 Baird and Deputy Chief VanderMaiden?
14   **A.   I did not.**
15   Q.   Okay.  When you talked about this issue
16 with Lieutenant Dreyer about your questions, do you
17 remember anything about her response to you
18 conveying those concerns?
19   **A.   I don't.**
20   Q.   And do you remember anything about
21 Sergeant Summers's response when you conveyed those
22 concerns?
23   **A.   I don't.**
24   Q.   Did you have three separate conversations

Transcript of Adam Gibson
Conducted on July 17, 2018

113

1  with those three people about this issue?
2      **A.  Yes.**
3      Q.   And I think you said you may have
4  discussed this with Ed Parkinson; is that correct?
5      **A.  Yes.**
6      Q.   And do you remember anything about his
7  response when you discussed -- if you discussed
8  this issue with him?
9      **A.  I don't recall specifically any response,**
10 **no.**
11     Q.   In February of 2006, you were a patrol
12 officer in the Quincy Police Department; is that
13 right?
14     **A.  Yes.**
15     Q.   And we now know, of course, that Cory
16 Lovelace's body was found on February 14th of 2006;
17 do you agree that's the right date?
18     **A.  Yes.**
19     Q.   Okay.  Do you know when it is that you
20 first learned that Cory Lovelace had died?
21     **A.  No.  Probably either the same day or days**
22 **after.**
23     Q.   Is it a notable occurrence in Quincy for
24 someone to -- someone who is not dying of -- let me

114

1  start that question again.
2          Is it a notable occurrence in Quincy for
3  someone who is not elderly to pass away?
4          MR. HANSEN:  Object to form.
5          THE WITNESS:  I wouldn't say it's
6  notable, no.
7  BY MS. THOMPSON:
8      Q.   Well, as a police officer, did the police
9  department have any methods of informing members of
10 the police department if there were deaths that
11 occurred in the city that were going to be
12 investigated?
13     **A.  We have what they call a daily log, which**
14 **is all the reports that are turned in for that**
15 **particular day.  Reports typically take sometimes a**
16 **couple days to generate, so sometimes the logs are**
17 **a few days behind.  The reason that this obviously**
18 **was notable was that he was an Assistant State's**
19 **Attorney at the time.**
20     Q.   All right.  And I have some questions
21 about that, but going back to the daily log, in
22 2006 what form did the daily log take?
23     **A.  It's a printed sheet that's read at roll**
24 **call.**

115

1      Q.   And how much information is on there
2  about any given occurrence?
3      **A.  Minimal, because it's released to the**
4  **media.  Not everything on there.  There is**
5  **actually -- when they generate it, there is check**
6  **boxes that takes out things that are not to be**
7  **media released, but the information is just**
8  **basically a name with what an arrest was for or**
9  **what the report was.**
10     Q.   And is it your belief that you would have
11 at least learned about this -- about Cory Lovelace
12 passing because that would have been noted in the
13 daily log either the same day or a couple days
14 later as that information was finalized?
15     **A.  I don't know that it was even that I read**
16 **it or was told about it on the log.  It was**
17 **information that was -- that people had passed on.**
18     Q.   And you said, and I don't want to
19 misstate your testimony, that this would be notable
20 anyway because this is the wife of an Assistant
21 State's Attorney; is that correct?
22     **A.  Yes.**
23     Q.   And in 2006 -- well, let me ask you this
24 question.

116

1          In 2006, did you know Curtis Lovelace?
2      **A.  I did.**
3      Q.   Did you know Cory Lovelace before her
4  passing?
5      **A.  No.**
6      Q.   Did you know Curtis Lovelace through his
7  work as an Assistant State's Attorney?
8      **A.  Yes.**
9      Q.   Had you worked with him on any cases?
10     **A.  Yes, I believe we had one trial.**
11     Q.   Okay.  And was that -- did you testify in
12 that case?
13     **A.  I believe so.  I believe it was a jury**
14 **trial.**
15     Q.   Okay.  Did Curtis prepare you to testify
16 in that case?
17     **A.  Yes.**
18     Q.   And is he the person who examined you on
19 the stand?
20     **A.  Yes.**
21     Q.   Do you have a memory, as you sit here
22 today, of working with Curt to prepare to testify
23 in that case?
24     **A.  I believe so, yes.**

Transcript of Adam Gibson
Conducted on July 17, 2018

117

1    Q.   What kind of case was it?

2    **A.   If I remember correctly, it was a**

3    **possession of meth.**

4    Q.   All right.  Was there a conviction in

5    that case?

6    **A.   Yes.**

7    Q.   All right.  And was that a case where you

8    were the arresting officer?

9    **A.   Yes.**

10   Q.   Other than that one meth case, had you

11   worked with Curtis Lovelace on any other cases

12   before his wife passed?

13   **A.   I don't believe so.  He may have had some**

14   **of the cases that I was assigned, but that was the**

15   **only one that I think -- I can only remember one**

16   **trial.**

17   Q.   As you sit here today, do you have a

18   specific memory of any other interactions that you

19   may have had with Curt in any context before the

20   death of his wife, other than your testimony in

21   that one case?

22   **A.   No.**

23   Q.   Were you familiar -- well, let me ask you

24   this.

118

1         As you sit here today, are you familiar

2    with what Curtis Lovelace's reputation was in the

3    community in 2006?

4    **A.   Yes.**

5    Q.   And what was his reputation in the

6    community in 2006?

7    **A.   I believe he was on the school board,**

8    **although I could be wrong.  I don't know that I**

9    **remember specifically 2006, but I was familiar with**

10   **him outside of the State's Attorney's Office.**

11   Q.   All right.  Did you have any other

12   understanding of his reputation in the community

13   other than the fact that he may have been on the

14   school board and that he was an Assistant State's

15   Attorney?

16   **A.   And that he played football at U of I.**

17   Q.   Anything else besides that?

18   **A.   No.**

19   Q.   Was the fact that Cory Lovelace had died

20   and that her death was investigated something that

21   was discussed within the police department other

22   than through the daily log that you just told us

23   about?

24   **A.   Yeah.  People talked about it.**

119

1    Q.   And is it fair to say that people talked

2    about it because this was something that was of

3    interest?

4    **A.   It's someone that we worked with's**

5    **spouse.**

6    Q.   And what kinds of things did people in

7    the department discuss about the case during the

8    investigation in 2006?

9         MS. EMERY:  Objection as to form.

10   BY MS. THOMPSON:

11   Q.   You can answer the question.

12   **A.   Some of the things that were discussed**

13   **was the autopsy report and the injury to her mouth.**

14   Q.   Anything else that you can remember being

15   discussed besides the autopsy report and the injury

16   to her mouth?

17   **A.   No.**

18   Q.   And what do you remember specifically

19   being discussed with respect to the injury to her

20   mouth?

21   **A.   Just that she had an unexplained injury**

22   **to her lip.**

23   Q.   All right.  What do you remember being

24   discussed about the autopsy report?

120

1    **A.   That same thing.  That was all just part**

2    **of it.**

3    Q.   All right.  And is that topic generally,

4    the autopsy report, the injury, is that something

5    that you talked about with other members of the

6    department?

7    **A.   Yeah.**

8    Q.   Who did you discuss it with?

9    **A.   I don't know.  I mean, one was Bryan**

10   **Dusch, who was an investigator at the time, but**

11   **people just talked about it.**

12   Q.   Did you personally in 2006 review any

13   reports related to the investigation into Cory

14   Lovelace's death?

15   **A.   I did not.**

16   Q.   Did you have access if you wanted to

17   review them to look at those reports?

18   **A.   Yes, we all have access to them.**

19   Q.   Have you ever in your career in the

20   police department looked at the reports of an

21   investigation that you're not involved in because

22   you are curious about it?

23   **A.   Yes.**

24   Q.   Is that something you've done more than

Transcript of Adam Gibson
Conducted on July 17, 2018

---

**121**

1  ten times in your career as a police officer?
2      **A.   Numerous.**
3      Q.   More than 50 times?
4      **A.   Probably.**
5      Q.   Okay.  Is it fair to say that in 2006 you
6  were not curious enough about this investigation to
7  go read the reports?
8      **A.   No.**
9          MS. EMERY:  Object.  No, you -- it's kind
10 of a --
11         MR. HANSEN:  Double negative.
12         MS. EMERY:  -- double negative.  Can you
13 read the question back, please?
14         MS. THOMPSON:  Well, he answered the
15 question.
16         MS. EMERY:  Can you read the question
17 back, please?
18         (Record read.)
19         MS. EMERY:  And the answer was, no,
20 that's not fair to say.
21         MS. THOMPSON:  Well, he gave an answer
22 no.  I mean, you are characterizing it now.
23         MS. EMERY:  So I'm --
24         MR. HANSEN:  I'm going to step in.  I

**122**

1  want clarification.  Is the answer to the question,
2  yes, you were curious or, no, you weren't curious
3  and didn't go look at them.
4          THE WITNESS:  The answer was, no, I was
5  not curious and did not look at them.
6          MR. HANSEN:  Thank you.
7  BY MS. THOMPSON:
8      Q.   All right.  Did you review any reports
9  related to this investigation at any point prior to
10 late 2013?
11     **A.   No.**
12     Q.   At any point between February of 2006 and
13 late 2013, did you think at all about Cory
14 Lovelace's passing?
15     **A.   No.**
16     Q.   Did you discuss Cory Lovelace's passing
17 with anyone in that timeframe?
18     **A.   I don't believe so, no.**
19     Q.   During that timeframe between February of
20 2006 and late 2013, did you work on any cases with
21 Jeff Baird?
22     **A.   I would assume that I did.  To say**
23 **specifically about a case, I don't know.**
24     Q.   Is Jeff Baird someone that you have ever

**123**

1  considered to be a friend?
2      **A.   Yes.**
3      Q.   Is he some -- is Jeff Baird someone you
4  consider to be a friend today?
5      **A.   He is a colleague.**
6      Q.   Is there a point at which you felt that
7  you and Jeff Baird stopped being friends with one
8  another?
9      **A.   Yes.**
10     Q.   Did your stopping being friends with Jeff
11 Baird have something to do with the investigation
12 in this case?
13     **A.   Yes.**
14     Q.   And what is your understanding about what
15 about this case caused you and Jeff Baird to stop
16 being friends?
17     **A.   We just don't speak.**
18     Q.   Why do you believe that you and Jeff
19 Baird not speaking has something to do with this
20 investigation?
21     **A.   Because this investigation is -- it was**
22 **after this investigation that this happened.**
23     Q.   It was after this investigation that you
24 two stopped speaking?

**124**

1      **A.   Yes.**
2      Q.   Did you stop speaking before this case
3  went to the Grand Jury?
4      **A.   No.**
5      Q.   Did you stop speaking -- when exactly did
6  you stop speaking with Jeff?
7      **A.   After the second trial.**
8      Q.   Did anyone ever tell you that Jeff Baird
9  was upset with you with something having to do with
10 this case?
11     **A.   No one told me that, no.**
12     Q.   Are you upset with Jeff Baird with
13 something having to do with this case?
14     **A.   No.**
15     Q.   Well, do you believe that he is the one
16 that's not talking to you?
17     **A.   We speak in passing.**
18     Q.   Other than the timing of when you and
19 Jeff Baird stopped speaking, do you have any other
20 information that would lead you to believe that
21 this investigation has caused you and Jeff Baird to
22 stop being friends?
23     **A.   What do you mean do I have any other**
24 **information?**

---

Transcript of Adam Gibson
Conducted on July 17, 2018

125

1    Q.   Sure.  I asked you -- and I don't want to
2 misstate your testimony, so correct me if I've got
3 this wrong.  I asked you why it is that you
4 believed that this investigation caused you and
5 Jeff Baird not to be friends, and I think your
6 answer was it was the timing of when you stopped
7 speaking; is that correct?
8    A.   Yes.
9    Q.   And my question to you is:  Is there
10 anything other than the timing of when you stopped
11 speaking that has led you to conclude that it's
12 this investigation that has caused some rift
13 between you and Jeff?
14    A.   No.  You mean specifically as has he said
15 something to me, the answer is no.
16    Q.   Do you harbor some feelings about this
17 investigation that leads you to conclude that you
18 wanted to be less friendly with Jeff Baird?
19    A.   No.
20    Q.   Do you believe that for some reason as a
21 result of this investigation he wants to be less
22 friendly with you?
23    A.   I don't know what he believes.
24    Q.   Well, I'm asking what you believe.

126

1    A.   I couldn't tell you why he does what he
2 does.
3    Q.   Do you believe that the work that you've
4 done in investigating Cory Lovelace's death is in
5 some way in conflict with the work that Jeff Baird
6 did in his part of the investigation?
7    A.   I do.
8    Q.   And why do you believe it's in conflict?
9    A.   Because we did different things.
10    Q.   What are the things that you did
11 differently than what Jeff Baird did?
12    A.   Spoke to neighbors, spoke to Larson,
13 spoke to the paramedics and firefighters, spoke
14 with Dr. Bowman, spoke with friends.
15    Q.   Is it your belief that in the initial
16 investigation that was done by Jeff Baird that no
17 one spoke to Dr. Bowman?
18    A.   No, I know that he spoke to her.
19    Q.   All right.  So you both talked to
20 Dr. Bowman?
21    A.   Uh-huh.
22    Q.   And is it your belief that during the
23 initial investigation that Detective Baird did not
24 speak with paramedics and firefighters that were on

127

1 the scene?
2    A.   It's not documented in his reports, no.
3    Q.   Did you ever ask him if he talked to
4 them?
5    A.   No.
6    Q.   When you were talking with him before the
7 Grand Jury, did you think it was important to
8 understand whether he had spoken with them or not?
9    A.   No.  I had read his reports.
10    Q.   You never discussed that topic with him?
11    A.   No.
12    Q.   As you sit here today, is it your belief
13 that in his investigation Jeff Baird was not aided
14 by the observations of paramedics or firefighters?
15    A.   I'm not saying that's my belief at all.
16    Q.   Well, you said that one thing you did
17 different was talk to paramedics and firefighters,
18 right?
19    A.   That's true.
20    Q.   So do you believe he didn't?
21    A.   I don't know what he did.
22    Q.   Well -- so do you know if that's
23 something that's different or it's something you're
24 guessing is different?

128

1    A.   I know that that is not documented that
2 any of the paramedics or firefighters run reports
3 were included.
4    Q.   It's not documented that those are
5 reports that he reviewed?
6    A.   Correct.
7    Q.   Okay.  And do you believe, as you sit
8 here today, that at the scene of Cory Lovelace's
9 death that Jeff Baird talked with the first
10 responders?
11    A.   I don't know the answer to that question.
12 I wasn't there.
13    Q.   Okay.  And you've never -- have you ever
14 taken any steps to understand whether or not he did
15 talk to first responders at the scene?
16    A.   I did not.
17    Q.   Okay.  Did you ask the first responders
18 themselves if they talked with Jeff Baird?
19    A.   No.
20    Q.   And is it your belief, as you sit here
21 today, that in the first investigation no one spoke
22 with any of Curtis Lovelace's neighbors?
23    A.   I don't believe so, no.
24    Q.   And did you ever talk with Jeff Baird

Transcript of Adam Gibson
Conducted on July 17, 2018

129

1 about whether or not in the first investigation
2 anyone spoke with any neighbors?
3     A.   No.
4     Q.   In late 2013, before you started
5 investigating Cory Lovelace's death, had you ever
6 spoken with Coroner Keller before?
7     A.   Yeah.
8     Q.   Had you spoken with him -- well, what had
9 you spoken with Coroner Keller about?
10    A.   Various deaths.  I mean, he responds to
11 all the deaths that we have.
12    Q.   Aside from talking about investigative
13 work with Coroner Keller, had you ever talked with
14 him about anything else?
15    A.   No.
16    Q.   Before you started investigating Cory
17 Lovelace's death, had you ever spoken with Coroner
18 Keller about his opinions about Dr. Jessica Bowman?
19    A.   No.
20    Q.   Had you ever -- before you started
21 investigating this case, had you ever -- had
22 Dr. Bowman ever come up in any conversation you had
23 ever had with Coroner Keller?
24    A.   No.

130

1     Q.   Was your investigation into -- I'm sorry,
2 my phone is going off here.  I'm going to silence
3 it so it doesn't interrupt us anymore.  Sorry about
4 that.
5         I think you said before that between Cory
6 Lovelace's death and late 2013 you had not thought
7 about her passing at all; is that correct?
8     A.   No.
9     Q.   When is the first time that you thought
10 about anything having to do with Cory Lovelace
11 after her death?
12    A.   Basically the day that I read the report.
13    Q.   Okay.  And what day is it that you read
14 the report?
15    A.   Sometime late December.
16    Q.   Do you have any -- are you able to narrow
17 that down any further other than that it was late
18 December?
19    A.   No.
20    Q.   Are there any documents that you could
21 review that would refresh your memory as to when
22 that was more specifically?
23    A.   No.
24    Q.   And you said when you reviewed -- well,

131

1 what is it that you reviewed on that date in late
2 December that first brought Cory Lovelace back into
3 your mind?
4     A.   That day I was sitting reading, there
5 were several old cases that I had read through, and
6 opened up this report.
7     Q.   And what report is it that you opened up?
8     A.   The death investigation report.
9     Q.   Let's take a step back.  So in -- after
10 you were assigned to elder crimes, did you have to
11 go to any detective training?
12    A.   Yes.
13    Q.   When did you do that training?
14    A.   Some of it started in November and some
15 into December.
16    Q.   What training did you do in November?
17    A.   November, I believe -- actually it might
18 have been October was the elder service officer
19 school.  I went through lead homicide investigator
20 school, crime scene investigations.  I think those
21 are the three main ones at the start.
22    Q.   Had you had any training in homicide
23 investigations before you took that lead homicide
24 investigator training that you took when you became

132

1 a detective?
2     A.   Yes.  We had various homicide-related
3 trainings throughout the years.
4     Q.   What trainings had you had before you
5 took the lead class?
6     A.   They are basically one-day trainings that
7 are through the mobile training unit, and I don't
8 remember specifically what trainings I had, but we
9 have different trainings that we can attend.
10    Q.   Okay.  Do you have any of the course
11 materials from your lead homicide course still
12 today?
13    A.   I believe so, yes.
14    Q.   Did you get like a binder for that
15 course?
16    A.   I believe we did.
17    Q.   Okay.  Who conducted the training?
18    A.   It was in -- it's through the law
19 enforcement training and standards board and it was
20 conducted in Springfield.
21    Q.   Okay.  And did you learn things in that
22 course that you hadn't known before?
23    A.   Yeah.
24    Q.   Was the training useful for you in terms

Transcript of Adam Gibson
Conducted on July 17, 2018

---

133

1 of understanding how to do your job as a detective?
2 **A. It was geared more towards homicide**
3 **investigations, suicide investigations, and those**
4 **things.**
5 Q. So was it useful for you in learning --
6 in doing your job in investigating homicides and
7 suicides?
8 **A. Yes.**
9 Q. And when you said that you opened up the
10 report in this case, how physically did you review
11 it?
12 **A. On the computers.**
13 Q. And is this through the --
14 **A. RMS.**
15 Q. (Continuing) -- RMS system?
16 **A. Yes.**
17 Q. How -- you said that there were several
18 old cases that you were reading through?
19 **A. Yes.**
20 Q. What other cases besides this case did
21 you read through?
22 **A. Clyde Jackson, which was a homicide on**
23 **North 12th Street in the 12th Street Apartments;**
24 **the homicide at Antoine Hunt, which was at 5th and**

---

134

1 **Elm; and there might have been one or two more.**
2 Q. Did you document anywhere what old cases
3 you were reviewing when you opened up this report
4 or are you going purely off your memory that the
5 two you looked at were Clyde Jackson and Antoine
6 Hunt?
7 **A. Just off memory.**
8 Q. And is there a reason why you selected
9 the particular case files that you read through to
10 review?
11 **A. One, they were old homicide cases, and**
12 **basically it was just reviewing them or reading**
13 **them to see what the investigators had done.**
14 **Antoine Hunt I was actually the first officer on**
15 **scene that found him shot, and Clyde Jackson I was**
16 **also involved in -- through canine -- using the**
17 **canine to search for evidence.**
18 Q. When did Clyde Jackson die?
19 **A. I don't remember the exact year.**
20 Q. Was it -- well, it was sometime while you
21 were a canine services officer, correct?
22 **A. Yes. I think 2008 possibly.**
23 Q. And when did Antoine Hunt die?
24 **A. Sometime early 2000s, I believe.**

---

135

1 Q. At the time that you reviewed those files
2 in late 2013, were either of those cases closed?
3 **A. No.**
4 Q. Were they both cases in which there had
5 been a determination that there was, in fact, a
6 homicide?
7 **A. Yeah, they were shootings.**
8 Q. But in both cases the perpetrator had
9 never been found?
10 **A. Yes. The investigations are still**
11 **ongoing.**
12 Q. Okay. In -- at the time that you were a
13 detective in Quincy, did the police department have
14 a particular nomenclature for describing whether
15 investigations were opened or closed or pending or
16 had any particular kind of status?
17 **A. No.**
18 Q. So one status, I take it, for an
19 investigation at the time you started as a
20 detective is that an investigation could be
21 cleared; is that correct?
22 **A. Yeah.**
23 Q. I mean, is there a different term that
24 you in the Quincy Police Department use to describe

---

136

1 an investigation that had been resolved and wasn't
2 coming back?
3 **A. No, not necessarily.**
4 Q. Would you call it a closed investigation
5 or a cleared investigation or what term would you
6 use?
7 **A. Yeah. Well, you can close them or**
8 **suspend them, either one.**
9 Q. And what does it mean to suspend
10 something?
11 **A. Basically something that either doesn't**
12 **have a resolution or that you've reached the limits**
13 **of your investigation.**
14 Q. And could an investigation also be open?
15 **A. Yes.**
16 Q. So when you started as a detective, is
17 there any other status an investigation could have
18 besides being closed, open, or suspended?
19 **A. No.**
20 Q. In the RMS system, is there a way in the
21 system to search for open investigations?
22 **A. No. It's not -- they are not classified**
23 **like that in the computer.**
24 Q. Okay. So if you are sitting in front of

Transcript of Adam Gibson

Conducted on July 17, 2018

**137**

1  the RMS system and you say I want to look for all
2  the open homicides in Quincy, there is not a way to
3  do a search for that?
4      **A.   No, not that I'm aware of.**
5      Q.   Okay.  Is there a way to do a search for
6  all suspended investigations?
7      **A.   No.**
8      Q.   Is there a way to search for
9  investigations by category?
10     **A.   I would guess that the investigation**
11 **supervisor could do that, but like as far as us as**
12 **detectives, no.**
13     Q.   So could you as a detective say I want to
14 look at all the homicide cases?
15     **A.   I guess you could go in there and say**
16 **that, yeah.  Whether they can search that, I don't**
17 **know.**
18     Q.   Okay.
19     **A.   But I can't just sit down at the computer**
20 **and type in homicide and then it pops up every**
21 **homicide we've had, no.**
22     Q.   Or -- I mean, when you're looking at the
23 computer, is there a way that you can narrow your
24 search by fields or something like that that would

**138**

1  let you search for certain categories of cases that
2  have, you know, certain data in certain fields?
3      **A.   If there is, I'm not aware.**
4      Q.   Okay.  So when you reviewed the Clyde
5  Jackson case in the RMS system, you had to pull it
6  up specifically?
7      **A.   Yes.**
8      Q.   Did you search for it by name?
9      **A.   Yes.**
10     Q.   Okay.  And did you search for the Antoine
11 Hunt case by name?
12     **A.   Yes.**
13     Q.   And you said there might have been one or
14 two other old cases you looked at as well?
15     **A.   Yes.**
16     Q.   Were those cases you were involved in in
17 some way?
18     **A.   I don't recall what they were.**
19     Q.   Okay.  And do you know how you found
20 those cases in the system?
21     **A.   I would have just searched RMS.**
22     Q.   Would you have searched by name?
23     **A.   Yes.**
24     Q.   Okay.  So when you pulled up the Cory

**139**

1  Lovelace case, you pulled it up by name?
2      **A.   Yes.**
3      Q.   And do you know why it is -- what it is
4  that prompted you to look at that particular
5  report?
6      **A.   I don't have any specific reason why I**
7  **pulled that report up, no.**
8      Q.   But you had to physically type Lovelace
9  into the computer to get those reports to come up
10 on your screen?
11     **A.   Yes, ma'am.**
12     Q.   Had you talked with anyone about the case
13 before you did your search?
14     **A.   No.**
15     Q.   Were you sitting at your desk in the
16 police station when you did that?
17     **A.   Yes.**
18     Q.   What time of day was it?
19     **A.   I have no idea.**
20     Q.   Were you working -- were you like working
21 your regular shift at the time you did that?
22     **A.   Yes.**
23     Q.   Was anyone else there in the room with
24 you when you pulled it up?

**140**

1      **A.   No.**
2      Q.   Am I right that you pulled up the Clyde
3  Jackson case because that's a case that you had
4  been involved in as a canine officer?
5      **A.   Yeah.**
6      Q.   And am I right that you picked up Antoine
7  -- you reviewed Antoine Hunt's case because you
8  were the first officer on the scene?
9      **A.   Right.**
10     Q.   Other than what you've told me, do you
11 have any additional information about what caused
12 you to look at the Lovelace file?
13     **A.   No.**
14     Q.   And is it your testimony, as you sit here
15 today -- well, let me ask you this.
16          Before you pulled up the Cory Lovelace
17 reports on the computer, had you had any
18 conversations about Curtis Lovelace with anyone
19 since 2006?
20     **A.   No.**
21     Q.   Had his name even come up in conversation
22 with anyone that you had communicated with at any
23 point between 2006 and when you pulled up that Cory
24 Lovelace report?

Transcript of Adam Gibson
Conducted on July 17, 2018

141

1    A.    Yeah.  I mean, we took his son to the
2  all-star baseball in Joliet.
3    Q.    When did you do that?
4    A.    Let's see, probably around 2010, I
5  believe.  It was for Y baseball.
6    Q.    And when you say "we" took him, who is
7  the "we" that took them?
8    A.    My ex-wife and I.
9    Q.    Were you involved in youth baseball at
10 that time?
11   A.    Yes.
12   Q.    Okay.  And was he on a team that you were
13 involved with?
14   A.    Yeah.  His -- Logan and my son were both
15 chosen on the all-star team.
16   Q.    Did Curt go to that tournament as well?
17   A.    He did not.
18   Q.    Okay.  At the time that you opened up the
19 Cory Lovelace report on your computer, did you know
20 Erika Gomez?
21   A.    Yes, I knew who she was.
22   Q.    How did you know her?
23   A.    Because she used to date another officer.
24   Q.    Who did she used to date?

142

1    A.    James Brown.
2    Q.    And was James Brown someone you were
3  friends with?
4    A.    I wouldn't say that we are friends, but
5  we are associates.
6    Q.    Had you ever --
7    A.    It's not somebody that I hang out with,
8  no.
9    Q.    Had you ever been out socially with Erika
10 Gomez at any point before you opened the Cory
11 Lovelace report?
12   A.    Maybe on one occasion when they dated,
13 but...
14   Q.    When she and Mr. Brown dated?
15   A.    Yes.
16   Q.    Okay.  Is she somebody that you would
17 recognize by sight?  At the -- let me ask that
18 question in a better way.
19         At the time you opened the Cory Lovelace
20 report in your computer, if you saw Erika Gomez
21 walking down the street, would you be able to say
22 that's Erika Gomez?
23   A.    Yeah, I knew who she was.
24   Q.    Okay.  Had you ever had any conversation

143

1  with her at the time that you opened up the Cory
2  Lovelace report, other than maybe going out with
3  her and Mr. Brown one time?
4    A.    No.
5    Q.    Had you ever had any phone conversations
6  with her before that?
7    A.    No.
8    Q.    At some point have you developed the
9  belief that Dr. Jessica Bowman had some -- let me
10 ask that question again.
11         At some point have you developed the
12 belief that you could not rely on the opinions of
13 Dr. Jessica Bowman in a professional capacity?
14   A.    Yeah.
15   Q.    When did you first have a conversation
16 with anyone about there being some reason to
17 distrust Dr. Bowman's professional opinions?  Not
18 just talking about this case, but at all, in any
19 context.
20   A.    It probably would have been in 2014
21 during the course of this investigation that I had
22 learned about the reason why she was no longer a
23 practicing forensic pathologist.
24   Q.    Who first had a conversation with you

144

1  about the reasons that Dr. Jessica Bowman had had a
2  career change?
3    A.    The Sangamon County coroner.
4    Q.    And is there a reason that you were
5  discussing those issues with the Sangamon County
6  coroner?
7    A.    Because I was trying to locate pieces of
8  evidence in this case.
9    Q.    Were you trying to locate some of the
10 biological material that would have been collected
11 at the autopsy?
12   A.    Yes, ma'am.
13   Q.    And were you checking Sangamon County to
14 see if it was there?
15   A.    Yes.
16   Q.    And in the course of communicating with
17 the Sangamon County Coroner's Office, what did they
18 tell you with respect to Dr. Bowman?
19   A.    That she was no longer practicing
20 forensic pathology because of some issues that they
21 had had with autopsies that she had done.
22   Q.    Who in Sangamon County told you that?
23   A.    I believe it was either the coroner or
24 one of the assistant or deputy coroners.  I don't

Transcript of Adam Gibson
Conducted on July 17, 2018

145

1  know what they call them over there.
2      Q.  Okay.  Before you had that conversation
3  with the Sangamon County Coroner's Office, had you
4  had any conversations with Scott Denton about
5  Dr. Bowman?
6      A.  No.
7      Q.  Before you had that conversation with the
8  Sangamon County coroner, had you had any
9  conversations with Jim Keller about Dr. Bowman?
10      A.  I don't believe so, no.
11      Q.  And did you discuss what the Sangamon
12  County coroner told you with either Dr. Denton or
13  Mr. Keller?
14      A.  I'm sorry, could you ask that again?
15      Q.  Sure.  You said that the Sangamon County
16  coroner told you, told you that Dr. Bowman was no
17  longer practicing as a forensic pathologist; is
18  that right?
19      A.  Yes.
20      Q.  Did they tell you -- did they give you
21  negative information about Dr. Bowman?
22      A.  Yes.
23      Q.  Did they tell you that -- well, what did
24  they tell you that was negative?

146

1      A.  Basically that she had been ousted from
2  being a coroner's physician in Sangamon County.
3      Q.  All right.  And did you tell Jim Keller
4  that Dr. Bowman had been ousted in Sangamon County?
5      A.  Yes.
6      Q.  All right.  And is it your belief that
7  Mr. Keller was hearing that for the first time from
8  you?
9      A.  No.  And he may have relayed that to me
10  at some point, but when we discussed it, it's not
11  something that he told me.  It was -- my initial
12  information came from Sangamon County.
13      Q.  Okay.  And did you discuss Dr. Bowman's
14  ouster from Sangamon County with Dr. Denton?
15      A.  He was aware.
16      Q.  So you didn't -- you're not the one who
17  gave that information to him for the first time?
18      A.  No, ma'am.
19      Q.  Okay.  I want to go back to the RMS
20  system for a minute.  How do -- let me start that
21  question again.
22          In 2006, how did you as a Quincy police
23  officer complete police reports?
24      A.  We dictate them.

147

1      Q.  Do you dictate them into the computer
2  system?
3      A.  No.  It's -- back then it was dictated on
4  a cassette tape and then you turned your cassette
5  in, the typist typed it, they erased your tapes,
6  and give them back to you, because you use the same
7  tapes over and over and over again.
8      Q.  And in 2006, after someone else had used
9  your dictation to prepare the report, did you have
10  an opportunity to review the report and correct any
11  errors?
12      A.  Yeah.  Once the typist types them, then
13  they give you the report, the hard copy back, and
14  then you go through and fix whatever it is needed
15  to be fixed, give it back to them, they retype
16  it, and give it back to you.
17      Q.  Okay.  By 2013, had that process changed?
18      A.  Yes.
19      Q.  All right.  In 2013, what was the process
20  for completing a police report?
21      A.  Actually in '13 we were probably still
22  using cassettes.  I don't know if it had changed by
23  then or not.  But at some point, it would have been
24  probably around that time, '13, '14, but now what

148

1  we do is dictate them and then e-mail the dictation
2  to the typists and then they type it, send it back
3  to you, and then you correct it.
4      Q.  And how does the typist send it back to
5  you to be corrected?
6      A.  They e-mail them back to you.
7      Q.  Okay.  And are they -- what format --
8  what file format are the reports in when they are
9  e-mailed to you for that purpose?
10      A.  I don't know.  Word, I would assume.  I
11  don't know.
12      Q.  Is there a template in Word for the
13  reports?
14      A.  I think records has it, yeah.
15      Q.  Okay.  How do -- do you have any
16  knowledge of how the reports that come to you in
17  that Word form get uploaded into the RMS system?
18      A.  I don't know how they upload them.  I
19  don't know what they -- I don't know anything about
20  how they do it.
21      Q.  When you are reviewing reports in the RMS
22  system, what file format are they in?
23      A.  I don't know.
24      Q.  Is the RMS system an application on your

Transcript of Adam Gibson
Conducted on July 17, 2018

149

1 computer?
2    **A.   Yes.**
3    Q.   When you're reviewing reports in the RMS
4 system, are they in a format where they can be
5 edited?
6    **A.   No.**
7    Q.   And what kinds of reports go into the RMS
8 system?
9    **A.   Basically anything that you dictate goes**
10 **into RMS.**
11    Q.   Okay.  Do -- if you are at a crime scene
12 and you're sketching out a, you know, a map of the
13 area, does that get uploaded into RMS?
14    **A.   No.**
15    Q.   Can -- can photographs get uploaded into
16 RMS?
17    **A.   They actually just found out like two**
18 **weeks ago that you can.**
19    Q.   All right.  Prior to two weeks ago, had
20 you ever seen photographs in the RMS system before?
21    **A.   No, ma'am.**
22    Q.   Okay.  Had you seen any documents in the
23 RMS system other than police reports prior to a
24 couple weeks ago?

150

1    **A.   Yeah, that's it.**
2    Q.   Okay.  So when you were reviewing the
3 Cory Lovelace report, was there something about it
4 that caught your attention?
5    **A.   Yes.**
6    Q.   And what about the report caught your
7 attention?
8    **A.   Some of the inconsistencies in the**
9 **various statements and then some of the**
10 **inconsistencies in the children's statements and**
11 **then, you know, the -- basically the question of**
12 **the unexplained injuries, and then from that point**
13 **then I looked at the photos.**
14    Q.   And when you are saying
15 "inconsistencies," can you tell me what
16 inconsistencies caught your attention?
17    **A.   I can't tell you as I sit here**
18 **specifically.  There were different points where**
19 **one kid said that mom was on the steps, one said**
20 **that she was up, helped fixing breakfast, and then,**
21 **you know, obviously you have the things that were**
22 **described that Curtis did upon discovering Cory**
23 **dead, not calling 911, calling Jon Barnard.  You**
24 **know, there is just several different things.**

151

1    Q.   Okay.  And all those things you just
2 described, are those all things that you noticed
3 when you were reviewing the case report on the RMS
4 system the first time you looked at it?
5    **A.   Are you asking me if those are all of the**
6 **things or just all things that I saw?**
7    Q.   I'm asking you if those are all things
8 you saw on your first review of the report?
9    **A.   I did.**
10    Q.   Okay.  And are there additional things
11 that you saw in your first review of the report
12 besides what you have just testified about that
13 caused you to look into this further?
14    **A.   I'm sure there are, but I can't tell you**
15 **what they are right now.**
16    Q.   All right.  Is there anything that would
17 refresh your memory, as you are sitting here today,
18 about what else caught your attention the first
19 time you looked at the reports?
20    **A.   I could reread the reports.**
21    MS. THOMPSON:  Let's mark this as 2.
22    (Gibson Exhibit 2 marked.)
23
24 BY MS. THOMPSON:

152

1    Q.   So Detective Gibson, I've given you
2 what's been marked as Gibson Exhibit 2.  And just
3 for the record, this is Bates stamped Plaintiff
4 9753 through 9755.  Is this one of the reports or
5 the report that you looked at on the RMS system?
6    **A.   It's one of them, yes.**
7    Q.   Let me show you --
8    MS. THOMPSON:  Let's just go ahead and
9 mark these now.
10    (Gibson Exhibits 3 - 7 marked.)
11 BY MS. THOMPSON:
12    Q.   So Detective Gibson, I'm going to show
13 you some additional exhibits.  I'll talk to you
14 about these separately, but for now I'm going to
15 show you several.  I'm showing you Gibson Exhibit
16 3, which is Bates stamped Plaintiff 9756, that's Plaintiff,
17 through Plaintiff 9769; Gibson Exhibit 4, which is
18 Bates stamped Plaintiff 9770, 9771; Gibson 5, which
19 is Bates stamped Plaintiff 9772 through 9782;
20 Gibson 6, which is Bates stamped Plaintiff 9783 to
21 9793; and Gibson 7, which is Plaintiff 9794 and
22 9795.
23    Detective Gibson, I'm showing you those
24 other exhibits, and my question for you is whether

Transcript of Adam Gibson
Conducted on July 17, 2018

153

1 each of those exhibits are documents that you
2 reviewed on the RMS system the first time that you
3 looked at the Cory Lovelace reports?
4     **A.  Yes, ma'am.**
5     Q.  All right.  And are there any other
6 documents besides what I've just shown you, Gibson
7 2 through Gibson 7, that you looked at on the RMS
8 system the first time you went through and looked
9 at the reports?
10    **A.  No.**
11    Q.  So does what you have in front of you,
12 Gibson 2 through Gibson 7, the sum total of
13 everything you looked at on the computer during
14 your first review?
15    **A.  Yes.**
16    Q.  How long did you spend looking at these
17 reports on the RMS system the first time you read
18 through them?
19    **A.  I don't know.**
20    Q.  More than a couple hours?
21    **A.  I don't know.**
22    Q.  Did you take any notes while you were
23 reviewing reports that day?
24    **A.  I did not.**

154

1     Q.  All right.  Is there anything that would
2 refresh your memory about how long you spent
3 reviewing these reports the first time you looked
4 at them?
5     **A.  No.**
6     Q.  When you're looking at reports in the RMS
7 system, are you able to -- well, let me ask you a
8 better question.
9         When you're looking at reports on the RMS
10 system, do you pull up each of these reports,
11 meaning, you know, Exhibits 2, 3, 4, et cetera, do
12 you pull up each of those reports separately?
13    **A.  Yes.**
14    Q.  And the first time that you looked at
15 these reports, did you go back and forth, you know,
16 reading one report and then another and then going
17 back to something you already looked at, et cetera?
18    **A.  I don't recall if I did or not.**
19    Q.  How many reports did you review that
20 first time when you were sitting down and looking
21 at reports from the other two cases that you told
22 us you looked at as well?
23    **A.  I don't know how many reports were in**
24 **the -- are in the file.**

155

1     Q.  After that first day that you were
2 reading reports, did you take any other steps to
3 review or investigate the Clyde Jackson case?
4     **A.  I actually have worked on the Clyde**
5 **Jackson case to try to attempt to apprehend the**
6 **suspect in the case.**
7     Q.  Okay.  And what -- during what years have
8 you done additional work on the Clyde Jackson case
9 since that first day that you looked at it on the
10 RMS system?
11    **A.  That was actually before I read it on the**
12 **RMS system.**
13    Q.  Okay.  My question is:  After you read
14 about Clyde Jackson's case on the RMS system, did
15 you take any further steps to conduct any
16 investigation or otherwise review the file in that
17 case?
18    **A.  Yes.  We worked with the Department of**
19 **Corrections and did an overhear on the suspect, who**
20 **was incarcerated on a separate case.**
21    Q.  When did you do that?
22    **A.  Probably 20 -- either 2014 or 2015.**
23    Q.  Other than doing that overhear, did you
24 conduct -- did you do any other work on that

156

1 investigation after you looked at the report on the
2 RMS system?
3     **A.  I don't believe so.**
4     Q.  At the time that you looked at the Clyde
5 Jackson report on the system, who was the lead
6 detective on it?
7     **A.  I think it's now Sergeant Dusch.**
8     Q.  And did you work with now Sergeant Dusch
9 on the overhear that you did in 2014 or 2015?
10    **A.  Yes.  He and the ATF -- an ATF agent are**
11 **the ones that actually conducted the overhear.**
12    Q.  Did you have any role or involvement in
13 the overhear?
14    **A.  I had contacts through Department of**
15 **Corrections to basically try to get it set up, and**
16 **then I determined where the suspect was at the**
17 **time.**
18    Q.  Did you do that by looking at the IDOC
19 website to see where he was?
20    **A.  Yes, ma'am.**
21    Q.  Okay.  Other than making calls about the
22 overhears and looking him up on the website, is
23 there any other work that you did on the Clyde
24 Jackson case after you looked at the report on the

Transcript of Adam Gibson
Conducted on July 17, 2018

---

157

1  RMS system?
2      **A.  Not that I can recall, no.**
3      Q.   After you looked at the Antoine Hunt case
4  on the RMS system, is there any further work that
5  you did on that investigation?
6      **A.  Yes.**
7      Q.   What further steps did you take on the
8  Antoine Hunt investigation after you looked at it
9  on the RMS site?
10     **A.  We've interviewed other individuals that**
11 **were possibly involved, and then one of the other**
12 **detectives interviewed numerous people as well as**
13 **potential suspects.**
14     Q.   At the time that you looked at the
15 Antoine Hunt system on -- or the Antoine Hunt
16 report on the RMS system, who was the lead
17 detective in that case?
18     **A.  I don't know.**
19     Q.   Did you work with whoever that person was
20 on the additional steps that you took in the
21 Antoine Hunt case after you'd read it, read the
22 reports on the RMS system?
23     **A.  I didn't work with that detective, no.**
24     Q.   Okay.  After you looked at the Antoine

---

158

1  Hunt report on the system, did you become the lead
2  detective in that case?
3      **A.  No.**
4      Q.   After you looked at the Antoine Hunt case
5  on the RMS system, did you talk with whoever the
6  lead detective had been about any aspect of that
7  investigation?
8      **A.  I don't recall if I talked to anybody**
9  **about it or not.**
10     Q.   Is there anything that would refresh your
11 memory about whether you did?
12     **A.  No.**
13     Q.   So you said that you looked at the
14 reports about the Cory Lovelace death in the system
15 and then you said you looked at the photos; is that
16 correct?
17     **A.  Yes.**
18     Q.   What steps did you have to take to get
19 the photos to look at them?
20     **A.  They are also on the computer.**
21     Q.   And are they in a separate part of the
22 computer system?
23     **A.  Yeah.**
24     Q.   When did you actually review those

---

159

1  photos?
2      **A.  Either that same day or the next day.**
3      Q.   Okay.  And how much time did you spend
4  reviewing the photos?
5      **A.  I don't know.**
6      Q.   Did you print any of those photos out
7  from the computer to look at them?
8      **A.  I did.**
9      Q.   And did you take those photos home with
10 you to look at at home?
11     **A.  I have.**
12     Q.   And the first time that you looked at
13 them on the computer system, did you print them out
14 at that point to take them home to look at them?
15     **A.  I don't know if it was that day or not.**
16     Q.   After looking at the documents on the RMS
17 system -- or looking at the reports on the RMS
18 system and then looking at the photos, what is the
19 next thing that you did with respect to Cory
20 Lovelace's death?
21     **A.  Went and spoke to Chief Copley.**
22     Q.   All right.  And when did you speak with
23 Chief Copley?
24     **A.  It would have been early January.**

---

160

1      Q.   Did you speak with anyone else about
2  anything related to Cory Lovelace between when you
3  spoke with Chief Copley and when you finished
4  looking at the photographs on your computer?
5      **A.  Can you ask me that again?**
6      Q.   Sure.  Between when you finished looking
7  at the photographs on your computer -- you just
8  told us that you pulled those up after you looked
9  at --
10     **A.  Right.**
11     Q.   (Continuing) -- the RMS, right?
12     **A.  Yes.**
13     Q.   So between when you did that and when you
14 talked to Chief Copley, did you do anything else
15 with respect to the Cory Lovelace case?
16     **A.  No.**
17     Q.   All right.  And why is the next thing you
18 did to talk with Chief Copley?
19     **A.  Spoke to him about what was -- I asked**
20 **him first if he had actually ever seen the photos,**
21 **and he said no; and then after looking at the**
22 **photos, we talked about having Dr. Denton review**
23 **the autopsy.**
24     Q.   Whose idea was it for Dr. Denton to

---

Transcript of Adam Gibson
Conducted on July 17, 2018

161

1 review the autopsy?
2    **A. I asked him if we could send the autopsy**
3 **to Dr. Denton to review.**
4    Q. Is there a particular reason why you
5 wanted to send the autopsy to Dr. Denton?
6    **A. Because he was someone that had been**
7 **discussed by other colleagues in the lead homicide**
8 **investigations class as being a good forensic**
9 **pathologist and that he had reviewed other cases**
10 **for them.**
11    Q. Were there any other pathologists who
12 were mentioned in your lead forensics class as
13 being good besides Dr. Denton?
14    **A. None that I recall.**
15    Q. Was there anyone mentioned in your lead
16 forensics class as being a pathologist that you
17 should avoid?
18    **A. I don't believe so, no.**
19    Q. At the time that you talked to Chief
20 Copley, had you reviewed Dr. Bowman's original
21 autopsy report?
22    **A. I believe I had, yes.**
23    Q. And did you have questions about her
24 report?

162

1    **A. I did.**
2    Q. All right. Before you talked to
3 Dr. Denton, what were the questions that you had
4 about Dr. Bowman's report?
5    **A. I didn't necessarily have questions about**
6 **her report. I had questions about things that she**
7 **had put in her report where she included in her**
8 **synopsis that the signs of death were not**
9 **consistent with the timeframe given and indicated**
10 **also that there were suspicious or traumatic**
11 **findings of the injury to the underside of the top**
12 **lip.**
13    Q. Were there any other things that you had
14 questions about after reviewing her autopsy report
15 other than the things you just identified?
16    **A. Not that I can remember at this time, no.**
17    Q. Okay. Did you -- let me ask you this.
18    At the time that you reviewed
19 Dr. Bowman's report, had you had any training in
20 pathology?
21    **A. No.**
22    Q. When you took your lead homicide
23 investigator class, did they talk at all about
24 basic pathology issues that you might encounter,

163

1 for instance, at a crime scene?
2    **A. Yes.**
3    Q. Did you get some training if what rigor
4 mortis is?
5    **A. Yes.**
6    Q. And did you get any training in any other
7 sort of basic concepts of pathology?
8    **A. Yeah, lividity, just obviously the basic**
9 **things.**
10    Q. Okay.
11    **A. Those are all things that I was already**
12 **familiar with. Because I was a patrol officer, I**
13 **responded to hundreds of deaths throughout my**
14 **career also.**
15    Q. Okay. Prior to reading Dr. Bowman's
16 report, had you ever received any training or
17 reviewed any materials that gave you any
18 information about something called tache noir,
19 T-A-C-H-E, two words, N-O-I-R?
20    **A. Prior to that, no.**
21    Q. Okay. Had you -- have you subsequently
22 had any training or reviewed any material that have
23 given you an understanding of what tache noir is?
24    **A. I have.**

164

1    Q. This is something that was discussed at
2 the trial of this case; is that right?
3    **A. Yes, ma'am.**
4    Q. All right. Prior to trial, had you ever
5 discussed the concept of tache noir with anyone?
6    **A. Prior to the trial I had discussed it**
7 **with the doctors, yes.**
8    Q. Which doctors did you discuss tache noir
9 with?
10    **A. Dr. Baden. Actually we talked about**
11 **it -- all of them at some point spoke about it.**
12    Q. Prior to -- well, let me ask you this.
13    So you had your discussion with the chief
14 and you asked if this case could go to Dr. Denton,
15 and I take it that the chief agreed that it could;
16 is that right?
17    **A. Yes.**
18    Q. All right. And how soon after you talked
19 with the chief did you talk with Dr. Denton?
20    **A. I actually didn't talk to Dr. Denton. I**
21 **talked to Coroner Keller, who took the information**
22 **to Dr. Denton.**
23    Q. How soon after you talked with the chief
24 did you talk with Coroner Keller about this?

Transcript of Adam Gibson
Conducted on July 17, 2018

165

1    A.  I would say within a week probably.
2    Q.  Did you talk with Coroner Keller about
3  any of the questions that you had about this case?
4    A.  I can't recall specific conversation, but
5  I would assume that I would have, yes.
6    Q.  Okay.  In that conversation, did -- well,
7  let me ask you this.
8        You had already -- you talked with
9  Coroner Keller sometime in late December about the
10  case, correct?
11    A.  Yes.
12    Q.  Was that before or after you looked at
13  the reports on the RMS system?
14    A.  That was after I had looked at the
15  reports.
16    Q.  Okay.  So there was a step you took
17  between when you looked at the reports and when you
18  talked to Chief Copley then, correct?
19    A.  Yes.
20    Q.  Okay.  And that was talking to Coroner
21  Keller?
22    A.  Right.
23    Q.  Okay.  So is there anything else you did
24  between when you looked at the reports and when you

166

1  talked to Chief Copley other than talking to
2  Coroner Keller?
3    A.  No, ma'am.
4    Q.  Were there any parts of the case file
5  that -- about the work that had previously been
6  done in the case that weren't previously available
7  to you on the computer?
8    A.  No.  There is no officers' notes or
9  anything like that.  RMS is just strictly what's
10  dictated in the officers' reports.
11    Q.  So did you ever go to any part of the
12  police station to pull a box related to the prior
13  investigation?
14    A.  Later on, yes.
15    Q.  All right.  When did you do that?
16    A.  I don't know if that was -- it was
17  probably after that I had talked to Chief Copley,
18  but it's possibly before.
19    Q.  Okay.  And when you went and pulled the
20  box, what was in the box that you hadn't seen on
21  the computer?
22    A.  The autopsy report is not on the
23  computer.  And I think that was it.  Because at the
24  time you didn't have any handwritten notes that

167

1  were included.
2    Q.  So at the time you talked to Chief Copley
3  about Dr. -- your concerns about Dr. Bowman's
4  conclusions you hadn't read the autopsy report?
5    A.  Yes, I had.
6    Q.  Well, I thought you just said it wasn't
7  on the computer?
8    A.  It's not on the computer.
9    Q.  Okay.  So where did you access it before
10  you talked with Chief Copley?
11    A.  From the records file.
12    Q.  Okay.  So you did pull the records file
13  before you talked to Chief Copley?
14    A.  Yes, that's what I said.  I said it was
15  either directly after or directly before.
16    Q.  Okay.  So now is it your conclusion that
17  it must have been before because you definitely
18  read the autopsy report before you talked to Chief
19  Copley?
20    A.  Yes, ma'am.
21    Q.  Okay.  So did you review it just before
22  you talked to Chief Copley?
23    A.  What do you mean "just before"?
24    Q.  Well, did you pull the box just before

168

1  you talked to Chief Copley?
2    A.  No.  It would have been with the days
3  prior.
4    Q.  Okay.  Did you have to submit like a
5  request for somebody to go pull the box for you?
6    A.  No.
7    Q.  Did you go pull it yourself?
8    A.  I don't know if I pulled it myself or if
9  I had somebody from records pull it.
10    Q.  Okay.  So did you -- you developed your
11  questions about the autopsy report after you had
12  actually looked at the autopsy report, correct?
13    A.  Yes.
14    Q.  And that's whenever -- from whenever you
15  pulled the box?
16    A.  Yes.
17    Q.  Okay.  What is it about what you saw in
18  the reports or the photos that made you want to go
19  pull the box?
20    A.  Well, you look at the photos, you have
21  the obvious hands raised in the air, which is an
22  unnatural position, her lips were very dark in the
23  photos, you saw the drying of the eyes.  It just --
24  her position appeared unnatural.

Transcript of Adam Gibson
Conducted on July 17, 2018

169

1    Q.   And was it unnatural to you based on your
2  experience as a police officer?
3    **A.   In all of the bodies that I have seen in**
4  **my 20-year career, I have never seen a person with**
5  **their arms raised in the air after death.**
6    Q.   Okay.  Did you ultimately -- well, have
7  you ever reviewed Paramedic Ballard's testimony
8  from the second trial in this case?
9    **A.   I did.**
10   Q.   And you remember being asked some
11 questions about Paramedic Ballard during your
12 testimony in the second trial?
13   **A.   I do.**
14   Q.   And you remember being asked about
15 whether you were aware that Paramedic Ballard said
16 that her hands weren't in the air when they got
17 there?
18       MS. EMERY:  Objection.  Misstates the
19 testimony.
20       But you can answer.
21 BY MS. THOMPSON:
22   Q.   Let me ask you this question.  What is
23 your understanding of what Paramedic Ballard
24 testified to at the second trial?

170

1    **A.   That he raised her arm to put an EKG lead**
2  **on.**
3    Q.   Okay.  And did it change your view of the
4  position of her hands when the responding officers
5  got there to learn about what Paramedic Ballard had
6  testified to at the trial?
7    **A.   No, ma'am.**
8    Q.   And why didn't it?
9    **A.   Because Mr. Lovelace himself said her**
10 **arms were raised when he found her, the first**
11 **person that ever laid eyes on her, the first**
12 **officers that walked in the room said her arms were**
13 **raised, the first paramedics that were in the room**
14 **said her arms were raised, the first firefighters**
15 **that were in the room said her arms were raised,**
16 **the coroner described her arms as being raised in**
17 **an unnatural position, and the photos depict her**
18 **arms raised in an unnatural position.**
19   Q.   Well, some of the photographs were taken
20 after the EKG work has been done, correct?
21   **A.   Yes, the leads were still on her.**
22   Q.   In fact, all of them after the EKG
23 work was done, right?
24   **A.   Yes.**

171

1    Q.   So none of those photos depict how she
2  looked when the first responders got there,
3  correct?
4        MR. HANSEN:  Object to form.
5        Go ahead, you can answer.
6        THE WITNESS:  None of the photos depict
7  prior to the EKG leads.
8  BY MS. THOMPSON:
9    Q.   Right.
10   **A.   Correct.**
11   Q.   Okay.  And when you were reviewing the
12 photos for the first time, did you notice the leads
13 in the photos?
14   **A.   Yes.**
15   Q.   Okay.  So it was your understanding from
16 the very beginning that these photos depicted how
17 she looked after the paramedics had tried to revive
18 her, correct?
19   **A.   But I had read Mr. Lovelace's statements**
20 **prior to even seeing the photos.**
21   Q.   Okay.  But that wasn't my question.  My
22 question was:  When you looked at the photos, you
23 understood that the photos did not depict how her
24 hands looked when the first responders got there,

172

1  correct?
2    **A.   The photos did depict the description**
3  **that was included in the reports.**
4    Q.   Okay.  But my question was a little
5  different.  When you reviewed the photos for the
6  first time, you noticed the EKG leads in the
7  pictures, correct?
8    **A.   Yes.**
9    Q.   Okay.  And so you understood that those
10 photos depicted her body as it appeared after the
11 paramedics had tried to revive her, correct?
12   **A.   Yes.**
13   Q.   And is it your testimony, as you sit here
14 today, that you don't believe, based on everything
15 that you've looked at in this case, that her hands
16 moved at all between when the paramedics first got
17 there and when they did the work they did to try to
18 revive her?
19   **A.   I believe that all the statements are**
20 **consistent that her hands were raised that's**
21 **depicted in the photos.**
22       MS. THOMPSON:  Can you read my question
23 back.
24       (Record read.)

Transcript of Adam Gibson
Conducted on July 17, 2018

173

1      THE WITNESS:  I don't believe that they
2  moved.
3  BY MS. THOMPSON:
4      Q.   And do you believe that Paramedic
5  Ballard's testimony at the second trial is
6  inaccurate?
7      MS. EMERY:  Objection; relevance.
8  BY MS. THOMPSON:
9      Q.   You can answer the question.
10     **A.   I don't know if I would say that it's**
11 **inaccurate or mistaken.**
12     Q.   Do you believe it's one of the two,
13 either inaccurate or mistaken?
14     **A.   I do believe that.**
15     Q.   When did -- when you interviewed
16 Paramedic Ballard, did you ask him about the work
17 that the paramedics did to try to revive Cory
18 Lovelace?
19     **A.   Yes.**
20     Q.   And what did he tell you about that when
21 he spoke to you?
22     **A.   That basically they put the EKG on and**
23 **that she showed asystole rhythm.**
24     Q.   All right.  Did you ask him about whether

174

1  they had to move the body to put the leads on?
2      **A.   No.**
3      Q.   Okay.  Is that something that was just
4  not discussed -- was that topic discussed between
5  you and Paramedic Ballard at all during your
6  conversation with him?
7      **A.   No.**
8      Q.   Have you been present at the scene when a
9  person who seems to be deceased, there were
10 nevertheless efforts taken to try to revive them?
11     **A.   Yes.**
12     Q.   All right.  And one of the things that
13 has to be done is those leads have to be attached,
14 correct?
15     **A.   Typically they move -- one of the first**
16 **things they do, especially if a person is in bed,**
17 **is move them to the floor.**
18     Q.   And that wasn't done here?
19     **A.   No.**
20     Q.   Do you have any explanation for why she
21 wasn't moved to the floor?
22     **A.   Just for that reason, that he showed --**
23 **that they showed an asystole rhythm and also she**
24 **was described as cool to the touch.**

175

1      Q.   So it's your assumption from what you
2  reviewed that when the paramedics got there they
3  knew these efforts were not going to be successful?
4      **A.   Yes, ma'am.**
5      Q.   Because she was clearly dead?
6      **A.   Correct.**
7      Q.   When those leads are attached, you saw in
8  the photos that there are some on the neck and some
9  on the torso, correct?
10     **A.   Yes.**
11     Q.   And you saw that her -- she had -- her
12 clothing had to be moved somewhat to get those
13 leads on, right?
14     **A.   Yes.**
15     Q.   All right.  And the one at the neck was
16 sort of up by her shoulder, correct?
17     **A.   Yeah, it wasn't on her neck.  I think it**
18 **was actually on her collar bone or somewhere in**
19 that area (indicating).
20     Q.   You are sort of indicating at the lapel
21 area of the jacket?
22     **A.   Yeah, just below the collar bone.**
23     Q.   Okay.  And someone had to get -- someone
24 had to work in her shoulder area to get that lead

176

1  attached to where the collar bone is, right?
2      **A.   They would have had pull her shirt down,**
3  **yeah.**
4      Q.   Okay.  When you interviewed Cole Miller,
5  did you ever discuss with him the specifics about
6  how the first responders tried to revive Cory
7  Lovelace?
8      **A.   Cole Miller said that all he did when he**
9  **got in there was grabbed her arm to check for a**
10 **pulse and that immediately upon touching her he**
11 **noticed that she was cool to the touch and that she**
12 **was stiff, and then that was when the paramedics**
13 **arrived.**
14     Q.   Okay.  And did you have an understanding
15 from Paramedic Ballard as to who was present when
16 the efforts were made to try to revive her?
17     **A.   Yes.  There was another paramedic or EMT**
18 **that was with them.**
19     Q.   And did you talk to the other paramedic
20 or EMT?
21     **A.   Yes, ma'am.**
22     Q.   All right.  And did you include your
23 summary of what that person told you in your death
24 investigation summary?

Transcript of Adam Gibson
Conducted on July 17, 2018

177

1    A.  No.

2    Q.  And is there a reason you didn't?

3    **A.  Because his information was basically the**

4  **same as Paramedic Ballard, and he also said that**

5  **he -- if I remember correctly, that Bill Ballard is**

6  **the one that did everything because of the limited**

7  **space in the room.**

8    Q.  All right.  So if there was someone who

9  would know about how the EKG pads were applied, it

10  would be Bill Ballard?

11    **A.  Yes, I'm certain he is the one that put**

12  **them on.**

13        MS. THOMPSON:  Let's go off the record

14  for one second.

15        (Discussion held off the record.)

16        THE VIDEOGRAPHER:  We are going off the

17  record.  The time is 12:13.

18        (Whereupon a lunch recess was taken.)

19        THE VIDEOGRAPHER:  Here begins media

20  number 3.  We are back on the record.  The time is

21  13:06.

22        MS. THOMPSON:  Detective Gibson, while we

23  were on the break, your counsel and I conferred,

24  and I think we have an agreement that while, you

178

1  know, we would take the position that we have the

2  right today to ask you questions that would relate

3  to the punitive damages sought in this case, which

4  would be questions primarily about your financial

5  circumstances, that we will not ask those questions

6  today and that if this matter proceeds to trial

7  your counsel and I would confer and determine an

8  appropriate way for us to get information related

9  to your finances.  That's our agreement with the

10  understanding by your counsel that you would

11  cooperate in getting that discovery later.

12        Is that our agreement, Counsel?

13        MS. EMERY:  That's our agreement.

14  BY MS. THOMPSON:

15    Q.  I want to take you to August of 2014.  In

16  August of 2014, Detective Gibson, who was your

17  immediate supervisor?

18    **A.  Sergeant Summers.**

19    Q.  And then was Sergeant Summers's

20  supervisor Lieutenant Dreyer?

21    **A.  No, Lieutenant Dreyer is -- was the**

22  **supervisor of investigations.**

23    Q.  Was there someone that Sergeant Summers

24  directly reported to?

179

1    **A.  Lieutenant Dreyer.**

2    Q.  And then was there anyone in the sort of

3  chain of command between Lieutenant Dreyer and

4  Chief Copley?

5    **A.  Two deputy chiefs.**

6    Q.  Who were those two deputy chiefs?

7    **A.  Doug VanderMaiden and Shannon Pilkington.**

8    Q.  And Doug VanderMaiden was the deputy

9  chief of patrol; is that correct?

10    **A.  Deputy Chief of operations.**

11    Q.  Okay.  And what did his job entail in

12  operations?

13    **A.  Operations is the patrol side of the**

14  **department.**

15    Q.  And what was Ms. Pilkington's area of

16  authority?

17    **A.  Mr. Pilkington.**

18    Q.  I'm sorry, Mr. Pilkington, excuse me.  I

19  didn't catch the first name.  Thanks for correcting

20  me.

21    **A.  Shannon, but it's a mister.**

22    Q.  All right.  What was Mr. Pilkington's

23  area of authority?

24    **A.  He is the deputy chief of administration.**

180

1    Q.  Okay.  You would agree with me that

2  Curtis Lovelace was arrested in August of 2014,

3  correct?

4    **A.  Yes.**

5    Q.  And who made the decision to arrest

6  Mr. Lovelace?

7    **A.  It was a Grand Jury indictment.**

8    Q.  Okay.  Who made the decision to arrest

9  Mr. Lovelace at the time he was arrested?  And let

10  me ask that question in a better way.

11        The Grand Jury returning an indictment

12  meant that there was the authority under the law to

13  proceed with charging Mr. Lovelace with the murder

14  of his then wife, correct?

15    **A.  Yes.**

16    Q.  Who made the decision that -- about the

17  timing of when Mr. Lovelace would be arrested?

18    **A.  It was a decision after the indictment**

19  **was issued to make the arrest.**

20    Q.  And who participated in that decision?

21    **A.  It would have been Lieutenant Dreyer.**

22  **Basically once an indictment is issued, then you**

23  **try to serve it.**

24    Q.  Is the goal once an indictment has been

Transcript of Adam Gibson
Conducted on July 17, 2018

181

1  issued to arrest somebody as quickly as possible?
2      **A.  Typically.**
3      Q.  And was that the -- was that what you
4  were trying to accomplish in this case in terms of
5  arresting Mr. Lovelace?
6      **A.  Yes.**
7      Q.  Okay.  Did you confer with anyone about
8  the timing of when he would be arrested?
9          MR. HANSEN:  You mean like the date and
10  hour and that kind of stuff?
11          MS. THOMPSON:  Did you understand my
12  question?
13          MR. HANSEN:  I'll object to the form then
14  if we are going to -- okay.  I object to the form.
15          THE WITNESS:  I guess are you talking
16  specifically was it -- when was it or who decided
17  that he was arrested at 12:00 o'clock, 1:00
18  o'clock, whatever, that day?
19  BY MS. THOMPSON:
20      Q.  Well, my question is:  Did you talk with
21  anybody about the fact that the Grand Jury had
22  returned an indictment and now there would be, you
23  know, steps taken to arrest Mr. Lovelace?
24      **A.  Yes, the supervisors.**

182

1      Q.  And is that Summers and Copley and
2  Dreyer?
3      **A.  It would have been Lieutenant Dreyer.  I**
4  **don't believe Sergeant Summers was there that day.**
5      Q.  Okay.  Is there anyone you talked with
6  about the logistics of making that arrest besides
7  Lieutenant Dreyer?
8      **A.  There were other detectives that were**
9  **involved.**
10      Q.  Who else was involved?
11      **A.  Doug McQuern, and I'm not sure if it was**
12  **Detective VanderBol.  There were two or three other**
13  **people.**
14      Q.  At the time that the Grand Jury returned
15  its indictment, you had interviewed Lindsay
16  Lovelace, correct?
17      **A.  I had.**
18      Q.  Okay.  Had you interviewed any of Curt's
19  sons?
20      **A.  No.**
21      Q.  Was interviewing his sons something that
22  you wanted to accomplish as part of your
23  investigation?
24      **A.  Yes.**

183

1      Q.  Why?
2      **A.  Basically to speak to them about what**
3  **they remembered and their statements from that day.**
4  **And the fact that Larson had never been**
5  **interviewed.**
6      Q.  Did you believe that the interviews that
7  Logan Lovelace and Lincoln Lovelace had given
8  closer in time to when their mom was -- when their
9  mom died that there was something inaccurate about
10  the information that they reported at that time?
11      **A.  No, I don't think there was anything**
12  **inaccurate.**
13      Q.  Well, if they had already been
14  interviewed and you didn't believe that information
15  was inaccurate, why did you believe they needed to
16  be interviewed again?
17      **A.  Because there was inconsistencies in**
18  **their statements at the time even.**
19      Q.  Okay.  So did you believe that those
20  inconsistencies indicated something about their
21  memories was wrong?
22      **A.  I'm not saying their memory was wrong at**
23  **all.  That's why I wanted to talk to them to**
24  **basically confirm what their details were.**

184

1      Q.  Am I right in -- well, let me ask you
2  this.
3          Did you believe that it was -- that if
4  you had asked either of their parents permission to
5  interview them that their parents would have said
6  no?
7          MS. EMERY:  I object to the form of the
8  question.
9          If you understand, go ahead.
10          THE WITNESS:  Well, considering that
11  their father was the suspect in the investigation
12  that had not been released -- or the
13  reinvestigation had not been released, it would not
14  have been practical to notify them that there was a
15  reinvestigation occurring.
16  BY MS. THOMPSON:
17      Q.  Well, let me ask you this.  You
18  ultimately did interview Logan and Lincoln and
19  Larson Lovelace, correct?
20      **A.  Yes.**
21      Q.  Did you ask the permission of either of
22  their parents before you interviewed them?
23      **A.  No.**
24      Q.  And did you inform either Curtis Lovelace

Transcript of Adam Gibson
Conducted on July 17, 2018

185

1  or Christine Lovelace that you were -- that their
2  children were going to be detained to be
3  interviewed?
4      A.  No.
5      Q.  And why did you not inform either of them
6  that their children were going to be detained to be
7  interviewed?
8      A.  One, I did not know the relationship
9  between Christine and the boys at the time, that
10 there was an adoption.
11     Q.  Is there any other reason you didn't
12 inform their parents?
13     A.  No.
14     Q.  At what point, is it your testimony
15 today, that you learned that Christine Lovelace
16 was -- had adopted the boys formally?
17     A.  It was at some point in a conversation
18 with Marty Didriksen.
19     Q.  At the time that Curtis was arrested, you
20 knew that he and Christine were married, correct?
21     A.  Yes.
22     Q.  Did you have any -- well, let me ask you
23 this.
24         At the time that Curtis was arrested, did

186

1  you believe that Christine Lovelace did not have
2  any legal relationship with the boys?
3      A.  I did not.
4      Q.  And did you take any steps to learn
5  whether or not she had a legal relationship with
6  the boys before you detained them?
7      A.  No.
8      Q.  At the time that you detained the boys,
9  did you believe that it was appropriate for you to
10 detain them in order to interview them without
11 informing Curtis Lovelace because Curtis Lovelace
12 was the subject of your investigation?
13     A.  Yes.  He was the suspect.
14     Q.  All right.  And why did you believe that
15 the fact that he was the suspect meant that you
16 didn't have to seek the permission of a parent
17 before interviewing them?
18     A.  You don't have to seek the permission of
19 a parent to interview a juvenile as a witness.
20     Q.  And is that your belief based on your
21 training and experience in the Quincy Police
22 Department?
23     A.  Yes.  As a witness, you don't have to
24 have the permission of a parent.

187

1      Q.  Did you -- well, let me ask you this.
2          How did you go about deciding the timing
3  of when you were going to interview Logan, Lincoln,
4  and Larson?
5      A.  It was discussed the morning of the Grand
6  Jury.  After the Grand Jury I spoke with
7  Mr. Parkinson about it.  I spoke with Lieutenant
8  Dreyer, Deputy Chief VanderMaiden.  We all spoke
9  about initially having the kids out of class when
10 he was arrested and then eventually interviewing
11 them about their recollection.
12     Q.  So did all the people you just identified
13 participate in the decision making about how the
14 boys were going to be pulled out of class and
15 interviewed?
16     A.  And Sergeant Grott.
17     Q.  Sorry, which sergeant?
18     A.  Grott.
19     Q.  Can you spell that for the court
20 reporter?
21     A.  Sure.  G-R-O-T-T.
22     Q.  All right.  Is there anyone else besides
23 those people that you've identified that
24 participated in decisions about the boys?

188

1      A.  I don't believe so at this time.
2      Q.  Is it your understanding, as you sit here
3  today, that it is lawful for a police officer to
4  detain a juvenile without probable cause to believe
5  that that juvenile has committed a crime?
6          MS. EMERY:  Objection; calls for a legal
7  conclusion.
8          You can answer as to your understanding.
9          THE WITNESS:  I'm sorry, could you repeat
10 that?
11         MS. THOMPSON:  Sure.  Could you reread
12 the question, please.
13         (Record read.)
14         THE WITNESS:  You can detain people
15 without probable cause, but in this case it began
16 out of a mere concern for the kids at school, and
17 then they were brought to the station where Curtis
18 and Christine were, and then ultimately they were
19 turned over to Christine and eventually she gave
20 them to George and Maureen Crickard.
21 BY MS. THOMPSON:
22     Q.  At the time that the boys were turned
23 over to Christine, did you -- at that point did you
24 know that she had adopted them?

Transcript of Adam Gibson

Conducted on July 17, 2018

**189**

1    A.  I don't believe I did, no.

2    Q.  Why did you turn kids over to a person
3  that didn't have any legal relationship to them?

4    A.  Because that's who they lived with.

5    Q.  At the time that you released the boys
6  into Christine's custody, is it your testimony, as
7  you sit here today, that you did not believe that
8  she had any legal relationship to them?

9    A.  I don't recall being aware that she
10  adopted them before that day.

11    Q.  When you -- well, let me ask you this.

12      You were not present at any of the boys's
13  schools when they were pulled out of class; is that
14  correct?

15    A.  Correct.

16    Q.  Did you talk with anyone at the schools
17  about how that was going to be accomplished?

18    A.  No.

19    Q.  Who did?

20    A.  I'm not sure.

21    Q.  Was there somebody who -- at the police
22  department whose responsibility it was to set up
23  the boys getting pulled out of class?

24    A.  Sergeant Grott basically oversees the

**190**

1  school resource officers, or at the time he did.

2    Q.  So is it your belief that he is the
3  person who did that in this case?

4    A.  I can't say with 100 percent certainty.
5  All I can say it would be an assumption.

6    Q.  Who made the decision that the boys were
7  going to be brought to the police station to be
8  interviewed?

9    A.  That was a discussion amongst all of us.

10    Q.  And is it among -- when you say among all
11  of us, are those the people that you identified
12  before that were in the supervisory chain and that
13  participated in this investigation at the Quincy
14  Police Department?

15    A.  Yes.  And it's also something that I had
16  spoken to Mr. Parkinson about.

17    Q.  Okay.  And what did Mr. Parkinson tell
18  you about interviewing the boys?

19    A.  That it was a good idea.

20    Q.  Did he tell you that he believed that the
21  boys could be detained in order to be interviewed?

22    A.  That was not discussed.

23    Q.  All right.  Did you discuss with him what
24  would happen if the boys didn't want to come to the

**191**

1  police station to be interviewed?

2    A.  No.

3    Q.  Did you discuss that in any of your
4  planning meetings with any of the rest of the
5  supervisory chain that you talked with about making
6  the plans for these interviews?

7    A.  No.

8    Q.  Did you have any plan for what to do if
9  Logan Lovelace said I don't want to talk to you?

10    A.  No.  If he would have said he didn't want
11  to talk to us, then I wouldn't have talked to him.

12    Q.  Well, did you ask -- did you ask Logan
13  Lovelace if he wanted to be at the police station
14  talking to you?

15    A.  No.  And he never said he didn't.

16    Q.  Did you ask Lincoln Lovelace at any point
17  if he wanted to speak with you?

18    A.  No.

19    Q.  Did you ask Larson Lovelace at any point
20  if wanted to speak with you?

21    A.  No.

22    Q.  Did you hear any other police personnel
23  at any point ask any of the boys if they wanted to
24  be interviewed?

**192**

1    A.  I wasn't around them the whole entire
2  time.

3    Q.  But from what you observed, did you
4  observe anyone asking them if they wanted to be
5  interviewed?

6    A.  No.

7    Q.  Did you see -- well, let me ask you this.

8      At some point at the station you and
9  Detective Biswell interviewed the boys; is that
10  right?

11    A.  Yes.

12    Q.  And did you see any of the boys at the
13  station before they actually went into the
14  interview room to be interviewed by you?

15    A.  I don't believe so.

16    Q.  Did you see -- well, let me ask you this.

17      During Logan Lovelace's interview with
18  you at the police station, what was his demeanor?

19    A.  Calm, laid back.

20    Q.  Did it seem to you like he was at all
21  concerned about being at the police station?

22    A.  No.

23    Q.  And is your -- what was Lincoln
24  Lovelace's demeanor when you were interviewing him?

Transcript of Adam Gibson
Conducted on July 17, 2018

193

1    A.  The same.
2    Q.  And is it your testimony he was not at
3 all concerned about being at the station and being
4 interviewed?
5    A.  He did not say anything to us, no.
6    Q.  Okay.  And when you interviewed Larson
7 Lovelace, what was his demeanor?
8    A.  Again, calm and jovial.
9    Q.  It's your testimony that he was jovial?
10    A.  Yes.
11    Q.  Can you describe to me how Larson was
12 jovial in your interview with him?
13    A.  He was just relaxed and that was it.
14    Q.  Do you have any other -- is there any
15 other description you can give of how he was jovial
16 other than he was relaxed?
17    A.  No.
18    Q.  Did you joke why with Larson Lovelace
19 during his interview?
20    A.  A little bit.
21    Q.  What did you joke about?
22    A.  I don't recall specifically.  Something
23 about his birthday coming up.
24    Q.  Any other joking that you remember during

194

1 the interview?
2    A.  Not at this time, no.
3    Q.  After you had interviewed the boys, you
4 informed them and Christine Lovelace that Curt had
5 been charged with murder, correct?
6    A.  Yes.
7    Q.  And where were you when you informed the
8 boys and Christine Lovelace that Curt had been
9 charged with murder?
10    A.  I don't remember exactly where it was at.
11    Q.  Why -- do you remember what specifically
12 you said in informing them that Curt had been
13 charged with murder?
14    A.  I do not.
15    Q.  Why did you inform them that Curt had
16 been charged with murder?
17    A.  Because that's what happened.
18    Q.  Well, what was the reason that you needed
19 to inform them that that had occurred?
20    A.  Because I felt that I needed to tell them
21 why they were there and what was going on.
22    Q.  Was it your belief that after the fact,
23 after you had interviewed them, that was the time
24 to inform them as to what was going on?

195

1    A.  Yes.
2    Q.  All right.  And you mentioned the
3 Crickards.  What is the basis of your belief that
4 after Christine -- after you released the boys into
5 Christine's custody that she in turn gave the boys
6 to the Crickards?
7    MR. HANSEN:  Object to the form.  I think
8 that mischaracterizes his prior testimony.
9    Subject to that, go ahead and answer.
10    MS. THOMPSON:  Are you representing --
11    MR. HANSEN:  I can object any time I want
12 to.
13    MS. THOMPSON:  But you are instructing --
14 you are instructing the witness how to answer.
15    MR. HANSEN:  I didn't instruct him to
16 anything, Tara.  You can go back and read.
17    MS. THOMPSON:  You said you can go ahead
18 and answer.
19    MR. HANSEN:  That's right.  He can go
20 ahead and answer subject to my objection.
21    MS. THOMPSON:  All right.  Can you reread
22 the question for the witness, please.
23    MR. HANSEN:  If you've got a problem with
24 that, I'm going to keep objecting, so I mean, you

196

1 know, we can do it however you want to do it.
2    MS. THOMPSON:  I think we will both
3 represent our interests on the record at this
4 point.
5    MR. HANSEN:  Exactly.  Exactly.
6    MS. THOMPSON:  Can you read the question
7 for the witness, please.
8    (Record read.)
9    THE WITNESS:  Because Christine stayed
10 behind and talked to me.
11 BY MS. THOMPSON:
12    Q.  What did you discuss with Christine when
13 she stayed behind to talk to you?
14    A.  I don't believe Christine was in the room
15 when I talked to the boys about what their father
16 had been arrested for.  I talked to her
17 individually in the room directly across from the
18 watch commander's office and advised her what was
19 going on.
20    Q.  What did you tell her about what was
21 going on?
22    A.  That Curtis had been arrested for murder.
23    Q.  And is that a conversation that you had
24 privately with her?

Transcript of Adam Gibson
Conducted on July 17, 2018

197

1    **A.   It was.**
2    Q.   Who was present for your conversation
3 with the boys when you told them that their dad had
4 been arrested and charged?
5    **A.   I don't recall if anybody else was there.**
6 **Possibly Detective Biswell.  I don't remember for**
7 **sure.**
8    Q.   So if you had that conversation with the
9 boys in front of other people, is there a reason
10 you wouldn't have had that conversation with them
11 privately?
12        MS. EMERY:  Objection to form.
13 BY MS. THOMPSON:
14    Q.   You can answer the question.
15    **A.   Well, I did have it with them privately.**
16    Q.   Well, as you sit here today, do you
17 specifically remember where you were when you told
18 the boys their dad had been arrested?
19    **A.   In the Quincy Police Department.**
20    Q.   Do you remember where in the department?
21    **A.   I don't.**
22    Q.   All right.  Do you remember who was
23 present?
24    **A.   No, I don't.**

198

1    Q.   Were the Crickards there?
2    **A.   No.**
3    Q.   Was -- were any other police personnel
4 present besides Detective Biswell?
5    **A.   I answered that.  I don't recall.**
6    Q.   Where was Christine when you told the
7 boys that?
8    **A.   I believe she was in the lobby.**
9    Q.   Is there a reason why you didn't call
10 Christine in to have the boys have a concerned
11 adult there when you told them their dad had been
12 arrested?
13        MS. EMERY:  Object to the form.
14        THE WITNESS:  No.
15 BY MS. THOMPSON:
16    Q.   What was the boys's reaction to you
17 telling them that their dad had been arrested?
18    **A.   They cried.**
19    Q.   And after -- well, let me ask you this.
20        After you told them that their dad had
21 been arrested, how much more time did you spend
22 with them?
23    **A.   Minimal.**
24    Q.   What did you do after you told them that?

199

1    **A.   They were taken to the lobby.**
2    Q.   Why were they taken to the lobby?
3    **A.   Because that's where everybody else was**
4 **at.**
5    Q.   Who was in the lobby when they were
6 brought out there?
7    **A.   Christine and then George and Maureen**
8 **Crickard.**
9    Q.   And when the boys came out to the lobby,
10 did -- at that point did you tell -- did you or any
11 other police officer tell the people assembled what
12 was going on?
13    **A.   I don't know if I told them in the lobby**
14 **or not.**
15    Q.   Do you believe, as you sit here today,
16 that it would have been better for the Lovelace
17 boys to have learned from a different person than
18 you that their dad had been arrested for murder?
19        MS. EMERY:  Objection to form.
20        THE WITNESS:  I can't say what's better.
21 I can tell you what happened.
22 BY MS. THOMPSON:
23    Q.   Okay.  So you have no opinion on whether
24 it would have been -- well, let me ask you this.

200

1        Do you have any opinion on whether it
2 would be less emotionally difficult for the boys to
3 learn their dad had been arrested for murder if
4 that information came from someone other than you?
5        MS. EMERY:  Objection to form.
6        MR. HANSEN:  Join.
7        THE WITNESS:  I don't have an opinion.
8 BY MS. THOMPSON:
9    Q.   In your conversation -- so going back to
10 your conversation with Christine Lovelace, how long
11 did that conversation last?
12    **A.   Just a few minutes.**
13    Q.   All right.  And do you remember what, if
14 anything, she said to you during that conversation?
15    **A.   I do.**
16    Q.   What did she say?
17    **A.   I told her that Curtis had been arrested**
18 **for murder, and her first comment was is what am I**
19 **going to do for money.**
20    Q.   Did you have any response to her asking
21 you that question?
22    **A.   I did not.**
23    Q.   What if -- did she say anything else
24 besides asking about her finances?

Transcript of Adam Gibson
Conducted on July 17, 2018

201

1      A.   She answered a phone call, and while she
2  was on the phone she said that Curtis has been
3  arrested for murder, and then she stopped and said,
4  well, I guess that's what they are calling it now.
5      Q.   Do you know who she was talking to on the
6  phone?
7      A.   I don't.
8      Q.   Do you remember anything else about your
9  conversation with Christine other than what you
10 have just testified to?
11     A.   I don't.
12     Q.   Did you give her any other information
13 during that conversation other than just to say
14 that Curt had been arrested?
15     A.   Not that I recall.
16     Q.   And what did Christine do after your
17 conversation with her?
18     A.   She left.
19     Q.   And it's your testimony that at the time
20 that she left that the Lovelace boys had already
21 left?
22     A.   I believe so.
23     Q.   Do you know how it is that the Crickards
24 came to be at the police station?

202

1      A.   I don't.
2      Q.   Do you know how it is that Christine
3  Lovelace came to be at the police station?
4      A.   I don't.
5      Q.   Have you ever heard from any other person
6  as to how the Crickards ended up there?
7      A.   No.
8      Q.   Did you know George and Maureen Crickard?
9      A.   Yes.
10     Q.   How did you know them?
11     A.   He is a doctor and he is also active in
12 the Y football.
13     Q.   Did you know Maureen Crickard at all
14 other than knowing her as George's spouse?
15     A.   Just knew of her, yeah.
16     Q.   Okay.  Did -- well, let me ask you this.
17         At the time that Curtis Lovelace was
18 arrested, there were detectives in the Quincy
19 Police Department who were responsible for juvenile
20 cases; is that right?
21     A.   Yes.
22     Q.   Who were those people?
23     A.   The actual juvenile investigators were
24 Doug McQuern and Cathy Martin.

203

1      Q.   And Doug McQuern was at the police
2  station that day that Curt was arrested, correct?
3      A.   He was.
4      Q.   Was the other juvenile detective there?
5      A.   I don't remember if she was or not.
6      Q.   Did Doug have particular training on
7  dealing with youth?
8      A.   He has the same training I have as a
9  juvenile officer through the juvenile officer's
10 school.
11     Q.   When did you attend juvenile officer's
12 school?
13     A.   Well, the first time I went was September
14 11th of 2001.  That class got cancelled that
15 morning, and I went back probably the months after.
16     Q.   How many people in the Quincy Police
17 Department have that juvenile officer training?
18     A.   Probably close to all of us.
19     Q.   In your training as a juvenile officer,
20 did you receive any -- well, let me ask you this.
21         Who conducted the juvenile officer
22 training that you attended?
23     A.   It's conducted by the Law Enforcement
24 Training and Standards Board.

204

1      Q.   Okay.  And in your training about dealing
2  with youth, did you receive any training about
3  dealing with the particular emotions and
4  sensitivities of youth?
5      A.   I don't recall that being a particular
6  portion of the class.  It was mainly about the
7  juvenile law, the Juvenile Court Act.
8      Q.   Is there anyone in the Quincy Police
9  Department that you're aware of that has any
10 particular training on some of the sensitivities
11 associated with dealing with youth?
12     A.   The juvenile investigators go through --
13 I don't know what the class is, but it's basically
14 to interview the kids through CACs and different
15 things like that.
16     Q.   Is that for interviewing youth who might
17 have been the victims of abuse?
18     A.   Yes.
19     Q.   And Detective McQuern had that training,
20 to your knowledge?
21     A.   Yes.
22     Q.   Do you have any other memory about what
23 happened at the police station with respect to
24 Logan, Lincoln, or Larson Lovelace after your

Transcript of Adam Gibson
Conducted on July 17, 2018

205

1 interview with them other than what you've
2 testified to?
3     **A.   Not at this time, no.**
4     Q.   And do you have any other memory of
5 your -- any conversations you had with Christine
6 Lovelace at the police station other than what
7 you've just testified to?
8     **A.   No, ma'am.**
9     Q.   In your conversation with Christine, was
10 she upset?
11    **A.   Yes.**
12    Q.   And how did you determine that she was
13 upset?
14    **A.   She was crying.**
15    Q.   Who left the interview -- well, let me
16 start that question again.
17        The room that you interviewed Christine
18 in, which of you left the room first when the
19 conversation was over?
20    **A.   I have no idea.**
21    Q.   And what did you do after you spoke with
22 Christine?
23    **A.   I don't know.**
24    Q.   At the police station, did you hear

206

1 anybody talking about words to the effect of a
2 circle of trust?
3        MS. EMERY:  Objection to the form.
4        Go ahead.
5        THE WITNESS:  No.
6 BY MS. THOMPSON:
7     Q.   Did you hear Christine Lovelace say
8 anything about a circle of trust?
9     **A.   No.**
10    Q.   Did you hear any other person talking
11 about there being a circle of trust?
12    **A.   That day, no.**
13    Q.   Did you hear that term at some point
14 later?
15    **A.   Yes.**
16    Q.   When did you hear that term later?
17    **A.   On jail phone calls.**
18    Q.   All of Curtis Lovelace's telephone calls
19 from the jail were recorded; is that right?
20    **A.   Yes.**
21    Q.   And do you as a member of law enforcement
22 have the ability to listen to those calls?
23    **A.   Yes.**
24    Q.   What is the mechanism by which you have

207

1 the ability to review those calls?
2     **A.   It's through a website.**
3     Q.   So you don't have to get physical copies
4 of tapes or anything?
5     **A.   No, ma'am.**
6     Q.   Am I right that you can log in at anytime
7 and listen to any of the calls from the jail?
8     **A.   Yes.**
9     Q.   And is that true even for the calls from
10 a neighboring jail?
11    **A.   Typically, no.**
12    Q.   Okay.  So for the time that Curtis was in
13 pretrial custody in this case for most of that time
14 he was in the neighboring county's jail, right?
15    **A.   Yes.**
16    Q.   So how were you able to listen to those
17 calls in the neighboring jail?
18    **A.   They established a log-in for us.**
19    Q.   How did they work with you -- well, let
20 me ask a different question.
21        Did they e-mail you about establishing
22 that website?
23        MS. EMERY:  Object to the form.
24        THE WITNESS:  No.  It was done by phone.

208

1 BY MS. THOMPSON:
2     Q.   Okay.  And was there some kind of like
3 user name and password you entered to access the
4 website where you could pull everything up?
5     **A.   Yes, ma'am.**
6     Q.   Who else, if anyone, had access to that
7 same website?
8     **A.   Well, it's the same website, just**
9 **different jails.**
10    Q.   Okay.  Are you aware of anyone else that
11 had access to that same website to listen to Curt
12 Lovelace's calls?
13    **A.   Yeah, anybody could have.**
14    Q.   Anyone who had the log-in information?
15    **A.   Right.**
16    Q.   Have you ever learned that anyone else
17 besides you listened to Curtis Lovelace's calls
18 through that website?
19    **A.   No.**
20    Q.   Did you ever talk with Ed Parkinson about
21 whether Ed Parkinson had listened to any of those
22 calls?
23    **A.   I don't know.  Not that I recall.  But**
24 **I'm sure it's possible at some point during the**

Transcript of Adam Gibson
Conducted on July 17, 2018

209

1  time period.
2     Q.  As you sit here today, do you have any
3  memory of discussing with any prosecutor that that
4  person was listening to Curtis Lovelace's jail
5  calls?
6     **A.  I can't answer yes or no.  I honestly**
7  **don't know.**
8     Q.  And when you say you don't know, does
9  that mean that you don't remember?
10    **A.  Correct.**
11    Q.  Is there anything that would refresh your
12 memory about whether or not you ever discussed with
13 any prosecutor whether or not that person had
14 access to listening to Curt's calls from the jail?
15    **A.  No.**
16    Q.  Did you listen, to your knowledge, to
17 every minute of phone calls that Curtis Lovelace
18 had from the Hancock County Jail?
19    **A.  No.**
20    Q.  How did you decide which of his calls or
21 what portions of those calls to listen to?
22    **A.  There was really no decision process.  I**
23 **would just listen.**
24    Q.  Is it fair to say you were doing it

210

1  somewhat randomly?
2     **A.  Yes.**
3     Q.  And is it fair to say you were doing it
4  as you had time to do that?
5     **A.  Yes.**
6     Q.  What was your reason for monitoring his
7  phone calls from the jail?
8     **A.  I monitor jail calls for several people.**
9     Q.  Do you monitor jail calls for all of the
10 serious felony cases that you've been involved in
11 investigating?
12    **A.  Typically, yes.**
13    Q.  How many of Curtis's jail calls did you
14 listen to?
15    **A.  I have no idea.**
16    Q.  How much time did you spend reviewing
17 those calls?
18    **A.  I have no idea.**
19    Q.  And you said you heard something on the
20 calls about the circle of trust.  What did you hear
21 with respect to that term?
22    **A.  That was Christine saying that the boys**
23 **had to be kept within the circle of trust because**
24 **no one else could be trusted and she needed to**

211

1  protect them.
2     Q.  Okay.  And she was telling that to Curt?
3     **A.  Yes.**
4     Q.  All right.  And so she was talking about
5  the concept of a circle of trust in the context of
6  protecting the boys?
7     **A.  Yes.**
8     Q.  Had you ever heard that term before or
9  since in connection with the Cory Lovelace
10 investigation other than on that call?
11    **A.  I heard it several times on calls.**
12    Q.  How many times did you hear it?
13    **A.  Several.  I don't know an exact number.**
14    Q.  Is the reason that you monitor the calls
15 of people that are in jail because you are trying
16 to determine if there is something incriminating
17 they might say?
18    **A.  Yes.**
19    Q.  I mean, people know their calls are being
20 recorded, but sometimes people say dumb things on
21 jail calls, correct?
22    **A.  A lot of times people say incriminating**
23 **things on phone calls.**
24    Q.  Is there a reason why you didn't make an

212

1  effort to listen to more minutes of Curt's calls
2  then?
3     **A.  I would assume it was just timing.**
4     Q.  Is there someone else in the department
5  you could have asked to listen to some of those
6  calls?
7     **A.  I'm sure there was, yeah.**
8     Q.  That wasn't something you determined was
9  a priority in Curtis's case; is that right?
10    **A.  No.**
11    Q.  Did you create any police reports
12 documenting anything that you learned from
13 listening to the portions of Curt's legal calls
14 that you listened to?
15    **A.  No.**
16    Q.  And are any -- I'm sorry, go ahead.
17    **A.  Can I just correct that.  You said "legal**
18 **calls."  The legal calls are not monitored.**
19    Q.  And I misspoke and I appreciate you
20 making that correction.
21        Did you prepare any reports about any
22 portion of Curt's jail calls that you listened to?
23    **A.  No, ma'am.**
24    Q.  Did you pass on information to anyone

Transcript of Adam Gibson
Conducted on July 17, 2018

213

1 about anything you learned from those jail calls?
2    **A.  I don't know.  I'm assuming that there**
3 **would have been information that I would have**
4 **passed on to Mr. Parkinson or Ms. Wykoff, but I**
5 **don't recall exactly specifically what it would**
6 **have been.**
7    Q.  And did you pass on that information
8 through telephone calls with either Mr. Parkinson
9 or Ms. Wykoff?
10    **A.  Yes.**
11    Q.  At any point did Coroner Keller tell you
12 that he had opened up his own investigation into
13 the death of Cory Lovelace?
14    **A.  No.**
15    MS. EMERY:  Objection as to form.
16    THE WITNESS:  Sorry.
17 BY MS. THOMPSON:
18    Q.  Have you ever heard or been told that
19 Coroner Keller was separately investigating Cory
20 Lovelace's death before, you know, you talked to
21 him about it in late 2013?
22    **A.  No.  All he said was that he still had**
23 **the file out.**
24    Q.  Okay.  When you met with him in late

214

1 2013, the meeting that you previously testified
2 about here today, did he indicate to you that he
3 had independently already been thinking about Cory
4 Lovelace's death?
5    **A.  Yeah.  He said that he had -- still had**
6 **the file out because he had concerns about it.**
7    Q.  So he told you he still had the file out?
8    **A.  Yes.**
9    Q.  Did he tell you where the file was?
10    **A.  At his office.**
11    Q.  Have you ever heard him for any other
12 case talk about still having a file out because he
13 was concerned about it?
14    **A.  Not that I recall right now, no.**
15    Q.  For any of the other cases that you've
16 worked on with Coroner Keller, has there ever been
17 another situation where you told him, you know, I'm
18 thinking about something, and he said, yeah, I
19 still have that file out because I'm also thinking
20 about it?
21    **A.  The only other one, and I don't know that**
22 **that was specific, but the Booth case.**
23    Q.  The Booth case is a case that you
24 reinvestigated after Curtis Lovelace had been

215

1 arrested; is that right?
2    **A.  Correct.**
3    Q.  When did your reinvestigation of that
4 case start?
5    **A.  I want to say October, September,**
6 **October, somewhere in there.**
7    Q.  Of 2014?
8    **A.  Yes.**
9    Q.  And did you talk about the Booth case
10 with anyone before you reopened the investigation?
11    **A.  Yes.**
12    Q.  Who did you talk with that case about
13 before you reopened it?
14    **A.  The chief is actually the one that talked**
15 **to me about reinvestigating.**
16    Q.  And that was going to be my question.
17 Why is it that you reinvestigated that case?
18    **A.  He is the one that came to me.  I don't**
19 **remember specifically if he had received a phone**
20 **call or if somebody had stopped him and talked to**
21 **him, but that was -- that's basically how that one**
22 **happened.**
23    Q.  And we are talking about Chief Copley?
24    **A.  Yes, ma'am.**

216

1    Q.  The Booth case was a case that you had
2 originally been involved in the investigation of;
3 is that right?
4    **A.  I was not involved in the investigation.**
5 **I was a canine officer that responded as the call**
6 **came out.**
7    Q.  You weren't a detective, but you
8 participated in responding to the scene; is that
9 correct?
10    **A.  Yes.**
11    Q.  Okay.  At the time that Chief Copley
12 discussed the Booth case with you, did you have an
13 independent memory of having been at that scene?
14    **A.  Yes.**
15    Q.  At the time he discussed it with you, did
16 you have any concerns about the way that that
17 investigation had been resolved up to that point?
18    **A.  Yes, because the autopsy found no water**
19 **in her lungs and she was found in a pool.**
20    Q.  When did you learn about the autopsy
21 results in the Booth case?
22    **A.  I don't know, months -- probably in the**
23 **months after it happened.**
24    Q.  Were you, as a canine officer who had

Transcript of Adam Gibson
Conducted on July 17, 2018

---

217

1 responded to the scene, been informed in some way
2 about how the investigation was proceeding?
3     **A.   I had talked to Bryan Dusch, who was the**
4 **investigator on it.**
5     Q.   All right.  And is he the person who told
6 you that the autopsy had come back that there was
7 no water in the lungs?
8     **A.   Yes.**
9     Q.   And did that raise concerns for you as a
10 canine officer about what that meant?
11     **A.   It raised concerns for me as a police**
12 **officer, yes.**
13     Q.   Okay.  And what concerns did it raise for
14 you as a police officer at the time that the
15 investigator first told you about it?
16     **A.   Well, because you have someone who is**
17 **supposedly found in a pool dead that doesn't have**
18 **water in their lungs and there is no explanation as**
19 **to how she died.**
20     Q.   At the time that Chief Copley raised the
21 reinvestigation of the Booth case to you, when was
22 the last time that you had talked with someone
23 about that case?
24     **A.   Probably at that time that I talked to**

218

1 **Bryan Dusch.**
2     Q.   And after you talked with Chief Copley
3 about the Booth investigation, did you work on the
4 reinvestigation of that case also with Coroner
5 Keller?
6     **A.   Yes.**
7     Q.   Okay.  And did Coroner Keller tell you as
8 to the Booth case that he also had some independent
9 concerns about it?
10     **A.   I believe so, yes.**
11     Q.   Okay.  You also sent the Booth case to
12 Dr. Denton; is that right?
13     **A.   Yeah, it was an exhumation.**
14     Q.   And what was the ultimate conclusion as
15 to the Booth case?
16     **A.   Well, Dr. Denton left it as undetermined,**
17 **but there was clear blunt force trauma to the back**
18 **of the head that was not noted in Dr. Bowman's**
19 **autopsy, and we also found that she did not take**
20 **any pictures of that autopsy.  It was one of four**
21 **autopsies that day.  It was the only one not**
22 **photographed.  And also that the larynx and the**
23 **esophagus upon exhumation were not kept with the**
24 **remains of the body.**

219

1     Q.   When did -- well, let me ask you this.
2         Did Dr. Denton issue a written report
3 based on his reeview of that case?
4     **A.   He did.**
5     Q.   And when did you receive the results,
6 whether orally or in written form, of what
7 Dr. Denton's conclusions were about the Booth case?
8     **A.   I don't recall specifically.**
9     Q.   Was that before Curtis Lovelace's first
10 trial?
11     **A.   I believe so, yes.**
12     Q.   Was that before -- well, let me ask you
13 this.
14         Did Coroner Keller -- you talked with
15 Coroner Keller about the Booth case before you took
16 it to Dr. Denton; is that right?
17     **A.   Yes.**
18     Q.   And did Coroner Keller tell you what, if
19 anything, had bothered him about the Booth case?
20     **A.   I don't recall specifically, no.**
21     Q.   At the time that the Booth case was
22 reinvestigated, was it your understanding that it
23 was being reinvestigated because there were some
24 concerns specifically about Dr. Bowman?

220

1         MS. EMERY:  Object to the form.
2         THE WITNESS:  I don't know that it was
3 specifically questions about Dr. Bowman.  It was
4 questions about the autopsy and the undetermined
5 autopsy.
6 BY MS. THOMPSON:
7     Q.   That was an autopsy Dr. Bowman did,
8 correct?
9     **A.   Yes.**
10     Q.   And when Chief Copley discussed with you
11 reopening the Booth case, did he mention concerns
12 about Dr. Bowman's conduct during that autopsy?
13     **A.   No, not specifically anything about**
14 **Dr. Bowman during that autopsy, no.**
15     Q.   Did he tell you anything about why he
16 wanted it reinvestigated?
17     **A.   Like I said, I believe he got a phone**
18 **call or somebody had stopped him.  I don't recall**
19 **exactly how he -- how it came to him.**
20     Q.   We talked a little bit earlier about
21 Paramedic Ballard's testimony at the second -- at
22 Curtis Lovelace's second trial.  Do you agree that
23 if the Detective Ballard was not mistaken or
24 incorrect about what he observed at the scene that

Transcript of Adam Gibson
Conducted on July 17, 2018

221

1  that calls into question some of the pathology
2  opinions that you obtained in this case?
3       MS. EMERY:  I'm going to object to the
4  form.  It's unintelligible.  It makes reference to
5  Detective Ballard.
6       MR. HANSEN:  I object to the form.
7  BY MS. THOMPSON:
8     Q.  Let me re-ask the question.  We talked a
9  little bit earlier about Paramedic Ballard's
10 testimony at the second trial?
11    A.  Yes.
12    Q.  Do you agree that if Paramedic Ballard's
13 testimony at the second trial is correct that that
14 calls into question some of the pathology opinions
15 that you received in this case?
16      MS. EMERY:  Object to the form.
17      MR. HANSEN:  And I'll object to
18 foundation.
19 BY MS. THOMPSON:
20    Q.  You can answer the question.
21    A.  I do not agree with that.
22    Q.  How -- well, did you -- let me ask you
23 this.
24      After you heard about Paramedic Ballard's

222

1  testimony at the second trial, did you confer about
2  that testimony with any pathologist?
3     A.  No.
4     Q.  Do you have any understanding of what any
5  pathologist in this case has said about whether
6  that testimony would impact their opinions in this
7  case?
8     A.  No.
9     Q.  So you don't know, for instance, whether
10 that testimony would alter what Dr. Turner thought
11 about this case, for instance?
12    A.  I don't.
13    Q.  When you -- when did you first talk with
14 Dr. Denton about the Cory Lovelace investigation?
15    A.  It would have been January or February of
16 2014.
17    Q.  Let me do one thing first.  Going back to
18 the report, to the exhibits we looked at before the
19 break, I just have a couple of really quick
20 questions for you.
21    A.  Okay.
22    Q.  I'm going to refer you first to Exhibit
23 Gibson 5.  Am I right that one of the reasons that
24 you believe that Paramedic Ballard was mistaken is

223

1  because in your view Curtis Lovelace described the
2  hands being up at the time that he saw Cory
3  Lovelace's body?
4       MS. EMERY:  Object to the form.
5       THE WITNESS:  Yes.
6  BY MS. THOMPSON:
7     Q.  And did you obtain the information about
8  what Curtis Lovelace told investigators about the
9  hands from any source other than reviewing Baird's
10 reports about what Curtis told him about the hands?
11    A.  No.
12    Q.  And would you agree with me that Gibson 5
13 reflects Jeff Baird's interview with Curtis
14 Lovelace, correct?
15    A.  That's one of the interviews, yes.
16    Q.  And so for that particular interview, if
17 you turn to page 2, I'm looking at the third and
18 last paragraph on page 2, which is Plaintiff 9773,
19 that third paragraph says in part, "At
20 approximately 900 hours he decided it was time to
21 take a shower, at which time he went upstairs and
22 noticed that his wife's position in bed appeared
23 unnatural.  Curtis said he remembered seeing her
24 hands up near her shoulders and he went to check on

224

1  her."  Do you see that?
2     A.  Yes.
3     Q.  Is that the sentence that for you
4  indicates that what Curtis Lovelace told Jeff Baird
5  is inconsistent with Paramedic Ballard's testimony?
6     A.  I would have to look back at the other
7  interviews also before I can answer that.
8     Q.  Well, do you think -- as just to the
9  particular two sentences that I read you there, the
10 couple of sentences that I just read you there, is
11 it your belief that those particular sentences --
12 as to the portion of the report I just read you, is
13 it your belief that the portion of the report I
14 just read you is inconsistent with the Paramedic
15 Ballard's testimony at the second trial?
16    A.  I would say that that's a portion, yes.
17    Q.  And then I'm going to refer you to Gibson
18 Exhibit 3.  Gibson Exhibit 3 also reflects another
19 interview that Curtis Lovelace had with Jeff Baird;
20 is that correct?  And I'm referencing if you look,
21 for instance, at Plaintiff 9759 in that document.
22 I'm asking about that portion.
23    A.  Sorry, you said 59?
24    Q.  Yes.  It's got a Bates of 7 on it as

Transcript of Adam Gibson
Conducted on July 17, 2018

225

1  well.
2      **A.  Yes.**
3      Q.  This report reflects another interview
4  that Jeff Baird had with Curtis Lovelace; is that
5  right?
6      **A.  Yes.**
7      Q.  And if you look to the next page, which
8  is Plaintiff 9760, in that middle paragraph near
9  the end of it this report says in part, "Curtis
10  said that he called out his wife's name and said
11  Cory.  At approximately the same time he noticed
12  that both of her arms were up and that her hands
13  were pulled up by her shoulders."  Do you see that
14  portion of the report?
15      **A.  Yes.**
16      Q.  Do you believe that that account by
17  Curtis Lovelace is inconsistent with Paramedic
18  Ballard's testimony?
19      **A.  Yeah.  It says her arms were up.**
20      Q.  And do you -- again, you didn't talk to
21  Jeff Baird about what Curtis Lovelace told him, so
22  you don't know if there is more explanation about
23  what that meant; is that correct?
24      **A.  Correct.**

226

1      Q.  And then I'm going to refer you to --
2  well, let me actually do this.
3          I'm going to refer you to Gibson 2.  Do
4  you see the second page of that report?  This
5  reflects -- that reflects Doug VanderMaiden's
6  account of what he observed when he responded at
7  the scene; is that right?
8      **A.  Yes.**
9      Q.  All right.  And then in that second
10  paragraph, do you see where it says, looking at --
11  near the bottom of that second paragraph on page 2,
12  "By looking at Cory Lovelace it appeared that she
13  may be deceased.  Her eyes were open and her
14  forearms were elevated above her chest."  Do you
15  see that?  I'm looking at the first page of
16  narrative.
17      **A.  Oh, page 1 of the narrative.**
18      Q.  I'm sorry.  Yeah.  Thank you.
19      **A.  I was looking at page 2 of 2.**
20      Q.  So I'm looking in that middle paragraph
21  where it says, "By looking at Cory Lovelace it
22  appeared that she may be deceased.  Her eyes were
23  open and her forearms were elevated above her
24  chest."  Do you see that?

227

1      **A.  Yes.**
2      Q.  Do you believe that that is inconsistent
3  with Paramedic Ballard's testimony?
4      **A.  Yeah, her arms are already elevated.**
5      Q.  Did you ever talk with Doug VanderMaiden
6  about what he observed when he got to the scene?
7      **A.  I did.**
8      Q.  When did you do that?
9      **A.  I don't recall the exact time.**
10      Q.  And what did he tell you about how the
11  arms were elevated?
12      **A.  That they were raised above her chest.**
13      Q.  And did you make any reports about what
14  it is that Doug VanderMaiden told you about her
15  arms being elevated?
16      **A.  No.  Doug made his own report.**
17      Q.  And that's the report that we are just
18  referencing, Exhibit 2, correct?
19      **A.  Yes.**
20          (Gibson Exhibit 8 marked.)
21  BY MS. THOMPSON:
22      Q.  I'm showing you what's been marked as
23  Gibson Exhibit 8, and this is a multipage document
24  that starts with Bates Plaintiff 5568 and goes to

228

1  Plaintiff 5616.  Do you recognize the document
2  that's in front of you, Detective Gibson?
3      **A.  Yes.**
4      Q.  This is a collection of detective's daily
5  logs; is that right?
6      **A.  Yes.**
7      Q.  And can you explain to me what the
8  detective daily log was used for in the Quincy
9  Police Department in 2014?
10      **A.  It's basically how you document your**
11  **time.**
12      Q.  Is this a document that you yourself
13  complete for your own records?
14      **A.  Yes.  It's given to the sergeant.**
15      Q.  Okay.  Are you required to complete one
16  of these logs for every shift that you work?
17      **A.  Yeah.**
18      Q.  It looks like -- well, let me ask you
19  this.
20          Is this a report that you complete in
21  Word?
22      **A.  Yes.**
23      Q.  Okay.  And so where there is type --
24  where there is sort of typewriting in the form

Transcript of Adam Gibson
Conducted on July 17, 2018

229

1 that's already there, is that information you typed
2 in?
3    **A.   Well, the form itself is general, but,**
4 **yeah, where the information is typed on each**
5 **particular case is information that I input.**
6        MS. EMERY:  Tara, let me interrupt you
7 for a second.  There is all kinds of attempted
8 redactions in this exhibit, which don't look like
9 they were very successful, because when it copied
10 the copier pulled the type through the redactions.
11 So to the extent that those redactions are not
12 going to be honored and personal or private or any
13 other information is brought out, I will object;
14 and then, of course, if the exhibit is ever used
15 in -- outside the police department or at trial
16 that we would have appropriate redactions to it.
17        MS. THOMPSON:  Let me just say on the
18 record that these weren't redactions that we did.
19 I agree with you that they were not successful.  I
20 do not intend to -- well, I think there is one
21 redaction I intend to ask him about.  I'm happy to
22 put this under a confidentiality order.  I think
23 there is one redaction that's relevant to what we
24 are asking about.  But I don't have a problem with

230

1 making this portion of the -- with making this
2 document confidential.
3        MS. EMERY:  Okay.  I would prefer because
4 there is a lot of obvious private information in
5 there.
6        Do you have any objection, Jim?
7        MR. HANSEN:  No.
8 BY MS. THOMPSON:
9    Q.   Were you required to complete a
10 detective's daily log for every shift that you
11 worked?
12    **A.   You are supposed to, yes.**
13    Q.   Okay.  And how did you provide these
14 completed forms to whoever needed to review them?
15    **A.   Typically I would e-mail them or just**
16 **print them and put them in Sergeant Summers' box.**
17    Q.   Did you save your own daily logs?
18    **A.   Usually for a month at a time and then as**
19 **the month goes by I get rid of them.**
20    Q.   Was it your understanding that these
21 detective's daily logs were being -- that were
22 required to complete those for time keeping
23 purposes?
24    **A.   Basically, yes.**

231

1    Q.   Okay.  At any point when you worked at
2 the Quincy Police Department, have you received any
3 reprimands from anyone about putting more
4 information in your daily logs?
5    **A.   No.**
6    Q.   Has anyone ever told you that you need to
7 be more comprehensive in the way that you complete
8 these logs?
9    **A.   No.**
10    Q.   I'm going to turn you -- and this is, I
11 think, the one redacted version that I -- or the
12 one redacted piece of information I want to ask you
13 about, so if you want to designate this
14 confidential, I don't object to that.  But I'm
15 going to turn to Plaintiff 5585.
16        MS. EMERY:  We are going to ask that
17 the -- for purposes of it being a group exhibit
18 that it be confidential.
19        MS. THOMPSON:  I don't object.
20 BY MS. THOMPSON:
21    Q.   Okay.  This page we are looking at, 5585,
22 is a detective's daily log that you completed for
23 June 30th of 2014; is that right?
24    **A.   Yes.**

232

1    Q.   And there is some material on here that's
2 been redacted.  I won't put more on the record here
3 than I need to about this, but this reflects that
4 on June 30th of 2014 you were doing investigation
5 about a woman that you believed maybe was having
6 checks signed over and used by someone else?  Let
7 me ask that question in a better way.
8        This reflects that you were involved in
9 an investigation where an elderly person was maybe
10 having someone encourage them to sign checks and
11 turn over to someone that didn't really have a
12 right to have that money; is that right?
13    **A.   That's correct.**
14    Q.   Do you remember the investigation that's
15 referenced that you worked on at least on June
16 30th, 2014?
17    **A.   I don't, but I can tell you the content**
18 **is a typo, because the suspect name is Darlene**
19 **Savage.**
20    Q.   Okay.  And I think you and I are looking
21 at the same thing, which is the second line where
22 there is a name that's been X'd out.  The name
23 that's been X'd out is Darlene Steinkamp; is that
24 correct?

Transcript of Adam Gibson
Conducted on July 17, 2018

233

1    A.  That's correct.
2    Q.  And are you telling me that Darlene
3  Steinkamp did not have any role in the
4  investigation you were working on on June 30th of
5  2013?
6    A.  Correct.  It would be Darlene Savage, the
7  name at the top.
8    Q.  Darlene Steinkamp is a person who was the
9  daughter of -- or is the daughter of Erika Gomez;
10 is that correct?
11   A.  Yes.
12   Q.  And do you know why you put the typo in
13 this investigation referencing Darlene Steinkamp
14 instead the person the this investigation is really
15 about?
16   A.  I have no idea.
17      MS. THOMPSON:  Let me mark these other
18 logs.  This is 9.
19      (Gibson Exhibit 9 marked.)
20      MS. EMERY:  Can we have the same
21 agreement as to this with the confidentiality?
22      MS. THOMPSON:  Sure.  I don't think I
23 have questions about anything that's redacted in
24 this one, but if for some reason we talk about it,

234

1  I have no problem with that.
2  BY MS. THOMPSON:
3    Q.  I have shown the witness what's been
4  marked as Gibson Exhibit 9, and this is a document
5  that's a multipage document that's Bates stamped
6  Plaintiff 5509 through 5567.  And this is also a
7  collection of your daily logs; is that correct?
8    A.  Yes.
9    Q.  And I will tell you that these two
10 documents 8 and 9 are not chronological, and I'm
11 not sure why they were produced in the way they
12 were produced, but I have got some questions about
13 specific logs from 8 and 9, and I will do my best
14 to be clear, but we might kind of jump back and
15 forth between these two sets.
16   A.  Okay.
17   Q.  Let me ask you first, when you completed
18 your daily logs, did you try to do that at the end
19 of your shift?
20   A.  Not always.  Sometimes it was the next
21 day and sometimes you do it at the end of the week.
22   Q.  Okay.  Let me refer you first to Exhibit
23 9 to the very first page.  This reflects that you
24 were at least doing daily logs as of December 16th

235

1  of 2013; is that right?
2    A.  Yes.
3    Q.  Did you do -- is the daily log something
4  that you started doing when you became a detective?
5    A.  Yeah.  That's what it's for.
6    Q.  So this indicates that at least by
7  December 6th of 2013 you were working as a
8  detective; is that right?
9    A.  Yes.
10   Q.  Okay.  I'm going refer you to the third
11 page of this document, which is Plaintiff 5511,
12 which has a shift date of January 2nd of 2014.
13   A.  Yes.
14   Q.  Are you looking at that page?
15   A.  Yes.
16   Q.  This document reflects that on January
17 2nd of 2014 you did some work on the Cory Lovelace
18 investigation; is that right?
19   A.  Yes.
20   Q.  Is it your belief that as of January 2nd
21 of 2014 that you had already talked with Chief
22 Copley about working on this investigation?
23   A.  I honestly couldn't give you a date.
24   Q.  Well, this reflects that on January 2nd

236

1  you worked on getting some autopsy records and you
2  talked with Jim Keller about Scott Denton; is that
3  right?
4    A.  Yes.
5    Q.  Okay.  So did you talk with Jim Keller
6  about sending this case to Scott Denton before you
7  talked to Chief Copley about Dr. Denton?
8    A.  I don't believe so, no.
9    Q.  Okay.  So does this indicate to you that
10 you had already spoken with Chief Copley about this
11 case?
12   A.  That's possible, yes.
13   Q.  Well, is it possible that you took the
14 steps you took on January 2nd without talking to
15 Chief Copley?
16   A.  I don't believe so, no.
17   Q.  Do you know why it is you were talking to
18 Memorial Medical Center about the autopsy records
19 on January 2nd?
20   A.  To -- basically to find out if there were
21 still any tissues that were kept, any other
22 photographs that they may have had that were taken
23 at autopsy.
24   Q.  Before you called Memorial Medical

Transcript of Adam Gibson
Conducted on July 17, 2018

237

1  Center, had someone talked to you about how you'd
2  go about kind of pulling together the various
3  medical samples and records related to the autopsy?
4      A.  No.
5      Q.  So that's something you were doing on
6  your own?
7      A.  Yes.
8      Q.  Let me refer you to the next page, which
9  is Plaintiff 5512.
10     A.  Yes.
11     Q.  This reflects that on January 6th of 2014
12 you also took some steps related to this case; is
13 that right?
14     A.  Yes.
15     Q.  And it reflects that you interviewed two
16 paramedics and three firefighters?
17     A.  Yes.
18     Q.   Did you -- well, let me ask you this.
19        Is there any reason why on January 6th of
20 2014 that you could not have also interviewed
21 Coroner Hamilton about what he observed at the
22 scene of Cory Lovelace's death?
23     MS. EMERY:  Objection to form.
24     Go ahead.

238

1      THE WITNESS:  I didn't.
2  BY MS. THOMPSON:
3      Q.  Well, the question is:  Is there any
4  reason why you couldn't have done that on January
5  2nd?
6      A.  And the answer is I didn't.
7      Q.  My question is:  Is there any reason you
8  couldn't have?
9      A.  No.
10     Q.  Okay.  This also reflects that you
11 e-mailed a forensic expert named Derrick Pounder;
12 do you see that?
13     A.  No, it does not say I interviewed him.
14     Q.  Sorry.  You e-mailed a forensic expert
15 named Derrick Pounder.  Did you see that?
16     A.  Yes.
17     Q.  Thanks for your correction.
18        Do you know why it is that you e-mailed
19 Dr. Derrick Pounder?
20     A.  It was in reference to the cadaveric
21 spasm.
22     Q.  How did you locate him as a person who
23 might have information about cadaveric spasm?
24     A.  Just through research.

239

1      Q.  Is that through the internet?
2      A.  Yes.
3      Q.  And this indicates that you also
4  interviewed State's Attorney Barnard on this day,
5  correct?
6      A.  Yes.
7      Q.  When did you first discuss with State's
8  Attorney's Barnard anything having to do with the
9  Cory Lovelace death investigation?
10     A.  I believe it would have been that day.
11     Q.  What do you remember about your
12 conversation from this particular day with
13 Mr. Barnard?
14     A.  Just the fact that we were
15 reinvestigating it or looking at trying to clear up
16 the undetermined autopsy and his recollection of
17 his involvement from that morning.
18     Q.  Do you believe that you were informing
19 the State's Attorney on this call that someone was
20 relooking into this case?  Let me ask that question
21 in a better way.
22        Do you believe that from everything that
23 you know in this case that you were the first
24 person to let Mr. Barnard know that this case was

240

1  being reinvestigated?
2      A.  Yes.
3      Q.  And do you remember him expressing any
4  surprise or concern about that reinvestigation?
5      A.  Not specifically at that time, no.
6      Q.  At some point did he express some
7  surprise or concern about this investigation?
8      A.  Well, he indicated that it was -- that he
9  would not be able to be involved in the
10 prosecution, that it would have to be a special
11 prosecutor's case.
12     Q.  Did he tell you on January 6th that he
13 would not be able to be involved in the
14 prosecution?
15     A.  I don't know if that was that day or if
16 it was after.
17     Q.  And then the next page, which is
18 Plaintiff 5513, that reflects that the next day,
19 January 7th, that you again talked to -- or at
20 least e-mailed Jim Keller and Dr. Denton about
21 autopsy issues in this case; is that correct?
22     A.  And by "autopsy issues," what do you
23 mean?
24     Q.  Well, this reflects you e-mailed Jim

Transcript of Adam Gibson
Conducted on July 17, 2018

241

1 Keller and you e-mailed Dr. Denton about reviewing
2 the autopsy; is that right?
3    **A.   Yes.**
4    Q.   Now, this daily log says -- the first
5 sentence is, "Obtained crime scene photos and
6 reviewed them."  Do you see that?
7    **A.   Yes.**
8    Q.   What does it mean that on January 7th you
9 obtained crime scene photos?
10    **A.   The actual crime scene photos were not**
11 **with the autopsy photos.**
12    Q.   Okay.  So is January 7th of 2014 the
13 first day that you obtained -- that you reviewed
14 copies of the crime scene photos?
15    **A.   I had seen the crime scene photos, but**
16 **the ones that I had seen were photocopies.**
17    Q.   Okay.  So when this says you obtained
18 them, does that mean you obtained physical copies?
19    **A.   Yes.  I was able to -- because they were**
20 **actually in a different file, other than the photo**
21 **file on, in our system.  So we were able to find**
22 **the photos, the scene photos, and print them off.**
23    Q.   You said that you had already talked to
24 Chief Copley before you -- before you -- you said

242

1 that you had already talked to Chief Copley before
2 you spoke with Memorial Medical Center about the
3 autopsy; is that right?
4    **A.   Yes, I believe so.**
5    Q.   And I believe it was your testimony that
6 you had already pulled the hard copy file before
7 you talked to Chief Copley, correct?
8    **A.   Yes.**
9    Q.   So is it your testimony that the hard
10 copy file did not obtain -- did not include crime
11 scene photos?
12    **A.   I said I had seen copies of the photos.**
13 **They were photocopies.**
14    Q.   So was it photocopies that was in the
15 hard copy file?
16    **A.   Yes.**
17    Q.   The next day of this report -- or these
18 daily logs is Plaintiff 5514, and that's January
19 8th of 2014; is that correct?
20    **A.   Yes.**
21    Q.   All right.  And this indicates that on
22 January 8th you continued to review crime scene and
23 autopsy photos; do you see that?
24    **A.   Yes.**

243

1    Q.   And this says that you began highlighting
2 inconsistencies in stories from all parties
3 involved?
4    **A.   Yes.**
5    Q.   Is this the first time that you began,
6 you know, thinking about inconsistencies in the
7 various reports that people had given about what
8 happened in the case?
9    **A.   No.**
10    Q.   Do you know why this says you began
11 highlighting inconsistencies on that day?
12    **A.   Because that's the day I made notes.**
13    Q.   And then the next day, which is Plaintiff
14 5515, that's January 9th of 2014; do you see that?
15    **A.   Yes.**
16    Q.   And this reflects that you spent two
17 hours that day reviewing statements by Curtis and
18 highlighting discrepancies?
19    **A.   Yes.**
20    Q.   And the day before you spent six hours
21 reviewing reports and making seven pages of notes
22 and highlighting inconsistencies; do you see that?
23    **A.   Yes.**
24    Q.   Were there any reports that you were

244

1 reviewing other than the exhibits that we've looked
2 at and the so far today that are, I think, Exhibit
3 2 through Exhibit 7?
4    **A.   No.**
5    Q.   So those are the documents that you were
6 reviewing over eight hours over those two days?
7    **A.   Yes.**
8    Q.   Let me have you turn, it's a couple pages
9 ahead, to January 13th of 2014, which is Plaintiff
10 5517.  Do you see that?
11    **A.   Yes.**
12    Q.   So this log shows that on January 13th
13 you met with Jim Keller about Dr. Denton's autopsy?
14    **A.   Yes.**
15    Q.   Do you know what you discussed with Jim
16 Keller on this date?
17    **A.   I don't.**
18    Q.   Let me have you jump ahead, and it's a
19 few pages, to Plaintiff 5522.  That's January 22nd
20 of 2014?
21    **A.   Yes.**
22    Q.   Are you on that page, Detective?
23    **A.   I am.**
24    Q.   This page indicates that on that date you

Transcript of Adam Gibson
Conducted on July 17, 2018

245

1   talked to Jim Keller and he told you he hoped to
2   hear something by the end of the week?
3       **A.   Yes.**
4       Q.   All right.  And this reflects that that
5   call was about 30 minutes?
6       **A.   Yes.**
7       Q.   What did Jim Keller talk to you for 30
8   minutes about with respect to the update on the
9   autopsy review?
10      **A.   I don't recall.**
11      Q.   Do you have any idea what Jim Keller
12  would have known about the case as of January 22nd
13  of 2014 that would have taken 30 minutes to update
14  you on?
15      **A.   I can't tell what you Jim Keller knew.**
16      Q.   Well, do you remember anything about what
17  you talked about with him for half an hour on this
18  date?
19      **A.   No.**
20      Q.   At this point, as of January 22nd, other
21  than the interviews you did of the paramedics and
22  firefighters, had you conducted -- and of State's
23  Attorney Barnard, had you conducted any other
24  interviews in this case?

246

1       **A.   I believe so.**
2       Q.   All right.  I'm going to have you jump
3   ahead again then to January 27th, which is
4   Plaintiff 5526.  Are you on that page, sir?
5       **A.   Yes.**
6       Q.   This reflects that on January 27th you
7   did computer research on ethylene glycol poisoning;
8   do you see that?
9       **A.   Yes.**
10      Q.   When did the concept of poisoning first
11  come to your mind with respect to this case?
12      **A.   From Dr. Denton.**
13      Q.   What did Dr. Denton tell you about
14  ethylene glycol poisoning?
15      **A.   He indicated that he believed that Cory**
16  **Lovelace was possibly the victim of ethylene glycol**
17  **poisoning.**
18      Q.   And had he told you that before January
19  27th of 2014?
20      **A.   I believe that was relayed by Coroner**
21  **Keller prior to that day, that he told me when I**
22  **had met with him, and I don't remember the exact**
23  **date that I met with him.**
24      Q.   But you believe that would have been

247

1   before January 27th?
2       **A.   Well, it had to be; otherwise -- that's**
3   **the first indication of ethylene glycol poisoning**
4   **came from Dr. Denton.**
5       Q.   And that was relayed to you from Coroner
6   Keller?
7       **A.   I believe so, because I don't believe at**
8   **this point I had actually met with Dr. Denton in**
9   **person yet.**
10      Q.   Okay.  To go back to Dr. Pounder for a
11  second, did he respond to you at any point about
12  your e-mails asking him for an opinion about this
13  case?
14      **A.   He did.**
15      Q.   And when did he respond to you?
16      **A.   I don't recall.**
17      Q.   Had he responded to you by January 27th
18  of 2014?
19      **A.   I don't know.**
20      Q.   I'm going to refer you then to the next
21  page, which is January 28th of 2014.  That's
22  Plaintiff 5527.  Are you on that page, sir?
23      **A.   Yes.**
24      Q.   All right.  So this indicates that the

248

1   next day, the day after you did computer research
2   on ethylene glycol poisoning, you interviewed Erika
3   Gomez; is that right?
4       **A.   Yes.**
5       Q.   Why did you interview Erika Gomez on
6   January 28th?
7       **A.   I interviewed her because she was**
8   **Mr. Lovelace's now ex-wife.**
9       Q.   How did you learn that Curtis Lovelace
10  had been married to and was now divorced from Erika
11  Gomez?
12      **A.   I knew that they were married just**
13  **through him being at the office.**
14      Q.   How did you learn that they had become
15  divorced?
16      **A.   That, I don't know.**
17      Q.   Have you ever reviewed any reports that
18  reflect to you that anyone told you that Erika
19  Gomez had divorced Mr. Lovelace?
20      **A.   I honestly don't know who told me that**
21  **they got divorced.**
22      Q.   Was this -- I mean, is it your testimony
23  you believe you learned that sort of through office
24  talk about people's lives?  And I don't mean

Transcript of Adam Gibson
Conducted on July 17, 2018

249

1 anything nefarious by that, but just people talking
2 about what's going on.
3   **A.   I honestly don't know how I found out.**
4   Q.   Okay.  Did you set up your interview with
5 Erika Gomez in advance of going to talk to her?
6   **A.   I did.**
7   Q.   And did you talk to her on the phone
8 before this interview?
9   **A.   Yes.**
10   Q.   And was it your understanding before you
11 went to talk to her that she had, you know,
12 negative opinions of Mr. Lovelace?
13   **A.   No.**
14   Q.   Was it your understanding before you went
15 to talk to her that she believed that Curt had
16 killed Cory?
17   **A.   No.**
18   Q.   When you asked her if you could come
19 interview her, did you tell her what the interview
20 was going to be about?
21   **A.   I did not.**
22   Q.   And she agreed to talk with you without
23 having any idea what you were going to interview
24 her about?

250

1       MS. EMERY:  Object to the form.
2       Go ahead.
3       THE WITNESS:  Yes.
4 BY MS. THOMPSON:
5   Q.   What did you actually say to her on the
6 phone about coming to talk to her?
7   **A.   I just told her that I wished to speak to**
8 **her and that I would like to speak to her in**
9 **person.  She asked me what it was about.  I told**
10 **her that I would rather talk to her in person about**
11 **it.**
12   Q.   Did you ever learn or have you ever
13 learned that prior to you interviewing Erika Gomez
14 on January 28th that Erika Gomez had relayed to
15 anyone her belief that Curt Lovelace culled Cory
16 Lovelace?
17   **A.   Prior to talking to her?**
18   Q.   My question is:  Have you learned at any
19 point that prior to you talking to her that she had
20 relayed that opinion to someone?
21   **A.   Yes.**
22   Q.   When did you learn that?
23   **A.   I believe Lindsay is the one that told me**
24 **that.**

251

1   Q.   What did Lindsay tell you about that?
2   **A.   That Erika had sent her a text message.**
3   Q.   And when did you learn that Erika had
4 sent Lindsay a text message?
5   **A.   I don't know what the date was.**
6   Q.   Did you learn anything from Erika Gomez
7 on January 28th of 2014 that indicated for you some
8 belief that there might be a poisoning issue in
9 this case?
10   **A.   That was information that she had**
11 **provided that she felt that she had been poisoned.**
12   Q.   And she told you that on January 28th?
13   **A.   Yes.**
14   Q.   Is there a reason that you didn't get a
15 hair sample from her on January 28th?
16   **A.   I did get a hair sample from her.**
17   Q.   On that date?
18   **A.   I don't think I got it that date, but it**
19 **was within a few days after.**
20   Q.   Okay.  When did you send that hair sample
21 for testing?
22   **A.   I don't recall the exact time, but it**
23 **would have been between the first trial and the**
24 **second trial.**

252

1   Q.   Is there a reason that you waited until
2 after the first trial to have that hair tested?
3   **A.   That was a decision by Mr. Parkinson.**
4   Q.   Well, was Mr. Parkinson involved in this
5 investigation in January of 2014?
6   **A.   No.**
7   Q.   Who was running the investigation in
8 January of 2014?
9   **A.   I guess technically it would have been**
10 **Sergeant Summers and Lieutenant Dreyer.**
11   Q.   Did you talk with Sergeant Summers and
12 Lieutenant Dreyer in January or February of 2014
13 about Erika Gomez's assertion to you that she had
14 been poisoned?
15   **A.   Yes.**
16   Q.   And did you talk with them about the
17 possibility of having her hair tested?
18   **A.   I don't recall the specific conversation**
19 **about that, no.**
20   Q.   You independently on your own wanted to
21 reach out to a pathologist to have them relook at
22 the conclusions in this case, correct?
23   **A.   It was not independently on my own at**
24 **all.**

Transcript of Adam Gibson

Conducted on July 17, 2018

253

1    Q.   Well, it was your idea to have this case
2 reinvestigated, correct?
3    A.   That was -- that decision was made after
4 speaking with the chief and also the lieutenant.
5    Q.   Am I wrong that you went to them and said
6 you had questions about this case and wanted to
7 look into it?
8    A.   You are not wrong.
9    Q.   Okay.  Did you ask them for permission to
10 reinvestigate this case?
11    A.   It was a discussion that I had with the
12 chief in which we discussed the original
13 investigation, the undetermined autopsy, and the
14 discussion was to have the autopsy reviewed to see
15 if there was a determination.
16    Q.   In that meeting with the chief where you
17 discussed having the autopsy rereviewed, did you
18 talk with him about other steps that the
19 reinvestigation could also take?
20    A.   I don't recall the whole conversation,
21 no.
22    Q.   Well, is there anything that would
23 refresh your memory, as you sit here today, if in
24 that conversation where a decision was made to

254

1 relook at the autopsy that you discussed with him
2 taking other investigative steps in the case?
3    A.   There is nothing that I could review.
4    Q.   Okay.  And was there a feeling when you
5 talked with the chief about the autopsy that you
6 were going to first deal with the autopsy, see what
7 it showed, and then do other stuff?  Potentially.
8    A.   Potentially, yeah.
9    Q.   Okay.  So is that why you didn't get the
10 hair tested when you collected it from Erika Gomez?
11    A.   I can't offer an explanation as to why I
12 didn't do it right then.  I don't -- I don't know
13 why I didn't.  I don't recall what the decision was
14 why it wasn't sent in at that time.
15    Q.   Well, when she told you that she had been
16 poisoned, did you believe her?
17    A.   I didn't have a reason not to believe
18 her.
19    Q.   Well, at the time that you collected her
20 hair for testing, you understood that a way you
21 could determine if someone had been poisoned was by
22 having their hair checked, correct?
23    A.   Yes.
24    Q.   And that is the purpose you collected the

255

1 hair for, right?
2    A.   Yes.
3    Q.   Can you think of any reason, as you sit
4 here today, why you didn't on your own seek to have
5 the hair tested?
6    A.   I actually did research on what labs
7 could test the hair specifically for any types of
8 poisons because hair doesn't contain all types of
9 poisons.  Different types of tests you do for
10 different types of poisons, and I don't recall
11 specifically -- I know that it was costly at the
12 time, but I don't know whether that was a part of
13 the decision why we decided not to do it then or
14 not.
15    Q.   Was it your belief from your research
16 that you could determine ethylene glycol poisoning
17 from hair testing?
18        MS. EMERY:  Object to the form.
19        THE WITNESS:  I don't recall
20 specifically.
21 BY MS. THOMPSON:
22    Q.   Turning to the next page, on January 29th
23 of 2014, and I'm looking at Plaintiff 5528, you did
24 get some of the liquid samples and evidence to send

256

1 for testing; is that right?
2    A.   Yes.
3    Q.   And is there a reason why you sent those
4 samples for testing, but not Erika Gomez's hair?
5    A.   Because those samples can go to the state
6 police crime lab and the hair cannot be tested at
7 the state police crime lab.
8    Q.   When did you learn that you couldn't have
9 the hair tested at the state police crime lab?
10    A.   I spoke to them before I sent the liquid
11 samples.
12    Q.   Okay.  And is that reflected in any of
13 your reports in this case?
14    A.   That I spoke to the lab, no.
15    Q.   Okay.  But is it your testimony that when
16 you talked to them about the liquid samples you
17 asked them about the hair?
18    A.   Yes.
19    Q.   And then on January -- please take your
20 time.
21    A.   Thank you.
22    Q.   I'm going to turn you ahead to Plaintiff
23 5529.  This reflects that on January 30th you took
24 the liquid samples to the lab, correct?

Transcript of Adam Gibson
Conducted on July 17, 2018

257

1      A.   Yes, ma'am.
2      Q.   When did you get those liquid samples
3  back -- or let me ask you that question a better
4  way.
5           When did you get the results of that
6  testing?
7      A.   I don't recall specifically when they
8  came back.  With the lab it could be anywhere from
9  two weeks to eight months.  I don't remember the
10  exact timing that this one came back.
11      Q.   The lab told you that there was no
12  evidence from those liquid samples that they
13  contained any kind of poison, correct?
14      A.   Correct.
15      Q.   And when you got those results back, did
16  you then take steps to have Erika Gomez's hair
17  tested?
18      A.   No.
19      Q.   Why not?
20      A.   Again, I don't recall what the specific
21  reasoning was.
22      Q.   Any of the times that you spoke with
23  Erika Gomez, did you ever develop a suspicion that
24  Erika Gomez was not a stable person?

258

1           MS. EMERY:  Object to the form.
2           THE WITNESS:  I would not say that I
3  determined or made an opinion that she was not
4  stable, no.
5  BY MS. THOMPSON:
6      Q.   Well, is one of the things that you have
7  to do as a detective is evaluate the credibility of
8  information that people are giving to you; is that
9  correct?
10      A.   Yes.
11      Q.   And that's an important part of your job
12  as a detective?
13      A.   It's part of it, yes.
14      Q.   Because there are people who might
15  believe what they are telling you, but they may
16  just not be right about what they are saying,
17  correct?
18      A.   Correct.
19      Q.   At any point did you have any suspicion
20  that the information Erika Gomez was giving you
21  wasn't accurate?
22      A.   No, I had no proof that the information
23  that she was giving was inaccurate.
24      Q.   Did you have any conversations with Erika

259

1  Gomez where she displayed symptoms of mania during
2  your meetings with her?
3           MR. HANSEN:  I'll object to the form and
4  foundation.
5           Go ahead.
6           MS. EMERY:  Go ahead.
7           THE WITNESS:  Can you define "mania"?
8  BY MS. THOMPSON:
9      Q.   And I appreciate that question.  So let
10  me ask it to you this way.
11           At any point when you were meeting with
12  Erika Gomez, did you question whether she was
13  displaying any symptoms that to you would be
14  consistent with some level of mental illness?
15           MS. EMERY:  Object to the form.
16           Go ahead.
17           MR. HANSEN:  Join.  And foundation.
18           THE WITNESS:  I don't -- I can't say that
19  I'm qualified to determine if someone has mental
20  illness.
21  BY MS. THOMPSON:
22      Q.   Well, as a detective, have you had
23  situations where in evaluating the credibility of
24  what someone is telling you you take into account

260

1  the possibility that although they believe what
2  they are telling you is true that they are not
3  perceiving reality accurately?
4      A.   If I have evidence to show me that what
5  they are saying is not true, then that's what I
6  believe.
7      Q.   Okay.  So if you did not have affirmative
8  evidence in front of you to say that what someone
9  is telling you is not true, is it your practice as
10  a detective to credit everything that someone is
11  telling you?
12      A.   Until I have a reason not to believe
13  them, yes.
14      Q.   Did Erika Gomez ever -- did you ever
15  learn any information about Erika Gomez up until
16  the present, as you sit here today, that for you
17  calls into question the veracity of anything that
18  she told you over the course of this investigation?
19      A.   I don't have proof of the contrary of
20  anything that she told me, no.
21      Q.   Can you reread the question back.
22           (Record read.)
23           THE WITNESS:  My answer remains the same,
24  that I don't have any proof to not believe what she

Transcript of Adam Gibson
Conducted on July 17, 2018

261

1   said.
2   BY MS. THOMPSON:
3       Q.   And as you sit here today, have you
4   never -- let me start that question again.
5           As you sit here today, am I right that
6   you have never harbored a suspicion even that
7   anything that Erika Gomez told you in the course of
8   this investigation is inaccurate?
9       A.   **I don't have proof that Erika Gomez told**
10  **me inaccurate information.**
11      Q.   My question is whether you have ever even
12  harbored the suspicion that something she told you
13  was inaccurate?
14      A.   **My answer still remains the same, that I**
15  **don't have proof that she told me inaccurate**
16  **information.**
17      Q.   Well, my question is:  Have you ever --
18  have you ever questioned whether anything she told
19  you was inaccurate?
20      A.   **You question everything everyone tells**
21  **you.**
22      Q.   All right.  And is there anything
23  specific that you've learned as to Erika Gomez that
24  causes you to question whether something she told

262

1   you was inaccurate?
2       A.   **I do not have any proof of any**
3   **information that she told me being inaccurate.**
4       Q.   Have you ever taken any steps to look
5   into whether something she told you was true?
6       A.   **Yeah, that's part of the investigation.**
7       Q.   One of the things that she told you over
8   the course of your investigation was that Curtis
9   Lovelace had had his sons assist him in hiding
10  evidence of crimes, correct?
11      A.   **Yes.**
12      Q.   All right.  And when you were
13  interviewing Logan Lovelace, did you ask him about
14  that?
15      A.   **No.**
16      Q.   Did you ask Larson about that?
17      A.   **No.**
18      Q.   Did you ask Lincoln about that?
19      A.   **No.**
20      Q.   Why not?
21      A.   **It wasn't relevant to the investigation.**
22      Q.   It was -- are you telling me that it
23  wasn't relevant to your investigation about whether
24  Curtis Lovelace hid for years that he killed his

263

1   wife whether he hid evidence of other crimes?
2           MS. EMERY:  Objection to the form.
3   Objection; argumentative.
4           MR. HANSEN:  I join.
5           THE WITNESS:  Can you ask that question
6   again, please?
7           MS. THOMPSON:  Can you repeat the
8   question, please.
9           MS. EMERY:  Oh, and lack of foundation.
10          (Record read.)
11          THE WITNESS:  She said nothing about
12  him -- the kids concealing the fact that he killed
13  his wife.
14  BY MS. THOMPSON:
15      Q.   So is it your testimony here today that
16  you were not interested in investigating further
17  whether Curtis Lovelace had engaged his children in
18  assisting him in hiding evidence of a crime?
19      A.   **I interviewed his children about what**
20  **they remembered about those events.**
21      Q.   Right.  And did you ask them -- other
22  than asking them about the day that their mother
23  died, did you ask them any other questions that
24  were designed to elicit information about whether

264

1   they had assisted their father in hiding evidence
2   of a crime?
3       A.   **I don't recall specifically.**
4       Q.   I mean, isn't it true that the reason you
5   didn't ask them about that is because you knew that
6   what Erika Gomez was telling you was crazy?
7           MS. EMERY:  Objection; form, foundation,
8   argumentative.
9           MR. HANSEN:  I join.
10          THE WITNESS:  That's not true.  I'm
11  sorry.
12          MS. EMERY:  That's okay.
13  BY MS. THOMPSON:
14      Q.   Looking back at Exhibit 9 -- actually
15  let's move to Exhibit 8.  We will come back to 9 in
16  a minute, but as I explained, the chronology of
17  these two exhibits is off.
18          MS. EMERY:  Can we take a bathroom break?
19          MS. THOMPSON:  Sure.
20          THE VIDEOGRAPHER:  We are going off the
21  record.  The time is 14:32.
22          (Whereupon a short recess was taken.)
23          THE VIDEOGRAPHER:  We are back on the
24  record.  The time is 14:43.

Transcript of Adam Gibson
Conducted on July 17, 2018

265

1  BY MS. THOMPSON:
2      Q.   Detective Gibson, I'm going to refer you
3  to Exhibit 8.
4      A.   Okay.
5      Q.   The first page of Exhibit 8, which is
6  Plaintiff 5568, this indicates that on February 7th
7  of 2014 you met Dr. Denton in person to go over
8  autopsy; is that right?
9      A.   Yes.
10     Q.   And what did he tell you during that
11 meeting?
12     A.   That he believed that Cory Lovelace was a
13 victim of poisoning with a possible coup de grace
14 suffocation.
15     Q.   Did he explain to you why -- what
16 evidence he saw for poisoning?
17     A.   He indicated that he had had a recent
18 poisoning case that he -- that he had performed an
19 autopsy on and the things that he saw in the
20 autopsy photos, the accelerated decomposition, the
21 accelerated drying, were some of the things that
22 were consistent with what he had seen this in the
23 other ethylene glycol death.
24     Q.   Did he also tell you during that meeting

266

1  that it was going to be important for your
2  investigation for Dr. Bowman to change her original
3  finding of undetermined?
4      A.   Yes.
5      Q.   And, in fact, that's why the same day
6  that you talked with him you called her to try to
7  talk to her about her findings?
8      A.   I did.
9      Q.   All right.  I'm going to show you --
10 well, let me show you one other thing first.  We
11 will come back to that.
12     (Gibson Exhibit 10 marked.)
13 BY MS. THOMPSON:
14     Q.   I'm going to show you what's been marked
15 as Exhibit 10.  Exhibit 10 is a one-page document
16 that is Bates stamped Plaintiff 2377.
17     A.   Yes.
18     Q.   And this is an e-mail that's sent from
19 you to Cheryl Ely; is that correct?
20     A.   Yes.
21     Q.   And Cheryl Ely is someone who works for
22 the State's Attorney's Office?
23     A.   Yes.
24     Q.   Was Cheryl Ely the person that in 2014

267

1  was responsible for managing Grand Jury subpoenas?
2      A.   Yes.
3      Q.   Why is it that on March 12th of 2014 you
4  asked Cheryl Ely for a subpoena to the Comcast
5  Legal Response Center?
6      A.   That was in response to information that
7  Erika Gomez had provided to me in reference to
8  Mr. Lovelace possibly hacking into her Comcast
9  account, also changing her passwords, and different
10 things like that.
11     Q.   Okay.  And at the time that you made this
12 request of Cheryl Ely, did -- was there an open
13 Grand Jury investigation into Cory Lovelace's
14 death?
15     A.   No.
16     Q.   And isn't it true that at the time that
17 you submitted this request to Cheryl Ely that it
18 was improper for you to be seeking information
19 through the Grand Jury for a matter that didn't
20 have an open Grand Jury investigation?
21     A.   I actually ended up doing a search
22 warrant on this particular account.
23     Q.   And that's because Comcast wouldn't
24 respond to the subpoenas in the manner in which it

268

1  was issued, correct?
2      A.   Right.  They indicated --
3          MS. EMERY:  Objection to the foundation.
4  I believe your question said wouldn't respond to
5  this subpoena in the manner it was issued?
6          MS. THOMPSON:  Yes.
7          MS. EMERY:  Okay.  Objection; lack of
8  foundation.
9          THE WITNESS:  The subpoena -- I don't
10 believe that the subpoena was ever issued.  I spoke
11 with Comcast because what I wanted was call taker
12 notes, and the call taker notes they said they
13 would not be able to provide with any subpoenas.
14 So that's why there was a search warrant that was
15 done.
16         MS. THOMPSON:  I'm going to show you -- I
17 think this will be 11.
18     (Gibson Exhibit 11 marked.)
19 BY MS. THOMPSON:
20     Q.   I've shown you what's been marked as
21 Gibson Exhibit 11.  It's a one-page document that's
22 Bates stamped Plaintiff 3955.
23     A.   Yes.
24     Q.   And I'm going to ask you to read it

Transcript of Adam Gibson
Conducted on July 17, 2018

269

1  first, and then I have got a couple of questions
2  for you, so let me know when you have read it.
3      **A.  Yes.**
4      Q.  Gibson Exhibit 11 is an e-mail that you
5  sent on January 12th of 2015 to John Summers and
6  Dina Dreyer; is that correct?
7      **A.  Yes.**
8      Q.  And this reflects that at least on this
9  day you were informed that Grand Jury subpoenas if
10 used for a case that -- for which there is not an
11 investigation are not valid; is that right?
12     **A.  Yes.**
13     Q.  Okay.  And it indicates in this e-mail
14 that Jon Barnard said this could cause an issue in
15 pending cases?
16     **A.  Where do you see that at?**
17     Q.  Well, I'm referring you to line 4 where
18 it says, "So Jon has advised that he is probably
19 correct."  And I guess my question for you is:
20 Does the Jon in this e-mail refer to Jon Barnard?
21     **A.  Yes.**
22     Q.  And did you have a conversation with Jon
23 Barnard about the information that you learned from
24 Barney Bier about this issue?

270

1      **A.  I don't know if the information came from**
2  **Jon or if it was when I had talked to Laura.**
3      Q.  What did you learn about the Grand Jury
4  subpoena process with respect to this mechanism of
5  using them?
6      **A.  That we wouldn't be able to use subpoenas**
7  **as we had done for years.**
8      Q.  And did either Laura or Jon tell you why
9  that's the case?
10     **A.  Because Barney Bier had filed a motion**
11 **against one of the subpoenas.**
12     Q.  And in that motion did he indicate this
13 wasn't a proper way to use the Grand Jury subpoena
14 process?
15     **A.  I don't know what the motion was.**
16     Q.  Okay.  Let me take you back to -- let me
17 take you back to Exhibit 8 and to your conversation
18 with Dr. Denton on February 7th of 2014.  Did
19 Dr. Denton tell you on February 7th of 2014 that if
20 Dr. Bowman did not change her opinion that in his
21 view this investigation couldn't go forward?
22     **A.  No.**
23     Q.  What did he tell you with respect to
24 getting Dr. Bowman to change her opinion in the

271

1  case?
2      **A.  He just said that I needed to meet with**
3  **her and go over the autopsy and the information.**
4      Q.  And did he tell you why he wanted you to
5  do that?
6      **A.  Because he said he wasn't -- that it**
7  **needed to come from her --**
8      Q.  And --
9      **A.  (Continuing) -- if there was a change.**
10     Q.  I'm sorry for interrupting you.  Did you
11 have anymore you wanted to say in response?
12     **A.  That was it.**
13     Q.  Did Dr. Denton tell you that unless
14 Dr. Bowman changed her opinion he was not going to
15 write a report for you?
16     **A.  No.**
17         MS. THOMPSON:  Let's mark this.
18         (Gibson Exhibit 12 marked.)
19 BY MS. THOMPSON:
20     Q.  Detective Gibson, I've shown you what's
21 been marked as Gibson 12, the one-page document
22 Bastes stamped Plaintiff 3592.  This is an e-mail
23 that you sent to Dina Dreyer and John Summers on
24 February 9th of 2014; is that right?

272

1      **A.  Yes.**
2      Q.  Okay.  This e-mail reflects that you
3  talked to Dr. Bowman on February 7th for about two
4  hours, right?
5      **A.  Yes.**
6      Q.  And you had a meeting that was scheduled
7  for her for that week in Keokuk, which is where she
8  lived at this point, right?
9      **A.  Yes.**
10     Q.  What did you talk with her about for two
11 hours?
12     **A.  The autopsy, the previous investigation,**
13 **her dealings with Baird and Hamilton, a lot of**
14 **things.**
15     Q.  What did she tell you about her dealings
16 with Baird and Hamilton?
17     **A.  She told me that she did not feel that**
18 **there was a push by either Coroner Hamilton or**
19 **Detective Baird for the autopsy to be anything**
20 **other than undetermined.**
21     Q.  And did she tell you why she thought that
22 was the case?
23     **A.  I don't recall that specific answer, no.**
24     Q.  Your e-mail here indicates that she said

Transcript of Adam Gibson
Conducted on July 17, 2018

273

1  she felt during the initial autopsy that
2  suffocation was the cause of death, but with
3  information she was given by Baird she didn't feel
4  she had enough to rule that way.  Do you see that?
5      A.   Yes.
6      Q.   And did she tell you what information she
7  was given by Baird that didn't give her enough to
8  rule that way?
9      A.   I don't recall that part of the
10  conversation, no.
11      Q.   Did you discuss with her on this phone
12  call the fact that at least some of the -- that the
13  older Lovelace children had reported seeing their
14  mom alive that morning?
15      A.   Yes, she was aware of that from the
16  original autopsy.
17      Q.   Okay.  And was that information that she
18  was given by Baird that for her stood in the way of
19  finding suffocation to be the cause of death?
20      A.   I don't recall specifically what it was
21  that kept her from ruling suffocation.
22      Q.   Was it clear to you in your conversation
23  with her on February 7th that she did not want to
24  be involved in this matter further?

274

1      A.   She specifically said that she didn't
2  want to be involved.
3      Q.   And she didn't want to be involved
4  because she had -- she did not want to testify in
5  this case; is that right?
6      A.   Yes, she said that she and lawyers didn't
7  get along.
8      Q.   Okay.  Do you see the last sentence in
9  Exhibit 12 says, "Keller is talking to Denton about
10  writing a report on his review"?  Do you see that?
11      A.   Yes, I do.
12      Q.   Did you and Coroner Keller ride up to
13  Bloomington to meet with Dr. Denton together?
14      A.   No.
15      Q.   Did you come separately?
16      A.   He wasn't there.  It was Dr. Denton and
17  I.
18      Q.   And did you talk with Jim Keller after
19  your meeting with Dr. Denton about what Dr. Denton
20  had told you?
21      A.   Yes.
22      Q.   Did you and Jim reach a conclusion that
23  Jim would talk to Dr. Denton about writing a
24  report?

275

1      A.   Yes.
2      Q.   And was the reason that Jim was going to
3  talk to Dr. Denton about writing a report because
4  in your meeting with Dr. Denton he told you he
5  didn't want to write a report on this case?
6      A.   No.
7      Q.   Why was it that Jim was going to talk to
8  him about writing a report?
9      A.   Because he had the contact with him.
10      Q.   Well, you were literally in a meeting
11  with him, correct?
12      A.   Yes.
13      Q.   So why didn't you talk to him at that
14  meeting about writing a report?
15      MS. EMERY:  Objection to the form.
16      THE WITNESS:  In that meeting is when he
17  told me that I should go talk to Dr. Bowman.
18  BY MS. THOMPSON:
19      Q.   Isn't it true that the reason Jim said he
20  would talk to him is because Dr. Denton had told
21  you he didn't want to write the report and Jim was
22  going to try to change his mind?
23      MR. HANSEN:  Objection to the form and
24  argumentative.

276

1      MS. EMERY:  Objection.
2      THE WITNESS:  That is not true.
3      MS. THOMPSON:  Can you mark this.
4      (Gibson Exhibit 13 marked.)
5  BY MS. THOMPSON:
6      Q.   Detective Gibson, I've handed you what's
7  been marked as Gibson Exhibit 13, which is a
8  one-page document that's Bates stamped Plaintiff
9  3602.  This page reflects a couple of e-mails back
10  and forth between you and Dr. Denton; is that
11  right?
12      A.   Yes.
13      Q.   And you see at the bottom that there is
14  an e-mail from February 18th where you ask
15  Dr. Denton to call you?
16      A.   Yes.
17      Q.   Do you know why you asked Dr. Denton to
18  call you on February 18th?
19      A.   I would assume to talk about the e-mail
20  that's at the top, which would be my conversation
21  with Dr. Bowman, another conversation with
22  Dr. Bowman.
23      Q.   All right.  And you sort of got what
24  looks like an out-of-office response from him right

Transcript of Adam Gibson
Conducted on July 17, 2018

277

1  after you sent this; is that right?  Or at least an
2  e-mail from him a couple hours later indicating he
3  was out, right?
4      **A.  Yes.**
5      Q.   And you followed that up, as you said,
6  with an e-mail to him where you cc'd Lieutenant
7  Dreyer and Sergeant Summers; is that right?
8      **A.  Yes.**
9      Q.   Why did you cc Lieutenant Dreyer and
10 Sergeant Summers on this e-mail?
11     **A.  So they were aware of what was going on.**
12     Q.   Do you see in this e-mail -- and if you
13 need to read this before I ask you a question, I'm
14 happy to have you do that.  Do you need to read --
15 do you want to read the top portion first?
16     **A.  If you could just direct me to the**
17 **portion you are talking about --**
18     Q.   Sure.
19     **A.  (Continuing) -- it would be easy enough.**
20     Q.   I'm going to refer you to sort of the
21 third line from the bottom that starts with "so I
22 am hoping."  Do you see that?
23     **A.  Yes.**
24     Q.   Is it your understanding that between the

278

1  time that you met with Dr. Denton yourself and the
2  sending of this e-mail that Jim Keller had
3  conferred with Dr. Denton about being an expert in
4  this case?
5      **A.  I'm not positive.**
6      Q.   Well, do you believe, as you sit here
7  today, that he talked with Dr. Denton between
8  February 9th and February 18th?
9      **A.  I believe that he did, but I can't be**
10 **positive.**
11     Q.   All right.  Did you talk with Coroner
12 Keller about anything that Dr. Denton told him?
13     **A.  I don't specifically remember any**
14 **conversation.  I'm not saying it didn't happen, but**
15 **I don't recall it.**
16     Q.   All right.  And the portion of this
17 e-mail I just directed you to that starts with "so
18 I am hoping" --
19     **A.  Yes.**
20     Q.   (Continuing) -- says, "So I am hoping
21 that you will still be willing to continue to
22 review this and give me an official opinion so this
23 case can proceed.  Can you see that?
24     **A.  Yes.**

279

1      Q.   Why if Dr. -- let me start that question
2  again.
3          Why if Coroner Keller was going to talk
4  to Dr. Denton about writing a report did you on
5  February 18th e-mail Dr. Denton and ask him to give
6  you an official opinion?
7      **A.  I don't know the reasoning.**
8      Q.   Isn't the reason you sent this e-mail to
9  make that request because Dr. Denton told Coroner
10 Keller that he did not want to be involved in this
11 case unless Dr. Bowman was going to change her
12 mind?
13         MS. EMERY:  Object to the form,
14 argumentative.
15         MR. HANSEN:  And speculation.
16         THE WITNESS:  That is not true.
17 BY MS. THOMPSON:
18     Q.   At the time that you sent this e-mail to
19 Dr. Denton on February 18th, did you believe that
20 Curtis Lovelace had killed Cory Lovelace?
21     **A.  At that point I had the opinion from**
22 **Dr. Bowman and from Dr. Denton both indicating that**
23 **they believed that she had been killed.**
24     Q.   Well, my question is what you believed at

280

1  that point.
2      **A.  I believed what the doctors told me.**
3          MS. THOMPSON:  Let's mark this.
4          (Gibson Exhibit 14 marked.)
5  BY MS. THOMPSON:
6      Q.   Detective Gibson, I've showed you what's
7  been marked as Gibson Exhibit 14, which is
8  Plaintiff 3606.
9      **A.  Yes.**
10     Q.   This is -- there is two different e-mails
11 on this exhibit; is that correct?
12     **A.  Yes.**
13     Q.   And this refers -- this references --
14 well, actually I said two e-mails, but there is
15 actually three e-mails on this exhibit; isn't that
16 right?
17     **A.  Yes.**
18     Q.   And these are e-mails that were sent on
19 February 24th of 2014?
20     **A.  Yes.**
21     Q.   On -- prior to these e-mails being sent
22 on February 24th of 2014, had you talked with Jon
23 Barnard about whether or not the Adams County
24 State's Attorney's Office had a conflict in being

Transcript of Adam Gibson
Conducted on July 17, 2018

281

1 involved in a prosecution of in this case?

2    **A.  Yes.**

3    Q.   And what had you discussed prior to the

4 sending of these e-mails with respect to that

5 topic?

6    **A.   Exactly that, about with about the fact**

7 **that they would have to appoint a special**

8 **prosecutor.  We had actually talked about it early**

9 **on in the investigation just so that we had some**

10 **legal advice.**

11    Q.   Prior to the sending of these e-mails

12 then, you had talked with Jon Barnard about the

13 reinvestigation that you were conducting, correct?

14    **A.   Yes.**

15    Q.   And you told us that you'd had your one

16 conversation with Jon where you discussed him with

17 him witness information he may have, right?

18    **A.   Yes.**

19    Q.   You had other conversations with him,

20 too, correct?

21    **A.   Yes.**

22    Q.   And what had you discussed with him in

23 the other conversations you had prior to the

24 sending of these e-mails on February 24th?

282

1    **A.   I don't recall everything specifically,**

2 **but I had been speaking with him throughout the**

3 **course of the investigation about what was going**

4 **on.**

5    Q.   Had you been seeking his advice and input

6 about what you were doing?

7    **A.   I don't know that it was seeking advice**

8 **or input.  It was just making him aware of what was**

9 **happening.**

10    Q.   Okay.  Why is it that on February 24th

11 you asked him about taking this case to the Grand

12 Jury?

13    **A.   Just as I said earlier, about getting**

14 **witnesses in front of the Grand Jury and getting**

15 **the case started for the Grand Jury.**

16    Q.   Well, it's your testimony that at the

17 time you sent this e-mail on February 24th you

18 believed that Curt had killed his wife, correct?

19    **A.   That's what the doctors had told me, yes.**

20    Q.   Okay.  And so the purpose of taking this

21 to the Grand Jury on February 24th would be to

22 begin the process of indicting Curt?

23    **A.   Possibly, but that's the prosecutor's**

24 **decision.**

283

1    Q.   Well, you -- were you asking Jon for his

2 advice about whether or not to take this to the

3 Grand Jury or were you asking him to make a

4 decision about that?

5    **A.   I was asking him about his advice about**

6 **going to the Grand Jury, and I had already spoke to**

7 **him previously about appointing the special**

8 **prosecutor.**

9    Q.   And do you see in the third of these

10 e-mails, so the bottom one, in that e-mail to Jon

11 Barnard on February 24th that you told him, "I am

12 waiting on the formal response from Dr. Denton on

13 the autopsy review, which I am hoping to have

14 sometime soon, disclosing injuries consistent with

15 smothering."  Do you see that?

16    **A.   Yes.**

17    Q.   And isn't it true that what you were

18 referring to in talking with Jon was a formal

19 expert opinion from Dr. Denton?

20    **A.   Yeah, that I was waiting on the formal**

21 **response, the written opinion.**

22    Q.   And you did not tell Jon Barnard in this

23 e-mail when specifically you expected to get an

24 opinion from Dr. Denton, correct?

284

1    **A.   It says "sometime soon."**

2    Q.   But beyond sometime soon, you didn't tell

3 him, right?

4    **A.   No.**

5    Q.   And that's because as of the writing of

6 this e-mail Dr. Denton had not agreed to provide an

7 opinion, correct?

8       MS. EMERY:  Objection to the form, calls

9 for speculation.  And argumentative.

10       You can go ahead and answer.

11       THE WITNESS:  At the time I hadn't been

12 -- Coroner Keller had been speaking with

13 Dr. Denton, so I don't know what kind of timeframe

14 that was.

15 BY MS. THOMPSON:

16    Q.   As of February 24th, had you gotten a

17 response from Dr. Denton to your February 18th

18 e-mail?  And that was Exhibit 13, if you need to

19 reference it again.

20    **A.   I don't know if I did or not.**

21       MS. THOMPSON:  Can you mark this.

22       (Gibson Exhibit 15 marked.)

23

24 BY MS. THOMPSON:

Transcript of Adam Gibson
Conducted on July 17, 2018

285

1    Q.   Detective Gibson, I've showed you what's
2  been marked as Gibson 16, which is a --
3        MS. EMERY:  15.
4        MS. THOMPSON:  15.  I'm sorry.  Thank you
5  for correcting me.
6  BY MS. THOMPSON:
7    Q.   So the record is clear, Detective Gibson,
8  I'm showing you what's been marked as Gibson 15,
9  which is a four-page document that is Bates stamped
10  Plaintiff 6132 through plaintiff 6l35.
11    A.   Yes.
12    Q.   You have seen this before,
13  correct?
14    A.   I have.
15    Q.   And Gibson 15 is a formal opinion letter
16  that Dr. Denton ultimately issued in this case,
17  right?
18    A.   Yes.
19    Q.   Did you see any drafts or copies of this
20  report before June 22nd of 2015?
21    A.   I don't believe so, no.
22    Q.   And this report is directed towards the
23  prosecutor, Mr. Parkinson, and not to you, correct?
24    A.   That's correct.

286

1    Q.   And do you know why this report is
2  written as reflecting this coming at
3  Mr. Parkinson's request?
4    A.   Because Mr. Parkinson asked for him to do
5  the formal opinion.  Up to this point he had
6  relayed to Jim Keller that he didn't particularly
7  want to be involved in the case due to Dr. Bowman's
8  involvement.
9    Q.   The first page of this report indicates
10  some specific materials that he reviewed.  Those
11  are the 1 through 5 numbers.  Do you see that?
12    A.   Yes.
13    Q.   And then it also indicates in the
14  paragraph below that he reached these opinions
15  after additional investigation -- additional
16  investigation information verbally relayed by
17  Quincy Police Detective Gibson during a meeting.
18  Do you see that?
19    A.   Yes.
20    Q.   Do you know what additional investigation
21  information that you verbally related to Dr. Denton
22  besides, you know, the information contained in the
23  documents referenced in the numbers 1 through 5 on
24  this page?

287

1    A.   That would have been the information from
2  my reports that were available at that time.
3    Q.   Do you know why Dr. Denton indicated that
4  that information was verbally related as opposed to
5  being a paper document that he reviewed like the
6  other documents that are listed in 1 through 5?
7        MS. EMERY:  Wait.  Object to the form.
8  There is a paper writing on the third page of the
9  document.
10  BY MS. THOMPSON:
11    Q.   You can answer the question.
12    A.   It's possible that my reports weren't
13  done at this time.  I don't know.  I don't know
14  what that was, but it's information that's
15  contained in my reports.
16    Q.   Is it your testimony, as you sit here
17  today, that prior to June 22nd of 2015 you gave
18  Dr. Denton copies of you're the investigative
19  reports that you prepared in this case?
20    A.   I don't know if he ever got copies of my
21  reports or not.
22    Q.   Did you take any steps to give him those
23  reports?
24    A.   I just said I don't know if he got them

288

1  or not.
2    Q.   Well, I'm asking if you took any steps to
3  provide them?
4    A.   I can't answer that because I don't know
5  if he got them or not.  I don't know if -- I don't
6  remember if I provided them to him or not.
7    Q.   Is there anything that would refresh your
8  memory, as you sit here today, about whether you
9  gave any copies of your reports to Dr. Denton?
10    A.   No.
11    Q.   I am going to refer you to page 3.
12  That's Plaintiff 6134.  And I'm asking you about
13  that first paragraph.  If you want to read that and
14  let me know when you've read it.
15    A.   Yes.
16    Q.   This reflects that Dr. Denton talked with
17  Coroner Keller and then Coroner Keller asked
18  Dr. Denton to meet with you and you met with him in
19  Bloomington.  Do you see that?
20    A.   Yes.
21    Q.   And to your understanding, is that a
22  reference to a meeting with him on February 7th
23  that we just discussed?
24    A.   Yes.

Transcript of Adam Gibson
Conducted on July 17, 2018

289

1    Q.   And this says he met with you, he -- and
2  I'm paraphrasing, but Dr. Denton met with you, he
3  reviewed the photographs with you, and then it
4  says, and this is a quote, "and he verbally relayed
5  new investigation information he had regarding the
6  morning of her death."  Do you see that?
7    A.   Yes.
8    Q.   What information did you give to
9  Detective Gibson on February 7th of 2014 that was
10 new investigation information about the morning of
11 Cory Lovelace's death?
12   A.   It would be the information from my
13 reports.
14   Q.   And what information did you have as of
15 February 7th of 2014 that was new information about
16 the morning of Cory Lovelace's death?
17        MS. EMERY:  Object to the form.  Calls
18 for speculation.  This document was not written by
19 the witness.
20        THE WITNESS:  Well, could you reread
21 that?
22        MS. THOMPSON:  Sure.  Can you reread the
23 question.
24        (Record read.)

290

1        THE WITNESS:  By that time I had
2  re-interviewed the firefighters, the paramedics,
3  some of the neighbors, I had interviewed Erika
4  Gomez, interviewed some of the friends, but that's
5  not all-inclusive.  I am sure there are things that
6  I have forgotten.
7  BY MS. THOMPSON:
8    Q.   In your meeting with Dr. Denton, did you
9  go through with him the things that you had learned
10 from the sources you just described?
11   A.   I believe so, yes.
12   Q.   All right.  And did any of those people
13 that you just listed give you new information about
14 what happened the morning of Cory Lovelace's death?
15   A.   Yes.  There was information that was
16 relayed from the firefighters and the paramedics
17 upon interviewing them.
18   Q.   And is it your belief that what the
19 firefighters and paramedics were telling you was
20 new information?
21   A.   It had not been documented at anytime
22 prior to that, no.
23   Q.   Did you tell Dr. Denton that that
24 information was new?

291

1    A.   I don't specifically remember saying all
2  of this is new information.
3    Q.   And Dr. Denton goes on in the next
4  sentence to say, we are looking at that same
5  paragraph on page 3 of the report, "As I recall, he
6  discussed Mr. Lovelace's activities that morning,
7  Mr. Lovelace's school class scheduling, and new
8  interviews with their children that contradicted
9  the prior reports I reviewed."  Do you see that?
10   A.   I do.
11   Q.   What new interviews with the children did
12 you tell Dr. Denton about that contradicted the
13 prior reports that Dr. Denton had reviewed?
14   A.   I don't recall that at all.
15   Q.   I mean, in fact, as of February 7th there
16 were no new interviews with the children, correct?
17   A.   No.
18   Q.   So if Dr. Denton believed that the kids
19 had said something new, he is incorrect?
20   A.   I would say so, yes, because I don't
21 remember discussing any new interviews with the
22 children.
23   Q.   In your meeting on February 7th with
24 Dr. Denton, did you talk with him about what the

292

1  kids had reported that they remembered about that
2  morning?
3    A.   He had reviewed the reports.
4    Q.   And did you talk about those reports with
5  him?
6    A.   I don't recall if we'd specifically
7  talked about the reports or not.  Most of his time
8  was spent talking -- looking at photos and pointing
9  out different things in the photos.
10        MS. THOMPSON:  Let's go off the record
11 for one second.
12        (Discussion off the record.)
13        THE VIDEOGRAPHER:  We are back on the
14 record.  The time is 15:16.
15        (Gibson Exhibit 16 marked.)
16 BY MS. THOMPSON:
17   Q.   Detective, you have been shown what's
18 been marked as Gibson Exhibit 16, and this is a
19 lengthy set of materials that are Bates stamped
20 Plaintiff 11047 through Plaintiff 11147.  Do you
21 have those documents in front of you?
22   A.   Yes.
23   Q.   And this document consists of a subpoena
24 response that you participated in preparing in the

Transcript of Adam Gibson
Conducted on July 17, 2018

293

1  criminal case; is that right?
2      A.  Yes.
3      Q.  And there is an affidavit on page 2,
4  which is Plaintiff 11048, that explains what you
5  did to locate these records; is that right?
6      A.  Yes.
7      Q.  The phone records that are contained in
8  this document come from a couple of different
9  sources; is that correct?
10      A.  Yes.
11      Q.  The first records that are roughly
12  through page 11100 --
13      A.  Yes.
14      Q.  (Continuing) -- those are from a -- those
15  are from your personal phone account; is that
16  correct?
17      A.  Yes.
18      Q.  All right.  And there is two numbers on
19  here, and we don't have to put full numbers on the
20  record, but one of the numbers ends in a 6.  Do you
21  see that?
22      A.  Yes.
23      Q.  And what number is that?
24          MR. HANSEN:  I'm sorry, what page?

294

1          MS. EMERY:  What page are you on?
2          MS. THOMPSON:  I'm looking at the first
3  page of phone records, which is 11049.
4          MS. EMERY:  Okay.
5  BY MS. THOMPSON:
6      Q.  So there is account records on this page
7  for an account that ends in a 6?
8      A.  Yes.
9      Q.  That's the bottom half of this page?
10      A.  Yes.
11      Q.  What number is that?
12      A.  What number is the phone number?
13      Q.  Yeah, like what account does it
14  represent?
15      A.  Oh, that's my cell phone.
16      Q.  Okay.  And then there is records on this
17  page and on some of these other pages for a number
18  that ends in an 8.  That's the top of 11049.
19      A.  Yes.
20      Q.  What number is that?
21      A.  That's Tricia.
22      Q.  Who is Tricia?
23      A.  My significant other.
24      Q.  And then on 11101, which is sort of

295

1  halfway through these documents, those records are
2  records related to your office number; is that
3  right?
4      A.  I believe so, yes.
5      Q.  Those pages that are at the top say "Area
6  Aging"?
7      A.  Yes.
8      Q.  Those are records of your office number?
9      A.  Yes.
10      Q.  All right.  And then if you look back at
11  starting with Plaintiff 11126 --
12      A.  Yes.
13      Q.  (Continuing) -- and I'm not going to put
14  this on the record, but those pages refer to a
15  telephone number that ends in a 7.  Do you see
16  that?
17      A.  Yes.
18      Q.  And that is your office cell phone
19  number; is that right?
20      A.  No.
21      Q.  What number is that?
22      A.  That was my cell phone when I was a
23  canine officer.  If you go -- because I had a cell
24  phone as a canine officer up until October, I

296

1  believe, or possibly December.  But on Plaintiff
2  11131 the 9949 is my work cell phone.
3      Q.  So the number that ends in 9949 is your
4  work cell phone, and the records before that that
5  end in 47, is that a private number or a work
6  number you had associated with your canine work?
7      A.  That was a work number.
8      Q.  Okay.  But your cell phone number changed
9  when your job changed?
10      A.  Yes.
11      Q.  Okay.  Do you have any reason to doubt
12  that any of the records that are contained in
13  Gibson Exhibit 16 are inaccurate?
14      A.  I don't.
15      Q.  Did you have an opportunity to review
16  these records at some point, you know, after you
17  collected the records for production?
18      A.  No.
19      Q.  And did you note anything in here you
20  believe is wrong?
21      A.  I didn't review them.
22      Q.  I'm going to refer you to Plaintiff
23  11068, which is -- the top there is something that
24  says A6 of 9.  So it's 11068.

Transcript of Adam Gibson
Conducted on July 17, 2018

297

1    A.   Yes.
2    Q.   And I'm going refer you to the line there
3  that's line 41, which is near the bottom of the
4  page.
5    A.   Uh-huh.
6    Q.   Do you -- the number there -- and again,
7  I'm not going to put this on the record, but the
8  number there ends in a 25.  Do you see that?
9    A.   Yes.
10   Q.   Do you recognize that phone number?
11   A.   Yes.
12   Q.   Whose phone number is that?
13   A.   The State's Attorney's Office.
14   Q.   Is that Gary Farha's cell number?
15   A.   No.  That's the number to the State's
16 Attorney's Office.
17   Q.   All right.  And do you know who you spoke
18 with on November 19th of 2013 at 4 p.m. from the
19 State's Attorney's Office?
20   A.   I don't.
21   Q.   Do you have any memory of talking to
22 someone from the State's Attorney's Office that
23 day?
24   A.   No.

298

1    Q.   The number that is just below that in
2  line 42, that ends in an 80.  Do you see that?
3    A.   Yes.
4    Q.   And is that Gary Farha's cell phone
5  number?
6    A.   It is.
7    Q.   And do you know what you discussed with
8  Gary Farha on November 19th, at 4:41 p.m.?
9    A.   I do not.
10   Q.   I'm going to refer you now to Plaintiff
11 11128, which is in that back set of records.
12   A.   Yes.
13   Q.   Do you see on these records on line 25,
14 which reflects a call on September 23rd of 2013 at
15 7:51 p.m., that that reflects another conversation
16 you had with Gary Farha's cell phone?
17   A.   Yes.
18   Q.   And do you know what you discussed with
19 Gary Farha on that date?
20   A.   I don't.
21   Q.   I'm now going to refer you to your work
22 records, and let me refer you to the records that
23 reflect calls on January 27th, which are on
24 Plaintiff 11108.

299

1    A.   Yes.
2    Q.   Do you see on line -- there isn't a line
3  for this, but it's the 9:41 a.m. on January 27th.
4    A.   Yes.
5    Q.   Do you see an indication there of a call
6  of two minutes and 30 seconds?
7    A.   Yes.
8    Q.   And I'm referring to the number that ends
9  in 68.  Do you see that?
10   A.   Yes.
11   Q.   Do you recognize that number to belong to
12 Erika Gomez?
13   A.   I don't recognize that number to belong
14 to her.
15   Q.   Do you know what -- if that is Erika
16 Gomez's number, and I understand you have to accept
17 that as fact for the purposes of this question, do
18 you know what you discussed with her for two
19 minutes and 30 seconds in that call?
20   A.   I believe that was the call to set up the
21 interview.
22   Q.   All right.  And then on January 29th,
23 going down to 2:50 p.m., do you see that line?
24   A.   Yes.

300

1    Q.   Do you see there a call of 20 seconds to
2  that same number that ends in 68?
3    A.   Yes.
4    Q.   And do you know what that call was about?
5    A.   I believe it was because I was running
6  late from when I was supposed to meet her.
7    Q.   All right.  And then going down to
8  January 30th at 3:20 p.m.
9    A.   Yes.
10   Q.   Do you see there is another call there to
11 that same number of 6 minutes and 20 seconds?
12   A.   Yes.
13   Q.   And do you know what that conversation
14 was about?
15   A.   I do not.
16   Q.   Is there anything that would refresh your
17 recollection about what any of these telephone
18 calls concerned?
19   A.   No.
20   Q.   I'm going to send you ahead to March 3rd,
21 which is on page 11111, and we are still in your
22 work records here.
23   A.   Okay.
24   Q.   Let me know when you are there.

Transcript of Adam Gibson
Conducted on July 17, 2018

301

1    A.   Okay.
2    Q.   Looking on January 3rd at 2:20 --
3         MR. HANSEN:  You mean March 3rd?
4         MS. THOMPSON:  Yes.  Thank you.
5    BY MS. THOMPSON:
6    Q.   Looking ahead on March 3rd at 2:20 and
7    again at 2:40, do you see there is two calls to
8    that same number that ends in 68?
9    A.   There is an incoming call from that
10   number.  Where did you say there was a second one?
11   Q.   So at 3/3 at 2:20 do you see there is a
12   call of zero duration to that number?
13        MS. EMERY:  At 2:20 p.m.?
14        THE WITNESS:  Yes.
15   BY MS. THOMPSON:
16   Q.   All right.  And then a couple lines down
17   at 2:40 do you see that there was a call to that
18   number again of 19 seconds?
19   A.   Yes.
20   Q.   Do you know what either of those calls
21   were about?
22   A.   No.
23   Q.   And I'm going to send you ahead to 3/18.
24   Actually, let me send you ahead to 3/25, so -- it's

302

1    3/24, I'm sorry.  I'm sending you ahead to 3/24,
2    which is at 3:19 p.m.  So that's on page 11114.  Do
3    you see that?
4    A.   Yes.
5    Q.   That 3:19 call, do you see that there is
6    another call to that 68 number?
7    A.   Yes.
8    Q.   And do you know what you discussed with
9    that number for seven some minutes on that date?
10   A.   I do not.
11   Q.   And jumping ahead to 4/24, which is
12   Plaintiff 11118, do you see at 1:58 p.m. there is a
13   number from a -- that there is an incoming call
14   from that same number?
15   A.   At what time?
16   Q.   1:58 p.m.
17   A.   On 4/23?
18   Q.   4/24, I'm sorry.  If I misspoke, I
19   apologize.  4/24 at 1:58 p.m.  Let me know when you
20   are looking at that.
21   A.   Oh, yes.
22   Q.   There is an incoming call that's over 19
23   minutes and then one that's incoming that's for
24   over five minutes that are back to back on 4/24.

303

1    Do you see that?
2    A.   Yes.
3    Q.   Do you know what you were discussing with
4    that number on that day?
5    A.   I do not.
6    Q.   In total, do you have any memory of what
7    you discussed on the phone with Erika Gomez at
8    various points during this investigation?
9    A.   I don't recall specific phone
10   conversations, no.
11   Q.   Okay.  On the phone was she concerned
12   about the course of the investigation?
13   A.   Not that I recall, no.
14   Q.   On the phone was she concerned with you
15   about establishing for you that the things that she
16   was telling you were true?
17   A.   I don't recall that, no.
18   Q.   As of 4/24 you had been investigating
19   this case for several months, correct?
20   A.   Three.
21   Q.   Okay.  And you had had numerous prior
22   conversations with Erika Gomez, correct?
23   A.   I wouldn't say numerous, no.
24   Q.   Was there new information that you were

304

1    learning from Erika in April of 2014 that was
2    causing you to have longer conversations with her
3    on the phone?
4    A.   I don't recall what our conversations
5    were about.
6    Q.   I'm going to show you --
7         MS. THOMPSON:  Let's mark this.
8         (Gibson Exhibit 17 marked.)
9    BY MS. THOMPSON:
10   Q.   You've been shown what's been marked as
11   Gibson 17, and that's a one-page document that's
12   Bates stamped 3638.  Do you have that in front of
13   you?
14   A.   Yes.
15   Q.   This is an e-mail that you sent to John
16   Summers in on March 18th of 2014?
17   A.   Yes.
18   Q.   Had you sought John Summers's advice
19   about the course of this investigation prior to
20   March 18th of 2014?
21   A.   Yes.
22   Q.   And what advice had you sought from John
23   prior to March 18th of 2014?
24   A.   We had been discussing it since it began.

Transcript of Adam Gibson
Conducted on July 17, 2018

305

1    Q.   Was there particular advice you had been
2  seeking from him?
3    **A.   We discussed all aspects of the case.**
4    Q.   Okay.  And was he giving you direction,
5  suggestions about how to move forward?
6    **A.   At times, yes.**
7    Q.   Okay.  This e-mail in Gibson 17 is you
8  asking a question of John.  "Do you think I am
9  wrong for trying to push this case forward, should
10 it be let go," question mark.  Do you see that?
11   **A.   Yes.**
12   Q.   Why did you send this e-mail to John
13 Summers on March 18th of 2014?
14   **A.   Basically because we continued to hit**
15 **roadblocks with the doctors, and so it was**
16 **basically an attempt to glean from him whether or**
17 **not we should let the case go or continue to push**
18 **it forward.**
19   Q.   What roadblocks had you hit from the
20 doctors as of March 18th, 2014?
21   **A.   Dr. Bowman had given us an opinion and**
22 **then changed her mind, and then Dr. Denton had**
23 **given us an opinion and then by that time hadn't**
24 **issued a written opinion.  I'm not sure if by then**

306

1  **we had consulted Dr. Teas or not.  I don't recall**
2  **the exact timing of that.**
3    Q.   Are there any other roadblocks you recall
4  at any point in this investigation from the doctors
5  besides the things that you just testified to?
6    **A.   Not that I can recall at this time.**
7    Q.   Isn't it true that as of March 18th of
8  2014 a roadblock in this case was that Dr. Denton
9  did not want to issue a formal report?
10       MS. EMERY:  Objection to the form.
11       THE WITNESS:  Dr. Denton had not issued a
12 written report at that time, no.
13 BY MS. THOMPSON:
14   Q.   But isn't it true that as of March 18th
15 of 2014 he told you he did not want to issue a
16 formal report?
17   **A.   That's not true.**
18   Q.   Were you questioning as of March 18th of
19 2014 whether this investigation ought to continue?
20   **A.   I don't know that I was questioning**
21 **whether the investigation should continue, just**
22 **given in light of the dynamics of the case whether**
23 **it should continue.**
24   Q.   And the dynamics of the case that you are

307

1  referencing, anything beyond the roadblocks you had
2  with the investigators?
3        MS. EMERY:  Objection to the -- did you
4  mean investigators?  Your question --
5        MS. THOMPSON:  Let me restate my
6  question.  Let me restate my question.
7  BY MS. THOMPSON:
8    Q.   As of March 18th of 2014, did -- were
9  there any roadblocks you had experienced in the
10 case besides the interactions that you had with the
11 pathologists that you consulted?
12   **A.   No.**
13   Q.   And when you say that the dynamics of the
14 case -- when you talk about the dynamics of the
15 case, are you referencing anything beyond the
16 roadblocks with the pathologists that you just
17 described?
18   **A.   No.**
19   Q.   Did you John Summers respond to this
20 e-mail?
21   **A.   I don't remember if he responded with an**
22 **e-mail or if we talked in person.**
23   Q.   Did he talk to you about your question
24 about whether this should go forward?

308

1    **A.   It was either in an e-mail or in a**
2  **conversation, but he said yes.**
3    Q.   And what -- did he expand beyond telling
4  you that, yes, this should go forward?
5    **A.   No.  I mean, we had a conversation, but I**
6  **don't recall the specifics of the whole**
7  **conversation.**
8    Q.   In the conversation did he give you a pep
9  talk?
10   **A.   No.**
11   Q.   Did he give you advice about how to move
12 this forward?
13   **A.   I don't know if there was advice about**
14 **how to move it forward or -- I don't recall the**
15 **whole conversation, no.**
16   Q.   Do you remember anything about the
17 conversation other than that he told you it should
18 go forward and you talked about the case?
19   **A.   No.**
20   Q.   Is there anything that would refresh your
21 memory about that conversation?
22   **A.   No.**
23   Q.   Did you -- similar to your communications
24 with Sergeant Summers, did you confer with

Transcript of Adam Gibson
Conducted on July 17, 2018

309

1 Lieutenant Dreyer throughout the investigation
2 about what you were doing?
3    **A.  Yes.**
4    Q.  And did you get advice and direction from
5 her as well?
6    **A.  Yes.**
7    Q.  Did you get advice and direction from
8 Chief Copley as well?
9    **A.  I don't know if it was advice and**
10 **direction as much as it was just keeping him**
11 **informed of what was going on.**
12    Q.  Did you talk with Lieutenant Dreyer about
13 the delays you were having with getting a report
14 from Dr. Denton?
15    **A.  Yes, we spoke about it.**
16    Q.  And what did you tell her about those
17 delays?
18    **A.  Just that he had not issued a written**
19 **opinion yet.**
20    Q.  Did you tell her you were frustrated
21 about the delay in getting that opinion?
22    **A.  I don't know that frustrated would be a**
23 **word that I use, no.**
24    Q.  Did you tell her any words to the effect

310

1 that you were, you know, concerned about that
2 delay?
3    **A.  No.**
4    Q.  Did she give you any advice about how to
5 move forward in spite of that delay?
6    **A.  I don't recall specifically.**
7    Q.  Did she give you -- do you remember, as
8 you sit here today, any specific advice that she
9 gave you about moving this investigation forward?
10    **A.  No.**
11    Q.  Were you present for any of Erika Gomez's
12 testimony at the second trial?
13    **A.  I don't believe so, no.**
14    Q.  Have you ever watched any video of it?
15    **A.  I think I've seen portions of it, yes.**
16    Q.  Did you see any excerpts of it that were
17 on any news programs related to this case?
18    **A.  Yes.**
19    Q.  Have you seen any excerpts from any other
20 source?
21    **A.  No.**
22    Q.  The excerpts from her testimony you saw
23 on the news program, was that from the Dateline?
24    **A.  I don't remember which one it was.**

311

1    Q.  Well, the excerpts that you saw on a news
2 program, were they consistent with her demeanor the
3 times that you communicated with her about this
4 case?
5    **A.  We just had conversations about the case.**
6    Q.  Okay.  I'm saying, in those
7 conversations, was her demeanor different than the
8 demeanor of hers that you observed in the excerpts
9 of her testimony that you saw?
10    **A.  She was not crying and breaking down when**
11 **I spoke to her, no.**
12    Q.  And have you talked with anyone other
13 than your counsel, because I'm not asking about
14 confidential communications you've had, but other
15 than your counsel, have you talked with anyone
16 about her demeanor on the stand when she testified?
17    **A.  Not that I can remember specifically, no.**
18    Q.  Have you communicated with her at all
19 since the second trial -- since her testimony in
20 the second trial?
21    **A.  No.**
22    Q.  To your knowledge, has she reached out to
23 any member of the department, the Quincy Police
24 Department, since her testimony in the second

312

1 trial?
2    **A.  I have no idea.**
3    Q.  To your knowledge, has anyone in the
4 Quincy Police Department reached out to her since
5 the end of her testimony in the second trial?
6    **A.  I don't know that either.**
7    Q.  Did you ever have any phone calls with
8 either of the Crickards about this investigation?
9    **A.  I don't remember if I spoke to either one**
10 **of them or not.**
11    Q.  As you sit here today, do you remember an
12 investigative reason why you would have needed to
13 have communicated with either of the Crickards
14 about this case?
15    **A.  Like I say, I don't know if I did or not.**
16    Q.  Is there anything that you could review
17 that would refresh your memory about any
18 investigative reasons you would have had to have
19 communicated with either Crickard?
20    **A.  No, because I don't recall whether I**
21 **talked to them or not.**
22    Q.  I've got -- let's go off the record for
23 one second.
24    THE VIDEOGRAPHERS:  We are going off the

Transcript of Adam Gibson

Conducted on July 17, 2018

313

1  record.  The time is 15:41.
2       (Discussion off the record.)
3       (Whereupon a short recess was taken.)
4       THE VIDEOGRAPHER:  We are back on the
5  record.  The time is 15:55.
6  BY MS. THOMPSON:
7       Q.  I have some questions for you, Detective
8  Gibson, about a couple of additional e-mails, but I
9  want to go back to Exhibit 7 with you for a moment,
10 which is one of your detective daily log forms.
11 Are those still in front of you?
12      MS. EMERY:  Yeah, they are right there.
13 Should be at the bottom of that pile.
14      THE WITNESS:  I don't have those.  That's
15 just reports and Dr. Denton.
16      MS. EMERY:  Number 7.
17      MS. THOMPSON:  Is there -- you know what,
18 it's actually 9.  I'm sorry.  I gave the wrong
19 number.  I apologize.  It's one of those -- sorry,
20 I cannot read my own handwriting.  I apologize
21 about that.
22      MS. EMERY:  That's okay.
23
24 BY MS. THOMPSON:

314

1       Q.  Detective Gibson, you've been shown again
2  Gibson Exhibit 9, which is some of your logs.  I'm
3  going to ask you to turn to page 5558, which is
4  near the back.
5       A.  Yes.
6       Q.  This page references work that you did on
7  April 5th of 2017; is that right?
8       A.  Yes.
9       Q.  All right.  And the second entry on this
10 page indicates that you spent three hours working
11 on the Lovelace case that day, right?
12      A.  Yes.
13      Q.  And your comments say, "I spoke to a
14 subject on the phone about the case and input from
15 the trial."  Do you see that?
16      A.  Yes.
17      Q.  Who did you talk to for three hours on
18 that date?
19      MS. EMERY:  Object to the form of the
20 question.  It's not what it says.  That it's a
21 three-hour phone call.
22 BY MS. THOMPSON:
23      Q.  Well, who did you talk to about this case
24 on April 5th of 2016?

315

1       A.  I don't know.
2       Q.  And that -- this log indicates that you
3  spent three hours working on the Lovelace case that
4  day, right?
5       A.  Yes.
6       Q.  And does it indicate that you did
7  anything besides talk to someone on the phone?
8       A.  No.
9       Q.  Is there a reason that this log doesn't
10 indicate the person you were talking to on the
11 phone that day?
12      A.  I have no idea, unless it was Ed or -- I
13 don't know.  Or Julia maybe.
14      Q.  Did you review your logs before your
15 deposition today?
16      A.  No.
17      Q.  Would you agree with me that there is
18 other places in the logs where if you spoke to Ed,
19 for instance, you named Ed?
20      A.  I can't agree to that because I haven't
21 seen it.
22      Q.  Well, let me refer you to -- let's look
23 at Plaintiff 5564.
24      A.  Yes.

316

1       Q.  That's an entry for 12/14 of 2016; is
2  that right?
3       A.  Yes.
4       Q.  All right.  And then this -- the work
5  that you did for the case on this date, you named
6  Julia Wykoff as a person you spoke to, right?
7       A.  I did.
8       Q.  Is there a reason in your log that you
9  would have been keeping confidential whether or not
10 you spoke to a prosecutor?
11      A.  No.  I don't know who I spoke to.
12      Q.  And I'm going to refer you to Plaintiff
13 5545 also.
14      MS. THOMPSON:  And this actually, just
15 while you're looking for that page, so it's 5545,
16 this is another page where I do have a question
17 about something that is redacted.  So if you want
18 to make this confidential, we can.
19      MS. EMERY:  Yeah, the whole exhibit is
20 confidential so...
21 BY MS. THOMPSON:
22      Q.  Are you on 5545, sir?
23      A.  Yes.
24      Q.  This is a log page from April 26 of 2016;

Transcript of Adam Gibson

Conducted on July 17, 2018

317

1  is that right?
2      A.  Yes.
3      Q.  The victim name has been redacted in this
4  entry, correct?
5      A.  Yes.
6      Q.  There is a reference in the entry to
7  speaking with Ed about the symposium and also
8  having the hair of Erika Gomez tested; is that
9  right?
10     A.  Yes.
11     Q.  Is there any reason why you would have
12  been speaking to Ed or having Erika Gomez's hair
13  tested or considering that possibility for an
14  investigation other than the Lovelace case?
15     A.  No.
16     Q.  Do you think there is possibly an error
17  in this page about this entry belonging with
18  Lovelace as opposed to another case?
19     A.  I would assume that's correct because the
20  30455 was a -- is a separate homicide from '15.
21     Q.  Okay.  Did you ever consider the
22  possibility of having someone take a polygraph in
23  the Lovelace investigation?
24     A.  No.

318

1      Q.  So the stuff that's redacted out of this
2  entry, do you have any reason to think that it
3  pertains to the Lovelace case?
4      A.  I know that it does not.
5      Q.  Okay.  But this is another entry where
6  you've named Ed, right?
7      A.  Yes.
8      Q.  So based on what we have reviewed, do you
9  have any reason -- based on what we've reviewed,
10  can you think of any reason why in doing your time
11  records for April 5th of 2016 that you would not
12  have identified the person you talked to on the
13  phone?
14     A.  Again, alls I can say is I don't know who
15  I talked to.
16     Q.  I have one more question about that same
17  document.  Let me have you turn to 5544.
18     A.  Yes.
19     Q.  This page 5544 is a daily log from April
20  24th of 2014; is that right?
21     A.  Yes.
22     Q.  And this reflects that on that date you
23  got back a response to your search warrant for the
24  Gomez Comcast records, right?

319

1      A.  Correct.
2      Q.  And this reflects that you told Erika
3  Gomez that these records didn't provide any new
4  evidence about her accounts, correct?
5      A.  Yes.
6      Q.  And, in fact, those records did not show
7  that Erika Gomez was correct in her belief that
8  Curtis Lovelace had stolen her identity, correct?
9      A.  Correct.  But it did show that Curtis had
10  called to try to gain access to the account.
11     Q.  It showed that he had called and tried to
12  gain access to an account at an address where he
13  resided, correct?
14     A.  I don't believe it was at the address he
15  resided.  It was after she moved out.
16     Q.  Well, who lived in the -- who lived in
17  the address after she moved out?
18     A.  He lived in the house after she moved
19  out.
20     Q.  Right.  And so did the records reflect
21  that he was calling to address an issue about an
22  account for a residence where he was now living?
23     A.  No.  I believe it was for the residence
24  that she lived in.

320

1      Q.  Her new residence?
2      A.  Yes.
3      Q.  Okay.  This also reflects that on this
4  date you talked to, and I'm just referencing the
5  last sentence of your entry there, "I also spoke to
6  her again about the ongoing death investigation and
7  whether she had any contact with Curtis outside of
8  class prior to Cory's death."
9      A.  Yes.
10     Q.  Was this date, April 20th, 2014, the
11  first date where you had talked with Erika Gomez
12  whether or not she had contact with Curtis outside
13  of class before Cory's death?
14     A.  No.  That questions was asked the first
15  time I talked to her.
16     Q.  All right.  And is there a reason why you
17  were asking her about that again a few months
18  later?
19     A.  Yes, because there was another witness
20  that said that he had seen them at the gym
21  together.
22     Q.  And what witness was that?
23     A.  Dustin Strothoff, I believe.
24     Q.  And did -- on this occasion, April 24th,

Transcript of Adam Gibson

Conducted on July 17, 2018

321

1 did Erika Gomez give you any information that would
2 indicate that she had been spending time of a
3 romantic nature with Curtis Lovelace outside of
4 class before Cory's death?
5     **A.   No.  She said that she had spoke to him**
6 **at the gym.**
7     Q.   As a detective with the Quincy Police
8 Department, is it your belief that you have an
9 understanding of the policies and practices of the
10 Quincy Police Department as they relate to your job
11 as a detective?
12    **A.   I do.**
13    Q.   And was that true for you, that you had
14 such an understanding, at the time that you were
15 investigating Cory Lovelace's death?
16    **A.   I believe so.**
17    Q.   And is it your belief, as you sit here
18 today, that the steps that you took in this
19 investigation were consistent with the policies and
20 practices of the Quincy Police Department as you
21 understood them?
22    **A.   I believe they were.**
23    Q.   Have you ever had any conversation with
24 anyone, and I'm excluding any conversations with

322

1 counsel, where someone informed you that they
2 believed that your conduct in this case was
3 contrary to those policies and practices?
4     **A.   No.**
5     Q.   After the second trial in Curtis
6 Lovelace's case concluded, did you have any
7 conversations with anyone in the police department
8 about sort of the way that this investigation and
9 the case resolved?
10    **A.   I don't remember any conversations**
11 **specifically.**
12    Q.   Did you have any meetings after the
13 second trial to, you know, reflect on the results
14 of this investigation or how things proceeded?
15    **A.   No.**
16    Q.   Did you talk with anyone in the
17 department about this case after the second trial
18 verdict?
19    **A.   Yeah.  I talked to Lieutenant Dreyer.  I**
20 **talked to the chief.**
21    Q.   What did you discuss with Lieutenant
22 Dreyer?
23    **A.   Just about the case in general and the**
24 **trial and the outcome.**

323

1     Q.   What do you remember about that
2 conversation?
3     **A.   I don't remember specifics.  I just**
4 **remember it was just a general conversation.**
5     Q.   When was that conversation?
6     **A.   Within days of the trial ending.**
7     Q.   All right.  And how long did the
8 conversation last?
9     **A.   I don't know that.**
10    Q.   Was anyone else present for the
11 conversations beside you and Lieutenant Dreyer?
12    **A.   Possibly Sergeant Summers.**
13    Q.   Anyone else?
14    **A.   I don't think so.**
15    Q.   And other than what you testified to, do
16 you have any memory of any specifics of that
17 conversation?
18    **A.   No.**
19    Q.   Did either you or Lieutenant Dreyer or
20 Sergeant Summers, if he was there, express any, you
21 know, regret about sort of how the case had
22 resolved in that conversation?
23    **A.   Regret about how the case was resolved?**
24    Q.   Yes.

324

1     **A.   You mean the not guilty finding?**
2     Q.   Well, let me ask the question more
3 directly.  In that meeting, did any of you, either
4 Lieutenant Dreyer, you, or Sergeant Summers if he
5 was there, say anything to the effect that, you
6 know, you believe that outcome was incorrect?
7     **A.   Yeah, we all said that.**
8     Q.   Have you had any conversations with Gary
9 Farha about this case since the verdict in the
10 second trial?
11    **A.   I don't know.  I'm sure at some point**
12 **we've discussed it after the verdict.**
13    Q.   Has Gary Farha ever expressed an opinion
14 to you about whether that verdict was correct or
15 not?
16    **A.   Not that I recall.**
17    Q.   And have you had any conversations with
18 Jon Barnard since the verdict in the second trial
19 about this case?
20    **A.   I don't think so.  I could be wrong, but**
21 **I don't remember any specific conversations.**
22    Q.   Have you had any conversations with Jim
23 Keller since the verdict in the second trial about
24 this case?

Transcript of Adam Gibson
Conducted on July 17, 2018

325

1    A.  Yeah, we've discussed it.
2    Q.  How many times?
3    A.  I don't know.  A couple.
4    Q.  When was the first conversation you had
5  with him?
6    A.  All of them were shortly after the end of
7  the trial.
8    Q.  All right.  Where did those conversations
9  take place?
10    A.  I couldn't even tell you.
11    Q.  Did they take place somewhere other than
12  either the police department or the coroner's
13  office?
14    A.  I don't know where they were.
15    Q.  And what did you discuss with Coroner
16  Keller in those conversations?
17    A.  Again, just generalities about the trial,
18  the investigation, and the outcome.
19    Q.  Did he express to you in those
20  conversations a belief that the outcome was wrong?
21    A.  Yes.
22    Q.  You said that prior to this deposition
23  that you reviewed a transcript of your testimony in
24  that proceeding that was held in the second trial

326

1  where you testified with just the parties and the
2  court present.  Did you -- you reviewed that
3  transcript before today?
4    A.  Yes.
5    Q.  And in your review of the transcript, is
6  it your belief that your testimony in that
7  proceeding was accurate?
8    A.  I believe so, yes.
9    Q.  All right.  And one of the specific
10  things you were asked about in that testimony was
11  whether or not you had given certain e-mails from
12  Dr. Denton to Ed Parkinson?
13    A.  Yes.
14    Q.  Do you remember those questions during
15  that testimony?
16    A.  Yes, ma'am.
17    Q.  And were your questions -- were your
18  answers specifically as to the questions on that
19  topic accurate?
20    A.  Yes.
21    (Gibson Exhibit 18 marked.)
22  BY MS. THOMPSON:
23    Q.  I want to go through a couple of e-mails
24  with you, and what we've done is mark those as a

327

1  Group Exhibit 18.  These are not in order.  Let me
2  say that in a better way.  Group Exhibit 18
3  contains numbers that are not in a -- that have
4  Bates numbers that do not follow one another, so
5  I'm just going to read the Bates numbers as we go
6  and talk about this exhibit.
7    A.  Okay.
8    Q.  But the first Bates number in this range,
9  and there is Bates numbers missing, is 5809 and the
10  last is 5990.  So I'm going to show you Exhibit 18
11  now --
12    MR. HANSEN:  Could you at some point read
13  those off to us because you gave us the big one?
14    MS. THOMPSON:  Sure.
15    MR. HANSEN:  I'd like to pull the rest
16  out so I can just follow along.
17    MS. THOMPSON:  If you want to pull them
18  first, we can do that, I will just read them to you
19  now.  The first is 5809.  The second is 5819.
20  There is then 5832 and 33.  Then 5841.  Then 5860
21  through 5864.
22    MR. HANSEN:  I'm sorry, 5860 through
23  5864?
24    MS. THOMPSON:  Through 5864, yes.

328

1    Then 5886 and 87.  Then 5890.  Then 5964
2  and 65.  Then 5974 through 5977.  And finally 5989
3  through 5990.
4    MR. HANSEN:  5989?
5    MS. THOMPSON:  And 5990.  So those two
6  successive pages.
7  BY MS. THOMPSON:
8    Q.  Before I show you Exhibit 18, did you
9  have any conversations about the Cory Lovelace
10  death investigation with Ed Parkinson before the
11  Grand Jury proceedings?
12    A.  Yeah, we had discussions.
13    Q.  All right.  When did you first
14  communicate with Ed Parkinson about this case?
15    A.  It would have been, I believe, in June or
16  early July.
17    Q.  Did you and Ed Parkinson ever meet with
18  or talk to Scott Denton together?
19    A.  No, not together.
20    Q.  And I'm asking you just about this
21  investigation, not in general about other cases.
22    A.  Correct.
23    Q.  So the answer to that is no?
24    A.  Correct.

Transcript of Adam Gibson
Conducted on July 17, 2018

329

1    Q.   All right.  Did you ever -- did Ed
2  Parkinson ever independently tell you about
3  conversations he separately had with Scott Denton
4  without you about this case?
5    A.   I don't recall any conversations like
6  that, no.
7    Q.   Did Jim Keller ever tell you about
8  conversations that he had with Ed Parkinson about
9  Scott Denton without you?
10    A.   That Keller had with Parkinson?
11    Q.   Let me ask you that question a better
12  way.  That is a bad question.  Did Jim Keller ever
13  tell you that he had separate conversations with
14  Scott Denton with Ed Parkinson with you not there?
15    A.   That's even more confusing than the first
16  question.
17    Q.   All right.  Let me try a third time.  We
18  will do the third time is a charm here.  Are you
19  aware of any separate conversations that Jim Keller
20  and Ed Parkinson had with Scott Denton without you?
21    A.   No.
22    Q.   All right.  I'm going to show you some
23  additional documents then in Exhibit 18, and let me
24  just put Exhibit 18 in front of you.  So the first

330

1  page you should be looking at is 5809, and this is
2  an e-mail from you to an e-mail address that is
3  coroner@co.adams.il.us.  Do you see that?
4    A.   Yes.
5    Q.   And that is Jim Keller's e-mail address,
6  correct?
7    A.   Yes.
8    Q.   To your knowledge, is that e-mail address
9  monitored by anyone in the coroner's office besides
10  Jim?
11    A.   I have no idea.
12    Q.   But you understood if you e-mailed that
13  address you would get Jim?
14    A.   Yes.
15    Q.   All right.  And do you know what
16  documents you were sending to Jim in this e-mail?
17    A.   I do not.
18    Q.   It looks like photographs, though,
19  correct?
20    A.   Yes.
21    Q.   All right.  The next document should be
22  5819; is that correct?
23    A.   Yes.
24    Q.   And that is an e-mail from Jim to Chief

331

1  Copley, you, and Lieutenant Dreyer; is that right?
2    A.   Yes.
3    Q.   This reflects that there were some kind
4  of news release prepared in the Booth case?
5    A.   Yes.
6    Q.   And what did that news release consist
7  of?
8    A.   It was prepared by Jim Keller.  I don't
9  know -- I don't know what it was.
10    Q.   Did you review that news release before
11  it went out?
12    A.   No, ma'am.
13    Q.   And was it ever released, to your
14  knowledge?
15    A.   I don't know.  I believe it was, but I
16  don't know specifically of when.
17    Q.   Let me have you turn to the next page,
18  which should be 5832.  Is that what you are looking
19  at?
20    A.   Yes.
21    Q.   And this is an e-mail from you to that
22  same e-mail address for Jim Keller on May 13th of
23  2014.  Do you see that?
24    A.   Yes.

332

1    Q.   And this -- does this e-mail indicate
2  that you had set an appointment to talk to
3  Dr. Turner that -- a couple days after this e-mail
4  at 11?
5    A.   Yes.
6    Q.   And do you know why you were telling Jim
7  about your meeting with Dr. Turner?
8    A.   I do not know.
9    Q.   Did Jim communicate -- or did Jim
10  participate in any of your conversations with
11  Dr. Turner about this case?
12    A.   Not that I can recall at this time.
13    Q.   Let me turn you to the next one, which is
14  5841.  Are you looking at that document?
15      MS. EMERY:  5833 is my next one.
16      MS. THOMPSON:  Thanks.  And, you know, I
17  don't have questions for you about 5833.  So let's
18  move to 5841.  Is that next?
19      5841 is an e-mail from you to Coroner
20  Keller from January 22nd of 2014; do you agree?
21    A.   Yes.
22    Q.   And this e-mail address instead of
23  coroner@co et cetera is jkeller@co et cetera.  Do
24  you see that?

Transcript of Adam Gibson
Conducted on July 17, 2018

84 (333 to 336)

333

1    A.  Yes.
2    Q.  Is this a separate e-mail address for Jim
3 with the county?
4    A.  Apparently.
5    Q.  I mean, is this a more personal address
6 for him than the coroner@co address?
7       MR. HANSEN:  Object to form, foundation.
8       THE WITNESS:  I don't know if it's more
9 personal.  I don't know unless he had sent me
10 something from that e-mail.
11 BY MS. THOMPSON:
12    Q.  Did you e-mail Jim Keller on Wednesday,
13 January 22nd because you wanted to know if you guys
14 had heard anything about from Denton?
15    A.  Yes.
16    Q.  All right.  And in part, this e-mail also
17 suggests, and I'm referencing 5841, that Chief
18 Copley had asked you about results, correct?
19    A.  Yes.
20    Q.  What does this last sentence of this
21 e-mail mean, and the sentence I'm referring to is,
22 "Not that I'm on pins or needles or anything,
23 comma, the chief also asked me about any results
24 yesterday as I informed him when I reopened the

334

1 case"?
2    A.  I think that was referring to the fact
3 that I had told him that we would have something
4 from Dr. Denton by the end of the week.  That was
5 on something previously he had given me.
6    Q.  Do you know -- do you know what the
7 phrase "as I informed him when I reopened the case"
8 is referencing?
9    A.  No.  Like I said, my assumption is that
10 it had something to do with waiting on the opinion
11 from Denton.
12    Q.  So this e-mail reflects that you reopened
13 the case, correct?
14    A.  I did.
15    Q.  And when you say in this e-mail that you
16 reopened the case, do you mean that you personally
17 made a decision to relook into this matter?
18       MS. EMERY:  Objection; asked and answered
19 much earlier.
20       Go ahead.
21       THE WITNESS:  The decision was made in
22 consultation with the chief, the lieutenant, and
23 the sergeant.
24 BY MS. THOMPSON:

335

1    Q.  Did you tell Chief Copley when you talked
2 to him about reopening the case that you expected
3 you would get some information from Dr. Denton?
4    A.  That was the question -- that was the
5 discussion was to take it to Dr. Denton to find out
6 if he could make a determination on the
7 undetermined autopsy.
8    Q.  Isn't it true that the reason you
9 contacted Dr. Teas in this case is because
10 Dr. Bowman suggested to you that she is another
11 pathologist that you could consult?
12    A.  Yes.
13    Q.  And you consulted Dr. Teas because you
14 were looking for people who, you know, might have
15 information to provide that Dr. Bowman wasn't
16 willing to formally give; is that right?
17    A.  To give us an actual opinion, yes.
18    Q.  Okay.  Let's turn to the next page, which
19 should be Plaintiff 5860.
20    A.  Yes.
21    Q.  And there is an e-mail chain that sort of
22 extends from 5860 to 5864; do you see that?
23    A.  Yes.
24    Q.  You forwarded this entire e-mail chain

336

1 that's in 5860 to 5864 to that coroner e-mail
2 address on April 17th of 2014; is that right?
3    A.  Yes.
4    Q.  Why did you forward this chain to Coroner
5 Keller?
6    A.  I don't know.  Obviously there was some
7 discussion about it.
8    Q.  From your review of materials in
9 preparation for this deposition and your memory of
10 what occurred during this investigation, you
11 conferred with Jim Keller on multiple occasions
12 about what was going on in the investigation,
13 correct?
14    A.  During the course of the investigation?
15    Q.  Yes.
16    A.  Yeah.
17    Q.  And he was interested in what these
18 various pathology experts were saying about the
19 case, correct?
20       MR. HANSEN:  Object to form.
21       THE WITNESS:  Yes.  He was the coroner.
22 BY MS. THOMPSON:
23    Q.  Okay.  And when you say "he was the
24 coroner," do you mean that as the coroner naturally

Transcript of Adam Gibson
Conducted on July 17, 2018

337

1 he would be interested if what was going on in
2 investigations related to deaths in Adams County?
3    **A.   He is involved in all the investigations,**
4 **or has been, yes.**
5    Q.   Okay.  You've seen this e-mail chain
6 that's 5860 through 5864 before today, right?
7    **A.   Yes.**
8    Q.   And this e-mail chain, to your memory,
9 was something that was discussed at -- to some
10 extent at the second trial, right?
11   **A.   Yes.**
12   Q.   And is it your -- I asked you a little
13 bit about this before, but I want to make sure the
14 record is clear.  Is it your testimony that you
15 gave the e-mails in this physical e-mail chain --
16 well, let me start that question again.
17       Is it your testimony today that you
18 showed these e-mails that are comprised in 5860 to
19 5864 to Ed Parkinson?
20   **A.   I specifically showed him the e-mail that**
21 **is indicated on 5861.**
22   Q.   There is an e-mail that goes from 5861 to
23 a couple lines to 5862; is that correct?
24   **A.   Yes.**

338

1    Q.   And that's an e-mail from Dr. Denton to
2 you, Lieutenant Dreyer, Sergeant Summers, and Jim
3 Keller on March 5th of 2014; is that the e-mail we
4 are looking at?
5    **A.   That's correct.**
6    Q.   And when you showed it to Ed Parkinson,
7 is it your testimony you showed it to him without
8 the rest of this chain included?
9    **A.   Yes.**
10   Q.   All right.  And I think you testified to
11 some extent about that e-mail in your testimony in
12 that special proceeding in the second trial, right?
13   **A.   Yes, ma'am.**
14   Q.   Other than that e-mail, did you show any
15 of the rest of the e-mails in this chain to Ed
16 Parkinson?
17   **A.   I don't believe so.  I don't recall any**
18 **other ones other than this one.**
19   Q.   Is it your testimony, as you sit here
20 today, that you discussed beyond that e-mail more
21 generally with Ed Parkinson any issues you were
22 having with Dr. Denton's delay in providing a
23 formal report in this case?
24   **A.   Yes.  That's ultimately why Dr. Denton**

339

1 **issued a written report was because Ed contacted**
2 **him.**
3    Q.   Did you discuss with Ed that there were
4 roadblocks in the case related to the doctors?
5    **A.   I discussed the whole investigation with**
6 **Mr. Parkinson.**
7    Q.   And did you express any concern to Ed
8 about what you were hearing from various
9 pathologists in the case?
10   **A.   What do you mean by concerns?**
11   Q.   Sure.  Well, were you concerned at all
12 about the fact that there was delay in Dr. Denton
13 getting you a report?
14   **A.   Yes, but by that time Dr. Turner --**
15 **Dr. Denton had referred us to Dr. Turner.**
16   Q.   You say "by that time."  Are you
17 referring to the -- what time are you referring to?
18   **A.   By the time that we had met with**
19 **Mr. Parkinson.**
20   Q.   Okay.  By the time you met with
21 Mr. Parkinson, you had already conferred with
22 Dr. Teas, right?
23   **A.   Yes.**
24   Q.   And by the time you conferred with Ed

340

1 Parkinson, you had already exchanged e-mails with
2 Dr. Pounder, right?
3    **A.   Yes.**
4    Q.   Did you ever give to Ed Parkinson any of
5 your e-mail exchanges with Dr. Pounder?
6    **A.   No.**
7    Q.   Did you tell him you had consulted with
8 Dr. Pounder?
9    **A.   I think it's indicated in one of the**
10 **reports somewhere.**
11   Q.   And you provided that report to
12 Mr. Parkinson?
13   **A.   Yes, he had the reports.**
14   Q.   Was your e-mail included as an attachment
15 to that report?
16   **A.   No.  If I can clarify?**
17   Q.   Sure.
18   **A.   Dr. Pounder, I consulted him basically**
19 **as research.  He is a doctor in England, and it**
20 **wasn't expected that he was going to come here as a**
21 **witness.  That was more on the fact finding**
22 **information, not particular to this particular**
23 **case, but to parts of pathology in general**
24 **referenced in the e-mail.**

Transcript of Adam Gibson
Conducted on July 17, 2018

341

1    Q.   Well, did Dr. Pounder give you
2 information that assisted you in your investigation
3 in this case?
4    A.   Ultimately, no.
5    Q.   Did he give you information that sort of
6 for you told you there was a certain road that
7 wasn't going to be fruitful to go down?
8    A.   I don't remember anything about a road
9 that's not going to be fruitful to go down, no.
10    Q.   When you say that ultimately that -- the
11 information he gave you wasn't helpful, what do you
12 mean -- or wasn't fruitful, excuse me, what do you
13 mean?
14    A.   It wasn't -- it was basically just
15 general pathology information.  You know, in that
16 e-mail he indicated that if the hands were raised
17 that the body had been moved after death.  But
18 specific to the case, it wasn't information that he
19 provided specific information related to that case.
20    Q.   Well, didn't his -- didn't the
21 information he gave you that the hands were raised
22 she was moved -- the body was moved after death,
23 didn't that suggest to you that what William
24 Ballard ultimately testified to in the second trial

342

1 might be correct?
2    A.   No, because I had the other information
3 from Curtis himself that said her arms were already
4 raised.
5    Q.   And the information you are talking about
6 is the information we looked at in that report
7 from -- the couple of reports from Baird and
8 VanderMaiden, correct?
9    A.   Yes.
10    Q.   We are looking back now at 5860, and
11 I'm -- the question I have for you is about that
12 first e-mail within the forward.  So this is the
13 e-mail from Dr. Denton to you on April 15th of
14 2014.  Do you see that e-mail?
15    A.   Yes.
16    Q.   In the last paragraph of that e-mail,
17 Dr. Denton says, "I can write my opinions up."  Do
18 you see that?
19    A.   Yes.
20    Q.   After he sent you this e-mail on April
21 15th of 2014, when is -- well, let me start that
22 question again.
23        After Dr. Denton sent you this e-mail on
24 April 15th, did you ask Dr. Denton to write his

343

1 opinions up?
2    A.   I believe the next time came from
3 Mr. Parkinson after questions during -- prior to
4 the first trial.
5    Q.   Did you discuss with Jim Keller after you
6 forwarded this e-mail chain to him whether or not
7 either one or both of you should ask Dr. Denton to
8 write his opinions up?
9    A.   I don't recall any conversation about
10 that, no.
11    Q.   The first paragraph of this e-mail, the
12 same e-mail from Dr. Denton to you on April 15th of
13 2014, do you see that second line where it says, "I
14 can see what the coroner sent me and add it to it"?
15    A.   Uh-huh.
16    Q.   Do you know what he is referencing as far
17 as what the coroner sent him?
18    A.   I believe that would have been the photos
19 and possibly the case reports.
20    Q.   Okay.  Were you -- did you have any
21 reaction to receiving this e-mail from Dr. Denton
22 on April 15th?
23    A.   I don't know what my reaction was.
24    Q.   Well, were you -- did you feel that this

344

1 e-mail was going to be an impediment to you using
2 Dr. Denton in this investigation?
3    A.   Again, I don't know what I felt.  This
4 obviously was in response to asking about the other
5 people to review.
6    Q.   I know that you looked at -- were asked
7 questions about this first paragraph of this e-mail
8 extensively in your prior trial testimony in this
9 case.  As you sit here today, do you believe that
10 what Dr. Denton wrote in this first paragraph of
11 this e-mail on April 15th of 2014 was an impediment
12 to convicting Curtis Lovelace in this case?
13    MR. HANSEN:  Object to form.
14    THE WITNESS:  I guess I don't understand
15 your question.
16 BY MS. THOMPSON:
17    Q.   Sure.  Well, do you believe that the
18 information in that first paragraph was harmful to
19 an effort to convict Curt of killing Cory?
20    MR. HANSEN:  Same objection; form.
21    THE WITNESS:  I'm not even sure how to
22 answer that.  I don't know -- I don't understand
23 what your question is.
24 BY MS. THOMPSON:

Transcript of Adam Gibson
Conducted on July 17, 2018

345

1    Q.   Well, let me ask you this.  You said that
2 you showed the e-mail that's on 5861 and 5862, that
3 March 5th e-mail, to Ed Parkinson, right?
4    A.   Yes.
5    Q.   Why did you show that e-mail to Ed
6 Parkinson?
7    A.   It was during a discussion that
8 Mr. Parkinson, Mr. Page, and Mr. Elmore were
9 having.  It was in relation to a dispute between
10 the two attorneys involved, that being that
11 Mr. Page said that he had indicated that he had
12 interviewed Dr. Denton and that Dr. Denton had told
13 him opposite information of what was given to us,
14 and after that hearing there was discussion about
15 whether or not Dr. Denton was going to be used --
16 or be allowed to be used as at trial or any
17 reference to him was going to be allowed to be used
18 at trial.
19    So in response to them saying that
20 Dr. Denton changed his opinion or gave
21 contradictory opinion and said that he had never
22 told us some of the information, I showed that to
23 Mr. Parkinson basically to reiterate the fact that
24 on March 5th, which was very early on in the

346

1 investigation, Dr. Denton had opined in that
2 paragraph that he believed that Cory was the victim
3 of poisoning.
4    Q.   In the last sentence of this e-mail that
5 we have been discussing that's on 5861 and 5862,
6 Dr. Denton also said to you, "I submit to you that
7 we are both stuck right now in this currently
8 suspicious death."  Do you see that?
9    A.   I do.
10    Q.   Did you -- when you read this e-mail for
11 the first time, did you believe that him indicating
12 to you that you were stuck in this currently
13 suspicious death was a roadblock in the case?
14    A.   It obviously was a roadblock, yes.
15    Q.   Because this e-mail, 5861, would not
16 assist you in moving this investigation forward,
17 correct?
18    MS. EMERY:  I object to the form.
19    THE WITNESS:  It actually does assist us
20 and ultimately did assist us because in that same
21 e-mail chain is when he referred us to Mary Case,
22 Jane Turner, Mike Graham, or Lindsay Thomas of
23 Minneapolis.
24 BY MS. THOMPSON:

347

1    Q.   I'm referencing only the March 5th, 2014,
2 e-mail that's on 5861 to 5862.  Did that particular
3 e-mail give you confidence that you were going to
4 be able to proceed with charging Curtis Lovelace in
5 this case?
6    MS. EMERY:  Objection to the form.
7 That's assuming he's going to charge him.
8    THE WITNESS:  Again, at that point there
9 had been no decision.  The decision to charge is
10 ultimately up to the prosecutor, not to the police
11 officers.  Obviously with Dr. Denton at that point
12 not issuing a written opinion, it was obviously a
13 roadblock.
14 BY MS. THOMPSON:
15    Q.   At the time that you received this e-mail
16 on March 5th of 2014, did you believe that Curtis
17 Lovelace should be charged in this case?
18    A.   That decision is ultimately up to the
19 prosecutor.  Alls I can do is present the evidence
20 that the investigation has unturned.
21    Q.   Well, when you present a case to a
22 prosecutor, do you ever present that evidence in
23 order to give the opinion to the prosecutor that
24 someone should not be charged?

348

1    A.   Yeah, there is cases that you present
2 that people should not be charged.
3    Q.   All right.  And the presentation you were
4 making in this case was not based on everything I
5 have reviewed don't charge Curt, right?
6    A.   It's not a suggestion don't charge a
7 person.  It's a suggestion of here is the evidence,
8 make your decision.
9    Q.   Have you ever presented a case to a
10 prosecutor by telling the prosecutor what you've
11 learned and telling him that it's your opinion that
12 the case should not be charged?
13    A.   I have.
14    Q.   And in this case did you ever give the
15 opinion to anyone that Curt should not be charged?
16    A.   I did not.
17    Q.   Did you ever give the opinion to anyone
18 that Curt should be charged?
19    A.   That decision was made by Ed Parkinson.
20    Q.   My question for you is:  Did you ever
21 give the opinion to anyone that Curt Lovelace
22 should be charged?
23    A.   No.
24    Q.   Did anyone ever ask you your opinion

Transcript of Adam Gibson
Conducted on July 17, 2018

88 (349 to 352)

349

1 about whether or not Curt Lovelace should be
2 charged?
3 **A.   I don't remember specifically any**
4 **conversation where anyone asked me if he should be**
5 **charged or whether he should not be charged.**
6     Q.   Did you ever have any conversations with
7 Jon Barnard where you discussed -- well, let me ask
8 you this.
9         Is it your testimony, as you sit here
10 today, that -- I want to ask that question in a
11 different way.
12         During the course of this entire
13 investigation from when you opened this file in the
14 records system to when the jury returned a verdict
15 in the second trial, did you ever have any
16 conversations with anyone about whether or not this
17 prosecution was going to result in a guilty verdict
18 against Curt?
19 **A.   Well, sure, you have those conversations**
20 **all the time.**
21     Q.   Did you have any of those conversations
22 with Ed Parkinson?
23 **A.   I'm sure I did.**
24     Q.   Did you have conversations with your

350

1 colleagues in the police department about that
2 question?
3 **A.   I probably did.**
4     Q.   All right.  And in those conversations,
5 did you ever express your opinion to anyone that
6 you believed that Curt Lovelace should be
7 convicted?
8 **A.   If I didn't believe that he should be**
9 **convicted, I wouldn't have pursued the case.**
10     Q.   And my question is:  Did you convey the
11 opinion to anyone that he should be convicted
12 during that time period?
13 **A.   I don't remember a specific conversation**
14 **that I would have said that, no.**
15     Q.   Okay.  And you said if you didn't believe
16 that he should have been convicted that you
17 wouldn't have pursued the case; is that right?
18 **A.   Yes.**
19     Q.   At what point in your reinvestigation of
20 the Cory Lovelace -- of Cory Lovelace's death did
21 you choose to pursue the investigation because you
22 believed that he should be convicted?
23     MR. HANSEN:  I'll object to the form.
24     THE WITNESS:  So specifically what are

351

1 you asking me?
2 BY MS. THOMPSON:
3     Q.   When you opened the file, when you
4 actually went into the record system and opened the
5 investigative files, were you looking at those
6 files because you believed that Curtis Lovelace
7 should be convicted for killing Cory Lovelace?
8 **A.   No.**
9     Q.   And after you had reviewed the documents
10 in this case as you testified to, at that point
11 were you looking -- were you seeking from Chief
12 Copley to look into this case further because you
13 believed that Curt should be convicted?
14 **A.   No.**
15     Q.   And when you conferred with Scott Denton
16 about this case, were you conferring with him
17 because you believed that he would give an opinion
18 that would assist you -- that would result in Curt
19 Lovelace being convicted?
20 **A.   My speaking with Dr. Denton was merely to**
21 **get a determination as to the cause of death.  If**
22 **Dr. Denton had said that she died of natural causes**
23 **or that he could not determine what caused her**
24 **death, the investigation would have stopped at that**

352

1 **point.  He didn't do that.  He said that he**
2 **believed that she was a victim of ethylene glycol**
3 **poisoning with a coup de grace suffocation and**
4 **referred me to Dr. Bowman.  I referred -- I went to**
5 **Dr. Bowman.  Dr. Bowman also told me that she**
6 **believed that Cory Lovelace was a victim of**
7 **suffocation.**
8     Q.   Did -- after you spoke with Dr. Denton
9 and he told you that he believed that Cory Lovelace
10 had been suffocated and poisoned as you just
11 described, at that point did you believe that
12 Curtis Lovelace should be convicted for killing
13 Cory Lovelace?
14     MS. EMERY:  I object to the form.
15     MR. HANSEN:  I'll join.
16     THE WITNESS:  I believed that the
17 investigation needed to continue from that point.
18 BY MS. THOMPSON:
19     Q.   Well, you said that you wouldn't have
20 pursued this investigation if you didn't believe
21 that Curtis Lovelace should be convicted.  Do you
22 remember that testimony?
23     MS. EMERY:  I don't believe that's what
24 he said.

Transcript of Adam Gibson
Conducted on July 17, 2018

353

1    MS. THOMPSON:  Can we read back his
2  answer to that question.
3    MS. EMERY:  I believe that's how you
4  interpreted it.
5    (Record read.)
6  BY MS. THOMPSON:
7    Q.  At what point in your investigation were you pursuing
8  the case because you believed that Curtis Lovelace
9  should be convicted?
10  should be convicted?
11    **A.  After getting the opinions from all the**
12  **doctors that were involved.**
13    Q.  And is that for you after you got those
14  later opinions from Dr. Spitz and Dr. Baden?
15    **A.  No.**
16    Q.  So when you say all the doctors involved,
17  which doctors do you include in that answer?
18    **A.  Basically all the doctors with the**
19  **exception of Dr. Spitz and Dr. Baden because they**
20  **came along after the inception of the criminal**
21  **case.**
22    Q.  So you are talking about Dr. Turner --
23    **A.  Dr. Bowman.**
24    Q.  Dr. Bowman.

354

1    **A.  Dr. Denton, Dr. Teas.**
2    Q.  All right.  And when you say getting --
3  when you are talking about getting an opinion from
4  Dr. Denton, are you talking about the oral
5  conversation that you had with him on February 7th
6  of 2014?
7    **A.  Yes, ma'am.**
8    Q.  If in your conversation -- well, let me
9  ask you this question.
10    You have testified about how your
11  conversations with Dr. Bowman in this case
12  proceeded.  If Dr. Bowman told you that she
13  believed this case should be undetermined and
14  that -- and didn't tell you the things that you've
15  testified about that, you know, she thought this
16  was a suffocation, but she didn't want to testify,
17  and the things that you said about that
18  conversation, do you agree that then her opinions
19  in this case would not have assisted you in
20  pursuing your investigation?
21    MS. EMERY:  I object to the form.
22    MR. HANSEN:  So do I.
23    MS. EMERY:  It's compound and confusing.
24    THE WITNESS:  It is confusing.

355

1  BY MS. THOMPSON:
2    Q.  I am going to ask you to assume a
3  hypothetical in which in your conversations with
4  Dr. Bowman rather than telling you that she, you
5  know, thought that this was a homicide, but she
6  didn't want to -- she wasn't given information by
7  Detective Baird that would assist her in making
8  that conclusion, that instead of you telling her
9  that, she told you that she believed still that
10  this should be an undetermined death.  I'm going to
11  ask you to assume a hypothetical in which that is
12  true.  Okay?
13    **A.  Okay.**
14    Q.  If in your conversations with Dr. Bowman
15  that hypothetical were true, do you agree that what
16  she told you would not have assisted you in
17  pursuing a case against Curtis Lovelace?
18    **A.  So if she told me that the case -- or**
19  **that the autopsy should be left undetermined, my**
20  **assumption is that the information she provided**
21  **would not be beneficial; is that your question?**
22    Q.  Yes.
23    **A.  Then no, I mean, it wouldn't have been**
24  **beneficial, and it also wouldn't have lent credence**

356

1  to continuing the investigation.
2    Q.  I have one more question about that
3  e-mail chain we have been looking at.  So I'm going
4  to have you look at 5863.  In that e-mail -- the
5  e-mail that I'm referencing is an e-mail that you
6  wrote to Dr. Denton on February 18th of 2014 at
7  12:43 p.m.  Are we looking at the same e-mail?
8    **A.  Yes.**
9    Q.  So it starts on 5862 and goes to 5863.
10    **A.  Yes.**
11    Q.  In the portion of the e-mail that's on
12  5863, you told Dr. Denton in that e-mail that you
13  wanted him to give you an official opinion so this
14  case can proceed; is that right?
15    **A.  Yes.**
16    Q.  And in -- and as you said, although he
17  wasn't willing to give you an official opinion at
18  this time, he referred you to other pathologists
19  that ultimately led to someone giving an official
20  opinion, right?
21    **A.  Yes.**
22    Q.  And that person was Dr. Turner?
23    **A.  Yes.**
24    Q.  Did you ever meet with Dr. Turner about

Transcript of Adam Gibson
Conducted on July 17, 2018

357

1 this case where anyone was in the meeting besides
2 you?
3     **A.   I think that I had met with her with Ed.**
4     Q.   And did you meet with her with Ed before
5 the Grand Jury in this case?
6        MS. EMERY:  You mean before the Grand
7 Jury was convened?
8 BY MS. THOMPSON:
9     Q.   Let me ask that question in a better way.
10 Did you meet with Dr. Turner with Ed Parkinson
11 before or after she issued her written report in
12 this case?
13     **A.   I don't recall a specific time and**
14 **whether it was before or after.**
15     Q.   Did you provide -- well, let me ask you
16 this.
17        How did you convey to Dr. Turner what it
18 is that witnesses were saying about what happened
19 at the -- what they observed at the scene of Cory
20 Lovelace's death.
21     **A.   I provided her copies of the police**
22 **reports.**
23     Q.   Did you give her oral information about
24 those exchanges in addition to giving her copies of

358

1 the reports?
2     **A.   Not that I recall, no.**
3     Q.   And did she confer with you about what
4 her opinion was going to say before she wrote
5 that -- she wrote her formal report?
6     **A.   Yes.**
7     Q.   Did she give you an opportunity to
8 correct any of the, you know, factual bases of her
9 opinions that might not be right?
10     **A.   No.  She actually called.  I think we had**
11 **a conference call.  It was myself.  I believe**
12 **Lieutenant Dreyer and Sergeant Summers were a party**
13 **to that call.**
14     Q.   And on that call she gave you her
15 opinions?
16     **A.   Yes.**
17     Q.   All right.  And did she tell you in that
18 call what sort of the factual assumptions she was
19 making about this case were in reaching her
20 opinions?
21     **A.   Just what was in her written opinion.**
22     Q.   Okay.  Did you have an opportunity after
23 her written opinion to tell her that she got any --
24 she got any facts wrong, if that's something you

359

1 had wanted to do?
2     **A.   Did I have an opportunity?**
3     Q.   Yes.
4     **A.   Yeah, I could have called her, talked to**
5 **her at court.**
6     Q.   All right.  I'm going to have you look at
7 5886 now.  And I've got a couple more e-mails to
8 look at with you here, and I think we are done,
9 Detective.  Let's look at 5886.
10     **A.   5886?**
11     Q.   Yes, sir.
12     **A.   Yes.  Thank you.**
13     Q.   This is an e-mail from you to Coroner
14 Keller on January 7th of 2014; is that right?
15     **A.   Yes.**
16     Q.   And that e-mail vinsision@comcast.net
17 (phonetic), that's Dr. Denton's e-mail, right?
18     **A.   I do not know that from my own**
19 **independent knowledge right at the time.**
20     Q.   Okay.  Do you know why you would have
21 been cc'ing someone on an e-mail you sent to Jim
22 about the photos?
23     **A.   I don't know.  I'll take you at your word**
24 **that that's Dr. Denton.**

360

1     Q.   Do you know -- taking me at my word that
2 that's Dr. Denton's e-mail, do you know why you
3 would have been cc'ing him on this e-mail to Jim
4 Keller on January 7th of 2014?
5     **A.   I don't.  That had to be after -- it**
6 **looks like it was all part of the Lovelace scene**
7 **photos from Coroner Keller.**
8     Q.   I'm going to send you -- we are going to
9 jump ahead to 5890.  This is an e-mail that you
10 sent to Jim Keller on January 7th of 2014, correct?
11     **A.   Yes.**
12     Q.   And this references your belief that some
13 of what you are seeing in the photos is not a
14 matter of decomposition; is that right?
15     **A.   Yes.**
16     Q.   And one of the things you were
17 referencing in saying that this wasn't a matter of
18 decomposition was something that you saw that you
19 thought was a bruise inside the right eye, correct?
20     **A.   Well, the first part is about blood under**
21 **the lips.**
22     Q.   Okay.  So the things that you are
23 referencing in this e-mail were not a matter of
24 decomposition are the blood under the lip and the

Transcript of Adam Gibson
Conducted on July 17, 2018

361

1  bruise inside the right eye, is that correct?
2      **A.  That's not correct.**
3      Q.  Okay.  So the only thing you are talking
4  about is the blood under the lip?
5      **A.  It appears -- it appears that's correct.**
6  **This says you can also see the bruise inside the**
7  **right eye on scene.**
8      Q.  Did anyone ever explain to you that the
9  bruise inside the right eye was actually this
10  phenomenon called tache noir?
11          MS. EMERY:  Objection to the form of the
12  question.
13          THE WITNESS:  Yes, later.
14  BY MS. THOMPSON:
15      Q.  Okay.  When did you learn that that's
16  what that meant?
17      **A.  I don't know which one of the doctors is**
18  **the one that ultimately told me about it, but**
19  **Dr. Baden talked a lot about it and so did**
20  **Dr. Spitz.**
21      Q.  As of January 7th of 2014, you'd had an
22  opportunity to review all of the initial interviews
23  from the kids that were interviewed about what they
24  saw the morning that their mom's body was found,

362

1  right?
2      **A.  Right.**
3      Q.  And at least as of the writing of this
4  e-mail on January 7th, you were crediting those
5  accounts, correct?
6      **A.  I was what?**
7      Q.  You were -- were you assuming on January
8  7th when you wrote this e-mail that the kids'
9  accounts about seeing their mom that morning were
10  true?
11      **A.  Can you ask me your question again?**
12      Q.  Sure.
13      **A.  I don't really see that.**
14      Q.  At the time that you wrote this e-mail,
15  5890, were you assuming that what the kids had said
16  about seeing their mom that morning was true?
17      **A.  It looks like it, yes.**
18      Q.  And, in fact, as you said in this e-mail,
19  your initial opinion based on what you had learned
20  about the case as of the writing of this e-mail was
21  that she was killed that morning, correct?
22      **A.  Yes.**
23      Q.  Did you ever discuss the theory that she
24  was killed that morning with anybody in this case?

363

1      **A.  Obviously Coroner Keller.**
2      Q.  Anyone else?
3      **A.  I don't remember any specific**
4  **conversations, no.**
5      Q.  I'm going to refer you to Plaintiff 5964.
6  Do you have that in front of you?
7      **A.  Yes.**
8      Q.  This e-mail that's from Dr. Denton to you
9  and Coroner Keller includes an e-mail that looks
10  like it was sent from Coroner Keller to Dr. Denton
11  earlier that day.  Do you see that?
12      **A.  Yes.**
13      Q.  Okay.  And were you -- were you cc'd on
14  the e-mail, the original e-mail, that went from Jim
15  Keller to Dr. Denton on January 7th of 2014 at
16  12:14 p.m.?
17      **A.  Am I cc'd on this particular e-mail?**
18      Q.  Yeah.  I mean, I don't know that you can
19  tell from this chain, but I'm asking you if you
20  remember being on the original e-mail that Jim sent
21  to Dr. Denton?
22      **A.  I don't remember it individually, no.**
23      Q.  In that e-mail to Dr. Denton, Jim says,
24  "To me looking at the photos that show the eyes in

364

1  the position and the hands concern me and have for
2  some time."  Do you see that?
3      **A.  Yes.**
4      Q.  Prior to this e-mail being sent to
5  Dr. Denton, had Coroner Keller told you that the
6  position of the hands had concerned him for some
7  time?
8      **A.  Yes.**
9      Q.  Is that something he discussed in your
10  first meeting with you?
11      **A.  Yes.**
12      Q.  I want to skip ahead to 5989.  This
13  e-mail on 5989 includes an e-mail that Dr. Denton
14  sent you and Coroner Keller on January 30th of 2014
15  at 11:01 a.m.  Do you see that?
16      **A.  Yes.**
17      Q.  And in that e-mail he told you he wanted
18  to sit down and talk about the case, right?
19      **A.  Yes.**
20      Q.  Okay.  And one of the things he said in
21  the e-mail was that he wanted to show you what he
22  was seeing with respect to severe alcoholism in her
23  liver microscopic slide.  Do you see that?
24      **A.  Yes.**

Transcript of Adam Gibson
Conducted on July 17, 2018

365

1    Q.   When you met with -- when you met with
2  Dr. Denton in Bloomington, did he talk with you
3  about the severe alcoholism in her liver
4  microscopic slide?
5    **A.   He did talk about the fatty liver, but he**
6  **did not describe it as severe in our conversation,**
7  **though.**
8    Q.   Did you -- did he ever convey to you at
9  any point an opinion that there was severe
10 alcoholism in her liver microscopic slide other
11 than in this e-mail from January 30th?
12   **A.   Not that I recall, no.**
13   Q.   All right.  And did you ever provide this
14 e-mail to anyone in the case?
15   **A.   No.**
16   Q.   In general, in your record keeping
17 practice for this case, I think we have talked
18 about what happens with police reports and we've
19 talked about what happened with photos in the case,
20 and I think you said -- I don't want to misstate
21 you about this.  If there were interviews that you
22 were conducting where you used notes -- where you
23 took notes during the interview and then you used
24 those notes to dictate a report, what did you do

366

1  with your notes?
2    **A.   The notes were included with the case**
3  **file.**
4    Q.   Okay.  And are your notes about this case
5  still in the physical file at the Quincy Police
6  Department?
7    **A.   I would assume they are.**
8    Q.   Okay.  Do you -- has anyone ever told you
9  that they destroyed your notes?
10   **A.   No.**
11   Q.   What about e-mails that you received
12 related to the case, did you have a record keeping
13 practice for those e-mails?
14   **A.   No.**
15   Q.   Did you ever in the course of your
16 investigation print out e-mails you thought were
17 particularly relevant to include in the physical
18 case file?
19   **A.   There were some e-mails that I printed**
20 **out and put with the case file, yes.**
21   Q.   Okay.  Was one that e-mail we have been
22 discussing that you said you showed to Ed Parkinson
23 related to Dr. Denton's opinions?
24   **A.   That was not in the case file.  I gave**

367

1  that to Ed and he handed it back to me.
2    Q.   All right.  Other than just reviewing
3  your case file to see what's in there, would
4  someone have a way of knowing what e-mails you
5  printed out and put in the case file in this case?
6    **A.   Other than what's in the case file.**
7    Q.   Did you make -- and, for instance, did
8  you make notes and reports, for instance, you know,
9  received e-mails, printed and put in file?  Did you
10 create any reports like that in this case?
11   **A.   It would have been indicated in the**
12 **reports if there was an e-mail that I attached to**
13 **it.**
14   Q.   Okay.  At the time that you were
15 investigating this case, did the Quincy Police
16 Department have a policy of how detectives were to
17 store correspondence related to investigations?
18   **A.   As far as everything, no, but any of your**
19 **handwritten notes go with your case file in any**
20 **homicide investigation.**
21   Q.   Did anyone ever tell you that the
22 practice that you've just described that you used
23 in this case with respect to e-mails was
24 inconsistent with the policies and practices of the

368

1  Quincy Police Department?
2    **A.   No one has told me that, no.**
3    Q.   From your experience in the police
4  department, were other detectives following the
5  similar practice that you've described of, you
6  know, using e-mail for cases, but not necessarily
7  printing it out and putting it in the case file?
8    **A.   I don't know what the other detectives**
9  **are doing.**
10   Q.   In any of the training you had about
11 record keeping or any other aspect of your work as
12 a detective, did anyone ever train you on the topic
13 of what needed to go in your physical case file?
14   **A.   No.**
15   Q.   Since the concept of e-mails came up in
16 this investigation, have you discussed with anyone
17 in the police department the issue of the e-mails
18 in this case that -- where there is some dispute
19 about whether they were ever disclosed?
20   **A.   Can you ask me that again?**
21   Q.   Sure.  I mean, in this case in the second
22 trial there was an issue raised about whether or
23 not certain e-mails in this case were disclosed to
24 the prosecution, right?

Transcript of Adam Gibson
Conducted on July 17, 2018

369

1    A.  Yes.
2    Q.  And I mean, you understand from what's
3 happened so far that there may be a disagreement
4 between you and Ed Parkinson about what was shown
5 to him, correct?
6    A.  I do.
7    Q.  After that disagreement arose, did you
8 ever talk with anyone in the police department
9 about the policy of the provision of e-mails to the
10 prosecutors in cases that you are working on as a
11 detective?
12    A.  I don't recall a specific conversation
13 whether we had it or whether we didn't.
14    Q.  As you sit here today, do you believe
15 that such a conversation ever occurred in the wake
16 of this disagreement between you and Mr. Parkinson
17 about these e-mails?
18    A.  My last answer still remains the same.  I
19 don't know whether the conversation did or did not
20 happen.
21    Q.  Is there anything that would refresh your
22 memory about whether such a conversation occurred?
23    A.  No, ma'am.
24        MS. THOMPSON:  Let's just take a quick

370

1 break, but I think -- I think I'm done, but I just
2 want to make sure.
3        THE VIDEOGRAPHER:  We are going off the
4 record.  The time is 17:00.
5        (Whereupon a short recess was taken.)
6        THE VIDEOGRAPHER:  Here begins media
7 number 5.  We are back on the record.  The time is
8 17:05.
9 BY MS. THOMPSON:
10    Q.  Detective Gibson, I just have two quick
11 questions and then I'm done.
12        Did you ask Curtis Lovelace in this case
13 if he would take a polygraph exam?
14    A.  Yes.
15    Q.  And I think I asked you earlier about
16 some of those logs whether or not anyone had -- the
17 issue of a polygraph had come up in this case.  Did
18 it come up for anyone besides Curt?
19    A.  No.  The information that was on that log
20 was on a totally unrelated case.
21    Q.  Is there a reason why a polygraph was
22 never conducted for Lovelace in this case?
23    A.  No.  That was in consultation with
24 Mr. Parkinson.

371

1    Q.  Okay.  You were asked some questions
2 about your preserving of e-mails.  The e-mails that
3 we've looked at in this case that were produced
4 were produced from the Quincy Police Department
5 server; is that your understanding?
6    A.  Yes.
7    Q.  Because, in fact, you had a practice of
8 deleting your e-mails; is that right?
9    A.  Yes, we all delete our e-mails.
10    Q.  Okay.  And did anyone ever tell you that
11 your practice of deleting your e-mails was
12 inconsistent with the policies and practices of the
13 Quincy Police Department?
14    A.  No.  You have to delete your e-mails.
15 You only get a certain amount of storage space in
16 your mailbox and then it tells you that you have to
17 free up space.  The e-mails, when they are deleted,
18 they are saved to the server, so you can't get into
19 the server -- well, I'm assuming somebody maybe
20 can, but I don't know.  You can't get into the
21 server and delete them off the server, so I delete
22 them from my account and they are to the server of
23 the City.
24    Q.  And everything you have just described,

372

1 your practice for freeing up your inbox so you can
2 continue to use e-mail, you believe that's
3 consistent with the policies and practices of the
4 Quincy Police Department as you understand them?
5    A.  Yes, ma'am.
6    Q.  The last question I have is this:  I
7 asked you a question about whether or not you had
8 an opportunity to, if you wanted to, to let
9 Dr. Turner know that any of the facts she was
10 relying on were wrong, and I have the same question
11 for you for Dr. Denton.  After Dr. Denton conveyed
12 to you his opinions in this case, did you have an
13 opportunity to correct with him any facts that he
14 was relying on that might have been incorrect?
15    A.  Yeah, I had an opportunity, but there
16 were no facts that were incorrect.
17        MS. THOMPSON:  I don't have any other
18 questions.  Thank you.
19        THE WITNESS:  Thank you.
20        MR. HANSEN:  Detective, I only have a few
21 short follow-ups and hopefully we won't be too
22 long.  As I introduced myself, I represent the
23 county.  My name is Jim Hansen.  I just have some
24 questions about, starting out, your involvement

Transcript of Adam Gibson
Conducted on July 17, 2018

373

1  with anything to do with Gary Farha.
2       EXAMINATION BY
3       MR. HANSEN:
4       Q.   Would you agree with me that Gary Farha
5  did not participate in any of your interviews with
6  any of the witnesses?
7       A.   That is correct.
8       Q.   Would you agree we me that Gary Farha did
9  not present anything to the Grand Jury?
10      A.   That's correct.
11      Q.   And the Grand Jury presentment and each
12 of Mr. Lovelace's murder trials were done by Ed
13 Parkinson and/or any of the assistants in his
14 office?
15      A.   That's correct.
16      Q.   Okay.  And other than -- well, would you
17 agree with me that the evidence you presented based
18 on your investigation was presented to the
19 prosecutor Ed Parkinson to determine whether or not
20 to go to the Grand Jury?
21      A.   That's correct.
22      Q.   And that was not presented at any point
23 in time to Gary Farha to review?
24      A.   No.

374

1       Q.   Okay.  And we looked at Exhibit Number
2  16, which is your subpoena.  I'm just handing you
3  the copy I had -- excuse me, it's a group exhibit
4  of all your phone records.
5       A.   Yes.
6       Q.   I looked through that.  That's a hundred
7  pages of records, okay.  And there are a grand
8  total of three times where Mr. Farha's cell phone
9  number appears on those records.  They are on page
10 11051, which is August 9 of 2013, and I'll let you
11 get to that page.  11051 down on line 110.
12      A.   Yes.
13      Q.   And would you agree with me that August 9
14 of 2013 was four months prior to you ever going
15 into the City record system to determine whether or
16 not you were going to look at anything related to
17 the Cory Lovelace murder?
18      A.   Yes.
19      Q.   The next entry is on page 11059, and it's
20 on line 29 of September 17 of 2013 for one minute.
21 Would you agree with me that on September 7 of 2013
22 you had not even instituted anything related to the
23 Cory Lovelace murder investigation?
24      A.   Just to quickly correct, you said

375

1  September 7.  The date is September 17th.
2       Q.   Correct, I'm sorry.  I didn't see the 1
3  in my note.  Would you agree with me at that point
4  in time you had done nothing to review or do
5  anything with regard to the Cory Lovelace murder
6  investigation?
7       A.   No.
8       Q.   You would agree with me?
9       A.   I would agree with you I had not done
10 anything.
11      Q.   Would you agree with me at this point in
12 time Gary Farha was an Assistant State's Attorney?
13      A.   Yes.
14      Q.   And as a Quincy Police Department
15 officer, did you have cases in which you worked
16 with Gary Farha on various things?
17      A.   Yes, regularly.
18      Q.   Okay.  And the next item is on line --
19 excuse me, page 11068, line 42 dated November 19 of
20 2013.  Again, that date would have been before you
21 did anything relative to reopening an investigation
22 into the Cory Lovelace murder, correct?
23      A.   That's correct.
24      Q.   Okay.  And you indicated on questions

376

1  earlier today that your first time you would have
2  looked at that was -- anything related to the Cory
3  Lovelace murder investigation would have been late
4  2013 and the investigation was reopened, I believe
5  it's January 2 or 3 of 2014, correct?
6       A.   Correct.
7       Q.   And to the best of your recollection, the
8  death investigation summary that you forwarded to
9  not only Gary Farha, but Jon Barnard was simply to
10 confirm what they had told you about an incident
11 that occurred with Mr. Lovelace in 2012 after he
12 did not get an interview for a public defender job;
13 is that correct?
14      A.   That's correct.
15      Q.   Okay.  And other than that
16 conversation -- or excuse me, other than forwarding
17 that to Gary, you said he may have called you back
18 and confirmed, yes, that's how I recollect things?
19      A.   Yes.
20      Q.   Okay.  Other than that, did Gary Farha
21 have anything to do with the investigation you
22 conducted into the death of Cory Lovelace that
23 ended up in Curt Lovelace being charged and going
24 through two murder trials?

Transcript of Adam Gibson
Conducted on July 17, 2018

377

1      A.   Nothing.
2           MR. HANSEN:  That's all I have.  Thanks.
3           MS. THOMPSON:  I have one follow-up
4    question based on that.
5           MS. EMERY:  Go ahead.
6           FURTHER EXAMINATION
7           BY MS. THOMPSON:
8      Q.   Counsel just went through your phone
9    records as to your calls with Gary Farha.  And do
10   you agree based on what counsel represented to you
11   and what I showed you of those records that the
12   last call that those records reflect you having
13   with Gary Farha is on April 8th of 2014?  If you
14   need to look at them again, you can.
15     A.   I would have to look.
16          MR. HANSEN:  Can you identify it for me?
17          MS. THOMPSON:  Yeah.  It's -- can you
18   pull the exhibit again.
19          MR. HANSEN:  It's in the pile over there.
20   He was looking at mine.
21          MS. EMERY:  Oh, no, I've got them.  They
22   are confidential.  Which date have you got, Tara?
23          MS. THOMPSON:  It's in his personal
24   records, so those would be the first set, April 8th

378

1    of 2014.  It's at 12:41 p.m.
2           MS. EMERY:  Ending in 80?
3           MS. THOMPSON:  Well, that's, I guess, a
4    question for the witness.  Do you want to show that
5    to the witness.
6           MS. EMERY:  Page 11081?
7           MR. HANSEN:  Yeah, uh-huh.
8           MS. EMERY:  Okay.
9           BY MS. THOMPSON:
10     Q.   So you've been shown your phone records
11   exhibit again, which is Exhibit 16.  And do you see
12   that on April 8th of 2014 there is a call from Gary
13   Farha's cell to your cell at 12:41 p.m.?
14          MS. EMERY:  Line number?
15          MS. THOMPSON:  I'm not looking at it, but
16   it's 12:41 p.m.
17          THE WITNESS:  Yeah, 102.
18          MS. EMERY:  You got it?
19          THE WITNESS:  Yes.
20   BY MS. THOMPSON:
21     Q.   And do you agree that that's a
22   four-minute call from Gary to you?
23     A.   Yes.
24     Q.   All right.  And counsel just represented

379

1    to you that other than that and the two other
2    instances he showed you that Gary's number doesn't
3    show up in any of your phone records thereafter,
4    and I take it you accept that representation?
5      A.   I don't think that he represented that.
6      Q.   Well, if I represent to you that Gary's
7    number doesn't show up in your records after April
8    8th, do you know how it is that -- well, I'm
9    actually going to -- let me withdraw that question.
10          Do you know when it is that Jon Barnard
11   confirmed for you that what was in the summary of
12   the case that you prepared -- that what was in
13   there as to him was correct?
14     A.   I could not give you a timeframe as to
15   that.
16     Q.   Okay.  And did you discuss that document,
17   the death investigation summary that we have just
18   been talking about, did you discuss that
19   investigation summary with Gary Farha?
20     A.   Other than what's already been testified
21   to, no.
22     Q.   Okay.  And if there aren't calls to your
23   phone with Gary Farha after April 8th of 2014,
24   would you assume from that that you discussed it

380

1    with Gary Farha in person?
2      A.   That would be my assumption, yes.
3      Q.   Okay.  And would that indicate to you
4    that there are conversations that you had with Gary
5    Farha about this case that your phone records don't
6    reflect?
7           MR. HANSEN:  Object to form.
8           THE WITNESS:  I did have conversations
9    with Gary, but Gary was not involved in the
10   prosecution of the case.
11   BY MS. THOMPSON:
12     Q.   Did you have conversations throughout
13   this investigation with Gary Farha about the
14   investigation itself?
15     A.   Yes.
16     Q.   And how many such conversations did you
17   have over the course of the investigation?
18     A.   I don't know.  For some of it I believe
19   he was actually in the hospital.
20     Q.   Did you have conversations with Gary
21   Farha about this investigation after Ed Parkinson
22   formally became the prosecutor in the case?
23     A.   I don't believe so, no.
24          MS. THOMPSON:  Those are all the

Transcript of Adam Gibson
Conducted on July 17, 2018

381

1  questions I have.
2          EXAMINATION BY
3      MS. EMERY:
4      Q.  Detective Gibson, was it your decision to
5  issue an indictment against Curtis Lovelace?
6      **A.  No.**
7      Q.  Whose decision was it?
8      **A.  That was the decision of Ed Parkinson to**
9  **take it to the Grand Jury.**
10     Q.  And was it your decision to go forward to
11 the arrest stage after it went in front of the
12 Grand Jury?
13     **A.  The decision to arrest was based on the**
14 **indictment that was issued by the Grand Jury.**
15     Q.  At the time of Curtis Lovelace's arrest,
16 did you believe a crime had been committed?
17     **A.  I did.**
18     Q.  Was that crime a felony?
19     **A.  It was.**
20     Q.  What crime did you believe had been
21 committed?
22     **A.  Murder.**
23     Q.  At the time of Curtis Lovelace's arrest,
24 did you believe that Curtis had committed that

382

1  crime?
2      **A.  I did.**
3      Q.  During the time of the prosecution
4  pursuant to the indictment that was issued by the
5  Grand Jury, the arrest, did you continue to believe
6  that a crime had been committed?
7      **A.  Yes.**
8      Q.  Did you continue to believe that that
9  crime was the felony crime of murder?
10     **A.  Yes.**
11     Q.  And during the entire prosecution of that
12 crime, did you continue to believe that Curtis
13 Lovelace committed that crime?
14     **A.  Yes.**
15         MS. EMERY:  I don't have anything else.
16     We will reserve.
17         THE VIDEOGRAPHER:  This marks the end of
18 the deposition of Detective Adam Gibson.  The time
19 is 17:18.  We are going off the record.
20         MS. THOMPSON:  E-tran.
21         MS. EMERY:  E-tran for me, too, mini
22 script preferably.
23         MR. HANSEN:  E-tran. No exhibits attached.
24             (DEPOSITION CLOSED)

383

1  STATE OF ILLINOIS )
                     )  SS.
2  COUNTY OF ADAMS   )
3
4
            C E R T I F I C A T E
5
6      I, Gina L. Nottingham, Certified Shorthand
7  Reporter in and for the State of Illinois, do hereby
8  certify that ADAMS GIBSON, the witness whose
9  deposition is hereinfore set forth, was duly sworn by
10 me and that such deposition is a true record of the
11 testimony given by the witness.
12     I further certify that the signature of the
13 witness to the deposition was not waived.
14     I further certify that I am not counsel for
15 nor in any way related to any of the parties to this
16 action, nor am I in any way interested in the outcome
17 thereof.
18     In testimony thereof, I have hereunto set my
19 hand this 27th day of July, A.D., 2018.
20
21         _Gina L. Nottingham CSR_
22
23         _____
                Certified Shorthand Reporter
24

## Cory Lovelace Death Investigation Summary

Victim:

Cory D. Lovelace DOB 12-7-67 Ht 5'4 Appx 120 lbs

Suspect:

Curtis T. Lovelace DOB 10-22-68 Ht 6'3 205 Lbs

On 2-14-06 police, fire, and ambulance were called at 0920 to 1869 Kentucky after Jon Barnard called 911 and reported Curtis Lovelace had called him at the State's Attorney's office and told him he had found his wife, Cory, dead in bed.  Curtis had told Jon he didn't know what to do so he called him.  Curtis said he had not called for help or called anyone else and asked Barnard to call the ambulance.  Curtis reported he last saw her alive at 0815 when he helped her to bed.

**Interview of firefighter Cole Miller who was first in the room:**

Miller stated he was the first to check Cory.  She was lying in bed on her back, mouth partially open, eyes open, skin pale, and hands in a rigored position up off of her chest.  He stated he felt for a pulse and found her temperature to be cool almost cold to the touch and found no pulse.

**Interview of Paramedic William Ballard:**

Stated he took over for Miller and found "modeling" on Cory's chest and her sides.  Modeling was described as being similar to lividity in color and occurs after death.  He observed her hands raised, "as if she was holding something at her chest".  He stated the room "smelled".  She was pulse less with no breathing.

**Curtis' first statement to Officer now Deputy Chief Doug Vandermaiden on scene:**

Vandermaiden stated when they arrived Curtis was standing on the front porch talking on the cell phone.  He told them Cory was upstairs but did not show them where or go with them.  Vandermaiden stated after going upstairs he came back down and Curtis was sitting in the kitchen on his laptop.  Curtis did not go upstairs at any point or ask anything about Cory.  Curtis said Cory had not felt well for a couple of days with flu-like symptoms.  Said he had canceled the classes he taught at QU for the previous night and for that day.  Curtis said he saw Cory at 0815 when he left to take the children to school.  He returned home at 0835 and worked on the computer.  Curtis said he went upstairs to shower and noticed she was not moving.  He said he walked over to her and shook her and noticed she was cold, he then changed and said she was

**443**

Plaintiff 007932

actually "sort of warm".  Curtis said it became apparent she was deceased.  Curtis then said he "walked around a little bit and yelled at her".  He said he didn't know what to do so he called State's Attorney Jon Barnard.

**Detective Jeff Baird's initial examination:**

Described the same body position but also noted her lips were discolored a very dark red.  Also noted covers only pulled up to the waist of Cory.  Baird reported Coroner Hamilton reported that Cory was warm to the touch even though all others reported her as cool to cold to the touch.  Hamilton reported seeing lividity and that rigor was present in Cory's arms and legs.  Cory was removed at 1035 hours.

**Detective Baird's first interview of Curtis at the residence: 2-14-06**

Curtis said he woke at 0630 and said Cory was not feeling well and complaining of being tired from being up all night.  He said he knew he needed to cancel class at QU so he printed a sign and took it to QU and posted it on his door canceling class and returned home at 0740.  Curtis said when he returned home he heard Cory upstairs yelling for the children to get ready for school.  Curtis said he began helping the children get ready for school when Cory came downstairs to get 8 year old Logan a pair of jeans for school.  Curtis said Cory told him she did not feel well and felt weak at which time he helped her up the stairs and helped her into bed.*  Cory said she had been up all night and to the bathroom several times due to flu like symptoms.  After taking Cory to bed he says he continued helping the kids get ready for school.  He said he left at 0815 to take the kids to school and returned home at 0835.  When he returned home he worked on the computer.  He said he had a meeting at QU at 0930 and decided to go shower at 0900, although he previously said he canceled class because he was going to have to stay home with Larson the 4 year old due to Cory being sick.  He also had a pre-board meeting for the school board at 1100.  He said after going upstairs to shower he also decided to check on Cory.  He said as he entered the room he noticed her eyes were open and looked like she was awake.(Picture of Cory)  He said he called out her name and then noticed her arms pulled up to her chest.  He said when she didn't answer he tried to wake her by shaking her when she didn't answer he shook her again and called her name and then "knew something was very wrong".  Curtis said he went down stairs and "paced around" and yelled her name.  Curtis "said" he became distraught when he realized she was not breathing and there was nothing he could do.  He went downstairs and got Larson and took him to Cory's mothers, Martha Didriksen's, house which was directly behind theirs.  He stated that when he found Cory she was on her back and he noticed her lips were very dark.  He went on to say he is trained in CPR but knows it does not work without a defibrillator...?  Curtis said she had taken Tylenol the previous night and then again when he gave her one at 0500.  Said he wasn't sure if she drank the previous night because she didn't feel well but normally drank vodka and tonic.  Curtis said the door was

**444**

Plaintiff 007933

unlocked when he left but did not find anything disturbed or out of the ordinary when he got home.  Concerning the previous night Curtis said he fell asleep on the couch and woke around 0300 and came upstairs to find Cory awake in bed.  Cory told him she could not sleep.  Curtis said he went to sleep after setting the alarm for 0600.  He stated that when the alarm went off he hit snooze a couple times before getting up.  He said Cory informed him that she did not feel well and he decided he would have to take the children to school.  He also knew at that time he would have to cancel class for the morning.  After waking he was downstairs working on the computer when he says Cory yelled at him and told him his alarm was going off.  He said Cory came down later to get a pair of jeans but she was so weak he helped her back up to bed.  He covered her up and tucked the blankets at the foot of the bed.  He said he only pulled the covers to her waist.  He then says he went downstairs and began readying for the day and had also planned to call the State's attorney's office because he knew they had jury trials and he was going to see if they needed help, even though he had previously said he canceled class because he knew he was going to have to stay home with their child.  He then said he knew something was wrong with Cory when he went in and saw her arms in an unnatural position, although he previously said, he first noticed her eyes were open and thought she was awake.  He said he was confused after finding Cory so he called Barnard to find out what he should do and then told Barnard to call for help.  He said after calling Barnard he took Larson to DIdriksen's.  He said he did not go back upstairs after returning to the house.  Prior to leaving Curtis asked Baird to take clothing over to Didriksen's for Larson.

**Baird's 2nd interview of Lovelace at Lovelace's residence: 2-15-06**

Curtis said he had left the house to go to QU to cancel class and had returned home at 0735.  He said when he got home he heard Cory yell something about getting the kids Valentine stuff together for school.  He said she came downstairs at around 0800 to get Logan's jeans from the basement.  He said Cory then sat on the steps in the front hallway while the kids got ready for school.  He said as he was getting the kids ready for school he remembered seeing her sitting on the steps, he previously said he helped her upstairs after she got the jeans because she felt weak and then finished helping the kids get ready.  While the kids got ready he was in the kitchen checking his schedule on the computer.  Curtis said he helped Cory up to bed and tucked her in and then left to take the kids to school, previously he said he helped her up to bed then finished helping the kids get ready for school.  He said he laid her on his side of the bed because it was the closest side of the bed and she wouldn't have to move around as many items in the bedroom.  He then left between 0815 and 0820 to take the kids to school.  He said he came home and began working on the computer to prepare for the day even though he said he canceled class to stay home with the youngest child due to Cory's illness.  He said at around 0900 he went up to take a shower and noticed Cory's position in bed appeared "unnatural".  He said he called her name and she did respond and he believed something "didn't look right"  He

**445**

Plaintiff 007934

called her name again and got no response.  He noticed her eyes were open and her lips were "very dark".  He said he approached and took her hand and found it to be cold, he had previously said she was cold then corrected it to warm.  He said he didn't know what to do so he went downstairs and "paced around for a moment" before going back upstairs to check on her again.  He then got Larson out of bed and took him to Didriksen's house.  He stated he went back home and may have gone back upstairs" although previously he said he did not go back upstairs after returning home.  He then called Barnard.  He said he did not know why he called Barnard instead of calling 911 but he was confused.  He said the last meal he remembered Cory eating was on Sunday due to her feeling ill.  Curtis then said while talking to his 12 year old daughter Lyndsay, she had mentioned that Cory had said she fell out of bed on Saturday or Sunday.  Curtis said it was not uncommon for her to fall out of bed but it had not happened for a while.  Curtis was asked by Baird if he was there when she fell out of bed and Curtis said he was not in the room because he would often fall asleep on the couch but he said Cory did "mention" it to him.  Curtis said Cory was sitting on the steps telling the kids to get there Valentine stuff together and he said she also mentioned her tongue felt swollen.  He said she went on to state she drank Sierra Mist the previous night and that may have caused it.  He said Cory did not help the kids get dressed because they dressed themselves but she did get jeans for one of the boys from the basement.  Curtis then expressed his surprise at how cold and stiff Cory was when she was found and said the only explanation he could think of was that she passed away immediately after they left.  He said he believed that 3 of the 4 children saw her that morning before leaving for school.  He said the last time they fought was 1 week prior to Cory's death and that it was over him purchasing a cell phone and during the argument he threw the phone across the house and it landed in water.  He said there was no physical violence.  He said 2-13-06 during the evening Cory and the kids were upstairs making Valentines.  He was downstairs watching the Olympics and fell asleep on the couch.  He said he woke 0200 and that Cory woke him at 0300 for Tylenol.  He initially said he woke at 0300 and got her Tylenol before he laid down in bed.  He said the previous night she came down once and made icing for cupcakes and then asked him to ice them for her and she went back upstairs because she did not feel well.  Curtis said the morning of 2-14-06 the van was parked in front and he loaded all the kids at 0815 and took them to school.  He said Larson was in bed when he left and when he got home.  He said after returning home from taking the children at 0835 he worked on the computer for 30 minutes and went upstairs at 0905 or 910.  He said after dropping Larson off after finding Cory he either called Barnard on the way back to the house or from the kitchen he could not recall.  He said he did remember going up and checking on her one more time, again he previously had said he did not go upstairs after returning home.  Baird then had Curtis recount that morning.  He said he took the sign to QU and was home at 0735.  Curtis said Cory "finally" came downstairs and sat on the steps as the children were getting ready for school.  He said he "followed" her up to bed and tucked her into bed and then

**446**

Plaintiff 007935

immediately left the house which was at 0815 or 0820. He said he couldn't remember if the kids were waiting for him at the bottom of the steps or if they were already outside, but he had the keys to the van.

**Interview of Curtis on 2-16-06:**

Baird asked Curtis about the broken arm comment and Curtis said that a year prior she had hurt her wrist playing kickball with the kids but didn't seek treatment and sometimes had pain in her wrist. Curtis told Baird that Cory drank too much and that she drank vodka and tonic and denied any drug issues with Cory.

**Interview of Curtis on 3-15-06:**

Baird went and met Curtis at QU after he had obtained the original autopsy report from Dr. Bowman. Baird informed Curtis that the report ruled that the cause of death was undetermined. He again asked Curtis if he had any explanation for the cut to the inside of Cory's lip. Curtis pointed out she had told him she fell out of bed on Sunday but never complained of any injury. The interview was completed after Baird informed him the investigation by the police was complete. Curtis told Baird he was satisfied with the investigation.

**Baird's conversation with Coroner Gary Hamilton about the autopsy by Dr. Jessica Bowman:**

2-15-06 an autopsy was performed by Dr. Jessica Bowman. Hamilton relayed that Bowman had informed him of a "suspicious" cut to the inside of Cory's upper lip. Bowman relayed that that type of cut can sometimes be associated with a suffocation or a smothering type death. Bowman reported to Hamilton that there were no other signs of injury or trauma to indicate cause of death. Bowman relayed her concern about the time of reported death and the "level of rigor" found on scene.

**A meeting was set up for Baird to talk to the children on 2-16-06**

**Interview of Lyndsay Lovelace 12 years of age:**

Lyndsay said she woke at 0630 and watched TV in bed. She said she got dressed at 0730 and then her dad came in and got her and she went downstairs at 0745. She had breakfast while watching TV in the kitchen. Lyndsay said her Dad helped her make her toast and also fixed her brother's breakfast after he woke them. She said Curtis woke her brother's up at 0730. Lyndsay said Cory was in bed watching TV and that she later came down and got Logan's jeans. She said saw Cory sitting on the steps watching as they got ready for school. She said Cory said bye and I love you before they left as she sat on the steps and said they went out the back door to go to the vehicle. She said she had the keys to the van and that they went straight to the van

**447**

Plaintiff 007936

and waited for her Dad to come out.  Curtis said the van was in front and he had the keys.  The steps are by the front door not the back.  Lyndsay was asked what Cory was doing while she ate breakfast.  She indicated Cory was sitting in the kitchen watching TV and helping Curtis get everyone ready for school.  She said Cory had a "sore throat Sunday and Monday" and didn't feel well.  Lyndsay then recounted that on Monday she and her mom stayed in Cory's bedroom during the day making Valentines crafts and cards and watched TV.  Curtis watched TV downstairs.  Lyndsay went to bed at 2130 and when she went to bed both her mother and father were still awake.  She said she woke up once to go to the bathroom and all lights and the TV in her parent's room were off.  Curtis said when he went up to bed at 0200 or 0300 Cory was up and watching TV because she said she couldn't sleep.  He also said she had been up all night because she was sick and going to the bathroom.  She said she saw her mother in bed asleep but that at some point her mom got up and went to the basement to get Logan's pants.  She said her mom told her that her tongue was swollen from drinking Sprite.  She said she saw her mom sitting on the steps and saw her Dad help her mom part way up the steps but not all the way.  She said they left out the back door for school and her Dad was right behind them.  When asked where her mom was when she walked out the door for school she said her mom was still sitting on the steps even though she said her dad had already helped her up by that time.  Lyndsay said her parents argued sometimes but had not recently.  She was asked if she had any other information and Lyndsay replied, "My mom and I had an awesome relationship".

**Re-Interview of Lyndsay Lovelace: 3-27-14**

Lyndsay said the morning Cory died she was up and moving and had told her she still didn't feel good but felt better.  She said she went to school and was called at 10 or 1030 and was told her dad was coming to get her.  She stated Curtis took her into the principal's office and told her that her mother had passed away.  She stated he told her that after dropping them off he had ran errands and when he got home he found her in bed unresponsive and there was nothing he could do to help her.  He told Lyndsay she had went down and got the laundry and was doing laundry when she must have just laid down and died.  She also recalled her Mom being sick since Sunday prior to her death and described her as weak and believed she may have had pneumonia.  She stated her mother she believed was bulimic but otherwise healthy and active.  She stated that morning Cory was up and had made them breakfast.  Cory sat on the steps as they were getting ready for school and when they left she hugged them all and told them she loved them.  She stated that the van was parked in front and Curtis followed them out.  Lyndsay said Curtis told her that Cory's death was ruled; "Unknown" and that Curtis often painted it to her drinking.  Lyndsay said she felt her dad had,"a lot of guilt about her death".  He often told her that Cory had, "traits that were not good" and he wanted to make sure she didn't get any of them.  She indicated she did not remember any red marks on Cory's face and did not remember saying anything or remember hearing her mom saying anything about falling out of bed or

**448**

Plaintiff 007937

hitting her face.  She indicated that her parents did have fights while growing up and she also recalled seeing her mom hit her dad once.  She stated they both drank a lot.  I asked her if she ever thought her dad may have done something to her mom to cause her death and she replied, "as a kid I did".  She also confirmed that all pictures of Cory had been gotten rid of.  She later emailed me and told me of sitting at the top of the steps and watching them physically fight often.  She also stated that on March 23, 2014 while Curtis was taking her back to school they had gotten into an argument and he called her a, "drunk like her mother".  She confronted him about spending all of the college memorial money and he called her selfish and immature and told her she was making horrible decisions just like her mother.  She also advised me she had been told by Curtis in June of 2006 that he was dating Erika even though Erika says they didn't start seeing each other until August.  Lyndsay states she also has always found it odd that her dad told her that Cory was doing laundry and laid down.  She stated that her mother was weak and there basement steps were nearly straight up and down and she did not believe her mom could have went down them and carried the clothes back up to the second floor.  I advised her in one of the photos there was some clothing items on the floor at the top of the steps and asked if it would be normal for items to be left on the floor and she said no.  There also were no folded clothes in any of the pictures taken on scene that morning, only a full basket lying on the floor under the ironing board in the bedroom.  Lyndsay stated she had received a text from Erika in September that stated to Lyndsay that Curtis had killed her mom.

**Interview of 8 year old Logan Lovelace: 2-16-06**

 Logan said his dad woke him at approximately 0800 for school.  He said his dad and mom came downstairs and his mom was "laying" on the steps because she didn't feel well.  He said he grabbed his coat and book bag and, "that was about it".  Baird further inquired about what Cory did.  He asked if she had gotten anyone jeans for school and he stated Curtis got the jeans and that they were upstairs in a pile.  Baird asked what Cory did that morning and Logan said she got juice out for them to take to school and then sat on the steps.  Logan went on to say his dad helped his mom up the steps, and when asked if he saw that happen he said he did not see it but his dad told him he helped her up the steps.  He also said that when they left for school Cory was still sitting on the steps.  Logan was asked if he ate breakfast and he stated that he had and that he had cinnamon toast and that his dad fixed it for him.  He was asked what his mom was doing while that happened he said he didn't know.  Logan was asked if Cory was feeling bad over the weekend and he said she was feeling bad on Sunday.  Logan said his parents did not argue Monday night when asked.  When asked if he had anything to add he stated, "She had a sore throat".

**449**

Plaintiff 007938

**Interview of 7 year old Lincoln Lovelace: 2-16-06**

Lincoln said he didn't remember what time he got up for school but that his dad woke him up. Lincoln said after waking up he went upstairs and his mom was in bed and he asked what she was doing but he couldn't remember her answer.  Lincoln was asked if he had help getting dressed for school and he said he did not and could not remember if anyone got any clothes for him.  Baird asked him where Cory was when he was getting ready for school and he said, "up in bed"  then went on to say "well she was downstairs and my dad helped her upstairs"  Lincoln said he saw his dad help his mom up the steps but didn't know why he was helping her.  Lincoln said he saw his mom in the kitchen and when she was sitting on the steps she was drinking a cup of juice.  He said his dad took them to school but he wasn't asked where she was when they left out the door.  When asked if he had anything to add he said, "All I know is she died in the afternoon" and then went on to say "She had a broken arm and she held it like this." But Baird didn't describe how it was shown.  (Part of me wonders now if he saw his mom in bed with her arms raised and was demonstrating how she was found in bed with her arms raised but I can't be sure.)

**Re-Investigation began 1-3-14**

The above information from paramedics and firefighters were all part of my investigation not the initial investigation.

**Interview of Jon Barnard 1-6-14:**

Barnard indicated he was at the State's Attorney's office when he received a phone call from Curtis.  Barnard said when he answered the person on the other end said, "Jon this is Curtis my wife's dead".  Barnard indicated it was possible he said the name Cory but that the call was the same.  He described Curtis' tone as "disengaged" and no emotion.  Barnard asked Curtis if he had called the ambulance and Curtis said he did not, Barnard volunteered to call the ambulance and the conversation was concluded.

**Interview of Erika Gomez-Lovelace 1-28-14:**

I met with Gomez at QHS where she was a teacher and informed her I was looking into the death of Cory Lovelace and knew she was married and now divorced from Curtis.  When I told her this she immediately began shaking and tears formed in her eyes.  She immediately stated, "He killed her."  I asked her if she knew when Cory had died she stated, "Valentine's Day 2006."  I asked her why she knew the date so vividly.  She stated that she was a student in Curtis' Business Law class at QU.  She stated that she went to class and she and the other students

**450**

Plaintiff 007939

were sitting in class and Curtis never showed up for class so they left. This is important because Lovelace said he left that morning to go put a sign on the door canceling class. I asked her if she was sure there was nothing canceling class and she said she was 100% sure nothing was posted. She said the next time they had class the substitute informed them that Cory had died and that was why Curtis didn't show up. I asked Gomez when she began having a relationship with Curtis and she said she believed it was around August of 2006, however, I later learned from Lyndsay and Martha Didriksen that they were told by Curtis in June of 2006 that he and Erika were dating. I asked Erika if they ever talked about Cory's death. She stated that she was told very early in the relationship that Cory's death was off-limits to talk about. She talked about an incident in late 2006 in which Curtis got extremely drunk and was lying on the couch. She stated that he started talking about killing a cat, she said he told her about remembering the cat "writhing" when he killed it but Erika was not aware of any incidents of him killing cats and stated that they had approximately 5 cats at the house. Erika moved in with Curtis at his residence of 1869 Kentucky in August of 2006 the same month she says they started dating. They got married in 2008. She stated that for the first 4 ½ or 5 years of their relationship that he was a perfect gentleman and they had a good relationship. She stated that in May of 2012 their relationship began to fall off after he did not get the job of chief public defender that he had applied for. I had spoke with Gary Farha, Jennifer Cifaldi, and Jon Barnard about that day. They stated he came into the state's attorney's office in a rage screaming and yelling to the point they thought they were going have to call the police. She stated that after that he began to spin out of control. She stated he began drinking very heavily and became violent towards her. She stated on one occasion he had been drinking all day and she they were in the kitchen and he had poured a glass of tea and vodka and she knocked it over and told him she did not want him drinking anymore. She stated he hit her and pulled her hair and knocked her to the floor. She stated he grabbed her and threw her out the back door with no socks or shoes on. She said she was able to get back in and get them but when she was inside Curtis called all 3 boys to the kitchen and told them to look at what she had done. She said he told the boys to tell her she should not call the police on him, so she didn't but left. She stated that after that Curtis would often call her by Cory's name when he would be angry at her. On one occasion she locked herself in a bedroom during a fight to keep him away and had put a door under the door knob to keep him out. She stated that he stood outside the room and yelled, "you shouldn't lock me out Cory!" She said he broke the door open and when he came in he threw the chair at her but did not hit her. She stated that he would often pull her hair and grab her arms. She described him as extremely controlling. He often told her that even if she did call the police she would be the one getting arrested because he was an assistant state's attorney and they would believe what he said over her. She stated that she had enough of his drinking and abuse and on 12-1-12 she called his family and said they needed to come get him. She stated he moved out of the residence on 12-3-12 and gave her the keys to the residence telling

**451**

Plaintiff 007940

her she had all the keys to the house.  Gomez stated that approximately 2 weeks after Curtis moved out both she and her daughter, Darlene Steinkamp, became extremely ill.  She stated they were both extremely nauseous, weak, exhausted and both began losing hair.  Gomez stated that one day Darlene was home sick when she heard the back door open and heard someone in the kitchen.  Darlene went to go see who it was thinking it was her mother and found Curtis standing in the kitchen.  Curtis left after seeing Darlene.  Curtis later contacted Gomez and stated he knocked and no one answered so he came in thinking no one was home because he had to get something he had forgotten at the house.  Gomez stated that after she found he still had a key she had the locks changed.  She stated that she was seeing a counselor who suggested to her that he may have been poisoning her and that she should get rid of the food and drinks in the house and get new so she did.  Gomez stated that after changing the locks and getting all new food and drinks that both she and her daughter got better.  Gomez reiterated to me how scared she was of Curtis.  Gomez also said that both Lyndsay and Cory's mother, Martha Didriksen, had said several times they believed Curtis had something to do with Cory's death.  Gomez also later sent me pictures she had taken of a broken door, a ripped shirt, and a broken side care mirror all of which she said Curtis did.  She also indicated to me that when she was living at 2025 Maine after Curtis moved out that neighbor's had told her Curtis was in the alley while she was gone going through her trash.  I spoke with Gomez again on 4-24-14 and asked her about having any contact with Curtis outside of class prior to Cory's death.  She said they had seen each other, "a handful of times" and had spoken but they did not start dating until August.

**Interview of Justin Bower, Student in Lovelace's class: 2-10-14**

I spoke with Justin Bower by phone after obtaining a class roster from Quincy University. Bower said he was a student in Lovelace's Business Law class in 2006.  I asked him if he remembered anything that occurred that year and he said that Lovelace's wife died that year.  I asked him if he remembered what day it was and he said he didn't remember the date but remembered the events from the day she died.  I asked him what happened and he indicated that he went to class that morning and that they all sat in class for approximately 30 minutes and when Lovelace did not show up everyone left.  I asked him what the normal procedure was if class was canceled.  He said the professor would either e-mail everyone or put a sign on the door.  I asked him if either of those things happened on the day Cory died and he stated that they did not and that they went to class and left when Curtis did not show up.

**Interview of Student, Michael Brouse:**

**452**

Plaintiff 007941

Brouse confirmed he was a student of Lovelace's in 2006. I asked him if he remembered anything significant. He said that Lovelace's wife left him or she passed away that year but he couldn't remember which. I asked if there were any days that he had Lovelace that class was canceled. He stated that there was one day that Lovelace did not show up and other's where signs were posted canceling class. I asked him if he remembered when Lovelace did not show up without posting a sign. He stated he re-called that it only happened 1 time but he couldn't recall the day it occurred on.

**Interview of student Steven Miller:**

Miller confirmed he was in Lovelace's class in 2006. He also indicated he remembered that Lovelace's wife passed away that year but did not know the day or remember the day specifically. He also stated he remembered one occasion that Lovelace did not show up for class and the class was not posted as being canceled. He could not remember if that was the day Cory passed away. He did say that there were other occasions that class was canceled by a sign on the door.

**Interview of Cory's mother, Martha Didriksen: 2-10-14**

I asked her to tell me about Cory and Curtis' marriage prior to Cory's death. She stated that, "everything was going wrong". She stated Curtis had lost his job at DOT Foods a few months prior and she stated that she also believes he was having a relationship with one of his students but she didn't have any proof of that. She indicated that student was his second wife, Erika Gomez. She stated that both Cory and Curtis were heavy drinkers and at times Curtis would not come home or come home very late. She described Curtis as controlling and domineering. I asked her to tell me what she remembered from the morning Cory died. She stated she was giving her husband, John, a bath. She stated John was in ill health from cancer. She said she heard a knock at the back door and went and answered and it was Curtis holding Larson. She stated Curtis handed her Larson and said, "Cory's dead" and then walked away back toward Lovelace's house. She stated he was, "emotionless and matter of fact" before he walked away with no further explanation. She stated Cory was generally healthy leading up to her death and again said their marriage was, "falling apart". I asked what she meant. She stated that Curtis had lost his job at DOT and lied to Cory about it continuing to tell her he was working everyday and weekends. Didriksen described Curtis as an absent father. She also stated he was extremely controlling. In 2008 Lyndsay moved in with Didriksen because she did not get along with Erika. Didriksen stated that in 2012 when Curtis separated from Erika he was going to separate the 3 boys and send them to live with different families because he could not take care of them due to his drinking, however, she took them in to keep them all together. She stated during that time she would have Curtis over for dinner with the kids ever night. She stated she observed Curtis controlling behavior first hand in that he would control when the

**453**

Plaintiff 007942

meal was going to be served and would control the conversation.  She stated Curtis would get upset when the kids would talk to her instead of him.  Didriksen stated that Curtis was, "joyful and delighted" when he says he found out the autopsy showed Cory died from, "being a drunk".  She stated Curtis indicated to her that the autopsy showed she had damage to her liver from drinking and that is what caused her death.  Didriksen indicated that Cory did not have life insurance but that Curtis had received 32 or 39000 in memorials from her funeral to be used towards the kids college but Curtis eventually admitted to her that he had spent all of the money.  Didriksen stated that she had found out from the kids after Cory's death that their parents argued frequently and had also spoke of divorce.  Didriksen stated that Curtis refused to help with any funeral arrangements and that she paid for Cory's head stone.

**I was contacted by Martha Didriksen at the end of July 2014:**

Didriksen told me Curtis' new wife Christine had called her and wanted to have a family meeting because they had heard Lyndsay was saying bad things about their family.  Christine went on to tell Didriksen what a terrible mother and wife Cory was and that all of the problems in Cory and Curtis' home were due to Cory.  Didriksen is no longer allowed to see the boys and was told that they were possibly selling the house and moving out of town.  I asked Didriksen if Curtis might have found out this case was being reinvestigated and she said she didn't know.

**Interview of Jani Brooks(Cory's Hairdresser):2-11-14**

Brooks stated Cory was very private about her relationship but had shared that she was upset at how much Curtis was gone and often described him as an, "absent father".  Brooks indicated that she had done Cory's hair on Tuesday or Thursday of the week before she died and Cory was in good spirits other than telling Brooks she had a cold.

**Interview of Beth Dobrzynski, Friend:2-11-14**

Dorzynski stated that Curtis told her that the autopsy showed Cory died from her organs shut down from not eating for 2 weeks and that it was ruled undetermined because she was from a prominent family and they didn't want any scandal about her not eating for 2 weeks.

**Interview of Amy Herkert, Cory's best friend:2-11-14**

Herkert told me of an email Curtis had sent just Sunday prior to us meeting about the kids no longer being allowed to celebrate her death and any contact with the children in reference to Cory needed to be approved by him.  Herkert stated Cory was very private about her relationship but that after Cory died Curtis shared with her that the last 90 days of his marriage to Cory was, "not good".  He told Herkert that he blamed Cory for him not talking to his parents for a long period of time although he did not elaborate why.  Herkert  stated that on 2-14-06

**454**

Plaintiff 007943

she was told by Ariel Prost that Cory had passed away.  Herkert did not believe Prost and called Curtis.  She stated she asked Curtis what was going on and Curtis' response was, "Cory's dead" and then hung up on her.  She described him as matter of fact and he did not sound upset when she spoke to him.  She stated Curtis had picked up all the kids at school and told them that their mother died and then took the kids back to school to finish the day.  She described Curtis at the funeral as stoic and stated he gave the eulogy.

**Interview of Kelly Fragassi Cory's friend: 2-12-14**

Fragassi stated she routinely spoke to Cory prior to her death and that Cory had told her that the marriage was, "strained" because they were always struggling for money.  Curtis stayed with Fragassi and her husband for one night in the summer of 2006 after Cory's death.  Curtis told them that the autopsy showed that Cory had died from either a heart attack or that her organs had shut down from not eating but she couldn't recall which it was he said.  Curtis also told them that the marriage had been strained but that it was due to Cory being too focused on her father being sick, her father had cancer and was in very ill-health leading up to Cory's death, and as a matter of fact he died 3 weeks after her.

**Interview of William Steve Belko, Curtis and Cory's good friend: 2-13-14**

Belko stated that he spoke to Cory on the Sunday prior to her death.  Belko stated when he spoke to Cory she was at the store with the kids and that she was in good spirits but sounded like she had a head cold.  He said she told him she had a cold or the flu but he couldn't remember which.  Belko stated Curtis told him of the events on the day Cory died.  Curtis told him Cory had been up overnight throwing up and that she had asked him to get her more Tylenol.  Curtis said that in the morning he and the kids got up and that Cory got up and came down and was helping with the kids even though she didn't feel well.  Curtis said he got the kids ready for school and got all of their Valentine's stuff for school and then left to take the kids to school.  Curtis told Belko when he left Cory was sitting at the bottom of the stairs.  Curtis said when he came home she was no longer on the stairs and he went upstairs to go to the bathroom and looked into the bedroom and saw her hand was raised above her head and her hand looked cramped.  Curtis stated her lips were blue and he went in and shook her and yelled at her.  He stated he knew she was dead and called the ambulance.  Curtis told Belko that he had to be interviewed by the police but that the person that interviewed him was a person he went to school with.  Curtis stated he had to be interviewed because he was the husband and the one that had found her dead.  I verified that Curtis said she was on the steps and that he said he is the one who called the ambulance and he confirmed both of those things.

**455**

Plaintiff 007944

**Interview of Dr. Jessica Bowman, pathologist from autopsy: 2-12-14**

Dr. Bowman gave me emails she had sent to Baird in which she raised concerns of the position of the hands after only an hour and a half of death.  She also talked about cadaveric spasm.  She also expressed concerns about, "findings of death that do not match the time frame given".  Bowman stated she was not comfortable with the autopsy of Cory Lovelace or the lack of an explanation for the injury to the inside of Cory's lip and the level of rigor mortis.  She pointed out in pictures the red mark under the nose and the cut to the inside of the lip and stated that they would be consistent with a smothering type death.  She stated that the lack of petechaie hemorrhaging was insignificant due to the fact it was not as prevalent in suffocation cases as it is in strangulation cases.  She stated she would review it but could not do an addendum due to no longer being a forensic pathologist only a general pathologist.  Dr. Bowman later referred me to Dr. Shaku Teas to do a review.  Dr. Teas did a review but after doing research her opinion was highly questionable and it was decided to get another review.  A review was done by Dr. Jane Turner who Dr. Bowman later advised me we would be much better served by Dr. Turner's opinion due to her being a medical examiner at the City of St. Louis Medical Examiner's Office.

**I was contacted by Assistant State's Attorney Jennifer Cifialdi on 8-6-14:**

ASA Cifaldi advised that she had an intern named Austin Moore and that Curtis had came into her office and was talking to her about Lyndsay and about her getting drunk while she was home on break and that she chose not to live with him during the summer because he had rules and she wasn't willing to follow them.  Moore later indicated to Cifaldi that the Curtis was lying because he is trying to smear Lyndsay's name because he found out she has been talking to the police about her mother's death.

**Report from Dr. Jane Turner on review of Autopsy: 7-3-14**

Dr. Turner ruled that based on toxicology, the autopsy report , and photos, that the time of death reported did not match and she believes that Cory was dead 8-12 hours prior to being reportedly found.  She also ruled on cause and manner of death: Suffocation at the hands of another.

**456**

Plaintiff 007945