## Page 1

1  UNITED STATES DISTRICT COURT
2  FOR THE CENTRAL DISTRICT OF ILLINOIS
3
4  LOVELACE, et al.,              )
5                                 )
6          Plaintiff,      )
7                                 )
8      vs.            ) Case No.
9                     ) 17 CV 1201 JES JEH
10  GIBSON, et al.,        )
11                                 )
12      Defendants.      )
13
14
15
16
17
18      DEPOSITION OF EDWIN R. PARKINSON
19    TAKEN ON BEHALF OF THE PLAINTIFF
20          NOVEMBER 19, 2018
21
22        Ann Marie Hollo, CSR, RDR, CRR
22
23
24

## Page 3

1  UNITED STATES DISTRICT COURT
   FOR THE CENTRAL DISTRICT OF ILLINOIS
2
3      LOVELACE, et al.,        )
                                )
4          Plaintiff,      )
                                )
5      vs.          ) Case No.
                    ) 17 CV 1201 JES JEH
6  GIBSON, et al.,        )
                                )
7      Defendants.      )
8
9      DEPOSITION OF EDWIN R. PARKINSON,
10  produced, sworn, and examined on NOVEMBER 19, 2018,
11  between the hours of six minutes after nine o'clock
12  in the forenoon and forty-two minutes after twelve
13  o'clock in the afternoon of that day, at the office
14  of Alaris Litigation Services, 1 South Old State
15  Capitol Plaza, Springfield, Illinois 62702, before
16  Ann Marie Hollo, CSR, RDR, CRR, in a certain cause
17  now pending in the UNITED STATES DISTRICT COURT FOR
18  THE CENTRAL DISTRICT OF ILLINOIS, wherein LOVELACE,
19  et al., is the Plaintiff, and GIBSON, et al., are
20  the Defendants.
21
22
23
24

## Page 2

1      QUESTIONS BY:                  PAGE
2  MS. THOMPSON                    5, 139
3  MS. EMERY                       119
4  MR. HANSEN                      130
5
6          INDEX OF EXHIBITS
7
   EXHIBIT                         PAGE
8
9  Plaintiff's Exhibit 1           62
10  Plaintiff's Exhibit 2          66
11  Plaintiff's Exhibit 3          69
12  Plaintiff's Exhibit 4          71
13  Plaintiff's Exhibits 5 - 14    79
14  Plaintiff's Exhibit 15         95
15  Plaintiff's Exhibit 16         98
16  Plaintiff's Exhibits 17 - 23   105
17
18      (Exhibits were retained by Ms. Thompson.)
19
20
21
22
23
24

## Page 4

1
2  A P P E A R A N C E S
   For the Plaintiff:
3  Ms. Tara Thompson
   LOEVY & LOEVY
4  311 North Aberdeen
   3rd Floor
5  Chicago, Illinois 60607
   (312) 243-5900
6  tara@loevy.com
7  For the Quincy Defendants:
   Ms. Ellen K. Emery
8  ANCEL GLINK
   140 South Dearborn Street
9  Chicago, Illinois 60603
   (312) 782-7606
10  eemery@ancelglink.com
11  For the Defendants Adams County,
   Farha and Keller:
12  Mr. James A. Hansen
   SCHMIEDESKAMP, ROBERTSON, NEU &
13  MITCHELL, LLP
   525 Jersey Street
14  Quincy, Illinois 62301
   (217) 223-3030
15  jhansen@srnm.com
16  For Ed Parkinson:
   Mr. William F. Moran, III
17  Stratton, Moran, Reichert,
   Sronce & Appleton
18  725 South Fourth Street
   Springfield, Illinois 62703
19  (217) 528-2183
   bmoran@stratton-law.com
20  ALSO PRESENT: Mr. Curtis Lovelace,
   Ms. Christine Lovelace,
21  Mr. Adam Gibson
   The Court Reporter:
22  Ann Marie Hollo, CSR, RDR, CRR
   Alaris Litigation Services
23  711 North 11th Street
   St. Louis, Missouri 63101
24  (314) 644-2191

1 (Pages 1 to 4)

## EDWIN R. PARKINSON  11/19/2018

Page 5

1    IT IS HEREBY STIPULATED AND AGREED, by and
2    between counsel for Plaintiff and counsel for
3    Defendants that the deposition may be taken in
4    shorthand by Ann Marie Hollo, RDR/CRR, a Certified
5    Shorthand Reporter, and afterwards transcribed into
6    typewriting; and the signature of the witness is
7    expressly waived.
8                        * * * * *
9            EDWIN R. PARKINSON,
10   of lawful age, being produced, sworn and examined on
11   behalf of the Plaintiff, deposes and says:
12   (Starting time of the deposition is:  9:06 a.m.)
13           DIRECT EXAMINATION
14   BY MS. THOMPSON:
15       Q.  Mr. Parkinson, good morning.
16       A.  Good morning.
17       Q.  Could you please identify yourself for the
18   court reporter, sir.
19       A.  Proper name is Edwin R. Parkinson,
20   P-A-R-K-I-N-S-O-N.  I work as a special prosecutor
21   with the Illinois State's Attorneys Appellate
22   Prosecutor here in Springfield.
23       Q.  Mr. Parkinson, as you know, I represent
24   Curtis and his sons and Christine in this matter.

Page 6

1    Have you been deposed before, Mr. Parkinson?
2        A.  Yes.
3        Q.  And I know as an experienced attorney, you
4    know the rules here.  A couple of things that I
5    would say is, as you know, I tend to be a fast
6    talker.  I'm going to try my best to slow down this
7    morning.  If there's any questions that I ask that
8    you either don't understand or don't hear, let me
9    know.  Otherwise I'm going to assume that you
10   understood my question, all right?
11       A.  Yes.
12       Q.  And, obviously, you have counsel here.  If
13   you need to confer with your counsel or take a break
14   at any time, that's your right.  I just ask if
15   there's a question pending, that you answer it
16   before you take a break, okay?
17       A.  Yes.
18       Q.  Is there any reason that you would be
19   unable to give true and accurate testimony today?
20       A.  No.
21       Q.  You just indicated that you're with the
22   Illinois State's Attorney Appellate Prosecutor.  And
23   could you tell me how long you've been with that
24   office?

Page 7

1        A.  December 15, 1994.  So it would be almost
2    14 years -- 24 years.
3        Q.  Prior to that, did you work as an attorney
4    in another capacity?
5        A.  Just prior to that, for seven years from
6    April 1, 1987 until December 15, '94, I was the
7    chief legal counsel for the then Illinois Department
8    of Conservation.  It's now known as "Natural
9    Resources."
10       Q.  Can you briefly tell me what other
11   positions you've held as an attorney in your career.
12       A.  Prior to 1987, I was in private practice
13   in Jacksonville, Illinois from 1981 until '87.  From
14   '71 to 1981, I was the elected state's attorney of
15   Morgan County, Jacksonville, Illinois.  And I
16   graduated from law school in 1971.  So that's the
17   extent of my legal career.
18       Q.  Were you admitted to the bar in Illinois
19   in 1971?
20       A.  I was.
21       Q.  Have you been admitted to the bars of any
22   other states?
23       A.  No other state.
24       Q.  Have you been admitted to certain federal

Page 8

1    bars?
2        A.  Yes, the United States Supreme Court,
3    federal court.
4        Q.  And how many jury trials have you tried in
5    your career?
6        A.  Over 200, maybe 300.  Between 200 and 300.
7        Q.  How many felony cases have you handled
8    regardless of the disposition in your career?
9        A.  Many did not go to trial, but I would say
10   in excess of 500 felonies.  That's my guess.  I
11   don't -- I didn't keep track.
12       Q.  How many murder cases have you prosecuted?
13       A.  Over 160.
14       Q.  Is that 160 trials or 160 cases?
15       A.  No.  Actual trials?  Probably over a
16   hundred, but the rest of them perhaps started a
17   trial or went to -- you said, "jury trial" or
18   "trials?"
19       Q.  Well, let me ask you about trials of any
20   kind.
21       A.  Trials of any kind?  Felony trials,
22   between 100 and 130 probably.
23       Q.  In your capacity as an Illinois State's
24   Attorney special -- or an Illinois State's Attorney

2 (Pages 5 to 8)

Page 9

```
 1    appellate prosecutor, have you supervised other
 2    people in that office?
 3         A.  Yes.  I have the sort of unofficial title
 4    of being in charge of the special prosecutions so
 5    that others, who are also special prosecutors, seek
 6    advice from me, and I help mete out or assign cases
 7    and also assist others with advice because I'm old.
 8         Q.  Well, do people in your office rely on
 9    your experience?
10         A.  Yes.
11         Q.  To guide them as well?
12         A.  Yes.
13         Q.  Can you briefly describe what a special
14    prosecutor in your office does.
15         A.  We work for the Illinois State's
16    Attorneys, the elected 100 -- 101, and sometimes
17    Cook County asks for our assistance.  So 102
18    counties.  We work for the elected state's attorneys
19    in those areas, so that when the elected state's
20    attorney, he or she thinks that they have a conflict
21    or the appearance of a conflict of interest, they
22    would ask -- mainly ask that our office would take
23    over in that particular case as the prosecutor.
24    They can do the same thing with the attorney
```

Page 10

```
 1    general's office, but many of them come to us
 2    because our prosecutors used to be state's
 3    attorneys, most of us.
 4         In addition to a conflict of interest,
 5    sometimes state's attorneys feel uncomfortable when
 6    there's not an actual conflict, so they ask us to
 7    take over or to assist them, not in a true conflict
 8    capacity, but to assist them.
 9         For instance, somebody might have a
10    relative that might appear to be a conflict, or
11    they're uncomfortable doing a murder trial for the
12    first time or doing any felony trial for the first
13    time, so we assist or act as special prosecutors.
14         Q.  In your capacity as a special prosecutor,
15    you are at times assisting counties who may have
16    smaller state's attorney's offices or people with
17    less experience than the special prosecutors in your
18    office; is that right?
19         A.  That's correct.
20         Q.  In your capacity as a special prosecutor,
21    you prosecuted Curtis Lovelace for the murder of his
22    then wife, Cory Lovelace; is that right?
23         A.  That's right.
24         Q.  And prior to beginning that prosecution,
```

Page 11

```
 1    had you acted as a special prosecutor on prior cases
 2    in Adams County?
 3         A.  Yes.
 4         Q.  How many times?
 5         A.  It's a guess.  I'm just saying ten.
 6         Q.  When was the last time that you had acted
 7    as a special prosecutor in Adams County before you
 8    took over prosecuting Curtis Lovelace?
 9         A.  Well, there was a case against an attorney
10    who was the brother of a circuit judge, and he was
11    charged with financial exploitation of an elderly
12    person, and -- how long before?  Probably six or
13    seven years ago.
14         Q.  What was the name of the defendant in the
15    case you just described?
16         A.  If I could think of the judge's name, his
17    brother.
18              MR. HANSEN:  I can help.
19              THE DEPONENT:  What?
20              MR. HANSEN:  It was Devin Cashman.
21              THE DEPONENT:  Yes, Devin Cashman.
22    His brother was Judge Cashman.
23    BY MS. THOMPSON:
24         Q.  In any of the prior cases in Adams County
```

Page 12

```
 1    that you have worked as a special prosecutor -- and
 2    when I say, "prior," I mean before Curtis Lovelace's
 3    case -- had you worked with Coroner Jim Keller?
 4         A.  No, I don't believe so.
 5         Q.  Had you worked on any of the prior cases
 6    you'd worked on in Adams County with Adam Gibson?
 7         A.  No.
 8         Q.  Have you worked on any of those prior
 9    cases in Adams County with Jessica Bowman?
10         A.  No, not in Adams County.
11         Q.  Had you worked on cases with Jessica
12    Bowman in another county before you prosecuted
13    Curtis Lovelace?
14         A.  Sangamon County.
15         Q.  How many cases had you worked on with her
16    in Sangamon County?
17         A.  I know of one, of one.  It was a death of
18    a young boy named Anakin Credit.  A-N-A-K-I-N
19    Credit.
20         Q.  And any other cases you recall working on
21    with her -- Dr. Bowman -- before you prosecuted
22    Curt?
23         A.  No, no.  I don't believe so.
24         Q.  Have you worked on any cases after Curt's
```

3 (Pages 9 to 12)

EDWIN R. PARKINSON  11/19/2018

## Page 13

1    with Jim Keller?
2        A.  No.
3        Q.  What about with Adam Gibson?
4        A.  No.
5        Q.  Had you worked on any cases before Curt's
6    prosecution with Gary Hamilton?
7        A.  I don't believe so.  Was he an EMT or
8    fireman?  I don't know.
9        Q.  I'll represent to you that Gary Hamilton
10   was a former coroner of Adams County.
11       A.  Oh, that's right.  No, I have not.
12       Q.  In any of the prior cases that you'd
13   worked on in Adams County before Curt's prosecution,
14   had you consulted on any of those cases with Gary
15   Farha?
16       A.  No.
17       Q.  And what about consulting with Jon Barnard
18   on any of those prior cases?
19       A.  Yes, probably on all of the prior cases,
20   all six or seven of them, because he was the elected
21   state's attorney.
22       Q.  And did you have a good working
23   relationship with Jon Barnard at the time of Curt's
24   prosecution?

## Page 14

1        A.  Yes.
2        Q.  Was he someone that you considered to be a
3    friend outside of your professional relationship?
4        A.  No, I didn't really know him outside of
5    our professional relationship.
6        Q.  And were you friends with Gary Farha at
7    the time of Curt's prosecution?
8        A.  No.
9        Q.  Can you describe for me the process by
10   which the special prosecutor is brought onboard a
11   case where a local prosecuting agency determines
12   that they have a conflict.
13       A.  The procedure that is to be followed is
14   that when we are asked to take over the duties of a
15   state's attorney, and thereby become a special
16   prosecutor, the agency, pursuant to statute, is
17   appointed by a judge, a sitting judge in that
18   county.  And there is a request made first by the
19   state's attorney's office to the judge outlining
20   that there is, in brief, a conflict or an appearance
21   of a conflict.  And then on a motion to appoint
22   special prosecution by our office, and then a judge
23   would sign an order, and then we would receive the
24   order, and that's how we become appointed pursuant

## Page 15

1    to a court authority, so.
2        Q.  If a case has not been made public yet
3    because there's still an ongoing investigation, or a
4    grand jury hasn't returned an indictment yet, for
5    instance, does that motion practice you described
6    happen in secret?
7        A.  That would happen in secret, I believe,
8    but it would be -- there would still be a case
9    logged in called an "MR," miscellaneous remedy case,
10   so that the state's attorney would go -- would make
11   the same motion, and it would be labeled "in the
12   interest of" or "regarding the investigation into
13   the felony of robbery" or whatever it is, and it
14   would still be signed by the judge.  And then we
15   would be authorized by the authority to engage in an
16   investigation with the investigators to determine if
17   a charge would be brought.
18       Q.  Before a court signs that order appointing
19   your office, does your office engage in any
20   investigation?
21       A.  I don't believe so.
22       Q.  Does your office confer, to some extent,
23   with the local prosecuting agency or local law
24   enforcement to just confer about whether or not an

## Page 16

1    appointment is going to be made?
2        A.  Yeah, that happens because the state's
3    attorney would call our office and kind of outline
4    what the deal is, what the conflict is, and we would
5    either agree or disagree, and ask, "Why do you
6    really want us to be a special prosecutor?  Can't
7    you handle it?  Can't your staff handle it?"  So
8    there would be conversation, yes.
9        Q.  Do you need some water?
10       A.  I'm sorry.  I have a --
11       Q.  No.  I want to make sure you're okay.
12       A.  I've got my cough drops.  I'm not
13   coughing; I just have a raspy throat.
14       Q.  I appreciate you being here, even though
15   your voice may not feel a hundred percent today.
16       A.  Okay.
17       Q.  How does the special prosecutor's office
18   go about getting files related to a case either
19   before or after it's appointed?
20       A.  Well, we assume that police reports in a
21   case of a death -- it would be an autopsy
22   report -- whatever the police or state's attorney's
23   office had or has, and they would forward that to us
24   or at least fax it to us perhaps.  Some of the

4 (Pages 13 to 16)

EDWIN R. PARKINSON  11/19/2018

Page 17

1  papers, not a full file, but enough for us to know
2  whether we should get in or not.
3      Q.   And then once your office has gotten in,
4  how does your office go about getting the relevant
5  documents related to a case?
6      A.   Well, most counties have a -- they put
7  together a binder, and they include everything they
8  have, we hope, and we ask for them to give us
9  everything they have.  And from that, we can
10  ascertain with our other lawyers, perhaps, whether
11  we should have them reinterview people or do further
12  investigation or get other reports or talk to other
13  experts, that sort of thing, but a binder is
14  compiled and given to the office that I work for.
15      Q.   And is the binder process that you
16  described the process that you've used with Adams
17  County to get documents in cases to which you've
18  been appointed in Adams County?
19      A.   Yes.  They vary in thickness and depth,
20  depending on complexity of the case, but, yes.
21      Q.   When did you first become aware that there
22  was an investigation into Cory Lovelace's death?
23      A.   Well, her death was February 14th of
24  2006, as I recall, and I'm thinking it was -- I'm

Page 18

1  doing this from memory -- the spring of 2015 or '14.
2  Now, I don't know which for sure.  But 2000 -- let's
3  say it's 2015.  Two officers from the Adams -- from
4  the Quincy Police Department, Adam Gibson and
5  another officer, who I think was the supervisor.
6  I'd know his name if you told me, but they brought
7  me a binder.  They wanted to meet with me, and I
8  believe we met halfway in Morgan County, actually,
9  for convenience.  I think I told him we could meet
10  at the Morgan County Courthouse in the grand jury
11  room, which wasn't being used, and they had a binder
12  for me.
13      Q.   Was that a Sergeant Summers that was
14  there?
15      A.   Yes, it was.  And Summers -- I think it's
16  S-U-M-M-E-R-S.
17      Q.   All right.  And did you look through the
18  binder at that point?
19      A.   Well, not that day, but, yes, from then
20  on, yes, they gave -- I mean, I leafed through it,
21  and it had categories of police reports, autopsy,
22  that sort of thing.
23      Q.   At that point had your office been
24  appointed by a judge to work on this case?

Page 19

1      A.   I believe we were because -- I believe we
2  were, because I believe in the binder was the motion
3  and order signed by the judge, I believe.  I think
4  it had an MR -- I think it had an MR number on it
5  regarding the death of Cory Lovelace.
6      Q.   After you -- well, let me ask you this.
7  At the point that you had that meeting with
8  Detective Gibson and Sergeant Summers, the grand
9  jury had not returned an indictment yet; is that
10  right?
11      A.   That's right.
12      Q.   All right.  And from that point forward,
13  did you play some role in getting this case to the
14  grand jury?
15      A.   Yes, I was assigned to the case, and so
16  from -- I say the spring.  I don't know if it was
17  March or April, but it strikes me as April.  And up
18  until August, I was the one in charge of reviewing
19  all the reports and convening the grand jury, I
20  think, in August of that year.  And, again, I don't
21  know if it was '15 or -- of 2015 or '14, but a few
22  months, four or five months.
23      Q.   In that four or five months, the April to
24  August period, did you talk, yourself, with any

Page 20

1  witnesses in this case?
2      A.   Well, witnesses, I believe I talked with
3  the mother of the deceased, of Cory Lovelace, and
4  Martha -- Marty, I believe.  I made a trip or two to
5  Quincy to talk to a few witnesses.  I think they
6  were Jim Keller; Adam Gibson; Marty, the mother.
7      Q.   Marty Didriksen?
8      A.   Marty Didriksen, yes.
9      Q.   Is there anyone else you spoke to in that
10  time period before the grand jury returned an
11  indictment besides Mrs. Didriksen, Jim Keller, and
12  Adam Gibson?
13      A.   Well, I believe I talked to some
14  pathologists.  I talked to -- on the phone.  I
15  talked to Dr. Michael Baden out of New York City.  I
16  talked to forensic pathologist, Jane Turner, out
17  of -- at that time St. Louis.  I talked to Dr. Scott
18  Denton.  Those are some of the people.  I may have
19  talked to other witnesses, but I don't think I did
20  at that time because there were reports of
21  statements made by officers, EMTs and that sort of
22  thing, but the ones that I personally talked to,
23  either by phone or in person, I think I've covered
24  it.

5 (Pages 17 to 20)

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334

EDWIN R. PARKINSON  11/19/2018

Page 21

1    Q.   And you said that you were also reviewing
2  reports during this time period; is that right?
3    A.   Yes.
4    Q.   Were those reports primarily of interviews
5  that Detective Gibson had had with various
6  witnesses?
7    A.   Yes.
8    Q.   Did you rely on the veracity of those
9  reports in making your assessments about the case?
10   A.   Yes.
11   Q.   And was that true both before and after
12 the grand jury came down that you relied on the
13 truthfulness of what you were reading in reports to
14 guide your prosecution of the case?
15   A.   Yes.
16   Q.   Did you play any role in deciding what
17 pathologists were going to be retained to give
18 advice or opinions in this case?
19   A.   Yes.
20   Q.   Can you explain your involvement in that
21 process?
22   A.   Well, I suggested to both -- I think it
23 was Sergeant Summers and Detective Gibson.  I
24 suggested that we might contact Michael Baden from

Page 22

1  New York City because I had used him in other -- in
2  at least one other murder case years before.
3        And I also had used -- when I say, "used,"
4  that's consulted with and used as an expert
5  witness -- Dr. Jane Turner in at least three cases
6  that I knew of at the time, and these were all death
7  cases.
8        And I also had used Dr. Scott Denton
9  because he had been assigned to cases in Sangamon
10 County that I had prosecuted.  And he also took
11 over, I believe, as the forensic pathologist for
12 Adams County after Jessica Bowman no longer was
13 being used by them.
14       So I don't know if that answers your
15 question.
16       But also there were autopsy report and
17 findings by Dr. Jessica Bowman, and I had reviewed
18 hers before in other cases and was not satisfied
19 with her findings in at least one other case in
20 Sangamon County, so I knew about her.  So I read her
21 report.
22   Q.   Did you talk to Dr. Bowman at all about
23 this case before the grand jury returned its
24 indictment?

Page 23

1    A.   I don't think so.
2    Q.   Before the grand jury indictment, was
3  there anyone else in your office that was similarly
4  involved in advising or working on the
5  investigation?
6    A.   Before the grand jury?
7    Q.   Yes.
8    A.   No.  I think it was just me.
9    Q.   At some point, a prosecutor named Julia
10 Wykoff became involved; is that right?
11   A.   Yes.
12   Q.   When did Ms. Wykoff become involved?
13   A.   She became involved -- she was hired as a
14 brief writer, and also a very sharp, young lady, who
15 just got her law degree.  So she took an interest in
16 the case and did research for me, did research
17 probably six months before the first trial.
18   Q.   Did she have any role in speaking with
19 witnesses in preparation for the first trial?
20   A.   Well, I believe she spoke to -- I believe
21 she spoke to Adam Gibson several times.  I think she
22 was in charge of calling people, asking if they had
23 any other -- anything else to say.  She read the
24 complete binder file that I had.  And so she would

Page 24

1  contact, among others, Marty Didriksen probably, the
2  mother of the deceased, and Adam Gibson, and I
3  believe she also talked with Dr. Scott Denton.  I
4  don't know if -- I don't believe she ever talked to
5  Dr. Jessica Bowman.
6    Q.   At some point, she also communicated with
7  someone named Erika Gomez; is that right?
8    A.   Oh, yes, she had several.  Actually, I
9  think there were some e-mails as well as phone
10 calls back and forth.  Quite frankly, I assigned her
11 to that prior to the trial because we -- I think we
12 had -- we think -- I don't "think."  I know we had a
13 dispute perhaps with your legal team about whether
14 she would be called at the first trial, and it was
15 determined by the judge, I think, that she would not
16 be called at the first trial.  But she did maintain
17 a relationship with Julia Wykoff over the phone.
18   Q.   Later, another attorney from your office,
19 named David Robinson, was involved in this matter;
20 is that correct?
21   A.   Yes.
22   Q.   When did Mr. Robinson become involved?
23   A.   He became involved shortly before the
24 second trial.  I think the reason was that Julia

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334

EDWIN R. PARKINSON  11/19/2018

## Page 25

1  Wykoff took another job with -- she may still be
2  there with the Supreme Court library.  She took a
3  better job, and so she was no longer -- otherwise
4  she would have been available for the second trial
5  because she did appear at the first trial as the
6  second chair, but she left our office.
7       So David Robinson, who is and was then and
8  still is the deputy director in charge of appeals, I
9  believe, for the Fourth Circuit.  He's with our
10 office.  So he took over her place.
11      Q.  Did Mr. Robinson have any involvement in
12 this case until that time shortly before the second
13 trial where he began preparing for the second trial
14 with you?
15      A.  No.
16      Q.  Is there anyone else in your office who
17 would have spoken to any witnesses in this case
18 about anything substantive other than you and
19 Ms. Wykoff and Mr. Robinson?
20      A.  From our office?
21      Q.  Yes.
22      A.  No.  I think the three of us would be it.
23      Q.  And when I say, "anything substantive," I
24 mean, I assume there might have been some point

## Page 26

1  where someone called and maybe asked for one of the
2  three of you and their call got transferred or
3  something like that, but I'm talking about
4  conversations that would be more than simply passing
5  on a message to one of the three of you.
6       A.  I think it was just us.  I'm pretty sure
7  it was just us three, we three.
8       Q.  What do you remember discussing with Marty
9  Didriksen before the grand jury indictment in this
10 case?
11      A.  Well, I wanted to meet her more or less
12 first because she was the mother of the deceased
13 young lady, and I believe Adam Gibson arranged the
14 time.  I believe we went there together to her home,
15 more or less just a meeting so she knows who I was
16 and what we were going to do.  And also wanted to
17 know if she had anything of remembrances of that
18 day, and I think that it had already been covered in
19 reports from the police.  Of course, that wouldn't
20 have been Adam Gibson's reports.  This was at the
21 time of the event, in 2006 when she died.  So I went
22 over that with her briefly.
23      She told me how Curtis Lovelace, her
24 son-in-law, came across that morning with, I

## Page 27

1  believe, the youngest child, Larson, in his arms and
2  said that his wife was dead.  Very brief
3  conversations, merely -- met with her once in her
4  home probably just to meet her, and that was it.
5       Q.  Was there anything that she told you that
6  contradicted any of those initial reports from her
7  about what had happened the day that Cory Lovelace
8  was found passed away?
9       A.  No, but I didn't really go into detail.
10 She did not say anything was -- she thought it was a
11 shock to her, and that Curtis Lovelace brought the
12 child over and just merely said that, and turned
13 around and went back, because, I believe, fire and
14 rescue people were on their way or maybe they were
15 already there.  I don't know, but she didn't tell me
16 anything that was contradictory.
17      Q.  Was the main reason you were talking with
18 her because as the mother of the person who had
19 died, she had the role of being the -- you know, the
20 victim's family in this case and a person you needed
21 to confer with because of that status?
22      A.  Yeah.  As a courtesy, I wanted to meet
23 with her, but I also believe she ended up -- we
24 didn't go into much depth about it, but she told me

## Page 28

1  that she ended up at some point later -- Lyndsay,
2  the oldest, came to live with her.  And that
3  was -- she didn't go into detail, and I think she
4  told me that she was now off in school in Iowa, and
5  that she pretty much lived with -- she made it sound
6  like Lyndsay was kind of not kicked out of the
7  house, but she kind of didn't want to live there
8  anymore when Erika Gomez lived there.  I believe it
9  was mostly about Erika Gomez and she not getting
10 along.
11      Q.  What do you remember about your
12 conversations with Jim Keller before the grand jury
13 indictment?
14      A.  Well, the conversations with him, since he
15 was on the scene that morning, that he was the
16 assistant coroner, I believe, in 2006, to
17 Mr. Hamilton.  He arrived, and he said that his
18 observations of Cory and the -- that she was in -- I
19 believe he used the word "in full rigor," "full
20 rigor."  She was -- her body was stiff.  Her
21 coloring was such that from his experience with
22 other deceased persons -- and I believe he worked
23 for a funeral home -- that there had been lividity.
24 In other words, a pooling of the blood due to

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334

EDWIN R. PARKINSON  11/19/2018

Page 29

1  gravity, and he thought that she'd been dead for
2  some time.
3      Q.  Did he tell you when exactly he'd gotten
4  to the scene the day that Ms. Lovelace's body was
5  found?
6      A.  Did he tell me what time he got there
7  or --
8      Q.  Yes, or when.
9      A.  It was that morning.  Sometime after
10  10:00 o'clock a.m.
11      Q.  And you said it was your suggestion that
12  Michael Baden be contacted to evaluate this case?
13      A.  Yes.
14      Q.  Are you the person who contacted him about
15  looking into this matter?
16      A.  Yes.
17      Q.  Did you have a formal opinion from him
18  before the grand jury indictment?
19      A.  Well, formal?  I don't know when he wrote
20  a report, but I did have an oral report that he -- I
21  remember him using the words, from his review of the
22  autopsy and whatever other reports we sent him, that
23  she died of suffocation at the hands of another.
24      Q.  Are all of the materials that you sent him

Page 30

1  to review in this case materials you sent via
2  e-mail?
3      A.  No.  I probably sent them by regular mail,
4  snail mail.  I probably copied -- I don't remember
5  for sure, but I'm almost positive I copied some
6  reports and sent them to his office, and they were
7  by mail or by fax.
8      Q.  And as to Dr. Turner, are you the person
9  who recommended that Dr. Turner be contacted?
10      A.  Yes.
11      Q.  At the time that you recommended that
12  Dr. Baden and Dr. Turner be contacted, did you know
13  about prior conversations that either Jim Keller or
14  Adam Gibson had had with Scott Denton?
15      A.  I am familiar to some extent that they,
16  together, I think, went to Bloomington or made
17  arrangements to talk to Dr. Denton, and I'm pretty
18  sure it was in the spring.  I keep -- I used that
19  term because of when we were -- after I had gotten
20  the binder and in the spring of 2015 or '14.  I wish
21  I knew which year it was.
22      Q.  Can I stop you there?  If I were to show
23  you a copy of the grand jury transcript in this case
24  that had a date of August 27th of 2014, would that

Page 31

1  refresh your memory about the year?
2      A.  It's '14.  It's '14.
3      Q.  So your understanding was they talked to
4  Dr. Denton in the spring of 2014?
5      A.  Right, because I don't think it was at my
6  suggestion, but there was a problem with the autopsy
7  done by Jessica Bowman, and part of that was my
8  doing, because I had other cases, at least one or
9  two other cases that I was aware of Jessica Bowman
10  who always -- almost always came up with an
11  undetermined cause of death when she should have
12  been able, in my opinion, not being a pathologist,
13  but should have been able to determine a cause of
14  death, so -- but she found that the death of Cory
15  was undetermined.
16          But in her report, there were obvious
17  signals that she observed.  She observed a cut on
18  her lip.  She observed -- I believe she observed
19  petechia.  I know she went by the reports of the
20  EMTs that she was in a state of rigor, but she still
21  found it undetermined.
22          So my long-winded answer is at some point,
23  I suggested that Adam Gibson and Keller talk to
24  Dr. Denton and see what he thought.  And he made the

Page 32

1  observation right away that unless the one who
2  performed the autopsy was willing to look further
3  and to amend her report, then they're pretty much
4  stuck with that finding.
5          And that's been interpreted as we went
6  through the trial -- sorry I'm so windy, but -- as
7  he wasn't asking that she change her report, but he
8  was making an observation that the way it was
9  written, go back to talk to her.  So I believe
10  Dr. Denton told the officers to, you know, unless
11  she changes that, you're stuck with that report.
12      Q.  So when did you first learn that
13  Dr. Denton had said that unless she changed
14  something, you were stuck with her report?
15      A.  Well, I probably -- I probably learned it,
16  at least to that extent, within that four or five
17  months that I had the case because Dr. -- that's why
18  we asked that other experienced pathologists looked
19  into the same -- her report, her autopsy findings,
20  and see what they found.
21      Q.  When was the first time that you talked
22  with Dr. Denton about this case?
23      A.  I don't know that I talked to him before
24  the indictment or not.  Casually maybe, but not -- I

8 (Pages 29 to 32)

EDWIN R. PARKINSON  11/19/2018

Page 33

1  didn't get a report from him.
2      Q.   Were you relying on Dr. -- on Detective
3  Gibson and on Jim Keller's accounts to you about
4  their conversations with Dr. Denton before you met
5  with Dr. Denton personally about this matter or
6  talked with him personally about this matter?
7      A.  I think so.
8      Q.   In your conversations with Detective
9  Gibson before the grand jury indictment, were you
10  talking to him on your office telephone?
11      A.  Either my office telephone or my cell
12  phone.
13      Q.   All right.  And has the number of the
14  Illinois State's Attorney Appellate Prosecutor
15  changed between 2014 and today?
16      A.  No.  782-2168.
17      Q.   And I would ask you for your cell phone
18  number, Mr. Parkinson, that you would have used to
19  communicate with Detective Gibson, and I'm happy to
20  put that under seal in this transcript so that
21  doesn't become a public number.
22      A.  It's --
23      MS. THOMPSON:  So I think the
24  parties, we'll agree we'll make that number private.

Page 34

1      THE DEPONENT:  It's on my business
2  card.  It's 836-046 -- area (217) 836-0462.
3  BY MS. THOMPSON:
4      Q.   Are there any other telephone numbers that
5  you used to talk with either Adam Gibson or Jim
6  Keller about this case?
7      A.  Probably my personal cell, which I'd be
8  glad to give it to you, too, because depending on
9  what cheap phones the state gives us to work with,
10  sometimes I'm in an area where my personal cell
11  would work better, and I can give you that.  That's
12  (217)414-3938.
13      MS. THOMPSON:  I think the parties
14  would agree we'll also keep that number as a
15  confidential part of this transcript.
16      THE DEPONENT:  Mm-hmm.
17      MS. EMERY:  Correct.
18  BY MS. THOMPSON:
19      Q.   Did you have any in-person meetings with
20  either Jim Keller or Detective Gibson, other than
21  the meeting you described with Gibson and Summers,
22  where you met halfway to get the binder from them?
23      A.  Well, I met with Jim Keller prior to the
24  grand jury.

Page 35

1      Q.   Where did you meet with him?
2      A.  In Quincy.
3      Q.   And when was that meeting?
4      A.  I probably met with him once or twice
5  before August, probably early in the summer to
6  confirm what he said he saw.
7      Q.   That was when he was describing his
8  memories of being at the scene?
9      A.  Yes.
10      Q.   Did you talk about any other topics with
11  him in that one or two in-person meetings other than
12  what he observed at the scene?
13      A.  No.  I believe that was the extent of what
14  I wanted to hear from him is what did he observe.
15  And he also talked about -- was it at the morgue, or
16  whatever you would call it, that her body was taken
17  to.  He observed there, too -- that was probably at
18  a funeral home.
19      But he also observed, he said, that when
20  the EMTs were there, couple of them, that when they
21  turned her to remove her from the bed, that her body
22  and neck and arms and everything all moved in one
23  motion, which he remembered because she was stiff.
24  "Stiff and cold," he said.

Page 36

1      Q.   Was there anyone else that was present at
2  those meetings with you and Mr. Keller other than
3  the two of you?
4      A.  Oh, probably Adam Gibson was there, I
5  believe.
6      Q.   How many cases had you worked on with
7  Dr. -- well, let me strike that and ask you a
8  different question.
9      How many cases are you aware of where
10  Dr. Bowman returned and made an undetermined finding
11  at autopsy before the Lovelace case?
12      A.  I know of at least two others.  One in
13  Adams County and one in Springfield.  It's a
14  drowning case in Adams County.  I wasn't involved in
15  it, but I knew about it.
16      Q.   That was the Booth case?
17      A.  Yeah, I think so.  Booth, where she was
18  found in the pool, her husband's pool.
19      Q.   All right.
20      A.  And she found that undetermined.
21      Q.   All right.  And was the Bowman, the other
22  Bowman case in Sangamon County, was that the
23  Anakin --
24      A.  The death of Anakin Credit, young boy.

9 (Pages 33 to 36)

**EDWIN R. PARKINSON  11/19/2018**

Page 37

1    Q.   Are you aware of any other cases where she
2  made an undetermined finding?
3        A.   There are others.  I don't know their
4  names, because consulting with local prosecutors
5  here, Jessica Bowman had been the pathologist used
6  in Sangamon County, and they had more than one jury
7  trial with her.  And she was -- according to the
8  prosecutor, she was remiss in ever coming up with a
9  positive cause of death of blunt force trauma or
10  homicide.  Either a cause of death or a manner of
11  death, they didn't like her, because she was
12  reluctant to put her name to a specific finding.
13       Q.   How did you learn that the Sangamon County
14  prosecutors were concerned about Dr. Bowman's
15  performance in these cases in the manner you just
16  described?
17       A.   Well, first of all, my one case was in
18  Sangamon County -- that was Anakin Credit.  And then
19  the prosecutors, state's attorneys who prosecuted
20  other cases knew -- or told me that she doesn't give
21  solid opinions and that she's reluctant to give a
22  positive opinion.
23          There was another case in Decatur,
24  Illinois.  I don't know the name, but I could find

Page 38

1  it.  Another death case where she wouldn't render a
2  specific opinion as to the cause of death.
3        Q.   Well, when did it first come to your
4  attention that there was this potential issue with
5  her not reaching opinions?
6        A.   Well, probably right away because I had
7  already done the Anakin Credit case, and I probably
8  already knew that, but I didn't -- I already knew
9  that she was -- even though she makes findings, she
10  isn't going to put her name to a cause of death.  I
11  already -- probably in the four or five months that
12  I had the case before the indictment of
13  Mr. Lovelace.
14          It's a general answer, I know, because it
15  all is enveloped in why we asked Scott Denton his
16  opinion, and he was very reluctant to go -- not
17  second guess her, but to guess her, because he was
18  very frustrated with any case he ever had to come in
19  to comment on her lack of ability to find what a
20  forensic pathologist should find in his opinion.  So
21  Scott Denton was familiar with her, too.
22       Q.   Detective Gibson testified before the
23  grand jury in this case; is that right?
24       A.   Yes, he did.

Page 39

1    Q.   All right.  And he was the only witness
2  that you put before the grand jury to secure the
3  indictment against Mr. Lovelace; is that right?
4        A.   I think that's right.  I don't think I
5  called Mr. Keller.  I think it was Adam Gibson would
6  recite to the grand jurors what others had said.
7        Q.   And at the time that you put Detective
8  Gibson before the grand jury, did you have any
9  reason to believe that the testimony he was giving
10  to that grand jury was anything but truthful?
11       A.   No.
12       Q.   As a prosecutor, you are aware of your
13  obligations under Brady versus Maryland; is that
14  right?
15       A.   Yes.
16       Q.   And those are your obligations to disclose
17  material exculpatory evidence to the defense?
18       A.   Yes.
19       Q.   Is that an obligation that you take
20  seriously?
21       A.   Very.  I usually -- not usually.  Even
22  when I was a state's attorney, I gave them my whole
23  file.
24       Q.   You have a professional reputation in

Page 40

1  Illinois that goes back to 1971, correct?
2        A.   Yes.
3        Q.   And have you, in every case that you have
4  prosecuted, done your best to comply with your
5  ethical obligations under Brady versus Maryland?
6        A.   Yes.  I'm very sure of that, yes.
7        Q.   How did you get -- well, let me ask you
8  this.
9          Other than that initial binder that you
10  got from Gibson and Sergeant Summers in the
11  spring -- I think we determined that was 2014,
12  correct?
13       A.   '14, yes.
14       Q.   All right.  Other than the binder you got
15  from them in the spring of 2014, how did you get
16  other materials from the Quincy Police Department
17  related to this case?
18       A.   Well, I don't know if every interview was
19  done by then because there was -- I think the guy
20  walking his dog, Dustin Strothoff, or something, I
21  think that was -- that may have come after the
22  indictment.  I'm not sure.  But I would get reports
23  to supplement it, I guess.
24       Q.   And I'm asking about how you got reports

10 (Pages 37 to 40)

EDWIN R. PARKINSON  11/19/2018

Page 41

1  thereafter.  So I take it that you got the binder
2  from them in the spring of 2014, and then an
3  investigation continued thereafter, correct?
4      A.  Yes.
5      Q.   And how did you get materials from them
6  going forward from that point?
7      A.  Oh, for one, I utilized Julia Wykoff to
8  continue to ask is this everything of -- since Adam
9  Gibson was the chief case agent, I would call him in
10 charge of this.  She made a continuing effort to ask
11 of him and others, "Is this everything you've got?
12 Do you have anything else?"  And she was satisfied
13 that we had -- she satisfied herself and me that we
14 were getting ongoing reports.  There weren't a lot
15 coming in, but she kept asking that, because it's
16 always my opinion that the investigation continues
17 all through the trial, so.
18     Q.   And when you said she made an effort to
19 ask, was that to ask of Detective Gibson if she had
20 everything?
21     A.  Well, him, and also -- as I said, she was
22 in contact with Erika Gomez, too.
23     Q.   Was it your understanding in the
24 conversations you had with Jim Keller that Jim

Page 42

1  Keller was assisting in this investigation?
2      A.  Was it my understanding he was assisting?
3      Q.  Yes.
4      A.  Yeah, but he was, I'm sure, because he
5  went with Adam Gibson, for instance, to go talk to
6  Dr. Scott Denton.  I think he took -- I think he
7  took an interest in being part of the investigative
8  team.  I do.
9      Q.   And why do you think that?  And let me ask
10 you a better question, which is why was it your
11 impression that he took an interest in being a part
12 of the investigative team?
13     A.  Well, I talked to him on the phone a few
14 times, and he said, "You know, I remember what I saw
15 that day of her body."  And there's already a report
16 to that effect.  And then I think he just -- he was
17 free to call, talk about the case whenever he wanted
18 to, and I bet I talked to him 10 or 12 times over
19 the next year.
20     Q.   Did he tell you that he had undertaken his
21 own investigation of this case before Detective
22 Gibson began looking into it?
23     A.  I don't know if he used those words, but I
24 assumed he was always interested in it since the

Page 43

1  date of the death until the time Adam Gibson took
2  interest in it.  So, yeah, that's probably a fair
3  question.  I think he always was interested in what
4  he saw that day and that nothing was ever
5  prosecuted.
6      Q.   Is it your belief that Julia Wykoff took
7  her Brady obligations as seriously as you take
8  yours, Mr. Parkinson?
9      A.  Oh, definitely.
10     Q.   And was that the policy of your office to
11 take your obligations under Brady versus Maryland
12 seriously?
13     A.  Well, it should be.  I don't know about
14 others in there, but it should be.  It should always
15 be the office's policy.
16     Q.   Do you have any information to suggest
17 that Ms. Wykoff ever knowingly withheld in this case
18 information that she had, which she thought should
19 have been disclosed under Brady versus Maryland?
20     A.  No.
21     Q.  Is the same true for Mr. Robinson?
22     A.  Yes.  The same is true that he did not
23 withhold anything.
24     Q.   And you have no reason to believe that he

Page 44

1  withheld any evidence that he thought he had a duty
2  to disclose?
3      A.  That's my opinion.
4      Q.   After the grand jury returned its
5  indictment, did you have any involvement in
6  arranging for Curtis Lovelace to be arrested?
7      A.  No.
8      Q.   Did you talk with anybody in the Quincy
9  Police Department about the logistics of having him
10 brought into custody?
11     A.  No, I didn't think there would be any
12 problem with that, and I don't take any interest in
13 that anyway.  That's up to the police.
14     Q.   Did you have any involvement in setting up
15 a plan for interviewing Curt's children at the time
16 that Curt was arrested?
17     A.  No.
18     Q.   Did Detective Gibson or anyone else at the
19 Quincy Police Department tell you that they were
20 planning on trying to interview Curt's sons?
21     A.  Well, they may have.  I don't remember
22 that specifically.  The reason is because the day
23 the indictment came down, sometime in August,
24 actually I heard that they confronted Mr. Lovelace

11 (Pages 41 to 44)

EDWIN R. PARKINSON  11/19/2018

Page 45

1  at his office.  I don't know if he was coming and
2  going from lunch or something, but the -- I didn't
3  know they were going to do that, but they walked up
4  and arrested him, I believe, at his office, and I
5  don't think there was any discussion about the kids.
6  I learned later that they took them from school
7  maybe.  I didn't have anything to do with that, but
8  I just heard about the events of the day.
9      Q.  How did you hear about the events of the
10  day?
11      A.  Well, I believe that most likely Adam.
12  I'm not pinning this to him for certain.  He may
13  have called me and said, "Well, he's in custody, and
14  we've got -- we were talking to the kids."  So they
15  decided to do that on their own, I guess.  I
16  remember something being said about their school,
17  so.
18      Q.  Did you ever give any advice to anybody in
19  the Quincy Police Department about how or if to
20  interview Curt's boys?
21      A.  I don't believe I did.  I don't know what
22  I would have said.  I don't know that it's unusual
23  to probably go -- you know, it's -- you're not
24  asking that.  I mean, they went and found them at

Page 46

1  school.  Maybe they didn't want them to find out
2  that their dad wasn't going to be home when they got
3  out of school.  I don't know.  Maybe he was the one
4  that was going to pick the kids up at school.  I
5  don't know.  So I didn't put any import on it at
6  all.  I didn't have anything to do with it.
7      Q.  When was the first time you had
8  any -- well, let me actually ask you a different
9  question.
10      At some point did you -- at some point,
11  did you form the belief that there was a formal
12  report that had been prepared by Dr. Denton about
13  this case only to learn that you'd been mistaken
14  about that?
15      A.  Well, I bugged Dr. Denton for months about
16  I wanted him to give me an opinion.  He finally did
17  give me one, because I thought if we were going to
18  call him -- again with Brady, for instance.  If
19  we're going to call him as a witness, which I
20  planned to call, I wanted a report, and he didn't make
21  a report for months.
22      Q.  And when did you start -- when did you
23  first ask him for a report?
24      A.  Well, it was after the indictment, of

Page 47

1  course, because we didn't need -- we didn't need him
2  since we had two other forensic pathologists who
3  already gave me a report, but sometime after that.
4  And I think he was reluctant to get in the case, but
5  I thought he was important because he was the one
6  hired by Adams County to take over for Jessica
7  Bowman and that I thought he was a fine forensic
8  pathologist.
9      Q.  As you testified earlier, was your
10  understanding that his reluctance stemmed from
11  a -- not wanting to get involved in this case
12  because it involved Dr. Bowman?
13      A.  I think that's fair, yes, because he was
14  tired of trying to clean up her -- trying to use his
15  words.  "Trying to clean up her vague non-opinions"
16  when he thought, as a professional, that she should
17  be able to give one.  And he did not want to get
18  involved in a case to second guess a person who
19  performed the autopsy.
20      Q.  And at the time of the grand jury
21  indictment, did you have any information from any
22  source that Dr. Denton had any reservations about
23  this case being a murder?
24      A.  No.

Page 48

1      Q.  At the time of the grand jury indictment,
2  did you have any information from any source that
3  Dr. Denton had any reservations about the timing of
4  when Cory Lovelace died not fitting with a theory
5  that Curt was responsible for her death?
6      A.  No.
7      Q.  Did that remain true at the time that you
8  tried Curt Lovelace for the first time?
9      A.  Yes.
10      Q.  And to be clear, at the time of Curt's
11  first trial, did you have any information that
12  suggested to you that Dr. Denton had any reluctance
13  about calling Cory Lovelace's death a "murder"?
14      A.  Well, reluctance is -- he was reluctant to
15  get in the case because of his prior dealings with
16  cases performed by Jessica Bowman.
17      And where the rub comes in, in my opinion,
18  it's a misinterpretation of Dr. Denton's theory of
19  the case when some people have said that he was
20  trying to get Jessica Bowman to change her report.
21  That's not what he said.  What he told the
22  detectives and what he told me was unless Jessica
23  Bowman, who performed the autopsy, is willing to
24  amend her report that might be consistent with some

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334

EDWIN R. PARKINSON  11/19/2018

Page 49

1   of her findings, then you're stuck with her report.
2       Now, that's from a scientific and medical
3   person, and so he's not saying, "Tell her to change
4   her report." But unless you get someone
5   else's -- unless you get her to admit that she made
6   sufficient findings that should have led her to a
7   cause of death, then you're stuck with her report.
8   I know that sounds like around -- around the bend,
9   but that's different than him telling Gibson, "Go
10  tell her to change the report." He never did that.
11      That probably didn't answer your question.
12      Q.   Well, when did Dr. Denton first tell you
13  that unless Dr. Bowman was willing to amend her
14  report, you were stuck with her report?
15      A.   Well, I guess he probably said that all
16  along. Probably after the indictment, for sure, but
17  he made that statement to me. And if she wasn't
18  going to amend the report -- in other words, her
19  report is going to come out at any trial you do. So
20  the defense attorneys are going to have that in
21  their favor that she actually did the autopsy. He
22  didn't, but he reviewed what she found, and he
23  thought she should be able to look at her own report
24  and come up with a conclusion.

Page 50

1       So I think I probably learned that all
2   along. After Mr. Lovelace was indicted, that was
3   always Dr. Denton's statement, but it wasn't -- it
4   wasn't to tell the lady to change her report. It
5   was unless you -- unless she is not going
6   to -- unless she is going to change and amend her
7   report to include "I think this is the cause of
8   death," then you're stuck with that. I remember him
9   using the word "stuck with that."
10      Q.   Did you ever talk to a witness in this
11  case -- and I'm asking at any point, you know, up
12  until the present -- named William Ballard?
13      A.   He was probably one of the EMTs that -- I
14  don't know if he was a fireman or EMT, because
15  they're both that way, I guess. Before the first
16  trial or the second -- before the first trial, for
17  sure.
18      Q.   And when did you meet with him?
19      A.   Well, I met with him probably the day he
20  testified at the first trial. I had his report, I
21  think. I'm sure I did. I had a report from him.
22      Q.   Is that the first time that you'd spoken
23  with him?
24      A.   I think so.

Page 51

1       Q.   Have you ever talked with someone at any
2   point about this case named Dr. Ezra Pounder (sp)?
3       A.   No. Is he a poet from England?
4       Q.   It sounds like a poet.
5           Prior to the first trial, had you ever
6   spoken, yourself, with Erika Gomez?
7       A.   Prior to the first trial?
8       Q.   Yes.
9       A.   I don't think I have ever talked to her.
10  I think there was some e-mails she sent, which I
11  referred to Julia. I don't believe I have ever
12  talked to her prior to the first trial.
13      Q.   And had you ever talked with
14  Dr. Shaku, S-H-A-K-U; Teas, T-E-A-S; about this case
15  before the first trial?
16      A.   Personally talked to her?
17      Q.   Yes.
18      A.   No.
19      Q.   Had you exchanged -- did you exchange any
20  e-mails with her before the first trial?
21      A.   No.
22      Q.   Did you talk with her before the second
23  trial?
24      A.   I don't think I have ever talked to her

Page 52

1   until she took -- got on the stand. Because she was
2   the same lady that was in those trials both in
3   Springfield and in Decatur where she and Jessica
4   Bowman teamed up together, and I didn't think I was
5   going to learn anything from her because she was an
6   advocate who ignores the facts.
7       Q.   When did you develop the belief that she
8   was an advocate who ignored the facts?
9       A.   Because all the places she testified
10  around here and up near Chicago and the suburbs in
11  different trials. She's not -- she's not very
12  believable.
13      Q.   Have you ever talked with Lyndsay Lovelace
14  about anything having to do with this case?
15      A.   Yes.
16      Q.   How many times have you spoken with her?
17      A.   Two or three.
18      Q.   When's the first time that you spoke with
19  her?
20      A.   Prior to the first trial.
21      Q.   And what did you discuss with her?
22      A.   Why she lived with her grandmother. How
23  was the relationship between her and her father, how
24  did Erika Gomez affect her wanting to not live there

13 (Pages 49 to 52)

## EDWIN R. PARKINSON  11/19/2018

Page 53

1    anymore.
2        Q.  The first time that you talked with her,
3    was that before or after the grand jury indictment?
4        A.  After.
5        Q.  Did you ever talk with her in that first
6    conversation about any of her memories from the day
7    that her mom was found passed away?
8        A.  I did.  Probably by phone or in person.
9    Probably by phone.  And then she remembered that she
10   remembered seeing her mother that morning.  I think
11   she said her last memory of her was that she was
12   sitting on the stairway as the kids were going to go
13   off to school, and I think she remembered it being
14   Valentine's Day, and that her mother and she both
15   exchanged "I love you," something like that.  And
16   then Curtis then took the two boys and her to
17   school, the two of the three boys to school.
18       Q.  When was the second time that you worked
19   with her, with Lyndsay?
20       A.  I know that in between that time and the
21   first trial, I believe, that -- I don't know if Adam
22   Gibson paid her a visit to Iowa or whether she came
23   home to Marty's house.  I don't know.  But he
24   interviewed her again, and he let me know what she

Page 54

1    said, and she said that's what she remembers, but I
2    think the second time I talked to her, she said she
3    wasn't quite as sure if it was that day or not, but
4    she does remember seeing her mother sit on the step
5    and saying, "goodbye" to her as she went off to
6    school.
7        Q.  That about her mother sitting on the step
8    that she went to school, that's what she told you
9    during her second conversation with her?
10       A.  I think she was a little more vague about
11   it.  She said, "I'm not so sure, but I think it was
12   that day."
13       Q.  And when was that second conversation
14   relative to the first trial?
15       A.  Probably just prior to it, prior -- a week
16   maybe by phone.
17       Q.  Did Lyndsay ever express to you any desire
18   not to have to participate in Curt's first trial?
19       A.  She was reluctant.  I don't think she
20   wanted to participate in either trial, yes.
21       Q.  And after the first trial when the second
22   trial was going on, she also expressed to you a
23   desire not to be involved in that; is that correct?
24       A.  Yes.

Page 55

1        Q.  And did she tell you why she didn't want
2    to participate?
3        A.  I believe she started a new job.  She
4    graduated from Iowa, and she was starting a new job
5    as a teacher, and she asked, "Is it really necessary
6    that I testify?"
7        Q.  Did Lyndsay ever express to you a belief
8    that her memories about the morning that her mom had
9    passed were not accurate?
10       A.  She didn't tell me that.  I mean, did she
11   say, "No, I'm mistaken," no, she didn't tell me
12   that.
13       Q.  Well, did she ever say something to the
14   effect that she was concerned that maybe what she
15   was remembering somehow wasn't right?
16       A.  Well, again, I didn't have a big interview
17   with her, but she -- it was cloudier to her later
18   on.
19       Q.  How did you learn it was cloudier later
20   on?
21       A.  I didn't suggest that.  I just thought
22   that she was thinking maybe -- that would be me
23   assuming it, but she still stuck with on the day
24   their mother was -- died, that she remembers her

Page 56

1    sitting on the step near the kitchen.  And something
2    about her -- she went downstairs to get some blue
3    jeans or some jeans for one of the boys to wear to
4    school, and she remembers her sitting down.  And I
5    think she said that Curtis, her father, helped her
6    back up to bed.  So she stuck with that.  I
7    disclosed all that, but the defense already knew it,
8    but that's not a Brady violation, because I already
9    knew it, but I don't think she's ever said any
10   different.
11       Q.  Other than the first meeting that you had
12   with Detective Gibson where Sergeant Summers came as
13   well to give you the binder, have you had any other
14   conversations with Sergeant Summers about this case?
15       A.  No.  I think he pretty much assigned it to
16   Adam Gibson.  I believe he attended the trial, but
17   he was never a witness.  I think he was his
18   superior.  I think he was Adam's sergeant.
19       Q.  And have you ever talked with Dina Dreyer
20   about this case?
21       A.  Dina Dreyer?  A police officer, Dina
22   Dreyer?
23       Q.  Yes.
24       A.  Yes.  Is she the one that in the -- I have

14 (Pages 53 to 56)

EDWIN R. PARKINSON  11/19/2018

Page 57

1  talked to her, yes.  She was instrumental in the
2  second trial, for sure, as a witness came forward
3  the Friday of the conclusion of jury selection.  I
4  think that was Dina, who was in the courtroom, who
5  said that Mr. Soshi (sp) -- I believe that was his
6  name -- came forward, and she was in charge of
7  running that down in Missouri.  I think in Missouri
8  he was, and he said that he saw something the -- on
9  the day of the event.
10      Q.  Did you ever talk with Dina Dreyer about
11  this case before the issue arose involving Mr. Soshi
12  and some witnesses related to him?
13      A.  I talked to Dina Dreyer before -- I'm
14  trying to think what else she may have been in
15  charge of.  I don't know if she was the one in
16  charge of trying to run down where the sign on the
17  door, that there was -- a class was going to be
18  canceled that day.  I don't know if she had
19  something to do with that, or if she had something
20  to do with the recovery of digital or telephone
21  records.  I don't know.
22      Q.  At some point were you aware that the
23  police -- the Quincy Police Department had recovered
24  a laptop that was in some way connected with Mr. --

Page 58

1      A.  That's it.
2      Q.  With Mr. Lovelace?
3      A.  I think she had something to do
4  with -- she was either in the chain, and there was a
5  laptop that was recovered that he -- "he," meaning
6  Mr. Lovelace -- may have been using the morning of
7  the death of Cory.  And I believe she recovered or
8  downloaded some things from that, or someone under
9  her command downloaded some things from that laptop.
10      Q.  Did you or your office have any role in
11  the decision to seize that laptop or obtain that
12  laptop?
13      A.  No.  I don't believe we -- we didn't ask
14  for a search warrant.  I don't know.  As far as I
15  know, they asked Mr. Lovelace for it, and he gave it
16  to me.  I'm not sure.
17      Q.  Did you hear that the Quincy Police
18  Department had that laptop after the fact, meaning
19  when they already had possession of it?
20      A.  Yeah, yes.
21      Q.  Did you ever talk with Chief Copley about
22  this case?
23      A.  Yes.
24      Q.  How many times?

Page 59

1      Q.  And let me actually put a time frame on
2  that first.  Did you talk with Chief Copley at all
3  about this case before the first trial?
4      A.  I probably talked briefly with him only
5  as -- since he was the Chief of Police of Quincy,
6  probably as a courtesy, and inform him about what we
7  were going to do.  We were going to convene the
8  grand jury.  And I don't believe he was a witness to
9  anything.
10      I probably asked him when Adam Gibson was
11  hired and what his duties were and he was promoted
12  to some position that he could look into cold cases.
13  And he told me that in December of -- I think it was
14  December of 2013, or somewhere thereabouts, that
15  Adam Gibson had been promoted to the detective
16  section and that he knew that Adam was looking into
17  this case.
18      Q.  When you first met with Detective Gibson
19  or at any point after that, did he ever tell you why
20  he started investigating this case in the first
21  place?
22      A.  I would presume he was proud to be a
23  detective and that there were other cases sitting on
24  the shelf somewhere, and he had time to go look

Page 60

1  through them and see if there's anything that maybe
2  somebody may have missed.  I don't know if he ever
3  told me that the case bothered him from six years,
4  eight years before, eight years before.  He just
5  said he was looking through unsolved cases.
6      Q.  Did you review any drafts of Dr. Denton's
7  formal written report before the report was
8  produced?
9      A.  No.
10      Q.  Did you talk to him -- and I understand
11  your testimony earlier was that you had to bug him
12  for several months to get a written report from him;
13  is that right?
14      A.  Yes, because he didn't want to be involved
15  in the case.
16      Q.  In the process of bugging him to get a
17  report, did you actually talk with him about the
18  content of the report itself, either that the
19  content that you wanted or the content that he was
20  thinking about?
21      A.  I didn't suggest anything that should be
22  in his report.  I just wanted to know if he could
23  give an opinion within a reasonable degree of
24  forensic certainty as to the cause of death, and if

15 (Pages 57 to 60)

Page 61

1  he could, I'd appreciate it, because he's going to
2  be called as a witness, and without a report, that's
3  going to be hard to explain.
4      Q.   And when you -- did he talk with you at
5  all to review with you, you know, "Here's what I'm
6  planning to write down"?  Or was it simply that you
7  bugged him several times to produce a report and
8  then he produced a report and gave it to you?
9      A.   Probably the latter.  I mean, I hate to
10  use the word "bugged."  I shouldn't have used that.
11  But I did bug him, because I wanted something in
12  writing, but I didn't tell him anything I wanted in
13  it.  I wanted to know what his findings would be,
14  because we need to have something in writing if
15  we're going to call him as a witness.
16      Q.   And when I say, "bugged," I don't mean to
17  suggest anything inappropriate about that.  I simply
18  mean --
19      A.   I probably did bug him.
20      Q.   You needed a written report from him to
21  use him at trial, which was your goal?
22      A.   It was my intent, yes.
23      Q.   And your intent to use him at trial was
24  because you believed that he had information that

Page 62

1  would be relevant to proving your case at trial?
2      A.   Yes.
3          MS. THOMPSON:  Let's mark this as
4  Exhibit 1.
5          (Plaintiff's Exhibit 1 was marked for
6  identification.)
7          MS. THOMPSON:  This is the official
8  marked exhibit.  I think the other copy is for Bill,
9  if you want.
10          MR. MORAN:  Thanks.
11  BY MS. THOMPSON:
12      Q.   I'm showing the witness what's been marked
13  as Exhibit 1, and just for the record, this is a
14  two-page document, which has two sets of Bate's
15  stamps on it.  I'm going to refer to it as Plaintiff
16  Bate's stamp 5082 and 5083.
17          Mr. Parkinson, do you recognize this
18  letter?
19      A.   I signed it.  I wrote it.  I dictated it.
20  Well, I actually wrote it from my PC.  I didn't use
21  a secretary.
22      Q.   This is a letter that is dated June 16th
23  of 2015; is that correct?
24      A.   Yes.

Page 63

1      Q.   Do you see if you look at the -- I have
2  some questions about the content of this letter.  I
3  don't know if it would be easier for you to briefly
4  review it, and let me know when you're done, and
5  then I have a couple questions for you.
6          MS. EMERY:  While you're doing that,
7  can we take a short bathroom break?
8          MS. THOMPSON:  Sure.
9          If you want to take a break as well,
10  Mr. Parkinson, and come back and review it when
11  you're done, that's fine.
12          THE DEPONENT:  I'm all right.
13          (Whereby a short break was taken.)
14  BY MS. THOMPSON:
15      Q.   Mr. Parkinson, we took a break, and I
16  think through the break you had an opportunity to
17  review Exhibit 1; is that correct?
18      A.   Yes, I did.
19      Q.   And this letter is dated June 16th of
20  2015, and is this letter the first effort by you to
21  seek a formal written report from Dr. Denton about
22  his opinions in this case?
23      A.   Yes.  So I'll correct myself because I
24  said I don't think I asked for one prior to the

Page 64

1  grand jury, but evidently I did.
2      Q.   Well, let me just point out this letter --
3      A.   No, this is a year later.  You're right.
4  This is a year after.
5      Q.   And this letter is your first attempt to
6  get a report by Dr. Denton?
7      A.   I believe it is, yes.
8      Q.   In the second paragraph of this letter,
9  you give what you call "some history."  Do you see
10  that in the second paragraph?
11      A.   Yes.
12      Q.   And why was it your belief that he was
13  first contacted on January 6th of 2014?
14      A.   Because that's when I believe Adam Gibson
15  and Keller may have gone together, but they went to
16  visit Dr. Denton in Bloomington, Illinois.
17      Q.   Did you get that information from a report
18  that either Coroner Keller or Mr. Gibson provided to
19  you?
20      A.   I don't know that I got a written report
21  from them, but probably documented that they went to
22  visit Dr. Denton up there.
23      Q.   And do you see in that second-to-last
24  sentence in that paragraph that there's a sentence

16 (Pages 61 to 64)

Page 65

1 that says, "You observed bloody congestion on or
2 around the brain consistent with suffocation"?
3     A.  Yes.  I believe that's something that he
4 put in writing to Keller and maybe to Gibson.
5     Q.  And why is that your belief?
6     A.  Because I used quotation marks for one
7 thing, and so it must have been a report that I -- a
8 summary of a report that either Keller or Gibson was
9 giving me that these are the things that Dr. Denton
10 told them, told Keller anyway.
11     Q.  And at the time you wrote this letter, it
12 was your belief that Dr. Denton had observed bloody
13 congestion on or around the brain that was
14 consistent with suffocation?
15     A.  Yes.
16     Q.  You also requested in the last paragraph
17 of this letter to have a meeting with Detective
18 Gibson and Dr. Denton about this case; is that
19 right?
20     A.  Yes.
21     Q.  Did you have such a meeting before
22 Dr. Denton provided you his written report?
23     A.  No, I don't think we ever did drive to
24 Bloomington to discuss anything with Dr. Denton.

Page 66

1 You mean Adam -- like, Adam Gibson and I driving up
2 there?  No.
3         MS. THOMPSON:  Let's mark this as
4 Exhibit 2.
5     (Plaintiff's Exhibit 2 was marked for
6 identification.)
7         MR. MORAN:  Thanks.
8 BY MS. THOMPSON:
9     Q.  I've shown the witness what's been marked
10 as Exhibit 2, and this has Bate stamp numbers on it
11 of Plaintiff 9212 through Plaintiff 9215.  Is this a
12 copy of the report that you received from
13 Dr. Denton?
14     A.  Yes.
15     Q.  And this report is dated June 22nd of
16 2015.  Do you see that?
17     A.  Yes.
18     Q.  Is that when you received this report from
19 Dr. Denton?
20     A.  Yes.  It was about a week after I wrote my
21 letter to him in what was Exhibit 1.
22     Q.  At some point after you got that report,
23 you received some notes from Curtis Lovelace's then
24 defense lawyers about a meeting that one of them had

Page 67

1 had with Dr. Denton; is that right?
2     A.  Yes.
3     Q.  When did you first talk with Curt's
4 defense counsel about them having notes of some
5 meeting that they had with Dr. Denton?
6     A.  Well, since their office -- it was
7 Elmore & Page.  I believe it was discussion with
8 both of them, but I believe it was Jeff Page that
9 went up and met with Dr. Denton.  And he, Jeff Page,
10 made notes.  And they were trying to impress on me
11 that -- they used the phrase I thought they were
12 using wrong, that the suffocation was not a rule-out
13 cause of death.  And so they -- Jeff Page was
14 misinterpreting that, I think.
15         But it was -- to answer your question, it
16 was right away.  I see them all -- I see them in
17 court here at least once a month.  And it was
18 shortly after this that they said, "I don't know why
19 you're pursuing this because he's
20 ruled -- suffocation is a rule-out cause of death."
21 That's what Jeff Page told me.
22     Q.  Well, this issue with Dr. Denton arose in
23 the context of Jeff not having had a proofer for his
24 conversation with Dr. Denton; is that right?

Page 68

1     A.  Yes.
2     Q.  There was an issue -- or there was some
3 period of time in the first trial where Mr. Page was
4 concerned that he was going to have to withdraw as
5 counsel for Curt because he thought he had made
6 himself a witness; is that right?
7     A.  There was that, yes.
8     Q.  And you asked for the notes from Jeff in
9 order to assess your position on whether or not Jeff
10 had conflicted himself out of this case essentially;
11 is that right?
12     A.  Yes.
13     Q.  Then you subsequently reviewed those
14 notes?
15     A.  Yes.  It was -- I think it was a one page
16 or maybe two of handwritten summary, according to
17 Jeff Page, as to what Dr. Denton had told him.
18     Q.  When you reviewed those notes, did you
19 send them to Dr. Denton?
20     A.  I think I did.  If -- we met with
21 Dr. Denton in Lincoln, Illinois shortly thereafter.
22     Q.  Who is "we"?
23     A.  Jeff Page, Jay Elmore, myself, and
24 Dr. Denton met in the Logan County Courthouse

## EDWIN R. PARKINSON  11/19/2018

Page 69

1  because it was midway between Bloomington and
2  Springfield.
3      Q.  And did Dr. Denton say in that meeting
4  that words to the effect that Jeff had misunderstood
5  him?
6      A.  Yes.
7      Q.  Did he say that Jeff's notes were not
8  accurate as to his opinions in the case?
9      A.  Yes.
10         MS. THOMPSON:  Let's mark this as 3.
11      (Plaintiff's Exhibit 3 was marked for
12  identification.)
13  BY MS. THOMPSON:
14      Q.  I've shown the witness what's been marked
15  as Exhibit 3, and this is a document that is Bate's
16  stamped Plaintiff 9184 through Plaintiff 9191.  Do
17  you have that in front of you, Mr. Parkinson?
18      A.  Yes.  9184.
19      Q.  Through 9181 -- or 9191.  Excuse me,
20  Mr. Parkinson.
21      A.  Yes, I have that.  Yes.
22      Q.  The first two pages are first a fax header
23  page and then a full copy of a letter dated
24  June 30th of 2015 from James Elmore to you; is

Page 70

1  that right?
2      A.  Yes.
3      Q.  And this letter enclosed two pages of
4  typewritten notes from Mr. Page?
5      A.  Yes.
6      Q.  And are these two pages, which I think
7  appear here on Plaintiff 9186 and 9187, are those
8  the notes that Dr. Denton told you did not
9  accurately reflect his opinions?
10      A.  Yes.
11      Q.  And then if you look back at 9189, that is
12  your -- 9189 is a copy of a letter from you to James
13  Elmore dated June 29th of 2015 where you requested
14  those notes from Mr. Elmore?
15      A.  Yes.
16      Q.  Did you determine, as a result of
17  considering these issues, whether or not you thought
18  that Mr. Page did have a conflict about his
19  communications with Dr. Denton?
20      A.  I didn't think he had a conflict.
21      Q.  And why not?
22      A.  Well, why?  I didn't see the conflict that
23  he's -- his cross examination that he could utilize.
24  I didn't think that he had a -- because he

Page 71

1  misunderstood what Dr. Denton was telling him, I
2  didn't think that constituted a conflict.
3          (Plaintiff's Exhibit 4 was marked for
4  identification.)
5  BY MS. THOMPSON:
6      Q.  I'm showing the witness what's been marked
7  as Exhibit 4.  This has a couple of Bate's stamps on
8  the bottom, but one of the Bate's stamps there is
9  Plaintiff 5084.
10      A.  Yes.
11      Q.  Did you send Exhibit 4 to Mr. Elmore and
12  Mr. Page on July 10th of 2015?
13      A.  Yes.
14      Q.  And in the first paragraph here, in the
15  middle of the paragraph, you write, "Nowhere in that
16  summary does it state that Dr. Denton ruled out
17  suffocation as a cause of death."  Do you see that?
18      A.  Yes.
19      Q.  Was it your belief at the time that you
20  reviewed these notes that it was Dr. Denton's
21  opinion, to a reasonable degree of medical
22  certainty, that suffocation was the cause of Cory
23  Lovelace's death?
24      A.  Yes.

Page 72

1      Q.  This letter also references you asking
2  for, I think, an original copy of Mr. Page's
3  presumably handwritten notes.  Do you see that?  I'm
4  looking at the second paragraph.
5      A.  Yes, yes.
6      Q.  Did you ever get a copy of any handwritten
7  notes from Mr. Page from that interview?
8      A.  I don't know.  I think he brought with him
9  to the meeting in Lincoln and went down them one by
10  one with Dr. Denton.
11      Q.  He had a copy of his handwritten notes at
12  that meeting?
13      A.  Yes.
14      Q.  Did his handwritten notes differ from what
15  is in the typewritten notes that we just looked at?
16  If you need to refer back to that exhibit, please do
17  so.
18      A.  Well, the very last paragraph on Page 9191
19  is different than what Dr. Denton said.
20      Q.  And that refers to this issue of there
21  being suffocation being a rule-out cause of death?
22      A.  Yes.
23      Q.  My question is, when -- were there any
24  differences between the typewritten version of these

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334

EDWIN R. PARKINSON  11/19/2018

Page 73

1  notes and the handwritten version in their
2  substance?
3      A.  I can't answer that without looking at the
4  typed -- of the handwritten ones.  I'd be glad
5  to -- if you furnish that to me, I'd be glad to look
6  at them, but I don't know if we ever had those
7  handwritten notes until we had a meeting with Dr. --
8      Q.  Well, at the meeting, do you remember
9  identifying any differences between the hand notes
10  and the typed-up version?
11      A.  No.  I remember Dr. Denton getting him
12  pretty fed up with the questioning and said, "This
13  interview is over."
14      Q.  How long did your meeting with him last?
15      A.  Less than an hour.
16      Q.  Was Dr. Denton upset at that meeting that
17  Mr. Page had taken notes of his meeting with him?
18      A.  Oh, I don't know that he was upset that he
19  took notes, but he was upset that he interpreted
20  them differently or mis -- or misquoted him.
21      Q.  Ultimately at this first trial, Dr. Denton
22  did not testify; is that right?
23      A.  That's right.
24      Q.  The parties had reached the stipulation

Page 74

1  about him?
2      A.  Because of Jeff Page's feeling that he
3  would have to withdraw, even though I thought he was
4  mistaken, we had a stipulation, and so Dr. Denton
5  did not testify.
6      Q.  And was that stipulation, in part, because
7  it was important to keep this trial for the date
8  that it had been scheduled?  And if Mr. Page had to
9  withdraw -- or felt he had to withdraw, that would
10  delay these proceedings?
11      A.  That was up to the judge.  Quite frankly,
12  I didn't care if he withdrew or not.  I was ready
13  for trial.  So was Mr. Lovelace.
14      Q.  At the time of the first trial, though,
15  did you believe that Dr. Denton's opinions in this
16  case supported Curt's guilt?
17      A.  Yes.
18      Q.  And after Curt's first trial ended in a
19  hung jury, and the matter proceeded to a second
20  trial, you learned at some point that there had been
21  a FOIA request issued to the Quincy Police
22  Department that resulted in the production of
23  certain e-mails between Dr. Denton and Mr. Gibson;
24  is that right?

Page 75

1      A.  I believe so.
2      Q.  And at that time, did you see copies of
3  certain e-mails between Mr. Gibson and Dr. Denton
4  that you had not seen before?
5      A.  Yes.  I'm trying to think of the exact
6  content of it.  There was something that I had never
7  saw before.
8      Q.  Well, prior to -- well, strike that.
9          After that FOIA request, there was a
10  motion to compel that the defense filed that
11  attached some of those e-mails as exhibits; is that
12  right?
13      A.  I think so.
14      Q.  All right.  And did that motion prompt you
15  and your office to undertake some discussion with
16  the Quincy Police Department about whether evidence
17  related to Dr. Denton had all been disclosed?
18      A.  I believe that the discussion was between
19  David Robinson and Adam Gibson.
20      Q.  At that point after that motion to compel
21  was filed, did you have any conversations with
22  Detective Gibson about this issue?
23      A.  No.
24      Q.  Mr. Robinson undertook all of that

Page 76

1  communication?
2      A.  Yes.
3      Q.  Did you talk with anybody at that point
4  after the motion to compel was filed about anything
5  having to do with their collection of documents or
6  their production of documents either to your office
7  or to the defense in the case?
8      A.  My only discussions were with David
9  Robinson.
10      Q.  So Mr. Robinson handled those --
11      A.  Yes.
12      Q.  -- communications?
13          Subsequently, there was an in camera
14  hearing that was held with the Court about this
15  issue at which you made some representations as an
16  officer of the Court on the record to the Court; is
17  that right?
18      A.  Yes.
19      Q.  And were the representations that you made
20  to the Court at that time accurate?
21      A.  Yes.
22      Q.  Prior to receiving that motion to compel,
23  when Detective Gibson and Sergeant Summers gave you
24  that binder, or in any of the times after when they

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334

Page 77

1    provided you with additional reports, did they
2    provide you with any copies of e-mails between
3    Detective Gibson and Dr. Denton?
4        A.  I don't believe so.
5        Q.  Did Jim Keller ever give you any e-mails
6    that he had exchanged with Dr. Denton to which you
7    were not a party that was also CC'd?
8        MR. HANSEN:  Hold on.  I'm going to
9    object to the form.  Any e-mails from Keller to who?
10       MS. THOMPSON:  Let me ask the
11   question again.
12   BY MS. THOMPSON:
13       Q.  Did you -- at any point, did Jim Keller
14   ever give you copies of any e-mails between him and
15   Dr. Denton other than e-mails that you might have
16   been CC'd on originally?
17       A.  I don't think so.  I don't know, but I
18   don't think so.
19       Q.  And, in general, did you ever get
20   documents directly from Jim Keller in this case or
21   from the coroner's office?
22       A.  I don't know.  I don't think so.
23       Q.  When you had that meeting about -- with
24   Jim Keller where he gave you his observations from

Page 78

1    the morning that Cory Lovelace's body was found, was
2    it your understanding that he had documented those
3    observations in a written report somewhere?
4        A.  I guess I assumed -- I assumed he would
5    have.
6        Q.  Did you assume that Detective Gibson or
7    someone else as the investigating agency in this
8    case would have documented any witness accounts of
9    people who had observations at the scene?
10       A.  I don't know.  I can't assume what one
11   coroner would do from one county to the next.  It
12   would be a good practice.  I don't know.
13       Q.  Have you ever seen a written report from
14   Jim Keller about his observations about what
15   happened, what he observed when he went to the scene
16   where Cory Lovelace's body was found?
17       A.  I think that's in the binder to some
18   extent.  I think there was a report.  Although I
19   remember -- not adding.  I should not.  But I don't
20   know that there was something in the report where
21   Keller told us that when the body was moved from the
22   bed, that her body was all in one fluid motion.
23   Like, her arms didn't fall down.  And so that's -- I
24   don't know that that was in the report, but I know I

Page 79

1    was told that.
2        MS. THOMPSON:  Let's go off the
3    record for one second.
4        (Whereupon there was a short discussion
5    off the record.)
6        (Plaintiff's Exhibits 5 through 14 were
7    marked for identification.)
8    BY MS. THOMPSON:
9        Q.  Let's actually start.  We are going to use
10   all these exhibits, but I'm going to go slightly out
11   of order, and let's actually start with Exhibit 14,
12   which is the last one I handed around.
13       So I'm showing the witness what's been
14   marked as Exhibit 14, and this is a document, a
15   multipage document, which has Bate's stamps of
16   Plaintiff 6432 through 6436.  There are a chain of
17   e-mails in this document.  Do you agree,
18   Mr. Parkinson?
19       A.  Yes.
20       Q.  I actually just have a question for you
21   about -- I guess the first e-mail was technically a
22   forward e-mail, but it's forwarding an e-mail from
23   you to Detective Gibson on May 1, 2015 at 1:42 p.m.
24   Do you see that, Mr. Parkinson?

Page 80

1        A.  Yes.
2        Q.  Did you send an e-mail to Adam Gibson on
3    that date containing this content?  And I'm just
4    asking about the e-mail that --
5        A.  Yes.  The bottom part?  Yeah.  What I sent
6    to Adam Gibson?  Yes.
7        Q.  I'm just asking about the e-mail that goes
8    from 6432 over to the first couple of pages -- or
9    the first couple lines of 6433.
10       A.  Okay.  Okay.  Yes.
11       Q.  So this e-mail references your request or
12   your indication to Mr. Gibson that you needed to get
13   a formal opinion from Dr. Denton.  Do you see that?
14       A.  Yes.
15       Q.  It also says in the second sentence after
16   that, there's a question about what materials
17   Mr. Gibson sent to Detective Turner and Dr. Baden.
18   Do you see that?
19       A.  Yes.
20       Q.  Was it your understanding that the
21   materials that Dr. Turner and Dr. Baden had about
22   this case actually came from Detective Gibson?
23       A.  Yes.
24       Q.  And you then asked him this question about

20 (Pages 77 to 80)

EDWIN R. PARKINSON  11/19/2018

Page 81

1  if he'd already sent him sufficient information to
2  render his expert opinion as to the cause of death,
3  and I'm obviously paraphrasing the exact language
4  that's there.  But do you see that sentence?
5      A.  Yes.
6      Q.  Did you talk with Mr. Gibson after you
7  sent this e-mail about whether Dr. Denton had
8  everything that he needed to review in this case?
9      A.  I don't know.  I don't remember.  I don't
10 remember talking to him.  I just asked if he sent
11 sufficient reports to him.
12     Q.  Well, do you remember Dr. Denton getting
13 any additional information from you at least after
14 May 1st of 2015?
15     A.  He got the letter from me on June
16 6th -- the 16th of 2015.
17     Q.  Other than that letter, did you give
18 Dr. Denton any additional information about the case
19 after May 1st of 2015?  And I'm asking about you,
20 personally.
21     A.  I don't believe so.
22     Q.  All right.  I'm going to now show
23 you -- I'm going to try and do these in order.  So
24 we're actually going to start with Plaintiff's

Page 82

1  Exhibit 9, which should have a Bate's of Plaintiff
2  6277.
3          MS. THOMPSON:  Does everyone have
4  that?
5          MS. EMERY:  Yes.
6  BY MS. THOMPSON:
7      Q.  I'm showing the witness what's been marked
8  as Exhibit 9.  This is a two-page document that's
9  Bate stamped Plaintiff's 6277 and 6278.  Is this
10 e-mail a document -- well, let me ask that question
11 in a different way.  Did you first receive this
12 e-mail or this exhibit, Mr. Parkinson, just prior to
13 the beginning of Curt's second trial?
14     A.  I don't remember when I got it.  I don't
15 know if I did get it, but it's not -- I'm not CC'd,
16 so I don't know.
17     Q.  Well, did either Mr. Gibson or Mr. Keller
18 tell you prior to the beginning of Curt's second
19 trial when this issue about the undisclosed messages
20 came up that Mr. Keller had concerns about Cory's
21 eyes and the position of her hands in the photos
22 that he had looked at?
23     A.  I'm reading this.  I don't know that I
24 ever saw this prior to, even prior to the second

Page 83

1  trial.  I don't know.  I never saw it -- it wasn't
2  included, I don't think.  Although you would know.
3  The dates of this should have been in the binder
4  that you have.  I don't believe I saw this because
5  it's dated 2014.
6      Q.  Thanks.  Those are all the questions I
7  have about that exhibit.
8          Prior to the end of Mr. Lovelace's first
9  trial, did you know that Detective Gibson had
10 contacted a Dr. -- and I asked you before about an
11 Ezra Pounder, but I'm asking you now if you
12 know -- if he had contacted a doctor named a Derrick
13 Pounder?
14     A.  I believe he said he made calls.  I don't
15 know if that's the University of Michigan or
16 somebody from England, but I believe he did tell me
17 that he was following up on some experts that
18 perhaps a defense had referred to, and he called
19 them and tried to find out what they would have to
20 offer in this case.
21     Q.  Did Detective Gibson tell you prior to the
22 end of the first trial that he had talked to a
23 Dr. Pounder in England who told him that the amount
24 of rigor in the photographs of Cory Lovelace's death

Page 84

1  were consistent with her having died after speaking
2  with her children the morning of her death before
3  they went to school?
4      A.  I don't remember if he told me that.  He
5  talked to a -- he talked to an expert in England.
6      Q.  Did he tell you what that person told him?
7      A.  No.
8      Q.  And showing you what's been marked as
9  Plaintiff's 10.  So this is the -- this is a
10 two-page document that has a Bate stamp of
11 Plaintiff's 6203 and 6204.  Did you receive copies
12 of Exhibit 10 prior to the end of Curt's first
13 trial?
14     A.  I don't think so.  This looks unfamiliar
15 to me.
16     Q.  In any of your conversations with
17 Dr. Denton before -- well, let me just ask you this.
18 I'm going to refer you to Plaintiff's Exhibit 5, and
19 this is Bate stamped Plaintiff's 6275 and 6276.
20         MS. THOMPSON:  Is everyone there?
21 BY MS. THOMPSON:
22     Q.  Is Plaintiff's Exhibit 5 a document -- let
23 me start the question again.
24         Did you receive Plaintiff's Exhibit 5 from

21 (Pages 81 to 84)

EDWIN R. PARKINSON  11/19/2018

Page 85

1    either -- from any source before the end of Curt's
2    first trial?
3         A.   I don't believe so.
4         Q.   And looking to Plaintiff's Exhibit 12,
5    this is a document that's Bate stamped Plaintiff's
6    6424 to 6426.
7              MS. THOMPSON:  Is everyone there?
8              MR. HANSEN:  I'm sorry.  What
9    exhibit?
10             MS. THOMPSON:  Exhibit 12.
11   BY MS. THOMPSON:
12        Q.   This has some similar e-mails that were in
13   the chain that we just looked at in Exhibit 5, but
14   some e-mails that appear that they're different.
15   Did you receive a copy of Exhibit 12 from anyone
16   before the end of Curt's first trial?
17        A.   I don't believe so, but you would know
18   because it would be in the binder.
19        Q.   To go back one minute as well.  You
20   indicated that your personal policy for discovery in
21   cases was to have an open-file policy; is that
22   right?
23        A.   That's mine, yes.
24        Q.   And is that your policy because you always

Page 86

1    want to ensure that anything the defense has a right
2    to see or an interest in seeing that they're able to
3    review it before trial?
4         A.   That's the main purpose of it, to keep me
5    free from a Brady violation.  I'm concerned about
6    that, too, so I give up everything.
7         Q.   And did you have an open-file policy as to
8    both of Curtis Lovelace's trials in this case?
9         A.   Yes, from what I had.
10        Q.   You can't give someone what you don't
11   have, but you opened your file to both sets of
12   counsel to review if they wanted to?
13        A.   Yes.
14        Q.   Let's go to Exhibit 7.  Exhibit 7 is a
15   two-page document that's Bate stamped Plaintiff's
16   6323 and 6324.  Did you receive a copy of Exhibit 7
17   prior to the end of Curt's first trial?
18        A.   I don't believe I did.
19        Q.   Then let's go to Exhibit 13.  Exhibit 13
20   is a multipage document that is Bate stamped
21   Plaintiff's 6318 through 6320.  Did you receive a
22   copy of Plaintiff's Exhibit 13 prior to the end of
23   Curt's first trial?
24        A.   I don't think I did receive this prior to

Page 87

1    the first trial.
2         Q.   Then let's go to Exhibit 6.  Exhibit 6 is
3    a multipage document that is Bate stamped
4    Plaintiff's 6290 through 6293.  Did you receive a
5    copy of Exhibit 6 at any point before the end of
6    Curt's first trial?
7         A.   I don't remember this specific multipage
8    document at all, but I do remember the contents
9    somewhere where Dr. Denton in some report that I did
10   have said that the comment about, "Unless you get
11   Dr. Bowman to amend her report, you're stuck with
12   it."  And I think he even said, "If that's all you
13   get, then that would be more than sufficient to meet
14   reasonable doubt."
15        Q.   And you said that it's your belief that
16   that's -- that comment was expressed by him in a
17   report?
18        A.   Somewhere, but I don't remember this.
19        Q.   Was that expressed in a report from
20   Detective Gibson documenting his conversations with
21   Dr. Denton?
22        A.   Probably from Adam to me.  He did reflect
23   that that's what Dr. Denton said.  And we had the
24   discussion about, well, Dr. Denton wishes she could

Page 88

1    amend her report just to support the findings that
2    she did find, but for some reason, I know we
3    discussed it, but I don't remember this report.
4         Q.   And it was your understanding in all of
5    your conversations with Dr. Denton that Dr. Denton
6    did believe it would be beneficial to this case for
7    Dr. Bowman to amend her report; is that right?
8         A.   Yeah.  Well, yes, it would -- yes, because
9    the report of her autopsy would go into evidence.
10   And so without a specific finding as to a cause of
11   death, it didn't change his opinion, but that would
12   go into evidence that the autopsy performer did not
13   come up with a cause of death.
14        Q.   It was your understanding that Detective
15   Gibson was conferring with Dr. Bowman to try to get
16   her to write an amendment; is that right?  Or he had
17   done that in the past?
18             MS. EMERY:  Object to the form.
19   BY MS. THOMPSON:
20        Q.   Let me strike that question and ask it
21   again.
22             Did Detective Gibson tell you that he had
23   tried to confer with Dr. Bowman to get her to amend
24   her opinions in this case?

22 (Pages 85 to 88)

**EDWIN R. PARKINSON  11/19/2018**

Page 89

1      MS. EMERY:  Object to the form.
2      THE DEPONENT:  I don't know if he
3  talked to Dr. Bowman.  I know he talked to Shaku
4  Teas, but I don't know if he talked to Dr. Bowman or
5  not.
6  BY MS. THOMPSON:
7      Q.   Did you ever direct Detective Gibson to
8  try to talk to Dr. Bowman to get her to amend her
9  opinions in this case?
10     A.   No.
11     Q.   Did you, yourself, talk with Dr. Bowman at
12  any point before the first trial in this case?
13     A.   Yes, I traveled to Keokuk, Iowa, and met
14  with her as a -- I think it was at a new hospital
15  that she was working at in Keokuk, and I met her in
16  one of the conference rooms.
17     Q.   Was your meeting with her close in time to
18  the first trial?
19     A.   Yes.
20     Q.   And what did she convey to you in your
21  meeting with her?
22     A.   She did the autopsy, and she was unable to
23  find a specific cause of death.  I didn't suggest
24  that she change anything.  I pointed out that she

Page 90

1  made certain findings, like the cut under the lip
2  and the eyes, and the rigor mortis that was present
3  according to Jeff Baird's report to her.  And so we
4  just had a friendly conversation, and I told her I
5  may or may not call her as a witness.
6      Q.   Did she tell you anything in that meeting
7  to the effect that she believed this was a murder,
8  but she just wasn't willing to come forward to say
9  that?
10     A.   No, I don't think she said that.
11     Q.   I mean, did she maintain to you in that
12  meeting that it was her belief that the appropriate
13  findings for this autopsy was that it was an
14  undetermined death?
15     A.   I believe she told me the findings she
16  made probably needed further investigation, but from
17  what she did, she could not put her name to an
18  autopsy report as to the cause of death.
19     Q.   Did you ever express to Detective Gibson
20  your belief that Dr. Bowman, you know, couldn't be a
21  witness in this case because she was unstable in
22  some way?
23     A.   I don't think I have ever used the word
24  "unstable."  She was a character.  She was a -- she

Page 91

1  looked like she was dedicated to her job.  She
2  was -- I used the word "character" not in a mean
3  way.  She just was flamboyant and kind of doing her
4  own -- in her own world.
5      Q.   Did you ever tell anyone that you thought
6  that Dr. Bowman was crazy?
7      A.   No.
8      Q.   Did you -- you talked about getting a
9  binder from Detective Gibson.  Did you produce that
10  binder to the defense in -- as part of discovery
11  prior to the first trial in this case?
12     A.   Every page.
13     Q.   All right.  And then you subsequently
14  reproduced that binder to the defense when they
15  requested it after the -- after he got new counsel
16  for the second trial, correct?
17     A.   Yeah, it was the same -- reproduced it.  I
18  thought they turned it over to you, but we
19  reproduced it, yes.
20     Q.   Did you go through that binder and take
21  any pages out before you produced it --
22     A.   No.
23     Q.   -- either at the first or second --
24     A.   No.

Page 92

1      Q.   So you produced that binder in total to
2  defense counsel twice?
3      A.   Yes.
4      Q.   Let me show you what's been marked as
5  Exhibit 11.  This is a multipage document, which is
6  Bate stamped -- at least one of the sets is Bate
7  stamped Plaintiff's 6286 through Plaintiff's 6289.
8      A.   Mm-hmm, yes.
9      Q.   Did you see a copy of Plaintiff's
10  Exhibit 11 at any point before the end of the first
11  trial in this case?
12     A.   I don't believe so, no.
13     Q.   In any of your conversations with
14  Dr. Denton, did he ever tell you that unless
15  Dr. Bowman amended her opinions in this case, the
16  investigation into Cory Lovelace's death could not
17  continue?
18     A.   No, I don't think he said that.
19     Q.   Finally, let me show you what's been
20  marked as Exhibit 8.  This is a multipage document,
21  which is Bate stamped Plaintiff's 6297 through 6300.
22  Did you see a copy of Plaintiff's Exhibit 8 at any
23  point before the end of the first trial in this
24  case?

23 (Pages 89 to 92)

## EDWIN R. PARKINSON  11/19/2018

Page 93

1    A.  No.
2    Q.  It was your understanding that Dr. Bowman
3  had talked with Detective Gibson and Jim Keller a
4  few times without you during their investigation; is
5  that right?
6    A.  Yes.
7    Q.  Do either of them ever give you any
8  updates or summaries about what Dr. Bowman told
9  them?  And let me say when I ask about that, I'm
10  asking about other than written reports you might
11  have reviewed that summarized those meetings.
12    A.  No.
13    Q.  Did there ever -- let me strike that
14  question again.
15        Was there ever an encounter between you
16  and Detective Gibson where Detective Gibson tried to
17  hand you copies of paperwork that you told him you
18  didn't want to see?
19    A.  No.
20    Q.  Did you meet with any other -- well, let
21  me ask this question first.  Did you meet with Gary
22  Hamilton at all in preparation for the first or
23  second trials in this case?
24    A.  I don't think I did.

Page 94

1    Q.  Did you meet with any of the other first
2  responders?  We talked some about conversations
3  potentially with William Ballard and with Jim
4  Keller, but did you meet with any of the other first
5  responders in preparation for either trial?
6    A.  There was another first responder that was
7  with Mr. Ballard, I think, who arrived at the same
8  time.  I don't know if he was a fireman or a -- I
9  think he was a firemen or an EMT.
10    Q.  Was that Cole Miller?
11    A.  Yes.  Cole Miller, yes.
12    Q.  When did you first meet with Cole Miller?
13    A.  I'm thinking they arrived at the same time
14  in Quincy, in the witness room, to testify in the
15  first trial, but probably a few minutes or the
16  morning before they were to go on.
17    Q.  You also had access to a number of
18  photographs of the scene of where Mr. Lovelace's
19  body was found; is that right?
20    A.  Yes.
21    Q.  And was it your understanding for all the
22  photographs that you received that those photos
23  depicted how her body appeared when she was first
24  discovered?

Page 95

1    A.  Yes.
2        MS. THOMPSON:  What exhibit are we
3  on?  Is this 15?
4        THE REPORTER:  Yes.
5        (Plaintiff's Exhibit 15 was marked for
6  identification.)
7  BY MS. THOMPSON:
8    Q.  I've shown the witness what's been marked
9  as Exhibit 15.  This is a one-page document that has
10  a Bate stamp on it of SAAP344.  I think the witness
11  is reviewing the exhibits, so I'll ask him to finish
12  doing it before.
13    A.  I'm done.
14    Q.  All right.  And Exhibit 15, the lower
15  portion of the exhibit is an e-mail from Jim Keller
16  to you dated July 7th of 2015; is that right?
17    A.  That was from James Keller to me.
18    Q.  You received that e-mail, and then you
19  responded to it on July 8th of 2015; is that
20  right?
21    A.  July what?
22    Q.  You received that e-mail, and then you
23  responded to it on July 8th of 2015 at about
24  10:55 a.m.; is that correct?

Page 96

1    A.  Yes.  That's upside down.
2    Q.  Your e-mail at the top is the response?
3    A.  Response.
4    Q.  Did you have any conversations with Jim
5  Keller about the issue he was e-mailing you about on
6  July 7th other than your written response?
7    A.  I don't think I would have had to.  I
8  don't remember if I did, but it was a pretty
9  straightforward question.  I said that he doesn't
10  have to talk to the lawyers, but go ahead.
11    Q.  He told you he'd been contacted by defense
12  counsel, and he wanted to know if he needed to speak
13  to him, right?
14    A.  Yes, and I told him in my response he
15  doesn't have to, but go ahead.
16    Q.  That's an accurate statement of the rules,
17  correct?  That it's his choice whether to speak with
18  someone?
19    A.  I believe it is.
20    Q.  And you told him in your e-mail that you
21  thought that he should talk to defense counsel,
22  correct?
23    A.  Yes.
24    Q.  And you told him that because you thought

24 (Pages 93 to 96)

Page 97

1    that Jim Keller had information about what he saw at
2    the scene that would be relevant to your case, right?
3    how the defense was thinking about your case, right?
4        A.  Yes.
5        Q.  And you also thought that he could be a
6    source of information to the defense about
7    Dr. -- what Dr. Denton had told Mr. Keller, correct?
8        A.  Yes, the position of the arms.
9        Q.  Right.  And it was your belief at the time
10   that you wrote this e-mail that Dr. Denton's
11   opinions had led Jim Keller and Detective Gibson to
12   continue their investigation into why Cory Lovelace
13   died?
14       A.  Yes.
15       Q.  And that was because you believed that he
16   had told them information that had led them to
17   conclude that this was a murder?
18       A.  Yes.
19       Q.  At some point -- well, let me show you
20   this first.
21       MS. THOMPSON:  What are we on?
22       THE REPORTER:  This is 16.
23
24       (Plaintiff's Exhibit 16 was marked for

Page 98

1    identification.)
2    BY MS. THOMPSON:
3        Q.  The witness has been shown what's been
4    marked as 16.  This is a one-page document, Bate
5    stamped SAEP349.
6        A.  Okay.
7        Q.  You've had a chance to review Exhibit 16?
8        A.  Yes.
9        Q.  Did you send this e-mail to Erika Gomez in
10   response to her sending some thoughts to your office
11   about the case?
12       A.  Yes.
13       Q.  And is there a reason that you e-mailed
14   Ms. Gomez as opposed to calling her?
15       A.  Only that I thought she would get it by
16   e-mail, and I don't know if I knew a phone number I
17   could get her at, you know.
18       Q.  You asked Ms. Gomez some questions in this
19   e-mail, and did you get responses from her to the
20   questions that you posed?
21       A.  I don't know if I did.  I don't remember
22   getting them.  These are the things I wanted her to
23   prepare to answer, but I did ask for an answer, and
24   I don't know that I got them.

Page 99

1        Q.  In all of the investigation that you did
2    into this case, did you ever receive any information
3    corroborating that Erika Gomez and Curtis Lovelace
4    had a relationship before Cory passed?
5        A.  I believe the only corroboration I think
6    was from Dustin Strothoff who said that he worked at
7    a gym or visited a gym prior to the death of Cory,
8    and that he observed "them," meaning the two of them
9    kind of flirting with each other.  I don't know
10   which one did or which didn't, but I think he said
11   he saw them together at the gym.  Other than that, I
12   don't think I perceived any corroboration.
13       Q.  And Erika Gomez, herself, told you that
14   she did not begin seeing Curt until after his wife
15   had died?  Although she also told you that she
16   thought maybe Curt had been following her prior to
17   his wife's death; is that right?
18       A.  Yes.
19       Q.  Did you ever receive any evidence
20   corroborating that Curt had been somehow following
21   Erika Gomez around before she -- before Cory
22   Lovelace died, other than potentially the
23   information from Mr. Strothoff?
24       A.  No.

Page 100

1        Q.  Were you involved at all in any attempts
2    by the Quincy Police Department to get information
3    from a subpoena related to someone stealing Erika
4    Gomez's identity?
5        A.  I don't remember that at all.  Are you
6    talking about on the laptop maybe?  No.
7        Q.  Well, I'm asking in general about any
8    attempt to steal her identity or --
9        A.  Not steal her identity, no.
10       Q.  Were you involved in any attempt to get
11   information related to a Comcast account that Erika
12   Gomez had at one time?
13       A.  Was I involved in it?
14       Q.  Yes.
15       A.  Or our office?  No.
16       Q.  Did Erika Gomez ever tell you personally
17   that she believed that Curt had poisoned her and her
18   daughter?
19       A.  Yes.
20       Q.  When did she first tell you that?
21       A.  Well, I don't think I talked personally
22   with her, Erika, before the first trial, but I
23   learned that she had said that.
24       Q.  Did you or anyone in your office ever talk

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334

EDWIN R. PARKINSON 11/19/2018

Page 101

1    to her daughter, Darlene Steinkamp?

2      A. Yes. She, I believe, was a student here

3    in -- at a college here during the second trial. I

4    think she even came to court.

5      Q. Who in your office spoke with

6    Ms. Steinkamp?

7      A. Probably Julia Wykoff.

8      Q. All right. Did you learn any information

9    from Darlene Steinkamp through Julia or yourself

10   about any attempt by Curt to poison Erika or

11   Darlene?

12     A. Yes.

13     Q. What did you learn either directly or

14   indirectly from Darlene about that?

15     A. Indirectly I learned that after Curtis

16   Lovelace and Erika split up, in preparation for a

17   divorce, that Steinkamp and her mother had both been

18   experiencing loss of hair, feeling ill. And that at

19   one point, Darlene stayed home from school, and she

20   heard someone in the house, and she walked into the

21   kitchen area or thereabouts, and found Curtis

22   Lovelace there at the house. And she -- he then

23   left, and that she and Erika had thought that they

24   had -- Curtis had given up his keys to the house,

Page 102

1    but apparently he still had access to the house, and

2    he gave no explanation as to why he was in the

3    kitchen area, and that he left.

4      Q. Did you ever talk with Detective Gibson

5    about any efforts that he undertook to try to

6    corroborate or investigate this poisoning allegation

7    by Erika or Darlene?

8      A. Yes, I think so. I think there was some

9    attempt to send some slides or -- from Erika and or

10   Darlene, her daughter, to a place in Colorado where

11   testing could be done of their slides from their

12   bodies to see if they could detect any traces of

13   poison, and ethanol alcohol, and that it was -- it

14   was done. It was sent, and that it came back that

15   they could not confirm that there were -- I think

16   they also took hair samples. I'm trying to think.

17   Yeah, hair samples from Darlene and her daughter,

18   but that it had been much later, and because hair

19   grows, they didn't have enough of a root to do the

20   testing. Anyway, the results were inconclusive.

21     Q. Other than what you just described, did

22   you ever have any conversations with Detective

23   Gibson about any efforts that he took to try to

24   investigate or corroborate a claim that Curt

Page 103

1    poisoned Erika or Darlene?

2      A. Well, I talked to him about that, but I

3    didn't know of any other discussions. That was what

4    they had. And I think they tested the hair and the

5    roots of the hair of both persons, and that was the

6    extent of the testing.

7      Q. Did you ever have any conversations with

8    Detective Gibson where he expressed any opinion

9    about whether or not Erika Gomez was a credible

10   person?

11     A. Well, I don't know specifically, but, yes,

12   because she was -- in talking with Julia, I found

13   out that she was a rather fiery person. I'll call

14   it that. And credibility, that's always a question

15   at trial. So, yeah, we had questions about that.

16     Q. You had discussions about that with

17   Mr. Gibson?

18     A. Well, I imagine I did, yes.

19     Q. And do you remember anything about what

20   you and Detective Gibson discussed as to Erika

21   Gomez's credibility?

22     A. Well, I don't know if we had any

23   specifics. I can't think of any specific. Just

24   that she was a very vocal -- I didn't know that she

Page 104

1    would make a good witness basically.

2      Q. Did you -- well, let me ask you this.

3    There were some issues in this case with Jon Barnard

4    being a potential witness because of some encounters

5    he's had -- he had had with Curt either the day that

6    Cory died or with Curt in his office; is that right?

7      A. Yes.

8      Q. Other than talking with Mr. Barnard about

9    those issues, did you ever talk about this

10   prosecution with Jon Barnard?

11     A. Well, didn't talk about the details. I

12   just talked that he was a witness. Kind of minor

13   point, I guess. Well, he wasn't minor because

14   that's who Curtis called that morning when he found

15   his wife, and so that was the person he called

16   instead of an ambulance. So I thought that was

17   significant. But other than talking about the way

18   the trial was going to be presented or anything, no,

19   did not.

20     Q. Did you talk with Gary Farha at all about

21   the prosecution of this case?

22     A. No. Well, he was a witness to, I think,

23   to -- only to the extent where some other person who

24   worked for the newspaper, a real tall fellow came

26 (Pages 101 to 104)

## EDWIN R. PARKINSON  11/19/2018

### Page 105

1  in, and he knew Curtis Lovelace because he covered
2  the local paper.  And I think Gary Farha was there
3  that afternoon when the body was found, and he was
4  surprised that Curtis Lovelace came into the office.
5  He was just surprised, but I had no discussions with
6  him other than that.
7         MS. THOMPSON:  I think I'm close to
8  done.  Let's take one more quick break.  I've got a
9  couple of additional materials to show the witness,
10  and then I think I'm close.  Let's take one more
11  quick break.
12         MS. EMERY:  Okay.
13         (Whereby a short break was taken.)
14         (Plaintiff's Exhibits 17 through 23 marked
15  for identification.)
16  BY MS. THOMPSON:
17      Q.  Mr. Parkinson, did you review any
18  documents in preparation for your deposition today?
19      A.  No.
20      Q.  In any of your conversations either
21  directly with Dr. Denton or in getting updates from
22  Jim Keller and Adam Gibson about their conversations
23  with Dr. Denton, did you ever hear that Dr. Denton
24  had the opinion that unless Dr. Bowman changed her

### Page 106

1  opinions in this case, there would always be
2  reasonable doubt?
3      A.  Well, he -- in his opinion, that was his
4  reflection in some -- something you showed me today,
5  but I think I've also heard that.
6         I think I said that earlier that he said
7  unless Dr. -- I mean, I knew that that's the
8  statement he had made, that there would be
9  reasonable doubt, because if she didn't -- the one
10  who performed the autopsy said it was undetermined.
11  That was his opinion.  Of course, he didn't take
12  into -- what other experts I might call, but that
13  was his opinion, yes.
14      Q.  When did Dr. Denton first tell you that?
15      A.  Well, probably after I asked for -- after
16  or right at the time June of 2015 when I asked for a
17  written report.
18      Q.  Did you ever tell any of the defense
19  counsel in this case that Dr. Denton had told you
20  that unless Dr. Bowman changed her opinion, there
21  would be reasonable doubt?
22      A.  Well, he didn't tell me that.  I mean, he
23  said that.  We didn't have a discussion about what
24  he thought.  But he wrote that to Adam Gibson in a

### Page 107

1  note, or somehow discussed with he and Jim -- with
2  him and Jim Keller that probability that, in
3  his opinion, there would be more -- that would
4  amount to more than reasonable doubt, yes.
5      Q.  Did you see that note either to Mr. Keller
6  or to Mr. Gibson at some point before the end of the
7  first trial?
8      A.  Yes.
9      Q.  When did you see that note?
10      A.  Well, I don't know if I saw that note.  I
11  knew that he said that in the discussions with Adam
12  and Jim Keller.  I don't know that I saw anything in
13  writing, but I think in the binder, I think
14  initially in the binder at some point there was some
15  discussion by Dr. Denton that unless she amended her
16  report, that would be more than reasonable doubt.
17      Q.  And if you saw that in the binder, that
18  would come from an official report that was prepared
19  by either Jim Keller or Detective Gibson in the
20  investigation?
21      A.  If --
22         MR. HANSEN:  I'm going to object to
23  the form.  I don't think it necessarily becomes an
24  official report.

### Page 108

1         But subject to that, go ahead.
2  BY MS. THOMPSON:
3      Q.  You can answer the question.
4      A.  I don't know if it was an official report.
5  I would have found it somewhere in the binder that
6  he had that concern, that without her amending the
7  report -- that's always going to come out, and
8  that's amounted to reasonable doubt to him.
9      Q.  Did the binder, when you got it from
10  Summers and Gibson, contain any e-mails in it?
11      A.  Hmm.  I think there was some e-mails to
12  Shaku Teas from Adam Gibson and from her back to
13  him.  I think those were e-mails.
14      Q.  Any other e-mails?
15      A.  I don't think so.  I don't know, but I
16  don't think so.
17      Q.  I asked you some questions about the court
18  order appointing your office to this case.
19      A.  Yes.
20      Q.  Did you have any substantive involvement
21  in this investigation before you met with Sergeant
22  Summers and Detective Gibson in Morgan County to sit
23  down with them and get the binder?
24      A.  I don't think so, because -- I don't think

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334

EDWIN R. PARKINSON  11/19/2018

Page 109

1    so.  Because we want the appointment from the judge
2    to make us capable of entering into even an
3    investigation, let alone a prosecution.  So I don't
4    think so.
5        Q.  Am I right that without that order, your
6    office does not have statutory authority to be
7    involved?
8        A.  I don't think it prevents us from talking
9    to state's attorneys and giving them advice and
10   taking the input from them.  No, I don't think it's
11   prohibited by statute.
12       Q.  Is it prohibited by statute for your
13   office to be a formal prosecuting authority in a
14   case absent an appointment?  I mean, you can always
15   talk to people and give them advice, but you can't
16   formally lead an investigation before that order is
17   signed, correct?
18       A.  Yeah.  We can't file papers and appear in
19   court.  No, we can't actively and out front be the
20   prosecutor in the case unless we're appointed.  Now
21   if we're appointed as an assistant to help, we don't
22   need a court order.
23       Q.  Was it your understanding that the reason
24   you were appointed in this case was because there

Page 110

1    was an actual conflict of interest between the Adams
2    County State's Attorney and Mr. Lovelace because he
3    formerly had been a prosecutor in that county?
4        A.  Yes.  Jon Barnard applied for it because I
5    believe Mr. Lovelace had worked in his office.
6        Q.  It was never represented to you that this
7    was a case where the county needed help or simply
8    thought it would be better for you to be involved?
9        A.  No.
10       Q.  This was a case where it was always
11   represented to you that there was an actual conflict
12   of interest?
13       A.  Or an apparent conflict of interest, yes,
14   because he did not work for the office at the time
15   of the event, but that he had been an employee
16   before.
17       Q.  All right.  I'm going to show you
18   Exhibit 17.  This is a one-page document that is
19   Bate stamped AC293.  Had you ever seen a copy of
20   AC293 before the end of the first trial in this
21   case?
22       A.  No.
23       Q.  Have you ever seen a copy of that document
24   before today?

Page 111

1        A.  I don't believe so.
2        Q.  All right.  And I'm going to show you
3    Plaintiff's Exhibit 18 as well, which has a Bate
4    stamp of QPD1064.  Have you seen -- had you seen a
5    copy of Exhibit 18 before the end of the first trial
6    in this case?
7        A.  No, I don't believe so.  I've never seen
8    it.
9        Q.  I'm going to show you Plaintiff's Exhibit
10   19.  This is a multipage document, which is Bate
11   stamped AC225 through AC27 -- excuse me.  It's Bate
12   stamped AC225 through AC230.  Have you ever seen
13   Exhibit 19 before today?
14       A.  No.
15       Q.  I'm going to show you Plaintiff's Exhibit
16   20.  This is a one-page document AC273.  Have you
17   seen Exhibit 20 before today?
18       A.  No.
19       Q.  I'm going to show you what's been marked
20   as Plaintiff's 21.  This is a one-page document,
21   which is Bate stamped.  There's two sets of Bate's
22   stamped -- there's two sets of Bate's stamps, but
23   one is Plaintiff's 3770.  I have a couple of
24   questions about the substance of this, if you want

Page 112

1    to read it.
2        A.  Okay.
3        Q.  And let me know when you're done.
4        A.  What's your question?
5        Q.  This -- I have a couple of questions.  The
6    first is this:  Do you see in the attachments line
7    of this e-mail that there's an attachment or was an
8    attachment to this e-mail called, "Cory Lovelace
9    Death Investigation.docEx"?
10       A.  Yes, I see that.
11       Q.  Did you receive from Adam Gibson a summary
12   of his investigation that he had drafted out
13   documenting his account of what he looked into in
14   this case?
15       A.  Well, I don't know.  It indicates that he
16   sent this e-mail to me with an attachment.
17       Q.  Did you ever review that attachment?
18       A.  I assume I did.  If it was attached, I
19   did.  I don't remember what it said.  Probably
20   summarized in the paragraph there.
21       Q.  Well, did you -- did you ever follow up
22   with Detective Gibson about the substance of this
23   e-mail as to there being some incident where Curtis
24   yelled at Marty and Lyndsay about some belief that

28 (Pages 109 to 112)

EDWIN R. PARKINSON  11/19/2018

Page 113

1  somebody had been lying to people?
2      A.  There was some discussion related to me
3  from Adam Gibson that Marty and Lyndsay thought -- I
4  think that Lyndsay thought that her father was
5  taking some steps to make her look like -- out like
6  a liar, but that's all I heard.  I didn't follow up
7  on it and don't know what it was about, but
8  that . . .
9      Q.  Did Adam Gibson ever tell you that he had
10  reinterviewed the children at some point before Curt
11  was arrested and that they had given him new
12  information about the case?
13      A.  Well, I believe he did, because -- yeah, I
14  think he did tell me he reinterviewed the children.
15  Jeff Baird did the day of the incident, and I
16  believe Adam Gibson told me that he had
17  reinterviewed the children, and that was put in a
18  report to me.
19      Q.  Did he tell you that he'd reinterviewed
20  the children at some point before Curt was arrested?
21      A.  I don't know if it was then or afterwards.
22  I don't know, because the children would have been
23  in Curtis's custody, I think.  I don't know that.
24      Q.  I'm going to show you what's been marked

Page 114

1  as Exhibit 22.  This is a two-page document that's
2  Bate stamped SAAP342 and 343.  My main question is
3  about the first e-mail in this chain.  If you want
4  to read that e-mail, I have a couple of questions
5  for you.
6      A.  About the testing?
7      Q.  The paragraph that starts, "Adam refresh
8  my memory, please."
9      A.  Yeah.
10      Q.  Did you -- did Detective Gibson follow up
11  with you about this e-mail where you asked him some
12  issues related to poisoning?
13      A.  Did he follow up?  Did he --
14      Q.  Did he respond?
15      A.  Probably by phone.
16      Q.  Do you remember what, if anything, you
17  discussed with him in response to sending this
18  e-mail?
19      A.  I just -- he just told me that they were
20  unable to get in Colorado to come up with any
21  results that would be of assistance to us.
22      Q.  In this paragraph that starts with, "Adam
23  refresh my memory, please," do you see three lines
24  from the bottom that there's the word "Curtis"?

Page 115

1      A.  Yes.
2      Q.  And then there's a word in quotes,
3  "Love-less."  Do you see that?
4      A.  Yes.
5      Q.  Do you know why that appears in quotes in
6  this e-mail?
7      A.  Because I wrote it.
8      Q.  Did you refer to Curt in other
9  correspondence with Detective Gibson or other people
10  involved in the investigation as Curtis, quote,
11  "Love-less"?
12      A.  No.  That was, I think, the only time I
13  have ever wrote it that way, but I always have
14  called him "Lovelace."
15      Q.  That is your understanding of how to
16  pronounce his name; is that right?
17      A.  Yes.
18      Q.  I'm going to show you another document,
19  what's been marked as Plaintiff's Exhibit 23.  This
20  has a couple of Bate stamps on it.  One is Plaintiff
21  3949.  Do you know who Cathy Martin is?
22      A.  Have you given -- oh.  Cathy Martin?
23      Q.  Yes.  Do you see -- and so it's clear, I'm
24  looking at the "to" line of this e-mail, and one of

Page 116

1  the "tos" is Cathy Martin.
2      A.  Oh, I see it.  Cathy Martin.  I'm assuming
3  it's somebody with the police department, but I
4  don't know.
5      Q.  That is not someone that worked in your
6  office?
7      A.  Who?
8      Q.  Cathy Martin is not someone that worked in
9  your office?
10      A.  No.  Cathy Martin?
11      Q.  Do you see that there is a .wav, W-A-V,
12  file that's attached to this email?
13      A.  Yes.
14      Q.  During your investigation into this case,
15  did Detective Gibson occasionally send you
16  recordings of calls between Curtis and other people
17  while Curtis was --
18      A.  Oh, yes.  There were jail calls, I think.
19      Q.  Did you listen to this particular call?
20      A.  I don't know.  I don't think so.
21      Q.  Do you know why the file name includes the
22  word "desperation"?
23      A.  Desperation.wav?  I do not know why that's
24  there.

29 (Pages 113 to 116)

## EDWIN R. PARKINSON  11/19/2018

Page 117

1    Q.   Did you talk with Detective Gibson by this
2   particular call?
3    A.  I don't remember.
4    Q.   Did Detective Gibson ever make any joking
5   statements to you about Curtis's state of mind while
6   he was incarcerated?
7    A.  Joking?
8    Q.  Yes.
9    A.  I don't believe so.
10    Q.   Did he ever comment to you about Curtis's
11   state of mind while he was incarcerated?
12    A.  I vaguely remember an occasion that he
13   would tell me that it sounded like Curtis was
14   depressed, which he would be after being in jail,
15   but he just said he seemed depressed.
16    Q.  Did he ever tell you that --
17    A.  I can't remember any jokes.
18    Q.   Did he tell you that he had listened to
19   any calls where it appeared that Curtis and his wife
20   were having an argument?
21    A.  Yes.
22    Q.   And what did he tell you about those
23   calls?
24    A.  Well, that Christine was upset about being

Page 118

1   left with no income and no support, and I believe
2   they were going to have to sell their house, or
3   maybe they did sell their house, so she was
4   understandably upset.  And so there was some back
5   and forth between Curtis and his wife as couples
6   would have about what's this desperate situation
7   we're going to face.
8    Q.   What was Detective Gibson's demeanor in
9   telling you about those calls?
10    A.  As a matter of fact.  I don't believe -- I
11   don't think he laughed or joked about it.  I don't
12   know.  I just think he said that I ought to know
13   that they're arguing, and I think I may have said,
14   "Well, that's to be expected."
15    Q.   When is the last time prior to today that
16   you have talked with Detective Gibson?
17    A.  The end of the second trial, I believe.
18    Q.   When you say, "the end of the second
19   trial," was that the actual day that the jury came
20   back?
21    A.  Yeah, I believe so.
22    Q.   During both the first and second trials in
23   Mr. Lovelace's case, did you make every effort to
24   comply with your understanding of your own Brady

Page 119

1   obligations?
2    A.  Yes.
3    Q.   And do you believe, as you sit here today,
4   that you attempted to disclose to the defense in
5   both cases in a prompt manner the information you
6   had in your possession that you believed was
7   exculpatory?
8    A.  Yes, I do.
9    Q.   If you had believed that you were in
10   possession of exculpatory evidence, would you have
11   disclosed that to the defense in either of these
12   trials?
13    A.  Yes.
14        MS. THOMPSON:  I don't have any other
15   questions.
16        MS. EMERY:  I have some.
17        CROSS EXAMINATION
18   BY MS. EMERY:
19    Q.   Mr. Parkinson, do you think a
20   pathologist's opinion as to what a jury might or
21   might not find constitutes Brady material?
22    A.  No.
23    Q.   Do you think anybody's opinion as to what
24   a jury might do constitutes Brady material?

Page 120

1    A.  No.
2    Q.   Do you remember having discussions with
3   Lieutenant Dina Dreyer of the Quincy Police
4   Department about what to turn over?
5    A.  Everything.  I mean, I don't remember
6   telling her that, no, but I mean, I'm assuming I was
7   getting everything, and everything I got I turned
8   over.
9    Q.   Okay.  Do you remember any discussions
10   with Dina Dreyer about turnover of materials?
11    A.  Not specifically.
12    Q.   Okay.  Did you have any discussions with
13   Detective Gibson where you looked at e-mails and
14   said prior to the trials that you didn't want to use
15   them, so you gave them back to Detective Gibson?
16    A.  No.
17    Q.   Julia Wykoff --
18    A.  Yes.
19    Q.   -- she didn't come to work in your office
20   until after the first trial, correct?
21    A.  No.  She was working there for the first
22   trial.  She was gone before the second trial.
23    Q.   What's the purpose of a grand jury?
24    A.  To be a buffer and a protection between a

ALARIS LITIGATION SERVICES
www.alaris.us               Phone: 1.800.280.3376               Fax: 314.644.1334

EDWIN R. PARKINSON  11/19/2018

## Page 121

1  prosecutor deciding what case to take and what not,
2  and for the community to have a say-so in whether
3  there's probable cause to move forward.
4      **Q.** And do they do that by issuing an
5  indictment?
6      A. Yes.
7      **Q.** And who decided to take this case to the
8  grand jury?
9      A. I did.
10      **Q.** And that's an independent decision that
11  you make as the prosecutor, correct?
12      A. Yes.
13      **Q.** When you make that decision, is one of the
14  reasons you do it is because you believe there's a
15  reasonable chance of a guilty verdict?
16      A. Yes.
17      **Q.** And in this case, did you believe there
18  was -- certainly after the indictment, but even
19  before the indictment, did you believe, as
20  prosecutor, that there was probable cause to arrest
21  Curtis Lovelace?
22      A. Yes, I do. Did and do.
23      **Q.** And did you believe that there was
24  probable cause to go ahead and prosecute him?

## Page 122

1      A. Yes.
2      **Q.** And that there was probable cause to
3  continue to prosecute him?
4      A. Yes.
5      **Q.** Before a grand jury, hearsay evidence can
6  be presented to the grand jury, correct?
7      A. Yes.
8      **Q.** What factors led you to believe that there
9  was probable cause in this case to go to the grand
10  jury?
11      A. Three main ones. One is I reviewed all
12  the photographs of the crime scene. I call it a
13  "crime scene" -- of the death scene. And I observed
14  with my own eyes the position of the hands, the
15  arms, and reviewed the -- what I can see with my own
16  eyes, and the position of the hands with
17  relationship to Cory Lovelace's face.
18      Plus, we referred -- I referred this out
19  to two very well-noted forensic pathologists,
20  Dr. Jane Turner of St. Louis, and Dr. Michael Baden.
21  And they received from Adam Gibson, I presume, the
22  materials that they would have to look at. And I
23  received a report separately from each of them
24  that -- the same finding, that the death was caused

## Page 123

1  by suffocation at the hands of another, and they
2  independently arrived at that decision. So that was
3  what we based the calling the grand jury for.
4      **Q.** Okay. And were there other smaller
5  factors such as the amount of lividity that was
6  shown in the photos?
7      A. Yes.
8      **Q.** And Jim Keller's observation about the
9  rigidity of the body when they moved it?
10      A. Yes.
11      **Q.** And the desiccation or dryness around the
12  mouth and eyes?
13      A. Yes.
14      **Q.** So do you believe that all of these
15  factors constituted probable cause to arrest Curtis
16  Lovelace?
17      A. Yes. And one more factor was in the 20
18  minutes that allegedly Mr. Lovelace took his
19  children to school and his return, and they did that
20  at 8:15, and arrived back at 8:35. And according
21  to -- and his wife was dead. In the 20 minutes that
22  he was gone, allegedly she died then. That did not
23  comport with the rigidity, the rigor mortis or
24  anything else that I saw.

## Page 124

1      **Q.** And the same things -- the reason for your
2  decision to go ahead and prosecute this case was to
3  bring a guilty person to justice, correct?
4      A. Yes.
5      **Q.** And also the factors that we just went
6  through constituted reasonable cause to prosecute,
7  correct?
8      A. I believe so.
9      **Q.** Do you believe that -- well, let me ask it
10  differently.
11      There was nothing withheld from you that
12  would have changed your mind, correct, that you know
13  about today?
14      A. Even though I have never seen many of
15  these things that Ms. Thompson has showed me, it
16  wouldn't have changed my mind.
17      **Q.** And there's nothing that had you known it
18  now, it would have changed your mind, because it
19  didn't change any of the factors we've been through,
20  correct?
21      A. Correct.
22      MS. THOMPSON: Object to form.
23  BY MS. EMERY:
24      **Q.** Did you ever see any indication that

31 (Pages 121 to 124)

Page 125

1    anyone in the Quincy Police Department had
2    fabricated any evidence?
3        A.  No.
4        Q.  Did you see any indication by any evidence
5    or statements that the Quincy -- anyone in the
6    Quincy Police Department put a spin on something
7    versus giving you the facts as they were found?
8        A.  No.
9        Q.  Were you troubled by the ultimate number
10   of expert opinions in the case?
11       A.  Troubled with the jury, but they get the
12   final say.  Yes, I was.
13       Q.  But other than the jury, you weren't
14   troubled by the number of opinions, were you?
15       A.  No.
16       Q.  And the number of opinions had no effect
17   on your decision that there was probable cause to
18   prosecute and continue to prosecute, correct?
19       A.  Correct.
20       Q.  Now, despite -- do you also handle appeals
21   in addition to being a special prosecutor?
22       A.  Our office does.  I do not.
23       Q.  So all you do is the --
24       A.  Trial.

Page 126

1        Q.  -- the trial work?  I was going to say,
2    "hands-on prosecution."
3        A.  Right.
4        Q.  And advise younger ones, you said?
5        A.  Yes.
6        Q.  After the first trial with the hung jury,
7    why did you decide to retry the case?
8        A.  Well, because we still had what I presumed
9    to be very good evidence, and we got the opinion of
10   yet another expert from Michigan, Dr. Werner Spitz,
11   who wrote the book on medical-legal causes of death,
12   and he had the same opinion, and so we thought we
13   had a solid case, and by experts.
14       Q.  If at any time you learned of anything
15   before the end of the second trial that you believed
16   constituted Brady material, first of all, you would
17   have turned that over, correct?
18       A.  Yes, yes.
19       Q.  And if you believed that it affected your
20   determination of probable cause to continue to
21   prosecute, you believed that you would have had an
22   ethical obligation to stop the second trial if
23   something was of that import, correct?
24       A.  I would have asked for a continuance and

Page 127

1    time to check it out.
2        Q.  Was that an independent decision of yours
3    to retry Curtis Lovelace for the second time?
4            MS. THOMPSON:  Object to form.
5            You can answer.
6            THE DEPONENT:  It was talked about at
7    the office.  It was my opinion, but I shared it with
8    Julia Wykoff and with David Robinson and with a
9    couple of other prosecutors who are almost as old as
10   me, and we agreed it was worthy of going forward.
11   BY MS. EMERY:
12       Q.  Okay.  Did you get any push from anyone in
13   the Quincy Police Department to retry him?
14       A.  No, no push.  I know that they were
15   invested in doing a complete investigation, which
16   they thought they'd done, but nobody pressured me to
17   drop it or to pursue it.
18       Q.  By the time that you decided to retry the
19   case with the second trial, were you convinced of
20   Curtis Lovelace's guilt by that time?
21       A.  I was always convinced.
22       Q.  And the factors that we went through
23   before, do you believe that that was evidence strong
24   enough to justify the continued prosecution?

Page 128

1        A.  Yes, I do.
2        Q.  And did your office do any independent
3    investigation at any time?  You talked about what
4    Julia Wykoff -- when she talked to you, but I mean
5    other than that.
6        A.  No.
7        Q.  Did you ever ask Adam Gibson or anyone
8    else at the Quincy Police Department to do any
9    follow-up investigation?
10       A.  No.
11       Q.  Do you think their investigation was done
12   to your satisfaction?
13       A.  Yes.
14       Q.  Why did you put Erika Gomez on the stand
15   the second trial?
16       A.  I thought that it would show a motive.  We
17   were denied that right, that option in the first
18   trial, but to show that there was a relationship,
19   and particularly since there was some of her
20   statements made that she testified to at trial.
21       Q.  Was it that her concern about being
22   poisoned by Curtis that influenced you to put her on
23   the stand?
24       A.  That, coupled with Dr. Denton's opinions

32 (Pages 125 to 128)

**EDWIN R. PARKINSON  11/19/2018**

Page 129

1  that he personally believed that she had been
2  poisoned, which weakened her to the state that she
3  was in at the time of her death.  So when I had an
4  indication from Dr. Denton, and he knew nothing
5  about Erika Gomez as far as I know, then that would
6  be something for the jury to consider.
7      Q.  In the course of either trial, did
8  anything happen that you didn't expect?
9      A.  No.  I expected the testimony that would
10  come out that way.  I expected that the children
11  would testify as to what they believe they saw and
12  that they were telling it from their heart and what
13  they remembered, but I do not discount the fact that
14  the 4-year-old boy, Larson, told a different story
15  when he testified.
16      Q.  You stated earlier that Detective Jeff
17  Baird, the original investigator, had talked to the
18  kids the day that Cory was found having
19  been -- having passed away.  Do you recall that?
20      A.  I think they were talked to two days later
21  maybe on a Thursday.
22      Q.  That was my question as to whether you
23  recall whether they were actually talked to two days
24  after.

Page 130

1      A.  Yeah, and he talked to the three oldest,
2  ages 7, 8, and 12, but decided not to talk to Larson
3  because of his age.
4      Q.  And when you say, "he," you're talking
5  about Jeff Baird?
6      A.  Jeff Baird.
7          MS. EMERY:  I don't have anything
8  further.  Thank you, Mr. Parkinson.
9          THE DEPONENT:  Thank you.
10              CROSS EXAMINATION
11  BY MR. HANSEN:
12      Q.  I'll follow up right there.
13          You said Larson told you a different
14  story.  What did you mean?
15      A.  Larson was only 4 years old when his
16  mother died.  And when he testified, he told the
17  jury that morning, he heard his dad take
18  Lyndsay, Logan, and Lincoln to school because he
19  heard them go out the door.  He, Larson, 4 years
20  old, went into his mother's bedroom as he always
21  did.  He poked her, and yelled at her, and she
22  wouldn't respond.  He poked her, and she didn't
23  move, and so it scared him, and he went out and he
24  sat on the step, on the stairs, and waited for his

Page 131

1  dad to come home.  So according to Larson, she --
2  one could assume that his mother was already gone,
3  and that was between the hours of 8:15 and 8:35.
4      Q.  And which would contradict with the story
5  that was being told that she was sitting on the
6  steps when everybody left?
7      A.  Yes.
8      Q.  Which gave you concern, as you mentioned,
9  originally on the timeline that was being told in
10  the time of death?
11      A.  Yes.
12      Q.  I'm going to go back a little bit.  You
13  had talked about Jessica Bowman, not being satisfied
14  with her findings in another case.  Jessica Bowman
15  was discredited in prior cases she had worked on,
16  correct?
17      A.  Yes.
18      Q.  And the Credit case, which you had in
19  Sangamon County, was a big one, true?
20      A.  Yes.
21      Q.  And Macon County, Morgan County and other
22  counties stopped using her services based on her
23  autopsy reports?
24      A.  Yes.

Page 132

1      Q.  And the prosecuting attorneys in those
2  counties had serious doubts about her abilities and
3  the reports she was generating.  Is that how you
4  understand it?
5      A.  That is true.
6      Q.  In the Credit case, which you prosecuted
7  here in Sangamon County, there was issues with her
8  coming up with an undetermined cause of death and
9  other forensic pathologists differing with her about
10  that, correct?
11      A.  That's right.
12      Q.  And that -- strike that.
13          Would you agree that that put prosecutors,
14  such as yourself, in a difficult position when
15  trying to bring a murder trial with a pathologist
16  who had not come up with a cause of death?
17      A.  Yes.
18      Q.  Now, the fact that she did that doesn't
19  mean you didn't prosecute the case, correct?
20      A.  Right.
21      Q.  And as you had mentioned in this case, you
22  got some certainly renowned throughout the United
23  States forensic pathologist to give you the opinions
24  that Ms. Lovelace died of suffocation?

**ALARIS LITIGATION SERVICES**
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334

## EDWIN R. PARKINSON  11/19/2018

Page 133

1    A.  Yes.
2        Q.  In fact, Mr. Baden, he's been in some very
3    high profile murder trials, such as OJ Simpson?  He
4    was involved in the Kennedy assassination
5    investigation and things like that, true?
6        A.  That's true.
7        Q.  So you had that man's report and the
8    report from Dr. Turner, which you used in
9    determining whether or not to proceed and prosecute
10   Mr. Lovelace?
11       A.  Yes.
12       Q.  Okay.  And that was in your possession
13   prior to going to the grand jury, that information?
14       A.  Baden and Turner, yes.
15       Q.  Okay.  And as you said earlier, you are
16   presenting that information to a grand jury for
17   people in the community to decide whether or not you
18   have probable cause to proceed and the person should
19   be indicted?
20       A.  Yes.
21       Q.  And the grand jury in this case was made
22   up of citizens of Adams County, true?
23       A.  Yes.
24       Q.  And they came back with a decision for an

Page 134

1    indictment?
2        A.  Yes, a true bill of indictment.
3        Q.  Right.  And as a result of that,
4    Mr. Lovelace was arrested, correct?
5        A.  Yes.  That day, I think.
6        Q.  Okay.  And he got what is afforded under
7    the constitution or the criminal justice system in
8    the United States, he got his right to a trial,
9    true?
10       A.  Yes.
11       Q.  And he got to put on a defense and present
12   witnesses and confront the witnesses that were
13   called against him, true?
14       A.  That's true.
15       Q.  And that's what people in the United
16   States get when they're arrested, and they are
17   charged with a crime, true?
18       A.  That's right.
19       Q.  And that's what Mr. Lovelace had
20   prosecuted when he was a prosecuting attorney
21   against other people in the same shoes he was now
22   finding himself in, true?
23       A.  That's true.
24       Q.  And, ultimately, as you said, the jury in

Page 135

1    the United States of America comes to a decision,
2    which the defense and the prosecution are bound by,
3    true?
4        A.  That's right.
5        Q.  Okay.  And in this case, the first trial,
6    lasted how long?
7        A.  The trial, days.  Either nine or ten days.
8        Q.  Okay.  And you presented expert witnesses
9    on behalf of the prosecution, right?
10       A.  Yes.
11       Q.  And Mr. Lovelace's defense team presented
12   expert witnesses on his behalf?
13       A.  He did.
14       Q.  And, ultimately, the people in Adams
15   County after the first trial came back with a hung
16   jury; is that correct?
17       A.  That's right.
18       Q.  And after that hung jury came back, do you
19   know what the deadlock vote was?
20       A.  I didn't know for sure.  I was told nine
21   to three to start with, but it ended up six to six.
22   That's what I was told.
23       Q.  Okay.  So at least at the end of the day,
24   when Judge Hardwick called off any further jury

Page 136

1    deliberations, there were six people in that jury
2    room that believed that Mr. Lovelace was guilty of
3    first degree murder?
4        A.  That's right.
5        Q.  And did that weigh into your decision to
6    retry him?
7        A.  Yes, if it -- yes, because of the split.
8        Q.  And as you were asked, you then in
9    conjunction with other people in your office, went
10   back and reflected and discussed on whether or not
11   to prosecute him again for a second time?
12       A.  Yes.
13       Q.  And you believed you had enough evidence
14   beyond a reasonable doubt to convict him and
15   therefore decided to prosecute him again?
16       A.  Yes, plus getting an extra opinion from
17   Dr. Werner Spitz of Michigan.
18       Q.  Okay.  And, actually, that extra opinion
19   you got after the first trial?
20       A.  Yes.
21       Q.  Okay.
22       A.  Well, we got it at the first trial.
23       Q.  I'm sorry?
24       A.  We got it late, and so we didn't use it.

34 (Pages 133 to 136)

## EDWIN R. PARKINSON  11/19/2018

Page 137

1    Q.  Okay.  Now, in your -- I'll call it the
2    "investigation."  Let's call it that.  All the way
3    up to the prosecution of the first trial, okay?  As
4    the prosecuting attorney, do you have the right to
5    send out subpoenas?
6    A.  Yes.
7    Q.  Okay.  And I assume had you felt Jim
8    Keller, or the Adams County Coroner, had information
9    that you wanted, you could have asked him to -- for
10   his file, correct?
11   A.  Yeah.
12   Q.  You could have sent the subpoena to the
13   Adams County Coroner?
14   A.  Yes, could have.
15   Q.  And as you've indicated here today,
16   there's nothing that you've seen that -- in any of
17   these e-mails that have been marked as exhibits from
18   Jim Keller to and from Mr. Gibson, that would have
19   made you do anything other than prosecute
20   these -- the two times?
21   A.  I saw nothing that would change our
22   pursuit.
23   Q.  Okay.  Do you agree with me that after the
24   Adams County State's Attorney's office petitioned

Page 138

1    the Court, and the judge signed the order, that Jon
2    Barnard had no involvement in any of the decisions
3    regarding prosecution of Mr. Lovelace because he was
4    conflicted out and a witness?
5    A.  That's absolutely true.  We didn't even
6    talk about the case between us.
7    Q.  And I'm going to ask that same question.
8    Gary Farha wasn't even the Adams County State's
9    Attorney at the time of the first trial.  Did he
10   have any input or discussions with you at all about
11   the prosecution of Curt Lovelace?
12   A.  None.
13   Q.  Okay.  And is that true for the second
14   trial as well?
15   A.  Yes.
16   Q.  And ultimately when it comes down to the
17   prosecution in this case, Jim Keller isn't an
18   individual who was going to present any evidence,
19   correct?  The prosecutor presents the case?
20   A.  That's right.
21   Q.  Okay.  And you can call the coroner as a
22   witness, which you did with Mr. Keller, true?
23   A.  Yes, we did.
24   Q.  Okay.  But ultimately, the trial

Page 139

1    strategies, trial determination, witnesses to call,
2    and evidence to put on rests with the prosecuting
3    attorney, which was you in this case?
4    A.  That's right.
5    Q.  And you put on the witnesses that you
6    called, the experts you called, and in the best
7    effort possible to obtain a guilty verdict for the
8    death of Cory Lovelace?
9    A.  That's right.
10   Q.  In both cases?
11   A.  Both cases.
12   MR. HANSEN:  That's all I have.
13   Thanks.
14   THE DEPONENT:  Thank you.
15   REDIRECT EXAMINATION
16   BY MS. THOMPSON:
17   Q.  I have some follow-up.
18   A.  Okay.
19   Q.  Mr. Parkinson, the reason that you wanted
20   an opinion in writing from Dr. Denton is, in part,
21   because you have a duty to disclose the opinions of
22   experts that you're going to use at trial, correct?
23   A.  Yes.
24   Q.  And so if you haven't made the appropriate

Page 140

1    pretrial disclosures, a witness could be barred; is
2    that right?
3    A.  It could, but according to the Supreme
4    Court rule.
5    Q.  And you obviously wanted to comply with
6    those rules, which is part of why you wanted to get
7    a report from Dr. Denton?
8    A.  That's right.
9    Q.  If Dr. Denton had given statements to
10   anyone prior to giving his written report in this
11   case that contradicted the report, that's evidence
12   that could have been used to impeach him; is that
13   right?
14   A.  I don't know if it could have been used to
15   impeach him.  I don't know what you're -- what
16   you're referring to.
17   Q.  Well, my question is, if Dr. Denton had
18   made statements to someone that contradicted
19   statements that he made in his report, that's
20   potential impeachment, correct?
21   A.  Well, that would be -- yeah, that would be
22   used by a defense attorney for impeachment.
23   Q.  And information that impeached Dr. Denton
24   about material issues in his written report could

**ALARIS LITIGATION SERVICES**
Phone: 1.800.280.3376

www.alaris.us                              Fax: 314.644.1334

**EDWIN R. PARKINSON  11/19/2018**

Page 141

1    potentially be exculpatory, correct?
2        A.  You're asking me something that I don't
3    know if it's ex -- it could be exculpatory, yes.
4        Q.  I mean, it depends on what it is
5    obviously, correct?
6        A.  Yes.
7        Q.  It potentially could be exculpatory?
8        A.  Right.
9        Q.  And if you, as a prosecutor, had
10   information that an expert had made material
11   contradictory statements that contradicted
12   information in their report, that's something you
13   potentially would use to impeach that expert?
14       A.  Yes.
15       Q.  You said that it was your decision to take
16   this case to the grand jury; is that right?
17       A.  Yes.
18       Q.  Did you talk with Detective Gibson over
19   the course of the investigation before the case went
20   to the grand jury about when the case would be ready
21   to proceed to the grand jury?
22       A.  Yeah, we did.
23       Q.  Were you aware that Detective Gibson had
24   talked internally with people on the police

Page 142

1    department about taking this case to the grand jury
2    as early as February of 2014?
3        A.  No, I don't even know if that's true.
4    Talking to people in the --
5        Q.  Well, I understand that you're saying you
6    don't know that's true.  Did Detective Gibson ever
7    tell you that he had internally considered when he
8    personally thought this case would be ready to go to
9    the grand jury?
10       A.  No.
11       Q.  Did he ever tell you at any certain
12   point -- let me strike that question.
13           Did he ever discuss with you or seek your
14   opinion on when this case would be ready to try to
15   seek an indictment?
16       A.  Well, it wasn't as early as February of
17   2014 because I hadn't even seen anything until April
18   of 2014, so.
19       Q.  You weren't involved in this case in
20   February of 2014; is that right?
21       A.  Right.  So I don't know how he could have
22   told anybody that it would be ready.  Since he came
23   on as a detective in December of 2013, I don't know
24   how he could have made that statement to anybody.

Page 143

1        Q.  And when you ultimately were brought into
2    the case, Detective Gibson had already done a
3    significant amount of investigation before you got
4    on the case, correct?
5        A.  That's right.
6        Q.  I mean, he had a huge binder to give you
7    that reflected a lot of the investigation?
8        A.  Yes.
9        Q.  He had conversations with Dr. Turner that
10   you were not involved in; is that right?
11       A.  Yes.
12       Q.  He provided information to her?
13       A.  Yes.  He provided that to her, and he
14   provided it to Dr. Baden both separately.
15       Q.  Other than what is in Dr. Turner's and
16   Dr. Baden's reports, do you know specifically what
17   information Detective Gibson gave them?
18       A.  No.
19       Q.  And Jim Keller also talked to Dr. Turner;
20   is that right?
21       A.  I don't know that.
22       Q.  Do you have any information, one way or
23   the other, as you sit here today, about what
24   information Jim Keller conveyed to Dr. Turner?

Page 144

1        A.  No.
2        Q.  You talked some about the reasons that you
3    believed it was appropriate to seek an indictment
4    from the grand jury, and I think one of the things
5    you talked about was drawing issues related to the
6    amount of drying that was on Cory Lovelace's body
7    when she was found?
8        A.  Drying?
9        Q.  Drying.
10       A.  Probably was a part of her whole body, but
11   the drying was -- it indicated that she had been
12   deceased for longer than a few minutes, yes.
13       Q.  In general, you said that one of the
14   reasons you believed there was probable cause was
15   because of various ways that her body appeared when
16   she was found; is that right?
17       A.  That's right.
18       Q.  All right.  You consulted with experts to
19   learn the meaning of those physical indicia that
20   were present on her body when she was found; is that
21   right?
22       A.  Not necessarily.  I have been through a
23   lot of murder trials.  I knew that when your hands
24   are up by your face, you're either trying to push

36 (Pages 141 to 144)

EDWIN R. PARKINSON  11/19/2018

Page 145

1    something away, and they're in rigor, and they're
2    defying gravity. So, no, I didn't consult any
3    experts about that.
4        Q.   You were an experienced prosecutor and
5    have some medical understanding, yourself, based on
6    your years of experience?
7        A.   Yes.
8        Q.   But to present that evidence to either the
9    grand jury, or ultimately to a jury, or a finder of
10   fact, there's got to be a witness to testify about
11   what that means; is that right?
12       A.   Yes. Well, there doesn't have to be to
13   those particular things, but that would be a good
14   idea, yes.
15       Q.   I guess what I mean is, if you want -- if
16   you want that type of evidence to be something that
17   a finder of fact relied upon, there's got to be
18   somebody saying it other than you?
19       A.   Right, and there was testimony at the
20   grand jury that she was in full rigor.
21       Q.   Right. And that testimony came from
22   Detective Gibson describing to the grand jury the
23   results of his investigation?
24       A.   Yes, as discussions with Keller at the

Page 146

1    scene and his observations of the body in the
2    photographs.
3        Q.   Did Detective Gibson have independent
4    conversations with Dr. Spitz as Dr. Spitz was
5    developing his opinions in this case?
6        A.   I think so by phone.
7        Q.   Did he provide information to Dr. Spitz?
8    And by "information," I mean documents and
9    materials.
10       A.   I believe he did. I believe he sent the
11   same things that he sent to Dr. Turner and Dr. Baden
12   and to Dr. Spitz.
13       Q.   You never had any independent
14   conversations, yourself, with Curt's son, Larson, or
15   his sons, Logan or Lincoln; is that right?
16       A.   I think that's right.
17       Q.   So any information you have about what
18   they've said at various times is based on your
19   review of materials from other people's
20   conversations?
21       A.   And their testimony in court.
22       Q.   All right. And you did observe them
23   personally testify at the first and second trials?
24       A.   Yes. And they testified consistently with

Page 147

1    what the report said they would say.
2        Q.   Over the entire time that you've been
3    involved in -- that you were involved in this
4    prosecution, how many conversations have you had
5    with Detective Gibson either on the phone or in
6    person?
7        A.   Oh, 40 or 50, 30 or 40. Most of them
8    about two minutes long.
9        Q.   What about with Jim Keller?
10       A.   He likes to talk. Probably half that,
11   half that many.
12       Q.   And you have also participated generally
13   in producing your own correspondence file in terms
14   of e-mail in this litigation; is that correct?
15       A.   Yes. We actually had an IT person go
16   through and take whatever was in my PC.
17       Q.   And do you believe that you have produced
18   in this case, to the extent that those materials
19   weren't produced earlier in the criminal case, a
20   full accounting of your correspondence either with
21   Jim Keller or Detective Gibson related to this
22   investigation?
23       A.   Yes. I'm satisfied of that.
24           MS. THOMPSON: I don't have any other

Page 148

1    questions.
2           MS. EMERY: Jim?
3           MR. HANSEN: No.
4           MS. EMERY: No, I don't have anything
5    further.
6           MS. THOMPSON: Are you reserving,
7    Bill?
8           MR. MORAN: No.
9           THE DEPONENT: We'll waive signature.
10          MS. THOMPSON: Thanks for being here,
11   Ed.
12          THE DEPONENT: Thank you.
13
14        (Exhibits were retained by Ms. Thompson.)
15        (Deposition ended 12:42 p.m.)
16
17
18
19
20
21
22
23
24

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334

**EDWIN R. PARKINSON  11/19/2018**

Page 149

```
 1
 2              CERTIFICATE OF REPORTER
 3              I, Ann Marie Hollo, Certified
 4   Shorthand Reporter, Registered Diplomatic Reporter
 5   and a Certified Realtime Reporter within and for the
 6   State of Illinois, do hereby certify that the
 7   witness whose testimony appears in the foregoing
 8   deposition was duly sworn by me; the testimony of
 9   said witness was taken by me to the best of my
10   ability and thereafter reduced to typewriting under
11   my direction; that I am neither counsel for, related
12   to, nor employed by any of the parties to the action
13   in which this deposition was taken, and further that
14   I am not a relative or employee of any attorney or
15   counsel employed by the parties thereto, nor
16   financially or otherwise interested in the outcome
17   of the action.
18
19
20   _____
21   Certified Shorthand Reporter
     State of Illinois
22
23
24
```

**ALARIS LITIGATION SERVICES**

www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334

**EDWIN R. PARKINSON  11/19/2018**

**A**

A-N-A-K-I-N
  12:18
a.m 5:12 29:10
  95:24
Aberdeen 4:3
abilities 132:2
ability 38:19
  149:10
able 31:12,13
  47:17 49:23
  86:2
absent 109:14
absolutely
  138:5
AC225 111:11,12
AC230 111:12
AC27 111:11
AC273 111:16
AC293 110:19
  110:20
access 94:17
  102:1
account 100:11
  112:13
accounting
  147:20
accounts 33:3
  78:8
accurate 6:19
  55:9 69:8
  76:20 96:16
accurately 70:9
act 10:13
acted 11:1,6
action 149:12,17
actively 109:19
actual 8:15 10:6
  110:1,11 118:19
Adam 4:21 12:6
  13:3 18:4 20:6
  20:12 23:21
  24:2 26:13,20
  30:14 31:23
  34:5 36:4
  39:5 41:8

42:5 43:1
  45:11 53:21
  56:16 59:10,15
  59:16 64:14
  66:1,1 75:19
  80:2,6 87:22
  105:22 106:24
  107:11 108:12
  112:11 113:3,9
  113:16 114:7,22
  122:21 128:7
Adam's 56:18
Adams 4:10 11:2
  11:7,24 12:6,9
  12:10 13:10,13
  17:16,18 18:3
  22:12 36:13,14
  47:6 110:1
  133:22 135:14
  137:8,13,24
  138:8
adding 78:19
addition 10:4
  125:21
additional 77:1
  81:13,18 105:9
admit 49:5
admitted 7:18
  7:21,24
advice 9:6,7
  21:18 45:18
  109:9,15
advise 126:4
advising 23:4
advocate 52:6
  52:8
affect 52:24
afforded 134:6
afternoon 3:13
  105:3
age 5:10 130:3
agency 14:11,16
  15:23 78:7
agent 41:9
ages 130:2
ago 11:13
agree 16:5

33:24 34:14
  79:17 132:13
  137:23
agreed 5:1
  127:10
ahead 96:10,15
  108:1 121:24
  124:2
al 1:4,10 3:2,5,19
  3:19
Alaris 3:14 4:22
alcohol 102:13
allegation
  102:6
allegedly 123:18
  123:22
ambulance
  104:16
amend 32:3
  48:24 49:13
  49:18 50:6
  87:11 88:1,7,23
  89:8
amended 92:15
  107:15
amending
  108:6
amendment
  88:16
America 135:1
amount 83:23
  107:4 123:5
  143:3 144:6
amounted
  108:8
Anakin 12:18
  36:23,24
  37:18 38:7
ANCEL 4:7
Ann 1:21 3:16
  4:22 5:4 149:3
answer 6:15
  31:22 38:14
  49:11 67:15
  73:3 98:23,23
  108:3 127:5
answers 22:14

anybody 44:8
  45:18 76:3
  142:22,24
anybody's
  119:23
anymore 28:8
  53:1
anyway 44:13
  65:10 102:20
apparent 110:13
apparently
  102:1
appeals 25:8
  125:20
appear 10:10
  25:5 70:7
  85:14 109:18
appearance
  9:21 14:20
appeared
  94:23 117:19
  144:15
appears 115:5
  149:7
appellate 5:21
  6:22 9:1 33:14
Appleton 4:17
applied 110:4
appoint 14:21
appointed 14:17
  14:24 16:19
  17:18 18:24
  109:20,21,24
appointing
  15:18 108:18
appointment
  16:1 109:1,14
appreciate
  16:14 61:1
appropriate
  90:12 139:24
  144:3
April 7:6 19:17
  19:17,23
  142:17
area 34:2,10
  101:21 102:3

anybody 44:8
areas 9:19
arguing 118:13
argument
  117:20
arms 27:1 35:22
  78:23 97:8
  122:15
arose 57:11
  67:22
arranged 26:13
arrangements
  30:17
arranging 44:6
arrest 121:20
  123:15
arrested 44:6
  44:16 45:4
  113:11,20 134:4
  134:16
arrived 28:17
  94:7,13 123:2
  123:20
ascertain 17:10
asked 14:14
  26:1 32:18
  38:15 55:5
  58:15 59:10
  63:24 68:8
  80:24 81:10
  83:10 98:18
  106:15,16
  108:17 114:11
  126:24 136:8
  137:9
asking 23:22
  32:7 40:24
  41:15 45:24
  50:11 72:1
  80:4,7 81:19
  83:11 93:10
  100:7 141:2
asks 9:17
assassination
  133:4
assess 68:9
assessments
  21:9

**EDWIN R. PARKINSON 11/19/2018**

assign 9:6
assigned 19:15
  22:9 24:10
  56:15
assist 9:7 10:7,8
  10:13
assistance 9:17
  114:21
assistant 28:16
  109:21
assisting 10:15
  42:1,2
assume 6:9
  16:20 25:24
  78:6,10 112:18
  131:2 137:7
assumed 42:24
  78:4,4
assuming
  55:23 116:2
  120:6
attached 75:11
  112:18 116:12
attachment
  112:7,8,16,17
attachments
  112:6
attempt 64:5
  100:8,10
  101:10 102:9
attempted 119:4
attempts 100:1
attended 56:16
attention 38:4
attorney 6:3,22
  7:3,11,14 8:24
  8:24 9:20,24
  11:9 13:21 14:15
  15:10 16:3
  24:18 33:14
  39:22 110:2
  134:20 137:4
  138:9 139:3
  140:22 149:14
attorney's 10:16
  14:19 16:22
  137:24

attorneys 5:21
  9:16,18 10:3,5
  37:19 49:20
  109:9 132:1
August 19:18,20
  19:24 30:24
  35:5 44:23
authority 15:1,15
  109:6,13
authorized
  15:15
autopsy 16:21
  18:21 22:16
  29:22 31:6
  32:2,19 36:11
  47:19 48:23
  49:21 88:9,12
  89:22 90:13
  90:18 106:10
  131:23
available 25:4
aware 17:21 31:9
  36:9 37:1
  39:12 57:22
  141:23

**B**

back 24:10
  27:13 32:9
  40:1 56:6
  63:10 70:11
  72:16 85:19
  102:14 108:12
  118:4,20
  120:15 123:20
  131:12 133:24
  135:15,18
  136:10
Baden 20:15
  21:24 29:12
  30:12 80:17,21
  122:20 133:2
  133:14 143:14
  146:11
Baden's 143:16
Baird 113:15
  129:17 130:5,6

Baird's 90:3
Ballard 50:12
  94:3,7
bar 7:18
Barnard 13:17
  13:23 104:3,8
  104:10 110:4
  138:2
barred 140:1
bars 7:21 8:1
based 123:3
  131:22 145:5
  146:18
basically 104:1
Bate 66:10 82:9
  84:10,19 85:5
  86:15,20 87:3
  92:6,6,21
  95:10 98:4
  110:19 111:3,10
  111:11,21 114:2
  115:20
Bate's 62:14,16
  69:15 71:7,8
  79:15 82:1
  111:21,22
bathroom 63:7
bed 35:21 56:6
  78:22
bedroom
  130:20
began 25:13
  42:22
beginning
  10:24 82:13,18
behalf 1:19 5:11
  135:9,12
belief 43:6
  46:11 52:7
  55:7 64:12
  65:5,12 71:19
  87:15 90:12
  90:20 97:9
  112:24
believable
  52:12
believe 12:4,23

13:7 15:7,21
  18:8 19:1,1,2,3
  20:2,4,13
  22:11 23:20
  23:20 24:3,4
  25:9 26:13,14
  27:1,13,23
  28:8,16,19,22
  31:18 32:9
  35:13 36:5
  39:9 43:24
  45:4,11,21 51:11
  53:21 55:3
  56:16 57:5
  58:7,13 59:8
  64:7,14 65:3
  67:7,8 74:15
  75:1,18 77:4
  81:21 83:4,14
  83:16 85:3,17
  86:18 88:6
  90:15 92:12
  96:19 99:5
  101:2 110:5
  111:1,7 113:13,16
  117:9 118:1,10
  118:17,21 119:3
  121:14,17,19,23
  122:8 123:14
  124:8,9
  127:23 129:11
  146:10,10
  147:17
believed 61:24
  90:7 97:15
  100:17 119:6,9
  126:15,19,21
  129:1 136:2,13
  144:3,14
bend 49:8
beneficial 88:6
best 6:6 40:4
  139:6 149:9
bet 42:18
better 25:3
  34:11 42:10
  110:8

beyond 136:14
big 55:16 131:19
bill 62:8 134:2
  148:7
binder 17:7,13
  17:15 18:7,11,18
  19:2 23:24
  30:20 34:22
  40:9,14 41:1
  56:13 76:24
  78:17 83:3
  85:18 91:9,10
  91:14,20 92:1
  107:13,14,17
  108:5,9,23
  143:6
bit 131:12
blood 28:24
bloody 65:1,12
Bloomington
  30:16 64:16
  65:24 69:1
blue 56:2
blunt 37:9
bmoran@strat ...
  4:19
bodies 102:12
body 28:20
  29:4 35:16,21
  42:15 78:1,16
  78:21,22
  94:19,23
  105:3 123:9
  144:6,10,15,20
  146:1
book 126:11
Booth 36:16,17
bothered 60:3
bottom 71:8
  80:5 114:24
bound 135:2
Bowman 12:9
  12:12,21 22:12
  22:17,22 24:5
  31:7,9 36:10
  36:21,22 37:5
  47:7,12 48:16

48:20,23
49:13 52:4
87:11 88:7,15
88:23 89:3,4
89:8,11 90:20
91:6 92:15
93:2,8 105:24
106:20 131:13
131:14
**Bowman's**
37:14
**boy** 12:18 36:24
129:14
**boys** 45:20
53:16,17 56:3
**Brady** 39:13
40:5 43:7,11
43:19 46:18
56:8 86:5
118:24 119:21
119:24 126:16
**brain** 65:2,13
**break** 6:13,16
63:7,9,13,15
63:16 105:8,11
105:13
**brief** 14:20
23:14 27:2
**briefly** 7:10 9:13
26:22 59:4
63:3
**bring** 124:3
132:15
**brother** 11:10,17
11:22
**brought** 14:10
15:17 18:6
27:11 44:10
72:8 143:1
**buffer** 120:24
**bug** 60:11 61:11
61:19
**bugged** 46:15
61:7,10,16
**bugging** 60:16
**business** 34:1

**C**

**C** 4:1
**call** 16:3 26:2
35:16 41:9
42:17 46:18,19
61:15 64:9
90:5 103:13
106:12 116:19
117:2 122:12
137:1,2 138:21
139:1
**called** 15:9
24:14,16 26:1
39:5 45:13
61:2 83:18
104:14,15 112:8
115:14 134:13
135:24 139:6
139:6
**calling** 23:22
48:13 98:14
123:3
**calls** 24:10
83:14 116:16,18
117:19,23 118:9
**camera** 76:13
**canceled** 57:18
**capable** 109:2
**capacity** 7:4
8:23 10:8,14
10:20
**Capitol** 3:15
**card** 34:2
**care** 74:12
**career** 7:11,17
8:5,8
**case** 1:8 3:4
9:23 11:9,15
12:3 14:11 15:2
15:8,9 16:18,21
17:5,20 18:24
19:13,15 20:1
21:9,14,18
22:2,19,23
23:16 25:12,17
26:10 27:20

29:12 30:1,23
32:17,22 34:6
36:11,14,16,22
37:17,23 38:1
38:7,12,18,23
40:3,17 41:9
42:17,21 43:17
46:13 47:4,11
47:18,23
48:15,19 50:11
51:2,14 52:14
56:14,20 57:11
58:22 59:3,17
59:20 60:3,15
62:1 63:22
65:18 68:10
69:8 74:16
76:7 77:20
78:8 80:22
81:8,18 83:20
86:8 88:6,24
89:9,12 90:21
91:11 92:11,15
92:24 93:23
97:2,3 98:11
99:2 104:3,21
106:1,19
108:18 109:14
109:20,24
110:7,10,21
111:6 112:14
113:12 116:14
118:23 121:1,7
121:17 122:9
124:2 125:10
126:7,13
127:19 131:14
131:18 132:6,19
132:21 133:21
135:5 138:6,17
138:19 139:3
140:11 141:16
141:19,20 142:1
142:8,14,19
143:2,4 146:5
147:18,19
**cases** 8:7,12,14

9:6 11:1,24
12:5,9,11,15,20
12:24 13:5,12
13:14,18,19
17:17 22:5,7,9
22:18 31:8,9
36:6,9 37:1,15
37:20 48:16
59:12,23 60:5
85:21 119:5
131:15 139:10
139:11
**Cashman** 11:20
11:21,22
**Casually** 32:24
**categories**
18:21
**Cathy** 115:21,22
116:1,2,8,10
**cause** 3:16 31:11
31:13 37:9,10
38:2,10 49:7
50:7 60:24
67:13,20 71:17
71:22 72:21
81:2 88:10,13
89:23 90:18
121:3,20,24
122:2,9 123:15
124:6 125:17
126:20 132:8
132:16 133:18
144:14
**caused** 122:24
**causes** 126:11
**CC'd** 77:7,16
82:15
**cell** 33:11,17
34:7,10
**CENTRAL** 1:2
3:1,18
**certain** 3:16
7:24 45:12
74:23 75:3
90:1 142:11
**certainly** 121:18
132:22

**certainty** 60:24
71:22
**CERTIFICATE**
149:2
**Certified** 5:4
149:3,5,21
**certify** 149:6
**chain** 58:4
79:16 85:13
114:3
**chair** 25:6
**chance** 98:7
121:15
**change** 32:7
48:20 49:3,10
50:4,6 88:11
89:24 124:19
137:21
**changed** 32:13
33:15 105:24
106:20 124:12
124:16,18
**changes** 32:11
**character**
90:24 91:2
**charge** 9:4
15:17 19:18
23:22 25:8
41:10 57:6,15
57:16
**charged** 11:11
134:17
**cheap** 34:9
**check** 127:1
**Chicago** 4:4,8
52:10
**chief** 7:7 41:9
58:21 59:2,5
**child** 27:1,12
**children** 44:15
84:2 113:10,14
113:17,20,22
123:19 129:10
**choice** 96:17
**Christine** 4:20
5:24 117:24
**circuit** 11:10

25:9
citizens 133:22
City 20:15 22:1
claim 102:24
class 57:17
clean 47:14,15
clear 48:10
   115:23
close 89:17
   105:7,10
cloudier 55:17
   55:19
cold 35:24
   59:12
Cole 94:10,11,12
collection 76:5
college 101:3
Colorado
   102:10 114:20
coloring 28:21
Comcast 100:11
come 10:1 38:3
   38:18 40:21
   49:19,24
   63:10 88:13
   90:8 107:18
   108:7 114:20
   120:19 129:10
   131:1 132:16
comes 48:17
   135:1 138:16
coming 37:8
   41:15 45:1
   132:8
command 58:9
comment 38:19
   87:10,16 117:10
communicate
   33:19
communicated
   24:6
communication
   76:1
communicati...
   70:19 76:12
community
   121:2 133:17

compel 75:10
   75:20 76:4,22
compiled 17:14
complete 23:24
   127:15
complexity
   17:20
comply 40:4
   118:24 140:5
comport 123:23
concern 108:6
   128:21 131:8
concerned
   37:14 55:14
   68:4 86:5
concerns 82:20
conclude 97:17
conclusion
   49:24 57:3
confer 6:13
   15:22,24
   27:21 88:23
conference
   89:16
conferring
   88:15
confidential
   34:15
confirm 35:6
   102:15
conflict 9:20,21
   10:4,6,7,10
   14:12,20,21
   16:4 70:18,20
   70:22 71:2
   110:1,11,13
conflicted
   68:10 138:4
confront 134:12
confronted
   44:24
congestion 65:1
   65:13
conjunction
   136:9
connected
   57:24

Conservation
   7:8
consider 129:6
considered
   14:2 142:7
considering
   70:17
consistent
   48:24 65:2,14
   84:1
consistently
   146:24
constituted 71:2
   123:15 124:6
   126:16
constitutes
   119:21,24
constitution
   134:7
consult 145:2
consulted 13:14
   22:4 144:18
consulting 13:17
   37:4
contact 21:24
   24:1 41:22
contacted
   29:12,14 30:9
   30:12 64:13
   83:10,12 96:11
contain 108:10
containing 80:3
content 60:18
   60:19,19 63:2
   75:6 80:3
contents 87:8
context 67:23
continuance
   126:24
continue 41:8
   92:17 97:12
   122:3 125:18
   126:20
continued 41:3
   127:24
continues 41:16
continuing

41:10
contradict 131:4
contradicted
   27:6 140:11,18
   141:11
contradictory
   27:16 141:11
convene 59:7
convenience
   18:9
convening
   19:19
conversation
   16:8 53:6
   54:9,13 67:24
   90:4
conversations
   26:4 27:3
   28:12,14 30:13
   33:4,8 41:24
   56:14 75:21
   84:16 87:20
   88:5 92:13
   94:2 96:4
   102:22 103:7
   105:20,22
   143:9 146:4,14
   146:20 147:4
convey 89:20
conveyed
   143:24
convict 136:14
convinced
   127:19,21
Cook 9:17
copied 30:4,5
copies 75:2
   77:2,14 84:11
   93:17
Copley 58:21
   59:2
copy 30:23
   62:8 66:12
   69:23 70:12
   72:2,6,11
   85:15 86:16
   86:22 87:5

92:9,22 110:19
   110:23 111:5
coroner 12:3
   13:10 28:16
   64:18 78:11
   137:8,13
   138:21
coroner's 77:21
correct 10:19
   24:20 34:17
   40:1,12 41:3
   54:23 62:23
   63:17,23 91:16
   95:24 96:17
   96:22 97:7
   109:17 120:20
   121:11 122:6
   124:3,7,12,20
   124:21 125:18
   125:19 126:17
   126:23 131:16
   132:10,19
   134:4 135:16
   137:10 138:19
   139:22 140:20
   141:1,5 143:4
   147:14
corresponde...
   115:9 147:13
   147:20
corroborate
   102:6,24
corroborating
   99:3,20
corroboration
   99:5,12
Cory 10:22
   17:22 19:5
   20:3 27:7
   28:18 31:14
   48:4,13 58:7
   71:22 78:1,16
   83:24 92:16
   97:12 99:4,7
   99:21 104:6
   112:8 122:17
   129:18 139:8

144:6
Cory's 82:20
cough 16:12
coughing 16:13
counsel 5:2,2
6:12,13 7:7
67:4 68:5
86:12 91:15
92:2 96:12,21
106:19 149:11
149:15
counties 9:18
10:15 17:6
131:22 132:2
county 4:10 7:15
9:17 11:2,7,24
12:6,9,10,12,14
12:16 13:10,13
14:18 17:17,18
18:8,10 22:10
22:12,20
36:13,14,22
37:6,13,18
47:6 68:24
78:11 108:22
110:2,3,7
131:19,21,21
132:7 133:22
135:15 137:8
137:13,24
138:8
couple 6:4
35:20 63:5
71:7 80:8,9
105:9 111:23
112:5 114:4
115:20 127:9
coupled 128:24
couples 118:5
course 26:19
47:1 106:11
129:7 141:19
court 1:1 3:1,17
4:21 5:18 8:2
8:3 15:1,18
25:2 67:17
76:14,16,16,20

101:4 108:17
109:19,22
138:1 140:4
146:21
courtesy 27:22
59:6
Courthouse
18:10 68:24
courtroom 57:4
covered 20:23
26:18 105:1
crazy 91:6
credibility
103:14,21
credible 103:9
Credit 12:18,19
36:24 37:18
38:7 131:18
132:6
crime 122:12,13
134:17
criminal 134:7
147:19
cross 70:23
119:17 130:10
CRR 1:21 3:16
4:22
CSR 1:21 3:16
4:22
Curt 12:22
44:16 48:5,8
68:5 99:14,16
99:20 100:17
101:10 102:24
104:5,6 113:10
113:20 115:8
138:11
Curt's 12:24
13:5,13,23 14:7
44:15,20
45:20 48:10
54:18 67:3
74:16,18 82:13
82:18 84:12
85:1,16 86:17
86:23 87:6
146:14

Curtis 4:20
5:24 10:21 11:8
12:2,13 26:23
27:11 44:6
53:16 56:5
66:23 86:8
99:3 101:15,21
101:24 104:14
105:1,4 112:23
114:24 115:10
116:16,17 117:13
117:19 118:5
121:21 123:15
127:3,20
128:22
Curtis's 113:23
117:5,10
custody 44:10
45:13 113:23
cut 31:17 90:1
CV 1:9 3:5

---

## D

dad 46:2 130:17
131:1
Darlene 101:1,9
101:11,14,19
102:7,10,17
103:1
date 30:24 43:1
74:7 80:3
dated 62:22
63:19 66:15
69:23 70:13
83:5 95:16
dates 83:3
daughter
100:18 101:1
102:10,17
David 24:19
25:7 75:19
76:8 127:8
day 3:13 18:19
26:18 27:7
29:4 42:15
43:4 44:22
45:8,10 50:19

53:6,14 54:3
54:12 55:23
57:9,18 104:5
113:15 118:19
129:18 134:5
135:23
days 129:20,23
135:7,7
dead 27:2 29:1
123:21
deadlock
135:19
deal 16:4
dealings 48:15
Dearborn 4:8
death 12:17
16:21 17:22,23
19:5 22:6 31:11
31:14,14 36:24
37:9,10,11 38:1
38:2,10 43:1
48:5,13 49:7
50:8 58:7
60:24 67:13
67:20 71:17,23
72:21 81:2
83:24 84:2
88:11,13 89:23
90:14,18 92:16
99:7,17 112:9
122:13,24
126:11 129:3
131:10 132:8,16
139:8
Decatur 37:23
52:3
deceased 20:3
24:2 26:12
28:22 144:12
December 7:1,6
59:13,14
142:23
decide 126:7
133:17
decided 45:15
121:7 127:18
130:2 136:15

deciding 21:16
121:1
decision 58:11
121:10,13 123:2
124:2 125:17
127:2 133:24
135:1 136:5
141:15
decisions 138:2
dedicated 91:1
defendant 11:14
Defendants 1:12
3:6,20 4:6,10
5:3
defense 39:17
49:20 56:7
66:24 67:4
75:10 76:7
83:18 86:1
91:10,14 92:2
96:11,21 97:3
97:6 106:18
119:4,11 134:11
135:2,11
140:22
definitely 43:9
defying 145:2
degree 23:15
60:23 71:21
136:3
delay 74:10
deliberations
136:1
demeanor 118:8
denied 128:17
Denton 20:18
22:8 24:3
30:14,17 31:4
31:24 32:10,13
32:22 33:4,5
38:15,21 42:6
46:12,15
47:22 48:3,12
49:12 63:21
64:6,16,22
65:9,12,18,22
65:24 66:13

**EDWIN R. PARKINSON 11/19/2018**

66:19 67:1,5,9
67:22,24
68:17,19,21,24
69:3 70:8,19
71:1,16 72:10
72:19 73:11,16
73:21 74:4,23
75:3,17 77:3,6
77:15 80:13
81:7,12,18
84:17 87:9,21
87:23,24 88:5
88:5 92:14
97:7 105:21
105:23,23
106:14,19
107:15 129:4
139:20 140:7
140:9,17,23
**Denton's** 48:18
50:3 60:6
71:20 74:15
97:10 128:24
**department** 7:7
18:4 40:16
44:9,19 45:19
57:23 58:18
74:22 75:16
100:2 116:3
120:4 125:1,6
127:13 128:8
142:1
**depending**
17:20 34:8
**depends** 141:4
**depicted** 94:23
**DEPONENT**
11:19,21 34:1,16
63:12 89:2
127:6 130:9
139:14 148:9
148:12
**deposed** 6:1
**deposes** 5:11
**deposition** 1:18
3:9 5:3,12
105:18 148:15

149:8,13
**depressed**
117:14,15
**depth** 17:19
27:24
**deputy** 25:8
**Derrick** 83:12
**describe** 9:13
14:9
**described** 11:15
15:5 17:16
34:21 37:16
102:21
**describing** 35:7
145:22
**desiccation**
123:11
**desire** 54:17,23
**desperate** 118:6
**desperation**
116:22
**Desperation....**
116:23
**despite** 125:20
**detail** 27:9 28:3
**details** 104:11
**detect** 102:12
**detective** 19:8
21:5,23 33:2,8
33:19 34:20
38:22 39:7
41:19 42:21
44:18 56:12
59:15,18,23
65:17 75:22
76:23 77:3
78:6 79:23
80:17,22 83:9
83:21 87:20
88:14,22 89:7
90:19 91:9
93:3,16,16
97:11 102:4,22
103:8,20
107:19 108:22
112:22 114:10
115:9 116:15

117:1,4 118:8,16
120:13,15
129:16 141:18
141:23 142:6
142:23 143:2
143:17 145:22
146:3 147:5,21
**detectives**
48:22
**determination**
126:20 139:1
**determine** 15:16
31:13 70:16
**determined**
24:15 40:11
**determines**
14:11
**determining**
133:9
**develop** 52:7
**developing**
146:5
**Devin** 11:20,21
**dictated** 62:19
**Didriksen** 20:7
20:8,11 24:1
26:9
**died** 26:21
27:19 29:23
48:4 55:24
84:1 97:13
99:15,22
104:6 123:22
130:16 132:24
**differ** 72:14
**differences**
72:24 73:9
**different** 36:8
46:8 49:9
52:11 56:10
72:19 82:11
85:14 129:14
130:13
**differently**
73:20 124:10
**differing** 132:9
**difficult** 132:14

**digital** 57:20
**Dina** 56:19,21,21
57:4,10,13
120:3,10
**Diplomatic**
149:4
**direct** 5:13 89:7
**direction** 149:11
**directly** 77:20
101:13 105:21
**director** 25:8
**disagree** 16:5
**disclose** 39:16
44:2 119:4
139:21
**disclosed** 43:19
56:7 75:17
119:11
**disclosures**
140:1
**discount** 129:13
**discovered**
94:24
**discovery**
85:20 91:10
**discredited**
131:15
**discuss** 52:21
65:24 142:13
**discussed** 88:3
103:20 107:1
114:17 136:10
**discussing** 26:8
**discussion** 45:5
67:7 75:15,18
79:4 87:24
106:23 107:15
113:2
**discussions**
76:8 103:3,16
105:5 107:11
120:2,9,12
138:10 145:24
**disposition** 8:8
**dispute** 24:13
**DISTRICT** 1:1,2
3:1,1,17,18

**divorce** 101:17
**doctor** 83:12
**document**
62:14 69:15
79:14,15,17
82:8,10 84:10
84:22 85:5
86:15,20 87:3
87:8 92:5,20
95:9 98:4
110:18,23
111:10,16,20
114:1 115:18
**documented**
64:21 78:2,8
**documenting**
87:20 112:13
**documents** 17:5
17:17 76:5,6
77:20 105:18
146:8
**dog** 40:20
**doing** 10:11,12
18:1 31:8 63:6
91:3 95:12
127:15
**door** 57:17
130:19
**doubt** 87:14
106:2,9,21
107:4,16 108:8
136:14
**doubts** 132:2
**downloaded**
58:8,9
**downstairs**
56:2
**Dr** 12:21 20:15
20:17 22:5,8
22:17,22 24:3
24:5 30:8,9
30:12,12,17
31:4,24 32:10
32:13,17,22
33:2,4,5 36:7
36:10 37:14
42:6 46:12,15

**EDWIN R. PARKINSON  11/19/2018**

47:12,22 48:3
48:12,18 49:12
49:13 50:3
51:2,14 60:6
63:21 64:6,16
64:22 65:9,12
65:18,22,24
66:13,19 67:1
67:5,9,22,24
68:17,19,21,24
69:3 70:8,19
71:1,16,20
72:10,19 73:7
73:11,16,21
74:4,15,23
75:3,17 77:3,6
77:15 80:13,17
80:21,21 81:7
81:12,18 83:10
83:23 84:17
87:9,11,21,23
87:24 88:5,5
88:7,15,23
89:3,4,8,11
90:20 91:6
92:14,15 93:2
93:8 97:7,7,10
105:21,23,23
105:24 106:7
106:14,19,20
107:15 122:20
122:20 126:10
128:24 129:4
133:8 136:17
139:20 140:7
140:9,17,23
143:9,14,15,16
143:19,24
146:4,4,7,11,11
146:12
**drafted** 112:12
**drafts** 60:6
**drawing** 144:5
**Dreyer** 56:19,21
56:22 57:10
57:13 120:3,10
**drive** 65:23

**driving** 66:1
**drop** 127:17
**drops** 16:12
**drowning** 36:14
**drying** 144:6,8,9
144:11
**dryness** 123:11
**due** 28:24
**duly** 149:8
**Dustin** 40:20
99:6
**duties** 14:14
59:11
**duty** 44:1 139:21

**——— E ———**

**E** 4:1,1
**e-mail** 30:2
79:21,22,22
80:2,4,7,11
81:7 82:10,12
95:15,18,22
96:2,20 97:10
98:9,16,19
112:7,8,16,23
114:3,4,11,18
115:6,24
147:14
**e-mailed** 98:13
**e-mailing** 96:5
**e-mails** 24:9
51:10,20
74:23 75:3,11
77:2,5,9,14,15
79:17 85:12,14
108:10,11,13,14
120:13 137:17
**earlier** 47:9
60:11 106:6
129:16 133:15
147:19
**early** 35:5 142:2
142:16
**easier** 63:3
**Ed** 4:16 148:11
**Edwin** 1:18 3:9
5:9,19

**eemery@anc...**
4:9
**effect** 42:16
55:14 69:4
90:7 125:16
**effort** 41:10,18
63:20 118:23
139:7
**efforts** 102:5,23
**eight** 60:4,4
**either** 6:8 16:5
16:18 20:23
30:13 33:11
34:5,20 37:10
54:20 58:4
60:18 64:18
65:8 76:6
82:17 85:1
91:23 93:7
94:5 101:13
104:5 105:20
107:5,19 119:11
129:7 135:7
144:24 145:8
147:5,20
**elderly** 11:11
**elected** 7:14
9:16,18,19
13:20
**Ellen** 4:7
**Elmore** 67:7
68:23 69:24
70:13,14 71:11
**else's** 49:5
**email** 116:12
**Emery** 2:3 4:7
34:17 63:6
82:5 88:18
89:1 105:12
119:16,18
124:23 127:11
130:7 148:2,4
**employ** 25:6
**employed**
149:12,15
**employee**
110:15 149:14

**EMT** 13:7 50:14
94:9
**EMTs** 20:21
31:20 35:20
50:13
**enclosed** 70:3
**encounter**
93:15
**encounters**
104:4
**ended** 27:23
28:1 74:18
135:21 148:15
**enforcement**
15:24
**engage** 15:15,19
**England** 51:3
83:16,23 84:5
**ensure** 86:1
**entering** 109:2
**entire** 147:2
**enveloped**
38:15
**Erika** 24:7 28:8
28:9 41:22
51:6 52:24
98:9 99:3,13
99:21 100:3,11
100:16,22
101:10,16,23
102:7,9 103:1
103:9,20
128:14 129:5
**essentially**
68:10
**et** 1:4,10 3:2,5
3:19,19
**ethanol** 102:13
**ethical** 40:5
126:22
**evaluate** 29:12
**event** 26:21
57:9 110:15
**events** 45:8,9
**everybody**
131:6
**evidence** 39:17

**44:1 75:16**
88:9,12 99:19
119:10 122:5
125:2,4 126:9
127:23 136:13
138:18 139:2
140:11 145:8,16
**evidently** 64:1
**ex** 141:3
**exact** 75:5 81:3
**exactly** 29:3
**examination**
5:13 70:23
119:17 130:10
139:15
**examined** 3:10
5:10
**excess** 8:10
**exchange** 51:19
**exchanged**
51:19 53:15
77:6
**exculpatory**
39:17 119:7,10
141:1,3,7
**excuse** 69:19
111:11
**exhibit** 2:7,9,10
2:11,12,14,15
62:4,5,8,13
63:17 66:4,5
66:10,21 69:11
69:15 71:3,7,11
72:16 79:11,14
82:1,8,12 83:7
84:12,18,22
84:24 85:4,9
85:10,13,15
86:14,14,16,19
86:19,22 87:2
87:2,5 92:5
92:10,20,22
95:2,5,9,14,15
97:24 98:7
110:18 111:3,5,9
111:13,15,17
114:1 115:19

exhibits 2:6,13
2:16,18 75:11
79:6,10 95:11
105:14 137:17
148:14
expect 129:8
expected 118:14
129:9,10
experience 9:9
10:17 28:21
145:6
experienced
6:3 32:18
145:4
experiencing
101:18
expert 22:4
81:2 84:5
125:10 126:10
135:8,12 141:10
141:13
experts 17:13
83:17 106:12
126:13 139:6
139:22 144:18
145:3
explain 21:20
61:3
explanation
102:2
exploitation
11:11
express 54:17
55:7 90:19
expressed
54:22 87:16
87:19 103:8
expressly 5:7
extent 7:17
15:22 30:15
32:16 35:13
78:18 103:6
104:23 147:18
extra 136:16,18
eyes 82:21 90:2
122:14,16
123:12

**F**

Ezra 51:2 83:11

F 4:16
fabricated
125:2
face 118:7
122:17 144:24
fact 58:18 118:10
129:13 132:18
133:2 145:10
145:17
factor 123:17
factors 122:8
123:5,15 124:5
124:19 127:22
facts 52:6,8
125:7
fair 43:2 47:13
fall 78:23
familiar 30:15
38:21
family 27:20
far 58:14 129:5
Farha 4:11 13:15
14:6 104:20
105:2 138:8
fast 6:5
father 52:23
56:5 113:4
favor 49:21
fax 16:24 30:7
69:22
February 17:23
142:2,16,20
fed 73:12
federal 7:24 8:3
feel 10:5 16:15
feeling 74:2
101:18
fellow 104:24
felonies 8:10
felony 8:7,21
10:12 15:13
felt 74:9 137:7
fiery 103:13
file 17:1 23:24

39:23 86:11
109:18 116:12
116:21 137:10
147:13
filed 75:10,21
76:4
files 16:18
final 125:12
finally 46:16
92:19
financial 11:11
financially
149:16
find 37:24 38:19
38:20 46:1
83:19 88:2
89:23 119:21
finder 145:9,17
finding 32:4
36:10 37:2,12
88:10 122:24
134:22
findings 22:17
22:19 32:19
38:9 49:1,6
61:13 88:1 90:1
90:13,15 131:14
fine 47:7 63:11
finish 95:11
fire 27:13
fireman 13:8
50:14 94:8
firemen 94:9
first 10:12,12
14:18 17:21
23:17,19 24:14
24:16 25:5
26:12 32:12,21
37:17 38:3
46:7,23 48:8
48:11 49:12
50:15,16,20
50:22 51:5,7
51:12,15,20
52:18,20 53:2
53:5,21 54:14
54:18,21 56:11

59:2,3,18,20
63:20 64:5,13
67:3 68:3
69:22,22
71:14 73:21
74:14,18 79:21
80:8,9 82:11
83:8,22 84:12
85:2,16 86:17
86:23 87:1,6
89:12,18 91:11
91:23 92:10
92:23 93:21
93:22 94:1,4,6
94:12,15,23
97:20 100:20
100:22 106:14
107:7 110:20
111:5 112:6
114:3 118:22
120:20,21
126:6,16
128:17 135:5
135:15 136:3
136:19,22
137:3 138:9
146:23
fitting 48:4
five 19:22,23
32:16 38:11
flamboyant 91:3
flirting 99:9
Floor 4:4
fluid 78:22
FOIA 74:21 75:9
follow 112:21
113:6 114:10,13
130:12
follow-up 128:9
139:17
followed 14:13
following 83:17
99:16,20
force 37:9
foregoing 149:7
forenoon 3:12
forensic 20:16

22:11 38:20
47:2,7 60:24
122:19 132:9
132:23
form 46:11 77:9
88:18 89:1
107:23 124:22
127:4
formal 29:17,19
46:11 60:7
63:21 80:13
109:13
formally 109:16
former 13:10
formerly 110:3
forth 24:10
118:5
forty-two 3:12
forward 16:23
19:12 41:6
57:2,6 79:22
90:8 121:3
127:10
forwarding
79:22
found 27:8
29:5 31:14,21
32:20 36:18
36:20 45:24
49:22 53:7
78:1,16 94:19
101:21 103:12
104:14 105:3
108:5 125:7
129:18 144:7
144:16,20
four 19:22,23
32:16 38:11
Fourth 4:18
25:9
frame 59:1
frankly 24:10
74:11
free 42:17 86:5
Friday 57:3
friend 14:3
friendly 90:4

**EDWIN R. PARKINSON  11/19/2018**

friends 14:6
front 69:17
    109:19
frustrated 38:18
full 17:1 28:19,19
    69:23 145:20
    147:20
funeral 28:23
    35:18
furnish 73:5
further 17:11
    32:2 90:16
    130:8 135:24
    148:5 149:13

--- G ---

Gary 13:6,9,14
    14:6 93:21
    104:20 105:2
    138:8
general 38:14
    77:19 100:7
    144:13
general's 10:1
generally 147:12
generating
    132:3
getting 16:18
    17:4 19:13
    28:9 41:14
    73:11 81:12
    91:8 98:22
    105:21 120:7
    136:16
Gibson 1:10 3:5
    3:19 4:21 12:6
    13:3 18:4 19:8
    20:6,12 21:5
    21:23 23:21
    24:2 26:13
    30:14 31:23
    33:3,9,19 34:5
    34:20,21 36:4
    38:22 39:5,8
    40:10 41:9,19
    42:5,22 43:1
    44:18 49:9

53:22 56:12
56:16 59:10,15
59:18 64:14,18
65:4,8,18 66:1
74:23 75:3,19
75:22 76:23
77:3 78:6
79:23 80:2,6
80:12,17,22
81:6 82:17
83:9,21 87:20
88:15,22 89:7
90:19 91:9
93:3,16,16
97:11 102:4,23
103:8,17,20
105:22 106:24
107:6,19
108:10,12,22
112:11,22 113:3
113:9,16 114:10
115:9 116:15
117:1,4 118:16
120:13,15
122:21 128:7
137:18 141:18
141:23 142:6
143:2,17
145:22 146:3
147:5,21
Gibson's 26:20
118:8
give 6:19 17:8
21:17 34:8,11
37:20,21
45:18 46:16,17
47:17 56:13
60:23 64:9
77:5,14 81:17
86:6,10 93:7
109:15 132:23
143:6
given 17:14
101:24 113:11
115:22 140:9
gives 34:9
giving 39:9

65:9 109:9
125:7 140:10
glad 34:8 73:4
73:5
GLINK 4:7
go 8:9 15:10
16:18 17:4
27:9,24 28:3
32:9 38:16
42:5 45:23
49:9 53:12
59:24 79:2,10
85:19 86:14,19
87:2 88:9,12
91:20 94:16
96:10,15 108:1
121:24 122:9
124:2 130:19
131:12 142:8
147:15
goal 61:21
goes 40:1 80:7
going 6:6,9 16:1
21:17 26:16
38:10 41:6
45:2,3 46:2,4
46:17,19 49:18
49:19,20 50:5
50:6 52:5
53:12 54:22
57:17 59:7,7
61:1,3,15 62:15
68:4 77:8
79:9,10 81:22
81:23,24
84:18 104:18
107:22 108:7
110:17 111:2,9
111:15,19
113:24 115:18
118:2,7 126:1
127:10 131:12
133:13 138:7
138:18 139:22
Gomez 24:7
28:8,9 41:22
51:6 52:24

98:9,14,18
99:3,13,21
100:12,16
103:9 128:14
129:5
Gomez's 100:4
103:21
good 5:15,16
13:22 78:12
104:1 126:9
145:13
goodbye 54:5
gotten 17:3
29:3 30:19
graduated 7:16
55:4
grand 15:4 18:10
19:8,14,19
20:10 21:12
22:23 23:2,6
26:9 28:12
29:18 30:23
33:9 34:24
38:23 39:2,6
39:8,10 44:4
47:20 48:1
53:3 59:8
64:1 120:23
121:8 122:5,6
122:9 123:3
133:13,16,21
141:16,20,21
142:1,9 144:4
145:9,20,22
grandmother
52:22
gravity 29:1
145:2
grows 102:19
guess 8:10 11:5
38:17,17 40:23
45:15 47:18
49:15 50:15
78:4 79:21
104:13 145:15
guide 9:11 21:14
guilt 74:16

127:20
guilty 121:15
124:3 136:2
139:7
guy 40:19
gym 99:7,7,11

--- H ---

hair 101:18
102:16,17,18
103:4,5
half 147:10,11
halfway 18:8
34:22
Hamilton 13:6,9
28:17 93:22
hand 73:9 93:17
handed 79:12
handle 16:7,7
125:20
handled 8:7
76:10
hands 29:23
82:21 122:14
122:16 123:1
144:23
hands-on 126:2
handwritten
68:16 72:3,6
72:11,14 73:1,4
73:7
Hansen 2:4 4:11
11:18,20 77:8
85:8 107:22
130:11 139:12
148:3
happen 15:6,7
129:8
happened 27:7
78:15
happens 16:2
happy 33:19
hard 61:3
Hardwick
135:24
hate 61:9
header 69:22

hear 6:8 35:14
  45:9 58:17
  105:23
heard 44:24
  45:8 101:20
  106:5 113:6
  130:17,19
hearing 76:14
hearsay 122:5
heart 129:12
held 7:11 76:14
help 9:6 11:18
  109:21 110:7
helped 56:5
high 133:3
hired 23:13
  47:6 59:11
history 64:9
Hmm 108:11
Hold 77:8
Hollo 1:21 3:16
  4:22 5:4 149:3
home 26:14
  27:4 28:23
  35:18 46:2
  53:23 101:19
  131:1
homicide 37:10
hope 17:8
hospital 89:14
hour 73:15
hours 3:11 131:3
house 28:7
  53:23 101:20
  101:22,24
  102:1 118:2,3
huge 143:6
hundred 8:16
  16:15
hung 74:19
  126:6 135:15
  135:18
husband's
  36:18

———————
I
idea 145:14

identification
  62:6 66:6
  69:12 71:4
  79:7 95:6 98:1
  105:15
identify 5:17
identifying 73:9
identity 100:4,8
  100:9
ignored 52:8
ignores 52:6
III 4:16
ill 101:18
Illinois 1:2 3:1,15
  3:18 4:4,8,13
  4:18 5:21 6:22
  7:7,13,15,18
  8:23,24 9:15
  33:14 37:24
  40:1 64:16
  68:21 149:6,21
imagine 103:18
impeach 140:12
  140:15 141:13
impeached
  140:23
impeachment
  140:20,22
import 46:5
  126:23
important 47:5
  74:7
impress 67:10
impression
  42:11
in-person 34:19
  35:11
inappropriate
  61:17
incarcerated
  117:6,11
incident 112:23
  113:15
include 17:7
  50:7
included 83:2
includes 116:21

income 118:1
inconclusive
  102:20
independent
  121:10 127:2
  128:2 146:3,13
independently
  123:2
INDEX 2:6
indicated 6:21
  85:20 137:15
  144:11
indicates 112:15
indication 80:12
  124:24 125:4
  129:4
indicia 144:19
indicted 50:2
  133:19
indictment 15:4
  19:9 20:11
  22:24 23:2
  26:9 28:13
  29:18 32:24
  33:9 38:12
  39:3 40:22
  44:5,23 46:24
  47:21 48:1
  49:16 53:3
  121:5,18,19
  134:1,2 142:15
  144:3
indirectly 101:14
  101:15
individual
  138:18
influenced
  128:22
inform 59:6
information
  43:16,18 47:21
  48:2,11 61:24
  64:17 81:1,13
  81:18 97:1,6,16
  99:2,23 100:2
  100:11 101:8
  113:12 119:5

133:13,16
  137:8 140:23
  141:10,12
  143:12,17,22
  143:24 146:7,8
  146:17
initial 27:6 40:9
initially 107:14
input 109:10
  138:10
instance 10:9
  15:5 42:5
  46:18
instrumental
  57:1
intent 61:22,23
interest 9:21
  10:4 15:12
  23:15 42:7,11
  43:2 44:12
  86:2 110:1,12
  110:13
interested
  42:24 43:3
  149:16
internally 141:24
  142:7
interpreted
  32:5 73:19
interview 40:18
  44:20 45:20
  55:16 72:7
  73:13
interviewed
  53:24
interviewing
  44:15
interviews 21:4
invested 127:15
investigate
  102:6,24
investigating
  59:20 78:7
investigation
  15:3,12,16,20
  17:12,22 23:5
  41:3,16 42:1,21

90:16 92:16
  93:4 97:12
  99:1 107:20
  108:21 109:3
  109:16 112:12
  115:10 116:14
  127:15 128:3,9
  128:11 133:5
  137:2 141:19
  143:3,7 145:23
  147:22
Investigation. ....
  112:9
investigative
  42:7,12
investigator
  129:17
investigators
  15:16
involved 23:4
  23:10,12,13
  24:19,22,23
  36:14 47:11,12
  47:18 54:23
  60:14 100:1,10
  100:13 109:7
  110:8 115:10
  133:4 142:19
  143:10 147:3,3
involvement
  21:20 25:11
  44:5,14
  108:20 138:2
involving 57:11
Iowa 28:4
  53:22 55:4
  89:13
issue 38:4 57:11
  67:22 68:2
  72:20 75:22
  76:15 82:19
  96:5
issued 74:21
issues 70:17
  104:3,9 114:12
  132:7 140:24
  144:5

issuing 121:4

**J**

Jacksonville
7:13,15
jail 116:18 117:14
James 4:11
69:24 70:12
95:17
Jane 20:16
22:5 122:20
January 64:13
Jay 68:23
jeans 56:3,3
Jeff 67:8,9,13,21
67:23 68:8,9
68:17,23 69:4
74:2 90:3
113:15 129:16
130:5,6
Jeff's 69:7
JEH 1:9 3:5
Jersey 4:13
JES 1:9 3:5
Jessica 12:9,11
22:12,17 24:5
31:7,9 37:5
47:6 48:16,20
48:22 52:3
131:13,14
jhansen@srn ...
4:14
Jim 12:3 13:1
20:6,11 28:12
30:13 33:3
34:5,20,23
41:24,24 77:5
77:13,20,24
78:14 93:3
94:3 95:15
96:4 97:1,11
105:22 107:1,2
107:12,19
123:8 137:7,18
138:17 143:19
143:24 147:9
147:21 148:2

job 25:1,3 55:3
55:4 91:1
joked 118:11
jokes 117:17
joking 117:4,7
Jon 13:17,23
104:3,10 110:4
138:1
judge 11:10,22
14:17,17,19,22
15:14 18:24
19:3 24:15
74:11 109:1
135:24 138:1
judge's 11:16
Julia 23:9 24:17
24:24 41:7
43:6 51:11
101:7,9 103:12
120:17 127:8
128:4
July 71:12 95:16
95:19,21,23
96:6
June 62:22
63:19 66:15
69:24 70:13
81:15 106:16
jurors 39:6
jury 8:4,17 15:4
18:10 19:9,14
19:19 20:10
21:12 22:23
23:2,6 26:9
28:12 29:18
30:23 33:9
34:24 37:6
38:23 39:2,8
39:10 44:4
47:20 48:1
53:3 57:3
59:8 64:1
74:19 118:19
119:20,24
120:23 121:8
122:5,6,10
123:3 125:11,13

126:6 129:6
130:17 133:13
133:16,21
134:24 135:16
135:18,24
136:1 141:16,20
141:21 142:1,9
144:4 145:9,9
145:20,22
justice 124:3
134:7
justify 127:24

**K**

K 4:7
keep 8:11 30:18
34:14 74:7
86:4
Keller 4:11 12:3
13:1 20:6,11
28:12 30:13
31:23 34:6,20
34:23 36:2
39:5 41:24
42:1 64:15,18
65:4,8,10 77:5
77:9,13,20,24
78:14,21 82:17
82:20 93:3
94:4 95:15,17
96:5 97:1,7,11
105:22 107:2
107:5,12,19
137:8,18
138:17,22
143:19,24
145:24 147:9
147:21
Keller's 33:3
123:8
Kennedy 133:4
Keokuk 89:13
89:15
kept 41:15
keys 101:24
kicked 28:6
kids 45:5,14

46:4 53:12
129:18
kind 8:20,21
16:3 28:6,7
91:3 99:9
104:12
kitchen 56:1
101:21 102:3
knew 22:6,20
30:21 36:15
37:20 38:8,8
56:7,9 59:16
98:16 105:1
106:7 107:11
129:4 144:23
know 5:23 6:3
6:4,5,9 12:17
13:8 14:4 17:1
18:2,6 19:16,21
22:14 24:4,12
26:17 27:15,19
29:19 30:12
31:19 32:10,23
36:12 37:3,24
38:14 40:18
42:14,23
43:13 45:1,3
45:21,22,23
46:3,5 49:8
50:11,14 53:20
53:21,23,24
57:15,18,21
58:14,15 60:2
60:22 61:5,13
63:3,4 64:20
67:18 72:8
73:6,18 77:17
77:22 78:10,12
78:20,24,24
81:9 82:15,16
82:23 83:1,2,9
83:12,15 85:17
88:2 89:2,3,4
90:20 94:8
96:12 98:16,17
98:21,24 99:9
103:3,11,22,24

107:10,12
108:4,15 112:3
112:15 113:7,21
113:22,23
115:5,21 116:4
116:20,21,23
118:12,12
124:12 127:14
129:5 135:19
135:20 140:14
140:15 141:3
142:3,6,21,23
143:16,21
knowingly 43:17
known 7:8
124:17
knows 26:15

**L**

labeled 15:11
lack 38:19
lady 23:14 26:13
50:4 52:2
language 81:3
laptop 57:24
58:5,9,11,12,18
100:6
Larson 27:1
129:14 130:2
130:13,15,19
131:1 146:14
lasted 135:6
late 136:24
laughed 118:11
law 7:16 15:23
23:15
lawful 5:10
lawyers 17:10
66:24 96:10
lead 109:16
leafed 18:20
learn 32:12
37:13 46:13
52:5 55:19
101:8,13 144:19
learned 32:15
45:6 50:1

74:20 100:23
101:15 126:14
**led** 49:6 97:11
97:16 122:8
**left** 25:6 101:23
102:3 118:1
131:6
**legal** 7:7,17
24:13
**let's** 18:2 62:3
66:3 69:10
79:2,9,11
86:14,19 87:2
105:8,10 137:2
**letter** 62:18,22
63:2,19,20
64:2,5,8 65:11
65:17 66:21
69:23 70:3,12
72:1 81:15,17
**liar** 113:6
**library** 25:2
**Lieutenant**
120:3
**likes** 147:10
**Lincoln** 68:21
72:9 130:18
146:15
**line** 112:6 115:24
**lines** 80:9
114:23
**lip** 31:18 90:1
**listen** 116:19
**listened** 117:18
**litigation** 3:14
4:22 147:14
**little** 54:10
131:12
**live** 28:2,7
52:24
**lived** 28:5,8
52:22
**lividity** 28:23
123:5
**LLP** 4:12
**local** 14:11 15:23
15:23 37:4

105:2
**LOEVY** 4:3,3
**Logan** 68:24
130:18 146:15
**logged** 15:9
**logistics** 44:9
**long** 6:23 11:12
73:14 135:6
147:8
**long-winded**
31:22
**longer** 22:12
25:3 144:12
**look** 18:17 32:2
49:23 59:12
59:24 63:1
70:11 73:5
113:5 122:22
**looked** 32:18
72:15 82:22
85:13 91:1
112:13 120:13
**looking** 29:15
42:22 59:16
60:5 72:4
73:3 85:4
115:24
**looks** 84:14
**loss** 101:18
**lot** 41:14 143:7
144:23
**Louis** 4:23
20:17 122:20
**love** 53:15
**Love-less** 115:3
115:11
**Lovelace** 1:4
3:2,18 4:20
4:20 10:21,22
11:8 12:13 19:5
20:3 26:23
27:7,11 36:11
38:13 39:3
44:6,24 48:4
48:8 50:2
52:13 58:2,6
58:15 74:13

97:12 99:3,22
101:16,22
105:1,4 110:2,5
112:8 115:14
121:21 123:16
123:18 127:3
132:24 133:10
134:4,19 136:2
138:3,11 139:8
**Lovelace's** 12:2
17:22 29:4
48:13 66:23
71:23 78:1,16
83:8,24 86:8
92:16 94:18
118:23 122:17
127:20 135:11
144:6
**lower** 95:14
**lunch** 45:2
**lying** 113:1
**Lyndsay** 28:1,6
52:13 53:19
54:17 55:7
112:24 113:3,4
130:18

_____

## M

**Macon** 131:21
**mail** 30:3,4,7
**main** 27:17 86:4
114:2 122:11
**maintain** 24:16
90:11
**making** 21:9
32:8
**man's** 133:7
**manner** 37:10
37:15 119:5
**March** 19:17
**Marie** 1:21 3:16
4:22 5:4 149:3
**mark** 62:3 66:3
69:10
**marked** 62:5,8
62:12 66:5,9
69:11,14 71:3,6

79:7,14 82:7
84:8 92:4,20
95:5,8 97:24
98:4 105:14
111:19 113:24
115:19 137:17
**marks** 65:6
**Martha** 20:4
**Martin** 115:21,22
116:1,2,8,10
**Marty** 20:4,6,7
20:8 24:1
26:8 112:24
113:3
**Marty's** 53:23
**Maryland** 39:13
40:5 43:11,19
**material** 39:17
119:21,24
126:16 140:24
141:10
**materials** 29:24
30:1 40:16
41:5 80:16,21
105:9 120:10
122:22 146:9
146:19 147:18
**matter** 5:24
24:19 29:15
33:5,6 74:19
118:10
**mean** 12:2
18:20 25:24
45:24 55:10
61:9,16,18 66:1
90:11 91:2
106:7,22
109:14 120:5,6
128:4 130:14
132:19 141:4
143:6 145:15
146:8
**meaning** 58:5
58:18 99:8
144:19
**means** 145:11
**medical** 49:2

71:21 145:5
**medical-legal**
126:11
**meet** 18:7,9
26:11 27:4,22
35:1 50:18
87:13 93:20
93:21 94:1,4
94:12
**meeting** 19:7
26:15 34:21
35:3 56:11
65:17,21
66:24 67:5
69:3 72:9,12
73:7,8,14,16,17
77:23 89:17,21
90:6,12
**meetings** 34:19
35:11 36:2
93:11
**memories** 35:8
53:6 55:8
**memory** 18:1
31:1 53:11 114:8
114:23
**mentioned**
131:8 132:21
**merely** 27:3,12
**message** 26:5
**messages**
82:19
**met** 18:8 27:3
33:4 34:22,23
35:4 50:19
59:18 67:9
68:20,24
89:13,15
108:21
**mete** 9:6
**Michael** 20:15
21:24 29:12
122:20
**Michigan** 83:15
126:10 136:17
**middle** 71:15
**midway** 69:1

Miller 94:10,11
  94:12
mind 117:5,11
  124:12,16,18
mine 85:23
minor 104:12,13
minute 85:19
minutes 3:11,12
  94:15 123:18
  123:21 144:12
  147:8
mis 73:20
miscellaneous
  15:9
misinterpretat ...
  48:18
misinterpreting
  67:14
misquoted
  73:20
missed 60:2
Missouri 4:23
  57:7,7
mistaken 46:13
  55:11 74:4
misunderstood
  69:4 71:1
MITCHELL 4:12
Mm-hmm 34:16
  92:8
mom 53:7 55:8
month 67:17
months 19:22
  19:22,23
  23:17 32:17
  38:11 46:15,21
  60:12
Moran 4:16,17
  62:10 66:7
  148:8
Morgan 7:15
  18:8,10 108:22
  131:21
morgue 35:15
morning 5:15,16
  6:7 26:24
  28:15 29:9

53:10 55:8
58:6 78:1 84:2
94:16 104:14
130:17
mortis 90:2
123:23
mother 20:3,6
24:2 26:12
27:18 53:10,14
54:4,7 55:24
101:17 130:16
131:2
mother's
130:20
motion 14:21
15:5,11 19:2
35:23 75:10
75:14,20 76:4
76:22 78:22
motive 128:16
mouth 123:12
move 121:3
130:23
moved 35:22
78:21 123:9
multipage 79:15
86:20 87:3,7
92:5,20 111:10
murder 8:12
10:11,21 22:2
47:23 48:13
90:7 97:17
132:15 133:3
136:3 144:23

———————
            N
———————
N 4:1
name 5:19 11:14
11:16 18:6
37:12,24
38:10 57:6
90:17 115:16
116:21
named 12:18
23:9 24:7,19
50:12 51:2
83:12

names 37:4
Natural 7:8
near 52:10 56:1
necessarily
107:23 144:22
necessary 55:5
neck 35:22
need 6:13 16:9
47:1,1 61:14
72:16 109:22
needed 27:20
61:20 80:12
81:8 90:16
96:12 110:7
neither 149:11
NEU 4:12
never 49:10
56:17 75:6
83:1 110:6 111:7
124:14 146:13
new 20:15 22:1
55:3,4 89:14
91:15 113:11
newspaper
104:24
nine 3:11 135:7
135:20
non-opinions
47:15
North 4:3,23
note 107:1,5,9
107:10
notes 66:23
67:4,10 68:8
68:14,18 69:7
70:4,8,14
71:20 72:3,7,11
72:14,15 73:1,7
73:9,17,19
NOVEMBER
1:20 3:10
number 19:4
33:13,18,21,24
34:14 94:17
98:16 125:9,14
125:16
numbers 34:4

66:10
———————
            O
———————
o'clock 3:11,13
29:10
object 77:9
88:18 89:1
107:22 124:22
127:4
obligation
39:19 126:22
obligations
39:13,16 40:5
43:7,11 119:1
observation
32:1,8 123:8
observations
28:18 77:24
78:3,9,14 146:1
observe 35:14
146:22
observed 31:17
31:17,18,18
35:12,17,19
65:1,12 78:15
99:8 122:13
obtain 58:11
139:7
obvious 31:16
obviously 6:12
81:3 140:5
141:5
occasion 117:12
occasionally
116:15
offer 83:20
office 3:13 6:24
9:2,8,14,22
10:1,18 14:19
14:22 15:19,19
15:22 16:3,17
16:23 17:3,4,14
18:23 23:3
24:18 25:10,16
25:20 30:6
33:10,11 43:10
45:1,4 58:10

67:6 75:15
76:6 77:21
98:10 100:15
100:24 101:5
104:6 105:4
108:18 109:6
109:13 110:5
110:14 116:6,9
120:19 125:22
127:7 128:2
136:9 137:24
office's 43:15
officer 18:5
56:21 76:16
officers 18:3
20:21 32:10
offices 10:16
official 62:7
107:18,24
108:4
oh 13:11 24:8
36:4 41:7 43:9
73:18 115:22
116:2,18 147:7
OJ 133:3
okay 6:16 16:11
16:16 80:10,10
98:6 105:12
112:2 120:9,12
123:4 127:12
133:12,15
134:6 135:5,8
135:23 136:18
136:21 137:1,3
137:7,23
138:13,21,24
139:18
old 3:14 9:7
127:9 130:15
130:20
oldest 28:2
130:1
onboard 14:10
once 17:3 27:3
35:4 59:11
67:17
one-page 95:9

98:4 110:18
111:16,20
ones 20:22
73:4 122:11
126:4
ongoing 15:3
41:14
open-file 85:21
86:7
opened 86:11
opinion 29:17
31:12 37:22
38:2,16,20
41:16 44:3
46:16 48:17
60:23 71:21
80:13 81:2
88:11 103:8
105:24 106:3
106:11,13,20
107:3 119:20
119:23 126:9
126:12 127:7
136:16,18
139:20 142:14
opinions 21:18
37:21 38:5
63:22 69:8
70:9 74:15
88:24 89:9
92:15 97:11
106:1 125:10
125:14,16
128:24 132:23
139:21 146:5
opportunity
63:16
opposed 98:14
option 128:17
oral 29:20
order 14:23,24
15:18 19:3
68:9 79:11
81:23 108:18
109:5,16,22
138:1
original 72:2

129:17
originally 77:16
131:9
ought 118:12
outcome 149:16
outline 16:3
outlining 14:19
outside 14:3,4

---

**P**

P 4:1,1
P-A-R-K-I-N-S ...
5:20
p.m 79:23
148:15
page 2:1,7 67:7
67:8,9,13,21
68:3,15,17,23
69:23 70:4,18
71:12 72:7,18
73:17 74:8
91:12
Page's 72:2
74:2
pages 69:22
70:3,6 80:8
91:21
paid 53:22
paper 105:2
papers 17:1
109:18
paperwork
93:17
paragraph 64:8
64:10,24
65:16 71:14,15
72:4,18 112:20
114:7,22
paraphrasing
81:3
Parkinson 1:18
3:9 4:16 5:9
5:15,19,23 6:1
33:18 43:8
62:17 63:10,15
69:17,20
79:18,24

82:12 105:17
119:19 130:8
139:19
part 31:7 34:15
42:7,11 74:6
80:5 91:10
139:20 140:6
144:10
participate
54:18,20 55:2
participated
147:12
particular 9:23
116:19 117:2
145:13
particularly
128:19
parties 33:24
34:13 73:24
149:12,15
party 77:7
passed 27:8
53:7 55:9
99:4 129:19
passing 26:4
pathologist
20:16 22:11
31:12 37:5
38:20 47:8
132:15,23
pathologist's
119:20
pathologists
20:14 21:17
32:18 47:2
122:19 132:9
PC 62:20
147:16
pending 3:17
6:15
people 9:2,8
10:16 17:11
20:18 23:22
27:14 48:19
78:9 109:15
113:1 115:9
116:16 133:17

134:15,21
135:14 136:1,9
141:24 142:4
people's 146:19
perceived
99:12
percent 16:15
performance
37:15
performed 32:2
47:19 48:16
48:23 106:10
performer
88:12
period 19:24
20:10 21:2
68:3
person 11:12
20:23 27:18
27:20 29:14
30:8 47:18
49:3 53:8
84:6 103:10,13
104:15,23
124:3 133:18
147:6,15
personal 34:7
34:10 85:20
personally
20:22 33:5,6
51:16 81:20
100:16,21
129:1 142:8
146:23
persons 28:22
103:5
petechiae 31:19
petitioned
137:24
phone 20:14,23
24:9,17 33:12
33:17 42:13
53:8,9 54:16
98:16 114:15
146:6 147:5
phones 34:9
photographs

83:24 94:18
94:22 122:12
146:2
photos 82:21
94:22 123:6
phrase 67:11
physical 144:19
pick 46:4
pinning 45:12
place 25:10
59:21 102:10
places 52:9
Plaintiff 1:6,19
3:3,19 4:2 5:2
5:11 62:15
66:11,11 69:16
69:16 70:7
71:9 79:16
82:1 115:20
Plaintiff's 2:9,10
2:11,12,13,14,15
2:16 62:5
66:5 69:11
71:3 79:6
81:24 82:9
84:9,11,18,19
84:22,24 85:4
85:5 86:15,21
86:22 87:4
92:7,7,9,21,22
95:5 97:24
105:14 111:3,9
111:15,20,23
115:19
plan 44:15
planned 46:20
planning 44:20
61:6
play 19:13 21:16
Plaza 3:15
please 5:17
72:16 114:8,23
plus 122:18
136:16
poet 51:3,4
point 18:18,23
19:7,12 23:9

24:6 25:24
28:1 31:22
41:6 46:10,10
50:11 51:2
57:22 59:19
64:2 66:22
74:20 75:20
76:3 77:13
87:5 89:12
92:10,23
97:19 101:19
104:13 107:6
107:14 113:10
113:20 142:12
pointed 89:24
poison 101:10
102:13
poisoned
100:17 103:1
128:22 129:2
poisoning
102:6 114:12
poked 130:21
130:22
police 16:20,22
18:4,21 26:19
40:16 44:9,13
44:19 45:19
56:21 57:23
57:23 58:17
59:5 74:21
75:16 100:2
116:3 120:3
125:1,6 127:13
128:8 141:24
policy 43:10,15
85:20,21,24
86:7
pool 36:18,18
pooling 28:24
portion 95:15
posed 98:20
position 59:12
68:9 82:21
97:8 122:14,16
132:14
positions 7:11

positive 30:5
37:9,22
possession
58:19 119:6,10
133:12
possible 139:7
potential 38:4
104:4 140:20
potentially 94:3
99:22 141:1,7
141:13
Pounder 51:2
83:11,13,23
practice 7:12
15:5 78:12
preparation
23:19 93:22
94:5 101:16
105:18
prepare 98:23
prepared 46:12
107:18
preparing 25:13
present 4:20
36:1 50:12
90:2 134:11
138:18 144:20
145:8
presented
104:18 122:6
135:8,11
presenting
133:16
presents 138:19
pressured
127:16
presumably
72:3
presume 59:22
122:21
presumed
126:8
pretrial 140:1
pretty 26:6
28:5 30:17
32:3 56:15
73:12 96:8

prevents 109:8
primarily 21:4
prior 7:3,5,12
10:24 11:1,24
12:2,5,8 13:12
13:18,19 24:11
30:13 34:23
48:15 51:5,7
51:12 52:20
54:15,15
63:24 75:8
76:22 82:12
82:18,24,24
83:8,21 84:12
86:17,22,24
91:11 99:7,16
118:15 120:14
131:15 133:13
140:10
private 7:12
33:24
probability
107:2
probable 121:3
121:20,24
122:2,9 123:15
125:17 126:20
133:18 144:14
probably 8:15
8:22 11:12
13:19 23:17
24:1 27:4 30:3
30:4 32:15,15
34:7 35:4,5,17
36:4 38:6,7,11
43:2 45:23
49:11,15,16
50:1,13,19
53:8,9 54:15
59:4,6,10 61:9
61:19 64:21
87:22 90:16
94:15 101:7
106:15 112:19
114:15 144:10
147:10
problem 31:6

44:12
procedure 14:13
proceed 133:9
133:18 141:21
proceeded
74:19
proceedings
74:10
process 14:9
17:15,16 21:21
60:16
produce 61:7
91:9
produced 3:10
5:10 60:8 61:8
91:21 92:1
147:17,19
producing
147:13
production
74:22 76:6
professional
14:3,5 39:24
47:16
profile 133:3
prohibited
109:11,12
promoted 59:11
59:15
prompt 75:14
119:5
pronounce
115:16
proofer 67:23
Proper 5:19
prosecute
121:24 122:3
124:2,6 125:18
125:18 126:21
132:19 133:9
136:11,15
137:19
prosecuted
8:12 10:21
12:12,21 22:10
37:19 40:4
43:5 132:6

134:20
prosecuting
11:8 14:11 15:23
109:13 132:1
134:20 137:4
139:2
prosecution
10:24 13:6,13
13:24 14:7,22
21:14 104:10
104:21 109:3
126:2 127:24
135:2,9 137:3
138:3,11,17
147:4
prosecutions
9:4
prosecutor
5:20,22 6:22
9:1,14,23 10:14
10:20 11:1,7
12:1 14:10,16
16:6 23:9
33:14 37:8
39:12 109:20
110:3 121:1,11
121:20 125:21
138:19 141:9
145:4
prosecutor's
16:17
prosecutors 9:5
10:2,13,17 37:4
37:14,19 127:9
132:13
protection
120:24
proud 59:22
provide 77:2
146:7
provided 64:18
65:22 77:1
143:12,13,14
proving 62:1
public 15:2
33:21
purpose 86:4

EDWIN R. PARKINSON  11/19/2018

120:23
pursuant 14:16
14:24
pursue 127:17
pursuing 67:19
pursuit 137:22
push 127:12,14
144:24
put 17:6 33:20
37:12 38:10
39:2,7 46:5
59:1 65:4
90:17 113:17
125:6 128:14
128:22 132:13
134:11 139:2,5

Q

QPD1064 111:4
question 6:10
6:15 22:15
36:8 42:10
43:3 46:9
49:11 67:15
72:23 77:11
79:20 80:16
80:24 82:10
84:23 88:20
93:14,21 96:9
103:14 108:3
112:4 114:2
129:22 138:7
140:17 142:12
questioning
73:12
questions 2:1
6:7 63:2,5
83:6 98:18,20
103:15 108:17
111:24 112:5
114:4 119:15
148:1
quick 105:8,11
Quincy 4:6,13
18:4 20:5
35:2 40:16
44:8,19 45:19

57:23 58:17
59:5 74:21
75:16 94:14
100:2 120:3
125:1,5,6
127:13 128:8
quite 24:10
54:3 74:11
quotation 65:6
quote 115:10
quotes 115:2,5

R

R 1:18 3:9 4:1
5:9,19
raspy 16:13
RDR 1:21 3:16
4:22
RDR/CRR 5:4
reached 73:24
reaching 38:5
read 22:20
23:23 112:1
114:4
reading 21:13
82:23
ready 74:12
141:20 142:8
142:14,22
real 104:24
really 14:4 16:6
27:9 55:5
Realtime 149:5
reason 6:18
24:24 27:17
39:9 43:24
44:22 88:2
98:13 109:23
124:1 139:19
reasonable
60:23 71:21
87:14 106:2,9
106:21 107:4
107:16 108:8
121:15 124:6
136:14
reasons 121:14

144:2,14
recall 12:20
17:24 129:19
129:23
receive 14:23
82:11 84:11,24
85:15 86:16,21
86:24 87:4
99:2,19 112:11
received 66:12
66:18,23
94:22 95:18
95:22 122:21
122:23
receiving 76:22
recite 39:6
recognize 62:17
recommended
30:9,11
record 62:13
76:16 79:3,5
recordings
116:16
records 57:21
recovered
57:23 58:5,7
recovery 57:20
REDIRECT
139:15
reduced 149:10
refer 62:15
72:16 84:18
115:8
references 72:1
80:11
referred 51:11
83:18 122:18
122:18
referring 140:16
refers 72:20
reflect 70:9
87:22
reflected 136:10
143:7
reflection 106:4
refresh 31:1
114:7,23

regarding 15:12
19:5 138:3
regardless 8:8
Registered
149:4
regular 30:3
Reichert 4:17
reinterview
17:11
reinterviewed
113:10,14,17,19
related 16:18
17:5 40:17
57:12 75:17
100:3,11 113:2
114:12 144:5
147:21 149:11
relationship
13:23 14:3,5
24:17 52:23
99:4 122:17
128:18
relative 10:10
54:14 149:14
relevant 17:4
62:1 97:2
relied 21:12
145:17
reluctance
47:10 48:12,14
reluctant 37:12
37:21 38:16
47:4 48:14
54:19
rely 9:8 21:8
relying 33:2
remain 48:7
remedy 15:9
remember 26:8
28:11 29:21
30:4 42:14
44:21 45:16
50:8 54:4
73:8,11 78:19
81:9,10,12
82:14 84:4
87:7,8,18 88:3

96:8 98:21
100:5 103:19
112:19 114:16
117:3,12,17
120:2,5,9
remembered
35:23 53:9,10
53:13 129:13
remembering
55:15
remembers
54:1 55:24
56:4
remembrances
26:17
remiss 37:8
remove 35:21
render 38:1 81:2
renowned
132:22
report 16:22
22:16,21
29:20,20
31:16 32:3,7,11
32:14,19 33:1
42:15 46:12
46:20,21,23
47:3 48:20,24
49:1,4,7,10,14
49:14,18,19,23
50:4,7,20,21
60:7,7,12,17,18
60:22 61:2,7
61:8,20 63:21
64:6,17,20
65:7,8,22
66:12,15,18,22
78:3,13,18,20
78:24 87:9,11
87:17,19 88:1,3
88:7,9 90:3,18
106:17 107:16
107:18,24
108:4,7 113:18
122:23 133:7
133:8 140:7,10
140:11,19,24

**EDWIN R. PARKINSON 11/19/2018**

141:12 147:1
reporter 4:21
5:5,18 95:4
97:22 149:2,4
149:4,5,21
reports 16:20
17:12 18:21
19:19 20:20
21:2,4,9,13
26:19,20 27:6
29:22 30:6
31:19 40:22
40:24 41:14
77:1 81:11
93:10 131:23
132:3 143:16
represent 5:23
13:9
representatio...
76:15,19
represented
110:6,11
reproduced
91:14,17,19
reputation
39:24
request 14:18
74:21 75:9
80:11
requested
65:16 70:13
91:15
rescue 27:14
research 23:16
23:16
reservations
47:22 48:3
reserving 148:6
Resources 7:9
respond 114:14
130:22
responded
95:19,23
responder 94:6
responders
94:2,5
response 96:2

96:3,6,14
98:10 114:17
responses
98:19
responsible
48:5
rest 8:16
rests 139:2
result 70:16
134:3
resulted 74:22
results 102:20
114:21 145:23
retained 2:18
21:17 148:14
retry 126:7
127:3,13,18
136:6
return 123:19
returned 15:4
19:9 20:10
22:23 36:10
44:4
review 29:21
30:1 60:6 61:5
63:4,10,17
81:8 86:3,12
98:7 105:17
112:17 146:19
reviewed 22:17
49:22 68:13
68:18 71:20
93:11 122:11,15
reviewing 19:18
21:1 95:11
right 6:10,14
10:18,22,23
13:11 18:17
19:10,11,12
21:2 23:10
24:7 31:5 32:1
33:13 36:19,21
38:6,23 39:1,3
39:4,14 40:14
55:15 60:13
63:12 64:3
65:19 67:1,16

67:24 68:6,11
70:1 73:22,23
74:24 75:12,14
76:17 81:22
85:22 86:1
88:7,16 91:13
93:5 94:19
95:14,16,20
96:13 97:3,9
99:17 101:8
104:6 106:16
109:5 110:17
111:2 115:16
126:3 128:17
130:12 132:11
132:20 134:3
134:8,18 135:4
135:9,17 136:4
137:4 138:20
139:4,9 140:2
140:8,13 141:8
141:16 142:20
142:21 143:5
143:10,20
144:16,17,18,21
145:11,19,21
146:15,16,22
rigidity 123:9,23
rigor 28:19,20
31:20 83:24
90:2 123:23
145:1,20
robbery 15:13
ROBERTSON
4:12
Robinson 24:19
24:22 25:7,11
25:19 43:21
75:19,24 76:9
76:10 127:8
role 19:13 21:16
23:18 27:19
58:10
room 18:11 94:14
136:2
rooms 89:16
root 102:19

roots 103:5
rub 48:17
rule 140:4
rule-out 67:12
67:20 72:21
ruled 67:20
71:16
rules 6:4 96:16
140:6
run 57:16
running 57:7

_____
**S**

S 4:1
S-H-A-K-U 51:14
S-U-M-M-E-R-S
18:16
SAAP342 114:2
SAAP344 95:10
SAEP349 98:5
samples 102:16
102:17
Sangamon
12:14,16 22:9
22:20 36:22
37:6,13,18
131:19 132:7
sat 130:24
satisfaction
128:12
satisfied 22:18
41:12,13 131:13
147:23
saw 35:6 42:14
43:4 57:8
75:7 82:24
83:1,4 97:1
99:11 107:10,12
107:17 123:24
129:11 137:21
say-so 121:2
saying 11:5 49:3
54:5 142:5
145:18
says 5:11 65:1
80:15
scared 130:23

scene 28:15
29:4 35:8,12
78:9,15 94:18
97:2 122:12,13
122:13 146:1
scheduled 74:8
SCHMIEDESK...
4:12
school 7:16
28:4 45:6,16
46:1,3,4 53:13
53:17,17 54:6
54:8 56:4
84:3 101:19
123:19 130:18
scientific 49:2
Scott 20:17
22:8 24:3
30:14 38:15,21
42:6
seal 33:20
search 58:14
second 24:24
25:4,6,12,13
38:17 47:18
50:16 51:22
53:18 54:2,9
54:13,21 57:2
64:8,10 72:4
74:19 79:3
80:15 82:13,18
82:24 91:16
91:23 93:23
101:3 118:17,18
118:22 120:22
126:15,22
127:3,19
128:15 136:11
138:13 146:23
second-to-last
64:23
secret 15:6,7
secretary 62:21
section 59:16
secure 39:2
see 31:24
32:20 60:1

63:1 64:9,23
66:16 67:16,16
70:22 71:17
72:3 75:2
79:24 80:13
80:18 81:4
86:2 92:9,22
93:18 102:12
107:5,9 112:6
112:10 114:23
115:3,23 116:2
116:11 122:15
124:24 125:4
seeing 53:10
54:4 86:2
99:14
seek 9:5 63:21
142:13,15
144:3
seen 75:4 78:13
110:19,23 111:4
111:4,7,12,17
124:14 137:16
142:17
seize 58:11
selection 57:3
sell 118:2,3
send 68:19 71:11
80:2 98:9
102:9 116:15
137:5
sending 98:10
114:17
sent 29:22,24
30:1,3,6 51:10
80:5,17 81:1,7
81:10 102:14
112:16 137:12
146:10,11
sentence 64:24
64:24 80:15
81:4
separately
122:23 143:14
sergeant 18:13
19:8 21:23
40:10 56:12,14

56:18 76:23
108:21
serious 132:2
seriously 39:20
43:7,12
services 3:14
4:22 131:22
sets 62:14 86:11
92:6 111:21,22
setting 44:14
seven 7:5 11:13
13:20
Shaku 51:14
89:3 108:12
shared 127:7
sharp 23:14
she'd 29:1
shelf 59:24
shock 27:11
shoes 134:21
short 63:7,13
79:4 105:13
shorthand 5:4,5
149:4,21
shortly 24:23
25:12 67:18
68:21
show 30:22
81:22 92:4,19
97:19 105:9
110:17 111:2,9
111:15,19
113:24 115:18
128:16,18
showed 106:4
124:15
showing 62:12
71:6 79:13
82:7 84:8
shown 66:9
69:14 95:8
98:3 123:6
sign 14:23 57:16
signals 31:17
signature 5:6
148:9
signed 15:14

19:3 62:19
109:17 138:1
significant
104:17 143:3
signs 15:18
similar 85:12
similarly 23:3
simply 26:4
61:6,17 110:7
Simpson 133:3
sir 5:18
sit 54:4 108:22
119:3 143:23
sitting 14:17
53:12 54:7
56:1,4 59:23
131:5
situation 118:6
six 3:11 11:12
13:20 23:17
60:3 135:21,21
136:1
slides 102:9,11
slightly 79:10
slow 6:6
smaller 10:16
123:4
snail 30:4
solid 37:21
126:13
somebody 10:9
60:2 83:16
113:1 116:3
145:18
son 146:14
son-in-law
26:24
sons 5:24
44:20 146:15
sorry 16:10 32:6
85:8 136:23
sort 9:3 17:13
18:22 20:21
Soshi 57:5,11
sound 28:5
sounded 117:13
sounds 49:8

51:4
source 47:22
48:2 85:1 97:6
4:18
South 3:14 4:8
sp 51:2 57:5
speak 96:12,17
speaking 23:18
84:1
special 5:20
8:24 9:4,5,13
10:13,14,17,20
11:1,7 12:1 14:10
14:15,22 16:6
16:17 125:21
specific 37:12
38:2 87:7
88:10 89:23
103:23
specifically
44:22 103:11
120:11 143:16
specifics
103:23
spin 125:6
Spitz 126:10
136:17 146:4,4
146:7,12
split 101:16
136:7
spoke 20:9
23:20,21
52:18 101:5
spoken 25:17
50:22 51:6
52:16
spring 18:1 19:16
30:18,20 31:4
40:11,15 41:2
Springfield 3:15
4:18 5:22
36:13 52:3
69:2
Sronce 4:17
St 4:23 20:17
122:20
staff 16:7

stairs 130:24
stairway 53:12
stamp 62:16
66:10 84:10
95:10 111:4
stamped 69:16
82:9 84:19
85:5 86:15,20
87:3 92:6,7,21
98:5 110:19
111:11,12,21,22
114:2
stamps 62:15
71:7,8 79:15
111:22 115:20
stand 52:1
128:14,23
start 46:22 79:9
79:11 81:24
84:23 135:21
started 8:16
55:3 59:20
starting 5:12
55:4
starts 114:7,22
state 3:14 7:23
31:20 34:9
71:16 117:5,11
129:2 149:6,21
state's 5:21
6:22 7:14 8:23
8:24 9:15,18
9:19 10:2,5,16
13:21 14:15,19
15:10 16:2,22
33:14 37:19
39:22 109:9
110:2 137:24
138:8
stated 129:16
statement 49:17
50:3 96:16
106:8 142:24
statements
20:21 117:5
125:5 128:20
140:9,18,19

**EDWIN R. PARKINSON  11/19/2018**

141:11
states 1:1 3:1,17
  7:22 8:2
  132:23 134:8
  134:16 135:1
status 27:21
statute 14:16
  109:11,12
statutory 109:6
stayed 101:19
steal 100:8,9
stealing 100:3
Steinkamp 101:1
  101:6,9,17
stemmed 47:10
step 54:4,7 56:1
  130:24
steps 113:5
  131:6
stiff 28:20
  35:23,24
STIPULATED
  5:1
stipulation
  73:24 74:4,6
stop 30:22
  126:22
stopped 131:22
story 129:14
  130:14 131:4
straightforward
  96:9
strategies 139:1
Stratton 4:17
Street 4:8,13,18
  4:23
strike 36:7 75:8
  88:20 93:13
  132:12 142:12
strikes 19:17
strong 127:23
Strothoff 40:20
  99:6,23
stuck 32:4,11,14
  49:1,7,14 50:8
  50:9 55:23
  56:6 87:11

student 101:2
subject 108:1
subpoena
  100:3 137:12
subpoenas
  137:5
subsequently
  68:13 76:13
  91:13
substance 73:2
  111:24 112:22
substantive
  25:18,23
  108:20
suburbs 52:10
sufficient 49:6
  81:1,11 87:13
suffocation
  29:23 65:2,14
  67:12,20 71:17
  71:22 72:21
  123:1 132:24
suggest 43:16
  55:21 60:21
  61:17 89:23
suggested
  21:22,24
  31:23 48:12
suggestion
  29:11 31:6
summaries
  93:8
summarized
  93:11 112:20
summary 65:8
  68:16 71:16
  112:11
summer 35:5
Summers 18:13
  18:15 19:8
  21:23 34:21
  40:10 56:12,14
  76:23 108:10
  108:22
superior 56:18
supervised 9:1
supervisor 18:5

supplement
  40:23
support 88:1
  118:1
supported
  74:16
Supreme 8:2
  25:2 140:3
sure 16:11 18:2
  26:6 30:5,18
  40:6,22 42:4
  49:16 50:17,21
  54:3,11 57:2
  58:16 63:8
  135:20
surprised 105:4
  105:5
sworn 3:10 5:10
  149:8
system 134:7

———————
**T**
T-E-A-S 51:14
take 6:13,16
  9:22 10:7
  14:14 39:19
  41:1 43:7,11
  44:12 47:6
  63:7,9 91:20
  105:8,10
  106:11 121:1,7
  130:17 141:15
  147:16
taken 1:19 5:3
  35:16 63:13
  73:17 105:13
  149:9,13
talk 17:12 19:24
  20:5 22:22
  30:17 31:23
  32:9 34:5
  35:10 42:5,17
  44:8 50:10
  51:22 53:5
  57:10 58:21
  59:2 60:10,17
  61:4 67:3 76:3

81:6 89:8,11
  96:10,21
  100:24 102:4
  104:9,11,20
  109:15 117:1
  130:2 138:6
  141:18 147:10
talked 20:2,13
  20:14,15,16,17
  20:19,22 24:3
  24:4 31:3
  32:21,23 33:6
  35:15 42:13,18
  51:1,9,12,13,16
  51:24 52:13
  53:2 54:2
  56:19 57:1,13
  59:4 83:22
  84:5,5 89:3,3
  89:4 91:8 93:3
  94:2 100:21
  103:2 104:12
  118:16 127:6
  128:3,4 129:17
  129:20,23
  130:1 131:13
  141:24 143:19
  144:2,5
talker 6:6
talking 26:3
  27:17 33:10
  45:14 81:10
  100:6 103:12
  104:8,17 109:8
  130:4 142:4
tall 104:24
Tara 4:2
tara@loevy.c...
  4:5
teacher 55:5
team 24:13 42:8
  42:12 135:11
teamed 52:4
Teas 51:14 89:4
  108:12
technically
  79:21

telephone
  33:10,11 34:4
  57:20
tell 6:23 7:10
  27:15 29:3,6
  42:20 44:19
  49:3,10,12
  50:4 55:1,10,11
  59:19 61:12
  82:18 83:16,21
  84:6 88:22
  90:6 91:5
  92:14 100:16
  100:20 106:14
  106:18,22
  113:9,14,19
  117:13,16,18,22
  142:7,11
telling 49:9 71:1
  118:9 120:6
  129:12
ten 11:5 135:7
tend 6:5
term 30:19
terms 147:13
tested 103:4
testified 38:22
  47:9 50:20
  52:9 128:20
  129:15 130:16
  146:24
testify 55:6
  73:22 74:5
  94:14 129:11
  145:10 146:23
testimony 6:19
  39:9 60:11
  129:9 145:19
  145:21 146:21
  149:7,8
testing 102:11
  102:20 103:6
  114:6
Thank 130:8,9
  139:14 148:12
Thanks 62:10
  66:7 83:6

EDWIN R. PARKINSON  11/19/2018

139:13 148:10
**theory** 48:4,18
**thereabouts**
    59:14 101:21
**thereto** 149:15
**they'd** 127:16
**thickness** 17:19
**thing** 9:24 17:13
    18:22 20:22
    65:7
**things** 6:4 58:8
    58:9 65:9
    98:22 124:1,15
    133:5 144:4
    145:13 146:11
**think** 11:16 18:5
    18:9,15 19:3,4
    19:20 20:5,19
    20:23 21:22
    23:1,8,21 24:9
    24:11,12,12,15
    24:24 25:22
    26:6,18 28:3
    30:16 31:5
    33:7,23 34:13
    36:17 39:4,4,5
    40:11,19,21
    42:6,6,9,16
    43:3 44:11
    45:5 47:4,13
    50:1,7,21,24
    51:9,10,24
    52:4 53:10,13
    54:2,10,11,19
    56:5,9,15,17
    56:18 57:4,7
    57:14 58:3
    59:13 62:8
    63:16,24
    65:23 67:14
    68:15,20 70:6
    70:20,24 71:2
    72:2,8 75:5,13
    77:17,18,22
    78:17,18 83:2
    84:14 86:24
    87:12 89:14

90:10,23
    92:18 93:24
    94:7,9 95:10
    96:7 99:5,10
    99:12 100:21
    101:4 102:8,8
    102:15,16
    103:4,23
    104:22 105:2
    105:7,10 106:5
    106:6 107:13
    107:13,23
    108:11,13,15,16
    108:24,24
    109:4,8,10
    113:4,14,23
    115:12 116:18
    116:20 118:11
    118:12,13
    119:19,23
    128:11 129:20
    134:5 144:4
    146:6,16
**thinking** 17:24
    55:22 60:20
    94:13 97:3
**thinks** 9:20
**Thompson** 2:2
    2:18 4:2 5:14
    11:23 33:23
    34:3,13,18
    62:3,7,11 63:8
    63:14 66:3,8
    69:10,13 71:5
    77:10,12 79:2
    79:8 82:3,6
    84:20,21 85:7
    85:10,11 88:19
    89:6 95:2,7
    97:21 98:2
    105:7,16 108:2
    119:14 124:15
    124:22 127:4
    139:16 147:24
    148:6,10,14
**thought** 27:10
    29:1 31:24

43:18 44:1
    46:17 47:5,7
    47:16 49:23
    55:21 67:11
    68:5 70:17
    74:3 91:5,18
    96:21,24 97:5
    98:15 99:16
    101:23 104:16
    106:24 110:8
    113:3,4 126:12
    127:16 128:16
    142:8
**thoughts** 98:10
**three** 22:5
    25:22 26:2,5
    26:7,7 52:17
    53:17 114:23
    122:11 130:1
    135:21
**throat** 16:13
**Thursday**
    129:21
**time** 5:12 6:14
    10:12,13 11:6
    13:23 14:7
    20:10,17,20
    21:2 22:6
    25:12 26:14,21
    29:2,6 30:11
    32:21 39:7
    43:1 44:15
    46:7 47:20
    48:1,7,8,10
    50:22 52:18
    53:2,18,20
    54:2 59:1,24
    65:11 68:3
    71:19 74:14
    75:2 76:20
    89:17 94:8,13
    97:9 100:12
    106:16 110:14
    115:12 118:15
    126:14 127:1,3
    127:18,20
    128:3 129:3

131:10 136:11
    138:9 147:2
**timeline** 131:9
**times** 10:15 11:4
    23:21 42:14,18
    52:16 58:24
    61:7 76:24
    93:4 137:20
    146:18
**timing** 48:3
**tired** 47:14
**title** 9:3
**today** 6:19 16:15
    33:15 105:18
    106:4 110:24
    111:13,17 118:15
    119:3 124:13
    137:15 143:23
**told** 18:6,9
    26:23 27:5,24
    28:4 32:10
    37:20 48:21
    48:22 54:8
    59:13 60:3
    65:10,10 67:21
    68:17 70:8
    78:21 79:1
    83:23 84:4,6
    90:4,15 93:8
    93:17 96:11,14
    96:20,24 97:7
    97:16 99:13,15
    106:19 113:16
    114:19 129:14
    130:13,16 131:5
    131:9 135:20
    135:22 142:22
**top** 96:2
**topics** 35:10
**tos** 116:1
**total** 92:1
**traces** 102:12
**track** 8:11
**transcribed** 5:5
**transcript**
    30:23 33:20
    34:15

**transferred**
    26:2
**trauma** 37:9
**traveled** 89:13
**trial** 8:9,17,17
    10:11,12 23:17
    23:19 24:11,14
    24:16,24 25:4
    25:5,13,13
    32:6 37:7
    41:17 48:11
    49:19 50:16,16
    50:20 51:5,7
    51:12,15,20,23
    52:20 53:3
    54:14,18,20,21
    54:22 56:16
    57:2 59:3
    61:21,23 62:1
    68:3 73:21
    74:7,13,14,18
    74:20 82:13
    82:19 83:1,9
    83:22 84:13
    85:2,16 86:3
    86:17,23 87:1
    87:6 89:12,18
    91:11,16 92:11
    92:23 94:5,15
    100:22 101:3
    103:15 104:18
    107:7 110:20
    111:5 118:17,19
    120:20,22,22
    125:24 126:1,6
    126:15,22
    127:19 128:15
    128:18,20
    129:7 132:15
    134:8 135:5,7
    135:15 136:19
    136:22 137:3
    138:9,14,24
    139:1,22
**trials** 8:4,14,15
    8:18,19,21,21
    52:2,11 86:8

**EDWIN R. PARKINSON  11/19/2018**

93:23 118:22
119:12 120:14
133:3 144:23
146:23
**tried** 8:4 48:8
83:19 88:23
93:16
**trip** 20:4
**troubled** 125:9
125:11,14
**true** 6:19 10:7
21:11 43:21,22
48:7 131:19
132:5 133:5,6
133:22 134:2
134:9,13,14,17
134:22,23
135:3 138:5,13
138:22 142:3
142:6
**truthful** 39:10
**truthfulness**
21:13
**try** 6:6 81:23
88:15 89:8
102:5,23
142:14
**trying** 44:20
47:14,14,15
48:20 57:14
57:16 67:10
75:5 102:16
132:15 144:24
**turn** 120:4
**turned** 27:12
35:21 91:18
120:7 126:17
**Turner** 20:16
22:5 30:8,9
30:12 80:17,21
122:20 133:8
133:14 143:9
143:19,24
146:11
**Turner's** 143:15
**turnover** 120:10
**twelve** 3:12

**twice** 35:4 92:2
**two** 18:3 20:4
31:9 35:11
36:3,12 47:2
52:17 53:16,17
62:14 68:16
69:22 70:3,6
99:8 111:21,22
122:19 129:20
129:23 137:20
147:8
**two-page** 62:14
82:8 84:10
86:15 114:1
**type** 145:16
**typed** 73:4
**typed-up** 73:10
**typewriting** 5:6
149:10
**typewritten**
70:4 72:15,24

─────── U ───────

**ultimate** 125:9
**ultimately** 73:21
134:24 135:14
138:16,24
143:1 145:9
**unable** 6:19
89:22 114:20
**uncomfortable**
10:5,11
**understand** 6:8
60:10 132:4
142:5
**understanda ...**
118:4
**understanding**
31:3 41:23
42:2 47:10
78:2 80:20
88:4,14 93:2
94:21 109:23
115:15 118:24
145:5
**understood**
6:10

**undertake**
75:15
**undertaken**
42:20
**undertook**
75:24 102:5
**undetermined**
31:11,15,21
36:10,20 37:2
90:14 106:10
132:8
**undisclosed**
82:19
**unfamiliar** 84:14
**United** 1:1 3:1,17
8:2 132:22
134:8,15 135:1
**University**
83:15
**unofficial** 9:3
**unsolved** 60:5
**unstable** 90:21
90:24
**unusual** 45:22
**updates** 93:8
105:21
**upset** 73:16,18
73:19 117:24
118:4
**upside** 96:1
**use** 47:14 61:10
61:21,23
62:20 79:9
120:14 136:24
139:22 141:13
**usually** 39:21,21
**utilize** 70:23
**utilized** 41:7

─────── V ───────

**vague** 47:15
54:10
**vaguely** 117:12
**Valentine's**
53:14
**various** 21:5
144:15 146:18

**vary** 17:19
**veracity** 21:8
**verdict** 121:15
139:7
**version** 72:24
73:1,10
**versus** 39:13
40:5 43:11,19
125:7
**victim's** 27:20
**violation** 56:8
86:5
**visit** 53:22
64:16,22
**visited** 99:7
**vocal** 103:24
**voice** 16:15
**vote** 135:19
**vs** 1:8 3:4

─────── W ───────

**W-A-V** 116:11
**waited** 130:24
**waive** 148:9
**waived** 5:7
**walked** 45:3
101:20
**walking** 40:20
**want** 16:6,11
28:7 46:1
47:17 55:1
60:14 62:9
63:9 86:1
93:18 109:1
111:24 114:3
120:14 145:15
145:16
**wanted** 18:7
26:11,16 27:22
35:14 42:17
46:16,20
54:20 60:19
60:22 61:11,12
61:13 86:12
96:12 98:22
137:9 139:19
140:5,6

**wanting** 47:11
52:24
**warrant** 58:14
**wasn't** 18:11
32:7 36:14
46:2 49:17
50:3,4 54:3
55:15 83:1
90:8 104:13
138:8 142:16
**water** 16:9
**wav** 116:11
**way** 27:14 32:8
50:15 57:24
82:11 90:22
91:3 104:17
115:13 129:10
137:2 143:22
**ways** 144:15
**we'll** 33:24,24
34:14 148:9
**we're** 46:19
61:15 81:24
109:20,21
118:7
**we've** 45:14
124:19
**weakened**
129:2
**wear** 56:3
**week** 54:15
66:20
**weigh** 136:5
**well-noted**
122:19
**went** 8:17 26:14
26:21 27:13
30:16 31:19
32:5 42:5
45:24 54:5,8
56:2 64:15,21
67:9 72:9
78:15 84:3
124:5 127:22
130:20,23
136:9 141:19
**weren't** 41:14

**ALARIS LITIGATION SERVICES**
www.alaris.us                    Phone: 1.800.280.3376                    Fax: 314.644.1334

**EDWIN R. PARKINSON  11/19/2018**

125:13 142:19 147:19
**Werner** 126:10 136:17
**When's** 52:18
**wife** 10:22 27:2 99:14 104:15 117:19 118:5 123:21
**wife's** 99:17
**William** 4:16 50:12 94:3
**willing** 32:2 48:23 49:13 90:8
**windy** 32:6
**wish** 30:20
**wishes** 87:24
**withdraw** 68:4 74:3,9,9
**withdrew** 74:12
**withheld** 43:17 44:1 124:11
**withhold** 43:23
**witness** 5:6 22:5 39:1 46:19 50:10 56:17 57:2 59:8 61:2,15 62:12 66:9 68:6 69:14 71:6 78:8 79:13 82:7 90:5,21 94:14 95:8,10 98:3 104:1,4,12,22 105:9 138:4 138:22 140:1 145:10 149:7,9
**witnesses** 20:1 20:2,5,19 21:6 23:19 25:17 57:12 134:12 134:12 135:8 135:12 139:1,5
**word** 28:19 50:9 61:10

90:23 91:2 114:24 115:2 116:22
**words** 28:24 29:21 42:23 47:15 49:18 69:4
**work** 5:20 7:3 9:15,18 17:14 18:24 34:9,11 110:14 120:19 126:1
**worked** 12:1,3,5 12:6,8,11,15,24 13:5,13 28:22 36:6 53:18 99:6 104:24 110:5 116:5,8 131:15
**working** 12:20 13:22 23:4 89:15 120:21
**world** 91:4
**worthy** 127:10
**wouldn't** 26:19 38:1 124:16 130:22
**write** 61:6 71:15 88:16
**writer** 23:14
**writing** 61:12,14 65:4 107:13 139:20
**written** 32:9 60:7,12 61:20 63:21 64:20 65:22 78:3,13 93:10 96:6 106:17 140:10 140:24
**wrong** 67:12
**wrote** 29:19 62:19,20 65:11 66:20 97:10 106:24 115:7 115:13 126:11
**Wykoff** 23:10,12

24:17 25:1,19 41:7 43:6,17 101:7 120:17 127:8 128:4

— **X** —

— **Y** —
**yeah** 16:2 27:22 36:17 42:4 43:2 58:20 80:5 88:8 91:17 102:17 103:15 109:18 113:13 114:9 118:21 130:1 137:11 140:21 141:22
**year** 19:20 30:21 31:1 42:19 64:3,4
**years** 7:2,2,5 11:13 22:2 60:3,4,4 130:15,19 145:6
**yelled** 112:24 130:21
**York** 20:15 22:1
**young** 12:18 23:14 26:13 36:24
**younger** 126:4
**youngest** 27:1

— **Z** —

— **0** —

— **1** —
**1** 2:9 3:14 7:6 62:4,5,13 63:17 66:21 79:23
**1:42** 79:23
**10** 42:18 84:9,12
**10:00** 29:10
**10:55** 95:24

**100** 8:22 9:16
**101** 9:16
**102** 9:17
**105** 2:16
**10th** 71:12
**11** 92:5,10
**119** 2:3
**11th** 4:23
**12** 42:18 85:4,10 85:15 130:2
**12:42** 148:15
**1201** 1:9 3:5
**13** 86:19,19,22
**130** 2:4 8:22
**139** 2:2
**14** 2:13 7:2 18:1 19:21 30:20 31:2,2 40:13 79:6,11,14
**140** 4:8
**14th** 17:23
**15** 2:14 7:1,6 19:21 95:3,5,9 95:14
**16** 2:15 97:22 97:24 98:4,7
**160** 8:13,14,14
**16th** 62:22 63:19 81:16
**17** 1:9 2:16 3:5 105:14 110:18
**18** 111:3,5
**19** 1:20 3:10 111:10,13
**1971** 7:16,19 40:1
**1981** 7:13,14
**1987** 7:6,12
**1994** 7:1
**1st** 81:14,19

— **2** —
**2** 2:10 66:4,5,10
**20** 111:16,17 123:17,21
**200** 8:6,6
**2000** 18:2
**2006** 17:24

26:21 28:16
**2013** 59:14 142:23
**2014** 30:24 31:4 33:15 40:11,15 41:2 64:13 83:5 142:2,17 142:18,20
**2015** 18:1,3 19:21 30:20 62:23 63:20 66:16 69:24 70:13 71:12 79:23 81:14,16 81:19 95:16,19 95:23 106:16
**2018** 1:20 3:10
**21** 111:20
**217** 4:14,19 34:2
**217)414-3938** 34:12
**22** 114:1
**223-3030** 4:14
**22nd** 66:15
**23** 2:16 105:14 115:19
**24** 7:2
**243-5900** 4:5
**27th** 30:24
**29th** 70:13

— **3** —
**3** 2:11 69:10,11 69:15
**30** 147:7
**300** 8:6,6
**30th** 69:24
**311** 4:3
**312** 4:5,9
**314** 4:24
**343** 114:2
**3770** 111:23
**3949** 115:21
**3rd** 4:4

— **4** —
**4** 2:12 71:3,7,11

**EDWIN R. PARKINSON  11/19/2018**

130:15,19
**4-year-old**
129:14
**40** 147:7,7

---
### 5
**5** 2:2,13 79:6
84:18,22,24
85:13
**50** 147:7
**500** 8:10
**5082** 62:16
**5083** 62:16
**5084** 71:9
**525** 4:13
**528-2183** 4:19

---
### 6
**6** 87:2,2,5
**60603** 4:8
**60607** 4:4
**62** 2:9
**6203** 84:11
**6204** 84:11
**62301** 4:13
**62702** 3:15
**62703** 4:18
**6275** 84:19
**6276** 84:19
**6277** 82:2,9
**6278** 82:9
**6286** 92:7
**6289** 92:7
**6290** 87:4
**6293** 87:4
**6297** 92:21
**6300** 92:21
**63101** 4:23
**6318** 86:21
**6320** 86:21
**6323** 86:16
**6324** 86:16
**6424** 85:6
**6426** 85:6
**6432** 79:16
80:8
**6433** 80:9

**6436** 79:16
**644-2191** 4:24
**66** 2:10
**69** 2:11
**6th** 64:13 81:16

---
### 7
**7** 86:14,14,16
130:2
**71** 2:12 7:14
**711** 4:23
**725** 4:18
**782-2168** 33:16
**782-7606** 4:9
**79** 2:13
**7th** 95:16 96:6

---
### 8
**8** 92:20,22
130:2
**8:15** 123:20
131:3
**8:35** 123:20
131:3
**836-046** 34:2
**836-0462** 34:2
**87** 7:13
**8th** 95:19,23

---
### 9
**9** 82:1,8
**9:06** 5:12
**9181** 69:19
**9184** 69:16,18
**9186** 70:7
**9187** 70:7
**9189** 70:11,12
**9191** 69:16,19
72:18
**9212** 66:11
**9215** 66:11
**94** 7:6
**95** 2:14
**98** 2:15