Transcript of Gary Farha
Conducted on July 18, 2018

E-FILED
Monday, 08 July, 2019 02:46:57 PM
Clerk, U.S. District Court, ILCD
(1 to 4)

---

**1**

IN THE UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF ILLINOIS

SPRINGFIELD DIVISION

```
CURTIS LOVELACE, LOGAN      )
LOVELACE, LINCOLN           )
LOVELACE & CHRISTINE        )
LOVELACE on behalf of       )
her minor son LARSON        )
LOVELACE,                   )
                            )
        Plaintiffs,         )
                            )
   - vs -                   )  No. 1:17-CV-01201-
                            )  JES-JEH
DET. ADAM GIBSON, POLICE    )
CHIEF ROBERT COPLEY,        )
SGT. JOHN SUMMERS, LT.      )
DINA DREYER, DET.           )
ANJANETTE BISWELL,          )
UNKNOWN QUINCY POLICE       )
OFFICERS, GARY FARHA,       )
CORONER JAMES KELLER,       )
THE CITY OF QUINCY and      )
COUNTY OF ADAMS,            )
                            )
        Defendants.         )
```

VIDEO DEPOSITION of GARY FARHA, taken in

the above-entitled case before Gina L. Nottingham,

Certified Shorthand Reporter of Adams County,

Illinois, at 8:55 A.M., on July 18, 2018, at 625

Vermont Street, Quincy, Adams County, Illinois.

---

**2**

APPEARANCES:

MS. TARA THOMPSON
Attorney at Law
Loevy & Loevy
311 North Aberdeen
3rd Floor
Chicago, Illinois 60607
(312) 243-5900
tara@loevy.com

          appeared for the Plaintiffs.

MS. ELLEN EMERY
Attorney at Law
Ancel Glink Diamond Bush DiCianni &
  Krafthefer
140 South Dearborn Street
Suite 200
Chicago, Illinois 60603
(312) 782-7606
eemery@ancelglink.com

MR. WILLIAM MECKES
Attorney at Law
Scholz Loos Palmer Siebers & Duesterhaus
625 Vermont Street
Quincy, Illinois 62301
(217) 223-3444
wmeckes@slpsd.com

          appeared for the City of
          Quincy Defendants.

MR. JAMES HANSEN
Attorney at Law
Schmiedeskamp Robertson Neu & Mitchell
525 Jersey Street
Quincy, Illinois 62301
(217) 223-3030
jhansen@srnm.com

          appeared for the County of
          Adams Defendants.

Gina L. Nottingham, CSR
License No. 084-002584

---

**3**

I N D E X

DEPONENT                                    PAGE NUMBER

GARY FARHA

   Examination by Ms. Thompson        5

   Examination by Ms. Emery           136


E X H I B I T S

| NUMBER | DESCRIPTION | MARKED |
|---|---|---|
| Farha 1 | E-mails Bates stamped PLF 4753 and PLF 4754 | 84 |
| Farha 2 | E-mail Bates stamped PLF 3250 | 95 |
| Farha 3 | E-mail and Adam Gibson Summary Bates stamped AC 59 through AC 73 | 97 |
| Farha 4 | E-mail Bates stamped AC 113 | 103 |
| Farha 5 | E-mails Bates stamped PLF 5008 through PLF 5013 | 108 |
| Farha 6 | E-mail Bates stamped PLF 2845 | 111 |
| Farha 7 | Document page numbered 1 of 71, 6 of 71, 7 of 71, 8 of 71, 9 of 71, 10 of 71, 34 of 71, and 37 of 71 | 119 |

---

**4**

1      THE VIDEOGRAPHER:  The time is 8:55.
2  Here begins media number 1 in the videotaped
3  deposition of Gary Farha in the matter of Lovelace,
4  et al., versus Gibson et al., in the United States
5  District Court for the Central District of
6  Illinois, case number 1:17-cv-01201-JES-JEH.
7      Today's date is July 18, 2018.  The
8  videographer today is Erin Schuppert representing
9  Planet Depos.  This video deposition is taking
10  place at 625 Vermont Street, Quincy, Illinois.
11      Would counsel please voice identify
12  themselves and state whom they represent.
13      MS. THOMPSON:  Good morning, Mr. Farha.
14  My name is Tara Thompson and I represent the
15  plaintiffs.
16      THE WITNESS:  Good morning.
17      MR. HANSEN:  Jim Hansen for Gary Farha,
18  Jim Keller, and Adams County.
19      MS. EMERY:  Ellen Emery for the Quincy
20  defendants.
21      MR. MECKES:  William Meckes for the
22  Quincy defendants.
23      THE VIDEOGRAPHER:  The court reporter
24  today is Gina Nottingham representing Planet Depos.

---

**5**

1      Would the reporter please swear in the
2  witness and proceed.
3      (Witness sworn.)
4          GARY FARHA,
5  having been first duly sworn by the Court Reporter,
6  was examined and testified as follows:
7          EXAMINATION BY
8          MS. THOMPSON:
9      Q.   Mr. Farha, good morning.  Have you ever
10 been deposed before, sir?
11     **A.   Not in a deposition, no.**
12     Q.   Obviously you have a significant
13 familiarity with the law and with legal
14 proceedings; is that right, sir?
15     **A.   I do.**
16     Q.   Let me give you just a couple of brief
17 background rules for this deposition and then we
18 will proceed.  There is a court reporter here
19 that's obviously writing down everything both of us
20 says, so I will do my very best not to interrupt
21 you, sir, and I would ask that you wait until I
22 finish asking a question before you answer so that
23 we're not talking over one another.  All right?
24     **A.   That's fine.**

**6**

1      Q.   She has got to give verbal -- she has got
2  to write down your responses, and so if you are
3  saying huh-uh or uh-huh, she won't be able to type
4  that down.  So I would ask if you have a response
5  that's a yes or no that you indicate yes or no.
6  Okay, sir?
7      **A.   That is fine.**
8      Q.   Obviously you can take a break at any
9  time.  I would just ask that if there is a question
10 pending that you answer that question before we
11 break.  All right?
12     **A.   That's fine.**
13     Q.   And if there is any questions I ask that
14 you don't understand, please let me know;
15 otherwise, I'm going to assume that you understood
16 the questions.  Okay?
17     **A.   Fine.**
18     Q.   Can you think of any reason, Mr. Farha,
19 why you would be unable to give truthful and
20 accurate testimony today?
21     **A.   No.**
22     Q.   What did you do to prepare for this
23 deposition, sir?
24     **A.   I spoke with my attorney on several**

**7**

1  occasions.
2      Q.   And prior to the deposition today, have
3  you reviewed any documents?
4      **A.   Some of the documents that he had showed**
5  **me with regard to the various e-mails that had been**
6  **produced.**
7      Q.   Other than looking at e-mails, are there
8  any other documents that you reviewed?
9      **A.   Just the late discovery today.**
10     Q.   All right.  Am I correct, Mr. Farha, that
11 you were admitted to the Illinois Bar in 1984?
12     **A.   Yes.**
13     Q.   And have you been admitted to the bars of
14 any other states?
15     **A.   No.**
16     Q.   You also graduated from law school in
17 1984; is that correct?
18     **A.   University of Missouri at Columbia.**
19     Q.   All right.  And what was your first legal
20 job after graduating from law school?
21     **A.   My first legal job was basically starting**
22 **out on my own in a sole practitioner -- as a sole**
23 **practitioner.**
24     Q.   What kind of legal work were you doing in

**8**

1  in a practice?
2      **A.   Anything that I could get.  As a solo**
3  **practitioner, you basically do whatever.  I was --**
4  **in 1985, I became a part-time public defender, but**
5  **I also handled virtually any type of case that I**
6  **could handle, divorces, bankruptcies.  We did a**
7  **large amount of collection work for Check Brokerage**
8  **Corporation, which was a company that collected on**
9  **bad checks and things like that.**
10     Q.   Was your practice here in Adams County?
11     **A.   Yes.**
12     Q.   And when you became a part-time public
13 defender, was that also here in Adams County?
14     **A.   Yes.**
15     Q.   How long were you a part-time public
16 defender for?
17     **A.   Three and a half years.**
18     Q.   And what did you do after ending your
19 time as a part-time public defender?
20     **A.   I went into partnership with Tom Leeper,**
21 **who was the outgoing State's Attorney.**
22     Q.   And that was with the firm of Leeper &
23 Farha?
24     **A.   Yes.**

**9**

1    Q.   How long did you work in the firm of
2 Leeper & Farha?
3    **A.   From 1988 to 2001.**
4    Q.   What did you do after -- well, let me ask
5 you this.
6         At some point you left that firm,
7 correct?
8    **A.   Yes, but in 1995, July of 1995, I became**
9 **a part-time State's Attorney.  I still worked in my**
10 **partnership with Tom Leeper until 2001.**
11    Q.   In 2001, did your position with the
12 State's Attorney's Office become full-time?
13    **A.   Yes.**
14    Q.   And what happened to your firm at that
15 point?
16    **A.   I left it.**
17    Q.   Did the firm remain in existence in some
18 form?
19    **A.   I believe so.**
20    Q.   During the time that you were a part-time
21 member of the State's Attorney's Office, what kind
22 of work did you do with the office?
23    **A.   Initially traffic for two years, and then**
24 **Mr. Bier asked me if I wouldn't go out to the task**

**10**

1 **force.  We had an explosion of methamphetamine**
2 **cases and they needed help getting organized to**
3 **deal with that problem, so I went out there and**
4 **worked with those guys on procedures and things.**
5    Q.   How long did you work with the task
6 force?
7    **A.   Well, I still work with them, so that's**
8 **been continuous since 1997.**
9    Q.   In 1997, were you the person in the
10 State's Attorney's Office that was tasked with
11 assisting the task force?
12    **A.   Yes.**
13    Q.   And has that been your assignment -- I
14 understand now you don't get assignments from the
15 office, but has that been your responsibility since
16 that time that you started there?
17    **A.   I would say no.  Sometime in 2004 when I**
18 **became the first assistant, I continued to work**
19 **solely drug cases, but I've had other**
20 **responsibilities.  In 2014, after my illness, I did**
21 **not do drug cases after that.**
22    Q.   In 2014, what did your work in the
23 State's Attorney's Office entail after you stopped
24 doing drug cases?

**11**

1    **A.   Well, in 2014, in the early part, I was**
2 **still doing the same duties.  In August of 2014,**
3 **when I came back, at first, because I was still**
4 **recuperating, I basically handled anything that**
5 **they threw at me.  We were doing pleas and**
6 **sentencings and things like that, but I cannot say**
7 **that I was advising the task force any longer.**
8    Q.   When you returned from your illness, were
9 you still involved in criminal prosecutions in the
10 office?
11    **A.   Yes.**
12    Q.   Were you doing any civil work in the
13 office when you returned?
14    **A.   No.**
15    Q.   And at the time that you became first
16 assistant in 2004, from that point until 2014, did
17 you do any civil work in the office?
18    **A.   No.**
19    Q.   For what period of time in 2014 were you
20 away from the State's Attorney's Office dealing
21 with your illness?
22    **A.   On June 30th I went to the doctor for the**
23 **first time and I was immediately hospitalized and**
24 **remained in the hospital until August the 3rd.  I**

**12**

1 **think that is the day the staples came out of my**
2 **stump, and I returned to work on that next Monday,**
3 **which I believe was the 6th.**
4    Q.   Had you missed any periods of work in
5 2014 before June 30th?
6    **A.   No.**
7    Q.   And --
8    **A.   Sorry.**
9         MR. HANSEN:  Just let her finish the
10 question before you answer.
11 BY MS. THOMPSON:
12    Q.   I think you anticipated the question, but
13 were there periods of time you missed prior to June
14 30th in 2014 leading up to your taking more
15 extended leave, sir?
16    **A.   No.**
17    Q.   Were there special responsibilities that
18 you had in the State's Attorney's Office during the
19 time that you were the first assistant?
20    **A.   I handled all the negotiations for felony**
21 **cases, plea negotiations.**
22    Q.   Were there any other specific
23 responsibilities of the person who worked as the
24 first assistant during the time that you had that

Transcript of Gary Farha
Conducted on July 18, 2018

13

1  position?
2  **A.  No.**
3  Q.  During the time that you were in the
4  State's Attorney's Office, did you try felony
5  cases?
6  **A.  Absolutely.**
7  Q.  Did you first chair felony cases?
8  **A.  Absolutely.**
9  Q.  And to the present, how many felony cases
10 have you first chaired at the State's Attorney's
11 Office?
12 **A.  Hundreds.**
13 Q.  Have you tried murder cases, sir?
14 **A.  Two, one as a public defender, one as the**
15 **first assistant.**
16 Q.  When was the murder case that you tried
17 as the first assistant?
18 **A.  I think it was probably 2012.  I can tell**
19 **you the circumstances of it.  It was a shooting.**
20 **And Jon, my boss, would always handle the murder**
21 **cases.  He was an excellent trial attorney, and**
22 **that was his job.  However, this particular case**
23 **was on a docket and he had a fishing trip planned**
24 **to Canada and did not want to do it and gave me the**

14

1  **opportunity to do it, which we did, and eventually**
2  **that pled out, not to murder.**
3  Q.  What was the name of the defendant in
4  that case?
5  **A.  I don't remember.  I believe it was**
6  **Jackson, but I do not remember.**
7  Q.  Who else in the office was involved in
8  assisting with that prosecution?
9  **A.  Joshua Jones.**
10 Q.  Was he the second chair?  Had the case
11 proceeded to trial, would he have served as the
12 second chair?
13 **A.  Yes.**
14 Q.  During your time in the State's
15 Attorney's Office in total, how many murder
16 investigations have you been involved in?
17     MR. HANSEN:  I would object to the form.
18     Go ahead, you can answer.
19     THE WITNESS:  The word involvement is
20 difficult because when the cases would come to us,
21 I would never charge them, Jon would always do
22 that.  I may have handled a couple preliminary
23 hearings, because I handled all the preliminary
24 hearings for the felony cases.  If they went to the

15

1  Grand Jury, Jon would have presented them.
2  BY MS. THOMPSON:
3  Q.  You've mentioned your boss several times.
4  That is Jon Barnard; is that right?
5  **A.  That is Jon Barnard, yes.**
6  Q.  And again, I understand that you know
7  where I'm going.  I'm just going to ask you again
8  to try not to interrupt me just so we are getting a
9  clear record here, sir.  Okay?
10 **A.  Certainly.**
11 Q.  During your time in the State's
12 Attorney's Office, is the Quincy Police Department
13 the main law enforcement agency that your office
14 has worked with in the prosecution of criminal
15 cases?
16 **A.  There are three offices that we deal**
17 **with.  I don't know if I want to say main.  That's**
18 **a hard thing.  We deal with the Illinois State**
19 **Police, the Adams County Sheriff's Department, and**
20 **the Quincy Police Department.  Those are the main**
21 **investigatory agencies that we deal with.**
22 Q.  Does one of those three agencies end up
23 being the arresting agency in more cases that your
24 office is involved in than the other two?

16

1  **A.  Certainly I think the Quincy Police**
2  **Department has more investigations than the other**
3  **two agencies here in Adams County.**
4  Q.  Has that been true over the entirety of
5  the time that you've been with the State's
6  Attorney's Office?
7  **A.  Yes.**
8  Q.  And you now, sir, are the elected State's
9  Attorney?
10 **A.  I am.**
11 Q.  And when were you elected to the State's
12 Attorney position?
13 **A.  On November, I believe it was the 8th,**
14 **but I'm not sure, of 2016.**
15 Q.  I want to ask you some questions about
16 the procedures in the State's Attorney's Office,
17 and I want to ask you about the procedures as they
18 existed during the time that you were -- well, let
19 me limit that in a better way.
20     I want to ask you about some procedures
21 in the State's Attorney's Office, and I'm asking
22 you about the procedures in the office that were in
23 place in the 2013-2014 time period.  All right,
24 sir?

17

1     A.   All right.
2     Q.   So for these questions I will make myself
3  as clear as I can, but that's the time period that
4  I'm talking about.  All right?
5     A.   Yes.
6     Q.   So during the 2013-14 time period in the
7  State's Attorney's Office, did the State's
8  Attorney's Office have a procedure for what to do
9  when the Quincy Police Department informed your
10  office that they were investigating a potential
11  homicide?
12     A.   There were no procedures written.  The
13  standard procedure was to talk to Jon Barnard.
14     Q.   And were there any particular people in
15  the Quincy Police Department who were the contacts
16  for Jon Barnard in discussing homicide
17  investigations?
18     A.   It would be whoever the lead detective
19  was on that particular case.
20     Q.   Were you involved in meeting with the
21  Quincy Police Department about homicide
22  investigations with Mr. Barnard at any point during
23  the time that you have been with the State's
24  Attorney's Office?

18

1     A.   No.
2     Q.   Would Jon Barnard delegate to any other
3  member of the State's Attorney's Office any
4  responsibility for assisting the Quincy Police
5  Department with a homicide investigation?
6     A.   Perhaps on occasion, but I don't remember
7  any specific occasion.
8     Q.   Can you tell us any tasks that you recall
9  Jon Barnard delegating to someone else in the
10  office to assist the Quincy Police Department with
11  a homicide investigation?
12     A.   I think he probably delegated research
13  opportunities for different cases, but -- maybe
14  courtroom assignments like a preliminary hearing or
15  something like that, but, no, I really don't
16  ever -- he was very proprietary about the murder
17  cases.
18     Q.   When you are talking about "research
19  opportunities," are you talking about legal
20  research?
21     A.   Yes.
22     Q.   Over the time that you were the first
23  assistant in the State's Attorney's Office, did you
24  ever discuss with Mr. Barnard any ongoing homicide

19

1  investigations prior to a charging decision being
2  made in those investigations?
3     A.   Probably.
4     Q.   As you sit here today, do you remember
5  discussing any specific homicide investigations
6  that were precharging with Mr. Barnard?
7     A.   Only the one -- and now I remember.  I
8  think it was Vincent Jackson when he turned that
9  over to me, but that was not -- it had already been
10  charged.  So no.
11     Q.   Did the State's Attorney's Office have
12  any written documentation that it created with
13  respect to homicide investigations that were in a
14  precharging posture?
15     A.   Not that I'm aware of.
16     Q.   At meetings in the State's Attorney's
17  Office, did -- as a matter of, you know, informing
18  members of the office what was going on, did the
19  State's Attorney's Office personnel discuss
20  homicide investigations that were in a precharging
21  posture?
22     A.   Ma'am, you are making an assumption there
23  that was not true.  We didn't have meetings.
24     Q.   Did you have any staff meeting during the

20

1  entirety of the time that you were in the State's
2  Attorney's Office as a first assistant?
3     A.   We had staff meetings very, very
4  occasionally and they were very specific, not on
5  cases, though.  It was never a discussion -- maybe
6  pretrials as to what cases remained on, but there
7  was never discussion at those meetings as to
8  specifics of an individual case.
9     Q.   Am I correct that during your time as
10  first assistant in the State's Attorney's Office
11  that a way that case assignments would be made or
12  shared would be to send around a memo listing all
13  of the cases and the personnel who were assigned to
14  those cases?
15     A.   That is true.  Usually is about two weeks
16  before the cases were going to pretrial.
17     Q.   And who in your time as the first
18  assistant in the State's Attorney's Office would
19  make the decision about who to assign to what
20  particular cases?
21     A.   I did for the first couple years.  After
22  that it was -- from like 2004 to 2006 while Jon was
23  getting acclimated to the office.  He had been an
24  assistant in the early 1990s, and after that had

Transcript of Gary Farha
Conducted on July 18, 2018

21

1  not been really working with the State's Attorney's
2  Office other than trying the major cases that went
3  on from 1995 until his election in 2004. I was
4  working. Mr. Bier had had me taking over
5  negotiations, and I was working with those cases
6  and helping him assign the cases from 2001 until
7  probably about 2006 when Jon completely took that
8  over.
9      Q.   And when Jon took over the assignment of
10 cases, would he, to your knowledge, confer with
11 anyone about how to assign those cases out in
12 the -- using the process that you've previously
13 described?
14     A.   Well, first of all, if I may, let me
15 explain our office a little bit to you. It was the
16 State's Attorney and six other attorneys. All of
17 them were full-time except for one. I would get
18 automatically assigned every drug case. In Adams
19 County I would say drug cases are about 50 percent
20 of any individual trial docket. So I was
21 automatically assigned those cases. He would put
22 his initials there, too, but I usually had about 50
23 cases. And then he would just pick and choose who
24 would get the other cases.

22

1      Q.   Was there -- let me ask you this
2  question.
3           In the 2013-2014 time period, was there a
4  particular person in the State's Attorney's Office
5  who was responsible for dealing with matters that
6  concerned the Grand Jury?
7      A.   Jon Barnard.
8      Q.   All right. And I take it that the Grand
9  Jury process was used not just for homicide cases
10 but for other kinds of felony cases as well; is
11 that right?
12     A.   It is. Our policy has changed
13 dramatically in the past year, but then the cases
14 that were presented to the Grand Juries were in
15 basically three categories. There were cases that
16 were drug sales and buys that the drug task force
17 would want to present to it in order to keep the
18 confidential source anonymous. There were cases
19 that would be presented to the Grand Jury if we did
20 not prevail at a preliminary hearing. Those were
21 few and far between. And the third case would be a
22 case that was of major consequence.
23     Q.   And the procedure you just described and
24 the kind of cases that went to the Grand Jury, that

23

1  process was true in 2013 and 2014?
2      A.   Yes.
3      Q.   Did the State's Attorney's Office utilize
4  the Grand Jury process for cases of consequence, as
5  you indicated, as an investigative tool?
6      A.   There were times.
7           MR. HANSEN: Go ahead. Go ahead.
8           THE WITNESS: There were times.
9  BY MS. THOMPSON:
10     Q.   For instance, people can be compelled to
11 testify before the Grand Jury as a way of locking
12 in their testimony, correct?
13     A.   They can, but I can tell you that in the
14 years that I was ever involved with the Grand Jury
15 we have never brought somebody that was a
16 defendant -- proposed defendant or anticipated that
17 he would be the -- or she would be the defendant to
18 a Grand Jury in my memory. The only people that
19 would ever be brought to the Grand Jury, other than
20 a law enforcement officer, would be a corroborating
21 witness just to lock up their testimony.
22     Q.   And for cases of consequence, is that
23 process of locking in testimony of corroborating
24 witnesses something that the State's Attorney's

24

1  Office used on a regular basis?
2           MR. HANSEN: Object to form.
3           Go ahead.
4           THE WITNESS: Not on a regular basis.
5  BY MS. THOMPSON:
6      Q.   And I want to make sure I understood what
7  you said about this. Would it be used to lock up
8  testimony of corroborating witnesses or cooperating
9  witnesses?
10     A.   Both.
11     Q.   Would the --
12     A.   Sorry about my use of language there, but
13 it is actually both.
14     Q.   And I just want to make sure I
15 understand, which is why I'm asking. Would the --
16 and to follow on that, in this 2013-2014 time
17 period, would the State's Attorney's Office use the
18 Grand Jury process to compel people who might not
19 otherwise willingly cooperate in order to give
20 testimony that would then be locked in?
21          MR. HANSEN: Object to form.
22          Go ahead.
23          THE WITNESS: I know there were occasions
24 where subpoenas were issued, but I don't remember

Transcript of Gary Farha

Conducted on July 18, 2018

**25**

1  any case -- and again, I was not presenting cases
2  at that time, but I'm not aware of any cases where
3  the witness was unwilling to come and testify.
4  BY MS. THOMPSON:
5      Q.  Did the State's Attorney's Office in the
6  2013-14 time period also use the availability of
7  Grand Jury subpoenas as a way to get information
8  about ongoing investigations?
9      **A.  I believe Mr. Barnard did, yes.**
10     Q.  Okay.  Were you ever involved in the
11  process for discussing or obtaining such subpoenas?
12     **A.  I did not ever issue them.  I mean,**
13  **somebody may have asked me can I get a subpoena,**
14  **and I would refer them on to Jon because, again, I**
15  **was not doing the Grand Jury at that time.**
16     Q.  Are you familiar with the member of the
17  State's Attorney's Office named Josh Jones?
18     **A.  Yes.**
19     Q.  And Mr. Jones is employed with the
20  State's Attorney's Office under you today; is that
21  right, sir?
22     **A.  I brought him back from Madison County,**
23  **yes.**
24     Q.  Before he went to Madison County, he was

**26**

1  also with the State's Attorney's Office here in
2  Adams County?
3      **A.  Yes.  I don't remember the dates of his**
4  **employment before he left, but yes, he was.**
5      Q.  In 2013 and 2014, did he have a
6  particular assignment in the State's Attorney's
7  Office?
8          MR. HANSEN:  If you know.
9          THE WITNESS:  Yeah, I don't really recall
10  what his assignment was.  I think he was handling
11  misdemeanor -- the misdemeanor call.  We have
12  completely changed how we assign cases and do
13  things now, but I think at that time that's what he
14  was doing.
15  BY MS. THOMPSON:
16     Q.  One of the other people that you worked
17  with in the State's Attorney's Office was Curtis
18  Lovelace; is that correct?
19     **A.  Yes.**
20     Q.  And when did you first meet Mr. Lovelace?
21     **A.  Because I am an Illinois fan and because**
22  **I have a close friend, Larry Blickhan, I met him**
23  **when he was an intern with Lewis Blickhan Longlett**
24  **& Timmerwilke.**

**27**

1      Q.  When was that?
2      **A.  I don't know.**
3      Q.  This is while Mr. Lovelace was in law
4  school?
5      **A.  I assume so.**
6      Q.  And did you -- did you work with
7  Mr. Lovelace at any point before he joined the
8  State's Attorney's Office?
9      **A.  No.**
10     Q.  Do you remember what year Mr. Lovelace
11  joined the State's Attorney's Office?
12     **A.  It would have been when Jon Barnard was**
13  **elected.**
14     Q.  And at that point he worked in the
15  State's Attorney's Office part-time; is that right?
16     **A.  Yes.**
17     Q.  While he was in the State's Attorney's
18  Office as a part-time employee, did you and he ever
19  work on any cases together?
20     **A.  I would be answering any questions he had**
21  **about a particular case, yes.**
22     Q.  As the first assistant in the office, did
23  you have any supervisory responsibility over other
24  Assistant State's Attorneys?

**28**

1      **A.  In theory, I guess I did.  In practice,**
2  **no.**
3      Q.  And even if there was no structural
4  organization of, you know, here is the chain of
5  command so to speak, when you were the first
6  assistant, did people see you as a person they
7  could go to for advice and to get questions
8  answered?
9      **A.  Yes.**
10     Q.  And was that true of your relationship
11  with Mr. Lovelace, that he came to you for advice
12  and with questions?
13     **A.  Absolutely.  And at the time he and I**
14  **also had a friendship out of the office as well.**
15     Q.  During the time that he was an Assistant
16  State's Attorney, how often did you and
17  Mr. Lovelace spend time together socially outside
18  the office?
19     **A.  Quite frequently, particularly after the**
20  **death of his first wife.**
21     Q.  Would you go out to dinner together?
22     **A.  Maybe.  Or see him out to dinner.  I**
23  **mean, Quincy is a small town, but I definitely had**
24  **him over to my house numerous times with his**

Transcript of Gary Farha
Conducted on July 18, 2018

---

**29**

1  children.

2      Q.   And the numerous times that you had him

3  over to your house, were those both before and

4  after the passing of his first wife?

5      **A.   I wouldn't say before because, I'll be**

6  **quite candid, I did not get along with his first**

7  **wife.**

8      Q.   Was there a particular reason that you

9  did not get along with his first wife?

10      **A.   Yeah, because she was an alcoholic and**

11  **very obnoxious.**

12      Q.   Was her -- the way that you perceived her

13  behavior something that led you to conclude she was

14  not a person you wanted to spend time with?

15      **A.   Yes.**

16      Q.   After his wife passed, is it fair to say

17  that one of the reasons you had him and his

18  children over to your home is because you were

19  concerned about your friend and wanted to make sure

20  that he had caring people in his life that he could

21  spend time with?

22      MR. HANSEN:  Object to form.

23      Go ahead.

24      THE WITNESS:  I would say that's

---

**30**

1  generally true.  I also enjoyed his company.  The

2  one thing we had in common was Illinois football,

3  Illinois basketball, and his kids were great kids,

4  and so I enjoyed having him over to the house to

5  watch -- it was usually around a sporting event

6  that he would come over.

7  BY MS. THOMPSON:

8      Q.   Was there -- did there come a time where,

9  you know, you consider in looking back on things

10  that your friendship with Mr. Lovelace came to an

11  end?

12      **A.   Probably.  I would say once Mr. Gibson**

13  **had talked to me about that.**

14      Q.   And when you say when Mr. Gibson talked

15  to you about that, do you mean when Mr. Gibson

16  talked to you about the investigation into Cory

17  Lovelace's death?

18      **A.   Yes.**

19      Q.   And is it fair to say that you were

20  alarmed to think that Mr. Lovelace might have been

21  involved in a terrible crime?

22      MR. HANSEN:  Object to form.

23      THE WITNESS:  I was astounded at the

24  allegations, things I had never known.

---

**31**

1  BY MS. THOMPSON:

2      Q.   And is what Mr. Gibson told you what

3  caused you to re-evaluate your friendship with

4  Mr. Lovelace?

5      **A.   I need to say this:  That my friendship**

6  **with Curtis disintegrated somewhat by his second**

7  **marriage, but I still did things with him.  I was**

8  **not a fan of his second wife either.**

9      Q.   The second wife that you're referring to

10  is someone named Erika Gomez; is that correct?

11      **A.   Yes.**

12      Q.   And at some point Mr. Lovelace and

13  Ms. Gomez separated; is that true?

14      **A.   I don't know when, but yes.**

15      Q.   All right.  And did your friendship,

16  although it was impacted by that marriage, did it

17  survive the marriage?

18      MR. HANSEN:  Object to form.

19      But go ahead.

20      THE WITNESS:  I was still doing things

21  when he was married to Erika, but she made me very

22  uncomfortable.

23  BY MS. THOMPSON:

24      Q.   Well, after Mr. Lovelace and Ms. Gomez

---

**32**

1  separated, did you continue to, you know, interact

2  with Mr. Lovelace socially?

3      **A.   Probably not much.**

4      Q.   Did you interact with him socially after

5  he left the State's Attorney's Office?

6      **A.   Occasionally.**

7      Q.   And you said that when -- and we will

8  talk about this more, but when Mr. Gibson informed

9  you about his investigation, you said there was

10  things that you learned about from Mr. Gibson that

11  you had not known before; is that right?

12      **A.   Yes.**

13      Q.   And did learning those things cause you

14  to conclude that you had -- there was no further

15  reason to continue any level of friendship with

16  Mr. Lovelace?

17      **A.   Yes, that's fair.**

18      Q.   At what point did you decide that you

19  were going to run for the position of State's

20  Attorney?

21      **A.   Probably --**

22      MR. HANSEN:  Go ahead.

23      THE WITNESS:  Probably when Jon Barnard

24  told me that he was going to resign halfway through

---

33

1  his third term, told people that I was with that he
2  was going to resign and have me appointed. So
3  possibly 2012.
4  BY MS. THOMPSON:
5      Q.  Did -- when Mr. Barnard resigned, did you
6  have any inkling --
7      A.  He did not resign.
8      Q.  So please explain to me the chronology by
9  which you became State's Attorney after you had
10  that conversation with him?
11      A.  I ran in 2016 after he filled his office
12  and announced he was not going to run for a fourth
13  term.
14      Q.  Did you -- prior to him telling you --
15  prior to the meeting that you just described, had
16  you had any inkling that his time as the State's
17  Attorney might be coming to an end?
18      A.  That was not a meeting. That was a
19  social occasion involving the Federation of
20  Neighborhoods' Christmas -- annual Christmas party.
21      Q.  So he gave you that information at that
22  party?
23      A.  He gave it to me with Rocky and Ronda
24  Murry there, and he said it to them.

34

1      Q.  And prior to him telling you that, had
2  you had any inkling that, you know, his career as a
3  State's Attorney might be coming to an end?
4      A.  Well, he was 65, 66, when he retired. So
5  yes, I knew his age and I knew he wasn't going to
6  do it forever. So that's an inkling.
7      Q.  Had you been taking any preparatory steps
8  before that conversation to put yourself in a
9  position to run for State's Attorney?
10      A.  Well, if working every day day in and day
11  out, never taking a vacation is preparatory, yes.
12      Q.  Anything else besides your diligence with
13  which you took your career in the office?
14      A.  No.
15      Q.  At the time that you had that
16  conversation with Mr. Barnard, did you consider
17  that there might be other people who would be
18  interested in succeeding Mr. Barnard as State's
19  Attorney?
20      A.  No, not in my mind.
21      Q.  Did you ever consider the possibility
22  that Curtis Lovelace might run for that position?
23      A.  No, not at all.
24      Q.  Had you ever discussed with Curt in the

35

1  course of your friendship any of his political
2  aspirations?
3      A.  No.
4      Q.  Did you ever discuss your political
5  aspirations with him?
6      A.  I think it was -- no. To answer your
7  question, not specifically, but I would say this:
8  I think it was generally understood in our office
9  that I was going to run once Jon retired.
10      Q.  And as someone who had been the first
11  assistant for a really long time, I mean, that
12  would be a natural progression of things after he
13  left; is that right?
14      A.  Yes.
15      Q.  So it wouldn't be a surprise to anyone
16  that that's something you might do next?
17      A.  No.
18      Q.  Nor would it be a surprise to anyone that
19  you might have Jon Barnard's approval or support in
20  being his successor, correct?
21      A.  I thought so.
22      Q.  Did you run in your election under a
23  particular political affiliation?
24      MR. HANSEN:  Object to the relevance.

36

1      Go ahead, you can answer.
2      THE WITNESS:  Republican party.
3  BY MS. THOMPSON:
4      Q.  And did you receive the support of the
5  local Republican party in your campaign?
6      A.  That depends on what you mean by the
7  "support." The formal support of the central
8  committee, no.
9      Q.  Did you receive support other than the
10  formal support of the central committee?
11      A.  Absolutely.
12      Q.  And what support did you receive?
13      A.  I received support from, I would
14  estimate, about 95 percent of local law enforcement
15  who I had worked with for 20 some years. I
16  received support of the local bar association to a
17  large degree. I received the support of Mr. Harold
18  Knapheide, who is an incredible generous supporter
19  of local Republican efforts, Jack Sharkey and some
20  very well-known people within the established
21  Republican party, but not on the central committee.
22      Q.  Your opponent in your first election was
23  Jennifer Cifaldi, correct?
24      A.  My only election, yes.

Transcript of Gary Farha

Conducted on July 18, 2018

37

1    Q.   All right.  And Ms. Cifaldi at that point
2 was a member of the State's Attorney's Office; is
3 that right?
4    A.   Yes.
5    Q.   And she left the office after the
6 election?
7    A.   Yes.
8    Q.   I want to go back to the process in the
9 office in 2013 and 2014 for investigating cases of
10 significance, and let me ask you first again about
11 the Grand Jury process.  Did you ever discuss with
12 any members of the Quincy Police Department at any
13 point when you were a first assistant about the
14 availability of the Grand Jury to assist that
15 department in homicide investigations?
16    A.   When you use the word "discuss," I'm sure
17 I did, but I don't remember any specifics, but
18 somebody may have said I want to take this case to
19 the Grand Jury.  I didn't schedule those or
20 anything like that, but "discuss" is such a broad
21 term.  I believe I probably did.
22    Q.   Did you ever work with any members of the
23 Quincy Police Department in bringing drug cases
24 before the Grand Jury?

38

1    A.   Certainly.
2    Q.   I mean, as you said, one of the ways that
3 your office used the Grand Jury was to deal with
4 drug cases where there was confidentiality issues
5 you wanted to preserve, correct?
6    A.   Correct.
7    Q.   And when the police department came to
8 you about a drug investigation that was proceeding
9 towards the Grand Jury, would you be the person who
10 would be telling the police department how to
11 conduct the investigation and how to, you know,
12 prepare the case in order to get it to the Grand
13 Jury?
14    A.   No, not at that time.  If you are talking
15 about specifically the 2013-2014?
16    Q.   Well, let me ask you about that time
17 period, yes, sir.
18    A.   No.
19    Q.   I mean, is it fair to say that for the
20 drug cases you worked on with the police department
21 that they would come to you with what their
22 investigation had shown and where it was at and you
23 would work with them to get the case to the Grand
24 Jury?

39

1    MR. HANSEN:  Just object to form and
2 mischaracterizing his prior testimony.
3    You can answer.
4    THE WITNESS:  What you need to know is
5 that in 1998 when I -- or 1999 or 1997 when I first
6 started working with the task force, I did a lot of
7 that.  That was because they were kind of rookies,
8 and they didn't -- we were working on procedures.
9 We were working on investigations.  But by the time
10 2014 rolled around they were veterans, and most of
11 them were still -- in the task force were still
12 there, and they would guide the young officers with
13 the Quincy Police Department.  They worked very,
14 very closely together.  So there is no need for me
15 to instruct them on how to prepare a case.  They
16 knew, and we didn't have time to sit there and go
17 over every aspect of a case.
18 BY MS. THOMPSON:
19    Q.   Am I right then that in the 2013-14 time
20 period you were not supervising police officers in
21 finishing those drug investigations to get them
22 before the Grand Jury?
23    A.   No, you are right.
24    MR. HANSEN:  I want to make sure this is

40

1 right.  Did you say, no, she is right or, no --
2    THE WITNESS:  Yeah.
3    MR. HANSEN:  She is correct?
4    THE WITNESS:  She is correct, yes.
5    MR. HANSEN:  Okay.  Thank you.
6 BY MS. THOMPSON:
7    Q.   You mentioned that, you know, you had
8 some belief about the way in which Cory Lovelace
9 conducted herself with respect to alcohol.  Was
10 there some point that you determined that you
11 believed that Curtis Lovelace might have a problem
12 with alcohol?
13    A.   Yes.
14    Q.   And when did you reach -- when did you
15 start having concerns about that issue?
16    A.   I don't remember specifically the date,
17 but I can tell you why.
18    Q.   Well, why don't you start by telling us
19 why?
20    A.   He was coming to court with alcohol on
21 his breath, and it was very noticeable to all the
22 people in the office.
23    Q.   And when you say that you don't know when
24 it was, can you give any estimated timeframe for

Transcript of Gary Farha

Conducted on July 18, 2018

---

**41**

1  when you started to notice that?

2  **A.  I really can't.  It was prior to 2010,**

3  **but I can't say when.**

4  Q.  And how do you know it was prior to 2010?

5  **A.  Because it was early on.  He started in**

6  **2004, and he was given some assignments that he did**

7  **not perform particularly well, and we talked to the**

8  **judges and people, and the analysis was he may have**

9  **been intoxicated when he was in court.**

10  Q.  The conversations you had with court

11  personnel about those issues, were those in 2010?

12  **A.  I don't know specifically.**

13  Q.  Were there any documents that the State's

14  Attorney's Office prepared documenting any of those

15  performance issues that you observed?

16  **A.  I didn't prepare any.  I didn't have**

17  **that -- that was not a function of my particular**

18  **responsibilities.**

19  Q.  Were you part -- well, let me ask you

20  this.

21  Did you personally talk with any court

22  personnel about the performance issues that you

23  just described?

24  **A.  Judges, yes.**

---

**42**

1  Q.  What judges did you talk to about that?

2  **A.  Judge Walden in particular.**

3  Q.  Are there any other judges you talked to

4  about that issue?

5  **A.  Undoubtedly there were, but I don't**

6  **specifically remember any of those conversations.**

7  Q.  Why do you say "undoubtedly there were"?

8  **A.  Because it was a general consensus of the**

9  **problem.**

10  Q.  And who besides yourself was involved in

11  the general consensus about that problem?  Let me

12  ask you that question a better way.

13  Who else besides you in the State's

14  Attorney's Office -- who -- let me start that

15  question again.

16  Who else besides the judge that you just

17  named did you discuss the issue of Curt's

18  performance and this possibility that he was --

19  that he had alcohol on his breath in court with?

20  **A.  I would say every attorney in the office**

21  **at one time or another.**

22  Q.  And are you able to give us any time

23  frame for when you had those conversations with

24  every attorney in the office?

---

**43**

1  **A.  Not specifics.**

2  Q.  Was it before or after Mr. Lovelace's

3  marriage to Erika Gomez that you had these

4  discussions with every attorney in the office?

5  **A.  I would say it was -- well, I don't know**

6  **when Curtis got married to her, but I would say it**

7  **was during that marriage.**

8  Q.  And over -- do you know over what period

9  of time there was this process of, you know,

10  talking with court personnel and sort of reviewing

11  his performance in terms of what he was doing when

12  these issues arose?  Let me ask you that question

13  in a better way.

14  Was it over a period of weeks or months

15  that there was some checking in with court

16  personnel about these issues, or how long of a

17  period of time were these discussions with court

18  personnel about his performance?

19  **A.  Years.  And if I might, the discussions**

20  **were not just with judges, but court personnel;**

21  **bailiffs, circuit clerks, court reporters.  It was**

22  **not unknown to the entire courthouse of the**

23  **problems.**

24  Q.  Can you name for me every court

---

**44**

1  personnel, courtroom personnel person that you

2  recall having conversations with about Curt

3  possibly drinking in court or having alcohol on his

4  breath in court?

5  **A.  I can tell you that as far as the circuit**

6  **clerk, Kim Goodwin, who handled most of the felony**

7  **cases, was one that had mentioned it to me.  As far**

8  **as court reporters, I believe -- now her name has**

9  **escaped me because she has since retired.  Linda --**

10  MR. HANSEN:  Snyder.

11  THE WITNESS:  Linda Snyder, thank you.

12  Linda Snyder.  Court security officer Lindy

13  Thompson, Hank Pfeiffer to name a couple.

14  BY MS. THOMPSON:

15  Q.  Is there anyone else that you can --

16  **A.  There are plenty of people.  I'm sorry.**

17  MR. HANSEN:  Let her finish the question.

18  She is asking specific names, not just plenty of

19  people.  So if there are specific, fine.  If not,

20  then --

21  THE WITNESS:  I don't -- I don't at this

22  time recall other specific people.

23  BY MS. THOMPSON:

24  Q.  As of today, have we exhausted your

---

Transcript of Gary Farha

Conducted on July 18, 2018

---

**45**

1 memory about specific people that you discussed
2 this issue with?
3    **A.**   **Yes.**
4    Q.   Did you have conversations with Jon
5 Barnard about the issue of Curt having alcohol on
6 his breath in court?
7    **A.**   **Yes.**
8    Q.   And how many times did you have
9 conversations with Jon Barnard about this?
10    **A.**   **Several.**
11    Q.   Do you have any idea of the timeframe of
12 those conversations?
13    **A.**   **Over years.**
14    Q.   And what did you discuss with Jon Barnard
15 with respect to this issue?
16    **A.**   **I just told him what I had heard.**
17    Q.   And what, if anything, was his response?
18    **A.**   **There was no response.**
19    Q.   And when you say "there was no response,"
20 do you mean that he literally had no words to offer
21 in response to what you were saying about what you
22 had heard?
23    **A.**   **I think his basic philosophy was, okay,**
24 **let me know if you hear anything more or if you see**

**46**

1 **anything more.**
2    Q.   Did you personally have experiences with
3 Curt either at work, meaning at the office or at
4 court or at a time when Curt was performing his job
5 as a State's Attorney, where you personally
6 observed the smell of alcohol on his breath?
7    **A.**   **There were several occasions.**
8    Q.   And what do you remember -- well, let me
9 ask you this.
10       Over what period of time were those
11 occasions?
12    **A.**   **I would say 2010 until he was discharged**
13 **by Jon Barnard.**
14    Q.   And do you remember for any of those
15 occasions where Curt was when you made that
16 observation?
17    **A.**   **Usually in court.**
18    Q.   And when you say "usually in court," were
19 there any other places besides court where you had
20 that observation?
21    **A.**   **No.**
22    Q.   Other than saying that there were several
23 occasions, can you provide anymore specifics about
24 how many times you had that observation?

**47**

1    **A.**   **Well, I can tell you that it was at**
2 **pretrials, because there would be -- all of the**
3 **State's Attorneys that were available would be at a**
4 **pretrial. So there may be 60 to a hundred cases**
5 **set for that, and everybody that had a particular**
6 **assignment would be there. We all sat in close**
7 **proximity to each other as those cases were called**
8 **one by one.**
9    Q.   And the several times you had this
10 observation, were all of them at pretrials?
11    **A.**   **I can't say all of them.**
12    Q.   Well, did you ever have any other
13 experiences working with Curt in the State's
14 Attorney's Office where you were sitting in close
15 proximity to him?
16    **A.**   **Yeah.**
17    Q.   I mean, that's something that happened
18 all the time, correct?
19       MR. HANSEN: Object to form,
20 argumentative.
21       Go ahead.
22       THE WITNESS: I would not say I spoke to
23 Curtis on a daily occasion. He would be in the
24 office generally, but I was usually in court.

**48**

1 Particularly on Tuesdays and Wednesdays when there
2 were docket calls, I would be in court from 8:30
3 until 4:30 without even a lunch break. So I didn't
4 have that much of an occasion on a daily basis to
5 speak to Curt.
6 BY MS. THOMPSON:
7    Q.   Did you have interactions with Curt over
8 his time in the State's Attorney's Office where
9 you -- where you interacted with him and you didn't
10 smell alcohol on him?
11    **A.**   **Certainly.**
12    Q.   Was that a regular occurrence that you
13 didn't smell alcohol on him?
14    **A.**   **Certainly.**
15    Q.   For any of the several times where you
16 were -- where you observed that you smelled alcohol
17 on Curt's breath, did you discuss it with him after
18 any of those observations?
19    **A.**   **I didn't see it as my place.**
20    Q.   Why didn't you see it as your place?
21    **A.**   **Because Jon did not give me that type of**
22 **authority to discipline or counsel any of the other**
23 **attorneys. I was the first assistant, but I had no**
24 **responsibilities for hiring, counseling, anything**

Transcript of Gary Farha
Conducted on July 18, 2018

49

1   like that.
2       Q.   Did you consider discussing this with
3   Curt not as a, you know, supervisor but as a friend
4   or as a caring person?
5       A.   No.  No.
6       Q.   And why not?
7       A.   Because part of my perception was he had
8   married this person that had led him to do these
9   things, and I wasn't going to get into his personal
10  life and criticize him for the selection he made.
11      Q.   Did you consider reporting Curt to the
12  ARDC for you smelling alcohol on his breath while
13  he was in court?
14      A.   No.
15      Q.   Why not?
16      A.   There was nothing that I saw when I
17  smelled alcohol on his breath so egregious that it
18  would amount to a reporting to the ARDC.
19      Q.   Well, what about what you -- what was
20  being reported to you that there were performance
21  concerns about his that might be associated with
22  that, is that something you considered reporting to
23  the ARDC?
24      A.   No.

50

1       Q.   Why not?
2       A.   Same reason.
3       Q.   Did you ever have a time in the State's
4   Attorney's Office when you believed that his
5   ability to perform his job was compromised by a
6   possible alcohol issue?
7       A.   That I was personally involved with, no.
8   Cases that were handled by him that the police
9   reported to me, that was a different story.
10      Q.   You said cases reported to you by the
11  police?
12      A.   Yes.
13      Q.   Who from the police made a report to you
14  about there being cases that he was working on that
15  were possibly compromised by this issue?
16      A.   Detective Bryan Dusch, who is now a
17  sergeant with the Quincy Police Department.
18      Q.   And what did he report to you about
19  Curt's performance in a case with respect to this
20  issue?
21      A.   It was a jury trial that had involved a
22  fraud on a credit card with this lady that was
23  gambling, and Bryan was very, very displeased with
24  Curtis's performance of this case.  I think there

51

1   was a directed verdict, and he was just absolutely
2   insistent that Curtis did nothing right in that
3   case and he thought he was compromised by his
4   drinking.
5       Q.   When was that case?
6       A.   Sometime probably between 2010 to 2012.
7       Q.   And did you discuss that case with anyone
8   besides -- is it --
9       A.   Bryan Dusch.
10      Q.   Dusch.  I want to say it correctly.
11           Did you discuss this with anyone besides
12  Bryan Dusch?
13      A.   No, because Bryan also talked to Jon
14  Barnard.
15      Q.   How do you know he talked to Jon Barnard?
16      A.   He told me.
17      Q.   What, if anything, did he tell you about
18  Mr. Barnard's response?
19      A.   He didn't.
20      Q.   Did you believe what Mr. Dusch was
21  telling you?
22      A.   Yes.
23      Q.   Did you believe that that gave you an
24  obligation to report Curt to the ARDC?

52

1       A.   No.
2       Q.   Why not?
3       A.   Because he had told Mr. Barnard.
4   Mr. Barnard was the State's Attorney.
5       Q.   Other than Mr. Dusch, is there anyone
6   else from the -- from law enforcement that came to
7   you or that discussed with you a concern about
8   Curt's drinking?
9       A.   I don't recall specifics, but yes, I
10  believe there were.
11      Q.   All right.  And how many other people
12  from the police talked to you about these issues?
13      A.   Three or four.
14      Q.   Can you remember who those people were?
15      A.   No.
16      Q.   Can you remember anything about what they
17  conveyed to you about Curt in this regard?
18      A.   No.
19      Q.   Is your memory exhausted as to people
20  from law enforcement coming to you with concerns
21  about Curt's drinking?
22      A.   Is my memory exhausted?
23      Q.   Right.  And I'm asking -- I'm sorry to
24  interrupt.  I'm asking if there is any other

Transcript of Gary Farha

14 (53 to 56)

Conducted on July 18, 2018

---

**53**

1 information you can provide about that in terms of
2 the people who talked to you and what they conveyed
3 to you?
4 **A. Well, if your question is constrained to**
5 **law enforcement, I cannot remember anybody. There**
6 **were also county board members. Curtis's chief**
7 **responsibility was with the advising the county**
8 **board, and there were several county board members**
9 **that I talked with. They didn't report to me or**
10 **anything, but that were concerned about his**
11 **performance and whether or not he had been**
12 **drinking.**
13 Q. What county board members did you have
14 those discussions with?
15 **A. Mike McLaughlin, who was the chairman of**
16 **the county board at the time.**
17 Q. And anyone else besides Mr. McLaughlin?
18 **A. I don't recall specifically, although I**
19 **know there were other county board members.**
20 Q. When did you have any conversations with
21 Mr. McLaughlin about this?
22 **A. There were several occasions, but I don't**
23 **remember the specific dates.**
24 Q. All right. And what did Mr. McLaughlin

---

**54**

1 tell you in this regard?
2 **A. That he had come in and he clearly was**
3 **drunk.**
4 Q. And when you say that he'd come in, you
5 are talking about Curt coming in?
6 **A. To board meetings. The board meetings**
7 **are the second Tuesdays of every month at 7**
8 **o'clock.**
9 Q. And did he describe for you how -- what
10 led him to conclude that Curt was drunk?
11 **A. No. No. But he -- these were**
12 **conversations generally speaking that would just**
13 **occur when I would see him. His father was --**
14 **Mike's father was a good friend of mine. I lived**
15 **next to him for a number of years. Mike was a good**
16 **friend of mine, and it would just be in**
17 **conversations.**
18 Q. Am I right that other than
19 Mr. McLaughlin, you can't give me the names of
20 other county board members that you discussed this
21 issue with?
22 **A. Not at this -- I have talked to county**
23 **board members since then that would say that, but,**
24 **no, not contemporaneously, no.**

---

**55**

1 Q. And when you say "contemporaneously," we
2 are talking about this time period when Curt still
3 worked with the State's Attorney's Office?
4 **A. Correct.**
5 Q. And do you remember anything that any
6 county board members told you while Curt worked for
7 the State's Attorney's Office in terms of concerns
8 about Curt's performance in any way?
9 **A. No.**
10 Q. And were there any other performance
11 concerns that Mr. McLaughlin told you about other
12 than what you've just described?
13 **A. No.**
14 Q. You said you've had conversations with
15 county board members since about this issue?
16 **A. Yes.**
17 Q. Who have you had conversations with since
18 about this issue?
19 **A. Mike Troup, who was a county board member**
20 **during part of the time that Curtis was advising**
21 **them, Kent Snyder. There is also Rick Genenbacher.**
22 **I'm not sure if -- there may have been others, but**
23 **those are people I specifically remember talking**
24 **to.**

---

**56**

1 Q. When did you talk with Mr. Troup about
2 this issue?
3 **A. I go to church with him. I probably have**
4 **talked to him two or three times about it.**
5 Q. And what, if anything, did he tell you in
6 those conversations with Curt?
7 **A. Just that, that he would come to -- he**
8 **would come to the meeting with alcohol on his**
9 **breath.**
10 Q. And what about Mr. Snyder, what did he
11 tell you about this?
12 **A. Same thing.**
13 Q. When did you have any conversations --
14 **A. I talk to him virtually actually every**
15 **day. He is the vice chairman of the county board.**
16 Q. Can you give any indication about when
17 those conversations were in terms of years or other
18 time description?
19 **A. No.**
20 Q. Were those conversations with Mr. Snyder
21 after Curt was arrested in this case?
22 **A. Yes.**
23 Q. Were your conversations with Mr. Troup
24 after Curt was arrested?

Transcript of Gary Farha
Conducted on July 18, 2018

57

1    A.  Yes.
2    Q.  And what about Mr. Genenbacher, were
3 those conversations after Curt was arrested?
4    A.  Yes.
5    Q.  And what did Mr. Genenbacher tell you?
6    A.  Same thing.
7    Q.  That Curt had come to board meetings
8 smelling of alcohol?
9    A.  Yes.
10   Q.  Did any of them tell you that Curt's
11 conduct during the board meetings was compromised
12 by the smelling of the alcohol?
13   A.  Not that I recall.
14   Q.  And other than what Mr. Dusch told you,
15 can you think of any other information you received
16 while Curt was a member of the State's Attorney's
17 Office where someone told you that they believed
18 that Curt's conduct with respect to the litigating
19 of cases had been compromised by drinking?
20   A.  I'm trying to think back at trials he
21 had, but I think that was the main one.
22   Q.  Do you remember the name of the defendant
23 in that case?
24   A.  It was a Chinese lady.  We had to bring

58

1 in a Mandarin interpreter.  I do not remember her
2 name.
3       MR. HANSEN:  Whenever you get to a spot,
4 I need to take a few.
5       MS. THOMPSON:  This is a good place to
6 take a break.  We will do it now.
7       MR. HANSEN:  Okay.  Thank you.
8       THE VIDEOGRAPHER:  We are going off the
9 record.  The time is 9:54.
10      (Whereupon a short recess was taken.)
11      THE VIDEOGRAPHER:  We are back on the
12 record.  The time is 10:06.  This begins media
13 number 2.
14 BY MS. THOMPSON:
15   Q.  Mr. Farha, you mentioned before the break
16 that we took Adam Gibson, and I want to go back to
17 that issue.  Do you know a member of the Quincy
18 Police Department named Adam Gibson?
19   A.  Certainly.
20   Q.  Did you know Mr. Gibson before the Cory
21 Lovelace investigation came to your attention?
22   A.  Absolutely.
23   Q.  Had you worked with him on drug cases?
24   A.  Yes.

59

1    Q.  He was the canine officer for a number of
2 years in Quincy, correct?
3    A.  Before that he was with the West Central
4 Illinois Task Force.  That's where I first got to
5 know him.
6    Q.  Had you worked with him closely on drug
7 cases before the Lovelace case began?
8    A.  Yes.
9    Q.  Was he someone you considered a friend?
10   A.  Yes.
11   Q.  Is he someone today you consider a
12 friend?
13   A.  Yes.
14   Q.  Is he someone that you see socially
15 outside of work?
16   A.  No.
17   Q.  But you had a good working relationship
18 with him over the years that you worked with him on
19 drug cases; is that right?
20   A.  Absolutely.
21   Q.  At some point did you become aware that
22 there was an investigation into Cory Lovelace's
23 death?
24   A.  Yes.

60

1    Q.  When did you become aware of that
2 investigation?
3    A.  When he came by my office one day.
4    Q.  When was that?
5    A.  I don't recall.
6    Q.  Was that in 2013?
7    A.  I assume.
8    Q.  Why do you assume it was in 2013?
9       MR. HANSEN:  Hold on.  I don't want you
10 to assume.  If you know, you know.
11      THE WITNESS:  I don't know.
12 BY MS. THOMPSON:
13   Q.  What did Mr. Gibson tell you when he came
14 by your office?
15   A.  He was asking me if I knew of anything
16 about Curtis and that investigation, and I didn't
17 know anything.
18   Q.  When you say he was asking you about that
19 investigation, is there any more specific
20 information that you recall about what he said?
21   A.  No.
22   Q.  And was he -- was he -- well, let me ask
23 you this.
24      Did he say anything else to you besides

Transcript of Gary Farha
Conducted on July 18, 2018

61

1 asking you if you knew about that investigation?

2 **A. I don't recall how he asked it, but he**
3 **was asking about Curt's behavior, if I was ever**
4 **alarmed by it or anything that I ever noticed.**

5 Q. And what did you -- what, if anything,
6 did you tell him in response?

7 **A. I told him that there was one occasion**
8 **that I felt threatened by Curtis.**

9 Q. Was this an incident that had to do with
10 Curt not getting a public defender job?

11 **A. It wasn't not getting a public defender**
12 **job. It was not getting an interview for the chief**
13 **public defender.**

14 Q. All right. And what did you tell
15 Mr. Gibson about that topic?

16 **A. That I had absolutely witnessed Curtis**
17 **in a rage and it seemed directed at me when I had**
18 **nothing to do with any of it.**

19 Q. Did you tell him when that occurred?

20 **A. I told him when it occurred in my**
21 **recollection only in that it occurred when they**
22 **were interviewing for the position that Holly Henze**
23 **was eventually appointed to. I didn't give him a**
24 **date.**

62

1 Q. Other than talking about that time when
2 Curt was in a rage, was there any other information
3 you gave Mr. Gibson about Curt's behavior?

4 **A. Not that I recall.**

5 Q. At that time, did you tell Mr. Gibson
6 about these performance concerns about Curt's
7 conduct as a State's Attorney?

8 **A. I don't believe so.**

9 Q. Did you tell him that there were people
10 who believed that Curt had alcohol on his breath
11 while he was working?

12 **A. I don't recall.**

13 Q. Can you not -- are you saying you don't
14 recall whether you told him that or not?

15 **A. Yes, I am saying I do not recall whether**
16 **I told him that or not.**

17 Q. Did he ask you about -- and I want to
18 make sure I understand your testimony.

19 Was the question he asked you about
20 whether there was anything unusual you'd noted
21 about Curt or how did he phrase the question, as
22 best you recall?

23 **A. I don't recall, other than I know that I**
24 **had responded because I had seen him in a fit of**

63

1 rage where I personally felt threatened.

2 Q. Was Mr. Gibson asking you about violence
3 associated with Curt's behavior?

4 **A. Given my response, I assume so, but I**
5 **don't know.**

6 Q. And at that point did he tell you that
7 there was an investigation into Cory Lovelace's
8 death?

9 **A. Yes.**

10 Q. So what did he tell you about that?

11 **A. I don't recall, but just that there was,**
12 **that he had reopened a case.**

13 Q. Did he tell you how -- did he tell you
14 when it was that he had reopened the case?

15 **A. No.**

16 Q. Did you ask any questions of him about
17 what was going on with that reinvestigation?

18 **A. I don't recall.**

19 Q. Is there anything that would refresh your
20 memory about whether you had any questions for him
21 about the reinvestigation?

22 **A. I know that he sent me a document that I**
23 **reviewed that was very interesting, things I did**
24 **not know.**

64

1 Q. And my question is: Is there anything
2 that would refresh your memory about what, if
3 anything, you asked him about the reinvestigation
4 when he came by your office to ask you about Curt's
5 behavior?

6 **A. I could look at that document, but that**
7 **would be the only thing.**

8 Q. All right. At that meeting, did he tell
9 you who, if anyone, was involved in this
10 reinvestigation?

11 **A. I don't recall him telling me details**
12 **then, no.**

13 Q. What was your reaction to hearing that
14 there was a reinvestigation into Cory Lovelace's
15 death?

16 **A. Surprised.**

17 Q. And why were you surprised?

18 **A. Because I knew nothing about this. It**
19 **happened in our office and no one had told me a**
20 **word, not a police officer, not Jon Barnard, none**
21 **of our office staff, nobody.**

22 Q. And when you say "it happened in our
23 office," what do you mean?

24 **A. That there had been the initial contact**

Transcript of Gary Farha

Conducted on July 18, 2018

---

**65**

1  by Curtis to Jon, that he had come in the office
2  that same day, I knew nothing of that.  I did not
3  know that the police were even questioning that
4  something might have happened to him in the initial
5  investigation.
6      MR. HANSEN:  I think he is talking about
7  2006.
8      THE WITNESS:  Yeah.  Thank you.
9  BY MS. THOMPSON:
10     Q.   Well, but you -- I think the answer you
11  just gave you were indicating the reasons why you
12  were surprised.  You were indicating what you meant
13  by saying that "it happened in our office."  You
14  mean that your office was involved in sort of the
15  initial events that had occurred with respect to
16  Cory -- the aftermath of Cory Lovelace's death; is
17  that right?
18     A.   Yes.
19     Q.   And would it have been your expectation
20  that if there was a reinvestigation going on that
21  someone would have discussed that with you?
22     A.   Not necessarily.
23     Q.   Well, were you surprised that you were
24  learning about that reinvestigation first from

**66**

1  Mr. Gibson?
2      A.   I'm not saying I was surprised by what
3  Mr. Gibson was saying.  I was saying that I'm
4  surprised by the initial -- the events.  I was
5  never led to believe that anything like that was
6  possible.
7      Q.   Before Mr. Gibson came to talk to you and
8  told you about this reinvestigation, did you have
9  any belief, talking about your personal belief,
10  that there was something suspicious about Cory
11  Lovelace's death?
12     A.   No, or I would not have allowed him in my
13  house, around me niece and nephews, absolutely not.
14     Q.   After -- well, let me ask you this.
15         How long was your conversation with
16  Mr. Gibson when he came by your office?
17     A.   Very short.
18     Q.   And was anyone else present for the
19  conversation besides you and Mr. Gibson?
20     A.   No.
21     Q.   Was Mr. Gibson taking notes when the two
22  of you spoke?
23     A.   I believe -- he may have.  I don't
24  recall.

**67**

1      Q.   Did Mr. Gibson ask you about any of the
2  events you just described in terms of, you know,
3  Curt being at the office the day his wife passed
4  and the call to Jon Barnard or any of that?
5      A.   He didn't tell me that, no.
6      Q.   I mean, did he ask you any questions
7  about that is what I'm asking?
8      A.   No.
9      Q.   Let's go back to those events for a
10  minute.  Do you recall, as you sit here today,
11  learning that Cory Lovelace had passed away?
12     A.   Yes.
13     Q.   How did you learn that information?
14     A.   From the secretaries at our office.
15     Q.   When did you learn that information?
16     A.   That day, but probably later in the day.
17     Q.   And when you say "that day," you are
18  talking about the day --
19     A.   Of her death.
20     Q.   All right.  Did you talk with Jon Barnard
21  about her death that day, the day you learned of
22  it?
23     A.   No.
24     Q.   How did you learn that -- well, let me

**68**

1  ask you this.
2          I think you testified a minute ago that
3  there was a call made to Jon Barnard that day?
4      A.   I subsequently learned that.
5      Q.   And when did you learn that?
6      A.   When I read the summary that Adam had
7  sent me to review what I had told him.
8      Q.   So before you got the summary, had you
9  ever known before that that Curt had made a call to
10  Jon Barnard the day of his wife's death?
11     A.   Absolutely not.
12     Q.   After you were told by the -- well, let
13  me ask you this.
14         When the secretaries told you that Cory
15  Lovelace had died, was Curt in the office at that
16  time?
17     A.   I don't recall seeing him.  I did not
18  recall him ever coming to the office.
19     Q.   Do you remember any specifics about the
20  day that Cory Lovelace died other than that you
21  heard it -- about it from the secretaries in the
22  office?
23     A.   No, I don't.
24     Q.   When is the next time you remember seeing

Transcript of Gary Farha
Conducted on July 18, 2018

69

1  Curt after you got that news?
2      A.  I don't recall.  Well, the next time I
3  have a memory would have been at the visitation and
4  funeral.
5      Q.  Did you talk with him at any point
6  between when you learned that news and the funeral?
7      A.  Not that I recall.
8      Q.  Did you speak with him at the funeral
9  other than to give general condolences?
10     A.  That would have been it.
11     Q.  Do you remember seeing him at the
12 funeral?
13     A.  Yes.
14     Q.  What was his demeanor at the funeral?
15     A.  Sad.
16     Q.  And you said that you did see him at your
17 home in some of the time period after Cory's death;
18 is that right?
19     A.  Yes.
20     Q.  Did he ever express to you anything about
21 sadness over Cory's passing?
22     A.  I don't recall ever bringing it up.  I
23 recall just trying to deal with his kids, being
24 good to his kids, being gentle with his kids, and,

70

1  you know, I don't recall ever talking to Curtis
2  about the death.
3      Q.  Let's move forward then back to
4  Mr. Gibson coming and talking to you about the
5  reinvestigation.  Did you talk with anyone about
6  what Mr. Gibson had told you after he left your
7  office?
8      A.  Yes.  If I could explain?
9      Q.  Go ahead.
10     A.  Our office is basically probably 60 feet
11 long and there is offices and a corridor and
12 Jennifer Cifaldi was two offices down from me and
13 we didn't close the door when we were talking about
14 it, and I do know that he went from my office to --
15 or Jen may have even walked in the hallway and said
16 I saw the same thing and described what she saw.
17     Q.  And was she talking about this incident
18 involving the public defender job?
19     A.  Absolutely.
20     Q.  All right.  So were you present for when
21 she came over and said that?
22     A.  I know they had a conversation.  No.  My
23 day was so busy.  In the usual course I never
24 really engaged in just conversation.  We had other

71

1  things we had to do, so I did not take part in that
2  conversation, but I know she was talking about it.
3      Q.  You heard her talking to Mr. Gibson about
4  this?
5      A.  Initially, yes.
6      Q.  Is there anyone else that you remember
7  Mr. Gibson talking to in your office that day?
8      A.  Not that I'm aware of.
9      Q.  Okay.  Do you know how long his
10 conversation with Ms. Cifaldi was?
11     A.  No.
12     Q.  And after what you overheard Ms. Cifaldi
13 saying, did you talk with anyone else about
14 anything having to do with the Cory Lovelace
15 investigation after that?
16     A.  That day?
17     Q.  Well, let's start with that day.
18     A.  No.
19     Q.  When is the next time after that
20 conversation with Mr. Gibson where you discussed
21 anything having to do with the Lovelaces with
22 someone?
23     A.  When Adam Gibson e-mailed me his summary
24 report.

72

1      Q.  Did you gain any understanding from your
2  conversations with Mr. Gibson whether anyone in the
3  State's Attorney's Office was involved in this
4  reinvestigation?
5      A.  I'm not necessarily understanding what --
6      Q.  Sure.  Did you -- from the conversation
7  you had with Mr. Gibson, did you come to any
8  understanding about whether this reinvestigation
9  involved anyone from the State's Attorney's Office?
10     A.  No.
11     Q.  I mean, for instance, did he tell you
12 that he was working with, you know, Jon Barnard on
13 this investigation?
14     A.  Not that I recall.
15     Q.  Did he tell you whether anyone else in
16 the police department was involved in this
17 reinvestigation?
18     A.  He told me that he had opened up a cold
19 case and found out some information and that was
20 it.
21     Q.  And when he -- he told you he had found
22 out some information, what did he tell you he had
23 found out?
24     A.  No specifics.

Transcript of Gary Farha
Conducted on July 18, 2018

---

73

1   Q.   Did he tell you about any pathology
2 experts that he was consulting about the case?
3   A.   No.
4   Q.   Did you ask him any questions about what
5 was going on in the reinvestigation?
6   **A.   No.  I was dumbfounded, bewildered,**
7 **because I had been in the office and knew nothing,**
8 **and I was the first assistant and literally knew**
9 **nothing.  I was dumbfounded.**
10   Q.   And is part of why you were dumbfounded
11 because you were dumbfounded that this
12 reinvestigation was going on without someone
13 informing you?
14   **A.   No.  Just dumbfounded about the facts.**
15   Q.   Well, how was it that your position --
16 how was your position as the first assistant
17 related to your feeling of being dumbfounded?
18       MR. HANSEN:  Object to the form and asked
19 and answered.
20       Go ahead.  You can say it again.
21       THE WITNESS:  Can you ask that again,
22 please?
23 BY MS. THOMPSON:
24   Q.   Sure.  I mean, were you dumbfounded

---

74

1 because this was -- the fact that this case was
2 being looked at was shocking to you?
3   **A.   Yes.**
4   Q.   And is there any other reason you were
5 dumbfounded besides that?
6   **A.   No.**
7   Q.   Were you curious about what was going on
8 with this reinvestigation?
9   **A.   Yes.**
10   Q.   Did you take any steps to satisfy your
11 curiosity about it?
12   **A.   No.**
13   Q.   Between the time that you had that
14 conversation with Mr. Gibson and when Mr. Gibson
15 sent you the summary document, did you learn
16 about -- did you ever come to learn anything else
17 that was going on with the reinvestigation?
18   **A.   Not until I got that summary.**
19   Q.   So is the summary the next time that
20 anything with the respect to the Lovelaces at all
21 entered your consciousness?
22   **A.   To the best of my knowledge.**
23   Q.   Did you -- have you before today at any
24 point discussed Cory Lovelace's death with Jon

---

75

1 Barnard?
2   **A.   No.**
3   Q.   Have you discussed Cory Lovelace's death
4 with anyone besides Adam Gibson, and I'm not
5 talking about communications with your counsel
6 obviously, so setting that aside?
7       MR. HANSEN:  Okay.  I'm just going to
8 object to the vagueness and broadness of that.
9 Obviously, if he is at a visitation and funeral, he
10 may have.
11       But to the best of your ability, go ahead
12 and answer that question.
13       THE WITNESS:  What was your timetable?
14 BY MS. THOMPSON:
15   Q.   Sure.  Let me -- and let me try to narrow
16 that a little better.  Between -- after the point
17 that Adam Gibson left your office after asking you
18 about Curt's behavior, other than communications
19 you may have had with your counsel, have you had
20 conversations with anyone about Cory Lovelace's
21 death?
22   **A.   Certainly.  I mean, when he was being**
23 **tried, it was kind of the talk of the office.**
24 **Nobody went to court or anything like that, Jon did**

---

76

1 **not want us doing that, nor was it in good form,**
2 **but the office staff, the attorneys, they talked**
3 **about it.**
4   Q.   Did you talk -- have you ever talked with
5 anyone else in the police department other than
6 Adam Gibson about Cory Lovelace's death?
7   **A.   Post trial or --**
8   Q.   Let's ask that with the timeframe of
9 after Adam Gibson left your office?
10   **A.   So from then until today?**
11   Q.   Yes.
12   **A.   Yeah, I've had several conversations.**
13 **I've had the Quincy Police Department Chief Copley**
14 **call me about sharing bills saying that Mr. Barnard**
15 **had agreed to do that, that came up, and things**
16 **like that, but I don't recall a specific**
17 **conversation with any police officer.**
18   Q.   Other than Chief Copley, is there anyone
19 else in the police department besides Mr. Gibson
20 that you've discussed anything having to do with
21 Cory Lovelace's death with?
22   **A.   In-depth discussions?**
23   Q.   Let's start with in depth.
24   **A.   No, not that I can recall.**

---

Transcript of Gary Farha
Conducted on July 18, 2018

77

1    Q.  What about in passing conversations?
2    A.  Sure.
3    Q.  Who have you discussed her death with?
4    A.  I have no idea, but I know that it was
5  the talk of the town.  You know, there is people
6  since the filing of this lawsuit against me that
7  have talked to me.  I mean, any number of people.
8  Any number of people that watched the TV shows have
9  talked to me.
10    Q.  During the time that the trial was going
11  on, you said that this was the talk of the office?
12    A.  The talk of the courthouse.
13    Q.  And as -- I think as you indicated, you
14  personally didn't attend any of the trial?
15    A.  No.
16    Q.  Have you ever expressed an opinion to
17  anyone about whether or not you think Curt is
18  responsible for his wife's death?
19    A.  Yes.
20    Q.  And what opinion or opinions have you
21  expressed?
22    A.  Based on the medical evidence, I thought
23  he was guilty.
24    Q.  And who have you given that opinion to?

78

1    A.  I don't know, a number of people.
2    Q.  Where did you get your understanding of
3  the medical information in this case from?
4    A.  I knew both nurses that were on the
5  original jury, and I talked with them about that.
6  One is at my ophthalmologist's that I go to on a
7  monthly basis.  The other was a personal friend
8  of a good friend of mine.
9    Q.  And did you talk with those jurors
10  obviously after the first trial?
11    A.  Oh, absolutely.
12    Q.  All right.  Have you talked with anyone
13  about the medical evidence that came out in the
14  second trial, again not talking about any
15  attorney/client information?
16    A.  No.
17    Q.  Have you ever taken any steps to inform
18  yourself about the medical information from the
19  second trial?
20    A.  No.
21    Q.  After you -- you said that after your
22  conversation in your office with Adam Gibson that
23  he sent you a summary document?
24    A.  Yes.

79

1    Q.  How did he send that document to you?
2    A.  E-mail.
3    Q.  Okay.  And did he indicate in the e-mail
4  the reason he was providing you this document?
5    A.  To review my testimony.
6    Q.  Okay.  Did you have any phone
7  conversation or in-person conversation with him in
8  connection with the sending of that document?
9    A.  Most likely, but I don't recall.
10    Q.  Okay.  How did you -- how did you get the
11  understanding that this document -- let me ask that
12  question in a better way.
13        What was your understanding of why it was
14  that Mr. Gibson was sending you this document?
15    A.  To review his account of what I told him.
16    Q.  Okay.  And did you in some fashion convey
17  back to him anything having to do with your review
18  of what you told him?
19    A.  I am certain that I expressed to him at
20  some point in time, wow.  I was dumbfounded.
21    Q.  Was it your understanding that he was
22  sending you this information to inform you about
23  what was going on with the investigation?
24    A.  It was my understanding he was sending me

80

1  the information to look at my -- his account of my
2  statement to him, but curiosity led me to read the
3  whole thing.
4    Q.  Did you, in responding to him, give him
5  any, you know, feedback about the portion of the
6  document that had to do with you?
7    A.  Yeah.  I said it was correct.
8    Q.  Okay.  And how did you convey that
9  information to him?
10    A.  I most likely in person.  I don't recall,
11  though.
12    Q.  Why do you say it was "most likely in
13  person"?
14    A.  Because that's generally how we
15  communicated.  I would see him virtually once or
16  twice a week.
17    Q.  At the time that he sent this document to
18  you, was it your understanding that you were a
19  witness in this case or that you might be a witness
20  in this case?  And I'm not talking about the civil
21  case, but the criminal case.
22        MR. HANSEN:  I'm sorry, could you repeat
23  that question?  Did you say it was his or Adam
24  Gibson's understanding?

Transcript of Gary Farha
Conducted on July 18, 2018

81

1  BY MS. THOMPSON:
2      Q.   Let me just restate the question.  At the
3  time that Mr. Gibson sent you this summary
4  document, was it your understanding that you were a
5  potential witness in the criminal case?
6      **A.   I didn't view myself as that because I**
7  **knew nothing of the actual situation on the night**
8  **of Cory Lovelace's death.**
9      Q.   After you had, I think, what you assume
10 was an in-person conversation with him about the
11 document that he had sent you, did you have any
12 additional conversations with Mr. Gibson after that
13 about anything having to do with Cory Lovelace's
14 death?
15     **A.   I didn't have any in-depth conversations.**
16 **I'm sure in passing I would say how is the**
17 **investigation going or this or that, just general**
18 **comments.**
19     Q.   And did he give you any information about
20 the investigation in any of those passing
21 conversations?
22     **A.   Other than going, well, or, this was --**
23 **no, not anything of substance.**
24     Q.   Did he ever convey to you anything other

82

1  than that the investigation was going well?
2      **A.   I think there was one time where he**
3  **indicated that he was listening to phone calls from**
4  **the Hancock County Jail and that -- with**
5  **Mr. Lovelace and his present wife and something**
6  **about Adam was being accused of having an affair**
7  **with Erika.**
8      Q.   Do you remember when that conversation
9  was?
10     **A.   No.**
11     Q.   What else, if anything, do you remember
12 about the conversation where he was talking about
13 that?
14     **A.   Just that he had brought it up.**
15     Q.   At the time that he had that conversation
16 with you, as you said, Curt was in jail, so charges
17 had already been filed in this case, right?
18     **A.   Yes.**
19     Q.   At that point, was this case being
20 prosecuted by the State Appellate Prosecutor?
21     **A.   Yes.**
22     Q.   When is the first time that you learned
23 that this case was not going to be tried by your
24 office?

83

1      **A.   From the minute -- that was just my**
2  **assumption.  I knew there was no way that our**
3  **office could be involved in the prosecution of**
4  **somebody that worked for us.**
5      Q.   And is it true that from the minute you
6  heard there was a reinvestigation you knew that
7  your office would not be prosecuting this case?
8      **A.   Absolutely.**
9      Q.   When did you -- at any point did you
10 learn specifically that the State Appellate
11 Prosecutor had been appointed?
12     **A.   I did not know.**
13     Q.   Did you ever talk with anyone in the
14 office about Grand Jury proceedings having to do
15 with this case?
16     **A.   No.**
17     Q.   Was there a support person in your office
18 that had responsibilities for Grand Jury matters?
19     **A.   Yes.**
20     Q.   And was that Cheryl Ely?
21     **A.   Yes.**
22     Q.   Am I saying her last name correctly?
23     **A.   You are.**
24     Q.   Did you ever talk with Cheryl Ely about

84

1  anything having to do with the Grand Jury
2  proceedings in this case?
3      **A.   No.**
4      Q.   And you mentioned jail phone calls.  Do
5  you remember what, if anything, you said in
6  response to Adam telling you about these
7  allegations of some affair?
8      **A.   I expressed support for him, like don't**
9  **worry about it or that sort of thing.**
10     Q.   And was -- when Adam Gibson told you
11 this, was he concerned about these allegations?
12     **A.   He was indignant about them.**
13     Q.   Was he indignant in his demeanor in
14 discussing it with you?
15     **A.   Sure.**
16     Q.   All right.  Have you ever had any
17 conversations with anyone else about any jail
18 con -- you know, any jail phone calls that Curt had
19 with anyone?
20     **A.   Not that I recall.**
21     Q.   I'm going to show you some documents.
22         (Farha Exhibit 1 marked.)
23 BY MS. THOMPSON:
24     Q.   Mr. Farha, I've given you what's been

Transcript of Gary Farha
Conducted on July 18, 2018

85

1 marked Farha Exhibit 1, and this is -- the last
2 page on this is actually an error, so I'm just
3 going to remove that from the exhibit. Can I see
4 this document for one second?
5      So the document you've been given that's
6 been adjusted is two pages of e-mails that are
7 Bates stamped 4753, that's Plaintiff, and Plaintiff
8 4754. Do you recognize -- let's look at the first
9 page of the document first, Mr. Farha. Do you
10 recognize this e-mail?
11   **A. I do.**
12   Q. And what do you recognize it to be?
13   **A. An e-mail from Adam Gibson to me.**
14   Q. Do you have any memory of Mr. Gibson
15 sending you an e-mail on March 20th of 2014 asking
16 you to review a document?
17   **A. I have memory of it, but not from the**
18 **time period. I have memory because Mr. Hansen and**
19 **I reviewed it.**
20   Q. And I don't want to ask you about
21 anything having to do with your counsel. Do you
22 remember actually receiving this e-mail from
23 Mr. Gibson?
24   **A. Not specifically.**

86

1    Q. Okay. Do you know why it is that
2 Mr. Gibson would have been sending you subpoena
3 information -- or something having to do with a
4 subpoena to Comcast in March of 2014?
5    **A. Because this was a regular course of**
6 **conduct. The police would send me stuff asking for**
7 **a subpoena because they knew I was the go-to**
8 **person, that I would get things done for them.**
9    Q. All right. And what was the -- in 2014,
10 what was the process by which if the police needed
11 a subpoena they could, you know go to you for
12 assistance with that; how did that work?
13   **A. They could go to any attorney. They just**
14 **knew that I would take care of them quickly.**
15   Q. And what steps did you have to do when
16 you got a subpoena request to issue that -- or to
17 do something to get that subpoena issued?
18   **A. Review a warrant or a subpoena and then**
19 **have the police officer come over and go to a judge**
20 **in the case of a warrant or have the subpoena**
21 **issued.**
22   Q. Did Adam Gibson come to you seeking a
23 subpoena for Comcast records related to either
24 Curtis Lovelace or Erika Gomez?

87

1    **A. If you are saying "come to," do you mean**
2 **figuratively or by electronic purposes?**
3    Q. Well, let me ask you this: My
4 understanding of your process is that if someone
5 from the police department needed a subpoena, they
6 knew, as you said, that you're a person who would
7 assist with that process; is that right?
8    **A. Yes.**
9    Q. And that would be true whether it was a
10 case you were working on with them or whether this
11 was just helping them with something that had
12 nothing to do with you, but that you would help with;
13 is that right?
14   **A. Right.**
15   Q. All right. And so if a police officer
16 needed a subpoena in that context, they would give
17 you the information, you -- and I believe your
18 testimony was you would go over it with them and
19 then take it to a judge; is that right?
20   **A. Generally speaking.**
21   Q. All right. And when the matter was taken
22 to a judge, would you go with the member of law
23 enforcement to --
24   **A. Generally speaking.**

88

1    Q. All right. So that process you've just
2 described, do you have any memory of doing that
3 with a subpoena for Comcast with Adam Gibson in
4 March of -- in on or around March of 2014?
5    **A. I know I didn't.**
6    Q. And when you say you know you didn't, why
7 is that?
8    **A. Because I looked at the e-mails.**
9 **Evidently you don't want to --**
10     MR. HANSEN: Well, hold on. She -- just
11 answer the question.
12     THE WITNESS: Okay. Because I have seen
13 an e-mail where I sent it on to Jon.
14 BY MS. THOMPSON:
15   Q. All right. And my question is: Do you
16 have a memory of doing anything with this
17 subpoena other than sending it on to Jon?
18   **A. No.**
19   Q. All right.
20     MS. EMERY: Object to the form of "this
21 subpoena."
22 BY MS. THOMPSON:
23   Q. Do you have any -- well, let's go to the
24 second page. So as you said, when you look at --

Transcript of Gary Farha
Conducted on July 18, 2018

89

1  when you look at 4754, that's got some additional
2  e-mails in this chain; is that correct?
3      A.  Yes.
4      Q.  And there is an e-mail from you to
5  Mr. Gibson on the afternoon of March 20th of 2014
6  that says, "Did you talk to Jon about this case?
7  He is going to speak with you and make a few
8  changes on the search warrant."  Do you see that?
9      A.  Yes.
10     Q.  All right.  And do you know why it is you
11 asked Adam if he talked to Jon?
12     A.  Yes.
13     Q.  And why is that?
14     A.  Because I sent it on to Jon when I first
15 got it and said Adam is looking for this.  I knew
16 that's the case that Jon wanted to be involved
17 with, not me.
18     Q.  All right.  And how did you know that
19 this was a case that Jon wanted to be involved
20 with?
21     A.  Based on what was presented to me.
22     Q.  And what --
23     A.  He was the person dealing with Curtis.
24     Q.  How do you know that he was the person

90

1  dealing with Curtis?
2      A.  He was the State's Attorney and Curtis
3  was an employee of the State's Attorney's Office.
4      Q.  If you'd had no conversations with anyone
5  about this investigation, how did you know that Jon
6  was involved in this investigation at all when you
7  got this e-mail in March of 2014?
8      A.  Well, I'm pretty certain that he already
9  had said something to me about it.  This is -- as
10 far as I was concerned, this is a case that was
11 Jon's, not anybody else's.
12     Q.  When -- did you have some conversation
13 with Jon where he indicated that he was going to
14 handle this?
15     A.  Yes.
16     Q.  When was that conversation?
17     A.  I don't recall specifically.
18     Q.  Was it before or after Adam Gibson came
19 to your office?
20     A.  After.
21     Q.  All right.  And what, if anything, was
22 said in that conversation?
23     A.  I will handle this, by Jon.
24     Q.  And when he said "I will handle this,"

91

1  what's the "this"?
2      A.  This investigation.
3      Q.  All right.  And I don't -- I just want to
4  make sure I understand.  I thought you told me that
5  you hadn't had any conversations with anyone about
6  Cory Lovelace's death between when Adam Gibson came
7  to your office and when he forwarded you that
8  summary investigation?
9      A.  I just know that -- and I don't know when
10 Adam sent me the summary investigation.  I know
11 when Adam talked to me, I probably went to Jon.
12     Q.  And why would you have done that?
13     A.  Because that's how I did anything that
14 was major, I would tell Jon what was going on.
15     Q.  Okay.  So is it your belief that you went
16 to Jon and told him what had transpired when Adam
17 came over?
18     A.  Yes.
19     Q.  And what, if anything, did Jon say in
20 response?
21     A.  I will handle this.
22     Q.  Okay.  So is it your belief that at the
23 time you got this subpoena request Jon had already
24 told you I'm handling this?

92

1      A.  Yes.
2      Q.  When you had the conversation with Jon
3  about him handling it, did either of you express
4  any, you know, disbelief about the fact that this
5  investigation was going on?
6      A.  No.
7      Q.  Did you discuss with him at that point
8  anything about the office's, and I think you said
9  it was an obvious conflict, in working on this
10 case?
11     A.  I didn't, no.
12     Q.  Okay.  Did Jon ever convey to you that
13 this case was obviously going to have to be -- that
14 this case would need to be prosecuted by somebody
15 that was outside the State's Attorney's Office?
16     A.  I don't recall that, but I think we
17 generally both assumed that.
18     Q.  And why do you think that he assumed
19 that?
20     A.  Because he has dealt with these type of
21 things before, and it's common knowledge that you
22 don't prosecute a case that you have an interest
23 in.
24     Q.  So to go back to the second page of this

Transcript of Gary Farha
Conducted on July 18, 2018

93

1  e-mail, the message that you sent at 3:30 p.m. on
2  March 20th, you indicated to Adam, to Mr. Gibson
3  that Jon was going to speak with him and make a few
4  changes on the warrant; is that correct?
5      A.  Yes.
6      Q.  And how did you gain an understanding
7  that Jon was going to make a few changes on the
8  warrant?
9      A.  From Jon.
10     Q.  Did he tell you that?
11     A.  Yeah.
12     Q.  Did you actually look at the search
13  warrant with him?
14     A.  No.
15     Q.  Was your conversation with him in person
16  or over e-mail?
17     A.  In person.
18     Q.  All right.  And at the time you had that
19  conversation, had he already looked at the search
20  warrant?
21     A.  I assume so.
22     Q.  All right.  Did he tell you to get back
23  with Mr. Gibson and tell him to contact him or --
24     A.  No.

94

1      Q.  But did he -- and I guess as the e-mail
2  indicates, did Jon tell you that he was going to
3  talk to Adam about this?
4      A.  Yes.
5      Q.  Okay.  This e-mail, again looking at
6  4754, which is the second page, Mr. Gibson
7  responded to you at 3:31 and said, "No, I have not,
8  but I will be over there tomorrow anyway."  Do you
9  remember Mr. Gibson being at the office the next
10  day?
11     A.  No.
12     Q.  Was it common in this 2013-2014 time
13  period for Mr. Gibson to be at the State's
14  Attorney's Office?
15     A.  Yes.
16     Q.  He was a regular visitor there; is that
17  right?
18     A.  Yes.
19     Q.  Did your office have sort of an open door
20  policy with members of law enforcement?
21     A.  Yes.
22     Q.  If someone needed something, they didn't
23  have to have an appointment; is that right?
24     A.  Absolutely not.

95

1      Q.  Was that true for Mr. Barnard as well, in
2  your experience?
3      A.  Pretty much so.
4          MS. THOMPSON:  Can you mark this as well.
5          (Farha Exhibit 2 marked.)
6  BY MS. THOMPSON:
7      Q.  Mr. Farha, I've shown you what's been
8  marked as Farha 2.  This is also an e-mail that's
9  Bates stamped 3250.  The first half of this -- the
10  first -- the top half of this page is the e-mail
11  that we just looked at -- or one of the e-mails
12  that we just looked at; is that correct?
13     A.  Yes.
14     Q.  And then the bottom half is a forwarded
15  e-mail on March 20th of 2014 from you to
16  Mr. Barnard; is that right?
17     A.  Yes.
18     Q.  And do you see that there as an FYI and
19  then a dot, dot, dot in your forward?
20     A.  Yes.
21     Q.  Are you -- do you recall any other e-mail
22  traffic between you and Mr. Barnard about this
23  request, other than the e-mail that's on the bottom
24  half of this document?

96

1      A.  Any other e-mails?
2      Q.  Yes.
3      A.  No.
4      Q.  Were you involved at all in a
5  reinvestigation of the death of someone with the
6  last name of Booth?
7      A.  Yes.
8      Q.  Is that a reinvestigation that you worked
9  on with Mr. Gibson?
10     A.  Yes.
11     Q.  And was the Booth case something that you
12  would consider to be a high profile case?
13         MR. HANSEN:  Object to form.
14         THE WITNESS:  It would have been one that
15  Mr. Barnard would have been involved with, not me.
16  BY MS. THOMPSON:
17     Q.  Well, did you have some involvement in
18  the reinvestigation?
19     A.  Yes, once I was elected and sworn in.
20     Q.  Do you remember talking with anyone about
21  this investigation at any point before you were
22  sworn in as the elected State's Attorney?
23         MR. HANSEN:  You are talking about the
24  Booth investigation?

Transcript of Gary Farha
Conducted on July 18, 2018

97

1         MS. THOMPSON:  I'm talking about the
2    Booth investigation.
3         MR. HANSEN:  I'll object to the
4    relevance.
5         MS. EMERY:  Join.
6         MR. HANSEN:  Go ahead, Gary.
7         THE WITNESS:  I don't recall.
8         MS. THOMPSON:  Let's mark this.
9         (Farha Exhibit 3 marked.)
10   BY MS. THOMPSON:
11   Q.   Mr. Farha, I've shown you what's been
12   marked as Farha Exhibit 3.  This has a Bates number
13   of AC 59 to AC 73.  Is this e-mail and attached
14   document the summary about the case that you
15   received from Mr. Gibson that you testified about
16   earlier?
17   A.   Yes.
18   Q.   And you note the e-mail at the top
19   indicates a date of August 19th of 2014.  Do you
20   have any reason to believe that you received a
21   summary of this case earlier than that date?
22   A.   No.
23   Q.   Do you have any reason to think that that
24   date's not the date you received the investigation

98

1    summary from Mr. Gibson?
2    A.   No.
3    Q.   How did you -- well, let me ask you this.
4         Would you agree with me that the e-mail
5    from Mr. Gibson to you forwarding this doesn't
6    contain any instructions about -- or any
7    information about why it's being sent?
8    A.   That's correct.
9    Q.   All right.  And so how did you gain an
10   understanding of why this information was being
11   sent?
12        MR. HANSEN:  Objection; asked and
13   answered.
14        THE WITNESS:  My belief was he wanted me
15   to look at what I had told him to make sure it was
16   accurate.
17   BY MS. THOMPSON:
18   Q.   Would you agree with me that this is a
19   pretty extensive summary?
20   A.   Absolutely.
21   Q.   Okay.  Do you know how much of this
22   summary has to do with you?
23   A.   A very small portion.
24   Q.   Would you agree with me that it's a

99

1    couple of lines?
2    A.   I'm trying to find it.  Give me a second.
3         MR. HANSEN:  Go to page 68.  Did you find
4    it?
5         THE WITNESS:  Yes.
6         It depends on your definition "of
7    couple."  But it is certainly a small portion of
8    it.
9    BY MS. THOMPSON:
10   Q.   You are looking at AC 68; is that right?
11   A.   Yes.
12   Q.   And do you see in the middle of that page
13   there's a portion of three lines of a couple
14   sentences that reference a conversation with you?
15   A.   Yes.
16   Q.   It looks like in this document that there
17   is some sort of highlighting on these lines; do you
18   see that, where they have been marked in some way?
19   A.   Yeah.
20   Q.   Do you know how those lines became
21   marked?
22   A.   No, I don't.
23   Q.   Were they marked when you got this
24   document?

100

1    A.   I don't recall.
2    Q.   Isn't it true that this case summary was
3    sent to you so that Mr. Gibson could inform you
4    about the information that he learned in the course
5    of his investigation?
6         MR. HANSEN:  First of all, I'm going to
7    object as to argumentative, lack of foundation, and
8    to form.
9         Go ahead.
10        THE WITNESS:  I don't believe that's
11   true.
12   BY MS. THOMPSON:
13   Q.   And you're saying that based on what you
14   say Mr. Gibson told you?
15   A.   Right.
16   Q.   Did Mr. Gibson tell you whether or not he
17   had created a police report about his conversations
18   with you about this incident involving the public
19   defender job?
20   A.   No.
21   Q.   Did you ask him if he had prepared some
22   contemporaneous summary about his conversation with
23   you in the office that day?
24   A.   No.

Transcript of Gary Farha
Conducted on July 18, 2018

---

101

1    Q.  Can you think of any reason why if
2  Mr. Gibson was trying to confirm for you that he
3  had the right information about what you told him
4  why he could not have sent you a police report, you
5  know, summarizing that interview?
6    **A.  No.**
7        MR. HANSEN:  Objection.  Sorry.
8        MS. EMERY:  Calls for speculation.
9        MR. HANSEN:  Yeah.
10 BY MS. THOMPSON:
11   Q.  Did Mr. Gibson or anyone else ever inform
12 you that there -- that there was someone who
13 thought that Curt had been at the State's
14 Attorney's Office the day that Cory Lovelace passed
15 talking with you about other cases?
16   **A.  No.**
17   Q.  Okay.  And I want to make sure that I've
18 got your testimony right.  You do not remember
19 seeing him at the office that day; is that correct?
20   **A.  I do not remember seeing him at the**
21 **office that day.**
22   Q.  Do you remember seeing him at your office
23 that day acting in an unusual manner?
24   **A.  No.**

---

102

1    Q.  Have you ever had any conversations with
2  Jim Keller about the Cory Lovelace investigation?
3    **A.  No.**
4    Q.  Did Mr. Gibson ever tell you whether or
5  not Jim Keller was in some way involved in that
6  investigation?
7    **A.  Did Adam tell me?**
8    Q.  Yes.
9    **A.  No.**
10   Q.  Have you ever been present at any county
11 board meetings where the issue of Curtis
12 Lovelace's -- let me ask you that question in a
13 better way.
14       Have you ever been present at any county
15 board meeting where the county board discussed, you
16 know, Curt's being charged in this case or any
17 misconduct with him having to do with anything with
18 respect to his wife's death?
19   **A.  County board meetings, no.**
20   Q.  Have you ever been present at any
21 meetings that involved someone named Roy Webb to
22 discuss those issues?
23   **A.  No.  Roy Webb is the superintendent of**
24 **the Quincy Public Schools.  I have --**

---

103

1    Q.  Have you ever -- I'm sorry.
2    **A.  No.  I know Roy Webb, I know him quite**
3  **well, but no, I've never been in any type of**
4  **meeting there.**
5    Q.  Have you ever been present at a school
6  board meeting where those issues were discussed?
7    **A.  I have never attended a school board**
8  **meeting probably for 30 years.**
9        (Farha Exhibit 4 marked.)
10 BY MS. THOMPSON:
11   Q.  I have shown you what's been marked as
12 Farha 4, and it's a one-page document that has a
13 Bates stamp of AC 113.  I'm just going to ask you
14 to read this e-mail, and my question for you is
15 going to be if you have any information about the
16 meeting that's being discussed in this e-mail?
17   **A.  I have no knowledge of this.**
18   Q.  Would you agree with me that you are cc'd
19 on this message?
20   **A.  I have been cc'd by Mr. Daniel Bastean on**
21 **hundreds of messages.**
22   Q.  Do you have any idea what this refers to?
23   **A.  No.  Can I clarify?**
24       MR. HANSEN:  No.  Just answer --

---

104

1        THE WITNESS:  All right.
2  BY MS. THOMPSON:
3    Q.  At some point after the charges in this
4  case, did you become aware of efforts to FOIA
5  documents related to -- related to various issues
6  with respect to Cory Lovelace's death?
7        MR. HANSEN:  I'm sorry.  I --
8  BY MS. THOMPSON:
9    Q.  Let me just ask you a different question.
10 Have you ever talked with anyone in the State's
11 Attorney's Office about FOIA requests to the
12 State's Attorney's Office about documents related
13 to Cory Lovelace?
14   **A.  No.**
15   Q.  In 2016, was there someone in your office
16 who was responsible for FOIA requests to the
17 State's Attorney's Office?
18   **A.  In 2016?**
19   Q.  2016, yes.
20   **A.  In December of 2016, I appointed Josh**
21 **Jones as my FOIA officer.  Prior to that date,**
22 **Mr. Barnard handled all the FOIA requests.**
23   Q.  Okay.  And have you and Josh Jones ever
24 discussed FOIA requests that were made to the Adams

Transcript of Gary Farha

Conducted on July 18, 2018

---

105

1 County Coroner's Office?

2    **A.  Yes.**

3    Q.  Have you ever discussed with Jim Keller

4 FOIA requests that were made of the coroner's

5 office about something having to do with Cory

6 Lovelace's death?

7    **A.  Something to do with her death, no.**

8    Q.  Okay.  Have you ever discussed with Jim

9 Keller any FOIA requests that were made of that

10 office by someone named Evan Parke?

11    **A.  Yes.**

12    Q.  And is it true that you advised Jim

13 Keller not to respond to some FOIA requests that

14 were made with respect to some issue?

15    MR. HANSEN:  I will object to form.

16 Something to some issue.

17    Go ahead.  If you know, go ahead.

18    THE WITNESS:  I recall asking about the

19 Linda Booth investigation, and at that time that

20 investigation had not been closed.

21 BY MS. THOMPSON:

22    Q.  And did you advise Mr. Keller not to

23 respond to a FOIA about the Booth case because it

24 was an open investigation?

---

106

1    **A.  Yes.**

2    Q.  All right.  And do you know whether --

3 well, let me ask you about something else.

4    Did you ever discuss with Mr. Jones after

5 he was appointed the FOIA officer for your office

6 anything having to do with that case summary report

7 that we looked at that Mr. Gibson sent you?

8    **A.  After he became the FOIA officer?**

9    Q.  Yes.

10    **A.  No.**

11    Q.  Did you forward an e-mail from -- did you

12 forward the e-mail that Adam Gibson originally sent

13 you, including that case summary, to Josh Jones?

14    **A.  I believe I did.  Well, I know I did to**

15 **Josh and I think I did to Jennifer Cifaldi.**

16    Q.  All right.  And why did you forward that

17 e-mail to Josh and Jennifer?

18    **A.  Because I was astonished at what it**

19 **contained.**

20    Q.  All right.  So did you forward the actual

21 case summary document to those people?

22    **A.  I forwarded the e-mail with the**

23 **attachment.**

24    Q.  Okay.  Did you forward it to anyone else

---

107

1 besides Josh and Jennifer?

2    **A.  No.  I'm sorry.  No.**

3    Q.  Did you discuss that document with them

4 after you forwarded it?

5    **A.  I don't recall, but I would -- I may**

6 **have.**

7    Q.  Okay.  Is there a reason you would

8 have -- well, let me ask you this.

9    Did you -- is there a reason why you

10 specifically selected Ms. Cifaldi and Mr. Jones as

11 people that you were going to forward that e-mail

12 to?

13    **A.  Well, I knew Ms. Cifaldi was mentioned in**

14 **it, and Mr. Jones was interested in those type of**

15 **cases, he was interested in prosecuting those type**

16 **of cases, and, again, we were astounded at what**

17 **that report said.**

18    Q.  When you say "he was interested in

19 prosecuting those types of cases," are you talking

20 about felony cases or homicide cases?

21    **A.  Homicide cases.  He left our office to go**

22 **to Madison County to be in the major case squad,**

23 **and he is now my lead trial attorney.  So, yes, he**

24 **is very interested.**

---

108

1    Q.  So you forwarded the case summary to him

2 because he had an interest in prosecuting

3 homicides?

4    **A.  Yes.**

5    Q.  Did you -- when you informed -- when you

6 forwarded that information to Ms. Cifaldi and

7 Mr. Jones, did you give them any instructions about

8 whether or not they should share that information

9 with other people?

10    **A.  No.**

11    MS. THOMPSON:  Let's mark this as an

12 exhibit.

13    (Farha Exhibit 5 marked.)

14 BY MS. THOMPSON:

15    Q.  Mr. Farha, I've shown you a document

16 that's been marked as Farha 5, and it is several

17 pages of e-mails that's Bates stamped Plaintiff

18 5008 through Plaintiff 5013.

19    **A.  Uh-huh.**

20    Q.  The question I have for is about that --

21 the first e-mail on the first page, but if you need

22 to read the rest of this chain to acquaint yourself

23 with it, please do that and let me know when you

24 are done.

---

Transcript of Gary Farha
Conducted on July 18, 2018

109

1    A.   Okay.

2    Q.   Would you agree with me that the first
3  e-mail on this chain on page 5008 is an e-mail from
4  Josh Jones to you on January 27th of 2017?

5    A.   Yeah.

6    Q.   All right.  And do you see there that
7  Mr. Jones has given you a proposed response for him
8  to provide to someone named Mr. Parke, that's Parke
9  with an E?

10   A.   Yes.

11   Q.   Did Josh Jones send you this e-mail for
12 you to review after having a conversation with you
13 about how he should respond to this request?

14   A.   Yes.

15   Q.   And does his proposed response reflect
16 the conversation that you had with him about why it
17 is that you believed Detective Gibson had sent that
18 case summary document to you?

19   A.   Yes.

20   Q.   And is it true?

21   A.   Yes.

22   Q.   So is it true that you received that
23 information from Detective Gibson as a heads up or
24 to be aware of what was happening so that you were

110

1  not surprised by the developments?

2    A.   Yes.

3    Q.   Okay.  So would you agree with me that
4  that's a different reason for Mr. Gibson to send
5  this to you to review the three sentences of the
6  document that concerns something you told
7  Mr. Gibson?

8        MR. HANSEN:  Object to form,
9  argumentative, asked and answered.

10       Go ahead.

11       THE WITNESS:  No, I would not agree with
12 that.

13 BY MS. THOMPSON:

14   Q.   Do you know someone named Adam Booth?

15   A.   Yes.

16   Q.   Who is Adam Booth?

17   A.   He is the son of Linda Booth and the son
18 of Mr. Booth.  I'm trying to think of what his
19 first name was.  I don't recall.

20   Q.   Did you have any conversations with Adam
21 Booth in 2014 about something having to do with his
22 parent's death?

23       MR. HANSEN:  Object to relevance and
24 where this is going, but I will allow it to go

111

1  ahead.

2        THE WITNESS:  No.

3        MS. THOMPSON:  Let's mark this.

4        (Farha Exhibit 6 marked.)

5  BY MS. THOMPSON:

6    Q.   You've been shown Farha Exhibit 6, which
7  is a one-page e-mail that's Bates stamped Plaintiff
8  2845.

9    A.   Right.

10   Q.   This is an e-mail from someone named
11 Sandy Brown Winner to you on April -- sorry, May
12 21st of 2014.  Do you see that?

13   A.   Yes.

14   Q.   And do you see that it is passing on a
15 message from Adam Booth?

16   A.   Yes.

17   Q.   Did you ever return this message?

18   A.   I assume so.

19   Q.   All right.  And do you remember what you
20 discussed with Mr. Booth?

21   A.   It's about a case where he was the victim
22 of an action by Nicole Schuckman.  I don't have
23 specific recollection, but...

24   Q.   Did that result in your office

112

1  investigating -- or your office being involved in
2  sort of looking into that case in some way?

3    A.   I think he was a victim.  Sandy Brown
4  Winner is the victim witness coordinator, and this
5  is a matter -- of course, we meet with victims, and
6  I do know Adam Booth.

7    Q.   And when you met with him, do you
8  remember what you -- well, let me ask you this.

9        Did you meet with him as a result of that
10 call?

11   A.   I assume so.

12   Q.   And do you know what you discussed with
13 him when you met?

14   A.   No.

15   Q.   Other than -- well, let me ask you this.

16       Do you remember there being any
17 conversations in the State's Attorney's Office by
18 any State's Attorney's Office employee about the
19 Cory Lovelace death investigation between the
20 conversation that you had with Jon Barnard about
21 what Adam Gibson had told you and the time that the
22 Grand Jury returned an indictment against Curt?

23   A.   Not that I can recall.

24   Q.   Were there any conversations with any

Transcript of Gary Farha

Conducted on July 18, 2018

113

1 State's Attorney employee that you can recall about
2 the convening of the Grand Jury in connection with
3 that case?
4    **A.  No, but, again, I was absent from the**
5 **office from June 30th to, I believe, August 6.**
6    Q.  And when you came back for that period in
7 August when you had returned, were there any
8 conversations that you can recall that had anything
9 to do with either Curtis Lovelace or Cory Lovelace?
10    **A.  Not that I can recall.**
11    MS. THOMPSON:  Okay.  You want to take a
12 break?
13    MR. HANSEN:  Yeah.
14    THE VIDEOGRAPHER:  We are going on off
15 the record.  The time is 11:07.
16    (Whereupon a short recess was taken.)
17    THE VIDEOGRAPHER:  Here begins media
18 number 3.  We are back on the record.  The time is
19 11:21.
20 BY MS. THOMPSON:
21    Q.  Mr. Farha, before we took our break, you
22 had mentioned how Curtis Lovelace's marriage to
23 Erika Gomez had changed your friendship with him.
24 And I take it that you don't have a high opinion of

114

1 Ms. Gomez; is that right?
2    **A.  That's correct.**
3    Q.  And what is it about Ms. Gomez that you
4 don't care for?
5    **A.  Her immaturity, the fact that she would**
6 **plead with Curtis to go inappropriate places at**
7 **inappropriate times when they had children in their**
8 **home.**
9    Q.  Anything else besides that?
10    **A.  Not particularly.**
11    Q.  You did on some occasions see Curt and
12 Erika socially when they were married; is that
13 right?
14    **A.  Yes.**
15    Q.  And did you get an opportunity to observe
16 her demeanor?
17    **A.  Yes.**
18    Q.  And -- well, did she have an excitable
19 demeanor?
20    **A.  I don't know what you mean by**
21 **"excitable."**
22    Q.  Well, do you have -- can you describe her
23 demeanor when you saw her on social occasions with
24 Mr. Lovelace?

115

1    **A.  Boisterous, wanting to be the center of**
2 **attention.**
3    Q.  After -- well, let me ask you this.
4        At any point in your life, has Erika
5 Gomez texted you?
6    **A.  Yes.**
7    Q.  And were those texts -- well, let me ask
8 you this.
9        Did Erika Gomez text you at points when
10 she was having difficulties in her relationship
11 with Mr. Lovelace?
12    **A.  Yes.**
13    Q.  Do you remember anything about text
14 messages that she sent you in terms of their
15 content?
16    **A.  Yes.**
17    Q.  And what were their content?
18    **A.  She was describing his behavior towards**
19 **her, and I told her to call the police.**
20    Q.  What did she describe about Curt's
21 behavior towards her?
22    **A.  Violence.**
23    Q.  What specifically did she describe to
24 you?

116

1    **A.  I don't recall the specific things, but I**
2 **know that she was complaining about his drunkenness**
3 **and violence towards her.**
4    Q.  All right.  And other than complaining
5 about drunkenness and violence, can you remember
6 anything else about what she told you about his
7 behavior?
8    **A.  No.**
9    Q.  And you said your response was that she
10 should call the police?
11    **A.  There were maybe one occasion where I**
12 **told her she should call her commanding officer**
13 **because they were both in the National Guard.**
14    Q.  All right.  Did you tell her -- did you
15 have any response to that information other than
16 that she should call the police or call her
17 commanding officer?
18    **A.  I didn't want to talk to her.**
19    Q.  Why didn't you want to talk to her?
20    **A.  Because I didn't like her.**
21    Q.  Did you believe that what she was telling
22 you about Curt's violent behavior -- supposed
23 violent behavior was true?
24    **A.  I didn't disbelieve her.**

Transcript of Gary Farha
Conducted on July 18, 2018

117

1    Q.   And was that based on your knowledge of
2  Curt and your -- well, let me ask you this.
3    Why didn't you disbelieve her?
4    **A.   Because I had seen Curtis in our office**
5  **the day he didn't get the public defender's**
6  **interview and I could see him being violent at that**
7  **point.**
8    Q.   Did -- have you ever texted with Erika
9  Gomez about any other topic other than her
10 complaining to you about Curt's behavior?
11   **A.   She might have -- when they were married,**
12 **she might have invited me to their house for like a**
13 **parade, they were on Maine Street, and invited me**
14 **to a party they might have had or something like**
15 **that.  I don't know if that was Curtis or Erika**
16 **that texted me.**
17   Q.   Have you ever -- have you ever talked
18 with Erika on the phone about allegations that she
19 had about Curt's behavior?
20   **A.   Not that I recall.**
21   Q.   Okay.  And at times when she has been
22 texting you or times in the past when she was
23 texting you about Curt's behavior, was she trying
24 to call you about that as well?

118

1    **A.   She may have.  I don't believe I ever**
2  **answered.**
3    Q.   Okay.  At the times when she was texting
4  you about with those allegations, did you take any
5  other steps to you, know, refer those allegations
6  for investigation or do anything else with respect
7  to those allegations, other than tell her to inform
8  the authorities?
9    **A.   No.**
10   Q.   I'm going to show you --
11      MS. THOMPSON:  Can you mark this.
12      MR. HANSEN:  While you are on the record,
13 are you marking the entire 78 pages that you sent
14 us last night?  I have like three copies here, and
15 I just don't need all the papers is what I want to
16 know.
17      MS. THOMPSON:  I'm happy to just mark the
18 pages that we are concerned about as along as no
19 one has an objection to this being a partial set of
20 record.
21      MR. HANSEN:  No, I don't.  And in fact, I
22 think I pulled the ones you told me, pages 12
23 through 16 and 40.
24      MS. THOMPSON:  I want to include -- we

119

1  can go off the record about this.
2       (Discussion off the record.)
3       (Farha Exhibit 7 marked.)
4  BY MS. THOMPSON:
5    Q.   Mr. Farha, you've just been shown an
6  exhibit which has been marked as Farha Exhibit 7.
7  This is an exhibit that the plaintiff's are
8  designating as confidential.  For the record,
9  because this doesn't have Bates stamps, there is a
10 front page that indicates it's page 1 of 6 that has
11 a bill cycle date of 11/28/12 through 12/27/12, and
12 then the pages that follow are -- have page numbers
13 at the top of 6 of 71, 7 of 71, 8 of 71,
14 9 of 71, 10 of 71, 34 of 71, and 37 of 71.  I do
15 want to ask the witness about his phone number, and
16 I'm happy to designate this portion of the
17 deposition confidential if you want to do that,
18 Counsel.
19      MR. HANSEN:  I do, and I just want to
20 make a record that these documents are not Bates
21 stamped.  It was my understanding they were
22 produced last night by plaintiff's counsel.
23 Approximately 8:30 was the first time we had seen
24 them.  We've agreed to proceed here.  If you want

120

1  to mark this confidential, that's fine.  I want
2  this portion of the deposition then confidential
3  relating to his number and everything regarding
4  that.
5       MS. THOMPSON:  Plaintiffs have no
6  objection to that.
7       (The following portion has been deemed
8  confidential.)
9  BY MS. THOMPSON:
10   Q.   This exhibit, Farha Exhibit 7, is a set
11 of phone records; is that right, Mr. Farha, or does
12 it appear to be that to you?
13   **A.   It appears to be that.**
14   Q.   And these are not your phone records,
15 correct?
16   **A.   That is correct.**
17   Q.   All right.  Do you remember what phone
18 number Curtis Lovelace had as a personal cell phone
19 back in 2012?
20   **A.   No, I do not.**
21   Q.   And do you remember what cell phone
22 number, if any, Erika Gomez had in 2012?
23   **A.   No, I do not.**
24   Q.   You had a cell phone number in 2012; is

Transcript of Gary Farha
Conducted on July 18, 2018

121

1  that correct?
2      A.  Yes.
3      Q.  And I'm going to ask you -- and again, as
4  your counsel just indicated, this portion of your
5  deposition will be confidential so this will not be
6  released to the public, but can you tell us what
7  your cell phone number was in 2012?
8      A.  Area code 217-430-8080.
9      Q.  All right.  And referring you to the
10 second page of this document, which is page 6 of
11 71, I'm referring you to the right-hand column in
12 these records.  The date on the record is Friday,
13 11/30, and then there is, it looks like, a set of
14 text messages from 7:04 a.m. to 7:11 a.m.  Do you
15 see where I'm looking?
16     A.  I do.
17     Q.  Do you agree these records indicate an
18 exchanging of text messages with a telephone
19 number -- between a telephone number that is yours?
20     A.  Yes.
21     Q.  And do you have any memory of receiving
22 test messages on 11/30 of 2012 in these times in
23 the morning?
24     A.  No, I don't.

122

1      Q.  Do you have a memory of receiving -- of
2  exchanging text messages with Erika Gomez on the
3  morning of November 30th?
4      A.  No, I don't.
5      Q.  Let me have you go to the next page,
6  which is page 7 of 71.  On that first column do you
7  again see an indication in these records that there
8  was an exchange of some text messages with your
9  telephone number?
10     A.  Yes.
11     Q.  All right.  And do you have any memory of
12 exchanging text messages with Erika Gomez
13 continuing on these times into the morning of 11/30
14 of 2012?
15         MR. HANSEN:  Just for the record, I'm
16 going to object.  There is no indication on here as
17 far as a number of Erika Lovelace -- or excuse me,
18 Erika Gomez and whose this number is.  The number
19 is under Curtis Lovelace's name, so -- but I
20 understand the question.  So I object to form and
21 foundation.
22         Go ahead.
23         THE WITNESS:  No, I don't have any
24 recollection.

123

1  BY MS. THOMPSON:
2      Q.  Okay.  Similarly, if you go to page 8 of
3  71, again on the left-hand column, do you see that
4  again your telephone number appears between 10:57
5  a.m. and 11 a.m. indicating text messages were sent
6  to that number during that timeframe?  Do you see
7  that?
8      A.  Yes.
9      Q.  Do you have any memory of receiving text
10 messages on December 1st of 2012 at that time?
11     A.  No, I don't.
12     Q.  And the text messages that you described
13 receiving and exchanging with Erika Gomez about her
14 allegations, allegations she was making about
15 Curt's behavior, is it possible that those text
16 messages were text messages that you exchanged in
17 the rough time period of late November and early
18 December of 2012?
19     A.  It's possible.
20     Q.  Do you have any reason to think that
21 those messages were at some different time than
22 that time period?
23         MR. HANSEN:  Object to form, speculation.
24         Go ahead.

124

1         THE WITNESS:  I don't know.
2  BY MS. THOMPSON:
3      Q.  Let me have you look at page 9 of 71, and
4  if you look on the left-hand column for the time
5  6:41 p.m., do you see there is an indication that a
6  text was sent to your cell number at that time?
7      A.  Yes.
8      Q.  Do you have any memory of what that text
9  message said?
10     A.  No.
11     Q.  And then again on the right-hand column
12 where it says "Tuesday, 12/4," do you see there
13 that some text messages were sent to -- sent to
14 your telephone number that morning?
15     A.  Yes.
16     Q.  And do you have any memory of any texts
17 you received at that time?
18     A.  No.
19     Q.  Turning to the next day -- or the next
20 page, excuse me, which is 10 of 71, on the
21 left-hand column where it says "Saturday 12/8," do
22 you see there between 5:06 p.m. and 5:08 p.m. a set
23 of text messages that were either sent or received
24 to your telephone number?

Transcript of Gary Farha
Conducted on July 18, 2018

125

1    A.   Yes.
2    Q.   And do you have any memory of what those
3  text messages were?
4    A.   No.
5    Q.   Then on the right column of that page, do
6  you see where it says "Tuesday, 12/11," and then at
7  3:59 p.m. there is an indication of a text message
8  sent to you -- or sent to your telephone number,
9  excuse me?  Do you see that?
10   A.   Yes.
11   Q.   Do you remember anything about the
12  content of that text message?
13   A.   No.
14   Q.   And then on Friday, 12/14 at 3:58 p.m.,
15  do you have any memory of a text message that you
16  received at that time?
17   A.   No.
18   Q.   And if you turn to the next page, 34 of
19  71, the bottom right-hand corner where it says
20  "Thursday, 12/6," do you see there an indication of
21  text messages that were either sent or received to
22  your telephone number on that day?
23   A.   I do.
24   Q.   And do you have any memory of what those

126

1  text messages were?
2    A.   No.
3    Q.   And finally, the last page, page 37 of
4  71, on Thursday 12/27, do you see a text message
5  that was sent to your number at 7:11 a.m.?  Do you
6  see that indicated on the records?
7    A.   I'm looking.  Thursday?
8    Q.   Thursday, 12/27.
9    A.   Oh, I thought you said 7 something.
10   Q.   At 7:11 a.m., the first entry on that
11  day.
12        MR. HANSEN:  Right there (indicating).
13        THE WITNESS:  Oh, okay.  Sorry.  Okay.
14        (Continuing in nonconfidential portion of
15  transcript.)
16  BY MS. THOMPSON:
17   Q.   Do you have any memory of getting a text
18  message at that time?
19   A.   No.
20   Q.   In general, with the text messages that
21  you recall receiving from Erika Gomez, in the
22  content of what you sent back, did you at all
23  encourage, you know, Erika Gomez in your responses
24  to contact you further about this topic?

127

1    A.   No.
2    Q.   Did you want to receive these text
3  messages?
4    A.   No.
5    Q.   Did you believe at the time that Erika
6  Gomez was texting you that she was in imminent
7  danger of being hurt by Curt Lovelace?
8    A.   No.
9    Q.   If you had believed that, would you have
10  taken some step beyond texting her back to call
11  someone about it?
12   A.   I would like to think I would have.
13   Q.   Do you have any reason, as you sit here
14  today, to think that that wouldn't have been your
15  response if would you have believed from what she
16  was texting you that she was in imminent danger?
17   A.   I would like to think that that's what I
18  would have done, but again, I just told her to
19  contact the police.  I remember at least one
20  occasion I told her to contact her commanding
21  officer.
22   Q.   Do you have any records of your own, as
23  you sit here today, of your own text activity on
24  the cell phone number we have been discussing from

128

1  the time period of late November and early December
2  of 2012?
3    A.   I do not.
4    Q.   And did Erika Gomez ever inform you
5  whether or not she and Curt had separated, and when
6  I say "separated," that they had stopped living in
7  the same residence?
8    A.   I don't recall that.
9    Q.   Okay.  In any of the --
10   A.   During this time period?
11   Q.   At all.  I'm asking about at all.
12   A.   Well, I knew at some point they had filed
13  for divorce.
14   Q.   Did you learn that through Ms. Gomez or
15  some other source?
16   A.   Through some other source.
17   Q.   Okay.  Did you ever talk with Erika Gomez
18  about her separation from Curt?
19   A.   No.
20   Q.   In any of the text messages that you do
21  recall receiving from Ms. Gomez, did she ever tell
22  you that Curt had -- that she believed that Curt
23  had killed Cory?
24   A.   Not that I recall.

Transcript of Gary Farha
Conducted on July 18, 2018

129

1    Q.  Did she ever tell you she had any
2 information related to Cory's death?
3    **A.  Not that I ever heard from her.**
4    Q.  If she had told you something along those
5 lines, is that something you would have taken some
6 action on?
7    **A.  That's a tough question, because, again,**
8 **she had zero credibility with me.**
9    Q.  Why did she have zero credibility with
10 you?
11    **A.  Just how she acted.**
12    Q.  Did you ever observe -- did you ever
13 observe any behavior from her that you believe
14 indicated that she might have some mental health
15 problem?
16       MR. HANSEN:  Don't answer yet.  I object
17 to form and foundation.
18       Go ahead.
19       THE WITNESS:  I didn't ever even think
20 about whether she had a mental health illness or
21 not.  I just -- I mean, I plain and simply could
22 not stand her.
23 BY MS. THOMPSON:
24    Q.  How long did you know her before you

130

1 determined that she didn't have any credibility
2 with you?
3    **A.  Not very long.**
4    Q.  If she had told you that -- well, let me
5 ask you this.
6       Did you ever discuss with Adam Gibson
7 whether Erika Gomez had made allegations to him
8 about Curt's involvement in -- or Curt's supposed
9 involvement in killing Cory?
10    **A.  No.**
11    Q.  At any point did you become aware that
12 she was making allegations that Curt had, you know,
13 made inculpatory statements to her?
14    **A.  Probably from the newspaper accounts of**
15 **the trial in Springfield, but that would be it.**
16    Q.  Okay.  Was that something that was
17 discussed in your -- in the State's Attorney's
18 Office at all about Erika Gomez making allegations
19 about Curt?
20    **A.  No.**
21    Q.  I have one -- I have a couple of
22 additional follow-up questions from what we talked
23 about earlier, and then I think we are done.
24       Did you ever come to learn -- well, let

131

1 me ask you this.
2       Did your office in its work with the
3 Quincy Police Department -- let me start this
4 question one more time.
5       In your personal involvement with the
6 Quincy Police Department in the cases that you
7 prosecuted that involved that agency, did you ever
8 discuss with any members of the Quincy Police
9 Department their record keeping practices for, you
10 know, investigations they were involved in?
11    **A.  Never.**
12    Q.  Is that something that you or your
13 office, to your knowledge, ever conferred with them
14 about or advised them about?
15    **A.  They had the city attorney, they had**
16 **Mr. Cameron who was an assistant -- well, no, he**
17 **was the city attorney.  They had corporation**
18 **counsel.  They made it clear they were the people**
19 **that would advise the Quincy Police Department on**
20 **policy and procedure.  Never once did I have a**
21 **discussion about that.**
22    Q.  Did you -- have you ever in any case that
23 you've been involved in in investigating or
24 prosecuting that involved the Quincy Police

132

1 Department developed some concern that the Quincy
2 Police Department had not retained all the
3 documents that were necessary for a criminal
4 investigation?
5    **A.  I never encountered that.**
6    Q.  If that's something you believed had
7 occurred, is that something you would have taken
8 some action on?
9    **A.  I would have.**
10    Q.  All right.  And finally, it's my
11 understanding that there is currently some
12 investigation that's ongoing that involves Coroner
13 Keller, and I have no questions for you about the
14 content of that investigation, but my question for
15 you is this:  As the State's Attorney, has your
16 office determined that there is a conflict between
17 your office and Mr. Keller with respect to that
18 investigation?
19       MR. HANSEN:  Object to -- is this going
20 to be the one question on this issue?
21       MS. THOMPSON:  There is one follow-up,
22 but I have no content-related questions.
23       MR. HANSEN:  As far as a conflict in
24 what, the investigation?

Transcript of Gary Farha
Conducted on July 18, 2018

133

1      MS. THOMPSON: Well, --
2      MR. HANSE: I'll object to form and
3  foundation. I mean, I don't know what you are
4  getting at as far as a conflict. I mean, I will
5  tell you the Illinois State Police is doing the
6  investigation, and we are not going to comment or
7  he is not going to answer any questions on that.
8      MS. THOMPSON: I understand that.
9      MR. HANSEN: Okay. Why don't you
10 maybe -- if you want the question to stand as it
11 is, I'm going to object to form.
12 BY MR. HANSE:
13     Q. Let me ask you this question, Mr. Farha.
14 Is there, to your knowledge, and this has been, I
15 think reported publicly, is there an investigation
16 going on involving Coroner Keller at the present
17 time?
18     A. Yes.
19     Q. And have you made a determination as the
20 State's Attorney that your office has a conflict in
21 being involved in any potential investigation or
22 potential prosecution of that matter?
23     A. The matter was referred --
24     MR. HANSEN: Okay. Go ahead.

134

1      THE WITNESS: The matter was referred to
2  the special prosecutor, which is the Appellate
3  Prosecutor's Office in Springfield.
4  BY MS. THOMPSON:
5      Q. Was that a decision that you personally
6  made about that investigation?
7      A. Absolutely.
8      Q. And who, if anyone, in the office of the
9  special -- what's the name of the office again
10 because I get it wrong?
11     A. The Illinois State Appellate Prosecutor's
12 Office.
13     Q. Thank you.
14     Who in the Illinois State Appellate
15 Prosecutor's Office, if anyone, have you conferred
16 with about that prosecution?
17     A. I personally spoke to Patrick Delfino,
18 who is the executive director of that agency.
19     Q. Let me just have one second. I just want
20 to confer for like 30 seconds.
21     THE VIDEOGRAPHER: We are going off the
22 record. The time is 11:48.
23     (Whereupon a short recess was taken.)
24     THE VIDEOGRAPHER: We are back on the

135

1  record. The time is 11:51
2  BY MS. THOMPSON:
3      Q. I have one additional question for you,
4  which is: The incident that you described where
5  Curt was upset about the public defender job, did
6  anyone who was present, to your knowledge, take any
7  disciplinary steps towards Curt as a result of that
8  incident?
9      A. I'm not aware of it, if they did.
10     Q. The police were not called?
11     A. No.
12     Q. And --
13     A. Because it was brief.
14     Q. All right. And at the time of that that
15 incident concluded, did you have any concern for
16 anyone's safety in the office as a result of what
17 you had observed?
18     A. Immediately, yes.
19     Q. While Curt was in there being upset, you
20 did have concern for your safety; is that right?
21     A. Yes.
22     Q. All right. After the incident concluded,
23 did you have concern for your safety thereafter?
24     A. Not once he left.

136

1      MS. THOMPSON: I don't have any other
2  questions.
3      MS. EMERY: I have a couple follow-ups.
4          EXAMINATION BY
5          MS. EMERY:
6      Q. Mr. Farha -- could you hand the witness
7  the Deposition Exhibit 7. You recall that
8  questions were asked by Ms. Thompson about these
9  phone records?
10     A. Yes.
11     MS. EMERY: And this part of the
12 deposition we would like to be confidential.
13     (The following portion has been deemed
14 confidential.)
15 BY MS. EMERY:
16     Q. If you look at the pages that in the
17 upper right-hand corner are pages 6, 7, 8, 9, and
18 10 of 71, do you see those pages?
19     A. Yes.
20     Q. And you had mentioned that this was --
21 that Curtis Lovelace's name was on the record as
22 the owner of this AT&T number?
23     A. Right.
24     Q. And do you see the number 217-257-2268?

Transcript of Gary Farha
Conducted on July 18, 2018

---

137

1    **A.   Yes.**
2    Q.   Do you know whose number that is
3  specifically?
4    **A.   No.**
5    Q.   Okay.  And if you look at the back two
6  pages of that exhibit that are pages 34 and 37 of
7  71, that involves a different phone number with
8  Curtis Lovelace's name on it, correct?
9    **A.   It appears to.**
10   Q.   And that number 217-257-8685, do you know
11 specifically whose number that was?
12   **A.   No, I do not.**
13       (Continuing in nonconfidential portion of
14 transcript.)
15 BY MS. EMERY:
16   Q.   Okay.  And if you will look at what was
17 previously marked as Farha Deposition Exhibit 1.
18   **A.   Yes.**
19   Q.   Ms. Thompson asked you a series of
20 questions about this two-page exhibit.  Was there
21 an attachment from Adam Gibson to you on the first
22 page of this exhibit, which is Bates stamped
23 Plaintiff 4753?  Was there an attachment to that
24 e-mail?

---

138

1    **A.   There may have been.  I'm not sure.  I**
2  **don't think so.  Oh, yes, I'm sorry, there was.**
3    Q.   Okay.
4    **A.   Yeah.**
5    Q.   And was that attachment his draft of a
6  search warrant?
7    **A.   I don't know, because I didn't look at**
8  **it.  I just forwarded it to Jon.**
9    Q.   Okay.  And do you know whether -- this
10 was referred to by Ms. Thompson as a subpoena
11 request in her question.  Do you know if this was a
12 subpoena request or a search warrant request?
13   **A.   I believe it was a search warrant.  I**
14 **think it mentioned Comcast in the first sentence,**
15 **but it then mentions search warrant in the second**
16 **part, so I'm pretty certain it was a search**
17 **warrant.**
18       MS. EMERY:  Okay.  I don't have anything
19 further.
20       MS. THOMPSON:  No.
21       MR. HANSEN:  All right.  You want to
22 read?  You want to reserve signature?
23       THE WITNESS:  Sure.
24       MR. HANSEN:  We will read.  We will

---

139

1  reserve.
2        MS. THOMPSON:  I actually have one more
3  thing.  I'm really sorry.  It's not a question.
4        Mr. Farha, your counsel and I discussed
5  previously that while I might have the opportunity
6  to ask you questions that would relate to any
7  punitive damages request in this case, which would
8  go into your financial situation, sir, that I will
9  not ask those questions today with the
10 understanding that if that becomes an issue later
11 in this litigation your counsel and I would confer
12 about an appropriate way to get that information
13 from you.  And I think with your counsel's
14 agreement, I won't ask those questions today.  If
15 your counsel --
16       Is that our agreement, Counsel?
17       MR. HANSEN:  Yeah.  If and when punitive
18 damages become an issue and you are allowed to
19 inquire into them, et cetera, I agree that we will
20 handle it at that point in time.
21       MS. THOMPSON:  All right.  Thank you,
22 Counsel.
23       THE VIDEOGRAPHER:  This marks the end of
24 the deposition of Gary Farha.  We are going off the

---

140

1  record.  The time is 11:57.
2            (DEPOSITION CLOSED)
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

---

Transcript of Gary Farha
Conducted on July 18, 2018

141

1  STATE OF ILLINOIS )
                    ) SS.
2  COUNTY OF ADAMS   )
3
4          C E R T I F I C A T E
5
6       I, Gina L. Nottingham, Certified Shorthand
7  Reporter in and for the State of Illinois, do hereby
8  certify that GARY FARHA, the witness whose deposition
9  is hereinfore set forth, was duly sworn by me and that
10  such deposition is a true record of the testimony
11  given by the witness.
12       I further certify that the signature of the
13  witness to the deposition was not waived.
14       I further certify that I am not counsel for
15  nor in any way related to any of the parties to this
16  action, nor am I in any way interested in the outcome
17  thereof.
18       In testimony thereof, I have hereunto set my
19  hand this 30th day of July, A.D., 2018.
20
21
22
23  _____
                    Certified Shorthand Reporter
24