1:17-cv-01201-SEM-EIL   # 90-8   Page 1 of 13

E-FILED
Monday, 08 July 2019 02:46:57 PM
Clerk, U.S. District Court, ILCD

JAY ELMORE
LOVELACE vs GIBSON
November 20, 2018

1–4

Page 1

```
 1            UNITED STATES DISTRICT COURT
              CENTRAL DISTRICT OF ILLINOIS
 2
 3  CURTIS LOVELACE, LOGAN LOVELACE,   )
    LINCOLN LOVELACE & CHRISTINE       )
 4  LOVELACE ON BEHALF OF HER MINOR    )
    SON LARSON LOVELACE,               )
 5                                     )
              Plaintiffs,              )
 6                                     )
         vs.                           ) No. 17 CV 01201
 7                                     )
    DET. ADAM GIBSON, POLICE CHIEF     )
 8  ROBERT COPLEY, SGT. JOHN SUMMERS,  )
    LT. DINA DREYER, DET. ANJANETTE    )
 9  BISWELL, UNKNOWN QUINCY POLICE     )
    OFFICERS, GARY FARHA, CORONER      )
10  JAMES KELLER, THE CITY OF QUINCY,  )
    AND COUNTY OF ADAMS,               )
11                                     )
              Defendants.              )
12
13
14
15
16
17            DEPOSITION OF JAY ELMORE
                   ELMORE & REID
18              808 SOUTH SECOND STREET
                 SPRINGFIELD, ILLINOIS
19                 NOVEMBER 20, 2018
                      10:30 A.M.
20
21
22
23
24          Reported and Transcribed by:
         Rhonda Rhodes Bentley, CSR #084-002706
25
```

Page 2

```
 1                      INDEX
 2  APPEARANCES:
 3  For the Plaintiffs:
              Tara Thompson
 4            LOEVY & LOEVY
              Attorneys at Law
 5            311 North Aberdeen Street, 3rd Floor
              Chicago, Illinois 60607
 6            (312) 243-5900
              tara@loevy.com
 7
    For the City of Quincy Defendants:
 8            Ellen K. Emery
              ANCEL, GLINK, P.C.
 9            Attorneys at Law
              140 South Dearborn Street, Sixth Floor
10            Chicago, Illinois 60603
              (312) 782-7606
11            eemery@ancelglink.com
12
    For the County of Adams Defendants:
13            James A. Hansen
              SCHMIEDESKAMP ROBERTSON
14            NEU & MITCHELL LLP
              Attorneys at Law
15            525 Jersey Street
              Quincy, Illinois 62301
16            (217) 223-3030
              jhansen@srnm.com
17
18
    ALSO PRESENT:
19            Curtis Lovelace
20            Christine Lovelace
21
22
23
24
25
```

Page 3

```
 1                  INDEX - CONTINUED
 2  EXAMINATION BY:                              PAGE
    Ms. Emery.......................................5
 3  Mr. Hansen.....................................37
 4
 5  EXHIBITS:    DESCRIPTION                     PAGE
    Exhibit 1    9.11.18 Letter....................6
 6
 7           (Exhibit attached.)
```

Page 4

```
 1                   STIPULATION
 2
 3         IT IS HEREBY EXPRESSLY STIPULATED AND
 4  AGREED by and between the parties that the
 5  DEPOSITION of JAY ELMORE may be taken on NOVEMBER
 6  20, 2018, at the Law Offices of Elmore & Reid,
 7  808 South Second Street, Springfield, Illinois,
 8  pursuant to the applicable Supreme Court rules,
 9  local rules, and the Code of Civil Procedure
10  governing said depositions.
11
12         IT IS FURTHER STIPULATED that the
13  necessity for calling the Court Reporter for
14  impeachment purposes is waived.
```



Page 5

```
 1           10:31 a.m.
 2           JAY ELMORE,
 3  having first been duly sworn, testifies as
 4  follows:
 5              EXAMINATION
 6  BY MS. EMERY:
 7      Q.   Would you state your name and spell
 8  it for the court reporter, please.
 9      A.   It's Jay, J-a-y, Elmore, E-l-m-o-r-e.
10      Q.   My name is Ellen Emery.  I represent
11  the Quincy defendants in this case.  It should be
12  pretty quick today.  That's the good news.
13      A.   Good.
14      Q.   Have you ever been deposed before?
15      A.   Yes, I have.
16      Q.   Okay.  Being a trial lawyer you know
17  all of the fundamentals of a deposition so I
18  won't go through all those.  Did you receive a
19  subpoena in this case --
20      A.   Yes.
21      Q.   -- for your trial records?
22      A.   Yes.
23      Q.   Okay.  Let me show you what's been
24  marked as Exhibit -- do you want to continue from
25  yesterday because you're going to be referring to
```

Page 6

```
 1  numbers, you said?
 2           MS. THOMPSON:  I got -- I brought new
 3  copies to remark.  So I'm happy to do whatever is
 4  easier.
 5           (Whereupon, Elmore Exhibit 1 was
 6  marked for identification.)
 7  BY MS. EMERY:
 8      Q.   I've handed you Exhibit 1, which is a
 9  two-page document.  Do you recognize it?
10      A.   Yes, I do.
11      Q.   Is that your signature or a copy of
12  your signature on the second page?
13      A.   Yes, it is.
14      Q.   Above that object pages?
15      A.   Yes.
16      Q.   And is your given name James Elmore
17  but you go by Jay?
18      A.   Yes.
19      Q.   All right.  And was this letter sent
20  to my office in response to the subpoena you got
21  for your litigation file in the Curtis Lovelace
22  case?
23      A.   Yes.
24      Q.   All right.  This document lists a
25  number of documents that you refuse to provide on
```

Page 7

```
 1  privileged reasons and such, does it not?
 2      A.   I believe so, yes, it does, uh-huh.
 3  Yes.
 4      Q.   Okay.  I want to go through those
 5  very briefly and let you know that in the event
 6  that we have to go before Judge Bruce -- the case
 7  has been switched from Judge Myerscough to Judge
 8  Bruce in Urbana -- regarding any of the privilege
 9  issues that we reserve the right to reopen your
10  deposition if necessary.
11           You've listed that privilege under
12  work product privilege trial counsel notes.
13      A.   Yes.
14      Q.   What type of documents comprise your
15  trial counsel notes?
16      A.   My trial preparation notes,
17  cross-examination of witnesses, direct
18  examination of witnesses, opening statements,
19  closing arguments, jury selection, anything you
20  would -- you would prepare for a for jury trial.
21      Q.   Okay.  And those were either
22  handwritten by you or typed on a computer by you?
23      A.   Handwritten by me.
24      Q.   Okay.  Your client notes, you've
25  listed as work product and attorney-client
```

Page 8

```
 1  privilege.  What type of documents comprise
 2  client notes?
 3      A.   Interview notes of Curt, interview
 4  notes of Christine, interview notes of witnesses
 5  we may not have called, interview notes of
 6  witnesses.
 7      Q.   Okay.  And those likewise were
 8  prepared directly by you?
 9      A.   Yes and Mr. Page together, yeah,
10  uh-huh.
11      Q.   Okay.  You have that you're claiming
12  work product on your interview notes of Dr.
13  Scott Denton by trial counsel, correct?
14      A.   Yes.
15      Q.   Okay.  What comprised those interview
16  notes?
17      A.   Those are the interview notes that
18  Jeff Page prepared in relation to his interview
19  with Dr. Denton.
20      Q.   All right.  And were they notes that
21  he himself wrote at the time or closely
22  thereafter his interview with Dr. Denton?
23      A.   Well, I wasn't there for the
24  interview, but I assume that would be true, yes.
25      Q.   Correspondence between trial
```



Page 9

```
 1  counsel's investigator and trial counsel as a
 2  work product privilege.  Do you see that one
 3  under number 4?
 4       A.   Yes, ma'am.
 5       Q.   Who was your trial -- who was your
 6  investigator?
 7       A.   Well, we had Bill Clutter for a
 8  while.  We ended up trying the case without the
 9  benefit of an investigator.
10       Q.   Okay.  What happened with
11  Mr. Clutter?
12       A.   I really don't know what happened
13  with Mr. Clutter.  I don't know.  You'd have to
14  ask Mr. Clutter, but we ended up trying the case
15  really without the benefit of an investigator.
16       Q.   Okay.  Did he conduct some
17  investigation on your behalf or on your client's
18  behalf?
19       A.   Other than locating an expert witness
20  for us in Louisville -- it's been a while -- not
21  that I recall.
22       Q.   Okay.  Did you hire Mr. Clutter to be
23  your investigator?
24       A.   Yes, we did.
25       Q.   Okay.  Between you and Mr. Page which
```

Page 10

```
 1  of the two of you specifically, if there is one,
 2  hired Mr. Clutter?
 3       A.   Probably myself.
 4       Q.   Okay.  And did you at some point
 5  terminate him as your investigator?
 6       A.   No, we did not terminate him.
 7       Q.   Did he quit?
 8       A.   No.  I think he sort of faded to
 9  black.  Like I said, he was just not available.
10  I believe he moved to Louisville, and it just
11  became -- he just wasn't involved anymore.
12       Q.   Okay.  So other than locating one
13  witness for you, what else did Mr. Clutter do?
14       A.   Nothing that I can recall, but it's
15  been -- been four years now so I could be
16  forgetting something, but I remember him locating
17  Dr. Nichols down in Louisville, and we went and
18  interviewed Dr. Nichols a time or two, Mr. Page
19  and myself, and Mr. Clutter was living in
20  Louisville.  So he facilitated that, which is
21  very important.
22            When we interviewed Dr. Bowman, he
23  wasn't with us.  When we interviewed
24  Dr. Denton -- Jeff interviewed him twice, I
25  interviewed him once, he was not with us.  When
```

Page 11

```
 1  we interviewed the children, he was not with us.
 2  When we -- when I interviewed Lyndsay in Quincy,
 3  he was not with us.
 4            I'm just going from memory.  So I
 5  just think he got Dr. Nichols for us, and that
 6  was pretty much it.
 7       Q.   Okay.  Under number 5 of Exhibit 1 it
 8  says the trial counsel's investigator's letters
 9  to expert witnesses you're claiming are work
10  product.
11       A.   Right.
12       Q.   Why do you claim that your
13  investigator's letters or any other
14  correspondence to independent expert witnesses is
15  a work product privilege?
16       A.   Well, because I think some of the
17  contents of the letter -- the letter or letters
18  that Bill Clutter would have written to us
19  concerning experts would be work product -- trial
20  strategy, whether we call a witness, whether
21  we're not.
22       Q.   Okay.  That's -- as I understand what
23  you've just said, that would be correspondence
24  between you and Bill Clutter.
25            Number 5 says that it's Mr. Clutter
```

Page 12

```
 1  or any other trial counsel's investigator's
 2  letters to expert witnesses.
 3       A.   Right.  That would be letters that
 4  Bill may have sent to Dr. Nichols and any other
 5  experts that we had contact with, and maybe he
 6  sent those letters as well.  Again I -- it's been
 7  a long time.  I can't remember what letters he
 8  sent.
 9       Q.   Okay.  I will tell you that it's the
10  Quincy defendants' contention that letters to
11  expert witnesses -- in fact, the entire expert
12  witness file is not privileged.  So I will ask
13  you to reconsider that privilege of work product
14  on number 5, and we will visit that through
15  correspondence later on.
16       A.   Okay.
17       Q.   Number 6, correspondence between
18  trial counsel and client's family.  You've
19  claimed work product and attorney-client
20  privilege?
21       A.   Yes.
22       Q.   Was there correspondence between you
23  and Christine Lovelace?
24       A.   Yes.
25       Q.   Okay.  And other members of Mr.
```



Page 13

1  Lovelace's family --
2     A.  Yes.
3     Q.  -- that falls within that?
4     A.  Yes.
5     Q.  Who did you correspond with?
6     A.  His mother and father.  Primarily his
7  father, but both Jan and Terry.
8     Q.  Okay.  Anyone else?
9     A.  Not that I can recall.
10    Q.  Okay.  Did you look at anything in
11 preparation for today's deposition?
12    A.  Nope.
13    Q.  Okay.  And did you meet with anybody
14 in preparation?
15    A.  Nope.
16    Q.  Okay.  You've got as work product
17 expert witness information and research regarding
18 expert witnesses.  What does that material
19 comprise that you're claiming work product?
20    A.  Well, you had cause and manner of
21 death, time of death.  So the case was an
22 expert-driven case in many respects -- at least
23 that's what it turned out to be, and so we had
24 done extensive research on cause, manner, and
25 time of death.  You had rigor mortis.  You had

Page 14

1  marbling.  You had artifact drying.  You had a
2  number of issues, and we spent a lot of time -- a
3  lot of time researching that.
4     Q.  Okay.  Obviously your letters to
5  client, are those letters specifically to Mr.
6  Lovelace?
7     A.  Yes.  Yes, ma'am.
8     Q.  Okay.  For number 9, likewise, the
9  correspondence between trial counsel and expert
10 witnesses, you've put as work product.  Are you
11 claiming work product privilege for any
12 correspondence between you or Mr. Page and expert
13 witnesses?
14    A.  Yes.
15    Q.  Okay.  I will tell you that we
16 contend that is not privileged material, and we
17 will address it at a later time, and, like I
18 said, if a judge rules otherwise, we reserve our
19 right to redepose you if necessary on that
20 limited issue.
21        Correspondence between the state's
22 attorney and trial counsel you've claimed as work
23 product privilege.  Tell me how that qualifies as
24 work product.
25    A.  Well, any -- any correspondence

Page 15

1  between us, Mr. Page and myself, and
2  Mr. Parkinson, plea negotiations, issues along
3  those lines I think are work product.
4     Q.  Okay.  So are you contending only
5  that the correspondence regarding plea
6  negotiations are privileged under work product,
7  or are you contending that all correspondence
8  between you and the -- when you say the state's
9  attorneys, it would be the special prosecutor?
10    A.  I think all correspondence is
11 confidential work product.
12    Q.  Okay.  Likewise, we'll reserve on
13 that.
14    A.  Okay.
15    Q.  You have a number 11 on page 2, the
16 litigation file utilized for trial preparation
17 and trial as work product.  Is there some
18 specific significance to a litigation folder that
19 doesn't qualify under the other materials you've
20 listed under work product?
21    A.  No, I think 11 is a repeat of 1.
22    Q.  Okay.  And you have folder containing
23 pre-trial discovery, you're claiming privilege
24 under rule 415(c).  Do you see that?
25    A.  Uh-huh, yes.

Page 16

1     Q.  With your subpoena did you get a copy
2  of Judge Hardwick's order saying that rule 415(c)
3  would not be considered and material should be
4  turned over in discovery?
5     A.  Yes.
6     Q.  Okay.
7     A.  This is a federal case.  Until I get
8  something from Judge Schanzle-Haskins or Judge
9  Bruce, we're not turning it over.
10    Q.  Okay.  Likewise, we will reserve on
11 that.  Other than Bill Clutter finding
12 Dr. Nichols for you, what investigation did you
13 do as part of your work in defending Curtis
14 Lovelace?
15    A.  Well, that's a broad question.  What
16 investigations did we do in defending Curt?
17 Well, we met with Curt.  I met with him a few
18 times.  Jeff Page met with him multiple times.
19 I'm going to guess 10, 15, 20 times up in Hancock
20 County Jail where he was being housed.  We
21 interviewed Logan, Lincoln, and Larson and
22 Lyndsay multiple times.  We met with Christine
23 dozens of times.  We interviewed Dr. Nichols.  We
24 interviewed Jessica Bowman in Keokuk, Iowa.  We
25 interviewed Nichols in Louisville on, I believe,



Page 17

1  two occasions.  Jeff interviewed Scott Denton.
2       We then also met with Denton,
3  Parkinson, and Page and I up in Logan County
4  because it was halfway between Bloomington, spent
5  a lot of time on the time, manner, and cause of
6  death, rigor, artifact drying of the eyes, just
7  all that stuff.  We -- I don't believe we ever
8  got inside the home on Kentucky.  We interviewed
9  Marty, Curt's former mother-in-law.  We attempted
10 to interview Gibson.  We attempted to interview
11 Baird.  That was declined by QPD.
12      I mean those are the highlights.  We
13 spent a lot of time on this case, and there was a
14 lot of work done.
15     Q.   Okay.  What was the total bill that
16 Curtis Lovelace incurred for your services?
17     A.   His father paid Jeff and I a hundred
18 thousand dollars as a flat earned-upon-receipt
19 fee.  It wouldn't be ceded for any reason.  Those
20 are our fees.  Now, there were expert fees, and
21 that got a little complicated because there was
22 some fundraising going on, but our fees were a
23 hundred thousand dollars.
24     Q.   And that did not include expert fees
25 though?

Page 18

1      A.   Did not.
2      Q.   Do you have any idea, even a
3  ballpark, of what the expert fees were?
4      A.   I've got an idea.  I think Nichols
5  was somewhere between 15 and 20,000.  Shaku Teas
6  was --
7      Q.   S-h-a-k-u T-e-a-s.
8      A.   -- and we went to Chicago to
9  interview Teas also on, I think, a couple
10 occasions.  Jeff made that trip.  Teas was
11 10,000.  And there's airplane tickets, and there
12 were hotels, and there was per diems, and there
13 was dinners and things of that nature.  So it was
14 probably less than 50,000.
15     Q.   Okay.  So your ballpark estimate for
16 expert fees and other expenses incurred in
17 working with experts max 50,000?
18     A.   I'd say -- that's an educated guess.
19 Some of it went through our trust account.  Some
20 of it I think was paid directly by Christine.
21 Some of it we paid -- Mr. Page and I paid
22 directly ourselves.  So that's a pretty good
23 guess.
24     Q.   How many times did you or Jeff talk
25 to Dr. Denton you said?

Page 19

1      A.   Well, Jeff talked to him once alone
2  in November without a prover, and he generated a
3  memo of that interview, and then because of the
4  content of -- and the reason we interviewed
5  Denton was because in the discovery Denton's
6  report didn't appear anywhere, and that was
7  unusual, unprecedented if I can go that far.  So
8  we wanted to drive up to Bloomington and
9  interview him.
10      We got the report from Denton, which
11 supported Mr. Lovelace's innocence, and then we
12 played, you know, dodge and jump and miss and all
13 that kind of stuff with Denton for about six
14 months -- three months, and then Denton
15 eventually prepared a report for Ed Parkinson,
16 which was in my mind in direct contradiction to
17 the interview that he gave to Jeff Page.
18      So then as a result of that, we met
19 -- Parkinson, Page, Denton and Elmore met in the
20 first floor courthouse in Lincoln to try to work
21 that out, and it was rather contentious, and
22 Denton ended up walking out.
23     Q.   What was your understanding as far as
24 how Dr. Denton supported Curtis's innocence?
25     A.   Well, Denton told -- and again I've

Page 20

1  not looked at Mr. Page's memo in years, but he
2  told -- the nutshell was that Bowman had made a
3  mess of this case, that there's no way you could
4  have determined the cause of death, that she did
5  not properly test the -- or draw slides or
6  properly preserve the brain, the lung, the heart,
7  the liver -- even though there was one slide on
8  the liver as I recall -- the kidney.  Rather, she
9  did a Vitullo kit, a rape kit, on Curt's first
10 wife, and that was pretty much it.  He said that
11 suffocation is a rule-out cause of death.  You
12 must rule out all other cases of death before you
13 get to suffocation, and because Dr. Bowman did
14 such a poor job on the autopsy that you could not
15 rule it out, that he wanted nothing to do with
16 this case, that -- that you need to go somewhere
17 else -- words to that effect.
18      Now, I'm paraphrasing.  It's been
19 four years, but that was the upshot of the
20 interview that Jeff had with Denton up in
21 Bloomington in November of '14.
22     Q.   Okay.  When was the next interview?
23     A.   That would have been the summer of
24 '15 in Logan County.  Reference to the first
25 floor courthouse.  The four of us were present.



Page 21

 1  And what happened was -- the reason we didn't
 2  have a prover there was because Scott Denton had
 3  an issue with Bill Clutter in another homicide
 4  case involving myself and another attorney where
 5  Clutter went up and interviewed Denton, produced
 6  a report, and Denton accused Clutter of
 7  dissembling and not being honest in the report.
 8         So I told Jeff that -- and I was --
 9  planned to go up there.  I can't remember if I
10  was in another trial.  I can't remember, but I
11  think I was in another jury trial so I couldn't
12  make the trip, but the bottom line is you're up
13  there naked because you don't have a prover.
14         So Jeff went up there, and out of an
15  abundance of caution we took Jeff's notes and
16  reduced them to writing, and I directed Jeff to
17  then send them to Dr. Denton so he could make
18  sure that he was not going to have an issue like
19  he had with Clutter earlier.
20         And so there was a time period where
21  we were waiting because Parkinson kept telling us
22  Denton's report in the discovery, and we had a
23  number of issues on that.  At one point, you
24  know, the judge got involved, and, you know, we
25  had discovery, okay, show us where in the

Page 22

 1  discovery is Denton's report.  He couldn't
 2  produce it.
 3         So then in the summer of '15, Jeff
 4  was not having any luck getting Denton to return
 5  his calls.  So I had his cell phone, and he's the
 6  pathologist in a number of homicides down here.
 7  So I called Denton under the guise of another
 8  case, and so he took my call, and I said, "Hey,
 9  while I've got you on the phone, we sent you
10  these notes of Page's interview on Mr. Lovelace's
11  case.  Can you look at those?"  And he said,
12  "Well, my office staff -- my helper, who is also
13  a pathologist, she just had a child, and we're
14  backed up, and I'm behind," and I said, "Scott, I
15  mean it's four pages.  Just look at it, you know.
16  This is a first degree murder case," and then he
17  said, "Well, Parkinson just contacted me, and he
18  wants me to write a report," and I said, "Oh,
19  that's interesting because Parkinson said you
20  wrote a report months and months and months ago."
21  "No, I haven't, and after I write the report, I
22  will then get back in touch with you."
23         So he writes the report which is in
24  stark contrast to the interview with Mr. Page
25  back in November of '14.  That prompted the

Page 23

 1  meeting with Denton to try to -- try to somehow
 2  reconcile these two different reports that the
 3  venerable Scott Denton wrote.
 4     Q.   Okay.  When you say there wasn't a
 5  prover there, explain what you mean by what a
 6  prover -- you're referring to -- what's your
 7  understanding when you use the word prover?
 8     A.   The third party who can -- who can
 9  verify what was said in an interview as opposed
10  to an attorney who would be -- because that
11  creates a conflict which it did in this case.
12     Q.   So then the four of you --
13     A.   Let me back up.
14     Q.   Okay.
15     A.   Denton would refuse to allow Clutter
16  in his office, and I knew that because I've had a
17  number of cases with Denton.  And Clutter was our
18  investigator.  We had nobody else, and money was
19  tight so we knew that he was not going to
20  allow -- in fact, I think he said, "You guys can
21  come up and talk to me but don't bring Clutter."
22     Q.   Okay.  Did Jeff tell you why Denton
23  said back in November of '14 that he -- why he
24  wanted nothing to do with the case?
25     A.   Yes, he did, and it was well-known

Page 24

 1  that there was a -- there was bad blood between
 2  Jessica Bowman and Scott Denton, and Bowman was a
 3  Springfield pathologist who was -- who was
 4  removed from the coroner's office, and it was a
 5  big to-do.  It was in the paper around here.  She
 6  was involved in many, many homicides in central
 7  Illinois.  She's a pathologist, Jessica Bowman,
 8  and so what had happened was she'd been
 9  discredited on some high profile cases.  So they
10  -- the local state's attorneys were having Denton
11  review a lot of Bowman's work and maybe changing
12  her opinion about the manner and cause of death
13  and so on and so forth.  So that created some bad
14  blood between Denton and Bowman, and so in that
15  regard, Denton said words to the effect to Jeff,
16  hey, you know, I don't want to get involved in
17  this because this is another Bowman case.  She's
18  going to hit the ceiling if I come in and
19  change -- change the -- Bowman had determined the
20  cause of death as undetermined and Denton's
21  leaning towards natural causes.  So that was a
22  problem.
23     Q.   Okay.  So you met with Denton and
24  Parkinson up in Logan County?
25     A.   Yes, ma'am.



Page 25

1  Q.  Okay.  Tell me what happened in that
2  meeting.
3       A.  Well, I told Jeff -- he can speak for
4  himself, but I said, listen, this is your
5  witness.  You need to take -- you need to handle
6  this.  You interviewed Denton.  I didn't.  And,
7  you know, Jeff doesn't do as many homicide --
8  murder cases as I have done or I do, and he
9  didn't have the relationship with Denton that I
10 had.  So I was going to let Jeff basically take
11 the lead, and, you know, Denton sort of, "I
12 didn't say that.  You took my words wrong."  So
13 on and so forth, and that went on for a few
14 minutes, and then I just said, "Look, Scott, come
15 on.  Seriously?"  I mean Jeff doesn't even know
16 these terms.  And -- you know, "We tried to call
17 you.  You didn't try to call back.  We tried to
18 call you.  We sent you a letter.  You didn't
19 respond."  "You're accusing me of not being
20 professional.  We're done, and I'm out of here,"
21 and he left.
22       So that -- that left Parkinson, Page,
23 and myself.  So then we're looking into it.
24 Okay.  Now Jeff's got a conflict.  I said, if you
25 call Scott Denton, Jeff's going to be a witness

Page 26

1  and I'm going to have to get a different
2  co-counsel."
3       So then Parkinson eventually, for
4  reasons that are still unclear to me, capitulated
5  and didn't call Denton in Lovelace 1 for that
6  reason.  Well, that's the purported reason.
7       Q.  After that episode in Logan County,
8  did you ever talk to Denton again concerning the
9  Lovelace case?
10      A.  Not concerning Lovelace, no.
11      Q.  But you have talked to him concerning
12 other matters?
13      A.  He's testified in murder cases since
14 then.  Yes, I've faced him two or three times as
15 an expert since then, but Curt's case has never
16 come up.
17      Q.  When the Loevy firm came in for
18 Curt's second trial, were you -- you or Jeff --
19 was it discussed as to whether either of you
20 could possibly be a witness if Denton were called
21 in that case?
22      A.  Not -- not to me.  I don't know if
23 Tara or Jon Loevy asked Jeff.  They didn't ask
24 me.  I think Jeff was maybe endorsed as a witness
25 in Lovelace 2, but I don't know.

Page 27

1  Q.  Other than the phone call where you
2  got Denton on the phone with another case and
3  then brought up the Lovelace case and the meeting
4  in Logan County that you described, did you have
5  any other conversations with Dr. Denton regarding
6  this case?
7       A.  No.
8       Q.  I should say regarding --
9       A.  Not that --
10      Q.  -- the Lovelace case.
11      A.  Not that I'm aware of.  I think that
12 was it.  Again I wasn't in Bloomington.  So I
13 really only talked to him once on the phone in my
14 office briefly, and I think Jeff was still in my
15 office because he called right back, and then up
16 in Lincoln for -- I don't know, a half hour, 45
17 minutes.  That was it.
18      Q.  Okay.  Were you surprised that --
19 that it appeared as though everything that he had
20 told Jeff was now 180 degrees from what he was
21 saying after that meeting?
22      A.  Well, yeah, I was surprised.  First
23 time it's ever happened.  Shocked.  Never look at
24 the guy the same.  Don't trust him at all.  I
25 think he's dangerous.  I think he's in it for the

Page 28

1  money.
2       See, the way these guys get paid -- I
3  don't know if you know this, but these
4  pathologists are just like private attorneys.
5  They've got to keep on the good side of the local
6  prosecutors, the state's attorneys from Adams
7  County over in Quincy all the way over to
8  Champaign County and the whole band in southern
9  Illinois.
10      So the last thing you want to do as a
11 pathologist is to anger and upset a prosecutor
12 because then they can say, well, we don't want
13 Denton to do this work.  We want so and so to do
14 this work.  And so the next thing you know is
15 Scott Denton is out of work.  And so I think
16 Denton is all about the money, and he will say
17 pretty much anything.  That's my opinion.
18      And here's another thing too.  I
19 faced him more than a dozen times, and he's got a
20 way about him the jurors love, and he is very
21 convincing, and he's very difficult to cross, and
22 he's very disarming, and that makes him all the
23 more dangerous for all of us, especially that guy
24 right over there.
25      MS. THOMPSON:  I'm sorry, but can the



Page 29

1  record just reflect that when he said, "the guy
2  over there," he was pointing at Curt?
3         MS. EMERY:  Yes.
4     A.   My former client, Mr. Curt Lovelace.
5  BY MS. EMERY:
6     Q.   What was your involvement in the
7  second trial?
8     A.   Nothing.  I turned the file over to
9  someone in Tara's firm who came down.  I turned
10 over the file absent my work-product notes,
11 trying to get it as organized as I could.  We had
12 made -- there were photographs, and there's just
13 a number of things.  It was a big deal -- a big
14 -- big file.
15    Q.   Okay.  But did you work in a
16 consulting capacity at all?
17    A.   No.
18    Q.   Okay.  So your involvement with the
19 Curtis Lovelace criminal trials ended when you
20 turned your file over to Tara's firm?
21    A.   Yes.
22    Q.   Okay.  Did you believe that there was
23 any police misconduct in the first trial?
24    A.   Now I do, yes.
25    Q.   Okay.  What do you believe?

Page 30

1     A.   Well, clearly Detective Gibson or Ed
2  Parkinson -- somebody had some emails between
3  Denton and Gibson.  I'm led to believe -- I've
4  not seen those.  This is what I've been told.  I
5  didn't attend the trial, but there were emails
6  purportedly between Gibson and Denton that
7  weren't turned over to us and maybe -- maybe more
8  emails from Gibson.
9     Q.   Who told you that?
10    A.   I think people that were in the
11 courtroom that -- had called me on the phone and
12 told me.  I think I read it in the newspaper.  I
13 think I saw it on TV.  I think I've had
14 conversations with Parkinson about it.  I know
15 there's a dispute about who knew what.  Just a
16 whole number of sources.  I've never talked to
17 Tara about it, but other people have told me
18 that.  I don't know if it's true or not, but
19 that's what was reported to me.
20    Q.   So everything you know about it is
21 based on what somebody not involved with the
22 Loevy firm have told you?
23    A.   Yes, I've not talked to them at all
24 about it.
25    Q.   You've said you had conversations

Page 31

1  with Ed Parkinson about it?
2     A.   I've -- well, I've had conversations
3  with Parkinson.  I see him all the time.  We've
4  got cases together.  His office is right across
5  the street.  So yeah.
6     Q.   So what are the conversations you've
7  had with Ed Parkinson about that issue?
8     A.   Well, some of them are private
9  conversations, but the upshot is I maintained
10 that, as I do now, that Curt was innocent and,
11 you know, Ed was wrong, and, you know, that I
12 strongly felt that way and feel that way.  I was
13 disappointed, shocked because I've had -- I don't
14 know -- ten, 15 murder cases with Parkinson,
15 death penalty cases with Parkinson, and a lot of
16 this criminal business is trusting people.  They
17 turn stuff over to you.  You as a defense
18 attorney, you trust people, and so I trusted Ed,
19 and -- that he was giving me all the information
20 and documents in the case that were -- that were
21 to be given to me and Mr. Page, and then when I
22 don't get those things, it was a problem, and I
23 told him that.  I thought that was not cool.  It
24 was not good.  And he said, "Gibson didn't give
25 them to me."

Page 32

1     Q.   Now, did you make any effort to see
2  what it was that supposedly wasn't turned over?
3     A.   No.  No, and I still haven't seen
4  anything.  I'd like to see them, but I've not
5  seen them.
6     Q.   Is your understanding that there's
7  something that would have affected the trial or
8  the outcome of the trial?
9     A.   Yeah.
10    Q.   What is your understanding?
11    A.   Well, if the -- do you have the
12 emails?  I'd like to see them.
13    Q.   No, I'm asking you for your
14 understanding because you've never seen them.
15    A.   Well, okay, if my understanding is
16 correct, that the emails supported in part or in
17 whole the interview that Denton had with Page; in
18 other words, Denton was expressing the same thing
19 to Gibson that he expressed to Page, I would have
20 probably called Denton in our case in chief, and
21 because then you don't have the problem of a
22 defense attorney or former defense attorney
23 impeaching a pathologist, now you have a -- the
24 lead prosecutor or the lead detective in the
25 case.  So you have -- you could have Page



Page 33

1 impeaching him, and you could have Gibson
2 impeaching him, and I think Denton would have
3 been a -- if he would have testified along the
4 lines of the notes from Page, he would have been
5 a devastating witness for the prosecution because
6 he was the guy that the state's attorneys picked
7 primarily to clean up Bowman's mess.
8     Q.   When did you learn that these --
9 there was emails that weren't turned over to you?
10    A.   During Lovelace 2.  During the trial
11 when people were coming back to me and saying,
12 hey, there's these emails between Denton and
13 Gibson that Jon Loevy and Tara Thompson thank
14 goodness were aggressive enough to get and didn't
15 trust Parkinson like we did and Gibson like we
16 did, and they got the emails, and I'm not even
17 sure how they got them, and I found out during
18 the trial 2 -- Lovelace 2.
19    Q.   And it was your understanding that
20 the emails supported Jeff Page's notes of the
21 initial interview?
22    A.   It was my understanding that the
23 emails had two -- two important purposes.  Number
24 one, it further buttressed the fact that Gibson
25 was doctor shopping, which we tried to establish

Page 34

1 in Lovelace 1, but that those emails showed that
2 he was not satisfied -- you know, Denton was
3 saying this was not a homicide, you can't prove
4 it.  There are problems with the case, similar to
5 what he was telling Page, and that Gibson for the
6 second or third time then goes and finds yet
7 another pathologist, Jane Turner down in St.
8 Louis, and maybe -- we heard rumors there was
9 even a pathologist between, you know, Shaku Teas
10 or Denton or Bowman and Turner.  Not Baden but
11 someone else, and that would have -- that would
12 have strengthened our case, and it would have
13 changed trial strategy.  It would have made
14 Gibson look absolutely awful on the witness stand
15 that he didn't turn those over, so on and so
16 forth.
17    Q.   Well, you said the one thing -- you
18 said there were two things.  One was the issue
19 that you contended Gibson was doctor shopping.
20 What was the second thing?
21    A.   And the second was that it would have
22 supported Page's words in his interview with
23 Denton.  We -- we would -- we first got the notes
24 -- when Jeff came back and told me about Denton,
25 we had numerous pretrials, and Parkinson kept

Page 35

1 throwing Denton's name out, and I said, "You
2 ain't calling him?"  "Yeah, we are."  I said,
3 "Have you talked to Denton because we have," and
4 so we were on the cusp of calling Denton in our
5 case in chief until he wrote the memo in the
6 summer of '15 which was contrary to what he told
7 Page.
8         So if I'd have had Gibson and
9 Denton's emails, then I probably would have run
10 the chance of impeaching him with those and
11 calling him in our case in chief, and who knows
12 what impact that would have had on Parkinson in
13 terms of pursuing the case, whether it ever would
14 have seen the light of day.  It had some internal
15 problems, discovery violations.  Who knows what
16 the impact would have been, whether we would have
17 even picked over in Quincy.
18         MR. HANSEN:  I'm sorry.  What was
19 that?  You would have picked what?
20    A.   Picked a jury -- whether we would
21 have selected a jury over in Quincy.  I'm just
22 telling you that ain't cheatin' fair.
23 BY MS. EMERY:
24    Q.   But you never even seen them,
25 correct?

Page 36

1    A.   No, I've not seen them, but nobody's
2 telling me that they don't -- they don't exist,
3 and nobody's telling me they don't contain the
4 contents that I think they contain.
5    Q.   What was Curtis's participation in
6 trial preparation?
7    A.   Well, is he waiving his
8 attorney-client privilege?
9    Q.   You can tell me generally what he did
10 without --
11    A.   Not unless he waives attorney-client
12 privilege I'm not going to tell you what we
13 talked about.
14        MS. EMERY:  Okay.  Tara, you want to
15 go outside and --
16        MS. THOMPSON:  He is not waiving his
17 privilege.  So we assert at least that
18 communications he had with his counsel remain
19 protected by privilege.
20        MS. EMERY:  Okay.  I'm not talking
21 about communications.  I'm talking about his
22 participation as far as did he do research, did
23 he assist you with strategy.  General areas which
24 if you had to log it, you wouldn't tell me what
25 the content was.



Page 37

1  A.  I don't think I can even touch that
2 because attorney-client conversations, I think
3 those are privileged.
4 BY MS. EMERY:
5  Q.  Okay.  We'll reserve that issue too.
6  A.  Thank you.
7  Q.  Have you ever met a man named Evan
8 Parke?
9  A.  Evan Parke?
10  Q.  Evan Parke.
11  A.  No.
12  Q.  Have you ever talked to or spoken on
13 the phone with him?
14  A.  No, not that I know of.  I don't
15 think I've ever heard that name before.
16      MS. EMERY:  Okay.  I don't have
17 anything else.  I'm sure co-counsel does.
18          EXAMINATION
19 BY MR. HANSEN:
20  Q.  Yeah.  So let's back up.  When you
21 were first contacted to represent Curt, who made
22 the contact with you?  Was it him or his parents?
23  A.  Christine.
24  Q.  Christine.  And you indicated that
25 Jan and Terry are the ones who paid you the

Page 38

1 hundred thousand dollars.
2  A.  Yes.
3  Q.  And was that by a flat fee retainer
4 agreement or --
5  A.  We called it a classic fee
6 arrangement.  It's earned upon receipt.  So we
7 just use a letter to solidify that agreement.
8  Q.  And did Terry and Jan sign that
9 letter?
10  A.  No, I don't think they signed the
11 letter.  We just mailed it to them confirming our
12 oral agreement.
13  Q.  Okay.  But you would have mailed that
14 to Terry and Jan, Curt's parents?
15  A.  Yes.
16  Q.  All right.  And the expert witness
17 fees that you mentioned earlier, you did retain
18 experts in the defense of the case, correct?
19  A.  Yes, we -- we retained Shaku Teas,
20 and we retained Steve Nichols, I believe.
21  Q.  Okay.  And Nichols is the gentleman
22 you said Bill Clutter found for you in Kentucky?
23  A.  Yes, I think that's his name.  It's
24 been a long time.
25  Q.  All right.  Regardless, those expert

Page 39

1 fees, were those paid separately apart from the
2 hundred thousand dollars?
3  A.  Yes.
4  Q.  And I would like to find out a little
5 more about that.  I thought you said -- did you
6 front some of those costs and then get reimbursed
7 for them?
8  A.  Well, what had happened was we ran
9 out of money, and Clutter was gone.  So we didn't
10 have an investigator, and Christine was
11 struggling mightily to fundraise and try to rob
12 Peter to pay Paul.  Some of those monies made it
13 to our trust account.  Some of the monies I think
14 Christine paid directly.  I can't remember
15 exactly because it was kind of a hodgepodge.  So
16 I think I asked Jan and Terry for some -- some
17 additional money.  It might have been during the
18 trial.  I believe it was after the trial, and
19 they declined because we had some outstanding
20 bills.  So we got to the point where both the
21 experts agreed to come up and testify basically
22 on a promise to get paid because we couldn't pay
23 them up front.  I believe Jeff and I paid for
24 Shaku Teas's plane ticket because I know we
25 picked her up at the airport in Quincy.  We paid

Page 40

1 for her hotel, and we paid for all her meals.
2 Nichols drove, I believe, and we paid for his
3 hotel and his meals.  And we -- we were
4 reimbursed -- Jeff and I were reimbursed for some
5 of those because there was some money in our
6 trust account.  Now, that left outstanding, you
7 know, thousands of dollars of actual fees to
8 Nichols and to Teas, and I lost track of that,
9 but I believe they were eventually paid.
10  Q.  All right.  And that's the next
11 question I have.  Were you part of eventually
12 getting them paid, or were you out of the case by
13 that time?
14  A.  It was during the transition period I
15 think there was some hearings on some monies that
16 had been raised, but I wasn't really involved in
17 that.
18  Q.  Okay.  Did you issue any subpoenas in
19 the defense of the case?
20  A.  I don't believe so, but the court
21 file would reflect that.  I think all the
22 witnesses were the children -- the kids and our
23 two experts.  I don't think we issued any
24 subpoenas.
25  Q.  How about subpoenas for documents



Page 41

1 from any agencies?
2   A.   No.
3   Q.   Was there a stipulation in the case
4 about Bowman not being called?
5   A.   I think there was.  Again you're
6 asking me to go back on that point four years
7 earlier.  I think there was a stipulation as to
8 why she was called.  It was sort of generic
9 vanilla stipulation.  It didn't hurt either side.
10 It didn't get in the business I just talked about
11 earlier.
12   Q.   Did you go up -- I thought you went
13 up and met with her one time in Keokuk?
14   A.   We drove to Keokuk.  She was working
15 at the hospital up in Keokuk.  Jeff and I drove
16 up.  It was in December right around Christmas,
17 met her at the county courthouse up there, and in
18 a big old room, and talked with her.  I knew her.
19 I'd seen her many times, and so I mean we were --
20 we were friends -- I was friendly with her and
21 got a really good report from her too.  Really
22 good report, and then she did the old 360 on us
23 too.
24   Q.   Okay.  So let's talk about that a
25 little bit.  Did you -- I'm not asking for copies

Page 42

1 of them, but did you make notes of your
2 interviews with her?
3   A.   Well, I was doing the questioning.  I
4 remember that, and Jeff was sitting there writing
5 some notes, but taking notes of an interview with
6 Jessica Bowman is a very difficult endeavor, and
7 she would be all over the place, but the takeaway
8 was she was still of the opinion the cause of
9 death was undetermined, the manner of death was
10 undetermined, that she could -- she absolutely
11 could not say that she was suffocated, and we
12 tried as best we could -- I tried as best we
13 could to control her a little bit, but I remember
14 she hugged us and said she would help us, and
15 she's on our side, that she didn't think he
16 committed the crime, blah, blah, blah, and she
17 would testify.
18         And then -- Jeff's office is right
19 behind us here.  I remember calling her on the
20 phone, and Parkinson had talked to her and had
21 made statements about things that little Larson
22 had been saying that we didn't tell her, and now
23 she's -- she's not -- "I want nothing to do with
24 this.  I think he very well could have killed his
25 wife."

Page 43

1   Q.   And did she tell you that information
2 based on information she had received from
3 Mr. Parkinson as to what Detective Baird had
4 interviewed Larson and discussed?
5   A.   No, it was not Baird.  It was Gibson.
6 It was based on information from Adam Gibson and
7 Ed Parkinson.  She said I -- I -- Parkinson and
8 Gibson spoke with me, and you didn't tell me
9 about Larson coming in and finding his mother
10 there in bed and Larson tried to shake her.  I
11 said, "Whoa, whoa, whoa, whoa, Jessica.  That's
12 not true.  That didn't happen.  That was" --
13 "Well, you lied to me.  You lied to me.  I can't
14 trust you."  I said, "We didn't lie to you.  What
15 are you talking about?  There's nothing in
16 discovery to say this," and that was one of the
17 theories that Parkinson had, and so then she --
18 we -- we lost her too.
19   Q.   Okay.  And --
20   A.   Not that I would have called her,
21 but --
22   Q.   Well, that's my next question.
23 You're familiar with Jessica Bowman from working
24 here in Sangamon County?
25   A.   Yes.

Page 44

1   Q.   And she had been discredited on many
2 occasions around here, true?
3   A.   Yes.
4   Q.   And in fact Morgan County and Macon
5 County stopped using her services?
6   A.   Yes.
7   Q.   And Sangamon County stopped as well?
8   A.   Yes.  And there may be more, but yes.
9   Q.   And that was because of various
10 autopsy reports she had done?
11   A.   Yes.  But let me -- but I -- I -- we
12 still may have called her.  We ultimately didn't
13 because of opening that up, but had she been
14 solid saying this is not a homicide, not
15 suffocation, I disagree with that -- that manner
16 of death, we probably would have called her just
17 because I think that would have put Parkinson in
18 a very difficult position because she did the
19 autopsy and now he's discrediting her, and how is
20 that going to -- but once she rolled on us,
21 flipped on us in a -- on the eve of trial we
22 decided not to call her.
23   Q.   And those are trial strategy
24 decisions that you make in defending a case?
25   A.   Yes.



Page 45

1  Q. But you were able to put on expert
2  witnesses regardless?
3  A. Yes, we called Teas and Nichols up
4  there.
5  Q. And you said earlier this was a case
6  that had some expert-driven issues which are
7  rigor mortis, the marbling?
8  A. Lividity, yes.
9  Q. The lividity, the dehydration, the
10  drying, all of which go into cause, manner, and
11  time of death, true?
12  A. That's correct. True. I agree.
13  Q. And at the end of the day, Mr.
14  Lovelace was not convicted, was he?
15  A. No, he was not convicted. It was a
16  hung jury in Quincy though, and he had to try it
17  again in Springfield.
18  Q. Well, that was after the prosecuting
19  attorney had to make a decision whether or not to
20  prosecute the case again, true?
21  A. Yes.
22  Q. Okay. And I wanted to ask you on
23  something else here. Hold on. Oh, yeah. So
24  Gary Farha --
25  A. Okay.

Page 46

1  Q. Do you know Gary?
2  A. I do. I went to high school with
3  him. Grew up with him.
4  Q. And is it fair to say you had
5  absolutely no involvement whatsoever in the first
6  defense of this case with Gary Farha?
7  A. That's a correct statement.
8  Q. Okay. In fact, the Adams County
9  State's Attorney's office -- at the time you were
10  aware the state's attorney was John Barnard?
11  A. Yes.
12  Q. John Barnard had nothing to do with
13  regard to the prosecution of the case, true?
14  A. Well --
15  Q. He was a witness?
16  A. Yeah, he had -- he had a member of
17  his office assisting Parkinson in the trial, a
18  young assistant state's attorney. She was a lady
19  -- or is a lady, and she helped him with the
20  electronic devices in the courtroom, and she sat
21  with him, I think, the entire trial.
22  Q. Okay. It was a female?
23  A. Yes.
24  Q. Okay.
25  A. That's my memory. She was a younger

Page 47

1  -- she's very nice, and she just was helping Ed,
2  and she was with John's office, and John did
3  testify. That was his only involvement.
4  Q. Okay. And as to Jim Keller, he was
5  called as a witness --
6  A. Yes.
7  Q. -- in the case, correct? And did you
8  interview him at all prior to trial?
9  A. No.
10  Q. Are you aware of -- as you sit here
11  today you had mentioned your thoughts and
12  opinions on the Quincy Police Department
13  misconduct. Is there any information you've been
14  provided at any time after the first trial that
15  there was any misconduct or fabrication of
16  evidence or withholding of any documents by the
17  Adams County State's Attorney's office?
18  A. No.
19  Q. Okay.
20  A. No.
21  Q. How about the Adams County Coroner's
22  office?
23  A. No. Gary Hamilton was the coroner --
24  Q. Correct.
25  A. -- at the time? Right. No. Now, I

Page 48

1  will say Keller's testimony was contradicted by
2  all the first responders, but --
3  Q. And that's an issue that sometimes --
4  A. Sure.
5  Q. -- interviews come out one way, then
6  a witness testifies another way? You've had that
7  happen before?
8  A. Yeah. Sure.
9  Q. Okay. And just in general your type
10  of practice, are you a hundred percent criminal
11  defense?
12  A. Yes, sir.
13  Q. Okay. And how many murder trials
14  have you taken to jury?
15  A. Between 40 and 50.
16      MR. HANSEN: Okay. That's all I
17  have. Thanks.
18      THE WITNESS: Thanks.
19      MS. THOMPSON: I don't have any
20  questions.
21      MS. EMERY: Reserve or waive?
22      THE WITNESS: I'll waive unless you
23  want me to --
24      MS. THOMPSON: I trust the court
25  reporter.



Page 49

1    THE WITNESS: Okay. I'll waive.
2    MS. EMERY: Okay.
3    (The deposition was concluded at
4  11:24 a.m., and the signature of the deponent was
5  waived.)
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 50

1              CERTIFICATION
2        I, Rhonda Rhodes Bentley, CSR, a
  Certified Shorthand Reporter (IL), do hereby
3  certify that JAY ELMORE, came before me on
  NOVEMBER 20, 2018, and swore before me to testify
4  to the truth, the whole truth and nothing but the
  truth regarding her knowledge touching upon the
5  matter in controversy.
6        I do further certify that I did take
  stenographic notes of the questions propounded to
7  said witness and her answers thereto and that
  said notes were reduced to typewritten form under
8  my direction and supervision.
9        I do further certify that the
  attached and foregoing is a true, correct and
10 complete copy of my notes and that said testimony
  is now herewith returned.  I do further certify
11 that said deposition was taken at the Law Offices
  of Elmore & Reid, 808 South Second Street, 1st
12 Floor, Springfield, Illinois.
13       I do further certify that I am not
  related in any way to any of the parties involved
14 in this action and have no interest in the
  outcome thereof.  Dated at Divernon, Illinois,
15 November 26, 2018.
16
17
18   _____
19     Rhonda Rhodes Bentley, CSR
       CSR# 084-002706
20
21
22
23
24
25

