1:17-cv-01201-SEM-EIL   # 90-9   Page 1 of 13

E-FILED
Monday, 08 July, 2019 02:46:57 PM
Clerk, U.S. District Court, ILCD

JEFF PAGE
LOVELACE vs GIBSON
November 20, 2018

1–4

## Page 1

```
1           UNITED STATES DISTRICT COURT
              CENTRAL DISTRICT OF ILLINOIS
2
3   CURTIS LOVELACE, LOGAN LOVELACE,   )
    LINCOLN LOVELACE & CHRISTINE       )
4   LOVELACE ON BEHALF OF HER MINOR    )
    SON LARSON LOVELACE,               )
5                                      )
              Plaintiffs,              )
6                                      )
         vs.                           ) No. 17 CV 01201
7                                      )
    DET. ADAM GIBSON, POLICE CHIEF     )
8   ROBERT COPLEY, SGT. JOHN SUMMERS,  )
    LT. DINA DREYER, DET. ANJANETTE    )
9   BISWELL, UNKNOWN QUINCY POLICE     )
    OFFICERS, GARY FARHA, CORONER      )
10  JAMES KELLER, THE CITY OF QUINCY,  )
    AND COUNTY OF ADAMS,               )
11                                     )
              Defendants.              )
12
13
14
15
16
17          DEPOSITION OF JEFF PAGE
                 ELMORE & REID
18           808 SOUTH SECOND STREET
              SPRINGFIELD, ILLINOIS
19              NOVEMBER 20, 2018
                   1:30 P.M.
20
21
22
23
24      Reported and Transcribed by:
        Rhonda Rhodes Bentley, CSR #084-002706
25
```

## Page 2

```
1                     INDEX
2   APPEARANCES:
3   For the Plaintiffs:
            Tara Thompson
4           LOEVY & LOEVY
            Attorneys at Law
5           311 North Aberdeen Street, 3rd Floor
            Chicago, Illinois 60607
6           (312) 243-5900
            tara@loevy.com
7
    For the City of Quincy Defendants:
8           Ellen K. Emery
            ANCEL, GLINK, P.C.
9           Attorneys at Law
            140 South Dearborn Street, Sixth Floor
10          Chicago, Illinois 60603
            (312) 782-7606
11          eemery@ancelglink.com
12
    For the County of Adams Defendants:
13          James A. Hansen
            SCHMIEDESKAMP ROBERTSON
14          NEU & MITCHELL LLP
            Attorneys at Law
15          525 Jersey Street
            Quincy, Illinois 62301
16          (217) 223-3030
            jhansen@srnm.com
17
18
19  ALSO PRESENT:
            Curtis Lovelace
20          Christine Lovelace
21
22
23
24
25
```

## Page 3

```
1                 INDEX - CONTINUED
2   EXAMINATION BY:                         PAGE
      Ms. Emery.......................................5
3   Mr. Hansen....................................39
4
5   EXHIBITS:    DESCRIPTION                  PAGE
    (None marked)
```

## Page 4

```
1                    STIPULATION
2
3           IT IS HEREBY EXPRESSLY STIPULATED AND
4   AGREED by and between the parties that the
5   DEPOSITION of JEFF PAGE may be taken on NOVEMBER
6   20, 2018, at the Law Offices of Elmore & Reid,
7   808 South Second Street, Springfield, Illinois,
8   pursuant to the applicable Supreme Court rules,
9   local rules, and the Code of Civil Procedure
10  governing said depositions.
11
12          IT IS FURTHER STIPULATED that the
13  necessity for calling the Court Reporter for
14  impeachment purposes is waived.
```



Page 5

    1:23 p.m.
    JEFF PAGE,
having first been duly sworn, testifies as
follows:
    EXAMINATION
BY MS. EMERY:
  Q.  Would you state your name and spell your last name for the record.
  A.  Jeff, last name Page, P-a-g-e.
  Q.  Mr. Page, have you been deposed before?
  A.  I don't believe so.  I know the process though.
  Q.  So I don't have to go through all of the --
  A.  Nope, you're good.  Thank you though.
  Q.  Okay.  Mr. Page, when were you retained to represent Curtis Lovelace?
  A.  August, I think, of 2014.  I know it was late summer, I believe, fall of 2014, I believe.
  Q.  And who was first contacted?  You or Mr. Elmore?
  A.  I'm not sure how that went down.  I know I had received a call, and also Jay had

Page 6

received a call somewhat in that time frame, but who got the call first I'm not sure.  I think it was a referral by Dave Penn which is a mutual friend of ours in Quincy.
  Q.  And then the two of you together undertook the representation of Curtis Lovelace in his first criminal matter, correct?
  A.  Correct.
  Q.  I'd like to show you what was marked for me as Mr. Elmore Exhibit 1.  Take a look at that and I'd ask you if you recognize it.
  A.  I do.
  Q.  Is that your signature on the second page?
  A.  Yes.
  Q.  Okay.  And who composed this response to a subpoena?  Was it you or Mr. Elmore?
  A.  I did.
  Q.  And this was in response to a subpoena you received for documents comprising your criminal defense file in the defense of Mr. Lovelace, correct?
  A.  Correct.
  Q.  And you listed out a number of documents that you contended were not going to be

Page 7

provided for reasons of work product and attorney-client privilege, correct?
  A.  That's right.
  Q.  First one is your trial counsel notes based on work product?
  A.  Correct.
  Q.  Obviously without revealing what was contained therein, what comprised your trial counsel notes?
  A.  What would be in the notes?
  Q.  Yes.  What they were?
  A.  Well, they were notes taken during the course of the trial.
  Q.  Okay.  Were there also notes regarding your preparation for trial?
  A.  I would assume so.  Off the top of my head, I can't recall.  I've got them listed in the file, but I would assume that potentially there could be some pre-trial prep as well, notes relating to preparation.
  Q.  And the second one is the client notes under work product and attorney-client privilege?
  A.  Right.
  Q.  Okay.  What comprises the client

Page 8

notes?
  A.  Well, that would be our client Mr. Lovelace.
  Q.  Were there notes that he made and you have possession of?
  A.  Correct.
  Q.  Okay.  And the interview notes of Dr. Scott Denton by trial counsel --
  A.  It's "trail" but should be "trial."
  Q.  Right.  You contend are work product?
  A.  Yes.
  Q.  And who took notes of an interview or interviews of Dr. Scott Denton?
  A.  I did.  I did, and there was technically one interview of Scott Denton -- Dr. Denton that occurred in November of, I believe, 2014.  I was the only person present for that interview, and I took notes during that interview.
  Q.  And where did that interview take place?
  A.  At Dr. Denton's office in Bloomington.
  Q.  Why did you go see Dr. Denton?
  A.  Well, we had reference in the



Page 9

1  discovery -- when we got discovery from the
2  state, we had reference in there that the lead
3  investigator, Detective Gibson, had some type of
4  contact with Dr. Denton.  Unfortunately, we did
5  not have the report from Dr. Denton.  We didn't
6  have any information from the detective or very
7  little information from the detective as to what
8  was discussed in their meeting.  So Jay and I
9  felt it necessary to go interview him and find
10 out what was being -- what was discussed or, more
11 importantly, what this witness is going to say.
12     Q.   When you and Mr. Elmore were
13 preparing for trial, did somebody take the
14 laboring, more so to speak, and do the bulk of
15 the work, or what was the split of the work in
16 preparing for the trial?
17     A.   Well, I mean technically speaking Jay
18 would have been considered lead counsel.  I was
19 co-counsel.  We divided up the work we thought as
20 equally as we could.  I can't remember off the
21 top of my head who took what witness.  I know
22 that Jay did -- he cross-examined Dr. Denton.
23 I'm sorry.  He cross-examined Adam Gibson --
24 Detective Gibson.  He was responsible for the
25 cross-examination of the state's expert

Page 10

1  witnesses.  I was responsible for the direct
2  examination of our witnesses -- of our expert
3  witnesses, and then we divided up the other
4  witnesses just as equally as we thought we could.
5      Q.   Okay.  And there's -- for number 4
6  there's correspondence between trial counsel's
7  investigator and trial counsel that you claim is
8  work product, correct?
9      A.   Correct.
10     Q.   Who was your investigator or who were
11 your investigators?
12     A.   Well, we had one.  Bill Clutter was
13 our investigator.  So that would be
14 correspondence between Mr. Clutter and us, either
15 myself or Jay.
16     Q.   Okay.  And just so that you know we
17 put on Mr. Lovelace's deposition record and we'll
18 do so for you, that in the event we have to go in
19 front of now Judge Bruce and further litigate
20 whether there are indeed privileges which attach
21 to these documents that we reserve the right to
22 reopen your deposition if necessary on those
23 limited areas.
24     A.   Okay.
25     Q.   Number 5 is trial counsel's

Page 11

1  investigator's letters to expert witnesses that
2  you claim are work product, correct?
3      A.   Correct.
4      Q.   And that would have been
5  Mr. Clutter's letters to expert witnesses,
6  correct?
7      A.   That's right.
8      Q.   Why do you contend that those are
9  privileged under work product?
10     A.   Well, without getting into the
11 content of what those letters were, clearly if
12 we're -- if we're -- these expert witnesses are
13 disclosing certain strategies to our investigator
14 or investigators disclosing strategies to the
15 expert witnesses, that would be work product.
16     Q.   Are you of the opinion that the
17 retained expert witnesses files are not fully
18 open for discovery?
19     A.   You talking about our expert
20 witnesses?
21     Q.   Yes.
22     A.   At this stage in the proceeding I
23 would consider that work product.
24     Q.   Down at number 9, correspondence
25 between trial counsel and expert witnesses, do

Page 12

1  you contend that's work -- privileged under the
2  work-product doctrine also?
3      A.   Yes.
4      Q.   For the same reason?
5      A.   Yes.
6      Q.   Okay.  If there's anything in that
7  correspondence which does not discuss strategy,
8  are you withholding anything else based on work
9  product privilege?
10         MS. THOMPSON:  Object to form.
11     A.   Yeah, I don't -- well, first of all,
12 I'm not -- I don't -- I don't have the documents
13 in front of me right now.  So there may very well
14 be discussions between trial counsel and expert
15 witnesses that were not strategic or strategy in
16 nature.  So that could be.
17 BY MS. EMERY:
18     Q.   Okay.  If there are such documents do
19 you contend that they are privileged under
20 work-product doctrine?
21     A.   Yes.
22     Q.   And for number 10 you have
23 correspondence between the state's attorney, and
24 I'm going to guess that means the special
25 prosecutor's office?



Page 13
1   A.   Correct.  Ed Parkinson and either
2  myself or Mr. Elmore.
3   Q.   Okay.  And you contend that
4  correspondence between Mr. Parkinson and you or
5  Mr. Elmore constitute work-product privilege?
6   A.   Yes.
7   Q.   Why is that?
8   A.   Well, it's discussions -- there could
9  have been a number of -- again I don't have them
10 in front of me, but I know there was
11 correspondence going back and fourth throughout
12 the course of this litigation where I don't
13 know -- I wouldn't -- of course, it wouldn't be
14 strategy, but it would be potentially an offer
15 being made or procedural matters.  I think it's
16 work product.
17  Q.   Okay.  Do you believe that that goes
18 to -- that privilege goes to documents beyond
19 discussions involving any plea agreement offers
20 or other negotiations?
21  A.   Yes.
22  Q.   On page 2 for number 12 you have a
23 folder containing pre-trial discovery withheld
24 under Illinois Supreme Court Rule 415(c).  Do you
25 see that?

Page 14
1   A.   I see it.
2   Q.   Were you made aware that Judge
3  Hardwick had an order saying that you were to
4  disclose anything that would be otherwise
5  privileged under rule 415(c)?
6   A.   No, I'm not aware of that.  I'm aware
7  of an order from Magistrate Schanzle-Haskins
8  saying he agreed with our position.  We did not
9  have to release that pursuant to 415(c), but I'm
10 not aware -- maybe there is, but I'm not aware of
11 a Judge Hardwick order.
12  Q.   Okay.  Are you aware that Ms.
13 Thompson or somebody else at her firm went in to
14 get such an order?
15  A.   I'm not aware of that.  If she did, I
16 don't recall that.
17  Q.   Okay.  So you went by yourself, you
18 said, in November of 2014 to meet with
19 Dr. Denton?
20  A.   Yes, ma'am.
21  Q.   Okay.  What was discussed at that
22 meeting?
23  A.   Well, I wanted -- Jay and I had
24 discussed meeting with him and decided in
25 determining whether or not he would review with

Page 15
1  us certain aspects of discovery to determine
2  whether or not -- if he could determine cause of
3  death, manner of death of Cory Lovelace, and to
4  review certain findings by Jessica Bowman, and
5  other parts of the discovery.
6   Q.   Okay.  And what did he tell you or
7  what conclusions did you reach in the course of
8  your conversation?
9   A.   His whole discussion -- I mean the
10 premise of our -- of his discussion was that
11 suffocation was a rule-out cause of death.  That
12 was his -- that was the premise behind the
13 initial discussions, and that's where you start
14 is what he told me.  So rule out cause of death.
15 You have to rule out other causes of death to get
16 to the cause of death of suffocation; i.e., you
17 have to look to see whether there were other
18 causes of death -- natural causes that
19 potentially could have led to an individual's
20 death; in this case Ms. Lovelace's death.  So he
21 went back to the autopsy, and it was his opinion
22 that this autopsy was not very well done, and
23 that because it was not very well done, he could
24 not rule out certain natural causes of death.  So
25 therefore how can you get to suffocation if you

Page 16
1  can't rule out these other potential natural
2  causes of death?  That's it in a nutshell, and
3  it's not verbatim, of course, but --
4   Q.   Did he discuss with you anything
5  regarding whether Dr. Bowman should amend or come
6  off her determination of cause of death being
7  undetermined?
8   A.   Not that I can recall.  If he did, I
9  don't recall that.
10  Q.   Okay.  Did Dr. Denton ever tell you
11 that it was his belief that Dr. Bowman's report
12 and autopsy findings might put the issue of
13 reasonable doubt in a jury's mind?
14  A.   I don't know if he would have -- if
15 he said it in that fashion.  If he did -- if he
16 did, I don't recall.  He had a lot of problems
17 with the way the autopsy was conducted, I know
18 that, and his quote was, "I'm not excited about
19 this case.  I'm not gung-ho about this case," in
20 the context that there were so many problems with
21 the prosecution's theory of the case.
22  Q.   Okay.  Did he ever tell you what he
23 thought -- what he meant by he's not excited or
24 gung-ho about this case?
25  A.   That -- that -- that comment was made



Page 17

 1  after we went -- after he went through a litany
 2  of the problems with the -- with the autopsy and
 3  the -- why you couldn't rule out certain natural
 4  causes of death.
 5       Q.   Okay.  And what was the impression
 6  you got then when he made the statements that he
 7  wasn't excited with it or wasn't gung-ho about
 8  the case?
 9       A.   That -- my impression was?
10       Q.   Your impression.
11       A.   My impression was he didn't want to
12  be any part of this case.  He didn't want to be a
13  part of the prosecution of Curtis Lovelace
14  because he thought there were significant
15  problems with the case, and it was to the point
16  where when I walked out of that meeting I asked
17  him if he would be willing to testify on our
18  behalf.  Now, he didn't want to do that.  He
19  didn't want to be part of our case.  He didn't
20  want to be part of the prosecution's case.  He
21  didn't want any part of that.
22       Q.   Did he tell you that?
23       A.   That's exactly what he said.
24       Q.   He said, "I want no part of this
25  case"?

Page 18

 1       A.   I don't want any part of this case.
 2       Q.   Okay.  Did you press him as to why he
 3  wouldn't testify on Curtis's behalf?
 4       A.   No.  I was disappointed.  I didn't
 5  press him.  He made it very clear that he didn't
 6  want to be part of the case one way or the other,
 7  and I didn't press him.  I came back to the
 8  office, talked to Jay Elmore.  He was very
 9  surprised at the -- what I disclosed to him of
10  what Dr. Denton told us because he's notorious
11  for being a prosecution witness.  That's who
12  Dr. Denton is.  It's not -- I'm not going
13  critical of the guy on that aspect of it, you
14  know, but he's the guy that most county
15  prosecutors utilize in autopsies and expert
16  witness when it comes to the manner of death,
17  cause of death, those types of thing.  So we were
18  both shocked that he would point out that many
19  problems with the prosecution's case in this
20  case -- in the Lovelace case.
21       Q.   Okay.  Do you recall -- when you say
22  that he pointed out that many problems, do you
23  recall what he pointed out?
24       A.   Oh, I can recall several things.  I
25  can't -- I'd have to again refer to my interview,

Page 19

 1  but I can point out several for you.  There was a
 2  cut on Cory's lip somewhere -- as I recall it was
 3  the top lip.  There was an issue as to the timing
 4  of that laceration.  He was critical of
 5  Dr. Bowman for not doing a biopsy of that lip,
 6  which could have potentially told us how -- how
 7  long that cut had been there.  It was his opinion
 8  that that cut was an older injury.  That was
 9  premised upon him stating that there was the
10  absence of blood around the area.  There was
11  absence of blood on the covers.  There was
12  absence of blood on the pillow; in her mouth, for
13  example, and he opined that that would lead him
14  to believe that that is an older injury as
15  opposed to a fresher injury, and that again he
16  was critical of Dr. Bowman for not doing a biopsy
17  of that to try and determine the age of that
18  laceration.
19            There was -- we went over -- Jeff
20  Baird was the -- Detective Baird's -- he had a
21  timeline in this case, and I was curious because
22  we -- in the timeline Dr. Baird had mentioned --
23  I'm sorry, not Dr. Baird -- Detective Baird had
24  mentioned that Cory was warm to the touch, and
25  that there was mild lividity, and Dr. Denton felt

Page 20

 1  that that would be indicative of a more recent
 2  death rather than a death that had occurred days
 3  before as the prosecution was contending through
 4  their experts.  Again he was critical of the --
 5  he thought that there should have been biopsies
 6  of the heart, of the brain, of the -- heart,
 7  brain, lungs.  He felt that that would have again
 8  potentially ruled out other natural causes of
 9  death.
10            His concern was, for example, with
11  the -- with the lungs.  This woman had been sick
12  prior to her death.  He'd mentioned that if they
13  would have done a biopsy or if Bowman would have
14  done a biopsy of the lungs, it potentially could
15  have determined whether or not she suffered from
16  sepsis or whether she had some type of infection
17  which could have led to her death.  He indicated
18  that sepsis can cause seizures.  He was concerned
19  that the liver was extremely large, much more
20  larger than a normal woman's liver, and it was
21  fatty liver, and this can cause sudden death in
22  individuals, which can be caused by drinking,
23  which, of course, we know that Cory had a
24  drinking problem.  He said that that could have
25  affected potentially the brain and other organs,



Page 21

1 and again these biopsies would have helped
2 determine whether or not she was suffering from
3 these types of ailments.
4     He stated that the -- again I'm going
5 off of memory here. He stated that these marks
6 on her chin and her upper cheek area appeared to
7 him to be adult acne. He said that the -- the
8 laceration on the lip would not in his opinion be
9 caused by a pillow, that that would require more
10 force such as a hand. So he discounted that
11 theory that the prosecution was utilizing.
12     I'm sure there's more, but that's
13 what -- that's what comes to mind.
14   Q.  Do you recall if he said anything
15 about the cut inside Cory's lip?
16   A.  That's the one I've been referring to
17 if I said outside.
18   Q.  There was one on the outside, and
19 there was one on the inside.
20   A.  The one I'm referring to was the
21 inside which he felt was rather significant that
22 would have produced quite a bit of blood, and
23 again I don't remember the one on the outside,
24 but it's been a while so.
25   Q.  Okay. And do you recall what he told

Page 22

1 you about her arms in the air and the issue of
2 rigor mortis?
3   A.  Yeah, he thought that was unusual.
4 He couldn't explain the arms in the air. He just
5 left it at that, thought that was unusual. I
6 think we all thought that was unusual.
7   Q.  Okay. And so when you left that
8 meeting, you left it quite sure that he wanted
9 nothing to do with the case, correct?
10   A.  Yes, I mean we -- I was in a sense --
11 I wouldn't say happy. Surprised but disappointed
12 because I was hoping that he would agree to help
13 us out. In fact, he was pointing out so many
14 problems. I was hoping that he would be on board
15 and disappointed that he didn't -- that he wasn't
16 able -- wasn't going to do that.
17     So we came back -- and the discussion
18 Jay and I had, well, maybe we should take another
19 run at it down the road, see if he'll -- let him
20 think about it and maybe he'll change his mind.
21   Q.  Okay. So tell me about the second
22 run at it.
23   A.  We really never -- never took a
24 second run. Never got to that point. I sent
25 him -- we sent -- I sent him a follow-up letter.

Page 23

1 I believe it was in May of -- the interview was
2 November of '14. I think we sent him a follow-up
3 letter in May of '15 basically saying, listen,
4 it's been some time since we talked. Here's a
5 copy of the summary interview that I had prepared
6 from my notes. I'm not a medical expert. I'm --
7 you know, I know very little about that, and so I
8 wanted to make sure that my recitation of our
9 discussion was accurate. I told him in that
10 letter, please, if anything in that summary
11 interview is inaccurate or you think I've
12 misstated something, please let us know, and we
13 never got a response back.
14   Q.  And did you have occasion to speak
15 with him about the Lovelace case again?
16   A.  We did, and I -- we had a meeting --
17 actually there was a couple occasions. I'm
18 trying to figure out the time. We had -- Jay
19 called him on the phone while I was in Jay's
20 office, and he hadn't -- we tried several times
21 to call him. He didn't call us back. Jay, I
22 believe, had other cases with him, and he told us
23 -- as I recall, he told the secretary, whoever
24 answered the phone, if he could talk to
25 Dr. Denton, this is Jay Elmore, and I think he

Page 24

1 referenced the other case, not the Lovelace case,
2 and eventually Dr. Denton got on the phone, and
3 he -- he essentially was saying, listen, I've
4 been very busy. Sorry I didn't get back to you,
5 but I've been contacted by Mr. Parkinson from the
6 state's attorney's office, and I will be
7 preparing a report and sending that out to all
8 the parties.
9   Q.  Okay.
10   A.  Words to -- I mean there's more to
11 it, but that's what I can recall.
12   Q.  Okay. And then did you talk to him
13 again after that?
14   A.  I did -- we all had a meeting. We --
15 when I say "we all," Ed Parkinson, myself, Jay
16 Elmore, and Dr. Denton met at the Logan County
17 Courthouse. This was after we had received his
18 report, I believe, and we met there to discuss
19 not only the new report that was in contradiction
20 to the -- what he had told me.
21     So we met to discuss those issues
22 with him at the Logan County Courthouse, but I
23 don't recall the date.
24   Q.  Do you recall when that was?
25   A.  I don't.



Page 25

1  Q.  Okay.
2  A.  I'm thinking it would have been --
3  I'm guessing.  It really is simply a guess.  I'm
4  guessing the summer of 2015.  Again that's a
5  guess.
6  Q.  And so who said what at the meeting
7  with the four of you?
8  A.  Well, essentially I was trying to go
9  through the summary interview notes that I had
10  taken, that I had sent to him before, and he was
11  -- I mean I can't remember the details, but he
12  was backing off what he told me before with --
13  for lack of a better term, putting different
14  spins on it.  Saying, you know, that's not
15  exactly what I meant or that's not -- that's not
16  what I said, which I mean I was taken aback.  I
17  mean Jay wasn't there for the interview, but I
18  was completely shocked, and then the conversation
19  disintegrated when Jay basically told him,
20  "Listen, we've been trying to get a hold of you,
21  you've not returned our telephone calls," and
22  that's when he got furious and called an end to
23  the meeting.
24  Q.  Did he walk out?
25  A.  Yeah, I mean I would characterize it

Page 26

1  as walking out, yeah.
2  Q.  Okay.
3  A.  He was upset.  He was mad.
4  Q.  Okay.  Is your practice limited to
5  criminal defense?
6  A.  I do criminal defense and divorce
7  work.  That's the extent of my practice.
8  Q.  Okay.  How many murder cases have you
9  tried?
10  A.  Probably 15.
11  Q.  If a case is going to trial on a
12  charge of murder, would you ever expect that the
13  county forensic pathologist would testify for the
14  defense?
15  A.  Very rare.
16  Q.  Okay.  Because he does --
17  A.  Well, I mean the county prosecutor on
18  the case -- on the case itself, the one that
19  actually did the autopsy?
20  Q.  Not the prosecutor.  You mean the
21  forensic pathologist?
22  A.  Yes.  Your question would be the
23  forensic pathologist -- that was the pathologist
24  in the murder case, would that pathologist
25  testify for the defense?

Page 27

1  Q.  Correct.
2  A.  I've never seen that happen.
3  Q.  Wouldn't in your experience the
4  reason why the case got to be a murder trial and,
5  you know, through the whole charging process and
6  such is because the county forensic pathologist
7  found a cause of death that supported a murder
8  charge, correct?
9  A.  Are you talking about Bowman?
10  Q.  No, I'm talking about Denton.
11  A.  Repeat the question for me.
12  Q.  Okay.  You testified earlier that
13  Dr. Denton is known to be a witness for the
14  prosecution.
15  A.  Correct.
16  Q.  Okay.  He is numerous counties'
17  forensic pathologist, correct?
18  A.  That's right.
19  Q.  So wouldn't the reliance on his
20  autopsies in murder cases be a basis for the
21  murder charges to go forward so you would expect
22  him to testify for the prosecution, correct?
23  A.  Sure.  Yeah.  I agree with that.
24  Q.  Okay.  How much did -- strike that.
25  How much were you paid to defend Curtis Lovelace?

Page 28

1  A.  We got -- Jay and I got a hundred
2  thousand total.
3  Q.  And that was just for attorneys'
4  fees, correct?
5  A.  Correct.
6  Q.  Okay.  What about the expert fees for
7  Doctors Nichols and Teas?
8  A.  Yeah, I can't remember.  I can't
9  remember.  Nichols was, as I recall,
10  significantly higher than Shaku Teas, but I don't
11  recall without going back and looking at it what
12  each of them were paid.
13  Q.  Okay.  Did you front the costs for
14  those?
15  A.  I believe the family paid extra for
16  that.  It did not come out of our attorney fees.
17  Q.  Okay.  Are you familiar with
18  Dr. Bowman -- Dr. Jessica Bowman?
19  A.  I know who she is, yeah.  I know who
20  she is.
21  Q.  Have you dealt with her in the past
22  in cases that you've worked on?
23  A.  As I recall, we -- I'm trying to
24  think who was -- I can't remember if it was Jay
25  working on the case or maybe it was Bill Clutter



Page 29
1  assisting with a homicide case, I remember -- and
2  this has been a long time -- consulting with her
3  potentially regarding hiring her as an expert,
4  and we -- immediately after meeting with her, we
5  felt that that was not going to be a good idea.
6  That's like -- other than that I don't really
7  recall dealing with her much.
8      Q.   Okay.
9      A.   I heard -- heard things, hearsay, but
10 that's -- that's about it.
11     Q.   Okay.  Did either you or Mr. Elmore
12 or Bill Clutter approach Dr. Bowman in this case
13 about amending her finding of undetermined
14 because of all of the things that as you pointed
15 out were not a rule-out for suffocation?
16     A.   We discussed -- we met with her --
17 I'm trying to think where, but I think it was
18 Iowa.  We met with Dr. Bowman just to determine
19 whether or not we potentially wanted to call her
20 as a witness in this case.  I don't recall ever
21 asking her to amend her report.
22     Q.   Okay.  What did she tell you at the
23 meeting that you had with her?
24     A.   We were just going through her
25 findings.  I don't remember the specifics.  I

Page 30
1  wasn't taking notes.  We just went through her
2  autopsy findings.  We went -- as I recall,
3  discussed the injuries to Cory Lovelace, what she
4  felt about them, but really, like I said, I
5  didn't take notes.  I don't recall much of that
6  discussion.  When we got done I think it was our
7  position we're not going to -- I doubt we call
8  her as a witness.
9      Q.   Do you know a gentleman named Evan
10 Parke?
11     A.   Evan Parke?
12     Q.   Yeah.
13     A.   Not that I can recall.  If I do, I've
14 forgotten.
15     Q.   Okay.  When I say do you know, it's
16 like do you know of him or have you ever talked
17 to him even if you've never met him?
18     A.   I don't think I've ever talked to
19 him.  It doesn't ring a bell.
20     Q.   Okay.  Beyond all of the documents
21 that you got and the investigation that was done
22 by the Quincy P.D. and others, what investigation
23 was done by your office in the defense of Curtis
24 Lovelace?
25     A.   You mean in terms of preparation for

Page 31
1  trial?
2      Q.   Well, investigation as to the facts
3  of the case.
4      A.   Well, we obviously interviewed -- Jay
5  interviewed the Lovelace children.  I interviewed
6  Shaku Teas.  We interviewed Dr. Nichols, of
7  course, in Kentucky.  Bill Clutter did some
8  initial investigation early on, but then he kind
9  of disappeared on us later, but I mean that's the
10 extent of it.
11     Q.   Okay.  What did Bill Clutter do for
12 you?
13     A.   I'm trying to recall what he did.  I
14 mean I remember he went -- I'm not suggesting he
15 didn't do anything.  I just can't recall off the
16 top of my head what he -- what his role was.  I
17 know he definitely introduced us to Dr. Nichols.
18 He helped us find him as an expert, lined up the
19 interview with Dr. Nichols.  I believe he did
20 some research on cause of death, manner of death,
21 type of things in relation to suffocation cases
22 as I recall.  He corresponded with other experts
23 in trying to figure out if we could -- if there
24 were other experts available for us.  So he
25 definitely was helpful in that regard.

Page 32
1      Q.   Did anybody on your team -- when I
2  say your team, it would be you and Mr. Elmore and
3  anyone working with you, but did anybody on your
4  team issue any subpoenas?
5      A.   Oh, I'm sure we did.  I think, yes,
6  the witnesses -- I can't remember who we
7  subpoenaed, but I'm sure witnesses were
8  subpoenaed, yeah.  I just can't remember who they
9  were.
10     Q.   Did you issue any document subpoenas?
11     A.   I can't recall.
12     Q.   When did your involvement in the
13 defense of Curtis Lovelace end?
14     A.   When did we quit representing him?
15 You mean a date?
16     Q.   Well, no, I mean in the context of
17 things.  Not the date so much as where things
18 were in the progression of it.
19     A.   Well, once there was a -- once there
20 was a hung jury, unfortunately the family didn't
21 have the funds to retain us for a second trial.
22 So they went -- they decided to take a different
23 course of action.  I say "they," Mr. Lovelace and
24 Christine.
25     Q.   And then the Loevy firm came in to



Page 33
1  represent Mr. Lovelace, and your representation
2  of him ended at that point or some point around
3  that?
4      A.   Yeah, around that time frame,
5  correct.
6      Q.   And was your entire file turned over
7  to Tara's firm?
8      A.   I think Jay provided a copy of the
9  file to her firm.  I believe he did.
10     Q.   Okay.  Do you believe that there was
11 any police misconduct in the first trial?
12     A.   Police misconduct?  I would say that
13 -- I don't know if I'd use the term police
14 misconduct.  I don't -- Detective Gibson in my
15 opinion did not act appropriately.  When I say
16 that, I believe he had an agenda.  I'm going back
17 in time.  We know he met with Scott Denton.  We
18 know that Dr. Denton then refers him back to
19 Bowman.  I believe that Dr. Denton told Detective
20 Gibson some things that were negative about his
21 case or about Gibson's theory of the case.  I'm
22 concerned that there was no report from
23 Dr. Denton initially.  I'm concerned that Dr. --
24 or that Detective Gibson did not document his
25 conversations that he had with Dr. Denton.  It's

Page 34
1  concerning to me that Detective Gibson then upon
2  talking to Bowman goes and talks to Shaku Teas,
3  and then when he gets information from Shaku
4  Teas, Dr. Teas, that this is not a murder, that
5  this woman was not murdered, she died of natural
6  causes, it just didn't end.  And it -- it was our
7  position that Detective -- my position that
8  Detective Gibson wasn't getting what he wanted
9  because he had his own theory of the case, and
10 therefore he just kept looking to find an expert
11 that would support his theory of the case.
12          Now, is that police misconduct?  I
13 don't know.  That's up for -- that's for somebody
14 else to determine, but I don't think it's
15 appropriate, and I guess it could rise to the
16 level of misconduct if you have a police officer
17 that has his own agenda and is not listening to
18 the experts in the field, at least one of them
19 that he was referred to telling him this is not a
20 murder, and I believe potentially that Scott
21 Denton said the same thing to him, and the man
22 wouldn't give up and just kept looking for
23 somebody that would support his theory.  So I
24 don't know whether you call that police
25 misconduct or not, but it's not -- it's not fair,

Page 35
1  and especially when a man's life's on the line.
2  So I think it's a problem.
3      Q.   Now, what do you have other than your
4  opinion that -- do you have any evidence,
5  documents, conversations that would show that
6  Dr. Denton told Adam Gibson that this was not a
7  murder?
8      A.   Well, let's put it this way.
9  Dr. Denton made it clear to me that there was a
10 lot of problems with the case.  Now, maybe I
11 guess he could have, like he did before, he
12 backtracked before, so I guess he could have told
13 Detective Gibson something totally different than
14 he told me, and if he did, that's -- that's --
15 that's shameful, and that shows lack of
16 integrity.
17          But I -- I'm not -- we watched the
18 second trial, of course.  I did.  Like, I didn't
19 watch every day of it, but it was on, you know,
20 we could watch it online or read it online, and
21 I'm familiar with there are emails out there.  I
22 know that -- I haven't seen those emails, but I
23 know there were emails going back and forth
24 between Denton and Gibson.
25     Q.   You saw -- you saw Dr. Denton's --

Page 36
1  when he finally did a written report, you saw
2  that report, correct?
3      A.   I saw that report.  I did see that
4  report, but I'm talking about the correspondence
5  that we did not see -- that Jay and I did not
6  see, those emails that went back and forth, and I
7  was led to believe just by the trial and
8  discussions that were had by people -- and close
9  to the case that those emails were -- were -- led
10 me to believe that Denton again was expressing
11 concerns to Gibson that either this -- maybe he
12 didn't say this wasn't a murder, but there were
13 problems with the case.  That's what I was led to
14 believe, and it's concerning to me regardless of
15 what's in those emails -- I mean if there are
16 emails that are going back and forth between the
17 -- Dr. Denton and Gibson, we should have gotten
18 them in the first trial.  I mean that's -- that's
19 concerning.  In my opinion it's a discovery
20 violation, and that should have been -- we should
21 have received that.  That's problematic to me.
22     Q.   If Ed Parkinson had seen them, do you
23 believe he should have given them to you?
24     A.   Absolutely.  Absolutely.
25     Q.   Do you believe it's prosecutorial



Page 37

1  misconduct if he had seen them or he had them and
2  he didn't give them to you?
3      A.   I believe that is a clear discovery
4  violation, and if he had them and didn't give
5  them to us, I would say yes, that that would be
6  prosecutorial misconduct.
7      Q.   To this day you've never seen them,
8  correct?
9      A.   I've never seen them other than just
10 hearing about them during the course of the trial
11 and people talking about them.  I've not seen
12 them so I couldn't tell you what -- I couldn't
13 tell you the details of what are in these
14 details.
15     Q.   So your opinions are based on what
16 other people have told you about them?
17     A.   Correct.
18     Q.   Okay.  Do you believe that if
19 Dr. Denton told Adam Gibson that there were
20 problems with this case and all that such as what
21 he told you and somebody else was there that
22 agreed with Adam Gibson's rendition of what
23 Dr. Denton told them, that they would both be --
24 both have an agenda?
25          MS. THOMPSON:  Object to form.

Page 38

1      A.   I'm not even sure I understand the
2  question.
3  BY MS. EMERY:
4      Q.   Well, Jim Keller was with Adam Gibson
5  when he met with Dr. Denton.  You know that,
6  right?
7      A.   I'm not sure I knew that.  If I did,
8  I've forgotten that fact.
9      Q.   Okay.  If I tell you he was with Adam
10 Gibson and they both came away from the meeting
11 with Denton convinced that, unlike how you came
12 away, that this was a murder, do you think
13 they're both making it up?
14     A.   I wouldn't know why Dr. Denton would
15 tell me one thing and tell them another.  So
16 that's -- that's problematic to me.  Why would
17 Dr. Denton sit down with me and point out all the
18 problems with the prosecutor's case, tell me he
19 didn't want any part of that case, and then tell
20 Gibson and Keller something different?  Why would
21 he do that?  That's a concern to me if that
22 happened.
23     Q.   Okay.
24     A.   Because he's being -- he's being
25 deceitful to somebody.  They can't both be right.

Page 39

1  So that's a problem for me.
2      Q.   Do you think then that after the
3  meeting that the report that you saw was
4  deceitful?
5      A.   I do.  I do.
6      Q.   Okay.
7      A.   I absolutely do.
8          MS. EMERY:  I don't have any further
9  questions.
10         THE WITNESS:  Okay.
11         MS. EMERY:  I'm sure Mr. Hansen does.
12             EXAMINATION
13 BY MR. HANSEN:
14     Q.   Okay.  So let me -- first of all, I
15 represent the county and Gary Farha.  Okay.  Do
16 you know Gary?
17     A.   Yeah, I know Gary.  I know of him.
18     Q.   All right.  Did you have any
19 interaction at all in your defense of Curt
20 Lovelace with Gary Farha?
21     A.   Gosh, other than, you know, Jay
22 Elmore's from Quincy, you know, those guys would
23 -- I think we would maybe see them at lunch, but
24 I didn't have any interaction with him that would
25 even be related to this case, no.

Page 40

1      Q.   Okay.  All right.  Now, you just got
2  done telling us about how Scott Denton told you
3  one thing, that you came back to your office to
4  memorialize in your interview notes, and typed
5  that up and then later sent that to Scott Denton?
6      A.   Correct.
7      Q.   You then saw that Dr. Denton issued a
8  report in June of 2015.  I'll represent to you
9  that's when his report was written.  That -- I'll
10 use whatever term you want, but let's just say
11 contraindicated or was in opposition of what he
12 had told you in November; is that fair?
13     A.   Fair.
14     Q.   Okay.  And it was that report that
15 you believe was deceitful when he signed his name
16 to it because he told you something different?
17     A.   Correct.
18     Q.   Okay.  So if in fact he told those
19 things to Jim Keller and Adam Gibson, clearly
20 that was what got memorialized in his written
21 report which you believe was in opposition to
22 what he told you?
23         MS. THOMPSON:  Object to form.
24     A.   I don't know what he told Gibson or
25 Keller.



Page 41

1  BY MR. HANSEN:
2  Q.  Okay.
3  A.  I have no idea what he told them, but
4  what I do know is those -- whenever he did tell
5  Keller and Gibson, we should have received that
6  through the course of discovery.
7  Q.  Okay.
8  A.  Regardless of whether it was negative
9  or positive, it should have been disclosed to us.
10  Q.  Okay.  And you received your
11  discovery through the prosecutor who you're
12  dealing with?
13  A.  That's right.
14  Q.  Okay.  Back to your original meeting
15  with Scott Denton in November of 2014, I believe
16  you said you walked away from that meeting with
17  the understanding that Denton wasn't going to
18  testify for you?
19  A.  Correct.
20  Q.  But he wasn't going to testify for
21  the prosecution either?
22  A.  That was the impression I got.  He
23  didn't want to testify either way.  He didn't
24  want any part of the case, but again I didn't --
25  I didn't know whether the prosecution was going

Page 42

1  to follow up and try to solicit him or have him
2  testify for them, but yeah, I would -- that's a
3  fair comment.  I didn't think when I left, gosh,
4  he's not going to testify.
5  Q.  You would agree that the prosecution
6  has a right to contact Dr. Denton to speak to him
7  as well?
8  A.  Of course.
9  Q.  Okay.  And did you -- did you take
10  issue with the fact that Gibson contacted Denton?
11  A.  No.
12  Q.  Okay.  Did --
13  A.  Not at all.
14  Q.  Okay.  And you didn't take issue with
15  the fact that he contacted Shaku Teas?
16  A.  Not at all.
17  Q.  Okay.  How many experts did Bill
18  Clutter contact on your behalf?
19  A.  I couldn't answer that.  I know that
20  there were several names that he threw out.  In
21  terms of how many he actually talked to, I'm not
22  sure.
23  Q.  Do you know how many rejected getting
24  involved in the case?
25  A.  I don't.

Page 43

1  Q.  Do you know if any of those rejected
2  by saying, look, I believe this woman was
3  murdered?
4  A.  No, I don't recall -- I don't believe
5  that it even got to that point.  I think he gave
6  us some names.  We discussed the names -- or he
7  had some names.  We ended up with Nichols.  No, I
8  don't believe that we ever sent out materials
9  that I can recall where they said -- where an
10  expert said this lady was murdered, no.  It was
11  just tough finding an expert.  I -- I -- I'm
12  going back in time.  I would say we had to find
13  somebody that was in our price range, that was --
14  would be willing to work with us in this case, so
15  -- but no, I don't believe we ever sent out any
16  discovery to an expert where they came back and
17  said no, this is murder.  I'm not getting
18  involved.  That I recall.
19  Q.  Have you had that happen in your
20  career?
21  A.  Sure.  Sure.
22  Q.  Okay.  And you don't stop there; you
23  have to find somebody to best represent your
24  client?
25  A.  That's right.

Page 44

1  Q.  Okay.  And in this case you needed
2  expert testimony; you agree with me?
3  A.  I think we needed expert testimony,
4  yeah.
5  Q.  And no matter how many times anybody
6  would have told you no, we're not going to help,
7  you would have kept going on to find an expert to
8  testify on behalf of Curt?
9  A.  Well, I mean unless there's -- unless
10  it's just clear, which it wasn't in this case --
11  I mean if it's clear that any expert we would
12  contact is going to say it's murder, you go
13  without an expert.
14  Q.  Okay.  But in this case reasonable
15  minds differ and there was experts on both sides,
16  correct?
17  A.  Well, there were experts on both
18  sides, right.
19  Q.  So there were experts for the
20  prosecution including Mr. Baden and Ms. Turner
21  who believed Cory Lovelace died of suffocation or
22  some means that constituted murder, correct?
23  A.  That's right.
24  Q.  Okay.  And you had experts on your
25  side that felt otherwise, correct?



Page 45
1   A.   That's right.
2   Q.   And you called them to testify in the
3  defense?
4   A.   That's correct.
5   Q.   And ultimately that's what a jury is
6  put there to decide?
7   A.   That's what they decide, that's
8  right.
9   Q.   In this case the jury weighed the
10 opinions of all of the experts when they came to
11 their conclusion?
12  A.   That's right.
13  Q.   And in this case you got a hung jury?
14  A.   We did.
15  Q.   And do you know the split out on
16 that?
17  A.   I heard that it was 6/6.  That's what
18 I heard.
19  Q.   Okay.
20  A.   But I didn't interview any of the
21 jurors.  I know that they were -- there was some
22 show where they were interviewed as I recall --
23 maybe I shouldn't -- I -- I don't remember during
24 that interview with the jurors whether or not
25 they said what the split was, but I heard it was

Page 46
1  6/6, but it wasn't through that television
2  interview, I don't believe.
3   Q.   And that's what I was going to ask
4  you.  Did you interview any of them or follow up
5  with them?
6   A.   I didn't.
7   Q.   Okay.  And if it was 6/6 -- let's
8  assume that's what the breakout was, there were
9  six people that thought he was guilty of murder
10 and six people who thought he was not, correct?
11  A.   Correct.
12  Q.   Had you -- well, strike that.  When
13 you walked out of the meeting with Jessica
14 Bowman, were you and Jay both there?
15  A.   Yeah.
16  Q.   Okay.
17  A.   Yeah.
18  Q.   Did you both know you weren't going
19 to call her at trial?
20  A.   No, I don't think -- I don't think it
21 was immediate.  I think we -- you know, it was --
22 it was interesting because it was a question
23 of -- it was one of these going back and forth.
24 Was -- was Parkinson going to call her, or were
25 we going to call her, and I just -- I don't -- I

Page 47
1  don't -- I'm not suggesting that we made that
2  decision right then and there.  I think we
3  probably went back, discussed it and said, gosh,
4  you know, we're not -- we're not going to call
5  her.
6   Q.   Ultimately was there a stipulation
7  reached as to her not testifying?
8   A.   I think there was.  I think you're
9  right.  I think there was some stipulation at
10 some point with Bowman.  There would have had to
11 have been.  She did the autopsy, and then --
12 yeah, there was.
13  Q.   As there was with Denton?
14  A.   Correct.  I think there was with
15 Denton too, yeah.
16  Q.   Because wasn't that the discussion
17 that you may become a witness?
18  A.   A potential witness, that's right,
19 yep.
20  Q.   So the parties in this case,
21 prosecution and the defense, entered into
22 stipulations to not call both Scott Denton and
23 Jessica Bowman?
24  A.   I believe you're correct on that.
25  Q.   And in your meeting with Dr. Denton

Page 48
1  in November of 2014 --
2   A.   Now, wait.  Let me just go back and
3  make sure we're clear.  On the Denton, as I
4  recall, there was not any stipulation as to cause
5  of death, manner of death.  I think it was more
6  of a procedural thing, a chronological sequence
7  of events, as I recall, as opposed to if Denton
8  were called to testify, he would testify that
9  this was a murder, this was not a murder, this
10 was a cause of death, those types of things.
11  Q.   Okay.  He didn't render opinions in
12 the case as to those items?
13  A.   Right.  Right.
14  Q.   Okay.  When you left your meeting
15 with him in November of 2014 and he had told you
16 he didn't want any part of this case, was one of
17 the other reasons he communicated to you was the
18 fact that Jessica Bowman was involved?
19  A.   Absolutely.  That was also part of
20 the discussion.  He did not -- he was not fond of
21 Jessica Bowman.  He didn't use those terms, but I
22 mean yeah, there was issues that he had with
23 Bowman also.
24  Q.   Is that in part due to the fact that
25 he was called in a lot of the criminal cases



Page 49

1 around Sangamon County, Macon County, Morgan
2 County after Ms. Bowman was discredited and let
3 go and he had to testify in those cases or some
4 people would say clean up her mess with some of
5 her autopsy reports?
6    A.   I think that's an accurate statement,
7 yeah.
8        MR. HANSEN:  Yeah.  I don't have
9 anything else.  Thanks.
10       THE WITNESS:  Uh-huh.
11       MS. THOMPSON:  Nothing from us.
12       THE WITNESS:  Okay.
13       MS. EMERY:  Thanks very much.
14       THE WITNESS:  No problem, guys.
15 Thanks for accommodating my schedule.
16       MS. THOMPSON:  Are you reserving or
17 waiving?
18       THE WITNESS:  I'll waive.  Yeah, I'm
19 good.
20       MS. EMERY:  I've ordered.  Do you
21 want an E-tran?
22       MR. HANSEN:  Yeah, I'll take E-tran
23 by PDF.
24 (The deposition was concluded at 2:15 p.m., and
25 the signature of the deponent was waived.)

Page 50

1                CERTIFICATION
2        I, Rhonda Rhodes Bentley, CSR, a
  Certified Shorthand Reporter (IL), do hereby
3 certify that JEFF PAGE, came before me on
  NOVEMBER 20, 2018, and swore before me to testify
4 to the truth, the whole truth and nothing but the
  truth regarding her knowledge touching upon the
5 matter in controversy.
6        I do further certify that I did take
  stenographic notes of the questions propounded to
7 said witness and her answers thereto and that
  said notes were reduced to typewritten form under
8 my direction and supervision.
9        I do further certify that the
  attached and foregoing is a true, correct and
10 complete copy of my notes and that said testimony
  is now herewith returned.  I do further certify
11 that said deposition was taken at the Law Offices
  of Elmore & Reid, 808 South Second Street, 1st
12 Floor, Springfield, Illinois.
13       I do further certify that I am not
  related in any way to any of the parties involved
14 in this action and have no interest in the
  outcome thereof.  Dated at Divernon, Illinois,
15 November 27, 2018.
16
17
18  
    _____
19    Rhonda Rhodes Bentley, CSR
      CSR# 084-002706
20
21
22
23
24
25