E-FILED
Monday, 08 July, 2019 02:46:58 PM
Clerk, U.S. District Court, ILCD

IN THE UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF ILLINOIS


CURTIS LOVELACE, LOGAN              )
LOVELACE, LINCOLN LOVELACE         )
and CHRISTINE LOVELACE on          )
behalf of her minor son,           )
LARSON LOVELACE,                   )   No.17 cv 01201
                                   )
          Plaintiffs,              )
                                   )
 vs.                               )

DET. ADAM GIBSON, POLICE
CHIEF ROBERT COPLEY, SGT.
JOHN SUMMERS, LT. DINA
DREYER, DET. ANJANETTE
BISWELL, UNKNOWN QUINCY
POLICE OFFICERS, GARY FARHA,
CORONER JAMES KELLER, THE
CITY OF QUINCY and COUNTY OF
ADAMS,

          Defendants.


     The CONTINUED VIDEOTAPED

deposition of CURTIS LOVELACE, taken under oath

at the Hampton Inn, 100 Harvester Drive,

Burr Ridge, Illinois, at 1:35 P.M. on Thursday,

January 31, 2019 pursuant to the Rules of the

United States District Court, Northern District

of Illinois, before Carol M. Siebert-LaMonica,

C.S.R. No. 084.001355 in and for the County of

Cook and State of Illinois, pursuant to notice.

2

1    APPEARANCES:

2

3        LOEVY & LOEVY, by

4        MS. TARA THOMPSON

5        311 North Aberdeen Street, 3rd Floor

6        Chicago, Illinois  60607

7            Appeared on behalf of the plaintiffs;

8

9        ANCEL GLINK DIAMOND BUSH DICIANNI &

10       KRAFTHEFER

11       MS. ELLEN K. EMERY

12       140 South Dearborn Street

13       Chicago, Illinois  60603

14           Appeared on behalf of the Quincy

15            defendants;

16

17       SCHMIEDESKAMP ROBERTSON NEU & MITCHELL

18       MR. JAMES A. HANSEN

19       525 Jersey

20       Quincy, Illinois  62301

21           Appeared on behalf of the defendants

22            Gary Farha and Coroner James Keller

23            and the County of Adams;

24

3

1    ALSO PRESENT:

2            MR. RICK KOSBERG, VIDEOGRAPHER

3            MS. CHRISTINE LOVELACE

4                 - - - - -

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

4

1          MR. VIDEOGRAPHER:  This is the video

2     deposition of Curtis Lovelace taken by the

3     Defendants in the matter of Lovelace et al.

4     v City of Quincy and County of Adams, et al.

5     Case No. 17 CV 1201.

6               Held at the Hampton Inn,

7     100 Harvester Drive, Burr Ridge, Illinois.

8               Today is January 31st, 2019.

9               The time is 1:39.

10              The court reporter is Carol

11    Siebert-LaMonica.

12              The videographer is Rick Kosberg.

13              The counsel can now introduce

14    themselves.

15              And the court reporter is free to

16    administer the oath.

17         MS. THOMPSON:  This is Tara Thompson

18    representing Curt Lovelace and the other

19    plaintiffs.

20         MS. EMERY:  Ellen Emery representing

21    the Quincy defendants.

22         MR. HANSEN:  Jim Hansen representing

23    the Adams County defendants.

24              THE REPORTER:  Carol Siebert from

5

1    Siebert & Associates Court Reporters. Raise

2    your right hand.

3                    CURTIS LOVELACE,

4    called as a witness herein, having been first

5    duly sworn, was examined upon oral

6    interrogatories and testified as follows:

7                    (Witness sworn.)

8

9                    EXAMINATION

10   BY MR. HANSEN:

11       Q.   Good afternoon, Curt.

12               You are aware you are here today

13   because the Court granted the defendants

14   additional time to conduct further questioning

15   from your deposition that was taken previously

16   in this case, correct?

17       A.   I'm aware of that.

18       Q.   And you are a licensed attorney in the

19   State of Illinois, so you understand that you

20   are still under oath as if you were

21   participating in that first deposition?

22       A.   And I just took the oath so --

23       Q.   Fair enough.  Same rules apply, you

24   know what they are, if I ask a question you

6

```
 1   don't understand, let me know and I will
 2   rephrase it, okay?
 3        A.   Okay.
 4        Q.   I don't have that much today, and
 5   hopefully this will move quickly.
 6             So picking up on that, you are
 7   currently licensed in the State of Illinois to
 8   practice law, correct?
 9        A.   I am.
10        Q.   And you practice from Champaign,
11   Illinois?
12        A.   My office is in Urbana, Illinois.
13        Q.   Okay.  So earlier in this case we were
14   trying to set some things, and I believe your
15   counsel told us that for whatever reason, one
16   of the items that precluded the date and time
17   which were discussing was I think you had a
18   motion or a docket in Southern Illinois.
19             And what I want to know is out of
20   Urbana, how far currently do you go south for
21   any active cases in which you are
22   participating?
23        A.   How far south?  As far as Court
24   appearances, 3 to 4 hours.
```

7

1      Q.    Okay.  Do you know what County that

2   is?

3      A.    I would rather not identify counties,

4   just because I'm not -- I mean then I think

5   there is a chance that I'm identifying clients

6   that I might represent, but I mean I do

7   represent clients in a number of counties

8   throughout the State of Illinois.

9      Q.    Well, if I were to go to that county

10  and Google and find out, that's public

11  information?

12     A.    Sure.

13     Q.    So I'm asking you to identify the

14  county.  I'm not asking for privileged

15  information.  But I'm going to sit here and go

16  over with you the cases you have in Adams

17  County.

18     A.    Okay.

19     Q.    So I want to know how far south, and

20  what counties you go and practice in currently?

21        MS. THOMPSON: Can I confer with my

22  client, just about the privilege issue, because

23  I think that will move us forward.

24        THE WITNESS:  Okay.

8

1           MR. HANSEN:  Sure.

2                (Discussion had off the record.)

3   BY MR. HANSEN:

4      Q.   Okay.  So having conferred with your

5   counsel, are you prepared to answer my prior

6   question, which is what is the county that you

7   identified 3 to 4 hours south of Urbana?

8      A.   Yes.  Yes, I am.  I have a case in

9   Madison County, Illinois.

10     Q.   That's in Edwardsville?

11     A.   Yes.

12     Q.   Okay.  And you practice as far west as

13  Quincy, correct?

14     A.   Adams County.

15     Q.   In fact, I'm going to go over some of

16  the cases, and I want to ask you about them.

17                One of the cases is People

18  versus Roger Willing, correct?

19     A.   That is correct.

20     Q.   And that is an active criminal

21  misdemeanor case?

22     A.   That is correct.

23     Q.   And when is the last time you appeared

24  in that case, was it recently?

9

1      A.   Yes, it was last week, I believe.

2      Q.   Okay.  And that was on the docket at

3 the Adams County misdemeanor docket?

4      A.   Correct.

5      Q.   And People v Rusty Willing, is that an

6 active criminal case?

7      A.   Yes, it is.

8      Q.   And that's a criminal felony case?

9      A.   Yes, it is.

10      Q.   And you represent Rusty Willing?

11      A.   Correct.

12      Q.   And Alexis Willing is a criminal

13 felony case in which you are representing the

14 defendant, true?

15      A.   Correct.

16      Q.   And that's an active case as well?

17      A.   Correct.

18      Q.   Okay.  And you had a prior case that I

19 believe is resolved, Judy Sparks v Robert

20 Sparks which was a divorce case?

21      A.   Yes.

22      Q.   And you represented the plaintiff Judy

23 Sparks?

24      A.   Correct.

10

1      Q.   And that was a dissolution of marriage

2  which was finalized on May 17, 2018, on or

3  about that time?

4      A.   Yeah, I think -- I think that's

5  correct.

6      Q.   Other than the three I will call them

7  the Willing cases, do you have any other active

8  cases that you currently are the attorney of

9  record for any of the parties in Adams County?

10     A.   May I confer real quick.

11     Q.   First of all, that's a yes or no

12  question.

13          Do you have any active, I'm not

14  asking you the names, I'm asking if you have

15  any other active cases in Adams County?

16     A.   I think the best way to answer that is

17  that I filed an entry of appearance, but I

18  don't think it is a matter of public record yet

19  in another case in Adams County.  So I don't

20  want to identify anything there until that is a

21  matter of public record.

22     Q.   Did you use the e-file?

23     A.   Adams County doesn't accept e-file for

24  criminal cases.

11

1          Q.   Okay.  When did you file your entry of

2     appearance, was it last week?

3          A.   I mailed it out earlier this week.

4          Q.   Okay.  On all of these cases, are you

5     as the attorney of record, being paid?

6          A.   Not on all of those cases.

7          Q.   Okay.  On some of them or on at least

8     one of them are you being paid?

9          A.   Yes, on some of them I am being paid.

10         Q.   Were you paid in the Sparks case?

11         A.   Again I feel uncomfortable saying what

12     clients paid and what clients didn't pay me.

13         Q.   Well, your complaint alleges you can't

14     practice law in Quincy, Illinois as a result of

15     the actions of the defendants and that you

16     can't make a living over there.

17              I believe my question is relevant

18     to your allegations.

19              So I'm not asking you the

20     amounts.

21         A.   Okay.

22         Q.   I'm asking you were you paid. That's

23     it.  So were you paid and receive a fee as the

24     attorney of record in the Sparks case?

12

1          A.    No.

2          Q.    You did that work pro bono?

3          A.    I did.

4          Q.    And your case in Madison County, are

5     you doing that pro bono?

6          A.    No.

7          Q.    As far as the 8th Judicial Circuit,

8     the counties that make that circuit up, do you

9     have any active cases, other than the ones we

10    described in Adams County?

11         A.    No.

12         Q.    Okay.  Do you practice at all in the

13    9th Circuit, which would be for instance

14    Hancock County, Carthage, Macomb, Galesburg,

15    Monmouth, that area?

16         A.    I don't have any active cases there.

17         Q.    How far north does your practice

18    currently extend, do you have cases in Cook

19    County?

20         A.    I do not have any cases in Cook

21    County.  I do have cases in the first district.

22         Q.    Which is where?

23         A.    I mean they were Cook County

24    convictions.

13

1      Q.   Okay.  All right.

2      Q.   They are on appeal?

3      A.   Yes.

4      Q.   And you are handling the appeal for

5  that?

6      A.   Yes.

7      Q.   Is there more than one?

8      A.   Two first district cases.

9      Q.   Are you licensed in any other states

10  other than Illinois?

11     A.   No.

12     Q.   When you were employed at the Adams

13  County State's Attorney's Office you were aware

14  that jail calls of inmates were monitored,

15  correct?

16     A.   When I was employed at the Adams

17  County --

18     Q.   Sure.

19     A.   I don't think I had phone calls.  I

20  don't think I had -- I never heard a jail call.

21  Yeah, I was probably aware of that.

22     Q.   You knew that was a mechanism that the

23  State's Attorney could work with law

24  enforcement to obtain information from those

14

1    calls?

2         A.    I never had any personal experience or

3    was aware of any cases where that information

4    was used or utilized or the process.

5                   So I did not have any personal

6    dealing with law enforcement as a State's

7    Attorney as to hey, let's listen to a phone

8    call or received e-mails from law enforcement

9    saying that here -- here is a phone call you

10   might want to listen to that.  I did not have

11   that experience, no.

12        Q.    You might not have had that experience

13   but did you have that knowledge that that was a

14   tool that was available to State's Attorneys

15   and law enforcement?

16        A.    I don't know that I ever thought about

17   it.  I probably was aware that jail calls would

18   be monitored.  I mean I think that's -- it is

19   fair to say that that's something that happens.

20        Q.    Is it fair to say that that's one of

21   the introductory principals taught in criminal

22   law classes in law school?

23        A.    About monitoring jail phone calls?

24        Q.    Yes.

15

1          A.    In none of the classes that I attended

2     at the University of Illinois in criminal law

3     or criminal procedure were jail calls discussed

4     that I'm aware of.

5                    There may have been something in

6     criminal procedure regarding reasonable

7     expectation of privacy regarding phone calls or

8     searches or anything like that.

9                    There may have been cases

10    regarding that that I would have studied, but

11    as far as the practical aspect of monitoring

12    phone calls for purposes of criminal

13    investigations, no, I don't remember that.

14         Q.    As you sit here today you have

15    attended many of the depositions in this case,

16    true?

17         A.    Yes.

18         Q.    And you are familiar with your

19    complaint that you filed in this case?

20         A.    Yes.

21         Q.    As you sit here today, I want you to

22    tell me, what is the evidence that you rely on

23    that Gary Farha fabricated to support your

24    allegations against him in this lawsuit?

16

 1        A.   I was at Gary Farha's deposition.  I

 2    did not -- I've not reviewed a copy of his

 3    deposition.

 4              So I have not made an evaluation

 5    of the evidence against Gary Farha as to his

 6    fabrication of evidence.

 7              Again, and I think I spoke to

 8    this at the last deposition, I am aware of

 9    e-mail communication between him and Adam

10    Gibson regarding the investigation.

11              And I don't believe there was

12    anything else that I learned that I can recall,

13    just from memory, from my attendance at his

14    deposition.

15        Q.   I'm not limiting it to your attendance

16    at his deposition.  I'm limiting it to all of

17    the facts and evidence and documents and

18    discovery that have been produced in this case

19    as to Gary Farha.

20              So other than e-mail

21    communication between him and Adam Gibson, is

22    there anything, as you sit here today, you can

23    point me to that you believe shows Gary Farha

24    fabricated evidence in your underlying two

17

1    murder trials?

2         A.    There is nothing that I can sit here

3    today to point to that to explain that to you.

4         Q.    Same question then for Jim Keller, can

5    you sit here and tell me the evidence Jim

6    Keller fabricated that you are suing him for in

7    your lawsuit that we are here for today?

8         A.    I believe that Jim Keller fabricated

9    his observations that he shared at some point,

10   which I'm not sure when, with Adam Gibson

11   regarding his involvement on February 14, 2006.

12   That's what I believe.

13        Q.    And when you say fabricated his

14   observations you mean of Cory's body?

15        A.    Correct.

16        Q.    And the state in which he found her

17   body?

18        A.    His description, yes, I believe that

19   is fabricated.

20        Q.    And you believe that description that

21   Keller gave regarding what he saw and observed

22   at the scene on February 14th of 2006 was

23   fabricated in his communications with Adam

24   Gibson?

18

1      A.   In his -- yeah, in his -- I believe it

2  was fabricated.

3      Q.   Anything else that you can point me to

4  as you sit here today that you believe Jim

5  Keller fabricated that ended up with you being

6  tried twice for the murder of your wife?

7      A.   I'm aware of e-mail communication

8  between Jim Keller and Dr. Denton.  I don't

9  remember the specific -- I don't remember

10  specifics.  I would have to look at those

11  e-mails where he communicated things about the

12  investigation that I think are fabricated.

13      Q.   You would agree with me you are not

14  saying the e-mails were fabricated, because

15  they were sent and received?

16      A.   Right.

17      Q.   What you are saying is the information

18  contained within the e-mails that Keller sent

19  to Denton you believe contained information

20  that was fabricated by Jim Keller?

21      A.   I believe so.  And again I haven't

22  looked at those e-mails for quite sometime.

23      Q.   So what that information that's

24  contained within the e-mails sent to

19

1    Mr. Denton, you can't tell me, you could just

2    generally state that you believe there was

3    fabricated information in those e-mails?

4         A.   Yes, just generally, yes, without

5    looking at those e-mails.

6         Q.   You agree ultimately it was Ed

7    Parkinson's decision whether or not to

8    prosecute you for the charge of murder?

9         A.   I know that Ed Parkinson presented

10   that to the Grand Jury.  I am not sure who,

11   what conversations he had with other people

12   regarding that decision.

13        Q.   You agree with me that the State's

14   Attorney in this case -- Strike that.

15             You will agree with me that a

16   special prosecutor that was appointed in this

17   case due to the conflict that John Barner had

18   with Ed Parkinson?

19        A.   Correct.

20        Q.   And Ed Parkinson presented the case to

21   the Grand Jury?

22        A.   Correct.

23        Q.   And the Grand Jury came back with

24   their indictment?

20

1      A.   Correct.

2      Q.   Okay.  And then it was Ed Parkinson

3  and his office who presented that case to the

4  jury in Adams County at your first trial?

5      A.   That is correct.

6      Q.   Okay.  And all of the decisions

7  regarding the evidence and the witnesses to be

8  put on by the state was the doing of Ed

9  Parkinson and his office?

10     A.   Yes.  I mean at the time after his

11  appointment as the special prosecutor, yes.

12     Q.   And --

13     A.   That I'm aware of, yes.

14     Q.   And after the hung jury in the first

15  trial, before the second trial was even

16  commenced, it was Ed Parkinson and the special

17  prosecutor's office of which he was a member,

18  their decision whether or not to charge you and

19  bring that second trial?

20     A.   As far as I know, yes.

21     Q.   Well, as you sit here today, I mean as

22  far as you know, who else was there, I mean

23  that's what we all know, right?

24     A.   Right.

21

 1       Q.   Okay.  So Ed Parkinson testified, and

 2   you were at his depo, that he made the decision

 3   to bring the second case to trial against you

 4   after the first hung jury verdict, correct?

 5       A.   I don't remember him -- I'm sure he

 6   testified to that, I don't remember that

 7   specifically, but yes.

 8       Q.   Okay.  And again at that second trial

 9   it was the state special prosecutor Ed

10   Parkinson and his office and the individuals

11   that I believe is David Robinson from his

12   office that presented that trial with the

13   witnesses and the evidence, correct?

14       A.   Ed Parkinson and David Robinson

15   represented the People of the State of Illinois

16   in my second trial.  Ed Parkinson alone

17   represented the People of the State of Illinois

18   in my first trial.

19            MR. HANSEN:  That's all I have.

20

21                 EXAMINATION

22   BY MS. EMERY:

23       Q.   Okay.  Mr. Lovelace, some other

24   questions for you on these cases that you have

22

  1    in other counties.

  2              Between your release and the end

  3    of the second trial in 2017 and today, what

  4    counties have you had cases in even if those

  5    cases are currently closed?

  6              MS. THOMPSON:  I'm going, Curt, to the

  7    extent that you are negotiating with current

  8    clients in various counties for which you have

  9    not filed appearances, to protect those

 10    clients' privilege, I'm going to instruct you

 11    not to include those in your answer.

 12              But if you have closed matters,

 13    you could talk about those.

 14              THE WITNESS:  Okay. So --

 15              MR. HANSEN:  Hold on.  I'm just going

 16    to object.  Well, if he is counsel of record,

 17    that's public information.

 18              MS. THOMPSON:  I agree.  That's what I

 19    am saying.

 20              THE WITNESS:  Okay.  Yeah.  Again I'm

 21    not trying to be evasive here obviously, I just

 22    want to be very careful on what information I

 23    disclose, because I have a duty to my clients.

 24              MS. THOMPSON:  Don't disclose anything

23

1    that's been on the record in a current or past

2    case, Curt

3              THE WITNESS:  Okay.  All right.  So

4    what cases --

5    BY MS. EMERY:

6         Q.    What counties?

7         A.    What counties am I an attorney of

8    public record or I have been an attorney of

9    public record.

10        Q.    Since the end of the second trial.

11        A.    Okay.  Right.  And I became licensed

12   to practice law or I become active in May of

13   2017.  So that's when I would have started to

14   practice law again.

15        Q.    And that's when you fulfilled your CLE

16   requirements?

17        A.    I fulfilled my CLA and became

18   registered again.

19        Q.    Okay.

20        A.    So I have been the attorney of record

21   in Champaign County.  I've been the attorney of

22   record in Hancock County, Adams County, I've

23   already said Madison County and Coles County.

24        Q.    You talked about the first district

24

1   that you had or have two appeals pending

2   before, any other Appellate Courts in which you

3   are counsel of record?

4        A.    4th District.

5        Q.    How many?

6        A.    I have been the attorney of record --

7   how many cases have I been the attorney of

8   record in the 4th District?

9             Give me a second I just have to

10  count them off.  I believe five.

11       Q.    And Federal Courts, any closed or

12  pending cases in the central district?

13       A.    One.

14       Q.    Is that in the central district?

15       A.    Yes.

16       Q.    Out of which branch?

17       A.    It is Urbana.

18       Q.    Is that pending or closed?

19       A.    It is pending.

20       Q.    How about Federal Courts, the 7th

21  Circuit?

22       A.    No.

23       Q.    How many cases did you have in Adams

24  County, we went through the Willing cases, but

25

1    how many have you had since May of 2017 that

2    are closed?

3        A.    The only one that is closed is Sparks.

4        Q.    And were there any cases in Adams

5    County which are currently now on appeal?

6        A.    No.

7        Q.    Were you counsel of record in a

8    criminal sexual assault case for Wesley Irvin,

9    I R V I N?

10       A.    Was I?

11       Q.    Yes.

12       A.    No.  I mean was I, no.

13       Q.    Okay. Were you involved in any legal

14   work for Mr. Irvin?

15            MR. HANSEN: Take five, go off the

16   record for a second.

17            MR. VIDEOGRAPHER:  Off the record

18   2:03.

19                (Recess.)

20            MR. VIDEOGRAPHER:  Standby. Back on

21   the record 2:04.

22   BY MS. EMERY:

23       Q.    Mr. Lovelace, have you met with people

24   at the Adams County Jail, one or more persons,

26

1    where you had conversations about possibly

2    becoming their counsel but for one reason or

3    another you did not become their counsel?

4         A.   Yes.

5         Q.   How many times did that happen?

6         A.   Once.

7         Q.   Do you recall from May of 2017 until

8    through December of 2017 how much you made as

9    an attorney?

10        A.   No.  I mean I don't recall that

11   amount.  Again I filed a tax return for 2017.

12        Q.   Have you prepared your tax return for

13   2018 yet?

14        A.   I have not.

15        Q.   Do you have a ballpark figure as to

16   what you made from your law practice in 2018?

17        A.   I do not.

18             MS. THOMPSON: Let me just say for

19   counsel that we intend to provide the tax

20   return for 2018 when it is available, and we

21   will do that promptly.

22             MS. EMERY:  Okay.  That's fine.

23        Q.   Mr. Lovelace, having a law license and

24   practicing in the area of criminal law, are you

27

1    familiar with the term "Brady material"?

2        A.    I am.

3        Q.    What is your understanding as to what

4    "Brady material" is?

5        A.    It is my understanding that the

6    prosecution has the duty to disclose all

7    discovery, whether it is inculpatory or

8    exculpatory.  And their failure to do so or the

9    failure of law enforcement that has that

10    material, they have a duty to disclose that

11    information.

12        Q.    And is it your understanding that

13    failure to disclose exculpatory evidence is

14    called a Brady violation?

15        A.    That is my understanding, yes.

16        Q.    Okay.  What is your understanding as

17    to what -- whether there was a Brady violation

18    or more than one Brady violation in this case?

19        A.    It is my understanding that there was

20    communications between law enforcement and

21    individuals in its investigation that was not

22    properly disclosed.

23        Q.    Okay.  What is your understanding as

24    to whether there was any exculpatory evidence

28

1    which was not disclosed?

2        A.    Exculpatory evidence I believe is the

3    information between law enforcement and

4    pathologists regarding diagnoses, opinions,

5    that type of information.

6        Q.    Okay.  So we have all seen what we

7    have referred to, and was referred to at the

8    special prosecutors' depositions, as the Denton

9    e-mail?

10       A.    Uh-uh.

11       Q.    Where Dr. Denton talks about what he

12   believes is reasonable doubt, do you know what

13   I am talking about, the Denton e-mail?

14       A.    If you are referring to the reasonable

15   doubt e-mail, yes, I understand what you are

16   talking about.  There are more than just those

17   e-mails.

18       Q.    Okay.  So is it your understanding

19   that Dr. Denton's statement about reasonable

20   doubt constitutes Brady material?

21       A.    That and other statements that he

22   made, yes.

23       Q.    Okay.  So you -- but definitely the

24   reasonable doubt statement you contend is Brady

29

1   material?

2       A.   I will leave the legal advice and

3   conclusions to my attorneys, but, yes, I

4   believe that.

5       Q.   Okay.  And you said that there is also

6   material between law enforcement and

7   pathologists regarding diagnoses-type things,

8   what are you referring to?

9       A.   I'm referring to e-mails exchanged

10  between Adam Gibson and Dr. Denton regarding

11  facts, observations, as well as e-mails

12  exchanged between James Keller and Dr. Denton

13  regarding the same thing.

14      Q.   Now, as a hypothetical, if I were to

15  go into say Best Buy and I stole some

16  electronics, and I was arrested for it, and the

17  manager told the police, well, we don't have

18  her on video, and that will create reasonable

19  doubt, do you believe that manager's statement

20  is admissible?

21          MS. THOMPSON:  Object to form.  He can

22  answer.

23          THE WITNESS:  Let me think about your

24  hypothetical.  Do I believe that who's failure

30

1    to disclose that.

2              So the law enforcement that that

3    comment was made to didn't disclose the fact

4    that the manager said, we don't have video and

5    that would create reasonable doubt?

6        **Q.    No.  I'm just saying the manager's**

7    **statement, he is a manager of a Best Buy, and**

8    **he says, we don't have the video and that will**

9    **create reasonable doubt, do you believe with**

10   **your training that that constitutes -- well, do**

11   **you believe that that is an admissible**

12   **statement?**

13             MS. THOMPSON:  Object to form.  You

14   can answer.

15             THE WITNESS:  Well, I don't -- I mean,

16   I guess you are talking about a fact witness

17   who says we don't have video versus I think

18   what you are getting at is Dr. Denton who is

19   giving his opinion as to what happened.  So

20   would I draw the distinction there, I've never

21   thought of that, but that's where I draw the

22   distinction.

23             So do I think that that statement

24   from -- I think there would be a duty to

31

1    disclose that there is no video.

2              But as far as his opinion, his

3    opinion, a Store Manager, as to what that legal

4    effect is, I don't think that's exculpatory.

5              But I mean I don't know, it would

6    be for a Court to decide, it is a hypothetical

7    I've never thought of before.

8         Q.   In your answers to written discovery

9    you state that your reputation in the Town of

10   Quincy, the place you were born and spent

11   almost your entire life, and the place where

12   you worked as a public servant in various

13   capacities, was destroyed.

14              By practicing in Adams County,

15   are you trying to rebuild your reputation in

16   Quincy?

17        A.   No.  That's not my reason for

18   practicing or having some cases in Adams

19   County.

20        Q.   Okay.  Why do you have some cases in

21   Adams County?

22        A.   I have some cases in Adams County

23   because I was sought out and hired to represent

24   a handful of people in those cases.

32

1          Q.    How do you get your clients now, I

2     know that you had talked about at your prior

3     deposition that you had -- when you decided to

4     do divorce law, you had run a radio ad, I

5     believe?

6          A.    Uh-uh.

7          Q.    Are you doing any kind of marketing

8     now?

9          A.    No.  We are not doing any sort of

10    advertising.  I don't even think the website

11    right now is active. But, no.

12         Q.    Are you attending like any local

13    functions in Champaign-Urbana area so people

14    get to know you and you are looking for

15    referrals through that?

16         A.    I -- we attend public events in

17    Champaign County.  As far as my interaction, I

18    have some interaction with the Champaign

19    County, it is a loose group of attorneys who

20    handle criminal defense work who meet once a

21    month and have lunch, and I will attend that

22    occasionally.  I haven't received any referrals

23    from that.

24                I've been to one Champaign County

33

1    bar event, a couple of Champaign County bar

2    events.  I haven't taken any cases on any

3    referrals from that.

4               Really, we don't handle that many

5    Champaign matters.

6        Q.   When you say "we", are you referring

7    to your wife Christine as part of your law

8    practice?

9        A.   Yeah, I'm referring to me as the

10   attorney working with, yeah, my wife Christine,

11   true.

12       Q.   You also claim in your Answers to

13   Interrogatories that you and your family were

14   forced to move from Quincy to live elsewhere

15   because of the stigma brought on by this

16   experience.  Were you treated badly by people

17   on the street in Quincy?

18       A.   By some, yes.

19       Q.   What did they do?

20       A.   Well, I think first off, my wife and

21   children had to experience more of that than I

22   did, because that experience for them started

23   the day of my arrest and continued until we

24   moved.

34

1                   So my personal experience with

2    that began when I first was out on bail, but

3    even then I was on home confinement, so I had

4    very little interaction except for twice a week

5    I was allowed to go to church, and then I had

6    to go to the courthouse for monitored checking

7    once a week.  So I had limited exposure then.

8                   My personal experience with

9    interaction, face-to-face, started after my

10   acquittal.

11                  And on the few instances and

12   there were a few we went out in public that I

13   would experience people who would stare, would

14   whisper, would point.

15                  There were some people who would

16   approach, and we would never know -- I say

17   "we", because most of the time I was, in fact,

18   actually I've never been out alone in Quincy

19   since my arrest at all.  So I think it was

20   always with Christine, would approach, and we

21   wouldn't know what they would be approaching

22   for.

23                  So it may be a situation where it

24   was, you know, hey, congratulations, but again

35

1    complete strangers, who would introduce

2    themselves, you don't know me but.

3              I can -- I guess one example I

4    can give that one of the few times we went out

5    in public after the acquittal, it was in a

6    restaurant, and we went there because there was

7    a group of friends that we felt comfortable

8    with, and there were some stares, even one of

9    the people that were there was a manager and

10   someone was staring and said, you want me to do

11   something, no, don't do anything about it, I

12   didn't think that was appropriate.  I guess if

13   somebody wants to stare or make comments and

14   point I guess they are free to do so.

15              At then one point I could see an

16   individual that I knew, I had coached his son

17   in football, and so I knew him pretty well, he

18   was about my age, was -- was off in the

19   distance, and I looked up and I saw him, and he

20   kind of waved or gave me a head nod, and I kind

21   of did the same thing.  I hadn't communicated

22   with him at all, you know, probably prior to my

23   arrest, but I'm not sure when.  And, you know,

24   felt good about that.

36

1           And then all of a sudden his wife

2   came up and looked at him, and he looked back

3   and she appeared to be scolding him for, you

4   know, acknowledging me or having that contact.

5           And I guess, you know, what I

6   took from that it was clear that she, for

7   whatever reason, had animosity towards me or I

8   guess I suspect she believed that I was guilty

9   and that he should no longer be friends with

10   me.  And so he stopped any interaction, and

11   they walked away.

12           That is one example.

13           I can also think of another

14   example, I was in a Quincy restaurant, this was

15   actually, yes, a Quincy restaurant, it was

16   after we moved, and we were back visiting a

17   family member.

18           And we were having dinner at this

19   restaurant.  And I noticed a commotion at the

20   bar.  And from what I observed and heard, one

21   of the patrons there was explaining to the

22   waitress that they had no business serving me,

23   that he was a regular customer and other people

24   were regular customers, and I shouldn't be

37

1    there.

2              And the waitress, I think she

3    didn't ask me to leave, and he left.

4              And so again it was from a

5    distance, but that's what I gathered from that.

6              So I guess those are two examples

7    of some of the interactions that I have had.

8              I don't know if that answers your

9    question.

10   Q.   Any where they actually confronted

11   you, in a negative way I'm talking about?

12   A.   We have tried to minimize as much as

13   possible our public interaction in the City of

14   Quincy, in those times that we go there, I

15   cannot think of a time where someone, you know,

16   walked up to me and addressed me in such a way

17   of being negative.

18             Usually those are conversations

19   or whispers or pointing, things of that nature.

20   Q.   Okay.  You also contend that as a

21   result of the defendants' actions that you have

22   suffered tremendous damage including physical

23   sickness and injury and emotional damages.

24             What is it that you have suffered

38

1  in the way of physical sickness and injury?

2       A.   I mean I can't, I guess, you know, it

3  is not a broken bone, I mean I'm just

4  physically what I have suffered from.  I mean,

5  I guess, it is a little bit private, but I have

6  a pelvic hernia that somehow developed while I

7  was in jail, that I just haven't had an

8  opportunity to have any sort of surgery or

9  anything.  It was a pretty embarrassing

10  experience, even dealing with it within the

11  jail.

12            So that's -- I mean I have been

13  sick to my stomach.  You know I felt the

14  stress, headaches, things of that nature.

15            So I can say those are the

16  physical manifestations of what I've

17  experienced.

18       Q.   So would you say there are more

19  physical manifestations of your emotional

20  state?

21       A.   Yes.  Yes, I would say that's correct.

22       Q.   Okay.  Now, Mr. Hansen went into a

23  little bit about your contentions about

24  fabricated evidence.

39

1       A.    Uh-uh.

2       Q.    And you have said that collectively

3    the defendants fabricated, withheld and

4    concealed evidence?

5       A.    Uh-uh.

6       Q.    You are aware of that.

7             As far as Chief Robert Copley,

8    other than being the Chief and the supervisor

9    over the Quincy Police Department, what did

10   Chief Copley and ultimately the supervisor over

11   Adam Gibson, what do you contend that Chief

12   Copley fabricated?

13      A.    I think it is pronounced Copley.

14   That's okay.

15      Q.    Yes.  You are right.

16      A.    As I understand it Chief Copley took a

17   supervisory role in this case and was involved

18   in some of the decision-making process.  So

19   beyond that, I am not sure what else he did in

20   this case.

21      Q.    Okay.  So you are just -- you are

22   saying that because he is Chief and it was as

23   supervisor that that's what -- why you have

24   made these contentions?

40

1      A.    And I was at his deposition, I have

2  not reviewed the transcript of his deposition

3  or analyzed any aspect of that.

4      Q.    And Sergeant John Summers, you were at

5  his deposition, too, right?

6      A.    I was.

7      Q.    And other than the fact that he was

8  the sergeant over the detectives and the

9  supervisor over Adam Gibson, what do you

10 contend that he fabricated, withheld or

11 concealed?

12     A.    I would say he was much closer to the

13 situation than Chief Copley was and had much

14 more access, as well as control over the

15 investigation and Adam Gibson, and any

16 allegations against him would be based upon

17 that.

18     Q.    How about Lieutenant Dina Dreyer,

19 likewise you were at her deposition?

20     A.    I was.

21     Q.    And she was in the hierarchy just

22 below Chief Copley and above Sergeant Summers

23 as the lieutenant, so is it your contention

24 that her actions in this case are based on that

41

1    she was a supervisor?

2         A.    Yes, similar as to the other two,

3    correct.

4         Q.    Okay.  And Anjanette Biswell, you were

5    at her deposition, correct?

6         A.    I was.

7         Q.    Okay. Is it your contention that

8    Anjanette Biswell fabricated, withheld or

9    concealed evidence?

10        A.    It is my understanding that her

11   involvement with the case was based upon

12   technology, analysis of computer, things of

13   that nature, so I don't believe she had any

14   supervisory, that I am aware of.  So that's

15   what I know about her.

16        Q.    Okay.  In your Answers to

17   Interrogatories you say that defendant Adam

18   Gibson withheld exculpatory information he

19   received from witnesses at the scene including

20   the firefighters, which I'm guessing would be

21   the EMTs because they come from the Fire

22   Department.

23             What is it that you contend Adam

24   Gibson withheld that was exculpatory

42

1    information that he received from EMTs?

2         A.    Okay.   Just because of my knowledge of

3    the EMTs, the Adams County ambulance is

4    separate from the Fire Department, it is a

5    little different than maybe in some

6    communities, but I believe that, and it is just

7    my belief, that Adam Gibson was well aware of

8    observations by the EMTs that were exculpatory

9    with the case and withheld those.

10         Q.    Do you know what -- with any

11    specificity what those would have been?

12         A.    Specificity, I think specifically

13    observations that they had at the scene on

14    February 14th of 2006.

15         Q.    Weren't all of those observations

16    included in Jeff Baird's report?

17         A.    Jeff Baird didn't, I don't believe,

18    interview any of the EMTs in his investigation,

19    because he was there during his investigation.

20         Q.    You also contend that defendant Adam

21    Gibson fabricated, withheld and concealed

22    exculpatory scientific information he received

23    from medical experts, which you talked about a

24    little bit about diagnoses and such, including

43

 1    but not limited to Dr. Ezra Pounder, what do

 2    think Dr. Pounder gave Adam Gibson that he

 3    fabricated, withheld or concealed?

 4        A.   I believe that Dr. Ezra Pounder was

 5    one of the initial pathologists that Adam

 6    Gibson consulted with, and gave an opinion as

 7    to Adam Gibson's theories at the -- at that

 8    stage of his investigation and that information

 9    was not disclosed.

10        Q.   And you believe there was exculpatory

11    forensic evidence that Adam Gibson did not

12    disclose from Jessica Bowman?

13        A.   Correct.

14        Q.   What did he not disclose from Jessica

15    Bowman?

16        A.   I don't believe that -- I believe that

17    he misrepresented in -- information that he

18    received from Jessica Bowman so it wouldn't

19    have to be included in a report that he would

20    turn over.

21        Q.   And do you know what that would be?

22        A.   Her opinions as to his theories that

23    he was presenting.

24        Q.   And did you get that information from

44

1    Dr. Bowman's deposition, that she gave him

2    opinions he did not disclose?

3         A.    Yes, I mean that is my feelings, yes.

4         Q.    And so you say that Detective Adam

5    Gibson coerced and fabricated witness

6    statements from among others Dr. Jessica

7    Bowman, so you believe that he coerced and

8    fabricated Dr. Bowman's statements?

9         A.    Yes.

10        Q.    What do you base that on?

11        A.    I base that on her deposition and from

12   what I know as far as her opinions in this

13   case.

14        Q.    And can you be more specific about

15   what that would be?

16        A.    Again I think it goes to his theory

17   versus the facts as well as her opinions

18   regarding facts.

19        Q.    And you say that Adam Gibson also

20   coerced witness statements and fabricated

21   witness statements from your wife Christine?

22        A.    Yes, I believe he fabricated.  Yes.

23        Q.    So you believe any statement Christine

24   gave was fabricated by Detective Gibson?

45

1      A.    Yes, I believe that he lied about

2  statements that Christine made to him.

3      Q.    Do you know in particular which

4  statements?

5      A.    I think most of the statements about

6  the interaction he had with her at the Quincy

7  Police Department when I was arrested, I think

8  most of that was a lie.

9      Q.    Okay.  What about you have that he

10  fabricated the witness statements from all four

11  of your children, Lyndsay, Logan, Lincoln and

12  Larson?

13      A.    Yes, I believe that he was telling

14  pathologists that they had been interviewed and

15  they were saying something different.

16      Q.    Okay.  What -- do you know any

17  specifics like what he was saying that any of

18  the children had said that was fabricated?

19      A.    I believe that Dr. Denton referenced a

20  fabrication that Gibson made to him in his

21  opinion letter.

22      Q.    Okay.  And what was that?

23      A.    That he had interviewed the children

24  and that they were saying something different

46

1      than what they said back in February of 2006.

2             Q.   Do you remember the details, I mean

3      what did he make up, that he fabricated it?

4             A.   That he had interviewed them and that

5      they were saying something different.

6             Q.   So -- and you also contend that

7      certain police reports prepared by individual

8      defendants were also fabricated, is there

9      anybody else that prepared police reports other

10     than Detective Gibson?

11            A.   Yes.  I believe there were other

12     people who did prepare police reports.  I guess

13     Anjanette -- I guess Anjanette Biswell did do a

14     little bit more than just the computer

15     forensics.  I believe that she did do some

16     investigative work.

17                  I think after the first trial but

18     before the second, especially with interaction

19     with Gomez, Ms. Gomez, because Adam Gibson was

20     told that he should know longer have contact

21     with her.

22                  I think that was in some of the

23     correspondence back and forth.

24                  But I'm not aware of any issues

47

```
 1    that I can think of offhand with the accuracy

 2    or any fabrication with those.

 3               So I think that would be centered

 4    on Adam Gibson.

 5         Q.   And you have that certain witnesses

 6    had been coerced, who do you believe was

 7    coerced and how?

 8               MS. THOMPSON:  Object to form.  You

 9    can answer.

10               THE WITNESS:  I mean I believe that

11    the pathologists in this case were coerced into

12    coming up with opinions.

13    BY MS. EMERY:

14         Q.   Do you know which pathologists

15    specifically?

16         A.   I mean I know that there were four

17    pathologists in this case.  Initially Dr.

18    Turner, then a pathologist from New York, I

19    cannot remember his name.

20         Q.   Baden?

21         A.   Baden.  Thank you.  Dr. Baden.  And

22    also Dr. Spitz.

23               And then ultimately then an

24    opinion in 2015, Dr. Denton.
```

48

 1              And I believe that in all those

 2    cases that Adam Gibson misled those

 3    pathologists in order to come up with an

 4    opinion that supported his theory.

 5         Q.   Now, you are aware that it was Ed

 6    Robinson who wanted to hire Baden, you remember

 7    that, right?

 8         A.   But Robinson came in much later, so if

 9    you meant Ed Parkinson.

10         Q.   Oh, yes, I'm sorry.  I'm confusing him

11    with David Robinson.

12         A.   Right.

13         Q.   Ed Parkinson wanted to hire Baden

14    initially, that was whose idea it was?

15         A.   I think there was some exchange, it

16    has been a while since I looked at it, between

17    the Quincy Police Department or Adam Gibson

18    regarding doctor -- regarding Dr. Baden.

19              I do believe that also I reviewed

20    the deposition where someone prior to my arrest

21    had indicated that Adam Gibson had referred her

22    to Dr. Baden saying, we have another doctor who

23    is involved in the Ferguson case who is of the

24    opinion that your -- that Cory was suffocated,

49

1    which would have been prior to my arrest, which

2    would be -- which would contradict anything

3    that I knew before that deposition.  So I am

4    not entirely sure now.

5        Q.   Okay.  And it was Ed Parkinson for the

6    second trial that hired Dr. Warner Spitz,

7    correct?

8        A.   Well, when you say hired, it is my

9    understanding that in both Dr. Spitz and

10   Dr. Baden, that all of the communication

11   regarding the case, all of the e-mails, and

12   quite honestly payment came from the Quincy

13   Police Department.

14            So I don't know whose necessarily

15   idea it was or interaction, so I don't know who

16   said, hey, we need to hire this guy.

17            What I do know is that Adam

18   Gibson communicated with all of the

19   pathologists directly.

20       Q.   Do you remember discussion at Ed

21   Parkinson's deposition about his -- it was his

22   idea to get Warner Spitz?

23       A.   I think I do remember that in the

24   deposition, yes.

50

1      Q.   You also contended that the defendant

2  officers, when you say defendant officers, I'm

3  going to say that that is everybody that was

4  named individually from the Quincy Police

5  Department, correct?

6      A.   Okay.  Yes. That's fine.

7      Q.   That's how we take it.

8      A.   Okay.

9      Q.   That the defendant officers, Gary

10  Farha and Jim Keller, while acting

11  individually, jointly and each in conspiracy,

12  deprived you of your constitutional right to a

13  fair trial.

14           Having been through 99%, we just

15  have your deposition to complete of the fact

16  discovery in this case, what do you believe

17  happened with Gary Farha and the officers that

18  constituted a conspiracy?

19           MS. THOMPSON:  I'm going to object to

20  form.  You can answer.

21           THE WITNESS:  I don't think there is

22  anything that I necessarily learned from Gary

23  Farha's deposition that properly explained one

24  way or another why Adam Gibson was

51

 1    communicating with him regarding the

 2    investigation when John Barner and his office

 3    had already made the determination to conflict

 4    out.  So that's what I know about Gary Farha.

 5         **Q.   Okay.  So you stated earlier about**

 6    **what you think Adam Gibson and Jim Keller, that**

 7    **they had worked together, but do you believe**

 8    **that there were any of the officers that so**

 9    **conspired with Jim Keller, aside from Adam**

10    **Gibson's communications with him?**

11              MS. THOMPSON:  Object to form.  You

12    can answer.

13              THE WITNESS:  Obviously I know that

14    there was some communication between Adam

15    Gibson and James Keller regarding this case.

16              It would appear to me that Jim

17    Keller seems to recall a lot less of that than

18    the Quincy Police Department recalled based

19    upon their depositions, meaning he seems to

20    think he didn't have much involvement at all,

21    compared to what Lieutenant Dreyer and Adam

22    Gibson recalled.

23              So I believe that is the

24    interaction between Adam Gibson, Lieutenant

52

1    Dreyer, Sergeant Summers and James Keller.

2    BY MS. EMERY:

3        Q.   As far as your emotional damages, we

4    got, and they are under protective order, the

5    records of therapy sessions that you have had.

6                 When is the last time that you

7    received any psychological or psychiatric

8    treatment for any emotional state that you've

9    had as a result of the actions of the defendant

10   that you contend?

11       A.   The last time I met with one of the

12   individuals, who I think responded to your

13   subpoena, would have been December, I had

14   another meeting scheduled in January and

15   unfortunately there was a conflict, and I'm

16   going to continue to visit with him.

17       Q.   Okay.  So it was December of 2018?

18       A.   Yes.

19       Q.   And then it was January, '19, this

20   month?

21       A.   Yes.

22       Q.   And which --

23       A.   I haven't met with him in January.

24       Q.   Oh, you haven't?

53

1      A.   I have not.  I don't believe I met

2  with him in January.

3             I think I had an appointment with

4  him, and unfortunately there was a conflict.

5  So --

6      Q.   Was that one up here in Chicago?

7      A.   No.

8      Q.   Who was that?

9      A.   The individual that I am meeting with

10  now?

11      Q.   Yes.

12             MS. THOMPSON:  We will designate this

13  discussion as confidential for the deposition,

14  so you can talk about it, maintain its

15  confidentiality.

16             MS. EMERY:  There is no objection.

17  Jim?

18             MR. HANSEN:  No, I mean --

19             THE WITNESS:  Yeah, that's -- he

20  responded to your subpoenas, that's Martin, and

21  I honestly don't know how to pronounce his last

22  name, so has more consonants than vowels.  He

23  is German.  So anyway that's who I have therapy

24  sessions with now.

54

1

2    BY MS. EMERY:

3        Q.   Okay.  It is the one that we already

4    got the first part of the therapy season?

5        A.   Yes.

6        Q.   Okay.  How often would he like you to

7    see him, I know you said about January -- or

8    December, and that got cancelled, and then

9    January you haven't seen him?

10       A.   Right.  I think initially we were

11   every two weeks, and we try to meet every two

12   weeks, but it is just sometimes difficult with

13   schedules and especially during the holidays.

14   And January has been difficult.

15              But I plan on continuing to meet

16   with him monthly or every two weeks, depending

17   on how our schedules work.

18       Q.   Okay.  Do you feel that meeting with

19   him has been beneficial?

20       A.   Yes, otherwise I wouldn't continue to

21   go if I didn't feel like there was some benefit

22   of meeting with him, so, yes.

23       Q.   Okay.  And so you are optimistic about

24   continued benefits from meeting with him, is

55

1    that correct?

2        A.   Yes.  Each time I go I think I

3    understand a little bit more and maybe uncover

4    a little bit more of my experiences and how

5    that impacts me today.

6             MS. EMERY:  Okay.  I don't have

7    anything else.

8             MR. HANSEN:  I do.  Do you want to

9    take a break?  Do you want to keep going?

10            MS. THOMPSON:  Do you want to take a

11   break?

12            THE WITNESS:  Doesn't matter, do you

13   want to take a quick --  it is -- how much

14   longer?

15            MR. HANSEN:  I'm ready to keep going.

16            THE WITNESS:  Okay.  Yeah, that's fine

17   with me.

18

19                 EXAMINATION (CONT'D)

20   BY MR. HANSEN:

21       Q.   Okay.  Some follow-up with some of the

22   questions you were asked.

23            The Wes Irvin matter, that is a

24   matter that you would have filed your entry of

56

1    appearance in last week when you were in

2    Quincy?

3         A.    No.

4         Q.    That's a different case altogether?

5         A.    I did not file an entry of appearance

6    in Wes Irvin's case last week.

7         Q.    Did you file an entry of appearance on

8    behalf of Wes Irvin in his criminal case?

9         A.    Yes, I mailed an entry of appearance,

10   that's the one again I was hesitant, I don't

11   know if it is a matter of public record,

12   however, in discussing that with counsel, and

13   thinking about it further, that entry of

14   appearance, as well as a speedy trial demand,

15   although it may not be public record, I did

16   serve a copy of what I filed by e-mail to the

17   Adams County State's Attorney.

18               And I'm assuming that's

19   potentially how you even are aware of it,

20   because again I'm not aware if that is public

21   record nor have I appeared with him in public.

22        Q.    The cases you have in Adams County,

23   you indicated that you are involved because

24   people sought you out and hired you to

57

1    represent them?

2         A.    Uh-uh.

3         Q.    Is that a yes?

4         A.    Yes.

5         Q.    And you could have, if you felt

6    uncomfortable or any stigma in practicing in

7    Adams County, declined to represent those

8    people, correct?

9         A.    I could have declined, yes.

10        Q.    Okay.  And by taking those cases you

11   in fact travel from Champaign/Urbana over to

12   Adams County for appearances in those cases,

13   correct?

14        A.    Correct.

15        Q.    How far of a drive is that?

16        A.    It is a two and a half, three-hour

17   drive.

18        Q.    Okay.  When was the last time you were

19   in Quincy for any cases in which you are an

20   attorney of record?

21        A.    Last -- I was in Court on Tuesday and

22   Wednesday of last week.

23        Q.    And what Judge was that in front of or

24   judges?

58

1          A.    Two different judges.  One, Judge

2     Lannard and the other Judge Adrian.

3          Q.    And did your wife come with you?

4          A.    She was with me.

5          Q.    And did you stay the night in Quincy

6     or did you turn around and drive back and

7     return on Wednesday?

8          A.    We did stay.

9          Q.    And you in those cases deal with the

10    Adams County State's Attorney's Office,

11    correct?

12         A.    That's correct.

13         Q.    And have you felt that the judges that

14    you just mentioned Lannard and Adrian have

15    treated you fairly in those cases?

16         A.    They haven't made any substantive

17    rulings in any of those cases, they have been

18    so far just appearances and status calls.

19                    So -- and I guess the bigger

20    question is will they treat my client fairly in

21    those decisions, and I do have some concern

22    about that, which I've shared with my clients.

23         Q.    I move to strike that as

24    nonresponsive.

59

1          My question solely is, Curt, was
2  have they treated you fairly?  Have they
3  treated you with respect when you appeared in
4  front of them?
5      A.   Yes.  My Court -- my interaction has
6  only been in Court on the record.  And I was
7  respectful to them, and they were respectful to
8  me, yes.
9      Q.   And as of this point in time you have
10 not filed a change of Judge for anything, have
11 you?
12     A.   No, I have not.
13     Q.   And you are dealing with which
14 attorneys from the Adams County State's
15 Attorney's Office?
16     A.   Laura Keck and Anita Rodriguez,
17 directly on those cases, however Josh Jones and
18 Todd Eyler were in Court last week in those
19 various matters, too.
20     Q.   And Anita was employed in the office
21 when you were employed there?
22     A.   Correct.
23     Q.   Was Josh employed in the office when
24 you were employed there?

60

1      A.    Yes.

2      Q.    And when you came over to Quincy last

3  Tuesday and Wednesday, did yu go see your

4  parents?

5      A.    I did not.

6      Q.    They still live in Quincy?

7      A.    It is my understanding that they do.

8      Q.    But you are not sure because you

9  haven't talked to them since when?

10     A.    I think the last time I spoke with

11 them was when I phoned in jail.

12     Q.    In jail in Carthage?

13     A.    Yes, in Clark County, yes.

14     Q.    That would have been your first trial?

15     A.    Correct.

16     Q.    Which was in 2016?

17     A.    Correct.

18     Q.    Do you still have an arrangement where

19 you are being paid by Evan Parke for any

20 services you provide?

21     A.    No.

22     Q.    Did you make any money, earn any

23 income from Evan Parke in the year 2018?

24     A.    I am not sure.  I think so.  I haven't

61

1    done any work always of counsel with Evan for

2    quite sometime.

3              In fact Evan works for another

4    firm now.  And so -- but I just -- I don't

5    recall if there was income in 2018.  There may

6    have been some.

7        Q.   Do you have any other referral

8    arrangements with any attorneys or law firms

9    currently?

10       A.   No.

11       Q.   When you came to Quincy last week,

12   when you stayed the night, did you stay in a

13   hotel or at someone's house?

14       A.   We stayed at someone's house.

15       Q.   Is that a relative?

16       A.   No.

17       Q.   Okay.  Friends of you or your wife or

18   both?

19       A.   Friends of both.

20       Q.   Who?

21       A.   I rather not disclose that because

22   again we try to keep a very low profile and

23   because of concerns about being in Quincy, I

24   would rather not people know where we are

62

 1   staying.  They are close friends that we have

 2   stayed with in --

 3        Q.    There is no privilege.

 4        A.    -- in the past, and I intend to

 5   potentially stay with them in the future.

 6        Q.    That's fine.  But there is no

 7   privilege that I'm aware of for you to retain

 8   that information.

 9               So you can, I guess, stand on

10   that position, but I'm entitled to an answer to

11   my question, Tara.

12               MS. THOMPSON:  Can we confer for a

13   second?

14               THE WITNESS:  Sure.

15               (Discussion had off the record.)

16               THE WITNESS:  The individuals are

17   David and Holly Cain, C A I N.

18   BY MR. HANSEN:

19        Q.    Other than the medical appointment you

20   mentioned in December of 2018, I took that and

21   I just want to make sure I'm on the same page,

22   that was an actual appointment you attended and

23   the January one is the one that got cancelled,

24   is that correct, or do I have that wrong?

63

1      A.   Yes, I did have an appointment in

2  December, and I did cancel an appointment in

3  January.

4      Q.   And I had my office get the last date

5  of service you had with Martin prior to

6  December from the records we obtained in this

7  case, and that was May 22 of 2018?

8      A.   Okay.

9      Q.   Between May 22 and December, did you

10  have any other appointments with him?

11      A.   Oh, yes.

12      Q.   Okay.  All right.  We will obtain

13  those records.

14           Do you know was it monthly, is it

15  more than monthly, best estimate?

16      A.   Every other week or monthly.

17      Q.   And besides Martin in Champaign, I

18  just want to make sure I'm clear, you have not

19  had any other medical or psychological or

20  psychiatry or any other treatment with any

21  other providers since -- since we last took

22  your deposition?

23      A.   Correct.

24      Q.   Okay.  Just following up on a couple

64

1    of items to see where we are currently.

2                    Does Larson still live at home

3    with you and Christine?

4         A.   Yes.

5         Q.   Okay.  And does he still attend is it

6    Champaign Sentinel?

7         A.   He does.

8         Q.   Okay.  And this was his junior year?

9         A.   Yes.

10        Q.   And did he play football?

11        A.   He did.

12        Q.   Is he involved in any other sports

13   currently?

14        A.   No.

15        Q.   Since we haven't received any updates

16   on it, well -- Strike that.

17                    Does Larson have a driver's

18   license?

19        A.   He does.

20        Q.   Does he have his own vehicle?

21        A.   No.

22        Q.   You had mentioned you had one case in

23   the Federal Courts through the Central District

24   and out of the Urbana Division, I didn't write

65

```
 1    that, is that an active case or is that a
 2    closed case?
 3          A.    It is an active case.
 4          Q.    Okay.  And maybe this was asked, and I
 5    didn't get it, is there any other cases that
 6    are closed that you had since May of '17?
 7          A.    No.  In Federal Court?
 8          Q.    Correct.
 9          A.    No, that is the only case I've had in
10    Federal Court.
11          Q.    Okay.
12          A.    And have, yes.
13          Q.    And what is, I don't want necessarily
14    your client's name, I can go on Pacer and
15    obtain that, but what type of case is it?
16          A.    It is a -- it is the federal version
17    of a post-conviction petition.
18          Q.    And of the five appeals you said you
19    had in the 4th District, are those all active,
20    closed or a combination?
21          A.    Two of them are closed.  And the
22    others are active.  And I'm trying -- yes, the
23    others are active.  Two of them, yes, two of
24    them are in the briefing stages.  And then one
```

66

1    of them is in conjunction with post-conviction,

2    so there is an entry of appearance in it, but

3    there haven't been any briefings.

4         Q.   Okay.

5         A.   Which, just to be accurate, as I think

6    about that case, it is a post-conviction case

7    that is also in McLean County, I don't think I

8    listed that as a county that I have an active

9    case in, and so I do very have an appearance in

10   McLean County, also.

11        Q.   You had some discussion about the

12   position you are taking on Brady violations

13   about failing to turn over exculpatory

14   evidence, and I believe I had asked you, and we

15   have gone over what your opinion is regarding

16   Keller and Farha on fabricated evidence, but I

17   didn't ask you, and I want to ask you now, do

18   you believe Gary Farha committed any Brady

19   violation by withholding exculpatory

20   information?

21        A.   I am still at this point, I don't

22   understand what Gary Farha's involvement

23   necessarily is.

24        Q.   Okay.  And your position was on Jim

67

1    Keller that you believe he committed a Brady

2    violation as to the e-mails he had exchanged

3    between he and Scott Denton regarding the

4    facts, diagnosis and opinions on the pathology

5    information?

6         A.   Yes.

7         Q.   Okay.  And that's what I wrote down

8    and that's what your opinion is as to Jim

9    Keller?

10        A.   I mean that's my opinion, yes.

11        Q.   Do you believe that Gary Farha coerced

12   any witnesses in your case?

13        A.   I'm not sure of any interaction he had

14   with witnesses at this point.

15        Q.   And as to Jim Keller, do you believe

16   he coerced any witnesses in this case?

17        A.   I believe he did have interaction with

18   Dr. Denton, and I don't know if you want to

19   label it as coercion or fabrication or just

20   misleading Dr. Denton, I would kind of combine

21   those as just my opinion.

22        Q.   And in your earlier statement when I

23   asked you about that, as to what that

24   fabrication, coercion, misleading was, you told

68

1    me it was as to the statements he made

2    regarding the observations and comments from

3    his being at the scene on February 14th of

4    2006, as to what he saw, the position of the

5    body, and that kind of stuff?

6         A.   I think your question was with regard

7    to what evidence did James Keller fabricate and

8    my response was that's what I believe he

9    fabricated.

10                  I think there is a separate issue

11   there as to the communication and failure to

12   disclose and misleading when it comes to James

13   Keller's interaction with Dr. Denton.

14        Q.   So what did he fail to disclose -- let

15   me start with that.

16                  What did he fail to disclose to

17   Dr. Denton, he being Jim Keller?

18        A.   He failed to disclose Dr. Denton's

19   opinions as to the case.

20        Q.   Hold on.  That's an impossibility.

21                  I asked you what did he fail to

22   disclose to Dr. Denton?

23        A.   Oh, I'm sorry.  Yes.  He failed to

24   disclose what Dr. Denton's opinions that were

69

 1    communicated to James Keller, as far as what

 2    James Keller communicated to Dr. Denton, is

 3    that what you are asking me?

 4         Q.   Okay.   I wrote down, I want to be

 5    clear on this, you testified to me earlier you

 6    said you believe that Keller coerced,

 7    fabricated and misled Dr. Denton, and you told

 8    me you consider all three of those coercion,

 9    fabricating, misleading as one.

10                So I asked you what then did he

11    coerce, fabricate or mislead with his

12    communications to Dr. Denton, so do you have an

13    opinion that Jim Keller mislead, fabricated or

14    coerced Dr. Scott Denton?

15         A.   Yes.

16         Q.   Okay.   In what way?

17         A.   I believe that he must have, and it is

18    a little bit unclear here, communicated these

19    alleged observations to Dr. Denton.

20                Although it is, based upon my

21    understanding, it is a little unclear as to

22    that, because the first time there is any

23    record of James Keller making any observations

24    as to what he saw, felt, heard, smelled,

70

1    whatever, in February of 2006 or him even being

2    there in February of 2006, I believe is

3    contained in the Grand Jury transcript when

4    Adam Gibson testified to that.

5         Q.   Okay.  So I'm trying --

6         A.   And I probably didn't answer your

7    question.  So, please.

8         Q.   I'm trying to figure out what you

9    contend, as you sit here today, that Jim Keller

10   did to coerce, mislead or fabricate anything

11   with regard to his communications to Scott

12   Denton?

13        A.   Okay.  And I still don't know, because

14   we have not obviously deposed Dr. Denton

15   exactly, other than the e-mails, what

16   communication there was between Dr. Denton and

17   James Keller.  So I think that there is still

18   something unknown.

19        Q.   Okay.  So other than something unknown

20   that Dr. Denton might testify to, anything you

21   can point me to with what you have in your

22   possession, the documents that have been

23   produced, all of the e-mails, the depositions,

24   anything with regard to Keller communicating to

71

1    Denton?

2              MS. THOMPSON:  Object to form.  You

3    can answer.

4              THE WITNESS:  I would have to look at

5    the e-mails, if you want me to specifically

6    point something out.

7              I believe, yes, there is some

8    communication where James Keller is misleading

9    or at I guess coercing, influencing, Dr. Denton

10   to come up with an opinion that fits a theory.

11       Q.   Do you believe that all of the

12   forensic pathologists -- let me back up.

13            You would agree with me that Jim

14   Keller did not have anything to do with

15   communications as to Dr. Spitz?

16       A.   Not that I am aware of, no.

17       Q.   I'm not either, so if you got

18   something I would like to see it.

19       A.   Not that I'm aware of.

20       Q.   And the same for Dr. Baden?

21       A.   I believe that Adam Gibson did

22   communicate directly with Dr. Baden, so I'm not

23   aware of communication with those two

24   pathologists.

72

1      Q.   Okay.  And do you believe that all of

2   the forensic pathologists, Turner, Baden, Spitz

3   and Denton, were influenced and unable to as a

4   professional licensed expert witness, come up

5   with their own independent review and opinions

6   that led to their testimony in your case?

7           MS. THOMPSON:  Object to form.  You

8   can answer.

9           THE WITNESS:  What I believe is that a

10   pathologist's opinion is only good as the

11   information that is being provided to them and

12   the way that information is presented.

13                And I believe that the

14   information that Adam Gibson and the Quincy

15   Police Department and James Keller was

16   providing to those pathologists was presented

17   in a way that they would give an opinion that

18   was not true, that was not accurate.

19                That's my opinion as to what

20   happened.

21      Q.   And you had experts that were retained

22   on your behalf, correct?

23      A.   Correct.

24      Q.   Okay.  And your experts had the same

73

1    information that these four pathologists we

2    just mentioned for the prosecution had,

3    correct?

4         A.   Yes.

5         Q.   Okay.  And your pathologists, how many

6    did you have in your case, two, three?

7         A.   Yes.  There were two experts who

8    testified in the second trial and then there

9    were two in the first trial and one was

10   different in the first so.

11        Q.   And those experts that you hired came

12   up with differing opinions, correct?

13        A.   Correct.

14        Q.   Okay.  And that's what the nature of

15   expert witnesses are, they have -- Strike that.

16              Expert witnesses can come to

17   different opinions after reviewing the same

18   information, correct?

19        A.   Yes, that's correct.

20        Q.   And, in fact, that was the situation

21   in your case, the prosecution presented their

22   case against you with their experts and your

23   lawyers in both cases defended you with your

24   experts, correct?

74

1      A.    Correct.

2      Q.    And then ultimately the jury is left

3  to make a decision and come to a verdict?

4      A.    Correct.

5      Q.    And in the first trial they weighed

6  the evidence from the prosecution and the

7  prosecution experts, your defense and your

8  experts and came to a hung jury, correct?

9      A.    Correct.

10      Q.    Which means some people were voting

11  you guilty of murder and some people were

12  voting you not guilty of murder?

13      A.    That is correct.

14      Q.    The second trial, the exact same thing

15  occurred with the prosecution presenting

16  information, evidence and expert witnesses,

17  true?

18      A.    Correct.

19      Q.    And your defense team did the same

20  thing with evidence and expert witnesses,

21  correct?

22      A.    Correct.  With additional evidence

23  that we didn't have in the first trial,

24  correct.

75

1      Q.   I will move to strike that.

2           My question simply was in the

3   second trial the prosecution presented evidence

4   and expert witnesses as did your defense team?

5      A.   That's correct.

6      Q.   Okay.  And the jury in that case

7   again, was charged with weighing the testimony

8   of all of the witnesses, including the experts

9   which came to differing opinions as to the

10  cause of death of your wife?

11     A.   Yes. That is correct.

12     Q.   And after they waived that in the

13  second trial you were acquitted of the charge

14  of murder, correct?

15     A.   Correct.

16          MR. HANSEN:  I don't have anything

17  else.

18

19              EXAMINATION (CONT'D)

20  BY MS. EMERY:

21     Q.   Curtis, I just have a quick follow-up.

22          Do you currently have an

23  attorney/client relationship with Evan Parke?

24     A.   An attorney/client relationship, no.

76

1      Q.   Have you ever had an attorney-client

2   relationship with Evan Parke?

3      A.   Yes.

4      Q.   And at what point was that

5   relationship with relation to the two trials,

6   first trial, second trial, in between, when did

7   that exist?

8      A.   I become a client of Evan Parke during

9   the Summer of 2016.  So after I was released on

10   bond and put on home confinement.

11      Q.   Okay.  And where was Evan Parke based

12   at the time?

13      A.   Washington, D.C.

14      Q.   How did you meet him?

15      A.   Evan Parke had initially reached out

16   to Christine based upon his interest in

17   following the case and had offered his

18   services, I guess, at that time.

19              I guess it wasn't really defined

20   what he would do, but he felt, I guess

21   compelled I think would be an accurate term, to

22   help in any way that he could.

23              I believe at that time he was

24   working for the SCC, and I understand that he

77

1    **had got permission to basically provide any**

2    **support or help on the case during his off**

3    **hours.**

4              **Again I learned of that after the**

5    **fact.  And then after I was released on bond --**

6              MS. THOMPSON:  Curt, I'm sorry to

7    interrupt you, I want to instruct you, if you

8    have -- if your answer includes communications

9    before you developed an attorney/client

10   relationship, you should testify about that,

11   but for anything after --

12             THE WITNESS:  Right.  Okay.

13             So after that then I would have

14   had direct communication of the attorney/client

15   nature with Evan, and he agreed to represent me

16   for purposes of using FOIA to obtain documents

17   in this case.

18   BY MR. HANSEN:

19        Q.   **So he came to you, you didn't seek him**

20   **out, if I understand that correctly?**

21        A.   Correct.

22        Q.   **Had you heard of him before he**

23   **contacted Christine?**

24        A.   No.

78

1      Q.   And when did your attorney/client

2  relationship end?

3      A.   I don't know that we have any sort of

4  official termination, if you will, I mean he

5  was present and available in Springfield for a

6  period of time and for the trial as a potential

7  witness, but as far as any work that he did on

8  my case, which again was solely focused on

9  FOIA, the last bit of that would have been, you

10  know, up until the date, the trial was to

11  begin.  Nothing afterwards.

12           I don't believe -- I don't

13  believe -- I don't believe there was any

14  continued requests, via FOIA, afterwards.

15           I'm trying to think if maybe

16  there were some questions that were asked or

17  FOIA, freedom of information asked, I don't

18  think there were after the trial.

19      Q.   Okay.  How did you develop some sort

20  of working relationship with him?

21           MS. THOMPSON:  I just want to clear,

22  you are asking about post-the attorney/client

23  relationship.

24  BY MS. EMERY:

79

1      Q.   Yes.  Post-attorney/client, that you

2  had mentioned earlier about doing some research

3  for him?

4      A.   Right.

5      Q.   Okay.

6      A.   Evan and I got to know each other

7  through the process of him representing me, and

8  I think he had a comfort level with me and I

9  with him, he had his own firm that he was a

10  one-man shop as far as members of his firm, he

11  didn't have any associates, but he did have

12  some of counsel relationships where if he

13  needed assistance, that he would reach out to

14  those individuals.

15          And so after the acquittal and

16  actually I think it was after we had moved, he

17  reached out, and we discussed me doing some

18  work for him, once my license was reactivated.

19      Q.   And did you do work for him?

20      A.   I did.

21      Q.   Okay.  Was it -- what kind of work was

22  it, was it appearing as local counsel,

23  research, writing, whatever, what was it?

24      A.   Just research.  Research and some

80

1    client interaction.  No Court appearances.

2         Q.   Okay.  And did you get paid for doing

3    that work?

4         A.   I did.

5         Q.   Okay.  How much did you make working

6    with Evan Parke?

7         A.   I know that I had disclosed, was it a

8    1099 or I'm not sure if I am using the correct

9    term, of what he paid me in 2017.

10                  And I don't remember what that

11   amount was.  And then again I don't know -- I'm

12   sure there was less, if any, in 2018.

13        Q.   Do you know if you did any work for

14   him in 2018?

15        A.   I think so.  I just -- I didn't look

16   back to see -- it probably would have been the

17   first half of 2018.  I'm certain I didn't do

18   any work with him in the latter half of 2018.

19        Q.   And how about 2019, have you talked to

20   him at all about doing work in 2019?

21        A.   I have spoken to him on the phone,

22   hey, how are you doing, but, no, I have not.

23                  Again he is -- is with another

24   firm now, and he is in the process of wrapping

81

1    up Parke, PLC, and I'm not involved in any of

2    the matters that he is wrapping up.  So I

3    haven't done any work with him.

4         Q.   Okay.  All right. Thank you,

5    Mr. Lovelace.

6              MS. THOMPSON:  I have a couple

7    questions.

8

9                   EXAMINATION

10   BY MS. THOMPSON:

11        Q.   Are you -- let me start here, Curt,

12   are you relying on your counsel in this case to

13   understand and define your claims?

14        A.   Yes.

15        Q.   Okay.  And you were asked some

16   questions about physical sickness or injury,

17   those components of your claims, I think by

18   Ms. Emery, do you recall those questions?

19        A.   Yes.

20        Q.   In your first portion of your

21   deposition you described weight loss that you

22   experienced while you were incarcerated, do you

23   recall that?

24        A.   Yes.

82

1     Q.   Is your weight loss and the other

2  physical experiences you had while in the jail

3  something you consider to be part of your

4  damages in this case?

5     A.   Yes.  Yes.  I thought the question was

6  more like, you know, where are you currently,

7  but, yeah, I would say that is correct.

8          MS. THOMPSON:  Okay.  I don't have any

9  other questions.

10          MS. EMERY: Waive or reserve.

11          MS. THOMPSON:  Do you want to read

12  this or are you good to waive?

13          MS. THOMPSON:  We will waive

14  signature.

15          MS. EMERY:  We will order.

16          THE VIDEOGRAPHER:  This concludes the

17  video deposition of Curtis Lovelace, 3:21.

18

19                    -0-o-0-

20

21

22

23

24

83

1    STATE OF ILLINOIS   )

2                       )  SS:

3       COUNTY OF COOK  )

4              The within and foregoing deposition

5    of the aforementioned witness was taken before

6    Carol M. Siebert-LaMonica, C.S.R, at the place,

7    date and time aforementioned.

8              There were present during the taking

9    of the deposition the previously named counsel.

10             The said witness was first duly sworn

11   and was then examined upon oral interrogatories;

12   the questions and answers were reported in

13   shorthand by the undersigned and transcribed

14   via computer-aided transcription.

15             The within and foregoing is a true,

16   accurate and complete record of all of the

17   questions asked of and answers made by the

18   forementioned witness at the time and place

19   hereinabove referred to.

20                 The signature of the witness was

21   not waived and the deposition was submitted

22   pursuant to Rules 207 and 211 (d) of the Rules

23   of the Supreme Court of Illinois to the

24   deponent per copy of the attached letter.

84

1          The undersigned is not interested in

2    the within case, nor of kin or counsel to any

3    of the parties.

4          Witness my official signature in and

5    for Cook County Illinois on February 1, 2019.

6

7

8                Carol M. Siebert-LaMonica

9                C.S.R. No. 084.001355

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

85

C O R R E C T I O N   P A G E

I made the following changes for the following reasons:

PAGE LINE  CHANGE:

_____ _____  _____

             REASON: _____

_____ _____  _____

             REASON: _____

_____ _____  _____

             REASON: _____

_____ _____  _____

             REASON: _____

_____ _____  _____

             REASON: _____

_____ _____  _____

             REASON: _____

_____ _____  _____

             REASON: _____

_____ _____  _____

             REASON: _____

_____ _____  _____

             REASON: _____

_____ _____  _____

             REASON:


(Signed)_____

86

WITNESS CERTIFICATION

                    I hereby certify that I
have read the foregoing transcript of my
deposition consisting of Pages 1 through 89,
inclusive.   Subject to the changes set forth on
the preceding pages, the foregoing is a true
and correct transcript of my deposition taken
on January 31, 2019.


                    (Signed) _____




SUBSCRIBED AND SWORN TO

Before me this ___ day of

_____,2019.



_____

Notary Public

87

SIEBERT & ASSOCIATES COURT REPORTERS, INC.

3768 North Oleander Avenue

Chicago, IL  60634


February 1, 2019


LOEVY & LOEVY, by

     MS. TARA THOMPSON

     311 North Aberdeen Street, 3rd Floor

     Chicago, Illinois  60607

Re:  LOVELACE V. GIBSON, ET AL.

     Dep:  CURTIS LOVELACE


Dear MS. THOMPSON:

     The deposition testimony given on

January 31, 2019 in the above captioned case

has been transcribed, and inasmuch as signature

was not waived, this is to advise that the

deposition will be available in our office for

30 days for reading and signing.

     If you choose to read and sign the

deposition at our offices, please call the

undersigned for an appointment.  Our office

hours are from 9:00 a.m. to 4:00 p.m., Monday

88

thru Friday.

          If you choose to make other

arrangements for the reading and signing of the

deposition, please advise us of the

arrangements you have made in writing with 30

days from the date of this letter.


                  Sincerely yours,


                  Carol M. Siebert-LaMonica


CC:  EMERY (Original)

     HANSEN (copy)

     THOMPSON (copy)

89

I N D E X

Witness:                                    Examination

 CURTIS LOVELACE (Cont'd video)


            Ms. Emery                        21
            Mr. Hansen                       55
            Ms. Emery                        75
            Ms. Thompson                     81


                E X H I B I T S

Number                                       Page


                NO EXHIBITS MARKED