Transcript of James Keller
Conducted on August 22, 2018

E-FILED
Monday, 08 July, 2019 02:46:58 PM
Clerk, U.S. District Court, ILCD

**Page 1**

IN THE UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF ILLINOIS

CURTIS LOVELACE, LOGAN )
LOVELACE, LINCOLN )
LOVELACE & CHRISTINE )
LOVELACE on behalf of )
her minor son LAROSN )
LOVELACE, )
                        )
        Plaintiffs, )
                        )
    - vs -             )   No. 1:17-CV-01201-
                        )   JES-JEH
DET. ADAM GIBSON, POLICE )
CHIEF ROBERT COPLEY, )
SGT. JOHN SUMMERS, LT. )
DINA DREYER, DET. )
ANJANETTE BISWELL, )
UNKNOWN QUINCY POLICE )
OFFICERS, GARY FARHA, )
CORONER JAMES KELLER, )
THE CITY OF QUINCY, and )
COUNTY OF ADAMS, )
                        )
        Defendants. )

        DEPOSITION of JAMES KELLER, taken in the

above-entitled case before Gina L. Nottingham,

Certified Shorthand Reporter of Adams County,

Illinois, at 9:05 A.M., on August 22, 2018, at

625 Vermont Street, Quincy, Adams County, Illinois.

**Page 2**

APPEARANCES:

        MS. TARA THOMPSON
        Attorney at Law
        Loevy & Loevy
        311 North Aberdeen Street
        3rd Floor
        Chicago, Illinois 60607
        (312) 243-5900
        tara@loevy.com

                appeared for the Plaintiffs.

        MS. ELLEN EMERY
        Attorney at Law
        Ancel Glink Diamond Bush DiCianni &
        Krafthefer
        140 South Dearborn Street
        Chicago, Illinois 60603
        (312) 782-7606
        eemery@ancelglink.com

        MR. WILLIAM MECKES
        Attorney at Law
        Scholz Loos Palmer Siebers & Duesterhaus
        625 Vermont Street
        Quincy, Illinois  62301
        (217) 223-3444
        wmeckes@slpsd.com

                appeared for the City of
                Quincy Defendants.

        MR. JAMES HANSEN
        Attorney at Law
        Schmiedeskamp Robertson Neu & Mitchell
        525 Jersey Street
        Quincy, Illinois  62301
        (217) 233-3030
        jhansen@srnm.com

                appeared for the County of
                Adams Defendants.

Gina L. Nottingham, CSR
License No. 084-002584

**Page 3**

I N D E X

DEPONENT                                    PAGE NUMBER

James Keller

    Examination by Ms. Thompson         6

    Examination by Ms. Emery            251

E X H I B I T S

NUMBER      DESCRIPTION                     MARKED

Keller 1    2-page document Bates           154
            stamped Plaintiff 10348
            and Plaintiff 10349

Keller 2    1-page document Bates           157
            stamped Plaintiff 6427

Keller 3    4-page document Bates           158
            stamped AC 289 through
            AC 292

Keller 4    1-page document Bates           159
            stamped AC 301

Keller 5    2 documents Bates stamped       162
            Ac 261 and AC273

Keller 6    2-page document Bates           168
            stamped Ac 236 and AC 237

**Page 4**

NUMBER      DESCRIPTION                     MARKED

Keller 7    6-page document Bates           174
            stamped AC 225 through
            AC 230

Keller 8    2-page document Bates           184
            stamped AC 159 and AC 160

Keller 9    1-page document Bates           187
            stamped SAAP 344

Keller 10   3-page document Bates           190
            stamped Plaintiff 5969
            through Plaintiff 5971

Keller 11   1-page document Bates           193
            stamped AC 293

Keller 12   5-page document Bates           196
            stamped Plaintiff 5860
            through Plaintiff 5867

Keller 13   1-page document Bates           207
            stamped Plaintiff 5843

Keller 14   14-page document Bates          213
            stamped Plaintiff 9756
            through Plaintiff 9769

Keller 15   1-page document Bates           243
            stamped Plaintiff 5980

Transcript of James Keller
Conducted on August 22, 2018

**5**

1    THE VIDEOGRAPHER:  Here begins tape
2 number 1 in the videotaped deposition of James
3 Keller in the matter of Curtis Lovelace, et al.,
4 versus Detective Adam Gibson, et al., in the United
5 States District Court for the Central District of
6 Illinois, case number 1:17-CV-0201-JES-JEH.
7    Today's date is August 22nd, 2018.  The
8 time on the video monitor is 9:06 a.m.  The
9 videographer today is Carrie Hooper representing
10 Planet Depo.  This video deposition is taking place
11 at 625 Jersey Street, Quincy, Illinois.
12    Would counsel please voice identify
13 themselves and state whom they represent.
14    MS. THOMPSON:  Good morning.  My name is
15 Tara Thompson and I represent the plaintiffs.
16    MR. HANSEN:  Jim Hansen for the county
17 defendants.
18    MS. EMERY:  Ellen Emery for the Quincy
19 defendants.
20    MR. MECKES:  William Meckes for the City
21 defendants.
22    THE VIDEOGRAPHER:  The court reporter
23 today is Gina Nottingham representing Planet Depo.
24 Would the reporter please swear in the witness.

**6**

1    (Witness sworn.)
2    JAMES KELLER,
3 having been first duly sworn by the Notary Public,
4 deposeth and saith as follows:
5    EXAMINATION BY
6    MS. THOMPSON:
7  Q.  Good morning, Mr. Keller.
8  **A.  Good morning.**
9  Q.  As I said, my name is Tara Thompson and I
10 represent the plaintiffs in this matter.
11    A couple of background things to go over
12 with you before we begin the deposition.  First of
13 all, have you been deposed before, sir?
14  **A.  As in?**
15  Q.  Have you ever sat for a deposition?
16  **A.  Yes, once.**
17  Q.  And what kind of a case was that for?
18  **A.  I believe one with a coroner's -- it's**
19 **been a while ago.**
20  Q.  When was it, as best you can recall?
21  **A.  It's been several years, I think.  I**
22 **believe it was a deposition.  I guess I'm not**
23 **really sure.  I can't remember.**
24  Q.  And this deposition had something do with

**7**

1 your position as Coroner?
2  **A.  No.  It was just a -- I don't believe I**
3 **was called.  They were going to and I don't think**
4 **it went through, no, no, no.**
5  Q.  Okay.  So have you ever actually had a
6 deposition --
7  **A.  No.**
8  Q.  (Continuing) -- go through for yourself
9 before?
10  **A.  No.**
11  Q.  Okay.  A couple of background rules to
12 make this work.  First is the court reporter is
13 writing down everything that both of us say and
14 things that anyone else says, and so in order for
15 her to be able to take down what we say, I will do
16 my very best not to interrupt you when you are
17 giving your answer, and likewise, I would ask that
18 you wait until I finish asking a question before
19 you start talking so that we're not talking over
20 one another.  Is that acceptable?
21  **A.  Yes, ma'am.**
22  Q.  If you don't understand any of my
23 questions, let me know; otherwise, I'm going to
24 assume that you understood.  All right?

**8**

1  **A.  Yes, ma'am.**
2  Q.  You need to give a verbal answer.  So if
3 you are saying huh-uh or uh-huh, the court reporter
4 can't type that down.  So if you're intending to
5 say yes or no, please answer the question in a way
6 that the court reporter can record.  All right?
7  **A.  Yes, ma'am.**
8  Q.  You can take a break at any time.  I
9 would just ask that if there is a question pending
10 that you answer the question before we break.  All
11 right?
12  **A.  Yes, ma'am.**
13  Q.  Is there any reason that you would be
14 unable to give truthful and accurate testimony
15 today?
16  **A.  No, ma'am.**
17  Q.  And are you under the influence of any
18 medications today that would impact your ability to
19 understand questions and to answer truthfully?
20  **A.  No, ma'am.**
21  Q.  What did you do to prepare for this
22 deposition?
23  **A.  I looked at some documents.**
24  Q.  What documents did you look at?

Transcript of James Keller
Conducted on August 22, 2018

---

9

1    A.   From the first -- that was given by
2  Mr. Hansen.
3    Q.   And without going into any of your
4  conversations with counsel, do you know what
5  documents you reviewed?
6    A.   They were the -- of the first trial, I
7  believe, of the testimony.
8       MR. HANSEN:  He reviewed his trial
9  testimony from the first trial and some e-mails.
10 BY MS. THOMPSON:
11   Q.   All right.  So your counsel has just
12 represented you looked at your first -- your
13 first -- your testimony from the first trial and
14 some e-mails.  Is that what you reviewed, sir?
15   A.   Yes.
16   Q.   And what e-mails did you look at?
17   A.   Just the e-mails that were provided.
18   Q.   Were they e-mails that you either sent or
19 received?
20   A.   Yes.
21   Q.   Did you look at any e-mails that you had
22 not originally sent or received?  Meaning e-mails
23 from other people that weren't -- didn't have
24 anything to do with you.

---

10

1    A.   Yes.  I was cc'd on some, but I had
2  looked at the ones, yes, that were given.
3    Q.   All right.  And without going into the
4  content of any of your communications with your
5  counsel, did you meet with your counsel to prepare
6  for this deposition?
7    A.   I did.
8    Q.   For how long?
9    A.   About an hour.
10   Q.   All right.  Did you meet more than one
11 time?
12   A.   No, just -- no.
13   Q.   All right.  And was anyone else present
14 for your meetings -- for the meeting you had with
15 your counsel to prepare for this deposition?
16   A.   No.
17   Q.   Have you ever talked about this lawsuit
18 with anyone else who was a defendant in the case?
19   A.   No.
20   Q.   And did you talk with anyone about your
21 deposition -- about the fact that you were going to
22 be deposed today, other than your counsel?
23   A.   No.
24   Q.   Are you currently employed, sir?

---

11

1    A.   I'm not.
2    Q.   All right.  And my understanding is that
3  you previously served as the Coroner for Adams
4  County; is that correct?
5    A.   Correct.
6    Q.   And is it correct that you have resigned
7  that position?
8    A.   I did.
9    Q.   On what date did your resignation become
10 effective?
11   A.   The 12th of July.
12   Q.   Are you currently receiving a salary from
13 Adams County?
14   A.   I am not.
15   Q.   And has anyone ever told you that they
16 have concerns about the manner in which you
17 performed your job as the Adams County Coroner?
18       MR. HANSEN:  Let me start by nipping this
19 in the bud before we get into it.  If you are going
20 to get into anything that's going on currently, I'm
21 going to instruct him not to answer.  I understand
22 the question is kind of vague.  So I'll object to
23 the vagueness, and I just want to put you on notice
24 that we are not going to be answering any questions

---

12

1  about things that have come out recently.
2       MS. THOMPSON:  And when you say you are
3  going to instruct him not to answer, on what basis?
4       MR. HANSEN:  It's his constitutional
5  right against self-incrimination if you are going
6  to try to get into that, because there is an
7  ongoing investigation.
8       MR. HANSEN:  All right.  I'm happy to
9  make a record that he would exercise his rights as
10 to those questions if he is going to indicate that
11 that's what he would do.
12 BY MS. THOMPSON:
13   Q.   So, sir, my understanding is that there
14 is currently an investigation that is pending
15 against you -- or pending concerning your
16 performance as Adams County Coroner, and my
17 understanding from your counsel is that if I were
18 to ask you any questions about that investigation
19 or any questions about your performance as Coroner
20 with respect to that investigation that you would
21 decline to answer those questions; is that correct,
22 sir?
23   A.   That is correct.
24   Q.   And on what basis would you decline to

---

**13**

1 answer those questions?
2    **A.  My rights.**
3       MR. HANSEN:  On the basis I just gave
4 him, so...
5       You would -- would you rise your
6 constitutional right against self-incrimination and
7 refuse to answer those questions?
8       THE WITNESS:  Yes.
9       MR. HANSEN:  Thank you.
10 BY MS. THOMPSON:
11    Q.  All right.  Setting aside the
12 investigation that is currently pending, has anyone
13 ever told you that they have concerns about the
14 manner in which you've performed your job as
15 Coroner?
16    **A.  No.**
17    Q.  And setting aside the current
18 investigation, other than issues which relate to
19 that, to your knowledge, has anyone ever accused
20 you of using your position as Coroner for your
21 personal gain?
22    **A.  No.**
23    Q.  I want to talk -- I want to ask you some
24 questions about your medical -- well, I want to ask

**14**

1 you some questions about your background.  When did
2 you become Coroner of Adams County?
3    **A.  2012.**
4    Q.  And before that, you worked as a deputy
5 coroner; is that right?
6    **A.  I did.**
7    Q.  When did you begin working as a deputy
8 coroner?
9    **A.  In '88 or '89.**
10    Q.  All right.  And did you work -- did you
11 work consistently as a deputy coroner from '88 --
12 or '89 to when you became the Coroner?
13    **A.  Yes.**
14    Q.  Prior to becoming the Deputy Coroner, can
15 you go through for me the jobs that you've had as
16 an adult?
17    **A.  A funeral director at Duker Haugh Funeral**
18 **Home, and that's all the jobs I've had since '82.**
19    Q.  All right.  You became a funeral director
20 there in 1982?
21    **A.  Yes.**
22    Q.  Okay.
23    **A.  I came to Quincy in 1982.**
24    Q.  Prior to coming to Quincy, did you have

**15**

1 any jobs as an adult?
2    **A.  I was -- went to school, was going to**
3 **school, so I was in school and was in the mortuary**
4 **after that in Quincy.**
5    Q.  What kind of schooling were you attending
6 before coming to Quincy?
7    **A.  Mortuary school.**
8    Q.  Where did you attend mortuary school?
9    **A.  In Skokie, Illinois.**
10    Q.  And what was the name of the program?
11    **A.  Worsham College of Mortuary Science.**
12    Q.  Can you spell that for the court
13 reporter?
14    **A.  W-O-R-S-H-A-M.**
15    Q.  Did you receive a -- did you graduate
16 from that program?
17    **A.  I did.**
18    Q.  And what certification or degree did you
19 receive?
20    **A.  Mortuary science degree.**
21    Q.  All right.  How many years was that
22 program?
23    **A.  It's two years of another college, which**
24 **means just to get prerequisites, and then one year**

**16**

1 of mortuary science.
2    Q.  Did you attend those two years from
3 another college?
4    **A.  I did.**
5    Q.  Where at?
6    **A.  Joliet Junior College.**
7    Q.  Did you get an associate's degree or
8 another --
9    **A.  No, it's not an associate's, no.**
10    Q.  So you did two years of your
11 prerequisites at Joliet College and then went to
12 mortuary school?
13    **A.  Yes.**
14    Q.  All right.  And have you ever worked at
15 any other funeral homes other than the funeral home
16 you've identified earlier?
17    **A.  No.**
18    Q.  Did you have any personal or professional
19 connections to Quincy before you came to Quincy to
20 work?
21    **A.  I did not.**
22    Q.  All right.  And I'm going to --
23    **A.  Sorry.  I apologize.**
24    Q.  Thanks.  Why did you come to Quincy to

17

1  work in a funeral home here?
2      **A.  Job opening.**
3      Q.   You are a licensed funeral director
4  currently; is that right?
5      **A.  I am.**
6      Q.   All right.  And prior to that
7  licensure -- well, let me ask you this.
8          You are currently a licensed funeral
9  director and embalmer; is that right?
10     **A.  I am.**
11     Q.   All right.  And was there some point at
12 which you became licensed in embalming separate
13 from the funeral director license or have you
14 always held the one license?
15     **A.  The licenses are -- when you obtain a**
16 **license, you are licensed for funeral director and**
17 **embalmer.**
18     Q.   All right.  When did you become licensed
19 as a funeral director?
20     **A.  1982.  It would have probably been, I'm**
21 **going to say, '82.**
22     Q.   At the time you became licensed in 1982,
23 what were the steps that you had to take to become
24 licensed?

18

1      **A.  The steps, I'm sorry?**
2      Q.   Did you have to apply for a license?
3      **A.  You did.  You had to apply -- you took a**
4  **state board exam to get your license.**
5      Q.   Was there anything else you had to do to
6  obtain your license other than to take the exam?
7      **A.  You had to complete mortuary science, you**
8  **had to do a year of apprenticeship, and then you**
9  **got your license after the apprenticeship.**
10     Q.   Have you ever had any continuing
11 education requirements in order to maintain your
12 license as a funeral director?
13     **A.  Yes.**
14     Q.   What are those requirements?
15     **A.  You have to have 24 hours of continuing**
16 **education every two years.**
17     Q.   And on what topics have you taken classes
18 to satisfy your continuing education requirements?
19     **A.  Whatever topics are available.  They have**
20 **programs and you go to the continuing education.**
21     Q.   Do those --
22     **A.  So the topics very.**
23     Q.   And I'm sorry for interrupting you.
24         Do those topics pertain to the, you know,

19

1  funeral home business?
2      **A.  Yes, uh-huh.**
3      Q.   Do any of those courses have anything to
4  do with crime scene investigation?
5      **A.  No, huh-uh.**
6      Q.   In your mortuary science program, were
7  any of the courses that you had to take either at
8  Joliet College or at mortuary school, were any of
9  those science courses?
10     **A.  Yes.**
11     Q.   And for those courses that were science
12 courses, can you tell me what those courses
13 covered?
14     **A.  Anatomy, pathology, microbiology, some**
15 **chemistry.  That's all I can remember.**
16     Q.   Have you taken any pathology courses
17 since receiving your mortuary degree?
18     **A.  On my own?**
19     Q.   Yes.
20     **A.  No.**
21     Q.   Have you taken any microbiology courses
22 since completing your mortuary science degree?
23     **A.  No.**
24     Q.   Have you taken any anatomy courses since

20

1  completing your mortuary science degree?
2      **A.  No, huh-uh.**
3      Q.   At the point that you became a deputy
4  coroner, did you have to complete any training or
5  classes to work as a deputy coroner?
6      **A.  No, I did not.**
7      Q.   And at the point at which you were
8  appointed coroner, did you have to take any classes
9  or training to assume the role of Coroner?
10     **A.  We -- we take continuing education**
11 **classes.**
12     Q.   Did you go to any specific training aside
13 from continuing education at the point at which you
14 became Coroner?
15     **A.  I took a class, I don't exactly know**
16 **when, it was in New haven, Connecticut, on my own,**
17 **a Dr. Henry Lee class in New Haven, Connecticut.**
18     Q.   When did you take that course?
19     **A.  I can't recall the year, ma'am.**
20     Q.   And what did that course cover?
21     **A.  It covered death investigation, crime**
22 **scene.  I don't recall all the -- just pertained to**
23 **death and crime scene investigations.**
24     Q.   Did you take that course before or after

Transcript of James Keller

6 (21 to 24)

Conducted on August 22, 2018

---

**21**

1 you became Coroner?

2 **A. I believe it before -- to be before I was**

3 **Coroner.**

4 Q. Can you give any -- do you have any

5 estimate as to when it was that you would have

6 taken that course?

7 **A. No, I can't.**

8 Q. Was it in the 1990s?

9 **A. I can't recall when it was, ma'am.**

10 Q. Do you recall if it was before or after

11 2000?

12 **A. I can't, no.**

13 Q. Did you pay for that course yourself?

14 **A. I did.**

15 Q. And how many hours was that course?

16 **A. It was a couple days of classes. I don't**

17 **know if it was put into hours or not. I'm not -- I**

18 **don't recall. It's been quite a while ago.**

19 Q. Was that course run through a particular

20 school or institution?

21 **A. Henry Lee in New Haven, Connecticut. I**

22 **can't even recall what --**

23 Q. You said that you have continuing

24 education requirements -- or you had continuing

---

**22**

1 education requirements as Coroner as well; is that

2 correct?

3 **A. Yes, ma'am.**

4 Q. All right. And what did -- what did

5 those continuing education requirements consist of?

6 **A. It consisted of courses on death**

7 **investigation, numerous topics.**

8 Q. How many hours a year were you required

9 to have as a coroner of continuing education?

10 **A. We had -- oh, I can't remember the**

11 **breakdown of the hours wise, but when I generally**

12 **went, I went for a week-long course in the -- they**

13 **had various ones in the spring and the fall of the**

14 **year --**

15 Q. Did --

16 **A. (Continuing) -- generally lasting two to**

17 **three days.**

18 Q. Did you keep any records of the

19 continuing education courses that you took while

20 you were Coroner?

21 **A. I did.**

22 Q. And where are those records today?

23 **A. They are -- I believe you -- they were**

24 **submitted.**

---

**23**

1 Q. Do you have any records beyond what you

2 produced in this litigation?

3 **A. No, ma'am.**

4 Q. Okay. Did you have any similar

5 continuing education requirements while you worked

6 as a deputy coroner?

7 **A. I believe I went on one occasion to --**

8 **prior to.**

9 Q. When you say you "went on one occasion,"

10 can you explain what you mean?

11 **A. To one -- I think I went to one**

12 **conference.**

13 Q. When was that?

14 **A. (Shook his head from side to side.)**

15 Q. Was that before or after 2000?

16 **A. It would have been probably before.**

17 **Before 2000?**

18 Q. Yes.

19 **A. I don't remember. I don't recall the**

20 **dates. Everything I've had I turned in as far as**

21 **schooling. So I'm...**

22 Q. At the time that you became a deputy

23 coroner, did you apply for that position?

24 **A. I did. I was -- I did, yes.**

---

**24**

1 Q. All right. And why did you apply to

2 become a deputy coroner?

3 **A. I was asked to -- by Coroner Chris Boyer.**

4 Q. And do you know -- did Coroner Boyer give

5 you -- give you any indication of why they wanted

6 you to apply?

7 **A. He just asked if I would -- he thought I**

8 **would do a good job with the Coroner's Office. He**

9 **felt I was good with people and just asked if I**

10 **would be a -- be a deputy.**

11 Q. In your time in the funeral home business

12 before becoming a deputy coroner, what were your

13 responsibilities?

14 **A. Removal of decedents, preparing bodies**

15 **for funerals, for visitations.**

16 Q. Over time while you were working in the

17 funeral home business, did you -- did you, you

18 know, work your way up in the funeral home to

19 additional responsibilities over time?

20 **A. Generally at the funeral home met with**

21 **some families, but not many, and really, no, you**

22 **basically done the same thing all the way through.**

23 **I mean, met with families and -- I'm sorry, went on**

24 **removals, embalmed, cosmetized, dressed, and**

---

Transcript of James Keller
Conducted on August 22, 2018

25

1  casketed.
2    Q.  Did you have any management
3  responsibilities at any point at the funeral home?
4    A.  No.  It was the owners.
5    Q.  Okay.  And you said that you went on
6  removals as part of your job; is that right?
7    A.  Yes, ma'am.
8    Q.  How many removals did you go on during
9  your time in the funeral business?
10    A.  I would say 275 to 300 a year.
11    Q.  And at the time that you became Deputy
12  Coroner, did you stop working at the funeral home
13  or did you hold those positions simultaneously?
14    A.  I held them at the same time.
15    Q.  Okay.  Did you work at the funeral home
16  up until you became Coroner?
17    A.  I did.
18    Q.  All right.  And at the time you became
19  Coroner, did you continue working at the funeral
20  home?
21    A.  I did.
22    Q.  Okay.  Are you still working at a funeral
23  home today?
24    A.  I am not.

26

1    Q.  When did you stop?
2    A.  June.
3    Q.  June of this year?
4    A.  Yes.
5    Q.  Okay.  Are you currently employed in any
6  capacity anywhere?
7    A.  I am not.
8    Q.  All right.  At the time you became
9  Coroner -- well, let me go back and ask you this.
10    Before you became Deputy Coroner, were
11  you working full-time in the funeral business?
12    A.  Yes, ma'am.
13    Q.  And how many hours a week were you
14  working?
15    A.  60.  I'll say 60ish.
16    Q.  When you became Deputy Coroner, did your
17  hours change in terms of your hours at the funeral
18  home?
19    A.  No.
20    Q.  All right.  And when you became Coroner,
21  did your hours change?
22    A.  They did change, yes.
23    Q.  And how many hours were you working at
24  the funeral home after you became Coroner?

27

1    A.  30 -- I'll say -- there was no set.  When
2  I wasn't at the office, I was at the funeral home,
3  so I never kept a time card or wrote hours down, so
4  they did vary greatly.
5    Q.  How were you compensated while working as
6  Deputy Coroner by the funeral home?
7    A.  I got a salary.
8    Q.  All right.  And what was that salary?
9    MR. HANSEN:  What's the -- I'm going to
10  object; relevance.  I mean, he can answer, but this
11  is getting far afield of anything relative to this
12  case.
13    Go ahead, you can answer, if you
14  remember.
15    THE WITNESS:  As Deputy Coroner?
16  BY MS. THOMPSON:
17    Q.  Well, let me ask you this.  As Coroner,
18  were you still on salary at the funeral home?
19    A.  I was.
20    Q.  All right.  And did your salary go down
21  commensurate with the hours you were spending
22  there?
23    A.  It did.
24    Q.  Okay.  Did your salary either as Deputy

28

1  Coroner or as Coroner, and I'm talking about your
2  salary at the funeral home, did it include any
3  bonuses for hours worked or, you know, performance
4  bonuses?
5    A.  No.  No.
6    Q.  Okay.  Did you keep any records at the
7  funeral home while you were Deputy Coroner or
8  Coroner of, you know, number of removals you went
9  on --
10    A.  No.
11    Q.  (Continuing) -- number of bodies you
12  prepared, number of funerals you were involved in?
13    A.  No, ma'am.
14    Q.  All right.  Why did you stop working at
15  the funeral home in June?
16    A.  Just the -- with the investigation.
17    Q.  Were -- did you willingly choose to stop
18  working at the funeral home?
19    A.  No.
20    Q.  Did they ask you to resign?
21    A.  Yes.
22    Q.  Okay.  And your number of 275 to 300
23  removals a year, is that -- that you were involved
24  at the funeral home, is that -- did that number

Transcript of James Keller
Conducted on August 22, 2018

---

29

1  remain the same while you were Deputy Coroner?
2     A.  Yes, uh-huh.
3     Q.  And did that number remain the same while
4  you were working as Coroner?
5     A.  No, that probably -- that went down.
6     Q.  What about the number of bodies that you
7  embalmed while you were -- well, let me start that
8  question again.
9        While you were working as Deputy Coroner,
10  how many bodies were you involved in preparing for
11  burial per year at the funeral home?
12     A.  I worked on -- I prepared a majority of
13  them, yes.
14     Q.  Majority of the 275 to 300?
15     A.  Correct.
16     Q.  And was it true still when you became
17  Coroner that you prepared the majority of the
18  bodies you were involved in removing?
19     A.  No.
20     Q.  All right.  How did those numbers change
21  as Coroner?
22     A.  If I wasn't there, another embalmer would
23  either embalm, cosmetize, or dress or casket, if I
24  wasn't available.

---

31

1     Q.  Can you spell Mr. Myer's last name?
2     A.  M-Y-E-R.
3        Greg Myers.  And I believe that to be it.
4  I'm not -- I don't remember.  I'm not quite sure.
5     Q.  In 2013, you were Coroner, correct?
6     A.  Yes.
7     Q.  And who worked as Deputy Coroners under
8  you in 2013?
9     A.  Gary Hamilton, Ben Hamilton, Greg Myers,
10  Pam Keller.  I believe that to be it.  I'm not -- I
11  believe that to be it.
12     Q.  In 2013, you were married to Pam Keller;
13  is that correct?
14     A.  Yes.
15     Q.  When did she become a deputy coroner?
16     A.  She was -- I made her Deputy Coroner when
17  I -- when I took office.  She was Gary Hamilton's
18  administrative accident.
19     Q.  When did she start working as his
20  administrative assistant?
21     A.  She -- I can't recall how many years it's
22  been.  It's 10 or 12 years she was -- I don't know
23  how many.  I don't know.
24     Q.  10 or 12 years before 2011?

---

30

1     Q.  And I understand that you said you didn't
2  keep a time card or write your hours down at the
3  funeral home while you were Coroner, but I think
4  you started to give the number 30.  Is 30 hours a
5  week a rough estimate of how many hours a week you
6  were at the funeral home while you were Coroner?
7     A.  It varied.  I don't know the hours.  I
8  never really kept -- I did not have to keep track
9  of the hours.
10     Q.  When you started working as Deputy
11  Coroner -- well, let me ask you this.  I want to
12  ask you a little bit about the composition of the
13  Coroner's Office in 2006.
14        In 2006, Gary Hamilton was the Coroner;
15  is that correct?
16     A.  That's correct.
17     Q.  All right.  And you worked as a deputy
18  coroner at that time?
19     A.  That's correct.
20     Q.  And was there anyone else also working as
21  a deputy coroner?
22     A.  Yes.
23     Q.  Who else that you recall in 2006?
24     A.  Gary Hamilton.  I believe John Myer.

---

32

1     A.  I think it was maybe 10 or 12 years
2  total.  I think she may have worked four or five,
3  six with him.
4     Q.  Did she continue her position as an
5  administrative assistant after becoming a deputy
6  coroner?
7     A.  Uh-huh.  Yes, ma'am.
8     Q.  Okay.  And so she -- there were four or
9  five years under Mr. Hamilton and then --
10     A.  Yes.
11     Q.  (Continuing) -- the remainder of that
12  time was after?
13     A.  Yes.
14     Q.  Okay.  Did she have any experience in the
15  funeral home business before?
16     A.  No.
17     Q.  All right.  Had she ever had any mortuary
18  training that you're aware of?
19     A.  No.
20     Q.  In 2014, were there any changes in the
21  composition of the Coroner's Office in terms of
22  Deputy Coroners leaving or coming?
23     A.  Actually, there probably -- there was one
24  more.  Loretta Lewis was a deputy coroner.

---

Transcript of James Keller
Conducted on August 22, 2018

33

1    Q.   Was she a deputy in 2013?
2    **A.   I believe so.**
3    Q.   And was she also a deputy in 2014?
4    **A.   I believe so, yes.**
5    Q.   Okay.  At the time -- well, at the time
6  you became a deputy coroner, what were your
7  responsibilities as Deputy Coroner?
8    **A.   To go to scenes when Coroner Hamilton**
9  **called me to go on, or if he was out of town, to**
10 **take the calls for him.**
11   Q.   And what were your responsibilities if
12 you were called to a scene as Deputy Coroner?
13   **A.   If Coroner Hamilton was there, it was**
14 **basically to assist him with whatever he needed.**
15   Q.   And what if he was not there?
16   **A.   Then to take care of the scene.**
17   Q.   When you say "take care of the scene,"
18 can you explain what that means?
19   **A.   To go to a scene and talk to families,**
20 **look at the scene as to what may have occurred, and**
21 **to make a determination if you need an examination,**
22 **have the body removed from the scene.**
23   Q.   If Coroner Hamilton was -- well, let me
24 ask you this.

34

1        Did your responsibilities as a deputy
2  coroner change at all between when you started and
3  2006?
4    **A.   I don't understand.**
5    Q.   Let me ask you a better question.  The
6  responsibilities you've just described the Deputy
7  Coroner having, were those the same
8  responsibilities you had as a deputy coroner in
9  2006?
10   **A.   Yes.**
11   Q.   All right.  And if the Coroner was also
12 on the scene of a body being found --
13   **A.   Uh-huh.**
14   Q.   (Continuing) -- and you as a deputy
15 coroner came their there, too, you said your
16 responsibilities were there to assist the Coroner;
17 is that right?
18   **A.   Correct.**
19   Q.   And all the things that you've just
20 listed that would be your responsibilities if the
21 Coroner was not there, would those be the Coroner's
22 responsibilities if the Coroner was there?
23   **A.   It would be, yes.**
24   Q.   All right.  And would you have any --

35

1  would your role in -- would you -- well, let me ask
2  you that question in a better way.
3        Would the Coroner be the person if they
4  were on the scene to decide when the body should be
5  removed?
6    **A.   Yes, he made that decision.**
7    Q.   Okay.  And would the Coroner be
8  responsible if they were on the scene for
9  conducting any investigation they thought should be
10 done?
11   **A.   He would.  With Coroner Hamilton, he**
12 **always had -- if you had any input, you could state**
13 **whatever you thought about a scene.  We always --**
14 **all of the deputies worked together with he as to**
15 **eyes, what you seen, what you thought.**
16   Q.   Okay.  But ultimately would it be Coroner
17 Hamilton's responsibility to see that any
18 investigation was done that he thought needed to be
19 done?
20   **A.   Yes.**
21   Q.   Okay.  And in -- at the scene of a body
22 being found, and I'm asking again about your time
23 as Deputy Coroner, at the scene where a body would
24 be found, typically the police would be present as

36

1  well, right?
2    **A.   Yes, ma'am.**
3    Q.   All right.  And how would -- well, let me
4  ask you this question.
5        In your time as Deputy Coroner on the
6  scenes that you went on, who did that scene belong
7  to?
8        MR. HANSEN:  Object to the form.
9        If you understand, you can answer.
10       THE WITNESS:  The Coroner's Office is in
11 charge of the decedent of the scene.
12 BY MS. THOMPSON:
13   Q.   And when you say that they are "in charge
14 of the decedent in the scene," can you explain what
15 you mean?
16   **A.   They -- generally speaking, the body is**
17 **not removed -- cannot be removed or moved until the**
18 **Coroner arrives at a scene.**
19   Q.   When the Coroner comes to a scene, can --
20 and let me -- I'm asking.  Let me say this.
21       You have received training about how to
22 conduct your job as a coroner at the time -- for --
23 at the time that you served as Coroner; is that
24 right?

Transcript of James Keller
Conducted on August 22, 2018

---

37

1    A.   Yes.

2    Q.   And based on your training and experience
3 and understanding of the Coroner's
4 responsibilities, can the police instruct the
5 Coroner not to conduct a certain piece of
6 investigation at the scene where a body is found?

7    **A.   Can they -- can they tell us not to, is**
8 **that what you're --**

9    Q.   Yes.

10    **A.   They can state their -- we work -- the**
11 **Coroner's Office and police departments work**
12 **together and we discuss cases and scenes, so**
13 **they -- yes, they state that they would rather not**
14 **have this or not that done.**

15    Q.   What if there is a disagreement at a
16 scene between the police and the Coroner about what
17 should be done?

18    **A.   Generally they will talk it out.  I mean,**
19 **discuss it.**

20    Q.   And you said that as a deputy coroner
21 that Coroner Hamilton would allow deputies to tell
22 him what they thought about --

23    **A.   What they seen, what they are**
24 **visualizing.**

---

38

1    Q.   And so at the scenes that you responded
2 to while Coroner Hamilton was the Coroner and you
3 were a deputy coroner, did you talk with him at the
4 scene about what you were observing?

5    **A.   At various scenes, yes.  He could be**
6 **doing something else while you were -- there is a**
7 **lot of activity going at a scene, so if he was**
8 **looking somewhere else and you observed something,**
9 **you could state that -- what you were seeing.**

10    Q.   While you were working as a deputy
11 coroner under Coroner Hamilton, was there certain
12 paperwork that the Coroner's Office would complete
13 at the scene?

14    **A.   It would be the -- he would complete that**
15 **paperwork.**

16    Q.   All right.  And what is that -- what
17 would that paperwork have been?

18    **A.   He would have an investigation report.**

19    Q.   Okay.  And you as the Deputy Coroner, if
20 Coroner Hamilton was at the scene, you did not
21 have -- you did not have any responsibilities over
22 completing that report; is that right?

23    **A.   That is correct.**

24    Q.   But you said you would tell Coroner

---

39

1 Hamilton what it is that you were observing?

2    **A.   Yes.**

3    Q.   Okay.  Did you -- in your time as Deputy
4 Coroner when you were on a scene that Coroner
5 Hamilton was on, would you take any notes for
6 yourself?

7    **A.   No.**

8    Q.   Would you take any photographs for
9 yourself?

10    **A.   No.**

11    Q.   And is there a particular reason you
12 wouldn't take notes as Deputy Coroner while you
13 were on the scene with the Coroner?

14    **A.   I did not need -- it wasn't required and**
15 **did not need to, so, no, I did not.**

16    Q.   Can you recall any time in your -- the
17 time -- in your time as Deputy Coroner where you
18 would take -- where you took notes on a scene that
19 you were at with Coroner Hamilton?

20    **A.   If he had instructed me -- if -- no, I**
21 **can't recall, but if we were at a -- no, I can't**
22 **recall making -- generally, he took care of his --**
23 **if you went to a scene and were called to a scene,**
24 **he -- he took care of the paperwork.**

---

40

1    Q.   Did you carry a paper and a writing
2 instrument with you on any of the scenes that you
3 responded to as Deputy Coroner?

4    **A.   I would have a -- sometimes I would have**
5 **a clipboard inside, but no -- I -- yes, I would**
6 **have it with me.  It would be in the vehicle.**

7    Q.   Okay.  And you said sometimes you had a
8 clipboard?

9    **A.   Yeah, it would be in my vehicle.  I mean,**
10 **it would stay -- the clipboard would stay with me**
11 **wherever I went.**

12    Q.   Okay.  If the Coroner was not at a scene
13 while you were Deputy Coroner, then I take it then
14 the investigative report would be the Deputy
15 Coroner's responsibility; is that right?

16    **A.   It would be.**

17    Q.   Okay.  And in completing that report,
18 would you take any notes that you would use to, you
19 know, finalize the report later, or how did you
20 complete it?

21    **A.   Yes, I would have notes, if I was on a**
22 **scene and he wasn't.**

23    Q.   As Deputy Coroner, when you were at a
24 crime scene -- or strike that.  Let me ask this

---

Transcript of James Keller
Conducted on August 22, 2018

41

1  question again.
2       As Deputy Coroner, when you were at a
3  death scene with Coroner Hamilton, is that
4  you were -- what is it that you were looking for at
5  the scene or what is it that you would visualize?
6      **A.  A lot of times I was called to the scene**
7  **with Coroner Hamilton to assist him with a removal**
8  **of a decedent.**
9      Q.  And when you say you were called to
10 assist with a removal, what do you mean?
11     **A.  If it was an automobile, when -- if it**
12 **was an automobile fatality or a removal from a**
13 **home, he would call to ask us to assistance for**
14 **removal of the decedent from wherever the decedent**
15 **was.**
16     Q.  Does that assistance consist of getting
17 that person in a, you know, a bag and getting them
18 out of wherever they are at out to the Coroner's
19 Office?
20     **A.  Onto a cot, yes, that's correct.**
21     Q.  If you were called to assist with
22 removal, would you have any other responsibilities
23 other than, you know, getting the decedent into a
24 bag and getting them out of the scene?

42

1      **A.  It just depended on what he wanted, what**
2  **he requested.**
3      Q.  From your memory, what else did Coroner
4  Hamilton ever request of you when you were at a
5  scene other than removing the body?
6      **A.  There were times that I would speak**
7  **with -- talk with families just reference to**
8  **funeral homes, just kind of speak with them and**
9  **talk to them.**
10     Q.  Are there any other things you can
11 remember Coroner Hamilton ever asking you to do at
12 a scene besides helping remove the body and
13 potentially talking with families?
14     **A.  I don't understand what --**
15     Q.  Sure.  My question was:  You said that as
16 Deputy Coroner that it would be your responsibility
17 at the scene to do whatever Coroner Hamilton asked
18 of you; is that right?
19     **A.  Correct.**
20     Q.  And I'm asking you, of all the scenes
21 that you ever responded to as Deputy Coroner where
22 Coroner Hamilton was there to, what else -- what do
23 you remember him asking you to do besides assisting
24 with removal of a body, and I think you said one

43

1  thing was talking with families; is that right?
2      **A.  Talking with families, speaking with**
3  **families.  There would be times that we would -- if**
4  **he wasn't quite ready, we would just look around**
5  **the area for anything that you seen that was out of**
6  **line, that -- to wrap up the investigation part.**
7      Q.  Is there anything else you can remember
8  him asking you to do at a scene besides removing a
9  body and talking with the family?
10     **A.  You would look -- if he would -- if he**
11 **was not quite done with a scene investigation,**
12 **there would be times he would just have you to look**
13 **around the area, see if you seen something that may**
14 **have been out of line or he would need to know**
15 **about.**
16     Q.  And as either Coroner or Deputy Coroner,
17 what did a scene investigation consist of?
18     **A.  Looking at a scene for whether it be**
19 **drugs, guns, knives, anything out of -- getting a**
20 **history.**
21     Q.  When you say "getting a history," can you
22 explain to me what that means?
23     **A.  Getting a history of what occurred, what**
24 **transpired.**

44

1      Q.  And how do you get a history of what
2  occurred or what transpired?
3      **A.  Speaking with family or if someone was**
4  **there that had seen the decedent prior to the**
5  **passing.**
6      Q.  If you were at a scene with Coroner
7  Hamilton and a history needed to be collected, is
8  that something you would only do if Coroner
9  Hamilton asked you to?
10     **A.  Yes.**
11     Q.  Okay.  Is there anything else that you
12 can remember doing at the scene as a deputy coroner
13 other than the things you've just testified about?
14     **A.  No.  No, because that just about**
15 **covers -- no.**
16     Q.  As Coroner, what were your duties?
17     **A.  To go to a scene, make a pronouncement of**
18 **death, and basically the same thing as I had stated**
19 **prior, look at the scene, speak with families, make**
20 **the removal.**
21     Q.  As Coroner, did you have responsibilities
22 outside of what you had to do at the crime scene --
23 or at the scene of a death, any death?
24     **A.  You would -- if there was an examination**

Transcript of James Keller
Conducted on August 22, 2018

45

1 that needed to be performed, you would schedule an
2 examination, death certificates, you would sign
3 death certificates, sign cremation permits, answer
4 e-mails.
5     Q.  Any other responsibilities?
6     A.  Send out autopsy reports to families.  Go
7 ahead.
8     Q.  Well, any other responsibilities you
9 recall?
10    A.  I don't think so.
11    Q.  Okay.  When you said -- when you talked
12 about scheduling examinations, is it the Coroner's
13 decision whether or not to have a body examined?
14    A.  Yes.
15    Q.  All right.  And is it the Coroner's
16 decision to decide what the cause of death was of a
17 person?
18    A.  It is.
19    Q.  The Coroner can do that, in part, through
20 an inquest; is that right?
21    A.  The State of Illinois does not have to
22 have an inquest anymore.
23    Q.  Can the Coroner -- and let me ask you
24 specifically about 2006.  Were Coroner's inquests

46

1 required in 2006?
2     A.  They were.
3     Q.  All right.  And did the Coroner get the
4 -- could the Coroner decide whether to convene and
5 inquest in 2006?
6     A.  Yes.
7     Q.  When did that stop being a requirement?
8     A.  I don't recall the year.  It was -- I
9 don't know if it was 2010, '9, '10.
10    Q.  Was it before you became Coroner?
11    A.  It was.
12    Q.  Okay.  As Coroner, what steps did you
13 take to determine the cause of death of a person
14 whose death you were investigating?
15    A.  What steps?
16    Q.  Yes.
17    A.  You would obtain medical records, obtain
18 medical records.  If there was an examination, you
19 would get the reports from the physicians, the
20 examination report.  On an autopsy, the cause of
21 death is determined by -- the pathologist puts down
22 the cause of death.
23    Q.  Did you as Coroner rely on the
24 pathologist's determination about cause of death?

47

1     A.  Yes.
2     Q.  All right.  And is it fair to say that
3 your responsibilities as Coroner then were to get
4 the pathologist the information they needed to make
5 a determination?
6     A.  Yes.
7     Q.  At various times the -- at various times
8 Adams County contracted with Dr. Scott Denton to
9 serve as pathologist; is that right?
10    A.  That is correct.
11    Q.  Okay.  In your time as Coroner, did you
12 ever confer with any pathologist besides
13 Dr. Denton?
14    A.  Dr. Denton and Dr. Amanda Youmans.
15    Q.  Can you spell her name?
16    A.  Amanda, and then Youman, Y-O-U-M-A-N.
17    Q.  Did she work with Dr. Denton?
18    A.  He and her are -- yes, yes, they are
19 together in McLean County.
20    Q.  Other than those two doctors, in your
21 time as Coroner, did you ever confer with any other
22 pathologists?
23    A.  No.  They -- they did the examinations.
24 There may have been sometimes that an examination

48

1 was performed if one of them was out of town, but
2 they took care of having someone, so I would not be
3 sure whom that was, or I can't remember if that
4 occurred.
5     Q.  Over the course of your time as Coroner,
6 on how many cases did you confer either with
7 Dr. Denton or Dr. Youmans?
8     A.  It would have been all of them.
9     Q.  And how many is that?
10    A.  Over the years, are you saying, or
11 just --
12    Q.  Over your time as Coroner.  And let me
13 ask you this.
14        For every death that the -- for every
15 death that you dealt with as Coroner, did you have
16 to consult a pathologist for each one?
17    A.  No, not every death, no.
18    Q.  Okay.
19    A.  No.
20    Q.  So how many -- of the deaths that you
21 were responsible for as -- you were responsible for
22 addressing as Coroner, how many of those did you
23 confer with either Dr. Youmans or Dr. Denton?
24    A.  On all of the examinations that were

Transcript of James Keller
Conducted on August 22, 2018

49

1 conducted. There would be other cases that you
2 would -- it was not very often, so I guess I can't
3 tell you number wise, and then -- number wise I
4 can't give you. There was probably 60, 70
5 autopsies a year, so would confer with one or the
6 other on each of those. And maybe eight to ten
7 others in a year.
8     Q.  So I want to make sure I heard you
9 correctly. For the time you were Coroner there was
10 roughly 60 to 70 autopsies a year?
11     A.  Yes.
12     Q.  Okay. And then you said there were eight
13 to ten other cases you consulted with those
14 pathologists about?
15     A.  Per year. Per year.
16     Q.  And how would those other cases come up
17 if they didn't come up through autopsy?
18     A.  Sometimes we would make a call -- I would
19 call him and ask him -- tell him I have a case and
20 discuss that case with him as far as if it needed
21 to have an examination. I would have medical
22 records and discuss the case with he or Dr. Youmans
23 and -- as far as what had occurred and what my
24 findings says, documented cause of passing to see

50

1 if he agreed with that.
2     Q.  Of those eight to ten cases per year that
3 you consulted with either Dr. Denton or Dr. Youmans
4 about where there was not an autopsy, would those
5 eight to ten cases be cases for people who had died
6 in that calendar year?
7     A.  Yeah. Yes.
8     Q.  And of -- as between Dr. Denton and
9 Dr. Youmans, was there one of them that you
10 conferred with more than the other?
11     A.  No. They were on a rotating schedule, so
12 it was just whomever was on call that particular
13 day.
14     Q.  Was their schedule pretty 50/50?
15     A.  Yes, I would -- yes.
16     Q.  Okay. On how many occasions in your
17 career as Coroner did you consult with Dr. Denton
18 on -- about a case in which the person you were
19 consulting with him about had not died in that
20 calendar year?
21     A.  Had not died?
22     Q.  Yes.
23     A.  I don't understand.
24     Q.  Sure. And let me ask you this. I mean,

51

1 you consulted with Dr. Denton about Cory Lovelace;
2 is that right?
3     A.  I did.
4     Q.  And obviously at the time you were
5 consulting with Dr. Denton Cory Lovelace's death
6 was at some point in the past, right?
7     A.  Correct.
8     Q.  Are there any other cases in your time as
9 Coroner that you consulted with either Dr. Denton
10 or Dr. Youmans about where the person who died, you
11 know, had died sometime before you were talking
12 with Dr. Denton or Dr. Youmans about the death?
13     A.  There was Linda Booth. There was --
14 once.
15     Q.  Are there any other cases besides Cory
16 Lovelace and Linda Booth that, you know, were old
17 cases that you checked in with either Dr. Denton or
18 Dr. Youmans about?
19     A.  I can't recall, ma'am.
20     Q.  Is it your belief as you sit there that
21 there were others and you can't recall them or do
22 you believe that -- or is it that you cannot recall
23 any other cases that you --
24     A.  I cannot recall any other cases.

52

1     Q.  Okay. Did you ever consult with
2 Dr. Youmans about Cory Lovelace's passing?
3     A.  No.
4     Q.  Do you recall ever having any either
5 phone conversations or in-person conversations or
6 e-mail communications with her about Cory Lovelace?
7     A.  No.
8     Q.  What about do you recall ever having
9 conversations with Dr. Youmans about Linda Booth?
10     A.  No.
11     Q.  You had two elections for Coroner during
12 the time that you served as Coroner; is that right?
13     A.  Yes, ma'am.
14     Q.  And in both of those elections you were
15 unopposed; is that right?
16     A.  Yes, ma'am.
17     Q.  Okay. In both of those elections, did
18 you receive campaign contributions from the Adams
19 County -- and I'm not going to get the name of this
20 right, but the -- basically the Adams County
21 Republican political organization?
22     A.  I actually don't know whom I received
23 contributions from.
24     Q.  Okay. As of 2006, had you had any

Transcript of James Keller

Conducted on August 22, 2018

53

1 training in determining time of death of a person?
2    **A. In the mortuary field you -- you get**
3 **training in your pathology and things.**
4    Q. Can you describe as of 2006 what specific
5 training you had had to assist you in determining
6 the timing of someone's death?
7    **A. No. There was just training that had**
8 **went on in reference to dehydrations and various --**
9 **but no, I guess I can't.**
10    Q. Okay. And you said you had training --
11 as of 2006 you had training about dehydrations?
12    **A. Yes.**
13    Q. Can you explain what that consisted of?
14    **A. Just dehydrations and -- dehydrations**
15 **were -- showed a -- if a body had been deceased a**
16 **little while, and it also consisted of how to**
17 **repair and to make that area look presentable to**
18 **the families. So it was kind of all in one, if you**
19 **will.**
20    Q. Was that training that you received in
21 mortuary school?
22    **A. Mortuary training classes, seminars.**
23    Q. Was some of that training that you
24 received then after mortuary school?

54

1    **A. Yes, after.**
2    Q. And what do you remember from your
3 training as far as how to assess the timing of
4 someone's death based on the amount of dehydration
5 that you observed?
6    **A. Ask that again.**
7    Q. Yeah, and let me ask a better question.
8 What is it that you learned about how you could
9 assess dehydration or take into account dehydration
10 in assessing the timing of someone's death?
11    **A. Dehydration doesn't occur -- it takes --**
12 **there is several hours before dehydration occurs of**
13 **lips, eyes on a decedent.**
14    Q. And what did your training -- what did
15 you learn in your training, if anything, about how
16 dehydration presents in the lips or eyes?
17    **A. There is no blood flow going to that**
18 **area. It has to be exposed to air. So time.**
19    Q. And when you said that dehydration to
20 the -- your training was that dehydration to the
21 lips or eyes takes several hours to show up; is
22 that right?
23    **A. Yes.**
24    Q. Okay. And what did your training -- what

55

1 did you learn in your training about how you can
2 tell whether someone's lips are dehydrated?
3    **A. Color, texture.**
4    Q. And what about how you can tell if
5 someone's eyes are dehydrated, what was your --
6 what does your training consist of with respect to
7 that?
8    **A. Their eyes are dark, eyelids. The whites**
9 **of the eyes has a marking across the eyes, around**
10 **the whites of the eyes.**
11    Q. Other than your training relative to
12 dehydration, as of 2006, did you have any other
13 training on how to assess the timing of someone's
14 death?
15    **A. Odors.**
16    Q. All right. And what -- when did you
17 receive training about odors?
18    **A. It was a continuous, decomposition,**
19 **odors. It was kind of an ongoing during seminars**
20 **and things.**
21    Q. All right. Do you remember any specific
22 seminars, as you sit here today, where you learned
23 information about how odors would be related to the
24 time of someone's death?

56

1    **A. Specific ones?**
2    Q. Yes.
3    **A. No. They were all -- they were all just**
4 **at various times.**
5    Q. Okay. And as of 2006, what did your --
6 what had you learned in training relative to how
7 odors were connected with someone's time of death?
8    **A. There is a distinct -- a distinct smell**
9 **between someone who had just passed and someone who**
10 **has been deceased for a time.**
11    Q. And what did your training that you had
12 received as of 2006 teach you about distinguishing
13 those odors?
14    **A. Basically there -- and then being around**
15 **decedents you could -- you -- I can't describe the**
16 **odors. I mean, it's just -- they are just distinct**
17 **odors that are there.**
18    Q. Your training was that those odors are
19 different if someone has just died versus if they
20 have been dead for some hours; is that right?
21    **A. Yes.**
22    Q. And what was your training about how
23 those odors were different?
24    **A. I can't describe how they taught it. I**

Transcript of James Keller
Conducted on August 22, 2018

57

1  don't recall.
2      Q.  Is there any description you can provide,
3  as you sit here today, that you have either from
4  your training or your experience about how those
5  odors are different?
6      **A.  The body produces a gas, releases gas.**
7  **There is -- the odors are much stronger.  That's**
8  **about the best way I could describe to you.**
9      Q.  And so it's consistent with your training
10 and your experience that the odor of a deceased
11 person's body gets stronger over time after they
12 have passed; is that right?
13     **A.  Yes.**
14     Q.  All right.  Other than what you've just
15 described about the odor getting stronger, is there
16 any other description you can give as to -- as you
17 sit here today, as to how the odor is different
18 between when someone has just passed and when they
19 have been dead for some hours?
20     **A.  I can't describe it, no.**
21     Q.  In any of the training that you have had
22 at any point between, you know, beginning -- well,
23 at any point in your life before today, have you
24 ever received any training on the impact of

58

1  septicemia on someone's body after they die?
2      **A.  There has been training as far as**
3  **septicemia, but -- or various pathology, but I**
4  **can't recall when or anything.**
5      Q.  It is your belief, as you sit here today,
6  that you've had training about septicemia?
7      **A.  Of individuals being septic, yes.**
8      Q.  All right.  And can you give any -- do
9  you have any -- do you have any memory, as you sit
10 here today, of when that training was?
11     **A.  No.**
12     Q.  Was it before or after you became
13 Coroner?
14     **A.  I can't recall, ma'am.**
15     Q.  Was it before or after 2006?
16     **A.  There was -- in mortuary school and**
17 **mortuary training conferences you always -- there's**
18 **always topics of pathology and microbiology that**
19 **affect chemical reaction in embalming process, your**
20 **various septic, which produces fever, which**
21 **produces -- if the body is septic, it probably has**
22 **something else going on, and which affects**
23 **different medications.  So there was always a --**
24 **ongoing classes as far as various pathological,**

59

1  microbiology, or that was going on with a cause of
2  death.
3      Q.  Did you learn in the training that you
4  had about septicemia, that septicemia can
5  prematurely advance the decomposition of a body?
6      **A.  It can -- it can, yes.  I guess, yes,**
7  **various -- yes.  I'll say yes.**
8      Q.  Okay.  And was it your understanding in
9  2006 that septicemia could prematurely advance the
10 decomposition of a body?
11     **A.  I would say I probably did hear -- have**
12 **that training, yes.**
13     Q.  In the eight to ten cases that you did --
14 that you talked about per year with either
15 Dr. Denton or Dr. Youmans, you said these are cases
16 where they weren't doing the autopsy, but where you
17 wanted to confer with them about how to address the
18 findings; is that correct?
19     **A.  As to what things I may not have**
20 **understood in the medical records as to what**
21 **occurred and if there needed to be an examination,**
22 **yes.**
23     Q.  Okay.  And in those conversations, is it
24 fair to say that you were giving them information

60

1  so that they could give you some opinion about
2  whether or not there needed to be an autopsy or how
3  to proceed?
4      **A.  Yes.**
5      Q.  Okay.  I want to talk to you specifically
6  about Cory Lovelace.  Let me ask you this question
7  first.
8          Have you ever testified in a criminal
9  case -- in any cases other than Cory Lovelace's,
10 related to Cory Lovelace's death?
11     **A.  No.**
12     Q.  Have you ever testified before a Grand
13 Jury relating to any criminal matters?
14     **A.  No, ma'am.**
15     Q.  Okay.  As to Cory Lovelace specifically,
16 you responded to the scene where her body was found
17 in order to assist Coroner Hamilton; is that right?
18     **A.  That is correct.**
19     Q.  And at the time that you went to the
20 scene, what was your understanding of what you were
21 going to be doing?
22     **A.  Removing.  He asked for assistance with**
23 **removal.**
24     Q.  Okay.  How did you get the information

Transcript of James Keller
Conducted on August 22, 2018

61

1  that you needed to go to the scene?
2      **A.  His phone call.**
3      Q.  All right.  Did he -- did you have a cell
4  phone at that time?
5      **A.  I believe he called the funeral home.**
6      Q.  You were at -- were you at work at that
7  time?
8      **A.  I was.**
9      Q.  Okay.  And did you talk to him directly?
10     **A.  I did.**
11     Q.  Okay.  And what did he tell you on the
12  phone?
13     **A.  He just asked me to respond to assist him**
14  **with making a removal.**
15     Q.  How long was your telephone call with
16  him?
17     **A.  Probably 30 seconds.**
18     Q.  Okay.  Did you go over right away?
19     **A.  I did.**
20     Q.  Okay.  At the time that you responded to
21  the scene of Cory Lovelace's death, did you know
22  either Curt or Cory Lovelace?
23     **A.  No.**
24     Q.  How long did it take you to get to her

62

1  home from the funeral home?
2      **A.  It wasn't very long, responded from 8th**
3  **and Broadway to the location.**
4      Q.  All right.  And do you know what time you
5  got to where her body was?
6      **A.  After 10 o'clock.  I don't recall the**
7  **exact time.**
8      Q.  Okay.  10 a.m.?
9      **A.  After 10.**
10     Q.  After 10 a.m.?
11     **A.  Yes.**
12     Q.  Okay.  Why do you recall that it was
13  after 10 a.m.?
14     **A.  I had seen it on a report.  I**
15  **responded after 10 -- it was in the morning.  I**
16  **guess I don't know the exact time at that time.  I**
17  **don't recall the exact time of responding to the**
18  **call.**
19     Q.  Okay.  And I think you said you saw on a
20  report that you responded after 10 a.m.?
21     **A.  I saw it one time the exact time I**
22  **responded.**
23     Q.  What report did you see that on?
24     **A.  I don't know if I saw it or heard it.  I**

63

1  don't know.
2      Q.  Okay.  When you got to the scene, what
3  did you do?
4      **A.  Went upstairs into the bedroom.**
5      Q.  Okay.  And what did you do when you went
6  upstairs to the bedroom?
7      **A.  Was -- observed the decedent on the bed**
8  **and got instructions from Coroner Hamilton.  We**
9  **were close to making the removal.**
10     Q.  What instructions did Coroner Hamilton
11  give you?
12     **A.  He was -- said he would just be a moment**
13  **and we were getting ready to -- he said we were**
14  **coming close to being ready to remove, to make a**
15  **removal.**
16     Q.  Okay.  At the time that you arrived there
17  and went upstairs, did you see anyone else there
18  besides Coroner Hamilton?
19     **A.  Detective Baird.**
20     Q.  Anyone else?
21     **A.  Upstairs?**
22     Q.  Well, and that's a good clarification.
23  So when you came in the house, did you see anyone
24  downstairs?

64

1      **A.  I saw -- there was a police officer.  I**
2  **believe he may have been outside or just inside the**
3  **door.  Instructed -- stated that Coroner Hamilton**
4  **was upstairs.**
5      Q.  Do you know who that officer was?
6      **A.  I do not.**
7      Q.  Okay.  Did you see anyone else downstairs
8  besides that officer?
9      **A.  I don't recall seeing -- there was people**
10  **there.  I don't know whom.**
11     Q.  Okay.  Did you look around downstairs at
12  all --
13     **A.  No.**
14     Q.  (Continuing) -- before you went upstairs?
15     **A.  I did not.**
16     Q.  Okay.  And when you went upstairs, you
17  said you saw Coroner Hamilton and you saw Detective
18  Baird?
19     **A.  I did.**
20     Q.  Where was Coroner Hamilton when you saw
21  him?
22     **A.  In the bedroom.**
23     Q.  And where was Detective Baird?
24     **A.  In the bedroom.**

Transcript of James Keller

17 (65 to 68)

Conducted on August 22, 2018

65

1    Q.   Did you see anyone else upstairs besides
2  those two men?
3    **A.   Not -- no.**
4    Q.   Okay.  And you previously, I think,
5  described what it was that Detective -- or what it
6  was that Coroner Hamilton told you; is that right?
7    **A.   Yes.**
8    Q.   Did he tell you anything else besides
9  what you have just testified to?
10     MR. HANSEN:  I'm going to just object to
11 form.  Are we talking about prior to, on the phone
12 call, or are we now at the scene?
13     MS. THOMPSON:  That's fair, and let me
14 clarify.
15 BY MS. THOMPSON:
16   Q.   You previously testified as to what
17 Coroner Hamilton said to you when you got up into
18 the bedroom; is that right?
19   **A.   Yes.**
20   Q.   Did he say anything else to you up in the
21 bedroom other than what you have just testified to
22 him saying?
23   **A.   I don't recall.**
24   Q.   Okay.  So am I right that when you got

66

1  upstairs the first thing that happened is that he
2  talked to you?
3    **A.   Yes.  I did speak with him, yes.**
4    Q.   Okay.  And before talking with him, had
5  you done anything else like look around the
6  upstairs or do anything else other than go speak to
7  him?
8    **A.   No.  When I entered the room, he was -- I**
9  **seen him.  We made eye contact.**
10   Q.   Okay.  What did you do after he talked to
11 you?
12   **A.   Basically we looked around.**
13   Q.   And did you look around in the bedroom?
14   **A.   Uh-huh.**
15   Q.   Did you look around anywhere else?
16   **A.   No.**
17   Q.   What, if anything, did you see when you
18 looked around the bedroom?
19   **A.   I seen the decedent on the bed with her**
20 **hands in the air, and seen her -- just visualized**
21 **her.  I noted an odor.**
22   Q.   Can you describe the odor that you noted?
23   **A.   Fairly strong odor, which kind of**
24 **indicated to me that she may have been there for a**

67

1  little bit.
2    Q.   Is there anything else that you observed
3  besides seeing Cory Lovelace in the bed and the
4  odor?
5    **A.   Just the body, covers, pillows, just the**
6  **condition of the room.**
7    Q.   What do you remember about the condition
8  of the room?
9    **A.   I'll say cluttered.  That's --**
10   Q.   You gave an indication when you were
11 describing her body before about her hands being in
12 the air.
13   **A.   Uh-huh.**
14   Q.   And since we are on video here, can you
15 indicate with your hands the position they were in
16 when you saw her body in the bed?
17   **A.   Hands were up (indicating).**
18   Q.   All right.  And you've raised your two
19 hands in the air with your hands themselves bent at
20 an angle?
21   **A.   Yeah.**
22   Q.   Is that correct?
23   **A.   Hands -- arms were up.  I'm trying to --**
24 **I've seen the photo.**

68

1    MR. HANSEN:  If you remember, testify.
2  If you don't, don't.
3    THE WITNESS:  I don't.  I don't recall
4  the exact position of her hands.  Her arms were up
5  off of the -- not touching the bed.
6  BY MS. THOMPSON:
7    Q.   Okay.  Where were the covers on the bed
8  at the time that you saw her?
9    MR. HANSEN:  I'm going to object to from.
10 I mean, you just said "where were the covers on the
11 bed."  Well, the covers -- object to form.
12     Go ahead.
13 BY MS. THOMPSON:
14   Q.   You said you observed covers when you
15 were looking around the room; is that right?
16   **A.   I did.**
17   Q.   Where were they?
18   **A.   They were -- they were on the bed.  I**
19 **believe they were -- I can't recall exact position**
20 **of the covers at this time.**
21   Q.   Were they down -- were they down around
22 her waist?
23     MR. HANSEN:  Objection.  He just said he
24 can't recall where the covers were.

Transcript of James Keller
Conducted on August 22, 2018

---

69

1     THE WITNESS:  I can't recall where the
2 covers were at this time.
3     MR. HANSEN:  Asked and answered.
4 BY MS. THOMPSON:
5     Q.  What, if anything, was she wearing when
6 you saw her?
7     **A.  She was wearing -- I'm going to say night**
8 **clothes.  She was clothed.**
9     Q.  Did she have on some type of shirt?
10    **A.  She did.**
11    Q.  All right.  Was the shirt pulled up at
12 all?
13    **A.  There was -- slightly pulled up.  There**
14 **was an EKG patch, I believe, on a -- on an abdomen**
15 **area, side.**
16    Q.  Did you see any EKG patches on her
17 besides the one on her abdomen or side?
18    **A.  I believe I did upon when we -- when I**
19 **went to roll her, I believe there was another one.**
20    Q.  Where was the other one?
21    **A.  It may have been on the other side, I**
22 **can't recall exactly, but I do remember thinking of**
23 **two.  It may have been on the other side as I was**
24 **on that side.**

---

70

1     Q.  All right.  And you said that -- and I
2 don't want to misstate your testimony, so correct
3 me if I've got this wrong, but you said that her
4 arms were not touching the bed; is that right?
5     **A.  The -- Yes.  Yes.**
6     Q.  So were her arms such that her --
7     **A.  Elbow was up.**
8     Q.  Her elbow was up off the bed; is that
9 right?
10    **A.  Yes.**
11    Q.  How far up off the bed were her elbows
12 when you first saw her?
13    **A.  I can't give a measurement.  I do not --**
14 **just off the bed.**
15    Q.  Were her elbows, either of them, up above
16 the level of her -- you know, the top of her
17 abdomen?
18    **A.  No, I don't believe so.  Just probably**
19 **below that.**
20    Q.  And when you said that -- when you said
21 that you were -- at this time after Coroner
22 Hamilton has talked to you and you're observing her
23 body, where in the room are you?
24    **A.  I don't recall exactly where I was or**

---

71

1 went --
2     Q.  How close --
3     **A.  (Continuing) -- at various times.**
4     Q.  How close were you to her when you were
5 observing her?  And I'm talking about Cory
6 Lovelace.
7     **A.  Right next to her.**
8     Q.  Okay.  Right next to the bed?
9     **A.  Correct, yes.  Sorry.**
10    Q.  Okay.  At some point then you did go to
11 assist in moving her body; is that right?
12    **A.  I did.**
13    Q.  How much time passed between when you
14 came in and talked to Coroner Hamilton and when you
15 started assisting in removing her body?
16    **A.  I don't know.  I don't know that.**
17    Q.  Was -- what did you do in that interim
18 time between talking to Coroner Hamilton and
19 starting to move her body?
20    **A.  Waiting for he.**
21    Q.  Where did you wait?
22    **A.  In the room.**
23    Q.  Did you go --
24    **A.  By the bed area.**

---

72

1     Q.  Did you go anywhere else in the upstairs
2 besides the bedroom?
3     **A.  No.**
4     Q.  At any point while you were there?
5     **A.  No.**
6     Q.  What was Coroner Hamilton doing while you
7 were waiting for him?
8     **A.  I don't know what all he was doing.  I**
9 **can't recall exactly what he was doing.  I'm not**
10 **sure.**
11    Q.  Did he stay in the bedroom?
12    **A.  He did.**
13    Q.  Okay.  Did you observe him writing during
14 that time between when you talked to him and when
15 you started to move the body?
16    **A.  No.**
17    Q.  Was he talking to anyone?
18    **A.  Detective Baird was at the opposite end.**
19 **He was doing various things in the room.  I can't**
20 **recall whether they were conversing back and forth**
21 **or what all was said.**
22    Q.  Was there anyone else in the room at that
23 point between when you came in and when you started
24 to move the body other than you and Coroner

---

Transcript of James Keller
Conducted on August 22, 2018

73

1  Hamilton and Detective Baird?
2      **A.  I don't recall that, no.**
3      Q.  Was there anyone else in the upstairs?
4      **A.  I don't believe so.**
5      Q.  Okay.
6      **A.  I don't know if there was anybody outside**
7  **the door or any of that, no, I do not know that --**
8      Q.  Did you hear anyone?
9      **A.  (Continuing) -- recall that.**
10     Q.  Did you hear anyone?
11     **A.  I can't -- I don't recall that, no.**
12     Q.  Okay.  When you -- at some point then you
13  started to move the body; is that right?
14     **A.  Yes, ma'am.**
15     Q.  Can you describe what you did at that
16  point?
17     **A.  I got on the bed, put my hand on her**
18  **hip/buttocks area, and the other arm underneath,**
19  **just underneath the arm, and went to roll her over**
20  **and rolled her over.**
21     Q.  And what was Coroner Hamilton doing at
22  the time that you rolled her?
23     **A.  Placing something under her so we could**
24  **remove her.**

74

1      Q.  Did Coroner Hamilton, before you started
2  to move her, give you an indication, you know, of,
3  okay, I'm ready to move her now?
4      **A.  Yes.**
5      Q.  How did he indicate that to you?
6      **A.  In that statement.**
7      Q.  Okay.  And you said that you got onto the
8  bed; is that right?
9      **A.  I did.**
10     Q.  Which side of the bed did you get on?
11         MR. HANSEN:  Describe it however you
12  want, looking at the room, looking out, whatever.
13         THE WITNESS:  Because I'm not exactly
14  sure --
15  BY MS. THOMPSON:
16     Q.  If you are standing at the foot of the
17  bed.
18     **A.  If I was standing at the foot of the bed,**
19  **I was -- I went to the opposite side of where she**
20  **was at and on the bed, because she was lying on**
21  **one side of the bed.  I can't recall which side it**
22  **was.  I think I -- and I got on that side of the**
23  **bed and rolled her.**
24     Q.  Were you rolling her towards you or away

75

1  from you?
2      **A.  Toward myself.**
3      Q.  Okay.  And which -- you said you put one
4  hand on her hip area; is that right?
5      **A.  Correct.**
6      Q.  Which hip?  If you were her, would that
7  have been her right hip or her left hip?
8      **A.  I don't recall which hip.**
9      Q.  If -- was it the hip that was closer to
10  you or further from you?
11     **A.  Furthest from.**
12     Q.  Okay.  And when -- you said you put
13  another hand on her arm; is that right?
14     **A.  The lower triceps area of the arm.**
15     Q.  Okay.  And was that -- in terms of her
16  arms, was it the arm that was closer to you or
17  further from you?
18     **A.  Further.**
19     Q.  Okay.  And then you --
20     **A.  Rolled her.**
21     Q.  You said you rolled her and Coroner
22  Hamilton put something under her?
23     **A.  Correct.**
24     Q.  What did he put under her?

76

1      **A.  He put under her a -- I can't recall if**
2  **it was -- I believe he placed her in a -- I can't**
3  **recall if it was a body bag itself, but I believe a**
4  **body bag.**
5      Q.  At the time -- did you assist in helping
6  put her in the bag?
7      **A.  Yes.**
8      Q.  All right.  And did you have to
9  maneuver -- did you or Coroner Hamilton have to
10  maneuver her legs to get her legs inside the bag?
11     **A.  No.  As far as maneuver her, no.  Bend**
12  **them, move them, no.**
13     Q.  Were you -- did -- essentially did you
14  slip the bag over her feet basically to get that
15  part of her in?
16     **A.  It was tucked under.  She came this way**
17  **(indicating), and it's pushed under and then she**
18  **was laid down inside the bag.**
19     Q.  Did you have to move her shoulders at all
20  to get her into the bag?
21     **A.  No.**
22     Q.  What about --
23     **A.  Upon -- go ahead.**
24     Q.  No.  Please finish, I'm sorry.

Transcript of James Keller
Conducted on August 22, 2018

---

**77**

1    A.    No, we did not.

2    Q.    Okay.  What about her arms?

3    A.    No.

4    Q.    You said that her arms were sort of up

5    off -- you said her arms were up off the bed when

6    you were observing her; is that right?

7    A.    Uh-huh.

8    Q.    Did you have to maneuver her arms at all

9    to fit inside the bag?

10    A.    We did not, no.

11    Q.    Did the bag have a zipper that went

12    lengthwise over her body?

13    A.    It went around the edges.

14    Q.    Okay.  And there was enough room in the

15    bag for her to fit there without having to move her

16    arms; is that correct?

17    A.    Yes.  She was a very petite lady.  The

18    bags are larger.

19    Q.    Was anyone else in the room at the time

20    that you and Coroner Hamilton were getting her

21    body?

22    A.    Detective Baird.

23    Q.    Okay.  And the time I'm asking about is

24    the time that you were putting her in the bag.  It

---

**78**

1    was just you, Detective Baird, and Coroner

2    Hamilton; is that right?

3    A.    I believe, yes.

4    Q.    Okay.  Did you talk with either of them

5    while you were situating her body in the bag?

6    A.    Spoke about her -- the rigor present and

7    the odor.

8    Q.    When you say you spoke about the rigor

9    and the odor, can you describe what you said?

10    A.    She was in rigor, rigor mortis, and when

11    I went to pull her over, I did not -- basically

12    could do that with one hand.  She came right over.

13    There was no flaccidness in the body.

14    Q.    And you said you talked -- at the time

15    you were getting her situated you were talking

16    about the rigor; is that right?

17    A.    I did.

18    Q.    What did you say?

19    A.    She is in full rigor.

20    Q.    Did anyone in the room respond to you

21    saying that?

22    A.    Detective Baird said that she had only

23    been deceased less than an hour prior to the

24    initial call.

---

**79**

1    Q.    And that's something he said as you were

2    getting her body in the bag; is that right?

3    A.    In that -- yes, I would say, yeah.

4    Q.    Okay.  Did anyone say anything in

5    response to him saying that?

6    A.    Did anyone else respond.  Say anything

7    after that?

8    Q.    Right.

9    A.    I stated I didn't believe that she -- it

10    appeared to me that she was deceased longer than

11    that due to the -- and that's due to the rigor and

12    the -- I also stated at that time due to the

13    dehydration of her face.

14    Q.    And do you remember what exactly you said

15    when you were responding to Detective Baird?  I

16    mean, the actual words that you said?

17    A.    I asked of what day.

18    Q.    So when he said she has only been dead --

19    when Detective Baird said that she had died within

20    the hour or however you described Detective

21    Baird -- whatever Detective Baird said to you, your

22    response was of what day?

23    A.    Uh-huh.

24    Q.    All right.  And how did you --

---

**80**

1        MR. HANSEN:  Was that a -- you got to say

2    yes or no.

3        THE WITNESS:  Yes.

4    BY MS. THOMPSON:

5    Q.    And do you remember the specific words

6    you said in talking about the dehydration and the

7    odor?

8    A.    I stated that the odor was -- she had an

9    odor.  I stated the odor was stronger, that the --

10    the odor was stronger and that the decomposition --

11    the dehydration was -- appeared to be quite

12    advanced.

13    Q.    And is that how you said it, that the

14    dehydration -- did you say words, you know, quote,

15    the dehydration --

16    A.    I won't be able to be quoted, but I

17    stated about the dehydration, yes.

18    Q.    And do you remember what you said about

19    the dehydration?

20    A.    I do not.  Word for word I do not.

21    Q.    Okay.  Did anyone say anything in

22    response to you talking about the dehydration and

23    the odor?

24    A.    He -- Detective Baird stated that -- just

---

Transcript of James Keller
Conducted on August 22, 2018

**81**

1 that -- preliminary that there was just -- she
2 hadn't been dead very long.
3     Q.   And that's something he said in response
4 to you commenting on the dehydration and the odor?
5     A.   Correct.
6     Q.   Okay.  Did Coroner Hamilton say anything
7 while you and Detective Baird were having this
8 exchange?
9     A.   I don't recall that he said anything.
10    Q.   Did -- was there any indication that you
11 had that at that point that he heard what you and
12 Detective Baird were discussing?
13    A.   I'm going to say he did.  He was right in
14 front of me.
15    Q.   Okay.  Once Mrs. Lovelace was -- once her
16 body had been put into the bag, what did you do
17 next?
18    A.   We assisted with removing the body to the
19 vehicle.
20    Q.   And when you say "we assisted," who was
21 that?
22    A.   I, Coroner Hamilton, and I don't know
23 whom else assisted as far as with going down the
24 stairs.

**82**

1     Q.   Was there someone else who helped?
2     A.   There may have been.  I don't recall
3 that, ma'am, I don't.
4     Q.   Okay.  In total, how long were you in the
5 upstairs bedroom of the Lovelace home that day?
6     A.   30 minutes, or less.  I don't know the
7 exact times.
8     Q.   And during -- how long did it take you
9 to -- once you started maneuvering the body, how
10 long did it take you to get Mrs. Lovelace's body in
11 the bag?
12    A.   I don't recall the exact time that it
13 took, but it generally -- when we start making a
14 removal, it generally doesn't take long to get them
15 into a bag, the body bag.
16    Q.   And when you say it "doesn't take long,"
17 what do you mean?
18    A.   We roll them, place -- the decedent is
19 placed in the body bag, and then we zip it back up
20 and then we look for -- on how to get out of the
21 residence.
22    Q.   You just described the rigor that you
23 observed when you were up in the bedroom?
24    A.   Yes, ma'am.

**83**

1     Q.   Is there -- you said that when you
2 pulled -- when you sort of pulled her body that she
3 came relatively easily; is that right?
4     A.   Yes.
5     Q.   All right.  And you said that she was a
6 petite woman as well; is that right?
7     A.   Yes.
8     Q.   You said you also discussed the
9 dehydration with Detective Baird?
10    A.   More of a statement, not so much discuss.
11    Q.   A comment; is that right?
12    A.   Correct.
13    Q.   What did you observe about dehydration
14 while you were in the room?
15    A.   Dehydration of the lips, eyes, even the
16 nose I observed.
17    Q.   All right.  And can you describe what you
18 observed of that dehydration?  Like how could you
19 tell that the lips were dehydrated?
20    A.   The lips were very brown in color, very
21 crusty, not rounded.  The eyes were dehydrated,
22 which is a darkened color.  There was dehydration
23 in the eyes and around the nose.
24    Q.   And can you describe how you determined

**84**

1 that around the nose was dehydrated?
2     A.   Brown in color, a brownish in color.
3     Q.   That her nose was brown in color?
4     A.   Uh-huh.  Not brown as brown (indicating).
5 Brownish, a darker color, uh-huh.
6     Q.   The skin of her nose was a brownish
7 color?
8     A.   Yes.
9     Q.   Okay.  Other than what you have just
10 described, were there any other indications to you
11 that there was dehydration in her body?
12    A.   Fingers.  The fingers -- the fingertips.
13    Q.   What did you observe about her fingertips
14 that led you to believe they were dehydrated?
15    A.   They were -- they were darker, not
16 rounded.
17    Q.   All right.  Anything else you observed
18 that led you to conclude that she was dehydrated?
19    A.   No, huh-uh.
20    Q.   Just taking the time between when you got
21 there and Coroner Hamilton told you words to the
22 effect that he was almost ready and when you
23 started moving her body, can you give any
24 indication of how much time that was?

Transcript of James Keller
Conducted on August 22, 2018

---

85

1    **A.   It was not a lot of -- a large amount of**
2  **time, no.**
3    Q.   When you say it was not a large amount of
4  time, what do you mean?
5    **A.   It wasn't an hour.**
6    Q.   Well, you said you were upstairs in total
7  like 30 minutes, about 30 minutes; is that right?
8    **A.   Yes.**
9    Q.   Could it have been less?
10    **A.   Yes, it could have been, yes.**
11    Q.   Okay.  So of that 30 minutes, how much of
12  that 30 minutes was spent waiting for Coroner
13  Hamilton to be ready to start moving her?
14        MR. HANSEN:  Asked and answered.  We have
15  been down this.
16        If you can provide anything else, provide
17  it.  If you can't, you can't.
18        THE WITNESS:  I can't recall the amount
19  of time in between I arrived and when we started
20  moving her time wise.
21  BY MS. THOMPSON:
22    Q.   Okay.  And then after you took her body
23  downstairs, you put her -- her body in the Coroner
24  vehicle; is that correct?

---

86

1    **A.   I think it may have been Hansen Spear.**
2    Q.   The funeral home vehicle?
3    **A.   Correct.**
4    Q.   Okay.  What happened after you put her in
5  the vehicle?
6    **A.   I don't know after that.**
7    Q.   Did you stay on the scene after that?
8    **A.   No.  No.**
9    Q.   Okay.  Did you talk with anyone after
10  you --
11    **A.   No one.  After the door was shut, I**
12  **turned around and left.**
13    Q.   And did -- how did you know at that point
14  that there was nothing else you needed to do?
15    **A.   Just after that -- after the body is**
16  **removed I always left.**
17    Q.   Was Coroner Hamilton still there when you
18  left?
19    **A.   He was.**
20    Q.   All right.  Was Detective Baird still
21  there?
22    **A.   He was.**
23    Q.   Did you see -- at any point when you were
24  at the home that morning, did you see any emergency

---

87

1  responder personnel at the scene in terms of
2  firefighters or EMTs?
3    **A.   Upon -- I don't believe that there was**
4  **any EMTs when I arrived, and I believe the fire**
5  **department had left.  I don't believe anyone else**
6  **was there.**
7    Q.   Did you see either an ambulance or a fire
8  truck on the street when you got there?
9    **A.   I can't recall that.**
10    Q.   Okay.  And you said that you put her in a
11  funeral home vehicle; is that right?
12    **A.   Yes.**
13    Q.   Was someone from the funeral home there?
14    **A.   Yes.**
15    Q.   Who?
16    **A.   I don't know that.**
17    Q.   Okay.  Did you see Mr. Lovelace at the
18  home when you were there?
19    **A.   I don't recall seeing him, no.**
20    Q.   Okay.  Did you see any of the Lovelace
21  children there?
22    **A.   No.**
23        MR. HANSEN:  We have been going about two
24  hours, so can we take a break?

---

88

1        MS. THOMPSON:  Yeah, we can take a break.
2        Let me just ask one question.  Can I ask
3  one question before we break?
4  BY MS. THOMPSON:
5    Q.   Other than the observations that you've
6  testified to about the condition of her body, is
7  there anything else that you observed about Cory
8  Lovelace's body while you were at the scene that
9  day?
10    **A.   Lividity.**
11    Q.   All right.  We will take a break and talk
12  about that when we come back.
13        THE VIDEOGRAPHER:  We are now off the
14  record.  The time is 10:53 a.m.
15        (Whereupon a short recess was taken.)
16        THE VIDEOGRAPHER:  We are now back on the
17  record.  The time is 11:06 a.m.
18  BY MS. THOMPSON:
19    Q.   Just before we broke, you had indicated
20  that you had some observations at the scene about
21  lividity; is that right?
22    **A.   That's correct.**
23    Q.   All right.  And what did you observe
24  relative to lividity at the scene?

---

Transcript of James Keller
Conducted on August 22, 2018

89

1     A.   Lividity was in the lower dependent parts
2 of her body, meaning back, back of her neck, arms.
3     Q.   And when did you observe that lividity?
4     A.   As I was standing by the bed.
5     Q.   Okay.  And where specifically could you
6 see the lividity when you were standing by the bed?
7     A.   Back of the neck, back of the arms.
8     Q.   Could you see the back of her arms when
9 you were standing by the bed?
10    A.   I was standing next to her.  You could
11 see the back side of her arms.
12    Q.   Which part of her arms?
13    A.   The posterior back region (indicating).
14    Q.   Are you pointing to --
15    A.   Lower.
16    Q.   Are you pointing to the lower part of the
17 triceps area?
18    A.   The lower -- yes.
19    Q.   Okay.  Could you see that on a particular
20 side of her arms?
21    A.   It would have been -- well, I couldn't
22 see the inside of her arms, just -- initially just
23 due to the way they were positioned, but the --
24 just would have been the lower probably exterior

90

1 portion and the back of the neck, ear lobes.
2     Q.   Okay.  Anywhere else you could see it
3 besides the back of the neck and the ear lobes and
4 the arms?
5     A.   Upon visual, no, at that time.
6     Q.   Okay.  Was she wearing a shirt with
7 sleeves when she was laying in bed?
8     A.   I believe it to be short sleeve.
9     Q.   Do you agree that if she had been wearing
10 a long-sleeve shirt, you could not possibly have
11 seen lividity in the triceps area of her upper
12 arms?
13    A.   Yes.
14    Q.   Okay.  Prior to 2006, what -- had you had
15 any training that covered how to assess lividity in
16 -- or how to -- how to consider lividity in
17 assessing when someone had died?
18    A.   Mortuary training there is a lot of
19 lividity, just various colors of lividity.
20    Q.   All right.  Is the training in mortuary
21 school as to lividity focused on how to make
22 someone presentable for their funeral?
23    A.   It is.
24    Q.   In terms of how to cover lividity

91

1 essentially?
2     A.   It is.
3     Q.   All right.  So what training did you have
4 in mortuary school relative to lividity that
5 addressed how to use lividity to assess the time
6 that someone died?
7     A.   Lividity is -- at a time of death
8 lividity starts fairly immediately.  It is very
9 light reddish in color, pools down fairly quickly
10 to the lower dependent parts of the body, as in
11 whichever direction the body is lying, whether it
12 be face down or on their back or sides.  It's
13 determined -- mortuary training they are used to
14 determine if it's -- how long a decedent has been
15 deceased.  It gives various colors on how you are
16 going to do your chemicals, when you can use a
17 stronger chemical.  It all kind of plays a part in
18 length of time a decedent in preparation of a
19 decedent.
20    Q.   And of the lividity that you observed in
21 Cory Lovelace at the scene where her body was, was
22 what color?
23    A.   It was a darker -- I'll go with a darker
24 purple, darker in color.

92

1     Q.   Okay.  And what did that indicate to you?
2     A.   That time was a little longer than what
3 was stated.
4     Q.   Than what was stated by who?
5     A.   Baird, Detective Baird.
6     Q.   Okay.  Did you discuss the lividity with
7 Detective Baird at the scene?
8     A.   I just -- no, no, no.
9     Q.   And when you say it was a little longer,
10 what was your assessment about what that level of
11 lividity meant?
12    A.   It wasn't -- I didn't feel it was within
13 the hour.
14    Q.   Could you draw any assessment other than
15 that it wasn't within the hour?
16    A.   Just with the dehydration, the -- the
17 dehydration and the odor and then the lividity.
18    Q.   Okay.  And my question is:  Based on
19 everything you observed, did you have any
20 conclusions at the scene about how long Cory
21 Lovelace had been dead, other than that it was not
22 within the hour?
23    A.   No.
24    Q.   You couldn't say beyond saying it wasn't

Transcript of James Keller
Conducted on August 22, 2018

93

1 an hour?

2    **A. No. I was just making an observation on**
3 **what I seen on her.**

4    Q. Okay. Living people can have lividity as
5 well; is that right?

6    **A. Yes.**

7    Q. Okay. And did you -- in trying to figure
8 out what was going on at the scene, did you
9 investigate how long she had been laying in bed
10 for?

11    **A. I did not ask, no.**

12    Q. Okay. To go back to your rigor
13 observations, had you had any training before 2006
14 about how to use rigor to assess when someone had
15 died?

16    **A. Once again, in mortuary training, rigor**
17 **is a standard. In various conferences on how long**
18 **somebody has been dead so we can give an assessment**
19 **on a decedent as to what problems we may encounter**
20 **during preparation.**

21    Q. And what did you learn in terms of how --
22 what levels of rigor indicated about the timing of
23 someone's death before 2006?

24    **A. Generally, it is eight to ten hours or**

94

1 **eight to 12 hours on a full -- for a full rigor,**
2 **for full rigor mortis.**

3    Q. All right. And rigor -- if someone is in
4 full rigor, then their limbs cannot be moved at
5 all; is that correct?

6    **A. No, you can always -- always move a limb**
7 **with rigor. You never break a bone. But rigor**
8 **never goes back into the position. If I was to**
9 **bend a knee -- if a knee was -- if a person was**
10 **sitting in a chair and you laid them down and their**
11 **knee would still be up and you bent that knee, it**
12 **would never go back up and stay.**

13    Q. If someone is -- if an adult is in full
14 rigor, you have to exercise some force to move
15 their -- to move them out of rigor; is that right?

16    **A. Correct.**

17    Q. I mean, so to use your example, if
18 someone is sitting in a chair and their leg is
19 bent, you can get it out of rigor, but you got to
20 do some work to do that, right?

21    **A. You have to push on that limb.**

22    Q. Because you are releasing the muscle
23 essentially from their -- the position they are in?

24    **A. Correct.**

95

1    Q. Okay. And if someone had been able to
2 move Cory Lovelace's arm without that level of
3 force before you got there, then at the time they
4 did that Cory Lovelace would not have been in full
5 rigor; correct?

6    **A. No, you could still move that limb. If**
7 **it was moved all the way out, all the way down, it**
8 **would the not come back into that position.**

9    Q. But if someone is in full rigor and you
10 moved their arm, you would have to exercise some
11 force to do that?

12    **A. You would.**

13    Q. It would take some work?

14    **A. No, not necessarily a brute force, no.**
15 **You could do it -- you could do it with an arm as**
16 **far as four fingers pushing an arm down.**

17    Q. And when you say that if you moved it it
18 wouldn't come back into rigor, can you explain what
19 that would mean?

20    **A. If your arm was -- if your arm was here**
21 **and you pushed it down and you went to bring it**
22 **back up, it would just fall back down to the table**
23 **(indicating).**

24    Q. Okay. If you moved it out of rigor -- if

96

1 you had to move someone's arm that was in rigor,
2 would you be able to position it in a different
3 rigor, in a different fixed position?

4    **A. No.**

5    Q. So if you moved it to get it out of
6 rigor, then there would be no rigor left?

7    **A. Correct.**

8    Q. Okay. Is there anything else that you --
9 well, let me ask you this.

10    Is there anything else besides what
11 you've testified about so far today that you
12 observed with respect to Cory Lovelace's body at
13 the scene?

14    **A. Not that I recall.**

15    Q. Okay. And you said that after you were
16 done moving her body to the funeral home vehicle
17 that you then left?

18    **A. I did.**

19    Q. And where did you go?

20    **A. Funeral home.**

21    Q. Okay. Your funeral home?

22    **A. Back to work.**

23    Q. Back to work, all right.

24    Did you -- were you concerned about

Transcript of James Keller
Conducted on August 22, 2018

97

1 anything that Detective Baird was telling you with
2 respect to her having his belief that she had died,
3 you know, within the hour?
4    A.  They were still investigating, so I
5 didn't -- it was just any investigation -- there is
6 just the first initial part of the investigation
7 and there is -- was a lot more investigating to go
8 on their part.
9    Q.  When you say "on their part," who do you
10 mean?
11   A.  He needed to do interviews and whatever
12 else he needed to do.
13   Q.  Were you concerned that when you were
14 having this conversation with Detective Baird that
15 Coroner Hamilton wasn't saying anything?
16   A.  No.  I -- I figured that that was between
17 he and Officer Baird to discuss anything other.
18   Q.  Okay.  And you said earlier that at
19 scenes you had been at with Coroner Hamilton that
20 Coroner Hamilton had welcomed information from
21 deputies; is that right?
22   A.  Yes.
23   Q.  Did you believe that it was important to
24 give Coroner Hamilton your observations of Cory

98

1 Lovelace's body?
2    A.  We did with he and he did with us and --
3 yes, so that was a standard.  He welcomed that,
4 yes.
5    Q.  And did you -- at the scene of Cory
6 Lovelace's death, did you think that it was
7 important for you to give Coroner Hamilton the
8 information that you had?
9    A.  I felt it was just important to give him
10 my observation at that time.
11   Q.  Well, why didn't you give him your
12 observations about lividity?
13       MR. HANSEN:  Object to form,
14 argumentative.
15       Go ahead.
16       THE WITNESS:  We were just in the process
17 of moving, and I didn't -- I didn't.  I don't know.
18 BY MS. THOMPSON:
19   Q.  Did you take any steps to have any
20 further conversation with him at the scene about
21 what you'd observed?
22   A.  No.
23   Q.  And is it fair to say that the only
24 comments you made to him -- or you made when

99

1 Coroner Hamilton were present about your
2 observations was anything you said in passing while
3 you were preparing to get Cory Lovelace's body out
4 of the house?
5    A.  Correct.
6    Q.  After you left the house that day, did
7 you have any further conversations with Coroner
8 Hamilton about anything having to do with Cory
9 Lovelace's death?
10   A.  I did not.
11   Q.  Did you follow the investigation that was
12 going on at all, the initial investigation that was
13 being done by Detective Baird?
14   A.  I did not.
15   Q.  Did you follow any of what the Coroner's
16 Office was doing to, you know, determine the cause
17 of her death?
18   A.  I did not.
19   Q.  Did you at any point learn about what the
20 determination was of the Coroner's Office as to the
21 cause of her death?
22       MR. HANSEN:  Just for time sake, can we
23 maybe limit it.  Obviously he learned at some point
24 in time.  Are you talking before 2014, before -- so

100

1 maybe --
2       MS. THOMPSON:  That's a fair point.  I'll
3 clarify.
4 BY MS. THOMPSON:
5    Q.  At any point in 2006, did you learn about
6 any determinations that had been made by the
7 Coroner's Office about the cause of Cory Lovelace's
8 death?
9    A.  I had learned that it was -- came back
10 that doctor had an undetermined cause of death.
11   Q.  When did you learn that?
12   A.  I do not know that.  It was a while
13 after.  I don't know how long.  I don't know
14 timeframe wise.
15   Q.  Was it the same -- was it in 2006 that
16 you learned that?
17   A.  Yes.
18   Q.  How did you learn that?
19   A.  Coroner Hamilton had stated that.
20   Q.  He told you that?
21   A.  Yes.
22   Q.  Where were you when he told you that?
23   A.  I don't recall that.
24   Q.  As a deputy coroner, did you have any

Transcript of James Keller

Conducted on August 22, 2018

101

1 hours that you kept at the Coroner's Office?

2   **A.   No.**

3   Q.   Is it fair to say as Deputy Coroner that

4 essentially you were called when you were needed to

5 respond to scenes and that was the extent of your

6 employment?

7   **A.   Yes.**

8   Q.   Okay.  Did he tell you -- did Coroner

9 Hamilton tell you this in an in-person

10 conversation?

11   **A.   We -- in person, yes.**

12   Q.   Was it a conversation you had in the

13 context of your work with the Coroner's Office?

14   **A.   Yes.**

15   Q.   Okay.  So would it have been a

16 conversation you had at the scene of some death?

17   **A.   I think it was -- I don't -- no, I don't**

18 **know if it -- I had conversation with him.  He just**

19 **stated that the cause of death was listed as**

20 **undetermined, and that was about all the**

21 **conversation.**

22   Q.   Do you know who raised the topic of Cory

23 Lovelace in the conversation that you had with him?

24   **A.   He did.**

102

1   Q.   Okay.  And what, if anything, did you say

2 in response?

3   **A.   Nothing.  I didn't -- I didn't.**

4   Q.   Well, were you concerned when you heard

5 that the cause of death was undetermined?

6   **A.   At -- just that was the cause of death**

7 **that was placed under, and I didn't respond.**

8   Q.   Did you think while you were at the scene

9 where Cory Lovelace's body had been found that what

10 you had observed -- that what you had observed

11 about her body was suspicious?

12   **A.   The positioning of the hands and the**

13 **timeframe.**

14   Q.   Did you think that the positioning of her

15 hands and the timeframe was suspicious?

16   **A.   Yes.**

17   Q.   Did those things concern you?

18   **A.   It did.**

19   Q.   Okay.  Did you take any steps to document

20 what you had observed while you were at the scene

21 where her body was found?

22   **A.   I did not.**

23   Q.   Why did you not take any steps to

24 document that?

103

1       MR. HANSEN:  Objection; asked and

2 answered.

3       Go ahead.  You already stated it.  State

4 it again.

5       THE WITNESS:  I -- we did not have to

6 make any reports or anything, so I did not write

7 anything, no.

8 BY MS. THOMPSON:

9   Q.   Prior to 2013, did you tell anyone

10 else -- let me start that question again.

11       Prior to 2013, did you talk with anyone

12 else about anything having to do with Cory

13 Lovelace's death other than the conversation you

14 had with Coroner Hamilton where he told you that it

15 was undetermined and other than the conversations

16 that you had at the scene while you were moving

17 Cory Lovelace's body?

18   **A.   No, we never really spoke about cases.**

19   Q.   And I'm saying did you have a

20 conversation with anyone, not just Coroner

21 Hamilton, but any person prior to 2013?

22   **A.   I don't recall anybody, no.**

23   Q.   Did you think about Cory Lovelace's death

24 at all between leaving, you know, the house the day

104

1 that her body was found and 2013?

2   **A.   No.  No.**

3   Q.   Were you ever present for a conversation

4 where other people were talking about Cory

5 Lovelace's death at any point between when you left

6 Cory Lovelace's home and 2013?

7   **A.   I don't -- I don't recall.**

8   Q.   Did you read anything about Cory

9 Lovelace's death at any point between when you, you

10 know, left her house and 2013?

11   **A.   I don't read much in the -- much media**

12 **wise, didn't ever have the time to do that, so I**

13 **never did.  So I would have to say no.**

14   Q.   And did you see any media reports about

15 anything having to do with Cory Lovelace between

16 when you left her house and 2013?

17   **A.   There was just stuff on -- various stuff**

18 **on the news media at times, but I never -- don't**

19 **recall what all -- what it was.**

20   Q.   Okay.  And when you say there was

21 "various stuff on the news"?

22   **A.   There might have been stuff on the news,**

23 **but I don't recall what -- listening to anything or**

24 **hearing -- really hearing of anything.**

Transcript of James Keller
Conducted on August 22, 2018

105

1    Q.  Did you ever at any point after you left
2  the house where Cory Lovelace's body was found talk
3  with Coroner Hamilton about what you had observed
4  at the scene?  And I'm asking you at any point from
5  when you left to the present.
6    A.  No, we really haven't discussed -- no, we
7  haven't discussed the case.
8    Q.  At some point you did -- well, let me ask
9  you this.
10        After you had the brief conversation with
11  Coroner Hamilton where he told you that Cory
12  Lovelace's death was undetermined, when is the next
13  time that you talked with Cory Lovelace about any
14  -- you talked about Cory Lovelace with anyone?
15    A.  I don't recall.
16    Q.  Well, at some point Cory Lovelace's death
17  sort of was an issue that came back into your
18  professional work as a Coroner; right?
19    A.  I was called by Detective Gibson.
20    Q.  When were you called by Detective Gibson?
21    A.  I don't recall the year.  I was called by
22  him about if there were records available, autopsy
23  reports and things.
24    Q.  Prior to him calling you about -- asking

106

1  about records, had you had -- had you thought about
2  all about Cory Lovelace's death at any point since
3  your one conversation with Coroner Hamilton where
4  he told you her death was undetermined?
5        MR. HANSEN:  Asked and answered.
6  Objection.
7        Go ahead, you can answer.  Answer it
8  again.
9        THE WITNESS:  No.  My thoughts, no.
10  BY MS. THOMPSON:
11    Q.  Okay.  So when Detective Gibson called
12  you, tell me -- tell me everything that you
13  remember about that conversation.  You said -- and
14  I understand you already testified that he asked
15  you about whether you had reports or records; is
16  that right?
17    A.  Yes.
18    Q.  What else, if anything, do you recall
19  about that conversation?
20    A.  He said he would -- was doing an inquiry
21  about opening the case.
22    Q.  Did he say anything else to you about
23  what he -- about -- did he say anything else to you
24  in the conversation at all other than those things?

107

1    A.  It was a very short conversation.
2    Q.  All right.  Did he --
3    A.  If I had records available.  I stated I
4  would have to see what was in Coroner Hamilton's
5  chart, in her chart as to what was available.
6    Q.  Do you remember what time of year it was
7  when he contacted you?
8    A.  I do not.
9    Q.  Did you make any notes of that
10  conversation with him?
11    A.  I did not.
12    Q.  Did you do anything -- is there anything
13  else that you said to him during that conversation
14  other than saying you would have to check to see
15  what Coroner Hamilton had?
16    A.  I don't recall.
17    Q.  Okay.  And did you, in fact, look for
18  records after that conversation?
19    A.  I don't think at that time.  I did a
20  short time after that.  I was not in a position at
21  that time upon his call to immediately look as to
22  what was available.
23    Q.  And when you say you weren't in a
24  position to look, why is that?

108

1    A.  I wasn't -- didn't have files in front of
2  me.
3    Q.  Okay.  Did you take some steps to pull
4  files?
5    A.  I did.
6    Q.  What did you do?
7    A.  I pulled the files that he -- autopsy
8  report at that time.
9    Q.  Did you pull anything else besides the
10  autopsy report?
11    A.  I believe the inquest also report.
12    Q.  Anything else that you pulled at that
13  time?
14    A.  I don't recall.
15    Q.  All right.  And did you pull physical
16  copies of those documents or did you get
17  electronic?
18    A.  Physical copies.
19    Q.  Okay.
20    A.  Uh-huh.
21    Q.  Did the -- prior to you pulling those
22  records for Detective Gibson, did the Coroner's
23  Office have a file on Cory Lovelace's death?
24    A.  Yes.

Transcript of James Keller

28 (109 to 112)

Conducted on August 22, 2018

109

1    Q.   All right.  And did it contain anything
2 else besides the autopsy report and the inquest?
3    A.   I don't recall what all pieces of paper
4 were in it.
5    Q.   Are there documents that are typically
6 kept in a file at the Coroner's Office about a
7 death investigation?
8    A.   There are -- would have been his -- I
9 think it was his investigative report on it -- or
10 in it.
11   Q.   When you say "his," you mean Coroner
12 Hamilton's?
13   A.   Correct.
14   Q.   All right.  Anything else?
15   A.   No, I don't recall.
16   Q.   Does the Coroner's Office keep
17 correspondence related to a death investigation in
18 the Coroner's file about a particular case?
19   A.   Correspondence as in e-mails or --
20   Q.   E-mails or letters or any other form of
21 correspondence.
22   A.   Yes, yes.
23   Q.   All right.  And when you pulled -- and
24 let me ask you this.

110

1         When you pulled these records, the
2 inquest and the autopsy report, were you pulling
3 them from a file about Cory Lovelace's
4 investigation.
5    A.   Yes.
6    Q.   Okay.  And was there any correspondence
7 in the file when you initially pulled it?
8    A.   I can't recall.  I know I -- I know I
9 gave him the autopsy and the -- I believe it to be
10 the autopsy report and the inquest report.
11   Q.   And is it your memory that you gave him
12 only some things that were in the file or did you
13 give him the only documents that were in the file
14 at that time?
15   A.   I can't recall if there was any other --
16 if Coroner Hamilton had requests to send anywhere
17 else in the file or not.  I can't recall that.
18   Q.   Okay.  How did you provide those
19 documents to Detective Gibson initially?
20   A.   I made copies of them.
21   Q.   And how did you get the copies to him?
22   A.   I -- I believe I took it to him.
23   Q.   Okay.  When you took those documents to
24 him, did you have any conversation about the case

111

1 at that time?
2    A.   No.  No.  I just basically took it to
3 his -- I believe I took it to his office and he was
4 going to review them.
5    Q.   Was it his office at the police
6 department?
7    A.   No, at the Senior Citizens Center.
8    Q.   Okay.  Was he there when you dropped them
9 off?
10   A.   Yes.
11   Q.   Okay.  When is the next time that you
12 remembered talking with Detective Gibson about Cory
13 Lovelace?
14   A.   I don't know that, when.
15   Q.   At some point did you learn that he had
16 reopened --
17   A.   He --
18   Q.   Let me finish the question.  I'm pausing,
19 so I'm sorry.  But the question is this.  At some
20 point did you learn that Detective Gibson had
21 reopened an investigation in into Cory Lovelace's
22 death?
23   A.   At the time of his first conversation
24 about wanting the records he stated that was going

112

1 to be opening back up an investigation.
2    Q.   Did he tell you that he was going to be
3 opening back up an investigation or that he was
4 looking into opening up an investigation?
5    A.   Looking into opening up an investigation,
6 yes.
7    Q.   Okay.  And at some point did you learn
8 whether he had actually reopened the investigation?
9    A.   Didn't have a lot of conversation with
10 him on his -- where he was on what he was doing.
11 So I would say no, I'm not -- wasn't really sure at
12 what point he stated that or what he was doing with
13 it.
14   Q.   Okay.  At the time that you provided
15 those documents to him, was there any investigation
16 by the Coroner's Office into -- any open
17 investigation by the Coroner's Office into Cory
18 Lovelace's death?
19   A.   There was not.
20   Q.   At some point did you as the Coroner
21 reopen the Coroner's investigation into her death?
22   A.   As he inquired about -- as the Coroner's
23 part of the investigation?  Coroners really didn't
24 have the investigation.  It was in the hands of the

Transcript of James Keller
Conducted on August 22, 2018

113

1  police department.
2      Q.  Were you ever at any point doing an
3  independent investigation into Cory Lovelace's
4  death?
5      A.  I did not.
6      Q.  Okay.  Is it your view that you
7  participated in the police investigation?
8          MR. HANSEN:  Object to form.
9          Go ahead.
10         THE WITNESS:  I went with him to
11 Dr. Bowman and delivered slides to Dr. Denton.
12 Other than that, as far as meeting with, I did not.
13 BY MS. THOMPSON:
14     Q.  And I have some additional questions for
15 you about Dr. Bowman and Dr. Denton, but let me ask
16 you this.  At some point in your conversations with
17 Detective Gibson, and I'm asking about
18 conversations either in person or via e-mail or
19 letter or however you communicated with him, did
20 the issue get raised between you that he was
21 investigating the time of when Cory Lovelace had
22 died?
23     A.  The time?
24     Q.  Yes.

114

1      A.  I think he used circumstances.
2      Q.  Can you explain what you mean about that?
3      A.  I think he stated that it was the
4  circumstances surrounding her passing.
5      Q.  That he was investigating the
6  circumstances?
7      A.  (Nodded his head up and down.)  Yes.
8      Q.  I'm sorry.
9      A.  I apologize.
10     Q.  Did you ever learn that the Lovelace
11 children had said that they had seen their mother
12 that morning before they went to school?
13     A.  I did hear that, yes.
14     Q.  When did you first hear that?
15     A.  I think Detective Baird may have said
16 something to that at the residence.
17     Q.  This is when you were at the scene where
18 her body was found?
19     A.  Yeah.
20     Q.  When did he say that to you?
21     A.  I think I heard.  I'm not sure it was to
22 myself.  I just had heard that someone had spoke
23 with -- and I'm not sure I knew it was children at
24 that time.

115

1      Q.  But it was Detective Baird you heard
2  discussing that issue?
3      A.  Yes.
4      Q.  Okay.
5      A.  I don't know whether he was on the phone
6  or whether he was -- I can't recall.
7      Q.  And I understand and appreciate your
8  clarification that he wasn't saying this to you,
9  but it's something you overheard; is that right?
10     A.  Yeah.
11     Q.  At the time you heard that, did you think
12 based on what you had observed that that couldn't
13 be true?
14     A.  I just didn't agree with the timeframe.
15     Q.  And at that point -- well, at the time
16 then going back to Detective Gibson's
17 investigation, did you ever tell Detective Gibson
18 what it was that you had observed at the scene?
19     A.  We did.
20     Q.  And when you say "we did"?
21     A.  I did.
22     Q.  All right.  When did you tell him that?
23     A.  I don't know -- I don't know when that
24 exactly was.  I never wrote down dates, times, or

116

1  anything of that sort.
2      Q.  Was that something you discussed early in
3  the investigation?
4      A.  Yes.
5      Q.  And how did you give that information to
6  Detective Gibson?
7      A.  Spoke with him.
8      Q.  All right.  And what specifically did you
9  tell him about what you had observed at the scene?
10     A.  That she was dehydrated, rigor.
11     Q.  Was anyone else present for that
12 conversation besides you and Detective Gibson?
13     A.  No, ma'am.
14     Q.  Did you tell him anything else other than
15 that there was rigor and that she was dehydrated?
16 And I'm talking about the first conversation you
17 had where you told him about what you had observed
18 at the scene.
19     A.  Just what I observed.
20     Q.  And when you say you told him what you
21 had observed, what did you tell him?
22     A.  About rigor, dehydration, odor.
23     Q.  Was Detective Gibson taking notes when
24 you told him this?

Transcript of James Keller
Conducted on August 22, 2018

117

1    A.  I don't recall that.

2    Q.  Was he sitting in front of a computer
3  when you were having this conversation?

4    A.  No.

5    Q.  Did he have any response to what you were
6  telling him about what you observed?

7    A.  I don't recall that.

8    Q.  Did this -- how did this topic come up as
9  far as what you had observed; was this something he
10  asked you about or something you offered or how did
11  it get raised in the conversation?

12    A.  I don't recall how it all come up.  It
13  was just part of him gathering information.

14    Q.  And did you tell him that these
15  observations that you'd made that this was
16  something you discussed with Detective Baird at the
17  scene?

18    A.  He did ask who was present.

19    Q.  Did you tell him that Coroner Hamilton
20  and Detective Baird were present?

21    A.  Yes.

22    Q.  Okay.  How long was your conversation
23  with Detective Gibson when you were telling him
24  about your observations at the scene?

118

1    A.  Not very long.  I don't recall how long,
2  but it was not very long.

3    Q.  All right.  Did you ever talk about your
4  observations at the scene with Detective Gibson
5  again after that first conversation?

6    A.  I don't recall.  I don't recall.

7    Q.  Have you ever talked about those
8  observations with any other members of law
9  enforcement besides Detective Gibson?

10    A.  No.  We don't -- no.  No.

11    Q.  All right.  And obviously you've
12  testified about these observations; is that right?

13    A.  Yes, ma'am.

14    Q.  All right.  Did you talk about -- did you
15  talk about what you'd observed at the scene at any
16  point with prosecutors?

17    A.  Yes.

18    Q.  When did you discuss your observations
19  with prosecutors?

20    A.  I don't recall when.

21    Q.  At some point did you meet to prepare for
22  your testimony in the first trial?

23    A.  Yes.

24    Q.  Was that close --

119

1    A.  That was about -- but when it was, I
2  don't know.  I don't recall when.

3    Q.  Was that close in time to the first
4  trial?

5    A.  Yes, ma'am.

6    Q.  Okay.  Did you ever talk with prosecutors
7  about what you had observed at the scene before
8  Curtis Lovelace was arrested?

9    A.  I don't understand.  I'm sorry.

10    Q.  Sure.  I'm trying to figure out when your
11  conversation with prosecutors was and, so I guess
12  I'm asking you if it was before or after Curtis was
13  arrested?

14    MR. HANSEN:  I think he just answered
15  that.  He said it was shortly before the first
16  trial in his testimony.

17    THE WITNESS:  Before the first trial.

18  BY MS. THOMPSON:

19    Q.  Okay.  Like a few weeks before the first
20  trial?

21    A.  Probably a week before -- yes, before the
22  first trial, not long before the first trial.

23    Q.  Did you talk with prosecutors at all
24  about what you observed after the first trial?

120

1    A.  So at the second trial?

2    Q.  Well, you testified again at the second
3  trial; is that right?

4    A.  I did.

5    Q.  Did you meet with prosecutors in between
6  the first and second trial?

7    A.  Yes, probably that -- I believe that
8  morning or the night before I was to be called, and
9  I believe I wasn't called that time.  So I was
10  talked to right moments -- a couple minutes.

11    Q.  Before you actually testified?

12    A.  (Nodded his head up and down.)

13    Q.  Okay.

14    MR. HANSEN:  Is that a yes?  You go to
15  answer.  You are nodding your head.  Is that a yes?

16    THE WITNESS:  Yes.

17  BY MS. THOMPSON:

18    Q.  Okay.  Before the first trial who was it
19  that you met with?  In talking about prosecutors,
20  who in the prosecutor's office did you meet with in
21  the first trial?

22    A.  Prosecutor Ed Parkinson.

23    Q.  And before the second trial, who did you
24  meet with?

Transcript of James Keller
Conducted on August 22, 2018

121

1    A.   I'm not sure if it was a formal meeting.
2  I just spoke with he and another man.
3    Q.   Okay.  Did you talk with prosecutors at
4  any point after the second trial about the issues
5  related to Cory Lovelace?
6    A.   There was just correspondence, I think,
7  but, no, as far as the trial wise goes, no.
8    Q.   All right.  And what correspondence was
9  there?
10   A.   There was some correspondence as to
11 sending information or -- he wished to be -- if we
12 had -- we were getting a lot of media reports,
13 requests, and I would -- just asked about any -- if
14 I should send anything or if I would get a request
15 if I could send a request.
16      MR. HANSEN:  I want to clarify.  She said
17 after the second trial.
18      THE WITNESS:  I'm sorry.  After the
19 second trial?  No.
20 BY MS. THOMPSON:
21   Q.   You did have some communications with
22 prosecutors related to requests from the media for
23 information; is that right?
24   A.   Yeah.

122

1    Q.   Were those before both the first and the
2  second trials?
3    A.   Yes.
4    Q.   Okay.  And there were some -- what is
5  what is it that the media was asking for?
6    A.   Anything, autopsy reports.  Autopsy
7  reports, inquest reports.  General public would ask
8  for information, request information.
9    Q.   How many times over the course of
10 Detective Gibson's investigation did you talk with
11 him about this case, and I'll start first with
12 in-person conversations that you had with him?
13   A.   I don't know a number.
14   Q.   Was it more than ten?  Ten times that you
15 talked to him in person about the investigation?
16   A.   I would say over the first two we spoke
17 probably ten times in reference to, yes.
18   Q.   I'm sorry, you said over the first --
19   A.   Over the trials, plural.
20   Q.   So at any point between when he called
21 you to start and the end of the process you talked
22 more than ten times?
23   A.   Around ten, yeah.
24   Q.   Okay.  Did you talk with Detective Gibson

123

1  between the first and second trials?
2    A.   Yes, we spoke.
3    Q.   And what did you talk about?
4    A.   Just sometimes he would give an update on
5  if they were thinking on doing a second trial or
6  not.  So it wasn't -- it was more of their thinking
7  on doing a second trial or not.  He was in charge
8  of the investigation and kept -- spoke with the
9  prosecution.  I did not.
10   Q.   Did he ever tell you that they were --
11 that someone was considering not retrying this
12 case?
13   A.   No.  It was just -- no.
14   Q.   What do you remember discussing with him
15 in terms of the second trial in between the first
16 and second trials?
17   A.   I don't recall.  There was not much
18 conversation between trials.
19   Q.   All right.  Between the first and second
20 trials, did you talk with him ever about anything,
21 you know, related to what your testimony would be
22 at the second trial?
23   A.   No.
24   Q.   And you said between -- between sort of

124

1  that whole time from when he first called you to
2  the conclusion to the second trial that you talked
3  with him about ten times; is that right?
4    A.   Yes.
5    Q.   How many of the ten were before the first
6  trial?
7    A.   Most of them were before the first trial.
8    Q.   Okay.  And between the first and second
9  trial is it fair to say that your conversations
10 with him were really logistical conversations about
11 scheduling of the trial and how it was going to go
12 forward?
13   A.   Yes, yes.
14   Q.   Did Detective Gibson ever tell you over
15 the course of the investigation that they were
16 preparing to arrest Curt?
17   A.   No.
18   Q.   Did he ever tell you that -- did he ever
19 tell you after Curt was arrested that, in fact,
20 Curt had been arrested?
21   A.   No.
22   Q.   How did you learn that Curt had been
23 arrested?
24   A.   Just the news thing over the telephone.

Transcript of James Keller
Conducted on August 22, 2018

125

1    Q.   You said a "news thing over the
2  telephone"?
3    **A.   A news flash, if you will.**
4    Q.   Is this something like a news alert that
5  you got on your phone?
6    **A.   News alert, yeah.**
7    Q.   At what point did you learn that you were
8  going to be a witness in the trial, in the first
9  trial?
10   **A.   It was quite a while after, a little**
11 **while.  I can't recall how long.**
12   Q.   Who was it that told you that you were
13 going to be testifying?
14   **A.   I believe I was contacted -- I can't**
15 **recall who told me.  I do not know.  I don't**
16 **remember that.**
17   Q.   Was it a prosecutor?
18   **A.   I believe it was.  Of that office.**
19   Q.   Of the state appellate prosecutor's
20 office?
21   **A.   Yes.**
22   Q.   Okay.  And when that person -- and I
23 understand you don't remember who that was, but
24 when that person told you that you'd be testifying,

126

1  did they indicate to you what you would be
2  testifying about?
3    **A.   My -- whatever I observed, whatever I**
4  **seen.**
5    Q.   Did that person tell you that they -- did
6  that person give you any information that indicated
7  to you that they knew that you'd had these
8  observations at the scene about dehydration --
9    **A.   No.**
10   Q.   (Continuing) -- and rigor and lividity?
11   **A.   No, ma'am.**
12   Q.   Sorry.  And when you met with Ed
13 Parkinson to prepare for your testimony at the
14 first trial, did he give an indication to you that
15 he already knew that you had observations about
16 dehydration or lividity or rigor?
17       MR. HANSEN:  I would just object.  It
18 calls for him to speculate as to what Mr. Parkinson
19 knew.
20       Subject to that go ahead, you can answer.
21       THE WITNESS:  I don't recall what all he
22 said.
23 BY MS. THOMPSON:
24   Q.   How long did you meet with him in -- meet

127

1  with Ed Parkinson in preparation for the first
2  trial?
3    **A.   It was only about a half-hour.**
4    Q.   And what did you discuss during that
5  half-hour?
6    **A.   Just kind of what maybe some of the**
7  **questions would be.  Just -- he just basically told**
8  **me to state what I had seen.**
9    Q.   Did you tell him at that point what you
10 had seen?
11   **A.   He had the information.**
12   Q.   Already?  And when you say "he had the
13 information," how do you know that he had the
14 information?
15   **A.   He stated that -- what I had seen.**
16   Q.   Before you had told him in that
17 conversation what it was?
18   **A.   Yes, ma'am.**
19   Q.   Okay.  Did he give you any indication of
20 how he knew what -- or how he had already had
21 knowledge of about what you had seen?
22   **A.   No, ma'am.**
23       MS. THOMPSON:  So this is a good time, I
24 think, to take a break, and I want to get the other

128

1  documents to continue.  So I'd like to take about
2  45 minutes and we will come back a little after 12,
3  12:30 --
4        MS. EMERY:  The other thing is if it
5  helps you Susan will go to the hotel and go get
6  your documents if you want.
7        MS. THOMPSON:  I'm going to just go get
8  some -- whether they are there or not, I'm going to
9  print out what I need.  I'm going to go to the UPS
10 store.  So I appreciate that offer, but I'm going
11 to -- I'll just get what I need to continue.  So if
12 we can just take a break at this point.
13       MR. HANSEN:  Why don't we say this.
14 Because I have an e-mail I have to send that has to
15 go out the door today, so I would like to come back
16 at 1 o'clock.
17       MS. THOMPSON:  That's fine.  I don't have
18 any problem with that.
19       THE VIDEOGRAPHER:  We are now off the
20 record.  The time is 11:52 a.m.
21       (Whereupon a lunch recess was taken.)
22       THE VIDEOGRAPHER:  We are now back on the
23 record.  The time is is 1:04 p.m.
24

Transcript of James Keller
Conducted on August 22, 2018

129

1  BY MS. THOMPSON:
2      Q.   A couple follow-up questions from some
3  things I asked you before lunch, Mr. Keller.
4          At any point in any conversation that
5  you've ever had with Coroner Hamilton, has he ever
6  expressed reservation to you about Dr. Bowman's
7  original finding that the -- that Cory Lovelace --
8  the manner of Cory Lovelace's death was
9  undetermined?
10     **A.   Repeat that, please.**
11     Q.   Sure.  Has Coroner Hamilton ever told you
12 that he had reservations about Dr. Bowman's
13 original finding that Cory Lovelace's death was
14 undetermined?
15     **A.   Not that I recall.  We never really**
16 **discussed.**
17     Q.   Have you ever heard that he expressed
18 reservations to someone else?
19     **A.   No.**
20     Q.   Have you ever heard that anyone involved
21 in the original investigation from the police
22 department had reservations about Cory Lovelace's
23 death?
24     **A.   Just heard that there was reservations**

130

1  **about her death, yes.**
2      Q.   But whose reservations?
3      **A.   Just hearsay.  I don't know whom.  I**
4  **don't know if it was a firsthand or what, but just**
5  **hearsay.**
6      Q.   Well, who was it that told you that
7  someone had reservations?
8      **A.   Just early on in the investigation,**
9  **probably assumption on my part, they wouldn't have**
10 **opened the investigation had they not had**
11 **reservations, so...**
12         MR. HANSEN:  I don't want you to assume
13 anything.  I want the answer to be clear.  She
14 asked you if you had heard that specifically from
15 anyone.  So that's the question.
16         THE WITNESS:  No.
17 BY MS. THOMPSON:
18     Q.   During the time that this case was being
19 reinvestigated by Detective Gibson, I take it that
20 you and Detective Gibson conferred about cases
21 other than this one; is that right?
22         MR. HANSEN:  I'm going to object just to
23 the form.  It's vague.  "Conferred" meaning just
24 his job duties or conferred about other ones he was

131

1  investigating?
2          MS. THOMPSON:  I'll rephrase the
3  question.
4  BY MS. THOMPSON:
5      Q.   This is not the only case that you worked
6  on with Detective Gibson; is that right?
7      **A.   Correct.**
8      Q.   I mean, there were other death
9  investigations that he was working on that you --
10     **A.   Yes.**
11     Q.   (Continuing) -- participated in; is that
12 right?
13     **A.   Uh-huh.**
14     Q.   And I think you mentioned Linda Booth as
15 being one old case that you conferred on.  And is
16 that a case that you conferred on with Detective
17 Gibson?
18     **A.   Yes.**
19     Q.   And were there other cases besides Cory
20 Lovelace, Linda Booth -- and Linda Booth that you
21 worked on with Detective Gibson during the time
22 that the Lovelace investigation was going on?
23     **A.   There were numerous deaths in which he**
24 **was a detective on a case.**

132

1      Q.   How often did you talk with Detective
2  Gibson about any case during the time that the
3  Lovelace case was going on?
4      **A.   If there was a case involving a case that**
5  **he was working on.**
6      Q.   I mean, would it be that you would either
7  talk to him in person or over the phone or via
8  e-mail basically every day while this investigation
9  was going on?
10     **A.   No, no.**
11     Q.   Did you ever know Detective Gibson --
12 well, let me ask a better question.
13         Did you know Detective Gibson before the
14 Lovelace reinvestigation began?
15     **A.   I had worked with him on cases, just**
16 **whatever cases he was on.**
17     Q.   Had you worked on any drug cases with
18 Detective Gibson before the Lovelace investigation
19 began?
20     **A.   I don't know what type of cases they**
21 **were.**
22     Q.   Had you ever worked with him on any cases
23 that did not involve someone having died?
24     **A.   No.**

Transcript of James Keller
Conducted on August 22, 2018

---

133

1    Q.  Is he someone that you consider to be a
2  friend outside of work?
3    **A.  No, we never have made contact outside of**
4  **work.**
5    Q.  Okay.  At some point during the criminal
6  case, you talked about responding to requests from
7  the media, and I think you said that you also
8  responded to some Freedom of Information Act
9  requests; is that right?
10   **A.  Yes.**
11   Q.  All right.  And did you confer with the
12 prosecutor about responding to Freedom of
13 Information Act requests?
14   **A.  I did.**
15   Q.  Did you at some point confer with the
16 prosecutor about responding to discovery requests
17 in the criminal case, either the first or the
18 second trial?
19   **A.  There was a request, and I done that**
20 **through the State's Attorney's Office.**
21   Q.  Okay.  Did you provide documents
22 responsive to the request to the State's Attorney's
23 Office?
24   **A.  I did.**

---

134

1    Q.  Okay.  And did you -- well, I've got some
2  more questions for you about that, too, but let me
3  ask you a different question.
4       At the time that this reinvestigation
5  began, was anybody who you considered to be
6  your supervisor in how you performed your job as
7  coroner?
8    **A.  The State's Attorney.**
9    Q.  Anyone else besides the State's Attorney?
10   **A.  No, huh-uh.**
11   Q.  Did you have authority in making
12 decisions about how to conduct death
13 investigations?
14   **A.  Would you state that again?**
15   Q.  Sure.  And let me ask you a better
16 question.
17      When you say that you considered the
18 State's Attorney to be your supervisor, how would
19 the State's Attorney direct your work as Coroner?
20   **A.  If I had a question as far as something I**
21 **needed to do, I would ask him.**
22   Q.  Did the State's Attorney, anyone in the
23 State's Attorney's Office ever check in with you,
24 you know, to ask for updates about investigations

---

135

1  or to find out what it is that you were doing on
2  cases?
3    **A.  No.  They -- the most they would do would**
4  **be they would ask if an autopsy report was**
5  **available.**
6    Q.  So am I right that you could ask the
7  State's Attorney's Office for advice about how to
8  proceed on a case; is that correct?
9    **A.  Correct.**
10   Q.  But if you didn't want their advice or
11 direction, you didn't have to seek it?
12   **A.  Correct.**
13   Q.  Did you provide any kind of annual
14 reports or regular reports to anyone in the county
15 about your work as Coroner during the time you were
16 Coroner?
17      MR. HANSEN:  Go ahead.  If you know.
18      THE WITNESS:  I don't know.
19 BY MS. THOMPSON:
20   Q.  Did you report to the county board during
21 the time that you worked -- during the time you
22 served as Coroner about your -- anything having to
23 do with aspects of your work as Coroner?
24   **A.  Just they would inquire number of**

---

136

1  **autopsies or something on that line, but no.**
2    Q.  Okay.  Were you responsible for -- well,
3  let me ask you this.
4       Did the county board set the budget for
5  your office during the time you served as Coroner?
6    **A.  Yes.**
7    Q.  All right.  And did you have input into
8  what your budget was?
9    **A.  Yes.**
10   Q.  Am I right that you could make requests
11 to the county board about what you needed and they
12 would decide how to allocate funds to your office?
13   **A.  Yes.**
14   Q.  Other than them asking about number of
15 autopsies, were there any other ways in which the
16 county board monitored your performance as Coroner?
17   **A.  I don't believe so.**
18   Q.  Was there anyone else in the county who
19 was responsible for communicating with either
20 Dr. Denton or Dr. Youmans about the pathology work
21 that they were doing for the county?
22   **A.  No.**
23   Q.  Were you involved in the negotiation of
24 the contract for those doctors to perform autopsies

---

Transcript of James Keller

Conducted on August 22, 2018

137

1 for Adams County?
2    A.   Not -- no.  I -- we went there to
3 Bloomington for the examinations.
4    Q.   Okay.
5    A.   Asked if they would do the examinations,
6 and they said yes.
7    Q.   At the time you were Coroner, Dr. Denton
8 and Dr. Youmans's practice had a contract with the
9 county to perform county autopsies; is that right?
10    A.   That's correct.
11    Q.   Was that contract in place before you
12 became Coroner?
13    A.   It was.
14    Q.   All right.  And did you ever have any
15 negotiations with them about costs or, you know,
16 renewing the contract or anything having to do with
17 the terms of the contract?
18    A.   No.
19    Q.   Do you know who, if anyone, in the county
20 was responsible for putting that contract --
21 putting that contract into place?
22    A.   No, no.
23    Q.   I want to go back to your conversations
24 with Detective Gibson.  During the course of

138

1 Detective Gibson's investigation, did he give you
2 updates about how the investigation was proceeding?
3    A.   There was various -- some updates on --
4 came through that I would get cc'd on, e-mails on
5 various things.
6    Q.   Other than updates through e-mail, did he
7 give you any updates either in person or over the
8 phone when you were talking?
9    A.   No.  We didn't do much -- there was not
10 much updates, no.
11    Q.   Okay.  Well, so --
12    A.   He did the investigation, and after the
13 initial with Bowman and the slides, there wasn't --
14 he done most of the investigation.  I didn't -- did
15 not get much updates except for e-mails, things.
16    Q.   Okay.  And I want to make sure I
17 understand your testimony.  You are saying after
18 Bowman and the slides you didn't get many updates?
19    A.   Correct.
20    Q.   All right.  And could you --
21    A.   I didn't do a lot of input on anything.
22    Q.   Okay.  And so were you -- you were
23 involved in something having to do with Dr. Bowman
24 and something having to do with slides; is that

139

1 right?
2    A.   Yes.
3         MR. HANSEN:  I think he testified to that
4 earlier.
5         THE WITNESS:  Yes.
6 BY MS. THOMPSON:
7    Q.   Okay.  So after -- at some point you met
8 with Dr. Bowman about this case; is that correct?
9    A.   Yes.
10    Q.   Okay.  After -- how many times did you
11 meet with her about this case?
12    A.   Once.
13    Q.   Okay.  After your meeting with
14 Dr. Bowman, did you have further involvement in the
15 investigation after that?
16    A.   No.
17    Q.   All right.  Did you communicate with
18 doctors -- with any doctors about this
19 investigation after your meeting with Dr. Bowman?
20    A.   I did not.
21    Q.   All right.  Did you have conversations
22 with Dr. Denton after the meeting with Dr. Bowman?
23    A.   I did.
24    Q.   Did you have conversations with any other

140

1 doctors besides Dr. Denton after you met with
2 Dr. Bowman?
3    A.   No.
4    Q.   And when you say the slides, you were
5 responsible for getting the tissue blocks to get
6 pathology slides for experts to review; is that
7 right?
8    A.   Yes, ma'am.
9    Q.   Did you have any other involvement with
10 slides besides procuring those tissue blocks?
11    A.   No, ma'am.
12    Q.   Does the county have any -- does the
13 county have an understanding with Dr. Denton when
14 Dr. Denton does autopsies for the county about how
15 tissue collection will be done?
16         MR. HANSEN:  Object to the form.
17         Go ahead.
18         THE WITNESS:  I don't understand the
19 question.
20 BY MS. THOMPSON:
21    Q.   Sure.  During autopsies, a medical
22 examiner will collect tissue from the person being
23 autopsied, correct?
24    A.   Yes, ma'am.

Transcript of James Keller
Conducted on August 22, 2018

36 (141 to 144)

---

141

1    Q.   And a medical examiner can take more or
2  can take fewer samples or more samples depending on
3  what they want to collect; is that right?
4    **A.   Yes, ma'am.**
5    Q.   Okay.  Does -- in the county's contract
6  with Dr. Denton, is there any understanding about
7  how -- about, you know, how much tissue collection
8  Dr. Denton will do during autopsies?
9    **A.   That is up to he as to what he feels he**
10 **needs and how much he needs of tissue samples.**
11   Q.   Does the county get charged more if
12 Dr. Denton collects more -- and I'm talking about
13 during your time as Coroner, so let me be clear on
14 the timeframe.
15         During your time as Coroner, did the
16 county get charged more for an autopsy if
17 Dr. Denton collected more tissue samples.
18         MR. HANSEN:  I just object ob to
19 foundation.  He said he didn't have any negotiation
20 role whatsoever in the contract and he doesn't know
21 the terms of the contract, so I don't think he is
22 qualified to testify to that.
23         If you know, go ahead and answer.
24         THE WITNESS:  No, I don't.  I mean, if we

---

142

1  are charged, is that what you are asking, if you
2  are charged per slide?
3  BY MS. THOMPSON:
4    Q.   Yes.
5    **A.   Sometimes there is -- if there is**
6  **histology done, there is a histology slide charge,**
7  **but I don't know if that's per or if that's one set**
8  **fee or how that is.**
9    Q.   During your time as Coroner, did
10 Dr. Denton take care of getting histology slides
11 for autopsies that he performed or is that
12 something that you took care of?
13   **A.   He did.**
14   Q.   Okay.  And in the case of Cory Lovelace,
15 when you got the tissue samples, were those at
16 Blessing Hospital?
17   **A.   They were not.**
18   Q.   Where were they?
19   **A.   They were at Springfield Memorial.**
20   Q.   Springfield Memorial Hospital?
21   **A.   Yes.**
22   Q.   During your time as Coroner, did the
23 Coroner's Office have any written policies and
24 procedures for how the Coroner's Office would

---

143

1  conduct its operations?
2    **A.   I don't believe there was, no.**
3    Q.   All right.  Were there any written policy
4  and procedures governing the Coroner's Office at
5  any point when you were a deputy coroner?
6    **A.   The guidelines of the Coroner's Office**
7  **was through the statutes is what we follow.**
8    Q.   Okay.  And if there were any questions
9  about how to best interpret the statutes or follow
10 the statute, who in the office was responsible for
11 making a decision about how to follow the statutes?
12   **A.   I.**
13   Q.   And I take it when you were a deputy, was
14 the person responsible the Coroner?
15   **A.   Yes.**
16   Q.   As Coroner, have you ever prepared any
17 written materials to direct Deputy Coroners under
18 your supervision about how to do their jobs?
19   **A.   No.**
20   Q.   And when you were a deputy coroner, were
21 there ever any written documents that you looked at
22 to understand how to perform your duties as Deputy
23 other than the statutes?
24   **A.   The statute.  Just the statute.**

---

144

1    Q.   Okay.  How did Dr. Denton become involved
2  in the investigation of Cory -- the reinvestigation
3  of Cory Lovelace's death?
4    **A.   I asked him if he would look into the --**
5  **look at the autopsy report and do a review of the**
6  **case.**
7    Q.   Why did you ask him to do that?
8    **A.   It had to be -- it had -- the case had to**
9  **be reviewed to see if there was any -- if he**
10 **thought there was evidence to reopen an**
11 **investigation.**
12   Q.   Okay.  And when you say it had to be
13 reviewed?
14   **A.   The case needs to be reviewed to -- by a**
15 **physician to see if there was any review of the**
16 **autopsy findings.**
17   Q.   Who decided that a physician needed to
18 review the autopsy findings in Cory Lovelace's
19 case?
20   **A.   I did.  If there needed to be -- if there**
21 **was any evidence that needed to be -- if there was**
22 **any evidence to and what his thoughts were.**
23   Q.   Why did you make the determination that
24 Dr. Denton -- let me start the question again.

Transcript of James Keller
Conducted on August 22, 2018

145

1       Why did you make the determination that a
2   physician needed to rereview Cory Lovelace's
3   autopsy?
4       **A.   I felt it just needed to be reviewed.**
5   **The documents needed to be reviewed with the**
6   **undetermined.**
7       Q.   Did you make the determination that
8   someone needed to reassess what Dr. Bowman's
9   original autopsy findings were?
10      **A.   Yes.**
11      Q.   And on what -- what made you decide that
12  that needed to happen?
13      **A.   It just -- you need to have the document**
14  **just reviewed.  That's the only way I can say.**
15      Q.   Have there been undetermined -- cases
16  that have been -- where there has been a finding of
17  undetermined during the time that you have been --
18  during the time that you served as Coroner where
19  you did not seek a second opinion about that
20  determination?
21      **A.   I don't believe so.  I -- no.**
22      Q.   What other cases have you encountered as
23  Coroner where there was a finding of undetermined
24  where you sought a second opinion?

146

1       **A.   I can't recall.**
2       Q.   And when you -- when you took over as
3   Coroner, were there older cases in Adams County
4   where Coroners before you became Coroner had
5   concluded that the manner of death was
6   undetermined?
7       **A.   Yes.**
8       Q.   Did you reinvestigate every single one of
9   those cases?
10      **A.   I did not.  They were -- we were asked to**
11  **look on the undetermined on Mrs. Booth, so that was**
12  **done.**
13      Q.   Who asked you to look at the undetermined
14  for Mrs. Booth?
15      **A.   There was a court order obtained, and I'm**
16  **not sure whom authorized it, who asked, if it came**
17  **from the State's Attorney or Detective Gibson or --**
18  **I'm not quite sure.**
19      Q.   But you said there was a court order
20  about that?
21      **A.   About we had to get an exhumation on**
22  **Ms. Booth.**
23      Q.   Okay.  Were there any other cases besides
24  Cory Lovelace and Linda Booth that were

147

1   undetermined at the time that you took over as
2   coroner?  I'm talking about cases from the past.
3       **A.   I can't recall.**
4       Q.   Did you take any steps to look into, you
5   know, the status of old cases to see if there were
6   any other cases that were undetermined at any point
7   when you were coroner?
8       **A.   I don't believe so.**
9       Q.   So is there anything specific about Cory
10  Lovelace's case that led you to conclude that it
11  needed to be reexamined by a pathologist?
12          MR. HANSEN:  I'm just going to object to
13  the form of the question.  Any investigation that
14  he undertook was only after it was reopened through
15  the City, so I want to be clear that he didn't
16  initiate this on his own.
17          Subject to that, you can go ahead and
18  answer.
19          THE WITNESS:  The death, due to it being
20  them wanting to reopen, just the records of
21  examinations just needed to be reviewed.
22  BY MS. THOMPSON:
23      Q.   Well, wasn't it your testimony that you
24  made the decision to contact Dr. Denton?

148

1       **A.   Yes.**
2       Q.   All right.  And did you make -- did
3   someone tell you that you needed to have this
4   rereviewed by a second pathologist?
5       **A.   I believe it's -- I don't have -- it's**
6   **procedure wise that you need to get -- have cases**
7   **reviewed, and I did so.**
8       Q.   What procedure?
9       **A.   To have case review.**
10      Q.   Right.  But are you saying that you
11  followed a certain procedure in having Dr. Denton
12  relook at this?
13      **A.   I'm going to say I believe it's with the**
14  **statute that you need to have cases reviewed if**
15  **need be.  You have the option of doing so.**
16      Q.   And is it -- is there any other reason
17  that you had this -- Cory Lovelace's case
18  rereviewed other than that Detective Gibson told
19  you that the Quincy Police Department was looking
20  into reinvestigating it?
21      **A.   If there is going to be any -- anything**
22  **of however -- if there was any need to move on, I**
23  **felt it needed to be reviewed to see if there was**
24  **any evidence to proceed.**

Transcript of James Keller
Conducted on August 22, 2018

149

1    Q.   And when you say "evidence to proceed,"
2  evidence to proceed with what?
3    **A.   Anything.  If they were wanting to**
4  **reinvestigate, if there was any evidence to proceed**
5  **with an investigation.**
6    Q.   Am I understanding then that when
7  Detective Gibson told you that they were looking
8  into reinvestigating the case that you determined
9  that if they were going to reinvestigate there
10 would need to be a pathologist to relook at the
11 original autopsy report and conclusions?
12   **A.   I felt that, yes.**
13   Q.   Okay.  And did Detective Gibson ever ask
14 you specifically to have the original autopsy
15 rereviewed by a pathologist?
16   **A.   No, I don't believe so.**
17   Q.   How did you first contact Dr. Denton
18 about this case?
19   **A.   I can't recall the mode of communication.**
20   Q.   At some point you met with Dr. Denton,
21 correct?
22        MR. HANSEN:  Objection.  No.  That's not
23 what he said.  It mischaracterizes his testimony.
24 He met with --

150

1        MS. THOMPSON:  Well, I'm asking him the
2  question if he ever met --
3        MR. HANSEN:  Well, it's been asked and
4  answered.  He said he talked to Denton.  He never
5  met with Denton.
6        THE WITNESS:  I did not meet with Denton.
7  BY MS. THOMPSON:
8    Q.   All right.  Did you ever have any
9  telephone conversations with Dr. Denton where he
10 told you what his, you know, opinions were about
11 Cory Lovelace's death?
12   **A.   There was a conversation I didn't have**
13 **that Detective Gibson had with Dr. Denton.  I was**
14 **not at that meeting.**
15   Q.   At some point did you learn about the
16 results of that meeting?
17   **A.   I did.**
18   Q.   Did you learn -- or about what had
19 happened at the meeting, did you learn about that
20 from Detective Gibson?
21   **A.   I did not.**
22   Q.   How did you learn about it?
23   **A.   I was at Dr. Denton's -- I spoke with he,**
24 **and he said he communicated everything with**

151

1  Detective Gibson.
2    Q.   Did you talk with him over the --
3  Dr. Denton over the phone after that meeting, the
4  meeting you had with Detective Gibson?
5    **A.   It was a while later.**
6    Q.   How much later?
7    **A.   A couple weeks.**
8    Q.   And at any point between when Detective
9  Gibson met with Dr. Denton and when you talked with
10 Dr. Denton later, did anybody else give you any
11 information about what had happened at the meeting
12 between Detective Gibson and Dr. Denton?
13   **A.   No.**
14   Q.   Did you know in advance of that meeting
15 that Detective Gibson was going to meet with
16 Dr. Denton?
17   **A.   I did.**
18   Q.   All right.  And were you curious about
19 what happened at the meeting?
20   **A.   I would -- I could not make that meeting,**
21 **and no, it -- with added job things, no.  Detective**
22 **Gibson was in charge of the investigation, and**
23 **whatever they were talking about, no, I did not**
24 **inquire.**

152

1    Q.   So when you talked with Dr. Denton a
2  while later, you said he told you during that
3  conversation that he had already -- he had said
4  what -- he told Dr. -- or he told Detective Gibson
5  basically what his thoughts were; is that right?
6    **A.   Correct.**
7    Q.   And did he give you any specifics about
8  what his conclusions were about this case?
9    **A.   He did not.  Not -- no, he did not go**
10 **into great deal on any -- on anything at that time.**
11   Q.   Did you talk with Dr. Denton more about
12 Cory Lovelace either in person, on the phone, or
13 via e-mail or other written correspondence at any
14 point after you had that conversation with him
15 where he told you he had already told Detective
16 Gibson what he thought?
17   **A.   As far as the Lovelace case?**
18   Q.   Yes.
19   **A.   I don't recall if there was a specific**
20 **conversation, no.**
21   Q.   Did Dr. Denton ever tell you at any point
22 that he did not want to be involved in the Cory
23 Lovelace case?
24   **A.   I don't recall that.**

Transcript of James Keller
Conducted on August 22, 2018

153

1    Q.   Were you involved in arranging for
2 Dr. Denton to prepare a written report in this
3 case?
4    **A.   I believe I asked him to do a report.**
5    Q.   All right.  And why did you ask him to do
6 a report?
7    **A.   Detective Gibson said we just need**
8 **everything to be in report.**
9    Q.   And is there a reason that Detective
10 Gibson -- that you were the person then that talked
11 to Dr. Denton about that as opposed to Detective
12 Gibson or someone else?
13   **A.   Generally, when -- the pathologist will**
14 **not -- a lot of times will not answer questions**
15 **unless he speaks with the Coroner first to give**
16 **permission.**
17   Q.   And at some point Dr. Denton did do a
18 written report; is that right?
19   **A.   I believe so, yes.**
20   Q.   Did you talk with him about the Cory
21 Lovelace case at any point after he prepared his
22 written report?
23       MR. HANSEN:  About that?  Obviously, he
24 talked to him in the course of his job, but

154

1 specific to the Lovelace case?
2       MS. THOMPSON:  That's a fair point.
3 BY MS. THOMPSON:
4    Q.   So I'm asking you if you talked with him
5 at any point about the Cory Lovelace case after he
6 did his written report?
7    **A.   No.**
8    Q.   All right.  I'm going to show you some
9 documents.
10       MS. THOMPSON:  This will be Exhibit 1.
11       (Keller Exhibit 1 marked.)
12 BY MS. THOMPSON:
13   Q.   The witness has been shown what's been
14 marked as Keller Exhibit 1, and just for the
15 record, this is a two-page document that is Bates
16 stamped Plaintiff 10348 and Plaintiff 10349.
17       Have you ever seen the first page of this
18 document, Mr. Keller?
19   **A.   Yes.**
20   Q.   All right.  And when have you seen it?
21   **A.   When it was delivered to the office.**
22   Q.   In response to this document -- in
23 response to receiving -- well, let me ask you this
24 question.  Let me just have you turn to page 2,

155

1 which is Plaintiff 10349.  Did you author this
2 letter?
3    **A.   I did.**
4    Q.   And why did you author this letter?
5    **A.   This was given to the -- I believe this**
6 **was given to the State's Attorney and I was just**
7 **authorized to send this on.**
8    Q.   And when you say you were authorized to
9 send it on, who gave you that authorization?
10   **A.   The State's Attorney.**
11   Q.   Okay.  So in this letter you indicate to
12 the court that your records -- the office -- the
13 Coroner's Office records pertaining to the Curtis
14 Lovelace case have been given to the Quincy Police
15 Department.  Do you see that?
16   **A.   I do.**
17   Q.   How did the Coroner's Office records
18 pertaining to the Curtis Lovelace case make their
19 way to the Quincy Police Department?
20   **A.   They were -- the autopsy report and the**
21 **inquest report were given by myself.**
22   Q.   Did you ever give any other records
23 related to either Cory or Curtis Lovelace to the
24 Quincy Police Department besides the autopsy report

156

1 and the inquest report?
2    **A.   I don't -- no.**
3    Q.   Now, you did have e-mail communications
4 with Dr. Denton about the Cory Lovelace case,
5 correct?
6    **A.   There was.**
7    Q.   Did you ever provide those e-mails to the
8 Quincy Police Department?
9    **A.   I don't -- no.**
10   Q.   Did you ever provide those e-mails to the
11 state appellate prosecutor?
12   **A.   I don't believe so.**
13   Q.   And have you ever given any e-mails
14 related to either Curtis or Cory Lovelace to the
15 state appellate prosecutor?
16   **A.   I did not, no.**
17   Q.   Are you aware of anyone in your office
18 ever did?
19   **A.   No.**
20   Q.   Did you ever give any e-mails that you
21 had related to either Curtis or Cory Lovelace to
22 the Quincy Police Department?
23   **A.   No.**
24       MS. THOMPSON:  Let's mark this as Keller

157

1  2.
2      (Keller Exhibit 2 marked.)
3  BY MS. THOMPSON:
4      Q.  I've shown the witness what's been mashed
5  as Keller Exhibit 2, which is a one-page document
6  that is Bates stamped Plaintiff 6427.  Mr. Keller,
7  there is two e-mails on this -- well, maybe three
8  e-mails on this page, and I'm directing you to the
9  top e-mail.
10     A.  Uh-huh.
11     Q.  So the one that's dated May 9th of 2014
12  at 1:47 P.M.  Do you see where I'm looking?
13     A.  Yes.
14     Q.  Is this an e-mail that you authored?
15     A.  Yes.
16     Q.  And you referenced earlier contacting
17  Dr. Denton about writing an opinion.  Is this
18  e-mail how you contacted Dr. Denton about writing
19  an opinion?
20     A.  I believe that to be.
21     Q.  Are you aware of any other mechanisms
22  that you used to communicate with Dr. Denton to ask
23  him to make a written opinion related to Cory
24  Lovelace?

158

1      A.  I can't recall.
2      Q.  Okay.  And the second sentence -- or I
3  guess the first sentence after the word "doctor" in
4  this e-mail says, "The defense is trying to use
5  that we doctor shop."
6          Why was it your understanding that the
7  defense was trying to use that someone doctor
8  shopped?
9      A.  That is just what I had heard.
10     Q.  Who told you that?
11     A.  During -- Gibson, Detective Gibson.
12     Q.  When did Detective Gibson tell you that?
13     A.  I don't know when.
14     Q.  Did you ever get an e-mail response to
15  this e-mail from Dr. Denton?
16     A.  I can't recall.
17     Q.  Let me show you --
18         MS. THOMPSON:  This is going to be Keller
19  3.
20     (Keller Exhibit 3 marked.)
21  BY MS. THOMPSON:
22     Q.  The witness has been shown what's been
23  marked as Keller Exhibit 3, and for the record
24  that's a four-page document and it's Bates stamped

159

1  AC 289 through AC 292.  And I'm directing your
2  attention, I think, to the top two e-mails in this
3  chain.
4          So the second e-mail from the top is
5  dated May 9th of 2015 at 4:02 p.m.  Do you see
6  where I'm looking?
7      A.  I do.
8      Q.  All right.  Did you receive -- I mean,
9  this record, Keller Exhibit 3, would indicate that
10  you did receive an e-mail response from Dr. Denton
11  in response to your e-mail of May 9th, 2015, at
12  2:47; do you agree?
13     A.  Yes.
14     Q.  Okay.  Do you see where Dr. Denton
15  references receiving Ed's letter in that e-mail?
16     A.  Yes.
17     Q.  Do you know what that's in reference to?
18     A.  I don't recall, no.
19         MS. THOMPSON:  Let's mark this as 4.
20     (Keller Exhibit 4 marked.)
21  BY MS. THOMPSON:
22     Q.  The witness has been shown what's been
23  marked as Keller Exhibit 4.  This is a one-page
24  document that's Bates stamped AC 301.  I have a

160

1  couple questions about this, Mr. Keller, so if you
2  could just review these e-mails and let me know
3  when you have finished doing that.
4      A.  The one I was given?
5      Q.  I'm sorry, just referring to Exhibit 4.
6  You don't need the other exhibits right now.
7      A.  Yes.
8      Q.  In your -- in the third e-mail down -- so
9  this is the e-mail that's dated June 14th, 2016, at
10  8:20 p.m. -- do you see where I'm looking?
11     A.  Yes.
12     Q.  This is an e-mail that you wrote, it
13  appears, to Ed Parkinson; do you agree?
14     A.  Yes.
15     Q.  All right.  And in this e-mail you
16  indicated that you received a subpoena, and then
17  the e-mail says, quote, all documents have been
18  turned over to your office.
19         Then in the e-mail above that, the June
20  17th, 2016, at 12:06 p.m. e-mail from Ed Parkinson,
21  he writes, in part, that you could prepare an
22  affidavit indicating that you had turned over
23  documents you had to the QPD.  And I'm paraphrasing
24  it.  That's not a quote from the e-mail.

Transcript of James Keller
Conducted on August 22, 2018

161

1    To go back to your original e-mail from
2  June 4th of 2016, did you turn over documents
3  directly to Ed Parkinson ever related to Curtis
4  Lovelace's case?
5    **A.  I don't recall if I sent him or not.**
6    Q.  Well, in the e-mail that he responds
7  back, he says you should indicate that you turned
8  over documents to QPD.  Do you have any reason to
9  think that he is wrong about that?
10   **A.  I don't.**
11   Q.  And ultimately that is the letter that
12  you wrote to the court, correct?
13   **A.  Yes.**
14   Q.  Okay.  Is there any reason you would have
15  told the court that you turned over all your
16  documents to the Quincy Police Department if, in
17  fact, you had given some of those documents to --
18  some or all of those documents to the state
19  appellate prosecutor?
20   **A.  I'm not sure whom had what at various**
21  **points.  I thought that all documentations were**
22  **out.**
23   Q.  When you say you thought all
24  documentations were out --

162

1    **A.  All documentations.  At this point I**
2  **don't know who -- I don't remember if I sent**
3  **anything to Parkinson or if he got what he got from**
4  **QPD.**
5    Q.  And when you are saying "at this point,"
6  are you referencing at the time at which you
7  authored the e-mail in Keller Exhibit 4?
8    **A.  Yes.  Yes, uh-huh.**
9    Q.  Well, do you have any memory, as you sit
10  here today, of specifically providing documents to
11  Ed Parkinson directly related to this case?
12   **A.  I can't recall.**
13   Q.  Okay.
14   MS. THOMPSON:  Let's mark this as 5.
15   (Keller Exhibit 5 marked.)
16  BY MS. THOMPSON:
17   Q.  The witness has been shown what's been
18  marked as Exhibit 5.  And this is two -- well, this
19  is two documents.  The first page is Bates stamped
20  AC 261 and the second is Bates stamped AC 273.
21   Did you ever receive a copy of AC 261,
22  Mr. Keller?  And I'm asking you just about the
23  first page.
24   **A.  Yes.**

163

1    Q.  All right.  And do you know why Ed
2  Parkinson -- I mean -- well, let me start that
3  question again.
4    Would you agree that this letter gives
5  you advice about how to respond to requests for
6  records related to Curtis Lovelace?
7    **A.  Yes.**
8    Q.  And do you know why Ed Parkinson was
9  giving you advice about responding to those
10  requests?
11   **A.  Due to an ongoing investigation.**
12   Q.  Okay.  In the second paragraph of this
13  letter, do you see where it says, and I'm quoting
14  in part a sentence from the second paragraph, "It
15  is my opinion that your records will be a part of
16  the court ordered pretrial discovery to the
17  defendant."  Do you see that?
18   **A.  Yes.**
19   Q.  Was it your understanding based on what
20  Ed Parkinson told you in this letter that, you
21  know, your records potentially would be disclosed
22  to the defendant in the People versus Curtis
23  Lovelace case?
24   **A.  Yes.**

164

1    Q.  The second page of this exhibit, AC 273,
2  let me have you turn to that.  Do you know why
3  Dr. Denton sent this e-mail that is on AC 273?
4    **A.  He was just letting me know that he was**
5  **contacted by two attorneys.**
6    Q.  And he -- do you agree that he was
7  letting you know in this e-mail that he intended to
8  talk to them, although he was inquiring with you
9  about that?
10   **A.  Yes.**
11   Q.  All right.  I'm going to refer you to the
12  last sentence of this e-mail.  I would -- and that
13  says, "I would basically say the same thing I said
14  to you and the investigator since I did not
15  generate a report.  It is likely suffocation.  They
16  need to talk to Dr. Bowan," B-O-W-A-N, "and find
17  their own FP experts."  Do you see that sentence?
18   **A.  Uh-huh.**
19   Q.  He is referencing something that he said
20  to you; do you agree?
21   **A.  I would agree.**
22   Q.  Okay.  And did he -- did Dr. Denton ever
23  tell you it is -- something to the effect that this
24  case was likely suffocation, but that you needed to

Transcript of James Keller

42 (165 to 168)

Conducted on August 22, 2018

165

1 talk to Dr. Bowman and, you know, find additional
2 experts?
3    A.   At one point he did.  I don't know when
4 or how that or that where it was at at that time.
5    Q.   But at some point -- I'm sorry, I didn't
6 mean to interrupt you.
7    A.   Go ahead.
8    Q.   At some point did Dr. Denton tell you
9 words to that effect?
10    A.   He did.
11    Q.   Okay.  And how did he convey that
12 information to you?
13    A.   He spoke it, but I can't recall how we
14 communicated.
15    Q.   Was that on the telephone or in person?
16    A.   I can't recall.
17    Q.   And on that call, who else was on -- I
18 guess -- and let me withdraw that because I
19 understand say you don't recall how you got
20 that information from him.
21        But was there anyone else present, either
22 in person if this was in person or on the phone if
23 this was on the phone?
24    A.   No one would have been present.

166

1    Q.   Just you and Dr. Denton?
2    A.   Yes.  Yeah.
3    Q.   Did you have -- whenever Dr. Denton told
4 you that, did you have additional questions for him
5 about, you know, what he was telling you?
6    A.   No.
7    Q.   Did you ask Dr. Denton for any advice
8 about finding additional experts at any point after
9 he told you that you needed to find your own
10 experts?
11    A.   No, because I wasn't involved in getting
12 anyone.  No.
13    Q.   And did you ask him anything about
14 talking to Dr. -- and I understand that this e-mail
15 says Dr. Bowan.  Do you --
16    A.   It's Bowman.
17    Q.   You assume that's a typo, I think,
18 correct?
19    A.   Uh-huh.
20    Q.   Did you ask him anything about talking to
21 Dr. Bowman about this case?
22    A.   It was stated -- I don't know if this was
23 when, but it was just stated that a communication
24 with her would need to be done to get her -- to

167

1 speak with her.
2    Q.   In this conversation with Dr. Denton when
3 he was telling you that you needed to talk to
4 Dr. Bowman and find other experts, did Dr. Denton
5 tell you that he could not provide further
6 assistance?
7    A.   I don't recall that.
8    Q.   Well, did he tell you in that
9 conversation that you needed to find other experts
10 because he could not serve as one?
11    A.   He just said -- stated that there would
12 be -- other experts would need to be obtained, and
13 that's kind of all I remember with --
14    Q.   Did he ever tell you that either you or
15 the Quincy Police Department needed to find either
16 your own or their own experts?
17    A.   He had just stated that, and I'm assuming
18 he spoke to Detective Gibson.
19    Q.   Going back to the e-mail, AC 273, the
20 last line where it says "their own FP experts," is
21 it your interpretation that that means forensic
22 pathologist or forensic pathology experts?
23    A.   Yes.
24    Q.   Is there anything else that you could

168

1 understand FP to mean in that context?
2    A.   No.
3        MS. THOMPSON:  Are we on 6?
4        (Keller Exhibit 6 marked.)
5 BY MS. THOMPSON:
6    Q.   The witness has been shown what's been
7 marked as Keller Exhibit 6, and that's a two-page
8 document with Bates stamp AC 236 and AC 237.  And
9 I'm going to reference you first, Mr. Keller, to
10 the bottom of these three e-mails which goes on to
11 the second page.  If you want to read that e-mail
12 and let me know when you have done so, I have some
13 questions.
14    A.   On which one, ma'am?
15    Q.   The third e-mail.  So the bottom one that
16 goes on to the second page.
17    A.   Okay.
18        Okay.
19    Q.   That third e-mail is an e-mail that you
20 sent to Dr. Bowman on February 7th of 2014; do you
21 agree?
22    A.   I would agree.
23    Q.   And did you contact Dr. Bowman about the
24 Lovelace case before you sent this e-mail?

Transcript of James Keller
Conducted on August 22, 2018

169

1    A.  No.

2    Q.  Sometimes, you know, a person can, you
3  know, both call or e-mail someone roughly at the
4  same time to make sure that they can reach out to
5  them.  Do you have any memory that you called
6  Dr. Bowman, you know, around the same time that you
7  sent this e-mail or do you think you only contacted
8  her via e-mail?

9    A.  I believe only by e-mail.

10    Q.  Okay.  I am -- I'm going to direct you to
11  the third sentence of that e-mail that starts "ever
12  since her death."  Do you see where I'm looking?

13    A.  I do.

14    Q.  And here you wrote, "Ever since her death
15  I have thought about this case and felt the
16  same" -- oh, and I think the word there is "was,"
17  but you may have meant "as it appears that you
18  did."

19        At the time that you wrote Dr. Bowman,
20  was it true that ever since Cory Lovelace's death
21  you had thought about the case?

22    A.  I had thought about the case as far as
23  just being opened, not had thought it needed to be
24  reviewed, but --

170

1    Q.  And can you -- I want to make sure that I
2  understand what you are saying.  When you say you
3  thought about the case, had you thought about the
4  case at all between when Coroner Hamilton told you
5  this was undetermined and when Detective Gibson
6  came to tell you that Quincy Police Department was
7  potentially going to reopen it?

8    A.  I'm going to have to say no.

9    Q.  Okay.  And when you said to her that you
10  felt the same -- and again, I think the there is a
11  typo there, and it should read "felt the same as it
12  appears you did."  Do you agree that's a typo?

13    A.  Yes.

14    Q.  Okay.  So when you tried to indicate to
15  her that you felt the same as it appears she did,
16  what did you mean?

17    A.  I'm not sure.  I can't recall.

18    Q.  All right.  Then the next sentence says,
19  "There was a lot that was unexplained and I am
20  grateful that you left it as undetermined."

21        At the time you wrote this e-mail, was it
22  true that you felt grateful that Dr. Bowman left
23  this case as undetermined?

24    A.  Just -- I think it was just stating that

171

1  she left it undetermined and I wasn't trying to
2  make her feel she should have made a determination.

3    Q.  The next sentence, "About two months ago
4  I just felt very strongly about opening this back
5  up and did so."

6        Is it true that two months before sending
7  this e-mail you felt very strongly about opening
8  this case back up and did so?

9    A.  I'm going to say no.

10    Q.  Do you know why you would have written
11  that to Dr. Bowman if that was not accurate?

12    A.  I don't.

13    Q.  All right.  And the next sentence, "About
14  a week after doing so, the detective that spoke
15  with you called me and stated that he had a case
16  that has been eating at him.  It just happened to
17  be Ms. Lovelace."  Is that sentence true?

18    A.  I'm not sure.  Detective Gibson did call
19  and state about that he wanted to open the case.

20    Q.  Well, had you opened up your own
21  investigation into Cory Lovelace's death about a
22  week before --

23    A.  I did not.

24    Q.  (Continuing) -- Detective Gibson -- and I

172

1  just need to finish the sentence, I'm sorry.

2    A.  Oh, sorry.

3    Q.  Did you open your own investigation into
4  Cory Lovelace's death about a week before Detective
5  Gibson called you about Cory Lovelace?

6    A.  I did not.

7    Q.  All right.  And do you know why you would
8  have indicated that to Dr. Bowman if that was not
9  true?

10    A.  I don't.

11    Q.  Then in the second -- on the second page,
12  there is a sentence, "I would like to speak with
13  you this evening," et cetera.  That sentence goes
14  on and then another sentence that reads, "This case
15  is really important to me."

16        Was it true at the time that you wrote
17  this e-mail to Dr. Bowman that the Cory Lovelace
18  case was really important to you?

19    A.  This was important to be looked at,
20  but...

21    Q.  Let me then reference you to the top
22  e-mail of this document, so that would be the first
23  e-mail on page 1.  That e-mail indicates that that
24  day, which was February 10th of 2014, that you

Transcript of James Keller
Conducted on August 22, 2018

173

1 called and left a message for Dr. Bowman.  Do you
2 see that?
3     **A.  I do.**
4     Q.  Do you know what you called her about
5 that day?
6     **A.  I believe it was to make -- to see about**
7 **making an appointment.**
8     Q.  Well, the next sentence -- the third
9 sentence of that -- well, so the first sentence
10 says, "Thank you for e-mailing me."  The second
11 sentence says, "I called this afternoon and left a
12 message.  You may not have received it."  And the
13 third sentence says, I will just speak with you on
14 Wednesday."  Do you see that?
15     **A.  Yes.**
16     Q.  I mean, wouldn't that indicate to you
17 that you already had a meeting scheduled with
18 Dr. Bowman for Wednesday?
19     **A.  I believe that there may have been a**
20 **meeting scheduled with -- by Detective Gibson.  I**
21 **think he may have spoke with her about the meeting**
22 **time.**
23     Q.  Were you calling to set up separate
24 arrangements with her somehow when you called her?

174

1     **A.  I think I called to verify, to make sure.**
2     Q.  Okay.  And then the next sentence of that
3 e-mail reads, "As I stated, this case has bothered
4 me ever since it occurred."
5         Do you know why you indicated that to
6 Dr. Bowman in this e-mail?
7     **A.  I don't.**
8     Q.  Have you ever told anyone else other than
9 Dr. Bowman that you had opened up an independent
10 investigation into Cory Lovelace's death before
11 Detective Gibson contacted you?
12     **A.  No.**
13     Q.  Did you ever tell Dr. Denton that you
14 were independently investigating Cory Lovelace's
15 death apart from the police department
16 investigation?
17     **A.  That I was?**
18     Q.  Yes.
19     **A.  I don't recall that, no.**
20     (Keller Exhibit 7 marked.)
21     Q.  The witness has been shown what's been
22 marked as Keller Exhibit 7, and just for the record
23 that is a document that is Bates stamped AC 225
24 through AC 230, and that's a six-page document.  I

175

1 have some questions for you about these e-mails,
2 Mr. Keller, so if you want to look through those
3 and let me know when you are done.
4     **A.  Okay.**
5     Q.  So I'm going to first refer you to
6 page -- it's page 4 or AC 228.  That page contains
7 an e-mail from you to Dr. Denton that's dated
8 January 7th, 2014, at 12:14 p.m.  Do you agree?
9     **A.  I do.**
10     Q.  Okay.  And this indicates that you were
11 forwarding Dr. Denton photos of the residence where
12 she was found.  Do you see that?
13     **A.  Yes.**
14     Q.  Do you know why you were sending
15 Dr. Denton those photos?
16     **A.  Upon his request.**
17     Q.  Okay.  And you listed in this e-mail some
18 things of concern.  Do you see that?
19     **A.  I do.**
20     Q.  All right.  So the concerns that you
21 listed were the injuries to the mouth, the position
22 of the hands, and the timeframe.  Do you see that?
23     **A.  I do.**
24     Q.  Is there a reason why you did not mention

176

1 lividity specifically in this e-mail to Dr. Denton
2 as something that concerned you?
3     **A.  No.**
4     Q.  And is there a reason that you did not
5 mention dehydration specifically in this e-mail as
6 something that concerned you?
7     **A.  I stated about the eyes.**
8     Q.  All right.  And the eyes was a reference
9 to the dehydration issues you talked about before?
10     **A.  Correct.**
11     Q.  Okay.  The last sentence of this e-mail
12 says, "To me upon looking at the photos that show
13 the eyes and the position of the hands concern me
14 and has for some time."  Do you see that?
15     **A.  I do.**
16     Q.  When you indicate that this has concerned
17 you for some time, do you know what period of time
18 you are referencing?
19     **A.  I -- no, I don't recall.**
20     Q.  Okay.  I want to refer you up then to
21 page 2.  On page 2, Dr. Denton forwarded you an
22 e-mail that he sent to Detective Gibson.  Do you
23 see that?
24     **A.  I do.**

---

177

1   Q.   All right.  And he forwarded it to you on
2   January 23rd of 2014 at 8:11, and it looks like
3   it's an e-mail that was sent, you know, a minute
4   before he forwarded it to you.  Do you agree?
5      A.   I agree.
6      Q.   Okay.  Did you read this e-mail from
7   Dr. Denton to yourself and then the forwarded
8   e-mail that he was sending you that he sent to
9   Detective Gibson at some point after they were
10  sent?
11     A.   I read it at some point, yes.
12     Q.   I mean, do you know when after it was
13  sent that you reviewed it?
14     A.   I do not.
15     Q.   Do you see on page 1 the e-mail that is
16  above those e-mails in this chain, January --
17  that's dated January 24th of 2014 at 8:25 a.m.?  Do
18  you see where I'm looking?
19     A.   I do.
20     Q.   It's the e-mail on the bottom of page 1?
21     A.   I do.
22     Q.   You indicate in that e-mail, "I received
23  your e-mail in reference to Cory Lovelace."  Do you
24  know what e-mail you are referencing in that

178

1   e-mail?
2      A.   At this time I don't, no.  I'm
3   assuming it -- I can't assume.
4          MR. HANSEN:  Go ahead.
5          THE WITNESS:  I don't.
6   BY MS. THOMPSON:
7      Q.   But you agree that the e-mail where you
8   said "I received your e-mail" is an e-mail that's
9   in the same e-mail chain as the one where
10  Dr. Denton is forwarding you the e-mail that he
11  sent to Detective Gibson, correct?
12     A.   Yes.
13     Q.   Okay.  And going back to page 2, in the
14  e-mail to -- in the e-mail that Dr. Denton sends to
15  Adam Gibson, so the January 23rd at 8:10 p.m.
16  e-mail, Dr. Denton writes, in part, and I'm
17  skipping to the second sentence, "I told Coroner
18  Keller I have seen accelerating drying just like
19  this within the history and timeframe stated by the
20  children in cases of infection that entered the
21  bloodstream, and she was sick for four days
22  reportedly and in ethylene glycol poisoning."  Do
23  you see that?
24     A.   I do.

179

1      Q.   All right.  And do you know when it is
2   that -- let me start that question again.
3          Did Dr. Denton ever tell you that he had
4   seen accelerated drying within a similar history
5   and timeframe stated by the Lovelace children in
6   other cases?
7      A.   I can't recall him physically telling me.
8   I remember that being stated.  I don't know whether
9   it was from a verbalization or from an e-mail.
10     Q.   Okay.  But do you believe that at the
11  time that Dr. Denton wrote this e-mail to Detective
12  Gibson that it was true that you had discussed
13  accelerated drying with Coroner Keller (sic) at
14  some point via e-mail or --
15     A.   I think he probably discussed that with
16  I.  Whether it be through this e-mail or -- I can't
17  recall how it was -- if it was ever communicated
18  prior to.  I don't believe it was.  I this was how
19  it was communicated.
20     Q.   Do you have any -- do you have any
21  explanation for why Coroner Keller -- or excuse me,
22  for why Dr. Denton would have told Detective Gibson
23  that he had told you about accelerated drying
24  before this e-mail was sent if he had not done

180

1   that?
2      A.   I don't recall how it was communicated at
3   this time.
4      Q.   Okay.  Then going back to your e-mail on
5   the bottom of page 1, you said, "It appears that
6   due to the lack of tissue this is all that can be
7   done at this time."  Do you know what you meant
8   when you wrote this?
9      A.   There wasn't -- there wasn't tissue
10  samples of the liver.  There wasn't many tissue
11  samples available.
12     Q.   Well, when you said "this is all that can
13  be done at this time," was it your belief on
14  January 24th, 2014, when you wrote this e-mail that
15  Dr. Denton was not going to be able to assist you
16  further in investigating this case?
17     A.   It was appearing that lack of tissue
18  slides -- it was just a statement by myself that I
19  didn't know if there could be anything else done
20  and left it basically in his interpretation.
21     Q.   Okay.  And then in the e-mail above from
22  Dr. Denton from January 24th of 2014 at 8:49 a.m.,
23  Dr. Denton wrote, in part, and I'm looking at the
24  second to last sentence, "Suffocation cannot be

Transcript of James Keller
Conducted on August 22, 2018

181

1 reasonably established in that context."  Do you
2 see that?
3    **A.  I do.**
4    Q.  Okay.  Did you ever discuss with -- well,
5 let me ask you this.
6        That e-mail -- do you know if that e-mail
7 was sent to anyone else besides you, the e-mail
8 where Dr. Denton said "suffocation cannot be
9 reasonably established in that context"?
10    **A.  If it was sent to anyone else?**
11   Q.  Right.
12    **A.  I do not know that.**
13   Q.  Okay.  Did you ever discuss the e-mails
14 that are included in Keller Exhibit 7 with anyone
15 other than Dr. Denton?
16    **A.  I can't recall.  Because Detective Gibson**
17 **was in charge of the investigation, so I figured**
18 **everything that -- what he -- what he was going to**
19 **do would be -- I was assuming he had all the**
20 **information I had.**
21   Q.  Before -- well, let me ask you this.
22       Did you ever give copies of the e-mails
23 that are included in Keller Exhibit 7 to anyone
24 before their production in this civil case?

182

1    **A.  No.**
2    Q.  Did you ever provide copies of these
3 e-mails to Detective Gibson or anyone at the Quincy
4 Police Department?
5    **A.  I did not.**
6    Q.  Okay.  Are you aware if anyone else in
7 the Coroner's Office did?
8    **A.  No.**
9    Q.  Did you ever provide copies of these
10 e-mails to anyone in the state appellate
11 prosecutor's office?
12    **A.  I believe the State's Attorney may**
13 **have --**
14   Q.  And when you say --
15    **A.  (Continuing) -- provided that.**
16   Q.  I'm sorry, I interrupted you, so please
17 finish.
18    **A.  The State's Attorney may have sent the**
19 **copies.  When I say "may," I'm not sure.  I believe**
20 **that's how it was done.**
21   Q.  And when you say that "that's how it was
22 done," can you explain what your understanding was
23 about how these --
24    **A.  I gave -- pardon me.  Go ahead.**

183

1    Q.  Can you explain your understanding about
2 how these e-mails might have been produced?
3    **A.  I gave a copy of a request to the State's**
4 **Attorney, and they got the documentation.**
5    Q.  Okay.  And when you say "the State's
6 Attorney," you are talking about the Adams County
7 State's Attorney's Office?
8    **A.  Adams County State's Attorney, I**
9 **apologize, yes.**
10   Q.  Okay.  Who did you give that copy to, the
11 copy of the request to?
12    **A.  State's Attorney Josh Jones, Assistant.**
13   Q.  And the requests that we are talking
14 about, is that a request that was made during one
15 of the two trials that Mr. Lovelace had?
16    **A.  I believe so.**
17   Q.  Do you know which of the two trials?
18    **A.  I do not.**
19   Q.  And did you -- did you physically -- did
20 you give an actual copy of your e-mails to Josh
21 Jones or was it your understanding he could obtain
22 them since they were on the county system?
23    **A.  He obtained them on the county system.**
24   Q.  How do you know that he obtained them?

184

1    **A.  I did not obtain them, so I'm not quite**
2 **sure how that was done.**
3    Q.  Okay.  And I don't want to ask you about
4 conversations with your counsel in this case, so
5 I'm not asking you to reveal information that would
6 be privileged, but when you say they don't know how
7 -- you don't know how they were obtained, are you
8 saying you don't know how they were obtained and
9 produced in this civil case or you don't know how
10 they could have potentially been obtained earlier?
11    **A.  They -- I gave it to him.  He said he**
12 **would get the necessary documents.**
13   Q.  You gave the request to him?
14    **A.  Yes, ma'am.**
15   Q.  Okay.  Did he ask you at that point any
16 questions about what documents you might have that
17 would be responsive?
18    **A.  No.**
19       (Keller Exhibit 8 marked.)
20   Q.  Mr. Keller, you have been shown what's
21 been marked as Keller Exhibit 8, and for the record
22 that is a two-page document that is Bates stamped
23 AC 159 and AC 160.  I'm going to direct you first
24 to page 1 of this exhibit.  This is an e-mail that

Transcript of James Keller
Conducted on August 22, 2018

185

1  you sent to Paul Davis on December 29th of 2013.
2  Do you agree?
3      A.   I agree.
4      Q.   Who is Paul Davis?
5      A.   Paul Davis was the ambulance director at
6  that time of the Adams County Ambulance Service.
7      Q.   Okay.  And in this e-mail, the third
8  sentence says, "I am opening a case on Mrs. Cory
9  Lovelace who died on 02/04/2013 (sic) at her
10 residence at 1869 Kentucky, Quincy."  On December
11 29th of 2013, had you already discussed this case
12 with Detective Gibson?
13     A.   No, I don't -- I don't recall.
14     Q.   Well, on December 29th of 2013 when you
15 told Paul Davis that you were opening a case on
16 Mrs. Cory Lovelace, is that referring to the Quincy
17 police investigation or to some other
18 investigation?
19     A.   I don't know -- I hadn't really opened --
20 I hadn't opened an investigation, so I don't know.
21     Q.   Well, when you indicated to him that you
22 were opening a case, what did you mean by opening a
23 case?
24     A.   I don't know.

186

1      Q.   Do you know why you would have needed the
2  ambulance report related to Cory Lovelace on
3  December 29th of 2013?
4      A.   I do not.
5      Q.   At any point did -- did Adam Gibson ask
6  you to get a copy of the ambulance report related
7  to this case?
8      A.   No.
9      Q.   Did anyone else ask you to get a copy of
10 the ambulance report?
11     A.   No.
12     Q.   If you look at page 2 of Exhibit 8, which
13 is AC 160, there is an e-mail where Paul Davis asks
14 if he could call you tomorrow.  Do you see that?
15     A.   I do.
16     Q.   Did you ever talk to Paul Davis about
17 this matter?
18     A.   I don't recall if we spoke about -- after
19 that or not on that.
20     Q.   Did you get a copy of the ambulance
21 report from him or anyone else at Adams County
22 Ambulance and EMS?
23     A.   I believe there was a copy of it.
24     Q.   That you received?

187

1      A.   I believe, yes.
2      Q.   When did you receive that?
3      A.   I don't know that.
4          (Keller Exhibit 9 marked.)
5      Q.   You've been shown what's been marked as
6  Keller Exhibit 9, and this is a document that's
7  Bates stamped SAAP 344.  And I'm going refer you
8  first to the e-mail that's on the bottom of these
9  two e-mails.  That is an e-mail that you sent
10 Ed Parkinson on July 7th of 2015.  Do you agree?
11     A.   Yes.
12     Q.   All right.  And in this e-mail you asked
13 Ed Parkinson about whether you had to speak to
14 defense counsel.  Do you see that?
15     A.   I do.
16     Q.   All right.  And the last sentence reads,
17 in part, "I am not really interested in that."  Was
18 it true at the time you sent this e-mail to
19 Mr. Parkinson that you were not interested in
20 talking to defense counsel?
21     A.   Yes.
22     Q.   Why were you not interested in talking to
23 defense counsel?
24     A.   I figured I would -- I didn't wish to

188

1  speak with them until trial.
2      Q.   Is there a reason why you didn't wish to
3  speak with them until trial?
4      A.   Just did not wish to speak with them
5  until trial.
6      Q.   Well, you had been speaking and preparing
7  with the prosecutor, correct?
8      A.   I had.
9      Q.   Did you view yourself as a prosecution
10 witness?
11     A.   Yes.
12     Q.   Then the e-mail above is an e-mail from
13 Ed Parkinson to you on July 8th of 2015.  Do you
14 see that --
15     A.   I do.
16     Q.   (Continuing) -- e-mail, Mr. Keller?
17          Okay.  And Mr. Parkinson told you that
18 you should make yourself available.  Do you see
19 that?
20     A.   Yes.
21     Q.   Did you ultimately talk to Mr. Elmore
22 about this case, or did you ultimately talk to any
23 defense counsel about this case?
24     A.   I don't recall, no.

Transcript of James Keller
Conducted on August 22, 2018

189

1    Q.   Did you ever tell defense counsel that
2  you would be willing to talk to them?
3    A.   I did not.
4    Q.   The first e-mail to Ed indicates that you
5  were contacted by James Elmore and that he wanted
6  to speak to you.  Did Mr. Elmore or anyone from the
7  defense contact you again after that initial
8  contact from Mr. Elmore?  And when I say "contact,"
9  I mean contact them to ask them to interview you?
10    A.   I believe I was contacted again to ask if
11  I would wish to meet.
12    Q.   Okay.  And did you -- what response, if
13  any, did you give the defense at that time?
14    A.   I did not wish to.
15    Q.   And is there any particular reason why
16  you did not follow the advice from Ed Parkinson
17  that you should make yourself available?
18    A.   I just didn't wish to do so.
19    Q.   The first e-mail from Ed, that third
20  sentence says, "Main reason you can set them
21  straight on what Dr. Denton told you about the
22  circumstances of Cory's death."
23         What is it that that Dr. Denton told you
24  about the circumstances of Cory's death?

190

1    A.   I don't recall all of the conversation.
2    Q.   At this point, July 8th of 2015, had you
3  met with Ed Parkinson to talk to him about your
4  testimony yet?
5    A.   I don't recall.  Because I do not recall
6  the date that I met with him.
7    Q.   So it's possible -- is it equally
8  possible in your mind, as you sit here today, that
9  you may have talked to him previous about your
10  testimony or you may not have?
11    A.   I didn't physically meet with him.  We
12  had a scheduled meeting, and I hadn't met with him
13  prior to.
14    Q.   When you say you "hadn't met with him
15  prior to," you mean you just met with him the one
16  time to prepare for your testimony?
17    A.   Yes.
18    Q.   Okay.  And I'm asking you whether that
19  meeting was before or after the e-mail that we just
20  looked at, the July 8th, 2015?
21    A.   I don't know.
22         (Keller Exhibit 10 marked.)
23    Q.   You've been shown what's been marked as
24  Keller Exhibit 10.  This is a three-page document

191

1  that has a couple of Bates stamps on it, but one
2  Bates stamp is Plaintiff 5969 through Plaintiff
3  5971.  The first page has an e-mail that you sent
4  to Adam Gibson on May 2nd of 2015.  Do you see
5  that?
6    A.   Yes.
7    Q.   And it looks like below that in the
8  e-mail chain is an e-mail from May 2nd, 2015, at
9  1:43 p.m. where Adam Gibson is forwarding a longer
10  e-mail chain to you.  Do you see that?
11    A.   Yes.
12    Q.   Do you know why Adam Gibson was
13  forwarding you that e-mail chain on May 2nd, 2015,
14  at 1:43 p.m.?
15    A.   No, I don't.
16    Q.   Did you read this e-mail when you got it?
17    Q.   I don't know if I did or not.
18    Q.   Your response in that first e-mail, the
19  e-mail that you sent on May 2nd, 2015, at 3:55
20  p.m., reads, in part, "I will send a request for
21  Dr. Denton if you want me to."  Do you see that.
22    A.   Yes.
23    Q.   And do you know why you indicated to Adam
24  Gibson on May 2nd of 2015 that you would send a

192

1  request for Dr. Denton if that's something he
2  wanted you to do?
3    A.   Generally, the -- if there is a request
4  made for something of the physician to do, that
5  physician will in turn contact the Coroner to ask
6  if they can do so...
7    Q.   Well, was that in response to the e-mail
8  that was forwarded to you from Ed Parkinson where
9  Ed Parkinson told Adam Gibson that you needed to
10  get a formal written opinion from Dr. Denton or
11  else he could not be used at trial?
12    A.   I don't know that.  I don't know if I got
13  it from there or it was a request to get one -- to
14  get that from Dr. Denton.
15    Q.   Do you have any memory, as you sit here
16  today, of someone asking you to get a formal
17  written opinion from Dr. Denton, other than what's
18  indicated in Keller Exhibit 10?
19    A.   I believe Detective Gibson had asked for
20  -- stated that we would need an opinion from
21  Dr. Denton.
22    Q.   Why is that -- where does that
23  understanding come from?
24    A.   I think it was during his investigation.

Transcript of James Keller
Conducted on August 22, 2018

193

1 I don't know whether -- who it came from.
2     Q.   All right.  In your e-mail to Detective
3 Gibson on page 1 of Keller Exhibit 10, your last
4 sentence says, "He had stated he would if needed."
5         Is that something that Dr. Denton stated
6 to you, that he would do a written report if
7 needed?
8     A.   Yes.
9     Q.   When did he tell you that?
10    A.   I don't know timeframe wise, ma'am.
11    Q.   Do you know if he told you that on a
12 phone call or in an e-mail or how he communicated
13 that to you?
14    A.   I don't.
15        (Keller Exhibit 11 marked.)
16    Q.   You've been shown what's been marked as
17 Keller Exhibit 11, and this is a one-page document
18 that's Bates stamped AC 293.  Do you know why
19 Dr. Denton -- well, let me ask you this.
20        Exhibit 11 is an e-mail from Dr. Denton
21 to you dated May 20th of 2015 at 9:27 a.m.  Do you
22 agree?
23    A.   I agree.
24    Q.   And do you know why Dr. Denton was

194

1 sending this e-mail to you?
2     A.   Probably just to inform me on what was
3 going on.
4     Q.   And do you know why he would have been
5 informing you on May 20th about what was going on?
6     A.   I don't.
7     Q.   The last sentence of that first paragraph
8 reads, "My impression was that he did not have the
9 new investigation information or had not reviewed
10 it yet."
11        Do you know what new investigation
12 information Detective -- well, let me ask you this.
13        That sentence refers to Dr. Denton's
14 meeting with a defense attorney, correct?
15    A.   I'm guessing.  I don't know.
16    Q.   Well, I'm not asking you to guess.
17    A.   I don't know.
18    Q.   But let me ask you this question.  Do you
19 know what new investigation information Dr. Denton
20 is referencing in that last sentence of the first
21 paragraph?
22    A.   I don't.
23    Q.   During your time as Coroner, did you
24 participate in something called fatality reviews?

195

1     A.   I did.
2     Q.   And can you explain to me what fatality
3 reviews are?
4     A.   It's a death review team that was to
5 investigate deaths of elderly cases.
6     Q.   How often were those fatality reviews
7 held during the time that you were a coroner?
8     A.   Once every three months.  They have only
9 been going for probably a little over a year.
10    Q.   What do you mean they had only been going
11 for a little over a year?
12    A.   It was formed -- the death fatality
13 review team was formed about -- I think about a
14 year, a little over a year, I believe.
15    Q.   A little -- about a year before you
16 became Coroner?
17    A.   No.  Make sure we are talking about the
18 same thing.  Is it the -- I was on a death fatality
19 review team for older -- for elderly people.
20    Q.   Right.  And I guess I'm asking you how --
21 during the time you were Coroner, how often were
22 those meetings held?
23    A.   Once every three months.
24    Q.   Okay.  Did Detective Gibson attend those

196

1 meetings while you were Coroner?
2     A.   Some of them he did, yes, uh-huh.
3     Q.   All right.  And did you attend them as
4 well?
5     A.   I did.
6         (Keller Exhibit 12 marked.)
7     Q.   Mr. Keller, you've been shown what's been
8 marked as Keller Exhibit 12.  This document has a
9 couple of different Bates numbers on it, but it is
10 Bates stamped Plaintiff 5860 through 5864 and it is
11 five pages long.  I'm going to start you on page
12 5862, which should be page 3.
13    A.   Okay.
14    Q.   I have some questions about the e-mail
15 that Detective Gibson wrote to Dr. Denton on page
16 3, the one that is dated February 18th of 2014.  So
17 if you want to read that e-mail and let me know
18 when you are done, I have a couple questions for
19 you.
20    A.   Okay.
21    Q.   At the bottom of that e-mail, at least at
22 the bottom of page 5862 in that e-mail, Detective
23 Gibson writes, in part, "Keller has told us
24 previously that you would be willing to write an

Transcript of James Keller
Conducted on August 22, 2018

197

1  official report of everything we have spoke about
2  in your observations of the autopsy."
3      Is it true that you told Detective Gibson
4  at some point before February 18th of 2014 that
5  Dr. Denton would do an official report?
6      **A.   Yes.**
7      Q.   And do you know when you told Detective
8  Gibson that?
9      **A.   I do not.**
10     Q.   The first part of that e-mail also says,
11  and I'm referencing again that February 8th of 2014
12  e-mail on page 3, that says Detective Gibson
13  indicates in that e-mail that he spoke with you and
14  Sergeant Summers that morning after having a
15  conversation with Dr. Bowman last night.
16     Do you remember having a conversation
17  with Detective Gibson after he had a conversation
18  with Dr. Bowman?
19     **A.   I believe -- he stated, I don't know if**
20  **it was in reference to this, that he had spoke with**
21  **Dr. Bowman.**
22     Q.   And what, if anything, did Detective
23  Gibson tell you about his conversation with
24  Dr. Bowman?

198

1      **A.   I don't recall.**
2      Q.   How long was that conversation?
3      **A.   Very short.**
4      Q.   Was anyone on the call besides you and
5  Detective Gibson?
6      **A.   No.**
7      Q.   And did you give Detective Gibson any
8  suggestions or direction about what to do in light
9  of his conversation with Dr. Bowman?
10     **A.   No.**
11     Q.   I mean, did you tell him to recontact
12  Dr. Denton to try to get an opinion from
13  Dr. Denton?
14     **A.   No, I don't recall that, no.**
15     Q.   Then I'm going to have you turn back to
16  page 2, and I'm referencing the e-mail from
17  Dr. Denton to you and other people.  This is the
18  e=mail that's dated March 5th of 2014 at 6:48 a.m.
19  Do you see where I'm looking?
20     **A.   I do.**
21     Q.   Did you read this e-mail after Dr. Denton
22  sent it to you?
23     **A.   I don't know.  There are some that I did**
24  **not read, so I don't know if I read this or not.**

199

1      Q.   Did you talk with Detective Gibson about
2  the opinions that Dr. Denton is expressing in this
3  e-mail?  And if you need to read it first to answer
4  that question, please do so.
5      **A.   Okay.  I can't recall if I've read it or**
6  **not.**
7      Q.   And my question is:  Did you talk with
8  Detective Gibson about this e-mail after it was
9  sent?
10     **A.   I can't recall that in reference to this**
11  **specific e-mail.**
12     Q.   Did you ever have a conversation with
13  Detective Gibson where you discussed Dr. Denton
14  expressing the opinion that Dr. Bowman's autopsy
15  and the way that she was expressing her opinions
16  after Detective Gibson talked to her was more than
17  reasonable doubt in any person's -- in any
18  reasonable person's mind?
19     **A.   I can't recall the conversation.**
20     Q.   Did you ever have any conversations with
21  Detective Gibson about Dr. Denton expressing that,
22  you know, this investigation couldn't go forward?
23     **A.   I did not have a conversation that stated**
24  **that -- that I felt it couldn't go forward, no.**

200

1      Q.   Well, did you have any conversations with
2  Detective Gibson where you and he discussed
3  Dr. Denton indicating that he thought the
4  investigation was stuck?
5      **A.   Adam -- Detective Gibson has -- did state**
6  **that Dr. Denton -- about not being sure if we were**
7  **going to be able to go forward.**
8      Q.   You did have a conversation with
9  Detective Gibson about Dr. Denton saying he wasn't
10  sure if it could go forward?
11     **A.   I believe he stated that, yes.**
12     Q.   Detective Gibson stated that to you?
13     **A.   Yes.**
14     Q.   When did you have that conversation?
15     **A.   I have no idea.  I don't know.**
16     Q.   And was anyone else present for that
17  conversation?
18     **A.   No.**
19     Q.   Where was it?  Where was the
20  conversation?
21     **A.   I don't recall.**
22     Q.   Going back to page 2, the e-mail above
23  the one we just looked at, there is an e-mail from
24  Detective Gibson to Dr. Denton, and he says, in

Transcript of James Keller
Conducted on August 22, 2018

---

**201**

1  part, "Coroner Keller has told me that you could
2  provide some names of other pathologists to review
3  the Lovelace autopsy and the lieutenant would like
4  for this to happen and have it reviewed."
5  Did you ever tell Detective Gibson that
6  Dr. Denton could give the names of some other
7  pathologists?
8  **A. I didn't get any information on any other**
9  **pathologists. I thought that all the pathologists**
10  **came from Dr. Denton and Detective Gibson's**
11  **conversations.**
12  Q. My question is: Did you tell Detective
13  Gibson that Dr. Denton was someone who could give
14  him other names of pathologists?
15  **A. I believe I stated that if he needed any,**
16  **he would have to speak with Dr. Denton as far as**
17  **other pathologist.**
18  Q. When did you tell Detective Gibson that?
19  **A. I don't know when.**
20  Q. Was it before or after his in-person
21  meeting with Dr. Denton?
22  **A. I don't recall.**
23  Q. And then going to the first page of this
24  e-mail, Detective Gibson forwarded this e-mail

---

**202**

1  chain that's in Keller Exhibit 12 to you on April
2  17th of 2014 at 12:23 p.m. Do you agree?
3  **A. Yes.**
4  Q. Do you know why he forwarded this to you?
5  **A. I do not.**
6  Q. In the e-mail that's -- in the e-mail
7  from Dr. Denton that is right below the forward,
8  I'm looking at the last paragraph so it's the
9  e-mail on page 1, the top e-mail on page 1, the
10  third paragraph, there is some names of reviewers
11  that are given.
12  Do you know if Detective Gibson or anyone
13  from the Quincy Police Department ever reached out
14  to Mary Case about the Cory Lovelace case?
15  **A. I do not.**
16  Q. Do you know if they ever reached out to
17  Mike Graham about Cory Lovelace?
18  **A. I do not.**
19  Q. And do you know if they ever reached out
20  to Lindsay Thomas about this case?
21  **A. I do not.**
22  MR. HANSEN: Excuse me, we have been
23  going about two hours. Can we take a break?
24  MS. THOMPSON: We can take a break.

---

**203**

1  THE VIDEOGRAPHER: We are now off the
2  record. The time is 2:47 p.m.
3  (Whereupon a short recess was taken.)
4  THE VIDEOGRAPHER: We are now back on the
5  record. The time is 3:01 p.m.
6  BY MS. THOMPSON:
7  Q. Had you ever been involved in any other
8  cases other than Linda Booth and the Cory Lovelace
9  case that involved Dr. Bowman?
10  **A. Explain "involved." I don't --**
11  Q. Let me ask you a better question. Had
12  you ever investigated any other cases as either
13  Coroner or Deputy Coroner where Dr. Bowman did the
14  autopsy?
15  **A. Coroner Hamilton had some cases when he**
16  **was Coroner, but not I.**
17  Q. Did you ever respond to the scene as
18  Deputy Coroner for any cases where Dr. Bowman
19  ultimately did the autopsy?
20  **A. I can't recall.**
21  Q. Other than the Linda Booth case and the
22  Cory Lovelace case, did you reinvestigate as
23  Coroner any cases that involved -- any cases where
24  Dr. Bowman had done the autopsy?

---

**204**

1  **A. Just those two, I believe.**
2  Q. And did you have any opinion of
3  Dr. Bowman professionally prior to the beginning of
4  the Cory Lovelace reinvestigation?
5  **A. That she was not extremely thorough or**
6  **got her -- took a lot of tissue samples of -- was**
7  **found out with various cases later.**
8  Q. So I guess my question is: Before the
9  Cory Lovelace reinvestigation began, did you have
10  any opinion about her professionally?
11  **A. Just that they had -- the association --**
12  **everyone had stopped using her as their**
13  **pathologist.**
14  Q. When did you learn that everyone had
15  stopped using her?
16  **A. It was way before I was Coroner.**
17  Q. Okay. And how did you learn that?
18  **A. Coroner Hamilton had stated that the**
19  **examinations were going to be conducted by Dr. --**
20  **we would go to Bloomington.**
21  Q. And did he tell you why that change was
22  being made?
23  **A. Just he wasn't comfortable with**
24  **Dr. Bowman.**

Transcript of James Keller
Conducted on August 22, 2018

205

1    Q.   Was it your understanding from him that
2  that was a decision he made to move away from her?
3    **A.   It was.**
4    Q.   And you said that the issue with the
5  tissue samples was learned later?
6    **A.   Tissue samples, autopsies, that some**
7  **other counties had cases in which they had --**
8  **that's the reason why -- and I'm not sure if she**
9  **left employment there or what all the reasons were.**
10   Q.   Well, when did you learn the information
11 that you knew about her professionally about there
12 being some issue with tissue samples?
13   **A.   I don't recall --**
14   Q.   Is that something --
15   **A.   (Continuing) -- when.**
16   Q.   I'm sorry.  Finish your answer.  I'm
17 sorry.
18   **A.   I don't recall when, ma'am.**
19   Q.   Okay.  And you said there was -- you
20 learned information about other -- there being
21 other counties who had problems or other counties
22 who had issues?
23   **A.   Yes.**
24   Q.   When did you learn that?

206

1    **A.   Coroner Hamilton had stated it.**
2    Q.   Did -- in the course of investigating the
3  Cory Lovelace case, did anyone give you
4  information -- or did anyone give opinions to you
5  that indicated that person had a negative opinion
6  of Dr. Bowman?
7    **A.   I don't understand.**
8    Q.   Well, let me ask you the question in a
9  better way.  During the course of the Cory Lovelace
10 investigation, did anyone that you communicated
11 with about that investigation tell you that they
12 had a negative opinion of Dr. Bowman?
13   **A.   Dr. Denton had stated that he had**
14 **reviewed other cases of Dr. Bowman for other**
15 **counties.**
16   Q.   Did he tell you anything about his review
17 of those other cases?
18   **A.   No.  He just stated he had other cases**
19 **that he had reviewed for her.**
20   Q.   Did he indicate that he had some negative
21 opinion of her?
22   **A.   Her autopsies were not thorough.**
23   Q.   When did he tell you -- when did
24 Dr. Denton tell you that Dr. Bowman's autopsies

207

1  were not thorough?
2    **A.   I can't give you times.  I don't know.**
3    Q.   Okay.  Other than Dr. Denton, did anyone
4  else give you a negative opinion of Dr. Bowman in
5  the context of the Cory Lovelace investigation?
6    **A.   No.**
7    Q.   Did you ever communicate with Dr. Jane
8  Turner about the Cory Lovelace investigation?
9    **A.   No.**
10       (Keller Exhibit 13 marked.)
11   Q.   Mr. Keller, you've been shown what's been
12 marked as Keller Exhibit 13.
13   **A.   Yes.**
14   Q.   It's one-page document that has a Bates
15 stamp of Plaintiff 5843.  This is an e-mail from
16 Adam Gibson to you on May 12th of 2014.  Do you
17 agree?
18   **A.   I agree.**
19   Q.   And the subject line is "Dr. Turner"?
20   **A.   Yes.**
21   Q.   Okay.  And then the e-mail says, "Jim,
22 she moved the call to Thursday, but waiting on what
23 time."  Do you see that?
24   **A.   I do.**

208

1    Q.   Do you know why Detective Gibson sent you
2  this e-mail?
3    **A.   I was to be go to his office and have**
4  **them -- he was going to have a telephone**
5  **conversation with her.**
6    Q.   All right.  Did you participate in that
7  phone conversation?
8    **A.   I can't recall that con -- being there,**
9  **no.**
10   Q.   Do you know of a reason why you would --
11 well, when you said that he was going to have a
12 call and you were going to go, why was that
13 understanding?
14   **A.   I believe for him to have had a call set**
15 **up and then, as it states, someone moved the time**
16 **of it, and I could not attend then.**
17   Q.   How did you inform Detective Gibson that
18 you could not make the move time?
19   **A.   I can't recall showing up.  I don't**
20 **believe I -- I don't know if I had another call at**
21 **that time or what.**
22   Q.   Well, did you tell him in advance you
23 weren't going to be able to make it?
24   **A.   No, I don't believe so.**

Transcript of James Keller
Conducted on August 22, 2018

53 (209 to 212)

209

1    Q.   Do you keep -- during the course of the
2 time that you were Coroner, did you keep a schedule
3 in any format?
4    A.   No.
5    Q.   Did you use your -- does your computer
6 have Outlook?
7    A.   I don't know.  Outlook Express or what?
8    Q.   Well, did you keep a calendar on your
9 computer?
10   A.   No, I did not.
11   Q.   Did you keep a, you know, pocket calendar
12 of any kind?
13   A.   No.
14   Q.   How did you keep track of your
15 appointments while you were Coroner?
16   A.   Just kept them in my head basically.
17   Q.   Did you talk with Detective Gibson after
18 any phone call he may have had with Dr. Turner
19 about what happened on that call?
20   A.   I don't recall that, no.
21   Q.   And why is it that the original plan was
22 for you to be there for the Dr. Turner call?
23   A.   I'm not sure.  I don't know.
24   Q.   Well, did you at some point agree to be

210

1 present for the call?
2    A.   Yes.
3    Q.   Did anyone indicate to you why they
4 thought it would be useful for you to be there?
5    A.   No.
6    Q.   You also worked -- well, let me ask you
7 this.
8         You appeared on a 48 Hours program
9 related to Cory Lovelace's death; is that right?
10   A.   Yes.
11   Q.   And why did you agree to appear on the
12 program?
13   A.   I just did.  I don't know.
14   Q.   Did you -- was your segment for 48 Hours
15 filmed before or after Mr. Lovelace's first trial?
16   A.   I don't know.  I can't recall when it was
17 and when the trial was dates wise.
18   Q.   Where did they -- where were you filmed?
19   A.   Here in Quincy.
20   Q.   Okay.  Did you talk with anyone in the
21 county about the 48 Hours before you agreed to be
22 interviewed?
23   A.   No.
24   Q.   So did you have to seek permission from

211

1 anyone to appear on the show?
2    A.   No.
3    Q.   Did you talk with Ed Parkinson about
4 appearing on 48 Hours?
5    A.   I don't recall that, no.
6    Q.   Okay.  So no one told you that you had
7 to -- that it would -- let me start that question
8 again.
9         No one told you, for instance, words to
10 the effect that it would be good for the case or
11 good for the county if you appeared on the show?
12   A.   No.
13   Q.   And is the information that you gave 48
14 Hours during your interview truthful information?
15   A.   I'll say yes.
16   Q.   I mean, did you -- did you watch the 48
17 Hours after it aired?
18   A.   I did not.
19   Q.   And I'm sorry.  I didn't mean to
20 interrupt your answer, so if you had more to say, I
21 didn't mean to cut you off.
22   A.   I did not watch the show, no.
23   Q.   Okay.  Is there any reason why you would
24 have given incorrect information to 48 Hours when

212

1 you were interviewed?
2    A.   No.
3    Q.   Is there a reason why you were willing to
4 talk to 48 Hours, but not to defense counsel about
5 this case?
6    A.   I wanted to wait until trial.
7    Q.   You wanted to wait until trial to talk to
8 defense counsel?
9    A.   Uh-huh.
10   Q.   Did you have any reservations about being
11 interviewed by 48 Hours?
12   A.   I did.
13   Q.   What were your reservations?
14   A.   Just that they would ask extremely
15 detailed questions.
16   Q.   Did you tell 48 Hours when you were
17 interviewed that there were any topics you were not
18 willing to be questioned about?
19   A.   They stated to me that they wouldn't ask
20 detailed questions.
21   Q.   And had you expressed to them before they
22 said that your concern about being asked detailed
23 questions?
24   A.   Yes.

Transcript of James Keller
Conducted on August 22, 2018

213

1    Q.   Why were you concerned about being asked
2  detailed questions?
3    **A.   I didn't think it -- I wanted to go into**
4  **the details of it, of everything.**
5    Q.   And why did you not want to go into the
6  details?
7    **A.   I just did not.**
8    Q.   At the time that you helped in moving
9  Cory Lovelace's body, was there anyone from the
10  funeral home who was present in the house and
11  assisting?
12    **A.   Hansen Spear Funeral Home was there or**
13  **arrived there very shortly after.  I'm not sure if**
14  **it was -- I can't recall them being upstairs.**
15    Q.   Okay.
16       (Keller Exhibit 14 marked.)
17    Q.   I'm showing the witness what has been
18  marked as Exhibit 14, and this is a document that
19  is Bates stamped Plaintiff 9756 through Plaintiff
20  9769.  Have you ever seen Keller Exhibit 14 before,
21  Mr. Keller?
22    **A.   I believe so, yes.**
23    Q.   Okay.  I'm going to refer you to page 2
24  of this report, but let me ask you, where is it

214

1  that you've seen this exhibit before?
2    **A.   Just in part of an investigation papers.**
3    Q.   Did you review this -- did you review
4  Keller Exhibit 14 in preparation for your
5  deposition today?
6    **A.   I did not.**
7    Q.   Did you review it at some point before
8  you testified in Mr. Lovelace's first trial?
9    **A.   I guess I don't know if it's the exact**
10  **same one, but I've looked at other reports.  I'm**
11  **not -- I guess I can't say if this was the exact**
12  **same paper or not, ma'am.**
13    Q.   Okay.  For any of the police reports --
14  have you looked at other reports in the case
15  potentially besides this one, besides Exhibit 14?
16    **A.   Some of the ones that may have been**
17  **presented with Mr. Parkinson.  I don't know if -- I**
18  **don't know if they were Quincy police reports or**
19  **not, but reports, yes.**
20    Q.   And when you say that there were reports
21  that were presented with Mr. Parkinson, what do you
22  mean?
23    **A.   He had papers that we reviewed at the**
24  **time we were speaking.**

215

1    Q.   Did you review any police reports that
2  you got from any other source -- and I'm asking
3  about prior to the first trial that Mr. Lovelace
4  had.  Did you review any police reports from any
5  source other than reports that you reviewed with
6  Ed Parkinson?
7    **A.   No, I didn't review police reports.**
8    Q.   Okay.  I'm going to refer you to page 2
9  then of this report, of Exhibit 14, and I
10  understand that this is not your report, but I have
11  some questions about the information that is
12  included in this report.
13       In this report, the author indicates that
14  when they saw Cory Lovelace that she was on her
15  back and was clothed in a dark blue sweatshirt with
16  a white print on the front.  Is that consistent
17  with your memory of how Cory Lovelace appeared when
18  you saw her in the bedroom at the scene?
19    **A.   Yes.**
20    Q.   This author also said that they noted
21  that she was wearing what appeared to be pajama
22  bottoms and that the bed covers were drawn up just
23  below her waist.  Is that consistent with what you
24  observed?

216

1    **A.   Yes.**
2    Q.   All right.  And I know you indicated
3  before that you couldn't recall specifically where
4  the bed covers were.  Does looking at Exhibit 14
5  refresh your memory at all about that?
6    **A.   I could recall that the -- I can't**
7  **exactly recall where the covers were positioned on**
8  **her, but they were, I was thinking, mid area, but**
9  **I'm not sure.**
10    Q.   Okay.  And this reporter also indicated
11  that they observed that Lovelace's hands were also
12  drawn up towards her shoulders in an unnatural
13  position.  Is that also consistent with your
14  memory?
15    **A.   Yes.**
16    Q.   All right.  Going on to this next
17  paragraph, this author indicated, and I'm looking
18  at the third sentence, "her eyes were set and fixed
19  and appeared glassy."  Is that consistent with your
20  memory of how she appeared when you saw her?
21    **A.   Yes.**
22    Q.   "I also noted that her lips were very
23  dark red."  Is that consistent?
24    **A.   No, I disagree with the color.**

Transcript of James Keller

Conducted on August 22, 2018

217

1    Q.   Okay.  And what is -- what is your -- the
2  difference in terms of your observations of the
3  color of her lips?
4    A.   Brown.
5    Q.   Okay.  The next sentence says, "I closely
6  examined the exposed areas of Lovelace's face,
7  neck, arms and abdomen and I was unable to find any
8  signs of trauma or injury or indication of the
9  cause of death."  Is that inconsistent with your
10  observations of the scene?
11      MR. HANSEN:  Well, hold on.  I want to be
12  clear.  Did you say is that consistent or
13  inconsistent?
14      MS. THOMPSON:  And I appreciate the
15  clarification.
16  BY MS. THOMPSON:
17    Q.   I'm asking if that is consistent with
18  your observations from what you observed at the
19  scene?
20    A.   Yes.
21    Q.   I'm going to turn you to page 3.  The
22  second sentence of the first paragraph on page 3
23  reads, "Hamilton advised that upon examination he
24  noted that Lovelace's body was still warm to the

218

1  touch and some lividity was setting in at certain
2  areas of the body."
3        Is that consistent with your observations
4  at the time that you were at the scene?
5    A.   I felt the body was cool.
6    Q.   And which parts of Mrs. Lovelace's body
7  did you touch besides her hip and her arm that you
8  touched when you rolled her?
9    A.   Her -- would have been her back area.
10    Q.   And was that also -- did you also touch
11  that in the context of rolling her over so she
12  could be in the bag?
13    A.   Yes, uh-huh.
14    Q.   Okay.  Are there any other areas of her
15  body that you touched besides her upper arm, her
16  back, and her hip?
17    A.   No.
18    Q.   Is it consistent with your observations
19  that there was some lividity setting in at certain
20  areas of her body?
21    A.   Yes.
22    Q.   Did you ever review the investigation
23  report that Coroner Hamilton completed at the scene
24  of Cory Lovelace's death?

219

1    A.   Did I look at it?
2    Q.   Yes.
3    A.   Yes, I did look at it.
4    Q.   All right.  And were there -- was there
5  anything in his investigation report that you
6  disagreed with?
7      MR. HANSEN:  If you recall, go ahead.
8  It's not in front of you here today.
9      THE WITNESS:  I can't recall all of
10  his -- what his -- all of his report stated.
11  BY MS. THOMPSON:
12    Q.   Well, do you recall, as you sit here
13  today, seeing things in the investigation report
14  that you disagreed with?
15    A.   He stated -- I felt the body was cool.  I
16  was just stating what I had observed.  I didn't
17  really read or talk to him about what he --
18    Q.   After this reinvestigation began, did you
19  ever contact Coroner Hamilton to discuss with him,
20  you know, the differences that you had about what
21  you observed at the scene?
22    A.   No.
23    Q.   And is there a reason you didn't do that?
24    A.   I did not.

220

1    Q.   Is there a reason you did not do that?
2    A.   No.  No.
3    Q.   So did you go with Detective Gibson to
4  meet with Dr. Bowman about this case?
5    A.   I did.
6    Q.   Okay.  And what do you recall about that
7  meeting?
8    A.   We discussed the -- Detective Gibson
9  spoke to her about the findings of her examination.
10  She stated what she -- how she come to her
11  conclusion, what was -- about her report and how
12  she came to her conclusion.
13    Q.   You are saying how she came to her
14  conclusion that this was undetermined?
15    A.   Correct.
16    Q.   And what do you remember her telling you
17  about how she came to her conclusion?
18    A.   She didn't agree with the findings
19  presented to her in Detective Baird's report and
20  some of the -- the way the body presented itself to
21  her, so she felt that undetermined was her cause.
22    Q.   And when she -- when she indicated that
23  she disagreed with some of Baird's findings, did
24  she explain to you what she meant?

Transcript of James Keller
Conducted on August 22, 2018

221

1    A.   She discussed some of the condition of
2  the body.
3    Q.   And what specifically did she discuss
4  with you?
5    A.   I don't recall all of it.  Positioning.
6    Q.   Well, when you said that she disagreed
7  with findings of Baird, did she explain to you what
8  findings it was that she disagreed with?
9    A.   His report that --
10   Q.   I'm sorry, go ahead.
11   A.   She basically stated his report.
12   Q.   She was saying she disagreed with his
13 report?
14   A.   His details of -- yes, I'm going to say
15 his report.
16   Q.   Well, did she tell you what specifically
17 about his report she disagreed with?
18   A.   The condition that the body presented
19 itself.
20   Q.   And did she give you any other details
21 about what it was that she disagreed with?
22   A.   I can't recall all of it now.
23   Q.   All right.  Did you do any talking during
24 this interview with her that you had with Detective

222

1  Gibson?
2    A.   No.  Detective Gibson spoke.
3    Q.   All right.  Did you -- I mean, did you
4  literally speak to her at all during this meeting?
5    A.   Acknowledged her.  Very little
6  conversation with her.  Detective Gibson was
7  speaking with her.
8    Q.   Why did you attend this meeting?
9    A.   Just to go and to attend.
10   Q.   Is there a reason you thought it was
11 necessary for you to attend?
12   A.   The Coroner's -- if there was anything
13 that needed to be done from a Coroner's Office
14 standpoint, I would be able to do or --
15   A.   I mean, did you believe that it was
16 relevant to your job as Coroner to be at that
17 meeting?
18   A.   I did.
19   Q.   Did she give any indications in that
20 meeting as to things that the Coroner's Office
21 should do to follow up on this case?
22   A.   Not that the Coroner's Office should do.
23   Q.   Well, did she give any suggestions or
24 direction to Detective Gibson about additional

223

1  things that should be done by anyone?
2    A.   They spoke as far as what -- if there was
3  anything that needed to be done.  I don't recall
4  all of the conversation.
5    Q.   Okay.  Did she tell you at this meeting
6  that she continued to believe that the appropriate
7  finding in this case was undetermined?
8    A.   She did state that.
9    Q.   Okay.  And did you or Detective Gibson
10 arrange with her any plans to follow up with her
11 further about the case?
12   A.   I did not.
13   Q.   Did Detective Gibson?
14   A.   I'm unsure if he followed up with her
15 again or not.
16   Q.   Well, what was your understanding at the
17 end of the meeting with Dr. Bowman as to where the
18 investigation was going to go from there?
19   A.   I think it was at that point just
20 Detective Gibson was under a fact finding if there
21 was any reason to go any further.
22   Q.   Well, did Dr. Bowman give -- was it your
23 belief at the conclusion of the meeting with
24 Dr. Bowman that the investigation should go

224

1  further?
2    A.   She stated that he didn't -- she didn't
3  agree with everything of the findings that were
4  initially done and did state that there needed to
5  be some follow-up, if there could be any follow-up
6  or any new information obtained.
7    Q.   Did Detective Gibson ever talk with you
8  about his belief that there might have been a
9  poisoning in this case?
10   A.   I don't know if Detective Gibson stated
11 that.  I think it was Dr. Denton.  Dr. Denton had
12 mentioned that -- about that.
13   Q.   Setting that aside for a second, as you
14 sit here today, do you have a belief as to how it
15 is that Cory Lovelace died?
16   A.   Do I have an opinion on how it occurred?
17   Q.   Yes.
18   A.   I don't believe it occurred the way he
19 said, but how it occurred, I don't really know.
20   Q.   And when you say you don't believe it
21 occurred how he said, who is the "he"?
22   A.   How Mr. Lovelace stated.
23   Q.   Okay.  And what is it that you disagree
24 with about what he said?

Transcript of James Keller
Conducted on August 22, 2018

57 (225 to 228)

225

1     A.   Just the time -- just the timeframe.
2     Q.   Is there anything other than the timing
3  that you disagree with in terms of statements that
4  Curtis Lovelace has made about his knowledge of his
5  wife's passing?
6     A.   No.
7     Q.   All right.  And is it your belief, as you
8  sit here, that she -- that Cory Lovelace died
9  earlier than -- died sometime before the kids went
10 to school that morning?
11    A.   Yes.
12    Q.   All right.  And is that belief based on
13 the -- is there anything that contributes to your
14 belief about that other than what you've testified
15 about so far here today?
16    A.   I was just going on what I observed, my
17 observation.
18    Q.   Okay.  At the time that you testified in
19 Curtis Lovelace's first trial, did you have -- did
20 your beliefs about how or when Cory Lovelace died
21 differ at all from your beliefs about those topics
22 today?
23    A.   No.
24    Q.   Did you understand at the time that you

226

1  testified in the first trial that your observations
2  at the scene were different than Coroner Hamilton
3  and Jeff Baird's observations?
4          MR. HANSEN:  I'm sorry, could you either
5  reread that question --
6          MS. THOMPSON:  I can -- let me restate
7  it.
8  BY MS. THOMPSON:
9     Q.   At the time you testified at Curtis
10 Lovelace's first trial, was it your understanding
11 that your testimony -- or that your observations
12 about what happened at the -- what you observed at
13 the scene of Cory Lovelace's death were different
14 than what Detective Baird and what Coroner Hamilton
15 said that they had observed?
16         MR. HANSEN:  I'll just object to the
17 form.  The testimony speaks for itself.
18         Go ahead.
19         THE WITNESS:  I have really no comment on
20 it.
21 BY MS. THOMPSON:
22    Q.   Well, at the time that you testified in
23 the first trial, you understood what Jeff Baird had
24 said he observed at the scene; is that right?

227

1     A.   Uh-huh.  Yes.
2     Q.   All right.  And you understood what
3  Coroner Hamilton had said he observed?
4     A.   Yes.
5     Q.   And did you recognize that there were
6  differences between what you observed and what they
7  said they observed?
8     A.   Yes.
9     Q.   Does the Coroner's Office, pursuant to
10 statute or pursuant to the obligations of the
11 office, as you understand them, responsible for
12 issuing reports about the cause and manner of a
13 person's death?
14    A.   Yes.
15    Q.   Okay.  And did the Coroner's Office in
16 Cory Lovelace's case ever issue a revised report
17 beyond what Dr. Bowman had initially indicated?
18    A.   No.
19    Q.   And is there a reason why after
20 everything that happened with this investigation
21 that you did not arrange to have a revised report
22 prepared?
23    A.   Did not -- I didn't do the investigation,
24 figured all the investigative information would

228

1  have been on Detective Baird's report -- I'm sorry,
2  Detective Gibson's report.
3     Q.   Well, if -- did you believe that there
4  had been further investigation done that had
5  altered Dr. Bowman's original conclusions?  I'm
6  asking at the end of Detective Gibson's
7  investigation, did you believe that there had been
8  additional investigation that had revealed things
9  that were different from Dr. Bowman's conclusions?
10    A.   I don't know how to answer that.
11    Q.   Well, Dr. Bowman's finding was that that
12 this was -- that Cory Lovelace's -- the cause of
13 Cory Lovelace's death was undetermined; is that
14 right?
15    A.   Uh-huh.  Yes.
16    Q.   And did you still believe at the
17 conclusion of Detective Gibson's investigation that
18 the cause of her death should still be reported as
19 undetermined?
20    A.   I don't think my opinion of it is
21 relevant.  Just what the facts were.
22    Q.   Well, did you believe that the -- at the
23 end of Detective Gibson's investigation, was it the
24 responsibility of your Coroner's Office to issue

Transcript of James Keller
Conducted on August 22, 2018

229

1  findings about the cause and manner of someone's
2  death?
3      **A.   If they were to be reissued, if that**
4  **cause and manner of death needed to be reissued.**
5      Q.   Did you see any reason -- did you see
6  any -- let me start that question again.
7          Did you see any need at the end of
8  Detective Gibson's investigation to reissue
9  findings about the cause and manner of Cory
10 Lovelace's death?
11     **A.   I could not reissue a cause or manner of**
12 **her death.**
13     Q.   My question is: Did you see any reason
14 to?
15         MR. HANSEN:  Objection; asked and
16 answered.  He just answered.
17         THE WITNESS:  I could not do a cause or
18 manner of death change.
19 BY MS. THOMPSON:
20     Q.   And why could you not do a cause or
21 manner of death change?
22     **A.   There was no -- the findings by the jury**
23 **stood, so it was kept.**
24     Q.   You said that there was a -- there is a

230

1  mechanism in the statute for death investigations
2  to be reopened, correct?
3      **A.   Yes.**
4      Q.   Did you see any reason pursuant to the
5  statute to reopen those mechanisms based on what
6  your understanding was of Detective Gibson's
7  investigation?
8      **A.   I could not -- once a charge has been**
9  **made, you can't remake a charge and change it.  I**
10 **can't change a death certificate just because**
11 **something you felt.**
12     Q.   Are there circumstances in which you
13 could change a death certificate as Coroner?
14     **A.   There are circumstances that I can**
15 **change, yes.**
16     Q.   What are those circumstances?
17     **A.   If there was a -- if a patient had a hip**
18 **fracture, fell, or was in an automobile accident,**
19 **two or three months later was still in the hospital**
20 **and died of injuries and the physician had signed**
21 **that death certificate stating that the cause was**
22 **due to a pneumonia, in fact, it would have been due**
23 **to an automobile accident, I can change that cause**
24 **of death.**

231

1      Q.   Are there any other circumstances in
2  which you can change -- as Coroner where you can
3  change a death certificate?
4      **A.   Not in a homicide investigation.  That**
5  **has been where a jury has decided, no, I can't.**
6      Q.   And when you say "where a jury has
7  decided," are you referring to the Coroner's
8  inquest --
9      **A.   No.**
10     Q.   (Continuing) -- jury?
11         You are referring to a Grand Jury?
12     **A.   Jury, jury.**
13         MR. HANSEN:  The jury trial.
14         THE WITNESS:  Jury trial.  I could not
15 change -- I cannot change a death certificate upon
16 a feeling.
17 BY MS. THOMPSON:
18     Q.   Can you change a death certificate if an
19 additional pathologist consulted by people
20 investigating the death reaches a different
21 conclusion than the original medical examiner
22 reached?
23     **A.   I have to get an opinion or an order to**
24 **change that.**

232

1      Q.   And who does the -- who can you get an
2  order from?
3      **A.   It would be from a judge.**
4      Q.   All right.  Well, in this case, there was
5  an opinion from Dr. Turner, correct?
6      **A.   I don't know that.**
7      Q.   Well, there was an opinion from
8  Dr. Denton ultimately, correct?
9      **A.   I don't -- I can't recall.**
10     Q.   I mean, isn't it true that you were --
11     **A.   With him stating -- with his statements,**
12 **but I could not do -- I cannot do it -- I cannot do**
13 **it on a physician's opinion.  I can't change a**
14 **death certificate.**
15     Q.   In a homicide case, is there any
16 mechanism for you to change the cause of death?
17     **A.   There is not.  I can't change a cause of**
18 **death.**
19     Q.   Once -- so once Dr. Bowman ruled that it
20 was undetermined, there was nothing you could do to
21 alter that?
22     **A.   Except for the -- if she alters her**
23 **opinion and states that she felt it was a homicide.**
24     Q.   And isn't it true that because that is --

**233**

1  isn't that why -- let me start that question again.
2      Isn't that why Dr. Denton was advising
3  you and Detective Gibson to talk to Dr. Bowman
4  because it was really only Dr. Bowman that could
5  alter her undetermined finding?
6      **A.  I believe so.**
7      Q.  All right.  And when you had your meeting
8  with Dr. Bowman, Detective Gibson was trying very
9  hard to get her to agree to at least rethink her
10 original findings in this case; isn't that right?
11     MR. HANSEN:  Object to the form.
12     Go ahead.
13     THE WITNESS:  Answer -- or ask it again.
14 BY MS. THOMPSON:
15     Q.  Sure.  In your meeting with Dr. Bowman,
16 Detective Gibson was trying very hard to get her to
17 agree to at least rethink her original conclusion
18 of undetermined; is that right?
19     MR. HANSEN:  Same objection.
20     MS. EMERY:  Object to form.
21     THE WITNESS:  I'm not going to answer.  I
22 didn't feel he -- he was not badgering the --
23 badgering her.
24     Q.  My question wasn't whether he was

**234**

1  badgering her.  My question was --
2      **A.  You said "very hard."**
3      Q.  Was he -- was he trying very hard?
4      **A.  No, I wouldn't say he was trying very**
5  **hard, no.**
6      Q.  Was he indifferent in that meeting as to
7  whether or not she agreed to relook at the Cory
8  Lovelace case?
9      **A.  No.  He was very professional in his**
10 **speaking with her.**
11     Q.  Did he express in that meeting a belief
12 that there was additional information that
13 Dr. Bowman should take into account in rethinking
14 this case?
15     **A.  He spoke with her about the investigation**
16 **and -- but he was not badgering her or putting a**
17 **paper in front of her to sign something that she**
18 **wanted or didn't want to sign.**
19     Q.  Okay.  But did he tell her that he
20 believed there was additional information that she
21 should take into account?
22     **A.  I don't know if it was worded that way.**
23 **That there was -- if she would be willing to look**
24 **at additional information if it was -- was.**

**235**

1      Q.  Okay.  And did she tell you at the
2  conclusion of that meeting that she was willing to
3  relook at the case?
4      **A.  I don't recall her exact words.**
5      Q.  Well, did she tell you words to the
6  effect that she would review some additional
7  information related to the case?
8      **A.  If he had additional information, she**
9  **could be willing to look at it.**
10     Q.  Okay.  And to your knowledge, did
11 Detective Gibson ever give her any additional
12 information to look at relative to the case?
13     **A.  I do not know that.**
14     Q.  All right.  Did Detective Gibson ever
15 tell you that he had interviewed any witnesses who
16 had given him additional -- well, let me ask -- let
17 me rephrase that question.
18     Did Detective Gibson ever tell you
19 whether he had brought additional information to
20 Dr. Bowman for her to review?
21     **A.  He did not.**
22     Q.  At the meeting that you had with
23 Dr. Bowman, did she tell you or Detective Gibson
24 words to the effect that no matter what you did she

**236**

1  was not going to rethink the undetermined finding?
2      **A.  I can't recall that statement.**
3      Q.  Okay.  We talked a little bit about the
4  Linda Booth case.  How is it that an exhumation
5  order came to be entered as to the Linda Booth
6  case?
7      MR. HANSEN:  So I'm going to object to
8  relevance.  I don't know how far you are going to
9  go into all of this.  I'm going to have a running
10 objection to all of it.
11     But go ahead.
12     THE WITNESS:  Do I have to answer?
13     MR. HANSEN:  Yeah.  I think the question
14 was how does an exhumation order come about.
15     THE WITNESS:  It was an undetermined
16 case, and the cases were -- I'm trying to think who
17 wanted it, if it was the State's Attorney that
18 wanted the investigations of the undetermined to be
19 looked at.
20 BY MS. THOMPSON:
21     Q.  Did someone in the State's Attorney's
22 Office tell you that that office was interested in
23 looking at undetermined cases?
24     **A.  As part of the investigation with -- we**

Transcript of James Keller
Conducted on August 22, 2018

237

1  needed to look at undetermined cases.
2      Q.  Who from the State's Attorney's Office
3  told you that?
4      A.  I think Jon Barnard.
5      Q.  And when you say as part of the
6  investigation you needed to look at undetermined
7  cases, what investigation are you referring to?
8      A.  Just with any undetermined cases that
9  Dr. Bowman had done.
10      Q.  All right.  And when did -- when did the
11  State's Attorney's Office tell you that you needed
12  to look at Dr. Bowman's undetermined cases?
13      A.  I don't know when dates wise.  I don't.
14      Q.  Was that before or after your meeting
15  with Dr. Bowman about the Lovelace case?
16      A.  After.
17      Q.  Did -- did you have any role in seeking
18  an exhumation order in the Booth case?
19      A.  I did get the -- I don't know if the
20  actual order was written by myself or the State's
21  Attorney's Office.
22      Q.  But were you involved in drafting the
23  order?
24      A.  I can't recall that, ma'am.

238

1      Q.  Did you look at a draft order before it
2  went to the court?
3      A.  I don't believe I did.  I'm not really
4  sure on how to write one, so I don't believe I
5  wrote one.
6      Q.  But you were aware before that order went
7  to the court that the State's Attorney's Office was
8  seeking an exhumation order as to Linda Booth?
9      A.  Yes.
10      Q.  Okay.  Did you also communicate with
11  Dr. Denton about the Linda Booth reexamination?
12      A.  I asked him if he would be willing to do
13  an examination.
14      Q.  And he did, in fact, conduct an
15  investigation?
16      A.  He conducted an autopsy.
17      MR. HANSEN:  You mean -- you said
18  investigation.  You mean examination?
19  BY MS. THOMPSON:
20      Q.  Well, I'll -- let me rephrase the
21  question.  Did he actually do a re-autopsy of that
22  case?
23      A.  He did.
24      Q.  Okay.  Did he ultimately reach any

239

1  different findings than Dr. Bowman had reached in
2  that case?
3      A.  It was -- it was ruled undetermined.
4      Q.  And was that Dr. Bowman's original
5  finding?
6      A.  It was.
7      Q.  Okay.
8      A.  No.  Yes.  Sorry.
9      Q.  Undetermined was her original finding?
10      A.  I can't recall what was actually written
11  on the death certificate.
12      Q.  You said earlier that you had
13  communicated with Josh Jones about a request for
14  documents, and I just want to make sure that I've
15  clarified my understanding about this.  Was the
16  request that you conferred with him about a request
17  for documents pursuant to the Freedom of
18  Information Act or a request for documents via a
19  subpoena or what was the request?
20      A.  It was a request.  I don't know just how
21  that was.
22      Q.  How many requests did you confer with
23  Josh Jones about?
24      A.  I think that request was probably -- I

240

1  think it was given to him by the State's Attorney.
2  I conferred with the State's Attorney and then got
3  a response from the State's Attorney's Office,
4  which was Josh Jones.
5      Q.  Okay.  So when you say you conferred with
6  the State's Attorney, did you confer with Gary
7  Farha?
8      A.  Yes.
9      Q.  And you said you provided -- did you
10  provide the State's Attorney with the request you
11  had received?
12      A.  I did.
13      Q.  Okay.  And did you do that on more than
14  one occasion?
15      A.  Any requests I received I gave to the
16  State's Attorney's Office, yes.
17      Q.  All right.  And how many requests for
18  information related to the Cory Lovelace or Curtis
19  Lovelace case did you receive that you provided on
20  to the State's Attorney?
21      A.  Probably only a couple.  I was -- due to
22  I was instructed to state that we couldn't do it
23  due to an ongoing investigation.
24      Q.  And how many times did you receive that

Transcript of James Keller
Conducted on August 22, 2018

241

1  instruction?
2      **A.  From them?**
3      Q.  Yes.  And I guess when you say "from
4  them" you are talking about the State's Attorney's
5  Office?
6      **A.  Yes.**
7      Q.  Yes.
8          MR. HANSEN:  Are you talking about --
9  okay, I want to be clear.  Are you talking about
10 Ed Parkinson and the letter we saw earlier, that
11 special prosecutor, or are you talking about the
12 Adams County State's Attorney?
13         THE WITNESS:  On Adams County State's
14 Attorney and Ed Parkinson both.
15 BY MS. THOMPSON:
16     Q.  So setting aside Ed Parkinson, did you
17 confer with the State's Attorney's Office, the
18 Adams County State's Attorney's Office, about
19 requests that you received for information, and I'm
20 leaving Ed and the state appellate prosecutor out
21 of it?
22     **A.  I had went to him on a couple occasions**
23 **on some information on requests for records,**
24 **autopsy.  Autopsies basically.**

242

1      Q.  You went to the State's Attorney Office
2  about that?
3      **A.  Yes.**
4      Q.  All right.  Was it ever your
5  understanding that the State's Attorney's Office
6  was responsible for the prosecution of Curtis
7  Lovelace?
8          MR. HANSEN:  I'll just object; calls for
9  a legal conclusion and speculation.
10         If you know.
11         THE WITNESS:  I don't.  That was just who
12 I went for legal counsel on what I needed to do.
13 BY MS. THOMPSON:
14     Q.  All right.  Well, if you had received
15 requests for documents through a subpoena, would
16 you have gone to the State's Attorney's Office or
17 to the state appellate prosecutor?
18         MR. HANSEN:  I would just object to the
19 form.  That assumes who he got it from.  I mean,
20 there is clearly in your case you sent FOIAs to
21 him, Ed Parkinson sent him stuff in the trials, and
22 then I have got stuff that you sent to me.  So I
23 think we have a very vague question there.
24         MS. THOMPSON:  I'm asking about

243

1  subpoenas, so let me rephrase the question.
2  BY MS. THOMPSON:
3      Q.  In Curtis Lovelace's criminal case, if
4  you received a subpoena for documents, would you
5  have gone to the State's Attorney's Office about
6  that or the state appellate prosecutor?
7      **A.  Subpoenas I'd have went to -- I don't**
8  **recall whom I went to for the various requests.  I**
9  **can't recall.**
10     Q.  Have you ever received any training from
11 anyone, either from Adams County or in any of the
12 training or continuing legal education that you've
13 received as a coroner, about responding to
14 discovery requests in a criminal case?
15     **A.  No.  We -- any requests that we had**
16 **obtained it was just we went to the State's**
17 **Attorney's Office for guidance.**
18         MS. THOMPSON:  Okay.  I think I'm close
19 to done.  Let's just take a quick break and then I
20 think I will be concluded here.
21         THE VIDEOGRAPHER:  We are now off the
22 record.  The time is 3:52 p.m.
23         (Whereupon a short recess was taken.)
24         (Keller Exhibit 15 marked.)

244

1          THE VIDEOGRAPHER:  We are now back on the
2  record.  The time is 3:57 p.m.
3          MS. THOMPSON:  Jim, we are doing the same
4  thing on punitives, right?
5          MR. HANSEN:  Yes.
6          MS. THOMPSON:  Okay.  So Mr. Keller,
7  normally I might have the opportunity in this
8  deposition to ask you some questions that would
9  relate to your financial situation for purposes of
10 punitive damages in this case, and my understanding
11 with your counsel is that I won't ask those
12 questions today, and your counsel and I might have
13 a disagreement about whether I'm allowed to or not,
14 but I'm agreeing that I will not ask those
15 questions of you today with the agreement by you
16 that if this matter proceeds to trial that I will
17 confer with your counsel and we will reach and
18 agreement about how to seek appropriate information
19 from you related to your finances.  And so with
20 that understanding, I'm not going to ask you those
21 questions in the deposition today.
22         MR. HANSEN:  Yes.
23         MS. THOMPSON:  I have a couple just
24 clean-up questions and then I'm done.

Transcript of James Keller
Conducted on August 22, 2018

245

BY MS. THOMPSON:

1   Q.   Did your resignation from the Coroner's
2   Office have anything to do at all with the Lovelace
3   case?

4   **A.   No.**

5   Q.   When you say that -- let me start that
6   question again.

7       You have indicated today that when you
8   observed or felt Cory Lovelace's body that she was
9   cool to the touch; is that right?

10  **A.   Yes.**

11  Q.   Have you ever expressed that observation
12  to anyone at all before today?

13  **A.   Yes, I believe I stated it at trial that
14  she was cool.**

15  Q.   And prior to trial, have you stated that
16  observation to anyone?

17  **A.   I don't recall, no.**

18  Q.   When you were feeling her -- when you
19  were feeling Cory Lovelace as you were moving her,
20  were you feeling her through her clothing?

21  **A.   No.**

22  Q.   Where did you make contact with her bare
23  skin while you were moving her?

246

1   **A.   Through the -- as I moved the back of her
2   hands kind of went up from upper buttocks to the
3   back, upper buttocks area.**

4   Q.   Did you feel her skin directly?

5   **A.   I did.**

6   Q.   Anywhere other than on her back and upper
7   buttocks?

8   **A.   Her side or back area.**

9   Q.   Anywhere else?

10  **A.   No.**

11  Q.   Did you respond to the scene of Linda
12  Booth's death as Deputy Coroner?

13  **A.   I did not.**

14  Q.   Okay.  And I asked you some questions
15  about this, but I just want to make sure I
16  understand.  In the meeting that you and Detective
17  Gibson had with Dr. Bowman, did Detective Gibson
18  give Dr. Bowman any information about additional
19  facts related to the investigation or anything that
20  had changed in the investigation since Dr. Bowman
21  issued her opinion that this was undetermined?

22  **A.   I don't -- can't recall what he --
23  information he gave to her.**

24  Q.   Is there anything that would refresh your

247

1   memory about what information he gave to her during
2   that meeting?

3   **A.   No, I don't know what he gave to her.**

4   Q.   Okay.  Finally, I just want to show you
5   this document, and this will be 15.

6       You've been shown what's been marked as
7   Keller Exhibit 15.  This is a one-page document
8   that is Bates stamped 5980.  The top -- there are
9   two e-mails on Exhibit 15, and the top one is an
10  e-mail from Detective Gibson to you on December
11  29th of 2015; is that right?

12  **A.   Yes.**

13  Q.   Okay.  And in this e-mail Detective
14  Gibson is relating to you that he was listening to
15  jail calls from Curtis and his feelings were hurt
16  because he was called a, quote, shit bag detective.
17  Do you see that?

18  **A.   I do.**

19  Q.   Do you know why Detective Gibson was
20  telling you that Curt had called him a shit bag
21  detective?

22  **A.   I don't.**

23  Q.   Did you and Detective Gibson have a, you
24  know, professional relationship where you joked

248

1   with one another on occasion?

2   **A.   I would say we did speak with each other
3   on occasions, yes.**

4   Q.   Did you joke with each other on occasion?

5   **A.   We were always joking.**

6   Q.   Was this --

7   **A.   I don't recall seeing this, but...**

8   Q.   And I didn't mean to interrupt you, so
9   I'm sorry.  If you want to finish your answer.

10  **A.   I don't recall seeing this, so -- go
11  ahead.**

12  Q.   Well, did Detective Gibson ever give you
13  any other information about things that he heard on
14  a phone call of Curtis Lovelace's?

15  **A.   No, he did not.**

16  Q.   Okay.  Do you know what the attachments
17  were that are included with this e-mail?

18  **A.   I do not.**

19  Q.   Okay.  Were you -- around December of
20  2014, were you working on a report related to
21  someone with the last name of Tournear,
22  T-O-U-R-N-E-A-R?

23  **A.   Yes.   There was -- there has been
24  several Tournears who have passed away, who have**

Transcript of James Keller
Conducted on August 22, 2018

249

1  died.
2     Q.  Okay.  And the reports that you were
3  getting from Detective Gibson about Tournear in
4  December of 2014, and I don't need any specifics
5  about that person's passing, but in general, what
6  did those reports consist of?
7        MR. HANSEN:  I'll just object to
8  relevance.
9        And don't give away any information on
10 medical conditions, anything like that.  In
11 general, if you recall, go ahead and answer.
12       THE WITNESS:  I don't recall what they
13 were.
14 BY MS. THOMPSON:
15    Q.  Do you know what it was that Detective
16 Gibson would have been e-mailing you in terms of a
17 report on this person, again without giving any
18 specific medical information about that person?
19    A.  I can only assume when he -- when a
20 detective requests information, it is generally due
21 to a toxicology or an autopsy report.
22    Q.  And are the reports that were attached to
23 this e-mail to you on December 29th of 2014, were
24 those reports that were related to this person

250

1  Tournear?
2     A.  I don't know that.
3     Q.  If you had gotten reports from Detective
4  Gibson related to a Tournear, would you have opened
5  those attachments?
6     A.  I would have opened them, yes.
7     Q.  Okay.  And finally, unrelated to Exhibit
8  15, did you ever take any steps to obtain
9  additional records related to Cory Lovelace's death
10 other than pulling the documents that you had in
11 the coroner's file?
12    A.  I don't understand.
13    Q.  Sure.  I mean, you said that one of the
14 things that a coroner might do in conducting an
15 investigation would be to get, you know, medical
16 records, for instance; is that right?
17    A.  Yes.  Yes.
18    Q.  Did you take any steps to get any medical
19 records related to Cory Lovelace's death?
20    A.  I did not.
21    Q.  Did you ever get those documents from
22 someone else during this reinvestigation?
23    A.  I did not.
24    Q.  Did you ever discuss with Detective

251

1  Gibson about him getting those reports?
2     A.  I did not.
3        MS. THOMPSON:  Okay.  I don't have any
4  other questions.  Thank you,
5        MS. EMERY:  I just have one follow-up.
6  Mr. Keller.
7            EXAMINATION BY
8            MS. EMERY:
9     Q.  Do you remember this morning when you
10 were talking about things that you had learned in
11 the course of your mortuary sciences studies about
12 you were discussing the progression of odors of a
13 dead body?
14    A.  Uh-huh.
15       MR. HANSEN:  Is that a yes?
16       THE WITNESS:  Yes, ma'am.
17 BY MS. EMERY:
18    Q.  And you indicated that the odors get
19 progressively stronger as gasses are produced and
20 then expelled by the dead body?
21    A.  Yes.
22    Q.  And I wrote in quotes here, but you said
23 that when you had gone to the scene of where Cory
24 Lovelace's body was you said the odor, quote,

252

1  indicated to me that she may have been there a
2  little bit, unquote.  Did you mean by saying "a
3  little bit" that she had been there only briefly or
4  was that your way of saying that she had been there
5  much longer than you had been told?
6     A.  Much longer than I had been told.  I felt
7  the -- it was eight to ten hours.
8        MS. EMERY:  Okay.  Thank you.  I don't
9  have anything else.
10       MR. HANSEN:  We will reserve.
11       THE VIDEOGRAPHER:  This concludes the
12 video deposition.  The time is now 4:07 p.m.
13           (DEPOSITION CLOSED)
14
15
16
17
18
19
20
21
22
23
24

Transcript of James Keller
Conducted on August 22, 2018

253

1  STATE OF ILLINOIS )
              )  SS.
2  COUNTY OF ADAMS   )
3
4
5       C E R T I F I C A T E
6
7       I, Gina L. Nottingham, Certified Shorthand
8  Reporter in and for the State of Illinois, do hereby
9  certify that JAMES KELLER, the witness whose
10 deposition is hereinfore set forth, was duly sworn by
11 me and that such deposition is a true record of the
12 testimony given by the witness.
13      I further certify that the signature of the
14 witness to the deposition was not waived.
15      I further certify that I am not counsel for
16 nor in any way related to any of the parties to this
17 action, nor am I in any way interested in the outcome
18 thereof.
19      In testimony thereof, I have hereunto set my
20 hand this 29th day of August, A.D., 2018.
21
22
23  _____
24  Gina L. Nottingham, Certified Shorthand Reporter