## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF ILLINOIS

| | |
|---|---|
| CURTIS LOVELACE, LOGAN LOVELACE, LINCOLN LOVELACE & CHRISTINE LOVELACE ON BEHALF OF HER MINOR SON LARSON LOVELACE, | |
| Plaintiffs, | |
| v. | Case No. 17 CV 01201 |
| DET. ADAM GIBSON, POLICE CHIEF ROBERT COPLEY, SGT. JOHN SUMMERS, LT. DINA DREYER, DET. ANJANETTE BISWELL, UNKNOWN QUINCY POLICE OFFICERS, GARY FARHA, CORONER JAMES KELLER, THE CITY OF QUINCY, AND COUNTY OF ADAMS, | The Honorable Judge Sue Myerscough  **ORAL ARGUMENT AND HEARING REQUESTED** |
| Defendants. | |

### MEMORANDUM OF LAW IN SUPPORT OF QUINCY DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

### INTRODUCTION

Cory Lovelace passed away on February 14, 2006 in her home in Quincy, Illinois. The pathologist who performed the autopsy on Cory, Dr. Jessica Bowman, reached a finding of "undetermined" as to the cause of Cory's death. In late 2013, Detective Adam Gibson of the Quincy Police Department re-opened the investigation into Cory's death. Plaintiffs allege that the investigation was undertaken with the knowledge, approval, and consent of Quincy Police Chief Robert Copley, Sergeant John Summers, and Lieutenant Dina Dreyer, who were Detective Gibson's supervisors in the police department.

Detective Gibson's investigation revealed new information into Cory's death which led to the results of the investigation being turned over to Special Prosecutor Edwin Parkinson, who

convened a Grand Jury on August 27, 2014. The Grand Jury indicted Curtis Lovelace for the murder of Cory Lovelace, and Curtis was arrested in Quincy on August 27, 2014.

On the same day that their father was arrested, August 27, 2014, Logan, Lincoln and Larson were all in school. Logan and Lincoln were students at Quincy High School and Larson was a student at Quincy Junior High. Each of the boys were driven to the Quincy Police Department where they were interviewed as witnesses by Detective Gibson, and then told that their father had been arrested for the murder of Cory.

A first trial against Curtis Lovelace was held in January and February of 2016. The trial concluded on February 5, 2016, with the jury deadlocked and unable to reach a verdict. A second trial against Curtis commenced on March 1, 2017, and on March 10, 2017, a second jury returned a verdict of not guilty.

On May 5, 2017, Plaintiff Curtis Lovelace and his three sons, Logan, Lincoln, and Larson, filed suit against the Quincy Defendants: Detective Adam Gibson, Police Chief Robert Copley, Sergeant John Summers, Lieutenant Dina Dreyer, Detective Anjanette Biswell, and the City of Quincy itself. Detective Gibson had involvement in the re-opened Lovelace murder investigation, and defendants Summers, Dreyer, and Copley were his respective Sergeant, Lieutenant, and Chief superior officers. Plaintiffs' counsel has told the undersigned counsel that defendant Detective Anjanette Biswell will be voluntarily dismissed, so there is no discussion about Detective Biswell in this Quincy Defendants' motion for summary judgment.

Curtis Lovelace alleges that the Quincy Defendants resorted to fabricating evidence, coercing witnesses, presenting false information to the Grand Jury, withholding and concealing exculpatory evidence, and other unlawful acts to frame Curtis for a crime that he did not commit. Curtis alleges that the Quincy Defendants failed to produce exculpatory evidence to the State and

to Curtis's defense.  In addition, Detective Gibson is alleged to have presented false, misleading, and incomplete information to the Grand Jury.  The three sons of Curtis Lovelace, Larson, Lincoln, and Logan, allege unlawful detention for their having been taken to the police station and interviewed on the date of Curtis' arrest.

The Lovelace's Complaint contains eleven counts.  Counts I and II are brought under 42 U.S.C. §1983 by Curtis Lovelace and allege the defendants violated his due process rights under *Brady*, and maliciously caused him to be prosecuted.  Counts III and V are brought by plaintiffs Logan, Lincoln and Larson Lovelace under 42 U.S.C. §1983 and state law for unlawful detention and false imprisonment.  Counts IV and VI are also brought under 42 U.S.C. §1983 by all plaintiffs for conspiracy and failure to intervene.  Count VII is brought by all defendants for intentional infliction of emotional distress under state law, and Count VIII is brought by Curtis Lovelace under state law for malicious prosecution.  Count IX is brought by all plaintiffs for civil conspiracy under state law, and Counts X and XI are derivative claims brought by all plaintiffs for *respondeat superior* and indemnification of the individual defendants, respectively.  The material facts are set out in detail in the Quincy Defendants' Local Rule 7.1(D)(1)(b) Undisputed Material Facts section, below.[1]  Defendants now move for summary judgment on plaintiffs' claims.[2]

Summary judgment shall be granted if "the movant shows that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(a).  The court may consider the "depositions, documents, electronically stored information,

---

[1] The prosecutor from the State Board of Appeals who prosecuted this case against Curtis Lovelace is variably referred to in this Memorandum as "the prosecutor," "the State," or by his name, Edwin Parkinson.

[2] The Quincy Defendants have not moved for summary judgment on Counts III and V brought by plaintiffs Logan, Lincoln and Larson Lovelace under 42 U.S.C. §1983 and state law for unlawful detention and false imprisonment.

affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials.  FED. R. CIV. P. 56(c).  When the moving party identifies an issue appropriate for summary judgment on which the non-moving party bears the burden of proof, the non-moving party must come forward with evidence to establish a factual dispute on that issue to defeat the motion.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S. Ct. 2548 (1986); *Walker v. Shansky*, 28 F.3d 666 (7th Cir. 1994).  A party needs more than a scintilla of evidence to defeat summary judgment.  *Audusmilli v. Chicago of Chicago*, 164 F.3d 353 (7th Cir. 1998).  For the reasons that follow, the Quincy Defendants are entitled to summary judgment on plaintiffs' claims.

## UNDISPUTED MATERIAL FACTS

### EXHIBITS

1. Filed in support of the Undisputed Material Facts are the following:

   A. Martha Didriksen's Deposition Transcript (**Exhibit A**);

   B. Jon Barnard's Deposition Transcript (**Exhibit B**);

   C. James Keller's Deposition Transcript (**Exhibit C**);

   D. Lyndsay Lovelace's Deposition Transcript (**Exhibit D**);

   E. John Summers' Deposition Transcript (**Exhibit E**);

   F. Adam Gibson's Deposition Transcript (**Exhibit F**);

   G. Dina Dreyer's Deposition Transcript (**Exhibit G**);

   H. Robert Copley's Deposition Transcript (**Exhibit H**);

   I. Dr. Jessica Bowman's Deposition Transcript (**Exhibit I**);

   J. Dr. J. Scott Denton's Deposition Transcript (**Exhibit J**);

   K. Edwin Parkinson's Deposition Transcript (**Exhibit K**);

L.  Logan Lovelace's Deposition Transcript (**Exhibit L**);

M.  Lincoln Lovelace's Deposition Transcript (**Exhibit M**);

N.  Larson Lovelace's Deposition Transcript (**Exhibit N**);

O.  Detective Jeff Baird's Police Reports, Bates-stamped Plaintiff 009756-009795 (**Exhibit O**);

P.  Cory Lovelace Death Investigation Report, Bates-stamped Plaintiff 007932-007945 (**Exhibit P**);

Q.  Photos of deceased Cory Lovelace (**Exhibit Q**);

R.  Dr. Jessica Bowman's Autopsy Report on Cory Lovelace (**Exhibit R**);

S.  Dr. J. Scott Denton's Written Report (**Exhibit S**);

T.  Dr. Jane Turner's Written Report, dated July 3, 2014 (**Exhibit T**);

U.  Plaintiff Curtis Lovelace's (amended) Answers to City of Quincy's First Set of Interrogatories, dated June 7, 2019 (**Exhibit U**);

Documents referred to in Plaintiff Curtis Lovelace's amended Answers to Interrogatory 12:

V.  Documents Bates-stamped QPD 0044 – QPD 0087 (**Exhibit V**); Containing:

QPD 0044-49    Quincy Police Supplemental Case Report #6, dated 1/07/2014; contact with Jim Keller (Adams County Coroner), William Ballard (EMT at scene), Francis Doellman (EMT at scene); Gregory Hay (firefighter at scene); Jeffrey Grawe (firefighter at scene); Cole Miller (EMT at scene); Katy Meyers (Ph.D. student at Michigan State re cadaveric spasm);

QPD 0050-0059    Quincy Police Supplemental Case Report #7, dated 1/30/2014 – contact with Sam Lathrop (Chief of Security for Quincy University); Erika Gomez-Steinkamp (Curtis Lovelace's second wife); Darlene Steinkamp (Erika's daughter);

QPD 0060-0071    Quincy Police Supplemental Case Report #8, dated 02/12/2014 – contact with Martha Didriksen (Cory Lovelace's mother); Justin Bower (student in Curtis Lovelace's Business Law Class); Steven Miller (student); Michael Brouse (student); Dr. Scott Denton (forensic pathologist in Bloomington, Illinois); Dr. Jessica Bowman (coroner's physician who performed autopsy on Cory Lovelace); Kameron Bridgeman (student); Laura Schwakert (student); Nicole Buckles (student);

QPD 0072-0080    Quincy Police Supplemental Case Report #9, dated 02/12/2014 – contact with Jani Brooks (Cory Lovelace's hairdresser); Amy Herkert (close friend of Cory's);

QPD 0081-0087    Quincy Police Supplemental Case Report #10, dated 02/13/2014 – contact with Ariel Prost (friend of Cory Lovelace); Kelly Fragassi (friend of Cory's); Jim Keller, and Dr. Jessica Bowman;

W.  Documents Bates-stamped QPD 0134 – QPD 0164 (**Exhibit W**); Containing:

QPD 0134-0137    Quincy Police Supplemental Case Report #11, dated 02/14/2014 – contact with Beth Dobrzynski (friend of Cory Lovelace); William Steven Belko (friend of Curtis and Cory)

QPD 0138-0141    Quincy Police Supplemental Case Report #12, dated 03/13/14 – contact with Dr. Jessica Bowman; Dr. Shaku Teas (forensic pathologist referred by Dr. Bowman); Andrea Rose (student in Curtis Lovelace's Business Law Class); Erika Gomez;

QPD 0142-0146    Quincy Police Supplemental Case Report #13, dated 03/27/14 – contact with Dr. Jessica Bowman, Dr. Shaku Teas, Martha Didriksen;

QPD 0147-0154    Quincy Police Supplemental Case Report, #14, dated 04/01/2014 - contact with Lyndsay Lovelace (daughter of Curtis and Cory Lovelace);

QPD 0155-0156    Quincy Police Supplemental Case Report #15, dated 04/28/14 - contact with Lyndsay Lovelace and Dr. Jane Turner (forensic pathologist from St. Louis City Medical Examiner's office);

QPD 0157        Quincy Police Supplemental Case Report #16, dated 05/15/14 - contact with Erika Gomez;

QPD 0158        Quincy Police Supplemental Case Report #17, dated 05/28/14 - contact with Dr. Jane Turner and Dr. Jessica Bowman;

QPD 0159-0161    Quincy Police Supplemental Case Report #18, dated 05/29/14 - contact with Lyndsay Lovelace and Martha Didriksen;

QPD 0162        Quincy Police Supplemental Case Report #19, dated 09/02/14

QPD 0163-0164    Quincy Police Supplemental Case Report #20, dated 08/24/14

X.  Documents Bates-stamped QPD 0171 – QPD 0217 (**Exhibit X**);
    Containing:

QPD 0171-0187      Quincy Police Supplemental Case Report #22, dated
09/01/2014 – contact with Dr. Jane Turner; Jennifer Cifaldi (Adams County
Assistant State's Attorney); Martha Didriksen; Detective Anjanette Biswell
(forensic examination of Curtis' laptop); Catherine Meckes (neighbor); David
Schlembach (neighbor);

QPD 0188-0190      Quincy Police Supplemental Case Report #23, dated
09/08/2014 – contact with David Schlembach (neighbor); Elizabeth Schlembach
(neighbor);

QPD 0191-0192      Quincy Police Supplemental Case Report #24, dated
09/08/2014 – contact with Paul Kurjanski (neighbor);

QPD 0193-0196      Quincy Police Supplemental Case Report #25, dated
09/08/2014 – contact with Lori Miles (neighbor); Steven Miles (neighbor);

QPD 0197-0200      Quincy Police Supplemental Case Report #26, dated
09/08/2014 – contact with Robert Sprague (neighbor);

QPD 0201-0205      Quincy Police Supplemental Case Report #27, dated
09/08/2014 – contact with Jennifer Cifaldi; Check Sackett (pastor); Dustin
Strothoff (neighbor); Brian Musholt (Strothoff's boss); Rhonda Brassfield
(neighbor)

QPD 0206-0208      Quincy Police Supplemental Case Report #28, dated
09/15/2014 – contact with Viola Sprague (neighbor);

QPD 0209-0215      Quincy Police Supplemental Case Report #29, dated
09/25/14 – interview of Larson Lovelace (youngest child of Cory and Curtis
Lovelace);

QPD 0216           Quincy Police Supplemental Case Report #30, dated
09/24/14 – contact with Dr. Michael Baden (forensic pathologist in New York
City);

QPD 0217           Quincy Police Supplemental Case Report #31, dated
09/24/14  - contact with Dr. Jessica Bowman

Y.  Documents Bates-stamped QPD 0355 – QPD 0374 (**Exhibit Y**);
    Detective Gibson's handwritten case notes

Z.  Documents Bates-stamped QPD 0394 – QPD 0397 (**Exhibit Z**);

Containing:

QPD 0394-0397    Quincy Police Supplemental Case Report #32, dated 10/30/14 – contact with Jon Barnard (Adams County State's Attorney); Rodney Hart (former reporter for Herald-Whig); Lynn Daly (member of Quincy Country Club);

AA.    Documents Bates-stamped QPD 0566 – QPD 0571 (**Exhibit AA**); Containing:

QPD 0566-0570    Quincy Police Supplemental Case Report #44, dated 03/04/2017 – contact with Melody Hackett (neighbor); Susan Niemann (neighbor); Edward Socci (neighbor)

QPD 0571    Quincy Policy Supplemental Case Report #45, dated 0205/17 – contact with Melody Hackett

(NOTE: All of the Quincy Police Supplemental Case Reports reflect that the Reporting Officer was Detective Adam Gibson.)

BB.    Documents Bates-stamped QPD 0576 – QPD 0612 (**Exhibit BB**); Detective Adam Gibson's Detective's Daily Log (of activities), dated 12/16/13 to 4/26/16.

CC.    Documents referred to in Plaintiff Curtis Lovelace's amended Answers to Interrogatory 13: (**Exhibit CC**); Containing:

Documents Bates-stamped AC 225-230    Email string

Document Bates-stamped AC 293    Email

Document Bates-stamped QPD 1064    Email

Documents Bates-stamped Plaintiff 6274-6276    Emails

Documents Bates-stamped Plaintiff 6280-6300    Emails

Documents Bates-stamped Plaintiff 6318-6320    Emails

Documents Bates-stamped Plaintiff 6323-6324    Emails

8

## JURISDICTION AND VENUE

Plaintiffs seek recovery under 42 U.S.C. §1983, so jurisdiction is proper in this court pursuant to 28 U.S.C. §1331.  Plaintiffs also allege state law claims arising out of the same facts, for which this court has supplemental jurisdiction under 28 U.S.C. §1367.

Venue is proper under 28 U.S.C. §1391(b) in this court in that the events giving rise to the lawsuit occurred within this district.

## PARTIES/PARTICIPANTS

Cory Lovelace, a married mother of four, was found dead in her bed on February 14, 2006. On August 27, 2014, Plaintiff Curtis Lovelace was arrested for the murder of his then-wife Cory Lovelace.  His first trial ended with a hung jury on February 5, 2016, and his second trial ended with an acquittal on March 10, 2017.  The parties and participants concerning this matter are introduced below:

### Parties

1.     Plaintiff Logan Lovelace is the second child and oldest son of Curtis and Cory Lovelace.  He was born on May 7, 1997, was eight years old when Cory died, and is 20 years old today. (Logan, p.24, 61).

2.     Plaintiff Lincoln Lovelace is the third child and middle son of Curtis and Cory Lovelace.  He was six years old when Cory died, and is 19 years old today.

3.     Plaintiff Larson Lovelace is the youngest of the four Lovelace children.  He was born on August 31, 2001, was four years old when Cory died, and is 17 today.  (Larson, p. 79).

4.     Defendant Adam Gibson began working with the Quincy Police Department on December 30, 1997.  Prior to that, he worked for the Illinois Department of Corrections as a correctional officer at Illinois River Correctional Center for a year and a half.  Detective Gibson

started as a patrol officer, and also worked with the drug task force.  He was a canine officer from 2006 until 2013, when his canine was retired.  In December of 2013, he became a detective, and remains one today.  (Gibson, pp. 29-30).

5.      Defendant Chief Robert Copley joined the Quincy Police Department on August 1, 1980.  He was a patrol officer and field training officer for twelve years.  In 1992, he became a detective for four years.  In 1996, he was promoted to Sergeant, where he was the youth unit supervisor for two years.  In 1998, he was promoted to Lieutenant, where he was the patrol night shift watch commander for six years.  In 2004, Robert Copley became Chief of the Quincy Police Department, and remains so today. (Copley, pp. 22-23).

6.      Defendant Sergeant John Summers joined the Quincy Police Department in 1977. He started in patrol, then went to investigations, was and promoted to Sergeant in 1983, and reassigned to the patrol division.  In 1996, he was reassigned to the detective section as a supervisor, and retired in July of 2017.  Sgt. Summers was Detective Adam Gibson's supervisor from December 2013 until July of 2017.  (Summers, pp. 11, 13).

7.      Defendant Lieutenant Dina Dreyer joined the Quincy Police Department on February 1, 1988. (Dreyer, p. 9).  She started out as a patrol officer, and was promoted to sergeant, supervising the patrol officers, in 1997.  She became the administrative services sergeant in 2000 was promoted again to lieutenant in 2004.  Lt. Drever became the detective lieutenant in January of 2013. (Dreyer, pp. 15-16, 21, 24).  In 2014, one of the detectives Lt. Dreyer supervised was Adam Gibson. (Dreyer, p. 51).  Lt. Dreyer is currently retired.

8.      Defendant James Keller was a deputy coroner for Adams County from 1988 or 1989 until he was elected Adams County Coroner in 2012.  He has a mortuary science degree from Worsham College of Mortuary Science, and became a licensed funeral director in 1982.  Jim Keller

worked as a funeral director at Duker Haugh Funeral Home in Quincy from 1982-2018. (Keller, p. 14).

## Participants

9.     Martha Didriksen is the mother of Cory Lovelace.  She saw her grandchildren quite often, as she lived two houses over on the next street from them, and so they would just walk through the backyard to see her.  (Didriksen, pp. 5, 7-9).

10.     Lyndsay Lovelace is the oldest child and only daughter of Curtis and Cory Lovelace, born December 23, 1993.  She was twelve years old on the day her mother died in February of 2006, and was in 6th grade at the time.  She is 25 years old today. (Lyndsay, pp. 6, 9-10.).

11.     Detective Jeff Baird of the Quincy Police Department was initially assigned to investigate the death of Cory Lovelace in February of 2014. (Summers, p.21).

12.     Jon Barnard was elected as State's Attorney in Adams County in November of 2004.  (Barnard, p. 9).  Jon Barnard hired, and then ultimately fired Curtis Lovelace from his part-time position as an assistant State's Attorney in Adams County on July 19, 2012 for reasons related to his non-performance. (Barnard, pp. 14, 40, 107, 113-114).

13.     Edwin Parkinson was appointed as special prosecutor, because of Barnard's conflicts, to prosecute Curtis Lovelace for the murder of his then-wife Cory Lovelace. (Parkinson, p. 10).

## FACTS

14.     Cory and Curtis Lovelace were married in January of 1991 and had four children together; Lyndsay, Logan, Lincoln, and Larson.  (Didriksen, p. 5).

11

15.     On February 14, 2006, Jon Barnard got a call from Curtis. Curtis said, "Jon, Cory's dead." Barnard asked, "where is she?" Curtis said she was in bed. Jon asked where Curtis was, and Curtis said, "at home." Barnard asked Curtis if he called the ambulance and Curtis said, "no." Barnard asked him if he called 911 and Curtis said, "no." Barnard told Curtis to stay put, hung up, and called 911. (Barnard, pp. 47-49).

16.     At around 8:30 or 9:00 that morning, February 14, 2006, Cory's mother, Marty Didriksen, heard a knock on her back door. When she opened the door, Curtis was standing there with the youngest son, Larson, in his arms. Curtis asked Marty if she would take Larson, and then said, "by the way, Cory is dead." And he left. (Didriksen, pp. 6-7).

17.     Quincy Police Sergeant John Summers assigned Detective Jeff Baird to do the initial investigation of Cory Lovelace's death on February 14, 2006 because Baird was available. (Summers, p. 21).

18.     Detective Baird's investigation showed that Baird arrived at the Lovelace home at approximately 9:44 a.m. Curtis said that he last talked to his wife at approximately 8:15 that morning and that after taking the children to school he returned and found his wife, Cory, deceased in their bed. (Exhibit O, p. 009756).

19.     Baird went into the bedroom and observed that Cory's hands were drawn up towards her shoulders in an unnatural position. He also noted that Cory's eyes were open, and were set and fixed and appeared glassy. Her lips were very dark red. Baird photographed the body of Cory Lovelace and the position her body was in at the time of his arrival. (Exhibit O, p. 009757)

20.     When Baird and Coroner Hamilton removed the bed coverings, Coroner Hamilton noted rigor in Cory's legs and arms. (Exhibit O, p. 009758).

21.     Baird interviewed Curtis at approximately 10:40 a.m. that morning.  Curtis said that he was up that morning at about 6:30.  Cory was not feeling well and she had been complaining of being tired and that she had been up all night.  Curtis said that he knew he would have to stay home with his youngest child and he determined that he would have to cancel class at Quincy University where he was an instructor..  Curtis said that he worked on his computer and printed out a class cancellation sign, which he too to post on the classroom door.  Curtis said he was back at the house ap about 7:40 a.m.  (Exhibit O, p. 009759).

22.     Upon his return Curtis found his wife upstairs yelling for their kids to get ready for school.  Curtis and Cory were downstairs when she said she was not feeling well.  Curtis said she was also feeling weak so he helped her walk back upstairs and put her into bed.  Curtis said he helped Cory lie down in bed and then continued getting the children ready for school.  Curtis said that he left with the children to take them to school at about 8:15. (Exhibit O, p. 009760).

23.     When Curtis came home, he worked on his computer in the kitchen, and at about 9:00, went upstairs to take a shower.  Curtis said he went upstairs to also check on Cory.  He saw her eyes were open and thought she was awake.  He called out her name, and also noticed that both of her arms were up and that her hands were pulled up by her shoulders.  He tried to wake her up and couldn't, and so he shouted her name a couple of times and shook her again and immediately knew that something was very wrong.  (Exhibit O, pp. 009760).

24.  Curtis became upset when he said that he did not try CPR and then he said although he is trained in CPR he knows that CPR does not work without a defibrillator.  (Exhibit O, p. 009761).

25.     That morning, deputy coroner Jim Keller was called to the Lovelace residence to remove the body of Cory Lovelace.  In his time in the funeral business, Keller was responsible for

13

removing 275-300 bodies a year, and on the majority of those removals he also embalmed, cosmetized, dressed, and casketed. (Keller pp. 24-25, 29, 60).

26.     Keller's mortuary science training taught him that after someone dies, it takes several hours before dehydration occurs of the lips and eyes of a decedent. You can tell whether someone's lips are dehydrated by their color and texture, and their eyelids are dark, with a marking across the whites of the eyes. (Keller, pp. 54-55, Exhibit Q).

27.     Keller's training also taught him that there is a distinct smell between someone who has just passed and someone who has been deceased for some hours. The odor of a deceased person gets stronger over time. (Keller, p. 56-57, Exhibit Q).

28.     When Keller entered the bedroom where Cory Lovelace was, he noted a fairly strong odor, which indicated to him that she may have been there for a while. Her hands were up in the air and bent at an angle. (Keller, pp. 66-67, Exhibit Q).

29.     When Keller went to roll Cory's body to begin the removal, he noticed that she was in full rigor mortis. Detective Baird said that Cory had only been deceased less than an hour prior to the initial call, and Keller asked, "of what day?" (Keller, pp. 78-79).

30.     The dehydration of Cory appeared to be quite advanced to Keller. The lips were very brown in color, very crusty, not rounded. There was dehydration in the eyes and around the nose. Her fingertips were also dehydrated, as they were darker, not rounded. (Keller, pp. 80, 83-84).

31.     Keller also noted that the lividity in Cory Lovelace was a darker purple, which indicated to him that she had been dead longer than what was stated by Detective Baird. Her body was also cool to the touch. (Keller, pp. 91-92, 218, 245).

14

32.     Keller's training taught him that it is generally eight to twelve hours for full rigor mortis, so he found the positioning of the hands and the timeframe suspicious.  (Keller, pp. 93-94, 102).

33.     Lyndsay Lovelace, the oldest child of Curtis and Cory Lovelace, said that there was a lot of fighting between her father and mother and at a young age, she didn't realize how toxic the relationship was.  But growing up, she's learned what's okay and what's not; the fights were not normal.  The interactions were not normal; It was not a good relationship. (Lyndsay, 96-97).

34.     Curtis and Cory Lovelace were heavy drinkers during their marriage. (Barnard, pp. 20-22).  Jon Barnard started suspecting that Curtis had a problem with alcohol between 2005 and 2007. (Barnard, pp. 17, 19).  Jon Barnard saw that Curtis had a volatile streak. (Barnard, p. 24).

35.     On February 14, 2006, the day Cory's body was found, Curtis came into the office that afternoon, and Barnard and others thought he was surprisingly not demonstrating any symptoms of grief. (Barnard, pp. 50-51).

36.     When the Quincy Police detectives would file reports, the reports would go to Sgt. Summers' desk prior to sending to Records.  He would read them, approve them, and then send them on to Records, or, at time, he had questions for the detective and may have had to send the report back to the detective for more clarity. (Summers, p.21).

37.     Sgt. Summers found Baird's report concerning because there were the marks on the body and where he described once or twice about how everything looked normal to him, but later described some of the postmortem disfiguration of the body and the position of the body. Sgt. Summers also found Baird's report concerning because he didn't do any neighborhood interviews at that time and didn't interview the kids until a day or two later. (Summers, p.27-28).

38.    Back in 2006, Detective Baird never spoke to the Lovelace's neighbors, never spoke to Larson Lovelace, the youngest boy, never spoke to the paramedics and firefighters, never spoke with Cory's friends. (Gibson, p. 126, Exhibits O and P).

39.    By looking at the condition of the body and it was two days later that Baird interviewed the kids, Sgt. Summers thought it was empirical that Baird should have talked to the kids right away just to get their fresh memory of what occurred. (Summers, p.29).

40.    Lt. Dreyer also believes that Baird's investigation was not complete because the youngest boy had not been interviewed and there was no specific cause of death; it was undetermined. (Dreyer, p. 90).

41.    When the autopsy report came back in February of 2006 as undetermined, Sgt. Summers talked to his Lieutenant, who talked to his boss, about getting a second autopsy done because he felt that the pathologist that conducted the autopsy was incompetent.  The answer from the Deputy Chief was that there wasn't going to be a second autopsy because they weren't going to spend the money. (Summers, pp. 30, 32-33).

42.    Within hours of receiving Dr. Bowman's autopsy report, Jon Barnard, the Adams County State's Attorney, talked to Dr. Bowman about things that were of significant concern.  He was concerned about the finding of "undetermined" for the cause of death and concerned about compression wounds inside the mouth.  He was also concerned about the condition of the body being inconsistent with the timeline reported by the deceased's husband. (Barnard, pp. 56-57, Exhibit R).

43.    In late December of 2013, Adam Gibson had just been made a detective and had just finished lead homicide investigator school and crime scene investigations training.  He was reading through several old cases to see what the investigators had done.  The Cory Lovelace case

was one of them, along with the homicides of Clyde Jackson and Antoine Hunt, along with one or two more old cases. (Gibson, pp. 130-131, 133-134).

44.     Detective Gibson questioned the work that Detective Baird had done back in 2006 because Baird didn't interview the children the same day, and Baird never brought Curtis to the station to interview him rather than interviewing him at his office when confronted with the information from the doctor about the suspicious injuries found during Cory's autopsy. (Gibson, pp. 107-108).   Gibson discussed these concerns with Chief Copley, Lieutenant Dreyer, and Sergeant Summers. (Gibson, pp. 110-111).

45.     When Detective Gibson looked at the photos of Cory Lovelace's body, he saw that her hands were raised in the air, which he found to be an unnatural position, her lips were very dark, and he saw the drying of the eyes.  In all the bodies that Gibson has seen in his 20-year career, he has never seen a person with their arms raised in the air after death. (Gibson, pp. 168-169).

46.     When Detective Gibson saw Dr. Jessica Bowman's autopsy report on Cory Lovelace, he had questions about things that she had put in her report where she included in her synopsis that the signs of death were not consistent with the timeframe given by Curtis and she also indicated that there suspicious or traumatic findings of the injury to the underside of the top lip. (Gibson, p. 162, Exhibit R).

47.     In the intervening time between February of 2006, and late December of 2013 when Detective Adam Gibson picked up the case again, Sgt. Summers thought about the fact that Dr. Bowman listed the cause of death as undetermined when there were other things that the police had concerns about. (Summers p.45).

48.     In late 2013, when Gibson first talked to Sgt. Summers about the Chief agreeing to let him reopen the case, Summers agreed with the decision to look at the case more.  At that point,

Sgt. Summers did not give Detective Gibson any direction about what he thought Gibson ought to do to pick up the case again. (Summers, p. 48).

49.     Detective Gibson told Summers that he was going to reopen the Lovelace investigation because he reviewed the reports and saw some discrepancies. (Summers, p. 91).

50.     Lt. Dreyer was in favor of reopening the case. (Dreyer, p. 101).

51.     Sgt. Summers can't recall any specific tasks with respect to the Lovelace investigation that he directed Adam Gibson to undertake. (Summers, p. 76).

52.     In late December of 2013, Detective Adam Gibson first talked with Coroner Jim Keller about what Keller personally observed at the scene where Cory Lovelace's body was found. (Gibson, pp.87, 89).  Coroner Keller relayed to Gibson the position of Cory's hands, the rigor mortis, the temperature, but Gibson did not believe at the time that there was any reason to document what Keller was saying. (Gibson, pp. 89-90).

53.     On January 6, 2014, Detective Adam Gibson interviewed Jon Barnard about the call he received from Curtis on February 14, 2006, advising Barnard of Cory's death. (Barnard, p. 83).

54.     Detective Adam Gibson stopped by Jon Barnard's office sometime in early 2014 and advised that he was reinvestigating or looking into the circumstances of Cory's death because of Dr. Jessica Bowman.  Dr. Bowman had been terminated from her position at Memorial Medical Center in Springfield because it had been found that she had provided conclusions of either accidental death or cause of death undetermined when it was later and reliably show to have been the result of foul play.  Detective Gibson was concerned over at least looking into the possibility that the autopsy protocol prepared by Dr. Bowman on Cory Lovelace fit that description or pattern. (Barnard, pp. 65-66).

55.     In 2014, during the course of this investigation, Detective Gibson also learned from the Sangamon County Coroner that Dr. Jessica Bowman was no longer a practicing forensic pathologist because of issues that they had had with autopsies that she had done. (Gibson, pp. 143-144).

56.     Adams County State's Attorney Jon Barnard made it clear from the outset that if Curtis Lovelace were to be prosecuted, the Adams County State's Attorneys' Office would not be the prosecuting agency because Barnard would be a witness. (Barnard, p. 69).

57.     Sometime after January of 2014, Detective Gibson went to the Chief's office to discuss the Lovelace case and said that this case had always interested him and that he had heard others concerned about how the case ended, and that's why he started to look at it. (Copley, p. 16).

58.     Detective Gibson had identified some inconsistencies between what was found at the scene and what was being said; from the pictures, the position of Cory's arms and hands did not appear to be consistent with the alleged time of death and also other facts.  There are pictures of her body, the lividity and rigor being the main issues. (Copley, p. 17; Dreyer, pp. 86-87).

59.     Gibson told Chief Copley that he and Jim Keller had conversed and Keller had concerns about the case as well. (Copley, p. 20).

60.     Gibson asked Chief Copley if he could have the original autopsy reviewed by Dr. Denton. (Copley, p. 17; Gibson, p. 164).

61.     Gibson asked Chief Copley if he knew that Curtis had not called 911 or attempted to assist Cory but rather called his boss, Jon Barnard, as the first call, and Chief Copley was not aware of that. (Copley, p. 18).

62.     Jon Barnard had one conversation with Jim Keller about Keller's observations at the scene; Keller said Cory appeared to be in full rigor mortis. (Barnard, p. 86).

62.    Chief Copley approved Detective Gibson's request to have the autopsy re-examined because he concurred with Gibson's thoughts that there were inconsistencies that needed to be answered and because the first autopsy did not indicate a cause of death. (Copley, pp. 20, 22).

63.    At the time Chief Copley approved the request, there were concerns about the initial detective Jeff Baird's work as a detective. The complaint against Jeff Baird was his failure to finish cases and not doing reports on interviews on more than one case he had been working on. (Copley, pp. 25, 28-29).

64.    Chief Copley believes there are things that should have been done in the initial investigation that were not done, such as all the children should be been interviewed that day, especially the youngest who was actually in the home when the deceased allegedly passed; a neighborhood canvass should have been done; Detective Baird missed some red flags in the investigation, mainly the condition and position of the body in conjunction with the statements by Mr. Lovelace; Baird missed some red flags on Mr. Lovelace's reaction and actions that morning, specifically just taking the youngest to grandma's house and casually stating that her daughter was dead; Baird should have done an intrusive interview of Mr. Lovelace - he had a couple of casual interviews but never really sat down with him and interrogated him; he missed a lot. (Copley, pp. 42-43).

65.    With all of this put together, Chief Copley believed a second autopsy should have been done.  It would have revealed that this was a homicide and that Cory was smothered. (Copley, p. 44).

66.     It was Sgt. Summers' understanding that Detective Gibson was going to talk to Dr. Bowman, and because of her concerns in the original autopsy, to see if she would reconsider or maybe look into it further as to what the manner of death was. (Summers, p.136).

67.     No one from the Quincy Police Department was trying to get Dr. Bowman to change her opinion to homicide.  They were trying to get a definitive answer from her (rather than "undetermined"). (Summers, p. 141).

68.     When Detective Gibson told Keller that they were looking into reinvestigation the case, Keller determined that there would need to be a pathologist to relook at the original autopsy report and conclusions.  Dr. Scott Denton of Bloomington, Illinois, became involved when Coroner Keller asked him if he would look at Cory Lovelace's autopsy report and do a review of the case. (Keller, p. 144).

69.     On February 7, 2014, Detective Adam Gibson met with Dr. Scott Denton in person to go over the autopsy results.  Dr. Denton told Gibson that he believed Cory Lovelace was a victim of poisoning with a possible coup de grace suffocation.  Dr. Denton had had a recent poisoning case that he had performed an autopsy on that had the things that he saw in Cory Lovelace's autopsy photos; the accelerated decomposition, the accelerated drying, were some of the things that were consistent with what he had seen in his recent ethylene glycol poisoning death. (Gibson, p. 265, Exhibit R).

70.     Dr. Denton further found that the inability to determine Cory's blood type because of hemolysis indicated a prolonged postmortem period.  A prolonged postmortem period was also consistent with the documented fixed posterior lividity and coming out of rigor mortis that was dissipating.  Dr. Denton found that this information was inconsistent with the witness-reported time of death interval of only one and one-half hours before authorities arrived.  (Exhibit S).

21

71.    Dr. Denton wished that Dr. Bowman had done microscopic routine biopsies of Cory's organs, but that was not done. (Denton, p. 16).  The most important thing that Dr. Denton observed was the decomposition change, the marling that they documented at the scene.  The pictures did not fit with that one and a half to two-hour time frame of being alive and then dead. The post-mortem interval was much longer.  The injuries that Dr. Bowman documented in her autopsy were consistent with Denton's opinion of suffocation.  (Denton, p. 20)

72.    If Cory Lovelace had not been cremated, Dr. Denton would have asked for an exhumation.  (Denton, p. 20).

73.    On February 7, 2014, Detective Gibson talked to Dr. Bowman on the phone and she told Gibson that she did not feel that there was a push (back in 2006) by either Coroner Hamilton or Detective Baird for the autopsy to be anything other than undetermined. (Gibson, p. 272).

74.    Dr. Bowman said she felt during the initial autopsy that suffocation was the cause of death, but with information she was given by Detective Baird she didn't feel she had enough to rule that way. (Gibson, p. 273, 352).

75.    Dr. Bowman specifically told Detective Gibson that she did not want to be involved in the matter any further because she didn't want to testify and that she and lawyers didn't get along. (Gibson, pp. 273-274).

76.    Adam Gibson and Jim Keller met with Dr. Bowman in Keokuk, Iowa.  Bowman, who is not a board certified forensic pathologist, knew they wanted a definitive answer, but she pushed for hard evidence, like a rag or something that's been put over somebody's face or in the case of smothering, a specific pillow that had fluids on it or something.  (Bowman, p. 73, 88).

22

77.    Dr. Bowman told Detective Gibson words to the effect that she relayed her suspicions about Cory Lovelace's death at the time and that it was then up to the coroner and the detectives to determine what happened. (Bowman, p. 106).

78.    Dr. Bowman refused to comment on the opinions of Dr. Denton and Dr. Turner because she is not a consulting forensic pathologist, so reviewing the reports of forensic pathologists is not in her job description.  (Bowman, p. 104).

79.    Dr. Bowman suggested Gibson contact Dr. Shaku Teas.   Detective Gibson consulted Dr. Teas because they were looking for people who might have information to provide that Dr. Bowman wasn't willing to formally give; to give them an actual opinion. (Gibson, p. 335).

80.    Curtis Lovelace became a suspect after Detective Gibson's meeting with Dr. Denton when Denton told Gibson that he thought Cory Lovelace's case of death was asphyxiation by the hands of another. (Dreyer, p. 147-149).

81.    On February 24, 2014, Jon Barnard advised Detective Adam Gibson that depending on the opinion expressed by Dr. Denton as to the cause of death based on his review of medical records, Barnard would need to apply for the appointment of the Special Prosecutor. (Barnard, p. 79).

82.    Detective Gibson contacted Dr. Jane Turner, a forensic pathologist with the medical examiner's office in St. Louis, and forensic pathology training program director at Saint Louis University School of Medicine.  Dr. Turner agreed to review the autopsy report and file on Cory Lovelace.  She found among the notable things in the scene photographs was the presence of rigor mortis in Cory's arms and their position.  She also found that the presence of a laceration on the inside of Cory's upper lip and abrasions below her nose to be a combination of findings suggestive of forcible suffocation at the hands of another.  (Exhibit T).

83.    Dr. Turner also found that the condition of livor mortis (lividity) depicted in the photos put Cory at or near the 12 hour postmortem time point, suggesting that she had been dead since approximately 9-10 p.m. the night before.  Dr. Turner found other postmortem changes that also suggested an approximate 12 hour postmortem time point. (Exhibit T).

84.    Chief Copley only had about a half dozen conversations with Lt. Dreyer or Det. Gibson about the status of the case: the conversation where he gave Detective Gibson permission to have the autopsy re-examined, the conversation with the Denton update, the conversation about Turner, and then the conversation that the case was going to the Grand Jury. (Copley, pp. 62-63).

85.    At no point prior to charges being brought did Chief Copley give any direction to Dreyer or Summers or Detective Gibson about the course of the investigation.  Copley did not talk about the reports with anyone connected to the investigation.  He also had no role in the decision to take this case to the Grand Jury. (Copley, pp. 66-67)

86.    Chief Copley does not recall anyone besides Detective Adam Gibson and Lieutenant Dina Dreyer keeping him informed of what was happening in the Lovelace case. (Copley, 13).

87.    Detective Gibson came to the belief that Curtis Lovelace killed Cory Lovelace during the course of the second investigation and after speaking with several of the doctors – Dr. Jessica Bowman, Dr. Scott Denton, and Dr. Jane Turner. (Gibson, pp. 13-14).  At the time Curtis was arrested, and at the time Gibson testified before the Grand Jury, he believed that Curtis had killed Cory.  (Gibson, p.15).

88.    Edwin Parkinson was assigned to the case and so he was the one in charge of reviewing all the reports and convening the Grand Jury. (Parkinson, p. 19). Detective Gibson first talked to Ed Parkinson about this case in June or early July of 2014. (Gibson, p. 328).

89.    Parkinson thought there was a problem with the autopsy done by Jessica Bowman because Bowman almost always came up with an undetermined cause of death when she should have been able to determine a cause of death – but she found that the death of Cory was undetermined. (Parkinson, p. 31).

90.    Parkinson said that in Bowman's report there were obvious signals; a cut on Cory's lip, petechiae, the state of rigor, but she still found it undetermined. (Parkinson, p. 31).

91.    At a meeting in Keokuk, Iowa with Dr. Bowman, Parkinson believed Bowman told him the findings she made probably needed further investigation, but from what she did, she could not put her name to an autopsy report as to the cause of death. (Parkinson, p. 89-90).

92.    Parkinson knew from the prosecutor in Sangamon County that Dr. Bowman was remiss in ever coming up with the positive cause of death of blunt force trauma or homicide.  Either a cause of death or a manner of death, they didn't like her, because she was reluctant to put her name to a specific finding. (Parkinson, p. 32).

93.    Parkinson had reviewed Dr. Jessica Bowman's reports and findings before in other cases and was not satisfied with her findings in at least one other case. (Parkinson, p. 23).  Jessica Bowman was discredited in prior cases she had worked on, and several counties stopped using her services based on her autopsy reports. (Parkinson, p.132).

94,    Parkinson believes that Dr. Shaku Teas ignores the facts and is not very believable. (Parkinson, p. 52).  Dr. Denton would never have told Keller or Gibson to call Dr. Teas because she is not reasonable.  (Denton, p. 29).

95.    Edwin Parkinson played a role in deciding what pathologists were going to be retained to give advice or opinions in this case by suggesting that his office contact Michael Baden from New York City and Dr. Jane Turner because he had used Baden in at least one other murder

case years before, and Dr. Turner in at least three cases that were all death cases. (Parkinson, pp. 21-22).

96.    It was Edwin Parkinson's suggestion that Michael Baden be contacted to evaluate this case, and so Parkinson contacted Baden.  From his review of the autopsy and other reports he was sent, Baden's oral report to Parkinson was that Cory died of suffocation at the hands of another. (Parkinson, p. 29).

97.    Parkinson had also used Dr. Scott Denton because he had been assigned to cases in Sangamon County that Parkinson had prosecuted and Denton also took over as the forensic pathologist for Adams County after Jessica Bowman was no longer being used by them. (Parkinson, p. 22).

98.    Parkinson believed that Dr. Denton's opinions had led Jim Keller and Detective Gibson to continue their investigation into why Cory Lovelace died; that Denton had told them information that had led them to conclude that this was a murder. (Parkinson, p. 97).

99.    Parkinson didn't suggest anything that should be in Dr. Denton's report.  Parkinson just wanted to know if Denton could give an opinion within a reasonable degree of forensic certainty as to the cause of death. (Parkinson, p. 60).

100.    Parkinson believed that it was Dr. Denton's opinion, to a reasonable degree of medical certainty, that suffocation was the cause of Cory Lovelace's death, and that Dr. Denton's opinions supported Curtis' guilt. (Parkinson, pp. 71, 74).

101.    Regarding Exhibit CC, pp. Plaintiff 06290-006293, Parkinson doesn't remember the email, but he does remember the contents somewhere where Dr. Denton in some report that he did have said that the comments about, "Unless you get Dr. Bowman to amend her report, you're

stuck with it."  And Parkinson thinks Denton even said, "If that's all you get, then that would be more than sufficient to meet reasonable doubt." (Parkinson, p. 87).

102.    Parkinson thought that initially in the binder [turned over to the defense] at some point there was some discussion by Dr. Denton that unless she amended her report, that would be more than reasonable doubt. (Parkinson, p. 107).

103.    Parkinson does not think a pathologist's opinion (or anybody else's opinion) as to what a jury might or might not find constitutes *Brady* Material. (Parkinson, p. 119).

104.    Sergeant Summers was not too concerned about the email when Detective Gibson talked to him about it because Dr. Denton, being a pathologist, giving a personal opinion about reasonable doubt, proves no facts at all. (Summers, pp. 78-79).

105.    Adam Gibson had gone to Lt. Dreyer and explained that he had showed the email to Ed Parkinson, but Parkinson had not remembered that happening, and so during the FOI what that email surfaced, Gibson got a call from Parkinson who asked why he wasn't told about the email.  Gibson had told him, "yes, I did, I showed it to you before the first trial, and you told me just to hold on to it."  And Gibson told Dreyer that he did, he held on to it, and put the email in his binder of the case. (Dreyer, p. 115).  Adam Gibson was very upset because Parkinson did not remember that conversation. (Dreyer, p. 117).

106.    Parkinson saw nothing in the Denton emails that would have changed his pursuit. (Parkinson, p. 137).

107.    Before the Grand Jury indictment, Parkinson met with Marty Didriksen, Cory's mother, and she told him how Curtis Lovelace, her son-in-law, came across that morning with the youngest child, Larson, in his arms and said that his wife was dead. (Parkinson, p. 26).

108.    Before the Grand Jury indictment, Parkinson met with Jim Keller who told Parkinson that at the scene that morning, Cory was in full rigor – her body was stiff.  Her coloring was such that from his experience with other deceased persons there had been lividity and Keller thought Cory had been dead for some time. (Parkinson, pp. 28-29, 35).

109.    Former Adams County State's Attorney Jon Barnard testified that is not the police, but the State's Attorney's responsibility to take cases to the Grand Jury, or in the case of a special prosecutor, he takes the case to the Grand Jury, not the police. (Barnard, p. 120).

110.    Parkinson decided to take this case to the Grand Jury; that's an independent decision that he makes as the prosecutor. (Parkinson, p. 121).

111.    Sgt. John Summers had no role in deciding to take this matter to the Grand Jury. Summers did not have any role in arresting Curtis Lovelace; Summers was out of town and so had no role in planning for the arrest.  He also had no role in arranging for the Lovelace children to be interviewed. (Summers, pp. 80-81).

112.    Lt. Dina Dreyer was not part of any conversations about the logistics of arresting Curtis Lovelace, nor was she involved in any conversations about interviewing any of the Lovelace children, as she was out of town, not at work, during all of that, including when Curt was arrest and the boys were interviewed..(Dreyer, p. 157)

113.    Chief Robert Copley was not involved in the decision to arrest Curtis Lovelace. (Copley, p. 97).

114.    At the request of special prosecutor Ed Parkinson, Detective Gibson prepared a document entitled "Cory Lovelace Death Investigation Summary" and gave it to Parkinson sometime before the Grand Jury was convened to assist Parkinson before the Grand Jury. (Exhibit

P; Gibson, p. 74). Most of the first three pages of the report are summaries of Gibson reviewing Detective Baird's reports from 2006. (Gibson, pp. 82-83).

115.   Firefighter Cole Miller told Gibson that all he did when he got in to Cory's bedroom was he grabbed her arm to check for a pulse and that immediately upon touching her he noticed that she was cool to the touch and that she was stiff, and then that was when the paramedics arrived. (Gibson, p. 176).

116.   Parkinson thought it was significant that when Curtis found his wife that morning he called Jon Barnard instead of an ambulance. (Parkinson, p. 104).

117.   Special Prosecutor Parkinson never saw any indication that anyone in the Quincy Police Department had fabricated any evidence, or even put a spin on any facts. (Parkinson, p. 124-125).  The investigation was done to his satisfaction. (Parkinson, p. 128).

118.   Parkinson did, and does, believe there was probable cause to arrest Curtis Lovelace., and probable cause to continue to prosecute him. (Parkinson, pp. 121, 127-128).

119.   Special Prosecutor Edwin Parkinson determined that there was probable cause to take this case to the Grand Jury, and for the arrest and prosecution of Curtis Lovelace based on the following factors::

(a) The photographs of the death scene that show the position of Cory's hands, the arms, and the position of the hands with relationship to Cory Lovelace's fact;

(b) The case was referred out to very well-noted forensic pathologists, Dr. Jane Turner of St. Louis, and Dr. Michael Baden, and each separately reported the same finding, that the death was caused by suffocation at the hands of other;

(c) The amount of lividity shown in the photos;

(d) Jim Keller's observation about the rigidity of the body when they moved it;

29

(e) The desiccation or dryness around the mouth and eyes; and

(f) The alleged 20 minutes that Mr. Lovelace took his children to school and returned, in which Cory supposedly died, did not comport with the rigidity, the rigor mortis, or anything else that Parkinson saw. (Parkinson, pp. 122-124).

120.    There was nothing withheld from Special Prosecutor Edwin Parkinson which would have changed his mind, because it did not change any of the factors he listed. (Parkinson, p. 124).

121.    The Grand Jury was convened, the came back with a true bill of indictment.  As a result of that, Curtis Lovelace was arrested. (Parkinson, p. 133-134).

122.    When Curtis was arrested, Detective Gibson told Chief Copley that he wanted to interview the boys and that he was concerned about them finding out about their father's arrest as class was letting out, so he felt that it would be best to pick them up from class.  Copley agreed, and instructed Gibson to make sure that was done with the school resource officer.  Copley was not concerned about the boys being interviewed without a parent or guardian present because they were being interviewed as witnesses. (Copley, pp. 98-99).

123.    Logan Lovelace, who was eight years old when Cory died, does not remember being interviewed by Detective Jeff Baird, but has no reason to believe that Detective Baird wrote down something incorrectly when Baird interviewed him on February 16, 2006. (Logan, p. 21, 22, 32).   He told Detective Baird that his mother was sitting on the steps when he left for school. (Exhibit O, p. 009789).

124.    Lyndsay Lovelace, who was twelve years old when Cory died, also does not remember being interviewed by Detective Baird. (Lyndsay, p. 18).   Lincoln Lovelace, who was

six years old when Cory died, also does not remember being interviewed by Detective Baird two days after Cory died. (Lincoln, p. 14).

125.   The three oldest Lovelace children told Detective Baird that they saw their mother sitting on the stairs when they left for school on February 14, 2006. (Parkinson, pp. 129, 131).

126.   Lyndsay does not remember seeing her mother sitting on the steps before she went to school on the morning of February 14, 2006. (Lyndsay, p. 14). She originally said she saw her mother sitting on the steps, and now Lyndsay can't stand behind what she said about seeing her mom because she doesn't know if it's the truth or it's something that she's dreamed about so many times. She told Detective Gibson that she can't separate the dreams from the facts. (Lyndsay, p. 88).

127.   Larson was only 4 years old when his mother died, and when he testified, he told the jury that that morning, he heard his dad take Lyndsay, Logan, and Lincoln to school because he heard them go out the door. He, Larson, went into his mother's bedroom as he always did. He poked her, and yelled at her, and she wouldn't respond. He poked her, and she didn't move, and so it scared him, and he went out and he sat on the stairs and waited for his dad to come home. So one could assume that Cory was already dead, and that was between 8:15 and 8:35 a.m. That gave Parkinson concern, as to the timeline that was being told as to Cory's death. (Larson, pp. Parkinson, p.130-131).

128.   Curtis told Detective Baird that he thought his youngest child, 4-year-old Larson, was in bed and that he got Larson out of bed after finding Cory deceased, and scooped Larson out of bed and carried him to Cory's parents' house. (Exhibit O, p. 009779).

129.   After the first trial with the hung jury on February 4, 2016, special prosecutor Edwin Parkinson decided to retry the case because they still had what he presumed to be very good

evidence, and the got the opinion of yet another expert from Michigan, Dr. Werner Spitz, who wrote the book on medical-legal causes of death, and he had the same opinion [of suffocation], and so they thought they had a solid case, and by experts. (Parkinson, p. 125).

130.    The decision of Parkinson's to retry Curtis Lovelace for the second time was talked about at Parkinson's office.  It was his opinion, but he shared it with his second chairs and a couple of other prosecutors who are almost as old as him, and they agreed it was worthy of going forward. (Parkinson, p. 278).

131.    Parkinson was told that the deadlock vote of the first jury was nine to three to start with, but it ended up six to six.  So there were six people in that jury room who believed that Curtis Lovelace was guilty of first degree murder.  And that weighed into Parkinson's decision to retry the case. (Parkinson, pp. 135-136).

132.    Parkinson did not get any push from the Quincy Police to retry Curtis; nobody pressured him to drop it or to pursue it. (Parkinson, p. 127).

133.    Parkinson was always convinced of Curtis' guilt, and he believed, and believes, the evidence was strong enough to justify the continued prosecution. (Parkinson, p. 127-128).

134.    The second trial of Curtis Lovelace ended on March 10, 2017 with an acquittal.

135.    On June 7, 2019, Lovelace served on defendants Amended Interrogatory Answers in response to the contention interrogatories that asked him to identify and describe:

a)    "pieces of exculpatory information" (#5);

b)    "information that confirmed that Cory Lovelace was not the victim of murder" (#6);

c)    "evidence that was fabricated, withheld, and concealed" (#7);

d)    "the false, misleading and incomplete information that was presented to the Grand Jury" (#8);

e)    "exculpatory evidence that defendants failed to produce" (#9);

32

f) "exculpatory forensic evidence that defendants failed to produce" (#10);

g) "evidence showing that witness statements had been coerced and fabricated" (#11);

h) "evidence showing that certain police reports prepared by Individual Defendants were also fabricated and incorrect" (#12);

i) "emails from Scott Denton" (#13);

j) "evidence subsequently revealed to Curtis Lovelace after the conclusion of the first trial" (#14);

k) "uncovered evidence that had previously been withheld" (#15); and

l) "evidence that ultimately resulted in his acquittal at the second trial" (#16).

136. Each of the above contention interrogatories contained the response that:

a) "Defendants' investigation revealed that numerous medical experts concluded that there was not a sufficient scientific basis to conclude that Cory Lovelace has been murdered.  This information came from, among other sources, Dr. Ezra Pounder, Dr. Jessica Bowman, Dr. Scott Denton, and Dr. Shaku Teas.

b) Defendants' investigation, including speaking with firefighters and coroner personnel on the scene also revealed that Cory Lovelace was not the victim of murder, at least in part because firefighters and coroner personnel on the scene provided physical descriptions of what they saw of Cory Lovelace's body that were inconsistent with a homicide and consistent with her having died that morning by natural causes, and

c) because generally there was not sufficient forensic evidence to bring charges against Mr. Lovelace, much less sustain a conviction.

d) Defendant Adam Gibson also interviewed all of the Lovelace children, who confirmed that they saw their mother alive before they went to school that morning.

e) Defendant[s] were aware that Erika Gomez, the source of purported inculpatory evidence as to Mr. Lovelace's guilt, was a wholly incredible witness.

f) Defendants Gibson and Keller also provided knowingly false and deliberately incomplete information to the experts they consulted, including Dr. Jane Turner, Dr. Werner Spitz, Dr. Michael Baden, and, ultimately, Dr. Scott Denton so that they knew they and others could not rely on the flawed medical opinions from these experts."

137.    In addition, in answering all the defendants' interrogatories regarding supposed exculpatory evidence, plaintiff consistently objected to the extent each "Interrogatory calls for information protected by the attorney-client or work-product privileges."

## ARGUMENT

### I.  COUNT I – THE QUINCY DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT ON CURTIS LOVELACE'S DUE PROCESS CLAIM.

In Count I, plaintiff Curtis Lovelace alleges that defendants violated his due process rights by the deliberately withholding exculpatory and impeachment evidence from Lovelace's[3] defense team and the prosecution during the initial prosecution of the criminal case, and that the individual defendants fabricated and solicited false evidence implicating Curtis in the crime.

#### A.  There is No Evidence of a Violation of Curtis Lovelace's Due Process Rights by Plaintiff's Claim of Fabricated Evidence.

On June 7, 2019, Lovelace served on defendants supplemental answers to interrogatories. (Facts, ¶135; Exhibit U).  In response to the contention interrogatories that asked him to identify and describe the information which he claims was fabricated, coerced or withheld, he gave a catch-all response which completely evaded the questions.  (Facts, ¶136; Exhibit U).  In addition, in answering all the defendants' interrogatories regarding supposed exculpatory evidence, plaintiff consistently objected to the extent each interrogatory "calls for information protected by the attorney-client or work-product privileges." (Facts, ¶136, Exhibit U).  Plaintiff cannot complain that information was withheld, or fabricated, or coerced, and then claim such information is protected by privilege from disclosing it.  Since plaintiff has chosen to rely on attorney-client and work-product privileges in his claims against defendants for wrongful conduct, those claims must fail as a matter of course.

---

[3] Unless otherwise noted, the name "Lovelace," on its own, refers to plaintiff Curtis Lovelace.

Curtis claims that information was fabricated by the Quincy defendants.  Although the Seventh Circuit has held that a police officer or prosecutor's fabrication of evidence against a criminal defendant violates due process if the evidence is later used to deprive the defendant of his liberty in some way, (*see, Bianchi v. McQueen*, 818 F.3d 309, 319 (7th Cir. 2016); *Fields v. Wharrie*, 750 F.3d 1107, 1114 (7th Cir. 2014)), there is no evidence of fabrication of evidence against Curtis Lovelace whatsoever.  In response to the contention interrogatory specifically asking for identification as to what evidence was fabricated, Lovelace not only answered with the blanket response that he gave to all of the contention interrogatories, but gave a laundry list of documents which consisted of all of the police reports, investigator notes, and daily activity logs generated as a result of the reinvestigation into Cory's death.

Curtis Lovelace must prove not only that any witness's statement was false but that Detective Gibson "manufactured" it.  *Coleman v. Thompson*, 111 S. Ct. 2546, *6 (1991); *Whitlock v. Brueggeman,* 682 F.3d 567, 580 (7th Cir. 2012).  That requires proof that Gibson caused a witness to provide him with a statement that Gibson knew – with certainty – was false.  *Fields*, 740 F.3d at 1112 (investigators fabricate evidence when they tell witnesses what to say knowing that what the witness is telling them is false).  Evidence that merely impeaches aspects of the witness's statement or suggest Gibson had reason to doubt the witness's veracity is insufficient. *Coleman*, at 6.  Although Lovelace is entitled to have all reasonable inferences drawn in his favor at this stage, "inferences that are supported by only speculation or conjecture will not defeat a summary judgment motion."  *Coleman*, at *6, *citing Carmody v. Bd. of Tr. of Univ. of Ill.*, 893 F.3d 397, 401 (7th Cir. 2018).  Lovelace's apparent claim that every piece of paper generated in the reinvestigation was fabricated is absurd.  It is also completely insufficient to defeat a motion for summary judgment.

### B.  There is No Evidence of a Violation of Curtis Lovelace's Due Process Rights by Plaintiff's Claim of a *Brady* Violation.

Despite Lovelace's kitchen-sink claims of withholding evidence, obviously made in hopes that some claim, however remote, will stick, defendants are entitled to summary judgment on Lovelace's *Brady* claims.  To prove a *Brady* due process claim, a plaintiff must show (1) the government suppressed evidence; (2) the evidence was favorable to the defense, either because it was exculpatory or had impeachment value, and (3) the evidence was material to an issue at trial. *Carvajal v. Dominguez*, 542 F.3d 561, 566-67 (7th Cir. 2008).  Plaintiff alleges a wide variety of evidence was withheld, but there is a complete lack of evidence to even suggest a *Brady* claim regarding any of it.

There certainly are cases recognizing a constitutional claim when police cause a *Brady* violation by not disclosing evidence to the prosecutors, thus preventing the prosecutor from fulfilling his *Brady* obligation.  *E.g., Manning v. Miller*, 355 F.3d 1028 (7th Cir. 2004).  However, defendants are entitled to summary judgment on Lovelace's due process claim because a) the evidence was not suppressed, in that Lovelace's defense attorneys either knew of the evidence not disclosed, or in the exercise of even the most minimal due diligence could have easily discovered the evidence; b) the allegedly withheld evidence was not material to any issue in Lovelace's criminal trial, and therefore could not have qualified as *Brady* material and, c) there is no evidence that any of the Quincy Defendants intentionally or recklessly withheld or failed to disclose any of the information plaintiff alleges was *Brady* material.

### 1.  All of the allegedly suppressed evidence was either known to Lovelace's defense team, or was easily obtained through reasonable diligence.

To establish a *Brady* violation claim against police officers, a plaintiff must prove that the exculpatory evidence was actually suppressed.  Evidence is not suppressed for *Brady* purposes if

it was otherwise available to the defendant through the exercise of reasonable diligence. *U.S. v. O'Hara*, 301 F.3d 563, 569 (7th Cir. 2002); *U.S. v. White*, 970 F.3d 328, 337 (7th Cir. 1992) ("Regardless of whether the evidence was material or even exculpatory, when information is fully available to a defendant at the time of trial and his only reason for not obtaining and presenting the evidence to the Court is his lack of reasonable diligence, the defendant has no *Brady* claim."). A *Brady* claim cannot be based on information that could have been reasonably obtained from other sources. *U.S. v. Boyd*, 833 F. Supp. 1277, 1357 (N.D. Ill. 1993).

Plaintiff cannot prove a *Brady* claim for Dr. Denton emails because one of his defense attorneys, Jeff Page, met with and talked to Dr. Denton prior to the first trial. Jeff Page knew that Dr. Denton had been in contact with Detective Gibson and Coroner Keller, and could have subpoenaed Dr. Denton's emails prior to the first trial. Had the defense team made any effort to do so, it could have procured the Denton emails that they contend were never turned over by Detective Gibson to the prosecutors. *Ienco v. Angarore*, 429 F.3d 680, 683 (7th Cir. 2005) (no *Brady* violation where reports were readily available to the plaintiff by subpoena); *U.S. v. Rodriguez-Andrade*, 62 F.3d 948, 952 (7th Cir. 1995) (no *Brady* violation where the defendant's employer's internal report available by subpoena); *U.S. v. Romo*, 914 F.2d 889, 898 (7th Cir. 1990) (no *Brady* violation where the defendant could have obtained records from police agency by subpoena).

## 2. There is no evidence that any defendant intentionally suppressed any *Brady* material.

Even more important to defendants' non-culpability for any *Brady* claim is that there is no evidence any defendant did anything to suppress or hide any *Brady* material. In the criminal context, a *Brady* violation occurs whether the suppression of evidence is willful or inadvertent. *Stickler v. Greene*, 527 U.S. 263, 288, 119 S. Ct. 1936, 1952 (1999). For a §1983 claim, however,

a much higher level of culpability than inadvertence is required.  Police officers may only be held civilly liable for a *Brady* violation if they deliberately, or at least recklessly, withheld exculpatory information, and thus prevent prosecutors from complying with the obligations articulated in *Brady*.  *Newsome v. McCabe*, 260 F.3df 824, 825 (7th Cir. 2001); *Cairel v. Alderden*, 821 F.3d 823, n.2 (7th Cir. 2016).

The Seventh Circuit held in *Newsome* that "[i]f all the plaintiff can prove at trial is that these officers failed to take the initiative in providing the prosecutors with information that would have come out as soon as the prosecutors asked (or as soon as defense counsel interviewed the police or questioned them on the stand), then no due process violation by the police has been established.  But, if the right characterization of the defendants' conduct is that they deliberately withheld information, seeking to misdirect or mislead the prosecutors and the defense, then there is a genuine constitutional problem." *Id*. at 825.

In *Johnson v. Dossey*, 878 F. Supp. 2d 905 (N.D.Ill. 2012), the plaintiff, after being acquitted of aggravated arson and insurance fraud, sued the police alleging they violated *Brady* by not providing her with a report about the fire prepared before her trial.  The report was found in the police files 13 months after the trial.  In finding no *Brady* violation, the court held that "there is no evidence suggesting they [the police] deliberately withheld the report" from the prosecutor or "knowingly" kept the prosecutor in the dark about the results contained in the report.

To prove defendants liable for a *Brady* violation, plaintiff needs evidence defendants deliberately withheld exculpatory material.  There is no such evidence here.  Detective Gibson believed he gave the Denton emails to the prosecutor before the first trial, and that the prosecutor handed them back to him, saying he did not need them.  The prosecutor did not remember that

happening.  That does not amount to a deliberate or reckless withholding of evidence such as to satisfy *Brady.*

### 3.  The alleged *Brady* emails From Dr. Denton were not material and do not constitute exculpatory or impeachment evidence.

Most importantly, the claimed *Brady* emails from Dr. Denton do not contain or constitute exculpatory or impeachment evidence.  In addition, the plaintiff's *Brady* claims are not material. An obligation to produce evidence is not triggered unless it is "material to either guilt or to punishment."  *Brady*, 373 U.S. at 1196-97.  Evidence is "material" under *Brady* if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.  *Carvajal v. Dominguez*, 542 F.3d 561, 567 (7th Cir. 2998). A reasonable probability exists where the "favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict."  *Kyles v. Whitley*, 514 U.S. 419, 435 (1994).  In other words, the duty to disclose under *Brady* rests on the materiality of the evidence to the question of guilt.

This materiality standard under *Brady* is not met by "the mere possibility that an item of undisclosed information might have helped the defense, or might have affected the outcome of the trial."  *U.S. v. Hamilton*, 107 F.3d 499, 509 (7th Cir. 1997).  As a result, *Brady* does not require the prosecution to "divulge every possible shred of evidence that could conceivably benefit the defendant."  *Id.  Brady* also does not require that absolutely "everything must be disclosed which might influence a jury."  *U.S. v. Solomon*, 688 F.2d 1171, 1178 (7th Cir. 1982).  Accordingly, the Seventh Circuit has explained that "police need not spontaneously reveal to prosecutors every tidbit that with the benefit of hindsight (and the context of other evidence) could be said to assist the defendant."  *Newsome*, 260 F.3d at 825.

Although the Seventh Circuit has expressed doubt that a defendant who was acquitted at trial can establish the requisite prejudice to prevail on a *Brady* claim, it has assumed that prejudice possibly could be established by showing that prompt disclosure of withheld, material evidence would have altered the prosecutor's decision to go to trial. *Huon v. Mudge, et al*., 597 Fed.Appx. 868 (7th Cir. 2015), *Mosley v. City of Chicago*, 614 F.3d 391, 397098 (7th Cir. 2010); *Parish v. City of Chicago*, 594 F.3d 551, 554 (7th Cir. 2009); *Bielanski v. Cnty. of Kane*, 550 F.3d 632, 644 (7th Cir. 2008).

Lovelace cannot show how a statement by Dr. Denton that a finding of "undetermined" for a cause of death at autopsy equates to "more than reasonable doubt in any person's mind," is exculpatory or material. The opinion of a medical person (or even a legal person) about what a jury will or will not find is not even an admissible statement at trial. It is preposterous to think that these words of Dr. Denton would have changed the course of the first trial. They certainly would not have changed the opinion of Edwin Parkinson to prosecute the case. He said he "does not think a pathologist's opinion (or anybody else's opinion) as to what a jury might or might not find constitutes *Brady* Material." There is no evidence, direct or circumstantial, that any defendant had any motive or intent to withhold any evidence, or operated under any plan to withhold evidence from plaintiff. The Quincy defendants are entitled to summary judgment on Count I of plaintiffs' complaint.

### C. Defendants are Entitled to Qualified Immunity from Liability for Plaintiff's *Brady* Claims.

Apart from whether plaintiff Curtis Lovelace can establish a constitutional claim, the Quincy defendants have qualified immunity from liability for plaintiff's *Brady* claims. Even if plaintiff could cobble together a possible *Brady* due process claim, the Quincy defendants are entitled to qualified immunity from any liability. Determining whether a government official has

qualified immunity is a two-step process.  First, a court must decide whether the facts show the officers' conduct violated a constitutional right.  Second, the court must decide whether the right at issue was clearly established at the time of the officers' alleged misconduct.  *Pearson v. Callahan*, 555 U.S. 223, 232 (2009); *Saucier v. Katz*, 533 U.S. 194 (2001).  In the preceding sections of this Memorandum, the Quincy defendants have demonstrated they did not violate Curtis Lovelace's rights.  If plaintiff could overcome that prong of the test, the court must then determine if the right allegedly violated was clearly established in 2014-2017, when the investigation and prosecution took place.

In a *Brady* case, the qualified immunity question is not whether the officer knew he had to disclose exculpatory information.  *Carvajal*, 542 F.3d at 569.  The question is whether it was clearly established that the information the plaintiff claims the police failed to disclose was material exculpatory evidence.  *Id.*  In other words, the question is whether the defendants should have recognized the allegedly withheld information as exculpatory or impeaching.  The relevant inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that the conduct was unlawful in the situation he confronted.  *Wilson v. Layne*, 526 U.S. 603, 609 (1999).

Plaintiff's *Brady* claim here for the purpose of qualified immunity analysis is the content of the emails from Dr. Denton to Detective Adam Gibson expressing his lay opinion on what a jury will or will not find in the wake of a finding of the cause of death as "undetermined."  The precedential case law has never clearly established that an opinion such as Dr. Denton's is *Brady* material.  No case law has ever even come close to establishing that such a lay opinion constitutes *Brady* material, so defendants are entitled to qualified immunity on liability, and thus, are also entitled to summary judgment.

41

### D. Plaintiff Can Produce No Evidence Against the City of Quincy Under §1983.

Finally, Curtis Lovelace has not produced any evidence which would form the basis for the City of Quincy's liability under §1983. The complaint alleges that the misconduct alleged in Count I was undertaken pursuant to the policies and practices of the Quincy Police Department, but plaintiff can put forward no evidence to that effect. The moving party may meet its burden of showing an absence of disputed material facts by demonstrating "that there is an absence of evidence to support the non-moving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 327, 325 (1986). As there is no evidence against the City of Quincy on any of Lovelace's §1983 claims, it is entitled to summary judgment on Count I of Lovelace's complaint.

## II. COUNT II – THE QUINCY DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT ON CURTIS LOVELACE'S FEDERAL CLAIM FOR MALICIOUS PROSECUTION.

The Quincy Defendants are entitled to summary judgment on Count II of the Complaint because the Seventh Circuit has confirmed that there is no free-standing constitutional tort of malicious prosecution.

Specifically, in both *Manuel v. City of Joliet, Illinois*, 903 F.3d 667 (7th Cir. 2018) and *Hurt v. Wise*, 880 F.3d 831 (7th Cir. 2018), the Seventh Circuit has repeated that no free-standing constitutional tort of malicious prosecution exists. The *Manuel* Court stated: "'[T]here is no such thing as a constitutional right not to be prosecuted without probable cause.'" *Manuel, supra*, 903 F.3d at 670, *quoting Serino v. Hensely*, 735 F.3d 588, 593 (7th Cir. 2013). The Seventh Circuit explained that after the United States Supreme Court ruled in *Manuel v. Joliet*, 137 S. Ct. 911 (2017), the plaintiff was entitled to damages "on the ground that detention without probable cause violates the Fourth Amendment," but that "malicious prosecution" is the "wrong characterization." *Manuel, supra*, 903 F.3d at 668, 670. Rather, "[t]here is only a Fourth Amendment claim – the

absence of probable cause that would justify the detention." *Id*., at 670, *citing Manuel, supra*, 137 S. Ct. at 917-20.

Further, the Seventh Circuit again stated that "there is no free-standing constitutional tort of malicious prosecution." *Hurt, supra*, 880 F.3d at 843. Rather, such constitutional violations that would be labeled as "malicious prosecution" should be covered under due process clause and Fourth Amendment violations for things like "abusive arrests, fabrication of evidence, etc." *Ibid.*

Since *Manuel*, it is likely that a Fourth Amendment claim can be brought if the defendant caused a prolonged seizure of the plaintiff pursuant to legal process unsupported by probable cause, and the criminal proceedings terminated in the plaintiff's favor. Curtis Lovelace's complaint alleges that there was no probable cause to bring and continue the legal process against him. This brief now addresses that contention.

### A. The Quincy Defendants did not Initiate or Commence Lovelace's Prosecution.

Police do not prosecute; prosecutors do. The police defendants cannot as a matter of law be held liable for decisions which are purely prosecutorial, in which the police play no role. As a result, to establish malicious prosecution against the police, the plaintiff must prove that the police proximately caused a malicious prosecution. *Beaman v. Freesmeyer, et al.*, 2019 IL 122654 (Feb. 7, 2019) ("Liability thus depends on whether the defendant was actively instrumental in causing the prosecution, and the presumption of prosecutorial independence can be overcome by showing that the defendant improperly exerted pressure on the prosecutor, knowingly provided misinformation to him or her, concealed exculpatory evidence, or otherwise engaged in wrongful or bad-faith conduct instrumental in the initiation of the prosecution."); *Fabiano v. City of Palos Hills*, 336 Ill. App. 3d 635 (1st Dist. 2002).

43

There is no evidence that any defendant proximately caused the prosecution, by engaging in any action that overcame the presumption of prosecutorial independence. or exerted any influence whatsoever on the prosecutors.   The decision to prosecute Curtis Lovelace was made after months of investigation, and that decision was solely made by Special Prosecutor Edwin Parkinson, with no push from the Quincy police.

Lovelace alleges in his complaint that Detective Gibson gave false testimony to the Grand Jury.  Presumably, plaintiff includes this allegation to satisfy the "commencement or continuation" element of the malicious prosecution claim, at least against defendant Gibson.   That allegation, however, cannot satisfy the commencement element for a number of reasons.  First, although Lovelace alleges false testimony was given, there is no evidence of any false testimony.  If plaintiff has such evidence, it is his burden to identify it for purposes of attempting to defeat summary judgment.  *Celotex Corp., v. Catrett*, 477 U.S. 317, 106 S. Ct. 2548 (1986) Defendants submit he cannot do so.  Even if the plaintiff has any such evidence at all, other than a bald allegation, Detective Gibson has absolute immunity for his testimony before the Grand Jury.  In *Rehberg, v. Paulk,* 566 U.S. 356, 132 S. Ct. 1497 (2012), the U.S. Supreme Court held that absolute immunity applies to Grand Jury testimony to the same extent it applies to a trial witness.

As a result, since defendant Gibson did not lobby for, urge, or otherwise influence the prosecutor's decision to prosecute Curtis Lovelace for the murder of his wife, and Gibson has absolute immunity for any Grand Jury testimony he gave (not to mention that he gave no false testimony), plaintiff cannot establish the first element of his malicious prosecution claim, and defendants are entitled to summary judgment on it.

44

### B. Probable Cause Defeats Curtis Lovelace's Claim of Malicious Prosecution.

The existence of probable cause is a "complete defense" to a malicious prosecution count. *Johnson v. Saville*, 575 F.3d 656, 659 (7th Cir. 2009), c*iting Cervantes v. Jones*, 188 F.3d 805, 810-11 (7th Cir. 1999). Probable cause exists if the "facts and circumstances … would excite the belief, in a reasonable mind, acting on the facts within the knowledge of the prosecutor, that the person charged was guilty of the crime for which he was prosecuted." *Johnson*, 575 F.3d at 659, *Cervantes*, 188 F.3d at 811; *see also Fabiano v. City of Palos Hills*, 784 N.E.2d 258, 266 (2002) ("Probable cause is a state of facts that would lead a person of ordinary care and prudence to believe or to entertain an honest and sound suspicion that the accused committed the offense charged.")

Probable cause does not require evidence sufficient to support a conviction beyond a reasonable doubt. It is sufficient if the known facts would support a reasonable person in believing that the suspect had committed a crime. *Jackson v. City of Peoria*, 2014 WL 12660539, \*3 (C.D. Ill. 2014). It should be concluded that the undisputed facts in this case "would lead a person of ordinary care and prudence to believe or to entertain an honest and sound suspicion" that Curtis Lovelace was guilty of murder. *Fabiano*, 784 N.E.2d at 266.

On summary judgment, defendants can prevail on such a claim if they demonstrate that no reasonable jury could find an absence of probable cause to initiate the charges. *Cariel v. Alderden*, 821 F.3d 823, 834 (7th Cir. 2016). For a malicious prosecution claim, probable cause is determined based upon the facts known to the prosecution at the time of filing, "not the actual facts of the case or the guilt or innocence of the accused." *Cariel,* at 834; *Sang Ken Kim* v. City of Chicago, 858 N.E.2d 569, 574 (2006).

45

Notably, an Illinois Grand Jury indicted Curtis Lovelace on the charge of murder, and such an indictment is *prima facie* evidence of probable cause.  *Wade v. Collier*, 783 F.3d 1081, 1085 (7th Cir. 2014).  Curtis will point out that this presumption may be rebutted by evidence that law enforcement obtained the indictment through improper or fraudulent means.  However, he must, but cannot, demonstrate defendants knew they lacked probable cause to arrest him.  *Williamson v. Curran*, 714 F.3d 432, 444 (7th Cir 2013).  Police officers are not required "to use the rules for summary judgment and draw inferences in favor of the suspects."  *Coleman, supra*, at 11, *citing Bridewell v. Eberle*, 730 F.3d 672, 676 (7th Cir. 2013).  "Where a reasonable person would have a sound reason to believe the suspect committed a crime, the police may arrest and allow the criminal justice system to determine guilt or innocence."  *Coleman,* at \*11; *Askew v. City of Chicago*, 440 F.3d 894, 895 (7th Cir. 2006).

It could hardly be disputed that there was probable cause to prosecute plaintiff.  There is an abundance of facts developed in the investigation which gave rise to probable cause.

- The fairly strong odor detected by Jim Keller when he entered Cory's bedroom, and the position of her hands in the air (Facts, ¶28);

- The condition of Cory being in full rigor mortis when Keller rolled her body over (Facts, ¶29);

- The dehydration of Cory appeared to be quite advanced to Keller in Cory's lips, eyes, around her nose, and her fingertips (Facts, ¶30);

- The dark purple lividity in Cory, and her body was also cool to the touch (Facts, ¶31);

- The concerns about the condition of the body being inconsistent with the timeline reported by Curtis;

- The opinions of Dr. Scott Denton and Dr. Jane Turner, board-certified forensic pathologists, that Cory's death was caused by suffocation at the hands of another;

Parkinson testified there was probable cause for the prosecution:

(a) The photographs of the death scene that show the position of Cory's hands, the arms, and the position of the hands with relationship to Cory Lovelace's fact;

(b) The case was referred out to very well-noted forensic pathologists, Dr. Jane Turner of St. Louis, and Dr. Michael Baden, and each separately reported the same finding, that the death was caused by suffocation at the hands of other;

(c) The amount of lividity shown in the photos;

(d) Jim Keller's observation about the rigidity of the body when they moved it;

(e) The desiccation or dryness around the mouth and eyes; and

(f) The alleged 20 minutes that Mr. Lovelace took his children to school and returned, in which Cory supposedly died, did not comport with the rigidity, the rigor mortis, or anything else that Parkinson saw.

(Facts, ¶119).

`       The undisputed facts show defendants had probable cause to arrest Curtis Lovelace, and probable cause to prosecute him. This defeats his Fourth Amendment claim and his state law malicious prosecution claim.

As to Quincy defendants Sergeant John Summers, Lieutenant Dina Dreyer, and Chief Robert Copley, individual liability under §1983 is appropriate only where the individual caused or participated in the constitutional deprivation. *Hildebrandt v. Ill. Dep't of Natural Res.*, 347 F.3d 1014, 1039 (7th Cir. 2013). A supervisor is liable under §1983 if the conduct occurred at the supervisor's direction or with the supervisor's knowledge and consent. *Id.* (citing *Gentry v. Duckworth*, 65 F.3d 555, 581 (7th Cir. 1995)). Since Detective Gibson is entitled to summary judgment, so are his supervising officers, whose participation is alleged to have the knowledge, approval, and consent of Detective Gibson's activities.

47

### III. COUNTS IV AND VI – THE QUINCY DERENDANTS ARE ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFFS' FEDERAL CLAIMS FOR CONSPIRACY AND FAILURE TO INTERVENE.

A §1983 conspiracy claim requires a plaintiff to establish (1) an agreement or meeting of the minds between two or more defendants to violate the plaintiff's constitutional rights, and (2) an overt act in furtherance of the conspiracy which results in a violation of a federal constitutional right. *Reynolds v. Jamison*, 488 F.3d 756, 764 (7th Cir. 2007). Most significantly, the plaintiff must prove an agreement between the defendants. *Kunz v. City of Chicago*, 234 F. Supp. 2d 820, 823 (N.D. Ill. 2002). A conspiracy claim cannot be based on attenuated inferences, speculation or conjecture. *Goetzke v. Ferro Corp*., 280 F.3d 766 (7th Cir 2002). There is no evidence that plaintiff can rely on to point to a common scheme to allow a jury to reasonably conclude a conspiracy existed between the Quincy police defendants and the Adams County defendants to violate plaintiff's constitutional rights.

In addition, Lovelace's conspiracy, failure to intervene, and municipal liability claims each depend on proof of an underlying constitutional violation. *Coleman, supra*, at *12; *Daugherty v. Page*, 906 F.3d 606, 612 (7th Cir. 2018 (conspiracy; *Gill v. City of Milwaukee*, 850 F.3d 335, 342 (7th Cir. 2017) (failure to intervene); *Petty, supra*, 754 F.3d at 424 (municipal liability). Because Lovelace cannot present evidence supporting an underlying violation, defendants are entitled to summary judgment on Lovelace's derivative claims as well.

Finally, there is no evidence that the decision to bring the three Lovelace boys to the police station to be interviewed was ever even discussed with anyone from the State's Attorneys' or special prosecutor's office. Thus, the Quincy Defendants are free from any conspiracy liability to the boys under the intracorporate conspiracy doctrine. *Wright v. Ill. Dep't of Children and Family Services*, 40 F.3d 1492, 1508 (7th Cir. 1994); *David v. Village of Oak Lawn*, 1996 WL 210072, at

48

*4 (N.D. Ill. Apr. 29, 1996). Logan, Lincoln, and Larson's attempt to allege a conspiracy between police officers, all of whom are within the same corporate entity, the City of Quincy. The intracorporate conspiracy doctrine bars their claim in Count IV.

As to Curtis Lovelace, since his Counts I and II fail as a matter of law, his Counts IV and VI for conspiracy and failure to intervene also fail as a matter of law.

## IV.  COUNT VII – THE QUINCY DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFFS' STATE LAW CLAIMS FOR INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS.

In any event, Curtis and Logan Lovelace's claims for intentional infliction of emotional distress under Illinois law fail because they are untimely. In Illinois, the Tort Immunity Act imposes a one-year statute of limitations period on intentional infliction of emotional distress claims. 745 ILCS 10/8-101(a); *Boyd, supra*, at 728; *Bridewell v. Eberle*, 730 F.3d 672, 678 (7th Cir. 2013). Claims for intentional infliction of emotional distress stemming from an arrest or prosecution accrue on the date of the arrest. *Id.*

Curtis was arrested on August 27, 2014, and Logan was interviewed at the police station on August 27, 2014 also therefore their claims are late. Logan's birthday is May 7, 1997, and he turned 18 on May 7, 2015. The statute of limitations on any IIED claim he may have had ran one year later, on May 7, 2016. Since the complaint was filed on May 5, 2017, both Curtis' and Logan's claims for IIED are time-barred.

As to Lincoln and Larson, to state a claim for intentional infliction of emotional distress under Illinois common law, plaintiffs must allege that: (1) defendants' conduct was extreme and outrageous; (2) defendants intended to inflict severe emotional distress or knew there was a high probability that their conduct would cause severe emotional distress; and (3) defendants' conduct did cause severe emotional distress. *See, Jackson v. City of Peoria*, 2014 WL 12660539, *3

(C.D.Ill. 2014); *Ivan Stan v. Fancy Colours & Co*., 125 F.3d 563, 567 (7th Cir. 1997); *Doe v. Calumet City*, 641 N.E.2d 498, 506 (Ill. 1994); *McGrath v. Fahey*, 533 N.E.2d 806, 809 (Ill. 1988).

Conduct is extreme and outrageous only if "the conduct has been so outrageous in character and so extreme in degree, as to go beyond all possible bounds of decency…." *Jackson, supra*, *citing Public Finance Corp v. Davis,* 360 N.E.2d 765, 767 (Ill. 1976). Moreover, "as to the third prong, an action may lie 'only where the distress inflicted is so severe that no reasonable man could be expected to endure it.'" *Jackson, supra, see McNamara v. Guinn*, 2000 WL 1222128, at *3-4 (N.D. Ill. August 23, 2000), *citing McGrath,* 533 N.E.2d at 809. Put another way, this standard is quite high, and in order to meet the threshold, "the defendant's conduct must extend beyond the bounds of human decency and be considered intolerable in a civilized community." *Jackson,* at *3, *citing Lewis v. School District #70*, 523 F.3d 730, 748 (7th Cir. 2008).

Lincoln and Larson's claim, in paragraph 124 of the Complaint, is that "by causing Logan, Lincoln and Larson Lovelace, as minors, to be unlawfully detained without the knowledge or consent of their parents, Defendants Copley, Summers, Dreyer, [and] Gibson engaged in extreme and outrageous conduct."

The basis for Curtis' IIED claim, which is time-barred, is that he was arrested and prosecuted for the murder of Cory. However, if this alone met the standard for establishing an IIED claim, every arrest and prosecution that resulted in an acquittal would qualify, and that is certainly not the case. Nor does the unlawful detention claim of two of the three Lovelace boys qualify for IIED claims. It is well-settled that indignities, threats, annoyances, petty oppressions, and other trivialities fail to qualify as outrageous conduct actionable in an IIED claim. *Lewis, supra*, at 747-48.

Curtis' major complaint is that he lives with the stigma of being known as "the guy who was on trial for killing his wife," that some people will no longer associate with him, and that he suffered great mental and emotional pain, as well as torment induced by fear.  "[A]lthough fright, horror, grief, shame, humiliation, etc. may fall within the ambit of the term 'emotional distress,' these mental conditions alone are not actionable." *Jackson, supra,* at *4, *citing Sornberger, v. City of Knoxville*, 434 F.3d 1006, 1030 (7th Cir. 2006).  Curtis' allegations cannot reasonably be construed as anything more than the "humiliation and indignities … mental, and emotional pain and suffering" that have repeatedly been found insufficient to demonstrate the level of emotional distress necessary to support an IIED claim.  *Jackson,* at *4.  All of their IIED claims are therefore without merit and the Quincy defendants are entitled to summary judgment on Count VII.

## V.  COUNT VIII – THE QUINCY DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT ON CURTIS LOVELACE'S STATE LAW CLAIM FOR MALICIOUS PROSECUTION.

Malicious prosecution under Illinois law requires proof of:  1) commencement or continuation of a criminal proceeding by the defendant; 2) absence of probable cause for the proceeding; 3) malice; 4) termination of the proceeding in a manner indicative of the plaintiff's innocence; and 5) damages.  *Swick v. Liautaud,* 169 Ill. 3d 504, 1238 (1996); *Reynolds v. Menard, Inc.*, 850 N.E.2d 831 (1st Dist. 2006).  Suits for malicious prosecution are not favored under Illinois law.  Public policy favors the exposure of and prosecution for criminal acts.  As a result, the plaintiff's burden in proving the elements of malicious prosecution is quite high.  *Swick v. Liautaud*, 169 Ill. 2d 504, 512 (1996); *Joiner v. Benton Community Bank*, 82 Ill.2d 40 (1980).  "It is axiomatic that probable cause is a complete defense to a malicious prosecution claim."  *Boyd v. City of Chicago,* 225 F. Supp. 3d 708, 728 (N.D. Ill. 2016), *citing Logan v. Caterpillar*, 246 F.3d 912, 926 (7th Cir. 2001).

Because probable cause supported the arrest and both prosecutions as explained earlier, Curtis Lovelace's state claim of malicious prosecution necessarily fails.  Probable cause is a bar to claims of false arrest under 42 U.S.C. §1983, see *Maniscalco v. Simon*, 712 F.3d 1139, 1143 (7th Cir. 2013); *McBride v. Grice*, 576 F.3d 703, 707 (7th Cir. 2009), as well as to claims of malicious prosecution under Illinois law, *see Johnson v. Saville*, 575 F.3d 656, 659 (7th Cir. 2009); *Hurlbert v. Charles*, 238 Ill.2d 248, 512 (2010).

## VI. COUNT IX – THE QUINCY DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFFS' STATE LAW CLAIM FOR CIVIL CONSPIRACY.

For all of the reasons the Quincy defendants are entitled to summary judgment on plaintiff's federal conspiracy claim, the defendants are entitled to summary judgment on Court IX.

## VII. COUNTS X AND XI – THE QUINCY DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFFS' STATE LAW CLAIMS FOR *RESPONDEAT SUPERIOR* AND INDEMNIFICATION.

All that remain to be discussed are Curtis Lovelace's claims resting on theories of conspiracy, municipal liability, and *respondeat superior*.  Since no claim against any individual Quincy defendant survives, there is no basis for liability against the City of Quincy.  *See League of Women Voters of Chicago v. City of Chicago*, 757 F.3d 722, 727 (7th Cir. 2014) (explaining that §1983 does not permit liability under theory of *respondeat superior*); *Smith v. Gomez*, 550 F.3d 613, 617 (7th Cir. 2008) ("[C]onspiracy is not an independent basis of liability in §1983 actions."); *Bublitz v. Cottey*, 327 F.3d 485, 488 n. 3 (7th Cir. 2003) (explaining that conspiracy liability under 42 U.S.C. §1985(3) depends on proof of underlying constitutional violation); *Lawlor v. N. Am. Corp. of Ill.*, 983 N.E.2d 414, 427 (Ill. 2013) (explaining that employer cannot be liable under theory of *respondeat superior* under Illinois law without tort of employee); *Adcock*

*v. Brakegate, Ltd.*, 164 Ill. 2d 54, 888, 894 (1994) (explaining that conspiracy under Illinois law requires tort committed in furtherance of agreement).

In addition, under the Illinois Tort Immunity Act, a local public entity is not liable for any injury resulting from an act or omission of its employee where the employee is not liable. 745 ILCS 10/2-109. Since Plaintiffs' Counts I and II fail as a matter of law, Plaintiffs' Counts X and XI *respondeat superior* and indemnification also fail as a matter of law and warrant no further discussion.

WHEREFORE, Defendants Det. Adam Gibson, Police Chief Robert Copley, Sgt. John Summers, Lt. Dina Dreyer, and the City of Quincy, pray that this court enter judgment in their favor and against the plaintiffs, and for an order dismissing Det. Anjanette Biswell as a defendant in this case.

Respectfully submitted,

/s/ Ellen K. Emery

ELLEN K. EMERY / ARDC# 6183693
*One of the attorneys for Defendants*
*Adam Gibson, Robert Copley, John Summers,*
*Dina Dreyer, Anjanette Biswell and*
*the City of Quincy*

Thomas G. DiCianni (ARDC #3127041)
Ellen K. Emery (ARDC # 6183693)
Justin DeLuca (ARDC #6308867)
ANCEL GLINK, P.C.
*Attorneys for Quincy Defendants*
312 782-7606/Fax: 312 782-0943
tdicianni@ancelglink.com
eemery@ancelglink.com
jdeluca@ancelglink.com

## CERTIFICATE OF SERVICE

The undersigned, one of the attorneys of record herein, hereby certifies that on **July 8, 2019**, the foregoing **QUINCY DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT** was e-mailed to the below counsel of record:

| | |
|---|---|
| Jonathan Loevy | jon@loevy.com |
| Tara Thompson | tara@loevy.com |
| James Hansen | jhansen@srnm.com |
| Daniel McCleery | dmccleery@srnm.com |
| James L. Palmer | jpalmer@slpsd.com; smast@slpsd.com |

/s/ Ellen K. Emery

ELLEN K. EMERY / ARDC# 6183693
ANCEL, GLINK, P.C.
140 South Dearborn Street, Sixth Floor
Chicago, Illinois 60603
Telephone:    (312) 782-7606
Facsimile:    (312) 782-0943
E-Mail:    eemery@ancelglink.com