## IN THE UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF ILLINOIS
## SPRINGFIELD DIVISION

| | | |
|---|---|---|
| CURTIS LOVELACE, LOGAN LOVELACE, LINCOLN LOVELACE, and CHRISTINA LOVELACE, on behalf of her minor son, LARSON LOVELACE, | ) ) ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | No. 17-cv-1201 |
| ADAM GIBSON, ROBERT COPLEY, JOHN SUMMERS, DINA DREYER, ANJANETTE BISWELL, UNKNOWN QUINCY POLICE OFFICERS, GARY FARHA, JAMES KELLER, THE CITY OF QUINCY, and THE COUNTY OF ADAMS, | ) ) ) ) ) ) ) ) | |
| Defendants. | ) | |

## OPINION

**SUE E. MYERSCOUGH, U.S. District Judge.**

This cause is before the Court on the Motion for Summary Judgment (d/e 89) filed by Defendants Gary Farha, James Keller, and Adams County ("Adams County Defendants") and the Motion for Summary Judgment (d/e 91) filed by Defendants Adam Gibson,

Robert Copley, John Summers, Dina Dreyer, Anjanette Biswell, and the City of Quincy ("Quincy Defendants").

## I. INTRODUCTION

This action stems from an investigation into the death of Cory Lovelace, the first wife of Curtis Lovelace, and the prosecution of Curtis Lovelace for the alleged murder of Cory Lovelace.  Plaintiffs Curtis Lovelace, Logan Lovelace, and Christine Lovelace, on behalf of her son Larson Lovelace, filed this action against the City of Quincy and Adams County along with several respective agents, including Detective Adam Gibson, Police Chief Robert Copley, Sergeant John Summers, Lieutenant Dina Dreyer, Detective Anjanette Biswell, unknown Quincy police officers, Coroner James Keller, and former Assistant State's Attorney Gary Farha.  Coroner James Keller and Chief Copley are sued in their official and individual capacities while the other defendants are sued in their individual capacities.

In the Complaint, Plaintiffs allege eleven separate claims, which are:

    (1)    Count I – due process violation pursuant to 42 U.S.C. § 1983 brought by Plaintiff Curtis Lovelace against all Defendants;

(2)     Count II – malicious prosecution pursuant to 42
        U.S.C. § 1983 brought by Plaintiff Curtis Lovelace
        against all Defendants;

(3)     Count III – unlawful detention pursuant to 42 U.S.C.
        § 1983 brought by all Plaintiffs against Quincy
        Defendants and Unknown Defendant Officers;

(4)     Count IV – conspiracy to deprive constitutional rights
        brought by all Plaintiffs against all individually
        named Defendants;

(5)     Count V – a state law claim for false imprisonment
        brought by Plaintiffs Logan, Lincoln, and Larson
        Lovelace against Quincy Defendants and Unknown
        Defendant Officers;

(6)     Count VI – failure to intervene pursuant to 42 U.S.C.
        § 1983 brought by all Plaintiffs against Quincy
        Defendants and Adam County Defendants;

(7)     Count VII – state law claim for intentional infliction of
        emotional distress brought by all Plaintiffs against all
        Defendants;

(8)     Count VIII – state law claim for malicious prosecution
        brought by Plaintiff Curtis Lovelace against all
        Defendants;

(9)     Count IX – state law claim for civil conspiracy
        brought by all Plaintiffs against all Defendants;

(10)    Count X – state law claim for respondeat superior
        brought by all Plaintiffs against all Defendants; and

(11)    Count XI – state law claim for indemnification
        brought by all Plaintiffs against all Defendants.

Adams County Defendants filed a motion for summary

judgment seeking a judgment in their favor on all counts.  Quincy

Defendants filed a similar motion for summary judgment, seeking a

judgment in their favor on all counts besides Counts III and V, the

claims for unlawful detention and false imprisonment respectively,

which are filed only against Quincy Defendants and Unknown Defendant Officers.  Both motions for summary judgment deal with the same issues, and, therefore, the Court addresses the motions together in this opinion.

## II. JURISDICTION

This Court has subject matter jurisdiction because Plaintiffs bring claims based on 42 U.S.C. § 1983, a federal law.  See 28 U.S.C. § 1331 ("The district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States").  The Court has supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367.  Venue is proper because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this district.  28 U.S.C. § 1391(b)(2).

## III. FACTS

Numerous facts were provided by each party.  The Court sets forth the pertinent facts that Defendants included in their Material Facts and that Plaintiffs included in their Additional Material Facts, taking into account each party's objections thereto.  Any fact submitted by any party that was not supported by a citation to

evidence will not be considered by the Court.  See CDIL-LR

7.1(D)(2)(b)(2).  In addition, if any response to a fact failed to

support each allegedly disputed fact with evidentiary

documentation, that fact is deemed admitted.  Id.  For those

reasons, Defendants' motions to strike, contained within the reply

brief, are denied.

## A. Curtis and Cory Lovelace

In January of 1991, Cory and Curtis Lovelace married.  Cory

and Curtis had had four children together: Lyndsay, Logan, Lincoln,

and Larson Lovelace.  The oldest, Lyndsay, recalls a lot of fighting

between her father and mother.  Mr. Lovelace believes that Cory

would sometimes yell at the children weekly or more.

Cory Lovelace drank excessively throughout her marriage with

Mr. Lovelace.  Mr. Lovelace also drank heavily at times.  He quit

drinking alcohol in 2012.  Cory also suffered from bulimia for some

time.  Both health conditions were confirmed by Cory's mother,

Marty Didriksen.  Ms. Didriksen also told Detective Jeff Baird that

Cory had not seen a doctor in the four years since Larson was born.

Between January 2005 and July 2012, Mr. Lovelace worked

for the Adams County State's Attorney's office.  Gary Farha worked

with Mr. Lovelace at the Adams County State's Attorney's office. Both Farha and Mr. Lovelace were supervised by Jon Barnard, the Adams County State's Attorney.

Mr. Lovelace was fired from his position in July 2012. On June 20, 2014, Farha was hospitalized and remained in the hospital until August 3, 2014. Farha was elected the Adams County State's Attorney on November 8, 2016.

## B. First Investigation

On February 14, 2006, Cory Lovelace was found dead by her husband, Mr. Lovelace, at their home. During an interview by Detective Jeff Baird, Mr. Lovelace said that Cory requested a Tylenol around 3:00 a.m., which he gave to her, and she may have thrown it up. In the morning, Mr. Lovelace stated that he woke up at 6:30 a.m. Cory was still not feeling well. She complained of being tired as she had been up all night. Mr. Lovelace also told another investigator, Officer Doug VanderMaiden, that Cory was suffering from flu-like symptoms over the last few days. Mr. Lovelace decided he would have to stay home to take care of their youngest child so he cancelled a class he taught at Quincy University. Mr. Lovelace said that Cory did get out of bed and went downstairs to help Logan

get a pair of pants for school.  Mr. Lovelace worked on his computer, printed out a class cancellation sign, then posted the sign on the classroom door.  Mr. Lovelace arrived back at the house around 7:40 a.m.  Upon his return, he heard Cory yelling from upstairs to their children to get ready for school.  At some point, Cory and Mr. Lovelace were downstairs when Cory said that she was not feeling well and that she felt weak.  Mr. Lovelace helped Cory walk up the stairs and put her in bed.  Mr. Lovelace then helped the children continue getting ready for school.  Mr. Lovelace left to take the children to school around 8:15 a.m.

Mr. Lovelace returned home, worked on his computer in the kitchen, then went upstairs to take a shower around 9:00 a.m.  He also went upstairs to check on Cory.  He saw her eyes were open and thought she was awake.  When he called out her name, he noticed both of her arms were up and that her hands were pulled up by her shoulders.  He found Cory lying in their bed, unresponsive.  He shouted her name a couple of times, shook her again, and then knew something was very wrong.  Mr. Lovelace did not attempt CPR because he knew CPR did not work without a defibrillator.

Around 8:30 to 9:00 a.m. that morning, Mr. Lovelace took their youngest son, Larson, to the home of Cory's mother, Marty Didriksen.  On his way home, Mr. Lovelace called his boss, Jon Barnard, the State's Attorney of Adams County at the time. Mr. Lovelace said to Mr. Barnard, "Cory is dead."  Barnard asked if Mr. Lovelace had called an ambulance, to which Mr. Lovelace said no. Barnard asked if Mr. Lovelace had called 911, to which Mr. Lovelace said no.  Barnard said he would call 911.

Medical personnel arrived on the scene and applied an EKG lead.  To do so, they had to move her arms.  One of the medical personnel, William Ballard, testified that Cory's arms were resting against her chest when they found her.  They pulled her arms up to apply the EKG and her arms remained in an upward position.  Mr. Ballard also testified that they felt a bit of rigor mortis[1] in her arms. Cory's hand and wrist area were cooler than her torso, which was warm.  Mr. Ballard documented the differing temperatures in his written report.

---

[1] Rigor mortis is defined as "temporary rigidity of muscles occurring after death." Rigor mortis, MERRIAM-WEBSTER DICTIONARY, https://www.merriam-webster.com/dictionary/rigor%20mortis (last visited October 13, 2020).

Detective Jeff Baird was assigned to do the initial investigation of Cory's death.  Detective Baird walked into the Lovelace home at approximately 9:50 a.m., which was after the medical personnel arrived at the scene.  Detective Baird noted that, upon arriving at the scene, Mr. Lovelace looked upset and was acting appropriately distraught given the situation.  Mr. Lovelace fully cooperated with Detective Baird's investigation.  Detective Baird interviewed Mr. Lovelace around 10:40 a.m. that morning.  However, Mr. Lovelace was never formally questioned during the first investigation.

Detective Baird went to the bedroom to inspect the area. Coroner Hamilton and Detective Baird removed the bed coverings, and Coroner Hamilton noted rigor in Cory's legs and arms.  Jim Keller, deputy coroner at the time, assisted Coroner Hamilton with the removal of Cory's body.

Detective Baird did not see any signs of trauma or injury. Detective Baird saw redness under Cory's nose and thought it was a skin blemish, not trauma.  He observed Cory's hands drawn up towards her shoulders in an unnatural position.  He took photographs of Cory's body between 10:00 a.m. and 10:20 a.m. Around the same time, both Detective Baird and Coroner Hamilton

felt that Cory's abdomen was warm to the touch.  The two also felt that Cory's forehead, which was exposed to the air, was also warm to the touch.

Detective Baird and Coroner Hamilton observed that Cory had mild lividity[2].  Detective Baird found Cory's left arm resting against a pillow and her right arm was partially against her body with her forearm and up suspended in the air.  Around 10:15 a.m., Detective Baird felt Cory's arms were pliable and moveable.  If Cory's arms had been moved before Detective Baird examined her, her arms would have stayed in the moved position instead of reverting back to the original position.  By noon, when he took photographs at the funeral home, there was more advanced rigor mortis, but the body was still not in full rigor mortis.   Detective Baird testified at the second trial that Keller did not tell Detective Baird that Cory was in full rigor mortis.  If Keller had said that, Detective Baird would have disagreed, saying Cory's body was not in full rigor mortis because Cory's arms were pliable.  See d/e 103-2, p. 50.

---

[2] Lividity is defined as "reddish- to bluish-purple discoloration of the skin due to the settling and pooling of blood following death."  Lividity, MERRIAM-WEBSTER DICTIONARY, https://www.merriam-webster.com/dictionary/lividity (last visited October 13, 2020).

Detective Baird examined the house and saw no signs of a struggle and no signs of a homicide.  Coroner Hamilton also did not find any signs of injury or trauma.  Based on the photographs, it did not appear to Detective Baird that Cory was suffocated.  Based on their observations, both Baird and Hamilton believed Cory's death was within two hours of when they observed her.

In the afternoon on the same day, Mr. Lovelace went into the Adams County State's Attorney's office.  Barnard and others thought Mr. Lovelace was surprisingly not demonstrating any symptoms of grief.

Detective Baird interviewed Mr. Lovelace again the next day on February 15.  He also interviewed the three oldest children. Detective Baird did not interview the youngest child, who was four years old at the time, as Detective Baird did not want to traumatize the young child and a toddler's memory is not necessarily the most reliable on details, times, and events.  Detective Baird felt the stories of the children were reasonably consistent on the important details.  Detective Baird did not interview any of Lovelace's neighbors or any of Cory's friends.  Detective Baird believes he performed a thorough investigation of the case.

After Detective Baird left the scene, he spoke with Coroner Hamilton and Dr. Bowman.  Dr. Bowman, a forensic pathologist, performed an autopsy on February 15, 2006.  On March 8, 2006, Dr. Bowman signed an autopsy report.  In Dr. Bowman's opinion, the cause of death was undetermined.  She noted "unexplained trauma of the mouth and signs of death inconsistent with the time frame given by history.  However, there is marked steatosis of the liver, associated with sudden demise but characteristically diagnosed in the absence of any other findings."  See Autopsy, d/e 93-18, p. 2.  Cory Lovelace's body was cremated thereafter.

After the autopsy, Dr. Bowman had concerns regarding the cut on Cory's lip, the mark under her nose, and the fatty change in Cory's liver.  Dr. Bowman was initially told that Cory was a social drinker, which did not correspond with the marked steatosis of the liver.  Dr. Bowman asked for further investigation from either the coroner or law enforcement to determine any particular cause for suspicion or concern in the case.  She was told that there was nothing suspicious in the investigation.  Dr. Bowman still questioned the marked steatosis of the liver and the position of the

body based on the photographs, which she believed represented an undisturbed body.

Detective Baird was surprised by Dr. Bowman's report because he was expecting to see a death from natural causes related to a health condition based on the conversations that he had with Coroner Hamilton. His follow-up conversations with Dr. Bowman did not lead him to seek murder charges against anyone.

Upon receiving Dr. Bowman's autopsy report, Barnard spoke to Dr. Bowman about her findings. He was concerned about her cause of death being "undetermined," the finding of the compression wounds inside of Cory's mouth, and the condition of the body being inconsistent with the timeline reported by Mr. Lovelace.

Sergeant Summers talked to his supervising lieutenant about getting a second autopsy done because he felt the autopsy was incomplete. Sergeant Summers was informed that a second autopsy would not be performed due to financial reasons. After that time, the investigation was suspended.

Coroner Hamilton then held an inquest into Cory's death and concluded the cause of death was undetermined.

## C. Second Investigation

In December 2013, Adam Gibson was made a detective and had recently completed lead homicide investigator school and crime scene investigations training.  Gibson reviewed several old cases to see what the investigators had done in the past, including the Cory Lovelace case.  Conflicting evidence has been presented as to the reason Gibson decided to review the Cory Lovelace case file. [3] Gibson has testified that he was reinvestigating the case because of Dr. Bowman being terminated from her position at Memorial Medical Center for circumstances surrounding her autopsy opinions.  However, Gibson also testified that he did not question Dr. Bowman's professional reputation at the beginning of the reinvestigation.

---

[3] Gibson has made numerous statements with differing reasons as to how and why he reviewed the Cory Lovelace file.  See d/e 93, p. 18 ("Detective Adam Gibson stopped by Jon Barnard's office sometime in early 2014 and advised that he was reinvestigating or looking into the circumstances of Cory's death because of Dr. Jessica Bowman."); d/e 93, p. 19 ("Sometime after January of 2014, Detective Gibson went to the Chief's office to discuss the Lovelace case and said that this case had always interested him and that he had heard others concerned about how the case ended, and that's why he started to look at it."); d/e 103-32, p. 10 (quoting Gibson as saying, "And I was at the office ... just reading old case files, and the Lovelace case popped into my head." ).

Gibson questioned the investigation done by Detective Baird in 2006 because Baird did not interview Mr. Lovelace at the station. Gibson discussed these concerns with Chief Copley, Lieutenant Dreyer, and Sergeant Summers.  Gibson also had questions relating to the autopsy performed by Dr. Bowman because the signs of death were inconsistent with the time frame given by Mr. Lovelace and the finding of a trauma injury to the underside of the upper lip. Gibson also had concerns based on the photographs of Cory's body, including the position of her hands, lip discoloration, and drying of the eyes.  When asked by Gibson, Chief Copley said he did not know Mr. Lovelace called Barnard instead of calling 911.

Gibson told Sergeant Summers that he wanted to reopen the case due to the discrepancies he saw in the reports.  In late 2013, Chief Copley and Sergeant Summers agreed to Gibson reopening the Cory Lovelace case and Lieutenant Dreyer was in favor of reopening the case.

In late December 2013, Gibson first spoke with Coroner Keller about what Keller personally observed at the scene where Cory's

body was found.[4]  Gibson also spoke to Keller to ask whether the autopsy and records were available as Gibson was interested in reopening the case.  During that conversation, Keller reportedly described to Gibson the position of Cory's hands, rigor mortis, and her temperature.  Keller told Gibson that when Keller moved Cory's body, she was in full rigor.  Gibson never took any steps to determine why this information was different than others' observations, including those of Coroner Hamilton and Detective Baird.

Keller collected information to send to Dr. Scott Denton from Bloomington, Illinois.  Gibson did not believe at the time that there was a reason to document what Keller was saying even though Gibson knew Keller would be a witness.  At some point, Gibson told Chief Copley that Gibson and Keller spoke and they were both concerned about the case.

After the second investigation began, Keller voiced certain beliefs about inconsistencies in Cory's death. Based on his training,

---

[4] Another account states that Keller and Gibson began communicating about the Cory Lovelace case on January 2, 2014.   See Combined Response, d/e 105, para. 69.

Keller believes it takes several hours before dehydration of the lips and eyes of a decedent occurs, which is evidenced by color and texture of the lips, dark eyelids, and a marking across the whites of the eyes.  He also believes there is a distinct smell between someone who has just passed and someone who has been deceased for some hours as the odor of a dead person gets stronger over time.  Keller testified that upon entering the bedroom, he noted a fairly strong odor, which indicated to him that she may have been there for a while.  He also witnessed her hands up in the air and bent at an angle.  He also noted that she was in full rigor mortis.  Keller believed Cory's dehydration was quite advanced as the lips were very brown in color and very crusty, not rounded.  He also witnessed dehydration in the eyes and around the nose and dehydration in her fingertips as they were darker, not rounded. Keller believed the lividity of Cory was darker purple, which indicated to him that she had been deceased longer than what was stated by Detective Baird – less than an hour prior to the initial call. Keller also believed that the position of Cory's hands and the stated time frame were suspicious because full rigor mortis generally takes

eight to twelve hours. This information was not provided in a report during the first investigation.

Barnard learned of the reinvestigation of Cory's death through detective Adam Gibson. Barnard informed Detective Gibson that if Mr. Lovelace would be prosecuted, the Adams County State's Attorney's office would not be the prosecuting agency. On January 6, 2014, Gibson interviewed Barnard about the call Barnard received from Mr. Lovelace in the morning of February 14, 2006.

Farha learned of the reinvestigation when Gibson went to Farha's office and specifically asked Farha about Mr. Lovelace's behavior. Farha stated that he once felt threatened by Mr. Lovelace when Mr. Lovelace did not get an interview for the Chief Public Defender position and Farha witnessed Mr. Lovelace in a rage. However, Barnard does not recall Mr. Lovelace acting angry at him about not getting a job.

On January 6, 2014, Gibson interviewed the paramedics and firefighters who responded to the scene of Cory's death. Gibson was told that the first responders applied EKG leads on Cory. Cole Miller, a firefighter and EMT with the Quincy Fire Department, told Gibson that he grabbed Cory's arm to check for a pulse and that

immediately upon touching her he noticed that she was cool to the touch and stiff.  Gibson also interviewed Ballard, the details of which were written in a report by Gibson.  Gibson's report states that Ballard smelled an odor in addition to alcohol in the room.  However, at trial, Ballard testified there was only an odor of alcohol, and the room did not smell of a deceased person.

Gibson emailed a forensic expert, Dr. Derrick Pounder, located in Scotland, about the possibility of smothering or suffocation causing spasm or instantaneous rigor.  Gibson told Dr. Pounder that Cory was in full rigor based on what Keller told Gibson.  Dr. Pounder told Gibson that it was entirely consistent that Cory Lovelace spoke to her children before they left for school that morning and still had her arms in rigor 1.5 hours later.  Gibson and Dr. Pounder communicated via email.  Gibson did not document what Dr. Pounder had told Gibson.  Gibson testified that this information could be exculpatory information and that, in hindsight, he should have turned over the information.  Gibson testified that it is his responsibility to document and thereby disclose exculpatory information.

Gibson and Copley wanted another forensic pathologist, Dr. Scott Denton, to review the original autopsy.  Keller also believed that another pathologist would need to review the autopsy report. Chief Copley agreed with that decision.  After reopening the case, Chief Copley complained about the initial investigation, namely, not formally interviewing Mr. Lovelace or the youngest son.  This information was never relayed to Baird during the first investigation.  Chief Copley did not instruct Baird to do any more than Baird had already done.

Dr. Scott Denton became involved in the case when Keller requested Dr. Denton to complete a review of the case.  Dr. Denton took over as the forensic pathologist for Adams County after Dr. Bowman was no longer being used by Adams County.  Keller's first task was collecting information to send to Dr. Denton.

On January 13, 2014, Gibson and Keller met for an hour to discuss Keller's communications with Dr. Denton.  Gibson did not create any notes or a report for this meeting.  Gibson told Summers, Dreyer, and Copley that Gibson had been communicating with Denton and expected Dr. Denton's findings by January 13.  However, Gibson later told Summers and Dreyer that

Dr. Denton could not provide more details until he could see slides
to rule out the liver as a cause of death as alluded to in the first
autopsy.  Keller took the slides to Dr. Denton in Bloomington.

Gibson met with Keller on January 22, 2014.  Keller had a
telephone conversation with Dr. Denton where Dr. Denton said he
would have information to them by the end of the week.  Again, no
notes were taken to memorialize the conversation. On January 23,
2014, Gibson sent the following email to Dr. Denton:

> Dr. Denton,
>
> I spoke with Jim Keller and he indicated he had spoken
> to you. Do you have any indication of a time frame for
> completion of the review on Mrs. Lovelace. The only
> reason I ask is to keep supervisors apprised of this
> investigation. Thank you for your time in this matter.
> Also please feel free to call me at any time with questions
> 217-430-9949
>
> Detective Adam Gibson

See d/e 103-25, p. 2.  On the same day, Dr. Denton responded with
the following email:

> Probably Wednesday or Thursday. I told Coroner Keller I
> have seen accelerated drying just like this within the
> history and timeframe stated by the children in cases of
> infection that entered the bloodstream, and she was sick
> for 4 days reportedly, and in ethylene glycol poisoning.
> That was why I asked to see all tissues from the slides
> and if any other tissues were saved. None were saved for

any further toxicology testing. The tear in the upper lip is older healing and would been bleeding if recent. The redness on the lower face can be trauma but if you closely have little white scales of skin consistent with a viral infection from the nose spreading to the skin. So I have go from what we have unfortunately, and Dr Bowman did not leave much. But we will discuss more next week

Scott Denton

See d/e 103-25, p. 2.

Gibson did not create a report memorializing the email communication with Dr. Denton on January 23, 2014.  During trial testimony, Gibson agreed that the email correspondence is exculpatory information and that he did not produce the email correspondence to Mr. Lovelace or his lawyers before the first trial, but that he should have produced it.

On January 27, 2014, Gibson spoke to Erika Gomez, Mr. Lovelace's ex-wife, via telephone.  After the call, he spent 2 hours researching ethylene glycol poisoning.  The next day, Gibson met with Ms. Gomez.  On the same date, after Gibson's research, Ms. Gomez claimed she was poisoned.  In an email, Gibson reported the telephone conversation to Summers and Dreyer suggesting that the conversation would support a poisoning theory.  In total, Gibson

spoke with Ms. Gomez eight separate times.  Liquids collected at the scene tested negative for poison.

On January 30, 2014, Dr. Denton emailed Keller and Gibson to request an in-person meeting instead of emailing back-and-forth. Dr. Denton also said that he wanted to show them what he was seeing in the autopsy photographs and "the severe alcoholism in her liver microscopic slide, and all the large holes in the autopsy report of Dr. Bowman."  See d/e 103-31, p. 2.

On February 7, 2014, Gibson met with Dr. Denton in person to review the autopsy results.   Gibson testified that Dr. Denton told Gibson at this meeting that he believed Cory Lovelace was a victim of poisoning with a possible coup de grace suffocation based on the autopsy photographs, accelerated decomposition, and accelerated drying.  However, Gibson did not document this interview.  Gibson wanted Dr. Denton to indicate his own findings.  Dr. Denton was going to try to speak with Dr. Bowman so Gibson made no detailed notes or report of the meeting.

Dr. Denton testified that he wished Dr. Bowman had done microscopic routine biopsies of Cory's organs.  Dr. Denton opined that the pictures did not fit the reported time frame of 1 ½ to 2

hours.  Dr. Denton believed that the injuries documented by Dr. Bowman in the autopsy were consistent with Denton's opinion of suffocation.  If Cory had not been cremated, Dr. Denton would have requested an exhumation.

Gibson and Keller reached out to Dr. Bowman.  On February 7, Keller sent an email to Dr. Bowman stating that he was glad her original report had termed this death "undetermined" and that, ever since Cory's death, Keller had thought about the case and, as a result, he felt very strongly about opening the case back up and had done so two months prior.

On February 7, 2014, Gibson spoke with Dr. Bowman on the telephone regarding the original autopsy performed by Dr. Bowman. Gibson testified that Dr. Bowman told him she felt that suffocation was the cause of death originally, but she did not feel she had enough information from Baird to make such a conclusion.  Gibson also testified that Dr. Bowman said she did not want to testify.  Dr. Bowman testified in her deposition that she never said she felt the cause of death was suffocation nor had she said she would not testify at trial.

On February 12, 2014, Gibson and Keller met with Dr. Bowman in Keokuk, Iowa. Based on Gibson's report of the meeting, Dr. Bowman had reservations about the autopsy, she told Gibson and Keller that Cory had sustained injuries consistent with suffocation, and she said she would consider providing an addendum to her findings. Dr. Bowman said that the mark on Cory's face could be consistent with smothering, which is one of a number of potential causes. Dr. Bowman knew that Gibson and Keller wanted a definitive answer, but Dr. Bowman needed more evidence than what she had been provided to change her opinions. Gibson's and Keller's pleas to give justice to Cory Lovelace were not sufficient to change her opinions. Dr. Bowman's suspicions that she had about Cory's death were relayed at the time of initial investigation, but it was up to the coroner and the detectives to determine what had happened.

On February 17, 2014, Dr. Bowman called Gibson and told him that she would not change her cause of death because there was no new evidence that would allow her to do so. On February 18, Gibson emailed Dr. Denton, including Dreyer and Summers on the email correspondence. Gibson stated that Dr. Bowman would

not write a report, but if she did, she would have to include several other potential theories for the unexplained marking. Therefore, Gibson expressed hope that Dr. Denton would be willing to continue a review of the case and provide an official opinion so the case could proceed. See d/e 103-40.

Sergeant Summers knew about Gibson meeting with Dr. Bowman. The Quincy Defendants contend they were not attempting to persuade Dr. Bowman to change her opinion from undetermined to homicide. Dr. Bowman felt the opposite.

On February 24, 2014, Gibson asked how to take the Cory Lovelace case to the grand jury and stated that he was awaiting a formal opinion from Dr. Denton disclosing injuries consistent with smothering. Barnard advised Gibson that depending on the opinion expressed by Dr. Denton as to the cause of death, Barnard would need to apply for the appointment of a special prosecutor.

On March 5, 2014, Dr. Denton sent an email to Gibson, Dreyer, Summers, and Keller ("March 5 email"), stating:

> I did finally get to it and was thinking how best to answer. If I understand, Dr Bowman will not write an amended statement to her report even simply to say what her opinion of the cause of death is, and that she is leaving it undetermined? Dr Bowman does not need to

write a report, but she does need to amend her autopsy report and even just write one sentence that after review her opinion it is a homicide so it is not left undetermined. Otherwise I agree you are stuck and the investigation can not proceed. If she leaves it undetermined after the abundant additional investigation information you gave her, that says to me that she will never say it is anything other than undetermined, and will never say it is a homicide, no matter what and no matter who reviews it. Suffocation as a cause of death has no positive demonstrable pathology findings such as in other blunt trauma, bruising or gunshot cases where I have disagreed with her. This is different. And after her outburst when you met with her, I am uncomfortable. I submit that if she, as the pathologist who did the autopsy and now has all this information you shared with her, and then leaves it undetermined without writing something different, and sticking to it in the future, that it is more than reasonable doubt in any reasonable person's mind.

It doesn't help that I think Mrs. Lovelace was probably poisoned and suffocated based upon what I see in the pictures and the circumstances, and circumstances of his next wife. I wish there was something to test now but she was cremated and there are no kidneys slides that were taken, nor even adequate histology performed, and the Memorial Hospital toxicology was inadequate for forensic purposes with poisons. The first thing I did when I started doing Sangamon Co autopsies was to make Sangamon Co use a forensic toxicology lab. If I write a paragraph stating that I believe that she was a victim of poisoning, as I have stated even before I knew of the next wife, just based upon review of the autopsy photos and autopsy report, does that help you? The poisoning could have been completed by suffocation with a soft object like a pillow, but there are no definite findings when someone is suffocated with a pillow. So I submit to you that we are both stuck right now in this currently suspicious death.

Scott Denton

<u>See</u> d/e 103-43, p. 2-3.

After receiving the March 5 email from Dr. Denton, Gibson spoke to Dr. Bowman again asking her to change her report, which she refused to do and instead referred Gibson to Dr. Teas, a forensic pathologist.  Gibson had a detailed conversation with Dr. Teas who told Gibson that there was no evidence Cory Lovelace had been suffocated or asphyxiated.  Dreyer and Summers were informed about the discussions.

After this conversation, Gibson contacted Dr. Denton to ask for names of other pathologists and stated that there was now more evidence that points to something else, like murder, happened.  On April 15, 2014, Dr. Denton sent a reply email to Gibson ("April 15 email") stating that Dr. Denton had concerns over Dr. Bowman not revising her report and the autopsy remaining "undetermined."  Dr. Denton stated, "Since there is no body, her opinion of undetermined will always trump anyone else's as reasonable doubt, at least to me."  <u>See</u> d/e 103-51, p. 2.  Dr. Denton went on to say he would write a report and that his review was not about money, "but for

[the] coroner as a favor since he was bringing his autopsies to me to perform." Id. Gibson forwarded the email correspondence to Summers and Dreyer.  Id.

Gibson contacted another forensic pathologist, Dr. Jane Turner, with the medical examiner's office in St. Louis and forensic pathology training program director at Saint Louis University School of Medicine.  Gibson had a telephone discussion with Dr. Turner.  He did not make a report of the conversation as he did not want to contradict her final report.  Dr. Turner agreed to review the autopsy report and file on Cory Lovelace.

Gibson next met with Dr. Turner at her office to give her background information and history of the case.  Gibson did not discuss with Dr. Turner Cory's history of bulimia.

On July 3, 2014, Dr. Turner provided a written report to Gibson.  Dr. Turner found that the presence of a laceration on the inside of Cory's upper lip and abrasions below her nose were suggestive of forcible suffocation at the hands of another.  Dr. Turner also found that the condition of livor mortis[5] depicted in the

---

[5] Livor mortis is defined as "hypostasis of the blood following death that causes a purplish red discoloration of the skins."  Livor mortis, MERRIAM-WEBSTER

photographs established that Cory was at or near the 12-hour postmortem point in time, which suggests that she had been dead since appropriately 9:00-10:00 p.m. the night before. Dr. Turner was told that Cory was in full rigor at the scene, which Dr. Turner assessed in reaching her opinion as to the timing of Cory's death.

After obtaining the report, Dreyer told Gibson that Chief Copley said it was time to discuss with Jon Barnard obtaining a special prosecutor.

Gibson contacted Dr. Bowman again to see if she would change her autopsy report based on Dr. Turner's report. Dr. Bowman did not comment on the opinions of Dr. Denton and Dr. Turner because reviewing reports of other forensic pathologists was not part of her job. Dr. Bowman did request to see the report of Dr. Denton, but Dr. Bowman was never provided the report.

Gibson met with Lyndsay Lovelace and Cory's mother, Marty Didrikson, on May 27, 2014. Lyndsay told Gibson that she saw her mother the morning of her mother's death. Her mother was sitting on the stairs. Mr. Lovelace helped her mother back up the steps.

_____

DICTIONARY, https://www.merriam-webster.com/medical/livor%20mortis (last visited October 13, 2020).

However, since that time, Lyndsay has testified that she does not know if she saw her mother that morning or not.

Gibson met with Ms. Erica Gomez, Mr. Lovelace's second wife, several other times. At that time, Mr. Lovelace and Ms. Gomez were divorced. Gibson and Ms. Gomez discussed testing her hair for poisoning, which can stay in the hair for up to 18 months. The test results of Ms. Gomez's hair tested negative for poisoning. Thereafter, Gibson met with Lyndsay Lovelace in Iowa. Lyndsay told Gibson that Ms. Gomez had been violent and abusive toward her, that Ms. Gomez was a violent person, and Ms. Gomez's conduct toward Lyndsay had not been rational.

The prosecution of Mr. Lovelace was handled by the special prosecutor, Ed Parkinson, who worked for the State Appellate Prosecutor's office. Gibson first spoke to Parkinson about the case in June or early July 2014. Parkinson took issue with the autopsy done by Dr. Bowman as Dr. Bowman had a tendency to conclude the cause of death as undetermined when the cause of death could have been determined. Parkinson met with Dr. Bowman in Keokuk, Iowa, and Dr. Bowman said her findings likely needed further investigation, but she could not change the cause of death on her

report.  Dr. Bowman was discredited in prior cases she had worked on, and several counties stopped using her services because on her autopsy reports.  Parkinson was involved in deciding what pathologists to retain for the prosecution.

On August 18, 2014, Gibson emailed to Parkinson, Summers, and Dreyer a document titled "Cory Lovelace Death Investigation" ("Summary"), which was prepared by Gibson for Ed Parkinson in preparation for the grand jury proceeding.  On August 19, 2014, Gibson sent the Summary to Assistant State's Attorney Gary Farha, and Farha responded to Gibson confirming the portion of the document that had to do with Farha was correct.  Farha forwarded the Summary to others in his office, including Josh Johnson and Jennifer Cifaldi.

Gibson never interviewed Coroner Hamilton.  He also did not discuss the investigation with Detective Baird until five months into the new investigation of the case.  Gibson did not discuss his concerns of the first investigation with Detective Baird.

Gibson has acknowledged that motive in the Cory Lovelace case was not a strong point.  Mr. Lovelace did not receive life

insurance from his wife's death, and Cory took care of the children, so without her, he was a single parent of four young children.

## D. Grand Jury and Investigation Thereafter

On August 27, 2014, Ed Parkinson took the case to a grand jury in Adams County.  Detective Gibson testified before the grand jury.  Gibson testified that rigor mortis usually takes 6-12 hours to set in a body, and in Cory's case, it was peculiar because it did not take 6 to 12 hours.  At the second trial, Gibson testified that such statement was inaccurate.  On the same day, the grand jury returned a True Bill of Indictment against Mr. Lovelace for the death of Cory Lovelace.

Around noon on August 27, 2014, Mr. Lovelace was arrested. Parkinson believes they had probable cause to arrest Mr. Lovelace and probable cause to continue to prosecute Mr. Lovelace.

Gibson, Dreyer, and Summers made the decision to take Mr. Lovelace's boys, Logan, Lincoln, and Larson, from school in police vehicles to the police station to be interviewed.  Gibson told Copley that he wanted to interview the Lovelace boys, but he was concerned about them finding out about Mr. Lovelace's arrest as school was letting out.  Gibson felt it was best to pick up the

children from school.  Copley agreed and told Gibson to use the
school resource officer.   Copley was not concerned about the boys
being interviewed without a parent or guardian present because
they were being interviewed as witnesses. Gibson called Lyndsay
after Mr. Lovelace's arrest to tell her that her brothers were alone at
the police station.  She was concerned about this and asked why
they were alone.  Gibson responded that he did not have enough
advanced notice to give any warning because the grand jury had
proceeded too quickly.  However, the investigative department knew
there would be an indictment that day.

By this time, Mr. Lovelace had married Christine Lovelace, and
Christine had adopted the boys, which Gibson knew.  Christine did
not know that the boys had been taken to the police station or that
Mr. Lovelace was arrested.  Once Christine found out, she went to
the police station.  Christine found the children crying and not
knowing why they were at the police station.  Gibson walked in and
told the boys that Mr. Lovelace had been arrested for the murder of
their mother, to which Christine asked, "Did you have to say that
like that to those boys?"  See d/e 105, p. 67.  Christine had the
boys leave the room, and Christine spoke to Gibson who told

Christine that threatening a witness in a homicide investigation is against the law and can be criminally punished.  Gibson told Christine that Lyndsay Lovelace claimed Christine was threatening Lyndsay and that Lyndsay was a prosecution witness.  Such a claim was untrue as Lyndsay did not say that anyone in the family other than Ms. Gomez had harassed Lyndsay.

Adams County played no role in the contact, transfer, or interviewing of the Lovelace boys after Mr. Lovelace's arrest.  No one from Adams County interviewed Mr. Lovelace or the boys.

In September 2014, Gibson contacted a new forensic pathologist, Dr. Michael Baden, to ask him to review the case.  Gibson provided Dr. Baden with Dr. Turner's report, scene photographs, and other documents.  Dr. Baden then provided a written report, which Gibson received and provided to Copley, Dreyer, Summer, and Parkinson.

After Mr. Lovelace's arrest, he was held at the Adams County jail.  His telephone calls were recorded, to which Gibson listened.  Keller and Gibson discussed how Gibson was listening to Mr. Lovelace's telephone calls and made jokes about what Mr. Lovelace said.  Gibson sent a file labeled as "Last Nights Call" to Parkinson,

Summers, Dreyer, and others.  Gibson also told Farha that he was listening to Mr. Lovelace's phone calls at the jail.

On January 8, 2015, Adam Gibson deleted all his emails. Gibson testified that they all delete their emails at the Quincy Police Department as they only had a certain amount of storage space in their email accounts.  Gibson's email account would prompt him to free up space.  Gibson also testified that the deleted emails were saved to the City of Quincy's server, and he cannot delete the emails from the server.

On May 1, 2015, Parkinson asked Gibson for a formal written opinion from Dr. Denton for use at trial.  Gibson forwarded the email to Dreyer, Summers, and Keller.  Keller offered to reach out to Dr. Denton about writing a report.

Dr. Denton provided a written report, which included an opinion that Cory's death was death by suffocation.  Dr. Denton's report did not reference his concerns or opinions from his prior emails with Gibson.

In December 2015, Gibson contacted Dr. Werner Spitz, another forensic pathologist, and provided him with the reports of

Dr. Turner and Dr. Baden.  Dr. Spitz provided Gibson with a written report.

Prior to 2017, the Quincy Policy Department had no specific policy to ensure exculpatory evidence was provided to the defendant.  Producing relevant correspondence was left to the discretion of the officer.

### E. Prosecution of Mr. Lovelace

In February 2016, the first criminal trial of Mr. Lovelace for the murder of Cory commenced.  Dr. Denton's agreed stipulation was consistent with his written report.  Dr. Turner and Dr. Baden also testified consistent with their reports.  Barnard, from the State's Attorney's office, testified at the first trial.  At the first trial, Mr. Lovelace was represented by Jay Elmore and Jeff Page.  In March 2016, the trial resulted in a mistrial due to a hung jury.

After the first trial, Parkinson decided to retry the case based on the same evidence and after obtaining the opinion of Dr. Werner Spitz.  Parkinson did not feel pressure from the Quincy Police to retry the case or to forgo it.

Mr. Lovelace's attorneys began working with an attorney, Evan Parke, from Washington D.C.  Parke issued FOIA requests to

various agencies seeking additional records relating to the case, including email communication.  The City of Quincy produced documents pursuant to the FOIA request, including email communications between Adam Gibson and other individuals involved in the case.  The email communications were obtained and produced from the City's backup server.

As a result of those emails being produced, Mr. Lovelace's attorneys requested additional discovery, which the trial court ordered on a variety of topics, including additional email communication, documents, and records.

Certain email communications between Gibson and Dr. Denton had not been produced to Mr. Lovelace and his attorneys but were produced pursuant to the FOIA request.  Based on the late production, the trial court held a pretrial hearing, at which Gibson contended he had shown the emails to Parkinson.

Gibson provided to Parkinson a binder that contained, what Gibson reported, was all Gibson's relevant case material.  Parkinson produced a copy of the binder to the defense attorneys prior to the first trial.  Parkinson testified at his deposition that he believes he saw in a report the statements from Dr. Denton that "unless you get

Dr. Bowman to amend her report, you're stuck with it," and "if that's all you get, then that would be more than sufficient to meet reasonable doubt." See d/e 90-6, p. 2. However, Parkinson has admitted that he does not believe he received the email correspondence between Dr. Denton and Gibson relating to Dr. Denton's belief in reasonable doubt. Parkinson also has testified that he produced everything to Mr. Lovelace and his attorneys that Parkinson received from Gibson. Sergeant Summers was aware that the email from Dr. Denton existed.

One of Mr. Lovelace's defense attorneys for the first trial, Mr. Jay Elmore, testified that he is not aware of any information that he had been provided after the first trial that shows there was any misconduct, fabrication of evidence, or witholding of documents by the Adams County State's Attorney's office.

Defense attorney, Mr. Jeff Page, believes that he should have received through the course of discovery in the first trial from the prosecutor handling the case any contradictory evidence as to what Dr. Denton had told Mr. Page at a meeting between the two. Dr. Denton told Mr. Page issues with the prosecutor's case and said he did not want to be a part of the case. Mr. Page also believes that

what Dr. Denton told Mr. Page contradicts with Gibson and Keller's representation that Dr. Denton told them that Dr. Denton believed Cory was murdered.  <u>See</u> d/e 90-9, pp. 38-39.   Mr. Page also believes, that if Parkinson saw the emails between Dr. Denton and Gibson, Parkinson would have produced the emails to Mr. Page and Mr. Elmore.  <u>See</u> d/e 90-9, p. 36.

Subsequently, Parkinson and the defense attorneys agreed to a stipulation that would be read to the jury instead of Gibson testifying.  The stipulation read:

> The State and its agents including Detective Gibson and the Quincy Police Department have an obligation in this and all criminal cases in Illinois to turn over relevant written or recorded statements from witnesses bearing on the prosecution.  In this case prior to February 20, 2017 Detective Gibson and the Quincy Police Department failed to turn over communications with some of the pathologists, doctors, Erika Gomez and other witnesses that the State had an obligation to turn over to Mr. Lovelace's defense.  There was a prior proceeding that occurred in this case in which these documents were never turned over to Mr. Lovelace's defense even though they should have been.
>
> On two occasions in February, 2017 Detective Gibson explained to a member of the Prosecution trial team that the reason for the failure to turn over these documents was oversight.  Members of the Prosecution trial team explained to Detective Gibson repeatedly and in very clear terms that he was obligated to search for, locate, preserve and produce all witness statements, all E-mail

> communications, and all other documents in the
> possession of the Quincy Police Department relating to
> this case.
>
> Mr. Parkinson denies that Detective Gibson ever showed
> him copies of the Denton E-mails referring to reasonable
> doubt at a bathroom break in any hearing or at any other
> time.  Mr. Parkinson is certain that Detective Gibson did
> not ever disclose the existence of these Denton E-Mails to
> him at any time prior to the Defense team obtaining them
> from a third party through the Freedom of Information
> Act.

See d/e 103-78, pp. 4-5.

The second trial commenced on March 1, 2017.  At the second
trial, Dr. Denton testified and his emails were shown to the jury.
Detective Baird also testified about his investigation.  Ballard
testified as well as to what he observed at the scene.  Dr. Shaku
Teas and Dr. Bill Oliver testified that Cory died from natural causes
and that alcoholism and possibly bulimia played a role in her death.
They both testified that there was no evidence Cory had died the
night before.   On March 10, 2017, the jury found Mr. Lovelace not
guilty.

After Mr. Lovelace's acquittal, Parkinson made the decision not
to prosecute the case again.  Mr. Lovelace was in custody from the
time of his arrest on August 27, 2014, until he was released on

bond in May 2016.  He spent over a year on house arrest until his acquittal in March 2017.

### F. Defendants' Involvement

When Cory Lovelace died, Lyndsay was 12 years old, Logan was eight years old,  Lincoln was six years old, and Larson was four years old.  Lyndsay, Logan, and Lincoln do not remember being interviewed by Detective Baird.  During the first investigation, Lyndsay, Logan, and Lincoln told Baird that they saw their mother sitting on the stairs when they left for school on February 14. Lyndsay now says that she does not know if it is the truth or something she has dreamed about many times.  Logan does not have reason to believe Baird wrote down any incorrect statements. Logan told Baird that his mother was sitting on the steps when he left for school.

Larson was only four years old when his mother died.  Larson testified at the criminal trial that he heard his father leave the house to take Larson's siblings to school.  Larson went into his mother's bedroom.  Larson poked and yelled at his mother, but she did not respond.  That scared him so he went and sat on the stairs waiting for his father to return.  Mr. Lovelace told Detective Baird

that he recalled that Larson was in bed after Mr. Lovelace found Cory deceased, and Mr. Lovelace picked up Larson out of bed and carried him to Cory's parents' house.

Larson, Logan, and Lincoln did not speak to the County Coroner regarding Mr. Lovelace's arrest or anything that followed. Larson, Logan, and Lincoln did not speak to Farha and were not interviewed by Farha. The three Lovelace children do not have independent information or knowledge of Farha fabricating or withholding evidence against Mr. Lovelace. Larson and Logan have no independent personal knowledge that Keller withheld evidence in the Cory Lovelace case. Sergeant Summers and Lieutenant Dreyer played no role in arranging for the Lovelace children to be interviewed or for the arrest of Mr. Lovelace. Chief Copley was not involved in the decision to arrest Mr. Lovelace.

After Parkinson was appointed, Barnard did not give any member of the special prosecutor's office any advice or direction about the case. Any file the Adams County State's Attorney's office had would have been provided to the special prosecutor's office after Barnard was appointed. Parkinson made the decision to prosecute Mr. Lovelace, he made the decisions of how to prosecute Mr.

Lovelace, and he handled the presentment of the case to the grand jury and the two murder trials against Mr. Lovelace.  During Parkinson's testimony, he admitted he could have asked Keller for Keller's file or subpoenaed the Adam's County Coroner.  What was said between Gibson and Keller in email correspondence would not have changed Parkinson's pursuit of the case.

Farha and Gibson are friends and had worked closely on other cases prior to the Cory Lovelace investigation.  Early in the second investigation, Gibson spoke with Farha about Mr. Lovelace and the Cory Lovelace investigation.  Farha told Gibson about an interaction with Mr. Lovelace where Mr. Lovelace did not get the public defender job and Farha felt Mr. Lovelace's reaction to the news was concerning. During the second investigation, Farha saw Gibson in general once or twice a week.  Farha regularly visited the State's Attorney's Office in 2013-2014.

When Farha received the Summary, he did not view himself as a witness.  Farha knew that his office could not be involved in the prosecution of someone who had worked for his office.  Farha never had any conversations with Keller about the Cory Lovelace investigation.  Gibson never told Farha Keller was involved in the

investigation.  Additionally, Farha never talked with anyone in the office about grand jury proceedings relating to Mr. Lovelace.  Farha did not take any witness statements, conduct interviews of witnesses, or present any information to the grand jury.  In spite of his knowledge of the second trial, Farha believes Mr. Lovelace is guilty.

Farha also knew Ms. Gomez from the time she was married to Mr. Lovelace.  Ms. Gomez texted Farha relaying purported violence Mr. Lovelace had committed towards her. Farha did not believe that Ms. Gomez was in imminent danger of being hurt by Mr. Lovelace. Farha believes Ms. Gomez lacked credibility.

Keller was a deputy coroner beginning in 1988 or 1989, and he became the Adams County Coroner in 2012.  Keller has made statements that he observed Cory on the bed with her hands in the air and a fairly strong odor, which indicated to him she had been there for a little bit.

Keller was involved in the second investigation of Cory's death, was in meetings with Dr. Bowman, and had communications with Dr. Denton.  He spoke with Dr. Denton to ask if Dr. Denton would review the autopsy and case.  Keller delivered the tissue slides to

Dr. Denton.  Dr. Denton communicated his opinions to Gibson, and Keller asked Dr. Denton to write a report at the request of Gibson. Keller also went with Gibson to meet with Dr. Bowman.  In July 2018, Keller resigned from the Adams County Coroner's office.  At his deposition, he exercised his Fifth Amendment right and refused to answer questions as to whether anyone had investigated or questioned his performance as a coroner.

When Mr. Lovelace was asked in his deposition about his allegations against Farha, Mr. Lovelace stated that he did not know the full extent of Farha's involvement.  Mr. Lovelace is aware of the email regarding the Summary sent to Farha from Gibson.  Based on that email, Mr. Lovelace assumes that Farha was involved in the investigation.  Mr. Lovelace did not identify any other information that Farha fabricated in the underlying two trials.  Mr. Lovelace believes that Keller fabricated the statements of his observations of Cory's body when Keller was on the scene.  He also believes that Keller failed to disclose information or misled Dr. Denton and provided information to retained forensic pathologists in such a way that would produce an opinion that was not accurate.

When a Quincy Police detective files a report, Sergeant Summers read it, approved it, and then sent it to the records department, or if he had a question for the detective, he may have sent the report back to the detective for more clarity.

After the investigation was reopened, Sergeant Summers testified that he found Baird's report concerning because of the marks on the body and Baird's description that matters were normal, yet he described postmortem disfiguration and the unusual position of the body. He also found Baird's report concerning because Baird did not do any neighborhood interviews at the time and did not interview the children until a day or two later. However, Sergeant Summers did not suggest to Baird that anything Baird did at the scene was wrong or that he should have done more. Sergeant Summers did not discuss with Baird nor did he direct him to do a neighborhood canvas or to interview the children more quickly. When Sergeant Summers closed the investigation, Sergeant Summers voiced no concern about how Baird had handled the Lovelace children, Mr. Lovelace's interview, or the lack of a neighborhood canvas.

Lieutenant Dreyer testified that she believes Baird's investigation was incomplete because Baird did not interview Larson because the cause of death was undetermined.

Chief Copley was involved in deciding whether to reopen the investigation.  He had several conversations relating to the case, including when he gave permission to Gibson to have the autopsy reexamined, a discussion relating to the Denton update, a conversation about Dr. Turner, and a discussion that the case was going to the grand jury.  Copley was kept informed by Gibson and Dreyer as to what was happening in the Lovelace case.  He would also regularly read reports about the Lovelace case.

In 2013 and 2014, one of Dreyer's responsibilities as a lieutenant was to ensure that a detective received the training they needed to be a detective.  Detectives were trained on what to turn over in Lead Homicide Investigator training.  Prior to 2017, the Quincy Police Department did not have a policy that required detectives to keep in their case files emails, copies of texts, or all communications they had involving a case.  It was up to the police investigator to turn over his or her material to the prosecutor, and

in turn, the prosecutor would produce the material to the defendant.

## IV. LEGAL STANDARD

Summary judgment is proper if the movant shows that no genuine dispute exists as to any material fact and that the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  The movant bears the initial responsibility of informing the court of the basis for the motion and identifying the evidence the movant believes demonstrates the absence of a genuine issue of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  No genuine issue of material fact exists if a reasonable jury could not find in favor of the nonmoving party.  Brewer v. Bd. of Trs. of the Univ. of Ill., 479 F.3d 908, 915 (7th Cir. 2007).  When ruling on a motion for summary judgment, the court must consider the facts in the light most favorable to the nonmoving party, drawing all reasonable inferences in the nonmoving party's favor.  Blasius v. Angel Auto., Inc., 839 F.3d 639, 644 (7th Cir. 2016).  The Court's role "is not to evaluate the weight of the evidence, to judge the credibility of the witnesses, or to determine the truth of the matter,

but instead to determine whether there is a genuine issue of triable

fact." <u>Outlaw v. Newkirk</u>, 259 F.3d 833, 837 (7th Cir. 2001).

## V. ANALYSIS

### A. Mr. Lovelace May Pursue Claims Under Both the Fourth Amendment and Fourteenth Amendment.

As an initial matter, the Court feels it necessary to address Mr.

Lovelace's argument that he is entitled to bring unlawful detention

claims under both the Fourth Amendment and Fourteenth

Amendment.  None of the Defendants address this issue or seek

summary judgment based on the argument that Mr. Lovelace is

entitled to bring such claims.  However, recent case law has been

issued since this Court denied Defendants' motions to dismiss that

warrants discussion of these issues.

The Supreme Court has held that pretrial detention can violate

the Fourth Amendment when the detention precedes or follows the

start of legal process in a criminal case.  <u>Manuel v. City of Joliet</u>,

137 S. Ct. 911, 918-19 (2017) (abrogating <u>Newsome</u> and <u>Liovet</u>).

Specifically, the Supreme Court held that the Fourth Amendment

"governs a claim for unlawful pretrial detention even beyond the

start of legal process," at least "when legal process itself goes

wrong," such as when "a judge's probable-cause determination is predicated solely on a police officer's false statements." Id. at 919-20.  However, the Supreme Court did not explicitly express "whether a claim of malicious prosecution may be brought under the Fourth Amendment." Id. at 923, 926 (Alito, J., dissenting); Hendricks v. Lauber, 16 C 627, 2017 WL 4899301, at *2 (N.D. Ill. Oct. 24, 2017) (noting that the Manuel case did not "definitively decide whether a claim for malicious prosecution may be brought under the Fourth Amendment").

On remand, the Seventh Circuit held that "'Fourth Amendment malicious prosecution' is the wrong characterization." Manuel II v. City of Joliet, 903 F.3d 667, 670 (7th Cir. 2018). Instead, "[t]here is only a Fourth Amendment claim—the absence of probable cause that would justify the detention." Id. ("But there is a constitutional right not to be held in custody without probable cause.  Because the wrong is the detention rather than the existence of criminal charges, the period of limitations also should depend on the dates of the detention.").  While a plaintiff may characterize his claim as one for malicious prosecution, the claim is one for unlawful detention under the Fourth Amendment.  See id.

Further, the claim for wrongful pretrial detention is not governed by the Fourteenth Amendment, but, instead, the claim is pursuant to the Fourth Amendment.  Id.; Lewis v. City of Chi., 914 F.3d 472 (7th Cir. 2019).

In Lewis v. City of Chi., which involved a pretrial detainee, the Seventh Circuit did not foreclose the possibility of a due process claim for other constitutional rights, such as Brady.  914 F.3d at 480.  The Seventh Circuit made a distinction between a claim for wrongful conviction versus wrongful pretrial detention based on fabricated evidence.  Id. ("We close by noting the important point that a claim for wrongful *pretrial detention* based on fabricated evidence is distinct from a claim for wrongful *conviction* based on fabricated evidence . . . .") (emphasis added).

After Lewis, the Supreme Court issued its decision in McDonough v. Smith, 139 S.Ct. 2149 (2019).  In McDonough, the plaintiff brought an action for violation of due process and malicious prosecution under § 1983 after the plaintiff was acquitted of state charges for forging absentee ballots.  Id. at 1253-54.  The allegedly fabricated testimony was elicited at two trials, the first of which ended in a mistrial and the second ended in an acquittal.  Id.

at 1254.  The Court noted that "[t]hough McDonough's complaint does not ground his fabricated-evidence claim in a particular constitutional provision, the Second Circuit treated his claim as arising under the Due Process Clause." Id. at 2155.  In a footnote, the Court further explained that in its acceptance of the Second Circuit's treatment of the due process claim, the Court "express[es] no view as to what other constitutional provisions (if any) might provide safeguards against the creation or use of fabricated evidence enforceable through a 42 U.S.C. § 1983 action." Id. at 2155 (citing Soldal v. Cook County, 506 U.S. 56, 70 (1992)("Certain wrongs affect more than a single right and, accordingly, can implicate more than one of the Constitution's commands")).

In this case, Mr. Lovelace claims the right to sue under both the Fourth Amendment based on Manuel and the Fourteenth Amendment based on McDonough.  In the complaint, Mr. Lovelace sued for due process violations (Count I) and malicious prosecution (Count II).  The Court construes the malicious prosecution claims (Count II) as claims for unlawful pretrial detention under the Fourth Amendment.  See Manuel II, 903 F.3d at 670.  Mr. Lovelace's due process violations (Count I) for fabrication of evidence and Brady

violations are construed under the Fourteenth Amendment,
consistent with the decision in <u>McDonough</u>.

Therefore, Mr. Lovelace's unlawful pretrial detention claims and due
process claims may proceed.

## B. Defendants Are Not Entitled to Summary Judgment on Mr. Lovelace's Claims for Unlawful Pretrial Detention (Fourth Amendment).

Pretrial detention can violate the Fourth Amendment when the
detention precedes or follows the start of legal process in a criminal
case.  <u>Manuel I</u>, 137 S. Ct. at 919-20.  A claim for wrongful pretrial
detention is premised on "the absence of probable cause that would
justify the detention."  <u>See</u> <u>Camm v. Faith</u>, 937 F.3d 1096, 1105
(7th Cir. 2019).  The Seventh Circuit has not specifically addressed
the elements of a Fourth Amendment unlawful pretrial detention
claim, but the court has emphasized that probable cause defeats
such a claim.  <u>See</u> <u>id.</u>  District courts in Illinois have held that a
plaintiff must prove that a defendant caused a prolonged seizure of
the plaintiff pursuant to legal process unsupported by probable
cause and that the criminal proceedings terminated in the plaintiff's
favor.  <u>Jackson v. City of Peoria</u>, No. 4:16-cv-01054-SLD-JEH, 2017
WL 1224526, at *9 (C.D. Ill. March 31, 2017), appeal filed; <u>see</u> <u>also</u>

Kuri v. City of Chi., No. 13 C 1653, 2017 WL 4882338, at *7 (N.D.
Ill. Oct. 30, 2017).

Defendants contend that they did not initiate the prosecution
of Mr. Lovelace.  However, prosecution is not the only way to
wrongfully detain a person.   As the Court in Manuel held, wrongful
detention occurs when the detention precedes or follows the start of
legal process in a criminal case. Manuel I, 137 S. Ct. at 919-20.
Certainly, a reasonable inference exists that Defendant Gibson and
Defendant Keller participated in causing Mr. Lovelace to be
detained for one year and nine months in the county jail and
another nine months on house arrest.  Both Gibson and Keller were
heavily involved in the investigation, each admitting to initiating his
own investigation, which led to the indictment.  Viewing the
evidence in the light most favorable to Plaintiff, a reasonable juror
could find that Defendant Gibson's superiors participated in
causing Mr. Lovelace's detention as they were routinely apprised
and involved in the decision making on how the investigation
developed.

As for Defendant Farha, a reasonable juror could believe that
Farha's account of Mr. Lovelace's fit of rage, Farha's impression of

Erika Gomez, and Farha's knowledge of Gibson listening to Mr.

Lovelace's jail telephone calls, contributed to the seizure of Mr.

Lovelace.  A question of material fact exists as to Farha's

participation in Gibson and Keller's investigation.

Defendants also argue that Gibson's and Keller's grand jury

testimony should be ignored because they have absolute immunity

for their testimony.  See d/e 93, p. 44; Rehberg v. Paulk, 566 U.S.

356, 374 (2012)(holding "that a grand jury witness is entitled to the

same immunity as a trial witness," which is absolute).  The Court in

Rehberg noted:

> Of course, we do not suggest that absolute immunity
> extends to all activity that a witness conducts outside of
> the grand jury room. For example, we have accorded only
> qualified immunity to law enforcement officials who
> falsify affidavits, see Kalina v. Fletcher, 522 U.S. 118,
> 129–131, 118 S.Ct. 502, 139 L.Ed.2d 471 (1997); Malley
> v. Briggs, 475 U.S. 335, 340–345, 106 S.Ct. 1092, 89
> L.Ed.2d 271 (1986), and fabricate evidence concerning an
> unsolved crime, see Buckley, 509 U.S., at 272–276, 113
> S.Ct. 2606.

Id. at 370, fn. 1.  As the Seventh Circuit said in Avery:

> If an officer who fabricates evidence can immunize
> himself from liability by authenticating falsified
> documentary or physical evidence and then repeating the
> false "facts" in his trial testimony, wrongful-conviction
> claims premised on evidence fabrication would be a dead
> letter.

Avery v. City of Milwaukee, 847 F.3d 433, 441 (7th Cir. 2017).

The same is true in this case.  While this Court ignores the grand jury testimony, the Court cannot ignore all the conduct that occurred outside of the grand jury proceedings, including statements made at trial.  See Avery, 847 F.3d at 441 (holding that trial testimony can be assessed when evaluating liability under § 1983 liability for due process violation).  Mr. Lovelace has presented evidence that leads to a reasonable inference that Gibson and Keller provided fabricated evidence to potential experts, some of which they later used at trial and was not disclosed to Mr. Lovelace's defense attorneys.  The alleged fabricated evidence and expert testimony was used against Mr. Lovelace at his criminal trial.

But even if Defendants caused a prolonged seizure, the existence of probable cause defeats such a claim.  Manuel I, 137 S.Ct. at 919-20 (holding that if probable cause is lacking, then the ensuing pretrial detention violates the person's Fourth Amendment rights).  "Probable cause exists to arrest a suspect if at the time of arrest the facts and circumstances within the arresting officer's knowledge and of which he has reasonably trustworthy information

would warrant a prudent person in believing that the suspect had committed or was committing an offense." Camm, 937 F.3d at 1105. However, probable cause is lacking when police hold a person "without any reason before the formal onset of a criminal proceeding." Manuel I, 137 S.Ct. at 918. Probable cause may also lack "when legal process itself goes wrong – when, for example, a judge's probable-cause determination is predicated solely on a police officer's false statements." Id.

Defendants argue probable cause existed to arrest and detain Mr. Lovelace. Defendants believe the testimony of the special prosecutor supports a finding of probable cause. However, Mr. Lovelace argues probable cause is lacking in this case because the special prosecutor, among others, relied on fabricated and suppressed evidence. According to Mr. Lovelace, the combination of fabricated evidence and suppressed evidence creates a situation where probable cause could not exist as Defendant was not detained based on "reasonably trustworthy information." See Camm, 937 F.3d at 1105.

The Adams County Defendants rely on Nugent v. Hayes, 88 F.Supp.2d 862 (N.D. Ill. 2000). In Nugent, the plaintiff brought a

§ 1983 action against the county and individual county officials for false arrest, malicious prosecution, and intentional infliction of emotional distress.  Nugent, 88 F.Supp.2d at 866.  The plaintiff was indicted for first degree murder of the plaintiff's wife, and the plaintiff was acquitted after a jury trial.  Id. at 865-66.  The plaintiff alleged that probable cause was lacking because the officer and coroner coerced and manipulated expert testimony, concealed exculpatory evidence, and made false representations about the plaintiff's financial condition.  Id. at 866.  While this case and Nugent may seem similar, there is a critical distinction.  In Nugent, all of the expert opinions were disclosed to the prosecutors and minimal misstatements were made to the expert.  Id. at 867-68.  The court noted that searching for a fourth expert, alone, is not enough for a malicious prosecution claim.  Id. at 867.  The district court granted the motion for summary judgment, finding probable cause for the plaintiff's detention even when excluding the tainted evidence.  Id. at 869.

In this case, the reinvestigation was preceded by an investigation immediately after Christine Lovelace was found dead, which was conducted by Detective Baird (the "original

investigation"). Mr. Lovelace alleges that the original investigation was thorough, and both Dr. Bowman and Coroner Hamilton found the cause of death to be undetermined. While there were some concerns over Dr. Bowman's finding of undetermined, Defendant Summers was informed by the Quincy Police Department that a second autopsy would not be performed and the investigation was suspended. The original investigation did not result in an arrest, charges, or a grand jury indictment. Mr. Lovelace was not arrested until after a second investigation was conducted seven years later. Copley did not instruct Baird to do any more than Baird had already done. Based on the evidence presented, discussed in more detail below, Mr. Lovelace has brought forth sufficient evidence to create a genuine issue of material fact whether probable cause existed to detain Mr. Lovelace.

Mr. Lovelace argues that Defendants Gibson and Keller made several materially false statements to several forensic pathologist experts, failed to disclose exculpatory statements made by Dr. Denton to the prosecutor, and failed to disclose an expert sought during the investigation, Dr. Pounder. Keller relies on the fact that Gibson said he turned the Dr. Denton emails over to prosecutors.

However, Gibson admitted in his deposition that he did not and a stipulation was read to the jury that "[t]he State and its agents including Detective Gibson and the Quincy Police Department" failed to turn over communications with some of the pathologists among other evidence.

Therefore, the Court denies the motion for summary judgment as to Plaintiff's Fourth Amendment <u>Manuel</u> claims against Gibson, Copley, Summers, Dreyer, Keller, and Farha.

## C. Defendants Are Not Entitled to Summary Judgment on Mr. Lovelace's Due Process Claims.

Mr. Lovelace presents two distinct theories of liability pursuant to the Fourteenth Amendment's Due Process Clause: (1) Defendants fabricated evidence, and (2) Defendants violated their <u>Brady</u> obligations by withholding information.  Defendants also contend that qualified immunity shields them from Mr. Lovelace's <u>Brady</u> claim.

### 1. Mr. Lovelace's claims for fabrication of evidence survive summary judgment.

To prove a fabrication claim, a plaintiff must prove not only that the defendant created evidence but that the defendant knew the evidence was false.  <u>See</u> <u>Avery</u>, 847 F.3d at 439; <u>Whitlock v.</u>

Brueggemann, 682 F.3d 567, 580 (7th Cir. 2012) ("[A] police officer who manufactures false evidence against a criminal defendant violates due process if that evidence is later used to deprive the defendant of her liberty in some way."); Khorrami v. Rolince, 713 F. App'x 494, 500 (7th Cir. 2017) ("For [the plaintiff] to sustain a due process claim premised on the false Declaration, he must prove the evidence was used against him to deprive him of his liberty. . . . The mere act of creating false evidence does not implicate due process rights, unless that evidence is later used to deprive the individual of liberty in some way."); see also McDonough v. Smith, 139 S. Ct. at 2156 ("[The plaintiff's] claim requires him to show that the criminal proceedings against him—and consequent deprivations of his liberty—were caused by [the defendant's] malfeasance in fabricating evidence.").

The Seventh Circuit has "consistently held that a police officer who manufactures false evidence against a criminal defendant violates due process if that evidence is later used to deprive the defendant of his liberty in some way." Avery, 847 F.3d at 439; see also Coleman v. City of Peoria, 925 F.3d 336, 344 (7th Cir. 2019) ("Obviously, law enforcement officers may not knowingly use false

evidence, including false testimony, to obtain a tainted conviction.").
"Using false evidence to convict violates a defendant's right to a fair
trial guaranteed by the Fourteenth Amendment's Due Process
Clause."  Id.; see also Whitlock v. Brueggemann, 682 F.3d 567, 585
(7th Cir. 2012) ("[T]he deliberate manufacture of false evidence
contravenes the Due Process Clause.").

   The same is true for a prosecutor who manufacturers evidence
when acting in an investigatory role.  Whitlock v. Brueggemann,
682 F.3d 567, 580 (7th Cir. 2012) ("The fact that the prosecutor
who introduces the evidence at trial cannot be liable for the act of
introduction, whether it is the same prosecutor who fabricated the
evidence or a different prosecutor, is beside the point.").  A plaintiff
must prove that the deprivation of liberty was caused by a
prosecutor's malfeasance in fabricating evidence.  McDonough, 139
S. Ct. at 2156.

   The Seventh Circuit in Avery v. City of Milwaukee explained
the seriousness of false evidence and the devastating effects it may
have, stating:

>    Falsified evidence will never help a jury perform its
>    essential truth-seeking function.  That is why convictions
>    premised on deliberately falsified evidence will always

> violate the defendant's right to due process. What's
> relevant is not the label on the claim, but whether the
> officers created evidence that they knew to be false.

Avery, 847 F.3d at 439 (internal citations omitted).

The Court first notes that Quincy Defendants incorrectly cite to the case of Coleman v. Thompson, 111 S.Ct. 2546 (1991) to support their argument that they are entitled to summary judgment on Plaintiff's fabrication claim. See Memorandum of Law, d/e 93, p. 93. The case of Coleman v. Thompson dealt with the review of a criminal conviction by way of a habeas petition, which is not the situation here. The Court assumes that defense counsel intended to cite Coleman v. City of Peoria, 925 F.3d 336, 344 (7th Cir. 2019)(holding that the plaintiffs' claim of fabricated evidence was insufficient to support due process claim).

Defendants argue that Mr. Lovelace cannot prove his claim because he has failed to provide specific citation to evidence that Defendants fabricated. They complain of Plaintiff's discovery responses failing to specifically identify the evidence at issue.

However, Mr. Lovelace contends that Defendants fabricated evidence: (1)"that Coroner Keller observed Cory Lovelace in full rigor at the scene with an odor in the room consistent with

decomposition;" (2) "that Dr. Jessica Bowman, when re-contacted, believed this was a murder but was simply too scared or indifferent to alter her official opinion;" and (3) that there was some material change in the recollection of Mr. Lovelace's children as to whether they had seen their mother alive that morning that could impact the expert opinions in this case.  See Response, d/e 105, p. 74.

Moreover, the present circumstances differ from those in Coleman v. City of Peoria.  In Coleman, plaintiff filed an action against the city and police officers alleging that the officers elicited false statements from an alleged accomplice through coercive interrogation techniques.  925 F.3d 336.  Here, Mr. Lovelace alleges that Defendants fabricated evidence.  Defendants' contention that Mr. Lovelace must prove "that Gibson caused a witness to provide him with a statement that Gibson knew – with certainty – was false" is incorrect.  Mr. Lovelace needs to prove that Defendants created evidence that they knew was false. See Avery v. City of Milwaukee, 847 F.3d 433, 439 (7th Cir. 2017); Whitlock v. Brueggemann, 682 F.3d 567, 580 (7th Cir. 2012).

Mr. Lovelace argues that Defendants fabricated evidence because several eyewitnesses at the scene indicated that parts of

Cory were warm to the touch, she was in mild rigor, and her arms were moved at the scene. To circumvent this evidence, Defendants created a false account that Keller smelled the scent of death and observed Cory in full rigor, which would prevent Cory's arms from being altered at the scene. The Quincy Defendants argue that Keller's observation at the scene is one of recollection and Mr. Lovelace has no evidence that Defendants fabricated that recollection. A reasonable juror could find otherwise. The evidence shows that Keller did not tell anyone during the first investigation of his belief as to the rigor or smell nor did he document such an observation. Only after the second investigation did Keller provide his alleged observation to Gibson.

Additionally, Mr. Lovelace argues that Defendants were motivated to create alternative evidence due to Dr. Bowman's autopsy report, which did not conclude Cory's death was a homicide. By attempting to persuade Dr. Bowman to change her report, and hiding the importance of Dr. Bowman refusing to change her report as stated by Dr. Denton, Defendants arguably created false evidence that Dr. Bowman thought Cory's death was a homicide. Defendants argue that Plaintiffs had full access to Dr.

Bowman and that Plaintiffs talked to her before the first trial.
However, a reasonable juror could find that Gibson and Keller
fabricated that Dr. Bowman thought Cory Lovelace was murdered
but was simply too scared or indifferent to alter her official opinion
after Gibson and Keller pressured her.

Dr. Denton also relied on evidence provided by Gibson that the
Lovelace children changed their statements.  Dr. Denton relied on
new interviews of the Lovelace children that revealed the children
altered their statements to say that they had not seen their mother
that morning.  Mr. Lovelace argues that the children had not even
been interviewed by Gibson before Dr. Denton allegedly reached his
opinions in this case.  Defendants allege that the allegation of a
fabricated statement from the Lovelace children was "only
reference" to "a mistaken comment made by Dr. Scott Denton in his
report . . . ."  See Reply, d/e 115, p. 43.  The Court's role "is not to
evaluate the weight of the evidence, to judge the credibility of the
witnesses, or to determine the truth of the matter, but instead to
determine whether there is a genuine issue of triable fact."  Outlaw
v. Newkirk, 259 F.3d 833, 837 (7th Cir. 2001).  The report raises an
issue of whether Defendants Gibson and Keller informed Dr.

Denton at their initial consultation, which was at the beginning of the investigation and prior to speaking to the children, that the Lovelace children had changed their stories.

Mr. Lovelace alleges that Defendants made these statements knowing they were false and that Defendants relayed the falsified evidence to Dr. Denton and Dr. Turner, which led to an indictment and trial Mr. Lovelace.  This prolonged Plaintiff's pretrial detention by an additional two years.

Mr. Lovelace has presented evidence that Defendant Farha had knowledge of Gibson and Keller's investigation even though he was not supposed to be involved in the investigation as his office had a conflict.  Mr. Lovelace has presented evidence that Farha may have been more involved than was allowed in his role as an assistant state's attorney and as a witness, which are dueling roles. A question of fact exists as to how involved Farha was with Keller's and Gibson's investigation and his participation in the fabrication of evidence.

Defendants, throughout their briefings, argue that any event, evidence, or testimony provided after Mr. Lovelace's arrest cannot result in liability.  That is not always the case.  In Avery, the

Seventh Circuit has recognized that liability may attach if a defendant later testifies, and therefore swears to, the fabricated evidence. Avery, 847 F.3d at 441.  The Seventh Circuit reasoned that "[i]f an officer who fabricates evidence can immunize himself from liability by authenticating falsified documentary or physical evidence and then repeating the false 'facts' in his trial testimony, wrongful-conviction claims premised on evidence fabrication would be a dead letter." Id.  If Defendants falsified the alleged evidence and used the falsified evidence to further the investigation, obtain favorable opinions, and testify at trial, all may create liability.

In Defendants' reply brief, they argue that Mr. Lovelace is trying to create a genuine issue of material fact by raising facts for the first time in a response to Defendants' motions for summary judgment.  See Reply, d/e 115, p. 41.  While a party opposing a summary judgment motion may not rely solely upon the allegations in his pleading, the party must still "set forth specific facts showing that there is a genuine issue for trial."  Widmar v. Sun Chem. Corp., 772 F.3d 457, 460 (7th Cir. 2014); Tallman v. Freedman Anselmo Lindberg, LLC, 2013 WL 489676, *17 (C.D. Ill. 2013)(finding that the plaintiff raised a new argument for the first time in in his

response to the defendant's motion for summary judgment as the argument was not alleged in his second amended complaint and failed to identify the argument in his answers to interrogatories). Here, Mr. Lovelace's Complaint did in fact raise the issue that Defendants allegedly fabricated evidence, and Mr. Lovelace provided details as to his theory of the case, which included the allegedly fabricated evidence. The Court does not find that Mr. Lovelace is attempting to create a genuine issue of fact. The voluminous records, trial testimony, and deposition testimony developed in this case present genuine issues of material fact.

The Court notes that Quincy Defendants' request to strike Plaintiff's Combined Response, found in Quincy Defendants' Reply Brief is improper, and, therefore, the Court denies the request. See Reply, d/e 115, pp. 38-39. The request should be made separately in a motion with citation to legal authority.

The Court finds that a factual dispute exists prohibiting summary judgment as to Mr. Lovelace's fabrication of evidence claim against Gibson, Copley, Summers, Dreyer, Keller, Gibson, and Farha.

## 2. Mr. Lovelace's __Brady__ claims survive summary judgment.

The U.S. Supreme Court has held that the suppression of potentially exculpatory evidence is a violation of the Due Process Clause of the Fourteenth Amendment.  Brady v. Maryland, 373 U.S. 83, 86 (1963); see also Steidl v. Fermon, 494 F.3d 623, 628 (7th Cir. 2007).  "The suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution."  Steidl, 494 F.3d at 628; see also Wearry v. Cain, 136 S. Ct. 1002, 1006 (2016).  A deprivation of liberty rather than a conviction or acquittal is key to a Brady claim.  Cairel v. Alderden, 821 F.3d 823, 833 (7th Cir. 2016)(holding that failure to disclose exculpatory evidence for the prosecution of a pretrial detainee "may cause the type of deprivation of liberty . . . even if the case ends without a trial or conviction."); see also Armstrong v. Daily, 786 F.3d 529, 553 (7th Cir.2015)(denying dismissal of claim for prolonged pretrial detention caused by destruction of exculpatory evidence).

The important question is whether the government suppressed evidence that was favorable and material to either a plaintiff's guilt or punishment.  See United States v. Ballard, 885 F.3d 500, 504 (7th Cir. 2018); Smith v. Cain, 565 U.S. 73, 75 (2012) (reversing denial of postconviction relief where undisclosed detective notes reflected eyewitness' uncertainty about identity of perpetrators of murder).  "Whether evidence is favorable and material 'is legally simple but factually complex.'"  Ballard, 885 F.3d at 504 (quoting Turner v. United States, 137 S. Ct. 1885, 1893 (2017)).  Courts "must examine the trial record, 'evaluat[e]' the withheld evidence 'in the context of the entire record,' and determine in light of that examination whether 'there is a reasonable probability that, had the evidence been disclosed, the result of the proceeding would have been different.'"  Ballard, 885 F.3d at 504 (quoting Turner, 137 S. Ct. at 1893).

Investigators also have an obligation under Brady to disclose exculpatory evidence to the prosecutor.  See Cairel v. Alderden, 821 F.3d 823, 832 (7th Cir. 2016) ("A corollary of the prosecution's duty to disclose to the defense is that the police must disclose exculpatory evidence to the prosecutors.  A police officer's failure to

disclose exculpatory evidence to a prosecutor may foreseeably result in a violation of the accused's due process rights under Brady.")(internal citation omitted); Coleman, 925 F.3d at 349 ("Police officers must provide exculpatory and/or impeachment evidence to prosecuting attorneys—a corollary to the prosecutor's obligation to disclose such evidence to defense counsel under Brady v. Maryland . . . .").

To prove a Brady violation, a plaintiff must show "(1) that the evidence in question was favorable to his defense, either because it had exculpatory or impeachment value; (2) that the state suppressed the favorable evidence either will-fully or inadvertently; and (3) prejudice ensued, which occurs if the evidence was material." Goudy v. Cummings, 922 F.3d 834, 838 (7th Cir. 2019).

Mr. Lovelace is alleging that Defendants failed to produce Gibson's correspondence with Dr. Pounder and Gibson's correspondence with Dr. Denton, including the March 5 email and April 15 email. Mr. Lovelace also argues that Defendants also withheld evidence of: (1) their attempts to coerce Dr. Bowman and to hide from the defense her true statements which were exculpatory; (2) Gibson's opinion that Erika Gomez was not

credible; and (3) William Ballard telling Gibson what Ballard saw at the scene, which was conveyed during Gibson's investigation.

While not conclusive, an agreed stipulation was read to the jury that allows an adverse inference against Defendants. The stipulation read in short part: "Detective Gibson and the Quincy Police Department failed to turn over communications with some of the pathologists, doctors, Erika Gomez and other witnesses that the State had an obligation to turn over to Mr. Lovelace's defense." See d/e 103-78, pp. 4-5. The stipulation noted that the documents "were never turned over to Mr. Lovelace's defense even though they should have been" during the first trial. Id. Moreover, "Mr. Parkinson is certain that Detective Gibson did not ever disclose the existence of these Denton E-Mails to him at any time prior to the Defense team obtaining them from a third party through the Freedom of Information Act." Id.

Mr. Lovelace has provided evidence that Gibson along with his supervisors knew the March 5 email and April 15 email existed, but Gibson did not produce them to the prosecutor. Keller also received the March 5 email and did not produce it to the prosecutor. Defendants argue that Gibson believes he gave the Denton emails to

the prosecutor before the first trial and the prosecutor handed them back to Gibson saying he did not need them.  However, the prosecutor does not remember that happening.  The prosecutor also testified that Gibson provided the prosecutor a binder of all relevant material from the investigation, and that entire binder was produced to Mr. Lovelace's defense team.  The emails in question were not in the binder.

Gibson also knew of his correspondence with Dr. Pounder and did not produce it.  Gibson specifically testified that he knew he did not produce his correspondence with Dr. Pounder.  Gibson's superiors were aware of Gibson speaking to Dr. Pounder.  Gibson also knowingly made his reports and chose the language to include in the reports.  Mr. Lovelace has raised a question of fact that Gibson failed to include exculpatory information in his reports that should have been disclosed pursuant to Brady, including information relating to Gibson's conversations with Dr. Bowman, Erika Gomez, and William Ballard.  Further, evidence has been presented that Gibson's superiors reviewed Gibson's reports and discussed the investigation with Gibson on a regular basis.

Defendants contend that the evidence is not inherently exculpatory. However, evidence that is helpful to the defense in impeaching a government witness is subject to <u>Brady</u>. <u>See</u> <u>Simental v. Matrisciano</u>, 363 F.3d 607, 613 (7th Cir. 2004)("This rule includes evidence useful to the defense in impeaching government witnesses, even if the evidence itself is not inherently exculpatory."); <u>Snow v. Pfister</u>, 880 F.3d 857, 867 (7th Cir. 2018)("There is no difference between exculpatory and impeachment evidence for these purposes."). The March 5 email and April 15 email could have been used for impeachment, at a minimum. The same is true for Gibson's emails with Dr. Pounder. The opinions and statements made by these forensic pathologists were arguably favorable to the defense, which implicates all those who knew of their existence and did not produce the evidence. Mr. Lovelace has raised a question of fact as to whether these materials were exculpatory.

Defendants argue that the evidence was either known to Mr. Lovelace's defense team or could have been easily obtained through reasonable diligence. But, the U.S. Supreme Court has rejected "the notion that defendants must scavenge for hints of undisclosed <u>Brady</u> material when the prosecution represents that all such

material has been disclosed." <u>Banks v. Dretke</u>, 540 U.S. 668, 695 (2004).

In <u>Strickler</u>, the Supreme Court also rejected a similar argument.  <u>Strickler v. Greene</u>, 527 U.S. 263, 284–85 (1999).  In that case, the defendant argued that the petitioner's defense counsel should have been on notice of the existence of undisclosed interviews by police of a witness based on trial testimony and a letter published in a newspaper article. <u>Id.</u> at 284.  Although the lawyers likely knew additional interviews existed, "it by no means follows that they would have known that records pertaining to those interviews, or that the notes that [the witness] sent to the detective, existed and had been suppressed." <u>Id.</u> at 285.  The Supreme Court reasoned that, if the prosecutor did have an open file policy, "it is especially unlikely counsel would have suspected that additional impeaching evidence was being withheld." <u>Id.</u> at 285.

The same is true here, in that, the prosecution portrayed to Mr. Lovelace's defense team that everything from the investigation was produced to the defense team.  Simply meeting with Dr. Denton or any other witness "by no means follows that they would have known that records . . . existed." <u>Strickler v. Greene</u>, 527 U.S. at

285.  The same logic applies to information that Gibson obtained but did not disclose in a report.

As to Defendant Farha, Mr. Lovelace presented evidence that Farha had knowledge of Gibson listening to Mr. Lovelace jail telephone calls, and Farha did not trust Erika Gomez.  Yet, Gibson asked Farha to help with a subpoena request to obtain telephone records between Mr. Lovelace and Erika Gomez.  Instead of interfering or preventing the search from going forward, Farha pushed the subpoena along.  Mr. Lovelace argues that Farha contributed as a witness to the investigation while also assisting in the investigation.  None of the information known by Farha was turned over to the prosecution. Mr. Lovelace has presented evidence that a genuine issue of material fact exists whether Farha violated the principles of <u>Brady</u>.

The Court finds that questions of fact exist as to Plaintiff's <u>Brady</u> claims against Gibson, Copley, Summers, Dreyer, Keller, and Farha, which should be decided by the jury, and, therefore, Court denies motions for summary judgment against those Defendants on the <u>Brady</u> claims.

### 3. Defendants are not entitled to qualified immunity.

Defendants argue that they are entitled to qualified immunity from Plaintiff's Brady claim.  Under the doctrine of qualified immunity, government officials are protected "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  Pearson v. Callahan, 555 U.S. 223, 231 (2009) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)). "Officers are entitled to qualified immunity . . . unless (1) they violated a federal statutory or constitutional right, and (2) the unlawfulness of their conduct was "clearly established at the time." District of Columbia v. Wesby, 138 S. Ct. 577, 589 (2018).  A defendant is entitled to qualified immunity based on summary judgment if (1) "the facts, taken in the light most favorable to the plaintiff, show that the defendants violated a constitutional right;" and (2) the "constitutional right was clearly established at the time of the alleged violation."  Campbell v. Kallas, 936 F.3d 536, 545 (7th Cir. 2019); see also Balsewicz v. Pawlyk, No. 19-3062, 2020 WL 3481688, at *4 (7th Cir. 2020)(citing Mitchell v. Forsyth, 472 U.S. 511, 526 (1985)("Whether an official is entitled to qualified

immunity on a motion for summary judgment turns on whether the plaintiff has both (1) alleged that the official committed acts violating a clearly established right and (2) adduced "evidence sufficient to create a genuine issue as to whether the [official] in fact committed those acts.")).  The Supreme Court has defined "clearly established "to mean "that, at the time of the officer's conduct, the law was sufficiently clear that every reasonable official would understand that what he is doing is unlawful."  Wesby, 138 S.Ct. at 589 (internal quotations omitted).

As stated earlier, a factual dispute exists as to whether Defendants failed to produce exculpatory evidence in violation of Brady.  Considering the evidence in the light most favorable to Plaintiff, a reasonable jury could conclude that Defendants withheld exculpatory evidence.

The only issue that remains is whether the constitutional right was clearly established when the alleged violation occurred. Defendants contend that a constitutional right that they needed to produce expert opinions to Mr. Lovelace's trial team was not clearly established.  For Brady claims, the question of qualified immunity is not "whether a law enforcement officer would clearly know that

he had to disclose impeaching or exculpatory information."
Carvajal v. Dominguez, 542 F.3d 561, 569 (7th Cir. 2008).
"Instead, the question is whether it was clearly established that the
information that [the plaintiff] claims they failed to disclose had to
be disclosed as exculpatory or impeaching."  Jimenez v. City of Chi.,
830 F. Supp. 2d 432, 449 (N.D. Ill. 2011)(citing Carvajal, 542 F.3d
at 569).  The principles of Brady v. Maryland have long been
established and engrained in society since the opinion was issued.
See Jimenez, 830 F. Supp. 2d 432, 449 ("Because the Brady
principle was announced in 1963, the only question is whether the
defendants should have recognized the information as exculpatory
or impeaching.").  The principle is well known by investigators and
prosecutors, including Defendants in this case.  If any reasonable
investigator, whether police investigator, coroner, or prosecutor,
knew of the existence of the correspondence from Dr. Denton and
Dr. Pounder and knew that it was not being produced, would have
known that not producing the material was a Brady violation, then
the right was clearly established.  See Balsewicz, 2020 WL
3481688, at *4 (citing Plumhoff v. Rickhard, 572 U.S. 765, 778-79
(2014)).

Mr. Lovelace has presented evidence that Gibson and Keller knew the correspondence existed and failed to produce it. The evidence also allows an inference that Gibson claims he attempted to determine if the correspondence should be produced, by asking Parkinson, the special prosecutor, whether he should produce it. However, the stipulation that was read at the second trial stated, "Mr. Parkinson denies that Detective Gibson ever showed him copies of the Denton E-mails referring to reasonable doubt at a bathroom break in any hearing or at any other time. Mr. Parkinson is certain that Detective Gibson did not ever disclose the existence of these Denton E-Mails to him at any time prior to the Defense team obtaining them from a third party through the Freedom of Information Act." See d/e 103-78, pp. 4-5. The evidence also shows that Gibson's superiors, Copley, Summers, and Dreyer, knew of the existence of the correspondence and that Gibson had not produced them to Parkinson. Further, Keller himself admitted that his email correspondence with Dr. Pounder could be exculpatory information and that, in hindsight, Keller should have turned over the information. As for Gibson's emails with Dr. Denton, Gibson testified at trial that the emails contained exculpatory information

and he should have produced the emails.  While the qualified immunity inquiry is objective, the Court treats the evidence-supported facts and inferences as true in favor of the nonmoving party. <u>See</u> <u>Blasius</u>, 839 F.3d at 644.

Keller relies on <u>Kompare v. Stein</u>, 801 F.2d 883 (7th Cir. 1986) to argue he is entitled to qualified immunity as coroner.  In <u>Kompare</u>, the plaintiffs, Mr. and Mrs. Kompare, brought a § 1983 action against two county medical examiners for an autopsy of the plaintiffs' son that led to Mrs. Kompare being indicted for voluntary manslaughter of their son.  <u>Id.</u> at 885.  The Seventh Circuit noted that "coroners enjoy the same qualified immunity as police officers or investigators for the state prosecutor." <u>Id.</u> at 887.  The plaintiffs argued that the defendants were not entitled to qualified immunity because the defendants violated a county ordinance requiring a medical examiner to conduct an investigation and for failing to disclose exculpatory evidence.  <u>Id.</u> at 890.  One of the defendants, Richmond, told the prosecutors about the alleged exculpatory evidence two weeks before trial.  <u>Id.</u> at 891.  The prosecutors decided to move forward with the case and disclosed the new evidence.  <u>Id.</u>

This Court agrees that Keller enjoys qualified immunity just the same as the other Defendants.  However, the factual circumstances of this case are different from those in <u>Kompare</u>. Keller and Gibson received the March 5 Email from Dr. Denton, which read, in part, "I submit that if she, as the pathologist who did the autopsy and now has all this information you shared with her, and then leaves it undetermined without writing something different, and sticking to it in the future, that it is more than reasonable doubt in any reasonable person's mind."  <u>See</u> d/e 103-43, p. 3.  Keller did not tell the prosecutor about the March 5 Email, and, as such, the email was not disclosed to Mr. Lovelace at any time during the first trial.  Keller knew of the existence of the emails with Dr. Denton and Dr. Pounder as Gibson and Keller discussed case details throughout their investigations, but Keller did not produce those emails to the prosecutor or the Mr. Lovelace's attorneys.

Given the amount of investigating that Keller conducted in this case, simultaneously doing his own investigation while also being heavily involved in the police investigation, this Court cannot find that Defendant Keller had no duty to disclose the information of his

investigation to the prosecutors.  In Illinois, coroners also have
powers similar to a sheriff.  55 ILCS 5/3-3007 ("Each coroner shall
be conservator of the peace in his county, and, in the performance
of his duties as such, shall have the same powers as the sheriff.").
Moreover, Keller assisted Gibson not only in locating experts but
also interviewing witnesses and attempting to persuade the former
forensic pathologist to change her cause of death opinion.  The
Court finds that Keller was under an obligation to disclose the
exculpatory evidence to prosecutors and that it was clearly
established that the information that Keller failed to disclose had to
be disclosed as exculpatory or impeaching.

The Court finds that at the time of the investigation and
prosecution of Mr. Lovelace, the information contained in the emails
with the pathologists, including Dr. Denton and Dr. Pounder, and
the communication with Erika Gomez and other witnesses had to
be disclosed as exculpatory or impeachment.

As to Defendant Farha, he did not raise the defense of
qualified immunity.  Accordingly, the Court finds that Gibson,
Copley, Summers, Dreyer, Keller, and Farha are not entitled to
qualified immunity on this record given the questions of fact on Mr.

Lovelace's constitutional claims and that the unlawfulness of their conduct was clearly established at the time of the alleged constitutional violations.

## D. The City of Quincy is Not Entitled to Summary Judgment on Mr. Lovelace's <u>Monell</u> Claim.

Defendant City of Quincy seeks summary judgment on the §1983 claims against the City in this case.  Mr. Lovelace alleges that a factual dispute remains prohibiting summary judgment.  "[A] municipality cannot be held liable under § 1983 on a respondeat superior theory."  Monell v. Dep't of Soc. Servs., 436 U.S. 658, 691 (1978).  Instead, municipal liability exists only "when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983."  Id., at 694; see also Hahn v. Walsh, 762 F.3d 617, 638–39 (7th Cir. 2014) ("Monell permits suits against municipal entities under § 1983, but only when a governmental policy or custom caused the constitutional deprivation; municipal entities cannot be liable for their employees' actions under a respondeat superior theory.").

To prove a claim against a municipality under § 1983, a plaintiff is required to show that he: "(1) [ ] suffered a deprivation of a federal right; (2) as a result of either an express municipal policy, widespread custom, or deliberate act of a decision-maker with final policy-making authority for the [municipality]; which (3) was the proximate cause of his injury." <u>King v. Kramer</u>, 763 F.3d 635, 649 (7th Cir. 2014); <u>see also</u> <u>Hoffman v. Knoebel</u>, 894 F.3d 836, 843 (7th Cir. 2018) ("To establish [departmental] liability under <u>Monell</u>, the plaintiffs must show that an official government policy or custom is responsible for the deprivation of rights.")(internal citation omitted).  A plaintiff must show that one of the municipality's policies caused the plaintiff's harm.  <u>Swanigan v. City of Chi.</u>, 881 F.3d 577, 582 (7th Cir. 2018).  A <u>Monell</u> claim "depend[s] on proof of an underlying constitutional violation." <u>Coleman</u>, 925 F.3d at 651 (holding that the plaintiff's municipal liability claim failed as a matter of law because the plaintiff's evidence was insufficient to support an underlying violation).

Mr. Lovelace can show a constitutional violation in a variety of ways, including by "point[ing] to an express municipal policy responsible for the alleged constitutional injury, or demonstrat[ing]

that there is a practice that is so widespread that it rises to the level
of a custom that can fairly be attributed to the municipality." <u>King</u>,
763 F.3d at 649.

Plaintiffs are alleging two theories of liability against the City of
Quincy.  First, Plaintiffs argue that Defendants' <u>Brady</u> violations
occurred because the Quincy Police Department[6] "did not have a
policy that required detectives to keep in their files emails, copies of
texts, or communications involving the case." <u>See</u> d/e 105, p. 92.
Second, the Quincy Police Department had a custom and practice
to "detain and question children without notifying their parents as
long as the children did not inform an officer that they did not want
to participate." <u>Id.</u> at p. 92-93.

Defendant argues it is entitled to summary judgment because
all theories of liability fail against the individual Defendants.  <u>See</u>
d/e 93, p. 52-53.  Plaintiffs raise a question of fact whether the lack
of a policy contributed to Defendants' failure to produce evidence
and causing a <u>Brady</u> violation.  Moreover, the Court is allowing the

---

[6] Quincy Police Department is an entity of Defendant City of Quincy. <u>See</u>
Quincy Police Department, QuincyIL, <u>https://www.quincyil.gov/public-safety/quincy-police</u> (last accessed August 21, 2020).

Brady claims to move forward, and, therefore, the Court will allow

Plaintiffs' first theory of liability under Monell to proceed.   Plaintiffs'

second theory relates to Count III of Plaintiffs' Complaint for claims

of unlawful detention pursuant to 42 U.S.C. § 1983 brought by all

Plaintiffs against Quincy Defendants.  The Quincy Defendants did

not seek summary judgment on those claims.  Therefore, the Court

will allow the second theory to move forward.  Defendant's motion

for summary judgment as to Plaintiffs' claims against the City of

Quincy is denied.

## E. Defendants Are Not Entitled to Summary Judgment on Plaintiffs' Conspiracy Claim.

Plaintiffs also allege a claim for conspiracy against all

Defendants.  Defendants seek summary judgment for the

conspiracy claim, arguing that the evidence does not show a

conspiracy and no underlying constitutional claim exists.

To establish § 1983 liability through a theory of conspiracy, a

plaintiff must prove: "(1) the individuals reached an agreement to

deprive him of his constitutional rights, and (2) [the individuals

committed] overt acts in furtherance [that] actually deprived him of

those rights."  Beaman v. Freesmeyer, 776 F.3d 500, 510 (7th Cir.

2015).  A plaintiff may rely on circumstantial evidence to prove a conspiracy. Id. at 511 ("Because conspiracies are often carried out clandestinely and direct evidence is rarely available, plaintiffs can use circumstantial evidence to establish a conspiracy, but such evidence cannot be speculative.").  "Summary judgment should not be granted if there is evidence from which a reasonable jury could infer the existence of a conspiracy." Id. at 510-11.

Plaintiffs have two theories of a conspiracy between Defendants.  The first is that the Quincy Defendants conspired together to deprive Logan, Lincoln, and Larson of their constitutional rights.  The second conspiracy was between the individual officer Defendants, Farha, and Keller to deprive Mr. Lovelace's constitutional rights.

As to the first, the Quincy Defendants did not seek summary judgment on the underlying constitutional claim, unlawful detention of Mr. Lovelace's children.

The Quincy Defendants again raise the intracorporate conspiracy doctrine as they did in their motion to dismiss.  This Court previously foreclosed that defense in this case. See d/e 41. In ruling on Defendants' motion to dismiss, this Court explained:

The Seventh Circuit has not, however, explicitly applied the doctrine to a conspiracy under 42 U.S.C. § 1983.  See Piercy v. Warkins, No. No. 14 CV 7398, 2017 WL 1477959 at *19 (N.D. Ill. Apr. 25, 2017); but see Scott v. City of Chi., 619 F. App'x 548 (7th Cir. 2015) (noting, in a § 1983 case, that "[a] conspiracy between private parties and state actors authorizes the suit against private parties in federal court" but that "[a]ll of the defendants in this suit . . . are public employees (plus their employer), which means that a conspiracy claim has no role to play").  District courts within the Seventh Circuit have taken different views on whether to apply the intracorporate conspiracy doctrine to § 1983 claims.  Compare David v. Vill. Of Oak Lawn, No. 95 C 7368, 1996 WL 210072, at *4  (N.D. Ill. Apr. 29, 1996) (finding that the intracorporate conspiracy doctrine applied to the plaintiff's § 1981, § 1983, and § 1985 conspiracy claims against Oak Lawn police officers) with Piercy, 2017 WL 1477959, at *19 (refusing to apply the doctrine to a § 1983 conspiracy, noting recent cases holding that the intracorporate conspiracy doctrine applies when the members are pursuing lawful business and the deprivation of civil rights is unlawful).  Moreover, exceptions to the doctrine exist.  For example, if an action is motivated solely by personal bias, the doctrine may not apply.  See Payton, 184 F.3d at 633 n. 9; see also Petrishe v. Tenison, No. 10 C 7950, 2013 WL 5645689, at * 6 (N.D. Ill. Oct. 15, 2013) (finding, in § 1983 conspiracy case, that the intracorporate conspiracy doctrine was inapplicable where the plaintiff plausibly alleged that the officers were not pursuing any lawful business in accordance with the interest of the village when they erased six seconds of video to cover-up their actions).

See d/e 41, p. 23-24.

Whether the intracorporate conspiracy doctrine applies to §
1983 cases is unclear.  The Quincy Defendants did not cite any new
legal authority for their position.  Regardless, the purpose of the
doctrine would not be furthered when applied in this case.  See
Sassak v. City of Park Ridge, 431 F. Supp. 2d 810, 821 (N.D. Ill.
2006)("The deprivation of civil rights is unlawful and the intra-
corporate doctrine only applies when members of a corporation are
jointly pursuing the corporation's lawful business.").  Mr. Lovelace
argues that the Quincy Defendants intentionally committed several
Brady violations and fabricated evidence.  While Gibson's
investigation may have began as lawful business, Mr. Lovelace
argues the investigation turned unlawful when Gibson committed
several Brady violations and fabricated evidence with the knowledge
of his supervisors, Copley, Summers, and Dreyer.  The Court
declines to apply the intracorporate conspiracy doctrine in this
case.

As to Plaintiffs' second conspiracy theory, as explained above,
the Court finds that a reasonable jury could infer Defendants
deprived Mr. Lovelace of his constitutional rights.  The remaining

question is whether Defendants agreed to deprive Mr. Lovelace of his constitutional rights.

Mr. Lovelace argues that a common scheme to fabricate evidence and withhold exculpatory evidence existed between the individual Quincy Defendants and Keller.  Copley, Summers, and Dreyer were regularly informed of the case progress, sometimes were copied on emails discussing the progression of the investigation, reviewed Gibson's reports, and authorized important decisions in the investigation.  Most notably, Copley, Summers, and Dreyer knew that the Denton emails existed.  Plaintiffs also argue that Gibson and Keller regularly communicated with each other and actively participated in an investigation together.  Mr. Lovelace has presented evidence that Gibson and Keller met Dr. Denton and Dr. Bowman together.  Gibson and Keller spoke with witnesses, including Dr. Denton, via email.  Keller knew of the emails from Dr. Denton and Dr. Pounder that were not produced to defense counsel.  Moreover, Gibson used Keller's alleged fabricated statements about Cory's body to obtain expert opinions.  Based on the evidence presented by Plaintiffs, the Court finds that a

reasonable jury could infer an agreement between Gibson, Copley, Summers, Dreyer, and Keller.

Mr. Lovelace separately argued that Defendant Farha played a role in the conspiracy because he remained involved in the case as a witness and assisted in the investigation as an assistant state's attorney. Further, Plaintiff contends that Farha knew Gibson was listening to jail calls of Mr. Lovelace and Farha assisted in obtaining records for Gibson. A question of material fact exists as to whether Farha conspired with Gibson and Keller.

Plaintiffs raised questions of fact that preclude summary judgment. Therefore, the Court denies the motions for summary judgment on Plaintiffs' conspiracy claims against Defendants Gibson, Copley, Summers, Dreyer, Keller, and Farha.

**F. Defendants Are Not Entitled to Summary Judgment on Plaintiffs' Failure to Intervene Claims.**

Plaintiffs also have pending failure to intervene claims based on § 1983 liability against Gibson, Copley, Summers, Dreyer, Keller, and Farha. To prove such a claim, a plaintiff must prove that the defendant "(1) knew that a constitutional violation was committed;

and (2) had a realistic opportunity to prevent it." <u>Gill v. City of Milwaukee</u>, 850 F.3d 335, 342 (7th Cir. 2017).

Defendants argue that the underlying constitutional claims have no merit, and therefore, the failure to intervene claims also have no merit. As discussed above, Mr. Lovelace has presented sufficient evidence to allow a reasonable inference that the Quincy Defendants and Keller fabricated evidence and withheld exculpatory evidence in violation of <u>Brady</u> and questions of fact exist on Mr. Lovelace's constitutional claims. As demonstrated by the evidence, a reasonable jury could find that the Quincy Defendants and Keller knew of the constitutional violations and had a realistic opportunity to prevent the violations as they were all intimately involved in the reinvestigation. Moreover, the Quincy Defendants did not seek summary judgment on Plaintiffs' unlawful detention claims (Count II) or false imprisonment claims (Count V).

Further, Farha contends that liability for failure to intervene does not extend to prosecutors. A split of opinion exists on whether prosecutors have a duty to intervene. <u>Compare, e.g.</u>, <u>Andrews v. Burge</u>, 660 F.Supp.2d 868, 876 (N.D. Ill. 2009)("In Illinois... a prosecutor does not have police powers, nor do prosecutors have

command of police operations, though at times courts act as if they do."); <u>Gordon v. Devine</u>, No. 08 C 377, 2008 WL 4594354, at *17 (N.D. Ill. Oct. 14, 2008) (finding no duty); and <u>Patrick v. City of Chi.</u>, 213 F. Supp. 3d 1033, 1055 (N.D. Ill. 2016)("If Plaintiff claims the duty was to intervene at the police station, the underlying premise—that the prosecutor is like another police officer—is incorrect.") with <u>Rivera v. Lake Cnty.</u>, 974 F.Supp.2d 1179, 1191 (N.D. Ill. 2013) ("Though this Court is aware of no case that has found prosecutors liable for failure to intervene, the Court is not convinced that it would be impossible for Plaintiff to prove facts supporting this claim").  Courts have held that the duty to intervene exists for police officers.  <u>See</u> <u>Gordon</u>, 2008 WL at *17.

In <u>Patrick v. City of Chi.</u>, the Northern District held that under the circumstances of that case, the prosecutor defendants were not under a duty to intervene.  213 F. Supp. 3d at 1055.  However, the court noted that "it was not inclined to foreclose the possibility of extending liability for failure to intervene to prosecutors," but the claim "cannot stand against [the prosecutor defendants] on the facts presented."  <u>Id.</u> at 1054.

The same cannot be said about this case. Plaintiffs argue that Farha was a witness to the case, yet Farha was involved in the investigation with Gibson. Plaintiffs have presented evidence that Farha knew Erika Gomez, did not find her credible, knew Gibson was listening to Mr. Lovelace's jail conversations, and assisted Gibson in obtaining Mr. Lovelace's telephone records. While Farha knew his office had a conflict from being involved in the case, Plaintiffs contend Farha was more involved than a typical witness. Plaintiffs argue that even though Farha knew of Gibson's unlawful conduct, Farha did nothing to intervene. As a prosecutor, Farha is intimately aware of the ethical code of conduct for prosecutors and an individual's constitutional rights. The Court finds that under the circumstances of this case, Farha was under a duty to intervene.

The Court finds that Defendants are not entitled to summary judgment on Plaintiffs' failure to intervene claims as genuine disputes of material fact exist.

## G. Some of Plaintiffs' Intentional Infliction of Emotional Distress Claims Survive Summary Judgment.

All Plaintiffs are alleging a claim for intentional infliction of emotional distress ("IIED") against the Quincy Defendants and the Adams County Defendants, against which all Defendants seek summary judgment.

Defendants argue that Mr. Lovelace's and Logan's claims for IIED are untimely and the remaining IIED claims are without merit. Under the Illinois Tort Immunity Act, a plaintiff has one year to bring an intentional infliction of emotional distress claim.  745 ILCS 10/8-101(a).  If at the time the claim accrues the person is under the age of 18 years, the limitations period is tolled until the person reaches the age of 18 years, and the person has one year after reaching the age of 18 years to bring the IIED claim.  See 735 ILCS 5/13-211; Lee v. Naperville Cmty. Unit Sch. Dist. 203, 2015 IL App (2d) 150143, ¶ 14 (holding that "although section 13–211 tolls the limitations period until the plaintiff attains the age of 18, section 8–101 requires the action to be commenced within one year thereafter.").  The children were interviewed at the police station on August 27, 2014.  Logan turned 18 years old on May 7, 2015.  One

year later, on May 7, 2016, the statute of limitations on Logan's IIED claim expired.  Plaintiffs' Complaint was filed on May 5, 2017.  Plaintiffs concede that Logan's IIED claim is untimely.  Therefore, Logan's claim cannot survive summary judgment.

Defendants also argue that Mr. Lovelace's IIED claim is time-barred because his IIED cause of action accrued on the date of his arrest.   Defendants cite Bridewell v. Eberle, 730 F.3d 672, 678 (7th Cir. 2013), to support their argument, which held that an Illinois IIED claim accrued on the date of the arrest.  Plaintiffs also concede that Mr. Lovelace's claim is timed barred as he was arrested on August 27, 2014, and the time to bring his IIED claim lapsed on August 27, 2015.  Therefore, Logan's and Mr. Lovelace's IIED claims are barred by the statute of limitations and Defendants' are entitled to summary judgment on those claims.

Further, Defendants argue that they are entitled to summary judgment on Lincoln's and Larson's IIED claims.  Under Illinois law, in order to survive summary judgment, Plaintiffs Lincoln and Larson must prove that: "(1) the defendant's conduct was extreme and outrageous; (2) the defendant intended that his conduct would cause severe emotional distress, or knew that there was at least a

high probability that the conduct would inflict severe emotional distress; and (3) the conduct did in fact cause severe emotional distress." Boston v. U.S. Steel Corp., 816 F.3d 455, 467 (7th Cir. 2016); see also Bailey v. City of Chi., 779 F.3d 689, 696–97 (7th Cir. 2015).  Mere "insults, indignities, threats, annoyances, petty oppressions, or other trivialities" do not amount to extreme and outrageous conduct.  Richards v. U.S. Steel, 869 F.3d 557, 566–67 (7th Cir. 2017) (quoting Van Stan v. Fancy Colours & Co., 125 F.3d 563, 567 (7th Cir. 1997)).

Defendants contend that the conduct of Defendants does not rise to the level of extreme and outrageous conduct.  Plaintiffs argue that Lincoln and Larson, as children, were taken to the police station without knowledge and permission of their parents and interrogated about their mother's death.  Plaintiffs allege that they were prevented from talking to their mother (Christine) and, when they finally spoke to her, Christine was told by one of the sons that they thought something had happened to Christine.  Plaintiffs were informed "by a laughing law enforcement officer that their father had been arrested for murder."  See Response, d/e 105, p. 98.  Plaintiffs argue that these actions were not done for a legitimate law

enforcement purpose, but instead, were done "as part of a scheme to frame their father for a crime that didn't even occur."  Id. Plaintiffs further allege that "kidnapping is not part of the 'trivialities' of life."  Id.  The Court finds that genuine issues of material fact exist on Larson and Lincoln's IIED claims against Gibson, Copley, Summers, and Dreyer.  However, Plaintiffs present no evidence about Defendants Farha's and Keller's involvement in the police interrogation.  No evidence in the record shows Farha and Keller were involved in or knew of the questioning of Lincoln and Larson at the police station, which is the heart of Larson's and Lincoln's IIED claims.

Therefore, the Court denies summary judgment for Gibson, Copley, Summers, Dreyer and the City of Quincy on Larson's and Lincoln's IIED claims.  The Court grants summary judgment for Keller, Farha, and Adams County on Larson's and Lincoln's IIED claims.  All Defendants are entitled to summary judgment on Mr. Lovelace's and Logan's IIED claims because the statute of limitations bars the claims.

## H. The Remaining Claims Survive Summary Judgment.

The Counts remaining are Count II for unlawful detention brought by all Plaintiffs against the Quincy Defendants; Count V for false imprisonment brought by Plaintiffs Logan, Lincoln, and Larson Lovelace against Quincy Defendants; Count VIII for malicious prosecution under Illinois law brought by Mr. Lovelace against all Defendants; Count X for respondeat superior under Illinois law brought by all Plaintiffs against all Defendants; and Count XI for indemnification under Illinois law brought by all Plaintiffs against all Defendants.

The Quincy Defendants did not request summary judgment on Counts II and V.  Therefore, those Counts stand.

Defendants seek summary judgment on Mr. Lovelace's state law claim for malicious prosecution because probable cause existed to prosecute Mr. Lovelace, which forecloses a malicious prosecution claim.  Under Illinois law, a plaintiff must prove five elements to state a cause of action for the tort of malicious prosecution: "(1) the commencement or continuance of an original criminal or civil judicial proceeding by the defendant; (2) the termination of the proceeding in favor of the plaintiff; (3) the absence of probable cause

for such proceeding; (4) the presence of malice; and (5) damages resulting to the plaintiff." <u>Beaman v. Freesmeyer</u>, 2019 IL 122654, ¶ 26.  The Court has already found that a question remains whether probable cause existed.  Keller and Gibson contend "there are no material facts [they] deprived any of the Plaintiffs of their constitutional rights." <u>See</u> d/e 90, pp. 23, 26.  The inquiry for the "commencement or continuance" element is "whether the defendants' conduct or actions proximately caused the commencement or continuance of the original criminal proceeding by determining whether defendants played a significant role in [the plaintiff's] prosecution." <u>Beaman</u>, 2019 IL 122654, ¶ 47.  The Court previously found that Keller actively participated in not only his own investigation, but in the police investigation.  A reasonable inference exists that Keller commenced or continued Mr. Lovelace's prosecution.  Mr. Lovelace has already raised questions of fact on the participation of the other Defendants in Keller and Gibson's investigation.  The Court, therefore, denies the motion for summary judgment on Mr. Lovelace's state law malicious prosecution claim.

Defendants further argue that no basis exists for respondeat superior and indemnification because no claim against any

individual Defendant survives.  That is not the case.  Mr. Lovelace's claims for constitutional violations, <u>Brady</u> violations, conspiracy, and failure to intervene against Gibson, Copley, Summers, Dreyer, Keller, and Farha still remain.  The IIED claim also remains against Gibson, Copley, Summers, and Dreyer.  As such, the City of Quincy and Adams County may be liable for the actions of their employees or may indemnify their employees.  The Court, therefore, also denies summary judgment on Plaintiffs' claims for respondeat superior and indemnification.

## VI. CONCLUSION

For the reasons stated, the Motion for Summary Judgment (d/e 91) filed by the Quincy Defendants (Gibson, Copley, Summers, Dreyer, and the City of Quincy) is GRANTED IN PART and DENIED IN PART.  The Court grants summary judgment for the Quincy Defendants for Mr. Lovelace's and Logan's IIED claims.  However, the remaining claims in Count VII remain pending against the Quincy Defendants.  The Court denies summary judgment on Plaintiffs' remaining claims against the Quincy Defendants.

Defendant Biswell was part of the Motion for Summary Judgment filed by the Quincy Defendants in that Defendants

requested "an order dismissing Det. Anjanette Biswell as a defendant in this case."  See d/e 91, p. 3.  Plaintiffs have agreed to dismiss her, without prejudice, from the case.  See d/e 105, p. 93. Therefore, Defendant Biswell is DISMISSED WITHOUT PREJUDICE. Plaintiffs have not identified the "Unknown Quincy Police Officers," and the time for joining other parties or amending the pleadings has passed.  See d/e 36.  Accordingly, "Unknown Quincy Police Officers" are DISMISSED WITHOUT PREJUDICE.  The Clerk is DIRECTED to terminate Defendant Anjanette Biswell and Defendant Unknown Quincy Police Officers as parties from this case.

The Motion for Summary Judgment (d/e 89) filed by the Adams County Defendants (Farha, Keller, and Adams County) is DENIED IN PART and GRANTED IN PART for the reasons stated above.  The Court grants the Adams County Defendants' motion for summary judgment on Count VII for intentional infliction of emotional distress.  The Court denies summary judgment on Plaintiffs' remaining claims against the Adams County Defendants.

The case will proceed against Defendants Adam Gibson, Robert Copley, John Summers, Dina Dreyer, James Keller, Gary Farha, the City of Quincy, and Adams County.

**ENTERED: October 13, 2020**

**FOR THE COURT:**

_s/ Sue E. Myerscough_
**SUE E. MYERSCOUGH**
**UNITED STATES DISTRICT JUDGE**